FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2016 MAY 23  A 9: 53

ROSY GIRON DE REYES; JOSE
DAGOBERTO REYES; FELIX ALEXIS
BOLANOS; RUTH RIVAS; YOVANA
JALDIN SOLIS; ESTEBAN RUBEN MOYA
YRAPURA; ROSA ELENA AMAYA; and
HERBERT DAVID SARAVIA CRUZ,

        *Plaintiffs,*

    vs.

WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP; WAPLES PROJECT
LIMITED PARTNERSHIP; and A.J.
DWOSKIN & ASSOCIATES, INC.,

        *Defendants.*

Civil Action No. 1:16CV563

## COMPLAINT

### PRELIMINARY STATEMENT

1.      Plaintiffs in this lawsuit are residents of Waples Mobile Home Park (the "Park"),
who challenge Defendants' enforcement of a discriminatory policy that impermissibly requires
all mobile home occupants over the age of 18 to prove either their U.S. citizenship or their legal
status in the United States. As designed and carried out, Defendants' enforcement of this policy
is disproportionately ousting Hispanic or Latino ("Latino")[1] families from their homes and
denying them one of the only affordable housing options in Fairfax County, Virginia.

2.      In carrying out their illegal and racially discriminatory policy, Defendants are
violating federal and state law while, at the same time, breaching their obligations under Lease

---

[1] "'Hispanic or Latino' refers to a person of Cuban, Mexican, Puerto Rican, South or Central
American, or other Spanish culture or origin regardless of race." Karen R. Humes, Nicholas A.
Jones, and Roberto R. Ramirez, U.S. Census Bureau, C2010BR-02, *Overview of Race and
Hispanic Origin: 2010* (March 2011), *available at*
http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (last accessed May 22, 2016).

Agreements with Plaintiffs. Defendants have wrongfully driven out longtime tenants from their homes, notwithstanding the fact that none have posed any problems to their neighbors or the Park's management. Defendants have forced families who remain at the Park to pay an extraordinary surcharge on their monthly rent and have pursued or threatened imminently to pursue their eviction.

3.      Defendants maintain a policy requiring that all individuals who live or intend to live at the Park present either (1) an "original social security card" or, if unavailable, (2) an "original Passport, original U.S. Visa, and original Arrival/Departure Form (I-94 or I-94W)" (the "Policy"). For years, Defendants did not enforce this Policy because there was no need to do so. Defendants did not need to verify each tenant's citizenship or legal status in the country to ensure that he or she would be a safe addition to the community and could pay rent. Instead, Defendants permitted individuals to rent and live on Park lots as long as the person signing the lease could present the documents required by the Policy. Defendants did not inquire as to every other person living in that individual's home.

4.      Beginning in or around mid-2015, without warning or justification, Defendants began enforcing the Policy strictly as to every person living in the Park. They began requiring each resident over 18-years-old to meet the same requirements as the leaseholder, even when the leaseholder had already provided the documents required under the Policy, and regardless of how long the person over 18-years-old had resided in the home. Defendants provided no legitimate justification for their change in Policy enforcement. Moreover, Defendants knew, or should have known, that this enforcement would likely result in the forced and disproportionate displacement of Latino families in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Virginia Fair Housing Law, Va. Code § 36-96 *et seq.* There is still need to enforce the Policy as to every tenant; nothing has changed in that respect.

5.      Defendants' actions did, in fact, disproportionately displace and punish Latino families. Plaintiffs are (1) current or former residents of the Park; (2) of Latino origin; and (3) , were, as a result of Defendants' actions, either ousted from their homes or forced to pay

extraordinarily high monthly surcharges.

6.      In addition to violating the federal Fair Housing Act and the Virginia Fair Housing Law, Defendants have violated the Manufactured Home Lot Rental Act, Va. Code § 55-248.41 *et seq.*, and have breached their Lease Agreements with Plaintiffs and other residents of the Park.

7.      Defendants have also directly and intentionally discriminated against non-U.S. citizens in violation of 42 U.S.C. § 1981. While U.S. citizens need only present a Social Security card to meet the Policy's requirements, non-U.S. citizens must either obtain and present a Social Security card or compile an arbitrary set of documents to prove their legal status in the country.

8.      Plaintiffs, like other residents at the Park, made a significant investment in purchasing and maintaining their mobile homes, all in reliance on the assurance that they could rent the underlying land from the Park. Plaintiffs send their children to neighborhood schools, attend local churches, and interact daily with, and rely upon, the community they have formed with their neighbors. Defendants' actions have cost and are costing these families their homes, financial stability, and their community network.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred on this Court by (1) 28 U.S.C. § 1343, because this action concerns an Act of Congress providing for the protection of equal rights or civil rights; (2) 28 U.S.C. § 1331, because this is a civil action arising under federal law; (3) 42 U.S.C. § 3613, because this is a civil action based on a violation of federal statutory rights to fair housing; and (4) Va. Code § 35-96.18 because this is a civil action based on a violation of Virginia statutory rights to fair housing.

10.     Supplemental jurisdiction over the state law claims asserted herein is conferred upon this Court by 28 U.S.C. § 1367(a). The transactions and occurrences giving rise to both the state law claims and the federal law claims share a common nucleus of operative facts. Accordingly, the state law claims form part of the same case or controversy as the federal law

claims.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants conduct business in and are residents of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## PARTIES

### Plaintiffs

12.     Plaintiffs Jose Dagoberto Reyes ("Mr. Reyes") and Rosy Giron de Reyes ("Mrs. Reyes") are Latinos of Salvadorian national origin.  From approximately May 2013 to May 6, 2016, they lived in their mobile home in the Park.  As of May 6, 2016, they live in an apartment complex in Annandale, Virginia.

13.     Plaintiffs Felix Alexis Bolanos ("Mr. Bolanos") and Ruth Rivas ("Ms. Rivas") are Latinos of Salvadorian national origin.  Since approximately 2012, they have lived in their mobile home in the Park.

14.     Plaintiffs Yovana Jaldin Solis ("Ms. Jaldin") and Esteban Ruben Moya Yrapura ("Mr. Moya") are Latinos of Bolivian national origin.  Since approximately February 2011, they have lived in their mobile home in the Park.

15.     Plaintiffs Rosa Elena Amaya ("Ms. Amaya") and Herbert David Saravia Cruz ("Mr. Saravia") are Latinos of Salvadorian national origin.  Since approximately January 1, 2010, they have lived in a mobile home in the Park.

### Defendants

16.     Defendant Waples Mobile Home Park Limited Partnership ("Waples L.P.") is a Virginia company with its principal place of business at 9302 Lee Highway, Suite 300, Fairfax, Virginia 22031.

17.     Defendant Waples Project Limited Partnership ("Waples Project L.P.") is a Virginia company with its principal place of business at 3050 Chain Bridge Road, Suite 200, Fairfax, Virginia 22030.

18.     Defendant A.J. Dwoskin & Associates, Inc. ("Dwoskin & Associates") is a

4

Virginia real estate development and management firm with its principal place of business at 3201 Jermantown Road, Suite 700, Fairfax, Virginia 22030.

## FACTS

### Waples Mobile Home Park

19.     Waples Mobile Home Park (the "Park") is a manufactured or "mobile" home community located at 4308 Mobile Court, Fairfax, Virginia 22030.  Defendant Waples Project L.P. owns the Park and serves as one of its landlords.  Defendant Waples L.P. is listed as the owner on the Park's Lease Agreement and thus also serves as one of its landlords.

20.     Defendant Dwoskin & Associates operates the Park.  Dwoskin & Associates is a real estate development and management company that manages several dozen apartment, town home, and mobile home communities, encompassing about 2,000 residential units, in the northern Virginia counties of Arlington, Fairfax, Fauquier, and Prince William.

21.     The Park is composed of approximately 150 lots on about 23 acres of land.  Typically, a newcomer to the Park will purchase a mobile home from a departing resident and lease the underlying lot.  Thus, tenants (1) own the mobile homes in which they live; and (2) enter into leases with Park management for the underlying land.

22.     Defendant Dwoskin & Associates signed Plaintiffs' leases in its capacity as agent for "Waples Mobile Home Park (Owner)."  Upon information and belief, as used in Plaintiffs' leases, the term "Waples Mobile Home Park (Owner)" refers to Defendant Waples Project L.P.

23.     Through its management of the Park, Defendant Dwoskin & Associates and its employees serve as agents acting on behalf of Defendants Waples L.P. and Waples Project L.P.

24.     As part of the Park's leasing and renewal process, each year, every prospective tenant or resident over the age of 18 must complete and submit a rental application to which the tenant or resident must attach a set of documents specified by the "Future Resident Information Guide" (the "Guide") (Exhibit A).  The Guide is a two-page document that lists fees, policies, and application requirements.  The Guide identifies Defendant Dwoskin & Associates as the Park's manager.

25.     In addition to a signed application, a prospective tenant must submit (1) a piece of government-issued photo identification (which may be issued by a foreign government); (2) proof of income; and (3) a list of the addresses at which he or she has resided within two years of the application to live at the Park.

### The Policy

26.     Defendants have a policy of requiring that all individuals who live or intend to live at the Park present either (1) an "original social security card" or, if unavailable, (2) an "original Passport, original U.S. Visa, and original Arrival/Departure Form (I-94 or I-94W)" (the "Policy"). The Policy is incorporated into the Guide, attached hereto as Exhibit A, and its contents are explicitly incorporated herein by reference.

27.     For many years, Defendants did not enforce the Policy with respect to residents other than the leaseholder. However, in or about mid-2015, Defendants began strictly enforcing the Policy for all occupants over the age of 18. Defendants now require that all individuals who live or intend to live at the Park present either (1) an "original social security card"; or (2) the three documents evidencing legal status in the country, which are an "original Passport, original U.S. Visa, *and* original Arrival/Departure Form (I-94 or I-94W) (emphasis added)." When a lease is up for renewal, Defendants also require each tenant to submit the documents specified in the Policy, regardless of how long the tenant has lived in the Park.

28.     Upon information and belief, Defendants began enforcing similar or identical policies at other housing communities that Dwoskin & Associates manages in Prince William County, Virginia.

29.     In enforcing the Policy, Defendants have not considered and do not consider (1) whether an existing tenant has already passed all criminal background and credit checks; or (2) otherwise satisfied the Park's leasing requirements.

30.     Under the newly enforced Policy, although Defendants in some instances have offered to accept a tenant's Individual Taxpayer Identification Number ("ITIN"), instead of his or her original Social Security card, Defendants have *only* accepted an ITIN if the tenant also

provided (1) an original passport; (2) original U.S. visa; *and* (3) an I-94 form.

31.     The Internal Revenue Service ("IRS") issues ITINs to all income-earning U.S. taxpayers who are ineligible to obtain a Social Security number, irrespective of their immigration status. To obtain an ITIN, an individual must submit IRS Form W-7, and attach thereto (1) a copy of his or her tax return; and (2) proof of his or her identity. The IRS strictly enforces the rigorous Form W-7 proof of identity requirement, under which an applicant must present original or certified documentation of the information entered on Form W-7. Each ITIN is composed of nine digits and, like a Social Security number, uniquely identifies the individual to whom it is assigned. ITINs thus not only facilitate tax compliance, but also provide undocumented immigrants with proof of identity. As a form of identification, the ITIN is as reliable and precise as a Social Security number.

32.     Defendants claim they need the documentation required by the Policy to conduct criminal background and credit checks of prospective and current tenants, but fail to justify why they require the specific documents outlined by the Policy for such checks. Indeed, these documents are not necessary to prove identity or to conduct background or credit checks.[2]

---

[2]  *See, e.g.*, U.S. Dep't of Housing and Urban Development, Press Release, *HUD and Huntsville Utilities Reach Agreement Settling an Allegation of Discrimination Against Prospective Hispanic Residential Customers* (Aug. 9, 2012), *available at* http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2012/HUDNo. 12-123A (To resolve potential liability under the Fair Housing Act, Huntsville Utilities agreed to "publish a list of alternative eligibility or identification documents that do not rely solely on Social Security numbers and clarify which identity documents are required to qualify for service.") (last accessed May 22, 2016); Fair Housing Program, City of Sioux Falls, South Dakota, *National Origin*, *available at* http://www.siouxfalls.org/community-development/fairhousing/types-discrimination/national-origination (advising landlords that they should be "willing to consider alternative forms of identification" in lieu of a Social Security Number, "including tax identification numbers") (last accessed May 22, 2016); Jo Becker, Fair Housing Council of Oregon, *Screening Without Social Security Numbers: There Are Options!* (2015), *available at* http://www.fhco.org/pdfs/published%20articles/read_on%20articles/Screening%20without%20S SN.pdf (noting that "applicants [lacking an SSN] may be able to provide other information such as proof of 'x' number of recent months' paid utility bills, rent, or other regular monthly bills that can show a pattern of timely payment," and also identifying the ITIN as a source for information about an applicant's background) (last accessed May 22, 2016).

33.     Social Security cards and immigration documents, such as visas and I-94 forms, are not necessary to prove identity. Foreign passports or government-issued identification cards are sufficient.

34.     Social Security cards and immigration documents also are not necessary for a criminal background check. Records of criminal convictions and evictions are created and maintained by courts. Owing to security and privacy concerns, courts do not disclose Social Security numbers in reporting judicial records. The screening companies hired by landlords therefore run background checks using other identifying information, such as a prospective tenant's name, date of birth, and current and previous addresses.

35.     While credit screening companies historically used Social Security numbers to compile credit history information and to run credit history reports, such companies now perform credit checks based on other identifying information, such as names, dates of birth, and current and previous addresses, as well as ITINs.

36.     Many major financial institutions accept ITINs on an equal basis as Social Security numbers. Similarly, major national credit reporting agencies have the capability to run credit reports using ITINs on an equal basis as Social Security numbers. Defendants have not provided any reason why they cannot accept ITINs while banks and credit reporting agencies can.

37.     Alternatively, applicants can demonstrate financial qualifications by showing that they have consistently and timely paid the rent, utility bills, and other regular monthly bills.

38.     For current tenants, whether or not named on a current lease, a formal credit check is unnecessary to prove their ability to pay rent in a timely fashion. Property managers such as Defendant Dwoskin & Associates need only look to the tenants' prior rent payments to confirm the likelihood that those individuals will continue paying.

39.     Defendants' demand for an arbitrary selection of immigration documents from those who cannot present an original Social Security card serves no purpose other than to illegally and illegitimately identify and exclude undocumented immigrants from the Park. As

8

evidenced in part by the Park's failure to enforce its own Policy for years, immigration and citizenship documentation is superfluous to an evaluation of a tenant's good character and creditworthiness.

### Defendants' Enforcement of the Policy Harms and Excludes Latino Undocumented Immigrants and Their Families

*Overview*

40.    Defendants' enforcement of the Policy denies current tenants the ability to remain in their own homes with their own families.  The result is that undocumented immigrants are precluded from living at the Park, even if they are cohabitants of existing residents who are U.S. citizens or have legal status in the United States.

*Sudden and Strict Enforcement of a Dormant Policy*

41.    Soon after Defendants began enforcing the policy against prospective tenants, Defendants initiated and began conducting probing audits of existing tenants' households.

42.    In enforcing the Policy, Defendants have demanded, for the first time, that all occupants over the age of 18 register with the Park's management office.  To register, all occupants must (1) complete a new rental application; (2) submit the requisite citizenship or immigration documentation; *and* (3) pass an additional round of criminal background and credit checks.

43.    In applying the Policy against existing tenants and their co-occupants, Defendants failed to consider whether tenants had already passed the criminal background and credit checks and fulfilled the other requirements to lease a lot.

44.    Defendants also failed to consider the extent to which existing tenants had demonstrated their reliability, trustworthiness, and good character during their time as residents of the Park through (1) consistent and timely payment of rent; and (2) compliance with other provisions of the Lease Agreement.

45.    Finally, Defendants failed to take into consideration whether they had previously permitted certain occupants who were relatives of the named leaseholders to live in the Park.

46.     Defendants enforced this Policy by issuing letters to tenants informing them that they were required to provide the necessary documentation—either (1) an original Social Security card; or (2) an original passport, original U.S. visa, *and* I-94 form—for each unregistered occupant living in the Park.

47.     According to Defendants' Policy, failure to provide such documentation constituted a material breach of the lease.

***Enforcement of the Dormant Policy Has Resulted in Significant Harm to Latino Immigrant Park Residents***

48.     Tenants who did not have the documentation that Defendants requested tried to resolve the issue in various ways. Some attempted to provide alternative documentation, such as ITINs, expired I-94 forms, and criminal background check reports. Others expressed confusion with the new demand, as these tenants had already undergone and passed Defendants' background check process when first obtaining leases at the Park. Finally, some tenants approached Defendants' agents and simply explained that they did not have the necessary documentation.

49.     Some tenants could not cure the claimed Lease Agreement violation because they, or some occupant with whom they resided, were non-citizens who did not have, and could not within the Defendants' stated time period (21 days) acquire, the documents required by the Policy.

50.     Pursuant to Va. Code §§ 55-248.21, 55-248.48, Defendants issued "21-30" letters to tenants they found to be in violation of the Policy. The purpose of the letters was to inform tenants that their living arrangements violated the Policy and their Lease Agreements. The "21-30" letters gave tenants 21 days from receipt of the letter to cure the violation, and, if they could not, 30 days from receipt of the letter to vacate the Park.

51.     Defendants informed affected tenants that, because they or others with whom they resided could not present the documentation required by the Policy, Defendants would not permit the tenants to renew their leases of the lots on which their homes stood.

52.     If Defendants' agents concluded that any unregistered occupants were living in a given mobile home, those agents informed the relevant leaseholder that the existing year-long lease would not be renewed and that the lease would instead convert into a "month-to-month" lease.  Defendants informed the relevant leaseholder that, under the "month-to-month" arrangement, Defendants would charge tenants an additional $125 fee per month.  Accordingly, tenants who initially paid Defendants $745 per month to lease the land under their homes would be required to pay $870 per month.

53.     On or around March 11, 2016, Defendants informed residents that the surcharge associated with a "month-to-month" lease would rise to $300 per month, effective June 1, 2016.  Accordingly, residents who have been denied the opportunity to renew their leases because they could not comply with the Policy now face, in addition to the loss of their homes, the threat of a monthly rent payment of $1,070, nearly 45 percent more than the cost of their original agreed-upon monthly rent.

54.     In some instances, Defendants pursued the eviction of tenants in Fairfax County General District Court.  Some of the eviction actions initiated by Defendants remain pending.

## Demographic Context and Disparate Impact

### Mobile Home Units

55.     Mobile homes are an important source of affordable housing in the United States.  Because of their affordability, mobile homes provide an opportunity to build wealth.  This is especially true for persons who do not have access to traditional methods of home financing.  For those individuals—including, for example, undocumented immigrants who cannot obtain traditional home mortgages—mobile homes represent not only a more affordable route to home ownership, but a stepping stone to greater housing and life opportunities.

56.     Virginia has about 3.4 million housing units,[3] of which about 180,000 are mobile

---

[3]  U.S. Census Bureau, *2010-2014 American Community Survey 5-Year Estimates, available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR _B25001&prodType=table (Table ID:  B25001 "Housing Units" for Virginia) (last accessed May 22, 2016).

homes.[4]  Mobile homes thus constitute about 5.3% of Virginia's housing stock.

57.    Fairfax County has approximately 409,100 housing units,[5] of which approximately 2,070 are mobile homes.[6]  Mobile homes thus constitute about 0.5% of Fairfax County's housing units.  Fairfax County's mobile home units are distributed among approximately eight mobile home parks.[7]

**Population of Immigrants without Legal Status**

58.    The Commonwealth of Virginia has one of the largest populations of immigrants without legal status as a U.S. resident or citizen (or "undocumented immigrants").  An estimated 269,000 undocumented immigrants currently live in Virginia.[8]  This makes Virginia the tenth most populous state for undocumented immigrants.[9]  Virginia also is among the states with the largest share of undocumented immigrants compared to other residents; these individuals

---

[4]  U.S. Census Bureau, *2010-2014 American Community Survey 5-Year Estimates, available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR_B25024&prodType=table (Table ID:  B25024:  "Units in Structure" for Virginia) (last accessed May 22, 2016).

[5]  U.S. Census Bureau, *2010-2014 American Community Survey 5-Year Estimates, available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR_B25001&prodType=table (Table ID:  B25001:  "Housing Units" for Fairfax County, Virginia) (last accessed May 22, 2016).

[6]  U.S. Census Bureau, *2010-2014 American Community Survey 5-Year Estimates, available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR_B25024&prodType=table (Table ID:  B25024:  "Units in Structure" for Fairfax County, Virginia) (last accessed May 22, 2016).

[7]  Fairfax County Dep't of Housing & Cmty. Dev., *Semi-Annual At-Risk Housing Report*, at 3, Attachment 4 (June 25, 2010), *available at* http://e-ffordable.org/documents/6-25-10%20Advisory%20Committee%20Meeting%20Materials/June%202010%20At%20Risk%20Report_Advisory%20Committee.pdf (last accessed May 22, 2016).

[8]  Center for Migration Studies, *Estimates of the Unauthorized Population for States, available at* http://data.cmsny.org (data for Virginia) (last accessed May 22, 2016).

[9]  Jeffrey S. Passel and D'Vera Cohn, Pew Research Center, *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14*, at 11 (Nov. 18, 2014), *available at* http://www.pewhispanic.org/files/2014/11/2014-11-18_unauthorized-immigration.pdf (last accessed May 22, 2016).

comprise 3.5% of Virginia's population.[10]

59.    The size of Virginia's undocumented immigrant population has increased significantly in recent years. Between 2009 and 2012—during which time the total number of undocumented immigrants living in the United States remained relatively stable at about 11.5 million—Virginia was one of only seven states to experience an increase in its undocumented immigrant population.[11] Further, even as the overall number of undocumented immigrants *fell* nationwide between 2007 and 2012, Virginia was one of only two states to experience an *increase*. Specifically, its undocumented population increased by 10% in that same period, from about 250,000 to about 275,000.[12]

60.    Virginia's outsized concentration of undocumented immigrants only amplifies at the county level. In total, Fairfax County has a population of 1.1 million, of which an estimated 83,000—or 7.5% of the overall county population—are undocumented immigrants.[13] This percentage of undocumented immigrants is more than double the statewide share.

61.    A strong link exists between the undocumented immigrant population and the Latino population, such that a policy that adversely affects the undocumented immigrant population will likewise have a significant disproportionate impact on the Latino population.

62.    In Virginia, Latinos constitute 64.6% of the total undocumented immigrant population,[14] whereas Latinos constitute only 8.4% of the overall population.[15] Thus, the Policy

---

[10]  *Id.* at 15 (Figure 1.3).

[11]  *Id.* at 11.

[12]  *Id.* at 6 (Table 1).

[13]  Migration Policy Institute, *Profile of the Unauthorized Population: Fairfax County, VA*, *available at* http://www.migrationpolicy.org/data/unauthorized-immigrant-population/county/51059 (last accessed May 22, 2016).

[14]  Center for Migration Studies, *Estimates of the Unauthorized Population for States*, *available at* http://data.cmsny.org (data for Virginia indicating that 64.6% of Virginia's undocumented population is Hispanic) (last accessed May 22, 2016).

[15]  U.S. Census Bureau, *2010-2014 American Community Survey 5-Year Estimates*, *available at* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR _S0501&prodType=table (Table ID:  S0501:  "Selected Characteristics of the Native and

adversely affects Latinos in a significantly disproportionate way.

       63.     From another perspective, comparing Virginia's undocumented immigrant population to other population groups confirms this disparate impact. Undocumented immigrants constitute 36.4% of the Latino population[16] but only 3.6% of the non-Latino population[17] and 5.1% of the white[18] population.[19] Thus, Latinos are over ten times more likely than non-Latinos, and over seven times more likely than whites, to be adversely affected by the Policy.

---

Foreign-Born Population" for Virginia indicating that people of "Hispanic or Latino origin" constitute 8.4% of Virginia's total population) (last accessed May 22, 2016).

[16]  As of 2014, about 8.3 million people lived in Virginia, of which 8.9% (or about 739,000) were of Hispanic or Latino origin. *See* U.S. Census Bureau, *QuickFacts: Virginia, available at* http://www.census.gov/quickfacts/table/PST045215/51 (last accessed May 21, 2016).

    Therefore, because there are, as already noted, about 269,000 undocumented immigrants in Virginia, that undocumented population constitutes about 36.4% of Virginia's Latino population.

[17]  As of 2014, Virginia's population included about 7.56 million non-Latino people. U.S. Census Bureau, *QuickFacts: Virginia, available at* http://www.census.gov/quickfacts/table/PST045215/51 (indicating that 91.1% of Virginia's 8.3-million population was non-Latino) (last accessed May 22, 2016).

    Therefore, because there are, as already noted, about 269,000 undocumented immigrants in Virginia, that undocumented population constitutes about 3.6% of Virginia's non-Latino population.

[18]  "'White' refers to a person having origins in any of the original peoples of Europe, the Middle East, or North Africa. It includes people who indicated their race(s) as 'White' or reported entries such as Irish, German, Italian, Lebanese, Arab, Moroccan, or Caucasian." Karen R. Humes, Nicholas A. Jones, and Roberto R. Ramirez, U.S. Census Bureau, C2010BR-02, *Overview of Race and Hispanic Origin: 2010* (March 2011), *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (last accessed May 9, 2016).

[19]  As of 2014, Virginia's population included about 5.24 million white people. *See* U.S. Census Bureau, *QuickFacts: Virginia, available at* http://www.census.gov/quickfacts/table/PST045215/51 (noting that 63.1% of Virginia's 8.3-million population was white) (last accessed May 22, 2016).

    Therefore, because there are, as already noted, about 269,000 undocumented immigrants in Virginia, that population constitutes about 5.1% of Virginia's White population.

## Harm to Plaintiffs

### *The Reyes Family*

64.    Plaintiff Jose Dagoberto Reyes has temporary protected status ("TPS") in the United States.[20] He has a Social Security number and work authorization. He and his wife, Plaintiff Rosy Giron De Reyes, are Latinos of Salvadorian national origin. They are native Spanish speakers with limited English proficiency. Mr. and Mrs. Reyes have a 4-year-old son who is a U.S. citizen.

65.    Mr. and Mrs. Reyes learned about the Park from a neighbor at their former residence in Annandale, Virginia. The neighbor explained that the Park would be a better and safer environment for the family. After determining that the Park was less costly than their earlier living arrangement, Mr. and Mrs. Reyes contacted the Park and, in or around March 2013, initiated the application process. At that time, Defendants requested Mr. Reyes's Social Security card for the express purpose of conducting a credit and criminal background check. Defendants never indicated that every member of the Reyes family over the age of 18 would be required to present a Social Security card.

66.    On May 1, 2013, Mr. Reyes entered into a one-year Mobile Home Lease Agreement ("Lease Agreement") with Defendants. Defendant Dwoskin & Associates signed the lease in its capacity as an agent for "Waples Mobile Home Park (Owner)," which, upon information and belief, references Defendant Waples Project L.P.

67.    From May 24, 2013, to May 6, 2016, Mr. Reyes, Mrs. Reyes, and their son lived at the Park in the mobile home they purchased for approximately $25,000.

68.    When the Reyes's initial lease expired in 2014, Defendants initially refused to

---

[20]   U.S. Citizenship and Immigration Services may grant TPS status "to eligible nationals of certain countries . . . , who are already in the United States." U.S. Dep't of Homeland Security, *Temporary Protected Status, available at* https://www.uscis.gov/humanitarian/temporary-protected-status (last accessed May 22, 2016). Individuals with TPS status "[a]re not removable from the United States," "[c]an obtain an employment authorization document," and "may be granted travel authoritzation." *Id.* "Once granted TPS, an individual also cannot be detained by DHS on the basis of his or her immigration status in the United States." *Id.*

allow the family to renew their one-year lease because Defendants discovered that Mrs. Reyes could not provide a Social Security card.

69.     Between March and May 2014, Mr. Reyes met with Defendants on three separate occasions. Defendants suggested that Mr. Reyes live separately from Mrs. Reyes, but Mr. Reyes knew he could not break up his family in this manner.

70.     Mr. Reyes therefore sought to persuade Defendants to renew the family's lease. To meet Defendants' demand for proof of his spouse's identity, Mr. Reyes offered to provide Defendants with Mrs. Reyes's ITIN, and, when that failed, her Salvadorian passport. Defendants refused to accept Mrs. Reyes's ITIN and refused to accept her passport without proof of lawful immigration status as reflected in a visa.

71.     In or around May 2014, an agent of the Defendants conducted a search of the family's home. During this invasive and upsetting search, Mrs. Reyes informed the agent that she did not have a Social Security card. The agent said that Defendants did not want undocumented immigrants to reside at the Park because undocumented immigrants "might be criminals." The agent then stated that Mrs. Reyes could simply leave the home—and her family—so that Mr. Reyes and their son could remain. Mrs. Reyes's only response was to cry.

72.     Approximately one hour after Defendants' agent left the Reyes family's home, the Defendants' agent called Mr. Reyes to request that he come to the Park office, because a decision had been made to permit the Reyes family to renew their lease. Mr. Reyes went to the Park office and finalized a renewal of the family's lease (Exhibit B).

73.     In 2015, 60 days prior to the expiration of their second one-year lease, the Reyes family received an envelope from Defendants containing a blank application form and a note stating that Mrs. Reyes would need to provide the documents required by the Policy. Approximately 50 days prior to the expiration of the lease, Mr. Reyes met with Defendants to negotiate a renewal of the family's lease, but Defendants informed him that the only option was for the family to enter into a "month-to-month" lease and pay a surcharge.

74.     On June 16, 2015, the Reyes family received a "reminder" marked "urgent" that it

16

was time to renew their lease and that in order to do so Mrs. Reyes would need to present her Social Security card along with an "application for residency." Defendants indicated that the information was necessary to conduct a background check of Mrs. Reyes, who, by June 2015, had been a resident of the Park for over two years. Defendants also informed the Reyes family that they were "adding [Mrs. Reyes] to the [household] account" and that the family's utility payments would increase as a result.

75.     On January 27, 2016, Defendants sent the Reyes family a "21-30" letter. In response, Mr. Reyes provided Defendants with (1) Mrs. Reyes's ITIN; (2) a criminal background report of Mrs. Reyes reflecting no convictions; and (3) a copy of Mrs. Reyes's passport. Ms. Reyes had obtained her criminal background report in connection with her application for a license to provide childcare services. To run the criminal background report, the certifying agency to which Mrs. Reyes applied relied on her Salvadorian passport.

76.     Defendants replied on February 4, 2016 that, unless Mrs. Reyes could present a "Government Issue ID [sic] & Social Security card," they would move to evict the family.

77.     That same day, Mr. Reyes executed and delivered a handwritten document to notify Defendants of his intent to sell the family's home and vacate the Park. Despite Mr. Reyes's efforts to register Mrs. Reyes as a tenant, Defendants, after approving her tenancy for several years, had made it impossible for the family to remain at the Park.

78.     The Reyes family finalized the sale of their mobile home on May 5, 2016 and vacated the Park the next day. The family moved into a one-bedroom apartment in one of the worst slums in Annandale, Virginia. At $1,750 per month, the rent for their one-bedroom apartment costs over twice what the Reyes family paid to reside at the Park in their mobile home.

79.     Before the Reyes family left the Park, Defendants forced them to pay hundreds of dollars in fees resulting from the higher rent imposed on them after they were unable to renew their year-long lease. Because the Reyes family, as Park residents, owned their home outright, their housing expenses were limited to the cost of renting the underlying land; however, the Reyes family now pays, on an annual basis, over $12,000 more to live in the Annandale

17

apartment complex and has lost pride of ownership, home equity, and the ability to make improvements to their home because they only rent the unit. The ordeal of confronting Defendants' sudden and aggressive enforcement of a discriminatory and senseless policy has also inflicted emotional harm on the Reyes family.

**The Bolanos-Rivas Family**

80.      Plaintiff Felix Alexis Bolanos has TPS in the United States. His wife, Plaintiff Ruth Rivas, has an ITIN. Mr. Bolanos and Ms. Rivas are Latinos of Salvadorian national origin. They are native Spanish speakers with limited English proficiency. They have a 3-year-old child and an 8-year-old child, both of whom are U.S. citizens.

81.      In or around April 2012, Mr. Bolanos entered into a one-year Lease Agreement with Defendants after purchasing a mobile home from a departing resident of the Park. Defendant Dwoskin & Associates signed the lease in its capacity as agent for "Waples Mobile Home Park (Owner)," which, upon information and belief, references Defendant Waples Project L.P. When he submitted his lease application, Mr. Bolanos told Defendants that his wife did not have a Social Security number. Defendants told him there would be no problem and said that he could complete the Lease Agreement on his own.

82.      Since April 2012, Mr. Bolanos has lived at the Park with Ms. Rivas and their children.

83.      Mr. Bolanos renewed his family's lease in 2013, 2014, and, most recently, on March 20, 2015 (the 2015 Lease Agreement is attached as Exhibit C). Defendants never asked for Social Security numbers or other immigration paperwork for the other members of the family. Each year, Mr. Bolanos informed Defendants that his wife did not have a Social Security number and asked if that was acceptable. Each year, Defendants confirmed that it was not a problem. Moreover, Defendants were aware that Ms. Rivas was living in the Park during these years because she was included on the insurance paperwork that her family submitted for the home.

84.      In late February 2016, Defendants conducted a search of the family's home.

During this search, the Defendants determined that a member of the household, Ms. Rivas, lacked the documentation necessary to satisfy the Policy. Defendants informed the family that it could only renew its lease if Ms. Rivas provided her Social Security number.

85.     On March 2, 2016, Defendants provided a letter informing Mr. Bolanos that he was ineligible to renew the lease because his family's residency at the Park violated the Policy.

86.     Had Ms. Rivas herself attempted to enter into an agreement to renew the lease with Defendants, her effort would have been futile because her application would have been refused on account of the Policy. The Policy also bars Ms. Rivas from entering into an agreement with Defendants that would allow her to continue to reside at the Park. This leaves just two equally unfortunate options: (1) Ms. Rivas must leave the Park and, with it, her family; or (2) the entire family must leave the home they have owned and cherished for the past four years.

87.     On April 1, 2016, Defendants forced Mr. Bolanos and his family into a "month-to-month" lease at a monthly surcharge of $125. Defendants have thus already forced the Bolanos-Rivas family to pay excessive fees. According to a March 11, 2016 letter from Defendants, the "month-to-month" surcharge will nearly triple to $300 as of June 1, 2016.

88.     Facing, at best, the threat of an increased monthly payment and, at worst, an eviction, Mr. Bolanos and Ms. Rivas have determined they can no longer afford to live in the Park. They plan to list their home for sale within the next month.

89.     Mr. Bolanos and Ms. Rivas had not received a "21-30" notice to cure violations or vacate premises at the time of the filing of this complaint, but they live in fear that they will soon be forced out of their home.

*The Moya-Jaldin Family*

90.     Plaintiff Esteban Ruben Moya Yrapura is a lawful permanent resident of the United States. He and his wife, Yovana Jaldin Solis, are Latinos of Bolivian national origin. They are native Spanish speakers with limited English proficiency. Mr. Moya and Ms. Jaldin have a 13-year-old daughter and a 16-year-old son, both of whom are U.S. citizens.

91.     In February 2011, Mr. Moya entered into a one-year Lease agreement with Defendants after he and Ms. Jaldin purchased a mobile home from a departing resident of the Park. Defendant Dwoskin & Associates signed the lease in its capacity as agent for "Waples Mobile Home Park (Owner)," which, upon information and belief, references Defendant Waples Project L.P.

92.     Since February 2011, Mr. Moya has lived at the Park with Ms. Jaldin and their children.

93.     Mr. Moya renewed his family's lease in 2012, 2013, 2014, and, most recently, for a lease term beginning on February 1, 2015 (Exhibit D).

94.     Throughout the family's residence at the Park, Defendants knew about Ms. Jaldin's presence. Ms. Jaldin frequently spoke to Defendants' agents; not once did they indicate that she was not authorized to live in the Park. Further, Defendants conducted annual inspections of the family's home, and never questioned Ms. Jaldin's presence during those inspections.

95.     In January 2016, however, when Mr. Moya spoke to Defendants about renewing his lease, Defendants' agent informed Mr. Moya that Defendants were aware that Ms. Jaldin did not have a Social Security card. Defendants' agent stated that, accordingly, Mr. Moya was ineligible to renew the lease unless Ms. Jaldin provided the documentation necessary to satisfy the Policy.

96.     On January 18, 2016, Defendants informed Mr. Moya by letter that he could not renew his lease "due to unauthorized occupants living in [his] home," which purportedly violated the Park's rules and regulations, as well as the Lease Agreement. That letter also stated that Mr. Moya would be "going on month to month until further notice" at a "new monthly rent" of $870. Defendants have thus already forced the Moya-Jaldin family to pay excessive fees.

97.     On March 11, 2016, Mr. Moya received a letter from Defendants stating that the surcharge on the "month-to-month" lease would increase to $300 as of June 1, 2016.

98.     Had Ms. Jaldin herself attempted to enter into an agreement to renew the lease

with Defendants, Ms. Jaldin's effort would have been futile because her application would have been refused on account of the Policy. The Policy also bars Ms. Jaldin from entering into an agreement with Defendants that would allow her to continue to reside at the Park. This leaves just two equally unfortunate options: (1) Ms. Jaldin must leave the Park and, with it, her family; or (2) the entire family must leave the home they have owned and cherished for the past five years.

99.     Mr. Moya and Ms. Jaldin had not received a "21-30" notice to cure violations or vacate premises at the time of the filing of this complaint, but they live in fear that they will soon be forced out of their home.

**The Saravia-Amaya Family**

100.     Plaintiff Rosa Elena Amaya and her husband, Herbert David Saravia Cruz, are Latinos of Salvadorian national origin. They are native Spanish speakers with limited English proficiency. They have five children (ages 9 years, 6 years, 4 years, 2 years, and 7 months), all of whom are U.S. citizens.

101.     Ms. Amaya and Mr. Saravia moved to the Park on January 1, 2010 pursuant to a sublease agreement to live in the home of another tenant, Ricardo Carcamo. Mr. Carcamo had a lease with the Park.

102.     As part of the sublease arrangement, Mr. Saravia signed a sublease agreement directly with Mr. Carcamo. The two presented the sublease to the Park's management office. Although Defendants initially rejected the sublease arrangement, they ultimately approved it. During the meeting regarding the sublease arrangement, Defendants initially told Mr. Saravia that his wife, Ms. Amaya, could not live in the Park because she did not have a Social Security card. But one week later, Defendants called Mr. Saravia to inform him that his wife could, in fact, live there.

103.     In or around February 2012, Ms. Amaya and Mr. Saravia purchased a neighbor's mobile home in the Park. They moved into that home along with their (then) three children on April 1, 2012.

104.    At that time, Mr. Saravia signed a Lease Agreement directly with the Park. During this process, he included his wife and their three children as occupants on the application form. Mr. Saravia provided Defendants with (1) his Social Security number; (2) a picture of his wife's passport; and (3) the Social Security numbers of his three children. Mr. Saravia later updated the occupancy list on his initial paperwork to add his two youngest children after each was born.

105.    In 2013, 2014, and 2015, Defendants renewed Mr. Saravia's lease without incident (Exhibit E). Defendants did not ask any further questions about any of the family members' Social Security numbers or other immigration paperwork.

106.    However, in January 2016, Defendants insisted, for the first time, that Ms. Amaya complete her own application and provide a Social Security number. Defendants informed Mr. Saravia that he had until April to submit Ms. Amaya's application showing a Social Security number. If he was unable to do so, Defendants insisted that Ms. Amaya would have to leave the Park, and only Mr. Saravia and the children could live there.

107.    In February 2016, when Mr. Saravia went to the Park's management office to pay his rent, Defendants asked about the status of Ms. Amaya's application form. When Mr. Saravia answered that he was not able to submit Ms. Amaya's application form, Defendants informed Mr. Saravia that, if he did not come back to the office to sign paperwork stating that his wife was leaving the property, he would receive a "21-30" letter and the police would place an eviction notice on his home. Defendants said they were placing Mr. Saravia on a "month-to-month" lease with a $125 monthly surcharge.

108.    Had Ms. Amaya herself attempted to enter into an agreement to renew the lease with Defendants, Ms. Amaya's effort would have been futile because her application would have been refused on account of the Policy. The Policy also bars Ms. Amaya from entering into an agreement with Defendants that would allow her to continue to reside at the Park. This results in two unfortunate options: (1) Ms. Amaya must leave her home and, with it, her family; or (2) the entire family must leave the home they have owned and cherished for the past four years.

22

109.    Facing, at best, the threat of an increased monthly payment and, at worst, an eviction, Mr. Saravia and Ms. Amaya decided to sell their mobile home.  In or around February 2016, they informed Defendants that they were going to sell and listed their home for sale.

110.    On March 11, 2016, Mr. Saravia received a letter from Defendants stating that the "month-to-month" surcharge would increase to $300 on June 1, 2016.

111.    Mr. Saravia and Ms. Amaya had not received a "21-30" notice to cure violations or vacate premises at the time of the filing of this compliant, but they live in fear that they will soon be forced out of their home even before they have a chance to find a buyer.

**FIRST CAUSE OF ACTION**
**(Violation of Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)**
*On Behalf of All Plaintiffs*

112.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 111 above.

113.    Defendants' enforcement of the Policy constitutes a denial of housing and discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of race and/or national origin in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).[21]

114.    Defendants' acts, policies, and practices inflict disproportionate harm on Latinos as compared to similarly situated non-Latinos.  The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a ban on residents who lack a Social Security number and a requested set of immigration documents.

115.    As a result of Defendants' acts, policies, and procedures, Plaintiffs and their families have been denied the opportunity to renew their leases of the land on which their homes stand.  Further, Plaintiffs who declined to (1) abandon their homes; or (2) exile undocumented family members in response to Defendants' demands have been forced to accept unlawful and

---

[21]    Courts have "treat[ed]" claims "of discrimination on the basis of being Latino as encompassing both race and national discrimination and [have] not differentiate[d] between the two concepts." *Central Alabama Fair Housing Center v. Magee*, 835 F. Supp. 1165, 1185 n. 15 (M.D. Ala. 2011).

exorbitant monthly leases. Defendants knew or should have known that only Latinos would be affected by their acts, policies, and practices.

116.    Defendants' acts, policies, and practices constitute discrimination in violation of the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

        a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race and/or national origin, in violation of 42 U.S.C. § 3604(a);

        b.    Defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race and/or national origin, in violation of 42 U.S.C. § 3604(b); and

        c.    Defendants' notices and statements have conveyed and continue to convey a race and/or national origin-based discriminatory preference in violation of 42 U.S.C. § 3604(c).

117.    Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602(d) and (i). They have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

## SECOND CAUSE OF ACTION
### (Violation of Virginia Fair Housing Law, Va. Code § 36-96 *et seq.*)
### *On Behalf of All Plaintiffs*

118.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 111 above.

119.    Defendants' enforcement of the Policy constitutes a denial of housing and discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of race and/or national origin in violation of the Virginia Fair Housing Law, Va. Code § 36-96.3.

120.    Defendants' acts, policies, and practices inflict disproportionate harm on Latinos as compared to similarly situated non-Latinos. The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a ban on residents who lack a Social Security number and a requested set of immigration documents.

121.    As a result of Defendants' acts, policies, and procedures, Plaintiffs and their families have been denied the opportunity to renew their leases of the land on which their homes stand.  Further, Plaintiffs who declined to abandon their homes or exile undocumented family members in response to Defendants' demand have been forced to accept unlawful and exorbitant monthly leases.  Defendants knew or should have known that only Latinos would be affected by their acts, policies, and procedures.

122.    Defendants' acts, policies, and practices constitute discrimination in violation of the Virginia Fair Housing Law, Va. Code § 36-96 *et seq*, in that:

    a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race and/or national origin, in violation of Va. Code § 36-96.3(1);

    b.    Defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race and/or national origin, in violation of Va. Code § 36-96.3(2); and

    c.    Defendants' notices and statements have conveyed and continue to convey a race and/or national origin-based discriminatory preference in violation of Va. Code § 36-96.3(3).

123.    Plaintiffs are aggrieved persons as defined in Va. Code § 36-96.1:1.  They have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

**THIRD CAUSE OF ACTION**
**(Violation of Manufactured Home Lot Rental Act, Va. Code § 55-248.41 *et seq.*)**
***On Behalf of Plaintiffs Jose Dagoberto Reyes, Felix Alexis Bolanos, Esteban Ruben Moya***
***Yrapura, and Herbert David Saravia Cruz***

124.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 111 above.

125.    Defendants' refusal to grant a one-year lease renewal to Park homeowners on grounds of their discriminatory Policy forced Plaintiffs Jose Dagoberto Reyes, Felix Alexis Bolanos, Esteban Ruben Moya Yrapura, and Herbert David Saravia Cruz (the "Lessee

Plaintiffs") either (1) to abandon their homes or; (2) to submit to a "month-to-month" lease of the underlying property at an exorbitant surcharge.  At the expiration of the one-year lease, Defendants unilaterally and unlawfully declared the Lessee Plaintiffs bound by a costly "month-to-month" lease.

126.    The "month-to-month" leases that Defendants have invented and unilaterally imposed on the Lessee Plaintiffs violate Virginia law.  In Virginia, if a one-year lease subject to the Manufactured Home Lot Rental Act is not lawfully renewed or terminated, and a tenant continues to reside on the property past the date of expiration, a one-year lease with terms and conditions identical to the expired lease forms automatically.  Va. Code §§ 55-248.42:1, 55-248.42.  To prevent the formation of such a lease, a landlord must abide by the procedures for lease renewal or termination.

127.    Defendants did not lawfully terminate or renew the one-year leases.  The Defendants' self-styled and unlawful "month-to-month" leases were never valid and had the effect of exacerbating the harm inflicted by the Policy.  Any surcharge that Defendants collected pursuant to these "month-to-month" leases was unlawful under Va. Code § 55-248.42.1(B) and must be returned to the Lessee Plaintiffs.

128.    Defendants' actions, by failing to comply with Va. Code § 55-248.42.1(B), have adversely affected the Lessee Plaintiffs, such that the Lessee Plaintiffs may pursue this action for damages and injunctive relief under Va. Code § 55-248.48, which incorporates Va. Code § 55-248.40.

129.    In refusing to acknowledge the existence of the one-year leases that formed by operation of Virginia law, Defendants have also failed to fulfill their statutory obligation to provide written documentation of the leases.  Therefore, as expressly provided in Va. Code § 248.51, the Lessee Plaintiffs are entitled to compensation for the damages they have suffered as a result.

130.    Defendants' conduct, by failing to comply with Va. Code § 55-248.42.1(B), constitutes a violation of Va. Code § 55-248.43(1) because Defendants were under, and failed to

meet, an obligation to "[c]omply with applicable laws . . . pertaining to manufactured home parks."

131.    The Lessee Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

**FOURTH CAUSE OF ACTION**
**(Violation of 42 U.S.C. § 1981)**
*On Behalf of all Plaintiffs*

132.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 111 above.

133.    All persons who reside in the United States, irrespective of alienage, are entitled to "the same right . . . to make and enforce contracts." 42 U.S.C. § 1981. Section 1981 was drafted deliberately to protect non-citizens. The statute prohibits private landlords from discriminating against current and prospective tenants based on alienage or citizenship.

134.    Defendants' Policy of demanding that current and prospective tenants who are not U.S. citizens either (1) obtain a Social Security number; or (2) collect and produce a set of documents authenticated by the U.S. government to demonstrate their immigration status, without requiring current or prospective tenants who are U.S. citizens to do the same, constitutes illegal discrimination on the basis of alienage, or citizenship.

135.    Each Plaintiff is either (1) a non-citizen; or (2) a family member of a non-citizen, affected under the Policy as a result of the non-citizen's status.

136.    As a result of Defendants' acts, policies, and procedures, Plaintiffs and their families have been denied the opportunity to renew their leases of the land on which their homes stand. Further, Plaintiffs who declined to (1) abandon their homes; or (2) exile undocumented family members in response to Defendants' demand have been forced to accept unlawful and exorbitant monthly leases, despite Defendants' knowledge that only non-citizens would be affected.

137.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

27

## FIFTH CAUSE OF ACTION
### (Breach of Contract)
*On Behalf of Plaintiffs Jose Dagoberto Reyes, Felix Alexis Bolanos, Esteban Ruben Moya*
*Yrapura, and Herbert David Saravia Cruz*

138.    Plaintiffs repeat and incorporate by reference all allegations set forth in
Paragraphs 1 through 111 above.

139.    The "[t]erms and [r]ent" that govern the lease of property at the Park are specified
in the Lease Agreement.  At the outset of their tenancies, the Lessee Plaintiffs and Defendant
Waples Project L.P. separately entered into Lease Agreements and agreed to the "[t]erms and
[r]ent" thereof.

140.    Pursuant to Va. Code § 55-248.42:1(B), upon expiration, all Lease Agreements
"shall be automatically renewed for a term of one year with the same terms unless the park
operator provides written notice to the tenant of any change in the terms of the agreement at least
sixty days prior to the termination date."  Pursuant to Va. Code § 55-248.46(A), to terminate a
Lease Agreement, Defendants must provide Waples homeowners with, at minimum, a 60-day
notice.

141.    When the Lease Agreements expired, and Defendants failed to comply with the
procedures specified in the Manufactured Home Lot Rental Act for the modification or
termination of the Lease Agreement, a new one-year Lease Agreement with "the same terms"
formed by operation of Va. Code § 55-248.42:1(B).  Defendants breached their obligations under
the new Lease Agreements by imposing a much costlier "month-to-month" lease on Waples
homeowners, even though they were entitled to "[t]erms and [r]ent" identical to those specified
in the expired Lease Agreements.

142.    The Lessee Plaintiffs have been injured by Defendants' conduct and have suffered
direct and proximate damages (which are continuing) as a result.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract)
*On Behalf of Plaintiffs Jose Dagoberto Reyes, Felix Alexis Bolanos, Esteban Ruben Moya Yrapura, and Herbert David Saravia Cruz*

143.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 111 above.

144.    The Lessee Plaintiffs entered into contractual relationships with Defendant Waples Project L.P. by executing the Lease Agreements for rental of the land on which their homes stand.

145.    Defendant Dwoskin & Associates signed the Lease Agreements in its capacity as agent for Waples Project L.P., and therefore knew of these contractual relationships.

146.    Defendant Dwoskin & Associates knew or should have known that pursuant to Va. Code § 55-248.42:1(B), upon expiration, all Lease Agreements "shall be automatically renewed for a term of one year with the same terms unless the park operator provides written notice to the tenant of any change in the terms of the agreement at least sixty days prior to the termination date."

147.    Defendant Dwoskin & Associates also knew or should have known that pursuant to Va. Code § 55-248.46(A), to terminate a Lease Agreement, Defendants must provide Park tenants with, at minimum, a 60-day notice. When the Lease Agreements expired, and Defendants failed to comply with the procedures specified in the Manufactured Home Lot Rental Act for the modification or termination of the Lease Agreement, Defendant Dwoskin & Associates knew or should have known that a new one-year Lease Agreement with "the same terms" formed by operation of Va. Code § 55-248.42:1(B).

148.    Defendant Dwoskin & Associates intentionally interfered with the Lease Agreements and caused Waples Project L.P. to breach its obligations thereunder by wrongfully demanding increased rent surcharges from Park tenants for "month-to-month" leases, even though Defendant Dwoskin & Associates knew or should have known they were entitled to "[t]erms and [r]ent" identical to those specified in the expired Lease Agreements.

29

149.    The Lessee Plaintiffs have been injured by Defendant Dwoskin & Associates'

conduct and have suffered direct and proximate damages (which are continuing) as a result.

## DEMAND FOR JURY TRIAL

150.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek from this Court:

        a.      An order declaring that Defendants' acts, policies, and practices
complained of herein violate Plaintiffs' rights under the Fair Housing Act,
42 U.S.C. § 3601 *et seq.*;

        b.      An order declaring that Defendants' acts, policies, and practices
complained of herein violate Plaintiffs' rights under the Virginia Fair
Housing Law, Va. Code § 36-96 *et seq.*;

        c.      An order declaring that Defendants' acts, policies, and practices
complained of herein violate the rights of Plaintiffs Jose Dagoberto Reyes,
Herbert David Saravia Cruz, Esteban Ruben Moya Yrapura, and Felix
Alexis Bolanos under the Manufactured Home Lot Rental Act, Va. Code §
55-248.41 *et seq.*;

        d.      An injunctive order requiring Defendants, their agents, employees,
successors, assigns, and those acting in active concert, combination, or
participation with them, to cease the publication, implementation, and
enforcement of the discriminatory policy complained of herein, and,
further, to take all affirmative steps necessary to remedy the harmful
effects of the unlawful and discriminatory conduct and to ensure that
future efforts to impose conditions on residence within the Park comply

with the law;

e.      Compensatory damages equal to the amount determined by jury as necessary to provide full compensation to Plaintiffs for their injuries suffered as a direct result of Defendants' discriminatory conduct alleged herein;

f.      Punitive damages as provided by 42 U.S.C. § 3613(c)(1) and Va. Code § 36-96.18(C);

g.      Attorneys' fees, costs, expenses, and interest incurred in prosecuting this action pursuant to 42 U.S.C. § 3613(c)(2), Va. Code § 36-96.18(C), and Va. Code § 55-248.51; and

h.      Such other relief as this Court deems appropriate.

DATED this 23rd day of May, 2016          Respectfully submitted,

LEGAL AID JUSTICE CENTER
Ivy Finkenstadt, VSB #84743
Simon Sandoval-Moshenberg, VSB #77110

6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
ivy@justice4all.org
simon@justice4all.org

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950
Jeanhee Hong (motion for *pro hac vice* forthcoming)
Ariel Wade Trajtenberg (motion for *pro hac vice*
forthcoming)
Diego Duran de la Vega (motion for *pro hac vice*
forthcoming)
Benjamin Cain (motion for *pro hac vice* forthcoming)
Jongwook Kim (motion for *pro hac vice* forthcoming)
Bill Margeson (motion for *pro hac vice* forthcoming)

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com
jeanheehong@quinnemanuel.com
arieltrajtenberg@quinnemanuel.com
diegoduran@quinnemanuel.com
benjamincain@quinnemanuel.com
wookiekim@quinnemanuel.com
billmargeson@quinnemanuel.com

*Attorneys for Plaintiffs*