### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Civil Action No. 1:16cv00563-TSE-TCB |

## <u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950
Jeanhee Hong (*pro hac vice*)
Ariel Wade Trajtenberg (*pro hac vice*)
Diego Duran de la Vega (*pro hac vice*)
Benjamin Cain (*pro hac vice*)
Jongwook Kim (*pro hac vice*)
William A. Margeson (*pro hac vice*)

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com
jeanheehong@quinnemanuel.com
arieltrajtenberg@quinnemanuel.com
diegoduran@quinnemanuel.com
benjamincain@quinnemanuel.com
wookiekim@quinnemanuel.com
billmargeson@quinnemanuel.com

LEGAL AID JUSTICE CENTER
Ivy Finkenstadt, VSB #84743
Simon Sandoval-Moshenberg, VSB #77110

6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
ivy@justice4all.org
simon@justice4all.org

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND .................................................................................................3

I.    FACTUAL BACKGROUND.......................................................................3

    A.    Plaintiffs Are Latino Immigrants Who Currently Live Or Formerly Lived At Waples Mobile Home Park...................................................................3

    B.    Defendants' Policy Requires Non-U.S. Citizens To Obtain Or Present Additional Paperwork Not Generally Required Of U.S. Citizens ...........................3

    C.    Defendants' Recent Enforcement Of The Policy Is Ousting Latino Immigrant Families From Their Homes .................................................................4

    D.    Defendants' Enforcement Of The Policy Has Harmed And Continues To Harm Plaintiffs And Other Latino Immigrant Families............................................5

II.    PROCEDURAL BACKGROUND.................................................................7

LEGAL STANDARD............................................................................................8

ARGUMENT .....................................................................................................9

I.    PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THE FAIR HOUSING ACT.......................................................................................................9

    A.    Plaintiffs Plead Discrimination Based On Race And National Origin, Both Of Which Are Protected Classes Under the FHA..................................................11

    B.    As Plaintiffs Plead, The Policy Has An Adverse Impact On Latinos...................13

        1.    Plaintiffs Allege Statistical Comparisons That Demonstrate A Disparate Impact On Latinos ...................................................................14

        2.    Plaintiffs' Complaint Adequately Alleges That The Policy Directly Caused The Disparate Impact .................................................................18

II.    PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THE VIRGINIA FAIR HOUSING LAW .................................................................................20

    A.    A Disparate Impact Claim Is Cognizable Under The VFHL................................20

    B.    The Complaint Alleges A *Prima Facie* Claim For Disparate Impact Discrimination Under The VFHL....................................................................22

        1.    Plaintiffs Plead Discrimination Based On Race And National Origin, Both Of Which Are Protected Classes Under The VFHL.............23

        2.    As Plaintiffs Plead, The Policy Has An Adverse Impact On Latinos........23

III.    PLAINTIFFS STATE A CLAIM FOR VIOLATION OF SECTION 1981 ....................24

i

A.     Plaintiffs Plead Discrimination Based On Alienage And Citizenship, Both Of Which Are Protected Classes Under Section 1981 ........................................... 24

B.     Plaintiffs Plead Evidence Of Intentional Discrimination Sufficient To State A Section 1981 Claim ................................................................................... 25

     1.     Direct Evidence Demonstrates A Discriminatory Purpose ........................ 25

     2.     Circumstantial Evidence Demonstrates Intentional Discrimination .......... 28

IV.     PLAINTIFFS' CLAIMS DO NOT CONFLICT WITH FEDERAL IMMIGRATION LAW ........................................................................................ 29

CONCLUSION ..................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Allen v. Seventy-Seven Acres*,
  48 Va. Cir. 318, 1999 WL 199665 (1999) ............................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................8

*Betsey v. Turtle Creek Associates*,
  736 F.2d 983 (4th Cir. 1984) ...............................................................................................14

*Burbank Apartments Tenant Ass'n v. Kargan*,
  48 N.E.3d 394 (Mass. 2016) .................................................................................................21

*Central Alabama Fair Housing Center v. Magee*,
  835 F. Supp. 2d 1165 (M.D. Ala. 2011), *vacated on other grounds*,
  *Central Alabama Fair Housing Center v. Comm'r, Alabama Dep't of Revenue*,
  No. 11-16114-CC, 2013 WL 2372302 (11th Cir. May 17, 2013) .........................................11

*City of Los Angeles v. Wells Fargo & Co.*,
  No. 2:13-cv-09007-ODW, 2015 WL 4398858 (C.D. Cal. July 17, 2015).....................19, 20

*DelRio-Mocci v. Connolly Props.*,
  672 F.3d 241 (3rd Cir. 2012) ................................................................................................30

*Demuren v. Old Dominion University*,
  33 F. Supp. 2d 469 (E.D. Va. 1999), *aff'd*, 188 F.3d 501 (4th Cir. 1999)....................25, 28

*Doe v. Edgar*,
  No. 88-C 1989 WL 91805 (N.D. Ill. Aug. 4, 1989)..............................................................26

*Dothard v. Rawlinson*,
  433 U.S. 321 (1977)...............................................................................................................17

*Duane v. GEICO*,
  37 F.3d 1036 (4th Cir. 1994) ................................................................................................24

*Edwards v. Johnston County Health Dep't*,
  885 F.2d 1215 (4th Cir. 1989) ..............................................................................................17

*Ellis v. City of Minneapolis*,
  No. 14-cv-3045, 2015 WL 5009341 (D. Minn. Aug. 24, 2015)............................................19

*Espinoza v. Farah Mfg. Co.*,
  414 U.S. 86 (1973)................................................................................................................13

*Gallagher v. Magner*,
   619 F.3d 823 (8th Cir. 2010) ...................................................................14, 15, 16

*Goines v. Valley Cmty. Servs. Bd.*,
   No. 15-1589, -- F.3d --, 2016 WL 2621262 (4th Cir. May 9, 2016) ...................26

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*,
   641 F. Supp. 2d 563 (E.D. La. 2009) ...................................................................15

*Holmes v. Bevilacqua*,
   794 F.2d 142 (4th Cir. 1986) ................................................................................25

*Hughes v. Bransfield*,
   84 Va. Cir. 214, 2012 WL 7960051 (2012) .........................................................22

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
   844 F.2d 926 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988) ...................................10, 17

*Jackson v. Okaloosa Cty., Fla.*,
   21 F.3d 1531 (11th Cir. 1994) .............................................................................14

*Lovelace v. Sherwin-Williams Co.*,
   681 F.2d 230 (4th Cir. 1982) ...............................................................................28

*Lozano v. City of Hazleton*,
   620 F.3d 170 (3d Cir. 2010), *vacated on other grounds, City of Hazleton v. Lozano*,
   563 U.S. 1030 (2011) ............................................................................................30

*Matarese v. Archstone Pentagon City*,
   795 F. Supp. 2d 402 (E.D. Va. 2011), *aff'd in part, vacated in part*
   *sub nom. Matarese v. Archstone Communities, LLC*, 468 F. App'x 283
   (4th Cir. 2012) ........................................................................................................9

*Metrocare v. Washington Metro. Area Transit Auth.*,
   679 F.2d 922 (D.C. Cir. 1982) .............................................................................26

*Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*,
   558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978).....................22

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*,
   56 F.3d 1243 (10th Cir. 1995) .............................................................................10

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
   658 F.3d 375 (3d Cir. 2011).....................................................................14, 15, 16

*Mylan Lab., Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) ...................................................................................8

*National Fair Housing Alliance, Inc. v. Prudential Insurance Company of America*,
   208 F. Supp. 2d 46 (D.D.C. 2002) .......................................................................16

*Nguyen-Truong v. Int'l Rehab. Associates, Inc.*,
   No. 98-2213, 1999 WL 140745 (4th Cir. March 16, 1999).........................9, 25, 28

*Nguyen v. City of Cleveland*,
   229 F.3d 559 (6th Cir. 2000) ............................................................................25

*Nickell v. Montgomery County*,
   878 F.2d 379, 1989 WL 69331 (4th Cir. June 20, 1989).....................................16

*Pers. Adm'r of Massachusetts v. Feeney*,
   442 U.S. 256 (1979).............................................................................................28

*Reinhart v. Lincoln Cty.*,
   482 F.3d 1225 (10th Cir. 2007) ...........................................................................10

*Ricci v. DeStefano*,
   557 U.S. 557 (2009)..............................................................................................10

*Rivera Inc. v. Vill. of Farmingdale*,
   784 F. Supp. 2d 133 (E.D.N.Y. 2011) .................................................................11

*Rodriguez v. Nat'l City Bank*,
   277 F.R.D. 148 (E.D. Pa. 2011), *aff'd*, 726 F.3d 372 (3d Cir. 2013) .................11

*Sisemore v. Master Fin., Inc.*,
   151 Cal. App. 4th 1386 (2007) ............................................................................21

*Smith v. Town of Clarkton, N.C.*,
   682 F.2d 1055 (4th Cir. 1982) .......................................................................14, 16

*Spagnuolo v. Whirlpool Corp.*,
   641 F.2d 1109 (4th Cir. 1981) .............................................................................27

*Stone v. Autoliv ASP, Inc.*,
   210 F.3d 1132 (10th Cir. 2000) ...........................................................................25

*Taylor v. Millennium Corp.*,
   No. 1:15-cv-1046, 2016 WL 927185 (E.D. Va. March 4, 2016).............................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................26

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
   135 S. Ct. 2507 (2015)...............................................................................10, 13, 21

*United States v. Aguilar*,
   477 Fed. App'x 1000 (4th Cir. 2012) ............................................................29, 30

*United States v. Vargas-Cordon*,
   733 F.3d 366 (2d Cir. 2013)(iii).........................................................................29

*Valdez v. Town of Brookhaven*,
   No. 05-CV-4323JSARL, 2005 WL 3454708 (E.D.N.Y. Dec. 15, 2005) ...............11

*Walters v. McMahen*,
   684 F.3d 435 (4th Cir. 2012) .................................................................................8

*Williams v. 5300 Columbia Pike Corp.*,
   891 F. Supp. 1169 (E.D. Va. 1995) ................................................................9, 14

**Statutes and Regulations**

8 U.S.C. § 1324................................................................................................12, 29, 30

42 U.S.C. § 1981.......................................................2, 7, 9, 24, 25, 26, 28, 29, 30

42 U.S.C. § 3601.........................................................................................................7

42 U.S.C. § 3602.......................................................................................................13

42 U.S.C. § 3604................................................................................2, 8, 10, 11, 13, 21

42 U.S.C. § 3613.......................................................................................................13

24 C.F.R. § 100.500.........................................................................9, 10, 13, 18

Fed. R. Civ. P. 10(c)................................................................................................26

Fed. R. Civ. P. 12(b)(6)............................................................................................8

Va. Code § 36-96.......................................................................................................7

Va. Code § 36-96.1..................................................................................................22

Va. Code § 36-96.3.........................................................................................2, 8, 20, 23

Va. Code § 55-248.41................................................................................................7

19 Va. Admin. Code § 135-50-30..........................................................................21

**Other Authorities**

Robert G. Schwemm, *Housing Discrimination: Law and Litigation* §11A:1 ...........................13

U.S. Citizenship and Immigration Services, *I-102, Application for Replacement/Initial
   Nonimmigrant Arrival-Departure Document* (March 9, 2016), https://www.uscis.gov/i-102
   (last visited June 27, 2016) ................................................................27

U.S. Customs and Border Protection, *Arrival/Departure History Now Available
   on I-94 Webpage* (April 30, 2014), https://www.cbp.gov/newsroom/spotlights/
   2014-04-30-000000/arrivaldeparture-history-now-available-i-94-webpage
   (last visited June 27, 2016) ................................................................27

U.S. Customs and Border Protection, *CBP Form I-94*,
   https://www.cbp.gov/sites/default/files/documents/CBP%20Form%20I-
   94%20English%20SAMPLE_Watermark.pdf, (last visited June 27, 2016) ...........................27

U.S. Department of State, *The Immigrant Visa Process* (last visited June 27, 2016),
   https://travel.state.gov/content/visas/en/immigrate/immigrant-process.html ...................27

U.S. SOCIAL SECURITY ADMINISTRATION, *Frequently Asked Questions:  How do I apply for a new or replacement Social Security number card?* (June 13, 2016), https://faq.ssa.gov/link/portal/34011/34019/Article/3755/How-do-I-apply-for-a-new-or-replacement-Social-Security-number-card (last visited June 27, 2016) .....................26

Plaintiffs Rosy Giron De Reyes, Jose Dagoberto Reyes, Felix Alexis Bolanos, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs"), by their attorneys, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Motion").

## PRELIMINARY STATEMENT

In this action, Plaintiffs, residents of Waples Mobile Home Park (the "Park"), challenge Defendants' enforcement of a discriminatory policy (the "Policy") that impermissibly requires all Park residents over the age of 18 to prove either their U.S. citizenship or their legal status in the United States.  As designed and carried out, Defendants' enforcement of this Policy is disproportionately ousting Hispanic or Latino ("Latino") families from their homes and denying them one of the only affordable housing options in Fairfax County, Virginia.  In carrying out their illegal and discriminatory Policy, Defendants are violating federal and state anti-discrimination statutes, and at the same time breaching Defendants' obligations under the Plaintiffs' lease agreements.  Accordingly, Plaintiffs brought this action for declaratory and injunctive relief and damages for the injuries they have suffered—and continue to suffer—as a result of Defendants' enforcement of the Policy.

In their Motion to Dismiss ("Motion"), Defendants contend that Plaintiffs fail to state certain claims (Counts I, II, IV, and VI).[1]  Defendants' Motion should be denied.

As an initial matter, Defendants largely base their arguments on the assumption that "Plaintiffs' [claims are] entirely dependent on unlawful aliens being considered a protected class," Memorandum in Support of Defendants' Motion to Dismiss ("Memorandum" or "Mem.")

---

[1]   As explained below, Plaintiffs do not contest Defendants' request to dismiss Count VI.

1

at 7.  This is not true.  The Complaint alleges Plaintiffs' membership in well-established protected classes based on race, national origin, alienage, and citizenship, and Defendants' discrimination against those classes.  No claim rests on immigration status.  No authority provided by Defendants supports the implication that immigration status deprives individuals of the protections afforded to all other members of the protected classes.

Plaintiffs state a *prima facie* claim for violation of the Fair Housing Act, 42 U.S.C. § 3604(a), ("FHA") (Count I), and Virginia Fair Housing Law, Va. Code § 36-96.3 ("VFHL") (Count II).  The FHA and VFHL prohibit discrimination on the basis of certain protected classes. Claims of discrimination based on a disparate impact theory are cognizable under both statutes. The Complaint pleads a claim for disparate impact discrimination by alleging that Defendants' Policy discriminates against Latinos, including the Plaintiffs, on the basis of their race and national origin—both of which are protected classes.

Plaintiffs also state a *prima facie* claim for violation of 42 U.S.C. § 1981 ("Section 1981") (Count IV).  Section 1981 guarantees equal rights to all persons within the United States to make and enforce contracts and provides for a private right of action by anyone who has suffered from discrimination based on alienage or citizenship, among other factors.  The Complaint alleges facts evidencing Defendants' intentional discrimination against lease applicants and current tenants on the basis of their alienage and citizenship.

Therefore, Plaintiffs respectfully request that the Court deny Defendants' Motion as to Counts I, II, and IV.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.   Plaintiffs Are Latino Immigrants Who Currently Live Or Formerly Lived At Waples Mobile Home Park

Each of the Plaintiffs is of Hispanic or Latino ("Latino") race and national origin.  *See* Complaint (Dkt. 1) ("Compl.") ¶¶ 12-15.  Each Plaintiff currently is or recently was a resident of Waples Mobile Home Park (the "Park"), a manufactured or "mobile" home community located in Fairfax, Virginia.  *See id.*  Plaintiffs Jose Dagoberto Reyes ("Mr. Reyes") and Rosy Giron de Reyes ("Mrs. Reyes"), who are Salvadorian, lived at the Park from approximately May 2013 until Defendants' actions left them no choice but to leave the Park in May 2016.  *Id.* ¶¶ 12, 64, 66, 67, 77, 78.  Plaintiffs Felix Alexis Bolanos ("Mr. Bolanos") and Ruth Rivas ("Ms. Rivas"), who are Salvadorian, have lived in the Park since approximately 2012.  *Id.* ¶¶ 13, 80-82. Plaintiffs Yovana Jaldin Solis ("Ms. Jaldin") and Esteban Ruben Moya Yrapura ("Mr. Moya"), who are Bolivian, have lived there since approximately 2011.  *Id.* ¶¶ 14, 90-92.  Plaintiffs Rosa Elena Amaya ("Ms. Amaya") and Herbert David Saravia Cruz ("Mr. Saravia"), who are Salvadorian, have lived there since approximately January 2010.  *Id.* ¶¶ 15, 100-101.

#### B.   Defendants' Policy Requires Non-U.S. Citizens To Obtain Or Present Additional Paperwork Not Generally Required Of U.S. Citizens

Defendants maintain a policy of requiring that all individuals who live or intend to live at the Park present either (1) an "original social security card" or, if unavailable, (2) an "original Passport, original U.S. Visa, and original Arrival/Departure Form (I-94 or I-94W)" (the "Policy").  *Id.* ¶ 26, Ex. A.  For many years, Defendants did not enforce the Policy with respect to residents other than the leaseholders.  *Id.* ¶ 27.  However, in or about mid-2015, Defendants began strictly enforcing the Policy for all occupants over the age of 18.  *Id.*  Because U.S.

citizens almost always have original Social Security cards, the second prong of the Policy

generally impacts only non-citizens.

### C. Defendants' Recent Enforcement Of The Policy Is Ousting Latino Immigrant Families From Their Homes

Defendants now require that all individuals who live or intend to live at the Park present

the documents described by the Policy. *Id.* When a lease is up for renewal, Defendants also

require each tenant to submit the documents specified in the Policy. *Id.* In enforcing the Policy,

Defendants have demanded that all occupants over age 18 register with the Park's management

office. *Id.* ¶ 42. To register, occupants must (1) complete a new rental application; (2) submit

the requisite citizenship or immigration documentation; and (3) pass an additional round of

criminal background and credit checks. *Id.*

Tenants who do not have the documentation that Defendants are requiring have tried to

resolve the issue in various ways. *Id.* ¶ 48. Some have attempted to provide alternative

documentation, such as Individual Taxpayer Identification Numbers ("ITINs"), expired I-94

forms, and criminal background check reports. *Id.* Others have expressed confusion with the

new demand, as these tenants had already undergone and passed Defendants' background check

process when first obtaining leases at the Park. *Id.* Some tenants have approached Defendants'

agents and explained that they did not have the necessary documentation. *Id.* Indeed, some

tenants could not cure the claimed violation of their lease agreements because they, or someone

with whom they resided, was a non-citizen who did not have, and could not acquire within the

Defendants' stated time period (21 days), the documents required by the Policy. *Id.* ¶ 49.

Defendants began issuing letters to tenants found to be in violation of the Policy. *Id.*

¶ 50. The letters gave tenants 21 days from receipt of the letter to cure the violation, and if they

could not, 30 days from receipt of the letter to vacate the Park.  *Id.*  Defendants informed affected tenants that, because they or others with whom they resided could not present the documentation required by the Policy, Defendants would not permit the tenants to renew their leases of the lots on which their homes stood.  *Id.* ¶ 51.

If Defendants concluded that any unregistered occupants were living in a given mobile home, those agents informed the relevant leaseholder that the existing year-long lease would not be renewed and that the lease would convert into a "month-to-month" lease.  *Id.* ¶ 52.  Under the "month-to-month" arrangement, Defendants would charge tenants an additional $125 per month ($25 on the base rent plus a $100 premium).  *Id.*  Accordingly, tenants who initially paid $745 per month to lease the land under their homes would be required to pay $870 per month.  *Id.*

On or around March 11, 2016, Defendants informed tenants that the surcharge associated with a "month-to-month" lease would rise to $300 per month, effective June 1, 2016.  *Id.* ¶ 53. Accordingly, those tenants who have been denied the opportunity to renew their leases because they could not comply with the Policy now face, in addition to the loss of their homes, the threat of a monthly rent payment of $1,070, nearly 45 percent more than the cost of their original agreed-upon monthly rent.  *Id.*

**D.     Defendants' Enforcement Of The Policy Has Harmed And Continues To Harm Plaintiffs And Other Latino Immigrant Families**

Defendants' enforcement of the Policy is denying Latino tenants the ability to remain in their own homes with their own families.  *See id.* ¶¶ 64-111.  For example:

- The Reyes family lived in the Park for just under three years.  *Id.* ¶ 67.  Plaintiff Mr. Reyes, who signed the family's lease, was able to provide the paperwork required under the Policy, but his wife, Plaintiff Mrs. Reyes, was not.  *See id.* ¶¶ 64, 68, 70-71, 74-77.

5

Despite having approved Mrs. Reyes's tenancy for several years, Defendants suddenly required her to provide the documentation required under the Policy. *See id.* ¶¶ 65-67, 69-70, 72, 73-76. When she could not come up with the papers quickly enough, Defendants increased the family's rent, refused to renew its lease, and threatened to evict the Reyeses. *See id.* ¶¶ 71, 76, 79. Ultimately, Mr. and Mrs. Reyes and their 4-year-old son were forced to sell their home and relocate to a much costlier 1-bedroom apartment in one of Annandale, Virginia's worst slums. *Id.* ¶¶ 64, 77-79.

- Similarly, the Bolanos-Rivas family has lived in the Park for over four years. *Id.* ¶ 82. Plaintiff Mr. Bolanos, who signed the family's lease, was able to provide the paperwork required under the Policy, but his wife, Plaintiff Ms. Rivas, was not. *See id.* ¶¶ 80-81, 83. Despite allowing Ms. Rivas to live in the Park for years, Defendants suddenly required her to provide the documentation required under the Policy. *See id.* ¶¶ 80-81, 83, 84. When she could not, Defendants sent a letter to Mr. Bolanos, refusing to renew the family's lease and increasing its rent on a "month-to-month" basis. *Id.* ¶ 85, 87. Though Mr. Bolanos, Ms. Rivas, and their two children continue to reside in the Park, they live in fear that they will soon be forced out of their home. *Id.* ¶ 88-89.

- The Moya-Jaldin family has lived in the Park for over five years. *Id.* ¶ 92. Plaintiff Mr. Moya, who signed the family's lease, was able to provide the paperwork required under the Policy, but his wife, Plaintiff Ms. Jaldin, was not. *See id.* ¶¶ 90, 94-95. Despite allowing Ms. Jaldin to live in the Park for years, Defendants suddenly required her to provide the documentation required under the Policy. *See id.* ¶¶ 92, 94-95. When she could not, Defendants sent a letter to Mr. Moya, refusing to renew the family's lease and increasing its rent on a "month-to-month" basis. *Id.* ¶¶ 96-97.

Though Mr. Moya, Ms. Jaldin, and their two children continue to reside in the Park, they live in fear that they will soon be forced out of their home.  *Id.* ¶¶ 99.

- The Saravia-Amaya family has lived in the Park for over six years.  *See id.* ¶ 101.  Mr. Saravia, who signed the family's lease, was able to provide the paperwork required under the Policy, but his wife, Plaintiff Ms. Amaya, was not.  *Id.* ¶¶ 102, 104.  Despite allowing Ms. Amaya to live in the Park for years, Defendants suddenly required her to provide the documentation required under the Policy.  *Id.* ¶¶ 102, 104-107.  When she could not, Defendants sent a letter to Mr. Saravia, refusing to renew the family's lease and increasing its rent on a "month-to-month" basis.  *Id.* ¶¶ 107, 110.  Though Mr. Saravia, Ms. Amaya, and their five children continue to reside in the Park, they live in fear that they will soon be forced out of their home.  *Id.* ¶ 111.

Defendants' enforcement of the Policy against each tenant has harmed (and continues to harm) not only individuals who cannot provide the paperwork required under the Policy, but also those individuals' spouses and children.  *See generally id.* ¶¶ 64-111.  For instance, Defendants' insistence that Mrs. Reyes, Ms. Rivas, Ms. Jaldin, and Ms. Amaya cannot live in the Park compels these women and their families to choose between two unfortunate options: either (1) these wives and mothers must leave their homes and families, or (2) their families must leave the homes they have owned and cherished for years.  *See id.* ¶¶ 69, 71, 76, 86, 98, 108.

## II.   PROCEDURAL BACKGROUND

On May 23, 2016, Plaintiffs filed their Complaint for: Violation of Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") (Count I); Violation of Virginia Fair Housing Law, Va. Code § 36-96 *et seq.* ("VFHL") (Count II); Violation of Manufactured Home Lot Rental Act, Va. Code § 55-248.41 *et seq.* (Count III); Violation of 42 U.S.C. § 1981 (Count IV); Breach of Contract

(Count V); and Tortious Interference With Contract (Count VI).  On June 13, 2016, Defendants moved to dismiss Counts I, II, IV, and VI.  For the reasons below, Plaintiffs respectfully request that the Court deny the Motion as to Counts I, II, and IV.[2]

## LEGAL STANDARD

A complaint survives a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) when the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim"; a plaintiff need only "allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation and quotation marks omitted).  "When considering a motion to dismiss, courts construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true."  *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

To evaluate the merits of discrimination claims under the Fair Housing Act, 42 U.S.C. § 3604(a) ("FHA"), and Virginia Fair Housing Law, Va. Code § 36-96.3 ("VFHL"), courts

---

[2]  Plaintiffs do not contest Defendants' request to dismiss Count VI.  The parties have stipulated that at all relevant times, Defendant A.J. Dwoskin & Associates, Inc. and its employees were agents of Defendants Waples Mobile Home Park Limited Partnership and Waples Project Limited Partnership and, with respect to the allegations in the Complaint, acted within the scope of that agency in signing the lease agreements and managing the Park.  On that basis, because an agent acting within the scope of its agency cannot interfere with the contract of its principal and is instead bound by the contract of its principal, Plaintiffs consent to dismiss Count VI with prejudice.

employ a three-step burden-shifting framework.  *See* 24 C.F.R. § 100.500(c); *see also Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 437 (E.D. Va. 2011), *aff'd in part, vacated in part sub nom. Matarese v. Archstone Communities, LLC*, 468 F. App'x 283 (4th Cir. 2012). First, a plaintiff must establish a *prima facie* case.  24 C.F.R. § 100.500(c)(1).  Second, once the plaintiff meets the initial burden, the defendant, to defeat the claim, must show that the policy is "necessary to achieve one or more . . . substantial, legitimate, non-discriminatory interests."  *Id*. §§ 100.500(b)(1), 100.500(c)(2).  Third, if the defendant demonstrates the existence of a valid justification, the plaintiff may still prevail on a showing that the defendant could serve the same interest through "another practice that has a less discriminatory effect."  *Id*. at §§ 100.500(b)(1)(ii), 100.500(c)(3).  At the motion to dismiss stage, however, a plaintiff need only present a valid *prima facie* case.  *See Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1181 (E.D. Va. 1995) (Ellis, J.).

Under Section 1981, a plaintiff also survives a motion to dismiss by pleading a *prima facie* case.  *See Taylor v. Millennium Corp.*, No. 1:15-cv-1046, 2016 WL 927185, at **5-7 (E.D. Va. March 4, 2016).  "[A] plaintiff may make out a prima facie case by proffering direct evidence of discrimination."  *Nguyen-Truong v. Int'l Rehab. Associates, Inc.*, No. 98-2213, 1999 WL 140745, at *1 (4th Cir. March 16, 1999).

## ARGUMENT

### I.   PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THE FAIR HOUSING ACT

Under the FHA, it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

9

42 U.S.C. § 3604(a). "Discrimination may occur either by disparate treatment or disparate impact." *Reinhart v. Lincoln Cty.*, 482 F.3d 1225, 1229 (10th Cir. 2007) (quoting *Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1250 (10th Cir. 1995)). Here, Plaintiffs bring a claim for discrimination by disparate impact.

Whereas a disparate treatment claim requires proof of intent to discriminate, a disparate impact claim does not. *See* 24 C.F.R. § 100.500 ("Liability may be established under the [FHA] based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent."). Rather, "a disparate impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano,* 557 U.S. 557, 577 (2009)). A policy that "actually or predictably results in . . . discrimination," even if facially neutral, violates the FHA under a disparate impact theory. *Reinhart*, 482 F.3d at 1229 (quoting *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.), aff'd, 488 U.S. 15 (1988)).

Defendants move to dismiss Plaintiffs' FHA claim for failure to plead a *prima facie* case. A *prima facie* case of discrimination requires proof of: (1) the existence of a policy that, albeit facially neutral, (2) "predictably or actually" results in a disparate impact on (3) a protected class. 24 C.F.R. §§ 100.500(a), 100.500(c)(1). Defendants do not dispute the existence of the Policy. Instead, they argue that (1) Plaintiffs fail to plead that a protected class is affected, and (2) the Policy has not resulted in a disparate impact. Neither argument has merit.

10

A.       **Plaintiffs Plead Discrimination Based On Race And National Origin, Both Of Which Are Protected Classes Under the FHA**

The Complaint pleads a viable claim for violation of the FHA based on race and/or national origin: "Defendants' enforcement of the Policy constitutes a denial of housing and discrimination in the terms, conditions, or privileges of rental of a dwelling ***on the basis of race and/or national origin*** in violation of the Fair Housing Act, 42 U.S.C. § 3604(a)."  Compl. ¶ 113 (emphasis added).  The Complaint alleges that "Defendants' acts, policies, and practices inflict disproportionate harm on Latinos as compared to similarly situated non-Latinos."  *Id.* ¶ 114; *see also id.* ¶¶ 5, 61-63.

Courts treat claims "of discrimination on the basis of being Latino as encompassing both race and national [origin] discrimination and [do] not differentiate between the two concepts." *Central Alabama Fair Housing Center v. Magee*, 835 F. Supp. 2d 1165, 1185 n.15 (M.D. Ala. 2011), *vacated on other grounds*, *Central Alabama Fair Housing Center v. Comm'r, Alabama Dep't of Revenue*, No. 11-16114-CC, 2013 WL 2372302 (11th Cir. May 17, 2013).  As such, courts have consistently recognized disparate impact claims for discrimination against Latinos. *See Valdez v. Town of Brookhaven*, No. 05-CV-4323JSARL, 2005 WL 3454708, at *15 (E.D.N.Y. Dec. 15, 2005) (finding that "Plaintiffs . . . set forth a sufficient disparate impact case to satisfy a showing of likelihood of success on the merits with respect to their Fair Housing Act claims" by alleging a neutral ordinance "resulted in the eviction of only Latino tenants"); *Rivera Inc. v. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 145 (E.D.N.Y. 2011) (permitting disparate impact claim against Latinos to proceed); *Magee*, 835 F. Supp. at 1196 ("[T]he plaintiffs have clearly established a prima-facie case of disparate impact against Latinos. . . ."); *Rodriguez v. Nat'l City Bank*, 277 F.R.D. 148, 153 (E.D. Pa. 2011), *aff'd*, 726 F.3d 372 (3d Cir. 2013)

11

("Defendants' discretionary lending practices had a discriminatory disparate impact for African American and Hispanic borrowers."). Latinos therefore constitute a protected race and national origin class under the FHA as a matter of law.

The premise of Defendants' argument—that "Plaintiffs' disparate impact claim under the FHA is entirely dependent on unlawful aliens being considered a protected class," Mem. at 7—is wrong. Plaintiffs do not seek to recover for discrimination against undocumented immigrants, *see id.* at 7-9, nor do they seek to create a new protected class under the FHA on the basis of citizenship or alienage, *see id.* at 9. Plaintiffs agree that undocumented immigrants are not a protected class under the FHA; this has no bearing on the FHA claim alleged in the Complaint.

Defendants fail in their attempt to confuse the issues. The fact that "Plaintiffs who were properly documented and in the United States legally all allege that they were able to enter into lease agreements," Mem. at 7, does not change the fact that Defendants denied those same Plaintiffs—all Latinos—an opportunity to renew their leases and charged them increased rent. Mr. Reyes has temporary protected status ("TPS") in the United States, yet Defendants refused to renew his lease, charged him a premium on his rent, and ultimately forced him out of his home in the Park. *See* Compl. ¶¶ 64, 77-78. Mr. Bolanos has TPS in the United States, Mr. Moya is a lawful permanent resident of the United States, and Mr. Saravia has a Social Security number. *Id.* ¶¶ 80, 90, 104. Defendants refused to renew each of these individuals' leases and charged a premium on their rent. *See id.* ¶¶ 85, 87, 96-97, 107, 110.[3]

---

[3] As described in Argument Part IV, *infra*, Defendants similarly fail in their effort to distract from the issues by referencing the Immigration Reform and Control Act, 8 U.S.C. § 1324, *et seq.* ("IRCA"). *See* Mem. at 9.

Finally, adopting Defendants' position—that the Policy does *not* violate the FHA, despite its obvious disparate impact on Latinos due to the fact that the Policy explicitly targets undocumented immigrants—threatens to impose a ban on undocumented immigrants bringing claims under the FHA. Citizenship has no bearing on a person's standing to enforce his or her rights to be free from discrimination. The FHA does not require a plaintiff to be a U.S. citizen, but instead prohibits discrimination against "any person." 42 U.S.C. § 3604(a). Thus, legal immigrants, as well as undocumented immigrants, may bring FHA claims as long as they have been injured by discrimination based on a protected classification. *See* 42 U.S.C. § 3613 (providing private right of action under the FHA to "aggrieved persons"); 42 U.S.C. § 3602(i) (defining an "aggrieved person" as "any person" claiming injury from a discriminatory housing practice or believing such an injury is about to occur); *see also* Robert G. Schwemm, *Housing Discrimination: Law and Litigation* §11A:1 ("Fair Housing Act suits alleging national origin discrimination may be brought by either United States citizens of a particular national background or citizens of other countries."); *cf. Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (holding that the fact that Title VII prohibits discrimination against "any individual" means "that aliens are protected from discrimination").

### B.    As Plaintiffs Plead, The Policy Has An Adverse Impact On Latinos

A Complaint pleads the adverse impact element of a *prima facie* case when a plaintiff alleges facts showing that the "challenged practice caused or predictably will cause a discriminatory effect." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2514 (2015) (quoting 24 C.F.R. § 100.500(c)(1)). Plaintiffs have done so here: the Complaint (1) alleges statistical comparisons showing the disparate impact on Latinos and (2) demonstrates that the Policy was the sole and direct cause of that disparate impact.

13

### 1.    Plaintiffs Allege Statistical Comparisons That Demonstrate A Disparate Impact On Latinos

A disparate impact is "typically" shown by statistical evidence and comparisons.  *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011). Indeed, "[s]tatistics have critical, if not decisive, importance in determining the significance of the alleged disparity."  *Williams*, 891 F. Supp. at 1178 (Ellis, J.).  A plaintiff need not show that all members, or only members, of a protected class are adversely affected by the policy.  *See, e.g.*, *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 988 (4th Cir. 1984) (concluding disparate impact was "self-evident" when 74.9% of non-whites, and only 26.4% of whites, were adversely affected); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064-66 (4th Cir. 1982) (concluding policy that "fell 2.65 times more harshly on black population than on the white" population "leaves no doubt" that the black population was adversely affected).

Courts accept at least two statistical comparison methods to show disparate impact.  One method compares (1) the proportion of the *overall* population whose members are within the protected class with (2) the proportion of the *adversely affected* population whose members are within the protected class ("*Magner* comparison").  *See Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010).[4]  Another method compares (1) the proportion of members of the *protected class*

---

[4]  In *Magner*, the Eighth Circuit reversed an order granting summary judgment to the defendants based on this type of statistical comparison.  *See Magner*, 619 F.3d at 838.  U.S. Census data showed that 11.7% of the City of St. Paul's population was African-American, but 61% and 62% of those on waiting lists for public housing and Section 8, respectively, were African-American.  *Id.* at 834.  The Eighth Circuit concluded that this comparison "reasonably demonstrate[d] that the City's aggressive enforcement of the Housing Code resulted in a disproportionate adverse effect on racial minorities, particularly African-Americans."  *Id.* at 835; *see also, e.g.*, *Jackson v. Okaloosa Cty., Fla.*, 21 F.3d 1531, 1534, 1543 (11th Cir. 1994) (reversing dismissal of disparate impact claim where 8% of county's population was African-American, but 86% of adversely affected population was African-American).

who are adversely affected with (2) the proportion of persons who are *not members of the protected class* who are adversely affected ("*Mt. Holly* comparison"). *See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011).[5]

Plaintiffs have alleged both a *Magner* comparison and a *Mt. Holly* comparison here. *See* Compl. ¶¶ 61-63. As to the *Magner* comparison, Plaintiffs allege that (1) 8.4% of Virginia's population is Latino and (2) 64.6% of Virginia's total undocumented immigrant population is Latino. *See id.* ¶ 62. As to the *Mt. Holly* comparison, Plaintiffs specifically allege that (1) 36.4% of Latinos are undocumented immigrants and (2) only 3.6% of the non-Latino population and 5.1% of the white population are undocumented immigrants. *See id.* ¶ 63. The disparity's magnitude exceeds that of *Magner*, and roughly equals that of *Mt. Holly*. These comparisons thus state a plausible basis for Plaintiffs' disparate impact claim.

Defendants fail in their efforts to challenge Plaintiffs' allegations as insufficient. Defendants take issue with Plaintiffs' reliance on certain statistics. *See* Mem. at 10-12 (suggesting the Complaint's allegations are not "robust" enough and criticizing the populations in the statistics). However, the detailed statistics in the Complaint are sufficient to meet the pleading requirements. In sustaining a disparate impact claim, one court noted that where the

---

[5]   In *Mt. Holly*, the Third Circuit reversed an order granting summary judgment to the defendants based on this type of statistical comparison. *See Mt. Holly*, 658 F.3d at 387-88. The Third Circuit noted that 22.54% of African-Americans and 32.31% of Latinos would be adversely affected by the housing policy at issue, but "only 2.73% of White households" would be adversely affected by the same policy. *Id.* at 382. Given this stark contrast—*i.e.*, "African-Americans would be 8 times more likely to be affected by the project than Whites, and Hispanics would be 11 times more likely to be affected"—the Third Circuit concluded that "[t]hese statistics . . . show a disparate impact." *Id.*; *see also, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 567 (E.D. La. 2009) (finding disparate impact based on expert's analysis finding that "17.61 % of African-American households" were adversely affected by the policy, "compared to only 9.54% of Caucasian households").

plaintiff included "data from the most recent U.S. census that support[ed] [the] allegation,"

"plaintiffs ha[d] alleged more than adequate facts to support their disparate impact claim."

*National Fair Housing Alliance, Inc. v. Prudential Insurance Company of America*, 208 F. Supp.

2d 46, 60-61 (D.D.C. 2002).  The Complaint here includes nine footnotes showing demographic

data derived from various U.S. Census Bureau datasets.  *See* Compl. ¶¶ 56-63.

Defendants also argue that Plaintiffs "fail to allege statistics on the percentages of

undocumented aliens or Latinos in ***mobile homes*** either nationwide, in Virginia, or in Fairfax

County."  Mem. at 12 (emphasis in original).  But Defendants provide no legal basis for their

demand for such specificity, which is by no means necessary to show a disparate impact.  If

anything, Fourth Circuit case law gives Plaintiffs leeway in presenting the exact comparators

used to show a disparate impact.  For example, in *Nickell v. Montgomery County*, 878 F.2d 379,

1989 WL 69331 (4th Cir. June 20, 1989) (unpublished), the Fourth Circuit acknowledged that

the "relevant population for determination of disparate racial impact" was "the rental population

of the affected units," but accepted statistics of the "overall rental population of the County"

because "[t]here [wa]s no evidence presented" that the former "differ[ed]" from the latter.  *Id.* at

1 & n.1; *see also Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1060-61, 1065-66 (4th Cir.

1982) (relying on township- and county-level statistics in affirming judgment that defendants

violated the FHA under a disparate impact theory, even though policy was applied at the town

level).[6]  Similarly, here, there is no reason to believe that mobile home-based statistics would

---

[6]   The Fourth Circuit is not alone in providing such leniency.  *See, e.g.*, *Mt. Holly*, 658 F.3d at
378 n.3 (3d Cir. 2011) (accepting plaintiffs' reliance on 2000 U.S. Census data because such
"data appears to provide the most accurate demographic data" available for the relevant time
period); *Magner*, 619 F.3d at 834 (8th Cir. 2010) (crediting statistical comparison as showing
disparate impact where plaintiffs used "2000 census data" for one data point and "data from
October 2004" for the other data point).

differ materially from the overall housing-based statistics alleged in the Complaint.  *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("[R]eliance on general population demographic data was not misplaced where there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population.").  At bottom, Defendants' argument—that the Complaint fails because it does not allege statistics using mobile homes as a denominator—has no merit.

Finally, Defendants misconstrue the case law on which they rely.  Defendants cite *Edwards v. Johnston County Health Dep't*, 885 F.2d 1215 (4th Cir. 1989) (Ellis, J.), for the proposition that a "statistical imbalance," standing alone, is insufficient to survive a motion to dismiss.  Mem. at 11.  But Defendants ignore critical context from that opinion.  The *Edwards* plaintiffs "concede[d] that white and non-white workers were *equally* affected" by the housing practice at issue, 885 F.2d at 1224 (emphasis added), and "nowhere in the Complaint [did they] contend that the appellees' actions affected non-white migrant farmworkers to a greater *degree* than white farmworkers," *id.* at 1223 (emphasis in original).  Though a preexisting statistical imbalance was insufficient in that factual context, here, the Complaint alleges that the Policy affected Latino residents to a much greater degree than non-Latino or white residents.  *See, e.g.*, Compl. ¶¶ 61-63.  Indeed, the magnitude by which Latinos are adversely affected in relation to non-Latino or white residents, as alleged in this Complaint, is significantly greater than precedent in which courts have concluded that a disparate impact exists.  *Compare id.* ¶ 63 (alleging, based on U.S. Census datasets, that "Latinos are *over ten times* more likely than non-Latinos, and *over seven times* more likely than whites, to be adversely affected by the Policy" (emphases added)), *with Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988) (finding a policy that affected "28% of minorities" and "11% of

17

whites"—*i.e.*, a policy that affected minorities at a rate roughly 2.5 times more than whites—had

a disparate impact), *aff'd*, 488 U.S. 15 (1988).  Accordingly, Plaintiffs' statistical allegations

meet their burden to plead an adverse impact on Latinos.

> **2.**        **Plaintiffs' Complaint Adequately Alleges That The Policy Directly Caused The Disparate Impact**

Plaintiffs have also alleged facts sufficient to show that the Policy caused—and continues

to cause—the disparate impact because the allegations show "that a challenged practice caused

or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  Plaintiffs'

Complaint is clear on this point: but for Defendants' Policy requiring original Social Security

cards (or other proof of legal status), Plaintiffs would not be deprived of housing; they would be

living peacefully in their homes, without a looming fear of being forced out.

The Complaint demonstrates that Defendants' enforcement of the Policy is the sole and

direct cause of the disparate impact at issue.  For example, the Policy compelled the Reyes

family to sell its home and vacate the Park.  *See* Compl. ¶¶ 75-78.  Construing the facts in the

light most favorable to Plaintiffs, the Policy was the *only* reason for the Reyes family's abrupt

departure.  The Complaint also alleges various attempts made by the Plaintiffs to cure their

non-compliance with the Policy—and documents the futility of such attempts—which further

shows that the Policy is the sole reason for creating the disparate impact.  *See id.* ¶¶ 70, 75, 86,

98, 108.

Defendants argue that Plaintiffs' stubbornness—*i.e.*, the fact that Plaintiffs are "unable or

unwilling to comply with federal law to obtain the documents identified in the Policy," Mem. at

11—rather than the Policy is causing the adverse impact.  This is absurd.  Defendants portray

Plaintiffs as having the choice to obtain Social Security cards, if only Plaintiffs would seek them out. The reality is that, under the existing legal framework, Plaintiffs have no such choice.

Further, the fact that Plaintiffs made numerous attempts to comply with the Policy through alternative means belies any assertion by Defendants that Plaintiffs could have complied with the Policy, if only they were willing. For example, Mr. Reyes tried to negotiate a lease that would permit his wife to remain with him. Compl. ¶ 73. When that failed, Mr. Reyes provided Defendants with "(1) [his wife]'s ITIN; (2) a criminal background report of [his wife] reflecting no convictions; and (3) a copy of [his]'s passport." *Id.* ¶ 75. When that also failed, it was evident that Defendants had made it "impossible" for the Reyes family to continue living in their home at the Park. *Id.* ¶ 77. No reasonable inference can be drawn from the facts alleged in the Complaint that anything but the Policy caused the disparate impact at issue here.

Defendants' reliance on *Ellis v. City of Minneapolis*, No. 14-cv-3045, 2015 WL 5009341 (D. Minn. Aug. 24, 2015), and *City of Los Angeles v. Wells Fargo & Co.*, No. 2:13-cv-09007-ODW, 2015 WL 4398858 (C.D. Cal. July 17, 2015), to argue that Plaintiffs have not alleged a sufficient causal link, is misplaced. *Ellis* involved landlords challenging a city's enforcement of certain housing policies that allegedly precipitated "increasing operating costs," which in turn forced the landlords to reduce the amount of low-income housing they provided, which in turn had a disparate impact on protected class members. *Ellis*, 2015 WL 5009341, at *10. The causation here is much less attenuated: Defendants' Policy directly caused the harm, and Plaintiffs are the ones who have been harmed, as opposed to the ones being forced to cause harm. *City of Los Angeles* did not even involve a causation analysis. There, the plaintiff based its disparate impact claim on an alleged *lack* of a policy, so the court dismissed the claim for the

plaintiffs' failure to identify an actual policy.  *City of Los Angeles*, 2015 WL 4398858, at *8. Here, Plaintiffs have identified the Policy at issue, a fact which Defendants do not dispute.

Accordingly, Plaintiffs sufficiently allege a *prima facie* claim for disparate impact discrimination under the FHA, and Defendants' request to dismiss Count I should be denied.

## II.     PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THE VIRGINIA FAIR HOUSING LAW

Under the VFHL, just as with the FHA, it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, national origin, sex, elderliness, or familial status."  Va. Code § 36-96.3.  As Defendants note, "[t]he VFHL claim is based on disparate impact,"  not intentional discrimination.  *See* Mem. at 14. Defendants contend the VFHL claim should be dismissed because (1) the statute does not recognize a disparate impact theory, and (2) the Complaint fails to state a *prima facie* claim for the same reasons Defendants cite under the FHA.  Mem. at 12-14.  Neither argument has merit.

### A.      A Disparate Impact Claim Is Cognizable Under The VFHL

Without citing any authority in support, Defendants contend that "the VFHL does not recognize a disparate impact claim."  Mem. at 12.  The text of the statute is silent concerning whether it encompasses a disparate impact claim, but the inquiry does not end there.  Reading the VFHL in conjunction with its regulations and policies reveals that a disparate impact claim exists in the VFHL to the same extent as in the FHA.

The VFHL is modeled after the FHA.  The relevant VFHL language is virtually identical to the FHA's language.  *Compare* Va. Code § 36-96.3 ("It shall be an unlawful discriminatory housing practice for any person:  1. To refuse to sell or rent after the making of a bona fide offer

20

or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, national origin, sex, elderliness, or familial status; . . ."), *with* 42 U.S.C. § 3604 (". . . it shall be unlawful— (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin . . .").

By regulation, the VFHL is construed to "impose obligations, rights and remedies which are substantially equivalent to those provided by the federal housing law and regulations." 19 Va. Admin. Code § 135-50-30. The express language of the FHA also does not provide for a disparate impact claim, but the Supreme Court of the United States nonetheless held that such claims were cognizable in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). This Court should similarly recognize a disparate impact claim in the VFHL. *See Sisemore v. Master Fin., Inc.*, 151 Cal. App. 4th 1386, 1420 (2007) (holding that a disparate impact theory was viable under California's state law version of the FHA, noting that "the Legislature sought to make the [statute] substantially equivalent to the federal Fair Housing Act" (internal quotations and citations omitted)); *see also Burbank Apartments Tenant Ass'n v. Kargan*, 48 N.E.3d 394, 407-408 (Mass. 2016) (holding that a disparate impact theory was viable under Massachusetts' state law version of the FHA).

Recognizing a disparate impact claim under the VFHL is consistent with the underlying policy rationale for the statute. The VFHL declares as follows:

> It is the policy of the Commonwealth of Virginia to provide for fair housing throughout the Commonwealth, to all its citizens, regardless of race, color, religion, national origin, sex, elderliness, familial status, or handicap, and to that end to prohibit discriminatory practices with respect to residential housing by any person or group

21

> of persons, in order that the peace, health, safety, prosperity, and general welfare of all the inhabitants of the Commonwealth may be protected and insured.  This law shall be deemed an exercise of the police power of the Commonwealth of Virginia for the protection of the people of the Commonwealth.

VA Code § 36-96.1.  When considering this policy rationale, Virginia courts have noted, "It is hard to envision a more emphatic expression of a desire to use the full police power of the state to outlaw sexual, racial, and other types of invidious discrimination to the maximum extent possible under the law."  *Hughes v. Bransfield*, 84 Va. Cir. 214, 2012 WL 7960051, at *3 (2012) (quoting *Allen v. Seventy–Seven Acres,* 48 Va. Cir. 318, 1999 WL 199665, at *5 (1999)). Recognizing a disparate impact claim in the VFHL is consistent with the spirit of combating discrimination and using the full power of the state to outlaw it.  *See Kargan*, 48 N.E.3d at 407-08 (relying on "the policy underlying the fair housing statutes" to find that a disparate impact theory was viable under Massachusetts' state law version of the FHA, noting: "After all, it is a steadfast principle in the affordable housing context that '[c]onduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment to replace the ghettos by truly integrated and balanced living patterns'" (quoting *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978))).

**B.**    **The Complaint Alleges A *Prima Facie* Claim For Disparate Impact Discrimination Under The VFHL**

The Complaint pleads a viable claim for violation of the VFHL for the same reasons as the FHA claim: (1) Plaintiffs bring their claim as part of a protected race and national origin class of Latinos, and (2) Plaintiffs allege that the discrimination they suffered as Latinos was a result of Defendants' enforcement of the Policy.  *See supra*, Argument Part I.

22

### 1.     **Plaintiffs Plead Discrimination Based On Race And National Origin, Both Of Which Are Protected Classes Under The VFHL**

The Complaint pleads a viable claim for violation of the VFHL based on race and/or national origin: "Defendants' enforcement of the Policy constitutes a denial of housing and discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of race and/or national origin in violation of the Virginia Fair Housing Law, Va. Code § 36-96.3," Compl. ¶ 119, and "Defendants' acts, policies, and practices inflict disproportionate harm on Latinos as compared to similarly situated non-Latinos," *id.* ¶ 120; *see also id.* ¶¶ 5, 62, 63. Plaintiffs agree with Defendants that "[u]nlawful and/or undocumented immigration status is not a protected class under the VFHL," Mem. at 14, but this has no bearing on the VFHL claim here, which is based on race and/or national origin discrimination.  The VFHL prohibits discrimination on the basis of race or national origin.  Va. Code § 36-96.3.  As described *supra*, Argument Part I, the Complaint pleads a *prima facie* case of discrimination based on race and/or national origin.

### 2.     **As Plaintiffs Plead, The Policy Has An Adverse Impact On Latinos**

The Complaint also pleads that "[t]he disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a ban on residents who lack a Social Security number and a requested set of immigration documents," Compl. ¶ 120, and "[a]s a result of Defendants' acts, policies, and procedures, Plaintiffs and their families have been denied the opportunity to renew their leases of the land on which their homes stand,"  *id.* ¶ 121; *see also id.* ¶ 122.  As described above, *supra*, Argument Part I, the Complaint pleads a *prima facie* case of discrimination based on the Policy's adverse impact on Latinos. Accordingly, Defendants' request to dismiss Count II should be denied.

### III.   PLAINTIFFS STATE A CLAIM FOR VIOLATION OF SECTION 1981

Section 1981 establishes that "[a]ll persons subject to the jurisdiction of the United States . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  The Complaint pleads that Defendants intended in both the design and application of the Policy to discriminate against Plaintiffs based on alienage and citizenship. *See, e.g.*, Compl. at ¶¶ 2, 4, 7, 39, 132-137 (alleging discrimination on the basis of alienage and citizenship).  Defendants argue that Plaintiffs fail to plead (1) that a protected class is affected, and (2) evidence of intent to discriminate.[7]  *See* Mem. at 15-19.  Neither argument has merit.

#### A.   Plaintiffs Plead Discrimination Based On Alienage And Citizenship, Both Of Which Are Protected Classes Under Section 1981

Defendants' Motion ignores a fundamental point: a person's alienage and citizenship are entirely distinct from that person's immigration status.  Plaintiffs belong to protected alienage and citizenship classes, which are protected under Section 1981.  *See Duane v. GEICO*, 37 F.3d 1036, 1044 (4th Cir. 1994) (applying Section 1981 to alienage and citizenship-based discrimination).  Contrary to Defendants' suggestion, Plaintiffs do not allege discrimination against a class of undocumented immigrants.  Indeed, the Complaint alleges that certain Plaintiffs do have legal status.  *See* Compl. ¶¶ 64, 80, 90.  However, the Section 1981 claim is based on the fact that none of the Plaintiffs are U.S. citizens.  *See id.* ¶¶ 64, 80, 90, 100.

Defendants provide no support for their actual argument—that Plaintiffs' immigration status somehow disqualifies them from protection on the basis of their membership in protected classes.  *See* Mem. at 15-16.  The conspicuous lack of authority is unsurprising, given Section

---

[7]   Defendants also argue, once again, that this claim conflicts with the IRCA.  As described in Argument Part IV, *infra*, this argument fails.

1981's extension of protections to "[a]ll persons within the jurisdiction of the United States."  42

U.S.C. § 1981(a).

### B.   Plaintiffs Plead Evidence Of Intentional Discrimination Sufficient To State A Section 1981 Claim

Plaintiffs base their Section 1981 claim on direct evidence of intentional discrimination.

*See Demuren v. Old Dominion University*, 33 F. Supp. 2d 469, 478 (E.D. Va. 1999) (stating that

plaintiffs may use direct evidence of a defendant's intent to satisfy 1981 claim), *aff'd*, 188 F.3d

501 (4th Cir. 1999); *see also Nguyen-Truong v. Int'l Rehab. Associates, Inc.*, No. 98-2213, 1999

WL 140745, at *1 (4th Cir. March 16, 1999) ("[A] plaintiff may make out a [Section 1981]

prima facie case by proffering direct evidence of discrimination.").  "Direct evidence of

discrimination is either [1] direct evidence of a stated purpose to discriminate, or [2]

circumstantial evidence of sufficient probative force."  *Demuren*, 33 F. Supp. 2d at 478-79; *see*

*also Holmes v. Bevilacqua,* 794 F.2d 142, 146 (4th Cir. 1986).  Both direct and circumstantial

evidence are present here.

### 1.   Direct Evidence Demonstrates A Discriminatory Purpose

As Plaintiffs have alleged, the Policy's design and Defendants' conduct constitute direct

evidence of Defendants' intent to discriminate against Plaintiffs based on alienage or citizenship.

*See* Compl. at ¶¶ 26-39 (outlining the Policy and alleging it "serves no purpose other than to

illegally and illegitimately identify and exclude undocumented immigrants from the Park").

"[A] facially discriminatory policy . . . is direct evidence of discriminatory intent."  *Nguyen v.*

*City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132,

1136 (10th Cir. 2000) ("A plaintiff proves discrimination through direct evidence by establishing

proof of an existing policy which itself constitutes discrimination.") (internal quotation marks

and citation omitted); *Metrocare v. Washington Metro. Area Transit Auth.*, 679 F.2d 922, 929

(D.C. Cir. 1982) (noting that a "discriminatory . . . policy" would have constituted direct

evidence of discriminatory intent).

On its face, the Policy evidences an express, discriminatory purpose by requiring lease

applicants to provide specific documents that are substantially more burdensome for aliens or

non-citizens, as opposed to U.S. citizens, to obtain and present. *See* Compl. ¶ 26, Exhibit A

(Defendants' Policy requiring (1) an original Social Security Card; or (2) an original passport,

original U.S. visa, and an original I-94 or I-94W "arrival/departure" form)[8]; *see also Doe v.

Edgar*, No. 88-C-579, 1989 WL 91805, at *3 (N.D. Ill. Aug. 4, 1989) (finding law requiring

driver's license applicants to produce Social Security cards raised issue of fact whether

legislature discriminated against undocumented immigrants in violation of Section 1981).

The Policy imposes only a nominal burden on U.S. citizens, who typically receive Social

Security cards around the same time as their birth certificates.  Aliens and non-citizens are much

less likely than U.S. citizens to possess Social Security cards, and must therefore typically

contend with the more burdensome requirements of the Policy's second prong.

For example, the Policy requires applicants not presenting a Social Security card to

provide an original I-94 or I-94W "arrival/departure" form.  While a lost Social Security card can

be replaced for free,[9] aliens or non-citizens replacing a lost original paper format I-94 issued

---

[8]   When evaluating a motion to dismiss, courts "consider documents that are explicitly
incorporated into the complaint by reference . . . and those attached to the complaint as exhibits."
*Goines v. Valley Cmty. Servs. Bd.*, No. 15-1589, -- F.3d --, 2016 WL 2621262, at *3 (4th Cir.
May 9, 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) and
Fed. R. Civ. P. 10(c)).

[9]   *See* U.S. Social Security Administration, *Frequently Asked Questions:  How do I apply for a
new or replacement Social Security number card?* (June 13, 2016),

prior to April 2013 must pay a $330 fee.[10]  Moreover, U.S. Customs and Border Protection

stopped issuing paper versions of such forms in April 2013.[11]  Consequently, aliens or

non-citizens who entered the country since that time may be unable to provide an "original"

form.

Notably, the Policy directly discriminates—to the point of apparent exclusion—against

aliens or non-citizens holding immigrant visas.  The Policy requires lease applicants to submit an

original I-94, yet persons holding immigrant visas do not need to complete an I-94 upon arrival

in the U.S.[12]  Immigrant visas represent the first step towards establishing lawful permanent

residency,[13] but it is unclear whether immigrant visa holders can ever comply with the Policy's

demand for an original I-94.  The Policy thus bars from the Park all immigrant visa holders save

those who have undertaken the additional step of obtaining a Social Security card.

Defendants' agents' conduct and statements regarding the Policy also demonstrate

discriminatory intent.  *See Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981)

(indicating a defendant's conduct may be offered as direct evidence of discriminatory intent).

---

https://faq.ssa.gov/link/portal/34011/34019/Article/3755/How-do-I-apply-for-a-new-or-replacement-Social-Security-number-card (last visited June 27, 2016).

[10]   *See* U.S. Citizenship and Immigration Services, *I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document* (March 9, 2016), https://www.uscis.gov/i-102 (last visited June 27, 2016).

[11]   *See* U.S. Customs and Border Protection, *Arrival/Departure History Now Available on I-94 Webpage* (April 30, 2014), https://www.cbp.gov/newsroom/spotlights/2014-04-30-000000/arrivaldeparture-history-now-available-i-94-webpage (last visited June 27, 2016).

[12]   *See* U.S. Customs and Border Protection, *CBP Form I-94* ("This form must be completed by all persons except U.S. Citizens, returning resident aliens, *aliens with immigrant visas*, and Canadian Citizens visiting or in transit.") (emphasis added), https://www.cbp.gov/sites/default/files/documents/CBP%20Form%20I-94%20English%20SAMPLE_Watermark.pdf, (last visited June 27, 2016).

[13]   *See* U.S. Department of State, *The Immigrant Visa Process* (last visited June 27, 2016), https://travel.state.gov/content/visas/en/immigrate/immigrant-process.html.

Specifically, Defendants' agents made clear the discriminatory intent against aliens or non-citizens underlying the Policy when an agent rationalized the Policy's requirements by telling Plaintiffs undocumented immigrants "might be criminals."  Compl. ¶ 71.

### 2.    Circumstantial Evidence Demonstrates Intentional Discrimination

"Circumstantial evidence of sufficient probative force" constitutes "[d]irect evidence of discrimination," *see Demuren*, 33 F. Supp. 2d at 478-79, and thus may form the basis of a *prima facie* case under Section 1981, *see Nguyen-Truong*, 1999 WL 140745, at *1.  As described above, the Policy's incoherent design inevitably causes discriminatory burdens for aliens or non-citizens, and when "the adverse consequences . . . upon an identifiable group are . . . inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 n.25 (1979).  Defendants' blanket practice of applying the Policy at its other housing communities in Northern Virginia, *see* Compl. ¶ 28, suggests a broad discriminatory intent to reduce the number of alien or non-citizen residents at Defendants' communities.  *See Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243 n.15 (4th Cir. 1982) (observing that circumstantial evidence of broadly-applied policy or plan to replace older workers with younger employees would have "obvious inferential force").

Moreover, while Defendants suggest that the Policy exists to facilitate "criminal background and credit checks," Mem. at 4, the Policy requires documents that are not necessary to achieve that purpose, *see* Compl. ¶¶ 32-39 (alleging documents required by the Policy are not necessary for background and credit checks and citing publications supporting the use of ITINs or other documents for such checks).  This evidence that Defendants could achieve the Policy's stated purpose by accepting other documents aliens or non-citizens can more easily provide supports the inference that the stated purpose is merely a pretext masking discriminatory intent.

28

Accordingly, Plaintiffs sufficiently allege a *prima facie* claim for discrimination under Section 1981, and Defendants' request to dismiss Count IV should be denied.

## IV.    PLAINTIFFS' CLAIMS DO NOT CONFLICT WITH FEDERAL IMMIGRATION LAW

Contrary to Defendants' arguments, Mem. at 9, 19-20, Plaintiffs' FHA and Section 1981 claims present no risk of conflict with the Immigration Reform and Control Act, 8 U.S.C. § 1324, *et seq.* ("IRCA").  The IRCA says nothing about Latinos as a class, nor does it permit Defendants to continue enforcing a policy that results in the disproportionate displacement of Latino families, regardless of their immigration status.  Defendants cannot present any support for the suggestion that the IRCA operates to bar landlords from leasing housing to individuals with unknown immigration status or individuals who reside with them.

In arguing that the ruling Plaintiffs seek would place Defendants in jeopardy of criminal liability for "harboring . . . aliens" within the meaning of IRCA § 1324(a)(1)(A)(iii), Defendants rely solely upon a distinguishable, unpublished precedent.  *See* Mem. at 9, 19-20.  That case, *United States v. Aguilar*, imposed liability on a boarding house operator who ignored multiple warnings from federal immigration officials over the course of several months.  *See* 477 Fed. App'x 1000, 1002-03 (4th Cir. 2012).  Defendants have offered no evidence that federal immigration authorities made any such warnings to the Park as explanation for Defendants' recent and sudden interest in strictly enforcing their discriminatory Policy.

Recent precedent from other circuits demonstrates that the IRCA only jeopardizes landlords who affirmatively shield undocumented immigrants from detection or discovery.  *See, e.g.*, *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by

29

immigration authorities or police, is . . . not an offense under § 1324(a)(1)(A)(iii).”); *DelRio-Mocci v. Connolly Props.*, 672 F.3d 241, 247 (3rd Cir. 2012) (“We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking lawful immigration status constitutes harboring.”); *see also Lozano v. City of Hazleton*, 620 F.3d 170, 223 (3d Cir. 2010), (“It is highly unlikely that a landlord’s renting of an apartment to an alien lacking lawful immigration status could ever, without more, satisfy this definition of harboring.  Renting an apartment in the normal course of business is not in and of itself conduct that prevents the government from detecting an alien’s presence.”), *vacated on other grounds*, *City of Hazleton v. Lozano*, 563 U.S. 1030 (2011).

As the Third Circuit has noted, “We cannot imagine that Congress contemplated that our nation’s landlords . . . would be tasked with making complex legal determinations about who is permitted to live in this country, much less that they would be criminalized in error in so doing.” *DelRio-Mocci*, 672 F.3d at 250.  The lone Fourth Circuit case Defendants cite for their interpretation of the IRCA, *Aguilar*, also suggests the IRCA focuses on active, intentional deception of authorities.   *See Aguilar*, 477 Fed. App’x at 1002-03 (IRCA applied to boarding house operator who ignored multiple warnings from immigration officials).  Defendants’ decision to ask about immigration status is an optional practice that is not required to avoid criminal liability, and does not otherwise support Defendants’ purported effort to identify negative criminal or consumer background information.  Accordingly, the IRCA does not bar Plaintiffs’ claims under the FHA and Section 1981.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that the Court deny Defendants’ Motion as to Counts I, II, and IV.

Dated this 27th day of June, 2016                    Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950
Jeanhee Hong (*pro hac vice*)
Ariel Wade Trajtenberg (*pro hac vice*)
Diego Duran de la Vega (*pro hac vice*)
Benjamin Cain (*pro hac vice*)
Jongwook Kim (*pro hac vice*)
William A. Margeson (*pro hac vice*)

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com
jeanheehong@quinnemanuel.com
arieltrajtenberg@quinnemanuel.com
diegoduran@quinnemanuel.com
benjamincain@quinnemanuel.com
wookiekim@quinnemanuel.com
billmargeson@quinnemanuel.com

LEGAL AID JUSTICE CENTER
Ivy Finkenstadt, VSB #84743
Simon Sandoval-Moshenberg, VSB #77110

6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
ivy@justice4all.org
simon@justice4all.org

*Attorneys for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2016, I filed the foregoing document

electronically with the Clerk of the Court using the ECF system, and caused to be served by

electronic mail a copy of the MEMORANDUM OF LAW IN OPPOSITION TO

DEFENDANTS' MOTION TO DISMISS upon the following parties:


Michael S. Dingman, VSB #30031
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
mdingman@reedsmith.com

*Counsel for Defendants*


_____
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950


777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com