IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| ROSY GIRON DE REYES, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, <br><br> Defendants. | Civil No.: 1:16cv563-TSE-TCB |

### **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A. J. Dwoskin & Associates, Inc. (collectively "Defendants"), by counsel, pursuant to Fed. R. Civ. P. 12(b)(6) submit their Reply Brief in support of their Motion to Dismiss Counts I, II and IV and in response to Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Dismiss ("Opp."). As detailed below, Defendants respectfully request the Court to dismiss Counts I, II and IV of Plaintiff's Complaint with prejudice.[1]

### **INTRODUCTION**

Plaintiffs concede that undocumented immigrants are not a protected class under either the Federal Fair Housing Act ("FHA") or 42 U.S.C. § 1981 and proclaim – as they must - that "no claim rests on immigration status." Opp. at 2. This assertion is belied by the Complaint which focuses almost exclusively on the impact of the policy at issue on undocumented immigrants. Plaintiffs attempt to ignore their own allegations and contend that the FHA claim is based on race – disparate impact on Latinos – and that their section 1981 claim is based on

---

[1] Plaintiffs have agreed to the dismissal of count VI – that was also the subject of the motion to dismiss - with prejudice.

US_ACTIVE-127482425

citizenship. The truth is both claims are based on the status of four of the eight plaintiffs being undocumented and/or illegal aliens. The four Plaintiffs who are alleged to be in the United States properly – all Latinos and all non-citizens of the United States - were able to comply with the policy and to execute the leases attached to the Complaint. Clearly the policy had no impact on them because of their citizenship or race. The only difference between them and the other four plaintiffs who allege that they cannot comply with the policy is their immigration status. Thus, Plaintiffs claims do in fact rest on immigration status which is why, among other reasons, they fail to state a claim under the FHA or 42 U.S.C. § 1981.

## FACTUAL BACKGROUND

Despite Plaintiff's assertions to the contrary, the Complaint is premised on the alleged impact of the policy on undocumented and/or illegal aliens. Paragraph 39 of the Complaint states: "Defendants' demand for an arbitrary selection of immigration documents from those who cannot present an original social security card serves no purpose other than to illegally and illegitimately identify and exclude undocumented immigrants from the Park." Plaintiffs go on to allege in paragraph 40 of the Complaint that "the result is that undocumented immigrants are precluded from living at the Park." Paragraphs 58-63 of the Complaint consist of allegations of the percentages of undocumented immigrants in the United States, in Virginia and in Fairfax County. In paragraph 71 of the Complaint, Plaintiffs allege that an agent of the Defendants stated "that Defendants did not want undocumented immigrants to reside at the Park." Plaintiffs allegations repeatedly refer to "undocumented immigrants" as the group allegedly impacted by the policy. There are no allegations that Defendants that did not want Latinos or non-citizens of

the United States at the Park. Instead, the allegations throughout the Complaint focus only on undocumented immigrants.[2]

## STANDARD OF REVIEW

The standard of review that Plaintiffs presented to the Court completely ignores the standard under *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). In *Texas Dep't of Hous. & Cmty. Affairs*, the Supreme Court instructed that courts focus intently on a plaintiff's *prima facie* case asserting a disparate impact claim under the FHA. *Id.* at 2523 ("Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.").

Likewise, Plaintiffs do not recite the complete legal standard required for a *prima facie* case under 42 U.S.C. § 1981. To state a § 1981 claim "a plaintiff must ultimately establish both that the defendant intended to discriminate… and that the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006).

## ARGUMENT

I. **Plaintiffs Fail to State a Claim Under the FHA**

   A. **Plaintiffs Improperly Base Their FHA Claim On Undocumented Immigration Status**

Plaintiffs concede in their Opposition that undocumented immigrants are not a protected class under the FHA and that an FHA claim cannot be based on the status of being an undocumented immigrant. To avoid the consequences of this concession, Plaintiffs argue that

---

[2] This is further demonstrated by the repeated allegation that it "would have been futile" for the four plaintiffs who are not alleged to be in the United States legally to attempt to comply with the Policy. *See* paragraphs 86, 98 and 108. This is because they cannot provide documentation as to their immigration status.

the FHA claim is actually based on race. This argument, however, finds no support in the Complaint which, as discussed above, repeatedly alleges that the policy impacts undocumented immigrants. This is most clearly demonstrated by the fact that the male Plaintiffs alleged to be in the United States legally – and who are Latino – were able to comply with the policy and sign leases. Plaintiffs protest in their Opposition that these Plaintiffs were impacted because they could not renew their leases. But Plaintiffs know – and allege – that this is only because the female Plaintiffs cannot comply with the policy because they are undocumented immigrants. If the four male Plaintiffs were not Latino the impact would be the exactly the same; their wives – as Plaintiffs allege – cannot comply with the policy because they are undocumented immigrants. Plaintiffs cannot hide from their own allegations which unmistakably show that Plaintiffs are in fact asserting a claim under the FHA based on the status of an undocumented immigrant. As Plaintiffs concede, no such claim exists and count I must be dismissed.

### B. Undocumented Immigrants Cannot Assert a Claim Under the FHA

Having conceded that undocumented immigrants are not a protected class under the FHA, Plaintiffs argue that an undocumented immigrant nonetheless can assert a claim under the FHA for race or national origin discrimination. Setting aside that the Complaint does not allege such claims, the Plaintiffs who are not alleged to be properly in the United States cannot assert a claim under the FHA.

Plaintiffs cite to no cases in support of their assertion that undocumented immigrants can assert a claim under the FHA. Courts that have considered this issue have held that undocumented immigrants cannot assert a claim under the FHA. *Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013) ("It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected

class of aliens not lawfully present in this country."); *see also Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) ("If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage ***but of noncompliance with federal law.***") (emphasis added). The *Keller* court specifically rejected Plaintiffs' argument, noting that it would be "unsound" to create a cause of action based on a protected class of "aliens not lawfully present in this country":

> We find no hint in the FHA's history and purpose that such a law or ordinance, *which is valid in all other respects,* violates the FHA if local statistics can be gathered to show that a disproportionate number of the adversely affected aliens are members of a particular ethnic group. In most cases today, that would of course be Latinos, but at various times in our history, and in various locales, the "disparate impact" might have been on immigrants from Ireland, Germany, Scandinavia, Italy, China, or other parts of the world. It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected class of aliens not lawfully present in this country. *Cf. Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S. Ct. 334, 38 L.Ed.2d 287 (1973). Whatever its statutory merit in other contexts, the cause of action urged by the Keller Plaintiffs is unsound.

719 F.3d at 949.[3]

Not only is there no support for Plaintiffs' proposition that undocumented immigrants can assert a claim under the FHA, but a decision finding that undocumented immigrants can assert a claim under the FHA would conflict with federal law, discussed below, that prohibits knowingly providing housing to an undocumented immigrant. As the Court held in *Keller*, there is nothing in the FHA that suggests that Congress intended for it to apply to undocumented and/or illegal immigrants, and a decision holding that it does runs headlong into federal law making it a crime to knowingly provide housing to an undocumented immigrant. Accordingly, the Court must

---

[3] Moreover, Plaintiffs cite to *Espinoza v. Farah Mfg. Co.* to argue that Title VII prohibits discrimination based on alienage, Opp. at 13, but the *Espinoza* decision actually permitted discrimination on the basis of citizenship or alienage. 414 U.S. 86, 95 (1973) ("Aliens are protected from illegal discrimination under the Act, but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage."). Further, the Court did not address in that case whether undocumented and/or illegal aliens can assert a claim under Title VII.

reject Plaintiffs' attempt to create a new protected class under the FHA consisting of illegal and/or undocumented aliens and should dismiss count I of the Complaint.

### C. Plaintiffs Fail to Identify A Causal Link Between Defendants' Policy and an Adverse Impact on Latinos

Plaintiffs fail to state a claim under the FHA because Plaintiffs' allegations do not meet the "robust causality" standard for a disparate impact claim under the FHA. Plaintiffs pay scant attention to the *Texas Dep't of Hous. & Cmty. Affairs* decision and fail to demonstrate that they have met the required "robust causality" standard necessary to state a claim for disparate impact under the FHA. In *Texas Dep't of Hous. & Cmty. Affairs*, the Supreme Court held that "[a] robust causality requirement ensures that 'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create."  135 S. Ct. at 2523 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Plaintiffs simply argue in their Opposition that the statistics they rely upon show an alleged impact on Latinos. *See* Opp. at 13-17. That misses the point of the robust causality requirement entirely. The Supreme Court made clear in *Texas Dep't of Hous. & Cmty. Affairs* that merely reciting statistics does not state a claim under the FHA.[4] Yet, that is the sum and substance of Plaintiffs' argument. Plaintiffs cannot satisfy the "robust

---

[4] The Fourth Circuit came to this conclusion in *Edwards v. Johnston Cty. Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989) According to the allegations, ninety percent of the migrant workers in Johnston County were non-white and forced to endure unsanitary living conditions. *Id.* The Fourth Circuit affirmed the dismissal of the plaintiffs' FHA claims and stated the following:

> Yet, nowhere in the Complaint do appellants contend that the appellees' actions affected non-white migrant farmworkers to a greater degree than white farmworkers. Nor could such a contention reasonably be made; manifestly, white and nonwhite migrant workers suffered the same degree of harm because they shared the same substandard housing. It is true, of course, that a majority of migrant farmworkers are non-white. And given this, any policy or action taken with respect to these workers will necessarily affect more non-white than white migrant farmworkers. But merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another.

*Id.* at 1223.

causality" requirement because their own Complaint demonstrates that the cause of the female Plaintiffs' alleged inability to comply with the policy is due to their status as undocumented immigrants – not to being Latino.  Having failed to satisfy the robust causality prong for a disparate impact claim under the FHA, Count I must be dismissed.

### D. Defendants' Policy is No Different Than HUD Regulations

Finally, if the Court accepts the arguments of the Plaintiffs, it would have to conclude that the policies of HUD also violate the FHA because HUD explicitly excludes undocumented immigrants from participation in many of its programs.  Defendants suggest that neither they nor HUD are in violation of the FHA.

Plaintiffs' construction of the FHA would allow undocumented immigrants to sue the Department of Housing for discrimination based on its HUD regulations. The Department of Housing differentiates between documented and undocumented aliens in providing public assistance for housing. *See* 24 C.F.R. § 5.500 ("This subpart E implements Section 214 of the Housing and Community Development Act of 1980, as amended (42 U.S.C. 1436a). Section 214 prohibits HUD from making financial assistance available to persons who are not in eligible status with respect to citizenship or noncitizen immigration status."); 42 U.S.C. § 1436a. This includes HUD programs covered by the conventional public housing program, the Section 8 program, the Section 236 program, the Rent Supplement program, the Section 235 program, and the National Homeownership Trust Program. 24 C.F.R. § 5.500; 42 U.S.C. § 1436a. Persons who qualify for assistance must have "eligible immigration status". 24 C.F.R. § 5.506 ("Financial assistance…is restricted to: (1) Citizens; or (2) Noncitizens who have eligible immigration status…"). The persons who qualify for eligible immigration status are limited to seven categories:

> (1) an alien lawfully admitted for permanent residence as an immigrant as defined by section 1101(a)(15) and (20) of Title 8, excluding, among others, alien visitors, tourists, diplomats, and students who enter the United States temporarily with no intention of abandoning their residence in a foreign country;
>
> (2) an alien who entered the United States prior to June 30, 1948, or such subsequent date as is enacted by law, has continuously maintained his or her residence in the United States since then, and is not ineligible for citizenship, but who is deemed to be lawfully admitted for permanent residence as a result of an exercise of discretion by the Attorney General pursuant to section 1259 of Title 8;
>
> (3) an alien who is lawfully present in the United States pursuant to an admission under section 1157 of Title 8 or pursuant to the granting of asylum (which has not been terminated) under section 1158 of Title 8;
>
> (4) an alien who is lawfully present in the United States as a result of an exercise of discretion by the Attorney General for emergent reasons or reasons deemed strictly in the public interest pursuant to section 1182(d)(5) of Title 8;
>
> (5) an alien who is lawfully present in the United States as a result of the Attorney General's withholding deportation pursuant to section 1231(b)(3) of Title 8;
>
> (6) an alien lawfully admitted for temporary or permanent residence under section 1255a of Title 8; or
>
> (7) an alien who is lawfully resident in the United States and its territories and possessions under section 141 of the Compacts of Free Association between the Government of the United States and the Governments of the Marshall Islands, the Federated States of Micronesia (48 U.S.C. 1901 note) and Palau (48 U.S.C. 1931 note) while the applicable section is in effect…

42 U.S.C. § 1436a. Further, HUD is prohibited from providing housing assistance to student aliens, including the alien's noncitizen spouse or minor children. 42 U.S.C. § 1436a(c)(2). Although Congress limited housing assistance to those with eligible immigration status, not every member of a family must have eligible immigration status for the family to receive housing assistance. 42 U.S.C. § 1436a(b)(2). However, at least one family member must be a citizen or eligible immigrant, 24 C.F.R. § 5.504(b), and the housing assistance is pro-rated to take into account the number of members of the household who are ineligible. 42 U.S.C. § 1436a(b)(2).

In order to qualify for assistance, every household member must sign a declaration under penalty of perjury (1) claiming status as a citizen or as an eligible immigrant or (2) stating the choice not to claim eligible status and acknowledging ineligibility. 24 C.F.R. § 5.508(b),(c), and (e). Every adult in the household must sign the declaration. For citizens, no verification besides the declaration is required, although the public housing authority or landlord may request verification by birth certificate or U.S. passport. 24 C.F.R. § 5.508(b)(1),(c)(1), and (e)(1). Noncitizens over 62 years of age must sign the declaration and also provide documentation of age. 24 C.F.R. § 5.508(b)(2). All other noncitizens must sign the declaration *and* provide documents showing eligible status *and* sign a consent permitting the authority/landlord to release information to HUD and the Bureau of Citizenship and Immigrations Services (BCIS, formerly the INS). 24 C.F.R. § 5.508(b)(3); *see* HDR Hdbk. of Housing and Dev. Law § 2:43 ("To demonstrate eligible immigration status, a family member must produce the original of a document designated as acceptable evidence by the Immigration and Naturalization Service (INS)…").

Plaintiffs rely upon and cite to HUD regulations regarding disparate impact. Mindful of its own regulations, HUD enacted and enforces a myriad of restrictions based on immigration status. Certainly HUD does not believe that its restrictions based on immigration status violate its regulations concerning disparate impact. Plaintiffs could apply the same statistics cited in their Complaint to argue that HUD's regulations have a disparate impact on Latinos. In reality, neither the HUD regulations, nor Defendants' policy violates the FHA.

### E. Plaintiffs Fail to Allege the Percentages of Undocumented Aliens or Latinos in Mobile Homes

Plaintiffs fail to allege a causal link between Defendants' policy and an adverse impact on Latinos because Plaintiffs fail to allege statistics on the percentages of undocumented aliens

or Latinos in *mobile homes* either nationwide, in Virginia, or in Fairfax County. *See* Compl. ¶¶ 56-57.  In response, Plaintiffs argue that they are entitled to leeway in presenting "exact comparators" based on *Nickell v. Montgomery Cnty.*, 878 F.2d 379, 1989 WL 69331, at *1 & n.1 (4th Cir. June 20, 1989) (unpublished). There, the Fourth Circuit acknowledged the relevant population for determining whether a zoning ordinance had a disparate impact on minorities was the population of affected renters. *Id.* at *2.  On appeal from a judgment, the Fourth Circuit noted that "[t]here is no evidence presented that the racial composition of the rental population of the affected units differs from the overall rental population of the County."  Here, the case is at the pleadings stage, and Plaintiffs have not alleged any statistics about the affected population – undocumented aliens and Latinos in mobile home units. *Id.* at *2 n.1.  Nor have they alleged that the statistics would be the same for mobile home park.

  Plaintiffs suggest that "there is no reason to believe that mobile home-based statistics would differ materially from the overall housing-based statistics alleged in the Complaint." Opp. at 16-17.  Plaintiffs provide no basis for this assertion and none is set forth in the Complaint. The Court cannot assume in the absence of any allegations that Plaintiffs' unsubstantiated supposition is correct.  Moreover, mobile home parks are different from, for example, an apartment, because the residents in a mobile home park own their mobile home which requires financing and purchasing of the home.  Indeed, the Policy requires persons to own their mobile homes in the Park, and to provide evidence of financing, which would be difficult if one is an undocumented immigrant. *See* Compl. Ex. A at 1.  Therefore, the Court cannot assume as Plaintiffs suggest that the statistics asserted in the Complaint – that have no relationship to a mobile home park – are indicative of the population at a mobile home park.  Thus, Plaintiffs fail

to allege a statistical disparity which is a predicate for their claim for disparate impact under the FHA.

## II. Plaintiffs Fail to State a Claim Under the VFHL

### A. The VFHL Does Not Recognize a Disparate Impact Claim

Plaintiffs acknowledge that the text of the VFHL does not provide for a disparate impact claim. *See* Opp. at 20. Moreover, Plaintiffs do not challenge the fact that no Virginia court, state or federal, has recognized a disparate impact claim under the VFHL. *See* Mem. Supp. Mot. Dismiss at 13. Plaintiffs also do not challenge that there are no statutes in Virginia that allow for a disparate impact claim. *Id.* Plaintiffs suggest that Defendants fail to cite any authority contending that the VFHL does not recognize a disparate impact claim – but it is Plaintiffs, not Defendants, who ask this Court to recognize a disparate impact claim under the VFHL *for the first time*.

In one sentence, Plaintiffs blithely ask this Court to apply the holding in *Texas Dep't of Housing* to create a disparate impact claim under the VFHL suggesting that whatever the federal courts decide under the FHA is binding under the VFHL and operates to expand that statute beyond its plain meaning. Opp. at 21. Plaintiffs, however, ignore the fact that the decision in *Texas Dep't of Housing* was based upon the history of the enactment of the FHA and the existence of disparate impact claims under other federal statutes. 135 S. Ct. at 2519. Moreover, Plaintiffs ignore that the *Texas Dept' of Housing* decision considered relevant legislative history. Mem. Supp. Mot. Dismiss at 13. There is no equivalent Virginia precedent establishing disparate impact liability under the VFHL, and Plaintiffs do not direct this Court to any relevant Virginia legislative history under the VFHL.

Instead, Plaintiffs assert that this Court should recognize a disparate impact claim under the VFHL for the first time because the text of the VFHL is similar to the FHA and because of

the policy of the VFHL. Failing to direct this Court to a single Virginia court or statute recognizing a disparate impact claim, similar language in the VFHL and the FHA is not sufficient to extend the holding of *Texas Dep't of Housing* to the VFHL. There are no statutes in Virginia recognizing disparate impact – as there is under federal law – and there are no Virginia cases recognizing disparate impact – as there was when the FHA was amended. The Court cannot extrapolate the legislative intent behind the FHA and apply it as the intent of the Virginia legislature in enacting the VFHL. Virginia law – statutory and case law – unlike federal law – is devoid of any reference to or creation of a claim for disparate impact – a claim the Supreme Court recognized with extreme caution under the FHA. There is simply no basis for the Court to conclude that the Virginia legislature intended to create a claim for disparate impact or intended for Virginia to be bound by whatever decisions the federal courts make with respect to the FHA.

Plaintiffs' reliance on a California decision and a Massachusetts decision is misplaced, but these cases also rely on the history of their jurisdictions in recognizing disparate impact claims. Of course, California and Massachusetts are separate states with separate fair housing laws with separate legislative histories, and Plaintiffs have not undertaken any comparison of California and Massachusetts' fair housing laws with the VFHL. Moreover, the court in *Sisemore v. Master Financial, Inc.*, 151 Cal. App. 4th 1386 (2007) noted that in California a disparate impact theory is recognized in the context of employment discrimination, and the court noted California specific legislative history in determining that a disparate impact theory is available under California's fair housing law. *Id.* at 1418-20. Likewise, the Court in *Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107 (2015) noted that other Massachusetts courts had recognized the disparate impact theory for claims other than fair housing. *Id.* at 407.

By contrast, Plaintiffs cannot direct this Court to a Virginia case, statute, or relevant legislative history suggesting disparate impact claims are available under the VFHL.

If Virginia wanted to create a disparate impact claim, the Virginia legislature could have done so. Instead, it chose not to create for the first time under Virginia law a claim for disparate impact. Accordingly, the VFHL claim must be dismissed because a disparate impact claim does not exist under the VFHL.

### B. Even Assuming This Court Creates a New Cause of Action Under The VFHL, Plaintiffs' VFHL Claim Fails

Even if this Court were to create a new cause of action under Virginia law for disparate impact under the VFHL, Plaintiffs fail to state a claim under the VFHL for the same reasons that Plaintiffs fail to state a claim under the FHA. *See supra.*

## III. Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1981

### A. Section 1981 Does Not Protect Illegal Aliens As a Class

Plaintiffs, as they did with respect to the FHA, concede that there is no claim under Section 1981 based on the status of being an undocumented immigrant. Instead, Plaintiffs assert that their Section 1981 claim is based on alienage and citizenship. Once again, this assertion is belied by the Complaint which focuses on the alleged effects of the policy on undocumented immigrants. Reference to the home countries of the Plaintiffs is made in passing in the Complaint and there is no assertion that Defendants intentionally discriminated against the Plaintiffs because they are from El Salvador or Bolivia. Indeed, the male Plaintiffs are from these countries and complied with the policy and signed leases. Nor are there any allegations of intentional discrimination based on non-citizenship in the United States. Again, the four male Plaintiffs – all noncitizens of the United States – had no issues complying with the policy and

signing leases. The basis for the Section 1981 claim is based on immigration status which the Plaintiffs concede is insufficient to state a claim under Section 1981.

### B. Undocumented Aliens Cannot Assert a Claim Under Section 1981

In any event, the Plaintiffs cite to no authority that allows an undocumented and/or illegal alien to assert a claim under Section 1981. The Second Circuit has confirmed that Section 1981 does not apply to illegal and/or undocumented aliens. *Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) ("If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage ***but of noncompliance with federal law***.") (emphasis added); *see also Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013) ("It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected class of aliens not lawfully present in this country."). The cases cited by Plaintiffs, such as *Duane*, involved Plaintiffs legally in the United States. Plaintiffs cite no authority expanding Section 1981 to undocumented or illegal immigrants. As discussed below, expanding Section 1981 in such a fashion would clash with federal law that criminalizes providing housing or employment to undocumented aliens.

### C. Plaintiffs Fail to Allege that Defendants Intended to Discriminate

Even assuming arguendo that illegal and/or undocumented aliens were a protected class under 42 U.S.C. § 1981, Plaintiffs fail to allege intentional discrimination based on alienage of citizenship. The paragraphs Plaintiffs cite in support of their claim that there is discrimination based on national origin do not tie any discrimination to Plaintiffs' origins from El Salvador and Bolivia. *See* Opp. at 24 (citing Compl. ¶¶ 64, 80, 90, 100). Rather, these paragraphs merely note Plaintiffs' origins. Moreover, the policy itself is facially silent on alienage or national origin. Accordingly, Plaintiffs' attempt to assert intentional discrimination based on national origin fails.

Likewise, Plaintiffs do not cite to any allegations in the Complaint demonstrating intentional discrimination based on citizenship, or more accurately, noncitizenship in the United States. Instead, Plaintiffs assert that the Policy discriminates against non-U.S. citizens because it only requires a social security card from U.S. citizens but requires other documents from non-U.S. Citizens. Opp. at 26 ("The Policy imposes only a nominal burden on U.S. Citizens, who typically receive Social Security cards around the same time as their birth certificates. Aliens and non-citizens are much less likely than U.S. citizens to possess Social Security cards, and must therefore typically contend with the more burdensome requirements of the Policy's second prong.").[5] This argument is nonsensical. The neutral policy provides a way for U.S. citizens and non-U.S. citizens to satisfy the policy so as to not discriminate against non-U.S. citizens. Indeed, the policy might be construed as discriminatory if the only way to satisfy the policy was to provide a social security card because non-U.S. citizens might not have a social security card and such a policy would only allow U.S. citizens to satisfy the policy. Indeed, Plaintiffs acknowledge that non-citizens might not have a social security card. *See* Opp. at 26. Therefore, Plaintiffs' policy rationally asks for other documents to complete criminal background and credit checks.[6]

Finally, Plaintiffs argue that there is intentional discrimination based on alienage or citizenship based on paragraph 71 of the Complaint. Opp. at 28. Yet, paragraph 71 does not support an inference of discrimination based on alienage or citizenship. Rather, the allegations of paragraph 71 discuss only "undocumented immigrants". Compl. ¶ 71. Plaintiffs' citation to this

---

[5] In *Doe v. Edgar*, the law required social security numbers but did not provide a substitute for social security numbers. 1989 WL 91805, at *1 (N.D. Ill. Aug. 4, 1989). Thus, the policy at issue here differs from *Doe v. Edgar* because it provides for submission of documents if an applicant does not have a social security card.

[6] Further, Plaintiffs' arguments regarding the difficulties of presenting an original I-94, *see* Opp. at 26-27, are not found in the allegations in the Complaint. Without amending the Complaint, Plaintiffs are asking this Court at the motion to dismiss stage to go outside the pleadings to consider to allegations not found the Complaint, which the Court cannot do. Further, Plaintiffs do not allege that any of the female Plaintiffs, who could not comply with the policy, presented an original passport and original U.S. Visa but could not comply with the policy because of difficulties obtaining an original I-94. Therefore, these arguments run counter to Plaintiffs' allegations.

paragraph further buttresses the fact that Plaintiffs are alleging discrimination against undocumented immigrants, not discrimination based on alienage or citizenship. *See* Compl. ¶¶ 39-40, 71.

Accordingly, Plaintiffs fail to state a claim for intentional discrimination under 42 U.S.C. § 1981.

### D.     The Male Plaintiffs Cannot Assert a § 1981 Claim

The male Plaintiffs cannot assert any intentional discrimination as a result of the policy because the male Plaintiffs who are alleged to be in the United States legally are not impacted at all by the policy. Plaintiffs do not address this issue. A party cannot assert a discrimination claim under § 1981 unless he is attempting to enforce his own contractual rights. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 480 (2006) ("Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's."); *Cannizzo v. Lab Corp. of Amer.*, 2007 WL 4617193, at *3 (D. Colo. Nov. 14, 2007) (husband had no standing to file Section 1981 claim based on alleged discrimination against his wife because he did not identify any impaired contractual relationship with the defendant under which he had rights); *See also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 348 (4th Cir. 2013) (principals of an LLC that operated restaurant did not have standing to bring a Section 1981 action alleging that their landlord, motivated by racial animus, interfered with the LLC's ability to contract with clientele and potential purchasers of LLC, even if the principals suffered personal damages as a consequence, because the principals, as agents of the LLC, had no rights under such contracts).

Plaintiffs' allegations acknowledge that the male Plaintiffs can comply with the policy and that they are not impacted by the policy. Yet, the male Plaintiffs assert that they are damaged

- 16 -

because their wives cannot comply with the policy because their wives are unwilling or unable to produce the required documents.

Accordingly, the male Plaintiffs cannot assert a § 1981 claim.

### E. Plaintiffs Do Not Allege Any Circumstantial Evidence of Intentional Discrimination

Plaintiffs do not allege any facts to support even a circumstantial inference that the policy was enacted to ***purposefully*** discriminate. Instead, Plaintiffs suggest that the policy itself is circumstantial evidence of intentional discrimination. Opp. at 28. As noted above, the facially neutral Policy provides a way for U.S. citizens and non-U.S. citizens to satisfy the policy so as to not discriminate against non-U.S. citizens. Plaintiffs' allegations acknowledge that policy is not a "pretext" for unlawful discrimination nor circumstantial evidence of intentional discrimination because as to the four male Plaintiffs – Latinos lawfully in the United States - the Policy had no effect on their ability to execute the leases attached to the Complaint. Indeed, Plaintiffs' "upon information and belief" allegation found in paragraph 28 of the Complaint, is belied by the fact that four of the male Plaintiffs could comply with the Policy – thus the effects of the Policy are not inevitable as Plaintiffs suggest. *See* Opp. at 28 (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 n. 25 (1979)). Further, the Plaintiffs here cannot allege circumstantial evidence of intentional discrimination by solely alleging disparate effects. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Accordingly, count IV must be dismissed.

### IV. Plaintiffs' Construction of the FHA, the VFHL and § 1981 is Inconsistent With Federal Immigration Law

Construing the FHA, the VFHL and Section 1981 as protecting illegal immigrants as a class would be inconsistent with current federal immigration law. *See* 8 U.S.C. § 1324, *et seq.* ("IRCA"). The IRCA has set criminal penalties for those who harbor illegal aliens ***or*** employ

illegal aliens. 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(3)(A). Thus, Congress has spoken with a clear policy against construing illegal aliens as a protected class. Plaintiffs cannot ignore this policy rationale.

Moreover, Plaintiffs do not dispute that the Fourth Circuit has interpreted 8 U.S.C. § 1324(a)(1)(A)(iii) broadly. Rather, Plaintiffs argue that the warnings provided to the landlord in *Aguilar* suggest a higher burden is needed for criminal liability for "harboring…aliens" under the IRCA. Opp. at 29 (citing *U.S. v. Aguilar*, 477 F. App'x 1000, 1002-03 (4th Cir. 2012)). Yet, the facts at issue in *Aguilar* are not a shield to criminal liability that landlords can deploy if they are concerned about their liability in housing illegal aliens. Moreover, the *Aguilar* decision notes that there is a split in the circuits on the elements of the crime of harboring under the IRCA. 477 F. App'x at 1002. Therefore, not only are the cases that Plaintiffs cite from the Second and Third Circuit not controlling in this Circuit, but clearly the circuits are not aligned on breadth of the definition of harboring. Landlords should be permitted to err on the side of caution.

Construing illegal aliens as a protected class would put landlords in between a rock and a hard place. If illegal aliens are a protected class under the FHA, the VFHL or § 1981, landlords would face criminal liability if they act in reckless disregard of the knowledge that they are housing illegal aliens but face the specter of a civil suit under the FHA, the VFHL or Section 1981 for asking for documents verifying legal status in the United States.[7] The Court should resist Plaintiffs' request for such an absurd result. *Chesapeake Ranch Water Co. v. Bd. of*

---

[7] If the Court construes undocumented aliens as a protected class under § 1981, employers would be in an especially difficult spot because § 1981 would be put directly at odds with 8 U.S.C. § 1324b which permits discrimination in employment practices against unauthorized aliens. 8 U.S.C. § 1324b ("It is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (***other than an unauthorized alien***…) (emphasis added). Thus, if an employer asked for documents justifying legal status to verify it was in compliance with the IRCA, the employer might be at risk of a civil suit by undocumented aliens under § 1981.

*Comm'rs of Calvert Cty.*, 401 F.3d 274, 280 (4th Cir. 2005) (stating the settled principle that statutes should not be construed in a manner that leads to absurd results).

## CONCLUSION

For the reasons set forth above, Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A. J. Dwoskin & Associates, Inc. respectfully request this Court to dismiss Counts I, II and IV of Plaintiff's Complaint with prejudice and for such other relief as is just and proper.

        Respectfully submitted,

WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP, WAPLES PROJECT LIMITED
PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of July, 2016, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
mdingman@reedsmith.com
jdebettencourt@reedsmith.com