IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ROSY GIRON DE REYES, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-563 |
| | ) | |
| WAPLES MOBILE HOME PARK | ) | |
| LIMITED PARTNERSHIP, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs, eight current or former residents of Waples Mobile Home Park ("the Park"), filed a six-count Complaint against the Park's owners and operators[1] in response to defendants' enforcement of a policy that, in plaintiffs' view, (i) impermissibly discriminates on the basis of race, national origin, alienage, and citizenship, (ii) violates the terms of their lease agreements, and (iii) violates Virginia law regulating mobile home parks. Specifically, the Complaint alleges the following causes of action:

- Count I: Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

- Count II: Violation of the Virginia Fair Housing Law, Va. Code § 36-96.3 *et seq.*;

- Count III: Violation of the Manufactured Home Lot Rental Act, Va. Code § 55-248.41 *et seq.*;

- Count IV: Violation of 42 U.S.C. § 1981;

- Count V: Breach of contract; and

- Count VI: Tortious interference with contract.

---

[1] Defendants are Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. These parties are referred to collectively as "defendants."

1

Defendants moved to dismiss Counts I, II, IV, and VI for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P. The motion has been fully briefed and argued orally, and the motion is therefore now ripe for disposition.[2]

## I.

Plaintiffs in this action are Jose Dagoberto Reyes, Rosy Giron de Reyes, Felix Alexis Bolanos, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz.[3] These eight individuals are the heads of four households that currently reside or once resided in the Park. All plaintiffs are non-citizen Latinos of Salvadorian or Bolivian national origin.

The Park is located in Fairfax, Virginia and provides a relatively low-cost option for housing when compared to other options in the surrounding area. This action focuses on a policy ("the Policy") that defendants began enforcing at the Park in 2015. Under the Policy, defendants require as a condition of entering into or renewing a lease at the Park that all adults living or seeking to live in the Park present either (i) an original social security card or (ii) an original passport, U.S. visa, and original arrival/departure Form I-94 or I-94W. Although defendants once applied the Policy only to leaseholders, in mid-2015 defendants began applying the Policy to all residents over the age of eighteen. As currently enforced, the Policy provides that all tenants of a mobile home lot in the Park must at the time of lease renewal (i) complete a new rental

---

[2] Plaintiffs did not oppose defendants' motion to dismiss Count VI, and Count VI was therefore dismissed with prejudice by Order dated July 22, 2016. *See Giron de Reyes v. Waples Mobile Home Park Ltd. P'ship*, No. 16-cv-563 (E.D. Va. July 22, 2016) (Order) (Doc. 34). That same Order took under advisement the motion to dismiss Counts I, II, and IV. *See id.*

[3] The facts recited here are derived from the Complaint, the factual allegations of which are assumed true for purposes of resolving a motion to dismiss. *See Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 827 (4th Cir. 2010).

application, (ii) submit the required documentation, and (iii) pass a criminal background and credit check. Tenants who cannot satisfy the Policy's documentation requirement have attempted without success to use alternative means of satisfying the Policy. For instance, some tenants have attempted to provide alternative documents such as an Individual Taxpayer Identification Number, an expired Form I-94, or old criminal background check reports. Defendants have declined to accept such documents as substitutes.

If a tenant cannot satisfy the Policy, defendants then issue a letter to the tenant affording the tenant twenty-one days to cure the deficiency; tenants who cannot do so are then given thirty days to vacate the Park. If defendants determine that a person who has not satisfied the Policy is living in the Park, then defendants inform the leaseholder of the lot on which the non-compliant tenant lives that the leaseholder's year-long lease will not be renewed and will instead convert into a month-to-month lease. Once the lease is converted to a month-to-month tenancy, leaseholders with non-compliant tenants are charged $300 per month above their former monthly rental rates.[4]

Each male plaintiff in this action satisfies the Policy, but each female plaintiff does not. In fact, the Reyes household vacated the Park under the threat of eviction because plaintiff Rosy Giron de Reyes could not satisfy the Policy. The remaining plaintiffs continue to reside at the Park, but they fear eviction or that they will be unable to afford to rent their lots because of the increased monthly charges associated with any tenant's non-compliance with the Policy.

---

[4] Counts III and V, which are not at issue in the instant motion, allege that this conversion to a month-to-month tenancy with altered monthly rental rates violates Virginia's Manufactured Home Lot Rental Act and the terms of plaintiffs' lease agreements.

In response to defendants' enforcement of the Policy, plaintiffs filed this lawsuit on May 23, 2016. Defendants' partial motion to dismiss attacks plaintiffs' Fair Housing Act, Virginia Fair Housing Law, and 42 U.S.C. § 1981 claims, each of which is addressed in turn.

## II.

Count I alleges that defendants' enforcement of the Policy violates the federal Fair Housing Act ("FHA"), which provides that it is unlawful, *inter alia*,

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). Under the FHA, "a landlord's housing practice may be found unlawful...either because it was motivated by a racially discriminatory purpose or because it is shown to have a disproportionate adverse impact on minorities." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984); *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015) (affirming that "disparate-impact claims are cognizable under the [FHA]"). In other words, FHA plaintiffs may pursue claims for either disparate treatment or disparate impact. *See Inclusive Cmties.*, 135 S. Ct. at 2525. The choice between these two approaches is not inconsequential, as "[t]he burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent." *Betsey*, 736 F.2d at 988. Specifically, whereas a disparate treatment defendant can "overcome a *prima facie* showing of discriminatory intent by articulating some 'legitimate non-discriminatory reason for the challenged practice,'" a disparate impact defendant "must prove a business necessity sufficiently compelling to justify the challenged practice." *Id.* Moreover, the threshold for a *prima facie* case of disparate impact is lower than the threshold for a *prima facie* case of disparate treatment

4

because in the former the defendant's intent is not part of the plaintiff's case. *See Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989).

Given these differences between disparate treatment and disparate impact claims, plaintiffs unsurprisingly couch their FHA claim primarily in terms of disparate impact. *See* Comp. ¶¶ 114-15. Where disparate impact theory properly applies, showing that a facially neutral policy causes a statistical disparity adverse to protected minorities is sufficient to make out a *prima facie* case of discrimination "because of" a plaintiff's protected status. *See Inclusive Cmties.*, 135 S. Ct. at 2523; *Holder*, 867 F.2d at 826. In this regard, to show that defendants' enforcement of the Policy—which targets illegal aliens—made housing unavailable to plaintiffs "because of race...or national origin,"[5] plaintiffs rely on statistics illustrating that illegal aliens are disproportionately Latino. *See* Comp. ¶¶ 58-63. In other words, defendants' enforcement of the Policy allegedly discriminates "because of race...or national origin" because the Policy aims at illegal aliens, the vast majority of whom are of Latino national origin, and thus disparately impacts Latinos.[6]

At the same time, a fair reading of the Complaint reflects that defendants' enforcement of the Policy is also alleged to constitute disparate treatment. This is so because (i) Count I can be read to say as much, *see* Comp. ¶ 113, (ii) the entire basis of plaintiffs' § 1981 claim is that defendants are engaged in intentional discrimination, and (iii) plaintiffs contend that the stated

---

[5] 42 U.S.C. § 3604(a).

[6] As plaintiffs point out, other courts "have treated claims of discrimination on the basis of being Latino as encompassing both race and national discrimination and have not differentiated between the two concepts." Comp. ¶ 113 n.21 (citing *Central Ala. Fair Housing Ctr. v. Magee*, 835 F. Supp. 1165, 1185 n.15 (M.D. Ala. 2011) (quotation marks and alterations omitted)). The following analysis proceeds as though both race and national origin are implicated by plaintiffs' FHA claim.

rationale for the Policy is merely a pretext for a discriminatory intent, *see* P. Opp. at 28. Nevertheless, the parties appear to agree that the thrust of plaintiffs' claim is based on the disparate impact theory, under which plaintiffs bear a lighter burden to state a *prima facie* case and defendants bear a heavier burden in justifying the Policy.

Defendants' motion to dismiss Count I focuses chiefly on whether the Complaint states a valid disparate impact claim. Specifically, defendants attack plaintiffs' reliance on a disparate impact theory on three grounds. First, defendants argue that recognition of plaintiffs' disparate impact claim would conflict with the policies of the United States Department of Housing and Urban Development ("HUD") and with certain criminal penalties under federal immigration law. Second, defendants maintain that in the context of this case, where the challenged Policy facially targets illegal aliens, Latinos cannot state a valid FHA disparate impact claim as a matter of law. And finally, defendants contend that even assuming a disparate impact claim is appropriate in this context, the allegations of a disparity alleged here are insufficient to state a plausible claim for relief. These arguments are addressed in turn.

### A.

Defendants first argue that recognizing plaintiffs' FHA claim requires the recognition of "illegal immigrants as a class" protected by the FHA, which would therefore create a conflict among certain federal laws and policies. D. Reply at 17. Specifically, defendants argue that (i) accepting plaintiffs' view about the scope of disparate impact liability under the FHA necessarily leads to the conclusion "that the policies of the HUD also violate the FHA because HUD explicitly excludes undocumented immigrants from participation in many of its programs," D. Reply at 7, and (ii) protecting illegal aliens under the FHA would be inconsistent with the

Immigration Reform and Control Act, which criminalizes the reckless harboring of such aliens. *See* 8 U.S.C. § 1324(a)(1)(A)(iii). These arguments fail.

First, permitting plaintiffs' FHA claims to proceed would not, as defendants contend, require the recognition of a new class—namely, illegal aliens—protected by the FHA. To be sure, the Policy challenged here draws a facially legitimate distinction on the basis of lawful presence in the United States. For the reasons discussed below, however, this facially lawful distinction may nonetheless be an impermissible pretext for discrimination on the basis of race or national origin—two classes that the FHA does protect. Thus, defendants' argument fails because it adopts a false premise, that plaintiffs' claims require the creation of a new class covered by the FHA's antidiscrimination provision.

Second, there is no conflict between HUD policies and the FHA. To be sure, HUD excludes illegal aliens from many of its programs because federal law prohibits HUD from "mak[ing] financial assistance available for the benefit of any alien unless that alien is a resident of the United States" and is lawfully present in this country. *See* 42 U.S.C. § 1436a(a). But this in no way creates a contradiction between HUD policies and the FHA. The latter prohibits discrimination in the provision of housing on the basis of, *inter alia*, race or national origin, whereas the former simply prohibits certain expenditures of funds based on an alien's unlawful presence, regardless of that alien's race or national origin.[7]

Finally, the federal prohibition on recklessly harboring illegal aliens, 8 U.SC. § 1324, does not require the conclusion defendants seek here. Once again, there is no conflict because the FHA prohibits discrimination on the basis of protected categories, such as race and national

---

[7] *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (holding that "national origin," as defined in Title VII's employment antidiscrimination provision, refers to a person's ancestry, not his citizenship status); *Inclusive Cmties.*, 135 S. Ct. at 2521 (observing that the text of Title VII's and the FHA's antidiscrimination provisions are nearly identical).

origin, whereas the prohibition against recklessly harboring illegal aliens focuses on an alien's lawful presence, not his race or ancestry. The FHA and § 1324(a)(1)(A)(iii) have different purposes and are not inconsistent. Nonetheless, it is worth noting that defendants' obligations under § 1324 may constitute a basis to argue that the Policy is supported by a legitimate non-discriminatory reason and is a business necessity.

In sum, neither the HUD policy regarding illegal aliens' ineligibility for certain financial assistance, nor § 1324(a)(1)(a)(iii) are a basis for dismissing plaintiffs' FHA claim.

**B.**

Defendants next argue that plaintiffs' FHA cause of action based on disparate impact must be dismissed for failure to state a claim. In this regard, defendants in essence argue that plaintiffs' disparate impact claim is inconsistent with the history and purpose of the judicially-created theory of disparate impact. Although this argument does not warrant threshold dismissal of plaintiffs' FHA claim, defendants' contention in this regard nonetheless must be carefully addressed, as it presents an important question as to the proper application of disparate impact theory to plaintiffs' FHA claim in the context of this case.

Analysis properly begins by recognizing that certain disparate impact claims are undoubtedly cognizable under the FHA to satisfy the statute's requirement that an actionable housing decision be made "because of" a protected status. *See Inclusive Cmties.*, 135 S. Ct. at 2525; *Betsey*, 736 F.2d at 986. Yet, importantly, it must also be noted that the Supreme Court has expressed concern about the scope and application of the disparate impact theory in certain circumstances. *See Inclusive Cmties.*, 135 S. Ct. at 2523. In this regard, the Supreme Court noted that FHA disparate impact claims are subject to a "robust causality requirement," which "protects defendants from being held liable for racial disparities they did not create." *Id.*

8

(quotation marks and alterations omitted). In other words, in determining whether the FHA permits a disparate impact cause of action, the Supreme Court in *Inclusive Communities* did not squarely address the limits or proper scope of such claims.

In this case, there are compelling reasons to conclude that plaintiffs' FHA disparate impact claim arises in a context different from that which prompted courts to apply the disparate impact theory to discrimination cases. Indeed, as the analysis that follows demonstrates, courts devised the disparate impact theory to ferret out long-entrenched racial discrimination that might otherwise have escaped scrutiny by using facially neutral policies to hide or shield already entrenched discrimination. Moreover, the analysis that follows also shows that allowing a disparate impact claim to operate in the context of this case would essentially erase the FHA's requirement that discrimination be "because of" race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(a). This is so for the obvious reason that the vast majority of illegal aliens in the United States are persons of Latino descent; thus, any policy that targets illegal aliens in the United States will disparately impact Latinos. In other words, allowing plaintiffs in this case to satisfy the FHA's causation element simply by proving that the Policy disparately impacts Latinos would effectively eliminate the statute's "because of" requirement, as essentially any policy aimed at illegal aliens will have a disproportionate effect on Latinos.

To begin with, it is important to note that disparate impact theory arose as a judicially-created doctrine to ferret out historically-entrenched racial discrimination that was perpetuated by facially neutral policies. The Supreme Court made this clear in the seminal case of *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). There, the Supreme Court interpreted Title VII to prohibit employment testing policies with unjustifiable and adverse disparate impacts regardless

of an employer's subjective intention to discriminate.[8] At issue in *Griggs* was the Duke Power Company's policy that only high school graduates who scored above a certain level on certain aptitude tests could be employed in higher wage and higher status positions within the company. *See* 401 U.S. at 427. In concluding that this policy violated Title VII, the Supreme Court in *Griggs* decided to apply the judicially-created disparate impact theory as a backward-looking doctrine concerned with "removing barriers that have operated in the past to favor an identifiable group," namely white employees. *See id.* at 429-30. The pre-existing barriers in *Griggs* were clear—the employees were segregated in the first instance through enforcement of a facially discriminatory policy, and the segregation endured because the *Griggs* plaintiffs "long received inferior education in segregated schools" as a result of *de jure* discrimination. *Id.* at 430. The Supreme Court observed that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* Thus, the goal of disparate impact, as *Griggs* tells it, is to remove long-entrenched barriers that are responsible for perpetuating the effects of past intentional discrimination.

_____

[8] It is interesting to note that the disparate impact theory was applied in the Title VII context as long ago as 1968. *See Quarles v. Philip Morris, Inc.*, 279 F. Supp. 505 (E.D. Va. 1968). There, African-American employees challenged their employer's seniority system as discriminatory because, in effect, it froze into place previously legal discriminatory practices. Before the enactment of Title VII, the employer in *Quarles* maintained a facially discriminatory policy that segregated African-Americans into certain less desirable departments. *See id.* at 514. Once such policies became illegal, the employer continued to enforce a facially neutral seniority policy which essentially maintained segregated departments, because the policy calculated an employee's seniority based on his length of service in his specific department. In finding this facially neutral policy unlawful, Judge Butzner, sitting by designation, reasoned that facially neutral seniority policies can "operate unfairly because of the historical discrimination that undergirds them." *Id.* at 518. Put simply, Judge Butzner concluded that in enacting Title VII, "Congress did not intend to freeze an entire generation of [African-American] employees into discriminatory patterns that existed before [Title VII]." *Id.* at 516.

The rationale for the disparate impact theory as articulated in *Griggs* and the underlying rationale for the FHA are essentially the same. *See Inclusive Cmties.*, 135 S. Ct. at 2521 ("Recognition of disparate-impact claims is consistent with the FHA's central purpose."). As the Supreme Court noted recently in *Inclusive Communities*, the FHA's purpose is to address the "vestiges" of "[d]e jure residential segregation by race" that remain "intertwined with the country's economic and social life." *See id.* at 2515. In other words, the disparate impact theory in FHA cases is designed to remove barriers to housing that endure as remnants of the country's tragic and regrettable history of state-sanctioned intentional discrimination. *See id.* at 2515-16.

Similarly, the facts in *Inclusive Communities* fit well within the conception of disparate impact theory as a doctrine designed to ferret out long-entrenched discrimination. The litigants in *Inclusive Communities* had disputed whether a Dallas low-income housing development should be built in the inner-city or in the suburbs. *Id.* at 2513. Specifically, the plaintiffs alleged that the Texas Department of Housing and Community Affairs, in determining where to place such developments, had perpetuated segregated housing patterns among whites and African-Americans. *Id.* at 2514. Thus, the Supreme Court in *Inclusive Communities* applied disparate impact theory as a means of ferreting out entrenched segregated housing patterns.

Also instructive in this regard is the Tenth Circuit's holding in *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250 (10th Cir. 1986). There, the Tenth Circuit recognized that disparate impact theory in Title VII cases is concerned with tearing down the "means by which historical discrimination is perpetuated." *Id.* at 1252. Thus, a plaintiff member of a "disfavored group" carries a lighter burden than does a member of a "favored group" in establishing a *prima facie* case of disparate impact. *Id.* Members of a historically disadvantaged group make out a *prima facie* case of disparate impact simply by showing that "a neutral practice has a disproportionate

11

impact on his or her class[.]" *Id.* By contrast, members of a historically favored group, such as white males, cannot make a *prima facie* case of disparate impact unless they show "background circumstances supporting the inference that a facially neutral policy with a disparate impact is in fact a vehicle for unlawful discrimination."[9] *Id.* This is so even though civil rights statutes "prohibit[] discrimination against groups that historically have not been socially disfavored." *Id.* (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). In other words, *Griggs*, *Inclusive Communities*, and *Livingston*, taken together, reflect that disparate impact theory is properly used to ferret out long-entrenched discrimination against historically disadvantaged groups.

Indeed, the Supreme Court has observed that, even within the Title VII context, in which the Supreme Court first recognized disparate impact theory as a viable cause of action, disparate impact claims are available only "in some cases." *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).[10] In sum, a review of the history, purpose, and application of the disparate impact theory

---

[9] This difference—between what must be shown by members of historically disfavored groups and by members of historically favored groups—arguably implicates constitutional questions about disparate impact theory that are neither reached nor decided here. It also bears mentioning that the Fifth Amendment "subject[s] to detailed judicial inquiry" all laws traceable to a racially discriminatory purpose, even if the motive is benign and even if the law is facially neutral. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Washington v. Davis*, 426 U.S. 229, 240 (1976). And it is widely accepted that disparate impact theory is racially allocative and encourages the use of quotas. *See, e.g.*, Richard Primus, Equal Protection and Disparate Impact: Round Three, 117 Harv. L. Rev. 493, 536 (2003) ("[L]egislation intended to break down inherited racial hierarchies...is at greater risk of being found to have an unconstitutional motive. Such motives are racially allocative."). Because it is "axiomatic that [the government] may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish," it is easy to see why the disparate impact theory may in certain circumstances present a constitutional problem under current equal protection doctrine. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Indeed, Justice Scalia once flagged these very concerns. *See Ricci v. DeStefano*, 557 U.S. 557, 594-96 (2009) (Scalia, J., concurring).

in discrimination cases reflects that the theory has properly been invoked and relied on in contexts—long-entrenched discrimination—very different from the context presented in this case.

Further demonstrating the proper limited scope of disparate impact theory in the FHA context is the fact that the Supreme Court has instructed that disparate impact claims are subject to a "robust causality requirement." *Inclusive Cmties.*, 135 S. Ct. at 2523. A robust causality requirement, as the Supreme Court puts it, "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quotation marks and alterations omitted). Plaintiffs' use of the disparate impact theory in this case is not consistent with a robust causality requirement; it operates instead to eliminate the statute's explicit requirement that the bar to housing be "because of" race or national origin. Indeed, to permit plaintiffs to use disparate impact in this case to establish causation results in essentially writing out of the FHA its robust causation requirement altogether. *See id.*

The Supreme Court in *Espinoza v. Farah Manufacturing Co.* wrestled with a similar causation problem in the employment discrimination context. *See* 414 U.S. 86 (1973). There, the Supreme Court was required to construe and apply Title VII's prohibition against employment discrimination "because of" a person's national origin. 42 U.S.C. § 2000e-2. In *Espinoza*—a post-*Griggs* case on appeal from summary judgment—a lawfully admitted resident alien

---

[10] As Justice Kennedy put it in *Ricci*, "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, *in some cases*, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." 557 U.S. at 577 (emphasis added). The Supreme Court further observed that "in *Griggs v. Duke Power Co.*, 401 U.S. 424 . . . the Court interpreted [Title VII] to prohibit, *in some cases*, employers' facially neutral practices that, in fact, are 'discriminatory in operation.'" *Id.* at 577-78 (emphasis added) (quoting *Griggs*, 401 U.S. at 431).

mounted a Title VII challenge to an employer's policy that all hires must be U.S. citizens. 414 U.S. at 87. The plaintiff, a Latina citizen of Mexico, had alleged that the employment policy discriminated against her "because of her 'national origin.'" *Id.* at 87-88. She relied on the Title VII provision which, like the FHA, prohibits discrimination "because of" national origin and race, but not alienage discrimination.[11] *See* 42 U.S.C. § 2000e-2(a)(1). In rejecting the plaintiff's discrimination claim, the Supreme Court held first that the term, "national origin," refers to a person's ancestry, not his citizenship. *Id.* at 88. Thus, even though Title VII permitted disparate impact claims,[12] the Supreme Court held that the disparate impact theory provided "no support" to the plaintiff, because there was "no indication in the record that [the] policy against employment of aliens had the purpose or effect of discriminating against persons of Mexican national origin." *Id.* at 92. Rather, the Supreme Court concluded that the plaintiff "was denied employment, not *because of* the country of her origin, but *because* she had not yet achieved United States citizenship." *Id.* at 93 (emphasis added). In other words, the employment policy's impact on a Latina from Mexico was only incidental to the policy's legitimate focus on non-citizens, and the employer could not be held liable for its policy's incidental adverse effect on a person of Latino national origin.

The *Espinoza* opinion, of course, does not directly address the Fair Housing Act, but the analogy between the discrimination provisions of Title VII and the FHA is extremely close. *See*

---

[11] Title VII, like the FHA, protects against discrimination "because of" race, color, religion, sex, or national origin. This statute, again, like the FHA, does not protect against discrimination "because of" citizenship or alienage. *See* 42 U.S.C. § 2000e-2. Of course, Title VII and the FHA are distinct in this manner from 42 U.S.C. § 1981, which prohibits discrimination against aliens and non-citizens, and is the subject of plaintiffs' Count IV, discussed *infra* Part IV.

[12] The Court specifically observed that Title VII "proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation." *Espinoza*, 414 U.S. at 92 (citing *Griggs*, 401 U.S 424).

*Inclusive Cmties.*, 135 S. Ct. at 2521. Thus, the causation logic articulated in *Espinoza* is persuasive here. Just as disparate impact theory could not carry the burden of showing that an employment policy discriminated "because of" national origin where the policy lawfully targeted non-citizens (and thereby incidentally affected a Mexican of Latino origin), the disparate impact theory can hardly meet the FHA's requirement to show discrimination "because of" race or national origin when a housing policy lawfully targets illegal aliens (the vast majority of whom, incidentally, are Latinos).

Judge Loken, in *Keller v. City of Freemont*—the precedent closest on point factually to this case—addressed the same issue. *See* 719 F.3d 931 (8th Cir. 2013). There, plaintiffs brought an FHA disparate impact claim to challenge a Nebraska city ordinance that made it "unlawful for any person or business entity to rent to, or permit occupancy by, 'an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law.'" *Id.* at 938. Judge Loken—the only member of the panel majority to reach the merits of the FHA claim[13]—concluded that a policy "that restricts or disadvantages aliens not lawfully present in the country has no…historic ties to the purposes of the FHA." *Id.* at 949. He continued, observing that there is

> no hint in the FHA's history and purpose that…a law or ordinance, *which is valid in all other respects*, violates the FHA if local statistics can be gathered to show that a disproportionate number of the adversely affected aliens are members of a particular ethnic group. In most cases today, that would of course be Latinos, but at various times in our history, and in various locales, the "disparate impact" might have been on immigrants from Ireland, Germany, Scandinavia, Italy, China, or other parts of the world. It would be illogical to impose FHA disparate

---

[13] The remaining judge in the *Keller* panel majority concluded that the plaintiffs there lacked standing to bring the FHA claim. *See Keller*, 719 F.3d at 951-53 (Colloton, J., concurring in part and concurring in the judgment).

impact liability based on the effect an otherwise lawful ordinance may have on a
sub-group of the unprotected class of aliens not lawfully present in this country.

*Id.* (citing *Espinoza*, 414 U.S 86).

As Judge Loken correctly recognized, the imposition of disparate impact liability for
policies that impact Latinos only incidentally to the impact on illegal aliens decouples disparate
impact theory from its original and central purpose. When properly applied, the disparate impact
theory should target only those policies with effects that cannot fairly be explained other than as
resulting at least in part "because of" a protected characteristic. *See* 42 U.S.C. § 3604(a);
*Inclusive Cmties.* 135 S. Ct. at 2523 (requiring a "robust causality requirement" to "protect[]
defendants from being held liable for racial disparities they did not create.") (quotation marks
and alterations omitted).

In the instant case, the disparate impact on plaintiffs *as Latinos* is incidental to the
Policy's effect on all illegal aliens. That is, a disparate impact exists as to Latinos because
Latinos have chosen in greater numbers than any other group to enter the United States
illegally.[14] Given the current correlation between the presence of illegal aliens in the United
States and the predominantly Latino national origin of the illegal alien population, it cannot
fairly be said—by the existence of a disparate impact alone—that a policy targeting illegal aliens
and thereby disproportionately making housing unavailable to a class of Latinos does so
"because of race...or national origin." 42 U.S.C. § 3604(a). To hold otherwise would, as
*Inclusive Communities* warns, eliminate a robust causality requirement and make defendants
answer for racial disparities they did not create.

---

[14] The Complaint recognizes this point in observing that "[a] strong link exists between the
undocumented immigrant population and the Latino population...." Comp. ¶ 61.

In summary, the history and purpose of disparate impact theory, and the application of that theory in the decided cases, make clear that it would be inappropriate to permit plaintiffs to use disparate impact theory alone to satisfy the FHA's "because of" requirement. Disparate impact theory, applied in this case, would be insufficient by itself to satisfy the FHA's causation requirement. This is not to say that landlords have free reign to discriminate against illegal aliens as Latinos, nor that Latinos or illegal aliens are categorically precluded from the benefits of the FHA, including the disparate impact theory. To the contrary, an illegal alien who can prove discrimination on the basis of his or her race or national origin is undoubtedly a "person" entitled to the benefit of the FHA's protection. *See* 42 U.S.C. § 3604(a) (protecting "any person"). Also, there may well be cases in which the adversity Latinos face in obtaining housing stems from the same sources of historical, state-sanctioned intentional discrimination faced by, for example, African-Americans. *Cf. Griggs*, 401 U.S. at 430 (noting the lasting effects of *de jure* educational segregation on African-American workers). In those cases, disparate impact theory may be sufficient, by itself, to carry the burden of satisfying the FHA's causation requirement. But in this case, the analysis here makes clear that plaintiffs cannot rely *solely* on disparate impact to satisfy the FHA's causation requirement; plaintiffs must still show that the Policy was instituted "because of" race or national origin.[15] In doing so, plaintiffs may use evidence of disparate impact, in addition to other proof, to meet their burden of demonstrating causation.

---

[15] Because plaintiffs cannot rely solely on the disparate impact theory to satisfy the FHA's causation requirement, defendants' alternative argument that the Complaint does not plausibly state a disparate impact claim is neither reached nor decided. It does warrant mentioning that the statistics alleged, which focus on the composition of the entire Commonwealth of Virginia, are likely insufficient to prove a disparate impact claim because they do not demonstrate a disparity in the community to which the Policy is applied. *See Edwards v. Johnston Cnty. Health Dep't*, 885 F.2d 1215, 1223 & n.20 (4th Cir. 1989); *Betsey*, 736 F.2d at 987. Yet, these figures may well be sufficient to support a plausible inference that the Policy is a pretext to discriminate against Latinos.

Although plaintiffs may not rely exclusively on disparate impact, the allegations in their Complaint are sufficient to state a claim under the FHA. Indeed, the Complaint alleges that plaintiffs have been denied renewals of their leases and subjected to increased monthly rates and threats of eviction that could—and for one set of plaintiffs, did—drive them from their homes. *See, e.g.*, Comp. ¶¶ 2, 53, 88, 107, 115. And as to defendants' motive or intent, the Complaint alleges that the Policy is a pretext for discrimination against Latinos. *See id.* ¶¶ 61-63. Indeed, the Policy challenged here draws a facially legal distinction on the basis of lawful presence in this country. It may well nonetheless be an impermissible pretext for discrimination on the basis of race or national origin. Thus, if defendants in this case establish a legitimate non-discriminatory reason or justification for the Policy, plaintiffs are entitled to attack it as pretextual, and to use any evidence, including evidence of disparate impact, to show that the apparently neutral Policy is in fact a pretext for intentional racial or national origin discrimination against plaintiffs. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

In essence, therefore, plaintiffs' complaint states a proper cause of action for a claim under the FHA. Although plaintiffs cannot rely solely on disparate impact to prove causation, they may use evidence of disparate impact to help prove that the Policy discriminates "because of" race or national origin, and to counter any claim of the Policy's legitimate, non-discriminatory reason or justification. For these reasons, defendants' motion to dismiss Count I is denied.

### III.

Count II alleges that defendants' enforcement of the Policy violates the Virginia Fair Housing Law ("VFHL"). Similar to the FHA, the VFHL makes it unlawful

> [t]o refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a

dwelling to any person because of race, color, religion, national origin, sex, elderliness, or familial status.

Va. Code § 36-96.3. The parties' arguments as to whether the Complaint states a disparate impact claim under the VFHL are essentially identical to the arguments they made regarding Count I, with the added wrinkle that it is unsettled whether the VFHL authorizes disparate impact liability at all. Assuming without deciding that the VFHL authorizes a cause of action based solely on disparate impact,[16] Count II states a claim for disparate treatment, and the evidence as to disparate impact may be used for Count II as it may for Count I—namely, to help establish causation or to counter any claim of the Policy's legitimate, non-discriminatory reason or justification. Disparate impact, however, cannot by itself satisfy the causation requirement in the VFHL. Plaintiffs will still have to prove that the bar to the sale or rental of space at the Park was "because of race [or] national origin[.]" *Id.* Thus, for the reasons previously stated, the motion to dismiss Count II must be denied.

## IV.

Count IV alleges that defendants' enforcement of the Policy violates 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State...to make and enforce contracts...as is enjoyed by white citizens...." Specifically, Count IV alleges intentional discrimination against aliens and non-citizens, which §

---

[16] There is good reason to think that the VFHL recognizes a disparate impact cause of action that is identical to the FHA's disparate impact cause of action. The relevant portion of the VFHL was enacted by the Virginia General Assembly in 1991 and tracks the operative language of the FHA almost word-for-word. *See* 1991 Va. Laws Ch. 557 (H.B. 1153). By the time of the VFHL's enactment, "all nine [federal] courts of appeals to have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims." *Inclusive Cmties.*, 135 S. Ct. at 2519 (observing that this was so as of 1988). As the Supreme Court noted in *Inclusive Communities*, where statutory language has been given a uniform and well-known interpretation by lower courts, the subsequent enactment of that same language is presumed to carry forward that interpretation. *See id.* at 2250.

1981 prohibits. *See Duane v. GEICO*, 37 F.3d 1036, 1044 (4th Cir. 1994) ("[W]e conclude that section 1981 prohibits private discrimination against aliens[.]"). To state a claim under § 1981, the Complaint must allege both (i) that defendants "intended to discriminate" on the basis of citizenship and alienage and (ii) "that the discrimination interfered with a contractual interest." *See Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006). Consistent with these requirements, the Complaint alleges sufficient facts to support the plausible inference that defendants violated § 1981.

The Complaint alleges that the Policy is designed to be more burdensome on non-citizens than on citizens to the point that non-citizens are essentially excluded from qualifying to lease a lot in the Park. *See* Comp. ¶¶ 26-39. Specifically, whereas citizens need only obtain a Social Security card (which any citizen can obtain for free), non-citizens must present three documents, namely (i) a passport, (ii) a U.S. visa, and (iii) an original I-94 or I-94W "arrival/departure" form. *Id.* ¶ 27. In this regard, the burden arises from the fact that copies of original I-94 and I-94W forms cost $330, and aliens with immigrant visas do not even need to acquire I-94 or I-94W forms in the first instance.[17] Moreover, the Complaint alleges that the Policy's burdensome design is inconsistent with its stated purpose to facilitate criminal background and credit checks in that those objectives could be achieved via less burdensome means. *See id.* ¶ 39. Thus,

---

[17] At the same time, plaintiffs appear to concede that immigrant visa holders can obtain Social Security cards, which mitigates the burden on these aliens. *See* P. Opp. at 27. It is also worth noting that the allegations about the difficulty in obtaining I-94 forms are not found in the Complaint and are raised for the first time in plaintiffs' memorandum in opposition to dismissal. Yet, because plaintiffs rely on federal government publications for their information, these facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and therefore it is appropriate to take judicial notice of this information. *See* Rule 201(b)(2), Fed. R. Evid.; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that it is appropriate on a motion to dismiss to consider "matters of which a court may take judicial notice").

plaintiffs contend that the Policy is a pretext to remove aliens and non-citizens from the Park. The Complaint further alleges that an agent of the Park rationalized the Policy on the ground that illegal aliens "might be criminals," which in plaintiffs' view evinces an intent to discriminate against aliens.[18] *Id.* ¶ 71.

The Complaint's allegations of intentional discrimination on the basis of alienage or non-citizenship, though not conclusive, are nonetheless sufficient to state a plausible claim under § 1981. Although each of the plaintiff husbands is a foreign national and non-citizen who satisfies the Policy and therefore qualifies to enter into a lease, the Complaint alleges improper denial of year-long lease renewals on the basis that the plaintiff wives do not satisfy the Policy. *See, e.g.*, Comp. ¶¶ 51-53, 73, 79, 85, 95, 107. One plausible and reasonable inference, therefore, is that defendants are attempting to reduce the number of aliens or non-citizens in the Park via enforcement of the Policy because even though certain members of immigrant households will satisfy the Policy, if only one member does not satisfy the Policy then the entire family will likely vacate the Park. To be sure, the fact that the Park would, in general, enter into a contract with the alien non-citizen husband plaintiffs also supports a reasonable inference of intent to discriminate against *only* illegal aliens, which § 1981 permits. *Cf. Anderson*, 156 F.3d at 180.

---

[18] Of course, illegal aliens are in fact criminals, albeit not necessarily dangerous or convicted ones. *See* 8 U.S.C. § 1325(a) (making unauthorized entry into the United States by an alien a crime). Moreover, as defendants correctly note, the statement alleged is specific to illegal aliens and therefore suggests, at most, an intent to discriminate only against illegal aliens. *Cf. Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) (refusing to contract on the basis of unlawful presence in the United States is permissible discrimination on the basis of immigration status, not illegal discrimination on the basis of a protected characteristic). In any event, at the motion to dismiss stage in which all reasonable inferences are drawn in the non-movant's favor, there is a reasonable and plausible inference here that the alleged statement by the Park's agent conveys a general intent to reduce the number of aliens in the Park for fear of increased crime. Of course, defendants are free to attempt to rebut this inference on the merits.

But at this stage, the allegations are sufficient to state a plausible claim that can proceed to the merits.[19]

Accordingly, Count IV states a plausible claim for relief under § 1981, and defendants' motion to dismiss Count IV must therefore be denied.

**V.**

For the foregoing reasons, defendants' partial motion to dismiss Counts I, II, and IV must be denied.

An appropriate Order will issue.

Alexandria, Virginia
September 1, 2016

/s/

T. S. Ellis, III
United States District Judge

---

[19] Defendants also argue that plaintiffs' § 1981 claim, like plaintiffs' FHA cause of action, requires the recognition of a new protected class—illegal aliens—which would create a conflict between § 1981 and federal immigration law. D. Reply at 17. Defendants are correct in observing that § 1981 does not protect illegal aliens as a class, but incorrect in arguing that plaintiffs' § 1981 claim in this case requires the creation or recognition of such a class. Rather, a person's alienage and citizenship are distinct from that person's immigration status. Of course, as previously stated, defendants are free to argue at the merits stage that the Policy was intended to discriminate only against illegal aliens, and thus does not run afoul of § 1981.