**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 1:16cv00563-TSE-TCB |
| WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS ...........................2

PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS................5

LEGAL STANDARD...........................................................................................................9

SUMMARY OF ARGUMENT .............................................................................................10

ARGUMENT .....................................................................................................................11

I.    Plaintiffs are Entitled to Summary Judgment on their FHA Claim Under a
      Disparate Impact Theory; Triable Issues of Material Fact Remain as to the FHA
      Claim Under a Disparate Treatment Theory.................................................................11

      A.    Plaintiffs are Entitled to Summary Judgment on their FHA Claim Based
            on a Disparate Impact Theory..............................................................................13

            1.    Plaintiffs Have Made Out a Prima Facie Case of Disparate Impact..........14

            2.    Defendants' Business Justification for the Policy is Pretextual................17

      B.    Defendants are Not Entitled to Summary Judgment on Plaintiffs' FHA
            Claim Based on a Disparate Treatment Theory....................................................22

      C.    Plaintiffs Have Standing Under the FHA. ..........................................................25

II.   Plaintiffs are Entitled to Summary Judgment on their VFHL Claim................................25

III.  Triable Issues of Material Fact Remain as to Plaintiffs' § 1981 Claim.............................26

IV.   Plaintiffs Are Entitled to Summary Judgment on Their MHLRA and Breach of
      Contract Claims. ......................................................................................................27

      A.    Defendants unlawfully placed Plaintiffs on month-to-month leases. ...................27

      B.    Defendants' contention that Plaintiffs misled them is factually inaccurate..........29

CONCLUSION..................................................................................................................30

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abi-Njam v. Concord Condominium, LLC,*
   699 S.E.2d 483 (Va. 2010)..................................................................28

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................................9

*Beaird v. Seagate Tech., Inc.,*
   145 F.3d 1159 (10th Cir. 1998) ..........................................................21

*Betsey v. Turtle Creek Assoc's,*
   736 F.2d 983 (4th Cir. 1984) ................................................13, 17, 22

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................9

*Connecticut v. Teal,*
   457 U.S. 440 (1982)..........................................................................24

*Corey v. Sec., U.S. Dep't of Housing & Urban Development ex rel. Walker,*
   719 F.3d 322 (4th Cir. 2013) .............................................................13

*DeJarnette v. Corning Inc.,*
   133 F.3d 293 (4th Cir. 1998) .............................................................24

*Dennis v. Columbia Colleton Med. Ctr., Inc.,*
   290 F.3d 639 (4th Cir. 2002) .............................................................21

*Desert Palace, Inc. v. Costa,*
   539 U.S. 90 (2003)............................................................................22

*Evans v. Technologies Applications & Serv. Co.,*
   80 F.3d 954 (4th Cir. 1996) ..............................................................24

*Foster v. Univ. of Md.-Eastern Shore,*
   787 F.3d 243 (4th Cir. 2015) .............................................................14

*Gallagher v. Magner,*
   619 F.3d 823 (8th Cir. 2010) .............................................................15

*Gen. Analytics Corp. v. CNA Ins. Cos.,*
   86 F.3d 51 (4th Cir. 1996) ................................................................22

*George Robberecht Seafood, Inc. v. Maitland Bros. Co.,*
   255 S.E.2d 682 (Va. 1979)................................................................28

*Giron de Reyes v. Waples Mobile Home Park Ltd. P'Ship,*
   No. 1:16cv-563, 2016 WL 4582049 (E.D. Va. Sept. 1, 2016) ....................... passim

*Groves v. Commc'n Workers of Am.*,
   815 F.3d 177 (4th Cir. 2016) ...................................................................................9

*Holder v. City of Raleigh*,
   867 F.2d 823 (4th Cir. 1989) .................................................................................12

*Holland v. Washington Homes, Inc.*,
   487 F.3d 208 (4th Cir. 2007) ................................................................................20

*Jackson Jr. v. Corp. Serv. Co.*,
   No. H-11-4404, 2013 WL 11309365 (S.D. Tex. Apr. 7, 2013)..............................24

*Johnson v. Garraghty*,
   57 F. Supp. 2d 321 (E.D. Va. 1999) ....................................................................27

*Johnson v. Toys R' Us-Delaware, Inc.*,
   95 F. App'x 1 (4th Cir. 2004) ..............................................................................26

*Keller v. City of Fremont*,
   719 F.3d 931 (8th Cir. 2013) ...............................................................................25

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)..........................................................................13, 14, 22, 26

*Merritt v. Old Dominion Freight Line, Inc.*,
   601 F.3d 289 (4th Cir. 2010) ...............................................................................22

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
   658 F.3d 375 (3d Cir. 2011) ................................................................................15

*Murrell v. Ocean Mecca Hotel Inc.*,
   262 F.3d 253 (4th Cir. 2001) ...............................................................................26

*N.C. State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ...............................................................................23

*O'Connor v. Consolidated Coin Caterers Corp.*,
   517 U.S. 308 (1996)............................................................................................24

*Office of Atty. Gen., Div. of Consumer Counsel v. State Corp. Comm'n*,
   762 S.E.2d 774 (Va. 2014)..................................................................................27

*Reeves v. Sanderson Plumbing Prod's, Inc.*,
   530 U.S. 133 (2000)............................................................................................22

*Texas Dept. of Community Affairs v. Burdine*,
   450 U.S. 248 (1981)............................................................................................20

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
   135 S. Ct. 2507 (2015)...........................................................................12, 13, 16, 17

*Washington v. Davis*,
   426 U.S. 229 (1976)............................................................................................23

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988)........................................................................14, 17, 19

*Williams v. Cerberonics, Inc.*,
    871 F.2d 452 (4th Cir. 1989) ..........................................................14, 26

*Wright v. Nat'l Archives & Records Serv.*,
    609 F.2d 702 (4th Cir. 1979) .................................................................11

*Zuniga v. Kleberg County Hosp., Kingsville, Tex.*,
    692 F.2d 986 (5th Cir. 1982) .................................................................19

## <u>Statutes</u>

8 U.S.C. § 1324.............................................................................................25

42 U.S.C. § 1981....................................................................2, 11, 20, 26

24 C.F.R. §100.500.....................................................................13, 16, 17

Fed. R. Civ. P. 56............................................................................................9

Va. Code § 55-248.42:1.............................................................................27

Va. Code § 55-248.46.........................................................................27, 28

Va. Code § 55-248.50:1.............................................................................29

Plaintiffs, by their attorneys, respectfully submit this Memorandum of Law in opposition to Defendants' motion for summary judgment on all counts of the complaint and in support of Plaintiffs' cross-motion for summary judgment on Counts I, II, III and V.

## <u>INTRODUCTION</u>

Defendants attempt to create an alternative reality where the policy they used to select and approve residential applicants ("Policy") only affected undocumented immigrants.  That is not the case.  Instead, the summary judgment record confirms that the Policy disproportionately impacts Plaintiffs and other Latinos, many of whom are lawfully present in this country, and their ability to live in Waples Mobile Home Park (the "Park") to the point where Plaintiffs faced unjustified rent increases and eviction from their homes.  The record is devoid of a single coherent justification for the Policy and the burdens that it imposes not only on individuals without Social Security cards, but also on their spouses and children.

Plaintiffs are entitled to summary judgment on Counts I, II, III and V.  With respect to Count I—the Fair Housing Act ("FHA") claim—under a disparate impact theory, the summary judgment record shows a specific causal link between the Policy and its unequal impact on Latino tenants.  The record further demonstrates that any proffered business necessity Defendants offer is pretextual, given the significant number of less discriminatory alternatives at their disposal.  Because the Virginia Fair Housing Law ("VFHL") mirrors the FHA, Plaintiffs are also entitled to summary judgment on Count II.   Alternatively, were this Court to deny Plaintiffs' cross-motion on Counts I and II, triable issues of material fact remain on each under a disparate treatment theory, because the documentation required from individuals lacking Social Security cards, coupled with the Policy's breadth, is evidence of discriminatory intent.

As for Counts III and V—the Manufactured Home Lot Rental Act ("MHLRA") and breach of contract claims, respectively—Plaintiffs are entitled to summary judgment because the

undisputed facts show that Defendants ignored mandatory statutory procedures governing the process for terminating leases.  Defendants' placement of Plaintiffs onto month-to-month leases was not a magnanimous gesture, but instead a violation of the law.  Finally, Defendants' motion for summary judgment on Count IV, under 42 U.S.C. § 1981, should be denied, as Plaintiffs have adduced sufficient evidence of discriminatory intent to proceed to trial on that claim.

## **RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

1.      Undisputed that the Policy, as written, is facially neutral.  Disputed that it was applied neutrally.  *See* **Ex. 1** (Waples 2016 File Review); **Ex. 2** (Yacub Decl.) ¶¶ 18-26; **Ex. 8** (Reyes Decl.) ¶¶ 11-23; **Ex. 9** (Bolaños Decl.) ¶¶ 11-17; **Ex. 10** (Saravia Decl.) ¶¶ 12-17; **Ex. 11** (Moya Decl.) ¶¶ 11-17; **Ex. 12-14** (Resident Screening Reports for Male Plaintiffs); **Ex. 15** (CoreLogic Credit Reports).

2– 9.   Undisputed.

10.     Disputed.  The cited testimony does not support Defendants' asserted fact.  For example, Felix Alexis Bolaños ("Mr. Bolaños") testified that his wife could not comply with the Policy because she did not have a Social Security card.  **Ex. 16** (Bolaños Dep. Tr.) at 29:12-15; 30:6-13.  Moreover, the documents the Policy requires from applicants without Social Security cards are poor indicators of legal presence.  **Ex. 2** ¶¶ 25-26; **Ex. 3** (Future Resident Information Guide).

11.     Undisputed.

12.     Undisputed prior to 2015, when the Policy was not being enforced.  Disputed once Defendants began enforcing the Policy.  **Ex. 4-7** (Violation letters to Male Plaintiffs).

13–18.  Undisputed.

19.     Disputed.  Defendants specifically instructed Mr. Bolaños not to list his wife on his lease application.  **Ex. 16** at 40:22-41:4.

2

20.    Disputed.  The leases were also made based on Plaintiffs' oral representations. Mr. Bolaños told Defendants' leasing agent at move-in that his wife would be living with him despite not having the required documents.  **Ex. 16** at 20:19-23:1; 40:22-41:4; 49:1-6.  The same was true of both Herbert David Saravia Cruz ("Mr. Saravia") and Esteban Ruben Moya Yrapura ("Mr. Moya").  **Ex. 17** (Saravia Application for Residency); **Ex. 18 (**Saravia Dep. Tr.) at 39:3-5; 86:22-88:22; **Ex. 19** (Moya Dep. Tr.) at 35:22-36:4, 75:19-76:4.  And Defendants renewed Jose Dagoberto Reyes's ("Mr. Reyes's") lease in 2014 even though his wife lacked documentation on the condition that the renewal was kept quiet.  **Ex. 20** (J. Reyes Dep. Tr.) at 34:5-12; 58:5-59:4.

21.    Undisputed as to Mr. Reyes and Mr. Moya.  Undisputed as to Mr. Bolaños, who was told to not list his wife on the application.  **Ex. 16** at 40:22-41:4.  Disputed as to Mr. Saravia, who listed his wife, Rosa Elena Amaya ("Ms. Amaya"), on his application.  **Ex. 17**.

22.    Undisputed.

23.    Disputed.  Mr. Bolaños informed Defendants that his wife would live with him, and was told that it was "fine" to omit her from the application.  **Ex. 16** at 40:22-41:4.  Mr. Saravia listed his wife as an occupant on the application.  **Ex. 17**.  Mr. Moya testified that he did not list his wife on his lease application because he thought his wife would have to fill out her own application.  **Ex. 19** at 39:9-40:5.  Mr. Reyes testified that he did not list his wife on the lease application because she did not move in with him right away; when she did, he informed the property manager, Josephine Giambanco.  **Ex. 20** at 33:10-36:10.

24.    Disputed.  Defendants notified Plaintiffs that that they would be charged an additional $300 a month, and only agreed not to charge this amount during the pendency of this litigation.  Dkt. 18; **Ex. 21** (Jones Dep. Tr.) at 186:22-187:4; **Ex. 22** (March 11, 2016 $300

surcharge letter); **Ex. 49** (March 12, 2016 Letter from nonprofit group urging Defendants to cease evictions).

      25–26. Undisputed.

      27.    Disputed.  Mr. Bolaños testified that Defendants discriminated against him



because his ▬▬▬▬▬▬ and that Defendants made him ▬▬▬▬▬▬ **Ex. 16** at 39:3-7.  Mr. Moya testified that he was never ▬▬▬▬▬▬ ▬▬▬ because he was Latino, but further testified that he had to pay $100 more each month because his wife did not have a Social Security number.  **Ex. 19** at 23:14-19; 56:1-9.  And when Mr. Reyes was asked if he was treated differently because he was Hispanic or Latino, he answered ▬▬▬▬ **Ex. 20** at 30:15-19.  Mr. Reyes also testified that he had to pay an extra $100 per month because his wife lacked a Social Security number.  *Id.* at 61:16-21.

      28.    Undisputed.

      29.    Disputed.  Mr. Bolaños testified that his wife was discriminated against because



▬▬▬▬▬ and answered ▬▬▬▬ when asked ▬▬▬▬▬▬ ▬▬▬▬▬▬▬ **Ex. 16** at 31:4-7; 34:8-18. Mr. Moya answered ▬▬▬▬ when asked if the issue with his wife had to do with legal presence, and further testified that his lease was not renewed because his wife did not have a Social Security number.  **Ex. 19** at 24:5-9, 28:2-15. Mr. Reyes testified that he was told that his wife could not live at the Park because she is an undocumented immigrant, and that he had to pay an extra $100 in rent each month because his wife did not have a Social Security number. **Ex. 20** at 31:18-32:2, 61:1-21.

      30–32. Undisputed.

33.     Disputed as to Yovana Jaldin Solis ("Ms. Solis"), who simply testified that nobody ▆▆▆▆▆▆ told her that she could not sign the lease because she was a non-citizen. **Ex. 23** (Solis Dep. Tr.) at 79:8-12.  Undisputed as to Rosy Giron de Reyes ("Ms. Reyes") and Ruth Rivas ("Ms. Rivas").

34.     Disputed.  Ms. Amaya testified that she was told ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆ **Ex. 24** (Amaya Dep. Tr.) at 34:16-35:4.

35-37.  Undisputed.

38.     Disputed.  The IRS requires the applicant to either submit an actual passport or bring the passport to a designated office for inspection.  **Ex. 2** ¶ 8.

**PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      The Policy requires applicants without Social Security numbers ("SSNs") to provide an original passport, original U.S. visa, and original arrival/departure form (I-94).  **Ex. 3**.

2.      Defendants' President and CEO is unaware of any other residential property management company that has a similar policy.  **Ex. 25** (Dwoskin Dep. Tr.) at 85:15-17; 86:1-12; 88:13-89:12.

3.      Although the Policy had been in place for years, Defendants only began strictly enforcing it and applying it to renewal applicants in 2015.  **Ex. 21** (Jones Dep. Tr.) at 44:11-46:7; **Ex. 25** at 53:9-11; **Ex. 26** (Giambanco Dep. Tr.) at 50:11-14; 51:25-52:8; **Ex. 27** (Easton Dep. Tr.) at 123:12-14, 186:7-14.

4.      Neither incident prompting the Policy's enforcement involved undocumented immigrants.  **Ex. 21** at 44:20-46:7; **Ex. 25** at 27:7-28:7; **Ex. 27** at 186:17-187:9.

5.      Each of the male Plaintiffs passed a criminal background check.  **Ex. 12-14**.

6.      Each of the male Plaintiffs, on his own, had sufficient income and credit to rent a lot from Defendants.  **Ex. 12-15**.

7.      All of the male Plaintiffs have SSNs. **Ex. 28-31** (Male Plaintiffs' Social Security cards).

8.      All of Plaintiffs' children are U.S. citizens with SSNs.  **Ex. 8** ¶ 3; Ex. **9** ¶ 3; **Ex. 10** ¶ 3; **Ex. 11** ¶ 3.

9.      Defendants knew that Mr. Saravia's wife lived with her husband as early as 2012. **Ex. 17**; **Ex. 18** at 39:3-5; **Ex. 32** (2014 Home Inspection of Mr. Saravia).

10.     Defendants knew that Mr. Reyes's wife was living with her husband as early as 2014.  **Ex. 8** ¶ 12; **Ex. 20** at 49:9-22; 58:5-59:4; **Ex. 33** (June 17, 2015 Letter notifying Mr. Reyes that his wife would be added to his account for water billing purposes).

11.     Defendants knew that Mr. Bolaños's wife was living with her husband as early as 2011, and told Mr. Bolaños not to list his wife on his lease application.  **Ex. 16** at 20:19-23:1; 40:22-41:13; 49:1-8.

12.     Defendants knew that Mr. Moya's wife lived with her husband from 2011 through 2016.  **Ex. 19** at 35:22-36:4, 75:19-76:4.

13.     Defendants did not accept Plaintiffs' efforts to comply with the Policy by providing alternative forms of identification.  **Ex. 16** at 59:7-9; **Ex. 20** at 50:7-53:2; **Ex. 34** (February 4, 2016 Letter to Mr. Reyes).

14.     In March 2015, Defendants placed the Reyes family on a month-to-month lease and increased their rent by $100 per month because Ms. Reyes was unable to meet the Policy's demands.  **Ex. 8** ¶¶ 17-21; **Ex. 50** (2014-2015 Mobile Home Lease Agreement between Mr. Reyes and Defendants); **Ex. 51** (Mr. Reyes's Resident Ledger) at 4-6.

15.    On March 2, 2016, 29 days before the Bolaños family's year-long lease was set to renew automatically, Defendants placed the Bolaños family on a month-to-month lease and increased their rent by $100 per month because Ms. Rivas was unable to meet the Policy's demands. **Ex. 5** (March 2, 2016 Letter to Mr. Bolaños); **Ex. 35** (2015-2016 Mobile Home Lease Agreement between Mr. Bolaños and Defendants).

16.    On January 18, 2016, 13 days before the Moya family's year-long lease was set to renew automatically, Defendants placed the Moya family on a month-to-month lease and increased their rent by $100 per month because Ms. Solis was unable to meet the Policy's demands. **Ex. 19** at 56:5-14; **Ex. 4** (January 18, 2016 Letter to Mr. Moya); **Ex. 36** (2015-2016 Mobile Home Agreement between Mr. Moya and Defendants); **Ex. 45-46** (2011-2012 and 2014-2015 Mobile Home Agreements between Mr. Moya and Defendants).

17.    On January 18, 2016, 13 days before their year-long lease was set to renew automatically, Defendants placed the Saravia family on a month-to-month lease and increased their rent by $100 per month because Ms. Amaya was unable to meet the Policy's demands. **Ex. 26** at 89:1-5; **Ex. 6** (January 18, 2016 Letter to Mr. Saravia); **Ex. 37** (2015-2016 Mobile Home Agreement between Mr. Saravia and Defendants); **Ex. 47-48** (2012-2013 and 2014-2015 Mobile Home Agreements between Mr. Saravia and Defendants).

18.    After Plaintiffs were subjected to the $100 monthly rent surcharge, Defendants notified Plaintiffs that their rent would increase again, this time by $300 per month, more than one-third of the monthly rent. **Ex. 22** (March 11, 2016 $300 Surcharge Letter).

19.    The Reyes, Bolaños, and Saravia families were forced to move out of the Park because of rent increases and threats of eviction. **Ex. 16** at 83:15-83:20, 84:9-15; **Ex. 20** at 61:1-

62:8; **Ex. 26** at 211:12-21; **Ex. 38** (January 27, 2016 Letter to Mr. Reyes and all Occupants); **Ex. 39** (January 27, 2016 Letter from Mr. Saravia listing mobile home for sale).

20.     The Policy disproportionately impacts Latinos. **Ex. 40** (Clark Decl.) ¶ 6, Exs. B, C.

21.     The overwhelming majority of individuals who could not comply with the Policy were Latino. **Ex. 26** at 161:10-165:5; **Ex. 41** (September 2016 list of noncompliant Park tenants).

22.     Defendants assert that the Policy is necessary to confirm applicants' identities, perform credit and criminal background checks, and minimize loss from eviction. **Ex. 21** at 139:16-140:12; **Ex. 42** (Defs.' Resps. to Pls.' First Set of Interrogs.) at 2.

23.     A SSN is not required to perform a credit or criminal background check. **Ex. 21** at 102:11-104:8; **Ex. 43** (CoreLogic Training Manual) at 67; **Ex. 44** (Bustany Decl.) ¶ 6.

24.     Defendants have run criminal background checks without SSNs. **Ex. 21** at 87:7-11; 102:11-103:13; 104:4-8; **Ex. 27** at 86:9-22.

25.     Defendants do not run credit checks for renewal applicants. **Ex. 21** at 113:17-114:6; **Ex. 27** at 187:10-14.

26.     SSNs are subject to identity theft and have no identifying picture. **Ex. 27** at 160:17-21; **Ex. 43** at 13-14.

27.     Defendants did not use SSNs to verify identity. **Ex. 21** at 122:8-13; 123:11-124:10.

28.     As recently as 2013, Defendants accepted individual taxpayer identification numbers ("ITINs") from applicants who did not have SSNs. **Ex. 21** at 89:21-90:11.

29.    ITINs are just as effective as SSNs for the purpose of running background checks. **Ex. 21** at 102:11-103:13; **Ex. 44** ¶ 6.

30.    Defendants did not use passports, visas, or I-94s to conduct background checks. **Ex. 27** at 36:20-37:10.

31.    The documents required from applicants without SSNs "are not good evidence of legal presence." **Ex. 2** ¶ 25; *id.* ¶ 20.

32.    Defendants were unaware of the MHLRA before this litigation. **Ex. 21** at 187:20-188:4, 205:4-16, 213:21-214:9; **Ex. 26** at 207:20-209:10; **Ex. 27** at 192:2-194:2.

33.    After this case was filed, Defendants realized that they improperly converted Plaintiffs' leases into month-to-month leases, but Defendants never considered reimbursing Plaintiffs their improperly charged month-to-month fee. **Ex. 21** at 213:21-217:12; **Ex. 26** at 210:9-211:9.

34.    The female Plaintiffs' presence in the Park did not affect the health, safety, or welfare of others. **Ex. 26** at 140:10-141:5.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When adjudicating a motion for summary judgment, courts must view "the facts in the light most favorable to the nonmoving party." *Groves v. Commc'n Workers of Am.*, 815 F.3d 177, 181 (4th Cir. 2016). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal

9

citations and quotation marks omitted).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

## SUMMARY OF ARGUMENT

Plaintiffs are entitled to summary judgment on their federal FHA claim and VFHL[1] claim under a disparate impact theory.  The record establishes a sufficient causal nexus between the Policy and its disproportionate impact on Latino tenants.  Critically, this impact included saddling several legally present Plaintiffs—namely the four male Plaintiffs and Plaintiffs' ten children—with increased rent and eviction.  The Policy has forced three of the four Plaintiff families to move and they have incurred substantial costs in the process.  The fourth family, meanwhile, faces eviction unless it vacates by January 31, 2017.  Moreover, Plaintiffs have demonstrated that the business necessity offered as a justification for the Policy—conducting background checks—is pretextual.  Indeed, uncontroverted record evidence shows that Defendants ran background checks for years without SSNs.  In addition, no explanation appears in the record for why the male Plaintiffs and Plaintiffs' children—all of whom have SSNs—were subject to the Policy's consequences.  It is undisputed that the male Plaintiffs had already passed credit and criminal background checks; yet, they were still subjected to increased rent and eventual eviction.

Plaintiffs are also entitled to summary judgment on their MHLRA and breach of contract claims because Defendants flouted the strictures of the MHLRA by failing to provide timely notice of termination or nonrenewal of Plaintiffs' leases.  Specifically, Defendants were required to give 60 days' written notice before terminating Plaintiffs' leases, which they did not do;

---

[1]  The VFHL is substantively identical to the FHA.

instead, they unilaterally converted the leases into month-to-month tenancies and charged increased rent, actions without any legal basis.

Finally, Plaintiffs' § 1981 claim should proceed to trial because Plaintiffs have adduced sufficient record evidence of Defendants' discriminatory intent. The documents the Policy requires from individuals lacking SSNs—and the corresponding burdens of procuring those documents—is circumstantial evidence of Defendants' intent to discriminate against noncitizens. For similar reasons, Defendants' motion for summary judgment on the FHA and VFHL claims under a disparate treatment theory should be denied. Plaintiffs have put forth sufficient circumstantial evidence of Defendants' discriminatory intent, including the burdens the Policy imposes on noncitizen Latinos who seek to satisfy the Policy's prerequisites and the Policy's repercussions for spouses and children of noncitizen Latinos without SSNs.

## **ARGUMENT**

I.    **Plaintiffs are Entitled to Summary Judgment on their FHA Claim Under a Disparate Impact Theory; Triable Issues of Material Fact Remain as to the FHA Claim Under a Disparate Treatment Theory.[2]**

Defendants' summary judgment motion is predicated on a false premise, namely that this Court "held that Plaintiffs fail to state a claim under a disparate impact theory." Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") [Dkt. 98] at 10. The text of the holding belies Defendants' assertion. In evaluating Plaintiffs' FHA claim at the motion to dismiss stage, this Court, consistent with recent Supreme Court precedent, found that to establish one *element* of a prima facie disparate impact claim—causation—Plaintiffs could not rely exclusively on statistical evidence of disparate impact. *See Giron de Reyes v. Waples*

---

[2] Plaintiffs may rely on both theories at the summary judgment stage as "no procedural election between [the two theories] is required of a claimant at either pre-trial, trial, or appellate stages." *Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 702, 711 (4th Cir. 1979).

*Mobile Home Park Ltd. P'Ship*, No. 1:16cv-563, -- F. Supp. 3d --, 2016 WL 4582049, at *6-*8 (E.D. Va. Sept. 1, 2016) ("[T]o permit plaintiffs to use disparate impact in this case to establish *causation* results in essentially writing out of the FHA its robust causation requirement altogether . . . Disparate impact theory, applied in this case, would be insufficient by *itself* to satisfy the FHA's *causation* requirement.") (emphasis added).  But the opinion did not foreclose Plaintiffs from bringing a disparate impact claim supported by statistical evidence "in addition to other proof, to meet their burden of demonstrating causation."  *Id.* at *8.  Defendants' contrary argument is meritless.

Indeed, this Court's focus on Plaintiffs' satisfaction of the "robust causality requirement" confirms that Plaintiffs' disparate impact claim withstood dismissal.  *Id.* at *6 (quoting *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015)).  The robust causality requirement only plays a role in assessing disparate impact claims based on statistical evidence to protect "defendants from being held liable for racial disparities they did not create."  *Inclusive Communities*, 135 S. Ct. at 2523.  Such a concern has no application to a disparate treatment claim, which necessarily requires a showing of "discriminatory intent" at the prima facie stage.  *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989).  It would make little sense for this Court to spill substantial ink on the proof necessary for Plaintiffs to meet the robust causality requirement—an issue inapplicable to disparate treatment claims—and simultaneously hold that Plaintiffs' FHA claim could only go forward under a disparate treatment theory.  *See Waples*, 2016 WL 4582049, at *8 ("[P]laintiffs' complaint states a proper cause of action for a claim under the FHA.  Although Plaintiffs cannot rely solely on disparate impact to prove causation, they may use evidence of disparate impact to

12

help prove that the Policy discriminates 'because of' race or national origin, and to counter any claim of the Policy's legitimate, nondiscriminatory reason or justification.").

This Court interpreted Plaintiffs' complaint as "*also*" alleging a disparate treatment claim. *Waples*, 2016 WL 4582049, at *3. It was clear, however, that Plaintiffs' FHA claim was evaluated on the understanding that the FHA claim implicated a disparate impact theory. *See id.* ("Nevertheless, the parties appear to agree that the thrust of Plaintiffs' claim is based on the disparate impact theory . . . ."). Both theories therefore remain viable.

For the reasons explained below, Plaintiffs' cross-motion for summary judgment on their FHA claim should be granted on a disparate impact theory. As for the disparate treatment theory, Plaintiffs have put forth sufficient circumstantial evidence showing discriminatory intent and pretext, respectively, for the claim to proceed to trial.

### A. Plaintiffs are Entitled to Summary Judgment on their FHA Claim Based on a Disparate Impact Theory.

Disparate impact claims under the FHA are evaluated under the well-established burden-shifting framework delineated in 24 C.F.R. § 100.500(c) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Inclusive Communities*, 135 S. Ct. at 2514-15; *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013). At step one of the framework, Plaintiffs bear the burden "of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Inclusive Communities*, 135 S. Ct. at 2514 (quoting 24 C.F.R. § 100.500(c)(1)). If Plaintiffs make the requisite showing, the burden shifts to Defendants to articulate a "business necessity sufficiently compelling to justify the challenged practice." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984); 24 C.F.R. § 100.500(c)(2). Assuming Defendants discharge their burden, Plaintiffs can still prevail "upon proving that the substantial, legitimate, nondiscriminatory interests supporting the

challenged practice could be served by another practice that has a less discriminatory effect." *Inclusive Communities*, 135 S. Ct. at 2515 (quoting 24 C.F.R. § 100.500(c)(3)). Evidence that a business necessity can be accomplished through less discriminatory means is also "relevant in determining whether the challenged practice has operated as the functional equivalent of pretext for discriminatory treatment." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 997-98 (1988) (internal citation and quotation marks omitted). Applying the *McDonnell Douglas* framework here points persuasively to the conclusion that Plaintiffs are entitled to summary judgment on their disparate impact claim.

### 1.    Plaintiffs Have Made Out a Prima Facie Case of Disparate Impact.

At the outset, it is important to recognize that although Plaintiffs must present individualized proof connecting the Policy to the statistical disparity presented in this case—in addition to the disparity itself—their burden for establishing causation at the prima facie stage is "less onerous" than the burden for showing causation at the pretext stage. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). This conclusion follows from the structure of the *McDonnell Douglas* framework; if Plaintiffs were required, at the prima facie stage, to demonstrate that the Policy was the "ultimate caus[e]" of the discrimination suffered, the need to show pretext subsequently would be obviated. *Id.* at 251. Thus, abiding by the robust causality requirement does not require Plaintiffs to show that the Policy was the "actual cause" of the discrimination Plaintiffs endured until the pretext stage. *Id.* at 250.

Plaintiffs have met all of the elements of a prima facie disparate impact claim. Plaintiffs have offered statistical evidence illustrating that individuals who lack SSNs and are forced to provide a passport, visa, and I-94 to comply with the Policy are disproportionately Latino. *See* Ex. 40 (Clark Decl.), Exhibit C at 2 ("Latinos are nearly twice as likely to be undocumented

compared to Asians and 20 times more likely to be undocumented than other groups, and are thus substantially more likely to be adversely affected than any other group."); *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (comparing proportion of adversely affected members of *protected class* with proportion of adversely affected persons who are *not members of protected class*).[3]  These statistics are sufficiently localized to show a "disparity in the community to which the Policy is applied." *Waples*, 2016 WL 4580249 at *8 n.15.  And Plaintiffs may utilize these statistics, in part, "to meet their burden of establishing causation."  *Id.*

Record evidence also evinces a causal connection between the Policy and the aforementioned statistical disparity.  When Defendants began forcing renewal applicants to adhere to the Policy in 2015, entire Latino households, the majority of whom are *lawfully* present in this country, were uprooted from the Park in a lopsided manner.  Once the female Plaintiffs could not tender the required documentation, each household—including members of those households with SSNs—was subject to a month-to-month lease with a $100 markup in rent. This markup, when coupled with notices sent to Plaintiffs that further increased the surcharge to $300, more than one-third of the base monthly rent, operated functionally to evict Plaintiffs.[4] Accompanying the rent increases were eviction letters addressed not just to violators of the Policy, but to all occupants of the mobile home.  *See, e.g.*, Ex. 34 at 1.  Defendants make much

---

[3]   *See also* Ex. 40, Exhibit B at 4; *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010).

[4]   *See* Ex. 16 at 84:9-15 (████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████); Ex. 22; Ex. 26 at 211:12-21.

of the fact that the male Plaintiffs were, prior to 2015, allowed to enter into and renew leases in the Park. *See* Defs.' Mem. at 5. But once Defendants began applying the Policy to renewal applicants in 2015, the male Plaintiffs, who had SSNs, could not renew their leases and were instead subject to significant rent increases accompanied by eviction threats, practices that are unquestionably proscribed by the FHA.[5]

Moreover, the record reflects that Plaintiffs' efforts to meet Defendants' demands by furnishing alternative forms of identification were fruitless, as Mr. Reyes testified:

> When I arrived at the office, I asked Ms. Giambanco why she would not renew the lease, and she responded that my wife did not have a Social Security number. I presented Ms. Giambanco with my wife's ITIN and her Salvadoran passport. Ms. Giambanco agreed to renew the contract, but she said I should not tell anybody . . . . My wife asked why they suddenly needed the Social Security number, if they had previously renewed a lease with us without the number. The employee told us the number was needed to perform a criminal background check. My wife presented a criminal record report that the state had performed on her, which reflected no criminal background. We also presented our ITIN and Salvadoran passport again. The employee accepted these documents and said she would request permission from a supervisor to allow us to remain in the Park . . . . On February 4, 2016, we received a letter from Ms. Giambanco acknowledging receipt of the documents my wife had presented, but saying that she would proceed with the [eviction] notice.

Ex. 8 ¶¶ 15, 22-23. Defendants boldly assert that the Policy caused "no impact to any Latino who is a properly documented alien." Defs.' Mem. at 12. The record unequivocally contradicts this contention. The Policy had an equal, if not greater, impact on Latino individuals legitimately present in the United States, including the four male Plaintiffs and all ten of their children. *See* Pls.' Counterstatement of Material Facts, Nos. 7, 8, 14-21.

Plaintiffs have therefore presented a prima facie claim of disparate impact by showing that the Policy "caused or predictably will cause a discriminatory effect." *Inclusive*

---

[5] In fact, to date, three of the four Plaintiff families have been forced out of the Park, and the fourth faces eviction on January 31, 2017 if it does not elect to leave its home.

*Communities*, 135 S. Ct. at 2514 (quoting 24 C.F.R. § 100.500(c)(1)).  And Plaintiffs have met the "robust causality requirement" by pointing to specific, concrete evidence illustrating that Defendants' "[P]olicy . . . caus[ed] that disparity."  *Id.* at 2523.

**2.**    **Defendants' Business Justification for the Policy is Pretextual.**

At the second step of the framework, the burden shifts to Defendants to articulate a business necessity justifying the Policy.  *See Betsey*, 736 F.2d at 988.  Throughout this litigation, Defendants have asserted one primary rationale for their enactment and enforcement of the Policy: obtaining identifying information to run background checks on residents.  *See* Ex. 42 at 2 ("The reasons for creating the policy are to confirm the identity of the applicant(s) and any adult occupants, to perform credit checks, minimize identity fraud, and to eventually perform criminal background checks, and minimize loss from eviction."); Defs.' Mem. at 18, 20.  If Plaintiffs show that this business necessity could be accomplished through "another practice that has a less discriminatory effect," then Plaintiffs are still entitled to summary judgment.  *See Inclusive Communities*, 135 S. Ct. at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).  Plaintiffs have met this burden; the summary judgment record reflects that Defendants could accomplish their stated purpose behind the Policy through multiple less discriminatory alternatives.  Stated differently, Defendants' business justification is pretextual.  *See Watson*, 487 U.S. at 997-98.

ITINs are just as effective as SSNs for purposes of conducting background checks, a fact corroborated by the training manual Defendants distributed to employees tasked with screening applicants.  *See* Ex. 43 at 67.  The company that Defendants currently retain to oversee the background check process, Yardi Resident Screening, does "not require a Social Security Number (SSN) to perform the . . . criminal background screening services it currently provides."  Ex. 44 ¶ 6.  And Defendants' witnesses admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 21 at 102:11-18; *see also id.* at 87:7-11 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17

███████████████████████████████████████████████████████████

████████████████████████████████████████).  This is likely why

Defendants were perfectly willing to accept ITINs in lieu of SSNs as recently as 2013.  *See id.* at

90:8-11 (████████████████████████████████████████████████

████████████████████████████████████████).  The female Plaintiffs, for

their part, attempted to use ITINs to comply with the Policy; they were rebuffed at every turn.

*See* Ex. 16 at 59:7-9; Ex. 20 at 50:9-19; Ex. 38.

      Defendants argue that ITINs are an inferior form of identification to SSNs because "there

is no in-person meeting or any other effort undertaken by the IRS to verify identity."  Defs.'

Mem. at 21-22.  But the record is bereft of any evidence that Social Security cards are equipped

with unique built-in safeguards that prevent identity theft; in fact, ███████████████████

███████████████████████████████████████████████████████████

██████████████████████████████  *See* Ex. 43 at 13-14.  More

fundamentally, SSNs and ITINs are *equally* effective for the purpose of running criminal

background checks.  *See* Ex. 21 at 87:7-11; 102:11-104:8; Ex. 27 at 86:9-22.[6]  And Defendants

have conceded that renewal applicants like Plaintiffs do not ████████████████████████

precluding Defendants from relying on this explanation to justify the Policy.  Ex. 27 at 187:10-

14.  Finally, the record is devoid of any evidence that Defendants actually considered the

purported superiority of SSNs to be the business reason for the Policy when it was implemented,

---

     [6] It is also worth noting that during the ITIN application process, the IRS verifies applicants' identities by requiring "the applicant to either submit the actual passport, or bring the passport to a designated office for inspection"; "the IRS does not accept a photocopy of a foreign passport."  Ex. 2 ¶ 8; *see also* INSTRUCTIONS FOR FORM W-7 at 2 (Sept. 6, 2016), *available at* https://www.irs.gov/pub/irs-pdf/iw7.pdf.  As a result, ITINs are sufficiently well-regarded to be the basis for obtaining "credit accounts" and "mortgages."  Ex. 2 ¶ 9.

as opposed to an after-the-fact litigation justification. Distilled to its essence, Defendants' stance against accepting other forms of identification—namely a foreign passport or an ITIN—stems from an apparent concern over identity theft. But *any* identifying document is subject to theft if it is not adequately protected. Moreover, unlike a foreign passport, a Social Security card has no identifying photograph. *See* Ex. 27 at 160:17-21. Thus, Defendants' argument is not a plausible explanation for why Social Security cards suddenly became the preeminent form of identification to satisfy the Policy, especially considering that prior to 2015, Defendants readily accepted ITINs as a form of identification.[7]

Accepting ITINs or already-completed background checks would impose no additional cost or burden on Defendants and "would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *Watson*, 487 U.S. at 998. Defendants' failure to utilize these less discriminatory alternatives shows pretext. *See id.*; *see also Zuniga v. Kleberg County Hosp., Kingsville, Tex.*, 692 F.2d 986, 992 (5th Cir. 1982) (finding that the plaintiff "has effectively revealed the alleged business necessity to be a mere pretext for discrimination by showing that the [defendant] failed to utilize an available, alternative, less discriminatory means of achieving its business purpose").

Further evidence of pretext becomes apparent when examining the impetus behind applying the Policy to lease renewals. It is undisputed that the incidents that spurred Defendants' enforcement of the Policy beginning in 2015 did not involve undocumented immigrants; rather,

████████████████████████████████████

---

[7] Another less discriminatory alternative was for defendants to accept completed criminal background checks from applicants. When informed of his wife's noncompliance with the Policy, Mr. Reyes attempted to submit a document showing his wife had no criminal record. The submission was deemed inadequate without explanation. *See* Ex. 34; Ex. 38.

███████████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Ex. 21 at 44:20-46:7.

Defendants' reliance on these episodes as the basis for demanding SSNs or proof of legal

presence from Park residents—ostensibly for background checks—is "unworthy of credence"

because neither incident presented security risks related to having undocumented immigrants live

in the Park, and because Defendants could run criminal background checks without SSNs both

before and after the two incidents. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir.

2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

    The veracity of Defendants' proffered business necessity is even further undermined

because the male Plaintiffs *did* pass the requisite credit, income, and criminal background

checks. Ex. 12-15. Defendants were perfectly willing to rent to the male Plaintiffs for years,

even while Defendants were aware that the female Plaintiffs were living with them in the Park.

*See* Part IV.B, *infra*. For Defendants to now claim that penalizing the male Plaintiffs furthers the

goal of carrying out background checks is nonsensical.

    Nor do Defendants gain ground by basing the Policy's enforcement on a desire to verify

legal presence. *See* Defs.' Mem. at 20-22. Determining whether an individual passes a criminal

background check and whether an individual is lawfully present ████████████████ Ex. 21 at

122:13. Indeed, neither the individual convicted of indecent exposure nor the registered sex

offender were undocumented immigrants, and Defendants did not offer the goal of verifying

legal presence as one of the reasons behind creating the Policy. *See* Ex. 42 at 2. In any event,

the documents needed to comply with the Policy in the absence of a Social Security card are

poor barometers of legal presence. *See* Ex. 2 ¶ 25 ("[T]he validity of a visa . . . has no bearing

on whether a person has legal presence in the United States. Likewise . . . [D]efendants' reliance

on I-94s fails to take into account that there are a great number of categories of people with legal presence in the United States that do not have I-94s, whether valid or expired."). The Policy's failure to advance the purpose of ensuring legal presence—which, in any event, was not one of Defendants' stated goals in enacting the Policy—reinforces a finding of pretext. Buttressing this finding even further is the fact that Defendants have not produced a single internal document justifying the Policy on either ground—conducting background checks and verifying legal presence—nor could any of Defendants' deponents recall a particular moment in time when they were aware of these justifications for the Policy.[8] "The fact that a [defendant] has offered inconsistent post-hoc explanations for its . . . decisions is probative of pretext." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002). This is all the more true where, as here, Defendants have not pointed to any landlord with a comparable policy. *See* Ex. 25 at 85:15-17; 86:1-12; 88:13-89:12. This case is thus a circumstance "in which a claimed business judgment is so idiosyncratic or questionable" that it is suggestive of pretext. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1169 (10th Cir. 1998).[9]

In sum, the summary judgment record demonstrates that Defendants ignored various less discriminatory means for achieving their stated goals. There is no genuine factual dispute that the business necessity put forth by Defendants is pretextual. Accordingly, the Court should grant Plaintiffs summary judgment on their FHA claim under a disparate impact theory.

---

[8]    *See* Ex. 25 at 53:9-11 (████████████████████████ ████████████████████); Ex. 27 at 123:12-14 (███████████ ████████████████).

[9]    Any other possible bases for the Policy—such as minimizing loss from eviction, lease underwriting concerns, and fear of liability due to harboring—lack sufficient record support to rise to the level of a business necessity justifying the Policy. Indeed, *none* of these explanations are mentioned by defendants as the "legitimate purposes of the Policy." Defs.' Mem. at 12.

**B.      Defendants are Not Entitled to Summary Judgment on Plaintiffs' FHA Claim Based on a Disparate Treatment Theory.**

Disparate treatment claims are analyzed using the same three-step *McDonnell Douglas* framework; at step one, though, Plaintiffs must show that the Policy was "motivated by a racially discriminatory purpose." *Betsey*, 736 F.2d at 986. Importantly, "determining intent is fact-intensive" and "when the circumstantial evidence of a person's intent is ambiguous, the question of intent cannot be resolved on summary judgment." *Gen. Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996). Defendants then have the opportunity to offer a "legitimate non-discriminatory reason for [the challenged practice]." *McDonnell Douglas*, 411 U.S. at 802. Once again, Plaintiffs still prevail if they show that this reason is pretextual. *See id.* at 803. "A plaintiff does not need a 'smoking gun' to prove invidious intent, and few plaintiffs will have one. Rather, '[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (alteration in original) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). And "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods.*, *Inc*., 530 U.S. 133, 147 (2000).

Two key pieces of evidence comprise the circumstantial evidence of Defendants' discriminatory intent: (1) the documents Latino noncitizens are required to provide to adhere to the Policy; and (2) the Policy's breadth. Neither an original I-94 nor an original visa is probative of legal status. *See* Ex. 2 ¶¶ 25-26. On the other hand, numerous lawfully present noncitizens simply do not have an I-94, including immigrants given temporary protected status, something

22

that "is extremely common in Northern Virginia." *Id.* at 7.  These individuals "are lawfully present in the United States, yet would not have a valid visa, valid I-94, or valid 'green card.'" *Id.* The cost of procuring an I-94, meanwhile, is a taxing $445,[10] especially when compared to what U.S. citizens have to pay to replace a Social Security card—nothing.  *See Waples*, 2016 WL 4582049 at *9 n.17.   The considerable difficulties the Policy imposes on Latino noncitizens is circumstantial evidence of discriminatory intent, especially because I-94s and visas do not further the Policy's alleged purpose.

Additional evidence of discriminatory intent is the Policy's sweeping scope.   The adverse consequences associated with noncompliance were not narrowly directed at the individual who lacked the requisite documentation; instead, all household members—including residents with SSNs—faced increased rent and eviction.  This impact on entire Latino households bolsters a finding of discriminatory intent.  *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) ("Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Defendants treat as dispositive a slew of deposition excerpts from Plaintiffs indicating their subjective beliefs that they were not discriminated against because of their race or national origin.  *See* Defs.' Mem. at 15-17, 25.  This argument is specious.  Plaintiffs' perceptions are immaterial; it is the *Defendants*' state of mind that is at issue, as they are the actors who implemented and eventually enforced the Policy.  This is precisely why the Fourth Circuit accords no weight to the subjective views of plaintiffs as evidence of pretext in discrimination

---

[10]   *See* U.S. Citizenship and Immigration Services, "Our Fees," *available at* https://www.uscis.gov/forms/our-fees.

cases. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]e have repeatedly explained that '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" (alteration in original) (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). If Plaintiffs' beliefs have no relevance in establishing discrimination, those same beliefs cannot be repurposed into evidence of an *absence* of discrimination. *See Jackson Jr. v. Corp. Serv. Co.*, No. H-11-4404, 2013 WL 11309365, at *11 (S.D. Tex. Apr. 7, 2013). Plaintiffs played no role in constructing and enforcing the Policy; their individual views on whether they felt they were targets of discrimination are inapposite.[11] Defendants' representations that they advertised to Latino individuals and allowed other Latino individuals to rent units in the Park are likewise of no consequence. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant . . . ."); *Connecticut v. Teal*, 457 U.S. 440, 455 (1982) (noting that "Congress never intended" to sanction discrimination "on the basis of race" simply because other members of the protected class are treated "favorably").

Because Plaintiffs have made the necessary showing of discriminatory intent, Defendants must respond with a legitimate, nondiscriminatory reason for the Policy. Defendants primarily cling to the same explanation, that the Policy is necessary to carry out background checks. For the reasons elucidated in Part I.A.2, *supra*, this justification—and any others Defendants may attempt to add in reply—is pretextual. Accordingly, Defendants' motion for summary judgment on the disparate treatment claim should be denied.

---

[11]   This is especially true considering that Plaintiffs' responses were confined to their personal knowledge without reviewing the documents Defendants have produced in discovery.

### C.    Plaintiffs Have Standing Under the FHA.

Defendants recycle an argument this Court already rejected, contending that the female Plaintiffs lack standing to sue under the FHA.  To the contrary, "[the Policy's] facially lawful distinction may nonetheless be an impermissible pretext for discrimination on the basis of race or national origin—*two classes that the FHA does protect*."  *Waples*, 2016 WL 4582049, at \*3 (emphasis added).  And allowing the female Plaintiffs to proceed under the FHA does not contravene 8 U.S.C. § 1324—the federal prohibition against harboring illegal aliens—because "the FHA prohibits discrimination on the basis of protected categories, such as race and national origin, whereas the prohibition against recklessly harboring illegal aliens focuses on an alien's lawful presence, not his race or ancestry."  *Id.* at 4; *see also* Plfs.' Mem. in Opp. to Defs.' Mot. to Dismiss [Dkt. 29] at 29-30.  It follows that all of the Plaintiffs have standing under the FHA.[12]

## II.    Plaintiffs are Entitled to Summary Judgment on their VFHL Claim.

The relevant language of the VFHL is virtually identical to the text of the FHA.  As such, Plaintiffs should be awarded summary judgment on their VFHL claim given that "[t]here is good reason to think that the VFHL recognizes a disparate impact cause of action that is identical to the FHA's disparate impact cause of action."  *Waples*, 2016 WL 4582049 at \*8 n.16.  In the event that the VFHL is construed only to encompass disparate treatment claims, triable issues of material fact preclude granting summary judgment to Defendants.  *See* Part I.B, *supra*.

---

[12]    Contrary to Defendants' claim, Judge Colloton's concurrence in *Keller v. City of Fremont*, 719 F.3d 931, 951-53 (8th Cir. 2013) did not find that undocumented immigrants categorically lacked standing under the FHA.  Rather, Judge Colloton found that based on the facts of that particular case, the plaintiffs were unable to show imminent injury because the challenged Ordinance did "not apply to rentals in effect before the Ordinance was enacted . . . . As long as Juan and his wife remain at their current residence, they will not be subject to the Ordinance and will suffer no injury."

### III.    Triable Issues of Material Fact Remain as to Plaintiffs' § 1981 Claim.

Section 1981 outlaws "purposeful discrimination" "in the making and enforcement of private contracts." *Murrell v. Ocean Mecca Hotel Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). "[A] plaintiff may seek to prove a § 1981 cause of action either by direct evidence or by the judicially-created burden-shifting proof scheme originally set out . . . in [*McDonnell Douglas*]." *Johnson v. Toys 'R' Us-Delaware, Inc.*, 95 F. App'x 1, 6 (4th Cir. 2004). Under either approach, Plaintiffs' § 1981 claim survives summary judgment.

"When the plaintiff seeks to prove her case by direct evidence, she must establish her prima facie case by showing through admissible evidence that: (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination concerned a privilege protected under § 1981." *Id.* It is undisputed that Plaintiffs satisfy the first and third elements: Plaintiffs are noncitizens facing discrimination in entering into housing contracts. And Plaintiffs have put forth sufficient evidence that the Policy intentionally discriminates against noncitizens through the hardships the Policy imposes only on noncitizens as well as the spouses and children of noncitizens. *See* Part I.B, *supra*. The same evidence satisfies Plaintiffs' burden under § 1981. Alternatively, Plaintiffs have created genuine issues of material fact on their § 1981 claim "circumstantially, through the . . . shifting intermediate evidentiary burdens employed in . . . Title VII claims." *Williams*, 871 F.2d at 457-58. *See* Part I.A, *supra*. Defendants therefore are not entitled to summary judgment on Plaintiffs' § 1981 claim.[13]

---

[13]    This Court already found unpersuasive Defendants' argument that the female Plaintiffs are ineligible to proceed under § 1981. *See Waples*, 2016 WL 4582049 at *10 n.19 ("Defendants are . . . incorrect in arguing that [P]laintiffs' § 1981 claim in this case requires the creation or recognition of such a [new] class. Rather, a person's alienage and citizenship are distinct from that person's immigration status.").

IV.     **Plaintiffs Are Entitled to Summary Judgment on Their MHLRA and Breach of Contract Claims.**

The undisputed facts show that Defendants have violated both the MHLRA and Plaintiffs' leases by failing to provide timely notice of termination or nonrenewal, resulting in the formation of new annual leases by operation of law. Plaintiffs, not Defendants, are thus entitled to summary judgment on Counts III and V.

A.     **Defendants unlawfully placed Plaintiffs on month-to-month leases.**

Under the MHLRA, a park operator must provide written notice of any changes to a lease's terms at least 60 days before the termination of the lease; otherwise, the lease agreement renews automatically for a term of one year. *See* Va. Code Ann. § 55-248.42:1(B).[14]  Likewise, Virginia law requires a landlord to give at least 60 days' notice before terminating a rental agreement. *See* Va. Code Ann. § 55-248.46(A). Together, the plain meaning of these two provisions provides that where a landlord *does not* provide any such notice, an annual lease automatically rolls over for another year with identical terms.[15]

Here, Defendants unquestionably failed to terminate Plaintiffs' annual leases properly under the MHLRA, causing new annual leases to be formed automatically for another year:

- *Plaintiff Jose Reyes*: Mr. Reyes had a valid lease from June 1, 2014 to May 31, 2015. *See* Ex. 50. Defendants did not give Mr. Reyes written notice that he would be placed on a month-to-month lease; they instead only communicated this to him orally. *See* Ex. 8 ¶¶ 17-21; Ex. 38; Ex. 33; Ex. 51. Accordingly, this notice was ineffective to terminate the rental agreement, and Mr. Reyes's lease was auto-renewed through May 31, 2016.

___

[14] The grounds and procedures for eviction are more stringent under the MHLRA to protect mobile home owners from the financial devastation of eviction from a mobile home.

[15] If the plain meaning of a statute is "unambiguous, the interpretive task is at an end as the statute must then be applied in accordance with its plain meaning." *Johnson v. Garraghty*, 57 F. Supp. 2d 321, 325-26 (E.D. Va. 1999); *see also Office of Atty. Gen., Div. of Consumer Counsel v. State Corp. Comm'n*, 762 S.E.2d 774, 779 (Va. 2014).

- *Plaintiff Felix Alexis Bolaños*: Mr. Bolaños had a valid lease until March 31, 2016. *See* Ex. 35. Defendants did not inform him until March 2, 2016 that they were placing him on a month-to-month lease. *See* Ex. 5. Accordingly, this notice was ineffective to terminate the rental agreement, which was auto-renewed through March 31, 2017.

- *Plaintiff Esteban Ruben Moya Yrapura*: Mr. Moya similarly had a valid, year-long lease set to terminate on January 31, 2016. *See* Ex. 36. Defendants did not inform him until January 18, 2016 that they were placing him on a month-to-month lease. *See* Ex. 4. Accordingly, this notice was ineffective to terminate the rental agreement, which was auto-renewed and remains valid through January 31, 2017.

- *Plaintiff Herbert David Saravia Cruz*: Like Mr. Moya, Mr. Saravia's lease was set to terminate on January 31, 2016. *See* Ex. 37. Defendants did not inform him until January 18, 2016, through verbal notice, that they were placing him on a month-to-month lease. *See* Ex. 6. Accordingly, this notice was ineffective to terminate the rental agreement, which was auto-renewed through January 31, 2017.

Citing to Va. Code § 55-248.46(A), Defendants argue that they were not required to provide a 60-day notice of termination because they "were not terminating a tenancy." Defs.' Mem. at 30. But the statutory text (notwithstanding its title) describes how a landlord may "terminate a *rental agreement*[.]" (emphasis added). Thus, when Defendants terminated Plaintiffs' annual leases, they undeniably terminated Plaintiffs' "rental agreements." Accordingly, Defendants' unilateral imposition of month-to-month leases and escalating month-to-month charges, from $100 to $300,[16] was *ultra vires* and without basis in law or contract. By itself, this entitles Plaintiffs to summary judgment on the MHLRA and breach of contract claims.[17]

---

[16] Defendants admit that they later attempted to impose an additional fee of $300, and only stopped attempting to collect that fee when, as a result of this litigation, they learned that they had given improper notice. *See* Dkt. 18; Ex. 21 at 213:21-217:12; Ex. 22.

[17] Defendants' reliance on *Abi-Njam v. Concord Condominium, LLC*, 699 S.E.2d 483, 489 (Va. 2010) and *George Robbrecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979) is misplaced. Both cases involved common-law rescission of sales contracts; neither sanctions ignoring procedures plainly set forth in a relevant statute that abrogates the common law. To rescind the leases, Defendants merely needed to follow proper procedures.

**B.      Defendants' contention that Plaintiffs misled them is factually inaccurate.**

Defendants' suggestion that Plaintiffs misled them, and that Defendants were somehow surprised to discover in 2015 that the female Plaintiffs were residing with their husbands, is preposterous.  Instead, the evidence shows that Defendants knew that the female Plaintiffs were living in the Park, but chose to turn a blind eye for many years:

- *Plaintiff Jose Reyes*: In 2014, Defendants expressed reluctance to renew Mr. Reyes's lease because Ms. Reyes could not provide a Social Security card.  *See* Ex. 20 at 49:9-22. Defendants' property manager conducted an inspection of the property, during which she spoke directly to Ms. Reyes.  *See* Ex. 8 ¶ 12.  Ultimately, Defendants agreed to renew the lease with the understanding that Ms. Reyes lived in the mobile home.  *See* Ex. 20 at 58:5-59:4.  Subsequently, in June 2015, Defendants explicitly notified the Reyes family that Ms. Reyes was being added to Mr. Reyes's water bill account.  *See* Ex. 33.

- *Plaintiff Felix Alexis Bolaños*: Defendants' knowledge of the presence of Mr. Bolaños's wife is evidenced by the fact that they *affirmatively* instructed him not to include his wife on his lease application.  *See* Ex. 16 at 40:22-41:3-13, 49:1-8.

- *Plaintiff Esteban Ruben Moya Yrapura*: Mr. Moya and his family have lived in the Park since signing a lease in 2011. See Ex. 36; Ex. 45-46.  During that time, Mr. Moya's wife ████████████████████████; when Mr. Moya visited the office, the property manager would ask "█████████████████████████" Ex. 19 at 35:22-36:4, 75:19-76:4.

- *Plaintiff Herbert David Saravia Cruz*: Mr. Saravia included his wife on his lease application in 2012 and for the following three years, he renewed his lease.  *See* Ex. 18 at 39:3-5; Ex. 47-48.  Defendants' 2014 inspection of Mr. Saravia's residence lists his wife as an occupant.  *See* Ex. 32.

Thus, the undisputed facts show that Defendants knew that all four female Plaintiffs resided in the Park before Defendants arbitrarily decided to begin enforcing the long-dormant Policy.

In any event, even if Defendants *were* misled, they still lacked a sufficient legal basis to unilaterally evict Plaintiffs.  An eviction must be preceded by the issuance of a proper notice, which Defendants never gave.  Nor can Defendants rely on Va. Code § 55-248.50:1,[18] as

---

[18] "A manufactured home park owner or operator may only evict a resident for: . . . 4. Violation of any rule or provisions of the rental agreement materially affecting the health, safety

Defendants have pointed to no facts showing that the presence of the female Plaintiffs in the Park affected the health, safety, or welfare of others. *See* Ex. 26 at 140:10-141:5. Defendants' conclusory assertion that having undocumented occupants at the Park jeopardizes the safety of others because background checks cannot be run on those occupants ignores that Defendants *could* have run criminal background checks on the female Plaintiffs without SSNs. And Plaintiffs have not committed two or more violations over six months; the alleged violation—the failure to list female Plaintiffs on lease applications—only occurred once annually.

As mobile home park operators, Defendants were responsible for complying with the law that forms the basis of their business—the MHLRA. Yet, by their own admission, they were not even aware of this foundational statute until this litigation commenced. *See* Ex. 21 at 187:20-188:4, 205:4-16, 213:21-214:9; Ex. 26 at 207:20-209:10; Ex. 27 at 192:2-194:2. Defendants may not now, belatedly, blame Plaintiffs for Defendants' own ignorance of the relevant law. By failing to give timely notice of termination or nonrenewal, Defendants allowed new, year-long rental agreements to form, which they then breached by unilaterally imposing month-to-month leases. Therefore, Plaintiffs should be granted summary judgment on Counts III and V.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs on Counts I, II, III, and V, and deny Defendants' motion for summary judgment on all counts.

---

and welfare of himself or others; or 5. Two or more violations of any rule or provision of the rental agreement occurring within a six-month period."

DATED this 23rd day of December, 2016  Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950
Jeanhee Hong (*pro hac vice*)
Ariel Wade Trajtenberg (*pro hac vice*)
Diego Durán de la Vega (*pro hac vice*)
Jongwook Kim (*pro hac vice*)
William A. Margeson (*pro hac vice*)
Archith Ramkumar (*pro hac vice*)

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com
jeanheehong@quinnemanuel.com
arieltrajtenberg@quinnemanuel.com
diegoduran@quinnemanuel.com
wookiekim@quinnemanuel.com
billmargeson@quinnemanuel.com
archithramkumar@quinnemanuel.com

LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Rebecca Wolozin, VSB #89690

6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
becky@justice4all.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2016, I filed the foregoing document

electronically with the Clerk of the Court using the ECF system, and caused to be served by

electronic mail a copy of the foregoing document upon the following parties:

Grayson P. Hanes, VSB # 06614
Michael S. Dingman, VSB #30031
Justin deBettencourt, VSB # 83806
REED SMITH LLP
7900 Tysons One Place, Suite 500
McLean, Virginia 22102
Phone: (703) 641-4200
Fax: (703) 641-4340
ghaynes@reedsmith.com
mdingman@reedsmith.com
jdbettencourt@reedsmith.com

*Counsel for Defendants*


QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com

*Counsel for Plaintiffs*