# Exhibit 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Civil Action No. 1:16-cv-563 |

## DECLARATION OF JOSE DAGOBERTO REYES

I, Jose Dagoberto Reyes, declare under penalty of perjury that the following is true:

1. I am a resident of Annandale, Virginia. I was born and raised in El Salvador. I moved to the United States from El Salvador in 1997.

2. I came to the United States because I thought I could have a better life and more opportunity. I also wanted to reunite with the family I had already living here. Since arriving in the United States, I have worked in various construction positions and currently work as a painter. In 2001, I gained Temporary Protected Status in the United States. I am proud of the life I have built in this country for me and my family.

3. I currently live in an apartment in Annandale, Virginia with my wife, Rosy Giron de Reyes, and our five-year-old son. Immediately prior to living in this apartment, we lived for

1

three years at Waples Mobile Home Park, which is located in Fairfax, Virginia. (Unless otherwise indicated, this declaration refers to the time I lived at the Park.) My wife, Rosy Giron de Reyes, came to the United States in 2003 from El Salvador. My son is a U.S. citizen.

4. I understand that the company that operates the Park is A.J. Dwoskin & Associates, Inc. ("Dwoskin & Associates"). Although I am not 100% certain, I also understand that Waples Mobile Home Park Limited Partnership ("Waples L.P.") and Waples Project Limited Partnership ("Waples Project L.P.") own the Park. Dwoskin & Associates, Waples L.P., and Waples Project L.P. are the Defendants in this lawsuit.

5. On May 1, 2013, I entered into a one-year Lease Agreement with Dwoskin & Associates for my lot at the Park.

6. I bought my home at the Park for about $25,000 in 2013. I bought it from a departing resident of the Park. While I lived at the Park, the title to my home was in my name. However, upon leaving the Park in May 2016, I had to sell the mobile home.

7. While I lived at the Park, I was a proud homeowner. Initially, I could not move in to the mobile home because it was not suitable for a family--I think the previous owner used the mobile home for business purposes, as it had business furniture and was generally not set up as a home. I had to take out everything that was in the mobile home and remodel it for a family. I spent substantial time and money preparing everything so that my family could live comfortably.

8. Although I owned my home while I lived in the Park, I rented the land on which my mobile home sat from Dwoskin & Associates, who I understand is an agent of the Park's owners. I would submit my lease payments for this land specifically to representatives of Dwoskin & Associates, including Josephine Giambanco ("Ms. Giambaco"), who is a property

manager. I made those payments on a monthly basis, usually by check made out to "Waples" from a joint checking account I have with my wife, Rosy Giron de Reyes.

9. Even though I lived in a mobile home park, I could not easily move my home, which was effectively permanently fixed in its location on the lot I rented from Dwoskin & Associates. The home was built in 1985.

10. Throughout my time at the Park, I never missed any rent payments. In those three years, I only paid late once. Additionally, I believe that I always complied with all of the Park's Rules and Regulations. I consider myself to have been a respectful Park resident.

11. My first lease was due to expire on May 31, 2014. In approximately March 2014, I went to the office to renew my lease. Although I cannot remember exactly what was said, or which of the employees at the office I spoke to, I was told that I could not renew my lease if I could not present either (1) a Social Security number, or (2) a passport, U.S. Visa, and I-94 form for my wife. I returned twice more, though I cannot remember the exact dates, and I presented my wife's Individual Taxpayer Identification Number ("ITIN") number and Salvadoran passport. Neither of these documents was accepted.

12. In May 2014, as part of the process of renewing my lease, Ms. Giambanco performed an inspection of my home. I was not present; however, my wife was home for the inspection. Ms. Giambanco asked my wife if she had been able to get a Social Security card. My wife said she had not gotten one and could not get one. Ms. Giambanco responded that my that my wife could not stay at the Park.

13. I was shocked and confused by Ms. Giambanco's statement. My wife had been living with me in the home since I had finished remodeling. Further, as a family, the idea of my son and I living in a household without my wife was unthinkable.

3

14. In addition, Dwoskin & Associates had known that my wife had lived with me at the Park; I know this because our front window faced the front window of the office. Employees, including Ms. Giambanco, would see my wife come in and out of the home, sometimes with our son, and would greet her. Additionally, rent payments came from our joint checking account.

15. After the May 2014 inspection, but on the same evening, Ms. Giambanco called me and asked me to come to the office. When I arrived at the office, I asked Ms. Giambanco why she would not renew the lease, and she responded that my wife did not have a Social Security number. I presented Ms. Giambanco with my wife's ITIN and her Salvadoran passport. Ms. Giambanco agreed to renew the contract, but she said that I should not tell anybody.

16. I signed the new lease on May 28, 2014. This is the most current, written lease that I have. My wife was not listed as a lessee or as an occupant. I continued to live at the Park with my wife and son under this second lease without incident.

17. My renewed lease was set to expire on May 31, 2015. Although I do not remember the exact date, in March 2015, I went to the office to renew. I do not recall which employee I spoke to at the office, but that person asked if my wife had been able to get a Social Security number. I said she had not gotten a Social Security number. The employee told me the lease could not be renewed, but that I could continue to live and the Park with my wife and son on a month-to-month basis. This meant that I would not have a lease, but that I would pay a monthly fee in addition to my rent.

18. After May 31, 2015, when my 2014 lease expired, my family and I lived at the Park on a month-to-month basis.

19. On June 17, 2015, I received a "Violation Letter." This letter said that my wife would be "added to my account," and that my next water bill would reflect the cost of three

people living in the mobile home. As a result, starting with that next bill, I was paying $770 rather than $730 per month.

20. Also in June 2015, I received a "lease renewal letter." The letter said that my monthly rent (written-in as $770) would increase to $870 per month if all leaseholders did not renew by August 31. Thereafter, I paid $870 per month.

21. On January 27, 2016, I received a "21/30 Notice to Cure Lease Violations or Vacate Premises." This notice said that I violated my lease by housing unauthorized occupants and staying past the expiration of my lease. According to the notice, if I did not "cure [my] violation" within 21 days, I would have to vacate the Park by February 27, 2016.

22. Although I do not remember the exact date, my wife and I went to the office the week I received the 21/30 Notice. I do not remember who we spoke with, but my wife asked one of the employees there why we could not continue living at the Park. The employee said it was because my wife lacked a Social Security number. My wife asked why they suddenly needed the Social Security number, if they had previously renewed a lease with us without the number. The employee told us the number was needed to perform a criminal background check. My wife presented a criminal record report that the state had performed on her, which reflected no criminal background. We also presented her ITIN and Salvadoran passport again. The employee accepted these documents and said she would request permission from a supervisor to allow us to remain in the Park.

23. On February 4, 2016, we received a letter from Ms. Giambanco acknowledging receipt of the documents my wife had presented, but saying that she would proceed with the 21/30 Notice.

5

24. Faced with mounting costs, the stress of receiving letter after letter, and the fear of an impending eviction, my wife and I determined that we were no longer at ease in our home. On February 4, 2016, I informed the office in writing that we had decided to list our mobile home for sale.

25. On May 5, 2016, I sold my mobile home and left the Park. The transition has been very difficult for my family, especially my son, who is autistic. We had to transfer him to a different school, and he has had a difficult time adjusting to the new environment. Our family has also suffered economically—not only as a result of the increased rent and costs of moving, but also because our current apartment costs more than double what we paid at the Park.

26. Yo no leo inglés. Lo anterior me ha sido leído en español antes de firmarlo. Yo, Jose Dagoberto Reyes, debidamente enterado de las penas de perjurio en que incurren los que declaran co falsedad, hago saber que lo que acabo de manifestar es verdadero y cierto. Cumplido y firado en esta fecha. (*I do not read English. The foregoing has been read to me in Spanish before I signed it. I, Jose Dagoberto Reyes, declare under penalty of perjury that the foregoing is true and correct. Executed and signed this date.*)

Executed in Annandale, Virginia on the 21st day of December, 2016.

_____
Jose Dagoberto Reyes

6