# Exhibit 10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC.; <br><br> *Defendants*. | Civil Action No. _____ |

## DECLARATION OF HERBERT DAVID SARAVIA CRUZ

I, Herbert David Saravia Cruz, declare under penalty of perjury that the following is true:

1.      I am a resident of Fairfax, Virginia. I was born and raised in El Salvador. I moved to the United States from El Salvador 15 years ago.

2.      I came to the United States in pursuit of better opportunities for me and my family. Since arriving in the United States, I have worked a variety of jobs. I obtained an employment authorization document ("EAD") after I was granted Temporary Protected Status ("TPS") in 2002. I am proud of the life I have built in the United States for me and my family.

3.      I currently own and live in a manufactured, or "mobile" home at Waples Mobile Home Park (the "Park"), which is located in Fairfax, Virginia. I live with my wife, Rosa Elena Amaya; and our 9-year-old, 6-year-old, 4-year-old, 2-year-old, and 7-month-old children, who are all U.S. citizens.

4.      I understand that the company that operates the Park is A.J. Dwoskin &
Associates, Inc ("Dwoskin & Associates").  Although I am not 100% certain, I also understand
that Waples Mobile Home Park Limited Partnership ("Waples L.P.") and Waples Project
Limited Partnership ("Waples Project L.P.") own the Park.  Dwoskin & Associates, Waples L.P.,
and Waples Project L.P. are the Defendants in this lawsuit.

5.      I moved to the Park with my wife and my only child at the time, on January 1,
2010, pursuant to a sublease agreement to live in the home of another tenant, Ricardo Carcamo.
Mr. Carcamo had a lease with the Park.

6.      I bought my current home at the Park for approximately $5,000 in February 2012.
I bought it from the family of a recently-deceased resident of the park.  The title to my home is in
my name.  As of today, my home is paid off in full.

7.      I am a proud homeowner.  Since buying my home in the Park, I have spent
substantial amounts of money in improvements including the roof, siding, patio, interior. I have
also spent substantial time redecorating my home to best meet my family's needs.

8.      Although I own my home, I rent the land that it sits on from Dwoskin &
Associates, who I understand is an agent of the Park's owners.  I submit lease payments for this
land specifically to representatives of Dwoskin & Associates, including Josephine Giambanco
("Ms. Giambanco"), who is a property manager.  I make these payments on a monthly basis.  I
pay my lease by checks or money order made out to "Waples Mobile Home Park."

9.      Even though I live in a "mobile home" park, I cannot easily move my home,
which is effectively permanently fixed in its location on the lot I rent from Dwoskin &
Associates.  The home was built in 1981.

10.     Around February 2012, I entered into a one-year Lease Agreement with Dwoskin

& Associates for my lot at the Park.  Each year after that, I renewed my lease with Dwoskin &

Associates for my lot.  Specifically, I renewed my lease in 2013, 2014, and, most recently, for a

lease term beginning on February 1, 2015.  This Lease Agreement has a monthly rent of $745.

(Attached as **Exhibit C-1** is a true and correct copy of my most recent Lease Agreement, which I

signed on January 15, 2015.)

11.     Throughout my time at the Park, I have maintained a good payment history.

Additionally, I have always complied with the Park's requests that I submit to the annual

inspections conducted by Defendants.  I consider myself to be a respectful Park resident.

12.     In January 2016, I spoke to Ms. Giambanco about renewing my lease for another

one-year term beginning on February 1, 2016.  However, when I spoke to Ms. Giambanco, she

explained that my wife needed to complete her own application and list a Social Security

number.  Ms. Giambanco said if my wife was unable to do so, then she would have to leave the

Park, and only me and my children would be able to live there.

13.     I was shocked and confused by Ms. Giambanco's statement.  My wife has been

living with me in our home since I first moved into the Park.  In fact, when I first moved in, I

told Dwoskin & Associates that my family would be living with me, and someone in the leasing

office said this was fine.

14.     In addition, Dwoskin & Associates has known that my wife has been living with

me at the Park since I moved there.  I included my wife's name in the resident application form I

signed when we first moved to the Park and when I signed the lease directly with Dwoskin &

Associates; Dwoskin & Associates has registered in their computer system my wife as an

occupant; and Dwoskin & Associates has conducted annual inspections of my home, at which

3

my wife has always been present, and has acknowledged my wife's presence through those inspections.

15.     In February 2016, when I went to the management office to pay my rent, Ms. Giambanco asked if I had resolved my wife's situation yet.  When I answered no, Ms. Giambanco informed me that if I did not come back to the office to sign paperwork stating that my wife was leaving the property, I would receive a "21-30" letter and the sheriff would place an eviction notice on my home.  Ms. Giambanco also said they were placing me on a month-to-month lease at a "new monthly rent" of $870, which included a $25 year rent increase plus a $100 premium for being on a month-to-month lease.

16.     I have not received a notice to cure violations or vacate my home at the time of the signing of this declaration, but my wife and I live in fear that we will soon be forced out of our home.

17.     Facing the threat of an increased monthly payment, at best, and an eviction, at worst, my wife and I decided to sell our mobile home.  In or around February 2016, I informed Ms. Giambanco that I was going to sell and listed my home for sale.

18.     On March 11, 2016, I received a letter from Ms. Giambanco stating that the month-to-month premium would increase to $300 per month.  (Attached as **Exhibit C-2** is a true and correct copy of this letter.)  After totaling up all of the new fees, Dwoskin & Associates will be charging me $1,070 per month starting in June for my lease.  This is $325 more per month than I have been paying under my last lease agreement.

19.     My family and I cannot afford this rent increase.  What my family is earning now is only enough to cover our basic living expenses.  Paying $1,070 per month is far beyond my family's means.

20.     I have a small flooring company where I do most of the work.  If we had to pay
$1,070 in rent, I would have to work significantly more than I do now.  I would have to work as
many hours as possible, both at night and during weekends.  Given the nature of my work,
however, I am not sure I would be able to find enough work.

21.     My wife cannot easily take on work outside the home, as she takes care of our
five children.

22.     If my family had to pay this new $300 premium each month until our home sells,
we would have to make tremendous sacrifices just to pay our rent.  I worry that, even if we were
lucky enough to find some additional work here and there, we may not even have enough money
leftover for basic expenses, including for expenses related to my children's education, such as
school supplies.

23.     Everything that has happened since the beginning of 2016 has been very stressful
for me and my family.  Every day, my wife and I worry about how we are going to make enough
money to pay the new rent.  Because the $300 increase will start on June 1, we are even more
stressed about our situation and about the hardships that the increase will impose on me and my
family, which is why we are asking the court for a temporary restraining order and preliminary
injunction until the court can consider the full merits of our lawsuit.

24.     Yo no leo inglés.  Lo anterior me ha sido leído en español, antes de firmarlo.  Yo,
Herbert David Saravia Cruz, debidamente enterado de las penas de perjurio en que incurren los
que declaran con falsedad, hago saber que lo que acabo de manifestar es verdadero y cierto.
Cumplido y Firmado en esta fecha. *(I do not read English.  The foregoing has been read to me
in Spanish before I signed it.  I, Herbert David Saravia Cruz, declare under penalty of perjury
that the foregoing is true and correct.  Executed and Signed this date.)*

Executed in Fairfax, Virginia on the _20_ day of May, 2016.

_____
Herbert David Saravia Cruz

# Exhibit C-1

## MOBILE HOME LEASE AGREEMENT

Project:Waples Mobile Home Park

**LESSOR AND LESSEE**

This Agreement made this 1st day of **January**, 2014, by and between A. J. DWOSKIN & ASSOCIATES, INC., AGENT for : **Waples Mobile Home Park** (Owner), hereinafter called Lessor, and Herbert Saravia-Cruz and Mario Medina  jointly and severally (if applicable) hereinafter called Lessee.

### WITNESSETH:

That in consideration of the representation made in the application filed by the Lessee with the Lessor, the rent herein reserved and the covenants herein contained and by the said Lessee to be performed, the Lessor hereby leases to the Lessee, premises in the State of Virginia known as Lot 11250 Mobile Drive, : **Waples Mobile Home Park, Fairfax , Virginia ("Lot").**

**TERM AND RENT**

The term of this lease shall be for the period of 12 months, commencing on the 1st **day of February ,** 2015 fully ending at midnight on the 31st **day of January ,** 2016hereinafter called the "Lease Term"), for the **total rent of** Eight Thousand Nine Hundred Forty Dollars (**$8940.00**), payable in equal **monthly installments of** Seven Hundred Forty Five **Dollars ($**745.00) at the manager's office located in the Mobile Home Park or such other place as the Lessor may designate in writing, each such monthly installment payable without demand or notice in advance on the first day of each month during the Lease Term.

It is further covenanted and agreed between the Lessor and Lessee as follows:

1.  **LATE CHARGE.** If any installment of rent required by this Lease is not received by the Lessor by close of business on the 5th day of the month in which the rent payment is due, a late charge of **$50.00** shall be paid to Lessor to compensate Lessor for the administrative expenses and other expenses associated with Lessee's failure to timely pay rent.  Lessee agrees that this late charge shall be deemed to be additional rent and failure to pay the late charge may result in the issuance of a five (5) day notice for such nonpayment.  In the event Lessee tenders to Lessor a check which is dishonored by the Lessee's bank for any reason, Lessee agrees to pay Lessor, in addition to the amount of the check, due a service charge of $50.00 representing Lessor's administrative expenses and service charges incurred as a result of Lessee's insufficient check.  In addition, Lessor may thereafter require Lessee to make all future payments of rent and other charges due under the Lease by means of certified check, cashier's check or money order.

2.  **SECURITY DEPOSIT.** The Lessee agrees to deposit with Lessor upon delivery of this lease, the sum of $670.00 security for the full and faithful performance by the Lessee of each and every term, provision, covenant and condition of this lease.  In the event that the Lessee defaults in respect to any of the terms, provisions, covenants, and conditions of this lease, including but not limited to payment of rent, additional rent or other sums required hereunder (including but not limited to charges for utilities), the Lessor may use, apply or retain the whole or any part of the security so deposited for the payment thereof.  The Lessee acknowledges that the security deposit is to be retained by the Lessor, and may be commingled with other funds of the Lessor, with interest being paid to the Lessee.  The Lessor shall accrue interest on said security deposit in six (6) month increments at a per annum rate equal to the Federal Reserve Board discount rate as of January 1 of each year during the term of this Lease, or such other rate required by law; provided, however, that no interest shall be due and payable unless said security deposit has been held by the Lessor for a period exceeding thirteen (13) months after the date hereof.

In the event that the Lessee shall fully and faithfully comply with all of the terms, provisions, covenants, and conditions of this lease, the security deposit, or any balance thereof, plus accrued interest, if any, shall be returned to the Lessee within thirty (30) days after the expiration of this lease and after the removal of the Lessee's mobile home and surrender of the Lot to the Lessor in good condition.

3.  **POSSESSION.** The Lessor shall not be liable for failure to deliver possession of the Lot at the time stipulated herein as the date of the commencement of the tenancy, nor, except as provided herein, shall such failure excuse the Lessee's obligation hereunder, unless the Lessor's failure to deliver possession is willful, in which event Section 55-248.22 of the 1950 *Code of Virginia*, as amended, shall govern.  Except in the event of delay by the Lessee, the rent herein stipulated to be paid shall be abated for the period from the date of the commencement specified in this lease to the date possession is tendered to the Lessee.

4.  **RULES AND REGULATIONS.** The Lessee shall comply with the rules and regulations governing the Mobile Home Park, a copy of said rules and regulations being attached  hereto and made a part hereof, and shall comply with such other reasonable rules and regulations and any reasonable alterations or changes which the Lessor shall or may adopt for the Mobile Home Park.

5.  **UNLAWFUL USE, DISTURBING NOISES, ETC.** The Lessee shall not engage in any unlawful or criminal activity, including but not limited to, drug-related criminal activity, nor permit any member of Lessee's household or any guest or other person under Lessee's control to do so, on or near the Lot or in the Mobile Home Park while the Lessee is a resident in the Mobile Home Park.  "Drug-related criminal activity" shall mean the illegal manufacture, sale, distribution, or use of or possession with the intent to manufacture, sell, distribute or use a controlled substance.

The Lessee shall not make or permit to be made any disturbing noises or do or permit any act which will unreasonably interfere with the rights, comforts or conveniences of the other tenants.

6.  **OCCUPANTS.** Only those tenants registered at the manager's office may live in the Mobile Home Park. This Lease Agreement shall not be sublet or assigned.  The taking in of roomers or tenants by the Lessee is prohibited.   Prior to selling the mobile home, Lessee shall give Lessor written notice of the name of the prospective purchaser (if the prospective purchaser intends to keep the mobile home on the Lot).  Lessor shall not unreasonably restrict the sale of the mobile home (see 55-248.47); however, any prospective purchaser who intends to keep the mobile home on the Lot must submit an application, which application must be approved by Lessor prior to occupancy.

Upon twenty-four (24) hours written notice, which may be delivered to the mobile home, Tenant will permit Landlord to inspect the Premises (including all spaces inside the mobile home) for the purpose of determining the number of residents in the mobile home, and otherwise evaluating compliance with the terms of this Lease Agreement. Any failure by Tenant to provide access to the mobile home for this purpose when requested by Landlord shall constitute an immediate default under this Lease Agreement, granting Landlord to all remedies set forth in paragraph 11 of this Lease Agreement.

7. **LIABILITY OF LESSOR.** All personal property, including the mobile home, placed on the Lot or on any part of the Mobile Home Park shall be at the sole risk of the Lessee, and the Lessor shall in no event be liable for the loss, destruction, theft or removal of or damage to such property unless caused by Lessor's willful negligence.

The Lessee agrees to keep the Lot and the mobile home free of any conditions that might represent a hazard to others.
The Lessee also agrees to obtain an insurance policy including liability and property damage coverage with a combined single occurrence liability limit of not less than $25,000.

8. **UTILITIES.** Lessee will be responsible for payment for all utilities including those set forth in the Utility Addendum; for each utility for which Lessee is responsible for payment, Lessee will pay related deposits and any charges, fees, or services on such utilities. Lessee must not allow utilities to be disconnected – including disconnection for not paying your bills – until the lease term or renewal period ends. Utilities may be used only for normal household purposes and must not be wasted. If Lessee's electricity is ever interrupted, Lessee must use only battery-operated lighting. If any utilities are sub metered for the Premises, Lessee must pay such billings promptly. If the billing company requests Lessor pay Lessee's bills and Lessor, in its sole and absolute discretion, pays such bills, the amount of such bills will be added to Lessee's rent and such amounts will be treated as additional rent for all purposes, including seeking possession of the Lot for nonpayment.

The Lessee acknowledges that utility services are available to the Lot and that they are in good working order. Unless caused by Lessor's willful negligence, the Lessor shall not be liable for any damage, injury or loss whatsoever which might arise, or accrue, from his providing, failure to provide, or the failure of utilities. Further, the Lessee agrees to bear the cost of repairing any damage to the utility lines or connectors resulting from his misuse.

9. **HOLDING OVER / RENEWAL.** Either Lessor or Lessee may terminate the Lease Agreement at the end of the Lease Term by giving the other party written notice of intent to terminate/vacate at least sixty (60) days prior to said termination date. Should the Lessee not give said notice and vacate the Leased Premises at the end of the Lease Term, Lessee shall be liable for the payment of rent for two (2) months thereafter. Should the Lessee not give said notice and continue in possession of the Leased Premises after the end of the Lease Term, the Lessee shall be deemed to be a tenant from month to month. In such event, all terms and conditions of this Lease shall continue in full force and effect, except rent, which Lessor may unilaterally adjust to the prevailing monthly fair rental value. It is also agreed that the tenancy can be terminated by either party by giving written notice to the other party at least thirty (30) days prior to the end of the month in which said party desires such termination. This thirty (30) day written notice can be given to the other party at any time without any reason for the notice being required.

Proof of identity, copy of the title or sales agreement and proof of active insurance will be required not only upon move-in date and initial lease signing, but upon renewal. NO renewals will be considered as executed unless these items are provided at signing.

10. **MILITARY TRANSFERS.** If Lessee is a member of the Armed Forces of the United States and Lessee receives permanent change of station orders or temporary duty orders (in excess of three [3] months duration) to depart thirty-five (35) miles or more (radius) from the location of the Lot or is discharged or relieved from active duty with the Armed Forces of the United States, or is ordered to report to government-supplied quarters, Lessee may terminate this Lease upon (a) giving written notice of termination to be effective on a date stated therein, said date to be not less than thirty (30) days after Lessor's receipt of such notice, (b) providing, together with such written notice of termination, a copy of the official orders, (c) paying all rent and miscellaneous charges through the effective date of the termination, and (d) paying Lessor the amount of (i) one (1) month's rent if the effective date of the termination is less than six (6) months after the beginning of the Lease Term or (ii) one-half (1/2) of one month's rent if such effective date is at least six (6) but less than twelve (12) months after the beginning of the Lease Term. This paragraph shall not be construed to relieve Lessee from any liability under this Lease except the liability for rent for the unexpired portion of the Lease Term.

11. **ACTION BY LESSOR UPON DEFAULT.** Should the Lessee at any time during the continuance of his occupancy of the Lot fail to pay the monthly rental or other sums required hereunder, including but not limited to charges for utilities, or should the Lessee violate any one of the agreements, terms, or conditions of this lease, or any of the rules or regulations of the Mobile Home Park two (2) times within a six (6) month period or should Lessee or any other person residing in the Lot be convicted of a drug-related crime during the Lease Term, then the Lessor shall have all rights and remedies of a landlord under applicable law, including but not limited to the rights and remedies provided in VA. Code Ann. Section 55-248.31 and, in addition, the Lessor shall have the right to take possession of the Lot pursuant to a court order for possession, and to remove the mobile home from the Lot and relet the Lot. In the event that the Lessor moves the Lessee's mobile home from the Lot pursuant to this paragraph, the Lessee agrees to pay a reasonable removal and storage charge to the Lessor or the party removing and/or storing the mobile home.

12. **LIEN FOR RENT AND OTHER SUMS.** The Lessor shall have a lien upon all of the personal property, including the mobile home, of the Lessee moved in and located upon the Lot, as and for security for the rent and other sums, including but not limited to, charges for utilities, herein provided to be paid; and such installments of rent and other sums as shall remain unpaid to the amount and extent thereof shall become and are hereby made a specific lien upon such personal property as shall be upon the Lot, to all intents and purposes as though the Lessee had executed a chattel deed of trust to secure the Lessor for the rent or other sums reserved; and the Lessee shall not remove, or attempt to remove any of the aforesaid personal property while there yet shall remain due and owing any portion of the rent or other sums reserved by this lease; and should the Lessee attempt to remove such property, the Lessor is hereby empowered to distrain said property pursuant to Section 55-230 of the 1950 *Code of Virginia*, as amended, and to employ such other remedies as are authorized by law.

13. **ATTORNEY'S FEE.** In the event that Lessor engages counsel as a result of Lessee's breach of this Lease, Lessee agrees to pay Lessor's attorney's fees in the amount of $200.00 or 25% of all rent due and owing at the time judgment is obtained, whichever is greater.

14. **WAIVING OF ONE BREACH NOT A GENERAL WAIVER.** No waiver of any breach of any covenant, provision, or condition contained in this lease shall be construed as a waiver of the covenant itself or of any subsequent breach thereof.

15. **SECURITY INTERESTS IN MOBILE HOME.** The name(s) and address(es) of any person or entity having a security interest in the mobile home is as follows:
Name and address of dealer from whom mobile home purchased (if applicable).
Lessee shall notify Lessor within ten (10) days of any new security interest, change of existing security interest, or settlement of security interest.

16. **MANUFACTURED HOME LOT RENTAL ACT.** The terms of the Manufactured Home Lot Rental Act (Title 55, Chapter 13.3, 1950 *Code of Virginia*, as amended) attached hereto, are incorporated by reference into this Lease Agreement. Any provision in the Lease Agreement which conflicts with said Act shall be superseded by the applicable provision of the Act.

A. J. DWOSKIN & ASSOCIATES, INC.
3201 Jermantown Road, Suite 700
Fairfax, Virginia  22030-2879

WITNESS:_____ DATE_____ BY:_____ DATE_____
PARK MANAGER, Yvette B Jimenez, Office Assistant

WITNESS:_____ DATE_____ BY:_____ DATE_____
LESSEE (Tenant) Herbert Saravia-Cruz

WITNESS:_____ DATE_____ BY:_____ DATE_____
LESSEE (Tenant) Mario Medina

06/09/14

## UTILITY ADDENDUM

This Utility Addendum ( "Addendum") shall become part of the Mobile Home Lease Agreement (the "Lease") dated the 1st day of February , 2015 by and between Herbert Saravia-Cruz and Mario Medina ("Owner"), by its agent A.J. Dwoskin & Associates, Inc. (collectively "Lessor")  and Herbert Saravia-Cruz and Mario Medina (collectively in the singular "Lessee") of 11250 Mobile Drive   Fairfax, VA 22030 ("Lot").

1.   **Payment of Utilities and Billing Methods:** Lessee will be responsible for payment of all utilities, including those as set forth below:
    a.   **Water/Sewer.**
        i.   **Responsible Party:** Charges for this services for the Lot will be paid for by:
            ☐ Lessor; or
            ☒ Lessee, and payment shall be made directly to: ☒ Lessor  ☐ Third Party Utility Service Provider.
        ii.   **Methodology:** If paid by Lessee, charges for this utility will based on <u>one</u> of the following methods
            ☐ A flat monthly rate of $_____ per month;
            ☐ Lessee's actual use; or
            ☒ Ratio utility billing system (RUBS) –
                1.   **Occupant Factor:** In calculating Lesse's water/sewer bill, each Lot  will be assigned an Occupant Factor based upon the total number of the occupants for the Lessee's Lot as follows:

| Number of Occupants | Occupant Factor |
|---|---|
| 1 | 1.0 |
| 2 | 1.6 |
| 3 | 1.9 |
| +1 | +0.3 |

                2.   **Calculation:** Lessee's water and sewer bill will be calculated based upon the following methodology:
- First, all applicable water and sewer charges and costs are totaled for the billing period ( "Total Property Utility Cost").
- Second, a common area deduction in the amount of 5% is applied to the Total Property Utility Cost ("Adjusted Bill"").
- Third, the Occupant Factor for each Lot is totaled for the billing period ("Total Occupant Factor")
- Fourth, the Adjusted Bill is divided by the Total Occupant Factor ("Amount per Occupant")
- Fifth, the Amount per Occupant is multiplied by the Number of Occupants of for Lessee's Lot the product of which becomes Lessee's water and sewer bill for the applicable period.

    b.   **Trash.**
        i.   **Responsible Party:** Charges for this services for the Lot will  be paid for by:
            ☒ Lessor; or
            ☐ Lessee, and payment shall be made directly to: ☐ Lessor    ☐ Third Party Utility Service Provider
        ii.   **Methodology:** If paid by Lessee, charges for this utility will based upon Lessee's separate agreement with the Third Party Utility Service Provider.
    c.   **Gas.**
        i.   **Responsible Party:** Charges for this services for the Lot will  be paid for by:
            ☐ Lessor; or
            ☒ Lessee, and payment shall be made directly to: ☐ Lessor    ☒ Third Party Utility Service Provider.
        ii.   **Methodology:** If paid by Lessee, charges for this utility will based upon Lessee's separate agreement with the Third Party Utility Service Provider.
    d.   **Electricity.**
        i.   **Responsible Party:** Charges for this services for the Lot will  be paid for by:
            ☐ Lessor; or
            ☒ Lessee, and payment shall be made directly to: ☐ Lessor    ☒ Third Party Utility Service Provider.
        ii.   **Methodology:** If paid by Lessee, charges for this utility will based upon Lessee's separate agreement with the Third Party Utility Service Provider.

2   **Additional Service Charges:** Lessee is also responsible for payment of the following additional service charges:

    a.   **Service Fee:**             $_____ /Month
    b.   **Set-Up Fee:**             $_____ /One Time Fee

In addition, Lessee agrees to be responsible for any other additional fees, deposits, assessments or any other charges related to its use of utilities at the Community or as charged to the Community.  Lessor reserves the right to modify the amount of and or add any additional fees, deposits, assessments or any other utility related charges as authorized under the applicable law.

06/09/14

3.   **Payment.** Charges for usage of all utilities are considered rent as defined by the applicable law. Unless otherwise stated in this Addendum, Lessee must pay all utility charges to the Lessor in the same form and fashion in which Rent is required to be made pursuant to the Lease. Payments for utility charges are due with monthly Rent, by the first day of the following month that the charges are calculated. In the event that Lessee fails to pay any or all portion of utility charges on or before the due date, Lessor may, (i) apply a late fee as defined under the Lease or applicable law; and (ii) in its sole and absolute discretion to apply any portion of Lessee's monthly Rent payment towards the balance owed by Lessee for utility charges and leave Lessee delinquent in monthly Rent and accruing late fees as stated in the Lease and or pursue any rights or remedies Lessor would otherwise be entitled to pursue under the Lease or applicable law for Lessee's failure to pay Rent.

   a.   **Electronic Billing:** Lessee agrees that utility charges may be billed and delivered in an electronic format. Lessee further agrees that Lessor may deliver electronic bills via email, the internet or by any method as determined by Owner. Lessee may opt out of electronic billing and may receive utility bills in paper form.

4.   **Third Party Utility Service Providers & Billing Providers:** Lessee shall be solely responsible for obtaining services for all utilities for the Lot. Lessee must pay any third party utility service provider directly for usage and charges relating to the applicable utility. Payment is due immediately upon issuance. The utility service provider may prepare and deliver utility bills in an electronic format as defined in the above paragraph.

   Lessor reserves the right to select and retain the services of a third-party billing provider of its choosing for any utility used at the Community. The Lessor reserves the right to change any third-party billing service provider at its sole and absolute discretion upon thirty (30) days written notice to the Lessee.

5.   **Placing Utility Account in Name of Lessee.** Lessee shall set up an account in the Lessee's name for each utility for which Lessees responsible for payment through any third party. Lessee shall set up such an account prior to taking possession of the Lot. Lessee shall ensure the account start date corresponds with Lessee' move-in date. Lessee's failure to place the utility account for the Lot in Lessee's name is a material and substantial breach of the Lease and shall entitle the Lessor to exercise all remedies available under the Lease and applicable law. Lessee agrees to pay and indemnify Lessor for any and all utility payments made by Lessor on behalf of the Lessee.

**Miscellaneous.** Lessee acknowledges that Lessor reserves the right upon sixty (60) days written notice to begin billing Lessee for utilities not checked above or to change billing to a new method at the Owner's sole and absolute discretion. In the event of any conflict between the provisions of this Addendum and any provision of the Lease, this Addendum shall control. Lessee must not allow utilities to be disconnected – including disconnection for not paying bills until the lease term or renewal period ends. Utilities may be used only for normal household purposes and must not be wasted. If electricity is ever interrupted, Lessee must use only battery-operated lighting

WITNESS:_____ DATE_____ BY:_____ DATE 1/15/15
                                                    PARK MANAGER, Yvette E. Jimenez, Office Assistant
WITNESS:_____ DATE_____ BY:_____ DATE 1/15/15
                                                    LESSEE (Tenant) Herbert Saravia-Cruz
WITNESS:_____ DATE_____ BY: X_____ DATE 1/15/15
                                                    LESSEE (Tenant) Mario Medina

06/09/14



# A.J. DWOSKIN
## & ASSOCIATES, INC.
Real Estate Development & Management

**Lease Addendum**
**Park Policies, Rules and Regulations**

This Lease Addendum is attached to and made a part of the lease. A.J. Dwoskin & Associates (hereinafter referred to as "Manager") is acting pursuant to express written authority by the Owner of Waples Mobile Homes Park.

Residents and all occupants, including children, adults and guests, must comply with all policies regarding use of the Park.

**Security.** Manager and Owner and their respective employees and agents (hereinafter referred to as "Affiliates") do not provide, guarantee, or warrant security. Each resident has the responsibility to protect him/herself, spouse, children or guests. Manager and Affiliates do not represent the Park is safe from criminal activities by third parties. "Neighborhood Crime Watch" signs, if any, do not imply safety or security. Resident(s) should call 911 if a crime occurs or is suspected.

The existence of any perceived security devices such as cameras, or other systems are not a guarantee of your personal safety or security, and they are not a guarantee against criminal activity. No representation is being made that they will be effective to prevent injury, theft or vandalism. Manager's representatives cannot physically be every place at every moment of the day or night. Manager assumes no duties of security. Manager reserves the right to cancel or reduce any security-related mechanism without notice. Any mechanical/electronic devices must not be relied upon by resident(s) as working all the time. There will invariably be breakdowns of anything mechanical or electronic in nature, and criminals can circumvent almost any systems designed to deter crime. Under all circumstances, residents should assume that electronic and mechanical systems may malfunction and that persons responsible for them are not infallible.

Manager reserves the right to reduce, modify or eliminate any security system, security devices or service (other than those statutorily required) at any time and without notice; and such action shall not be a breach of any obligation or warranty on the part of the Manager.

The Manager and Affiliates do not promise or warrant that Manager will be aware of crime that happens in the area or even on the property. Manager will try to notify the residents when Manager becomes aware of a serious crime on the property via written notice attached to resident's front door.

If you would like to obtain information regarding the specific crime statistics for this geographical area, the local police station will be able to provide you with that information.

**Ice.** Manager has no duty to remove ice, sleet, or snow from any areas within the Park. Resident is responsible for removing snow and ice on or around his vehicle and mobile homes, and understands that snow will likely return around the vehicle following parking lot plowing.

**Construction.** Your Park may be under construction. You need to observe all warning signs and stay out of the construction areas. Construction crews work throughout the days during the week and on weekends in order to complete construction. Areas of construction will have machinery and equipment for use by authorized personnel only and entry into these areas is strictly prohibited to resident, occupants, and guests. Any blockades need to be observed and are in place for your benefit.

**Maintenance** Emergency maintenance service is provided 24-hours a day by calling the Park Maintenance Hotline phone number. Qualified maintenance personnel are on duty to handle most problems that may arise. A maintenance emergency consists of:

- No Water
- Criminal Activity
- Fire
- Flood
- Leaking Water

- Potential Fire Hazard
- Property Damage (Significant)
- Smell of Gas
- Storm Damage

**Occupants and Guests.**  No person other than those listed on the Lease and/or Mobile Home Park Application for Leaseholder will be allowed to establish residency in the Mobile Home Park for a period of more than one week per visit without prior written consent of Management.  The resident(s) will be responsible and liable for the acts of their guests.  Acts of guests in violation of the Lease or these Rules and Regulations, may be deemed by Management to be a breach by resident(s).

**Parking of Mobile Homes.**  If additional electrical service is required, it must be installed at the homeowner or dealer's expense.

Footers must be dug and installed in accordance with State and/or County requirements at the homeowner or dealer's expense.  Tie-downs are also required and must be place in accordance with the manufacturer's standards and with State and/or County codes.

It is the homeowner's responsibility to obtain or make arrangements to obtain all permits required by government authorities.  The homeowner may not reside in the mobile home until all installation requirements are met.  Management reserves the right to copy all permits and/or approvals for retention in the homeowner's file.

Lots will be used only for the parking of a mobile home approved by the Management.

Manufactured skirting is required on every mobile home.  Skirting must be installed within 30 days after moving into the Park.  Skirting, lattice, or decorative blocks approved by Management, prior to installation, must also be installed around the base of any outside deck and/or steps.

One set of manufactured steps are required at the front and the back door of each mobile home.

**Parking of Vehicles.**  Parking shall be permitted only in those areas or spaces designated by the Management.  Inoperable and/or unlicensed vehicles shall not be parked or stored on resident(s) lot or common areas of the Park.

Any unauthorized or improperly parked vehicles, inoperable, unlicensed, without current inspection stickers or without a properly displayed Resident or guest parking permit may be towed away without notice at the vehicle owner's expense and risk.

All vehicles must have a **Resident** or **Guest/Visitor** parking permit displayed at all times in the windshield. Hanging passes must be displayed on the rear view mirror.

Permits must also be displayed on borrowed and/or rented vehicles and guests vehicles. If a vehicle is parked on the premises without an approved parking permit, or if the permit is displayed improperly, it will be towed at the vehicle owner's risk and expense.

If a Resident purchases a new vehicle, the old Permanent Resident Sticker from the original vehicle must be brought into the Leasing Office with the information for the new vehicle.

If a sticker is lost or not returned to the Leasing Office upon Move-Out, a **$100** fee per sticker will be charged.

All vehicles must have current State Tags, County Stickers, and Inspection Stickers. Local police departments have the authority to enter the property and issue tickets for violations of local and state motor vehicle laws; for example, expired State inspection and local stickers and tags.

**Permits Issued.**  A copy of a valid driver's license and a vehicle registration, under the leaseholder's name, is required for each permit issued. Upon move-out or if the vehicle is sold, the sticker/permit must be returned to the Leasing Office or a fee will be incurred.

**Types of Vehicle Allowed.**  Recreational vehicles, commercial vehicles, travel trailers, boats over 16 foot, buses, panel vans, wreckers, dump trucks, state body or flat-bed trucks and all other vehicles larger than pick–up trucks and standard vans are prohibited to be parked or stored in the Mobile Home Park. The storage of equipment, and/or the placement of commercial signs or advertisement are not permitted. Resident agrees to abide by parking regulations and to notify and to require guests to abide by such parking regulations.

**Rental Payments.**  All rents and water bills are due on or before the 1st of each month.  Rent is considered late after the first of the month.  If rent and/or water is received after the 5th day of the month a late fee of $50.00.  Personal checks for late rent will not be accepted after the 5th of the month.

In the event a check is returned for insufficient funds, a "bad check" service charge of $50.00 will be assessed against the Lessee. Returned checks must be covered by cashier's check, money order or certified check. After one returned check, residents must pay by either cashier's check, money order or certified check. After six (6) months, we will consider reinstatement of personal check privileges. We do not re-deposit returned checks. We will not be responsible for postdated checks.

**Disturbance and Noises.** Loud noises and other disturbing acts, in or around the mobile home, mobile home lot or common areas, that interfere with the rights comforts or convenience of other residents and/or their guests are prohibited at all times. Resident(s) should call the Park Office, during business hours, when a disturbance from other resident(s) or their guest(s) is occurring. Resident(s) will be asked to file a written complaint with Management.

**Supervision of Children.** All parent(s) are responsible to see that their children abide by the Park House Rules and Regulations. Children must play in their own lots or the playground (Park specific). An adult must supervise children at all times. Bicycle riding, scooter riding, roller blading or skateboarding is not permitted on the Park's streets. Loitering or playing on the Park's streets is prohibited.

**Insurance.** Resident(s) agree not to use the Park or their home in any manner that will increase the risks of, or rate of insurance, or cause cancellation of any insurance policy covering the Park. Resident(s) are required to obtain an insurance policy including liability and property damage coverage with a combined single occurrence liability limit of not less than $25,000.00.

**Lot Maintenance / Usage.** Mobile home lot must be kept neat and clean. Outside storage of boxes, bottles, can, tools, appliances and other unsightly debris is not permitted. Fireplace wood can be stored if piled neatly to the rear of the lot. Mobile home lot must be mowed on a regular basis. Neglected yards will be mowed and/or cleaned at the resident's expense 10 days after written notice has been served.

Vehicle parking areas are considered a part of your lot and must be kept clean.

Resident(s) must consult Management prior to planting or doing any excavation. All planting becomes the property of the Park.

Only standard outdoor furniture (not overstuffed or traditional indoor furniture) may be placed on decks or outside the mobile home.

Major vehicle repair or oil changes are not permitted in the Park.

Resident(s) must install and maintain a heat tape on the water lines and meter assembly to protect them from freezing during the winter months. Any damage to water lines or meter assembly will be billed to resident.

**Lot Inspection / Maintenance.** All mobile home lots remain under the direct control of Management. Residents shall permit Management or its agents to enter the lot at all reasonable times for the purpose of reading meters, inspecting, maintaining or making repairs, alterations or additions to any portion of the lot.

As deemed necessary by Management, all external portions of the mobile home and lots in the Park will be inspected as to their size, style, design, exterior number address, maintenance and condition to determine whether they conform to the standards and regulations outlined in these Rules & Regulations and the Mobile Home Lease Agreement. If a home or lot does not conform, the resident(s) will be given written notice to bring the mobile home or lot into compliance within 30 days. If the resident(s) does not conform within the required period, they would be subject to fines, legal action and possible eviction.

Management reserves the right to access and enter the mobile homes of its residents, upon a twenty-four (24) hours written notice, for the purpose of determining the number of residents in the mobile home, and otherwise evaluating compliance with the terms of the Lease Agreement. (See Lease Agreement, Paragraph 6)

Except for loss or damages caused by Landlord's gross negligence or willful misconduct, the resident(s) shall be solely responsible for and assume all risk of loss or damages to the mobile home and all property placed in or around the mobile home.

All resident(s) must show proof of property and liability insurance coverage for their mobile home. Resident(s) will be required to show Management an updated certificate of insurance each year.

**Soliciting.** Solicitors, canvassers, vendors and peddlers etc. are not permitted in the Park.

**Pets.** Pets are not permitted on the premises until approved by management. A pet agreement must be executed and all applicable deposits and fees paid. Pets must be on a leash at all times when outdoors. Residents are to clean up after their pets. There will be a $25.00 charge per incident to those who do no clean up after their pet(s). Pet privilege will be immediately revoked for non-compliance. Exotic animals and some dog breeds are restricted. No more than two (2) pets are permitted and each pet must weight no more than one hundred (100) pounds at maturity. Monthly pet rent is $20/per pet.

No Rottweilers, Pit Bulls, Malamutes, St. Bernards, Great Danes, Akitas, American Bulldog Staffordshire Terriers, Canary Dogs, Doberman Pinschers, Chow-Chows (including mix with restricted breeds) or exotic animals (Tarantulas, Piranhas, Reptiles – snakes, iguanas, Ferrets, Skunks, Raccoons, Squirrels, Rabbits, Birds – parrots, cockatiels, macaws) will be permitted.

**Speed Limit.** Our roadways must accommodate vehicles and pedestrian traffic. 10 M.P.H. and/or 15 M.P.H. speed limits (Park specific) have been posted. Speeds beyond the posted limited have been proven to be dangerous in the Mobile Home Park. Resident(s) will be held responsible for strict observance of the posted limits, not only for themselves, but also for their family members and guests.

**Fireworks.** Fireworks are strictly prohibited in the Mobile Home Park.

**General use of the Lot.** Lots will be used only for the parking of a mobile home approved by the Management.

No improvements to your mobile home or lot, including and not limited to the decks, awnings, carports, storage sheds, and fencing will be allowed without prior written permission from the Management. Storage sheds, awnings, and skirting must be of a manufactured rust-resistant variety and be approved by the Management in writing prior to installation. Storage sheds must be of manufactured type, not to exceed 100 square feet (10 X 10) in floor area and not higher than 8 feet in height complete with doors. Only one storage shed per lot is permitted. Fencing shall not exceed four (4) feet in height and must be approved by Management prior to installation.

The only type of clothesline that will be permitted is the umbrella type, to be placed at the rear of the mobile home lot.

Children's pools are allowed provided they do not exceed six (6) feet in diameter and two (2) feet in depth.

**Mail Services.** Mail is delivered to common area mail boxes or individual mobile home mail boxes depending on US Postal Service.

The Park Office will not accept any UPS, Federal Express or special deliveries.

**Zero Tolerance.** Any arrestable offense will not be tolerated. Fighting of any kind including intentionally or recklessly causing physical harm to any person is an arrestable offense and will not be tolerated. Intentionally or recklessly placing any person under mental duress or causing any person to be in fear of physical danger will not be tolerated. Criminal sexual behavior and public sexual acts will not be tolerated. Unauthorized use or possession of any weapon (licensed or otherwise) will not be tolerated. Illegal drug use or the possession of illegal drugs will not be tolerated. Intentionally initiating or causing to be initiated any false alarm or report, warning or threat of fire, explosion or other emergency will not be tolerated. Disposing of trash anywhere other than designated areas will not be tolerated. Inappropriate behavior including but not limited to fighting, playing on fencing, graffiti, destruction of property, or other use of Park property for other than designed use will not be tolerated. Open containers of alcohol are illegal. In the opinion of the Manager, any activity of a suspicious nature on the part of the resident, or any of the employees, guests or family members of the resident in the leased premises, or any areas adjoining the premises, shall be cause for immediate termination of the lease.

Zero tolerance offenses constitute a non-remediable act. We may terminate the Lease Contract immediately by written notice to you.

**Sale of Mobile Home.** Resident(s) may sell their mobile home to whomever they choose. If the mobile home is to remain in the Park, Management reserves the right to grant permission on the following conditions:

- The seller(s) must be current in rent and water payments.
- Only mobile homes in good exterior appearance and conditions will be considered to remain in the Park.
- Mobile homes must have manufactured mobile home skirting installed around the entire base of their mobile home; awnings and storage buildings/sheds must be in good repair. All mobile homes must have hitches, tires and axles so the mobile home may be transported on the public roads before permission will be given to sell a mobile home and remain in the Park.

4.  I agree to assume full and complete responsibility for all risks and hazards attributable to, connected with or in any way related to any construction now or hereafter occurring on the property.

| | | | |
|---|---|---|---|
| Resident | Date | Management Representative | Date |
| Resident | Date | | |
| Resident | Date | | |
| Resident | Date | | |
| Resident | Date | | |
| Resident | Date | | |

# Exhibit C-2



**BULL RUN**
**& WAPLES**
MOBILE HOME COMMUNITIES
Managed by A.J. Dwoskin & Associates

March 11, 2016

Dear Residents:

This letter is to inform you that the month-to-month premium will increase to $300 effective June 1, 2016.

This premium only applies to lots that are not in a current lease contract or fail to renew after the current lease contract expires.

Please feel free to contact the Leasing Office with any questions.

Sincerely,

Josephine Giambanco
Property Manager

**URGENT**