# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*, | |
| Plaintif, | |
| v. | Civil No.: 1:16cv563-TSE-TCB |
| WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, | |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN
## OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited

Partnership, and A. J. Dwoskin & Associates, Inc. (collectively "Defendants"), by counsel,

pursuant to Fed. R. Civ. P. 56 submit this memorandum of points and authorities in support of

Defendants' Motion for Summary Judgment on all counts of Plaintiffs' Complaint and in

opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Cross-Motion").

US_ACTIVE-130190805

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

IMPROPERLY DISPUTED MATERIAL FACTS...............................................................2

RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS .........3

SUMMARY OF ARGUMENT ............................................................................................9

ARGUMENT......................................................................................................................12

I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' FHA CLAIMS................................................................................12

        A.      Plaintiffs fail to identify any evidence to support a claim of disparate
                impact.........................................................................................................12

                1.      Plaintiffs cannot satisfy the robust causality requirement. ........................13

                2.      Plaintiffs Fail To Produce Evidence That Latinos are
                        Disproportionately Impacted by the Policy. ...........................15

        B.      Plaintiffs failed to provide any evidence of disparate treatment............................19

        C.      The Reasons for the Policy are Plainly Legitimate and Not Pretextual.................24

II.     THERE ARE NO TRIABLE ISSUES OF FACT ON PLAINTIFFS' § 1981
        CLAIM....................................................................................................................27

III.    PLAINTIFFS' FRAUD ENTITLES DEFENDANTS TO SUMMARY
        JUDGMENT ON COUNTS III AND V....................................................................29

CONCLUSION....................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*DeJarnette v. Corning, Inc.,*
    133 F.3d 293 (4th Cir. 1998) ...........................................................................................23

*Denny v. Elizabeth Arden Salons, Inc.,*
    456 F.3d 427 (4th Cir. 2006) ...........................................................................................27

*Dominion Bank, N.A. v. Moore,*
    688 F. Supp 1084 (W.D. Va. 1988) .................................................................................30

*Foster v. Univ. of Md.-E. Shore,*
    787 F.3d 243 (4th Cir. 2015) .............................................................................................9

*Merritt v. Old Dominion Freight Line, Inc.,*
    601 F.3d 289 (2010)..........................................................................................................11

*Murrell v. Ocean Mecca Motel, Inc.,*
    262 F.3d 253 (4th Cir. 2001) ...........................................................................................20

*Proud v. Stone,*
    945 F.2d 796,797 (4th Cir. 1991) ....................................................................................23

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502 (1993)...................................................................................................20, 24

*Tex. Dep't. of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.,*
    135 S. Ct. 2507 (2015)...........................................................................................9, 12, 13

*Texas Dept. of Community Affairs v. Burdine,*
    450 U.S. 248 (1981)..........................................................................................................20

*U.S. Postal Serv. Bd. Of Governors v. Aikens,*
    460 U.S. 711 (1983)..........................................................................................................11

*U.S. v. Aguilar,*
    477 Fed App'x 1000 (4th Cir. 2012) ...............................................................................26

**Statutes**

8 U.S.C. § 1324..........................................................................................................................26

**Rules**

Fed. R. Civ. P. 56 .........................................................................................................................1

# INTRODUCTION

In order to avoid dismissal of their Federal Fair Housing Act ("FHA"), Virginia Fair Housing Law ("VFHL") and Section 1981 claims, Plaintiffs claim to be able to prove intentional discrimination and to satisfy the "because of" requirement of robust causality by demonstrating: 1) a claimed hardship for Plaintiffs to provide the documents required by the Policy; and 2) a claimed hardship on the families due to the female Plaintiffs admitted inability to comply with the Policy because they are in the United States illegally.  Neither is factually correct or even remotely supports a claim of discrimination.  Plaintiffs do not contend that non-Latinos are not required to provide the documents required by the Policy, nor do they contend that non-Latinos are allowed to lease at the Waples Trailer Park (the "Park") without complying with the Policy. Plaintiffs further concede that none of the female Plaintiffs have any documents that comply with the Policy because of their illegal status.  In short, Plaintiffs do not contend or provide any evidence that they are treated any differently because they are Latino.  Further, the claimed impact on the families of the female Plaintiffs who cannot comply arises from their illegal status, not because they are Latino.  The impact would be exactly the same on, for example, an Asian family under the same circumstances.  Thus, Plaintiffs wholly fail to satisfy the robust causality requirement and wholly fail to show any evidence of intentional discrimination

The Plaintiffs' lack of evidence to support their claims of discrimination is not surprising given that they never alleged a claim of disparate treatment – as they admitted to the Court – and given that they testified at their depositions that they were not treated differently because they are Latino or non-citizens.  In fact, Plaintiffs testified that the reason the female Plaintiffs could not comply with the Policy was due to their illegal status.[1]  It is clear that Plaintiffs are asking this Court to rule that a policy that requires proof of legal residence as a prerequisite to leasing

---

[1] *See* paragraphs 7-9 of Defs.' Undisputed Statement of Facts – which are undisputed by Plaintiffs.

violates the FHA. As this Court has held, there is no such claim under the FHA. Accordingly, defendants are entitled to summary judgment as to counts I, II and IV.

With respect to their breach of contract claim and their claim asserted under the Mobile Home Lot Rental Act ("MHLRA"), Plaintiffs suggest that they can make knowing misrepresentations in their lease applications with impunity because the MHLRA protects them from their fraud. This is absurd and the evidence of the misrepresentations is clear. Defendants are entitled to summary judgment as to counts III and V.

## IMPROPERLY DISPUTED MATERIAL FACTS

Plaintiffs improperly dispute the following Undisputed Material Facts:

1.      The exhibits to which Plaintiffs cite provide no support for the contention that the Policy was *not* applied neutrally.

10.      The exhibits to which Plaintiffs cite do not refute Defendants' Undisputed Fact 10. Further, Defs.' Undisputed Facts 7-9 are admitted by Plaintiffs and show that Undisputed Fact 10 is also true.

12.      There is no basis to dispute "after 2015." The Violation Letters show that the issue was the inability of the female Plaintiffs to comply with the Policy. *See* Cross-Motion Ex. 4-7 (referencing "unauthorized occupants").

19.      There is no factual basis to dispute Undisputed Fact 19 other than a citation to Felix Bolanos' testimony. Not only is Undisputed Fact 19 not disputed for the remaining seven plaintiffs, but Mr. Bolanos' testimony does not dispute Undisputed Fact 19. Instead, Mr. Bolanos' testimony is that that he knew that he was misrepresenting the number of occupants in his trailer when he left his wife off of the application. Ex. 1 (Bolanos Dep. Tr. 42:11-15).

20.      Plaintiffs cannot rely upon parole evidence to modify the applications. Additionally, page 1 of each lease states that the leases were made based on the representations

in the male Plaintiffs' lease applications. *See* Ex. 21 – 24 to Defs.' MSJ (Dkt. 98).

21.     Improperly Disputed as to Mr. Saravia-Cruz. Plaintiffs' Exhibit 17 is not Mr. Saravia-Cruz's application. Exhibit 20 to Defs.' Motion for Summary Judgment is his application as he testified at his deposition. *See* Ex. 2 (Saravia-Cruz Dep. Tr. 41-42).

23.     The deposition testimony cited does not dispute Undisputed Fact 23.  The male Plaintiffs' wives are not listed on the applications. *See* Ex. 17-20 to Defs.' MSJ (Dkt. 98). The male Plaintiffs identified Ex. 17-20 as their applications to live at the Park. *See* Ex. 2 at 41-42; Ex. 1 at 40-41); Ex. 3 (Moya Dep. Tr. 35:11-36:14); Ex. 4 (Reyes Dep. Tr. 33:6-12).

24.     Undisputed Fact 24 states that Plaintiffs were not **_charged_** an additional $300. The testimony cited by Plaintiffs does not dispute this fact.

27.     The testimony cited by Plaintiffs does not dispute Undisputed Fact 27.  As for Mr. Reyes, although Mr. Reyes stated that he did not know if he was discriminated against because he was Latino, *see* Ex. 4 at 30:15-19, when Mr. Reyes was asked ███████████████ ████████████████████████████████████████████ Mr. Reyes stated in response ████████████ *See* Ex. 4 at 72:22-73:5.

29.     The deposition testimony cited by Plaintiffs does not dispute Undisputed Fact 29.

33.     Improperly Disputed as to Ms. Solis. The deposition testimony referred to by Plaintiffs does not dispute Undisputed Fact 33.

34.     Ms. Amaya repeatedly states that she does not know if she has been discriminated against because she is a non-citizen before admitting that she believes she has been discriminated against because she does not have any papers. *See* Ex. 5 (Amaya Dep. Tr. 28:21-34:6).

38.     Plaintiffs dispute their own interrogatory responses. Defs.' Undisputed Fact 38.

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Disputed. There are other documents that an individual without a Social Security Number ("SSN") can provide under the Policy to prove proof of legal presence. The documents an individual could provide under the Policy must be issued by the U.S. Government and prove legal presence in the United States. Ex. 6 (Jones Dep. Tr. 87-88; 224:8-20); Ex. 7 (Giambanco Dep. Tr. 29:24-31:20; 63:21-64:8); Ex. 8 (Easton Dep. Tr. 30:21-32:7; 47:9-14; 57:18-21; 96:5-12; 125:3-11); *e.g.*, Ex. 9 (2/19/13 Resident Selection & Occupancy Standards at Waples 2327) (outlining documents accepted); Ex. 10 (5/8/15 Resident Selection & Occupancy Standards at Waples 2511) (outlining documents accepted); Ex. 11 (Consumer Reports & CoreLogic SafeRent Training Manual at 50-59) (listing documents proving legal presence) at 62-66 (listing different visa types)).

2.      Disputed. Plaintiffs mischaracterize the deposition testimony cited. In response to the question "[d]o you know of any other landlords who require a Social Security number or proof of legal status rent to a tenant?" Mr. Dwoskin testified "Yes". Ex. 12 (Dwoskin Dep. Tr. 85:15-86:1).

3.      Undisputed that the Policy has been in place for years and that the Policy was applied to renewal applicants in 2015. Disputed that Defendants only began strictly enforcing the Policy in 2015. The deposition testimony cited does not support the contention that Defendants only began strictly enforcing the Policy in 2015. The deposition testimony cited by Plaintiffs from Mark Jones' deposition only notes that the Policy was enforced for renewals in 2015.  Ms. Giambanco's and Ms. Easton's deposition testimony discusses the policy of "recertification" not the enforcement of Policy in its entirety.

4.      Disputed. The deposition testimony referred to by Plaintiffs is silent on whether the other incidents involved individuals who were undocumented immigrants. Further, the cited

testimony does not state that the incidents referred to by Plaintiffs prompted enforcement of the Policy, rather, the incidents prompted enforcement of the Policy on renewals.

5-8.    Undisputed.

9.    Disputed. Defendants did not learn that Mr. Saravia's wife was living at the Park until the inspection of Mr. Saravia-Cruz's home. Ex. 7 at 77:10-78:13. Mr. Saravia-Cruz did not list his wife on his application. Pls.' Ex. 17 is not Mr. Saravia-Cruz's application. Ex. 20 to Defs.' MSJ (Dkt. 98) is Mr. Saravia-Cruz's application. *See* Ex. 2 at 41-42.

10.    Undisputed.

11.    Disputed. Mr. Bolanos did not list his wife on his lease application. Ex. 18 to Dkt. 98 (Bolanos Lease Application); Ex. 1 at 40:9-21. Further, Mr. Bolanos' testimony is that he knew that he was misrepresenting the number of occupants in his trailer when he left his wife off of the application. Ex. 1 at 42:11-15. Defendants first learned that Mr. Bolanos' wife was living with him at the Park when his home was inspected in 2015. Ex. 7 at 75:18-22.

12.    Disputed. Mr. Moya listed his children on his lease application but not his wife. Ex. 19 to Dkt. 98 (Moya Lease Application; Ex. 3 at 31:19-32:9. Defendants did not learn that Mr. Moya's wife was living with him until his trailer was inspected in 2015. Ex. 7 at 76:18-77:1.

13.    Disputed. First, Plaintiffs only cite to the deposition transcripts of Mr. Bolanos and Reyes in their factual statement that applies to all Plaintiffs. Second, according to the evidence in Plaintiffs' own citations, Plaintiffs' efforts plainly did not comply with the Policy.

14.    Disputed. Mr. Reyes was placed on a month-to-month lease and had his rent increased by $100 per month because Mr. Reyes misrepresented the occupants on his lease application and because Mr. Reyes' wife could not comply with the Policy. Ex. 17 to Dkt. 98 (Reyes Lease Application); Ex. 4 at 33-34; Defs.' Undisputed Facts 7-9.

15.    Disputed. Mr. Bolanos was placed on a month-to-month lease and had his rent increased by $100 per month because Mr. Bolanos misrepresented the occupants on his lease application and because Mr. Bolanos' wife could not comply with the Policy. *See* Ex. 18 to Dkt. 98; Ex. 1 at 40); Defs.' Undisputed Facts 7-9.

16.    Disputed. Mr. Moya was placed on a month-to-month lease and had his rent increased by $100 per month because Mr. Moya misrepresented the occupants on his lease application and because Mr. Moya's wife could not comply with the Policy. *See* Ex. 19 to Dkt. 98 (Moya Lease Application);  Ex. 3 at 41-43; Defs.' Undisputed Facts 7-9.

17.    Disputed. Mr. Saravia-Cruz was placed on a month-to-month lease and had his rent increased by $100 per month because Mr. Saravia-Cruz misrepresented the occupants on his lease application and because Mr. Saravia-Cruz's wife could not comply with the Policy. Ex. 20 to Dkt. 98 (Saravia-Cruz Lease Application); Ex. 2 at 41-42; Defs.' Undisputed Facts 7-9.[2]

18.    Undisputed that a notice was sent to Plaintiffs indicating that their rent would increase by $300 a month. Disputed that the $300 was ever charged or collected. Ex. 5 at 88:1-3; Ex. 13 (Rosy Reyes Dep. Tr. 105:5-8); Ex. 14 (Rivas Dep. Tr. 134:13-135:7); Ex. 3 at 56:5-14; Ex. 15 (Solis Dep. Tr. 99:6-11).

19.    Disputed.  The Reyes, Bolanos, and Saravia-Cruz families moved out of the Park because the female Plaintiffs could not comply with the Policy. Defs.' Undisputed Facts 7-9.

20.    Disputed. *See* Ex. 16 (Weinberg Decl. attaching Weinberg Expert Report).

21.    Disputed. Pls.' Ex. 41 is not a list of individuals who could not comply with the Policy but is a list of individuals who were not in compliance at that point in time.

22.    Undisputed that some of the reasons for the Policy were to confirm applicants' identities, perform credit and criminal background checks, and minimize loss from eviction.

---

[2] As noted above, Plaintiffs' Exhibit 17 is not Mr. Saravia-Cruz's lease application.

However, it is disputed that these reasons are all of the reasons for the Policy. Other reasons for the Policy include avoiding potential criminal liability for harboring and the underwriting of leases. *See* Ex. 29 to Defs.' MSJ. at Int. 1, 16. Ex. 6 at 133-40.

23.     Disputed. A SSN is necessary to help confirm the identity of the individual who a background check is run on. *See* Ex. 29 to Defs.' MSJ. at Int. 1, 16; Ex. 6 at 102:11-103:13; 116:19-117:18; Ex. 17 (Caruso Decl. with Caruso Expert Report); Ex. 8 at 60:9-13; Ex. 11 at 35-39 (discussing how a SSN helps verify identity); *e.g.*, Ex. 9 at WAPLES 2328) (detailing how SSN can help verify fraudulent identity).

24.     Undisputed that criminal background checks have been run without SSNs; however, these background checks have only been run when proof of legal presence documents have been provided. Ex. 6 at 134:4-12; 137:16-138:3. Ex. 8 at 125:12-21; 135:18-22.

25.     Undisputed.

26.     Undisputed.

27.     Disputed. Ex. 6 at 224 (discussing how ITINs are not valid for identification outside the tax system); Ex. 8 at 60:9-13; Ex. 11 at 35-39, 45, 49 (discussing how a SSN helps verify identity and a ITIN is not satisfactory for identity verification); *e.g.*, Ex. 9 at WAPLES 2327-28) (noting that a U.S. citizen without a SSN was grounds for immediate denial and discussing how SSN can help verify fraudulent identity).

28.     Disputed. Defendants accepted ITINs only when an individual had documents evidencing proof of legal presence. Ex. 9 at WAPLES 2327-28; Ex. 10 at WAPLES 2510-11); Ex. 6 at 224; Ex. 8 at 94:9-14; 95:11-16.

29.     Disputed. ITINs are not as effective at confirming the identity of an applicant so that the background check is run on the correct individual. *E.g.*, Rosy Reyes' Response to Int. 8

(Ex. 31 to Defs.' MSJ (Dkt. 98)); Ex. 6 at 224:3-7; Ex. 11 at 45, 49 (discussing how a ITIN is not satisfactory for identity verification); *e.g.*, Ex. 2 at 68:8-69:15 (discussing fingerprinting and background check as part application process for social security number).

30.    Disputed. The cited testimony does not support Plaintiffs' Fact. Among other reasons, Defendants used legal presence documents in order to verify identity to ensure the background check was run on the correct individual. *See* Ex. 29 to Defs.' MSJ at Int. 1, 16; Ex. 8 at 160:9-16); Ex. 6 at 134.

31.    Disputed. There are other documents that an individual without a SSN can provide under the Policy to prove proof of legal presence. The documents an individual could provide under the Policy must be issued by the U.S. Government and prove legal presence in the United States. *See supra,* Response to Pls.' Undisputed Fact 1.

32.    Disputed. The cited testimony does not support the contention that Defendants were "unaware" of the MHLRA before this litigation.

33.    Disputed.  Defendants did not improperly convert Plaintiffs' leases into month-to-month leases because the male Plaintiffs made misrepresentations in their applications, and the female Plaintiffs could not comply with the Policy. *See supra,* Defs.' Responses to Pls.' Undisputed Facts 14-17. The cited testimony does not support the contentions in Pls.' Fact 33.

34.    Disputed.  Because the female Plaintiffs were not listed on any application or lease with Defendants, Defendants were not able to verify the identity of the female Plaintiffs nor able to run background checks on the female Plaintiffs. *See* Ex. 29 to Defs.' MSJ. at Int. 1, 16.  If someone lives at the Park who Defendants are not aware of and who Defendants cannot run a background check on, it affects the health, safety and/or welfare of others at the Park. *See* Ex. 6 at 133-35, 140; Ex. 2 at 68:8-69:18 (explaining his wife has never been undergone the

fingerprinting or background check process of applying for a SSN).

## SUMMARY OF ARGUMENT

Recognizing that they cannot satisfy the robust causality requirement for a disparate impact claim, Plaintiffs attempt to circumvent this Court's prior ruling and the robust causality requirement set forth in *Tex. Dep't. of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct. 2507 (2015) by asking this Court to rely upon an inapposite Fourth Circuit case for the proposition that "robust causality" does not mean "actual causation," and that Plaintiffs need not prove "actual causation" to survive summary judgment.[3] This assertion is flat contrary to *Inclusive Cmties*. Plaintiffs' attempt to convince the Court that they need not show actual causation is telling; Plaintiffs have no evidence of any causal link between the Policy and the claimed disproportionate impact on Latinos.

As this Court already determined, "in the instant case, the disparate impact on Plaintiffs as Latinos is only incidental to the Policy's effect on all illegal aliens." Memo. Op. at 16 (Dkt. 56). Thus, the Court concluded that "plaintiffs must still show that the Policy was instituted 'because of' race or national origin." *Id.* at 17. Plaintiffs proffer no evidence to meet this burden. Indeed, the undisputed facts show that the Policy was not instituted for the purpose of targeting Latinos, the Policy applies to all residents and potential applicants regardless of race and affects illegal aliens the same regardless of their race. Plaintiffs concede that Latinos have and can sign leases at the Park, that 60% of the residents at the Park are Latino and that the issue confronted by the female Plaintiffs is not their race, but their illegal status. Additionally, Defendants have provided the Court with letters to other non-Latino residents at the Park who were required to provide proof of legal residence as required by the Policy. There is no evidence

---

[3] Plaintiffs rely on *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243 (4th Cir. 2015) for this argument. *See* Cross-Motion at 14. This is a Title VII retaliation case decided ***before*** *Inclusive Cmties.*

that the Policy was enacted "because of" race or  was only applied to Latinos.

In a final effort to create a disparate impact claim, Plaintiffs point to the effect of the Policy on the families of the female Plaintiffs as satisfying the robust causality requirement. This provides no support for Plaintiffs' claim.  The impact on the family members is due to the illegal status of the female Plaintiffs – not the race of the family members or the female Plaintiffs.  If the family at issue was of Asian descent, the effect of the Policy would be exactly the same.  Second, the impact on the families is due to the female Plaintiffs' choices to enter the United States illegally and to remain in the United States illegally.

In an attempt to argue that a disparate treatment claim that was never alleged by Plaintiffs should survive summary judgment, Plaintiffs contend that the documents required of "Latino non-citizens" and the effect on the families discussed above is sufficient circumstantial evidence to avoid dismissal.  Plaintiffs are wrong.  There is no evidence that only "Latino non-citizens" were required to provide the documents required by the Policy.  The evidence is just the opposite.  Further, Plaintiffs misrepresent the documents that Defendants would accept as proof of legal residency.  In fact, Defendants would accept any documents showing legal presence, not just I-94s.  And the "breadth of the Policy" argument provides no support for Plaintiffs for the reasons stated above.

Plaintiffs also spend considerable effort in attempts to attack the rationale of the Policy by stating, for example, ITINs are as good as SSNs.  In doing so, Plaintiffs misstate the full reasons for the Policy and ignore the salient purposes for the Policy such as underwriting, criminal background checks based on the *true* identity of the applicant and avoiding potential criminal issues under the anti-harboring statute.  Importantly, Plaintiffs also invite the Court to ignore their legal burden of proving that the reasons given are false *and* that the Policy was

enacted for the purpose of actual, intentional discrimination against Latinos.  In *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (2010), the Fourth Circuit made clear that "notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating the resolution of the 'ultimate question of *discrimination vel non.*'" (citing *U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 (1983)).  There is no evidence that Defendants enacted or enforced the Policy with the intent to discriminate against Latinos.

Plaintiffs' section 1981 claim fares no better.  Plaintiffs continue to argue that because of the supposed "hardship" of providing the documents required by the Policy, they can prove a claim of intentional discrimination based on citizenship.  The Plaintiffs, of course, point to no such burden for them because the female Plaintiffs have no documents to show legal status, and the male Plaintiffs complied with the Policy by providing social security numbers.  Moreover, it is not an onerous or discriminatory requirement to require non-citizens who do not have a social security number to show some proof of legal residence.

Finally, Plaintiffs seek summary judgment on their claims under the MHLRA asserting that they were not given proper notice of termination of their leases. Cross-Motion at 27-30.  What the Plaintiffs ignore is the fact that the male Plaintiffs intentionally failed to identify their wives as occupants as expressly required by the application, the lease and the rules and regulations of the Park.  The male Plaintiffs various assertions that they did not think they needed to identify their wives are not credible.  The male Plaintiffs knew that their wives are in the United States illegally and could not comply with the Policy.  Having made knowing misrepresentations, the Plaintiffs suggest that the MHLRA protects them from their fraud.  According to the Plaintiffs, after having the lease executed under false representations, the male Plaintiffs could have moved in any number of unidentified adult occupants and Defendants could

do nothing about it for a year.  The MHLRA does not protect a tenant from their own fraud.

## ARGUMENT

### I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FHA CLAIMS

It has been clear from the inception of this case that the Policy at issue applies to all applicants regardless of race, has no impact on Plaintiffs because they are Latino and was not enacted for the purpose of discriminating against Latinos or non-citizens.  Plaintiffs admit as much themselves and the facts overwhelmingly show a facially neutral Policy implemented for a myriad of proper purposes that at most impacts illegal aliens, as the Plaintiffs themselves have repeatedly alleged.  This Court has already correctly determined that a Policy aimed at illegal aliens cannot state a claim under the FHA. (Dkt. 56.)  Accordingly, Defendants are entitled to summary judgment as to Count I.[4]

#### A.     Plaintiffs fail to identify any evidence to support a claim of disparate impact.

In *Inclusive Communities*, the Supreme Court held that a plaintiff, at the "prima facie stage," must show a "robust causal connection" between – in this case – the Policy and the claimed impact on Plaintiffs as Latinos.  The Supreme Court rejected the notion that a "statistical disparity" is sufficient to prove a disparate impact claim stating "a disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's Policy … causing [the] disparity."  135 S. Ct. at 2523.  Relying on *Inclusive Communities*, this Court held that in order to satisfy the robust causality requirement, Plaintiffs cannot rely on disparate impact here, but "must still show that the Policy was instituted because of race or national origin."  Memo Op. at 17 (Dkt. 56).  Plaintiffs do not point this Court to any evidence to satisfy this robust causality requirement because the facts plainly demonstrate that the Policy was not

---

[4] Count II under the VFHL should also be dismissed for the same reasons that Count I should be dismissed.

enacted to impact or to target Latinos. Moreover, it is clear, as it has been from the beginning of this case, that the only Latinos affected by the Policy are those that are in the United States illegally. Further, Plaintiffs fail to even demonstrate a factual basis for their assertion that Latinos are disproportionately impacted by the Policy. Finally, the reasons for the enactment of the Policy are founded on legitimate and accepted practices in the multi-family arena. For all of these reasons, the Plaintiffs' claim of disparate impact must be dismissed.

     **1.**    **Plaintiffs cannot satisfy the robust causality requirement.**

In their Cross-Motion Plaintiffs contend, citing the *Foster* case, that they need not show that the Policy was the "actual cause" of the alleged discrimination until the "pretext stage." Cross-Motion at 14. This is wrong as a matter of law. Further, Plaintiffs identify no evidence to satisfy the robust causality requirement

In *Inclusive Communities* the Supreme Court held that the robust causality requirement must be satisfied at the prima facie stage stating "without adequate safeguards at the prima facie stage, disparate impact liability might cause race to be used and considered in a pervasive way and would almost inevitably lead government or private entities to use numerical quotas, and serious constitutional questions then could arise." 135 S. Ct. at 2523. The "safeguard" referred to by the Court is the "robust causality requirement" explained in that same paragraph. The *Foster* case was decided before *Inclusive Communities*, addresses a claim for retaliation and obviously must yield to *Inclusive Communities* in any event. *Inclusive Communities* makes clear that a Plaintiff must satisfy the robust causality requirement at the prima facie stage and that the Court must critically examine this obligation promptly.

Plaintiffs' attempt to avoid the burden of identifying facts to prove a prima facie case is understandable given the complete lack of evidence to support Plaintiffs' claim. There is no

evidence that the Policy targets or otherwise impacts Latinos in a way that is different from any other persons. The Policy is neutral on its face, Plaintiffs admit that Latinos regularly comply with the Policy and sign leases for the Park and that the majority of residents at the Park are Latino. *See* Defs.' Undisputed Facts 15, 17, Cross-Motion Ex. 40B at 5. The only subset of Latinos even arguably impacted are those – such as the female plaintiffs - who are in the United States illegally. Thus, Plaintiffs fail to satisfy the "because of" requirement for robust causality.

This Court previously held that Plaintiffs' "disparate impact theory can hardly meet the FHA's requirement to show discrimination 'because of' race or national origin when a housing policy lawfully targets illegal aliens (the vast majority of whom, incidentally, are Latinos)." Memo. Op. at 15 (Dkt. 56). The Court further stated "this is so for the obvious reason that the vast majority of illegal aliens in the United States are persons of Latino descent; thus, any Policy that targets illegal aliens in the United States will disparately impact Latinos…. allowing Plaintiffs in this case to satisfy the FHA's causation element simply by proving the Policy disparately impacts Latinos would effectively eliminate the statutes 'because of' requirement…." *Id.* at 9. Therefore, the Court concluded that Plaintiffs must prove that the Policy impacts them "because of" the fact that they are Latinos or non-citizens.

Plaintiffs cannot identify any evidence to this Court to sustain their burden of proving that they are impacted by the Policy because of their status as Latinos or non-citizens. The Policy's requirement for proof of legal residence in the United States applies to all regardless of race or nationality. Plaintiffs do not identify any evidence that even suggests that the Policy was applied only to Latinos. To the contrary, the evidence shows that non-Latino illegal aliens at the Park were also required to provide proof of legal residence. *See* Ex. 18 (letters to non-Latino residents). The male Plaintiffs all agree that they were able to execute leases for the Park and

able to comply with the Policy; and all of the Plaintiffs admit that Latinos are routinely able to comply with the Policy and to enter into leases for the Park. *See* Defs.' Undisputed Facts 11-15. It could not be more clear that the Policy does not impact the Plaintiffs because they are Latino. The impact arises solely from the fact that the female Plaintiffs are in the United States illegally.

Despite these undisputed facts, Plaintiffs argue that the alleged impact of the Policy on the families of the female Plaintiffs satisfies robust causality.[5] Cross-Motion at 15-17. This argument misses the mark for several reasons. First, the families here are no more affected than a similarly-situated family of Asian descent that includes a spouse in the United States illegally. The "because of" analysis leads back again to the female Plaintiffs' illegal status, not their race or the race of their family. Second, Plaintiffs' argument incorrectly focuses upon the impact of the Policy rather than the cause of the impact. That the families here may be impacted by the Policy begs the question of whether that impact is due to race. The answer is plainly no. The impact would be the same on any family – whether Latino, Asian or other ethnicity – requesting to have an adult illegal alien live with them at the Park. Try as they might, Plaintiffs cannot escape the obvious conclusion that they are impacted "because of" the female Plaintiffs' illegal status in the United States, not because of their race or non-citizenship.

### 2. Plaintiffs Fail To Produce Evidence That Latinos are Disproportionately Impacted by the Policy.

Further undermining Plaintiffs' efforts to prove a disproportionate impact on Latinos is their reliance upon Professor Clark's conclusion that Latinos are slightly less than two times as likely to be affected by a Policy directed at illegal aliens as undocumented Asians.[6] Professor

---

[5] Plaintiffs also contend that they can demonstrate a disproportionate impact on Latinos with respect to the Policy based upon the expert opinion of Professor William A.V. Clark. As discussed below, Professor Clark's opinion, which he admits has at least a margin of error of 26%, is wholly unreliable and fails to support Plaintiffs' assertion that Latinos are disproportionately impacted by the Policy.

[6] In his initial report, Professor Clark opined that the Latino population was seven times more likely to be impacted, but he failed to consider the remaining undocumented population, including the significant undocumented Asian

Clark's opinions are based on his estimate of the number of undocumented Hispanics in Virginia Census Tract number 4406 ("Census Tract 4406") in which the park is located. Based on this estimate, Professor Clark concludes that Hispanics are more likely to be impacted by a policy directed at illegal aliens. Professor Clark concedes that his estimate has a margin of error (MOE) of 26%. Cross-Motion Ex. 40B at 5. In truth, however, as shown by the Declaration of Daniel H. Weinberg ("Weinberg Decl.") (Ex. 16), former Deputy Director of the Decennial Census and the American Community Survey, and his expert report attached thereto, the MOE is much greater rendering Professor Clark's opinions wholly unreliable. Further, the data relied upon by Professor Clark undermines his very opinions.

Professor Clark testified at his deposition that a MOE is necessary because "when statisticians and demographers make estimates, they recognize that there is some – because it is not a count – error in the result." Ex. 19 at 26:19-22. Professor Clark used the 26% MOE published by the American Community Survey ("ACS") for its estimate of the total number of *Hispanics* in Census Tract 4406. *Id.* at 37-38. The ACS does not estimate the undocumented population. Therefore, the 26% MOE relates to the estimate of all Hispanics, not undocumented Hispanics, in Census Tract 4406. But, Professor Clark admitted that estimates of the undocumented are more difficult because many do not want to be exposed. *Id.* at 33:10-16.

Since the ACS does not estimate the undocumented population, Professor Clark relied on estimates from the Center for Migration Studies ("CMS") for his estimate of the undocumented population in Census Tract 4406. Cross-Motion Ex. 40B. CMS does not estimate the number of undocumented aliens for an area as small as a census tract. *Id.* at 46-47. The smallest geographical area for which CMS provides an estimate of the undocumented

---

population. *See* Clark Report, Cross-Motion Ex. 40B. When Professor Clark considered the Asian population, he adjusted his opinion to state that "Latinos are nearly twice as likely to be undocumented compared to Asians and 20 times more likely to be undocumented than other groups." Clark Reply Report, Cross-Motion Ex. 40C.

population is known as a Public Use Microdata Area ("PUMA").  Accordingly, Professor Clark

relied upon CMS's estimate of the undocumented population in a PUMA in Fairfax County that

has a population of approximately 158,000 – of which census tract 4406 is a part – to estimate

the undocumented population in the census tract.  Ex. 19 at 64.  According to Professor Clark,

CMS estimated that in 2014 31.4% of the Hispanic population  for that PUMA was

undocumented and he applied the same percentage to the Hispanic population for Census Tract

4406 for his estimate of the undocumented Hispanic population for that tract.  *Id.* at 69:14-70:14.

Professor Clark acknowledged at his deposition that the CMS estimate of the

undocumented population at the national level has a MOE of 9%.  *Id.* at 34.  He further testified

that CMS does not estimate a MOE at any other level – such as the PUMA level – because "they

say it's difficult enough to try and get estimates of the undocumented population."  *Id.*  Professor

Clark further testified that he made no effort to translate the MOE of 9% for CMS estimates at

the national level to what the MOE would be for the CMS PUMA estimate he relied upon or for

his application of that estimate to Census Tract 4406 with a population of less than 4,000.  *Id.* at

77:5-82:19. In fact he testified that he made no adjustment to the 26% MOE identified by the

ACS for the total Hispanic population for the census tract. Professor Clark even admitted at this

deposition that "[p]erhaps the margin of error should be larger…"  *Id.* at 78:12-13. Professor

Clark's opinions lack a sufficient basis, are inherently unreliable and cannot support Plaintiffs'

claim of disparate impact.

First, the CMS PUMA data relied upon by Professor Clark does not demonstrate that

Latinos are more likely to be impacted by a policy directed at illegal aliens.  The PUMA data

relied upon by Professor Clark is set forth in Table B of exhibit 2 to the Weinberg Decl.  The

data shows the CMS estimates of the undocumented population for the PUMA for 2012 and

2014. Weinberg Decl. ¶ 8. For 2014, CMS estimated that Hispanics comprised 52.8% of the undocumented population. The same CMS estimate of the undocumented population identifies Asians as comprising 37.10% of the undocumented population for the PUMA. These figures demonstrate that Latinos are at best 1.4 times more likely to be impacted by a policy directed at illegal aliens as undocumented Asians. Compared to the overall undocumented population, Latinos are no more likely to be impacted than other similarly situated illegal aliens. Thus, the data relied upon by Plaintiffs' own expert shows no disproportionate impact to Hispanics.

Finally, the MOE that Professor Clark concedes applies to his opinion – 26% - itself renders his opinions unreliable and, in fact, the MOE is much greater. In his expert report Dr. Weinberg opined that an MOE of 26% renders Professor Clark's estimate unreliable to establish the undocumented population for the census tract at issue. Additionally, it is clear that Professor Clark grossly underestimated the MOE for his estimate of the undocumented population in Census Tract 4406. Professor Clark admitted at his deposition that at the national level CMS' estimates of the undocumented population has an MOE of 9%. Ex. 19 at 34:6-15. Professor Clark also agreed that as the sample size goes from a larger to a smaller sample, such as from the national to the state to the PUMA level, the MOE increases. Indeed, he testified that the Census Bureau follows the same concept. Ex. 19 at 32:9-13. Dr. Weinberg states in his Declaration that "[t]his is a basic statistical concept associated with sample surveys." Weinberg Decl. ¶ 8. Professor Clark also agreed that it is more uncertain to estimate the undocumented population because they are reticent to be found out. Ex. 19 at 33:10-16. Despite all of this, Professor Clark did nothing to adjust the 26% MOE from the ACS estimates for the total Hispanic population when calculating his MOE for the undocumented population. Professor Clark did nothing to determine how the MOE of 9% for CMS' national level relates to CMS'

estimates at the PUMA level. *See* Cross-Motion Ex. 40B. Thus, Professor Clark does not know

what the MOE really is for his estimate and, therefore, does not know whether it's reliable or not,

though he did testify that "perhaps the margin of error should be larger." Ex. 19 at 78.

Dr. Weinberg, however, did perform an analysis of the MOE for the CMS estimates of

an undocumented population by taking the MOE for the undocumented population estimate from

CMS at the national level and analyzing how that MOE would change at the PUMA level. Ex.

16. Following the well-accepted concept that the MOE increases as a sample decreases – a

concept that Professor Clark agrees with – Dr. Weinberg concludes that the MOE is 101%

rendering Professor Clark's estimate of the undocumented population wholly unreliable. Ex. 16.

In his rebuttal report, Professor Clark did not take issue with the methodology utilized by Dr.

Weinberg in coming to his conclusions. Cross-Motion Ex. 40C. Dr. Weinberg's analysis further

demonstrates the unreliability of Professor Clark's opinions.

In response, Plaintiffs may argue that Professor Clark estimated, based on the surnames

from a list of tenants at the Park, that approximately 60% of the residents of the park are

Hispanic and that this statistic would somehow support their claim for disparate impact.

However, this estimate misses the point. At issue is what is the percentage of the undocumented

Latino population at the park compared to the undocumented population of other racial groups.

The 60% estimate based on surnames does nothing more than identify all Hispanics who may

reside at the park; it provides no statistics with respect to the undocumented Latino population at

the park and, of course, provides no statistics with respect to the composition of the remainder of

the undocumented population at the park.

B.    **Plaintiffs failed to provide any evidence of disparate treatment.**

Plaintiffs concede that they have no direct evidence of intentional discrimination and,

therefore, proceed under the so-called *McDonnell Douglas* framework. "The Plaintiff in such a case . . . must first establish by a preponderance of the evidence a '*prima facie*' case of racial discrimination." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981)). If a plaintiff is able to satisfy the burden of proving a *prima facie* case, then the defendant must produce evidence of "non-discriminatory reasons" for the Policy. *Id.* at 509. This burden of production "involves no credibility assessment." *Id.* Once non-discriminatory reasons are proffered by the defendant, plaintiff can then attempt to prove that the reasons given are a "pretext for discrimination." *Id.* at 515. However, a plaintiff cannot satisfy this burden "unless it is shown *both* that the reason was false *and* that discrimination was the real reason." *Id.* (emphasis within). The court in *Hicks* went on to state "it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 519 (emphasis in opinion). Therefore, in order to survive summary judgment on their disparate treatment claim, plaintiffs must posit evidence that the purpose of the Policy is to intentionally discriminate against Latinos. Plaintiffs fail to meet this burden or even to make out a *prima facie* case.

In order to make out a *prima facie* case, Plaintiffs must provide evidence that (1) they are members of a protected class[7]; (2) that they sought to enter into a lease for the Park; (3) that they qualified to enter into such a lease; and (4) that they were denied the right to enter into the lease while others outside their protected class were allowed to enter into leases. *See*, *e.g. Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253 (4th Cir. 2001). Plaintiffs have no evidence to satisfy requirements 3 and 4 because they do not qualify to lease at the Park because of the illegal status of the female plaintiffs and because there is no evidence that non-Latinos in the same situation

---

[7] As noted by Defendants in their Mot. Summary J. (Dkt. 98), Defendants dispute that Plaintiffs are members of a protected class as undocumented and illegal aliens are not protected under the FHA. (Dkt. 98 at 22-23.)

are allowed to execute a lease.  To make out a *prima facie* case, Plaintiffs must be able to show different treatment as a protected class.  Plaintiffs provide no evidence, and do not even argue, that the Policy was only applied to Latinos.  They do not contend that persons outside their protected class are not required to adhere to the Policy.  The Plaintiffs have no evidence to demonstrate that illegal aliens ***who are non-Latinos*** are not required to comply with the Policy.  The evidence is to the contrary.  Therefore, they have not shown a *prima facie* case because there is no evidence that they were treated differently from others outside their protected class.

Despite having no evidence that Plaintiffs were treated differently because they are Latino, Plaintiffs argue that "two key pieces" of circumstantial evidence allow them to survive summary judgment: (1) "the documents Latino non-citizens are required to provide;" and (2) "the Policy's breadth."  Cross-Motion at 22.  Neither allows Plaintiffs to withstand summary judgment on their disparate treatment claim.

With respect to the first issue – documents required of non-Latinos -- Plaintiffs do not contend that only Latino non-citizens are required to provide the documents necessary to comply with the Policy.  This is because the Policy is applied the same to all – not just to Latino non-citizens – and Plaintiffs point to no evidence to the contrary.  In fact, Defendants have demonstrated that they require non-Latinos to adhere to the Policy as demonstrated by the letters sent to non-Latinos demanding proof of legal residence. Ex. 18.

Further, Defendants accept proof of legal status through various documents, not just I-94s as Plaintiffs suggest.  Defendants' Resident Selection and Occupancy Standards, Ex. 9-10, which apply to the Park, Ex. 20 (Jones Decl.), identify a number of other documents that are proof of legal residency including a permanent resident card, temporary resident card and employment authorization card.  *See* Ex. 9 at 8; Ex. 10 at 11. Further, both of these documents contain a

detailed list of ██████████████ and identify ████████████████████ *Id.* at 9 and

12, respectively.  Additionally, the Consumer Report & CoreLogic SafeRent and Training

Manual also identifies various documents that will be accepted to establish legal residence and

includes samples of such documents.  Ex. 11 at WAPLES 628-638.  Consistent with these Policy

documents, Mark Jones, the designee for the Defendants, testified that the Defendants would

accept any documents issued by the United States government showing legal presence in the

United States. Ex. 6 at 224:16-20.  Josephine Giambanco, the manager for the park, also testified

that the Defendants accept any document demonstrating legal presence in the United States. Ex.

7 at 63:18-64:5.  Carolina Easton repeatedly testified that Defendants would accept any

document demonstrating legal presence in the United States. Ex. 8 at 30:21-32:7; 47:9-14; 57:18-

21; 96:5-12; 125:3-11. The Plaintiffs' assertion that the Defendants only accept a limited number

of documents to establish legal presence is flat wrong.  Moreover, none of the female Plaintiffs

have any documents they can submit because they are in the United States illegally.  Defs.'

Undisputed Facts 2-9.  Thus the Policy does not burden them, they simply are unable to comply

with it because of their illegal status.

Plaintiffs' argument regarding the "Policy's breadth" has been addressed above and

provides no basis for disparate treatment claim.  Latino families who have an adult illegal alien

are not affected any differently than an Asian family in the same circumstance.  Nor is the Policy

or the race of the Plaintiffs the cause of the effect on the families.  Rather, it is the illegal status

of the female Plaintiffs that causes an effect on the families.

Further, Plaintiffs suggest that the Court should ignore the undisputed fact that the

Defendants advertise to Latinos, Ex. 32-33 to Dkt. 98, and that Latinos comprise the majority of

the residents, Cross-Motion Ex. 40B at 5, at the Park as irrelevant.  Similarly, Plaintiffs ask the

Court to ignore their sworn testimony that they were not treated differently because they are Latino and that the reason they could not comply with the Policy was the illegal status of the female Plaintiffs. *See* Defs.' Undisputed Facts 10, 27-37.  Plaintiffs 'suggestion that the Court must not consider these undisputed facts is baseless.  These facts prove no discriminatory intent.

Defendants soliciting Latinos as tenants is powerful evidence of no discrimination.  In *Proud v. Stone*, 945 F.2d 796,797 (4th Cir. 1991), an employment discrimination case, the Court stated that "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby encouraging the psychological costs of associating with them), only to fire them once they are on the job." *Id.* at 797 (citations omitted).  Similarly, it makes no sense for Defendants to spend the cost of advertising, to spend the cost of the application process, to have Latinos as the majority of their residents at the Park, only then to try to remove them from the Park for discriminatory purposes.

Nor does it make any sense that Plaintiffs should be allowed to proceed with the disparate treatment case when they have testified under oath that they do not believe that they were treated differently because they are Latino – or because they are non-citizens - and admit that the issue in complying with the Policy was and is the legal status of the female Plaintiffs. *See* Defs.' Undisputed Facts 27-37.  Plaintiffs' argument that the Court should dismiss this testimony as irrelevant based on *DeJarnette v. Corning, Inc.*, 133 F.3d 293 (4th Cir. 1998) is wrong.  In the *DeJarnette* case, the issue was the plaintiff's perception of her job performance which the Fourth Circuit found was not relevant.  However, DeJarnette asserted affirmatively that she was treated differently because she was pregnant.  There is no suggestion in *DeJarnette* that the fact that a plaintiff in a discrimination action does not assert that he/she was treated differently – and in fact points to non-discriminatory reasons for their treatment – cannot be considered by the Court.  It

is hard to conceive of a claim of disparate treatment in which the Plaintiffs themselves do not allege or contend that they were treated differently because of their race and, in fact, concede that they were unable to comply with the Policy because of its requirement for proof of legal status.

    **C.**      **The Reasons for the Policy are Plainly Legitimate and Not Pretextual.**

Even if Plaintiffs can identify evidence sufficient to show a *prima facie* case of disparate impact – which they cannot – the reasons for the Policy are plainly legitimate and serve important purposes for the Defendants. Of course, to make out a claim of disparate treatment, Plaintiffs must prove that the reasons for the Policy are false and that the real reason for the Policy was discrimination. *Hicks, supra.* Plaintiffs cannot begin to satisfy either element.

In attacking the rationale for the Policy, Plaintiffs distort the record by making half statements, ignoring the underlying facts and cherry-picking isolated statements in hopes that the Court will not examine the full record. That record fully identifies and establishes the legitimate reasons for the Policy. Further, Plaintiffs argue – with no basis – that the reasons for the Policy are supposedly "post hoc explanations" even though the Plaintiffs are fully aware that the rationale for the Policy is set forth in numerous documents and have been in place for some time. Plaintiffs argument that the business rationale for the Policy are pretext is without any basis.

Defendants have long had a Policy of not leasing to persons who cannot demonstrate legal status in the United States. Mark Jones, the designee for the Defendants, testified "I would say for them to start a process with us, the legal status is one of the first steps." Ex. 6 at 133:20-21. Mr. Jones explained the rationale for that requirement as follows: "As part of our underwriting of the lease, we find that to be a key piece of information from an income perspective for valid employment and writing the lease. But also, we find it, for an actual visa to be present, because of the vetting done on the -- during the visa process, from a criminal

perspective…." *Id.* at 135:4-12.[8]  Mr. Jones further testified that "we do believe we have some exposure to the harboring of illegal immigrants because we have knowledge of their undocumented by taking the application." *Id.* at 136:4-7.  Mr. Jones' testimony is consistent with Defendants' response to Int. 16 (Cross-Motion Ex. 42), and sets forth three very clear reasons the Policy requiring proof of legal status:  underwriting of the lease, criminal background review and avoiding potential liability under the anti-harboring statute.  There are no facts or evidence to dispute these clearly legitimate reasons for requiring proof of legal status.

Nor is Defendants' requirement of proof of legal status, a "post-hoc explanation" as Plaintiffs suggest.  This Policy is well documented.  The Consumer Reports & Core Logic SafeRent and Training Manual dated January 24, 2011, Cross-Motion Ex. 43 (Ex. 11), states on page 21 that if an applicant cannot demonstrate legal status ███████████████████████ ████████████ The Resident Selection and Occupancy Standards dated February 19, 2013 states on page 7 that ███████████████████████████[9] Ex. 9 at 7. The Resident Selection and Occupancy Standards dated May 8, 2015 states at page 9 that ████ ██████████████████████████ Ex. 10 at 9. Defendants' Policy of not leasing to illegal aliens is not new and is well documented.  That these documents may not have explicitly explain all of the reasons for this Policy does not mean that the reasons are a "post-hoc" explanation.  In fact, Mr. Jones testified fully as to the Policy's reasons. Ex. 6 at 134-36; 139-41.

Mr. Jones also testified that the Policy of requiring proof of legal residence is in place to avoid running afoul of the anti-harboring statute set forth in 8 U.S.C. 1324. Ex. 6 at 136; 140:19-21. Plaintiffs offer no argument as to why avoiding potential criminal liability under that statute

---

[8] George Caruso, an expert with forty years' experience in residential leasing confirms in his declaration and report that underwriting and criminal background checks are legitimate reasons to ask for proof of legal status. (Ex. 17).
[9] In his attached declaration, Mr. Jones states that these standards applied to the Park. Ex. 20.

is not a legitimate reason for requiring proof of legal status. In *U.S. v. Aguilar*, 477 Fed App'x 1000 (4th Cir. 2012) the Fourth Circuit affirmed this Court conviction of a landlord for violating the anti-harboring statute because she leased to illegal aliens. The initial predicate for potential criminal liability under the anti-harboring statute is "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law..." 8 U.S.C. § 1324. Here, the Defendants have actual knowledge that all the female Plaintiffs have in fact came to, entered and remain in the United States in violation of law. *See* Defs.' Undisputed Facts 2-3, 7-8. With such knowledge, the question would then become whether leasing to an illegal alien with such knowledge constitutes harboring. Any suggestion that the Defendant should expose themselves to potential criminal liability based on how this issue would be interpreted by the U.S. Attorney or this Court is absurd. No reasonable business would potentially expose itself to criminal liability in hopes that the underlying statute will be interpreted in a particular way. Instead, a reasonable business person would steer well clear of any potential criminal liability. There can be no suggestion that this is rationale is false.

Defendants also require proof of legal residence in the United States as a starting point of a criminal background process. Plaintiffs' focus on what CoreLogic or YARDI do after they receive a name from the Defendants misses the point that proper identification of the person to be screened is the key to the entire process. It is for this reason that the Policy requires a social security number or proof of legal residence issued by the United States government.[10] An ITIN alone is not sufficient to determine identify and is not a reliable source of verifying identity.

The Consumer Reports and Core Logic's SafeRent Training Manual discusses the use of an ITIN and states the following:

---

[10] Contrary to Plaintiffs' assertion, the documents accepted by the Defendants for proof of legal residency are not limited to visas or I-94s as Plaintiffs well know. *See supra* Defs.' Response to Pls.' Undisputed Fact 1.

According to a 2009 U.S. Treasury report, "[t]here are also no controls to prevent an ITIN from being used by more than one taxpayer on multiple tax returns." Dkt. 98 at 21-22.

Plaintiffs' continued insistence that an ITIN is just as good as a social security number for identification purposes has no factual support and is refuted by the facts here. The male Plaintiffs have social security numbers because they went through the process to obtain legal status in the United States that included fingerprinting and an extensive application process. Ex. 4 at 16:11-17:7; Ex. 2 at 68:15-22; Ex. 1 at 70:6-71:1; Ex. 3 at 17:5-14. Only after properly completing that process were they able to obtain a social security number. While this process is not infallible, it is much more robust than simply mailing to the IRS a passport and a form to obtain an ITIN. *See* Defs.' Undisputed Fact 38. Moreover, the vetting process for obtaining legal status – and then a social security number – provides safeguards that are not found in the ITIN process. Again, Plaintiffs cannot sustain their burden of proving that the reasons for the Policy is false and that the Policy was actually motivated by intentional discrimination.

## II.       THERE ARE NO TRIABLE ISSUES OF FACT ON PLAINTIFFS' § 1981 CLAIM.

In order to survive summary judgment with respect to their Section 1981 claims, Plaintiffs are required to proffer evidence to this Court that shows a triable issue that Defendants enacted the Policy to intentionally discriminate against the Plaintiffs based on their non-citizenship. *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427 (4th Cir. 2006). The only "facts" asserted by the Plaintiffs to support their Section 1981 claim are the alleged "hardships" of the Policy, i.e., providing documentation of legal status in the United States and, once again,

the "Policy's breadth" i.e. the claimed effect on the family members. *See* Cross-Motion at 26.

Neither supports Plaintiffs' Section 1981 claim.

As demonstrated above, the Policy is not limited simply to I-94s only. *See supra.* In fact,

Defendants accept a wide variety of documentation to prove legal status in the United States.

*See supra.* Further, it is undisputed that the female Plaintiffs have no documents that would

comply with the Policy because they are in the United States illegally. Defs.' Undisputed Facts

2-9. The female Plaintiffs' inability to comply with the Policy has nothing to do with their

citizenship, just as it has nothing to do with their race.

There is no evidence that Defendants enacted the Policy in order to intentionally

discriminate against non-citizens. Rather, it is clear from the Policy that its purpose is to obtain

identifying information for potential applicants. If an applicant has a social security number, that

is acceptable under the Policy; including a social security number submitted by a non-citizen.

Here, for example, the male Plaintiffs have social security numbers and were not required to

provide any other documentation as part of the application process. This in and of itself

demonstrates that the Policy was not enacted to intentionally discriminate against non-citizens.

For non-citizens who do not have a social security number, the Policy provides for a

reasonable method to comply with the Policy; proof of legal residency in the United States.

Obviously, this will impact only non-citizens by definition. Simply requiring proof of legal

residency cannot prove intentional discrimination based on citizenship because then any Policy

requiring such proof would violate Section 1981. Thus, employers, for example, requiring proof

of legal residency would be deemed to be violating Section 1981. Such an assertion is baseless.

That the Policy was not enacted to discriminate against non-citizens is further

demonstrated by the fact that non-citizens, such as the male Plaintiffs, regularly comply with the

application process and enter into leases.  The process is not onerous; a non-citizen simply needs to provide a social security number or government-issued proof of legal residence.  The Plaintiffs here, can point to no hardship as a result of these requirements under the Policy.  The male Plaintiffs have social security numbers and comply with the Policy.  The female Plaintiffs have no documents to establish legal residency in the United States and cannot comply with the Policy for that reason.  Defs.' Undisputed Facts 2-9.

### III.  PLAINTIFFS' FRAUD ENTITLES DEFENDANTS TO SUMMARY JUDGMENT ON COUNTS III AND V.[11]

Plaintiffs declare as preposterous that Defendants did not know of the female Plaintiffs residing at the Park even though they admit that the female Plaintiffs were never identified on the applications submitted by the male Plaintiffs, were never registered with the Park's office and were never identified in the leases signed by the male Plaintiffs year after year.[12] According to Plaintiffs the "leases were also made based on Plaintiffs' oral representations," and alleged statements made by unnamed and unknown office staff not included in the actual signed applications and leases.  Plaintiffs further claim that since the female Plaintiffs allegedly came to the office from time to time that defendants surely must have immediately connected them with one of the 151 lots and certainly knew from memory each person identified as an occupant for all 151 lots.  What is preposterous is Plaintiffs' suggestion that the male Plaintiffs – who knew their wives could not prove legal residence - did not intentionally omit them from their applications and leases.  The male Plaintiffs knew that their application would not be accepted if they identified their wives on the applications.  Their fraud is not protected by the MHLRA and

---

[11] Since the female Plaintiffs did not sign any leases, they have no basis to assert a claim under counts III and V and these counts should be dismissed as to them for that reason.

[12] Plaintiffs assert that Mr. Saravia identified his wife on an application attached as part of Ex. 17 to Plaintiffs' Cross-Motion.  As noted above, that application is unsigned and not completed.  The actual signed and completed application – that Mr. Saravia testified was the application he submitted – does not list his wife as an occupant.

entitles defendants to summary judgment on counts III and V.

First, evidence of claimed "oral representations" relating to the applications and leases is barred by the parole evidence rule and cannot be relied upon by Plaintiffs to annotate the deficient applications. *See, e.g., Dominion Bank, N.A. v. Moore*, 688 F. Supp 1084, 1086 (W.D. Va. 1988) ("The court finds that any such oral agreements fail to defeat the summary judgment motion because they are barred by the parole evidence rule."). The applications are not ambiguous and clearly require, among other things, the identity of all occupants. Second, reliance on alleged passing hellos or encounters cannot be deemed sufficient to establish that the defendants should have discovered that the male Plaintiffs lied in their applications. Third, Josephine Giambanco testified at her deposition that she is not able to recognize the female Plaintiffs. Ex. 7 at 140:18-25.[13] Finally, the male Plaintiffs' assertion that the defendants supposedly knew that the female Plaintiffs lived at the Park is completely undermined by the fact that the male Plaintiffs never registered or identified their wives in any documents with the Park. *See* Plaintiffs' Leases and Applications (Ex. 17-24 to Dkt. 98). Surely they would have done so once it was clear that the defendants knew and approved of the wives living at the Park. But that never happened.

Plaintiffs' argument that even if the defendants were "misled," the MHLRA still applies is baseless. The MHLRA does not give tenants at mobile home parks leave to commit fraud. The MHLRA was not enacted to assist in the perpetration of a fraud. If Plaintiffs are correct, then tenants of mobile home parks in Virginia can commit fraud with impunity. Plaintiffs here could have moved in any number of unidentified adults and would have this Court find that defendants could do nothing about it for at least a year. The courts do not reward fraud.

---

[13] Ms. Giambanco did allow the Reyes to remain at the Park after she discovered Mrs. Reyes' presence, but with the understanding that documents compliant with the Policy would be provided. Ex. 7 at 95-100.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court enter judgment in favor of Defendants on all counts of Plaintiffs' Complaint, deny Plaintiffs Cross-Motion for Summary Judgment and for such other relief as is just and proper.

Respectfully submitted,


WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP, WAPLES PROJECT LIMITED
PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
7900 Tysons One Place
Suite 500
McLean, Virginia  22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, 2017, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/ _____
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
7900 Tysons One Place
Suite 500
McLean, Virginia  22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com