**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ,<br><br>          *Plaintiffs*,<br><br>     vs.<br><br>WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC.,<br><br>          *Defendants*. | Civil Action No. 1:16cv00563-TSE-TCB |

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

IMPROPERLY DISPUTED MATERIAL FACTS.............................................................2

ARGUMENT .......................................................................................................................4

I.    The Policy Required the Female Plaintiffs to Provide a Passport, Visa, and an Original Arrival/Departure Form (I-94).............................................................4

II.    Plaintiffs are Entitled to Summary Judgment on their FHA and VFHL Claims. ...............6

    A.    Plaintiffs have Demonstrated a Disparate Impact.....................................................6

    B.    Defendants' Proffered Justifications for the Policy are Pretextual.........................9

III.    Plaintiffs are Entitled to Summary Judgment on their MHLRA and Breach of Contract Claims. ...................................................................................................13

CONCLUSION..................................................................................................................16

i

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Bank of Montreal v. Signet Bank*,
193 F.3d 818 (4th Cir. 1999) ................................................................14

*Connecticut v. Teal*,
457 U.S. 440 (1982) ................................................................12, 13

*DelRio-Mocci v. Connolly Props.*,
672 F.3d 241 (3d Cir. 2012) ................................................................9

*Dominion Bank, N.A. v. Moore*,
688 F. Supp. 1084 (W.D. Va. 1988) ................................................................13

*Hitachi Credit Am. Corp. v. Signet Bank*,
166 F.3d 614 (4th Cir. 1999) ................................................................14

*Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*,
303 S.E.2d 894 (Va. 1983) ................................................................14

*United States v. Aguilar*,
477 F. App'x 1000 (4th Cir. 2012) ................................................................10

*United States v. Vargas-Cordon*,
733 F.3d 366 (2d Cir. 2013) ................................................................9

<u>Statutes</u>

8 U.S.C. § 1324 ................................................................9

8 U.S.C. § 1324(a)(1)(A)(iii) ................................................................9

Code of Va. § 55-248.41 ................................................................13

Code of Va. § 55-248.51 ................................................................15

<u>Other Authorities</u>

37 C.J.S. Fraud § 48 (2016) ................................................................14

Plaintiffs, by their attorneys, respectfully submit this Reply Memorandum of Law in support of Plaintiffs' cross-motion for summary judgment on Counts I, II, III, and V.

## INTRODUCTION

Despite having submitted over 60 pages of briefing, Defendants are unable to avoid a number of inescapable truths revealed upon examination of the summary judgment record.[1]  It is incontrovertible that the policy Defendants used to select and approve residential applicants (the "Policy") caused a real and significant disproportionate impact on Latinos.  None of Defendants' purported justifications for the Policy withstand scrutiny.  Indeed, an examination of the record and the parties' submissions reveals that the Policy was merely pretext for discrimination.  While Defendants have repeatedly harped on the female Plaintiffs' immigration status, they are unable to offer a credible reason for why the male Plaintiffs and their children—all legally present— faced rent increases and eviction.

Moreover, Defendants are unable to explain why they did not comply with the straightforward procedural requirements mandated by the statute that formed the foundation of their business—the Manufactured Home Lot Rental Act ("MHLRA").  Defendants' repeated insistence that the male Plaintiffs committed fraud is not only unfounded, but also misses the point; as landlords subject to the MHLRA, Defendants were required to abide by the strictures of the MHLRA, yet failed to do.

---

[1]  Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment [Dkt. 98] is referred to as "Defs.' Mem."  Defendants' Reply Memorandum in Support of Defendants' Motion for Summary Judgment and Memorandum in Opposition to Plaintiffs' Cross-Motion for Summary Judgment [Dkt. 150] is referred to as "Defs.' Reply Mem." Plaintiffs' Memorandum in Support of Plaintiffs' Cross Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment [Dkt. 142] is referred to as "Pls.' Mem."

For these reasons, Plaintiffs' cross-motion for summary judgment on Counts I, II, III and V should be granted.

## IMPROPERLY DISPUTED MATERIAL FACTS

Without conceding that Defendants have properly disputed any of Plaintiffs' Undisputed Material Facts, Plaintiffs highlight the following improperly disputed material facts:

1.     Defendants dispute the Policy that they defined and produced.  Yet the very first Undisputed Material Fact they list in their Memorandum in Support of Summary Judgment (Dkt. 98, at 4 ¶1) cites Exhibit A to the Complaint to define the Policy, and nowhere else in Defendants' Statement of Undisputed Material Facts do they suggest that any other document defines or comprises the Policy.  Exhibit A to the Complaint clearly states, "Applicants who do not have a Social Security number, must provide their original Passport, original US Visa and original Arrival/Departure Form (I-94 or I-94W)."  Ex. A to Compl. [Dkt. 1] at 2; *see also* Ex. 3 to Pls.' Mem. (May 14, 2015 Future Resident Information Guide for the Waples and Bull Run Communities) at 2 ("Applicants who do not have a Social Security Number, must provide their original Passport, original US Visa and original Arrival/Departure Form (I-94 or I-94W)); Ex. 1 (March 31, 2016 Future Resident Information Guide for the Waples and Bull Run Communities) at 2 (same).

2.     Although Mr. Dwoskin initially testified ███████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████

Ex. 25 to Pls.' Mem. (Dwoskin Dep. Tr.) at 86:16-89:16 (emphasis added).  Likewise, Defendants' expert witness George Caruso █████████████████████████████████ █████████████████████████████████ Ex. 2 (Caruso Dep. Tr.) at 23:15-24:22; 40:6-41:11.  Finally, Defendants objected to Plaintiffs' interrogatory asking, "State whether you are aware of other residential landlords in northern Virginia (or elsewhere) who enforce any policy, practice, or rule that requires current or prospective tenants to show proof that they are legally present in the United States," on the grounds of relevance, stating that "information on 'other residential landlords' who are not parties to this action" is "not relevant to the case."  Ex. 3 (Objections to Plaintiff Jose Dagoberto Reyes' First Set of Interrogatories to All Defendants) at 5.  Having made this objection, Defendants cannot now claim that their implementation of the Policy is justified because they are aware that other landlords have similar policies.

9.     Defendants puzzlingly maintain that the lease application Plaintiffs submitted as evidence that Mr. Saravia listed his wife when applying for a lease was not his lease application despite the fact that this was a document exclusively within Defendants' custody and which Defendants produced to Plaintiffs during discovery.  Ex. 17 to Pls.' Mem. at 1.  That document clearly shows that █████████████████████████████████ Indeed, this document is *identical* to the one that Defendants submitted as Mr. Saravia's lease application, down to the fact that *both* documents are signed, have the same date and have the same bates number; Plaintiffs simply included all of the application materials whereas Defendants did not.  *Id.* at 2; Ex. 20 to Defs.' Mem. at 1.  Moreover, Defendants' reliance on the testimony of Josephine Giambanco to dispute this fact is misplaced.  Mr. Saravia submitted his lease application in 2012, and Ms. Giambanco did not begin working at Waples Mobile Home Park (the "Park") until 2013.  Ex. 4 (Giambanco Dep. Tr.) at 13:8-16:9.

21.     Defendants offer no record evidence to dispute this fact and no reasoning to disturb Plaintiffs' conclusion that Exhibit 41 to Plaintiffs' opening brief is a list of tenants who failed to comply with the Policy.  Ex. 41 to Pls.' Mem. at 1-2.

30.     The exhibits cited by Defendants do not refute Plaintiffs' Undisputed Fact 30.  Instead, they reinforce that Defendants separately checked identity and—in cases where individuals lacked social security numbers ("SSNs")—legal presence, and did not use legal presence documents to check identity.  Ex. 21 to Pls.' Mem. at 122:8-16; Ex. 27 to Pls.' Mem. at 36:20-37:10.

31.     As with their response to Plaintiffs' Undisputed Fact 1, Defendants dispute the Policy that they defined, produced, and cited in their opening brief.  *See supra* ¶ 1.

33.     Defendants do not dispute that their 30(b)(6) representative admitted ███████████ ███████████████████████████████████ Ex. 21 to Pls.' Mem. at 213:10-214:9. Defendants simply make an invalid legal argument.  *See infra* Part III.

## **ARGUMENT**

**I.      The Policy Required the Female Plaintiffs to Provide a Passport, Visa, and an Original Arrival/Departure Form (I-94).**

Incredibly, Defendants assert that the female Plaintiffs could have complied with the Policy without providing a passport, visa, and I-94.   *See* Defs.' Reply Mem. at 4, 10, 22.  This assertion directly contradicts not just the record, but also Defendants' *own* definition of the Policy for purposes of adjudicating the parties' cross-motions for summary judgment.

In their opening brief, Defendants defined the Policy as Exhibit A to Plaintiffs' Complaint, which is the Future Resident Information Guide for the Waples and Bull Run Mobile Home Communities ("Guide").  *See* Defs.' Mem. at 4.  That document reads, in pertinent part: "*Applicants who do not have a Social Security Number, must provide their original Passport,*

4

_original US Visa and original Arrival/Departure Form (I-94 or I-94W)_." Ex. A to Pls.' Compl. at 2 (emphasis added). Presumably, this is why Defendants emphasized in their Statement of Undisputed Material Facts that the female Plaintiffs lack U.S. Visas and I-94s. *See* Defs.' Mem. at 4 ¶¶ 4-6. In other words, in their Motion for Summary Judgment, Defendants chose to define "[t]he Policy" based on the Guide they prepared; they cannot now evade the consequences of that choice by belatedly moving the goalposts.

Defendants' opening brief and their subsequent definition of the Policy, in conjunction with the versions of the Guides that Defendants have produced in the course of discovery, is precisely why Plaintiffs concluded that the Policy requires individuals without SSNs to "provide their Passport, original US Visa and original Arrival/Departure Form (I-94 or I-94W)." Ex. 3 to Pls.' Mem. (May 14, 2015 Guide) at 2. Subsequent versions of the Guide impose the same requirement. *See, e.g.*, Ex. 1 (March 31, 2016 Guide) at 2. It was not until April of last year approximately one month before the Complaint was filed, and months after the issue had been brought to the forefront by means of an article in the Washington Post, *see* Ex. 8, that Defendants altered the Guide to require that noncitizens "provide immigration documentation to prove legal presence in the United States." Ex. 7 (April 22, 2016 Guide) at 2. But by that time, Defendants had already determined that Plaintiffs were not in compliance with the Policy, prompting Defendants to illegally increase Plaintiffs' rent and place them on month-to-month leases before March 31, 2016. *See* Pls.' Mem. at 6-7; Ex. 1. The record, therefore, is clear that the operative version of the Guide required the female Plaintiffs to provide a passport, visa, and an I-94, and debunks Defendants' contention that the female Plaintiffs could have met the Policy's requirements by providing alternative documents showing proof of legal presence.

Accurately defining the Policy is of paramount importance because, as Plaintiffs have explained, visas and I-94s are poor indicators of legal status, yet procuring these documents imposes significant burdens on legally present individuals, including noncitizens with Temporary Protected Status. *See* Pls.' Mem. at 20-23. The Policy's failure to advance the goal of verifying legal status is an additional indicator that it was a pretext for discrimination. *See id.* at 20-21. Tellingly, Defendants do not engage this analysis—that neither visas nor I-94s are accurate barometers of legal presence—at all; they instead erroneously claim that the female Plaintiffs could have proven legal presence with any set of papers. Under the Policy at issue in this lawsuit, that claim is simply incorrect.

In any event, Defendants' belated theory that their "Policy" allowed Plaintiffs to prove their legal presence in any way—without tendering a visa, passport, and I-94—still runs afoul of the Fair Housing Act ("FHA") and Virginia Fair Housing Law ("VFHL") under a disparate impact theory. Requiring individuals who lack SSNs to prove legal presence disproportionately impacts Latinos and cannot be reconciled with the primary stated goal of the Policy: verifying identities and carrying out credit and criminal background checks.

## II.    Plaintiffs are Entitled to Summary Judgment on their FHA and VFHL Claims.

### A.    Plaintiffs have Demonstrated a Disparate Impact.

Defendants posit that the Policy has no disparate impact on Latinos because the consequences under the Policy would be the same for a hypothetical similarly-situated family of Asian descent. *See* Defs.' Reply Mem. at 1, 10, 15. According to the statistics available in the Census Tract at issue, Defendants are wrong. *See* Ex. 40-C to Pls.' Mem. at 2. Indeed, the simple fact is that there is no need to resort to conjecture; the record shows that the Policy *actually* disproportionately impacted Latino individuals more than any other group including Asians.

6

Plaintiffs have submitted a file review of the Park demonstrating that of the 12 individuals in the Park who were not in compliance with the Policy as of May 2016, 11 of them were Latino.  *See* Ex. 1 to Pls.' Mem. at 2.  This conclusion is based on the U.S. Census Bureau's surname analysis, something Defendants relied on in their opening brief.[2]  *See* Ex. 9 (Ramkumar Declaration) at 2-3.  Similarly, in a document Defendants prepared ████████████ ████████████████████████████████████████████ █ █████████████████ ████████████████████████████████████████████  *See* Ex. 41 to Pls.' Mem. at 1-2; Ex. 9; Ex. 26 to Pls.' Mem. at 180:3-13.  Therefore, even without evaluating the competing merits of the parties' expert reports, the Policy's disparate impact on Latino individuals is readily apparent.  Defendants expend substantial energy attempting to discredit Professor Clark's report and the conclusions he has offered, *see* Defs.' Reply Mem. at 15-19, but Defendants' efforts are in vain.  It is undisputed that the two point estimates offered by the parties' experts—Professor Clark and Dr. Weinberg—of the number of undocumented Hispanics in Census Tract 4406 are remarkably similar; Professor Clark estimated that there were 301 undocumented Hispanics in Census Tract 4406, while Dr. Weinberg estimated that there were 287 undocumented Hispanics in the same Tract.  *See* Ex. 16(1) to Defs.' Reply Mem. at 6.  Moreover, although Defendants claim that Professor Clark's reliance on data from the Center for Migration Studies ("CMS") was erroneous, Defendants' expert was unable to offer a better alternative for estimating the undocumented population at the tract level.  *See* Ex. 5 (Weinberg Dep. Tr.) at 110:6-11 (████████████████████████████████████ ████████████████████████████████████████████████

---

[2]  *See* Defs.' Mem. at 16 n.4.

[3]  Ex. 26 to Pls.' Mem. at 176:9-18.

███████████████████████████ Indeed, Dr. Weinberg conceded █████████████

████████████████████████ *Id.* at 97:23-98:1.

Defendants also gloss over the numerous assumptions Dr. Weinberg made in calculating the relevant margin of error ("MOE"), assumptions that are far from foolproof. Notably, in the first step of his analysis, where he attempted to calculate the MOE at the tract level for his point estimate, Dr. Weinberg approximated the undocumented population with the foreign-born population, but he conceded ████████████████████████████████

██████████████████████████████ *Id.* at 104:13-25. More generally, Defendants' focus on the MOE leads to implausible results, as Professor Clark explained in his rebuttal report. *See* Ex. 40-C to Pls.' Mem. at 1. Dr. Weinberg's MOE estimate of 809 percent—not 101 percent as Defendants claim on page 19 of their reply brief[4]—████████████

██████████████████████████████████████ Ex. 5 at 108:20-109:1. Dr. Weinberg also admitted ██████████████████████████████

████████████████████████ *Id.* at 110:19-23. Taken together, Dr. Weinberg's conclusion "obscures the reasonableness of a result which is a point estimate of about 300 undocumented Hispanics during the Census period of 2010-2014." Ex. 40-C to Pls.' Mem. at 1.[5] This point estimate supports the conclusion that "Latinos are nearly twice as likely" as any other group to be impacted by the Policy. *Id.* at 2.

---

[4] *See id.* at 109:10-16 ███████████████████████████████
████████████████████████████

[5] Importantly, Professor Clark did not concede what Defendants contend is a "well-accepted concept" that the MOE increases as the sample size decreases. Defs.' Reply Mem. at 19. ███████████████████████████████████████████
████████████████████████ Ex. 6 (Clark Dep. Tr.) at 30:1-11.

In sum, when examining the record in its entirety, including the expert reports, it is beyond dispute that the Policy disproportionately impacted Latino individuals.

## B.    Defendants' Proffered Justifications for the Policy are Pretextual.

Plaintiffs have already demonstrated why Defendants' rationales of (1) conducting criminal background, credit, and identity checks and (2) verifying legal presence are indicative of pretext.  *See* Pls.' Mem. at 17-21.  Defendants' reply brief does nothing to refute the pretextual nature of both explanations.  Plaintiffs accordingly now focus on what Defendants suddenly seem to view as the chief justifications for the Policy: avoiding liability under the anti-harboring statute, 8 U.S.C. § 1324, and lease underwriting concerns.  *See* Defs.' Reply Mem. at 7, 10, 25-26.  Neither consideration explains why the male Plaintiffs and their children, who are legally present, were subject to the Policy's consequences.  But most importantly, the veracity of both justifications is undermined both by applicable law and by Defendants' own behavior.

First, case law is clear that on the facts of this case, Defendants do not face liability under § 1324 because the statute only imposes liability on private landlords who *affirmatively* shield undocumented immigrants from discovery.  The statutory text makes this clear, as it limits liability to a circumstance where someone who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, *conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection . . . ."* 8 U.S.C. § 1324(a)(1)(A)(iiii) (emphasis added); *see also United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police is . . . not an offense under § 1324(a)(1)(A)(iii)."); *DelRio-Mocci v. Connolly Props.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking immigration status constitutes harboring.").  Defendants' citation to

9

*United States v. Aguilar*, 477 F. App'x 1000, 1003 (4th Cir. 2012) is inapposite, as there, a finding of liability was supported because the defendant took no steps to verify immigration status "after *repeatedly* being warned by officials that numerous . . . tenants were not properly documented . . . ." (emphasis added). *Aguilar* is far afield from this case, as the record is devoid of any evidence that Defendants received any sort of warnings about the female Plaintiffs' immigration status.

Additionally, Defendants do not dispute that they knew Mr. Reyes's wife was living with her husband as early as 2014. *See* Defs.' Reply Mem. at 5; *id.* at 30 n.13 ("Ms. Giambanco did allow the Reyes['s] to remain at the Park after she discovered Ms. Reyes['s] presence . . . ."). And the record is replete with evidence that Defendants were aware of the female Plaintiffs' presence well before 2015. *See* Ex. 16 to Pls.' Mem. at 40:22-41:17; Ex. 17 to Pls.' Mem. at 1; Ex. 19 to Pls.' Mem. at 35:22-36:4. Yet, despite this awareness, Defendants did not take any action against the female Plaintiffs until 2015, and even then, Defendants did not commence eviction proceedings, choosing instead to increase the Plaintiffs' rent. *See* Pls.' Mem. at 6-7. One would think that if Defendants were actually worried about facing jail time for harboring undocumented immigrants, they would not have been so slow to take corrective action, and that corrective action would have consisted of promptly evicting the female Plaintiffs, instead of attempting to increase profits. For this reason, Defendants' argument that application of the Policy was necessary to avoid exposing their business to "potential criminal liability" cannot be taken seriously. Defs.' Reply. Mem. at 26; *see also* Ex. 21 to Pls.' Mem. at 138:11-139:5 ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

Defendants' lease underwriting argument fares no better.  They contend that undocumented immigrants pose a greater risk from a lease underwriting perspective "because a lack of legal status limits employment opportunities to enable the applicant to pay the agreed rent."  Ex. 17 to Defs.' Reply Mem. at 1-2.  This argument is quickly dispatched by underscoring that the documented male plaintiffs, on their own and without taking their wives into account, had sufficiently high income and creditworthiness to enter into leases and to make timely rent payments for years.  *See* Exs. 12-15 to Pls.' Mem.  They do not somehow become less creditworthy once their wives are taken into account.  Indeed, were this their true reasoning, Defendants would not rent to a male with a stay-at-home or otherwise unemployed wife, yet the Policy shows no such prohibition.  On the facts of this case, the female Plaintiffs lived with the male Plaintiffs for years, during which time Plaintiffs never missed any rent payments.  *See* Ex. 8 to Pls.' Mem. ¶ 10; Ex. 9 to Pls.' Mem.¶ 10; Ex. 10 to Pls.' Mem. ¶ 11; Ex. 11 to Pls.' Mem. ¶ 10.  And Defendants voluntarily chose to renew Plaintiffs' leases on multiple occasions after acquiring knowledge of the female Plaintiffs' presence.  *See* Pls.' Mem. at 29.  For Defendants now to contend that the female Plaintiffs posed an unacceptable lease underwriting risk is nonsensical and empirically disproven.

The most telling evidence that neither of these purported justifications are the true reasons for the Policy is the fact that out of thousands of pages of internal documents produced by Defendants prior to the commencement of this litigation, *not one single page*—not one e-mail, internal memorandum, or policy manual—articulates these reasons.  The fact that

Defendants did not once discuss the issues of harboring or underwriting is perhaps the best evidence that they are nothing but post-hoc justifications invented after litigation was filed.[6]

In the end, Defendants' attempts to camouflage the true nature of the Policy ring hollow; Plaintiffs have shown that all of the reasons put forth by Defendants—carrying out criminal background and credit checks, verifying identity, verifying legal presence, concern over liability under the anti-harboring statute, lease underwriting concerns, and minimizing loss from eviction[7]—are illegitimate, and at best, pretextual.

Finally, Defendants again maintain that evidence that they advertised to Latinos should absolve them of liability in this case.  *See* Defs.' Reply Mem. at 22-23.  They do not address the Supreme Court precedent Plaintiffs cite that discrimination against members of a protected class is not permissible simply because other members of the protected class happen to be treated "favorably."  *Connecticut v. Teal*, 457 U.S. 440, 455 (1982); *see also* Pls.' Mem. at 24.  In any event, the exhibits that Defendants cite to are inapplicable to this case.  ██████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Ex. 33 to Defs.'

Mem. at 3.  ███████████████████████████████████████████████

███████████████████████████████ Moreover, accepting Defendants' premise would

---

[6]  Both justifications received scant attention in Defendants' opening brief, further underscoring that Defendants did not rely on either explanation until it was convenient for them to do so during the course of litigation.  *See* Defs.' Mem. at 12 ("[T]he legitimate purposes of the Policy—to allow for a criminal background check and to determine legal status—are clear.").  In fact, the word "harboring" does not appear in Defendants' opening brief, while the only mention of lease underwriting is in an interrogatory response that Defendants cut and pasted.  *See id.* at 19.

[7]  Defendants' argument that the Policy was necessary to minimize loss from eviction must be rejected for the same reasons that their lease underwriting argument fails to persuade, as the purpose of underwriting is to minimize loss from eviction; they are two sides of the same coin.

mean that because they advertised to Latino individuals some time in the past—at a property different than the property in which Plaintiffs lived—they are immunized from any instances of future discrimination against Latino individuals at *any* of their properties.  That is not the law. *See Teal*, 457 U.S. at 455.

Plaintiffs are therefore entitled to summary judgment on Counts I and II because Plaintiffs have demonstrated a disparate impact against Latinos and Defendants have failed to proffer a legitimate reason for that discrimination.  Defendants have failed to dispute this Court's sound reasoning that the VFHL recognizes disparate impact claims in the same manner as the FHA.  *See* Pls.' Mem. at 25.

### III.    Plaintiffs are Entitled to Summary Judgment on their MHLRA and Breach of Contract Claims.

In attempting to oppose Plaintiffs' Motion for Summary Judgment on Counts III and V, Defendants do not even attempt to argue that the MHLRA, Code of Va. § 55-248.41 *et seq*., permitted their actions.  With good reason: it does not.  Rather, they argue that (1) Virginia's parol evidence rule bars evidence of Defendants' actual knowledge of the existence of the female Plaintiffs; and (2) Plaintiffs' purported fraud somehow removes their leases from the MHLRA statutory scheme.  Neither argument holds water.

First, as the case Defendants cite makes clear, the parol evidence rule provides only that "parol evidence is generally not admitted to vary the terms of a written instrument." *Dominion Bank, N.A. v. Moore*, 688 F. Supp. 1084, 1086 (W.D. Va. 1988).  Here, Plaintiffs are not seeking to vary the terms of the leases; rather, they are offering evidence to show Defendants' actual knowledge of the true facts in rebuttal to Defendants' protestations that they were defrauded by the male Plaintiffs' failure to list their wives on their written lease applications.  It is well-settled under Virginia law that "[i]n all cases of fraud the plaintiff must prove that it acted to its

detriment in actual and justifiable reliance on the defendant's misrepresentation." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999). And one who "'makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry . . . cannot claim reliance.'" *Id.* (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999)).[8] Defendants cannot claim any sort of justifiable reliance on the male Plaintiffs' lease applications when Defendants were on notice of the female Plaintiffs' presence for years. *See supra* p. 10.[9] In any event, the parol evidence rule does not bar the introduction of evidence showing "additional independent facts contemporaneously agreed upon which bore on the actual agreement between the parties." *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 303 S.E.2d 894, 898 (Va. 1983). As an example, the parol evidence rule clearly does not preclude Plaintiff Bolaños from testifying that *Defendants' own employee* specifically instructed him not to list his wife on his lease application. Such testimony is not attempting to change the terms of the applicable leases, but is instead directed at explaining why Defendants' claims of fraud are meritless.

Second, even if Defendants actually were deceived by the male Plaintiffs' written lease applications—which they were not—this does not excuse Defendants' failure to follow the MHLRA's clear and precise notice provisions. Defendants' fear that "tenants of mobile home parks in Virginia can commit fraud with impunity," Defs.' Reply Mem. at 30, is groundless in light of the fact that they easily could have complied with the MHLRA by *issuing exactly the*

---

[8]    *See also* 37 C.J.S. Fraud § 48 (2016) ("Since it is essential that the party to whom a misrepresentation is made is deceived thereby, and should believe it to be true, one may not secure a redress for a representation which he or she knew to be false.").

[9]    For this reason, Defendants' argument that the male Plaintiffs were subjected to the consequences of the Policy because they committed fraud cannot be given credence and is incompatible with the record.

*same notice to each Plaintiff, just a few weeks earlier*.  Had Defendants given each family 60

days' (rather than 13 or 29 days') notice that they were terminating their annual leases and

placing them on a month-to-month lease, then they would have satisfied the MHLRA.

      The statute provides specific procedures that a mobile home park operator must follow to

terminate a rental agreement and evict a tenant.  There is no fraud carve-out.  Of course, it is not

surprising that Defendants made a procedural error in following the strictures of a statute that

they admittedly did not even know existed.  *See* Pls.' Mem. at 9.  What is surprising and

unfortunate, however, is that once Defendants realized their error, they never considered simply

admitting error and reimbursing Plaintiffs their illegally charged month-to-month fees,

amounting only to a few hundred dollars each.  *See* Ex. 21 to Pls.' Mem. at 213:10-214:9

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████ (emphasis added).  Instead, Defendants defended the timing of their notices through

discovery and all the way to summary judgment.[10]  *See id.* at 215:1-12:

              ███████████████████████████████████

              ██████████████████████████████████████

              ████████████████████████████████████

              ██████████████████████████████

              ████████████

Because Defendants' actions unquestionably violated the MHLRA, Plaintiffs are entitled to

summary judgment on Counts III and V.

---

[10]  Of course, if Plaintiffs win on this claim, they will be entitled to attorney's fees, pursuant to Code of Va. § 55-248.51, in an amount that will far exceed the amount in controversy on this claim.  But, just like the right to 60 days' notice prior to lease termination, this is another protection that the Virginia legislature provides to mobile home tenants in light of the unequal power relationship between tenant and landlord.

## **CONCLUSION**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs on

Counts I, II, III and V.

DATED this 17th day of January, 2017    Respectfully submitted,


QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950
Jeanhee Hong (*pro hac vice*)
Ariel Wade Trajtenberg (*pro hac vice*)
Diego Durán de la Vega (*pro hac vice*)
Jongwook Kim (*pro hac vice*)
William A. Margeson (*pro hac vice*)
Archith Ramkumar (*pro hac vice*)

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com
jeanheehong@quinnemanuel.com
arieltrajtenberg@quinnemanuel.com
diegoduran@quinnemanuel.com
wookiekim@quinnemanuel.com
billmargeson@quinnemanuel.com
archithramkumar@quinnemanuel.com

LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Rebecca Wolozin, VSB #89690

6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
becky@justice4all.org

*Counsel for Plaintiffs*

17

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of January, 2017, I filed the foregoing document

electronically with the Clerk of the Court using the ECF system, and caused to be served by

electronic mail a copy of the foregoing document upon the following parties:

Grayson P. Hanes, VSB # 06614
Michael S. Dingman, VSB #30031
Justin deBettencourt, VSB # 83806
REED SMITH LLP
7900 Tysons One Place, Suite 500
McLean, Virginia 22102
Phone: (703) 641-4200
Fax: (703) 641-4340
ghaynes@reedsmith.com
mdingman@reedsmith.com
jdbettencourt@reedsmith.com

*Counsel for Defendants*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Paul Brinkman, VSB # 35950

777 Sixth Street NW, 11th Floor
Washington, District of Columbia 20001-3706
Phone: (202) 538-8000
Fax: (202) 538-8100
paulbrinkman@quinnemanuel.com

*Counsel for Plaintiffs*

18