**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*,     ) | |
|     Plaintiffs,     ) | |
|     ) | |
|     v.     ) | **Case No. 1:16-cv-563** |
|     ) | |
| WAPLES MOBILE HOME PARK     ) | |
| LIMITED PARTNERSHIP, *et al.*,     ) | |
|     Defendants.     ) | |

## MEMORANDUM OPINION

At issue in this housing discrimination case are the parties' cross motions for summary judgment. On May 23, 2016, plaintiffs, eight current or former residents of Waples Mobile Home Park ("the Park"), filed a six-count Complaint against the Park's owners and operators[1] in response to defendants' enforcement of a policy (the "Policy") that, in plaintiffs' view, (1) impermissibly discriminates on the basis of race, national origin, alienage, and citizenship, (2) violates the terms of their lease agreements, and (3) violates a Virginia statute regulating mobile home parks. Plaintiffs comprise four married couples, and each plaintiff is a non-citizen of Salvadorian or Bolivian national origin.

The remaining causes of action are:

- Count I: Violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* (brought by all plaintiffs);

- Count II: Violation of the Virginia Fair Housing Law ("VFHL"), Va. Code § 36-96.3 *et seq.* (brought by all plaintiffs);

---

[1] Defendants are Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. These parties are referred to collectively as "defendants."

1

- Count III: Violation of the Virginia Manufactured Home Lot Rental Act (the "Rental Act"), Va. Code § 55-248.41 *et seq.* (brought by only the male plaintiffs);

- Count IV: Violation of 42 U.S.C. § 1981 (brought by all plaintiffs); and

- Count V: Breach of contract (brought by only the male plaintiffs).[2]

As the summary judgment motions have been fully briefed and argued orally, they are now ripe for disposition. For the reasons that follow, defendants' motion must be granted in part and denied in part, and plaintiffs' cross motion must be denied.

## I.

The following undisputed material facts are derived from the parties' statements of fact, as well as the summary judgment record.

- Each plaintiff is an adult Latino of Salvadorian or Bolivian national origin who currently resides in Virginia. None of the plaintiffs is a United States citizen.

- The female plaintiffs entered the United States illegally and thus are unlawfully present in the country.

- The male plaintiffs have passed criminal background checks, have Social Security Numbers, and had sufficient income and credit to rent lots at the Park.

- The four male plaintiffs were able to enter leases at the Park. Their wives, the four female plaintiffs, were not signatories on the leases.

- The lease application forms required the male plaintiffs to list all adult occupants of the male plaintiffs' mobile homes.

- Three of the male plaintiffs did not list their wives on their lease applications.[3]

---

[2] The Complaint alleged a sixth count for tortious interference with contract, but that claim was dismissed with prejudice by Order dated July 22, 2016. *See Reyes v. Waples Mobile Home Park LP*, No. 16-cv-563 (E.D. Va. July 22, 2016) (Order) (Doc. 34). Defendants' motion to dismiss Counts I, II, and IV was denied. *See id.*, 205 F. Supp. 3d 782 (E.D. Va. 2016).

[3] There is a factual dispute whether the fourth male plaintiff, Mr. Saravia Cruz, listed his wife, Rosa Amaya, on the first page of his lease application as his spouse who would reside with him. Plaintiffs' Exhibit 17 in their cross-motion for summary judgment—a document produced by defendants—shows that Mr. Saravia Cruz listed his wife on the first page of his application

- Nevertheless, the female plaintiffs lived with their husbands in the Park, which is located within the Eastern District of Virginia.

- Plaintiffs' children reside with plaintiffs and are United States citizens with Social Security Numbers.

- By 2014, defendants knew that Mr. Reyes's wife was living at the Park with her husband.[4]

- Before 2015, the male plaintiffs were also able to—and did—renew year-long leases at the Park until 2015.

- Yet, in 2015, defendants enforced the Policy for the male plaintiffs' lease renewals, requiring the male plaintiffs to submit documentation for all adult occupants in the plaintiffs' homes.[5]

- At the relevant time periods, the Policy required all applicants seeking to rent at the Park to provide government-issued photo identification (including a Passport), and proof of lawful presence in the United States, such as a Social Security Card.

- The Policy further provided that "Applicants who do not have a Social Security number[] must provide their original Passport, original US Visa[,] and original Arrival/Departure Form (I-94 or I-94W)." Compl. Ex. A.

- Similarly, defendants' "Future Resident Information Guides" published on May 13, 2015 and March 31, 2016 also state that adults without a Social Security Number must provide

---

materials. In response, defendants contend that this page was not part of the application. It is unclear, however, how defendants were able to produce this document if it did not comprise Mr. Saravia Cruz's rental application. For the reasons stated *infra*, this factual dispute is material to plaintiffs' Rental Act claims, but not the discrimination claims.

[4] With respect to Mr. Bolaños, there is a factual dispute regarding when defendants actually learned that Mr. Bolaños's wife was living at the Park. Although Mr. Bolaños testified that one of defendants' employees instructed him not to list his wife on his lease application, defendants have pointed to admissible testimony indicating that defendant did not learn that Mr. Bolaños's wife was living at the Park until 2015. Similarly, there is a factual dispute as to when defendants learned that Mr. Moya Yrapura's wife lived at the Park. Plaintiffs have cited evidence that Mr. Moya Yrapura's wife was the one who took the Moya Yrapura family's rent checks to the Park office to pay. By contrast, defendants have cited evidence indicating that defendants first learned of her presence in 2015, during a home inspection. For the reasons stated *infra*, this factual dispute is material to plaintiffs' Rental Act claims, but not the discrimination claims.

[5] Some version of the Policy had been in effect since 2006.

an original passport, original U.S. Visa, and original I-94 forms in order to reside at the Park.

- Today, residents at the Park may satisfy the Policy by producing documents besides an original passport, such as (1) a permanent resident card (Form 1-551 or I-151), (2) a temporary resident card (Form I-688A), or (3) a border crossing card.[6]

- Because the female plaintiffs entered the United States illegally, they cannot satisfy the Policy. In other words, because the female plaintiffs are illegal aliens, they do not have— and cannot acquire—a U.S. Visa, an original I-94 form, or any authentic document to prove their lawful residence in the United States.

- Once defendants began enforcing the Policy, the male plaintiffs would have been able to renew their leases provided they complied with the Policy and ensured that each adult occupant in their homes had supplied defendants with the requisite documents to show lawful presence in the United States.

- Defendants never used the male plaintiffs' statuses as Latinos to deny the male plaintiffs the right to enter into rental agreements at the Park.

- Defendants never used the male plaintiffs' statuses as non-U.S. citizens to deny the male plaintiffs the right to enter into rental agreements at the Park.

- Other Latinos and non-United States citizens entered into leases at the Park in 2015 and 2016—the same period of defendants' alleged discrimination against plaintiffs.

- Some of the individuals who entered into leases at the Park in 2015 and 2016 were Latino non-citizens.

- Approximately 60% of the residents at the Park are Latino.

- As of 2014, defendants advertised to Latinos for one of defendants' related properties.

- Defendants employ Latinos and Spanish-speakers in the Park's property management office.

- The male plaintiffs do not read English, but nonetheless were able to execute leases at the Park.

---

[6] The factual record is unclear, however, whether defendants communicated these alternative methods of proving legal residence to plaintiffs at the relevant time periods. Yet, this point is immaterial to the resolution of plaintiffs' discrimination claims, as it is undisputed that there is no set of documents that the female plaintiffs—who are illegal aliens—could provide to prove legal presence in the United States.

- Some of the male plaintiffs permitted adults to reside in plaintiffs' mobile homes in the Park even though those adults were not listed on the male plaintiffs' leases or rental agreements.

- In March 2014, defendants reminded plaintiff Reyes that his wife needed to satisfy the Policy for her to continue residing at the Park.

- Notwithstanding the fact that his wife could not satisfy the Policy, Mr. Reyes was permitted to renew his lease at the Park for another one-year term, from June 1, 2014 to May 31, 2015.

- In March 2015, Mr. Reyes was again reminded of the Policy. The Reyes family did not provide the requisite documents to satisfy the Policy.

- Later that same month, March 2015, defendants provided Mr. Reyes oral notice that he would be placed on a month-to-month lease and that his monthly rent would increase by $100 in part because an occupant in his residence could not comply with the Policy.

- On January 7, 2016, defendants sent plaintiff Moya Yrapura a letter, warning that his wife had not yet complied with the Policy. The January 7 letter advised that Mr. Moya Yrapura should submit his wife's occupant application and documentation by January 11, 2016.

- Because Mrs. Moya Yrapura is illegally present in the United States, she was unable to provide the documents required by the Policy.

- On January 18, 2016—13 days before Mr. Moya Yrapura's year-long lease was set to expire—defendants placed him on a month-to-month lease and increased his monthly rent by $100 in part because an occupant in his residence could not satisfy the Policy.

- In January 2016, defendants informed plaintiff Saravia Cruz that his wife would need to comply with the Policy in order for him to renew his lease.

- Because Mr. Saravia Cruz's wife, Ms. Amaya, is illegally present in the United States, she was unable to provide the documents required by the Policy.

- On January 18, 2016—13 days before Mr. Saravia Cruz's lease was set to expire—defendants placed him on a month-to-month lease and increased his monthly rent by $100 in part because an occupant in his residence could not satisfy the Policy.

- On January 27, 2016, defendants sent Mr. Reyes a letter advising him that he had 21 days to "cure" his violation of his lease terms—namely, the fact that he had unauthorized occupants living at his residence—else he would face eviction.

- In February 2016, defendants informed plaintiff Bolaños that his wife would need to satisfy the Policy for Mr. Bolaños to renew his lease.

- Because Mr. Bolaños's wife is illegally present in the United States, she was unable to provide the documents required by the Policy.

- On March 2, 2016—29 days before Mr. Bolaños's year-long lease was set to expire—defendants placed him on a month-to-month lease and increased his monthly rent by $100 in part because an occupant in his residence could not comply with the Policy.

- Defendants subsequently sent plaintiffs a notice that their rent would increase by $300, but defendants agreed not to charge or collect the $300 increase during the pendency of this litigation.

- Thereafter, six plaintiffs—the Reyes, Bolaños, and Saravia Cruz families—moved out of the Park.

- By September 2016, defendants had produced a report reflecting that Latinos comprise the majority of tenants who had failed to comply with the Policy.

- Defendants assert several reasons for implementing the Policy: (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability for harboring illegal aliens, and (5) to underwrite leases.

## II.

Where, as here, the parties have filed cross motions for summary judgment, each motion must be reviewed "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). No triable issue exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted). Once the movant meets its burden, the opposing party, in order to defeat the motion, must set forth specific facts showing a genuine issue for trial. *Covenant Media of S.C.,*

*LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). In this respect, "a motion for summary judgment … necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits," and thus the inquiry here is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," that is, whether reasonable jurors could find by a preponderance that defendants unlawfully discriminated against plaintiffs, violated the Virginia Rental Act, or breached the male plaintiffs' lease agreements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Finally, "the facts, with reasonable inferences drawn," are viewed "in the light most favorable" to the non-moving party. *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

Analysis now turns to plaintiffs' causes of action.

## III.

### A. Count I (FHA) & Count II (VFHL)

Defendants have moved for summary judgment on plaintiffs' disparate treatment claims under the FHA and VFHL. Because the FHA and VFHL are essentially similar,[7] the same

---

[7] Indeed, the relevant provisions of the FHA and VFHL are almost identical. Under the FHA, it is unlawful

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). And the VFHL makes it unlawful

> [t]o refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, national origin, sex, elderliness, or familial status.

Va. Code § 36-96.3.

analysis applies to both disparate treatment claims. *See, e.g.*, *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 495 n.2 (E.D. Va. 2002) (applying the same standards to FHA and VFHL claims); *Bradley v. Carydale Enters.*, 707 F. Supp. 217, 222 (E.D. Va. 1989) (same). Plaintiffs do not seek summary judgment on their disparate treatment claims, but rather contend that there are triable issues of fact that preclude summary judgment.[8] In essence, plaintiffs contend that defendants' implementation of the Policy constituted intentional housing discrimination on the basis of plaintiffs' race and national origin. *See, e.g.*, *Reyes v. Waples Mobile Home Park LP*, 205 F. Supp. 3d 782, 787 n.6 (E.D. Va. 2016) (noting that courts treat claims of discrimination against Latinos as encompassing both race and national origin discrimination). To succeed on these claims, plaintiffs must ultimately prove that race or national origin was a "motivating factor" for the challenged housing decisions. *See Hadeed v. Abraham*, 103 F. App'x 706, 707

---

[8] Plaintiffs' Complaint originally included a theory of disparate impact in support of the state and federal housing discrimination claims. Although it is true that disparate impact claims may be appropriate in "some cases," *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009), including some FHA claims, *see Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct. 2507 (2015), plaintiffs were precluded from relying exclusively on a disparate impact theory to prove housing discrimination. This is so because

> [g]iven the current correlation between the presence of illegal aliens in the United States and the predominantly Latino national origin of the illegal alien population, it cannot fairly be said—by the existence of a disparate impact alone—that a policy targeting illegal aliens and thereby disproportionately making housing unavailable to a class of Latinos does so "because of race ... or national origin." 42 U.S.C. § 3604(a). To hold otherwise would, as *Inclusive Communities* warns, eliminate [the FHA's] robust causality requirement and make defendants answer for racial disparities they did not create.

*Reyes v. Waples Mobile Home Park LP*, 205 F. Supp. 3d 782, 793-94 (E.D. Va. 2016). Thus, after full briefing and argument at the threshold stage, plaintiffs' housing discrimination claims were permitted to proceed as disparate *treatment* claims, and plaintiffs were further permitted to use evidence of disparate impact to support an inference of intentional discrimination. *Id.* at 794 ("[T]he analysis here makes clear that plaintiffs cannot rely *solely* on disparate impact to satisfy the FHA's causation requirement [but] plaintiffs may use evidence of disparate impact, in addition to other proof, to meet their burden of demonstrating causation.").

(4th Cir. 2004) (affirming summary judgment for defendants on FHA and VFHL gender discrimination claims because plaintiffs "failed to present any evidence from which a reasonable jury could conclude that gender was a motivating factor in [defendant's] decision"). For the following reasons, defendants' motion on the FHA and VFHL claims must be granted.

To begin with, plaintiffs correctly concede that there is no direct evidence in the summary judgment record of intentional discrimination. Accordingly, it is appropriate to analyze plaintiffs' disparate treatment claims under the *McDonnell Douglas*[9] burden-shifting framework. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990) ("The *McDonnell Douglas* scheme … is routinely used in housing and employment discrimination cases alike."); *Martin v. Brondum*, 535 F. App'x 242 (4th Cir. 2013) (similar). The purpose of the *McDonnell Douglas* scheme is to determine whether the factual record on summary judgment warrants an inference of discrimination sufficient to present a jury question. *See Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005). The *McDonnell Douglas* inferential proof scheme involves the following three steps.

First, plaintiffs must establish a prima facie case of intentional race or national-origin discrimination. *See Pinchback*, 907 F.3d at 1452. Here, a prima facie case comprises four elements:

(1) that plaintiffs belong to a protected class,

(2) that they sought and were qualified for a dwelling,

(3) that they were denied the opportunity to rent the dwelling, and

(4) that the dwelling remained available to others outside of plaintiffs' protected class.

---

[9] *See McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*See Martin*, 535 F. App'x at 244; *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (similar); *see also Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001) (setting forth similar standard for a prima facie § 1981 claim). The purpose of this first step in the *McDonnell Douglas* test is to "screen for cases whose facts give rise to an inference of non-discrimination"; thus, satisfying a prima facie case creates a "rebuttable[] presumption of unlawful discrimination." *Miles*, 429 F.3d at 488 n.5.

Second, assuming plaintiffs state a prima facie case, "[t]he burden of production then shifts to [defendants] to articulate a legitimate, non-discriminatory justification for [their] allegedly discriminatory action." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).

Last, if defendants meet their burden of production, "plaintiff[s] then ha[ve] the opportunity to prove by a preponderance of evidence that the neutral reasons offered by [defendants] were … a pretext for discrimination." *Id.* (quotation marks omitted). Ultimately, "[t]he final pretext inquiry merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Id.*

This analysis, applied here, demonstrates that plaintiffs' FHA and VFHL claims are nonstarters, for the undisputed factual record fails to show a prima facie case of race or national origin discrimination. Although plaintiffs, as Latinos, are members of a protected class who were denied the opportunity to renew housing rental agreements, the undisputed factual record discloses that plaintiffs did not qualify to renew leases under the Policy and Park rules. *See Martin*, 535 F. App'x at 244 (prima facie case requires evidence that plaintiffs were qualified for the dwelling). This is because some adult occupants in plaintiffs' households could not provide

the requisite forms showing lawful status—a requirement that applied uniformly to every household and applicant seeking to rent at the Park. Nor have plaintiffs pointed to any evidence showing that the dwellings remained available to others outside of plaintiffs' protected class on different terms from those offered to plaintiffs.

Plaintiffs apparently concede this point. Indeed, plaintiffs do not even address or enumerate the elements of a prima facie claim.[10] They argue instead that plaintiffs have made a sufficient prima facie showing because (1) the Policy requires documents—namely, visas and I-94 forms—that are not especially probative of legal presence in the United States, and (2) the Policy is over-inclusive, as the male plaintiffs, despite proving their own legal presence, faced higher rent and potential eviction because their wives could not satisfy the Policy.[11] Neither argument is persuasive; neither argument rescues plaintiffs' failure to establish a prima facie case.

Plaintiffs' first contention—that the Policy reflects intentional racial or national origin discrimination because it does not ask for the most probative forms of lawful presence—does not help plaintiffs establish a prima facie case. The fact that the Policy does not require the most probative forms does not invite an inference or rebuttable presumption of unlawful discrimination. *See Miles*, 429 F.3d at 488 n.5. Indeed, this fact does not aid plaintiff in making a prima facie case because it is undisputed that the Policy is facially neutral and that it applies to

---

[10] To be sure, the Fourth Circuit has noted that "[c]ourts must ... resist the temptation to become so entwined in the intricacies of the *McDonnell Douglas* proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*." *Merritt*, 601 F.3d 289 at 295 (quotation marks and brackets omitted). Although this warning is important, it does not stand for the proposition that a party may survive summary judgment by ignoring the prima facie case altogether.

[11] At the summary judgment hearing, counsel for plaintiff emphasized that this second argument is plaintiffs' best proof of intentional anti-Latino discrimination. *See Reyes v. Waples Mobile Home Park LP*, No. 1:16-cv-563 (E.D. Va. Feb. 17, 2017) (Hr'g Tr.) at 45.

all residents at the Park, regardless of race or national origin. In other words, *any* adult resident at the Park who lacks a Social Security Number must produce the same forms to demonstrate his or her lawful presence in the United States. And there is no evidence in the record that any person who is lawfully present in the country was unable to provide the requested documents, a fact that further belies any inference that the Policy targets *Latinos* as such, rather than targeting *illegal aliens*. *See United States v. Loaiza-Sanchez*, 622 F.3d 939, 941 (8th Cir. 2010) ("[A] person's legal status as a deportable alien is not synonymous with national origin.").

Notably, it is undisputed that the female plaintiffs are unable to satisfy the Policy—and prove legal presence in the United States—not because of their race or national origin, but because they are, in fact, unlawfully present in the country. Thus, plaintiffs' argument does not invite the inference or rebuttable presumption of race or national origin discrimination because the undisputed factual record confirms that the Policy burdens the female plaintiffs not because they are Hispanic, but rather because they entered the country illegally. *Cf. Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) (noting that the refusal to contract on the basis of unlawful presence in the United States is permissible discrimination on the basis of immigration status, not illegal discrimination on the basis of a protected characteristic); 8 U.S.C. § 1324a(a)(1) (making it unlawful knowingly to hire an "unauthorized alien"); *id.* § 1324b(a)(1) (providing that employers may "discriminate" against an "unauthorized alien"). In short, plaintiffs' focus on the type of forms required ignores the undisputed record, which record discloses that the Latino plaintiffs were treated no differently from non-Latinos. *See, e.g.*, *Roberson v. Graziano*, No. WDQ-09-3038, 2010 WL 2106466, at *2 (D. Md. May 21, 2010) (noting that a plaintiff, to establish an FHA disparate treatment claim, must show that "he is a member of a protected class and that he was treated differently [from] other tenants because of his membership in that class"),

*aff'd*, 411 F. App'x. 583 (4th Cir. 2011).[12] Therefore, defendants' alleged failure to require more probative forms to prove legal presence does not reflect anything about intent to discriminate on the basis of race or national origin.[13]

Plaintiffs' second argument is equally unpersuasive. This argument, like the first, does not rescue plaintiffs from the failure to show a prima facie case and does not invite an inference or rebuttable presumption of unlawful discrimination. Here, plaintiffs argue that a reasonable jury could infer that defendants harbored discriminatory intent against Latinos because the male plaintiffs faced increased rent and eviction despite their ability to prove their own lawful presence. This contention overlooks the undisputed facts that defendants informed each male plaintiff that he was living with unauthorized occupants *before* defendants imposed higher rent or threatened eviction. Indeed, plaintiffs were forewarned that their wives needed to provide the requisite forms proving lawful presence. And the lease agreements and Policy clearly stated that the leaseholder may not reside with unauthorized occupants. The increased rents and threat of eviction thus occurred not because the male plaintiffs were Latino, but rather because the male plaintiffs understandably wished to continue living with their wives, all of whom happen to be unlawfully present in the United States and therefore unable to satisfy the Policy. And defendants have correctly noted that there is no evidence in the factual record that any plaintiff was treated differently from individuals outside plaintiffs' protected classes, as the Policy applied to all applicants and adult residents at the Park. Thus, the undisputed factual record

---

[12] *See also Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (stating that the elements of a prima facie case of disparate treatment under Title VII include "different treatment from similarly situated employees outside the protected class"); *Pinchback*, 907 F.2d at 1451 (noting that "[f]air employment concepts are often imported into fair housing law").

[13] No method of determining a person's legal presence is flawless, as nearly any form of identification may be fabricated. This same point is addressed below in the context of the second and third stages of the *McDonnell Douglas* framework.

discloses that plaintiffs are unable to establish a prima facie case of intentional discrimination and that defendants are entitled to summary judgment on the FHA and VFHL claims.

This conclusion is confirmed by the following undisputed facts: (1) that defendants regularly rent lots at the Park to Latinos and non-citizens, (2) that the majority—approximately 60%—of residents at the Park are Latino, notwithstanding the effects of the Policy, (3) that defendants aimed their housing advertisements to Latinos,[14] (4) that defendants employed Latino Spanish-speakers at the Park, (5) that defendants never used the male plaintiffs' race, national origin, or non-citizenship as a ground to deny them the right to enter rental agreements at the Park, and (6) that defendants re-leased lots at the Park to the male plaintiffs for years. *See, e.g.*, *Martin v. Long & Foster Real Estate, Inc.*, No. 1:11-cv-1118, 2012 WL 3991900, at *8 (E.D. Va. Sept. 11, 2012) (granting defendants summary judgment on housing discrimination claim and noting an eight-year contractual relationship between lessor and lessee constituted "strong evidence" that the lessor lacked racial animus), *aff'd sub nom. Martin v. Brondum*, 535 F. App'x 242 (4th Cir. 2013). These undisputed facts belie any claim of intentional housing discrimination "because of" race or national origin. In sum, plaintiffs' disparate treatment claims under the FHA and VFHL fail as a matter of law.

---

[14] Plaintiffs correctly note that the record evidence of defendants' advertising relates to one of defendants' other rental properties, and not the Park. But plaintiffs incorrectly argue that this evidence is irrelevant in light of the Supreme Court's decision in *Connecticut v. Teal*, an employment case in which the Supreme Court noted that Title VII does not "give an employer license to discriminate against some employees on the basis of race … merely because he favorably treats other members of the employees' group." 457 U.S. 440, 455 (1982). *Teal* is factually inapposite, as in that case the defendant attempted "to justify" racial discrimination "on the basis of [defendant's] favorable treatment of other members of [plaintiff's] racial group." *Id.* at 454. Defendants in this case, unlike the defendant in *Teal*, point to the evidence of favorable treatment to other members of plaintiffs' class not to *justify* invidious discrimination, but rather to *negate* the accusation of unlawful discrimination. Plaintiffs' reliance on *Teal* is therefore misplaced. Importantly, however, the conclusion reached on the summary judgment record presented here does not depend on defendants' advertising; rather, defendants' advertising is but one of several undisputed facts that belie any claim of unlawful discrimination.

Given that plaintiffs' FHA and VFHL claims fail to establish a prima facie case of disparate treatment, it is unnecessary to address the parties' arguments regarding the second and third stages of the *McDonnell Douglas* proof scheme. Yet even assuming, *arguendo*, the factual record supported a prima facie case, the FHA and VFHL claims would still fail. This is so because defendants have met their burden of production to articulate legitimate, non-discriminatory justifications for the Policy, and plaintiffs have adduced no evidence that the stated reasons are pretext for discrimination on the basis of race or national origin. *See Merritt*, 601 F.3d at 294.

In this regard, defendants have identified several neutral reasons for implementing the Policy, namely, (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability under 8 U.S.C. § 1324 for harboring illegal aliens,[15] and (5) to underwrite leases.[16] None of the evidence plaintiffs cite in response to defendants' stated justifications creates a genuine factual dispute regarding pretext for unlawful discriminatory intent.

To be sure, plaintiffs are correct to argue that the Policy's required documents—a passport, a Visa and I-94 forms—will not always disclose whether an individual is legally present in the United States; nor is a passport, visa, or I-94 form the only way to prove legal presence. But no method of determining a person's legal presence is unassailable. Indeed, practically any form of identification or proof of lawful presence may be fabricated. The fact

_____

[15] Section 1324 imposes criminal liability on any person who harbors an alien with "know[ledge] or … reckless disregard of the fact that the alien has come to, entered, or remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A).

[16] Defendants have also submitted an expert report explaining that the Policy is reasonable. Although plaintiffs' motion to strike that report has been denied, that report played no role in this summary judgment analysis.

remains, however, that plaintiff has not cited any evidence that a legal U.S. resident was unable to provide a document required by the Policy. Thus, the Policy's documentation requirements do not create an inference of pretext for discrimination on the basis of race or national origin.

Plaintiffs' next argument—that defendants' justifications regarding lease underwriting and losses from eviction are pretextual—is also unavailing. Specifically, plaintiffs contend that defendants, in enforcing the Policy, could not have truly been concerned with lease underwriting and losses caused by eviction because (1) the male plaintiffs were able to afford their rent, and (2) adopting defendants' position would mean that no family could ever qualify for a lease if one occupant were a stay-at-home spouse. But plaintiffs' argument is unpersuasive because there is no doubt that a lessor faces substantially greater financial risk if an occupant were deported (or threatened with deportation) and her husband understandably decided to abandon the lease to continue living with his wife.[17]

Plaintiffs' last contention regarding pretext fares no better. Specifically, plaintiffs contend that defendants could not have truly feared liability under the federal anti-harboring statute, 8 U.S.C. § 1324, because defendants, upon learning of the female plaintiffs' unlawful status, continued to rent to the male plaintiffs, albeit at higher rates. In this respect, plaintiffs contend that defendants should have immediately evicted plaintiffs. But plaintiffs seek to have it both ways: they contend that defendants invidiously discriminated by choosing the *less* drastic option (changing the plaintiffs' rent terms in lieu of immediate eviction), and that defendants should have avoided liability under the anti-harboring statute by risking liability under the Virginia Rental Act. *See infra* Part III.D. Moreover, there is no question, given § 1324's imposition of liability for "reckless disregard of the fact that [an] alien has come to, entered, or remains in the

---

[17] Indeed, the plaintiff husbands' devotion to their wives explains the male plaintiffs' decisions not to ask their wives to vacate the Park to enable the households to satisfy the Policy.

United States in violation of law," that a lessor could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants. *See* 8 U.S.C. § 1324(a)(1)(A)(ii).[18] Thus, plaintiffs have not shown that defendants' stated justification is a pretext for unlawful animus against the very group—Latinos—to whom defendants rent most often.

It is worth noting, given the summary judgment record, that the Policy's alleged disparate impact on Latinos also does not support an inference of intentional discrimination on the basis of race or national origin.[19] As previously stated, it is undisputed (1) that defendants regularly rent to Latinos, (2) that the majority of residents at the Park are Latino, notwithstanding the effects of the Policy, (3) that defendants aimed their housing advertisements to Latinos, (4) that defendants employed Latino Spanish-speakers at the Park, (5) that defendants never used the male plaintiffs' race, national origin, or non-citizenship as a ground to deny them the right to enter rental agreements, and (6) that defendants re-leased lots at the Park to the male plaintiffs for years. Once again, these facts confirm that any disparate effect on Latinos caused by the Policy is incidental to the Policy's lawful effect on all illegal aliens and reflects nothing more than the fact that many illegal aliens in the U.S. happen to be Latino. Thus, plaintiffs' FHA and VFHL claims fail not only at the prima facie stage, but also at the pretext stage of the *McDonnell Douglas* inferential proof scheme.

---

[18] Indeed, in the employment context, employers may lawfully refuse to hire applicants on the basis of unauthorized presence in this country; it is in fact a crime knowingly to hire someone who is illegally present in the United States. *See* 8 U.S.C. §§ 1324a & 1324b.

[19] *Cf. Reyes*, 205 F. Supp. 3d at 795 ("[P]laintiffs are entitled … to use any evidence, including evidence of disparate impact, to show that the apparently neutral Policy is in fact a pretext for intentional racial or national origin discrimination against plaintiffs."). Plaintiffs now contend that their statistical evidence demonstrates that "Latinos are nearly twice as likely to be undocumented compared to Asians and 20 times more likely to be undocumented than other groups, and are thus substantially more likely to be adversely affected than any other group." P. Ex. 40-C at 2. As noted below, however, this evidence is insufficient to create an inference of intentional discrimination against Latinos.

This conclusion is supported by the Supreme Court's decision in *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86 (1973), an analogous Title VII employment case. *See Pinchback*, 907 F.2d at 1451 (noting that "[f]air employment concepts are often imported into fair housing law"). In *Espinoza*—on appeal from summary judgment—a lawfully admitted resident alien challenged an employer's policy that all hires must be U.S. citizens, contending that the policy discriminated on the basis of national origin. 414 U.S. at 87-88. The plaintiff in *Espinoza* relied on the Title VII provision which, like the FHA and VFHL, prohibits discrimination "because of" national origin and race, but not discrimination on the basis of citizenship.[20] *See* 42 U.S.C. § 2000e-2(a)(1). In rejecting the plaintiff's discrimination claim, the Supreme Court held that there was "no indication … that [the] policy against employment of aliens had the purpose or effect of discriminating against persons of Mexican national origin," particularly where: (1) the employer "accept[ed] employees of Mexican origin, provided the individual concerned has become an American citizen," (2) "persons of Mexican ancestry ma[d]e up more than 96% of the company's" relevant division, and (3) "there [wa]s no suggestion … that the company refused to hire aliens of Mexican or Spanish-speaking background while hiring those of other national origins." *Id.* at 93 & n.5. Thus, the Supreme Court concluded that the plaintiff "was denied employment, not *because of* the country of her origin, but *because* she had not yet achieved United States citizenship." *Id.* at 93 (emphases

---

[20] Title VII, like the FHA and VFHL, protects against discrimination "because of" race, color, religion, sex, or national origin. This statute, again, like the FHA and VFHL, does not protect against discrimination "because of" citizenship or alienage. *See* 42 U.S.C. § 2000e-2. Of course, Title VII, the FHA, and the VFHL are distinct in this manner from 42 U.S.C. § 1981, which prohibits discrimination against aliens and non-citizens, and is the subject of plaintiffs' Count IV, discussed *infra* Part III.B.

added). In other words, the employment policy's impact on a Latina from Mexico was only incidental to the policy's then-legitimate focus on non-citizens.[21]

One need only replace the concepts of "citizenship" and "hiring" with "lawful presence" and "renting" to see that the logic in *Espinoza* obtains here. Specifically, it is undisputed (1) that defendants "accept [adult residents] of [Latino] origin, provided the individual concerned [is lawfully present in the United States]"; (2) that "persons of [Latino] ancestry make up more than [half] of the [Park's residents]," and (3) that "there is no suggestion … that [defendants] refused to [rent to] aliens of [Latino] or Spanish-speaking background while [renting to] those of other national origins." *See id.* Here, similar to *Espinoza*, the Policy's impact on plaintiffs was only incidental to the Policy's legitimate focus on illegal status.[22]

---

[21] Since then, Congress has clarified that discrimination based on citizenship status is generally impermissible. *See* 8 U.S.C. § 1324b(a)(1). Yet, § 1324b created an exception to allow employment discrimination against illegal aliens. *See id.*

[22] Also worth noting in this respect is the District of Nebraska's decision in *Keller v. City of Fremont*, the most factually-apposite case to this matter. *See* 853 F. Supp. 2d 959 (D. Neb. 2012), *aff'd in part, rev'd in part on other grounds*, 719 F.3d 931 (8th Cir. 2013). There, the plaintiffs challenged a city ordinance that prohibited landlords from knowingly or recklessly permitting an illegal alien to rent or lease a dwelling unit. 853 F. Supp. 2d at 964. The plaintiffs alleged, among other things, that the ordinance constituted intentional discrimination against Latinos and thus violated the FHA. And at summary judgment, the plaintiffs "ask[ed] th[e] Court to infer that the Defendants … engaged in a scheme of unlawful discrimination by using the undocumented status of certain residents as a pretext to disguise what is in fact discrimination based on race or national origin." *Id.* at 977. The *Keller* court rejected this argument, noting that although "it is apparent that the Ordinance is likely to affect persons of Latino or Hispanic ethnicity more than persons of other races and national origins," this disparate impact was insufficient to prove "*inten*[*t*] to develop a scheme of unlawful discrimination." *Id.* at 977-78. In this respect, the district court found that the plaintiffs failed to "present[] sufficient evidence to demonstrate a genuine issue of material fact as to whether discriminatory animus was a motivating factor" behind the ordinance. *Id.* at 977-78. The same is true here: plaintiffs simply have not created a genuine dispute of material fact to preclude summary judgment on the FHA and VFHL claims.

Although the parties in *Keller* appealed the district court's conclusions on a number of other statutory and constitutional issues, the plaintiffs did not challenge the district court's conclusion that their disparate treatment claim under the FHA failed to pass summary judgment

In summary, defendants' motion for summary judgment on the FHA and VFHL claims must be granted. Nothing in this opinion, however, should be read as stating that no person could ever succeed on a housing discrimination claim challenging a policy similar to defendants'. Indeed, as noted at the motion to dismiss stage, the Complaint's allegations of discrimination against Latinos were plausible. *See Reyes*, 205 F. Supp. 3d at 794-796. Rather, the conclusion reached here is limited to the facts—or lack thereof—present in the summary judgment record. And this record discloses that there is no triable question on plaintiffs' FHA and VFHL claims. To be sure, this case presents difficult questions regarding race, national origin, and lawful presence in the United States—issues that have sparked significant debate and disagreement. Yet, at bottom, plaintiffs' claims of *intentional* race or national origin discrimination assert that defendants equated being Latino with being an illegal alien. That is an equation neither required by law[23] nor supported by the factual record presented here. Put differently, given the applicable legal standards and factual record presented here, no reasonable jury could conclude that defendants' Policy constitutes intentional discrimination "because of" plaintiffs' race or national origin. *See* FHA, 42 U.S.C. § 3604(a); VFHL, Va. Code § 36-96.3. Summary judgment must therefore be entered for defendants because the record is devoid of evidence from which a reasonable jury could conclude that plaintiffs' race or national origin was a motivating factor in the challenged housing decisions.

---

muster. *See Keller*, 719 F.3d 931 (reversing in part and affirming in part the district court's conclusions regarding preemption and the plaintiffs' Article III standing).

[23] *See, e.g.*, *Loaiza-Sanchez*, 622 F.3d at 941 ("[A] person's legal status as a deportable alien is not synonymous with national origin."); 8 U.S.C. § 1324b (drawing a distinction between national origin and legal presence in the United States).

**B. Count IV (42 U.S.C. § 1981)**

Defendants have also moved for summary judgment on plaintiffs' § 1981 claim.[24] Specifically, the Complaint alleges that the Policy reflects intentional discrimination on the basis of plaintiffs' alienage and non-citizenship.[25] This claim, like plaintiffs' FHA and VFHL discrimination claims, fails as a matter of law.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State … to make and enforce contracts … ." 42 U.S.C. § 1981(a). As relevant here, § 1981 "prohibits private discrimination against aliens[.]" *Duane v. GEICO*, 37 F.3d 1036, 1044 (4th Cir. 1994). Thus, to prevail on their § 1981 claim, plaintiffs must ultimately prove (1) that defendants "intended to discriminate" on the basis of citizenship and alienage and (2) "that the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006). Of course, "[Section] 1981 … can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). In the § 1981 context, actionable discrimination is "conduct motivated by a discriminatory purpose," rather than conduct that "merely result[s] in a disproportionate impact on a particular class." *Id.*

A § 1981 claim may be proven by direct evidence or pursuant to the *McDonnell Douglas* burden-shifting scheme. *See Murrell*, 262 F.3d at 257; *see also supra* Part III.A. Here, however, given that the undisputed facts did not establish a prima facie case of intentional discrimination on the basis of race or national origin, these same facts point convincingly to the conclusion that

---

[24] Plaintiffs have not moved for summary judgment on any of their intentional discrimination claims, including the § 1981 claim.

[25] Although § 1981 protects against race-based discrimination and plaintiffs' FHA and VFHL claims allege such discrimination, plaintiffs' § 1981 count alleges discrimination only on the basis of alienage and non-citizenship.

plaintiffs' have not established a prima facie case of discrimination on the basis of alienage or non-citizenship. Indeed, the Policy is facially neutral, as it requires *all* applicants, including U.S. citizens, seeking to qualify for a lease to provide proof of lawful presence in the United States. In this regard, all applicants can satisfy the Policy by presenting a Social Security Number—indeed, here the male plaintiffs did so. In addition, the Policy includes alternative methods for proving lawful presence in the United States, a fact that dispels, rather than supports, plaintiffs' accusation that defendants intended to discriminate against non-citizens as such.

Nor, on this record, is there any reasonable basis for an inference of unlawful discrimination on the basis of alienage or non-citizenship. To the contrary, it is undisputed that defendants never used the male plaintiffs' statuses as non-citizens as a ground to deny them the right to enter a rental agreement at the Park. The undisputed factual record further discloses that defendants continually rent to and contract with non-citizens, including non-citizens of Latino national origin. Thus, any burden or barrier the female plaintiffs faced was the result of their status as illegal aliens, not because they were non-citizens. And § 1981 does not prohibit this. *See Anderson*, 156 F.3d at 180 (noting that § 1981 permits discrimination on the basis of unlawful presence in the United States); *cf. Espinoza*, 414 U.S. at 93. To adopt plaintiffs' view— that the Policy's effect on illegal immigrants is sufficient for a reasonable inference of discrimination against non-citizens—would lead to the anomalous result that any private contracting party would be subject to § 1981 liability simply for inquiring whether the other contracting party is lawfully present in the United States. But, as federal law makes clear, such an inquiry is not only lawful, but sometimes necessary for prudent behavior.[26] And, as stated

---

[26] *See, e.g.*, 8 U.S.C. § 1324(a)(1)(A) (imposing criminal liability on any person who harbors an alien with "know[ledge] or … reckless disregard of the fact that the alien has come to, entered, or remains in the United States in violation of law"); *id.* § 1324a(a)(1)(A) (making it unlawful

*supra*, the increased rents and threat of eviction that the male plaintiffs faced occurred not because they were non-citizens, but rather because they wished to continue living with their wives, who were illegally present in this country and therefore could not satisfy the Policy. Accordingly, defendants' motion for summary judgment on plaintiffs' § 1981 claim must be granted.

*     *     *

In sum, no reasonable jury presented with this undisputed factual record could conclude that defendants engaged in intentional discrimination on the basis of race, national origin, alienage, or non-citizenship.

### C.

It remains to resolve plaintiffs' final two claims, both of which arise under state law: Count III (an alleged violation of the Virginia Rental Act) and Count V (breach of contract). Because the Complaint invoked supplemental jurisdiction[27] over these counts, it is first necessary to determine whether subject matter jurisdiction still exists over these claims, given the dismissal of the federal causes of action. *See, e.g.*, *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("[Q]uestions of subject-matter jurisdiction may be raised at any point during the proceedings and … must[] be raised *sua sponte* by the court."); *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) ("[A] federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." (citing Fed. R. Civ. P.

---

"to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien"); *id.* § 1324b(a)(1) (permitting employment policies requiring new hires to be lawfully present in the United States).

[27] *See* 28 U.S.C. § 1367 (courts may exercise supplemental jurisdiction over claims forming "part of the same case or controversy" as the cause of action that provided original jurisdiction).

12(h)(3)).[28] It is axiomatic that federal courts are "courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). Thus, "the facts providing the court jurisdiction must be affirmatively alleged in the complaint." *Id.* In this regard, a plaintiff generally must allege facts supporting at least one of two potential bases for subject matter jurisdiction: federal question jurisdiction or diversity jurisdiction. *See* 28 U.S.C. § 1331 (federal question); *id.* § 1332 (diversity).

It is apparent that diversity jurisdiction does not exist over these state-law claims; the Complaint alleges no facts relating to diversity of citizenship, nor do plaintiffs allege a specific amount in controversy.[29] Instead, plaintiffs allege that the basis for original subject matter jurisdiction over this action is federal question jurisdiction by virtue of plaintiffs' FHA and § 1981 claims. *See* Compl. ¶ 9 (citing 28 U.S.C. §§ 1331 & 1343; 42 U.S.C. § 3613). The Complaint further alleges that supplemental jurisdiction exists over the state-law claims pursuant to 28 U.S.C. § 1367, as these claims stem from the same nucleus of operative fact giving rise to plaintiffs' federal claims. *See* Compl. ¶ 10. Nevertheless, a district court "*may* decline to exercise supplemental jurisdiction" if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3) (emphasis added). Indeed, where, as here, "all federal claims have been extinguished" and there is no independent ground for subject matter jurisdiction, "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction

---

[28] Rule 12(h)(3), Fed. R. Civ. P., provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

[29] It is blackletter law that a federal district court has diversity jurisdiction only where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(a). In addition, to establish diversity jurisdiction, plaintiffs must satisfy the centuries-old "complete diversity rule," which requires that all plaintiffs be diverse from all defendants. *See, e.g.*, *Strawbridge v. Curtiss*, 3 Cranch 267 (1806).

over state claims[.]" *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). Among the relevant factors to consider are "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Although it would be proper to dismiss plaintiffs' remaining causes of action without prejudice pursuant to § 1367(c)(3), it is appropriate to decline to do so in the circumstances of this case. The *Shanaghan* factors, applied here, point persuasively to the conclusion that it is appropriate to retain jurisdiction over plaintiffs' state-law claims. *See* 58 F.3d at 109. Specifically, plaintiffs filed the Complaint almost one year ago, the parties have already completed discovery, the claims are ripe for summary judgment or trial, and it would be unfair to dismiss these claims at this advanced stage. Thus, the summary judgment analysis now turns to the merits of plaintiffs' final two counts.

### D. Count III (Rental Act) and Count V (Breach of Contract)

Defendants and the male plaintiffs have filed cross motions for summary judgment on the Rental Act and breach of contract claims.[30] Because these claims are essentially similar, they are addressed in tandem. The male plaintiffs allege in essence (1) that defendants violated the Rental Act by increasing plaintiffs' rent and changing the lease terms without providing proper notice, and (2) that the male plaintiffs' rental agreements automatically renewed pursuant to the Rental Act, and thus defendants' unilateral changes to those agreements constitute breach of contract. Because there are triable issues of fact precluding an award of summary judgment, the cross motions must be denied on Counts III and V.

---

[30] Only the male plaintiffs purport to bring these claims, as only the male plaintiffs signed leases at the Park.

Analysis of the Rental Act and breach of contract claims depends on a close reading of the Virginia Code. To begin with, the Rental Act provides:

> Upon the expiration of a rental agreement, such agreement shall be *automatically renewed* for a term of one year *with the same terms* unless the park operator provides *written notice* to the tenant of any change in the terms of the agreement at least *sixty days* prior to the termination date.

Va. Code § 55-248.41:1(B) (emphases added). In other words, if a mobile home park resident in Virginia has a year-long rental agreement, the mobile home park operator must provide written notice of any changes to the rental agreement terms at least 60 days before that rental agreement expires; otherwise, the agreement automatically renews for a one-year period on the previously-existing terms. *See id.* Similarly, § 55-248.46(A) provides:

> Either party may terminate a rental agreement which is for a term of 60 days or more by giving written notice to the other at least 60 days prior to the termination date; however, the rental agreement may require a longer period of notice.

*Id.* § 55-248.46(A). Put differently, if a mobile home rental agreement establishes a tenancy for a period exceeding 60 days, a landlord must provide at least 60 days' notice before terminating that rental agreement. *See id.*

Here, the male plaintiffs contend that defendants violated the Rental Act by increasing the male plaintiffs' rent and by changing the year-long leases to month-to-month terms without providing statutorily-required, written notice. Defendants did not comply with these notice requirements—defendants instead provided oral notice to some plaintiffs and fewer than 60 days' notice to the others. Given this, the male plaintiffs contend that defendants' actions also constituted breach of contract because defendants' notice was ineffective. Thus, in the male plaintiffs' view, their leases statutorily renewed on identical terms for another year, and as a result defendants could not unilaterally raise rent or impose month-to-month terms without breaching those rental agreements.

In response, defendants contend that the Park needed not provide 60 days' notice before changing the rental agreements because the Rental Act afforded defendants the greater power to *evict* plaintiffs and to terminate the leases *immediately*. To support their argument, defendants invoke two independent grounds for evicting plaintiffs, namely, Va. Code §§ 55-248.50:1(4) & (5), which permit defendants to evict a resident for a "[v]iolation of any rule or provisions of the rental agreement materially affecting the health, safety and welfare of himself or others," or "[t]wo or more violations of any rule or provision of the rental agreement occurring within a six-month period." Va. Code §§ 55-248.50:1(4) & (5). Defendants claim that the male plaintiffs' failure to disclose their wives' presence at the Park violated Park rules and posed material safety risks. Defendants also contend that they were not required to provide notice because the male plaintiffs defrauded defendants by failing to disclose that the female plaintiffs would be living at the Park.

Unfortunately, the parties have dedicated more ink to labeling each other's positions as "preposterous" than to identifying the key statutory provisions that help cut this Gordian knot. Here, defendants are incorrect to assert that their alleged power to evict permitted defendants to circumvent statutory procedures and notice requirements. To be sure, Virginia Code § 55-248.31—a provision explicitly incorporated by the Rental Act—provides that if

> a breach of the tenant's obligations under … the rental agreement involves or constitutes a criminal or a willful act, which is not remediable and which poses a *threat to health or safety*, [then] the landlord may *terminate the rental agreement immediately* and proceed to obtain possession of the premises.

Va. Code § 55-248.31(C) (emphases added); *see also id.* § 55-248.48 (providing that § 55-248.31 applies to the Rental Act). Yet, as relevant here, in the absence of such a "threat to health or safety" Virginia law requires defendants to provide *notice* of eviction, *id.* § 55-248.31, and 60 days' notice of termination of a rental agreement, *id.* § 55-248.46(A). Moreover, the Rental Act

provides that "acceptance of periodic rent payments with knowledge in fact of a material noncompliance by the tenant shall constitute a waiver of the landlord's right to terminate the rental agreement." *Id.* § 55-248.46:1. Thus, a full factual inquiry is necessary to determine whether defendants were entitled to terminate the male plaintiffs' rental agreements in the first instance.

Indeed, summary judgment on the Rental Act claim is inappropriate because there are genuine disputes of material fact whether the male plaintiffs' alleged misconduct—permitting their wives to live in the Park ostensibly without disclosing the wives' presence to defendants—posed a "threat to health or safety" such that defendants could have terminated plaintiffs' leases without 60 days' notice. *See id.* § 55-248.31. There is also a triable issue on the question of defendants' waiver, as there are factual disputes regarding whether defendants accepted rent payments despite "knowledge in fact" of the female plaintiffs' presence at the Park or plaintiffs' inability to satisfy the Policy. *See id.* § 55-248.46:1.

For essentially similar reasons, plaintiffs' breach of contract claims must proceed to trial. Indeed, whether the leases were automatically renewed cannot be determined without first resolving whether defendants were entitled to terminate the leases immediately. And insofar as defendants assert that they were entitled to rescind the leases because the plaintiffs committed *fraud*, this argument also glosses over a factual dispute incapable of resolution on this record. Specifically, there are factual disputes concerning (1) whether and when defendants learned of the female plaintiffs' presence at the Park, and (2) whether defendants actually and detrimentally relied on the male plaintiffs' alleged fraudulent representations. *See Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) ("In all cases of fraud the [victim] must prove that it

acted to its detriment in *actual and justifiable reliance* on the [alleged fraudster]'s misrepresentation." (emphasis added)).

Accordingly, the cross motions for summary judgment on Counts III and V must be denied.

## IV.

Nothing in this Opinion should be construed as passing judgment on the wisdom of defendants' Policy. There is no question that state and federal law prohibit landlords from discriminating against tenants and prospective tenants on the basis of race or national origin; nor is there any doubt that the law forbids interfering with a contractual interest by discriminating on the basis of, among other things, citizenship or alienage. But the law does *not* prohibit defendants from refusing, for legitimate business reasons, to rent to, or to contract with, illegal aliens. And the factual record reflects that precisely this occurred. Put simply, the summary judgment record discloses that there is no triable issue of fact that defendants engaged in intentional discrimination on the basis of race, national origin, alienage, or non-citizenship.

And although federal question jurisdiction over this action no longer exists, it is appropriate to retain jurisdiction over plaintiffs' state-law causes of action. Here, the parties' cross motions on the Rental Act and breach of contract claims must be denied, given the material factual disputes presented in the summary judgment record. The matter must therefore proceed to trial on Counts III and V.

An appropriate Order will issue.

Alexandria, Virginia
April 18, 2017

T. S. Ellis, III
United States District Judge