IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROSY GIRON DE REYES, ET AL.,           )
                                       )
                        Plaintiffs,    )
                                       )
v.                                     ) CIVIL ACTION
                                       )
WAPLES MOBILES HOME PARK LIMITED       ) 1:16-cv-563
PARTNERSHIP,                           )
                        Defendants.    )
_____)

REPORTER'S TRANSCRIPT

<u>MOTION HEARING</u>

Friday, July 22, 2016

---


<u>BEFORE</u>:        THE HONORABLE T.S. ELLIS, III
                 Presiding


<u>APPEARANCES</u>:   IVY FINKENSTADT, ESQ.
                 Legal Aid Justice Center

                 ARIEL WADE TRAJTENBERG, ESQ.
                 PAUL BRINKMAN, ESQ.
                 Quinn Emanuel Urguhart & Sullivan, LLP

                     For the Plaintiffs

                 MICHAEL DINGMAN, ESQ.
                 Reed Smith

                     For the Defendants


---


MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division

INDEX

RECAPITULATION BY THE COURT                              4

ARGUMENT BY THE DEFENDANTS                               5

ARGUMENT BY THE PLAINTIFFS                              27

        (Taken under advisement)

        (Court recessed)

                                ---

<u>PROCEEDINGS</u>

(Court called to order in Giron de Reyes v Waples Mobile Home Park Limited Partnership.)

THE COURT:  All right.  Call the next matter, please.

THE CLERK:  Rosy Giron de Reyes, et al., versus Waples Mobile Homes Park Limited Partnership, et al., Civil Case Number 1:16-cv-563.

THE COURT:  Who represents the plaintiff in this case?

ATTORNEY FINKENSTADT:  Good morning, your Honor.  Ivy Finkenstadt with Legal Aid Justice Center for the plaintiff.  And I have with me my cocounsel from Quinn Emanuel.

ATTORNEY BRINKMAN:  Good morning, your Honor.  My name is Paul Brinkman from Quinn Emanuel.  I would like to introduce you to Ariel Trajtenberg, who is a colleague of mine, who will be arguing today.

THE COURT:  All right.  Thank you.

Who is here for the defendant?

ATTORNEY DINGMAN:  Good morning, your Honor. Michael Dingman for the defendants.

THE COURT:  All right.

RECAPITULATION BY THE COURT

THE COURT:  The matter is before the Court on a motion, defendant's motion to dismiss under 12(b)(6).  And the plaintiffs are eight current and former residents of a mobile park -- a mobile home park, and they are suing the park and the real estate management firm growing out of the policy of that park, real estate management firm, to preclude rental to illegal aliens.

I don't use the euphemism "undocumented." They are illegal.  I think you have to use words that are true.  Yes, they are undocumented, but that means they are illegal.  But that's not the point of this case.  We are not here to litigate whether they are legal or illegal.

Here, there is a policy that's imposed that the plaintiffs contend violates the Fair Housing Act. You can't have a policy that would discriminate against people because of their national origin.  And that's the point of the plaintiffs' case.

Now what we are here today on, chiefly, is whether the complaint states a claim, because the complaint relies on certain statistics, and the defendant contends those statistics are not valid statistic to establish a cause of action.

Now, let me hear first from you,
Mr. Dingman.  You are the movant.  Tell me what your
contention is, in brief.

ARGUMENT BY THE DEFENDANTS

ATTORNEY DINGMAN:  Our contention, your
Honor, is that the complaint does not allege
discrimination under the Fair Housing Act for disparate
impact based upon race, nor does it allege a claim for
discrimination under Section1981 based on citizenship,
because the allegations demonstrate that the only impact
on four of the eight defendants (sic) --

THE COURT:  Well, the eight
defendants (sic), so that we are clear, it's a husband
and wife in each case.  That makes up the eight.

ATTORNEY DINGMAN:  Yes.

THE COURT:  And the husband is legal; the
wife is illegal.

ATTORNEY DINGMAN:  Right.

THE COURT:  All right.  Go on.

ATTORNEY DINGMAN:  And what that
demonstrates, your Honor, all the husbands are Latino
and noncitizens of the United States.  The allegations
in the complaint are clear, they were able to comply
with the application process and sign leases.  Those
leases are actually attached to the complaint.

THE COURT:  So the people who signed the leases were the husband or the wife?

ATTORNEY DINGMAN:  The husband.

THE COURT:  And they are all legal.

ATTORNEY DINGMAN:  Correct.

THE COURT:  So, what's the problem?

ATTORNEY DINGMAN:  The issue is, your Honor, the application process requires that any adult over the age of 18 provide --

THE COURT:  Why do you care who lives with them?

ATTORNEY DINGMAN:  Because we have an obligation to make sure that we can have a safe environment for this park, and that information is necessary to conduct criminal background checks and also for credit checks.

THE COURT:  All right.  But being an illegal alien isn't a violent crime.

ATTORNEY DINGMAN:  Well, we are not suggesting that it is, your Honor.  What we are suggesting --

THE COURT:  Why do you care that some of them are illegal?

ATTORNEY DINGMAN:  It's not that we care that they are illegal.  The problem, your Honor, is

without documentation required by the process, we are not able to perform a criminal background check so that we can ensure the other residents that everyone living there, to the best of our ability, is safe and not a threat to them.  That's the only reason for that policy.

THE COURT:  You would concede, I take it, that your clients are not entitled to discriminate against any prospective lessee on the basis of national origin.

ATTORNEY DINGMAN:  Well, your Honor, I think we have to look at --

THE COURT:  If somebody comes into your place and said, "I was born in El Salvador," you couldn't say, "We are not renting to you."

ATTORNEY DINGMAN:  Well, I think there is a distinction, your Honor, if there --

THE COURT:  I mean, answer my question.

ATTORNEY DINGMAN:  I am, your Honor.

THE COURT:  I don't understand why lawyers don't get that.  This is my 30th year.  I ask questions and they go off on some flight.

And I tell these students -- some were here yesterday -- answer the Court's questions.  And they just don't understand it.  They say, "You mean they really don't answer your questions?"

No, they really don't.

Now, if someone came in to your place of business and said, "I am Salvadoran and I want to rent," and you said, "No, because we don't rent to people from El Salvador," that would be a violation of the law, wouldn't it?

ATTORNEY DINGMAN:  If they are in this country legally, it would be.  If they are here illegally, then our position is --

THE COURT:  That wasn't my hypothetical.

The next question would be, if you said, "We do rent to Salvadorans but you have to be here legally," then your answer would be you can discriminate against people who are here illegally.

ATTORNEY DINGMAN:  I am not sure I would call it discrimination, your Honor.

THE COURT:  All right.

ATTORNEY DINGMAN:  But I think --

THE COURT:  That word has a bad connotation. But you certainly are distinguishing between them and Salvadorans who are here legally.

ATTORNEY DINGMAN:  Well, I think that the effect of complying with the process, if you are not here legally, then you are not able to provide the documentation that someone who is here legally can

provide.

But that's a result of that person's choice to come to this country illegally.  It's not a result of the policy.  If you are here legally, as the four male plaintiffs demonstrate, you can comply, and they did comply.

So the only issue for the other four plaintiffs is, they are not here legally.  That's the cause of the impact on them and on their husbands.  It has nothing do with race.  It has nothing do with citizenship.  It's a result of their inability to provide a visa, an I-94, to show that they are here in this country legally.

And that is why there is no cause of action on --

THE COURT:  Am I correct that the only reason for that is your statement that if they are not here legally and can't give you the documentation, that you can't ascertain whether it's safe for them to be in your trailer park?

ATTORNEY DINGMAN:  Well, the issue, your Honor --

THE COURT:  Can you give me a yes or no, and then explain?

ATTORNEY DINGMAN:  The answer is no.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

Without that information, we do not believe that we can
conduct an effective criminal background check.

They -- the plaintiffs suggest that you can
have an ITIN number, which can be obtained from the IRS,
with virtually no formal documentation of who that
person is.

What we are trying to do is obtain visa,
I-94 information that says this is the person.  Because
when you do criminal background checks, there are a lot
of John Smiths in the world.  And so when have you a
report you need to be able to determine, is this the
John Smith who is actually applying for residency in
this trailer park?

So we need that information to conduct the
background checks.  That's the only purpose for this
policy.

THE COURT:  So would it be fair to say that
your policy doesn't exclude illegal aliens?  If there is
an alien who is illegal, but can give you enough
information about his or her identity, then that would
satisfy you.

ATTORNEY DINGMAN:  If our criminal
background companies say -- if we have this data, if we
have this information, we can tell you we can do an
effective criminal background check -- that is the point

of this policy.

        And so the point of the policy is not to identify or call out illegal immigrants.  What's happened here, your Honor, is when these four women were asked to comply with the policy -- and they allege this in their complaint -- they are not capable of doing so because they are not here legally.

        THE COURT:  I'm not sure you all have explored that enough.

        Let me tell you something.  I think this case has a very interesting question in it about what kind of statistics you need in order to make use of the Doctrine of Disparate Impact, but I see it in a much more practical sense.  These people have been living in the trailer park for how long?  Do you know?

        ATTORNEY DINGMAN:  They allege in the complaint five to six years.

        THE COURT:  They have been there, right?

        Did anybody get stabbed or hurt or beat up?  Of course not.

        And what you want to do is to do a criminal background check.  Now I am sure you and your company won't be surprised to learn that the Federal Government can do federal background checks on people who are undocumented, illegal aliens.  Do it all the time.  Did

it this morning when I sentenced the person for reentering this country three times illegally.

         And guess what?  He had a criminal record, committed some crimes.  And we were able to ferret that out.  Your company ought to able to do that, too.

         I would think that if they have been there five years, one of them is legal, the person who signs the contract, why would your company, which doesn't sound to me like General Electric or Lockheed-Martin, with great finances, why is it interested in picking a fight like this?

         ATTORNEY DINGMAN:  It's not interested in picking a fight, your Honor.  What they are interested in is their responsibility to provide a safe environment for everybody who lives in the park.

         THE COURT:  All right.  Well, see if you can -- have you seen whether you can really do it?

         ATTORNEY DINGMAN:  The --

         THE COURT:  First of all, the four -- the four people who can't satisfy this are the four wives, right?

         ATTORNEY DINGMAN:  Yes.

         THE COURT:  And you're telling me you can't satisfy yourselves that these four women -- I am sure there are children, aren't there?

ATTORNEY DINGMAN:  Yes, there are.

THE COURT:  All right.  Are you going to do a background check on them?

ATTORNEY DINGMAN:  No.  It's only on adults 18 or over.

THE COURT:  I have known some pretty violent 17-year-olds in my life.

But anyway, putting that to one side -- and I am not going to go beyond saying this to your client. Your client is on the brink of engaging in a lengthy litigation that's going to cost them.  I mean, I am going to take seriously this underlying question.

I am fairly interested in what disparate impact, where it came from, what its purpose is, and how it can be shown.  And I have some doubts about whether you all have done it.

But why do all that if you really want to make a reasonable judgment about whether four women who have lived in your park for five years present a reasonable risk or an unreasonable risk of harm to the rest of the park?

I don't understand it.  I don't understand why people are unreasonable.

ATTORNEY DINGMAN:  Well, we have not, in our view, been unreasonable, and we have to look at this

policy which applies to anybody who wants to live in this park.  And we are trying to implement a policy. It's a policy that's been in place for quite a while, that provides reasonable information.  We are not GE. We aren't the Federal Government.  We don't have the ability to do extensive background checks.

THE COURT:  What is the population of the --

(Simultaneous speaking.)

ATTORNEY DINGMAN:  -- third parties.

THE COURT:  You hired a company to do that. It's easily done.

ATTORNEY DINGMAN:  That's what we did.

THE COURT:  You really take a lot of comfort from the fact that a background check -- and I can't tell you how cursory those are.  You shouldn't take a lot of comfort from it.

How many people in the park?  Not children. How many adults?

ATTORNEY DINGMAN:  I don't know that exact number, your Honor.  There -- I want to say --

THE COURT:  Can you give me an estimate?

ATTORNEY DINGMAN:  Forty to fifty lots, but I can't say for sure how many lots.

THE COURT:  All right, 40 to 50 lots.

Are there -- does your client own a number

of these lots?

> ATTORNEY DINGMAN:  They own the park.

> THE COURT:  They own the park that has 40 or 50 lots.

> As I recall, you're with Reed Smith; is that right?

> ATTORNEY DINGMAN:  Yes, sir.

> THE COURT:  Is this pro bono?

> ATTORNEY DINGMAN:  No, sir.

> THE COURT:  I must say, I am puzzled.  I just don't understand why you all can't solve this problem without litigating extensively.

> And we'll go through it.  And when we go through it, I don't think either side is going to like the result, if we go through this disparate impact issue, the extent that I intend to do it.

> It just seems to me that you ought to be able to work out -- if you tell me your core, your real concern is safety of the park, and you do -- you rely in part on background, criminal background checks, and you say that a person who's here illegally, without documents -- by the way, lots of illegal people have documents and records.

> They just aren't either the right ones or they aren't valid.  But they do have them.  And they

have names.  And lots of illegal immigrants commit crimes, and there are records.  I am not sure what you would miss or what your company would miss.

In any event, I am not going to discuss that any more.  That's your problem.  But if you haven't heard clearly that I think pursuing this policy, given what you -- your real core concern is, you know, if you want to spend that -- if your client wants to spend that kind of money, go to it.

Do you think -- I am switching now.  I have said all I'm going to say about that.  But if you don't think that's something I intended for you to take seriously and take to your client, you are mistaken.  I do intend you to do that.

ATTORNEY DINGMAN:  I fully understand, your Honor.

THE COURT:  Now, have the -- are the disparate impact allegations, in your view, adequate?  And if not, why not?

ATTORNEY DINGMAN:  They are not adequate.  And we would also submit, your Honor, that the four women who are here illegally do not have the right to assert a claim under the Fair Housing Act.

The plaintiffs have not cited any case in support of their position that an illegal alien or

illegal immigrant can pursue a claim under the Fair
Housing Act.

They referred in passing to the Espinosa
case, which is not a Fair Housing Act case.  And in the
second sentence of that opinion, Justice Marshal
identified the plaintiff as a legal resident of the
United States.

So there is not any case that the plaintiffs
have cited to this Court where an illegal alien has been
able to pursue a claim under the Fair Housing Act.

We cited to the Court the Keller decision
from 2013, which is a Fair Housing Act claim, very
similar to the facts here.  Juan Doe, one of the
plaintiffs, in the country under a temporary
protective -- or TPS, same as the allegations for some
of the male plaintiffs in this case, the wife here
illegally --

THE COURT:  The same as what?

ATTORNEY DINGMAN:  Some of the --

THE COURT:  The ones who are here legally.
Because if you have TPS, you are here legally.

ATTORNEY DINGMAN:  Yes, sir.

What I'm saying is some of the male
plaintiffs allege that they are here under TPS, same as
the allegation for Juan Doe in the Keller case, but that

their wife was here illegally.

In that case, the Eighth Circuit held that the Fair Housing Act -- it said, "It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a subgroup of the unprotected class of aliens not lawfully present in this country."

The Court went on to say that, "A state law or local ordinance that restricts or disadvantages aliens not lawfully present in this country has no historic ties to the purposes of the FHA."

So there is no authority for these four illegal aliens to pursue a claim under the Fair Housing Act.

The husbands, of course, are only affected by the alleged impact on their wives.  They've been able to comply with the process.  They've been able to sign leases.

So if the four spouses do not have a claim under the Fair Housing Act, neither do the husbands, and this Court has no authority given to it that the Fair Housing Act gives rise to a cause of action in favor of an illegal immigrant.

THE COURT:  All right.  My question to you, however, which you haven't answered yet, is whether you

think the complaint, given the statistics it relies on, adequately alleges a complaint employing disparate impact.

ATTORNEY DINGMAN:  It doesn't allege a basis for disparate impact, because these four women do not have a basis to assert a claim under the Fair Housing Act at all.

In addition to that --

THE COURT:  All right.  I guess what I -- I understand that argument and I see now that you understood, and I think reasonably so, that it was responsive to my question.

I think I was looking more at the statistical, you know, the --

ATTORNEY DINGMAN:  Yes.

THE COURT:  And I want to know whether you think there is anything wrong with their statistics and their use of the statistics.

ATTORNEY DINGMAN:  There are two issues wrong with their statistics, in our view, your Honor. The first is, they do not allege any statistics with respect to mobile home parks in general, in Fairfax County, in the State of Virginia, or this one in particular.

Now in response to that, the plaintiffs say:

Well, you can assume that the demographics would be the same.

Well, I think the Court has to rely on what's in the complain. The Court cannot make assumptions of fact outside the complaint. And so they have not met their burden of showing any statistical disparity with respect to the mobile home park in this case or in general.

The other problem that they have, your Honor, as the Supreme Court held in the Inclusive Communities case, statistical allegations are not enough. There must be what the Supreme Court referred to as robust causality.

So you can't simply allege statistics to allege a disparate impact. That's not enough. And the Supreme Court in Inclusive Communities was very clear that you have to have robust causality, which means whatever the policy or practice that's being complained of, that is the cause of the disparate impact.

In this case, what the plaintiffs have alleged is the cause of a disparate impact is the illegal status of the four women. That is why they are not able to comply. It's not the policy. The husband's can comply with the policy. Any Latino who is in this country legally can comply with the policy.

So there is no disparate impact as a result of the policy.  If there is an impact it's because these four women chose to come to this country illegally.

And the Virginia -- I'm sorry.  The US Supreme Court, your Honor, was very clear in the Inclusive Communities case that the Court has to look very closely to determine whether there is a prima facie case alleged that shows that robust causality.  It's not enough to have ten paragraphs of demographics and statistical allegations.  Robust causality is critical.  And there is no -- there are no allegations to show that this policy is what caused the impact.

In fact, the allegations are just the opposite.  The four male plaintiffs, all are Latino.  All complied with the policy.  All signed leases.

That completely undercuts any argument that it's the policy that's causing an impact with respect to race.  The only reason we are here is because these four women came to the country illegally and they cannot comply.

THE COURT:  Did your client --

ATTORNEY DINGMAN:  There is not a disparate impact --

(Simultaneous speaking.)

THE COURT:  -- do criminal background --

ATTORNEY DINGMAN:  -- alleged.

THE COURT:  -- checks on all adults living
in the park?

ATTORNEY DINGMAN:  Anyone over the age of
18.

THE COURT:  Even if they are not
signatories?

ATTORNEY DINGMAN:  Yes.  Because the park
owners want to make sure they know who is residing in
those homes.

THE COURT:  All right.

Anything further?

ATTORNEY DINGMAN:  Your Honor, I would just
touch on two other things quickly.  Count 2, which is
the claim under the Virginia Fair Housing Law, our
arguments there are pretty straightforward.  I will try
to be very brief with those.

THE COURT:  Well, are they in your brief?

ATTORNEY DINGMAN:  They are.

THE COURT:  You don't needed to restate
them.

ATTORNEY DINGMAN:  All right, sir.

Then I will move to Count 4, which is the
1981 action, which is based on, according to the
plaintiffs, intentional discrimination based on

citizenship, not on national origin but on citizenship; that is, that the plaintiffs are noncitizens of the United States.  And the allegation is they have to go through a process that's different from a US citizen.

And there are a number of issues with respect to that claim, your Honor.

First, as a practical matter, we cited the Court to HUD guidelines.  HUD itself has a two-step process for eligibility, one for US citizens, one who are not US citizens.  HUD requires documentation.  HUD requires a declaration.  HUD requires verified forms establishing that the --

THE COURT:  For what purpose does HUD require all this?

ATTORNEY DINGMAN:  HUD requires that to determine if the person seeking aid is a legal resident of the United States.  If they are not, they are not eligible for aid from HUD, who, of course, implemented the disparate impact regulations.

So HUD itself has a process of determining eligibility for its programs, and it's not dissimilar to the process that's at issue here.  It requires documentation.  It requires verified declarations.  And if they are not provided, then that family or members of that family are not eligible for federal assistance.

So that -- the fact that the process here has one for citizens and non-US citizens is not indicative and doesn't establish intentional discrimination based on citizenship.

Again, your Honor, the four male plaintiffs are all non-US citizens. All of them complied. All of them signed leases. That, again, completely obviates the notion that there is citizenship discrimination.

Additionally, your Honor, the four women who are here illegally have the same issue they have under the Fair Housing Act. The plaintiffs again have not provided this Court with a case providing that an illegal alien can assert a claim under 1981.

The cases that were cited, including the DeWayne (phonetics) case from the Fourth Circuit, which talks about citizenship discrimination, all identified the plaintiffs in that case as legal residents -- resident aliens of the United States. There is not one case where a 1981 action was allowed to proceed filed by an illegal alien or an illegal immigrant.

THE COURT: Do you have to be a legal alien to assert a claim under Title VII?

ATTORNEY DINGMAN: Under both Title VII and under 1981.

THE COURT: In other words, in your view, an

illegal alien cannot assert a Title VII claim?

ATTORNEY DINGMAN:  That's correct.

THE COURT:  And what case holds that?

ATTORNEY DINGMAN:  There are no cases, your Honor, where the Court has ever recognized that cause of action.  And to do so --

THE COURT:  No, I didn't ask you what -- has any case held that an illegal alien cannot assert a claim under Title VII?

ATTORNEY DINGMAN:  We have not found a case that's -- well, the Keller case, your Honor, the Court held that under the Fair Housing Act it does not apply --

THE COURT:  What does not apply?

ATTORNEY DINGMAN:  The Fair Housing Act is not -- does not protect illegal aliens.  It refers to them as an unprotected class.

Additionally, Your Honor, if the Court were to find that an illegal alien has rights under 1981 or the Fair Housing Act, you now have a conflict with federal law.  As we pointed out in our brief, there is federal law that makes it a crime to harbor illegal aliens.

We mentioned the Aguilar case that came from this Court, where a landlord was found guilty of a

crime.

There are other federal statutes that prohibit and make if illegal to hire illegal aliens.

So if the Court creates a cause of action for illegal aliens under Title VII, under 1981, there is now a conflict with federal law that's saying to landlords and employers:  You are breaking the law if you harbor or hire illegal aliens.

So, clearly, Congress could not have intended those acts to provide protection to illegal aliens, while at the same time outlawing their coming to this country and outlawing anybody harboring them or hiring them.  So they have that same issue, that they are not protected under 1981.

The husbands have not alleged any discrimination under 1981.  They were able to comply. They were able to sign their leases.

And the final point, your Honor, as far as any intentional discrimination, at page 25 of their brief, when the plaintiffs make their argument as to how they allege intentional discrimination, they refer to paragraph 39 of their complaint.

And that says that the policy was, quote, "intended to exclude undocumented immigrants from the park."  It doesn't say "noncitizens"; "undocumented

immigrants."

There are no allegations in this complaint with respect to citizenship, or even Latino race. What they repeatedly allege is illegal immigrants, that the park -- or the owners of the park want to exclude them. That's not a basis for a cause of action under 1981 or under the Fair housing Act.

So we would ask that the Court dismiss Counts 1, 2 and 4. And I would just note for the Court we had Count 6 in our motion to dismiss, but the parties have agreed to the dismissal of that count.

Thank you.

THE COURT:  All right.

Let me hear now from the plaintiff.

And, again, you are Ms. Finkenstadt?

ATTORNEY TRAJTENBERG:  Trajtenberg.

THE COURT:  Oh, Trajtenberg. Yes, of course. Trajtenberg.

Yes, Ms. Trajtenberg, you may proceed.

ARGUMENT BY THE PLAINTIFFS

ATTORNEY TRAJTENBERG:  Your Honor is correct that this case is not about illegal immigrants. It's about illegal discrimination. That's what the plaintiffs have alleged in their complaint and it's sufficient under the law to state a claim.

Under the Fair Housing Act, the plaintiffs, both men and women, have alleged that the policy has caused the disparate impact of discrimination on Latinos.

THE COURT:  Why are the figures that you have in your complaint adequate and proper to show that?

ATTORNEY TRAJTENBERG:  The statistics at paragraph 62 and 63 of the complaint meet two different ways that we can allege the disparate impact.  One is under the Magner (phonetics) case and one is under the Mount Holly case described in our brief.

In paragraph 63, the complaint alleges that Latinos are being impacted at a rate over ten times that of non-Latinos.  So the result of the policy --

THE COURT:  But what figures did you use for that?

There are only 50 lots in this, and the policy doesn't affect thousands of people outside the lots, does it?

So we are only interested, or you are only interested in the impact of that policy, correct?

ATTORNEY TRAJTENBERG:  Yes.  We are interested in the impact of this policy on --

THE COURT:  And this policy doesn't impact thousands of Latinos who don't try to rent there.

ATTORNEY TRAJTENBERG:  Just one small point of clarification --

THE COURT:  Well, what's the answer?  It doesn't, does it?

ATTORNEY TRAJTENBERG:  It impacts the Latinos who already live at the community --

THE COURT:  Yes.

ATTORNEY TRAJTENBERG:  -- and are being asked for --

THE COURT:  Yes.

ATTORNEY TRAJTENBERG:  -- as well as those who may come and attempt to rent there.

THE COURT:  That's right.  But nobody else. So talking about population in the region or in the state or in the country is irrelevant as to disparate impact of this policy.

ATTORNEY TRAJTENBERG:  The statistics --

THE COURT:  Yes or no.

ATTORNEY TRAJTENBERG:  Not exactly, your Honor.

THE COURT:  Why not?

ATTORNEY TRAJTENBERG:  The reason is that the statistics we have alleged show greater population and the Waples Mobile Home Park population is contained within it.

So just as in the Nichols case, which we cite in our brief, where county level statistics were used, despite the fact that the affected population was only renters in a certain community, that was sufficient in that case, just as these statistics are sufficient here.

And the reason is that there is no allegation by the defendants and there is no proof at this point, solely based on the complaint, that the mobile home residents statistics would differ from the statistics in Virginia as a whole.

And just to note, as well, in paragraph --

THE COURT:  But the policy doesn't apply to immigrants in Virginia as a whole.

ATTORNEY TRAJTENBERG:  That's correct.  The policy --

THE COURT:  It applies to people who are there and people who want to come there.

ATTORNEY TRAJTENBERG:  Yes.

THE COURT:  So it doesn't apply to immigrants in Roanoke or Norfolk or Newport News.

ATTORNEY TRAJTENBERG:  Assuming that Waples doesn't own at park there, where it's not using the policy, then --

THE COURT:  Does it?

ATTORNEY DINGMAN:  No, your Honor.

THE COURT:  And you -- you should know that before you bring a lawsuit.

In any event, tell me why specific -- tell me again what specific figures, statistics you rely on and why you believe those statistics are pertinent or relevant to show the impact of this policy as being illegally discriminatory.

ATTORNEY TRAJTENBERG:  In paragraph 62 of the complaint, the plaintiffs allege that in Virginia, Latinos constitute 64.6 percent of the total undocumented immigrant population, whereas Latinos constitute only 8.4 percent of the overall population.

THE COURT:  So what?  So what does that show about this policy?

ATTORNEY TRAJTENBERG:  So if the policy is going to affect undocumented immigrants, then Latinos will be significantly greatly -- greater affected than non-Latinos.

THE COURT:  Well, most citizens are not undocumented.  I don't know that you are getting -- I may not fully understand it, and I am going to spend more time on it.

But, clearly, you are not taking my point. This policy has no effect in Portland, Oregon.  So

figures from Portland, Oregon wouldn't do you any good. Figures in Virginia, it doesn't even apply throughout Virginia.  So why should I worry about figures elsewhere?

Why isn't it just the impact of these -- this gentleman over here is about to bust a gut.

You have to remain dispassionate at counsel table.  Now if you want to confer with her, I am happy to give you an opportunity to confer with her.

ATTORNEY BRINKMAN:  I apologize, your Honor.

THE COURT:  Well, go ahead and confer with her.

(Counsel conferring.)

THE COURT:  All right.  You can give me the benefit of that conference.

ATTORNEY TRAJTENBERG:  Of course.  So the statistics apply here because the statistics in Virginia represent the greater population of which Waples is a part, whereas the statistics --

THE COURT:  The statistics --

ATTORNEY TRAJTENBERG:  -- in Portland, Oregon --

THE COURT:  -- in Virginia demonstrate what, again?

ATTORNEY TRAJTENBERG:  Demonstrate -- the

statistics we have alleged in Virginia -- Virginia is a greater population within which Waples Mobile Home Park is a part.  So those statistics are representative of Waples Mobile Home Park as well.

       The statistics in Portland --

       THE COURT:  Really?

       ATTORNEY TRAJTENBERG:  -- Oregon --

       THE COURT:  You think if I did -- if a pollster did a poll on who was going to get elected and just took the people in that park, you think that would be representative?  No.  Okay.

       But I understand what your claim is.  I am indicating to you that I am not very impressed or persuaded by it.  But I understand -- at least I now understand your point.

       Go ahead.

       ATTORNEY TRAJTENBERG:  Sure.  And --

       THE COURT:  And that doesn't mean I have decided it.  It means I am going to think about it, but I don't mind disclosing to you my skepticism.

       ATTORNEY TRAJTENBERG:  Okay.

       And just your Honor is aware, there are actually 150 lots, we are aware of, at Waples.

       THE COURT:  One hundred fifty.

       ATTORNEY TRAJTENBERG:  Yes.  That's in

paragraph --

THE COURT:  Well, I think that's
interesting.  You know more about it than counsel for
the party.  That's kind of embarrassing.

ATTORNEY TRAJTENBERG:  It's in paragraph 21
of our complaint.  So it's included in the allegations
here.

As to the causation element, the complaint
also pleads the causation element here.  It's not the
sole fact that Latinos are a certain statistical amount
of individuals in Virginia.  The fact of the matter here
is that the policy is the sole cause of the harm
suffered by all plaintiffs, both males and females.

And that's alleged in the complaint at
paragraphs 64 through 111, as we've described each
family's existence in the park, the amount of time they
have lived there, and the way their lives have changed
as a result of the defendants' recent enforcement of the
policy.

Before the defendants were enforcing the
policy, each family was living in the park peacefully.
But ever since the defendants have begun enforcing their
policy, not just the women but the men have also been
told that they need to leave the park.

Allowing the men to remain in the park but

to kick out their wives and the mothers of their children is an absurd possibility.  These families have applied to live in the park --

THE COURT:  Well, it's an unhappy, unfortunate -- but it happens all the time.  I can't tell you how many criminals are deported and leave their families here.  The law requires it.  So it's not unthinkable at all.  It happens.  And it's appropriate in those case.

ATTORNEY TRAJTENBERG:  Certainly.

THE COURT:  You know, nothing prevents the citizen or legal resident mother and the children, nothing prevents them from going to El Salvador or Mexico or wherever to follow their husbands.  They can do that.

And they have the right to remain in the United States.  The father doesn't.  I haven't seen it in now 30 years with the mother, but the father doesn't; has to go.

ATTORNEY TRAJTENBERG:  Certainly, your Honor.  But there is a big difference here, which is that there is no allegation that any of the individuals who have not been able to provide papers are criminals. In fact, in paragraph 74 of the complaint --

THE COURT:  No, I know.  He says, "We don't

know that.  We want to know that."

And let me come to that because the time is
fleeting here.  I have another case.  And I am not going
to decide this today.  I am going to take it under
advisement.

But he has said today, Mr. Dingman, he said:
Look, our concern is that we want to be sure that our
place is safe.  And one of the ways we do that is we
hire this company to do criminal background checks,
because we don't want any -- I don't know.  I didn't ask
Mr. Dingman this, but I don't think he knows the answer
are.

Any felons living there who are citizens?

You don't know the answer, do you?

ATTORNEY DINGMAN:  If they are, then they
somehow circumvented the process.

THE COURT:  Why?

You can't be a felon and live there?

ATTORNEY DINGMAN:  Well, if the criminal
background check reveals it, the answer would be no.

THE COURT:  Well, you know, there are a lot
of felonies and many of them are not violent.  Is it the
policy that all felons can't live there?

ATTORNEY DINGMAN:  There is a criteria, your
Honor, based on the -- what the crime is.

THE COURT:  Well, of course.  Some felons can stay there, people evade tax or something of that sort -- although I would be more inclined to exclude those.  They might not pay your rent.

But the point I am making is that it isn't whether or not they are felons; it's whether or not they pose a risk to the other population in the park.

Now I don't understand why you and Mr. Dingman can't reach some kind of agreement -- I mean, apart from the fact that you are young lawyers, you are aggressive, you want to make some law, you are excited about representing minorities and all that stuff.  Okay.  I understand that.  Don't share it with you, but I understand it.  I am an old man.

Your problem -- or your task is to solve your client's problem.  Your client wants to stay in the park.  They have their interests that they -- why can't you get together and give your opponent enough information about these women to satisfy them so they can make a reasonable judgment that, despite the fact that they are illegal, that they don't pose a threat to the community of the park, and settle this thing, rather than run up money?

I think you work for the Legal Aid Justice Center; is that right?

ATTORNEY TRAJTENBERG:  I am with Quinn Emanuel.

THE COURT:  Quinn Emanuel, all right.  Well, you are doing it pro bono.

ATTORNEY TRAJTENBERG:  Yes, sir.

THE COURT:  All right.  Well, but there is still a cost in the sense that there is somebody here from are the Legal Justice Center.  They are paid.  Quinn Emanuel is paid, paid fairly handsomely, I think.

Find a way to solve this problem, you and Mr. Dingman.  This is not something that either of you is going to want to litigate, or either of your clients really want to litigate.

Your client wants to live in the park.  That's what your client wants.

Your client wants the park to be safe, and you want enough information you can make the park safe.

It staggers me that you can't find a practicable, reasonable way to resolve this.

I'll take the matter under advisement.  Thank you.

If you do, let me know right away because I don't want to spin wheels on this.

ATTORNEY DINGMAN:  Yes, your Honor.

ATTORNEY TRAJTENBERG:  Yes, your Honor.

                    THE COURT:  All right.

                    (Court recessed in Giron de Reyes, et al., v

Waples Mobile Home Park Limited Partnership, et al.)


                                ---

CERTIFICATE


        I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the motion hearing in the case of ROSY GIRON DE REYES, et al., v WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, et al.


        I further certify that I was authorized and did report by stenotype the proceedings in said motion hearing, and that the foregoing pages, numbered 1 to 40, inclusive, constitute the official transcript of said proceedings as taken from my machine shorthand notes.


        IN WITNESS WHEREOF, I have hereto subscribed my name this __7th__ day of __July_____, 2017.


                        _____/s/_____
                        Michael A. Rodriquez, RPR/CM/RMR
                            Official Court Reporter