1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2             ALEXANDRIA DIVISION


3    ------------------------------x
                                   :
4    ROSY GIRON DE REYES, et al    :
                                   :
5                       Plaintiffs :
                                   :
6              versus              : Civil Action Number
                                   :
7    WAPLES MOBILE HOME PARK       :
     LIMITED PARTNERSHIP, et al    : 1:16-CV-563
8                                  :
                                   :
9                      Defendants.:
     ------------------------------x
10
                            February 17, 2017
11
            The above-entitled Motions Hearing was continued
12   before the Honorable T.S. Ellis, III, United States District
     Judge.
13
            THIS TRANSCRIPT REPRESENTS THE PRODUCT
14          OF AN OFFICIAL REPORTER, ENGAGED BY THE
            COURT, WHO HAS PERSONALLY CERTIFIED THAT
15          IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
            THE CASE AS RECORDED.
16

17

18

19

20

21

22

23

24

25

2

1                     A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3              Archith Ramkumar, Esquire
               Quinn, Emanuel, Urquhart & Sullivan
4              777 6th Street NW, Suite 1100
               Washington, DV 20001
5
               Simon Yehuda Sandoval-Moshenberg, Esquire
6              Mary Joy Odom, Esquire
               Simon, Sandoval, Moshenburg
7              Legal Aid Justice Center
               6066 Leesburg Pike
8              Suite 520
               Fall Church, VA 22041
9
     FOR THE DEFENDANT:
10
               Michael Sterling Dingman, Esquire
11             Justin Daniel deBettencourt, Esquire
               Reed Smith LLP
12             3110 Fairview Park Dr
               Suite 1400
13             Falls Church, VA 22042

14

15

16

17

18

19

20

21   OFFICIAL UNITED STATES COURT REPORTER:

22             MS. TONIA M. HARRIS, RPR
               United States District Court
23             Eastern District of Virginia
               401 Courthouse Square
24             Tenth Floor
               Alexandria, VA 22314
25             763-443-9034

                              Tonia M. Harris OCR-USDC/EDVA 703-646-1438

                    EASTERN DISTRICT OF VIRGINIA

3

1                **P R O C E E D I N G S**

2

3           THE COURT:  All right.  Good afternoon.  You may

4   call the next case.

5           THE DEPUTY CLERK:  Rose Giron de Reyes, et al versus

6   Waples Mobile Home Park Limited Partnership, et al. Civil case

7   number 1:16-CV-563.

8           Counsel, please note your appearance for the record.

9           THE COURT:  All right.  For the plaintiffs who is

10  here?

11          MR. RAMKUMAR:  Good afternoon, Your Honor.  Archith

12  Ramkumar for the plaintiffs.  And with me is Joy Odom and

13  Simon Sandoval.

14          THE COURT:  All right.  Good afternoon.  And for the

15  defendant.

16          MR. DINGMAN:  Good afternoon, Your Honor.  Michael

17  Dingman and Justin deBettencourt for the defendants.

18          THE COURT:  All right.  First of all, is Ms. Cuellar

19  here?  Did we advise them that we would be delayed?

20          (A brief interruption in the proceedings.)

21          THE COURT:  You all may be seated.

22          Mr. Ramkumar, it's nice to see you again.

23          MR. RAMKUMAR:  Nice to see you too, Your Honor.

24          THE COURT:  Now, are all of these people here from

25  your law firm?

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

4

1        MR. RAMKUMAR:  A substantial portion of them, yes,

2   Your Honor.

3        THE COURT:  Now, you understand that I'm all in

4   favor of having people observe things, but they're not billed

5   to this case and I would not expect them to be.

6        MR. RAMKUMAR:  Understood, Your Honor.

7        THE COURT:  Do you understand that?

8        MR. RAMKUMAR:  I understand, Your Honor.

9        THE COURT:  And what your firm claims in terms of

10   pro bono time is up to your firm.  But in my view, their

11   appearance here is for their personal edification and does not

12   contribute to the world of pro bono work.

13        Secondly, Mr. Ramkumar was a clerk of mine a couple

14   of years ago, but I do not recuse myself in cases involving

15   former clerks.  If I only had one or two of them, I think that

16   would be appropriate.  I've now had 60-some.  So I can no

17   longer do it.  65 or more.

18        You may be seated for a moment.

19        I'm familiar with the facts of this case, having

20   addressed them previously.  And of course, I know we're here

21   today on cross motions for summary judgment.  One issue I want

22   to mention at the outset so that I can dispose of it and it

23   won't take our time for oral argument because I have another

24   matter.  As Mr. Ramkumar will be familiar with and be able to

25   tell you all, I sometimes schedule more in a day than I can

 1   possibly do.  And putting this matter at 11:00 was a fit of

 2   unwarranted optimism and I apologize to all of you for the

 3   delay, but that's what it is.

 4           Now, the first issue I want to address is the

 5   defendant's motion for summary judgment on the issue of

 6   disparate impact.  As you all know, I disposed of disparate

 7   impact at the motion to dismiss stage.  Wrote an opinion and

 8   made clear beyond dispute that my ruling was that disparate

 9   impact could not be used to prove the -- or to satisfy the

10   causation requirement.  Disparate impact is a judicially

11   created rule to operate in the case of statutes where

12   causation is required.  And I held explicitly that disparate

13   impact could not be used to satisfy the causation requirement

14   here, because to do so, given the unique circumstances;

15   namely, that virtually all illegal or undocumented aliens are

16   Latino or Hispanic.  And, therefore, to use disparate impact

17   to satisfy the causation requirement would effectively erase

18   the causation requirement.

19           But I went on to say that disparate impact could be

20   used -- could be used to help show disparate treatment in

21   addition to other proof to meet the plaintiff's burden of

22   demonstrating causation.  I don't know why that wasn't

23   recognized, and I'm not going to take any time for that

24   argument today.  I ruled that.  I wrote an opinion on it.  It

25   is law of the case, and nothing has been called to my

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP   Document 204   Filed 09/05/17   Page 6 of 46 PageID#
5093

6

1   attention that would cause me under well-established doctrine

2   to change the rule of the -- of the law of the case in that

3   regard.

4        So I would think that the motion for summary

5   judgment on that ground should be denied as moot.  Already

6   ruled on by the Court.  And we will turn then to the other

7   aspects of this case and to hear summary judgment on those.

8        Now, I'm familiar with your briefs, and I have read

9   them.  It seems to me that although the case is not without

10  its complexities or subtleties, it is in the end fairly

11  straightforward.  As I see it, the jury will be asked, if this

12  case goes to a jury, to decide whether the plaintiff has shown

13  by a preponderance of the evidence that the policy that is in

14  issue here, or versions of it, in issue here, whether in

15  implementing that policy the defendant or defendants did so

16  because of the Latino or Hispanic origin of these plaintiffs.

17  That's what the statute says.  It says "because of."  And

18  that's what the jury will decide.

19       So let me hear argument now focused on the disparate

20  treatment claim and the 1981 claim and -- let's take them one

21  at a time.  The 1981 claim and then there's a Randall Act

22  claim, a Virginia code claim, and a breach of contract claim.

23  Let's take the disparate treatment claim first, and let me

24  hear from -- let me hear from the plaintiff first.

25       On the disparate treatment claim, is it the

1   plaintiff's position that the plaintiff is entitled to summary

2   judgment on disparate treatment or that the defendant is not

3   entitled?  Which is it?

4         MR. RAMKUMAR:  It is the plaintiff's position, Your

5   Honor, that defendant is not entitled to summary judgment on

6   the disparate treatment claim.

7         THE COURT:  All right.  Let me point out to those of

8   you watching, I want to commend Mr. Ramkumar because he did

9   what no one else this morning has done.  He answered my

10  question.  And he knows that I'm rabid about that.  And that's

11  right.  He's here to tell me why the defendant is not entitled

12  to summary judgment on disparate treatment.

13        Now, with that out of the way, you may be seated.

14  And I'll ask you to tell me, since it's your burden Mr.

15  Dingman, it's your burden to persuade me that this record

16  warrants summary judgment on behalf of the defendants on the

17  disparate treatment claim.

18        MR. DINGMAN:  Yes, sir.  As the Court is aware, the

19  plaintiffs have no direct evidence of discrimination so they

20  are proceeding under the *McDonnell Douglas* rubric.  And that

21  has three aspects to it where burden may shift back and forth.

22  But as the Supreme Court held in *Hicks*, it is --

23        THE COURT:  I'm familiar with all of that.

24        MR. DINGMAN:  Yes, sir.

25        THE COURT:  They have to show that the plaintiffs

8

1   are members of a protected class.  They are, aren't they?

2          MR. DINGMAN:  Well, our position remains, Your

3   Honor, the female plaintiffs as illegal aliens are not a

4   protected class under the Fair Housing Act.

5          THE COURT:  Well, they may not be a protected class

6   in any statute, but as -- as people of Hispanic origin,

7   they're protected, aren't they?  The fact that they're illegal

8   is what's at the heart of the case.

9          MR. DINGMAN:  Well, the issue, Your Honor, is

10  whether, as the Court discussed in its motion to dismiss

11  opinion, regarding the *Keller* case.

12         THE COURT:  As the Court discussed in what?

13         MR. DINGMAN:  In your motion to dismiss opinion.

14         THE COURT:  I didn't say they weren't protected.

15         MR. DINGMAN:  No, sir.  But you referred to the

16  *Keller* case from the Eighth Circuit where that Court held that

17  there's no historic ties between the enactment of the Fair

18  Housing Act and illegal aliens.  And for that reason, we

19  believe that they are not proper plaintiffs under Fair Housing

20  Act, because the Act was never intended to apply to that.

21         We do agree that the male plaintiffs who are in this

22  country legally are in a protected class.

23         THE COURT:  All right.  What else do you argue under

24  the *McDonnell Douglas* framework?  First you say that the

25  females, as they're illegal or undocumented, they're not

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP    Document 204    Filed 09/05/17    Page 9 of 46 PageID#
5096

9

1    protected.  The next thing that they would have to show is

2    that they sought to enter a lease for the park.  No question

3    about that, is there?

4         MR. DINGMAN:  They attempted to enter into a lease

5    for the park, but they do not have a prima facie case.  And

6    the reason for that, Your Honor, is they have to demonstrate,

7    and they alleged in their complaint in Paragraph 114 that

8    they're treated differently from similarly situated

9    non-Latinos, meaning non-Latinos who are also illegal aliens.

10        They have presented this Court with no evidence that

11   non-Latino illegal aliens are allowed to circumvent the policy

12   and design leases.  In fact, we've provided to the Court

13   letters sent by the defendants to non-Latino residents

14   requiring that they provide proof of legal residency.

15        So they cannot establish a prima facie case.  They

16   have not been denied housing in favor of someone else.  They

17   cannot comply with the policy.  And the reason they cannot

18   comply with the policy is not because they're Latino, it's

19   because the female plaintiffs are in this country illegally.

20   And the uncontested facts, Your Honor, demonstrate that.  The

21   plaintiffs have admitted that Latinos routinely sign leases at

22   the park.  Their expert claims that 60 percent of the

23   residents in fact are Latino.  That would be 90 of the 150

24   lots.

25        They also testified at their depositions, the

10

1    plaintiffs themselves, that they do not believe that they were

2    treated differently because they're Latino.  They recognize

3    that the issue was the fact that the female plaintiffs are

4    illegal aliens.  All of that is conceded.  So they do not have

5    a prima facie case of discrimination.  They cannot comply with

6    the policy because of the fact that the female plaintiffs are

7    here illegally.  And that's been true since the inception of

8    the case, Your Honor.

9         The four male plaintiffs have not only signed

10   leases, they've re-upped their leases year after year after

11   year.  The plaintiffs have not presented to this Court any

12   evidence that non-Latinos are treated any differently with

13   respect to this policy, which everyone concedes is neutral on

14   its face.  So they have no evidence to establish a prima facie

15   case of discrimination.

16        If they were able to establish that burden, Your

17   Honor -- and I would again point to the Court that there's no

18   evidence of that.  The plaintiffs haven't even attempted to

19   point the Court to any example where a non-Latino illegal

20   alien was treated differently.  In other words, was allowed to

21   sign a lease without complying with the policy.  There is no

22   evidence of that.  Without that evidence, they cannot make out

23   their prima facie.  If they could, as the Court is aware,

24   under the *McDonnell Douglas* rubric, the defendants can then

25   set forth what are the policy reasons.  And as the Court in

1  *Hicks* held, this isn't a determination of whether those

2  policies are correct or not.  It would shift the burden back

3  to the plaintiffs to demonstrate that the policy reasons are

4  false and that the actual purpose for the policy is

5  intentional discrimination.

6        The policies are not only not false, Your Honor,

7  they're well grounded.  The first one is based upon the

8  anti-harboring statute found at AUSC 1324.

9        There was a case, and we talked about this case

10  quite a bit at the motion to dismiss stage, *United States v.*

11  *Aguilar*, where Ms. Aguilar was convicted of 13 counts under

12  the anti-harboring statute.

13        The issue in that case, Your Honor, is whether there

14  had to be proof of substantial facilitation.  Judge Trenga

15  found that that was not required.  The Fourth Circuit found

16  that there's a split, and because of that found there was no

17  plain error and affirmed the conviction of Ms. Aguilar.  In

18  doing so, I want to point the Court to two statements that the

19  Fourth Circuit made with respect to the evidence it relied on

20  in affirming the conviction.

21        The Court first said when immigration "showed up,"

22  that was enough to give knowledge to Ms. Aguilar.  We in fact

23  have actual knowledge that the female plaintiffs are in this

24  country illegally.

25        The Court went on to say this:  "But she also

1   admitted that it was" --

2            THE COURT:  That's the prosecution under the

3   statute, isn't it?

4            MR. DINGMAN:  Yes, sir.

5            THE COURT:  It's not a Fair Housing Act case?

6            MR. DINGMAN:  No.

7            THE COURT:  So you cite it for what purpose?

8            MR. DINGMAN:  I cite it, Your Honor, that one reason

9   for this policy is to avoid a potential criminal prosecution

10  under the anti-harboring statute.

11           THE COURT:  All right.  Next.  Go on.

12           MR. DINGMAN:  So here is what the Court said --

13           THE COURT:  Why do I need to know what the Court

14  said?

15           MR. DINGMAN:  Because it relates, Your Honor,

16  respectfully, to the policy here.

17           THE COURT:  Go on.

18           MR. DINGMAN:  Here is what the Court said --

19           THE COURT:  Well, you've told me already that the

20  merits of the policy are not at issue.  All it has to be is a

21  legitimate nondiscriminatory reason that isn't pretextual.  Is

22  that right?

23           MR. DINGMAN:  That's right.  And I also want to

24  argue as to why it's clearly not false.

25               So here is what the Court said, which relates

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP   Document 204   Filed 09/05/17   Page 13 of 46 PageID#
5100

13

1    specifically to the purpose of this policy, at least one of

2    them.

3            So she also admitted that, "It was the same to her

4    whether her tenants possessed proper documentation or did

5    not."

6            The Court went on to say the following:

7    "Particularly, inasmuch as she took no steps to ascertain the

8    status of her tenants, even after being repeatedly warned by

9    officials that numerous of her tenants were not properly

10   documented, we concluded the evidence induced at trial

11   supported a finding that she acted in reckless disregard that

12   her tenants were undocumented."

13           So under the facts of that case, if you have

14   knowledge that your tenants might be undocumented, that's

15   enough for a conviction.  So one of the reasons for this

16   policy, Your Honor, is to ask for evidence of legal presence

17   so that we avoid that.  The plaintiffs argue, well, there's a

18   split in the circuits, it's unclear whether there would

19   actually be a prosecution.  But a business isn't required to

20   walk up to the line of a criminal act.  It is certainly within

21   the reasonable operation of a company to avoid even the

22   possibility of that kind of prosecution.

23           The second reason for the policy, Your Honor, which

24   was talked about by Mr. Jones, a 30(b)(6) representative of

25   the defendants.  It's also to show the objective of Mr.

14

1    Caruso's expert testimony, which is not contradicted in this

2    case, is that requiring proof of legal residence is key to the

3    underwriting of a lease for a very straightforward reason.  As

4    the Court is aware, it's illegal to hire somebody who's in

5    this country illegally.  As Mr. Caruso stated in his opinion

6    in his deposition, Your Honor, making sure that an applicant

7    has viable employment and can actually pay the rent for the

8    extended period of the lease, is a very straightforward and

9    key issue in underwriting.  So that's another reason it's

10   requested.

11          The third reason is with respect to criminal

12   background checks.  And the plaintiffs in this case have

13   missed this point from the beginning.  We're not talking about

14   what you already -- what the entity who's performing the

15   background check does.  They take a name from the defendants.

16   If that name is not accurate with respect to the applicant,

17   then whatever he already does is meaningless.

18          So one of the other purposes to make sure that we

19   can verify identity.  And in the briefs we documented the

20   difference between what the male plaintiffs had to do to

21   obtain their social security numbers, being fingerprinted,

22   becoming legal, having legal status in this country, answering

23   questions, being fingerprinted on an annual basis.  That's how

24   they were able to get their social security.  The ITIN process

25   has none of that.  And in fact, the ITIN process doesn't even

15

1    concern itself with legal status.  The proof in this case is

2    that the four female plaintiffs all have ITINs, not one of

3    them are in this country legally.

4            THE COURT:  All had what?  I'm sorry.

5            MR. DINGMAN:  I'm sorry?

6            THE COURT:  You said they all had what?

7            MR. DINGMAN:  They all have ITINs, Individual Tax

8    Identification Numbers.  But --

9            THE COURT:  From what?  From whom?

10           MR. DINGMAN:  From the IRS.

11           THE COURT:  Oh, I see what you mean.  They had ID

12    numbers from paying taxes.

13           MR. DINGMAN:  Yes, sir.

14           THE COURT:  All right.  Go on.

15           MR. DINGMAN:  So those policy reasons are not --

16    they're not just not false, they're unsalable.  They're

17    business reasons, they're legitimate reasons.  So now under --

18           THE COURT:  But isn't it open -- whether they're

19    legitimate or not doesn't end the inquiry.  The inquiry is

20    whether they were pretextual for discriminatory purpose.  So

21    in other words, if the real reason for the -- for the policy

22    was to keep Latinos out, that would violate the FHA, wouldn't

23    it?  And the Virginia Fair Housing Act, wouldn't it?

24           MR. DINGMAN:  This is what the *Hicks* --

25           THE COURT:  I'm sorry.  I asked a question.

de Reyes v. Waples Mobile

16

1          MR. DINGMAN:  No, sir.  They have to show that the

2    policy reasons are false.

3          THE COURT:  No.  The hypothetical I gave you was

4    clear.  Even if the policy reasons you give have some merit,

5    if the true reason for the policy was to keep Latinos out,

6    that would violate the FHA; yes or no?

7          MR. DINGMAN:  If it's proven that it's false and

8    intentional, yes.

9          THE COURT:  All right.  Go on.

10         MR. DINGMAN:  And that's what the Supreme Court held

11   in *Hicks*.  It said, "A reason cannot be proved to be 'a

12   pretext for discrimination unless it has shown both that the

13   reason was false and that the discrimination was the real

14   reason.'"

15         So they have not -- the plaintiffs have not

16   proffered --

17         THE COURT:  Remind me of the date of *Hicks*.

18         MR. DINGMAN:  *Hicks* was decided in 1993, Your Honor.

19         THE COURT:  That's Fourth Circuit?

20         MR. DINGMAN:  *Hicks* is -- this is a U.S. Supreme

21   Court.

22         THE COURT:  Oh, the Supreme Court.

23         MR. DINGMAN:  Yes, sir.  *St. Mary's Honor Center v.*

24   *Hicks*.

25         THE COURT:  All right.  Go on.

1           MR. DINGMAN:  So in that case, the Court made it

2   very clear that when you're at this stage of the *McDonnell*

3   *Douglas* rubric, so to speak, the plaintiffs now have to prove

4   that these policy reasons not just aren't debatable, they have

5   to prove that they're false, that they're made up.

6           THE COURT:  Well, they have to prove that there's

7   evidence of pretext.  I don't determine at this stage -- if

8   there's evidence of pretext, it goes to trial.

9           MR. DINGMAN:  The evidence though, Your Honor, has

10  to be that these --

11          THE COURT:  That's right.  It has to be admissible

12  evidence of pretext.  Now, do you know what they're contending

13  is pretextual or why?

14          MR. DINGMAN:  No, they have not.

15          THE COURT:  All right.  Let's learn.

16          Mr. Ramkumar, let's hear from you on this.  I take

17  it you don't quibble with his argument that the policy

18  reasons, asserted by the defendant, are on the face of it

19  legitimate non-discriminatory reasons.  Whether they're a good

20  idea or a bad idea doesn't matter, but they're legitimate

21  non-discriminatory reasons.  Aren't they?

22          MR. RAMKUMAR:  Correct, Your Honor.  Plaintiff's

23  position would be that those reasons are pretextual.

24          THE COURT:  Yes.  Now, why?  On what admissible

25  evidence is that claim made or based?

de Reyes v. Waples Mobile

18

```
1              MR. RAMKUMAR:  So Your Honor, I'm going to address

2    the reasons given one at a time in the order they were

3    presented.

4              THE COURT:  I'm sorry, sir.  My ears, as you may

5    recall, they plug up occasionally, and they are fully plugged

6    today.

7              MR. RAMKUMAR:  I'm going to address the reasons

8    given by opposing counsel in the order that he presented them.

9              THE COURT:  All right.  Sir.

10             MR. RAMKUMAR:  And I'm going to begin with the

11   anti-harboring statute, 8 U.S.C. 1324.

12             So plaintiffs covered this in their briefing, but

13   there are two principal reasons why there are sufficient

14   evidence that that reason is pretextual.

15             First, the statutory language would not impose

16   liability merely for renting to illegal or undocumented

17   immigrants.  Indeed *Aguilar*, the case cited by opposing

18   counsel, involved a situation where a landlord was repeatedly

19   warned by immigration officials before the criminal conviction

20   was upheld.  So in that situation, the mens rea requirement

21   was met.

22             By contrast, there's no suggestion anywhere in these

23   facts that any such warnings were made and that the mens rea

24   requirement would be met.

25             Secondly, Your Honor, as plaintiffs pointed out,
```

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP   Document 204   Filed 09/05/17   Page 19 of 46 PageID#
5106

19

1    defendants did not behave like landlords who believed that

2    they would be exposed to criminal liability.  When they

3    learned or when they conducted the recertification process,

4    they did not take prompt steps to evict the plaintiffs.  They

5    had since switched all of the plaintiffs, including the male

6    plaintiffs, who were legally present on the month-to-month

7    leases with increased rent.  And as plaintiffs pointed out in

8    the reply brief, if defendants actually were worried about

9    facing criminal liability, they would have promptly taken

10   steps to evict the female plaintiffs, yet they did not do so.

11           For these reasons --

12           THE COURT:  Well, for being good-hearted they get

13   docked.

14           MR. RAMKUMAR:  Well, Your Honor, plaintiffs would

15   dispute the fact that they were good-hearted insofar as the

16   increased rent operated to functionally evict all of the

17   plaintiffs, both the male and the female plaintiffs.

18           Now, with respect to the next justification, which

19   was lease underwriting concerns.  Once again, plaintiffs have

20   presented sufficient evidence that this rational is

21   pretextual.  As a threshold matter, the lease underwriting

22   justification depends on the fact that defendants contend that

23   because one of the individuals in the household has no earning

24   potential, they present a risk to the lease.  But this would

25   be true of any household where one of the parents stayed at

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP   Document 204   Filed 09/05/17   Page 20 of 46 PageID#
5107

20

 1   home.  Yet, there's no indication anywhere in the policy that

 2   applies with equal force to those households.

 3        Moreover, there is no record of evidence that the

 4   plaintiffs have been anything but model tenants.  They have

 5   all paid their rent on time and there have been no risk to the

 6   lease presented as they lived on the lots when the policy was

 7   suddenly and abruptly applied to them.

 8        Moreover, the fact of the matter is there's simply

 9   no record of evidence as to why undocumented immigrants

10   suddenly pose an unacceptable lease underwriting risk.  And in

11   connection with this --

12        THE COURT:  Under what?

13        MR. RAMKUMAR:  There is no record evidence, Your

14   Honor, that undocumented immigrants pose an unacceptable lease

15   underwriting risk in connection with any other groups, such as

16   the stay-at-home parents I just mentioned.

17        In connection with this, plaintiffs want to

18   emphasize the retroactive nature of how the policy was applied

19   in this case.  Once again, the plaintiffs lived on the lots

20   four years.  They paid their rent on time and there was no

21   suggestion that they made any sort of -- or posed any sort of

22   unacceptable risk.

23        Finally, there are other ways if defendants were

24   truly interested in ensuring that lease underwriting was

25   properly supported for them to achieve that goal.  For

21

1  example, they could have asked for a guarantor.  They could

2  have asked for an additional security deposit.  These would

3  have been additional ways or reasons for them to mitigate

4  their risk, yet they chose to ignore those alternatives.

5          Third, opposing counsel mentioned criminal

6  background checks.  This has been the primary issue that

7  defendants have asserted throughout this litigation.  And

8  plaintiffs have thoroughly responded and demonstrated why this

9  rational is pretextual in their briefing.

10         The company that defendants retain to carry out the

11 criminal screening and criminal background checks did not

12 require a social security number.  And more importantly,

13 defendants themselves did not require a social security number

14 as recently as 2013.  Their 30(b)(6) representative conceded

15 that they accepted individual taxpayer identification numbers

16 from individuals as proof of identity and that social security

17 numbers were not required.

18         Moreover --

19         THE COURT:  Of course, you can buy those on the

20 streets of D.C.

21         MR. RAMKUMAR:  I'm sorry, Your Honor?

22         THE COURT:  You can buy those on the streets of

23 D.C., social security numbers.

24         MR. RAMKUMAR:  Yes, Your Honor.

25         THE COURT:  As you know from sitting in this

de Reyes v. Waples Mobile

22

1    courtroom for a year.

2            MR. RAMKUMAR:  Yes, Your Honor.

3            THE COURT:  All right.  So -- but I find it hard to

4    believe that doing a background check wouldn't be facilitated

5    by having some of this information to identify.  One of the

6    problems with undocumented or illegal aliens is that they

7    frequently use a lot of different names.  It makes it very

8    hard to check backgrounds.  But wouldn't you -- wouldn't it be

9    reasonable to check backgrounds of people who wanted to rent

10   in your facility?

11           MR. RAMKUMAR:  So, Your Honor, plaintiffs on this

12   point would point to defendants own --

13           THE COURT:  I'm sorry.  Did I ask a question?

14           MR. RAMKUMAR:  Yes, yes, Your Honor.  And the answer

15   is in a vacuum it would be reasonable, but on the facts of

16   this case the way the background check methodology has been

17   applied it is pretextual.

18           THE COURT:  All right.  Tell me why.

19           MR. RAMKUMAR:  The reason for that, Your Honor, is

20   defendant's own behavior.  As noted, they accepted individual

21   taxpayer identification numbers as proof of identity for a

22   number of years and abruptly stopped doing so.  So this Court

23   need not evaluate the relative efficacy of individual taxpayer

24   --

25           THE COURT:  And did they explain why they quit doing

-Tonia M. Harris OCR-USDC/EDVA 703-646-1438-

EASTERN DISTRICT OF VIRGINIA

1  it, such as it didn't work well, they didn't get accurate

2  results?

3          MR. RAMKUMAR:  There's no such record explanation,

4  Your Honor, as to why the switch was made.

5          THE COURT:  All right.  Go ahead.

6          MR. RAMKUMAR:  Moreover, on the criminal background

7  checks point, Your Honor, it is undisputed that half of the

8  plaintiffs in this lawsuit, the male plaintiffs, all pass

9  criminal background checks as they are legally present in this

10  country.  And there is not a coherent record justification for

11  why they were forced to pay increased rent and why they were

12  also functionally evicted.  For these reasons, the plaintiffs

13  contend that the criminal background checks justification is

14  also pretextual.

15          THE COURT:  All right.  Go back now to the

16  beginning.  Mr. Dingman argued that they're not a protected

17  class because they're illegal aliens.  Illegal aliens are not

18  a protected class.  And I suggested to him that that's not a

19  class under the FHA that's protected, what's protected is

20  Latinos.  What's your answer to his argument?

21          MR. RAMKUMAR:  The plaintiff's answer, Your Honor,

22  is simply what you just stated, which is the protected class

23  is race or national origin.  And Your Honor addressed this

24  issue in adjudicating defendant's motion to dismiss and

25  rejected this particular argument at that point in time.  The

24

1    female plaintiffs are suing as members of a protected class in

2    that -- in their race or national origin.

3            THE COURT:  All right.  Let me go back now to Mr.

4    Dingman.

5            Anything else you want to argue on your motion for

6    summary judgment on the disparate treatment under the FHA?

7            MR. DINGMAN:  Yes, sir.  I would like to address

8    some of the points that counsel for plaintiff made.  And I

9    want the Court aware --

10           THE COURT:  Speak up, please.

11           MR. DINGMAN:  I would like to address some of the

12   points that were made with respect to the policy issues, and

13   also to point the Court to undisputed facts that show, because

14   it's a two-step process.  They have the burden of proving that

15   the policy reasons are not only false.  That's step one.  Step

16   two is they have to have evidence to show that the real reason

17   is for discrimination.

18           So what are the undisputed facts in this case?

19   Sixty percent of the residents are Latino.  There is no

20   evidence that there's been a decline in the number of Latino

21   residents at this park.  There has been no evidence that a

22   Latino who is in this country legally has ever been denied the

23   right to lease.

24           We've provided the Court with documents showing that

25   the defendants advertise in Latino newspapers.  There's

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP    Document 204    Filed 09/05/17    Page 25 of 46 PageID#
5112

25

1    testimony from the plaintiffs themselves that we have Hispanic

2    Spanish speakers in our office to help them read their leases.

3            There is no evidence of an intent to discriminate

4    against Latinos.  In fact, the evidence is overwhelmingly

5    clear that that has never been the case.  And this is an

6    important point, Your Honor, because what often gets

7    overlooked here is it's not the defendant companies.  There's

8    a couple of women:  Josephine Giambanco, who herself is an

9    immigrant; Carolyn Easton, who's a Latino immigrant from Peru,

10   they are the ones that the plaintiffs are saying, "You're

11   racist.  You implement a discriminatory policy and you do it

12   on purpose."  And they have presented no evidence of that,

13   Your Honor.  None.

14           Even the plaintiffs themselves when they were asked

15   point-blank at their depositions:  "Do you think you were

16   treated differently because you're Latino?"  They either said,

17   "no" or "I don't know."  So there is no proof that creates a

18   tribal issue that the real purpose was to discriminate.  It's

19   exactly the opposite.

20           The majority of the people at that this park are

21   Latino.  None of the other Latino families have issues.  These

22   folks have issues because of the illegal status of the female

23   plaintiffs.  And that's really what they've alleged from the

24   beginning of this case.

25           So let me go back --

```
 1          THE COURT:  It has always been a puzzle to me why

 2   the parties did not work this out.  The reason that it's been

 3   a puzzle to me is that the defendants have always claimed, as

 4   you have just articulated, that they don't discriminate.

 5   Indeed, the facts show that they have many Latinos and that

 6   their employees are Latinos, or one of them anyway.  Am I

 7   correct?

 8          MR. DINGMAN:  Yes, sir.

 9          THE COURT:  All right.  Now, if what you really want

10   to do is to have enough information so that you could ensure

11   that somebody is staying with you is not a threat criminally

12   to other people, and if what you really want to do is to have

13   enough information so that you can assure that the lessee

14   does not -- is not going to skip and not pay the rent, that is

15   able to pay the rent, I've never understood why you couldn't

16   go to these people, rather than instituting a policy that

17   may -- may lead to disputes whether you win or lose you still

18   have to litigate, and get the information you need in order to

19   satisfy yourself that these four women are not ex-murderers or

20   some other kinds of threatening people, and that they or their

21   husbands are going to pay the rent.  I don't understand why

22   that wouldn't have been the sensible way to resolve this

23   matter.  Rather than, you can have a policy but in

24   implementing the policy you've got to use common sense.

25              Now, you may take the view that you don't want
```

27

1    illegal aliens in the park.  Period.  That's -- that's another

2    almost separate issue.  Undocumented.  I use the word

3    "illegal."  It's the same thing.  If they don't have

4    documents, they're not here legally.  But if that's your

5    position, you don't want illegal aliens in the park, then all

6    these justifications really don't matter.  You just don't want

7    illegal aliens in the park.  Is that it?

8              MR. DINGMAN:  No, sir.  The reason why we --

9              THE COURT:  You have other illegal aliens in the

10   park?

11             MR. DINGMAN:  Well, if we find that people don't

12   have the proper documentation, as we've provided to the Court,

13   they are sent letters to prove their legal residence in the

14   United States.

15             THE COURT:  And suppose they don't prove their legal

16   residence?

17             MR. DINGMAN:  Well, then we have to do something.

18             THE COURT:  What do you do?

19             MR. DINGMAN:  Well, Your Honor is talking about the

20   four female plaintiffs in this case.

21             THE COURT:  I beg your pardon?

22             MR. DINGMAN:  Your Honor referred to the four female

23   plaintiffs in this case.

24             THE COURT:  Yes.  They're gone.  They've moved out.

25             MR. DINGMAN:  One couple is still there.

de Reyes v. Waples Mobile

28

```
 1              THE COURT:  All right.

 2              MR. DINGMAN:  But under Your Honor's "why couldn't

 3     we do something different for them?"  Well, under Aguilar, we

 4     now know that we have illegal aliens --

 5              THE COURT:  I see.  So you're still concerned about

 6     that.

 7              Now, Mr. Ramkumar has distinguished this case

 8     because he says there was notice and everything else.  And

 9     your answer to that, as you've said, you're not required to

10     take the risk that --

11              MR. DINGMAN:  Our facts are worse.

12              THE COURT:  I beg your pardon?

13              MR. DINGMAN:  Our facts are worse, Judge.  We don't

14     have somebody saying I've -- we think you have illegal -- we

15     know.  We have actual knowledge.  We don't even -- the statute

16     has two parts:  Knowledge and reckless disregard.  We don't

17     even get to reckless disregard, because we have actual

18     knowledge that we have illegal aliens.

19              So under Judge Trenga's ruling, if you're not

20     required --

21              THE COURT:  Under whose ruling?

22              MR. DINGMAN:  Judge Trenga, who was the trial judge

23     for Aguilar.

24              THE COURT:  Oh, all right.

25              MR. DINGMAN:  He ruled that substantive
```

29

 1   facilitation, meaning you are actually engaging in trying to

 2   harbor, is not required for a conviction.  And the Fourth

 3   Circuit affirmed that.

 4          So to your point, once we know that we have somebody

 5   who is there illegally, we are exposed under the

 6   anti-harboring statute because we now have knowledge.

 7          THE COURT:  Let me hear from Mr. Ramkumar's answer

 8   to that argument.

 9          You distinguished *Aguilar,* but not yet quite

10   adequately given what Mr. Dingman says.

11          MR. RAMKUMAR:  So, Your Honor, plaintiffs also

12   presented a factual issue as to why the anti-harboring

13   justification is pretextual, and this is because defendants

14   did not behave like landlords who believed that they actually

15   would face criminal liability.

16          THE COURT:  Why not?

17          MR. RAMKUMAR:  And this goes back to the fact, Your

18   Honor, that they switched the plaintiffs, all of them,

19   including the male plaintiffs, onto month-to-month leases at

20   the point where they became aware of the female plaintiffs,

21   sir.

22          THE COURT:  Well, don't the female plaintiffs and

23   the male plaintiffs go together, they're couples?  So if

24   you -- how can you switch -- and in fact, the male was really

25   the signature, the lessor -- lessee, rather; isn't that right?

---

30

1          MR. RAMKUMAR:  That's correct, Your Honor.

2          THE COURT:  So they say, we don't want illegal

3     aliens in the park because of the statute, we risk criminal

4     liability.  And you say that's pretextual, why?

5          MR. RAMKUMAR:  Because, Your Honor, at the point

6     where they acquire that knowledge of the female plaintiff

7     status, they did not take prompt steps to evict the female

8     plaintiffs.

9          THE COURT:  Well, doesn't that make them decent

10    people rather than bad people?  I mean, to throw them out on

11    the street -- the fact that they didn't throw them out on the

12    street doesn't seem to me to point to the fact that they are

13    discriminating against Latinos.

14         MR. RAMKUMAR:  That point, Your Honor, goes

15    specifically to whether defendants actually believed that they

16    would face criminal liability under the statute or whether

17    they face a substantial risk of jail time and criminal

18    liability, as opposing counsel has represented.  Plaintiff's

19    position is that --

20         THE COURT:  So your point is simply that they really

21    believed they faced -- they faced criminal liability then they

22    would do nothing short of evicting them.  The fact that they

23    didn't do it, you're saying shows that they didn't really

24    believe they were at risk for criminal prosecution.

25         MR. RAMKUMAR:  That's correct, Your Honor.  And in

1  fact, defendant's own 30(b)(6) representative was unable to

2  name whether or not defendants faced liability under the

3  statue.

4        THE COURT:  Well, that doesn't matter.  It's a legal

5  question.  It's not something a witness is going to answer.

6  The 30(b)(6) isn't going to change that.  Are you saying that

7  the 30(b)(6) said they weren't concerned about it?

8        MR. RAMKUMAR:  No, Your Honor.  This simply goes

9  back to the point of what defendants actually believed at the

10  time of the recertification.

11        THE COURT:  Well, did he say at the time of the

12  implementation that they didn't believe that that was a risk?

13        MR. RAMKUMAR:  Your Honor, he simply said they did

14  not believe that they faced liability under any particular

15  immigration statute.

16        THE COURT:  Really?  I don't recall that being the

17  testimony.

18        Mr. Dingman, what was the testimony?

19        MR. DINGMAN:  Mr. Jones testified that concern over

20  the anti-harboring statute was one of the reasons --

21        THE COURT:  Was he the 30(b)(6) witness?

22        MR. DINGMAN:  Yes, sir.

23        THE COURT:  Well, maybe Mr. Ramkumar is referring to

24  something different.  But if that's a 30(b)(6) witness, I

25  don't think it can be said that he testified they weren't

de Reyes v. Waples Mobile

32

1    worried about criminal liability.

2          MR. RAMKUMAR:  Your Honor, plaintiff's position

3    would be that the 30(b)(6) representative was unsure about

4    whether or not the landlord ultimately faced liability.

5          THE COURT:  Well, he can be unsure as to whether he

6    would actually be prosecuted, but that doesn't mean that it

7    isn't sensible to take precautionary steps to ensure that

8    you're not prosecuted.  I'm sure when you've gone through a

9    red light you hope that you wouldn't be prosecuted, but you

10   were careful the next time to not to go through it.

11         (A brief interruption in the proceedings.)

12         THE COURT:  All right.  Go ahead, Mr. Ramkumar.

13         MR. RAMKUMAR:  Going back to the precautionary

14   measures point you just made, Your Honor.  Once again,

15   plaintiffs would stand behind the factual dispute they have

16   raised that the defendants did not behave like landlords who

17   actually believed they faced anti-harboring liability.

18         THE COURT:  I see.  I understand that argument.  I

19   think we have exhausted the principal arguments on the two

20   Housing Act claims.

21         Is there anything else I should know about either

22   the Virginia or FHA claims?

23         MR. DINGMAN:  Your Honor, I just want to respond --

24         THE COURT:  Louder, please.

25         MR. DINGMAN:  I would like to respond to the

33

1  argument that was just made.  The facts in this case -- and

2  this is the plaintiffs wanting to have their cake and eat it

3  too -- when we get to the Mobile Home Lot Rental Act claim,

4  they say, we attempted to evict these plaintiffs and the

5  evidence is clear we demanded that they provide proof of their

6  legal residence.  When they could not do that, we threatened

7  eviction.

8         This lawsuit was then filed, and the plaintiffs

9  claim that under the Mobile Home Lot Rental Act we couldn't

10 evict them anyway, that we had to at least give them 60 days

11 notice.

12        THE COURT:  Well, that's true.  Isn't it 60 days

13 notice?

14        MR. DINGMAN:  That's what the Act says.

15        So this argument that --

16        THE COURT:  It makes it true.

17        MR. DINGMAN:  -- that actual discrimination is shown

18 because we didn't evict immediately.

19        THE COURT:  That's what he's saying.  His argument

20 is --

21        MR. DINGMAN:  And the plaintiffs are saying --

22        THE COURT:  Just a moment.  One of us at a time.

23 He's saying that the fact that you didn't evict them

24 undermines your claim that you were really worried about

25 criminal prosecution, whether that's plausible or not is

34

1    another matter.  Go ahead.

2         MR. DINGMAN:  Well, how can the plaintiffs take that

3    position and at the same time say that if we had gone forward

4    with those evictions we would have violated the Mobile Home

5    Lot Rental Act?

6         THE COURT:  Now, have you and Mr. Ramkumar pretty

7    much exhausted the principal points of the FHA and the

8    Virginia Housing Act claims?

9         MR. DINGMAN:  I would just close with this, Your

10   Honor.  The plaintiffs have not pointed this Court to any

11   evidence showing intentional discrimination against Latinos.

12        THE COURT:  How about the 1981 claim?  Is that any

13   different in analysis?

14        MR. DINGMAN:  It's not any different, Your Honor.

15   Obviously, you have to show intentional discrimination under

16   1981.  With respect to the citizenship claims, we have all the

17   same admissions from the plaintiffs that non-U.S. citizens

18   routinely sign leases, they're not prohibited from signing

19   leases.

20        And when we were here on a motion to dismiss, the

21   plaintiffs told the Court the burden that they faced were

22   obtaining I-94's.  Well, that's not true.  The female

23   plaintiffs have no documents showing their legal presence in

24   the United States, let alone an I-94.

25        So the burden that was proffered was not true.  So

1    there is no basis for a 1981 claim, and it should be

2    dismissed.

3          THE COURT:  What do you say to the arguments under

4    both the Housing Act and the '81 claim that until April of

5    2016 the policy required documents that weren't particularly

6    probative of identity or legal status in the United States,

7    and that the criminal and credit background checks can be run

8    and indeed were run on some of the plaintiffs without the

9    forms that the policy requires, and that numerous legal

10   immigrants lack the forms that the policy require and that

11   Latinos are more likely than other groups to be affected by

12   the policy?

13         MR. DINGMAN:  Well, two responses to that, Your

14   Honor.  First of all, the female plaintiffs in this case have

15   no documents at all.  So there is no document they could

16   present to satisfy the policy.

17         Secondly, and we proffered these to the Court, the

18   residential occupancy manual standards have a laundry list of

19   documents that prove legal status and legal residence.

20         We provided a declaration from Mr. Jones who

21   testified that those applied to Waples Park.  And so it wasn't

22   simply limited to I-94s or Visas.  It was if you had proof

23   from a U.S. Government-issued document that you have legal

24   status, that was sufficient.  And all of the defendants who

25   were deposed on that, Mr. Jones, Ms. Easton, Ms. Giambanco,

de Reyes v. Waples Mobile

36

1   all testified to that fact.

2          So there is no evidence that the defendants limited

3   what would be accepted to prove legal status.  Nor is there

4   any evidence that there was any effort by the female

5   plaintiffs to provide any such documents, because they do not

6   exist.

7          THE COURT:  All right.  Let's turn to -- do you have

8   anything, Mr. Ramkumar, you want to say on the 1981 claim that

9   hasn't been already said?

10          MR. RAMKUMAR:  I do, Your Honor, just very briefly.

11   There are two principal reasons why plaintiffs have sustained

12   their burden on the Section 1981 claim sufficient for this

13   claim to go forward to a jury.

14          One is, as Your Honor just noted, an I-94 and a Visa

15   are not particularly probative of legal status, yet they

16   impose substantial burdens.  And the second --

17          THE COURT:  What's the I-94 again?

18          MR. RAMKUMAR:  That's the arrival/departure form,

19   Your Honor.

20          THE COURT:  Well, it has something to do with legal

21   presence.  If you didn't have an I-94 at all, then you could

22   have walked across the border in Texas because you wouldn't

23   have an I-94, right?  At least if you had an I-94, you would

24   have passed some inspection at some border.

25          MR. RAMKUMAR:  Yes, Your Honor.  But plaintiffs have

37

1   put forth a record evidence with a Yakub declaration showing

2   that there are some individuals who, for example, obtain

3   temporary protected status who don't necessarily have an I-94.

4           THE COURT:  That's true.  But to say that the I-94

5   have no relevance and no value at all seems to me to overstate

6   the case.  It has some, it isn't conclusive.  In fact, very

7   little is conclusive, other than a green card or a work permit

8   or something.  Even a social security card isn't proof of

9   legal presence, because you can buy those in Washington.  But,

10  I'm not sure that there is a single document that everyone

11  would have.

12          In any event, go ahead, I'll hear from you further.

13          MR. RAMKUMAR:  And then the second reason, Your

14  Honor, and the plaintiffs have pointed this out repeatedly, is

15  the policy's breadth.

16          THE COURT:  Is the what, sir?

17          MR. RAMKUMAR:  Is the policy's breadth.  And its

18  application --

19          THE COURT:  The policy's?

20          MR. DINGMAN:  Breadth.

21          THE COURT:  Breadth.  I'm sorry.  Yes, go ahead.

22          MR. RAMKUMAR:  And it's an application not just to

23  the female plaintiffs, but also to the male plaintiffs.

24          Now, moments ago when opposing counsel was

25  addressing the Fair Housing Act claims, he made the argument

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP    Document 204    Filed 09/05/17    Page 38 of 46 PageID#
5125

38

1   that the policy does not affect the ability of any legally

2   present individual to lease at the park.

3          Plaintiffs vigorously dispute that fact, insofar as

4   the male plaintiffs attempted to renew their leases repeatedly

5   yet were rebuffed because of this policy.

6          There's no --

7          THE COURT:  Well, that's because of their wives or

8   their female companions, right?

9          MR. RAMKUMAR:  Well, Your Honor, plaintiffs would

10  submit that that's not entirely clear from the record insofar

11  as the violation letters --

12         THE COURT:  What are you going to tell the jury

13  about all these other Latinos in the park that have not had

14  any trouble?  It's kind of hard to have an animus against

15  Latinos when they're 60 percent of your park.

16         MR. RAMKUMAR:  Your Honor, as the Supreme Court

17  cases in plaintiff's briefs note, it is not necessary to show

18  that treatment of other members of a --

19         THE COURT:  No, it isn't necessary, but you've got

20  to persuade a jury.

21         Do you really think you can do that with 60 percent

22  of the park being Latinos?

23         MR. RAMKUMAR:  We do, Your Honor.

24         THE COURT:  All right.  Good luck.  If I get to that

25  point.  Good luck.

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP    Document 204    Filed 09/05/17    Page 39 of 46 PageID#
5126

39

1          Go ahead.  Let me hear further from you.

2          MR. RAMKUMAR:  Similarly, Your Honor, the fact that

3     there's no record justification or rationale for why the male

4     plaintiffs were required to pay the increased rent and were

5     required to face an increased eviction.

6          So plaintiffs believe that these two pieces of

7     evidence satisfy our burden under the Section 1981 claim.

8          THE COURT:  All right.  And let me ask Mr. Dingman.

9     I don't see any rationale for the increased rent.  Why should

10    these people have to pay increased rent?

11         MR. DINGMAN:  Well, the issue, Your Honor, is when

12    you go to a month-to-month lease, you now have a higher-risk

13    tenant because they're not obligated and you have no agreement

14    that they have to stay for a full year.  So what the

15    defendants did here -- and it's exactly what you were saying

16    earlier, Your Honor.  We didn't immediately throw them out.

17    Had we done that, that would have been used against us.

18         What the evidence shows, and it's undisputed, is

19    that you --

20         THE COURT:  You get sued because you were

21    good-hearted.  Right?

22         MR. DINGMAN:  These women were all given the

23    opportunity --

24         THE COURT:  That's what the jury is going to hear.

25         MR. DINGMAN:  Well, the jury is going to hear that

40

1   there's no evidence that Latinos are targeted or have ever

2   been targeted.  That's the fundamental issue they have to

3   prove for both of these intentional discrimination claims.

4   They haven't given this Court any evidence of that.

5           THE COURT:  Tell me again what the record shows

6   about the ethnicity of your client, the workers?

7           Yours, Mr. Dingman.

8           MR. DINGMAN:  Carolina Easton is a Latina immigrant

9   from Peru.

10          THE COURT:  Who is she now?

11          MR. DINGMAN:  She is -- Josephine Giambanco is the

12  property manager.  Carolina Easton is her immediate

13  supervisor.  And they were both deposed in this case.  She

14  came from Peru.  She's a legal immigrant in this country.

15  She's Latino.  And I can tell you --

16          THE COURT:  Is she a Spanish speaker?

17          MR. DINGMAN:  She is a Spanish speaker.

18          THE COURT:  And who is the other person?

19          MR. DINGMAN:  Josephine Giambanco, who's Italian and

20  who also came to this county and is a legal resident now.

21          And one of the things, Your Honor, always in my mind

22  gets overlooked in this case, Caroline Easton is being told,

23  you discriminate against Latinos, and she herself is Latino.

24          THE COURT:  Save it for the jury.  I'm not moved.

25          MR. DINGMAN:  It shouldn't get to the jury.

1      THE COURT:  Tell me this, who is the head of Waples

2  Mobile Home Park Limited Partnership?

3      MR. DINGMAN:  It's a -- well, there's -- I would

4  probably have to say Mark Jones is the CFO.

5      THE COURT:  Was he deposed?

6      MR. DINGMAN:  Yes, he was.  He was the corporate

7  representative.

8      THE COURT:  All right.  And who made the decision to

9  implement this policy?

10      MR. DINGMAN:  This policy, as the evidence showed,

11  was implemented in 2006.  So it wasn't a policy that was

12  suddenly implemented, as the plaintiff suggests.  The

13  requirement for proof of legal residence has been in place for

14  more than ten years.  And as Mr. Caruso stated in his

15  declaration and report, there are a myriad of reasons for

16  that.  So this is not a sudden policy that was implemented.

17  It's a policy that's been in place for a long time.

18      THE COURT:  Who made the decision to implement the

19  policy?

20      MR. DINGMAN:  At that time it was the managers of

21  the park, and none of them are still with the company.

22      THE COURT:  All right.  And when the policy changed

23  in 2015, who made that decision?

24      MR. DINGMAN:  Well, the policy didn't change.  What

25  was discovered through audits, and we audited everybody, is

1    that we did not have the documentation that was required under

2    the policy.  And so we asked people, not just Latinos, to

3    provide the documentation that was missing.

4              THE COURT:  All right.  Well, the arguments that

5    I've heard -- Mr. Ramkumar, I'll give you the last word here

6    -- but the arguments I've heard have been helpful.

7              Let me hear anything further you have, Mr. Ramkumar.

8              MR. RAMKUMAR:  Just very briefly.  Opposing counsel

9    addressed the increased rent and the conversion of the female

10   and the male plaintiff's leases into month-to-month leases.

11   And he said the reason for that was the increased risk they

12   posed.  But once again, this goes to the pretextual nature of

13   the justifications offered.  There is no record evidence that

14   the male plaintiffs and the female plaintiffs posed any sort

15   of risk while they lived at the park.  And simply because the

16   defendants decided to abruptly begin the recertification

17   process does not make that risk appear.

18             For these reasons and the reason already elucidated

19   in our papers, we believe a 1981 claim can go to a jury.

20             THE COURT:  All right.  Mr. Dingman, you realize

21   that if this matter does go to trial -- I'm going to take the

22   matter under advisement -- but if the matter does go to trial,

23   the jury will not be instructed along the lines of the

24   *McDonnell Douglas*, *Burdine* proof scheme.

25             Instead, the jury will be asked the simple question:

de Reyes v. Waples Mobile

43

1    Do you find -- for example, on the FHA claims -- do you find

2    that the plaintiff has proved by a preponderance of the

3    evidence that the implementation of this policy was caused by

4    an anti-Latino animus; that the ethnic origin of the

5    plaintiffs was the cause of the imposition of the -- or the

6    imposition of the policy on them?  And that -- that's what the

7    jury will have.  To them, it's that simple.

8            But you're aware that it's not going to go through

9    this *McDonnell Douglas*, *Burdine* scheme?

10           MR. DINGMAN:  Yes, I'm aware, Your Honor.  And

11   that's the -- at the end of the day, what the *Hicks* case says

12   is there has to be evidence where a jury can say, you did this

13   to intentionally discriminate against Latinos.  I would ask

14   the Court, what evidence have you heard that demonstrates

15   that?  What you have heard is that the majority of the

16   residents are Latino.  And in request for admissions, all of

17   the plaintiffs say Latinos routinely are able to sign leases.

18   So where is their Latino animus?

19           THE COURT:  All right.  And Mr. Ramkumar, to be true

20   to my offer to have you have the last word, the anti-Latino

21   animus is where, in a sentence?

22           MR. RAMKUMAR:  It is found in the fact that the male

23   plaintiffs, who are legally present in this country, were

24   affected equally by the consequences of the policy.

25           THE COURT:  All right.  Thank you.  I'll take the

de Reyes v. Waples Mobile
Case 1:16-cv-00563-PTG-WBP   Document 204   Filed 09/05/17   Page 44 of 46 PageID#
5131

44

1    matter under advisement.

2            I'll take a brief recess and then I'll take up the

3    Nam matter.

4            MR. SANDOVAL:  Your Honor, respectfully, there's

5    another motion before you today in this matter.

6            THE COURT:  Yes, I do.  This was a motion to do

7    what?  Remind me.

8            MR. SANDOVAL:  To strike the report --

9            THE COURT:  I can't hear you.

10           MR. SANDOVAL:  Excuse me, Your Honor.  Plaintiffs

11   have moved to strike the expert report of defendant's expert.

12           THE COURT:  Oh, yes.  I'm familiar with that.  I'll

13   rule on that on the papers.

14           MR. SANDOVAL:  Thank you, Your Honor.

15           THE COURT:  I thank counsel for your cooperation.

16           MS. ODOM:  Your Honor, I apologize.  The pretrial is

17   also set for right now.

18           THE COURT:  Yes, but I'm not going to set the trial

19   date and do all of those things until I resolve this matter.

20   And then I will have you return.

21           MS. ODOM:  Thank you.

22           THE COURT:  But I appreciate your reminding me of

23   that.  But I don't want to do it until I decide these things.

24   But you're right, it was also scheduled for today.  And I'm

25   glad you reminded me of this other motion which I will rule

1    on.  Thank you.

2              It was nice to see you again, Mr. Ramkumar.

3              MR. RAMKUMAR:  Good to see you too, Your Honor.

4              THE COURT:  You don't look like you've aged very

5    much.

6              MR. RAMKUMAR:  I take that as a compliment.

7              THE COURT:  Court stands in recess.  And then I'll

8    begin with the United States against Nam Hoang.

9

10                  **(Proceedings adjourned at 2:59 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46

<u>CERTIFICATE OF REPORTER</u>

      I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Motions Hearing in the case of the **ROSY GIRON DE REYES, et al versus WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, et al.** Civil Action Number 1:16-CV-563, in said court on the 17th day of February, 2017.

      I further certify that the foregoing 46 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

      In witness whereof, I have hereto subscribed my name, this the August 23, 2017.

_____
Tonia M. Harris, RPR
Official Court Reporter

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA