**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 17-1723**

---

ROSY GIRON de REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLAÑOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; HERBERT DAVID SARAVIA CRUZ,

                Plaintiffs - Appellants,

     v.

WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; A.J. DWOSKIN & ASSOCIATES, INC.,

                Defendants - Appellees.

------------------------

LAURA E. GÓMEZ; IAN HANEY LÓPEZ; MICHAEL A. OLIVAS; STEPHEN PITTI; JOHN D. TRASVIÑA; EVA PLAZA; ELIZABETH JULIAN; GUSTAVO VELASQUEZ,

            Amici Supporting Appellants,

NATIONAL APARTMENT ASSOCIATION,

            Amicus Supporting Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria.  T. S. Ellis, III, Senior U.S. District Judge.  (1:16-cv-00563-TSE-TCB)

---

Argued:  March 21, 2018                Decided:  September 12, 2018

---

Before KEENAN, WYNN, and FLOYD, Circuit Judges.

———————————

Vacated and remanded by published opinion. Judge Floyd wrote the opinion, in which Judge Wynn joined. Judge Keenan wrote a separate dissenting opinion.

———————————

**ARGUED:** Archith Ramkumar, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellants. Terra White Fulham, COVINGTON & BURLING LLP, Washington, D.C., for Amici John D. Trasvina, Eva Plaza, Elizabeth Julian, and Gustavo Velasquez. Michael Sterling Dingman, REED SMITH LLP, McLean, Virginia, for Appellees. **ON BRIEF:** Matthew A. Traupman, New York, New York, Jongwook "Wookie" Kim, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C.; Simon Sandoval-Moshenberg, Angela Ciolfi, Nady Peralta, LEGAL AID JUSTICE CENTER, Falls Church, Virginia, for Appellants. Colin E. Wrabley, M. Patrick Yingling, Pittsburgh, Pennsylvania, Grayson P. Hanes, Justin deBettencourt, REED SMITH LLP, McLean, Virginia, for Appellees. Gregory F. Laufer, Andrew J. Markquart, Andrew Kau, New York, New York, Paul D. Brachman, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., for Amici Laura E. Gomez, Ian Haney Lopez, Michael A. Olivas, and Stephen Pitti. Caroline Brown, Samuel Adriance, COVINGTON & BURLING LLP, Washington, D.C. for Amici John D. Trasvina, Eva Plaza, Elizabeth Julian, and Gustavo Velasquez.

———————————

FLOYD, Circuit Judge:

Four Latino couples who live or lived at Waples Mobile Home Park (the "Park") challenge the Park's policy requiring all occupants to provide documentation evidencing legal status in the United States to renew their leases (the "Policy").  Plaintiffs contend that the Policy violates the Fair Housing Act ("FHA") because it disproportionately ousts Latinos as compared to non-Latinos.  To state an FHA claim under a disparate-impact theory of liability, the plaintiff is required to demonstrate that the challenged practices have a " 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).  Additionally, the plaintiff must demonstrate a robust causal connection between the defendant's policy and the disparate impact.  The district court determined that Plaintiffs failed to make a prima facie case of disparate impact because they failed to show the required causation between the Policy and the disparate impact, and consequently granted Defendants' motion for summary judgment.  For the reasons that follow, we now vacate and remand the district court's judgment.

I.
A.

The Park is owned and operated by several entities:  Waples Mobile Home Park Limited Partnership; Waples Project Limited Partnership; and A.J. Dwoskin & Associates, Inc. (collectively, "Waples" or "Defendants").  Waples leases approximately 150 lots in Fairfax, Virginia, on which tenants park their mobile homes, and Waples

serves as landlord for the Park.  As part of its leasing and annual lease renewal policies, Waples requires all individuals who live at the Park to present either (1) an original Social Security card, or (2) an original (foreign) Passport, original U.S. Visa, and original Arrival/Departure Form (I-94 or I-94W), which together evince legal status in the United States.[1]  Under the Policy, tenants who have one or more occupants who do not provide the required documentation will not have their leases renewed and are subject to eviction. Waples asserts that the Policy is necessary to confirm lease applicants' identities, to perform credit and criminal background checks, to minimize loss from eviction, to avoid potential criminal liability for harboring illegal aliens, and to underwrite leases.

Previously, Waples only enforced this Policy against the leaseholder.  In mid-2015, however, Waples started requiring this documentation for all occupants over the age of eighteen.  When one or more occupants had not complied with the Policy, Waples provided notice that the leaseholder had 21 days from receipt of the notification to cure the violation, or 30 days from receipt to vacate the Park.  These notifications were addressed to the entire household, including tenants who had complied with the policy. Waples also converted these leases to month-to-month leases, and charged leaseholders an additional $100 for each month a non-complying tenant had not vacated the lot, which Waples increased on June 1, 2016, to a $300 per month surcharge.

Plaintiffs are four couples who live or lived in the Park with their children:  Jose

---

[1] Waples later updated this policy to allow tenants to provide other documents to demonstrate legal presence, including a permanent resident card (Form I-551 or I-151), temporary resident card (Form I-688A), or border crossing card.

Dagoberto Reyes and Rosy Giron de Reyes (the "Reyes family"); Felix Alexis Bolaños and Ruth Rivas (the "Bolaños family"); Esteban Ruben Moya Yrapura and Yovana Jaldin Solis (the "Yrapura family"); and Herbert David Saravia Cruz and Rosa Elena Amaya (the "Saravia Cruz family"). Plaintiffs are all non-citizen Latinos of Salvadorian or Bolivian national origin. The four male plaintiffs each have a Social Security number and have provided documentation to satisfy the Policy, and the ten children living with Plaintiffs are each U.S. citizens, but the four female plaintiffs cannot satisfy the Policy because each female plaintiff is an illegal immigrant.

When the male plaintiffs initially leased a lot in the Park, three of the female plaintiffs were not listed on the lease applications, despite the requirement to list all adult tenants on the application. The male plaintiffs had each renewed their year-long leases without complying with the Policy, though Waples knew at least some of the female plaintiffs were living in the Park. In mid-2015, when Waples began enforcing the Policy's requirement that all adult tenants provide the required documentation, the four female plaintiffs attempted to use alternative methods to comply with the Policy, including providing their U.S. government-issued Individual Taxpayer Identification Numbers ("ITINs"),[2] which Plaintiffs alleged can be used to run background checks and credit reports. Waples declined to accept any alternative forms of identification.

---

[2] The IRS issues ITINs to all income-earning U.S. taxpayers who are ineligible to obtain a Social Security number, irrespective of immigration status. Before issuing an ITIN, the IRS requires IRS Form W-7, a copy of the individual's tax return, and proof of identity.

In March 2014, Waples notified the Reyes family that Rosy Reyes needed to comply with the Policy, but permitted the Reyes family to renew their one-year lease without complying.  In March 2015, at the expiration of the lease, Waples notified the Reyes family that they would be placed on a month-to-month lease and be subject to a $100 per month surcharge for non-compliance with the Policy.  In early 2016, Waples sent notifications and placed the Yrapura, Saravia Cruz, and Bolaños families on month-to-month leases with a $100 per month surcharge for non-compliance with the Policy. Waples later sent all Plaintiffs notification that the monthly surcharge would increase to $300, but agreed not to charge or collect this increase during the pendency of this litigation.

At the time of filing the Complaint, only one Plaintiff couple had vacated the Park under threat of eviction; the other three Plaintiff couples continued to reside at the Park but feared eviction.  By the time Plaintiffs filed their cross-motion for summary judgment, three Plaintiff families had been forced to move out of the Park because of threats of eviction and rent increases, and the remaining family was facing eviction but had not yet moved.

## B.

Plaintiffs commenced this lawsuit on May 23, 2016, by filing a six-count complaint, including a claim under the FHA, 42 U.S.C. § 3604, which is the only claim involved in this appeal.  As relevant to the procedural posture of this case, an FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial,

or appellate stages. *See Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 709, 711, 711 n.6 (4th Cir. 1979). Under a disparate-treatment theory of liability, a "plaintiff must establish that the defendant had a discriminatory intent or motive," whereas "a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 135 S. Ct. at 2513 (internal quotation marks omitted). Under the disparate-impact theory, the plaintiff must also demonstrate a causal connection between the defendant's policy and the statistical disparity. *Id.* at 2523.

In their Complaint, Plaintiffs alleged that Waples' Policy violates the FHA because it "is disproportionately ousting Hispanic or Latino ('Latino') families from their homes and denying them one of the only affordable housing options in Fairfax County, Virginia." J.A. 27. To support their argument, Plaintiffs provided statistical evidence of the "strong link [] between the undocumented immigrant population and the Latino population" to demonstrate that "a policy that adversely affects the undocumented immigrant population will likewise have a significant disproportionate impact on the Latino population." J.A. 39. These statistics included that Latinos constitute 64.6% of the total undocumented immigrant population in Virginia, and that Latinos are ten times more likely than non-Latinos to be adversely affected by the Policy, as undocumented immigrants constitute 36.4% of the Latino population in Virginia compared with only 3.6% of the non-Latino population. Plaintiffs sought declaratory and injunctive relief, compensatory and punitive damages, fees, and other relief deemed appropriate.

Waples filed a partial motion to dismiss several counts in the Complaint pursuant

7

to Federal Rule of Procedure 12(b)(6), including the FHA claim. The district court denied the motion to dismiss as it related to the FHA claim. In its memorandum opinion, the district court stated that "the allegations in their Complaint are sufficient to state a claim under the FHA." J.A. 165. It went on to state, however, that "[a]lthough plaintiffs cannot rely solely on disparate impact to prove causation, they may use evidence of disparate impact to help prove that the Policy discriminates 'because of' race or national origin," and may use such evidence "to show that the apparently neutral Policy is in fact a pretext for intentional racial or national origin discrimination against plaintiffs." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). In so doing, the district court seemed to suggest that Plaintiffs' FHA claim should continue under a disparate-treatment theory, rather than the disparate-impact theory Plaintiffs had argued. *See Wright*, 609 F.2d at 711 n.6 (noting that a trial court, in response to a motion to dismiss, may determine that either theory of liability is unsupported by the evidence, effectively allowing the claim to continue only under one theory of liability). In response to the denial of the motion to dismiss the FHA claim, Waples filed a motion for reconsideration, which the district court denied.

The parties then conducted months of discovery. Eventually, Waples moved for summary judgment on the FHA claim. In its motion, Waples addressed the FHA claim under both a disparate-impact theory of liability and a disparate-treatment theory of liability. In response, Plaintiffs opposed Waples' motion for summary judgment on their FHA claim under the disparate-treatment theory, and filed a cross-motion for summary judgment on the FHA claim under the disparate-impact theory. To support their cross-

motion for summary judgment, Plaintiffs submitted evidence that Latinos are nearly twice as likely to be undocumented compared to Asians, and twenty times more likely to be undocumented than other groups. They also submitted evidence that 60% of the tenants at the Park were Latino, and that eleven of the twelve tenants at the Park who were not in compliance with the Policy as of May 2016, or 91.7%, were Latino.

On February 21, 2017, the district court denied as moot the cross-motions for summary judgment as to the FHA claim under the disparate-impact theory, explaining that the "disparate impact claims [] failed to survive the Rule 12(b)(6) stage . . . ."  J.A. 1099 (describing *de Reyes v. Waples Mobile Home Park Ltd. P'ship*, No. 1:16-cv-563 (E.D. Va. Feb. 21, 2017) (Order)).  During the motions hearing on the cross-motions for summary judgment, the district court further explained:

> As you all know, I disposed of disparate impact at the motion to dismiss stage. . . . I held explicitly that disparate impact could not be used to satisfy the causation requirement here, because to do so . . . would effectively erase the causation requirement.   But I went on to say that disparate impact . . . could be used to help show disparate treatment in addition to other proof to meet the plaintiff's burden of demonstrating causation. . . . So I would think that the motion for summary judgment on that ground should be denied as moot.

J.A. 1149–50.  On April 18, 2017, the district court granted Waples' motion for summary judgment as to the FHA claim, and its memorandum opinion makes it clear that in doing so, the district court only considered the FHA claim under the disparate-treatment theory of liability.  *See de Reyes v. Waples Mobile Home Park Ltd. P'ship*, 251 F. Supp. 3d 1006, 1013 (E.D. Va. 2017) (starting its analysis by stating that "Defendants have moved for summary judgment on plaintiffs' disparate treatment claims under the FHA"); *id.* at

1013 n.8 ("Thus, after full briefing and argument at the threshold stage, plaintiffs' housing discrimination claims were permitted to proceed as disparate *treatment* claims, and plaintiffs were further permitted to use evidence of disparate impact to support an inference of intentional discrimination." (emphasis in original)).

On appeal, Plaintiffs contend that the district court erred in granting Waples' motion for summary judgment on the FHA claim. Moreover, Plaintiffs argue that the district court erred in concluding that their FHA claim could not continue past the motion to dismiss stage under a disparate-impact theory of liability and thus erred in failing to substantively address this theory in considering the cross-motions for summary judgment. Plaintiffs do not argue that the FHA claim should have survived the motion for summary judgment under a disparate-treatment theory of liability and, thus, we decline to address this theory of liability for Plaintiffs' FHA claim.

## II.

On appeal, the overarching question is whether the district court erred in granting Waples' motion for summary judgment on the FHA claim, which constitutes the legal action that prompted this appeal. But because the district court premised its grant of summary judgment on the fact that it had dismissed Plaintiffs' disparate-impact theory at the Rule 12(b)(6) stage and held that Waples was entitled to summary judgment under the disparate-*treatment* theory, our inquiry is more complicated. First, we must determine whether the district court erred in functionally dismissing Plaintiffs' disparate-impact theory at the motion to dismiss stage. Then, we must determine whether the district court

10

erred in granting Waples' motion for summary judgment on the FHA claim because it did not consider Plaintiffs' disparate-impact theory of liability at this stage. We now hold that the district court erred on both occasions.

A.

We review a district court's ruling on a motion to dismiss de novo. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). A complaint survives a Rule 12(b)(6) motion to dismiss when it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). On review, "we must assume all well-pled facts to be true," and "draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet*, 591 F.3d at 253 (citations & internal quotation marks omitted).

We also review a district court's grant of summary judgment de novo. *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "We apply the same legal standards as the district court while

11

viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Lawson*, 828 F.3d at 247 (internal quotation marks omitted).

## B.

We first examine whether the district court erred in dismissing Plaintiffs' disparate-impact theory of liability at the motion to dismiss stage on the grounds that they failed to show the required causality between the Policy and the disparate impact on Latinos. The FHA provides that it shall be unlawful

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a).[3] In *Inclusive Communities*, the Supreme Court confirmed that disparate-impact claims are cognizable under the FHA. 135 S. Ct. at 2525; *see also Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982). In general, "a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 135 S. Ct. at 2513 (internal quotation marks omitted).

---

[3] We need not decide whether discrimination against Latinos is discrimination on the basis of race, national origin, or both; it is sufficient that we agree that Latinos are a protected class under the FHA. *See, e.g.*, *Keller v. City of Fremont*, 719 F.3d 931, 948 (8th Cir. 2013) (acknowledging that Latinos are a protected class under the FHA); *see also Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) ("Most courts have assumed that Hispanics [and Latinos] constitute a 'protected class' [under Title VII] but without saying whether that protection derives from race or national origin." (citation omitted)).

In *Inclusive Communities*, the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework.[4]  Under the first step, the plaintiff must demonstrate a robust causal connection between the

---

[4]  In 2013, the Secretary of the U.S. Department of Housing and Urban Development ("HUD") issued a regulation interpreting disparate-impact liability under the FHA and detailing a three-step, burden-shifting framework to analyze these claims. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 24 C.F.R. § 100.500 (2014); *see also Inclusive Communities*, 135 S. Ct. at 2514–15.  The HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities*, and indeed, some courts believe the Supreme Court implicitly adopted the HUD framework altogether.  *See, e.g.*, *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach . . . ."); *Crossroads Residents Organized for Stable & Secure ResiDencieS v. MSP Crossroads Apartments LLC*, No. 16-233 ADM/KMM, 2016 WL 3661146, at *6 (D. Minn. July 5, 2016) (explaining that *Inclusive Communities* "announced several 'safeguards' to incorporate into [HUD's] burden-shifting framework," including a "robust causality requirement" at the prima facie stage and "leeway" when the burden shifts to the defendant to explain the interests served by the policies).  Without deciding whether there are meaningful differences between the frameworks, we note that the standard announced in *Inclusive Communities* rather than the HUD regulation controls our inquiry.  Under the HUD regulation, however,

> a plaintiff first must make a prima facie showing of disparate impact.  That is, the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."  24 CFR § 100.500(c)(1) (2014).  If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability.  After a plaintiff does establish a prima facie showing of disparate impact, the burden shifts to the defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  § 100.500(c)(2). . . .  Once a defendant has satisfied its burden at step two, a plaintiff may "prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  § 100.500(c)(3).

*Inclusive Communities*, 135 S. Ct. at 2514–15.

defendant's challenged policy and the disparate impact on the protected class. *Id.* at 2523 (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 653 (1989)), *superseded by statute as stated in Inclusive Communities*, 135 S. Ct. 2507. Under the second step, the defendant has the burden of persuasion to "state and explain the valid interest served by their policies." *Id.* at 2522 (stating that this step is analogous to Title VII's business necessity standard). Under the third step of the framework, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect." *Id.* at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).

In holding that disparate-impact claims were cognizable under the FHA using this framework, the Supreme Court emphasized that courts should only use disparate-impact claims to " 'remov[e] [] artificial, arbitrary, and unnecessary barriers,' " rather than "displace valid governmental and private priorities . . . ." *Id.* at 2524 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Supreme Court expressed that adequate safeguards must be implemented at the prima facie stage to avoid hailing defendants into court for racial disparities they did not create and to prevent governmental and private entities from using numerical quotas to avoid disparate-impact challenges based solely on racial disparities—a practice it acknowledged that disparate-impact liability is intended to protect *against*, and a practice which would itself raise serious constitutional questions. *Id.* at 2523.

As one safeguard to ensure that disparate-impact claims would be properly limited, the Supreme Court focused on the plaintiff's need to demonstrate a "robust

14

causality requirement" under the first step of the framework in order to state a prima facie disparate-impact claim.  *See id.*  Understanding this robust causality requirement is at the crux of this appeal.  Here, in dismissing Plaintiffs' disparate-impact theory, the district court concluded that Plaintiffs failed to make a prima facie case of disparate impact because they failed to satisfy the FHA's causation requirement, asserting that Plaintiffs did not show that the Policy was instituted " 'because of' race or national origin[.]"  J.A. 162.[5]  We disagree.

To establish causation in a disparate-impact claim, "[t]he plaintiff must begin by identifying the specific [] practice that is challenged."  *Wards Cove*, 490 U.S. at 656 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).  The plaintiff must also "demonstrate that the disparity they complain of is the result of one or more of the [] practices that they are attacking . . . , specifically showing that each challenged practice has a significantly disparate impact" on the protected class.  *Id.* at 657.  In other

---

[5] Plaintiffs also argue that the district court erroneously concluded that they were "unable to state an FHA disparate impact claim because the Policy was not a 'remnant[] of the country's tragic and regrettable history of state-sanctioned intentional discrimination[.]' "  Appellants' Br. 4–5 (alteration in original) (quoting J.A. 158); *see also* J.A. 159–60 (district court stating that "disparate impact theory is properly used to ferret out long-entrenched discrimination against historically disadvantaged groups," and that cases historically applying disparate impact theory are "very different from the context presented in this case").  We decline to specifically address this argument, but note that the burden-shifting framework for analyzing FHA claims under a disparate-impact theory, as described in *Inclusive Communities*, does not require an assessment of the historical discrimination of a group or a policy.  *See Inclusive Communities*, 135 S. Ct. at 2518–20; *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 988 (1988) ("We have not limited [disparate-impact claims] to cases in which the challenged practice served to perpetuate the effects of pre-[Title VII] intentional discrimination.").

words, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 135 S. Ct. at 2523. Additionally, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion [complained of] because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Watson*, 487 U.S. at 994–95.

"A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Communities*, 135 S. Ct. at 2523. "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (alterations in original) (quoting *Wards Cove*, 490 U.S. at 653); *see also Wards Cove*, 490 U.S. at 657 (stating that a racial imbalance alone is insufficient to make a prima facie case of disparate impact under Title VII). Additionally, in *Inclusive Communities*, the Supreme Court hypothesized several situations in which it may be difficult for a plaintiff to demonstrate the required causal connection between the defendant's offending policy and the statistical disparity: (1) when a one-time decision rather than a *policy* is challenged; (2) when federal law "substantially limit[ed] the [defendant's] discretion" in creating the policy; and (3) when "multiple factors [went] into investment decisions about where to construct or renovate

16

housing units." 135 S. Ct. at 2523–24.

The Supreme Court's opinion in *Wards Cove* provides a clear example of *Inclusive Communities*' robust causality requirement.[6]  In *Wards Cove*, the Supreme Court concluded that the Ninth Circuit erred in holding that plaintiffs had made out a prima facie case of disparate impact under Title VII using evidence that the percentage of salmon cannery workers in "noncannery jobs" (generally skilled) who were non-white was significantly lower than the number of workers in "cannery jobs" (unskilled) who were non-white, as this only demonstrated that a racial imbalance existed between the two jobs without demonstrating how a specific policy caused a racial imbalance in either job.  490 U.S. at 655.  The Supreme Court explained that a racial imbalance in the proportion of non-white workers hired for a position likely would not be considered a disparate impact on non-white workers as long as the proportion of non-white workers hired was similar to the proportion of non-white workers qualified for the job, and "[a]s long as there are no barriers or practices deterring qualified nonwhites from applying . . . ."  *Id.* at 653.  Expounding the Supreme Court's explanation into a more

---

[6] Although *Wards Cove* analyzes a Title VII disparate-impact claim, *Inclusive Communities* cited to *Wards Cove* in explaining the robust causality requirement. *Inclusive Communities*, 135 S. Ct. at 2523; *Wards Cove*, 490 U.S. at 645.  The Supreme Court also expressly stated that it used "[t]he cases interpreting Title VII . . . [to] provide essential background and instruction" in deciding *Inclusive Communities*, based on the similar language and anti-discrimination purposes in these Acts, and the short time period between the passage of each.  *Id.* at 2518–19.  *Inclusive Communities* also expressly acknowledged that its FHA burden-shifting framework closely resembles the Title VII framework for disparate-impact claims.  *See id.* at 2523; *see also Wards Cove*, 490 U.S. at 656–61 (describing the Title VII framework for disparate-impact claims).

concrete example, there would likely be no prima facie case of a disparate impact on non-whites if 5% of the workers were non-white as long as approximately 5% of the qualified applicants were non-white.  It is irrelevant to the disparate-impact analysis, then, that 5% of the workforce was non-white and 95% of the workforce was white—a bare statistical discrepancy—if the plaintiff cannot identify a specific policy or practice that caused the discrepancy.  "To hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.' " *Id.* at 657 (quoting *Watson*, 487 U.S. at 992).  The Supreme Court opined, for example, that in this example, the discrepancy may have been due to a dearth of qualified non-white applicants. *Id.* at 651.

Although this Court has not had occasion to address an FHA disparate-impact claim since *Inclusive Communities*, other courts have.  In *Mhany Management, Inc. v. County of Nassau*, for example, the Second Circuit analyzed a disparate-impact claim in accordance with *Inclusive Communities* and affirmed that the plaintiffs "more than established a prima facie case" that a rezoning decision had a disparate impact on minorities because the original rezoning proposal "would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted . . . ."  819 F.3d 581, 607, 620 (2d Cir. 2016).  The plaintiffs thus demonstrated that the specific rezoning policy disproportionately decreased the availability of housing for minorities as compared to whites, thereby satisfying the robust causality requirement to state a prima facie case of disparate impact. *See id.* at 619–20; *see also City of L.A. v. Bank of Am. Corp.*, 691 F.

18

App'x 464, 465 (9th Cir. 2017) (affirming that plaintiffs failed to prove robust causality because the defendant's policies of marketing toward low-income borrowers and incentivizing loan officers to issue high-amount loans "would affect borrowers equally regardless of race"); *Binns v. City of Marietta Ga., (Hous. Choice Voucher Program)*, 704 F. App'x 797, 802 (11th Cir. 2017) (affirming dismissal of FHA disparate impact claim because the plaintiff "provided no comparative data, statistical or otherwise, to show that elderly and disabled participants are disproportionately impacted by the City's policy"); *Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (affirming dismissal of FHA disparate impact claim because "[t]he complaint failed to allege facts suggesting that the [policy] affected a greater proportion of disabled individuals than non-disabled"); *Crossroads Residents Organized for Stable & Secure ResiDencieS v. MSP Crossroads Apartments LLC*, No. 16-233 ADM/KMM, 2016 WL 3661146, at *7–*8 (D. Minn. July 5, 2016) (stating that disparate impact is commonly shown in cases challenging a landlord's rental policy by "alleg[ing] that tenants at the complex harmed by Defendants' actions are disproportionately protected class members," and that allegations that the defendant's policies are the reason the plaintiffs are unable to remain at the complex present a straightforward causation argument); *Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 412–13 (Mass. 2016) (stating that the plaintiffs' allegations failed to meet the robust causality requirement because they "have not shown that the

defendant's decision not to renew their [subsidized housing contract] has resulted in a disproportionately negative impact on members of protected classes").[7]

Additionally, several of this Court's pre-*Inclusive Communities* FHA disparate-impact cases are consistent with this robust causality requirement and, as their holdings are still good law, we find them helpful in our analysis. In *Betsey v. Turtle Creek Associates*, for example, this Court reversed the district court's conclusion that the plaintiffs had failed to make a prima facie case of disparate impact. 736 F.2d at 988. The plaintiffs alleged that an apartment complex's institution of an all-adult rental policy had a disparate impact on non-whites in violation of the FHA, and introduced statistical evidence that 54.3% of non-white tenants received termination notices compared with 14.1% of white tenants, and that 68.3% of the tenants with children were non-white. *Id.* at 984, 988. This Court held that these statistics made the disparate impact of the policy "self-evident," and were sufficient to make a prima facie case of an FHA violation. *Id.* at 988. Essentially, plaintiffs had demonstrated that the specific policy of evicting tenants

---

[7] Some pre-*Inclusive Communities* cases also described the causality requirement in a way that parallels our understanding of robust causality post-*Inclusive Communities*. *See, e.g.*, *Keller*, 719 F.3d at 948 (stating that in order to prove a disparate-impact violation of the FHA, "a plaintiff must first establish a prima facie case, that is, that the objected-to action results in, or can be predicted to result in, a disparate impact upon a protected class compared to a relevant population as a whole." (internal quotation marks omitted)); *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011) (analyzing an FHA disparate-impact claim and explaining that "[i]n order to determine whether action of this sort was 'because of race' we look to see if it had a racially discriminatory effect, i.e., whether it disproportionately burdened a particular racial group so as to cause a disparate impact." (citations & internal quotation marks omitted)).

with children caused the protected class to be disproportionately evicted from the apartment complex, demonstrating robust causality sufficient to state a prima facie claim of disparate impact. *See also Crossroads Residents*, 2016 WL 3661146, at *7 (citing the statistical analysis in *Betsey*, 736 F.2d 983, as an example of how to show a disparate impact on a protected class).

Similarly, in *Smith v. Town of Clarkton*, this Court concluded that the plaintiff proved a disparate-impact claim under "any common sense analysis" by proving that the defendants' termination of a public housing project disparately impacted the black citizens of the county when the removal of low income housing in the county fell 2.65 times more harshly on the black population, and when the black population had the highest percentage of presumptively eligible applicants. 682 F.2d at 1064–66. Thus, the plaintiffs had demonstrated that the specific practice of terminating the public housing project caused affordable housing for the protected class to be disproportionately decreased.

Here, the Policy requires all occupants above the age of eighteen to provide documentation evidencing legal status, and failure to comply results in termination of the lease with Waples and eviction. In their Complaint, Plaintiffs alleged that this particular policy violates the FHA because it "is disproportionately ousting Hispanic or Latino ('Latino') families from their homes and denying them one of the only affordable housing options in Fairfax County, Virginia." J.A. 27. In their Complaint, Plaintiffs provided statistical evidence that Latinos constitute 64.6% of the total undocumented immigrant population in Virginia, and that Latinos are ten times more likely than non-

Latinos to be adversely affected by the Policy, as undocumented immigrants constitute 36.4% of the Latino population compared with only 3.6% of the non-Latino population. Based on this evidence, Plaintiffs asserted that "a policy that adversely affects the undocumented immigrant population will likewise have a significant disproportionate impact on the Latino population." J.A. 39.

At the motion to dismiss stage, we must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. *See Nemet Chevrolet*, 591 F.3d at 253. Therefore, accepting these statistics as true, we conclude that Plaintiffs sufficiently alleged a prima facie case of disparate impact. Plaintiffs satisfied step one of the *Inclusive Communities* framework by demonstrating that Waples' Policy of evicting occupants that are unable to provide documentation of legal status in the United States caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy. Notably, the evidence did not merely allege that Latinos would face eviction in higher numbers than non-Latinos. Instead, Plaintiffs satisfied the robust causality requirement by asserting that the specific Policy requiring all adult Park tenants to provide certain documents proving legal status was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park.[8]

---

[8] The dissent implies that we should only consider whether Latino tenants who were undocumented immigrants were disproportionately impacted by the Policy as compared to non-Latino tenants who were undocumented immigrants. *See* Dissenting Op. at 33–34. We disagree. Plaintiffs alleged that the Policy requiring that *each occupant* provide certain documentation created a disparate impact on Latino occupants

Accordingly, we now hold that Plaintiffs have made a prima facie case that Waples' Policy disparately impacted Latinos in violation of the FHA, satisfying step one of the disparate-impact analysis, and that the district court therefore erred in concluding otherwise.

## C.

We also take this opportunity to correct the district court's grievous error in concluding that the female Plaintiffs' legal status precluded them from making a prima facie showing of disparate impact, which is a misinterpretation of the robust causality requirement described in *Inclusive Communities*. In determining that Plaintiffs were unable to demonstrate robust causality, the district court stated that "it is undisputed that the female plaintiffs are unable to satisfy the Policy—and prove legal presence in the United States—not *because of* their race or national origin, but because they are, in fact, unlawfully present in the country." J.A. 1080 (emphasis added). The district court continued:

> In the instant case, the disparate impact on plaintiffs *as Latinos* is incidental to the Policy's effect on all illegal aliens. That is, a disparate impact exists as to Latinos because Latinos have chosen in greater numbers than any other group to enter the United States illegally. . . . [I]t cannot fairly be said . . . that a policy targeting illegal aliens and thereby disproportionately making housing unavailable to a class of Latinos does so "because of race . . . or national origin."

------------------------------------------------

in the Park. Based on Plaintiffs' challenge to this Policy, then, we must compare whether Latinos that are subject to the Policy—i.e., Latino tenants at the Park—are disproportionately impacted by the Policy as compared to non-Latinos that are subject to the Policy—i.e., non-Latino tenants at the Park.

J.A. 163 (quoting 42 U.S.C. § 3604(a)); *see also* J.A. 156 ("[A]llowing plaintiffs in this case to satisfy the FHA's causation element simply by proving that the Policy disparately impacts Latinos would effectively eliminate the statute's 'because of' requirement, as essentially any policy aimed at illegal aliens will have a disproportionate effect on Latinos."); J.A. 1152 ("The fact that [Plaintiffs are] illegal is what's at the heart of [this] case.").

In essence, the district court posits that courts should reject a disparate-impact claim if the plaintiff is impacted by the allegedly discriminatory policy for reasons that are distinct from the plaintiff's inclusion in a protected class, even if the protected class is disparately impacted by the challenged policy. Here, for example, even though the district court seemed to admit that Latinos *are* disparately impacted by the Policy, the district court dismissed the disparate-impact claim because the female plaintiffs were impacted by the Policy because they are illegal immigrants, which is distinct from their identity as Latinos (a protected class).

The district court's view threatens to eviscerate disparate-impact claims altogether, as this view could permit any facially neutral rationale to be considered the primary *cause* for the disparate impact on the protected class and break the robust link required between the challenged policy and the disparate impact. Thus, the district court's view of causation would seem to require an *intent* to disparately impact a protected class in order to show robust causality, thereby collapsing the disparate-impact analysis into the disparate-treatment analysis. *See Inclusive Communities*, 135 S. Ct. at 2513

(distinguishing intent-based disparate-treatment cases from effect-based disparate-impact cases).    This goes far beyond the "robust causality" requirement the Supreme Court described.  *Id.* at 2523; *see also id.* at 2522 (cautioning courts to *properly* limit disparate-impact claims).

This interpretation of the causation requirement would undermine the very purpose of disparate-impact claims to "permit[] plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment" and "prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping."  *Id.* at 2522.  If we adopted the district court's understanding of robust causality, for example, we would have dismissed the claim in *Betsey* by reasoning that the fact that the plaintiffs *had children* is what actually *caused* them to receive the termination notice, and that therefore any disparate impact on the plaintiffs as non-white tenants was merely incidental to the policy's effect on all parents.  736 F.2d at 988.  In other words, the district court would have us conclude that the disparate impact of the termination notices on non-white tenants existed because non-whites chose in greater numbers to have children, and therefore that their disparate-impact claim is foreclosed. Applying this logic to *Smith*, and parroting the district court's language, we would have similarly held that "it is undisputed that the plaintiffs are unable to obtain housing in the county not *because of* their race, but because they are, in fact, poor and unable to afford the available housing," and thus that "it cannot be fairly said that a policy terminating a public housing project and thereby disproportionately making housing unavailable to a class of the black population does so 'because of race.' "  *See* J.A. 163; *see also* 682 F.2d

at 1064–66.  This is plainly incorrect.

Rather, determining whether a plaintiff made a prima facie case of disparate-impact liability requires courts to look at whether a protected class is disproportionately *affected* by a challenged policy.  *See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 383–84 (3d Cir. 2011) (describing the error in conflating disparate-treatment with disparate-impact claims).  This is so because in disparate-impact cases, "[e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme."  *Id.* at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976)); *Griggs*, 401 U.S. at 432 (describing disparate-impact claims as addressing the consequences of challenged practices, not simply the motivation).  The extra step of determining whether such a practice that has a disparate impact on a protected class is *justified* is properly contained in steps two and three of the burden-shifting framework.  *See Watson*, 487 U.S. at 996–98 (describing the framework's constraints on the application of disparate-impact theory).

Moreover, the district court's approach conflicts with the approach taken by the Supreme Court, Congress, and the U.S. Department of Housing and Urban Development ("HUD") in similar circumstances.  First, the Supreme Court confronted a materially indistinguishable factual scenario, albeit under Title VII and not the FHA, and indicated that these facts would create a valid disparate-impact claim.  *See Inclusive Communities*, 135 S. Ct. at 2518 (describing Title VII disparate-impact cases as "provid[ing] essential background and instruction" in deciding *Inclusive Communities*).  In *Espinoza v. Farah Manufacturing Co.*, the Supreme Court considered a resident alien's Title VII challenge

26

alleging that an employer's policy of not hiring aliens amounted to discrimination against her because of her national origin of Mexico.  414 U.S. 86, 87 (1973), *superseded by statute on other grounds as stated in Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936 (7th Cir. 2012).  The Supreme Court stated that

> [c]ertainly Tit. VII prohibits discrimination on the basis of citizenship *whenever it has the purpose or effect of discriminating on the basis of national origin*.  "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation."

*Id.* at 92 (emphasis added) (quoting *Griggs*, 401 U.S. at 431).  In *Espinoza*, the Supreme Court looked past the hiring policy's facial discrimination against non-citizens to determine whether the policy disparately impacted Mexicans, ultimately concluding it did not, because 97% of employees doing the work for which the plaintiff applied, and 96% of all employees in the San Antonio division, were of Mexican ancestry.  *Id.* at 93.  The same cannot be said of our facts here, where Plaintiffs allege that the Policy that overtly discriminates based on citizenship *also*—in operation—discriminates based on race and national origin, in violation of the FHA.

The FHA Amendments also discredit the district court's approach.  *See* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6, 102 Stat. 1619, 1622–23; *see also Inclusive Communities*, 135 S. Ct. at 2520–21 (describing the FHA Amendments).  For example, Congress amended the FHA to provide a specific exemption from liability for exclusionary practices aimed at individuals with drug convictions.  42 U.S.C. § 3607(b)(4).  Despite that certain drug convictions are correlated with sex and race—both protected classes under the FHA—this exemption ensures that

27

disparate-impact liability will not attach if a landlord excludes tenants with such convictions, even if a plaintiff could prove the exclusionary policy disparately impacted a protected class. *Id.*; *see also Inclusive Communities*, 135 S. Ct. at 2521 (explaining that the FHA Amendments constrain disparate-impact liability for certain criminal convictions that are correlated with sex and race); *Kimbrough v. United States*, 552 U.S. 85, 98 (2007) (discussing the racial disparity in convictions for crack cocaine offenses).[9] Here, the district court acknowledged that being an illegal immigrant, at least at this time in Virginia, correlates with being Latino (a protected class), which parallels the correlation between certain drug convictions and race and sex (protected classes). Notably, however, there is no exemption for liability under the FHA for policies aimed at illegal immigrants. Consequently, in the absence of a specific exemption from liability for exclusionary practices aimed at illegal immigrants, we must infer that Congress intended to permit disparate-impact liability for policies aimed at illegal immigrants when the policy disparately impacts a protected class, regardless of any correlation between the two. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (citing *Cont'l Cas. Co. v. United States*, 314 U.S. 527, 533 (1942))).

---

[9] The other two relevant amendments relate to restrictions regarding the maximum number of occupants permitted to occupy a dwelling, and allowing an appraiser to consider factors other than race, color, religion, national origin, sex, handicap, or familial status. *See* 42 U.S.C. §§ 3605(c), 3607(b)(1); *see also Inclusive Communities*, 135 S. Ct. at 2520.

Similarly, HUD, the agency with the authority to interpret, administer, and enforce the FHA, signaled that disparate-impact claims may arise under circumstances in which the challenged policy, on its face, relates to conduct that was not protected under the FHA, but which may correlate with a protected class. For example, HUD stated that "[a] requirement involving citizenship or immigration status will violate the [FHA] when it has the purpose or unjustified effect of discriminating on the basis of national origin." *See* HUD Office of General Counsel, Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency 3 (Sept. 15, 2016) (internal quotation marks omitted).[10] HUD, thus, counsels that Plaintiffs' disparate impact claim is not precluded simply because the female Plaintiffs cannot satisfy the Policy because they are illegal immigrants when they have alleged that the Policy disparately impacts Latinos.

Consequently, we believe the district court seriously misconstrued the robust causality requirement described in *Inclusive Communities* and erroneously rejected Plaintiffs' prima facie claim that Waples' Policy disparately impacted Latinos.

### D.

In the ordinary case, once the Court has concluded that the plaintiffs established a prima facie showing of disparate impact, as we have done here, the Court then reviews

---

[10] Waples argues that the HUD regulation and guidance conflict with *Inclusive Communities* and thus cannot be relied upon, specifically noting that *Inclusive Communities* refers to a "robust" causality requirement. 135 S. Ct. at 2523. We disagree. To the extent the two conflict, *Inclusive Communities* controls, but we also afford the HUD regulation and guidance the deference it deserves. *See, e.g.*, *Griggs*, 401 U.S. at 433–34 (stating that the EEOC's interpretations of Title VII, as the enforcing agency of Title VII, was "entitled to great deference").

whether the defendants met their burden under step two of the burden-shifting disparate-impact analysis to "state and explain the valid interest served by their policies." *Inclusive Communities*, 135 S. Ct. at 2522. Because the district court concluded that Plaintiffs failed to make a prima facie case of an FHA violation under a disparate-impact theory at the motion to dismiss stage, it never considered this second step. Similarly, the district court never considered the third and final step in the burden-shifting analysis, which would have allowed Plaintiffs to "prov[e] that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).

In such circumstances, it is prudent for this Court to remand to the district court for consideration of these issues in the first instance. *See Betsey*, 736 F.2d at 988–89. (remanding for further consideration after holding that the district court erred in concluding that the plaintiffs had not established a prima facie case of discriminatory impact). Here, even though the district court failed to fully analyze Plaintiffs' disparate-impact theory at the motion to dismiss stage, this appeal is before us as a challenge to the district court's grant of Waples' motion for summary judgment. Consequently, because the district court concluded that the FHA claim survived the motion to dismiss stage, and because we conclude that Plaintiffs' submitted sufficient evidence of a prima facie case of disparate impact, the district court should have addressed the FHA claim under the

disparate-impact theory of liability at the motion for summary judgment stage.[11]   *See Wright*, 609 F.2d at 710–11 (stating that both theories can be analyzed by the trier of fact as alternative grounds of relief if sufficiently supported by evidence).

Therefore, we vacate the district court's grant of Waples' motion for summary judgment on the FHA claim and remand to allow the district court to consider the cross-motions for summary judgment under Plaintiffs' disparate-impact theory of liability in a manner consistent with this opinion.[12]   Although Plaintiffs did not argue that the FHA claim should have survived the motion for summary judgment under a disparate-treatment theory of liability and, thus, we declined to address this theory of liability on

---

[11] We note that Plaintiffs submitted additional, stronger statistical evidence in support of their cross-motion for summary judgment on the disparate-impact theory of liability, which may have been sufficient, on its own, for the district court to consider this alternative theory of liability on the FHA claim, regardless of whether the district court had determined that the evidence submitted at the motion to dismiss stage was insufficient to satisfy step one's robust causality requirement.   *See Inclusive Communities*, 135 S. Ct. at 2523; *Wright*, 609 F.2d at 710–11.   Most notably, Plaintiffs submitted evidence that Latinos comprised 91.7% of those unable to comply with the Policy and consequently facing eviction, despite comprising only 60% of those subject to the Policy.

[12] Despite the dissent's assertions otherwise, our holding does not extend FHA protection to individuals based on immigration status, nor does it even extend FHA protection to these Plaintiffs.   *See* Dissenting Op. at 34.   We merely hold that, under these facts, Plaintiffs have satisfied their burden under step one of the burden-shifting framework to make a prima facie showing of disparate impact.   It is for the district court to determine in the first instance whether Plaintiffs have satisfied the additional steps in this inquiry and, thus, whether Waples' Policy requiring occupants to provide documentation evincing legal status violated the FHA by disproportionately impacting Latinos.

appeal, we express no opinion on whether the district court should also address this alternative theory of liability on remand.[13]

## III.

For the foregoing reasons, the judgment of the district court is

*VACATED AND REMANDED*.

---

[13] On appeal, Waples argues that Plaintiffs have abandoned several arguments. First, Waples asserts that Plaintiffs "fail[ed] to raise any challenge to the district court's application of the controlling standards under *Inclusive Communities*," specifically contending that this was a failure under Federal Rule of Appellate Procedure 28(a) to include "an appropriately comprehensive" statement of issues presented for review, and thus, that Plaintiffs cannot obtain a reversal on this dismissal.  Appellees' Br. 19. Waples' also argues that Plaintiffs waived their argument for reversal based on the HUD regulation and guidance by failing to raise these arguments in the district court or in the statement of the issue in their opening brief, and also by failing to develop an argument for deference to HUD.  We disagree with these contentions and conclude that Plaintiffs sufficiently raised these arguments in their Complaint and in their briefs to this Court.

BARBARA MILANO KEENAN, Circuit Judge, dissenting:

I would affirm the district court's dismissal of the plaintiffs' disparate impact claim under Federal Rule of Civil Procedure 12(b)(6), because the plaintiffs have not alleged facts satisfying the "robust causality" standard required by *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). *See* Maj. Op. at 9-11 (addressing procedural history). Therefore, I respectfully dissent.

The Supreme Court has stated unequivocally that disparate impact liability under the FHA must be "limited in key respects" to avoid imposing liability "based solely on a showing of a statistical disparity." *Id.* at 2522. The Court accordingly instituted a "robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact." *Id.* at 2523 (citation, alterations, and quotation marks omitted). This causality requirement "protects defendants from being held liable for racial disparities they did not create." *Id.*

In my view, the plaintiffs have not adequately alleged that the defendants' policy caused the statistical disparity that they challenge. The plaintiffs rest their claim of causality on statistics showing that Latinos constitute the majority of undocumented aliens in the geographic area of the park, and thus that Latinos are disproportionately

impacted by a policy targeting undocumented aliens.[1]  Despite this statistical imbalance, however, all occupants of the park must comply with the policy addressing their immigration status, irrespective whether they are Latino.  Not all Latinos are impacted negatively by the policy, nor are Latino undocumented aliens impacted more harshly than non-Latino undocumented aliens.  Accordingly, I would conclude that the defendants' policy disproportionately impacts Latinos not because they are Latino, but because Latinos are the predominant sub-group of undocumented aliens in a specific geographical area.

Although Latinos constitute the majority of the undocumented population in the geographic area of the park, at different times and in different locales the "disparate impact" might have been on immigrant populations from many other parts of the world. *See Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013) (opinion of Loken, J.). Such geographical happenstance cannot give rise to liability against an entity not responsible for the geographical distribution.  Nor does linking disparate impact liability to the coincidental location of certain undocumented aliens further the aim of the FHA to avoid "perpetuating segregation."  *Inclusive Cmtys.*, 135 S. Ct. at 2522.  Thus, because the defendants' policy has not caused Latinos to be the dominant group of undocumented aliens in the park, the policy has not "caused" a disparate impact on Latinos.

---

[1] Although the plaintiffs rely in their complaint primarily on state-wide statistics, the summary judgment record includes additional statistics regarding the representation of Latinos in the immediate geographic area of the park.

Moreover, accepting the plaintiffs' theory of disparate impact liability would expand the FHA beyond its stated terms to protect undocumented aliens as a class, based solely on an allegation of disparate impact within that class.  *See Keller*, 719 F.3d at 949.  Yet, citizenship and immigration status are not protected classes under the FHA.  *See* 42 U.S.C. § 3604.  By holding that a policy targeting undocumented aliens could violate the FHA based on the policy's impact on Latinos, the majority in effect extends FHA protection to individuals based on their immigration status.  *See Keller*, 719 F.3d at 949 ("It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected class of aliens not lawfully present in this country.").  This Court is not authorized to reformulate the terms of the FHA by using undocumented status as a proxy for any protected class, thereby creating a new protected class under the statute.  Instead, it is the role of Congress to consider whether, as a matter of public policy, the FHA should be amended to prohibit discrimination based on citizenship or immigration status.

I am sympathetic to the severity of the consequences the plaintiffs likely will suffer in this case, to the difficulty they may experience in obtaining other housing, and to the hardships they have faced after relying in good faith on the defendants' prior failure to enforce the policy.  Nevertheless, under the FHA as currently written and the clear holding of *Inclusive Communities*, I cannot conclude that the plaintiffs have plausibly alleged that the policy caused a disparate impact on Latinos, or that the defendants should be "held liable for [statistical] disparities they did not create."  135 S. Ct. at 2523.  Because the FHA "mandates the removal of artificial, arbitrary, and

unnecessary barriers, not the displacement of valid" policies, *id.* at 2522 (citation and internal quotation marks omitted), I would affirm the district court's judgment.