**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

ROSY GIRON DE REYES, *et al.*,

                Plaintiffs,

v.

WAPLES MOBILE HOME PARK
LIMITED PARTNERSHIP, *et al.*,

                Defendants.

Civil No.:  1:16cv563-TSE-TCB

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF
PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

THIS COURT'S PRIOR FINDINGS OF UNDISPUTED FACT.................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2

STANDARD OF REVIEW .....................................................................................3

PROCEDURAL BACKGROUND.............................................................................4

ARGUMENT .......................................................................................................10

I.    PLAINTIFFS CANNOT SHOW A GENUINE ISSUE OF MATERIAL FACT
      AS TO THEIR *PRIMA FACIE* CLAIM OF DISPARATE IMPACT
      DISCRIMINATION ...................................................................................10

      A.    The Federal Anti-Harboring Criminal Statute Precludes Any Showing Of
            Robust Causality As A Matter Of Law................................................10

      B.    Plaintiffs Cannot Point To Any Evidence Showing That Defendants'
            Policy Is "Artificial, Arbitrary, And Unnecessary."..............................13

      C.    There Is No Evidence That Establishes A "Robust Causal" Link Between
            The Policy And The Alleged Disparate Impact.....................................14

      D.    Plaintiffs Fail To Produce Statistical Evidence That Latinos are
            Disproportionately Impacted by the Policy .........................................15

            1.    The statistics provided by Plaintiffs are unreliable and fail to
                  demonstrate a disparate impact................................................17

            2.    The 26% MOE Professor Clark applies renders his conclusions
                  unreliable.................................................................................20

            3.    In reality the MOE applicable to Professor Clark's opinions is
                  101%, which conclusively renders his conclusions unreliable.................21

II.   DEFENDANTS HAVE LEGITIMATE REASONS FOR THE POLICY THAT
      ARE NECESSARY TO ACHIEVE A VALID INTEREST ...............................22

      A.    Defendants' Policy Is Necessary To Avoid The Criminal Prohibition On
            Harboring Illegal Aliens ...................................................................23

      B.    The Policy Also Assists In Confirming Identity, Which In Turn Enables
            Credit And Criminal Background Checks And Minimizes Identity Fraud
            And Potential Losses From Eviction ...................................................24

      C.    George Caruso – A Leasing Expert With 44 Years of Experience –
            Offered *Unrebutted* Evidence Confirming The Validity Of Defendants'
            Legitimate Reasons For The Policy.....................................................25

III.  THERE IS NO EVIDENCE THAT DEFENDANTS' REASONS FOR THE
      POLICY ARE PRE-TEXTUAL OR THAT DEFENDANTS' INTERESTS

COULD BE SERVED BY OTHER PRACTICES WITH LESS
DISCRIMINATORY EFFECTS ......................................................................................27

CONCLUSION............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Conboy*,
    156 F.3d 167 (2d Cir. 1998)................................................................15

*Anderson v. Westinghouse Savannah River Co.*,
    406 F.3d 248 (4th Cir. 2005) ...........................................................19

*Cobb Cty. v. Bank of Am. Corp.*,
    183 F. Supp. 3d 1332 (N.D. Ga. 2016) ............................................13

*Crawford v. Newport News Indus. Corp.*,
    No. 4:14-CV-130, 2017 WL 3222547 (E.D. Va. July 28, 2017)............................18

*E.E.O.C. v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) ...........................................................18

*Ellis v. City of Minneapolis*,
    860 F.3d 1106 (8th Cir. 2017) .........................................................13

*Graves v. Lioi*,
    930 F.3d 307 (4th Cir. 2019) .............................................................9

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
    920 F.3d 890 (5th Cir. 2019) ...........................................................13

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018), *cert. denied sub nom.*, 139 S. Ct. 2026 (2019) ............... *passim*

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015).................................................................. *passim*

*United States v. Aguilar*,
    477 F. App'x 1000 (4th Cir. 2012) ................................................11, 12

*United States v. Lentz*,
    524 F.3d 501 (4th Cir. 2008) .............................................................8

*United States v. Tipton*,
    518 F.3d 591 (8th Cir. 2008) ...........................................................12

*United States v. Ye*,
    588 F.3d 411 (7th Cir. 2009) ...........................................................12

*Verisign, Inc. v. XYZ.COM LLC*,
 848 F.3d 292 (4th Cir. 2017) .............................................................................20

*Watson v. Fort Worth Bank & Tr.*,
 487 U.S. 977 (1988) ...........................................................................................10

**Statutes**

8 U.S.C. § 1324 ...........................................................................................................1, 6, 7

8 U.S.C. § 1324(a)(1)(A)(ii) ................................................................................7, 10, 24

8 U.S.C. § 1324(a)(1)(A)(iii) ...................................................................................10, 11

8 U.S.C. § 1324(a)(1)(B) ................................................................................................11

42 U.S.C. § 1436a ...................................................................................................13, 22

**Other Authorities**

24 C.F.R. §§ 5.508-5.512 .........................................................................................13, 22

HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84
 FR 42854-01, August 19, 2019. *Available at*
 https://www.federalregister.gov/documents/2019/08/19/2019-17542/huds-
 implementation-of-the-fair-housing-acts-disparate-impact-standard ......................4

## INTRODUCTION

Plaintiffs fail to adduce any facts to satisfy the requirements for a claim of disparate impact set forth in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Policy at issue in this case is a neutral policy that is not "arbitrary" but rather one that addresses a myriad of valid interests of the Defendants – as this Court previously found – and that protects Defendants from potential criminal liability under the Immigration Reform and Control Act of 1986's ("IRCA") anti-harboring provision, 8 U.S.C. § 1324. The statistics proffered by Plaintiffs to support their claim are flawed, invalid and fail to show any disparate impact on Plaintiffs as Latinos. Further, the Policy does not impact the Plaintiffs because of their protected status, but because of the illegal presence of the female Plaintiffs in the United States. Plaintiffs fail to make out a prima facie case of disparate impact and fail, in any event, to proffer any facts to contest the legitimacy of the interests served by the Policy. Therefore, this Court should grant Defendants' motion for summary judgment.

## THIS COURT'S PRIOR FINDINGS OF UNDISPUTED FACT

In addition to the statement of facts listed below, this Court previously made findings of undisputed fact in its ruling on the parties' prior motions for summary judgment. (Dkt. 190 at 2-6.) Plaintiffs did not appeal these factual findings and they accordingly remain undisturbed in this Court now. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 422 (4th Cir. 2018) ("Plaintiffs do not argue that the FHA claim should have survived the motion for summary judgment under a disparate-treatment theory of liability and, thus, we decline to address this theory of liability for Plaintiffs' FHA claim."), *cert. denied sub nom.*, 139 S. Ct. 2026 (2019). And indeed, the parties agreed to re-brief only Plaintiffs' disparate impact theory of liability on their FHA claim. (Dkt. 246.) As stated in the Court's prior summary-judgment ruling (Dkt. 190 at 2-6), the Court's prior factual findings, which are undisturbed, include, among others, the following:

1

- The female plaintiffs entered the United States illegally and thus are unlawfully present in the country.

- The four male plaintiffs were able to enter leases at the Park. Their wives, the four female plaintiffs, were not signatories on the leases.

- At the relevant time periods, the Policy required all applicants seeking to rent at the Park to provide government-issued photo identification (including a Passport), and proof of lawful presence in the United States, such as a Social Security Card.

- Today, residents at the Park may satisfy the Policy by producing documents besides an original passport, such as (1) a permanent resident card (Form 1-551 or I-151), (2) a temporary resident card (Form I-688A), or (3) a border crossing card.

- Because the female plaintiffs entered the United States illegally, they cannot satisfy the Policy. In other words, because the female plaintiffs are illegal aliens, they do not have—and cannot acquire—a U.S. Visa, an original I-94 form, or any authentic document to prove their lawful residence in the United States.

- Defendants never used the male plaintiffs' statuses as Latinos to deny the male plaintiffs the right to enter into rental agreements at the Park.

- Defendants never used the male plaintiffs' statuses as non-U.S. citizens to deny the male plaintiffs the right to enter into rental agreements at the Park.

- Some of the male plaintiffs permitted adults to reside in plaintiffs' mobile homes in the Park even though those adults were not listed on the male plaintiffs' leases or rental agreements.

- Defendants assert several reasons for implementing the Policy: (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability for harboring illegal aliens, and (5) to underwrite leases.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants incorporate by reference the undisputed material facts as described in Defendants' prior Motion for Summary Judgment and Memorandum in Support (Dkt. 98) and Opposition to Plaintiffs' Cross-Motion for Summary Judgment and Reply in support of Defendants' prior Motion for Summary Judgment (Dkt. 151). In addition, Defendants re-state and add to those undisputed material facts below:

1.    The smallest geographical area for which the Center for Migration Studies ("CMS") provides an estimate of the undocumented population is known as a "Public Use Microdata Area" ("PUMA"). Ex. 1B at 4-5 ("Clark Report").

2.    CMS does not provide a margin of error ("MOE") for its estimate of the undocumented population at the PUMA level. Ex. 2 at 34:6-35:1 ("Clark Dep. Tr.").

3.    CMS does not estimate an MOE for the undocumented population at any other level other than the national level. *Id.* at 34:6-19

4.    CMS' MOE for its estimate of the undocumented population at the national level is 9%. *Id.* at 34:6-15.

5.    CMS estimates that in 2012, Asians made up the majority of undocumented individuals for the relevant PUMA containing the Park.  Ex. 3 at exhibit 2, table B ("Weinberg Report").

6.    ███████████████████████████████████████
███████████████████████████

7.    The male Plaintiffs, who are all present in the United States legally, were required to be fingerprinted and to answer extensive questions about themselves as part of their application for Temporary Protected Status ("TPS") in the United States. Jose Reyes Dep. Tr. 16:11-17:7 (Dkt. 98, Ex. 13); Saravia-Cruz Dep. Tr. 68:15-22 (Dkt. 98, Ex. 16); Bolanos Dep. Tr. 70:6-71:1 (Dkt. 98, Ex. 14); Moya Dep. Tr. 17:5-14 (Dkt. 98, Ex. 15).

8.    A person can acquire an Individual Taxpayer Identification Number if a person sends to the IRS: a completed Form W-7 with an attached copy of a valid passport and a copy of a tax return. *E.g.*, Rosy Reyes' Response to Int. 8 (Dkt. 98, Ex. 31).

## STANDARD OF REVIEW

Defendants adopt and incorporate herein the standard of review set forth by this Court in its summary judgment ruling. (Dkt. 190 at 6-7.)  In this case, the general summary-judgment standards must be applied in accordance with the Supreme Court's controlling precedent in *Inclusive Communities*, which establishes a three-step, burden-shifting framework. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2515 (2015). "Under the first step, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class." *Reyes*, 903 F.3d at 424 (citing *Inclusive Communities* at 2523). Under the second step, the defendant has the burden

of persuasion to "state and explain the valid interest served by their policies." *Id.* (citing *Inclusive Communities* at 2522). Under the third step, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect." *Id.* (citing *Inclusive Communities* at 2515).

*Inclusive Communities* held that FHA disparate-impact liability is limited to the "removal of artificial, arbitrary, and unnecessary barriers"—it may not be employed to "displace valid governmental and private priorities."  135 S. Ct. at 2524; *see also Reyes*, 903 F.3d at 424-25 (same).  It therefore imposed "cautionary standards" to protect "defendants from being held liable for racial disparities they did not create."  *Id.* at 2524.  Under those standards, to meet its prima facie burden at Step 1, a plaintiff must show "robust causality" between the challenged practice and the claimed impact on the protected class.  *Id.*  Plaintiffs also must show that the policy at issue is an "artificial, arbitrary, and unnecessary barrier" to housing.  *Id.* at 2522.  In considering a disparate-impact plaintiff's prima facie case, courts should reject disparate-impact claims when "federal law substantially limits [a defendant's] discretion" in choosing and formulating the policy at issue.  *Id.* at 2524.[1]

**PROCEDURAL BACKGROUND**

The only issue to be resolved on summary judgment is whether the record would permit a trier of fact to rule for Plaintiffs on their disparate impact theory of FHA liability in Count I. The

---

[1] On August 19, 2019, HUD announced a proposed modified regulation amending HUD's interpretation of the Fair Housing Act's disparate impact standard "to better reflect the Supreme Court's 2015 ruling in …Inclusive Communities…" HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 FR 42854-01, August 19, 2019. *Available at* https://www.federalregister.gov/documents/2019/08/19/2019-17542/huds-implementation-of-the-fair-housing-acts-disparate-impact-standard. This proposed regulation clarified that under HUD regulations in order to establish a prima facie claim a plaintiff must state facts that plausibly allege, *inter alia*, that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;" "there is a robust causal link between the challenged policy or practice and a disparate impact on members of a protected class that shows the specific practice is the direct cause of the discriminatory effect"; and "the alleged disparity caused by the policy or practice is significant[.]"

viability of that theory was the only issue Plaintiffs appealed to the Fourth Circuit and the only issue that court decided. In fact, as Plaintiffs told the Fourth Circuit—despite what they previously told this Court—Plaintiffs "did not allege that Waples violated the FHA by intentionally discriminating against Latino individuals." Pls.' Brief (Dkt. 26), Case No. 17-1723.

Plaintiffs' Complaint alleged that Defendants' Policy affects illegal aliens, not Latinos specifically. Compl. at 9 ¶ 40 (Dkt. 1). Plaintiffs alleged that ***any*** policy directed towards illegal aliens impacts Latinos. *Id*. at 13 ¶ 61. Plaintiffs did not allege that non-Latino illegal aliens were not required to comply with the Policy, or that the inability of Latino illegal aliens to comply with the Policy was any different from that of non-Latino illegal aliens. Plaintiffs alleged statistics of the illegal alien population in Virginia in an attempt to show that Latinos are the highest percentage of that population. *Id.* at 13-14. Plaintiffs did not allege that the Policy itself caused or created this statistical racial disparity in Virginia. In short, Plaintiffs' disparate-impact theory of liability is that while all illegal aliens are impacted, Latinos are the largest constituency of that group at this moment in time, so they are disparately impacted because of their racial make-up.

Defendants moved to dismiss Plaintiffs' FHA disparate-impact claim on grounds that Plaintiffs did not satisfy the cautionary standards imposed in *Inclusive Communities*. (Dkt. 26.) This Court granted Defendants' motion in part. (Dkt. 57.) It dismissed Plaintiffs' disparate-impact claim based on *Inclusive Communities*. Mem. Op. at 13 (Dkt. 56). Plaintiffs later moved for summary judgment on their disparate-impact claim—believing it was still viable—and Defendants moved for summary judgment on the disparate treatment claim. With respect to disparate impact, Plaintiffs relied on "statistical evidence" that, they claimed, showed that those who cannot comply with the Policy—*i.e.*, illegal aliens—are "disproportionately Latino." (Dkt. 138 at 14).

In response, Defendants argued that the summary-judgment record makes clear that

Latinos, except those in the United States illegally, routinely comply with the Policy and enter into leases at the Park and that the sole impediment for the Plaintiffs is the illegal status of the female Plaintiffs, not that they are Latino. (Dkt. 98.) The record confirms the female Plaintiffs entered the United States illegally, are in the United States illegally, and, therefore, cannot comply with the Policy. (Dkt. 190 at 2-6.)  Conversely, the male Latino Plaintiffs—in the United States legally—were never denied the right to enter into leases at the Park. *Id.*[2]  Accordingly, Defendants submitted that the robust causality requirement of *Inclusive Communities* therefore was not satisfied.

Defendants also argued that, even if Plaintiffs could make out their prima facie case at Step 1, there are legitimate and non-discriminatory reasons for the Policy at Step 2—namely, that the Policy serves lease-underwriting concerns, including identity concerns, as well as the need to perform reliable criminal background checks and avoid criminal exposure under 8 U.S.C. § 1324. Defendants proffered an unrebutted industry expert who opined that Defendants' Policy was reasonable and that the reasons for it are legitimate.  Finally, Defendants demonstrated Plaintiffs' claimed statistical disparity failed to make out a disparate-impact claim under *Inclusive Communities*, and, even if it did, it was based on unreliable expert testimony.

Following a hearing, this Court found that Plaintiffs' disparate-impact claim had been dismissed at the motion-to-dismiss stage and granted Defendants' motion for summary judgment as to the unpled disparate–treatment claim.  On the disparate-treatment claim, the Court found that "the undisputed factual record fails to show a prima facie case of race or national origin discrimination[,]" because "[Plaintiffs] [have not] pointed to any evidence showing that the dwellings remained available to others outside of plaintiffs' protected class on different terms from

---

[2]    The Policy is applied to every adult occupant who applies to live at the Park.  Plaintiffs are unable to point to any evidence that ***non-Latinos*** did not have to comply with the Policy.

those offered to plaintiffs." (Dkt. 190 at 11.)

Moreover, in relevant part, the Court found it undisputed that there were legitimate, nondiscriminatory justifications for the Policy that independently supported dismissal of Plaintiffs' claims. The Court found that the Policy was implemented  (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability under 8 U.S.C. § 1324 for harboring illegal aliens, and (5) to underwrite leases and the Court found that none of these reasons were pretextual. (Dkt. 190 at 15.) The Court rejected Plaintiffs' argument that "defendants could not have truly feared liability under the federal anti-harboring statute, 8 U.S.C. § 1324," finding that "there is no question, given § 1324's imposition of liability for 'reckless disregard of the fact that [an] alien has come to, entered, or remains in the United States in violation of law,' that a lessor could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants." (Dkt. 190 at 16) (citing 8 U.S.C. § 1324(a)(1)(A)(ii)).

Plaintiffs did not appeal the Court's summary-judgment ruling or, specifically, its findings of undisputed fact made on summary judgment. Rather, Plaintiffs' sole issue on appeal was as whether this Court "err[ed] in concluding, as a matter of law, that the Families were unable to state an FHA disparate impact claim because the Policy was not a "remnant[] of the country's tragic and regrettable history of state-sanctioned intentional discrimination?" Pls.' Brief to the Fourth Circuit (Dkt. 26), Case No. 17-1723. In a 2-1 decision, the Fourth Circuit reversed this Court's dismissal of Plaintiffs' disparate impact claim at the motion to dismiss stage and remanded the case "to allow [this Court] to consider the cross-motions for summary judgment under Plaintiffs' disparate-impact theory of liability in a manner consistent with this opinion." *Reyes*, 903 F.3d at 433.

Following the Fourth Circuit's ruling, this Court has broad latitude in deciding the parties' summary-judgment motions.  The Circuit Court vacated the Court's summary-judgment order because, in its view, this Court had incorrectly determined that Plaintiffs failed to *plead* their disparate-impact claim under *Rule 12(b)(6)*—the Court's summary-judgment ruling did not decide anything when it came to the disparate-impact claim because, in the Court's view, it had already dismissed the claim.  *See Reyes*, *supra*.

Since the case is before the Court on remand from the Fourth Circuit, the Court must adhere to the court of appeals' ruling under the "mandate rule."  Under that rule, the Court is bound by "questions actually decided as well as those decided by necessary implication," but it is not bound by "questions which might have been decided but were not."  *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (citations and internal quotation marks omitted).

Here, the Fourth Circuit's decision leaves much in this case still to be decided at summary judgment.  As noted, when this case previously was before the Court, the Court issued two rulings of note.  It first denied Defendants' motion to dismiss Plaintiffs' FHA claim, concluding that Plaintiffs' allegations were sufficient to state a claim, but ruling that Plaintiffs could not "rely solely on disparate impact to satisfy the FHA's causation requirement…" Mem.  Op. at 17 (Dkt. 56).  Later, in granting Waples' motion for summary judgment, the Court found that it had already dismissed Plaintiffs' disparate-impact claim, and proceeded to find that Plaintiffs' disparate-*treatment* claim failed as a matter of law.  Mem. Op. at 8 n.8 (Dkt. 190).

On appeal, the Plaintiffs focused on the Rule 12(b)(6) dismissal of their disparate-impact claim.[3]  The Circuit recognized that this Court had dismissed Plaintiffs' disparate-impact claim at the Rule 12(b)(6) stage, and that to the extent this Court addressed Plaintiffs' disparate-impact

---

[3]    Defendants advanced some alternative grounds supporting affirmance of this Court's summary-judgment ruling, but the Fourth Circuit did not consider those arguments, let alone decide them.

claim at summary judgment, it was only to clarify that the claim already had been dismissed.  *See Reyes*, 903 F.3d at 422.  The Circuit thus evaluated Plaintiffs' disparate-impact claim under a Rule 12(b)(6) standard, taking Plaintiffs' factual allegations as true and declining to consider evidence outside the pleadings.  *See id.* at 428 ("At the motion to dismiss stage, we must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff.  Therefore, accepting these statistics as true, we conclude that Plaintiffs sufficiently alleged a prima facie case of disparate impact.") (citation omitted).  The Fourth Circuit did not evaluate Plaintiffs' disparate-impact claim under a summary judgment standard

Accordingly, the fact that the Circuit found that Plaintiffs' Complaint satisfied their "Step 1" prima facie burden at the *motion to dismiss* stage plainly does not preclude Defendants' now from showing how Plaintiffs fail to meet their Step 1 prima facie case burden at *summary judgment*.  A motion to dismiss and a motion for summary judgment involve different standards— the former being more favorable to the plaintiff because courts must accept factual allegations as true.  *See Graves v. Lioi*, 930 F.3d 307, 317 (4th Cir. 2019) ("Unlike the first time this case came before us [on a motion to dismiss], we are no longer obliged to accept [plaintiff's] allegations as true.  While [plaintiff] is still entitled to have the record viewed in the light most favorable to her, we can no longer simply accept her characterizations of what occurred.  Now that the parties have completed discovery, we have a fully-developed record to apply to those allegations upon a motion for summary judgment") (citations omitted).  And the law of this Circuit is clear that the mandate rule poses no bar "on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims."  *Id.* at 318.

Given the limited scope of the Fourth Circuit's mandate, Plaintiffs' failure to establish a

genuine issue of material fact relative to the Step 1 prima facie case inquiry is plainly a question for this Court to address on summary judgment—in addition to addressing Plaintiffs' failures at Steps 2 and 3.  In particular, the Court can and should address the fact that "federal law [*i.e.*, the anti-harboring law substantially limits [Defendants'] discretion," and thus prevents Defendants from showing robust causality.  *Inclusive Communities*, 135 S. Ct. at 2524.  The Court also can and should address the fact that Plaintiffs fail to "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion [complained of] because of their membership in a protected group."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994–95 (1988).  The same holds true for Defendants' other summary-judgment arguments.

## ARGUMENT

I.    **PLAINTIFFS CANNOT SHOW A GENUINE ISSUE OF MATERIAL FACT AS TO THEIR *PRIMA FACIE* CLAIM OF DISPARATE IMPACT DISCRIMINATION**

### A.    The Federal Anti-Harboring Criminal Statute Precludes Any Showing Of Robust Causality As A Matter Of Law

Plaintiffs cannot meet their burden to show a robust causal connection between Defendants' Policy and the alleged disparate impact as a matter of law under *Inclusive Communities* because federal "law"—here, the Immigration Reform and Control Act of 1986's ("IRCA") anti-harboring provision, 8 U.S.C. § 1324(a)(1)(A)(iii)—"substantially limits [Defendants'] discretion" in formulating its Policy. Indeed, this Court previously found "that ***there is no question***, given § 1324's imposition of liability for 'reckless disregard of the fact that [an] alien has come to, entered, or remains in the United States in violation of law,' that a lessor could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants. *See* 8 U.S.C. § 1324(a)(1)(A)(ii)." (Dkt. 190 at 17) (emphasis added).

As noted, the Supreme Court in *Inclusive Communities* found that a disparate-impact claim is deficient where "federal law substantially limits [the defendant's] discretion" in making housing

decisions, such as where federal law "ties the [defendant's] hands to such an extent that it lacks a meaningful choice." 135 S. Ct. at 2515, 2524. IRCA's anti-harboring provision makes it a federal crime if a person "knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors or shields from detection such alien in any place, including any building…." 8 U.S.C. § 1324(a)(1)(A)(iii). The sentence for such a crime can be up to 10 years in prison plus fines. *Id.* § 1324(a)(1)(B).

The Fourth Circuit addressed the application of the anti-harboring statute to a residential landlord in *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012). The defendant there was convicted for renting rooms in her home to illegal aliens. She claimed that the district court erred in not instructing the jury that it must be proven that her conduct "tended to substantially facilitate the alien remaining the United States." *Id*. at 1001-02. The Fourth Circuit affirmed the conviction, finding no plain error in the refusal to instruct the jury that intent to harbor is an element of the crime. The Fourth Circuit explained that "a defendant acts with reckless disregard where she is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien." *Id*. at 1002. And it found that defendant "recklessly disregarded the risk that [] her tenants w[ere] undocumented" because she "took no steps" to ascertain the status of her tenants. *Id*. at 1003.

Given that the conviction in *Aguilar* occurred in this District and was affirmed by the Fourth Circuit, Defendants have no discretion to ignore the potential criminal implications of renting to an illegal alien, thus necessitating its Policy. If Defendants ignored facts such as the inability of a Latino applicant from another country to provide a social security number or proof of legal status, it too could be accused of "reckless disregard" of the fact that applicants could be in the United States illegally and, like Ms. Aguilar, convicted of a crime for taking "no steps to

ascertain the status of their tenants." *Aguilar*, 477 F. App'x at 1003; *see also United States v. Ye*, 588 F.3d 411, 416 (7th Cir. 2009) (harboring "is unlawful conduct, regardless of how effective a defendant's efforts to help the alien might tend to be"). These concerns are especially heightened for mobile-home park owners like Defendants because, as Plaintiffs themselves have alleged, undocumented aliens "cannot obtain traditional home mortgages." Compl. ¶ 55. As a result, making nontraditional, mobile housing available to such aliens may be seen as an inducement that "substantially facilitate[s] an alien's remaining in the United States illegally" in violation of the anti-harboring statute. *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *see also Aguilar*, 477 F. App'x at 1002. The Policy protects Defendants from criminal exposure and thus cannot give rise to a disparate-impact claim because Defendants do not have "discretion" to ignore IRCA's anti-harboring criminal prohibition.

In this circumstance, the federal government effectively has "tie[d] [landlords'] hands to such an extent that [they] lack[] a meaningful choice," such that causation must be found lacking as matter of law. *Inclusive Cmtys.*, 135 S. Ct. at 2515; see *id*. at 2524. Allowing Plaintiffs' disparate-impact claim to proceed would force landlords into the untenable choice between flouting federal immigration policies and being accused of housing discrimination. Indeed, in so doing, it would risk the very "pervasive injection of race into . . . private transactions covered by the FHA"—and the constitutional concerns that come with it—that the "robust causality" requirement and other safeguards set forth in *Inclusive Communities* were designed to prevent. *Id*. For this reason alone, Plaintiffs' disparate-impact claim fails as a matter of law and the Court should grant Defendants' motion for summary judgment.

**B.    Plaintiffs Cannot Point To Any Evidence Showing That Defendants' Policy Is "Artificial, Arbitrary, And Unnecessary."**

Independently, Plaintiffs cannot meet their prima facie burden at summary judgment because they cannot show that Defendants' reasonable Policy is, as *Inclusive Communities* requires it to be to support disparate-impact liability, an "artificial, arbitrary, and unnecessary" barrier. *See supra*; *see also Inclusive Cmtys.*, 135 S. Ct. at 2522 (disparate-impact liability is intended "solely" to remove such barriers); *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 907 (5th Cir. 2019) (same); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017) (affirming dismissal of disparate-impact claim where plaintiffs failed to "allege facts plausibly demonstrating that the housing-code standards complained of are arbitrary and unnecessary"); *Cobb Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1347 (N.D. Ga. 2016) (same).

In fact, the record conclusively refutes any claim by Plaintiffs that the Policy is "artificial, arbitrary, and unnecessary." As noted, the Policy is reasonably aimed at avoiding criminal liability under the federal anti-harboring provision.  *Supra* at Argument I.A. It is also reasonably designed to help confirm the identities of lease applicants and ensure proper credit and criminal-background checks. *Infra* at Argument II and III. Perhaps most notably, the Policy in fact mirrors federal law and HUD housing-assistance policy. *See* 42 U.S.C. § 1436a (prohibiting public-housing assistance to undocumented aliens); 24 C.F.R. §§ 5.508-5.512 (HUD regulations requiring public-housing providers to request and review documentation "of eligible immigration status" before providing assistance).

In the face of this conclusive proof, Plaintiffs may try to meet the heightened *Inclusive Communities* standard by claiming, as they did previously, that documents evidencing legal status "are not necessary to prove identity or to conduct background or credit checks[,]" Compl. ¶¶ 32-35, and that "[f]oreign passports or government-issued identification cards are sufficient." *Id.* ¶ 33.

Plaintiffs also suggested that an Individual Taxpayer Identification Number ("ITIN") is sufficient to prove identity and conduct a background check. *Id*. ¶¶ 35 – 36. In particular, Plaintiffs allege that an ITIN "is ***as reliable and precise as a Social Security number***." *Id.* ¶ 31 (emphasis added). As shown below in Section III of the Argument, these contentions are baseless. For present purposes, they fall well short of showing that the Policy is "artificial, arbitrary, and unnecessary."

Plaintiffs also may argue – as they have in the past – that U.S. government documents evidencing legal status may not always confirm an individual's identity or disclose whether an individual is legally present in the United States. But as this Court correctly recognized, "no method of determining a person's legal presence is unassailable. Indeed, practically any form of identification or proof of lawful presence may be fabricated. The fact remains, however, that plaintiff has not cited any evidence that a legal U.S. resident was unable to provide a document required by the Policy. Thus, the Policy's documentation requirements do not create an inference of pretext for discrimination on the basis of race or national origin." Mem. Op. at 15-16 (Dkt. 190). And, by definition, the Policy is far from "artificial, arbitrary, and unnecessary." For this reason, too, the Court should grant summary judgment to Defendants.

**C.    There Is No Evidence That Establishes A "Robust Causal" Link Between The Policy And The Alleged Disparate Impact**

In ruling on Defendants' Motion to Dismiss, this Court found that Plaintiffs' allegations did not satisfy the "robust causality requirement" set by *Inclusive Communities*. Mem. Op. at 13 (Dkt. 56). The Court held that the disparate impact on plaintiffs as Latinos is incidental to the Policy's effect on all illegal aliens. *Id.* at 16. As a result, the Court did not rule on Plaintiffs' disparate impact theory at the summary judgment stage. On summary judgment, the Court, however, did make factual findings in reviewing and dismissing Plaintiffs' disparate treatment claim.  Mem. Op. (Dkt. 190). In reviewing the record before it – the record that remains the same

14

today – the Court determined that the "undisputed factual record" – as opposed to allegations reviewed at the motion to dismiss stage – "confirms that the Policy burdens the female plaintiffs not because they are Hispanic, but rather because they entered the country illegally." Mem. Op. at 12 (Dkt. 190) (citing *Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998)). Now, at the motion for summary judgment stage after remand, the "undisputed factual record" clearly confirms that the cause of the any alleged impact from the Policy is not because of Plaintiffs' status as Latinos but because the female Plaintiffs entered the country illegally. The factual evidence confirms that Plaintiffs cannot – and do not – establish a "robust causal" link between the Policy and the alleged disparate impact. *Inclusive Communities*, 135 S. Ct. at 2523. Plaintiffs, therefore, fail to demonstrate evidence of a *prima facie* claim of disparate impact at the summary judgment stage.

### D.    Plaintiffs Fail To Produce Statistical Evidence That Latinos are Disproportionately Impacted by the Policy

Separately, Plaintiffs fail to produce statistical evidence that Latinos are disproportionately impacted by the Policy as required to show the requisite robust causal connection between the Policy and the alleged disparate impact under Step 1 of the controlling analysis. *Inclusive Communities*, 135 S. Ct. at 2523.

Plaintiffs' claim of an alleged disparate impact is supported only by their statistical expert, Professor Clark. The data relied upon by Professor Clark and his analysis are unsupported and unreliable. Professor Clark himself admits to a margin of error ("MOE") in excess of 26% that, in and of itself, demonstrates the unreliability of the statistical basis for Plaintiffs' claim of disparate impact. Further, a review of the faulty data relied upon by Professor Clark reveals that there is no disparate impact on Latinos/Hispanics. In addition, Professor Clark admitted in his rebuttal report that Latinos are only ***slightly less than two times*** as likely to be affected by a Policy directed at illegal aliens as undocumented Asians. This is not nearly enough of a difference to raise a genuine

issue of material fact on whether the Policy has caused a disparate impact.

Professor Clark based his opinions on two different sources of statistics regarding the Hispanic population in general and the undocumented population. For his estimates of undocumented populations Professor Clark relied upon data from the Center for Migration Studies ("CMS"). The smallest geographical area for which CMS provides an estimate of the undocumented population is known as a "Public Use Microdata Area" ("PUMA"). Ex. 1B at 4-5. Professor Clark therefore relied upon CMS data from the "Burke PUMA" – which includes the Park and estimates a total PUMA population of approximately 158,000. The CMS estimates at issue show the undocumented population for the Burke PUMA for 2012 and 2014. Weinberg Decl. ¶ 8 (Ex. 3). For 2014, CMS estimated that Hispanics comprised 52.80% of the undocumented population of the PUMA. Ex. 3(2). The same 2014 CMS estimate of the undocumented population identifies Asians as comprising 37.10% of the undocumented population for the PUMA. *Id.* These CMS figures – which Professor Clark relied upon – thus demonstrate that Latinos are, ***at most***, only 1.4 times more likely to be impacted by a policy directed at illegal aliens as undocumented Asians.

Notably, CMS determines the MOE for its estimates only at the national level. It provides no MOE for its estimates at the PUMA level. Nor does CMS provide any statistics regarding the undocumented population at the census tract level. Here, the Park is located in Census Tract 4406 which includes a population of approximately 4,000.

Because CMS does not estimate the undocumented population at the census tract level, Professor Clark relied upon statistics from the American Community Survey ("ACS") regarding the number of Hispanics in Census Tract 4406. ACS does not estimate the undocumented population. Therefore, in performing his analysis, Professor Clark relied upon ACS's estimate of

the total number of Hispanics in Census Tract 4406 to estimate the number of undocumented Hispanics in the tract.  Professor Clark acknowledges that the ACS estimate of *all Hispanics* in the census tract has a MOE of 26%.   Professor Clark also acknowledged the obvious – that it is more difficult to estimate the undocumented population because they do not want to be found.  Despite this acknowledgment, he incorrectly applied ACS' 26% MOE for *all Hispanics* to his estimate of the undocumented population without adjusting the MOE.  Further, Professor Clark made no effort to determine the MOE for his estimate of the undocumented Hispanic population at the census tract level – or even determine an MOE for CMS' estimates of the undocumented population at the PUMA level – even though CMS provided a MOE at the national level – 9% - as a baseline for such an analysis.

> **1. The statistics provided by Plaintiffs are unreliable and fail to demonstrate a disparate impact**

The opinions of Professor Clark are not reliable and must be rejected because he does not provide a MOE upon which the Court can evaluate the reliability of his opinions.  Professor Clark testified at his deposition that a MOE is necessary because "when statisticians and demographers make estimates, they recognize that there is some – because it is not a count – error in the result." Ex. 2 at 26:19-22 (Clark Dep. Tr.) Here, Professor Clark concedes that the undocumented population is more difficult to estimate, however, he still uses the ACS MOE of 26% for ACS' estimate of *all Hispanics* in Census Tract 4406.  Admitting that the MOE must be adjusted for the undocumented population, Professor Clark fails to opine as to what is the appropriate MOE for his estimate of the undocumented Hispanic population in the census tract (or even opine as to what the appropriate MOE would be for CMS's estimates at the PUMA level).  Since the ACS does not estimate the undocumented population, Professor Clark relied on estimates from the CMS for his estimate of the undocumented population in Census Tract 4406. Ex. 1B at 4 ("To have a consistent

set of numbers, I have used data from Center for Migration Studies (CMS) for all calculations."). Professor Clark, however, admitted that undocumented populations are more difficult to estimate because many do not want to be exposed. Ex. 2 at 33:10-16.  Nonetheless, Professor Clark did nothing to adjust the 26% MOE from the ACS estimates *for the total Hispanic population* in the Census Tract when calculating his MOE *for the undocumented population*.  Since Professor Clark made no adjustment to the 26% MOE for the total Hispanic population he, in effect, provides no MOE for his analysis of the undocumented population leaving this Court with no basis to evaluate the reliability of his estimates.

Professor Clark's opinions, therefore are not reliable and cannot demonstrate a disparate impact.  *See Crawford v. Newport News Indus. Corp.*, No. 4:14-CV-130, 2017 WL 3222547, at *7-8 (E.D. Va. July 28, 2017) (striking expert's conclusions because they relied on unreliable data); *E.E.O.C. v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) ("Expert testimony under Rule 702 is admissible if it 'rests on a reliable foundation and is relevant.'").

Additionally, the CMS PUMA data relied upon by Professor Clark here does not demonstrate that Latinos are more likely to be impacted by a policy directed at illegal aliens. According to Daniel H. Weinberg, former Deputy Director of the Decennial Census and the American Community Survey, the PUMA data relied upon by Professor Clark did not show that Latinos were more likely to be impacted by the Policy than other similarly situated illegal-alien minority groups. Ex. 3(2), table B.  The PUMA data relied upon by Professor Clark is set forth in Table B of exhibit 2 to Dr. Weinberg's declaration. Ex. 3(2).  The CMS estimates at issue show the undocumented population for the relevant PUMA for 2012 and 2014.  Weinberg Decl. ¶ 8 (Ex. 3). For 2014, CMS estimated that Hispanics comprised 52.80% of the undocumented population of the PUMA. Ex. 3(2).   The same CMS estimate of the undocumented population identifies

18

Asians as comprising 37.10% of the undocumented population for the PUMA. *Id.* These CMS figures – which Professor Clark relied upon – thus demonstrate that Latinos are, ***at most***, only 1.4 times more likely to be impacted by a policy directed at illegal aliens as undocumented Asians. *See id.* (noting PUMA data of 52.80% Hispanic versus 37.10% Asian).[4] Accordingly, compared to the overall undocumented population, Latinos are no more likely to be impacted than other ***similarly situated*** illegal aliens. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 263 (4th Cir. 2005) ("And in order to evaluate whether or not there is disparate impact in ratings, similarly situated persons who are being rated must be compared.").

In addition, these same estimates demonstrate that, in 2012, Asians made up the majority of undocumented individuals for the relevant PUMA.  Ex. 3(2).  This data undermines Plaintiffs' entire case because, in 2012, Defendants' Policy would not have had a disparate impact on Latinos *even under Plaintiffs' faulty theory*. Thus, the data relied upon by Plaintiffs' own expert show no disproportionate impact on Latinos in the relevant PUMA, and the conclusions are unreliable.

Professor Clark also carried over CMS's estimate for the undocumented population in the relevant PUMA – an estimate without a published MOE – and applied the same percentage estimate for his estimate of undocumented Hispanics in Census Tract 4406 without adjusting the MOE for the fact that he was moving to a dramatically smaller sample size; the population of the census tract is less than 3% of the population of the PUMA.  According to Professor Clark, CMS

---

[4]  Initially, Professor Clark opined that the Latino population was seven times more likely to be impacted, but he failed to consider the remaining undocumented population, including the significant undocumented Asian population. Ex. 1(C) at 2 § 3 (Professor Clark's Reply Report) ("It is important to note that my calculations of the disparate impact used the data for Fairfax County as a whole where I estimated the undocumented ratio for the non-Hispanic population ***without adjusting for the Asian undocumented population***.") (emphasis added). When Professor Clark considered the Asian undocumented population, however, he adjusted his opinion dramatically to state that "Latinos are nearly twice as likely to be undocumented compared to Asians and 20 times more likely to be undocumented than other groups."  *Id.* Professor Clark's conclusion that that Latinos are ***slightly less than two times*** (CMS data reveals it is only 1.4 times) as likely to be affected by a Policy directed at illegal aliens as undocumented Asians reveals that there is no statistical evidence of disparate impact.

estimated that in 2014, 31.4% of the Hispanic population for that PUMA was undocumented and he applied the same percentage to the Hispanic population for Census Tract 4406 for his estimate of the undocumented Hispanic population for that tract. Ex. 1B at 5 ("We can apply that estimate to the 957 Hispanics in Tract 4406, which yields an undocumented Hispanic population of 301 in Tract 4406."). Professor Clark did not make any adjustments to the MOE when he applied the statistical estimate from a larger sample size (PUMA) to a sample size (Census Tract) more than 97% smaller than the PUMA even though it is a well-accepted statistical rule that the MOE for a statistical estimate goes up as you move from a larger sample size to a smaller sample size. Indeed, Professor Clark agreed that as the sample size goes from a larger to a smaller sample, such as the movement of a sample size from the national to the state to the PUMA level, the MOE increases. Professor Clark testified that the Census Bureau follows the same concept. Ex. 2 at 32:9-13. Dr. Weinberg states in his Declaration that "[t]his is a basic statistical concept associated with sample surveys." Weinberg Decl. ¶ 7 (Ex. 3). Despite this basic concept, Professor Clark, however, simply carried over CMS's estimate for the amount of undocumented Hispanics in the PUMA area to the significantly smaller Census Tract area without increasing the MOE or making any other adjustments. Of course, CMS does not even publish an MOE for its PUMA area estimates leaving the margin of error for those estimates completely unknown.

### 2.    The 26% MOE Professor Clark applies renders his conclusions unreliable

Professor Clark claims that he applied a 26% margin of error ("MOE") to his opinions. Such a high MOE – 26% – renders his opinions unreliable. "Acting as gatekeepers, district courts are charged with ensuring that expert testimony of all kinds is relevant and reliable." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300 (4th Cir. 2017) (affirming district court's decision to exclude testimony because methods were questionable and conclusions not reliable). Professor Clark

testified at his deposition that a MOE is necessary because "when statisticians and demographers make estimates, they recognize that there is some – because it is not a count – error in the result." Ex. 2 at 26:19-22.  In his expert report, Professor Clark states that the "estimate and variation for the Hispanic population in Tract 4406 is 957 +/-251, or 26%." Ex. 1B.[5]  In Professor Clark's Reply Report, Professor Clark states that the estimate of the Asian population for Tract 4406 is "682 with a margin of error of +/-128." Ex. 1C.  This is a Margin of Error of 18.7%.  Applying the 26% MOE to the estimates of Hispanic population in Tract 4406 and the 18.7% MOE to the estimates of the Asian population in Tract 4406 reveals that there is a significant range overlap where the Asian population is actually higher than the Hispanic population in Tract 4406. Accordingly, Professor Clark's 26% MOE renders his opinions unreliable. In addition, Dr. Weinberg opined that an MOE of 26% renders Professor Clark's estimate statistically unreliable to establish the undocumented population for the census tract at issue.  Ex. 3(1) at 7.

> **3.** **In reality the MOE applicable to Professor Clark's opinions is 101%, which conclusively renders his conclusions unreliable**

Professor Clark acknowledged at his deposition that the CMS estimate of the undocumented population at the national level has a MOE of 9%.  Ex. 2 at 34:6-15.  Professor Clark admitted in his report that the smallest geographical area for which CMS provides an estimate of the undocumented population is the PUMA. Ex. 1B at 4-5.  He testified that CMS does not estimate a MOE for the undocumented population at any other level ***other than the national level*** – such as the PUMA level – because "they say it's difficult enough to try and get estimates of the undocumented population."  Ex. 2 at 34:6-35:1.  Despite knowing this, Professor Clark admitted that he made no effort to translate the MOE of 9% for CMS estimates at the national level

---

[5] Census Tract 4406 includes the Park and has a population of 4,000; approximately 2.5% of the population in the PUMA relied upon by Professor Clark.

to determine what the MOE would be for the CMS PUMA estimate he relied upon or to determine his application of that estimate to Census Tract 4406 with a population of less than 4,000.  *Id.* at 77:5-82:19. In fact, he testified that he made no adjustment to the 26% MOE identified by the ACS for the total Hispanic population for Census Tract 4406. Professor Clark even admitted at this deposition that "[p]erhaps the margin of error should be larger…"  *Id.* at 78:12-13.

Dr. Weinberg's analysis further demonstrates the unreliability of Professor Clark's opinions. In contrast to Professor Clark's failure to calculate a MOE for the PUMA level, Dr. Weinberg did perform an analysis of the MOE for the CMS estimates of an undocumented population by taking the MOE for the undocumented population estimate from CMS at the national level – the only published MOE by CMS – and analyzing how that MOE would change at the PUMA level.  Ex. 3(1).  Following the well-accepted concept that the MOE increases as sample size decreases – a concept that Professor Clark agrees with – Dr. Weinberg concludes that the MOE at the PUMA level is 101%. *Id.* at 7. Such a MOE renders Professor Clark's estimate of the undocumented population wholly unreliable.  *Id.* at 1. In his reply report, Professor Clark did not take issue with the methodology utilized by Dr. Weinberg in coming to his conclusions.  Ex. 1C.

## II.    DEFENDANTS HAVE LEGITIMATE REASONS FOR THE POLICY THAT ARE NECESSARY TO ACHIEVE A VALID INTEREST

Even if Plaintiffs could identify evidence sufficient to show a *prima facie* case of disparate impact (they cannot), Defendants articulate legitimate reasons for the Policy that demonstrate that it is "necessary to achieve a valid interest." *Inclusive Communities*, 135 S. Ct. at 2507.  Indeed, as noted above, the Policy mirrors federal law and HUD housing-assistance policy. *See* 42 U.S.C. § 1436a; 24 C.F.R. §§ 5.508-5.512.

The Policy exists to facilitate multiple legitimate purposes as this Court ***already*** found. One is to avoid potential criminal liability under the IRCA, 8 U.S.C. § 1324, which criminalizes the

harboring of illegal aliens. The Policy also assists in confirming the identity of applicants and any adult occupants, which in turn enables credit and criminal background checks and minimizes identity fraud and potential losses from eviction. Waples' expert George Caruso—a residential leasing expert with 44 years of experience in the industry, provided ***unrebutted*** testimony that it is a "reasonable practice to require proof of legal status in the United States as part of a residential application process…because a lack of legal status limits employment opportunities to enable the applicant to pay the agreed rent" and because "[p]roof of legal status… is necessary to help prove identity for criminal background and credit checks of an applicant." Ex. 4 ("Caruso Decl.")

    In ruling on the parties' prior cross motions for summary judgment, this Court determined as a matter of undisputed fact that the Defendants "have met their burden of production to articulate legitimate, non-discriminatory justification for the Policy…." (Dkt. 190 at 15.)  The Court found that Defendants described a number of legitimate reasons for the Policy stating:

> defendants have identified several neutral reasons for implementing the Policy, namely, (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability under 8 U.S.C. § 1324 for harboring illegal aliens, and (5) to underwrite leases. ***None of the evidence plaintiffs cite in response to defendants' stated justifications creates a genuine factual dispute regarding pretext for unlawful discriminatory intent.***

*Id.*  Nothing has changed regarding this finding since the Court made this ruling.  And plainly a legitimate purpose must by definition be based upon a "valid interest."  Plaintiffs did not appeal this finding. The Fourth Circuit's ruling, therefore, does not disturb this Court's prior findings as to the legitimate reasons for the Policy. Nonetheless, out of an abundance of caution, Defendants explain below the legitimate reasons for the Policy.

### A.    Defendants' Policy Is Necessary To Avoid The Criminal Prohibition On Harboring Illegal Aliens

    Mark Jones – Defendants' corporate designee – testified that the Policy of requiring proof of legal residence is in place to avoid running afoul of the anti-harboring statute set forth in 8

U.S.C. § 1324. Ex. 5 at 136; 140:19-21 ("Jones Dep Tr."). Defendants also explained this rational in an interrogatory response. Ex. 6 at Int. 16 ("…Defendants also seek to comply with 8 U.S.C. § 1324, *et seq.* in their housing practices."). As discussed above, Plaintiffs have never offered an argument as to why avoiding potential criminal liability under that statute does not achieve a valid interest. Accordingly, this Court correctly agreed "that ***there is no question***, given § 1324's imposition of liability for 'reckless disregard of the fact that [an] alien has come to, entered, or remains in the United States in violation of law,' that a lessor could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants. *See* 8 U.S.C. § 1324(a)(1)(A)(ii)." (Dkt. 190 at 17) (emphasis added).

### B. The Policy Also Assists In Confirming Identity, Which In Turn Enables Credit And Criminal Background Checks And Minimizes Identity Fraud And Potential Losses From Eviction

Defendants' reasons for creating the Policy "are to confirm the identity of the applicant(s) and any adult occupants, to perform credit checks, minimize identity fraud, and to eventually perform criminal background checks, and minimize loss from eviction…" Ex. 6 at Int. 1.[6] These reasons are plainly legitimate because confirming an applicant's identity is foundational to running credit and criminal background checks and the underwriting process. If an applicant is an undocumented immigrant, Defendants cannot verify the applicant's identity by matching the

---

[6]    In response to Interrogatory No. 16, Defendants stated:

> Without proper identity documentation such as valid visas and passports, Defendants have no evidence to prove individuals are who they claim to be. Without this identity proof, it weakens the credit and criminal reports received from the third party providers. From a criminal history underwriting concern, the criminal screening reports all crimes found in the United States, particularly the three state area (Virginia, District of Columbia, and Maryland). It does not include crimes from other countries. From a continuous income and employment concern, the prospective tenants' employment opportunities are limited under current hiring laws if the prospective tenants are undocumented immigrants. From the Park management view of lease underwriting, Defendants believe analyzing these factors for all prospective tenants minimize to the best of our abilities the exposure to financial and safety concerns. Defendants also seek to comply with 8 U.S.C. § 1324, *et seq.* in their housing practices.

Ex. 6 at Int. 16.

applicant's name to a document issued by the U.S. Government. These documents are used to verify identity and therefore used as a starting point of a criminal background and underwriting process.  The background checks and underwriting checks performed by Defendants are run on the identity given by the applicant *as verified by these documents*.  It is crucial, therefore, that Defendants confirm the correct identity of the applicant to make sure that the background and underwriting check is being run on the correct individual.  As noted above, in ruling on the parties' prior cross motions for summary judgment, this Court already found that these reasons for the Policy support a legitimate business purpose.  This finding requires dismissal of the disparate impact claim because a legitimate business purpose must also satisfy the "valid interest" test; otherwise it is not a legitimate business purpose.

### C.    George Caruso – A Leasing Expert With 44 Years of Experience – Offered *Unrebutted* Evidence Confirming The Validity Of Defendants' Legitimate Reasons For The Policy

Defendants' *unrebutted* leasing and management expert, George Caruso, has more than 44 years of relevant housing policy and management experience. He concluded that Defendants' Policy was reasonable, was consistent with industry practices and served the valid interests of Defendants. Mr. Caruso opined that:

1.    It is a reasonable practice to require proof of legal status in the United States as part of an application process to lease either an apartment or mobile home lot.

2.    The legal status of an applicant is relevant to making underwriting decisions as whether to rent to a particular person because it impacts factor such as *income*, *sustained income*, *reliable employment*, availability of HUD assistance and repossession of a unit or lot if necessary.

3.    The legal status of a potential resident is also necessary to determine the correct identity of the applicant person and to conduct an effective criminal background check of the applicant.

Ex. 4(1) at 1 (emphasis added).

25

Mr. Caruso has substantial experience and knowledge of housing application processes and underwriting decisions on whether to rent to a particular person. Indeed, Mr. Caruso has managed apartments and condominiums since 1977. Ex. 4(2).  Mr. Caruso has held a Certified Property Manager license since 1982. *Id.* The National Association of Realtors notes that those who hold a Certified Property Manager license "are recognized as experts in real estate management and they are at the top of the profession."[7]  Among other positions, Mr. Caruso has served as a Chairman of both the Federal Advocacy Board and Federal Housing Advisory Board for the Institute of Real Estate Management. *Id.*  Mr. Caruso has been appointed to the Best Practices Board of Directors for HUD. *Id.* He also served as an Executive Director of the National Affordable Housing Management Association ("NAHMA") – an association that would "prepare and present or brief for presentation testimony for Congress." *Id.*

He testified that he has 44 years of experience in managing properties. Ex. 7 at 9:8-9 ("Caruso Dep. Tr.") He manages 5,000 multifamily units. *Id.* at 9:10-21. In this role, he is basically "the in-house expert on operations and property management." *Id.* at 10:6-7. He is the reviewer of drafts of the policies "across the whole board" including "policies on admissions, policies on tenant file management, federal regulatory policies, bidding, management, contracting, you name it" for the properties. *Id.* at 11:22-12:12. Mr. Caruso based his opinions on his substantial experience.

Mr. Caruso opined at his deposition that in the residential leasing industry, in deciding to permit someone to lease a residential unit, a landlord is granting "someone credit to the tune of somewhere between 15,000 and 40,000 a year" and in the event a tenant cannot pay, a landlord can face "a long fight in the courts" and "could lose a lot of money" in order to reclaim the property. *Id.* at 125:6-126:7. He testified that he knew the key issue with Defendants' policy is the

---

[7]    *Available at* https://www.nar.realtor/designations-and-certifications/cpm.

requirement for proof of legal status.  Applying his industry knowledge to that issue, Mr. Caruso testified that since an illegal alien cannot legally work in this country, "how are they going to earn the money to pay their rent?" *Id.* at 125:9-10; 109:14-15 (noting that underwriting needs to focus on whether a tenant can get legitimate employment); 111:18-20 (same); 118:14-119:13.   Mr. Caruso summed up the logical reasoning for his opinion succinctly:

> Well, we touched on this, I think, half a dozen times, and I've tried to be consistent about it, but what it boils down to is when we're leasing stuff, the rent has to get paid. ***And if they can't be legally employed, how do you assure yourself that the rent is going to get paid.***

*Id.* at 129:6-11 (emphasis added).

Moreover, Mr. Caruso testified that asking for proof of legal status helps verify the identity of an applicant because government documents "***are among the gold standards*** in terms of decent third-party documentation." *Id.* at 116:10-117:1 (emphasis added). Mr. Caruso also testified that it is reasonable to ask for proof of legal status because federal policy prohibits granting federal assistance to anyone who is not properly admitted to the United States, Ex. 4 at 1, and it is reasonable to adopt "***the most restrictive standard, which is the federal standard.***" Ex. 7 at 28:20-21.  Plaintiffs did not identify a countering expert and these opinions stand unrebutted and identify a number of valid interests served by the Policy.

## III.    THERE IS NO EVIDENCE THAT DEFENDANTS' REASONS FOR THE POLICY ARE PRE-TEXTUAL OR THAT DEFENDANTS' INTERESTS COULD BE SERVED BY OTHER PRACTICES WITH LESS DISCRIMINATORY EFFECTS

There is no evidence that Defendants' reasons for the Policy are pre-textual or that Defendants' asserted interests "could be served by another practice that has a less discriminatory effect." *Inclusive Communities*, 135 S. Ct. at 2515. Indeed, in reviewing these reasons under a disparate treatment framework upon the parties' prior cross motions for summary judgment, this Court rejected Plaintiffs' arguments that these reasons were pre-textual. (Dkt. 190 at 15-17.)

Plaintiffs alleged that documents evidencing legal status "are not necessary to prove identity or to conduct background or credit checks[,]" Compl. ¶¶ 32-35, and that "[f]oreign passports or government-issued identification cards are sufficient." *Id.* ¶ 33. Plaintiffs also suggested an ITIN "is ***as reliable and precise as a Social Security number***." *Id.* ¶ 31 (emphasis added). These contentions are baseless.

As stated above, one of Defendants' rationales for the Policy are "to confirm the identity of the applicant(s) and any adult occupants, to perform credit checks, minimize identity fraud, and to eventually perform criminal background checks, and minimize loss from eviction…" Ex. 6 at Int. 1.[8] This is accomplished by requiring a social security number or a document issued by the United States government showing legal presence.  These documents verify identity. Mr. Caruso confirms that underwriting and criminal background checks are legitimate reasons to ask for proof of legal status. Mr. Caruso also testified that U.S. government documents confirming legal status "***are among the gold standards*** in terms of decent third-party documentation." Ex. 7 at 116:10-117:1 (emphasis added).  Such a document is issued only after vetting by the United States government of the person seeking legal residence. For example, the male Plaintiffs, who are all present in the United States legally, were required to be fingerprinted and to answer extensive questions about themselves as part of their application for Temporary Protected Status in the United States. *See, supra,* Material Fact 7. By contrast, the female Plaintiffs have never been subjected to such a process because they have never sought legal status in the United States.  Thus, the United States government has never verified the identity of the female Plaintiffs or conducted

---

[8]    As an initial matter, Plaintiffs' contention that Defendants ***only*** accept a passport, a Visa and I-94 forms as proof of legal presence. Defendants' assertion to contrary is flat wrong as this Court concluded previously stating "residents at the Park may satisfy the Policy by producing documents besides an original passport, such as (1) a permanent resident card (Form I-551 or I-151), (2) a temporary resident card (Form I-688A), or (3) a border crossing card." (Dkt. 190 at 4). Additionally, the Consumer Report & CoreLogic SafeRent and Training Manual also identifies various documents that will be accepted to establish legal residence and includes samples of such documents.  (Dkt. 151, Ex. 11 at WAPLES 628-638.)

a criminal background check for them using their fingerprints as is the case with the male Plaintiffs. There is a reason – several – why there is a detailed process to gain legal status in the United States.

In response, Plaintiffs claim that foreign passports or ITINS are sufficient to prove an applicant's identity. Plaintiffs' claim that foreign passports are sufficient to prove identity is undercut by the fact ███████████████████████████████████████

███████. *See, supra,* Material Fact 6. The requirement for a document issued by the United States government in the absence of a social security number is reasonable.

Moreover, Plaintiffs' contention that an  ITIN is sufficient to prove identity is wrong because all that a person must do to acquire an ITIN is send in a passport, a simple Form W-7 application with an attached copy of a tax return –  there is no in-person meeting or any other effort undertaken by the IRS to verify identity.  Plaintiffs admitted to this. *E.g.*, Rosy Reyes' Response to Int. 8 (Dkt. 98, Ex. 31); Rosy Reyes Dep. Tr. 56:10-58:9 (Dkt. 98, Ex. 9); Rivas Dep. Tr. 88:3-89:15 (Dkt. 98, Ex. 10); Amaya Dep. Tr. 64:19-66:1 (Dkt. 98, Ex. 12); Solis Dep. Tr. 40:7-41:20 (Dkt. 98, Ex. 11). ███████████████████████████████████████

██████ to obtain an ITIN and the IRS would be unaware.  According to a 2009 U.S. Treasury report, "[t]here are also no controls to prevent an ITIN from being used by more than one taxpayer on multiple tax returns." (Dkt. 98, Ex. 30 at 2.)[9] The same report states "[t]hirty-five percent… of the [ITIN] application packages sampled that were submitted directly to the IRS by mail or through Taxpayer Assistance Centers[] contained errors.  The errors ranged from missing and illegible documents **to inconsistencies between the Forms W-7 and the supporting documents.**" *Id.* (emphasis added).   The IRS states that "ITINS do not serve any purpose other than federal tax

---

[9]    *Available at* https://www.treasury.gov/tigta/auditreports/2010reports/201040005fr.html. As the Court noted in its prior Memorandum Opinion (Dkt. 56), the Court can take judicial notice of facts published in government reports.

reporting."[10] On February 5, 2018, the Department of the Treasury Inspector General for Tax Administration stated that "the IRS may have issued 151,384 potentially erroneous or fraudulent ITINs."[11]  In this report, the Inspector General found that "IRS management has not made a programming change needed to identify potentially fraudulent [ITIN] applications." Ex. 8 at 3 ("What TIGTA Found"). The Inspector General also found that "the IRS is unable to identify applications that are questionable based on potentially false or fraudulent supporting documentation via its systemic validation and verification processes" and that the "IRS may have issued 151,384 potentially erroneous or fraudulent ITINs." *Id.*

Defendants' own documents reflect what the IRS and the Department of Treasury have irrefutably stated. The SafeRent Training Manual discusses ITINs and states the following:

> Are ITINs valid for identification?  No.  ITINs are not valid identification outside the tax system.  Since ITINs are strictly for tax processing, IRS does not apply the same standards as agencies that provide genuine identity certification.  ITIN applicants are not required to apply in person and IRS does not further validate the authenticity of identity documents.  ITINs do not prove identity outside the federal tax system, and should not be offered or accepted as identification for non-tax purposes. (Dkt. 98, Ex. 11 at WAPLES 622.)

It is clear that Defendants' asserted interest in confirming identity cannot be served by applicants offering ITINS or foreign passports.

## **CONCLUSION**

For the reasons above, Defendants request this Court to enter judgment in favor of Defendants on Count I of Plaintiffs' Complaint and for such other relief as is just and proper.

---

[10]  *Available at* https://www.irs.gov/individuals/individual-taxpayer-identification-number at "What is an ITIN used for?"

[11]  February 5, 2018 Press Release, *available at* https://www.treasury.gov/tigta/press/press_tigta-2018-02.htm.

Respectfully submitted,


WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP, WAPLES PROJECT LIMITED
PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of October, 2019, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/ _____
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia  22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*