**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Civil Action No. 1:16cv00563-TSE-TCB |

**<u>MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION</u>**
**<u>FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

<b>Page</b>

INTRODUCTION ...................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS ...........................3

I.     STATEMENT OF FACTS ...................................................................................5

II.    PROCEDURAL HISTORY.................................................................................7

I.     PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING OF DISPARATE IMPACT. .......................................................................................................12

      A.    The Fourth Circuit Held that "Plaintiffs Have Satisfied Their Burden Under Step One of the Burden-Shifting Framework" ...........................13

      B.    The Fourth Circuit's Decision that Plaintiffs Made a *Prima Facie* Case of Disparate Impact Is Correct ...................................................14

      C.    Defendants' Arguments under the ICRA Anti-Harboring Provision Were Presented to – and Implicitly Rejected by – the Court of Appeals.......................17

II.    THERE IS AT LEAST A FACTUAL DISPUTE AS TO WHETHER THE POLICY FULFILLS A BUSINESS NECESSITY...........................................................20

      A.    All of Defendants' Purported "Business Necessities" Are in Fact Post Hoc Justifications for the Policy...........................................................21

      B.    Defendants Can Verify Identity Without the Documents Required by the Policy ......................................................................................22

      C.    Defendants Can Conduct Credit Checks Without the Documents Required by the Policy ...............................................................................24

      D.    Defendants Can Conduct Criminal Background Checks Without the Documents Required by the Policy......................................................25

      E.    Defendants Have Not Demonstrated that the Policy is Necessary to Allay Lease Underwriting or Eviction Concerns............................................26

      F.    Renting to Undocumented Immigrants Does Not Subject Defendants to Liability Under the ICRA ...............................................................28

III.   THERE IS AT LEAST A FACTUAL DISPUTE AS TO WHETHER THERE ARE ALTERNATIVES FOR THE POLICY THAT HAVE A LESS DISCRIMINATORY EFFECT .........................................................................29

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
    51 F.3d 1191 (3d Cir. 1995)............................................................................................... 27

*United States v. Aguilar*,
    477 F. App'x 1000 (4th Cir. 2012) ............................................................... 19, 28, 29

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975)............................................................................................................ 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................................ 9

*Betsey v. Turtle Creek Assocs.*,
    736 F.2d 983 (4th Cir. 1984) ..................................................................... 11, 20, 21

*Boone v. Everett*,
    671 F. App'x 864 (4th Cir. 2016) ................................................................................ 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................ 9

*Charbonnages de France v. Smith*,
    597 F.2d 406 (4th Cir. 1979) ........................................................................................ 9

*Chung v. Los Angeles*,
    406 Fed.Appx. 207 (9th Cir. 2010)............................................................................. 15

*Coupe v. Federal Express Corp.*,
    121 F.3d 1022 (6th Cir. 1997) ..................................................................................... 19

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)............................................................................................................ 27

*DelRio-Mocci v. Connolly Props. Inc.*,
    672 F.3d 241 (3d Cir. 2012)............................................................................... 18, 28

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
    290 F.3d 639 (4th Cir. 2002) ...................................................................................... 23

*Greene v. Feaster*,
    733 F. App'x 80 (4th Cir. 2018) ................................................................................. 9

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971)..................................................................................... 10, 17

*Hogan v. Carter*,
   85 F.3d 1113 (4th Cir. 1996) ........................................................................ 19

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013)...................................................................... 19, 28

*Lulamandier v. State Farm*,
   2016 WL 3211515 at *3 (E.D. La. 2016) ...................................................... 15

*United States v. McClellan*,
   794 F.3d 743 (7th Cir. 2015) ........................................................................ 19

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)....................................................................................... 20

*Medical Device Technologies v. CR Bard Inc.*,
   7 Fed. App'x 945 (Fed. Cir. 2001)................................................................ 15

*Merritt v. Old Dominion Freight Line, Inc.*,
   601 F.3d 289 (4th Cir. 2010) ........................................................................ 29

*Miller v. Leathers*,
   913 F.2d 1085 (4th Cir. 1990) ........................................................................ 9

*Phillips v. Cohen*,
   400 F.3d 388 (6th Cir. 2005) ........................................................................ 22

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   No. 17-1723, *Br. of Appellees at 34-35,* (4th Cir. Dec. 15, 2017).......................... 18

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   903 F.3d 415 (4th Cir. 2018)
   *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes,*
   139 S. Ct. 2026, 204 L. Ed. 2d 218 (2019)....................................................... passim

*Schwaber v. Hartford Ins.*,
   2007 WL 4532126 *4 (D. Md. 2007) ............................................................. 15

*Tex. Dept. of Housing v. Inclusive Communities Project, Inc.*,
   135 S. Ct. 2507 (2015)..................................................................................... 8

*United States v. Vargas-Cordon*,
   733 F.3d 366 (2d Cir. 2013)...................................................................... 18, 28

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
   726 F.3d 524 (5th Cir. 2013) ........................................................................ 19, 28

### Statutory Authorities

8 U.S.C. § 1324 (a)(1)(A)(iii) ........................................................... 17, 18, 28

8 U.S.C. § 1611(a) ...................................................................................... 27

### Rules and Regulations

24 C.F.R. § 100.500 ................................................................................... 11

24 C.F.R. § 100.500(c)(3) ........................................................................... 29

29 C.F.R. § 1607(D) ................................................................................... 17

84 Fed. Reg. 42854, 42862-63  (Aug. 19, 2019) ....................................... 11

Fed. R. Civ. P. 56(a) .................................................................................... 9

Fed. R. Evid. 702 ........................................................................................ 15

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolanos, Ruth Rivas,

Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David

Saravia Cruz (collectively, "Plaintiffs"), by their attorneys, respectfully submit this

memorandum of law in opposition to the motion for summary judgment filed by Defendants

Waples Mobile Home Park, LP, Waples Project, LP, and A.J. Dwoskin and Associates

(collectively, "Defendants") (Dkt. No. 247) on Count I of the Complaint.

## <u>INTRODUCTION</u>

The Fourth Circuit's September 12, 2018 opinion provided this Court with a clear roadmap

to follow in deciding whether Plaintiffs' Federal Housing Act ("FHA") claim should survive

summary judgment.  It clarified that the robust causality requirement did not preclude the female

Plaintiffs, as undocumented immigrants, from arguing disparate impact liability because "in

disparate-impact cases, '[e]ffect, not motivation, is the touchstone because a thoughtless housing

practice can be as unfair to minority rights as a willful scheme.'"  It further found that Plaintiffs

had not only pled, but also provided sufficient evidence of, a *prima facie* case of disparate impact,

and left it to this Court to consider the final two prongs of the analysis: whether there was a dispute

of material fact as to whether Defendants had demonstrated a valid business necessity for the

policy challenged by the Plaintiffs, and whether there was a dispute of fact as to whether Plaintiffs

could provide a less discriminatory alternative to that policy.

In their summary judgment brief, Defendants make a herculean effort avoid the clear

language of the Fourth Circuit's opinion, and they would have this Court do the same.  Defendants'

brief urges the Court to adopt a hybrid disparate treatment standard that incorrectly lowers

Defendants' burden of proof while heightening that of Plaintiffs.  For example, Defendants ask the

Court to ignore the Fourth Circuit's finding that Plaintiffs had provided sufficient evidence to

support a *prima facie* case of liability for the first step of the disparate impact analysis, thereby

precluding summary judgment with respect to that step. What is more, in rearguing why Plaintiffs did not satisfy this step, Defendants hang their hat on points that were explicitly rejected by the Fourth Circuit, specifically by contending that because the challenged practice targets undocumented immigrants, it cannot possibly have a disparate impact on Latinos. At the second step, Defendants set out a much lower standard than what the Fourth Circuit articulated, which is akin to the "legitimate nondiscriminatory interest" inquiry of disparate treatment liability than the "business necessity" inquiry of disparate impact liability. Then, at the third step, Defendants would have Plaintiffs prove that Defendants' business interests were pretextual, rather than simply providing evidence of a less discriminatory alternative to the challenged practice. This, too, is wrong. The truth is that Defendants simply cannot meet their burden on summary judgment under the rubric set out by the Fourth Circuit for this Court to follow.

When considered under the correct standard, it is clear that Defendants' Motion for Summary Judgment should be denied because Plaintiffs' FHA claim is well-supported by both the law and the facts.

*First,* the Fourth Circuit has already found that "Plaintiffs[] ***submitted sufficient evidence*** of a *prima facie* case of disparate impact"; thus, the Court need not, and should not, reconsider this issue on remand. But even if the Fourth Circuit had not definitively decided this issue, it is evident that Plaintiffs have satisfied the robust causality requirement necessary to make their *prima facie* case. Specifically, they have identified a policy, namely, Defendants' requirement that all occupants or intended occupants of Waples Mobile Home Park (the "Park") provide either a Social Security number or an original passport, an original U.S. visa, and an arrival/departure form ("I-94" or "I-94W") in order to reside there (the "Policy"). Then, Plaintiffs provided statistical evidence, both in the form of expert testimony and Defendants' own records, that the Policy had a

2

disparate impact on Latinos.  To the extent that Defendants purport to contest the validity of these statistics, such a challenge is by definition a dispute of fact to be resolved by the jury.

*Second,* there are undeniable issues of material fact with regards to Defendants' purported "business necessities":  irrespective of the merit of these justifications in the abstract (which is questionable, given the lack of evidence that Defendants actually considered them before this litigation), Defendants have offered no compelling reason why they require either a Social Security number or a passport, visa, and arrival/departure form to satisfy same.  Indeed, many of their "business necessities" may be satisfied using a number of other forms of identification readily available to U.S. citizens and documented and undocumented immigrants alike, including foreign passports and Individual Taxpayer Identification Numbers ("ITINs").  Additionally, the bulk of Defendants' rationales that may rise to the level of necessities with regards to *lessees* are simply not applicable to *occupants.*

*Third,* Plaintiffs offer a viable, less discriminatory alternative to Defendants' current policy which still suffices to fulfill their business needs:  Defendants may request a Social Security number or proof of legal presence from all lessees to satisfy any credit check, underwriting, and eviction concerns, but they may only request a passport and criminal background check from other occupants.  Defendants offer no reason why this option is not feasible; indeed, this is essentially an enhanced version of the policy than that which Defendants used until 2015 without issue.  There is therefore at least an issue of material fact as to the third step of the disparate impact inquiry.

For these reasons, as elaborated herein, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment on Plaintiffs' FHA claim.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

The parties previously submitted statements of undisputed, material facts in support of cross-motions for summary judgment (Dkt. No. 98 at 4-8; Dkt. No. 138 at 5-9), and responded to

each other's submissions (Dkt. No. 138 at 2-5; Dkt. No. 150 at 3-9). The Court considered all of those submissions in its prior summary judgment decision and created a list of undisputed, material facts. *See* Dkt. No. 190 at 2-6. That decision was vacated by the Court of Appeals, but with one exception: the list of facts is still valid.[1] The exception is an undisputed fact highlighted by the Fourth Circuit that did not make the list: "Most notably, Plaintiffs submitted evidence that Latinos comprised 91.7% of those unable to comply with the Policy and consequently facing eviction, despite comprising only 60% of those subject to the Policy." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 433 n. 11 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026, 204 L. Ed. 2d 218 (2019); *see also* Dkt. No. 138 at 8.

Nevertheless, Defendants "incorporate by reference" their prior submissions, Dkt. No. 248 at 2, so Plaintiffs are compelled to do the same. Defendants also offer additional facts, and Plaintiffs respond to those additions as follows:

1.      Undisputed.

2.      Disputed. The testimony cited focuses on whether CMS has provided margins of error at the state level. *See* Dkt. No. 248, Ex. 2 at 34:6-35:1.

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

---

[1] Defendants quote a few of the facts from the list—apparently their favorites—but do not include the whole list. *Compare* Dkt. No. 248 at 2 *with* Dkt. No. 190 at 2-6. For example, the Court also found that find that "[b]y September 2016, defendants had produced a report reflecting that Latinos comprise the majority of tenants who had failed to comply with the Policy." Dkt. No. 190 at 6.

7.      Undisputed.

8.      Disputed.  A person must submit their original passport, or bring the passport to a designated location for inspection; photocopies are not accepted.  Dkt. No. 138, Ex. 2 ¶ 8.

### STATEMENT OF THE CASE

#### I.      STATEMENT OF FACTS

Plaintiffs are four Latino couples of Salvadorian and Bolivian national origin that lived in Waples Mobile Home Park in Fairfax, Virginia for years with their children before they were suddenly ousted from their homes in 2015 and 2016.  *See generally,* Dkt. No. 138, Exs. 8-11.  The four female Plaintiffs are undocumented immigrants who possess U.S. government-issued ITINs, and the four male Plaintiffs are legally present in the U.S.  *See id.*; *see also* Ex. 1 (Amaya Interrogatory Responses) at 4.  All of the Plaintiffs' children are U.S. citizens.  *See* Dkt. No. 138, Ex. 8 ¶ 3, Ex. 9 ¶ 3, Ex. 10 ¶ 3, Ex. 11 ¶ 3.  Notably, each of the male Plaintiffs passed a credit and criminal background check as part of the application process to live at the Park, and subsequently entered into a yearly lease.  *See* Dkt. No. 138, Exs. 12-15.

Plaintiffs were functionally evicted from the Park due to Defendants' sudden enforcement of the previously unenforced Policy, which required all individuals who lived or intended to live at the Park to present an original social security card or, in the absence of a Social Security number, an original passport, an original U.S. visa, and an original arrival/departure form.  *See* Dkt. No. 138, Ex. 3 at WAPLES00000750.  Simply put, the Policy demands proof of legal immigration status as a precondition not just for becoming a lessee, but even for residing at the Park as an occupant together with a qualifying lessee.  Such a Policy is not a standard leasing practice; indeed, with the exception of federally subsidized low-income public housing complexes not relevant here, Defendants could not identify a single landlord that maintained a similar policy.  Dkt. No. 138, Ex. 25 at 85:15-17; 86:1-12; 88:13-89:12.  Additionally, although the Policy was technically in

5

existence when the Plaintiffs moved into the Park, it was rarely enforced, and record evidence shows that Defendants initially acquiesced to the female Plaintiffs' residence at the Park despite their immigration status. *See, e.g.,* Dkt. No. 138 at Ex. 8 ¶ 14, Ex. 9 ¶¶ 12-13, Ex. 11 ¶ 12, Ex. 17, Ex. 18 at 39:3-5, Ex. 20 at 49:9-22; 58:5-59:4; Ex. 32.

Once Defendants began enforcing the Policy through a process of "recertification" in 2015, the Plaintiffs were informed that they were in breach of the Policy, because even though each of the male Plaintiffs—the sole leaseholders—were in compliance with the Policy, the female Plaintiffs were not. *See, e.g.,* Dkt. No. 138, Exs. 4-6. Defendants also rejected the female Plaintiffs' efforts to furnish alternative forms of identification to satisfy these new requirements for residency, such as passports, ITINs, and even already-completed criminal background checks. *See* Dkt. No. 138, Ex. 16 at 59:7-9; Ex. 20 at 50:7-53:2; Ex. 34. As a result of the female Plaintiffs' noncompliance with the Policy, Defendants refused to renew the Plaintiffs' annual leases, instead putting them on month-to-month leases with $100 surcharges. *See, e.g.,* Dkt. No. 138, Exs. 4-6. They also threatened eviction if Plaintiffs could not cure the violation of the Policy within 21 days, *id.*, which would force the female Plaintiffs to live apart from their husbands and children. The combination of rent increases and eviction notices—and the stress stemming from both—operated to functionally evict the families from the Park. *See, e.g.,* Dkt. No. 138, Ex. 16 at 83:15-84:19, Ex. 20 at 61:1-62:8, Exs. 38-39. Presently, none of the Plaintiffs lives there.[2] *Id.*

Empirical evidence demonstrates that the Policy disproportionally impacted Latino families, like Plaintiffs. Plaintiffs' expert, Professor William A.V. Clark, found that the majority of undocumented immigrants in Virginia, Fairfax County, and the tract on which the Park sits, are

---

2 ███████████████████████████████████████████████████████
████████████████████████████████████████████████

Latino.  *See generally* Dkt. No. 138, Ex. 40 ¶ 6, Exs. B-C.  This means that any policy which targets undocumented immigrants necessarily has a disproportionate impact on Latino individuals.  The effect is confirmed by Defendants' own documentation:  a review of the Park's files demonstrated that, of the 12 families who were found not in compliance with the Policy as of May 2016, 11 (or 91%) had Latino surnames.  *See* Dkt. No. 138, Ex. 1.  This disparity continued into September 2016, when 16 out of 19 (or 84%) individuals had Latino surnames.  *See* Dkt. No. 138, Ex. 41.

## II.   **PROCEDURAL HISTORY**

In its previous summary judgment opinion, the Court denied Plaintiffs' motion for summary judgment on their FHA claim, and granted Defendants' motion for summary judgment on the same claim.  *See* Dkt. No. 190 at 20.  However, the Court only addressed the FHA claim under a disparate treatment theory, rather than a disparate impact theory:  "[T]hus, after full briefing and argument at the threshold stage, [the] housing discrimination claims were permitted to proceed as disparate *treatment* claims, and Plaintiffs were further permitted to use evidence of disparate impact to support an inference of intentional discrimination."  *Id.* at 8 n.8 (emphasis in original).  Indeed, at oral argument, the Court found that "As you all know, I disposed of disparate impact at the motion to dismiss stage . . . .  I held explicitly that disparate impact could not be used to satisfy the causation requirement here, because to do so . . . would effectively erase the causation requirement."  2/17/2017 Hr'g Tr. at 5:6-18.

On appeal to the Fourth Circuit, the panel majority vacated this ruling.  *See Reyes,* 903 F.3d at 433.  In assessing the "robust causality" requirement elucidated in *Tex. Dept. of Housing v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507 (2015), the court concluded that it mandates that plaintiffs identify "a specific policy or practice that caused the discrepancy."  *Id*. at 426 (noting that a simple "racial imbalance" without an accompanying policy fails to make out a *prima facie*

case of disparate impact). The court also rejected the reasoning that "courts should reject a disparate-impact claim if the plaintiff is impacted by the allegedly discriminatory policy for reasons that are distinct from the plaintiff's inclusion in a protected class, even if the protected class is disparately impacted by the challenged policy" because such analysis "threatens to eviscerate disparate-impact claims altogether." *Id.* at 429-30. Instead, the proper inquiry is simply whether "a protected class is disproportionately *affected* by a challenged policy." *Id.* at 430 (emphasis in original).

Ultimately, the Fourth Circuit ruled that not only had Plaintiffs sufficiently pled their claim of disparate impact to survive a motion to dismiss, but they had also provided sufficient evidence to make a *prima facie* case of disparate impact at the summary judgment stage. *Reyes,* 903 F.3d at 432-33. The Fourth Circuit then remanded the case for the district court to consider the remaining two inquiries under disparate impact: whether Defendants had provided evidence of a "business necessity" sufficient to justify the Policy, and whether Plaintiffs had provided evidence of an alternative to the Policy with a less discriminatory effect. *Id.* Defendants' petition for rehearing *en banc* and petition for *certiorari* were both summarily denied.

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boone v. Everett,* 671 F. App'x 864, 865 (4th Cir. 2016) (same). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (finding that defendants "failed to discharge their burden of showing

the absence of evidence supporting" plaintiff's excessive force claim). "The facts and inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, and this party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Applying this criteria, it is clear that summary judgment is inappropriate in this case.

## **ARGUMENT**

At the outset, it is necessary to set out the correct standard for disparate impact claims under the Fair Housing Act. The Fourth Circuit's opinion was largely devoted to clarifying this standard; Defendants' brief, by comparison, is largely devoted to muddling it.

*First*, Defendants attempt to add requirements. The Fourth Circuit confirmed that there are only three steps to the disparate impact analysis: "[i]n *Inclusive Communities*, [135 S.Ct. 2507 (2015)], the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework," *Reyes*, 903 F.3d at 424:

- "Under the first step, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class." *Id.* (citations omitted).

- "Under the second step, the defendant has the burden of persuasion to state and explain the valid interest served by the policies. . . . (. . . this step is analogous to Title VII's business necessity standard)." *Id.* (citations omitted).

- "Under the third step of the framework, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests could be served by another practice that has less discriminatory effect." *Id.* (citations omitted).

But Defendants seek to lead this Court astray by adding a fourth step:

*Inclusive Communities* held that FHA disparate-impact liability is limited to the 'removal of artificial, arbitrary, and unnecessary barriers'—it may not be employed

9

to 'displace valid governmental and private priorities.' 135 S.Ct. at 2524, *see also Reyes*, 903 F.3d at 424-25.

Dkt. No. 248 at 4; *see also id.* at 13 (caption) ("Plaintiffs cannot point to any evidence showing that Defendants' Policy is 'artificial, arbitrary, and unnecessary'"); 14 ("by definition the Policy is far from 'artificial, arbitrary, and unnecessary.'").

There is no fourth step. Those phrases ("artificial, arbitrary, and unnecessary"; "valid governmental and private priorities") were taken from a portion of the Supreme Court opinion in which the Court was offering assurance that the three-part standard—by itself—would ensure proper results:

- "Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities." *Inclusive Communities*, 135 S.Ct. at 2524.

- "Governmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.' *Griggs [v. Duke Power]*, 401 U.S. at 431." *Id.*

As a result, there is no need to independently address whether a policy is "unnecessary," "artificial," "arbitrary," and "[in]valid," because the three-part test is designed to demonstrate whether those adjectives apply: a policy is "unnecessary" if defendants cannot show a "business necessity" at step two; and a policy is "artificial" and "arbitrary" (and ultimately "[in]valid") if plaintiffs show that other policies could serve defendants' interests with less discriminatory effect. In other words, if a policy fails the three-part test, then it is *by definition* "unnecessary," "artificial," "arbitrary," and "[in]valid"; if it meets the three-part test, it is not.[3]

---

[3] Defendants also cite to a recent proposal to revise FHA regulations in a way that would add more steps to the three-part analysis. 84 Fed. Reg. 42854, 42862-63 (Aug. 19, 2019). The existing regulations, which are applicable to this case, do not contain those additional steps. 24 C.F.R. § 100.500. And, for the reasons stated herein, the proposal is badly flawed.

*Second*, Defendants muddle the disparate impact standard by applying rules that are only applicable to disparate treatment cases.  As this Court noted in its decision addressing Defendants' motion to dismiss, it is notably easier to overcome a *prima facie* showing of disparate treatment than it is to overcome a *prima facie* showing of disparate impact:

> The choice between these two approaches is not inconsequential, as "[t]he burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent." *Betsey [v. Turtle Creek Assocs.]*, 736 F.2d [983] at 988 [(4th Cir. 1984)].   Specifically, whereas a disparate treatment defendant can "overcome a *prima facie* showing of discriminatory intent by articulating some 'legitimate non-discriminatory reason for the challenged practice,'" a disparate impact defendant "must prove a business necessity sufficiently compelling to justify the challenged practice." *Id.*

Dkt. No. 56 at 4.  Notwithstanding that admonition, Defendants argue that they have overcome Plaintiffs' *prima facie* showing of disparate impact because they can identify a "legitimate business purpose" for their policy.  *See, e.g.*, Dkt. No. 248 at 25 (reciting "legitimate business purpose" three times, and "legitimate reasons" once).  But "legitimate business purpose" is not the right standard; instead, they must make the "more difficult" showing of "business necessity."[4]  *See also* Section II, *infra*.

*Third*, Defendants attempt to muddle the causation inquiry.  The Fourth Circuit decision contains a separate section specifically addressing a "grievous error" in this Court's prior opinions; specifically, the conclusion that the female plaintiffs' immigration status—and not their Latin American origins—was the cause of the harm they suffered:

---

[4]  On page 25 of their brief, the Defendants also state: "in ruling on the parties' prior cross motions for summary judgment, this Court already found that these reasons for the Policy support a legitimate business purpose."  That is irrelevant, and further muddles the inquiry.  The Court was addressing the disparate *treatment* claim in that decision, and held (consistent with the disparate *treatment* standard) the Defendants identified "neutral reasons" for their policy.  Dkt. No. 190 at 15.  The Court did not hold that Defendants met the "more difficult" business necessity standard applicable to this disparate *impact* claim.

> In determining that Plaintiffs were unable to demonstrate robust causality, the district court stated that "it is undisputed that the female plaintiffs are unable to satisfy the Policy—and prove legal presence in the United States—not because of their race or national origin, but because they are, in fact, unlawfully present in the country."

903 F.3d at 429. The Fourth Circuit found that conclusion to be profoundly incorrect, because it

"threaten[ed] to eviscerate disparate impact claims altogether." *Id.* at 430. But Defendants ignore

that ruling and raise exactly the same argument again:

> Now, at the motion for summary judgment stage after remand, the "undisputed factual record" clearly confirms that the cause of the any [sic] alleged impact from the Policy is not because of Plaintiffs' status as Latinos but because the female Plaintiffs entered the country illegally. The factual evidence confirms that Plaintiffs cannot – and do not – establish a "robust causal" link between the Policy and the alleged disparate impact. *Inclusive Communities*, 135 S. Ct. at 2523. Plaintiffs, therefore, fail to demonstrate evidence of a *prima facie* claim of disparate impact at the summary judgment stage.

Dkt. No. 248 at 15. This assertion was a "grievous error" before, and it remains a "grievous error"

now.[5]

## I.    PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING OF DISPARATE IMPACT.

In addition to misstating the applicable standard, Defendants improperly urge this Court to

revisit the Fourth Circuit's holding that the Plaintiffs have made a *prima facie* case of disparate

impact, as required under step one of the burden-shifting framework. But the Court is bound by

the Fourth Circuit's ruling on this point; as such, it may only consider the second and third factors

here. Even if the Court was not so bound, however, Plaintiffs have more than adequately

demonstrated that there are, at the very least, disputed issues of material fact as to whether they

---

[5] Defendants imply that the situation is somehow different because the case is now "at the motion for summary judgment stage after remand." Dkt. No. 248 at 15. That makes no sense. The "error" did not involve the need for evidentiary support; instead, it was an error regarding the causation analysis.

have made the requisite showing through their statistical evidence, which demonstrates the requisite connection between the Policy and its disparate impact on Latinos.

### A.     The Fourth Circuit Held that "Plaintiffs Have Satisfied Their Burden Under Step One of the Burden-Shifting Framework"

This Court need not (indeed, may not) address step one of the *Inclusive Communities* analysis, because the Fourth Circuit has determined that the Plaintiffs "satisfied their burden" at that step.

The decision of the Court of Appeals specifically addresses both this Court's ruling on Defendants' motion to dismiss, and its ruling granting Defendants' motion for summary judgment:

> First, we must determine whether the district court erred in functionally dismissing Plaintiffs' disparate-impact theory of liability at the motion to dismiss stage. Then, we must determine whether the district court erred in granting Waples' motion for summary judgment on the FHA claim because it did not consider Plaintiffs' disparate-impact theory of liability at this stage. We now hold that the district court erred on both occasions.

903 F.3d at 423.

Regarding the motion to dismiss, the Fourth Circuit held that Plaintiffs met their burden to plead sufficient facts to overcome the motion:

> At the motion to dismiss stage, we must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. Therefore, accepting these statistics as true, we conclude that Plaintiffs sufficiently alleged a *prima facie* case of disparate impact.

*Id.* at 428 (citations omitted). The court then went further, and held that Plaintiffs "submitted sufficient evidence" of disparate impact:

> Consequently, because the district court concluded that the FHA claim survived the motion to dismiss stage, and because we conclude that Plaintiffs[] **submitted sufficient evidence** of a *prima facie* case of disparate impact, the district court should have addressed the FHA claim under the disparate-impact theory of liability at the motion for summary judgment stage.

13

*Id.* at 433 (emphasis added).[6]  Accordingly, only steps two and three remain under consideration:

> We merely hold, under these facts, Plaintiffs have satisfied their burden under step one of the burden-shifting framework to make a *prima facie* showing of disparate impact.  It is for the district court to determine in the first instance whether Plaintiffs have satisfied the additional steps in this inquiry and, thus, whether Waples' Policy requiring occupants to provide documentation evincing legal status violated the FHA by disproportionately impacting Latinos.

*Id.* at 433 n.12.

### B.    The Fourth Circuit's Decision that Plaintiffs Made a *Prima Facie* Case of Disparate Impact Is Correct

Because the Court of Appeals has held that Plaintiffs "satisfied their burden" under step one, all of Defendants' arguments regarding step one are entirely beside the point.  Those arguments are also wrong.

As an initial matter, Defendants incorrectly assert that "Plaintiffs' claim of alleged disparate impact is supported only by their statistical expert, Professor Clark." Dkt. No. 248 at 15.  That is not true.  Plaintiffs also submitted evidence showing the direct effect of the policy on the actual residents of the trailer park: Exhibit 1 to Plaintiffs' earlier-filed Cross Motion for Summary Judgment (a chart created by Defendants) showed that 11 of the 12 families affected by Defendants' Policy were Latino.  Dkt. No. 138, Ex. 1.  Moreover, the Fourth Circuit noted that such direct evidence is actually preferable to the evidence based on population statistics that was submitted by the experts:

> We note that Plaintiffs submitted additional, stronger statistical evidence in support of their cross-motion for summary judgment on the disparate-impact theory of liability . . . . Most notably, Plaintiffs submitted evidence that Latinos comprised 91.7% [11 of 12] of those unable to comply with the Policy and consequently facing eviction, despite comprising only 60% of those subject to the Policy.

---

[6]  Defendants state that "[t]he Fourth Circuit did not evaluate Plaintiffs' disparate impact claim under a summary judgment standard." Dkt. No. 248 at 9.  As the quotes in the text show, that is not true.

*Reyes,* 903 F.3d at 433 n.11.

Additionally, Defendants' complaints about the statistical validity of Professor Clark's analysis demonstrate—at most—that there are disputed facts, which preclude summary judgment. *Chung v. Los Angeles*, 406 Fed. App'x 207, 210 (9th Cir. 2010) ("Theories of dueling experts create a triable issue of fact."); *Medical Device Technologies v. CR Bard Inc.*, 7 Fed. App'x 945, 949 (Fed. Cir. 2001) ("Equivalence remains a question of material fact when specific, detailed evidence by dueling expert witnesses is submitted, and, therefore, summary judgment is inappropriate on this issue."); *Lulamandier v. State Farm*, 2016 WL 3211515, at *3 (E.D. La. 2016) (collecting cases); *Schwaber v. Hartford Ins.*, 2007 WL 4532126, at *4 (D. Md. 2007) ("However, plaintiff's evidence merely establishes a classic duel between competing experts, and judging the credibility of experts falls squarely within the province of the jury. Consequently, plaintiff's motion for summary judgment on the issue of the applicability of the policy exclusions is denied.").[7]

Defendants' complaint that Professor Clark's data and analysis "are unsupported and unreliable," Dkt. No. 248 at 15, also has no basis. In fact, Defendants' expert, Dr. Weinberg, uses the same data, and his analysis produces very similar population estimates (*e.g.*, 301 vs. 287). Dkt. No. 248, Ex. 1(C) at 1-2. Dr. Weinberg's disagreement with Professor Clark involves the "margin of error" for the smallest applicable geographic area ("census tract 4406"). Dr. Weinberg contends that the margin of error at that level is so large that it makes his estimate (and Professor Clark's) unreliable. Dkt. No. 248, Ex. 3(1) at 7. But that criticism misses the point. Professor Clark could

---

[7] Notably, Defendants did not move to exclude Professor Clark's testimony under Fed. R. Evid. 702, and any such motion would have been meritless: Professor Clark's credentials are extraordinary, and he has served as an expert witness in several prior federal cases. Dkt. No. 248, Ex. 1(A) (Clark curriculum vitae).

have looked at larger geographic areas (*e.g.*, Fairfax County), which would have produced the same conclusion regarding disparate impact on Latino residents. Dkt. No. 248, Ex. 1(C) at 1 ("Notably, Dr. Weinberg does not challenge my statements regarding disproportionate impact at the State and County levels. In fact, the 30.7 percent Hispanic undocumented ratio for Fairfax County (Clark Report at 4) is very close to my estimate for Census Tract 4406."). But Professor Clark reasonably concluded—and Dr. Weinberg does not contest—that the trailer park likely includes *at least* the same proportion of Latinos and undocumented individuals as Fairfax County, because it contains some of the only affordable housing in the vicinity. Dkt. No. 248, Ex. 3(1) at 1. The direct evidence shows that conclusion to be correct: 60 percent of the residents of the Park are Latino. Dkt. No. 190 at 4. The direct evidence also strongly supports Professor Clark's conclusion that the policy had a "disproportionate" impact on Latinos, Dkt. No. 248, Ex. 1 ¶ 6: 91.7% of the individuals actually affected by the policy are Latino. Dkt. No. 138, Ex. 1; *see also Reyes,* 903 F.3d at 433 n.11.

Finally, Defendants' analysis of the effects of the Policy on the Asian population is entirely beside the point. Defendants assert that Latinos are "only 1.4 times more likely to be impacted by a policy directed at illegal aliens as undocumented Asians," and they contend that "[t]his is not nearly enough of a difference to raise a genuine issue of material fact on whether the Policy has caused a disparate impact." Dkt. No. 248 at 15-16. But disparate impact analysis does not involve comparing one protected group against another (Asian vs. Latinos; African-Americans vs. Latinos); instead, the analysis involves comparing a protected group to the remainder of the population, or to a preferred group. *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 (1971) ("requirements operate to disqualify Negroes at a substantially higher rate than white applicants"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) ("the tests in question select applicants

16

for hire or promotion in a racial pattern significantly different from that of the pool of applicants"); 29 C.F.R.§ 1607.4(D) ("A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact.").  Accordingly, the Court of Appeals held that it was necessary to "compare whether Latinos that are subject to the Policy—i.e., Latino tenants at the Park—are disproportionately impacted by the Policy as compared to non-Latinos that are subject to the Policy—i.e., non-Latino tenants at the Park."  903 F.3d at 429 n.8.  As Professor Clark observed, "Latinos are nearly 7 times more likely to be undocumented as other groups and so 7 times more likely to be adversely affected by the policy." Dkt. No. 248, Ex. 1(B) at 5.  Plainly, that difference meets the standard for disparate impact.  *See* 29 C.F.R. § 1607(D).

## C.  Defendants' Arguments under the ICRA Anti-Harboring Provision Were Presented to – and Implicitly Rejected by – the Court of Appeals

A portion of the Immigration Reform and Control Act (the "IRCA") makes it illegal to "knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceal[], harbor[], or shield[] from detection such alien."  8 U.S.C. § 1324 (a)(1)(A)(iii).  Defendants argue that the quoted provision requires them to adopt the Policy at issue ("'ties the [defendant's] hands to such an extent that it lacks a meaningful choice'"), and for that reason IRCA breaks the causal chain between the policy and the impact on the Plaintiffs. Dkt. No. 248 at 10-12.  In other words, Defendants argue that IRCA is to blame for the harm experienced by Plaintiffs, and not Defendants' Policy.

The Court of Appeals implicitly rejected that argument.  Defendants presented the argument in the same way they present it here: arguing that they "do[] not have 'discretion' to ignore IRCA's anti-harboring criminal prohibition," and that lack of discretion "severs any

conceivable causal connection between the Policy and the impact on Plaintiffs."  Br. of Appellees at 34-35, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, No. 17-1723 (4th Cir. Dec. 15, 2017), Doc. No. 50.  Nevertheless, the Court of Appeals found a "robust causal connection" between Defendants' Policy and the Plaintiffs' harm, 903 F.3d at 433 and n.12, which necessarily means that the court rejected Defendants' argument that the causal connection was "sever[ed]."[8]  (Indeed, if the court had accepted Defendants' argument that the Policy is legally mandated by IRCA, then its entire opinion would have been unnecessary; given that the argument was squarely presented to the Court of Appeals, we should not presume that the judges knowingly rendered an advisory opinion.)

That result is consistent with all other reported appellate decisions: the simple act of renting property to undocumented immigrants, without more, does not violate the IRCA harboring provision.  *See United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police is . . . not an offense under §1324(a)(1)(A)(iii)."); *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking immigration status constitutes harboring."); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 320 (3d Cir. 2013); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 529 (5th Cir. 2013). Conviction under the statute requires evidence "that the defendant has taken actions to conceal an

---

[8]  The dissent disagreed that Plaintiffs demonstrated a causal connection, but not because of IRCA. 903 F.3d at 433-34.  Accordingly, the appellate court was unanimous in disregarding Defendants' IRCA argument.

alien by," for example, "moving the alien to a hidden location or providing physical protection to the alien." *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015).[9]

Scratching beneath Defendants' conclusory phrases ("ties the [defendant's] hands"; "severs any conceivable causal connection"), they don't really claim that IRCA *compels* them to follow the policy at issue. Instead, they claim that IRCA makes it *prudent* for them to consider immigration status in rental underwriting: "If Defendants ignored facts such as the inability of a Latino applicant from another country to provide a social security number or proof of legal status, it too could be accused of 'reckless disregard' . . . ." Dkt. No. 248 at 11. But that is a different issue—to be considered at step two, where Defendants have the opportunity to show a "business necessity" for the policy. The IRCA would be an issue at step one only if "ties the [defendant's] hands" by *compelling* a particular result. *See, e.g., Coupe v. Federal Express Corp.*, 121 F.3d 1022, 1026 (6th Cir. 1997) (federal rule prohibited airline from using pilots older than 60; therefore, airline did not violate Age Discrimination in Employment Act by refusing to use pilots above that age). Plainly, Defendants were not compelled to expel residents without lawful immigration status, because at first they only used immigration status as an excuse to raise the rent, *see, e.g.,* Dkt. No. 138, Ex. 4, Ex. 6, Ex. 8, ¶¶ 17-21.[10]

---

[9]  Defendants rely exclusively on *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012), a case which apparently involved a rooming-house, but that was an unpublished opinion which—unlike the Fourth Circuit decision here—is "not even regarded as binding precedent." *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996). In any event, the court in *Aguilar* did not hold that the simple act of renting property to undocumented immigrants could result in liability under IRCA. *See* Section II.F, *infra*.

[10]  Alternatively, to the extent Defendants attempt to justify their Policy based on a *belief* that it was a legal requirement under IRCA or any other federal statute, that belief was erroneous for the reasons set forth herein, and compliance with an incorrect understanding of law cannot possibly constitute a "business necessity" within the meaning of *Inclusive Communities*. There is no good-faith, bona fide error, or qualified immunity defense to the Fair Housing Act.

For these reasons, the Court cannot and should not deviate from the findings of the Fourth Circuit that Plaintiffs have made out a *prima facie* case of disparate impact sufficient to satisfy the first factor. Defendants' arguments that summary judgment is merited on this factor should therefore be rejected.

## II.      THERE IS AT LEAST A FACTUAL DISPUTE AS TO WHETHER THE POLICY FULFILLS A BUSINESS NECESSITY

As noted above (*see supra* at Section I), Defendants further attempt to lead the Court astray with regards to the second factor in the disparate impact analysis by once again conflating the disparate impact and disparate treatment inquiries. Specifically, Defendants continually emphasize that they have "legitimate reasons" for maintaining the challenged Policy, *see, e.g.,* Dkt. No. 248 at 22-25, akin to the second prong of the disparate treatment inquiry requiring evidence of a "legitimate non-discriminatory reason for the challenged practice," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). But that is not the correct standard under disparate impact; rather, Defendants must demonstrate a "***business necessity*** sufficiently compelling to justify the challenged practice." *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 988 (4th Cir. 1984) (emphasis added). As the Fourth Circuit has previously recognized, this is a "different and more difficult" standard than the one that Defendants promote, which applies to disparate treatment. *Id.* (distinguishing evidence of a "business necessity" from evidence of a "legitimate non-discriminatory reason for the challenged practice"). This Court recognized the same. Dkt. No. 56 at 4 ("The choice between these two approaches is not inconsequential, as '[t]he burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent.'" (quoting *Betsey,* 736 F.2d at 988)).

Thus, Defendants cannot simply rely on the Court's earlier assessment of their "legitimate reasons" on summary judgment, as it was applying the more lax disparate treatment standard. *See* Dkt. No. 90 at 15-17. In order for summary judgment to be merited here, they must prove that there are *no factual disputes* that their purported reasons are in fact "business necessit[ies] sufficiently compelling to justify" the Policy. *Betsey*, 736 F.2d at 988. This is a high bar that Defendants cannot meet, for the reasons that follow.

### A.    All of Defendants' Purported "Business Necessities" Are in Fact Post Hoc Justifications for the Policy

Defendants offer five reasons for the Policy: (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability for harboring illegal aliens, and (5) to underwrite leases. Dkt. No. 248 at 2.

But other than self-serving interrogatory answers, they have not produced any evidence demonstrating that the Policy was actually motivated by any of those reasons: not a single internal document dating to prior to the filing of this lawsuit, and no deposition testimony. Instead, Defendants' employees testified that they did not know why the Policy was written the way it was. For example, Carolina Easton, Defendants' Quality Control Manager, stated that the requirement for residents to provide a Social Security card was " ███████████████████████████ ██████████████████████████████ " Dkt. No. 138, Ex. 27 at 123:12-14. And, when asked specifically about Defendants' purported liability under the ICRA's anti-harboring provision, Mark Jones, Defendants' Chief Financial Officer and their 30(b)(6) designee, testified that, to his knowledge, there was " ██████████████████████████ ████████████████████████████████████████████ █████████ " Dkt. No. 138, Ex. 21 at 138:18-139:5. The weakness of Defendants' "business

necessities" are only further underscored by the fact that Defendants' Chief Executive Officer, Albert Dwoskin, could not identify a single property with similar policies.[11]  Dkt. No. 138, Ex. 25 at 85:15-17; 86:1-12; 88:13-89:12.

Plainly, all of Defendants' stated justifications were created *post hoc*—or, at the very least, there exists a disputed issue of material fact as to whether Defendants' stated justifications genuinely existed prior to the filing of this lawsuit—and for that reason they cannot satisfy the "business necessity" test.  *Cf. Phillips v. Cohen*, 400 F.3d 388, 400 (6th Cir. 2005) (finding that "[t]he trial judge was correctly dubious of the seductive logic of post-hoc explanation" used to justify defendant's otherwise discriminatory employment policy); *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1045 (7th Cir. 1991), *opinion supplemented on denial of reh'g,* 963 F.2d 929 (7th Cir. 1992).

## B.  Defendants Can Verify Identity Without the Documents Required by the Policy

Defendants cannot claim that the "business necessity" of verifying identity can only be advanced by the documents required by the Policy, namely, an Social Security card or "an original passport, original U.S. visa, and original arrival/departure form (I-94)."[12]  First and foremost,

---

[11]  Notably, the Court previously found there *is* a triable issue of fact as to whether Defendants were aware female Plaintiffs were living in the Park, further undermining the legitimacy of Defendants' "business necessities."  Dkt. No. 190 at 3 n.4.  In other words, Defendants knew that their Policy required them to collect from the female Plaintiffs either their Social Security number or their passport, visa, and I-94.  Yet their "business necessities" did not prevent them from looking the other way for several years so as to continue collecting Plaintiffs' rent.

[12]  Defendants also claim that they accepted other evidence of legal presence apart from the documentation enumerated in the Policy.  *See* Dkt. No. 248 at 28, n.8.  But the only documentary evidence that Defendants cite in support explicitly states that ███████████████████████ ████████████████████████████████████████████████████████████████████████ just as the Policy does.  Dkt. No. 138, Ex. 43 at WAPLES00000639; *see also* Dkt. No. 190 at 3 ("The Policy further provided that "Applicants who do not have a Social Security number[] must provide their original Passport, original US Visa[,] and original Arrival/Departure Form (I-94 or I-94W).").

Defendants have admitted that they do not use Social Security numbers to verify identity.[13]  *See* Dkt. No. 138, Ex. 21 at 123:16-19.  As such, the crux of Defendants' argument as to this "business necessity" is that it is impossible to verify an undocumented immigrant's identity.  This is not true: both foreign passports and ITINs, which are only granted by the IRS after receiving an original passport, Dkt. No. 138, Ex. 2 ¶ 8, may be used to verify identity on their own.[14]  The female Plaintiffs' passports are government-issued documents, reflecting their names, birth dates, physical characteristics, and a unique identifying number, just like a U.S. Passport.  *See, e.g.*, Dkt. No. 138, Ex. 38 at WAPLES00001789.  This is exactly the same information reflected in a U.S. passport.  Defendants recognize this:  that is why the Policy allows, among other things, a passport in the absence of an Social Security card, as do numerous other institutions such as banks, schools, and local police departments.  *See* Dkt. No. 138, Ex. 2 ¶ 9.  Other than an unsupported comment by Mr. Caruso that U.S.-issued documentation is "among the gold standards" in terms of identification, *see* Dkt. No. 248 at 28, Defendants have provided no evidence that the additional documents required by the Policy, *i.e.*, a U.S. visa and an I-94, enhance the credibility of foreign

---

In any event, Defendants' stated willingness to accept other forms of documentation only underlines the lack of business necessity that all tenant occupants provide those specific forms of documentation listed in the Policy.

[13]  This makes sense, as Plaintiffs have introduced evidence that, because Social Security cards do not have an identifying photograph, they are arguably less effective than a passport at verifying identity.  Dkt. No. 138, Ex. 27 at 160:17-27, Ex. 43 at 13-14.  And Social Security cards are just as (or more) liable to be stolen or fraudulent as a passport.  *Id.*

[14]  To the extent that Defendants now claim that ITINs are inadequate to prove identity because of their unreliability, not only is this argument belied by Defendants' own practices, but it is also a textbook example of a *post hoc* justification for the Policy that cannot be credited here.  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002).  This is particularly true given that the Department of the Treasury Inspector General's report that Defendants cite was not released until 2018, several years after Defendants began enforcing the Policy as written.  *See* Dkt. No. 248, Ex. 8.

passports for identification purposes.[15]  To the extent that Defendants really intend to use these additional documents to verify immigration status (which they have not argued), Plaintiffs have introduced evidence that they are poor barometers of legal presence.  *See* Dkt. No. 138, Ex. 2 ¶¶ 25-26.  It is therefore unclear how verifying identity using a Social Security card or the other documents required by the Policy constitutes a business necessity at all, let alone as a matter of law.

## C.    Defendants Can Conduct Credit Checks Without the Documents Required by the Policy

Defendants' own documents defeat their second purported "business necessity," the alleged need to conduct credit checks using a Social Security number.[16]  The Consumer Reports & CoreLogic SafeRent Training Manual (the "Training Manual") used by Defendants to train employees tasked with resident screening clearly states that *both* Social Security numbers and ITINs can be used to run consumer reports on lessees.  Dkt. No. 138, Ex 43 at WAPLES00000644. The Training Manual recognizes that ████████████████████████████████████ ████████████████████  *Id.* at WAPLES00000639; Dkt. No. 138, Ex. 44 ¶ 7.  Each female Plaintiff had an ITIN, Dkt. No. 138, Ex. 8 ¶¶ 11, 15, 22, Ex. 9 ¶ 15, Ex. 11 ¶ 15; Ex. 1 at 4, and each male Plaintiff had a Social Security number, which Defendants had already run to determine that each male Plaintiff had sufficient credit to qualify as a lessee.  And Defendants did not even ████████████████████████████████████████████████████, *id.* at

---

[15]  That it may have once been possible for an individual to enter the United States using someone else's passport in no way diminishes the reliability of foreign passports as a form of identification, particularly in the face of Defendants' alternatives.  All forms of identification—including those issued by the U.S. government—are subject to fraud.  *See* Dkt No. No. 138, Ex. 43 at WAPLES00000587-88  (████████████████████████████████████████████ ████████████████████  .

[16]  Defendants admitted that they did not use the passports, visas, or I-94s identified by the Policy to conduct background checks.  Dkt. No. 138, Ex. 27 at 36:20-37:10.

WAPLES00000645, ███████████████, Dkt. No. 138, Ex. 27 at 187:10-14.  It is therefore unclear how running credit checks for all occupants (as opposed to all lessees), let alone requiring a Social Security number to run a credit check where Defendants' credit-check vendor is clearly able to do so with an ITIN, constitutes a business necessity that could justify the Policy.

### D.    Defendants Can Conduct Criminal Background Checks Without the Documents Required by the Policy

Defendants' documents further undermine the business necessity of having a Social Security number to run criminal background checks.[17]  As was the case with consumer reports, the Training Manual states that both Social Security numbers and ITINs can be used to run Multi-State Sexual Offender Reviews on leaseholder applicants.   Dkt. No. 138, Ex. 43 at WAPLES00000644.   The same is true for running Multi-State Sexual Offender Reviews on occupants, like the female Plaintiffs.  *Id.* at WAPLES00000645.  This remained true at least through 2016, as evidenced by the fact that the company Defendants at that time to conduct background checks, Yardi Resident Screening, does not "require a Social Security Number (SSN) to perform the . . . criminal background services it currently provides."  Dkt. No. 138, Ex. 44, ¶ 6. And even Defendants' employees admitted that "████████████████████████████████ ████████████" Dkt. No. 138, Ex. 21 at 102:11-18; *see also id.* at 87:7-11 ("███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████").  Indeed, Plaintiff Rosy Giron

---

[17]  Defendants admitted that they did not use the passports, visas, or I-94s identified by the Policy to conduct background checks.  Dkt. No. 138, Ex 27 at 36:20-37:10.

de Reyes sought and obtained a criminal background check from the Virginia State Police using the identification information available to her.[18]  *See* Dkt No. 138, Exs. 34, 38.

### E.    Defendants Have Not Demonstrated that the Policy is Necessary to Allay Lease Underwriting or Eviction Concerns

Defendants' claim that the Policy is necessary for lease underwriting and to reduce loss from eviction also rings hollow insofar that the Plaintiffs satisfied all the financial prerequisites to rent at the Park.  Specifically, each of the male Plaintiffs alone possessed sufficient income and credit to rent a lot from Defendants.  Dkt. No. 138, Exs. 12-15.  Defendants never attempt to explain why this explanation justifies applying the Policy to all *occupants* of a mobile home, as opposed to all *lessees*.  In other words, even if the female Plaintiffs never contributed to the rent, whether because of their lack of legal immigration status or otherwise, the male Plaintiffs would be able to make the monthly rent payment.  (Indeed, were it truly a business necessity to ensure that each *occupant* possessed sufficient income and credit to meet rent obligations, no landlord could ever rent to families with one stay-at-home parent.)

To the extent that Defendants may cite Mr. Caruso's testimony to argue that a federal law requires landlords to verify the legal status of residents or risk not being able to underwrite them, among other things (Ex. 2 (Caruso Dep. Tr.) at 25:11-26:7), Mr. Caruso made it clear that this law (and indeed his entire knowledge of best practices in complying with this law) only applied to federally-funded housing (*id.* at 29:15-30:4).[19]  But Mr. Caruso was not even aware that the Park

---

[18]  Notably, Defendants have not articulated a compelling reason why they did not accept Mrs. Reyes' criminal background check to satisfy this requirement; instead, they merely insisted that they required a "Government Issue ID & Social Security card."  Dkt. No. 138, Ex. 34.

[19]  The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) bars federal public housing subsidies to non-U.S. citizens other than "qualified aliens." 8 U.S.C. § 1611(a), (c)(1)(B).  The trailer park at issue in this litigation does not receive federal subsidies, Ex 3 (30(b)(6) Dep. Tr) at 28:10-29:3, and thus inarguably is not subject to the PRWORA.  Defendants

does not fit into this category. *Id.* at 31:21-32:3; *see also id.* at 98:15-19. For that reason, he has created an issue of fact as to the validity of his own opinions, insofar as it is unclear whether they even apply to properties such as the Park. Mr. Caruso's testimony therefore cannot serve as the basis for summary judgment, as Plaintiffs are entitled to further test their validity at trial. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

More tellingly, the male Plaintiffs never missed *any* rent payments despite that the female Plaintiffs resided with them, *see* Dkt. No. 138, Ex. 8, ¶ 10, Ex. 9, ¶ 10, Ex. 10, ¶ 11, Ex. 11, ¶ 10, and Defendants even renewed Plaintiffs' leases several times, *see generally* Dkt. No. 138, Exs. 35-37, 45-50. Even Mr. Caruso admits that only the legal status of the leaseholder, *not the occupant(s)*, is necessary for lease underwriting. Dkt. No. 248, Ex. 4, Ex. 1 at 1; *see also* Dkt. No. 248 at 25. Thus, Defendants' own Policy goes above and beyond what their expert believes is necessary to satisfy lease underwriting concerns. Lastly, the only reason that Plaintiffs were evicted from the Park was due to Defendants' enforcement of the Policy, not for any failure to pay

---

do not claim otherwise; instead, they argue that it is reasonable to adopt policies to comply with a statute to which they are not even subject. Dkt. No. 248 at 27 ("it is reasonable to adopt 'the most restrictive standard, which is the federal standard.'"). But Mr. Caruso made clear in his deposition testimony that his entire knowledge consists of managing housing properties that are subject to the PRWORA, and that his best-practices recommendations are based on compliance with that federal statute. Ex. 2 at 25:11-26:7, 29:11-30:4. For this reason, his expert report cannot create an undisputed issue of material fact, as his own deposition testimony largely rebuts his conclusions. *Cf. Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1198 (3d Cir. 1995) ("When an expert opinion is not supported by sufficient facts ..., or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). More generally, leaving aside the implausibility that a business would voluntarily choose to subject itself to federal regulations even where not required by federal law, it simply cannot be a "business necessity" that a business comply with a statute to which it is not even subject.

rent or other violations.  In that sense, Defendants generated these eviction costs for themselves; they were not caused by Plaintiffs.

      **F.**      **Renting to Undocumented Immigrants Does Not Subject Defendants to Liability Under the ICRA**

      Finally, as argued previously (*see supra* at Section I.C), merely renting to undocumented immigrants, without more, does not violate the ICRA anti-harboring provision.  That result is consistent with all other reported appellate decisions.  *See United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police is ... not an offense under §1324(a)(1)(A)(iii)."); *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking immigration status constitutes harboring."); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 320 (3d Cir. 2013); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 529 (5th Cir. 2013).  Even in *Aguilar,* however, this Court noted that an individual possesses the pertinent *mens rea* when said individual acts "with reckless disregard" and "consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien."  477 F. App'x at 1002.  Thus, because the defendant "admitted that 'it was the same' to her whether her tenants possessed proper documentation or not," and failed "to ascertain the status of her tenants even after repeatedly being warned by officials that numerous of her tenants were not properly documented," she possessed the requisite *mens rea* for conviction. *Id.*  Defendants have submitted no evidence of (1) any conduct approaching the deliberate concealment described in the appellate decisions cited above; or (2) any intent approaching the "reckless disregard" of the defendant in *Aguilar.*  Thus, there is at least a factual dispute as to

whether avoiding conviction under the ICRA rises to the level of a "business necessity," given the minimal risk that Defendants' current course of conduct would violate it.

It is clear from the foregoing that there are ample factual disputes for a jury to resolve as to whether Defendants' justifications are true "business necessities" as opposed to mere *post hoc* justifications for a Policy that disparately impacts Latinos. Even taking the five purported reasons at face value, each one is contradicted by record evidence that shows it not to be a "business necessity," as set forth above, but rather (at best) a choice made by the Defendants for their convenience. For this reason, it is inappropriate to resolve this issue on summary judgment.

## III.   THERE IS AT LEAST A FACTUAL DISPUTE AS TO WHETHER THERE ARE ALTERNATIVES FOR THE POLICY THAT HAVE A LESS DISCRIMINATORY EFFECT

If the Court determines that there are factual issues regarding step two, consideration of step three is unnecessary at the summary judgment stage; however, even if the Court were to find that Defendants have demonstrated that there are no disputed facts that the Policy fulfills a "business necessity," there would be ample means for Defendants to satisfy these business necessities through policies with "a less discriminatory effect." *Inclusive Communities,* 135 S. Ct. at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).[20] And Plaintiffs can make this showing in a manner which completely avoids Defendants' concerns about the reliability of ITINs as a form of identification. Dkt. No. 248 at 28-30. Specifically, Defendants can request a Social Security number or documents showing proof of legal presence from all *lessees,* rather than all *occupants.* This satisfies Defendants' lease underwriting and eviction concerns, by allowing them to verify

---

[20]  Contrary to Defendants' arguments, Plaintiffs need not demonstrate that Defendants' purported "business necessities" are pretextual to satisfy the last prong of the disparate impact analysis: this is only for claims of disparate treatment. *Compare* Dkt. No. 190 at 10 (finding that Plaintiffs must demonstrate that Defendants' business justifications were pretextual under disparate treatment standard (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010)).

that leaseholders have and can maintain sufficient income and credit to rent at the Park, and would not have resulted in the eviction of any of the four Plaintiff families herein.  Dkt. No. 248, Ex. 4(1) at 1.  Defendants can also use these documents to conduct credit and criminal background checks. As for occupants, Defendants may collect identifying information from them in the form of a passport, ITIN, or other government-issued identity document sufficient to run a criminal background check, thereby ensuring that the safety of those who live at the Park.[21]   That this revised policy meets Defendants' business needs is evident from the fact that this is essentially an enhanced version of Defendants' leasing practices until 2015, when they started enforcing the Policy as written.  More importantly, it reduces the discriminatory effect on Latinos: Plaintiffs and others who were evicted from the Park due to their co-occupants' lack of documentation would be able to continue living there so long as they could continue to satisfy the requirements of their leases.  Defendants have not argued—let alone demonstrated that there is no dispute of material fact—that this proposal is not a legitimate alternative to the Policy.  Thus, summary judgment cannot be granted here.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.

---

[21]  This is why Defendants purportedly began enforcing the Policy against occupants in the first place.  *See* Dkt. No. 138, Ex. 21 at 44:20-46:7, Ex. 25 at 27:7-28:7, Ex. 27 at 123:12-14, 186:17-187:9.

Respectfully submitted,


_____ //s// _____                    Dated: October 25, 2019
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Nady Peralta, VSB #91630
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
nady@justice4all.org

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kaiyeu Kevin Chu, VSB #85746
Matthew Traumpan (pro hac vice)
Gianna Puccinelli (pro hac vice)
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
kevinchu@quinnemanuel.com
matthewtraupman@quinnemanuel.com
giannapuccinelli@quinnemanuel.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2019, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.


_____ //s// _____          Dated: October 25, 2019
Simon Sandoval-Moshenberg (VSB No. 77110)
*simon@justice4all.org*
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: (703) 720-5605
Fax: (703) 778-3454

32