# Exhibit 2



# Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP

**Date:** December 20, 2016

**Case:** de Reyes, et al. -v- Waples Mobile Home Park Limited Partnership, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION
- - - - - - - - - - - - - - - - - - - -x
ROSY GIRON DE REYES, et al.,          :
        Plaintiffs,                    :
    v.                                 :
WAPLES MOBILE HOME PARK LIMITED        :
PARTNERSHIP, et al.,                   :
        Defendants.                    :
- - - - - - - - - - - - - - - - - - - -x
Civil No.: 1:16cv563-TSE-TCB


        Videoconference Deposition of GEORGE C. CARUSO
                  McLean, Virginia
             Tuesday, December 20, 2016
                    12:37 p.m.

Job No.: 131024
Pages: 1 - 130
Reported by: Lisa Kirk
```

**Page 2**

```
        Deposition of GEORGE C. CARUSO, held at
the offices of:
        REED SMITH LLP
        7900 Tysons One Place
        Suite 500
        McLean, Virginia 22102
        703.641.4200












        Pursuant to Notice, before Lisa Kirk,
Court Reporter and Notary Public in and for the
Commonwealth of Virginia.
```

**Page 3**

```
                  A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFFS:
        JOY ODOM, ESQUIRE
        Quinn Emanuel Urquhart & Sullivan, LLP
        777 6th Street, Northwest
        11th Floor
        Washington, D.C. 20001
        202.538.8159

        SIMON SANDOVAL-MOSHENBERG, ESQUIRE
        Legal Aid Justice Center
        6066 Leesburg Pike
        Suite 520
        Falls Church, Virginia 22041
        703.778.3450
```

**Page 4**

```
          A P P E A R A N C E S   C O N T I N U E D
ON BEHALF OF THE DEFENDANTS:
        JUSTIN D. deBETTENCOURT, ESQUIRE
        Reed Smith, LLP
        7900 Tysons One Place
        Suite 500
        McLean, Virginia 22102
        703.641.4209
```

---

Page 5

```
              C O N T E N T S
EXAMINATION OF GEORGE C. CARUSO            PAGE
    By Ms. Odom                           6, 121
    By Mr. deBettencourt                    114




              E X H I B I T S
           (Attached to the transcript.)
CARUSO DEPOSITION EXHIBIT                   PAGE
   Exhibit 1      Expert Report              6
```

---

Page 6

    (Caruso Exhibit 1 was marked for
identification and is attached to the transcript.)
          P R O C E E D I N G S
    MS. ODOM: All right, so Mr. Caruso, we're going to go ahead and go on the record and the court reporter is going to swear you in in just a minute. Your testimony today is as if you were giving it in a courtroom.
    And I just need to ask Mr. deBettencourt if he agrees that we can stipulate to Mr. Caruso being sworn remotely.
    MR. deBETTENCOURT: Yes.
    MS. ODOM: Okay. So the parties are agreed on that and the court reporter will go ahead and give you the oath now.
Whereupon,
          GEORGE C. CARUSO,
being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
        BY MS. ODOM:

---

Page 7

Q  All right, so Mr. Caruso, have you ever been deposed before?

A  Yes, ma'am.

Q  How many times?

A  Well, I was asked that question in a deposition last year and I think it's five or six. If you've been doing this as many years as I have, you don't remember everything anymore, but I've been deposed multiple times.

Q  All right. Beyond the deposition last year, have you had any depositions in the last five years?

A  Yes, one prior to that that would be right at the five-year time frame.

Q  Okay. What kind of case was that?

A  That was an employment law case.

Q  All righty.

A  I was the corporate representative of my then employer before I retired.

Q  All right, so since you've been deposed before, you're probably already familiar with the rules of the road, so to speak, but I just want to

---

Page 8

go back over them with you. You and I want to try to not talk over each other. With you being remote, that might be a little bit difficult with the lag time, but we'll do our best because the court reporter can only take down one of us at a time. I'd ask you to let me finish my question before you start to answer and I'll try to let you finish your answer and try not to interrupt you. You understand, as we discussed a minute ago, that the testimony you give today is as if you were giving it in court in front of a judge and jury.

A  I do.

Q  So you've got a responsibility to tell the truth and the whole truth there. Is there any reason that you're aware of why you can't give your best and most accurate testimony today?

A  None that I'm aware of.

Q  All right. So I saw in your resumé to your report, which we've marked as Exhibit A, and I regret you don't have a copy of it, but I understand you're familiar with it. And if you need to refer back to your report at sometime, just let us know

25

1  Q  Do you know whether the Waples Mobile Home
2  Park received any form of federal or state housing
3  finance or subsidy?
4  **A  I'm unaware of their situation.**
5  Q  Would that be an important piece of
6  information for you to know in order to determine
7  whether the policy at issue in this case was
8  necessary?
9  **A  No, I don't think so.**
10 Q  Why not?
11 **A  When this legislation came into place, it**
12 **was clear that the intent of Congress was to ensure**
13 **that folks in residency should be in this country**
14 **appropriately.  In addition, at the same time, and**
15 **this is exceedingly important, as you know, laws**
16 **were enacted that employers are to ascertain the**
17 **legality of all employees.  And if you don't know**
18 **the status of somebody, you can't underwrite them,**
19 **because if you have somebody that doesn't have**
20 **status, that means, by definition, they're not**
21 **working legally.  It's difficult to underwrite it.**
22 Q  So we'll get to the employment verification

26

1  part of your opinions in a second, but I want to
2  finish up with you on the federal funding aspect
3  first.  You said when Congress passed the
4  legislation in the early 1990s, it was clear their
5  intent was that landlords verify the residency of
6  their tenants, the legal status of their tenants.
7  **A  Yes. Yeah.**
8         MR. deBETTENCOURT: Objection, form.
9         MS. ODOM:
10 Q  So my question for you is do you believe
11 that's true whether or not a particular landlord
12 receives federal or state subsidies for housing?
13        MR. DeBETTENCOURT: Objection, form.
14 **A  I'm not sure I understand precisely what**
15 **you're trying to get at.**
16        MS. ODOM:
17 Q  All right.  I'll rephrase it.  Is it your
18 opinion that the Congressional intent for what a
19 landlord has to verify about a prospective tenant,
20 is that the same whether or not that landlord is
21 receiving any type of government funding?
22        MR. deBETTENCOURT: Objection, form,

27

1  speculation.
2         MS. ODOM:
3  Q  You can go ahead and answer if you
4  understand the question.  If not, I can restate it.
5  **A  I think you better try and nail it down a**
6  **little bit, because the other thing you're doing**
7  **here is trying to divorce employment from leasing**
8  **activities, and you can't, because you're**
9  **underwriting against employment.**
10 Q  Well, I think I'd like to take it in two
11 pieces, so I understand your opinion that for
12 underwriting employment verification is important,
13 but I also understand your report to be offering a
14 second opinion, which is that in order for a
15 landlord to become eligible for federal or state
16 housing funding, they must verify that all tenants
17 are present in the United States legally.  Do I have
18 your opinions correct?
19        MR. deBETTENCOURT: Objection, form.
20 **A  Yes, you have my views right on that.  You**
21 **have to -- in order to qualify for subsidy money**
22 **from the federal or state agencies, you have to be**

28

1  **in the country legally.**
2         MS. ODOM:
3  Q  Okay.  So my question is if a landlord is
4  not applying for any subsidies and is not receiving
5  any sort of government funding, do they still have
6  to verify the presence of a tenant, that that tenant
7  is in the United States legally?  If you take
8  funding out of it, what does the government got left
9  to say to you?
10        MR. deBETTENCOURT: Objection, form.
11 **A  The government's still got left to say to**
12 **you you still have to underwrite it, so you run**
13 **around that issue.  And, two, if you're running what**
14 **I'll call a mixed company, which means you're**
15 **running a management house that does both types of**
16 **management, you can't have an inconsistent set of**
17 **standards.  Fair Housing will get on you about that.**
18 **So most of us that run mixed companies, we have one**
19 **set of standards whether the property is subsidized**
20 **or not.  And we adopt the most restrictive standard,**
21 **which is the federal standard.**
22        MS. ODOM:

**Page 29**

1  Q  Would you agree with me that the
2  underwriting of a lease is a more local focus for a
3  landlord? That is to say, that's something that the
4  landlord is concerned about, the risk of that lease,
5  and nobody else but the landlord is concerned about
6  that? Would you agree that's a fair statement?
7       MR. deBETTENCOURT: Objection, form.
8  A  I'm trying to understand what you're trying
9  to get at.
10      MS. ODOM:
11 Q  Sure. Is the government concerned about
12 the proper underwriting by a landlord of a
13 prospective tenant's lease?
14      MR. DeBETTENCOURT: Objection, speculation.
15 A  There will be instances where they would be
16 concerned, where you've got money borrowed from an
17 agency that's either insured by or cuts mortgages
18 on, because they want to make sure that the terms of
19 the loan are being met, most particularly that the
20 loan is getting paid. Now, that's a roundabout way
21 of getting to it, but you have to look at both
22 elements. You've got the financing element if

**Page 30**

1  you've got somebody in the equation that's got, you
2  know, government-related or government-insured
3  financing, and then you have the operational
4  element.
5       MS. ODOM:
6  Q  Okay. If we have no loan, if there's no
7  government loan or agency loan in the picture, is
8  the government concerned --
9  A  Right.
10 Q  -- about the quality of a landlord's
11 underwriting of a lease?
12      MR. deBETTENCOURT: Same objection.
13 A  No, but the landlord would be.
14      MS. ODOM:
15 Q  And only the landlord, correct?
16 A  So it would seem.
17 Q  So, really, there is -- there are two
18 pieces of your opinion. And I understand that you
19 want to take them in whole, but we have the federal
20 funding and subsidy part of your opinion, and then
21 we have the underwriting portion. And the
22 government doesn't concern itself with the

**Page 31**

1  landlord's underwriting of a lease; is that fair?
2       MR. DeBETTENCOURT: Objection, form.
3  A  There's one limited circumstance where they
4  would be concerned with the underwriting of the
5  lease. If it -- if someone filed a complaint that
6  they were being treated disparately from other
7  applicants, in other words, file a Fair Housing
8  complaint, the government can come in and take a
9  look at how you do your underwriting, how you do
10 your admissions, and whether you're consistent in
11 the application of the rules. I've had Fair Housing
12 inquiries look at those. They literally come in,
13 sit down, and go through the resident files.
14      MS. ODOM:
15 Q  But in the absence of such a complaint, the
16 landlord's underwriting is the landlord's business;
17 is that right?
18      MR. deBETTENCOURT: Objection, form.
19 A  Yeah.
20      MS. ODOM:
21 Q  Is Waples Mobile Home Park in the
22 low-income housing business?

**Page 32**

1  A  Counsel hasn't shared with me precisely
2  what the target market is on that, so I'm not in a
3  position to really opine on that.
4  Q  Would you have wanted to receive that
5  information for your opinions?
6       MR. deBETTENCOURT: Objection. To the extent
7  this question calls for communications from counsel,
8  I'm going to instruct you to answer -- instruct you
9  not to answer.
10      MS. ODOM:
11 Q  And just to be clear, I'm not asking you
12 for anything that counsel at Reed Smith has told
13 you. I'm simply asking if you had all the
14 information available to you that you would have
15 wanted to have in an ideal world?
16      MR. deBETTENCOURT: Objection, form.
17 A  As the folks at Reed Smith --
18      THE WITNESS: Go ahead.
19 A  As the folks at Reed Smith have indicated,
20 the only conversations I've had have been with the
21 lawyers.
22      MS. ODOM:

97

1  same act. Are you referring to the Personal
2  Responsibility and Work Opportunity Reconciliation
3  Act of 1996?
4      MR. deBETTENCOURT: Objection, form.
5      MS. ODOM:
6   Q   It's called PRWORA colloquially.
7   A   I'd have to go stick my head -- was the
8  principal sponsor on that Henry Hyde?
9   Q   I can look and check.
10  A   The reason I say that is we've always
11 called it internally the Hyde bill, but
12 Representative Hyde was chairman of the committee.
13 You know, I've had to deal, over the years, with all
14 these long acronyms that they invent over on the
15 Hill and I've gotten to the point where,
16 unfortunately, I know most things by bill numbers,
17 not by bill titles, because it's just easier. I
18 think, but can't guarantee, we're talking about the
19 same thing.
20  Q   And your opinion and testimony is that
21 federal regulations require entities who receive
22 deep assistance to check legal status of tenants?

98

1      MR. deBETTENCOURT: Objection,
2  mischaracterize.
3   A   Among other places, that's a requirement in
4  the HUD Occupancy Handbook, 4350.3. It's also a
5  requirement in the HUD Public Housing Handbook of
6  similar type. I don't remember the PIH.
7      THE WITNESS: That's -- for our recorder,
8  that's Public and Indian Housing. Sorry I was
9  engaging in HUD speak.
10  A   PIH also has a manual that relates to a
11 different manual number, but that's a requirement of
12 the 4350.3, which goes upwards and connects with the
13 legislation.
14     MS. ODOM:
15  Q   Do you know whether PRWORA that was passed
16 in 1996 regulates Waples Mobile Home Park?
17     MR. deBETTENCOURT: Objection, form.
18  A   Without sitting down and reading the bill,
19 I wouldn't be able to answer that.
20     MS. ODOM:
21  Q   And same answer as to whether it applies to
22 any of the other A.J. Dwoskin properties?

99

1      MR. deBETTENCOURT: Objection, foundation.
2   A   Yup, I would have to research that
3  specifically. I don't want to guess. I don't do
4  guessing, or at least I don't guess very well.
5      MS. ODOM:
6   Q   Do the HUD manuals that you have been
7  describing regulate Waples Mobile Home Park?
8   A   Again, not knowing the financial structure
9  underlying it, I don't -- I can't answer that.
10  Q   What would you need to know to be able to
11 answer that question?
12  A   At the minimum, I'd need to know how the
13 deal is financed, who holds the notes, and what
14 forms of assistance, if any, are granted, and
15 whether or not there's any -- you can get swept into
16 these requirements by having community development
17 block grant money in a property, you can get swept
18 in by having CBE money in the property. You can
19 get -- there's a number of ways you can get swept
20 into compliance on these rules by accepting various
21 funds for various things, including infrastructure
22 work. So without actually sitting and looking at

100

1  the documents, I would decline to speculate.
2   Q   Well, what types of documents would we look
3  at for the Waples Mobile Home Park?
4      MR. deBETTENCOURT: Objection, form.
5   A   You'd probably start with the
6  partnershipping (phonetic). Number one, I don't
7  know if it's a partnership or corporation, or an
8  LLC, so you need to figure out what the entity is
9  for starters. And then you start taking a look at
10 what the financing is on it, and you look and see if
11 there's any inbound money from a local agency that
12 takes federal money, from a state agency that takes
13 federal money, or from a federal agency. You'd have
14 to look, generally, at all of those when you start
15 doing it. I know how our deals are structured and
16 where they are. And the reason we came to the
17 decision we did was we wanted a one-size-fits-all,
18 so as to not drive our staff crazy. And what we do,
19 as I said before, is we went to the most
20 restrictive, complying with the federal rules for
21 everything we operate.
22     MS. ODOM: