**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| ROSY GIRON DE REYES, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No.:  1:16cv563-TSE-TCB |
| WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, | |
| Defendants. | |

<u>**REPLY MEMORANDUM IN SUPPORT OF**</u>
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF**</u>
<u>**PLAINTIFFS' COMPLAINT**</u>

Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A. J. Dwoskin & Associates, Inc. (collectively "Defendants"), by counsel, pursuant to Fed. R. Civ. P. 56 submit this reply memorandum of points and authorities in support of Defendants' Motion for Summary Judgment on Count I of Plaintiffs' Complaint.

# TABLE OF CONTENTS

**Page**

I.    PLAINTIFFS MISCONSTRUE THE FOURTH CIRCUIT'S MANDATE AND INCLUSIVE COMMUNITIES ...................................................................1

II.    PLAINTIFFS CANNOT DEMONSTRATE A PRIMA FACIE CLAIM OF DISPARATE IMPACT ...........................................................................6

    A.    Plaintiffs Point To No Evidence Suggesting, And Do Not Otherwise Argue, That The Policy Is "Artificial, Arbitrary and Unnecessary"......................6

    B.    Plaintiffs Fail To Rebut The Effect Of The Anti-Harboring Statute On Their Ability To Show A Prima Facie Case Of Disparate Impact .........................6

    C.    Plaintiffs' Statistical Evidence Is Unreliable and Fundamentally Flawed..............8

III.    DEFENDANTS HAVE LEGITIMATE REASONS FOR THE POLICY THAT ARE NECESSARY TO ACHIEVE A VALID INTEREST ..............................................11

    A.    The Policy Serves The Valid Interest Of Avoiding Criminal Liability ................12

    B.    The Policy Serves The Valid Interest Of Lease Underwriting .............................13

    C.    The Policy Serves The Valid Interest Of Conducting Criminal Background Checks..........................................................................................13

    D.    The Reasons For The Policy Are Not Post-Hoc Justifications.............................14

IV.    THERE IS NO EVIDENCE THAT DEFENDANTS' REASONS FOR THE POLICY ARE PRE-TEXTUAL OR THAT DEFENDANTS' INTERESTS COULD BE SERVED BY OTHER PRACTICES WITH LESS DISCRIMINATORY EFFECTS ...................................................................15

CONCLUSION....................................................................................................20

**TABLE OF AUTHORITIES**

Page(s)

## Cases

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975)................................................................14, 15

*Anderson v. Libby Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................8, 16

*Appleby v. Warden, N. Reg'l Jail & Corr. Facility,*
    595 F.3d 532 (4th Cir. 2010) ............................................................8

*Bender v. Suburban Hosp., Inc.,*
    159 F.3d 186 (4th Cir. 1998) ..........................................................16

*Betsey v. Turtle Creek Assocs.,*
    736 F.2d 983 (4th Cir. 1984) ..........................................................11

*City of Miami v. Bank of Am. Corp.,*
    171 F. Supp. 3d 1314 (S.D. Fla. 2016) ...............................................3

*Cobb Cty. v. Bank of Am. Corp.,*
    183 F. Supp. 3d 1332 (N.D. Ga. 2016) ...............................................2

*Connecticut v. Teal,*
    457 U.S. 440 (1982).....................................................................15

*Cty. of Cook v. Bank of Am. Corp.,*
    No. 14C 2280, 2018 WL 1561725 (N.D. Ill. Mar. 30, 2019) ...................2

*de Reyes v. Waples Mobile Home Park L.P.,*
    903 F.3d 415 (4th Cir. 2015) ....................................................3, 4, 6

*E.E.O.C. v. Freeman,*
    778 F.3d 463 (4th Cir. 2015) ............................................................8

*Ellis v. City of Minneapolis,*
    860 F.3d 1106 (8th Cir. 2017) ..........................................................3

*Greenlaw v. United States,*
    554 U.S. 237 (2008).......................................................................5

*Hoyt v. City of St. Anthony Vill.,*
    No. 18-CV-2434, 2019 WL 2212147 (D. Minn. May 22, 2019)...............2

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019), *pet. for cert. filed* No. 19-497 (U.S. Oct. 14, 2019) ........................................................................................................2

*Lawson v. Union Cty. Clerk of Court*,
828 F.3d 239 (4th Cir. 2016), *as amended* (July 8, 2016) ......................5

*Orbit Corp v. Fedex Ground Package Sys., Inc.*,
No. 2:14CV607, 2016 WL 6609184 (E.D. Va. Nov. 8, 2016) ................6

*Staudner v. Robinson Aviation, Inc.*,
910 F.3d 141 (4th Cir. 2018) ..................................................................5

*Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
135 S. Ct. 2507 (2015) ............................................................1, 2, 12, 15

*United States v. Aguilar*,
477 F. App'x 1000 (4th Cir. 2012) ....................................................7, 13

*United States v. Mendez*,
498 F.3d 423 (6th Cir. 2007) ..................................................................3

*United States v. O'Dell*,
320 F.3d 674 (6th Cir. 2003) ..................................................................3

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)................................................................................16

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988)................................................................................15

**Statutes**

8 U.S.C. § 1324............................................................................................20

8 U.S.C. § 1324(a)(1)....................................................................................5

**Rules**

Fed. R. Civ. P. 56 (c)(1)(B) ..........................................................................9

**Other Authorities**

https://www.irs.gov/individuals/individual-taxpayer-identification-number ..............................17

## **REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**[1]

I.    **PLAINTIFFS MISCONSTRUE THE FOURTH CIRCUIT'S MANDATE AND** *INCLUSIVE COMMUNITIES*

Defendants' motion for summary judgment explained the controlling framework applicable to Plaintiff's disparate-impact claim under *Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015) and the scope of the mandate following the Fourth Circuit's decision vacating this Court's prior summary judgment ruling. (Dkt. 248 at 3-4, 8-10.) Plaintiffs unsurprisingly take a different view, but they misstate *Inclusive Communities* and go so far as to claim that, in resolving Plaintiffs' challenge to this Court's 12(b)(6) dismissal of their disparate-impact claim, the Fourth Circuit concluded that Plaintiff had, for summary-judgment purposes, carried their prima facie burden at "Step 1" of the burden-shifting framework. In every particular, Plaintiffs' contentions are well wide of the mark.

Starting with *Inclusive Communities*, Plaintiffs claim that Defendants are trying to add a "fourth step" to *Inclusive Communities*' burden-shifting framework by requiring Plaintiffs to point to facts that show the Policy is "artificial, arbitrary, and unnecessary." (Dkt. 256 at 10.) Those words from *Inclusive Communities*, Plaintiffs contend, are just "adjectives" with no legal meaning—they simply describe a policy that flunks the three-step framework. (*Id.*) Plaintiffs are wrong. In *Inclusive Communities*, the Supreme Court stated in no uncertain terms that "private

---

[1]    Plaintiffs improperly dispute two materials facts—numbers 2 and 8.  On material fact 2, they claim that the testimony cited focuses on whether CMS has provided margins of error at the state level. Plaintiffs **admit** Undisputed Material Fact 3 – that CMS does not estimate a MOE for the undocumented population at any other level than the national level. Plaintiffs cannot in good faith admit to Material Fact 3 and dispute Material Fact 2. On Material Fact 8, Plaintiffs improperly dispute their own interrogatory responses. Moreover, the IRS states that "[y]ou may also choose to submit certified copies of documents from the issuing agency instead of original documents." Available    at    https://www.irs.gov/credits-deductions/individuals/how-do-i-apply-for-an-itin. Regardless of whether a copy of the passport may be certified, Plaintiffs do not dispute the description of the process required to acquire an ITIN.

policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" 135 S. Ct. at 2524. Full stop. It's impossible to read that language as optional, and it's certainly not for Plaintiffs (or Defendants) to unilaterally suggest otherwise— contrary to the language and surrounding context of the Supreme Court's chosen words. Nor was the Supreme Court's "artificial, arbitrary, and unnecessary barriers" holding made in "a portion of the Supreme Court opinion in which the Court was offering assurance that the three-part standard—by itself—would ensure proper results.'" (Dkt. 256 at 10.) In fact, it's clear from pages 2523 and 2524 of *Inclusive Communities* that the Supreme Court's quite mandatory directive on that score was made in the course of fleshing out both a plaintiff's required burden in making out a prima facie case, and the courts' required task in ensuring that the burden has been met. This no doubt explains why in the nearly four and one-half years since *Inclusive Communities*—and without exception—federal courts have demanded from disparate-impact plaintiffs precisely the prima facie showing Defendants advocate for here: facts showing that the challenged policy or practice is "artificial, arbitrary, and unnecessary." *See, e.g., Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909 (5th Cir. 2019) (referring to the "artificial, arbitrary, and unnecessary barriers" standard as one of the "cautionary standards that the Supreme Court has declared to be *necessary ... in evaluating a prima facie case*" of disparate impact) (emphasis added), *pet. for cert. filed* No. 19-497 (U.S. Oct. 14, 2019).[2] The Eighth Circuit put the matter

---

[2]    *See Hoyt v. City of St. Anthony Vill.*, No. 18-CV-2434 (PJS/ECW), 2019 WL 2212147, at *7 (D. Minn. May 22, 2019) (dismissing disparate-impact claim where plaintiffs failed "to plausibly allege" the required element that the defendant "'adopted an arbitrary and unnecessary policy'"); *Cty. of Cook v. Bank of Am. Corp.*, No. 14C 2280, 2018 WL 1561725, at *8 (N.D. Ill. Mar. 30, 2019) (explaining that "plaintiffs must plead and ultimately prove not only a statistical imbalance, but also an 'artificial, arbitrary, and unnecessary' [policy] and a 'robust' causal connection between the two") (citation omitted); *Cobb Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1347 (N.D. Ga. 2016) (stating that in *Inclusive Communities*, "the Supreme Court has explicitly called for claimants to allege, and then eventually show, that a policy is artificial, arbitrary, and

particularly plainly and directly: "Under *Inclusive Communities*, a plaintiff *must, at the very least,* point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity." *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) (emphasis added). Yet Plaintiffs do not even mention *Ellis* or any other post-*Inclusive Communities* case on this issue, or cite a single case supporting their imaginary interpretation—because there is none.

As for the scope of the Fourth Circuit's mandate, Plaintiffs offer up an equally flawed depiction. They lead with an extraordinary contention: that in vacating this Court's grant of summary judgment in Defendants' favor on Plaintiffs' disparate-impact claim—which undeniably was predicated on the Court's previous 12(b)(6) dismissal of that claim—the Fourth Circuit actually awarded summary judgment to Plaintiffs on their prima facie burden as to that claim, even though Plaintiffs never asked the court of appeals to do so. (Dkt. 256 at 12-13.) This is wrong too. Appellate-court mandates "must be read with the analysis offered in the [court of appeals'] opinion . . . [and] context matters." *United States v. O'Dell*, 320 F.3d 674, 681 (6th Cir. 2003) (internal quotation marks omitted). Thus, "an appellate court's disposition of an appeal must be read against the backdrop of prior proceedings in the case." *United States v. Mendez*, 498 F.3d 423, 426 (6th Cir. 2007) (internal brackets and quotation marks omitted). The Fourth Circuit plainly did not assess the summary-judgment record and conclude that plaintiffs were entitled to judgment on their prima facie burden. At the outset of its analysis in part II.B of its opinion, the Fourth Circuit made clear that its limited task was to assess whether this Court properly "dismissed Plaintiffs' disparate-impact theory at the Rule 12(b)(6) stage[,]" *de Reyes v. Waples Mobile Home Park L.P.*,

---

unnecessary") (citation omitted); *City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) (dismissing disparate-impact claim where plaintiff "fail[ed] to allege facts demonstrating that the Defendants' alleged policies constituted 'artificial, arbitrary, and unnecessary barriers'").

903 F.3d 415, 422-23 (4th Cir. 2018); *see also id.* at 423 ("We first examine whether the district court erred in dismissing Plaintiffs' disparate-impact theory of liability at the motion to dismiss stage"), which was the only reason this Court later granted summary judgment to Defendants on that same theory. The Circuit proceeded to analyze Plaintiffs' *allegations* under those precedents, concluding that "Plaintiffs sufficiently *alleged* a prima facie case of disparate impact." *Id.* at 428 (emphasis added).

The Circuit's understanding of its limited function in the prior appeal stood to reason, since Plaintiffs' argument was explicitly limited to "whether, applying the proper legal standard, the Families have stated a prima facie claim for disparate impact liability with 'all reasonable inferences' drawn in their favor" from their *allegations.* (Pls. 4th Cir. Opp. Br. at 62-63 (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir 2009) (articulating 12(b)(6) standards)).[3] In the statement of issues in their opening brief, Plaintiffs did not ask for summary judgment in their favor. (Id. at 4-5.) In their reply brief, Plaintiffs argued that the Circuit "should especially refrain from accepting Waples' unsupported invitation to sift through the factual record. . . ." *Id.* at 30. Yet "sift through the factual record" is what Plaintiffs now claim the Circuit actually did in purportedly finding that Plaintiffs carried their prima facie burden.

Plaintiffs ignore all of this. To try to justify their acontextual reading, Plaintiffs seize on one part of a single sentence toward the end of the opinion, where the Fourth Circuit states "that Plaintiffs submitted sufficient evidence of a prima facie case of disparate impact. . . ." 903 F.3d at 433. But that was not a ruling that the undisputed facts entitled Plaintiffs to judgment as a matter

---

[3] And the Fourth Circuit applied the 12(b)(6) standard, stating: "[A]t the motion to dismiss stage, we must accept all well-pled facts as true and draw all inferences in favor of the plaintiff….Therefore, accepting these statistics as true, we conclude that the Plaintiffs sufficiently alleged a prima facie case of disparate impact." 903 F.3d at 428. The statistics referenced are those set forth in the Complaint. *Id.*

of law on their prima facie burden—nor could it have been. The statement came at the end of the opinion, in a separate section focused solely on whether the Circuit should consider Steps 2 and 3 of the burden-shifting analysis. *Id.* at 432-33. The Circuit did *not* analyze the record evidence bearing on the Step-1 prima facie burden before making its "submitted sufficient evidence" statement—nor was it asked to do so. That is particularly notable since appellate courts do not decide issues the parties do not present. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("We rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *Staudner v. Robinson Aviation, Inc.*, 910 F.3d 141, 146 (4th Cir. 2018) (same). This is especially true where reversal would be the result of such an overreach, and where, as here, the argument not presented by the appellant is that the evidentiary record requires a grant of summary *for plaintiffs. See*, *e.g.*, *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 256 (4th Cir. 2016), *as amended* (July 8, 2016) (rejecting "dissent['s] propos[al] that we not only reach an undeveloped issue …, but that we take a leap further and grant summary judgment to a party"—the plaintiff—who did not "request[] that relief on appeal"). Plaintiffs, for their part, do not cite a case to support the fictitious Fourth Circuit ruling they advance.

Separately, Plaintiffs claim that the Fourth Circuit "implicitly rejected" Defendants' argument that the anti-harboring statute, 8 U.S.C. § 1324(a)(1), defeats Plaintiffs' disparate-impact claim. (Dkt. 256 at 17.) But this is just another desperate attempt to squeeze something out of the Circuit's opinion that isn't there. The Circuit did not even mention Defendants' argument based on the anti-harboring statute, let alone the statute itself or the cited case law. Nor did it have to, given the ruling the Circuit did make, and the ruling from this Court that it vacated. As noted, the Circuit merely concluded that Plaintiffs' allegations were sufficient to meet their prima facie burden at Step 1 under the Rule 12(b)(6) standard, and that "the district court should have

addressed the FHA claim under a disparate impact theory of liability at the motion for summary judgment stage." 903 F.3d at 433. And the case was remanded for that purpose.

## II.    PLAINTIFFS CANNOT DEMONSTRATE A PRIMA FACIE CLAIM OF DISPARATE IMPACT

### A.    Plaintiffs Point To No Evidence Suggesting, And Do Not Otherwise Argue, That The Policy Is "Artificial, Arbitrary and Unnecessary"

Plaintiffs' only challenge to Defendants' argument that summary judgment should be granted for lack of any evidence that the Policy is "artificial, arbitrary, and unnecessary" is the one addressed above—that Plaintiffs are not required to prove as much. As noted, that argument is baseless. Plaintiffs' failure to address the merits of Defendants' contention that the "record conclusively refutes any claim by Plaintiffs that the Policy is "artificial, arbitrary, and unnecessary'" (Dkt. 248 at 13) constitutes a waiver of any such argument here.[4] Nor, in any case, could Plaintiffs mount any opposition to what the record shows, as Defendants' Memorandum in Support makes clear. (*Id.* at 13-14.) For these reasons alone, Defendants are entitled to summary judgment on Plaintiffs' disparate-impact claim.

### B.    Plaintiffs Fail To Rebut The Effect Of The Anti-Harboring Statute On Their Ability To Show A Prima Facie Case Of Disparate Impact

Plaintiffs' principal response to Defendants' argument that summary judgment should be granted under *Inclusive Communities*' "substantially limits … discretion" standard based on the federal anti-harboring statute is that the Fourth Circuit "implicitly rejected" that argument. As noted, that argument is without merit too. Beyond that, Plaintiffs rely exclusively on out-of-circuit authority to say that "the simple act of renting property to undocumented immigrants, without

---

[4] *See Orbit Corp v. Fedex Ground Package Sys., Inc.*, No. 2:14CV607, 2016 WL 6609184, at *17 (E.D. Va. Nov. 8, 2016) (holding that where plaintiffs failed to argue that the evidence created a genuine issue of material fact as to one of their claims, "the record plainly reveals that Plaintiffs have waived/abandoned their substantive claim for relief") (citation omitted).

more," could not put Defendants in legal jeopardy under the anti-harboring statute. (Dkt. 256 at 18.) Of course, other Circuits' interpretations have no bearing on what conduct constitutes criminal liability under the IRCA's anti-harboring statute in this Circuit under *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012). Moreover, as Plaintiff acknowledge, even under these authorities, the "without more" that *can* establish criminal culpability under the statute is the defendant's *mens rea* in making the decision to harbor. *Mens rea* ordinarily can be proved with circumstantial evidence and, absent objective proof like the written Policy here, can be virtually impossible for a defendant to defeat at trial. To avoid such a criminal trial and conviction, then, Defendants adopted the Policy, which would be direct and powerful proof that any renting to undocumented immigrants was *not* knowing or reckless. A housing provider does not have any "discretion" to knowingly or recklessly rent to undocumented immigrants because—even under Plaintiffs' authorities—that is a crime. So at a minimum, the anti-harboring statute "substantially limits" Defendants' "discretion" in determining how its rental decisions are made and to whom it may rent. And given the Fourth Circuit's decision in *Aguilar*, that is all the more true.[5]

Perhaps acknowledging this, Plaintiffs claim—without any authority applying the FHA or the disparate-impact theory, before or after *Inclusive Communities*—that *Inclusive Communities*' "substantially limits … discretion" rule only precludes a disparate-impact claim where some other law (here, the IRCA) "compels [Defendants] to follow the policy at issue." (Dkt. 256 at 19.) That is not remotely what *Inclusive Communities* held. Rather, the Court used the phrase "substantially limits … discretion" in formulating policies—not "compels" the adoption of particular policies, or

---

[5] Plaintiffs relegate *Aguilar* to a footnote and say it does not matter because it was unpublished. (Dkt. 256 at 19 n.9.) But that does not mean those who own property in the Fourth Circuit's geographic footprint can or should ignore *Aguilar* as the Fourth Circuit's interpretation of the anti-harboring statute. And there is no basis for a property owner to surmise that the Fourth Circuit will eventually adopt a reading of the statute *contrary to* the one it previously announced in *Aguilar*.

- 7 -

anything like that. The Supreme Court says what it means and means what it says, and this Court should presume as much. *See Appleby v. Warden, N. Reg'l Jail & Corr. Facility*, 595 F.3d 532, 540 (4th Cir. 2010) ("We presume that the Supreme Court meant what it said when it used particular words in describing legal standard).

### C.      Plaintiffs' Statistical Evidence Is Unreliable and Fundamentally Flawed

Plaintiffs' Complaint alleged that undocumented immigrants are "precluded" from living at the Park. Compl. ¶ 40. Plaintiffs challenge not only the Policy as applied to occupants, but as applied to applicants. For precisely that reason, Plaintiffs provided statistics from Professor Clark as to the undocumented Latino population in the relevant area. Plaintiffs also reference a list of persons allegedly affected by the Policy, but this list fails to generate statistical evidence that the Policy disproportionately effects Latinos as required to defeat summary judgment. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient"). The Fourth Circuit's opinion directed that Latinos be analyzed as a class, and not through a comparison of undocumented aliens in particular groups, to determine if there is a disparate impact. Plaintiffs provide no evidence of such an impact. Indeed, Plaintiffs do not point to any evidence of a disproportionate impact on Latino applicants, any evidence of a decrease in the percentage of Latino residents living at the Park since the implementation of the Policy, or even any evidence that the persons on the list were evicted or could not comply with the Policy. Plaintiffs agree that 60% of the Park is Latino and offer no evidence that the percentage of Latinos at the Park has declined or that Latino applicants are turned away in a higher percentage than other groups because of the Policy.

Even if the Court accepts Plaintiffs' misdirected statistical approach, Professor Clark's opinions are unreliable and cannot support the allegation of disparate impact. As a result, his opinions are inadmissible and cannot defeat summary judgment. *E.E.O.C. v. Freeman*, 778 F.3d

463, 466 (4th Cir. 2015); Fed. R. Civ. P. 56 (c)(1)(B). There are two fundamental flaws in Professor Clark's analysis: (1) he failed to calculate the required Margin of Error (MOE) for his estimates as required by the field of statistical analysis; and (2) he extrapolated statistics from larger populations to smaller populations without making any adjustments. Professor Clark admits that because statisticians are making estimates, MOE associated with an estimate is necessary to determine its reliability. Dkt. 248, Ex. 2 at 26:19-22. At the outset, Professor Clark's analysis is unreliable because he simply carried over an American Community Survey ("ACS") MOE for estimates of *all Hispanics* in Census Tract 4406 to his estimate of *undocumented Hispanics* in Tract 4406 without adjusting the MOE for the fact that he was estimating an undocumented population that is undisputedly more difficult to estimate – which Professor Clark admits. Professor Clark's analysis also erred in failing to adjust his already incorrect MOE when he carried over a percentage estimate to a smaller population sample size. Professor Clark used Center for Migration Studies ("CMS") data regarding estimates of the undocumented population, but CMS stops estimating the undocumented population at the Public Use Microdata Area ("PUMA") level. *See* Undisputed Material Fact 1. Professor Clark carried over CMS's estimate of the undocumented Hispanic population for the PUMA to the dramatically smaller sample size of the Census Tract without increasing his MOE estimate to account for the larger MOE associated with the dramatically smaller sample size.[6]

In order to reliably determine an MOE for an estimate of undocumented Hispanics, Professor Clark should have relied on the ***only*** published MOE for statistical estimates of the

---

[6]    Professor Clark agreed that as the sample size goes from a larger to a smaller sample, such as the movement of a sample size from the national to the state to the PUMA level, the MOE increases. Professor Clark testified that the Census Bureau follows the same concept. (Dkt. 248, Ex. 2 at 32:9-13.)

undocumented population – that is CMS' 9% MOE for its estimate of national undocumented population. *See* Undisputed Material Fact 4. To obtain a correct MOE for the County, PUMA or Census Tract levels, Professor Clark should have taken that 9% MOE at the national level and extrapolated it downward, increasing it at each level to account for the smaller sample size. Indeed, the 9% MOE was based on a population of hundreds of millions, while the Census Tract is comprised of just a few thousand individuals. But Professor Clark made no attempt to determine the MOE at the Census Tract level. Dkt. 248, Ex. 2 at 77:5-82:19. He therefore admitted at this deposition that "[p]erhaps the margin of error should be larger…" *Id.* at 78:12-13. Without a proper MOE, Professor Clark's opinions are not reliable.

To overcome this fatal unreliability, Plaintiffs claim that Professor Clark would have reached the same conclusion regarding the alleged disparate impact on Latino residents at the state and county level. Wrong. Professor Clark's opinion in his opening report was confined to Tract 4406. (Dkt. 248, Ex. 1(B) at 1 ("Any policy focused specifically on the sub-area defined by Tract 4406 will have a disproportionate impact on the Hispanic population.").) Plaintiffs provide no evidence as to how statistics at the state and county level translate into reliable data regarding the make-up of the population in Tract 4406 because Professor Clark engaged in no such analysis.

Finally, Professor Clark's opinions are unsupported and thus unreliable because he did not take into account undocumented Asians. Initially, Professor Clark opined that the Latino population was seven times more likely to be impacted "than other groups." Dkt. 248, Ex. 1(B) at 5. But once Professor Clark took into account Asian population, it was revealed that this claim was not true. Professor Clark's opinions, therefore, are not reliable. Plaintiffs protest that a disparate impact analysis should not compare one protected group to another but Plaintiffs miss the point. In 2012, Asians made up the majority of undocumented individuals for the relevant PUMA and

therefore the Policy would not have had a disparate impact on Latinos. (Dkt. 248, Ex. 3(2).) In 2014, Latinos were, *at most*, only 1.4 times more likely to be impacted by a policy directed at illegal aliens as undocumented Asians. This demonstrates that the Policy does not have a robust causal connection to Latinos as a racial group.

### III. DEFENDANTS HAVE LEGITIMATE REASONS FOR THE POLICY THAT ARE NECESSARY TO ACHIEVE A VALID INTEREST

Even if Plaintiffs can satisfy the requirements of Step 1, they concede that Defendants have demonstrated valid interests in the Policy.[7] Plaintiffs conflate Steps 2 and 3 by attacking how the Policy is carried out, but they do not contest that a landlord has a valid interest in conducting credit and criminal background checks—which Plaintiffs concede are two of the reasons for the Policy here. (Compl. ¶ 32 ("Defendants claim that they need the documentation required by the Policy to conduct criminal background and credit checks…").) Instead, Plaintiffs jump ahead to Step 3 and contend that documents other than those required by the Policy can satisfy the valid interests served by the Policy. Plaintiffs present no evidence to even suggest that a landlord has no valid interest in the creditworthiness of an applicant or tenant or the criminal history of a person residing in a multi-family setting. Accordingly, Step 2 has been satisfied.

In an attempt to avoid this inconvenient fact, Plaintiffs ask this Court to ignore the requirements for Step 2 set forth in *Inclusive Communities* and to instead rely upon *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984) to apply a "business necessity" standard at Step 2. (Dkt. 260 at 20-21.) Plaintiffs' continuing effort to run from *Inclusive Communities* is telling and demonstrates that they cannot satisfy the requirements articulated in that decision to prove a disparate-impact claim under the FHA. *Inclusive Communities* held that Step 2 is satisfied if a

---

[7] Plaintiffs do contest that avoiding criminal liability under IRCA also is a "valid interest" served by the Policy, but for the reasons stated above, Plaintiffs are wrong.

"valid interest" is served by the policy and cautioned courts not to substitute their judgment for that of a private housing provider. The Court reasoned that "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers *leeway* to state and explain the *valid interest* served by their policies." *Inclusive Communities*, 135 S. Ct. at 2522 (emphasis added). It further explained that, "[j]ust as an employer may maintain a workplace requirement that causes a disparate impact if that requirement is a 'reasonable measure[ment] of job performance,' so too must housing authorities and private developers be allowed to maintain a policy *if they can prove it is necessary to achieve a valid interest.*" *Id.* (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 436 (1971)) (emphasis added).

Further, Plaintiffs confuse the inquiries at Steps 2 and 3. Under *Inclusive Communities*, Plaintiffs bear the burden at Step 3 of proving the "challenged practice could be served by another practice that has a less discriminatory effect," Dkt. 138 at 14, which Plaintiffs concede is the same burden as proving that a challenged practice was pretextual. Dkt. 138 at 17 ("If Plaintiffs show that this business necessity could be accomplished through "another practice that has a less discriminatory effect," then Plaintiffs are still entitled to summary judgment… *Stated differently, Defendants' business justification is pretextual*.") (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988)) (emphasis added). At Step 2, there is no dispute of material fact that the Policy is necessary to achieve the undisputedly valid interests demonstrated by Defendants.

## A.     The Policy Serves The Valid Interest Of Avoiding Criminal Liability

As argued above, Plaintiffs' contention that a landlord should see how close it can come to a criminal indictment is nonsense as this Court has already recognized. Under *Aguilar*, a defendant can be convicted of harboring if it "acts with reckless disregard where she is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an

undocumented alien." 477 F. App'x at 1002. Where that line is drawn is indiscernible *ex ante*, and defendants most certainly have a valid interest in not ending up on the wrong side of it.

### B.    The Policy Serves The Valid Interest Of Lease Underwriting

The Policy also unquestionably serves the valid interest of lease underwriting concerns, and Plaintiffs do not argue otherwise. An important step in the underwriting process is a credit check. Again, Plaintiffs do not contend, and present no evidence to suggest, that conducting a credit check does not serve a valid interest – or is not a "business necessity" - for a landlord. And this Court previously rejected the notion that lease underwriting is a "pretext." (Dkt. 190 at 16) ("Plaintiffs' next argument—that defendants' justifications regarding lease underwriting and losses from eviction are pretextual—is also unavailing."). Instead, Plaintiffs attempt to argue that Defendants' legitimate concerns regarding lease underwriting can be addressed through a different approach with different documents than what is set forth in the Policy. But this is a Step-3 argument, not an argument that the Policy does not serve a valid interest.[8]

### C.    The Policy Serves The Valid Interest Of Conducting Criminal Background Checks

It is also undisputed that a landlord for a multifamily property has a legitimate and valid interest in conducting criminal background checks for those who will reside at the property – in this instance the Park.  Plaintiffs do not suggest otherwise.  Protecting its residents is the most important obligation of a landlord and performing a criminal background check is well recognized as an important and necessary step in fulfilling that obligation.  Plaintiffs cite this Court no facts

---

[8] Plaintiffs' argument that the Policy is not necessary because the male Plaintiffs could pay their rent is irrelevant and its logic faulty. Plaintiffs' argument regarding the male plaintiffs is irrelevant because, even though the male plaintiffs could pay the rent, the Policy is uniformly applied to other potential applicants – not just the male Plaintiffs.  That the male Plaintiffs arguably at a point in time could pay the rent, does not mean the defendants have no valid interest in determining if other potential tenants can pay, or even whether the circumstances of the male Plaintiffs has changed such that they could not pay their rent.

- 13 -

or case that stands for the proposition that a landlord has no valid interest in conducting a criminal background check on those living in close proximity to each other in the community.

### D.    The Reasons For The Policy Are Not Post-Hoc Justifications

Plaintiffs claim that Defendants' reasons for the Policy are post-hoc justifications is irrelevant to the Court's inquiry here. This Court dismissed Plaintiffs' claim for disparate treatment which decision was not appealed. Therefore, whether the reasons for the Policy – which Plaintiffs largely do not contest – were "post-hoc rationalizations" (they are not) is irrelevant to Plaintiffs' remaining disparate impact claim. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422 (1975) (noting that Title VII "is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.'" (citing *Griggs*, 401 U.S. at 432)).

Further, this argument is factually baseless as this Court previously found. *See* Dkt. 138 at 21 (claiming justifications for Policy were post-hoc) and (Dkt. 190 at 15-17) (arguments were specifically rejected by this Court). This Policy and the reasons for it were set forth in documents predating this lawsuit despite Plaintiffs' false claim to the contrary. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(Dkt. 151, Ex. 9 at 7.) ██████████████████████

████████████████████████████████████████

---

[9]    The Complaint was filed on May 23, 2016. (Dkt. 1.)

[10]    In his attached declaration, Mr. Jones states that these standards applied to the Park. (Dkt. 151, Ex. 20.)

████████████████████████████████████████████████ (Exhibit 1., Jones

Dep. Tr. ██████████ Plaintiffs' conclusory claim that Defendants' legitimate reasons for the

Policy are post-hoc justification is simply belied by the evidence.

## IV.    THERE IS NO EVIDENCE THAT DEFENDANTS' REASONS FOR THE POLICY ARE PRE-TEXTUAL OR THAT DEFENDANTS' INTERESTS COULD BE SERVED BY OTHER PRACTICES WITH LESS DISCRIMINATORY EFFECTS

Under *Inclusive Communities*, at Step 3 of the burden-shifting framework, a plaintiff must

prove that the "the challenged practice could be served by another practice that has a less

discriminatory effect." *Inclusive Communities*, 135 S. Ct. at 2515. Despite Plaintiffs' newfound

claim to the contrary, Plaintiffs have ***already*** conceded that this burden is functionally the same as

demonstrating pretext. (Dkt. 138 at 17. ("If Plaintiffs show that this business necessity could be

accomplished through "another practice that has a less discriminatory effect," then Plaintiffs are

still entitled to summary judgment… ***Stated differently, Defendants' business justification is***

***pretextual***.") (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (emphasis

added)). There is no evidence that Defendants' interests are pretextual or that these interests can

be served by another practice that has a less discriminatory effect. Indeed, this Court already

rejected Plaintiffs' argument that Defendants' interests were pretextual. (Dkt. 190 at 15-17.)

The Supreme Court has found that the burden of demonstrating pretext is functionally the

same as demonstrating that there are other practices that would serve a defendant's legitimate

interests. *See Watson, supra*; *Albemarle Paper*, 422 U.S. at 425 ("If an employer does then meet

the burden of proving that its tests are job related, it remains open to the complaining party to show

that other tests or selection devices, without a similarly undesirable racial effect, would also serve

the employer's legitimate interest in efficient and trustworthy workmanship… Such a showing

would be evidence that the employer was using its tests merely as a 'pretext' for discrimination.")

(citations omitted); *Connecticut v. Teal*, 457 U.S. 440, 447 (1982) ("[T]he plaintiff may prevail, if

he shows that the employer was using the practice as a mere pretext for discrimination."). Likewise, the Fourth Circuit has found that in the disparate-impact Title VII context, a plaintiff has the burden of demonstrating pretext at Step 3 of the burden-shifting framework. *Anderson*, 406 F.3d at 265 ("[T]the plaintiff may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination.") (citing *Teal*, 457 U.S. at 447); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 660 (1989) (at step 3, "respondents will have to persuade the factfinder that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate [hiring] interest[s]"; by so demonstrating, respondents would prove that "[petitioners were] using [their] tests merely as a 'pretext' for discrimination.") (citation omitted).

The Step-3 issues – as framed by the Plaintiffs in their Complaint – are whether ITINs and foreign passports provide the same reliability and function as the documents requested by the Policy.[11] (*See* Complaint ¶¶ 31-33.) Plaintiffs now concede that the ITINs and foreign passports are not a viable alternative to the Policy as it applies to lessees as Plaintiffs proffer - as their alternative approach to the Policy - the suggestion that social security numbers and proof of legal residence can be required of lessees, but ITINs and lesser documents should be required or occupants. Opp. at p. 29-30. Plaintiffs provide no rational explanation as to why one set of documents is required for lessees and another for occupants when the core issue in both instances is verifying the identification of the person. By conceding that defendants may – and need to - require social security numbers and proof of legal residence from lessees, Plaintiffs concede that the challenged Policy cannot "be served by another practice that has a less discriminatory effect."

Plaintiffs' concession is hardly a surprise because ITINS are not effective for verifying

---

[11] Plaintiffs are bound by these allegations. *See Bender v. Suburban Hosp., Inc*., 159 F.3d 186, 192 (4th Cir. 1998).

identity. (Dkt. 151, Ex. 6 at 224 (discussing how ITINs are not valid for identification outside the tax system); Ex. 8 at 60:9-13; Ex. 11 at 35-39, 45, 49 (discussing how a SSN helps verify identity and a ITIN is not satisfactory for identity verification); Ex. 9 at WAPLES 2327-28) (noting that a U.S. citizen without a SSN was grounds for immediate denial and discussing how SSN can help verify fraudulent identity)). As described in Defendants' Memorandum in Support (and as admitted by plaintiffs), all that a person must do to acquire an ITIN is send in a passport, a simple Form W-7 application with an attached copy of a tax return – there is no in-person meeting or any other effort undertaken by the IRS to verify identity. (Dkt. 248 at 29.) The 2009 *and* 2018 U.S. Treasury Reports demonstrate that ITINS cannot be used to prove identity.[12] The IRS states that "ITINS do not serve any purpose other than federal tax reporting."[13] Consistent with the U.S. Government's statements, Defendants' CoreLogic Manual explained in detail that ITINS are not valid for identification. (Dkt. 151, Ex. 11 at 45.)[14]

Because ITINS are not effective to prove identity, the CoreLogic Manual requires ███

████████████████████████████████████████████████████████████████████████

---

[12] It is clear from the CoreLogic Manual that credit checks based solely on an ITIN are not nearly as reliable as credit checks run on a Social Security Number. (Dkt. 138, Ex. 43 at ███████

████████████████████████████████████████████████████████████

[13]   *Available at*  https://www.irs.gov/individuals/individual-taxpayer-identification-number  at "What is an ITIN used for?"

[14]   Plaintiffs also incorrectly claim that a social security number is not effective at verifying identity. In contrast to the ITIN application process, in order to obtain a social security number the male plaintiffs had were required to be fingerprinted and to answer extensive questions about themselves as part of their application for  Temporary Protected Status ("TPS") in the United States. (Dkt. 98, Ex. 13 at 16:11-17:7; Ex. 16 at 68:15-22; Ex. 14 at 70:6-71:1; Ex. 15 at 17:5-14.)

- 17 -

███████████████████████████████ (Dkt. 151, Ex. 11 at 68.) The starting place for a reliable credit check is verifying that the correct identity is being provided by the applicant. There is no dispute of material fact that ITINS are not effective in verifying identity and thus not as effective in running reliable credit checks or criminal background checks.

Foreign passports fare no better as demonstrated by the undisputed fact ████████ ████████████████████████████████████████████ could have then provided that fake passport to defendants, effectively concealing her actual identity. In response, Plaintiffs argue that U.S. Government documents may be fabricated, but as the Court correctly noted, "no method of determining a person's legal presence is unassailable. Indeed, practically any form of identification or proof of lawful presence may be fabricated." (Dkt. 190 at 15.) U.S. government documents confirming legal status "*__are among the gold standards__* in terms of decent third-party documentation." (Dkt. 248, Ex. 7 at 116:10-117:1 (emphasis added).) There is no such assurance from the hundreds of foreign countries issuing passports.

Moreover, the CoreLogic Manual also explains how a Social Security Number helps verify identity and provides a more accurate background check. (Dkt. 151, Ex. 11 at 35-39 (stating on ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████(emphasis added); Dkt. 151, Ex. 9 at WAPLES 2328) ███████████████████████████████████████████████ ████████████████████████) There is simply no dispute of material fact that a social security number or the documents evidencing legal status help verify identity to conduct reliable criminal background checks and credit checks on the correct individual.

Notably, Plaintiffs now agree that ITINs and foreign passports are *not* sufficient, accepting that Defendants can properly require social security numbers or proof of legal residency from lessees—but not from occupants. In their Complaint, implicitly acknowledging that proving identity and conducting reliable background and credit checks on the correct individual were valid interests, but alleged that using foreign passports and an ITIN instead of documents proving legal status could sufficiently accomplish the valid interest of proving identity. (Compl. ¶ 31 ("As a form of identification, the ITIN is *as reliable and precise as a Social Security number*.") (emphasis added); Compl. ¶ 33 ("Foreign passports or government-issued identification cards are sufficient.").) Now, faced with undisputed evidence that these assertions are flat out untrue (evidence from the Plaintiffs themselves – such as the illegal use of a foreign passport to assume someone's identity and enter the U.S.; the extensive identification and background process the male plaintiffs underwent to obtain social security numbers; and the lack of identity verification in the ITIN application process) *and* evidence from the U.S. government – such as, *inter alia*, the 2009 *and* 2018 U.S. Treasury Reports that demonstrate why ITINS should not be used for identification), Plaintiffs now completely abandon their ITIN and foreign passport theory that they alleged in the Complaint. (Dkt. 260 at 29.)  Instead, Plaintiffs now claim that the practice that would accomplish Defendant's legitimate interests with a less discriminatory effect would be to *actually enforce* Defendant's Policy on *lessees*—just not on *occupants*.[15]

Plaintiffs' newfound argument completely undermines Plaintiffs' disparate impact claim. In making this argument, Plaintiffs concede that there is no practice with a less discriminatory

---

[15]   Plaintiffs' contention that Defendants have not argued that this proposal is not a legitimate alternative is completely misleading because Plaintiffs are making this argument for the very first time. Indeed, because Plaintiffs never previously raised their new lessee/occupant distinction— either in this Court on the prior summary-judgment motions, or in the Fourth Circuit in appealing the Court's prior summary-judgment ruling—the argument is waived.

effect other than the Policy by which Defendants can ensure proper identification of their *lessees* sufficient to run credit and criminal background checks. Instead, Plaintiffs argue while the Policy can be applied to lessees, ITINs and/or foreign passports are sufficient to prove the identity of *occupants* sufficient to run a criminal background check on them. (Dkt. 260 at 30.) This argument is simply illogical, because if ITINs and foreign passports are not sufficient to prove the identity of lessees as Plaintiffs concede, they are not sufficient to prove the identity of occupants so that Defendants can run a criminal background check on the correct individuals.

Finally, Plaintiffs proffer no alternative to address the valid interest of avoiding criminal liability under 8 U.S.C. § 1324. This Court already concluded that "there is no question, given § 1324's imposition of liability for 'reckless disregard of the fact that [an] alien has come to, entered, or remains in the United States in violation of law,' that a lessor could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants." (Dkt. 190 at 16) (citing 8 U.S.C. § 1324(a)(1)(A)(ii).) The only viable means to avoid such potential criminal exposure is to require proof of legal residency or a social security number just as the Policy states.

## <u>CONCLUSION</u>

For the reasons above, Defendants request this Court to enter judgment in favor of Defendants on Count I of Plaintiffs' Complaint and for such other relief as is just and proper.

Respectfully submitted,


WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP, WAPLES PROJECT LIMITED
PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2019, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
_____
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*