1                **UNITED STATES DISTRICT COURT**
            **FOR THE EASTERN DISTRICT OF VIRGINIA**
2                   **ALEXANDRIA DIVISION**

3

   ROSY GIRON DE REYES,     )
4   et al,                )
                       )   Civil 16-563
5         Plaintiffs,     )
                       )
6     v.                  )
                       )   Alexandria, Virginia
7   WAPLES MOBILE HOME PARK   )   November 8, 2019
   LIMITED PARTNERSHIP,     )
8   et al,                )
        Defendants.     )
9   _____  )

10

11               **TRANSCRIPT OF MOTION HEARING**
           **BEFORE THE HONORABLE T. S. ELLIS**
12             **UNITED STATES DISTRICT JUDGE**

13

14              **APPEARANCES**:

15   For the Plaintiffs:    Simon Yehuda Sandoval-Moshenberg
                       Gianna Puccinelli
16

17   For the Defendants:    Michael Sterling Dingman
                       Grayson Hanes
18

19

   Court Reporter:   PATRICIA A. KANESHIRO-MILLER, RMR, CRR
20

21

   Proceedings reported by stenotype shorthand.
22   Transcript produced by computer-aided transcription.

23

24

25

2

P R O C E E D I N G S

(2:41 p.m.)

1    THE DEPUTY CLERK:  Civil Case Giron de Reyes, et al.,

2    versus Waples Mobile Home Park Limited Partnership, et al.,

3    Case Number 2016-CV-563.

4    May I have appearances please, first for the

5    plaintiff.

6    MR. SANDOVAL-MOSHENBERG:  Yes.  Good afternoon.

7    Simon Sandoval-Moshenberg of the Legal Aide Justice Center

8    for the plaintiffs.  With me is pro hac vice counsel Gianna

9    Puccinelli of the law firm Quinn Emanuel, who will be arguing

10   this afternoon.

11   THE COURT:  All right.  Good afternoon to both of

12   you.

13   For the defendants?

14   MR. DINGMAN:  Good afternoon, Your Honor.  Michael

15   Dingman and Grayson Hanes for the defendants.

16   THE COURT:  All right.  Good afternoon to you all.

17   All right.  The movant today is the defendant.  Let

18   me hear first from you.

19   Your briefs on both sides have been reviewed.  I have

20   some knowledge of this.  But let me give you an unfettered

21   opportunity to speak for about 10 or 15 minutes.  I do have

22   one question for you later on.  But go ahead and tell me what

23   you think I should know.

3

1          MR. DINGMAN:  Yes, sir.

2          Well, as the Court is aware, this case is before the

3    Court on summary judgment on remand from the Fourth Circuit

4    with respect to the disparate impact claim only.

5          In the appeal, the Fourth Circuit found that the

6    Court had improperly granted a motion to dismiss with respect

7    to the disparate impact claim and remanded it specifically

8    for consideration of that claim on summary judgment.

9          In their briefs, the plaintiffs seem to suggest that

10   the Fourth Circuit went further than that and granted summary

11   judgment with respect to the prima facie case, or step one,

12   as they call it, of the analysis.  I think the decision of

13   the Fourth Circuit is very clear and that the Court was

14   looking at this as a motion to dismiss appeal.  That's how it

15   was proffered by the plaintiffs.

16         In fact, the defendants asked the Fourth Circuit to

17   consider the summary judgment record.  Plaintiffs opposed

18   that.  We quoted in our brief, Fourth Circuit brief, asking

19   the Court not to, quote, sift through the facts.

20         The Court started its analysis by citing the standard

21   Rule 12(b)(6) standards of review, and when it completed its

22   analysis, the Court came to the conclusion that the motion to

23   dismiss was improperly granted, and it remanded the case for

24   consideration, and it specifically said the district court

25   should have addressed the FHA claim of disparate impact

4

1      theory of liability at the motion for summary judgment stage.

2      And therefore, the Court remanded it specifically for that

3      purpose.

4              I think it is also important, Your Honor, to look at

5      the Court's ruling after it completed its analysis.  Under

6      the Rule 12(b)(6) requirements, it said the following:

7              "At the motion-to-dismiss stage, we must accept all

8      well-pled facts as true and all reasonable inferences in

9      favor of the plaintiff.  Therefore, accepting these

10     statistics as true, referring to the statistics in the

11     complaint, we conclude that plaintiff sufficiently alleged a

12     prima facie case of disparate impact."

13             But a suggestion that the Fourth Circuit went beyond

14     that and made some summary judgment ruling has no basis in

15     their opinion.  There is no discussion of the summary

16     judgment standard, and the court made it very clear that it

17     was remanding to this court to take up this issue on summary

18     judgment, which of course was not done previously.  So there

19     wasn't even a summary judgment decision to be reviewed by the

20     Fourth Circuit.

21             So turning now to the substance of the claim, Your

22     Honor, as we have discussed with this Court and briefed many

23     times, the *Inclusive Communities* case is controlling.  In

24     that case, the U.S. Supreme Court recognized disparate impact

25     as a claim under the Fair Housing Act for the first time but,

5

1    in doing so, went out of its way to state that it was

2    enacting what it referred to as cautionary standards, to make

3    sure that the Fair Housing Act disparate impact claim did not

4    improperly impose requirements on both public bodies and

5    private developers with respect to their housing decisions.

6        One of the primary cautionary standards that the

7    court set forth -- and it repeats this throughout its

8    opinion -- and I will talk about that in some detail -- it is

9    that the disparate impact claim under the Fair Housing Act

10   could only be established if the underlying policy is

11   artificial, arbitrary, and unnecessary.  And the Court uses

12   that phrase multiple times in its opinion.  And it does so

13   because it was clear that, in recognizing disparate impact

14   under the Fair Housing Act claim, it was not inviting courts

15   to second-guess policy decisions by public bodies or by

16   private developers.  In fact, it specifically addressed the

17   erroneous assumption in its opinion.  The Court said the

18   following:

19       "This case on remand may be seen simply as an attempt

20   to second-guess which of two reasonable approaches that

21   housing authorities should follow in the sound exercise of

22   its discretion in allocating tax credits for low-income

23   housing."

24       Immediately after that, the court says the following:

25   "An important and appropriate means of ensuring that

1    disparate impact liability is properly limited is to give

2    housing authorities and private developers leeway to state

3    and explain the valid interest served by their policies."

4         It goes on to say, "Disparate impact mandates the

5    removal of artificial, arbitrary, and unnecessary barriers."

6         The court went on in its opinion to expand upon that,

7    and it said the following:  "Governmental or private policies

8    are not contrary to the disparate impact requirement unless

9    they are artificial, arbitrary, and unnecessary."

10         The Court reiterated that a second time and said the

11    following:  Were standings for proceeding with disparate

12    impact suits not to incorporate at least the safeguards

13    discussed here.  The disparate impact liability might

14    misplace valid governmental and private priorities rather

15    than solely removing artificial, arbitrary, and unnecessary

16    barriers, and that, in turn, would set our nation back in its

17    request to reduce the salience of grace in our social and

18    economic system."

19         So the Supreme Court said, unless the policy is

20    artificial, arbitrary, and unnecessary, it does not violate

21    the Fair Housing Act, and that disparate impact was intended

22    solely to address policies that are artificial, arbitrary,

23    and unnecessary.

24         In their briefs, the plaintiffs discount that

25    repeated mantra from *Inclusive Communities* and treat it as

7

1    meaningless.  But in fact, it is a basis for an analysis of

2    any Fair Housing Act disparate impact claim.  We identified

3    for the Court a number of other federal courts post-*Inclusive*

4    *Communities* who have come to that same conclusion, including

5    two circuit courts.  In *Communities v. Property Company*, at

6    920 F.3d 890, the Fifth Circuit said the following:  "We read

7    the Supreme Court's opinion in *ICP*, *Inclusive Communities*, to

8    undoubtedly announce a more demanding test, as set forth in

9    the HUD regulations.  As noted by a Minnesota district court,

10   the Supreme Court announced several safeguards to incorporate

11   into the burden-shifting framework to ensure that disparate

12   impact liability does not replace governmental and private

13   priorities."

14         The court went on to conclude accordingly.  "As noted

15   by the Fourth Circuit in the Reyes decision here, we were

16   bound to apply the stricter version of the burden-shifting

17   analysis."  And the Court went on to hold that unless the

18   policy is shown to be artificial, arbitrary, and unnecessary,

19   there is no disparate impact claim.

20         The Eighth Circuit came to the same conclusion in

21   *Ellis v. City of Minneapolis*.  Again, citing almost verbatim

22   the language from the Supreme Court's decision in *Inclusive*

23   *Communities* regarding artificial, arbitrary, and unnecessary

24   policies, it said the following:  "The Courts warned

25   disparate impact liability might displace valid governmental

8

1    and private priorities rather than solely removing

2    artificial, arbitrary, and unnecessary barriers."

3            The plaintiffs have not cited to this Court a single

4    case where a federal court has come to the conclusion that

5    the Supreme Court's repeated reference to artificial,

6    arbitrary, and unnecessary policies is meaningless.  It is,

7    in fact, the essence of that decision.  And they have

8    provided no facts for this Court that can possibly satisfy

9    that requirement.

10            The policy at issue -- and there is no dispute about

11    this -- is intended to assist in leasing decisions, credit

12    checks, background checks, avoiding criminal liability under

13    the anti-harboring statute.  There are no facts to suggest

14    those are artificial interests as opposed to valid interests.

15    In fact, this Court found as much in its prior decision on

16    summary judgment with respect to disparate treatment.  Nor

17    can there be an argument that using Social Security numbers

18    and valid U.S.-issued identification is arbitrary and

19    artificial.  At the end of the day, the plaintiffs' case is

20    simply we believe you can use ITINs or foreign

21    passports -- and I will talk about that more in a moment --

22    that's a good alternative.  That's not what the Supreme Court

23    created when it recognized disparate impact under the Fair

24    Housing Act.

25            THE COURT:  A good alternative to what?

9

```
 1              MR. DINGMAN:  To the policy that requires a Social
 2      Security number or a valid U.S. document showing legal
 3      presence in the United States.
 4              So what they're doing essentially --
 5              THE COURT:  -- going to come back in a moment as to
 6      why those two -- that is, the passport and the tax ID
 7      numbers -- in your view are not sufficient.
 8              MR. DINGMAN:  Yes, sir.
 9              THE COURT:  All right.  That seems to be the
10      principal focus of the parties' dispute.
11              MR. DINGMAN:  I agree with the Court.
12              And the point I'm making at this stage is that the
13      Supreme Court did not suggest that the federal court should
14      second-guess what are valid policy decisions simply because
15      one party says, well, I think you can do sort of the same
16      thing with this policy, or you should build that housing
17      development here instead of there.  If it is a -- if a valid
18      interest has been demonstrated -- and that's the language
19      used by the Supreme Court in Inclusive Communities -- and it
20      is not arbitrary or artificial, then there cannot be a
21      disparate impact claim under the Fair Housing Act.
22      Otherwise, courts would be invited to second-guess housing
23      decisions, which the Supreme Court expressly said, in
24      Inclusive Communities, it was not intending to create with a
25      disparate impact claim under Fair Housing.
```

1          There is also one other overarching issue in this

2     case before we get to the three-step analysis, and that has

3     to do with the Supreme Court also finding in *Inclusive*

4     *Communities* that there cannot be a disparate impact claim

5     under the Fair Housing Act if the policy is required, or the

6     defendant in this case, is substantially limited in its

7     discretion with respect to the policy.  And we have discussed

8     and argued with this Court, and Your Honor wrote about this

9     in your summary judgment opinion, the impact of the

10    anti-harboring statute as it was applied by Judge Trenga and

11    this Court and then interpreted by the Fourth Circuit in the

12    *Aguilar* case.

13          At the heart of that case, Your Honor --

14          THE COURT:  Which case?

15          MR. DINGMAN:  *United States v. Aguilar*.

16          THE COURT:  All right.  Go on.

17          MR. DINGMAN:  The Court was presented with the issue

18    of whether substantial facilitation requirements so-called

19    was necessary for a conviction under the anti-harboring

20    statute as opposed to a reckless disregard of information

21    that would put one on notice that the person that you're

22    leasing to is in fact in the United States illegally.  The

23    conviction was upheld, and the Fourth Circuit said two things

24    that I think are very important.  First, it said, "A

25    defendant acts with reckless disregard where she is aware of

1    but consciously ignores facts and circumstances clearly

2    indicating that an individual is an undocumented alien."  The

3    court then said:  "Circumstantial evidence alone can

4    establish the defendant's knowledge of reckless disregard

5    that the people harbor are illegally in the country."

6         And one of the facts that the Fourth Circuit pointed

7    out in affirming the conviction in that case was that the

8    defendant admitted, quote, that it was the same to her

9    whether her tenants possessed proper documentation or did

10   not.

11        In response, the plaintiffs point to cases from other

12   circuits, which are not binding.  They suggest that this

13   Court should ignore *Aguilar* because they claim it is an

14   unpublished opinion.  In fact, when you look at the opinion,

15   it refers to Appellate Rule 32.1, which only discusses

16   unpublished decisions prior to January 1, 2007.  This case

17   is, in fact, binding on this Court.  It is the only case in

18   which the Fourth Circuit has addressed the standards for a

19   criminal conviction under the anti-harboring statute.

20        When you apply that finding to the facts here, it is

21   clear that the defendants are substantially limited in their

22   discretion.  What is being suggested is defendants should

23   ignore the fact that there are illegal aliens or undocumented

24   aliens, however you want to describe them, at the park,

25   applying to live at the park, living at the park.  The

12

1    essence of the plaintiff's case is that there's a large group

2    of undocumented aliens living at the park.  When they're

3    asked to provide basic documentation and they cannot, that is

4    a further indication that they're in the United States

5    illegally.

6            Plaintiffs have even suggested that the four female

7    plaintiffs in the case should be able to come back and live

8    at the park.  Well, it is undisputed that they're in the

9    United States illegally.

10           THE COURT:  Come back and do what?  I'm sorry.

11           MR. DINGMAN:  Live in the park.  Move back in.

12           THE COURT:  All right.

13           MR. DINGMAN:  In that instance, the defense would

14   have actual knowledge that they were renting to someone who

15   is in the country illegally.

16           So the discretion is substantially limited here

17   because any landlord under those facts and circumstances

18   would be compelled to do exactly what the policy does here,

19   which is to ask for, if you do not have a Social Security

20   number, proof of legal residency in the United States.

21           Turning now to the three-step process under HUD,

22   which, by the way, is not controlling.  The Fourth Circuit

23   itself in the appeal in this case specifically found, as all

24   the circuit courts have and must, that the Supreme Court's

25   decision in *Inclusive Communities* controls, not the HUD

1    guidelines.

2         So the first step, the plaintiffs are required to

3    show that there will be a disparate impact as a result of

4    this policy and they must establish a robust causal

5    connection between the policy and the claimed impact.

6         With respect to causality, there is none.  At the

7    summary judgment stage, the Court is no longer confined to

8    the allegations in the complaint.  The Court can look at the

9    actual facts in this case.  And the actual facts in this case

10   demonstrate beyond any doubt that the only reason that the

11   plaintiffs are impacted at all is because of the illegal

12   status of the four female plaintiffs.  That's it.

13        The four male plaintiffs who have proper

14   documentation, who are in the United States illegally,

15   admitted that yes, we complied with the policy --

16        THE COURT:  Who are in the United States legally

17   or --

18        MR. DINGMAN:  Legally.

19        THE COURT:  I thought you said "illegally."

20        MR. DINGMAN:  If I did, I apologize, Your Honor.

21   That was not my intent.

22        THE COURT:  Go ahead.

23        MR. DINGMAN:  So there is no robust causality.

24        The second piece, Your Honor, is it is the

25   plaintiffs' burden to prove that there will be a disparate

1    impact.  They rely primarily on testimony from an expert

2    witness, Professor Clark, regarding the undocumented

3    population.

4              One of the things that the Supreme Court -- I'm

5    sorry -- the Fourth Circuit talked about in the appeal in

6    this case was you have to look at the impact on Latinos as a

7    class.  There is no evidence presented by the plaintiff that

8    as a result of this policy the number of Latinos who lease at

9    the park has declined, that the number of applicants rejected

10   has increased, that the number of Latino occupants has

11   declined.  There is absolutely no evidence that has been

12   presented to show that this policy has impacted Latinos as a

13   class at all.  Instead, their case is predicated solely on

14   the undocumented Latinos, which again gets you back to the

15   causality.  You can't disconnect those two things.

16             So, first of all, there is no evidence that shows

17   that Latinos as a class have been impacted.  With respect to

18   the undocumented population, they rely solely on the opinions

19   of Professor Clark, which are completely unreliable based

20   upon his own admissions.  And this is not, as the plaintiffs

21   suggest, a contest between two experts.  What we are saying

22   to the Court and what we think is clear from Professor

23   Clark's own admissions is that his opinion is completely

24   unreliable for two fundamental reasons.

25             Professor Clark testified -- it is in his report as

1    well -- that in looking at the undocumented population, he

2    relied solely on statistics and information from the Center

3    for Migration Studies, referred to as CMS.  He looked at what

4    was referred to as the Burke PUMA, which is a section of

5    Fairfax County that has a population of 157,949 people.  CMS

6    estimated that 31.4 percent of the Latino population in the

7    PUMA are undocumented.  But his opinion was based on the

8    undocumented population in Census Tract 4406, which Professor

9    Clark says has a population of 5,944 people, roughly

10    3 percent of the population of the PUMA.

11          So what does Professor Clark do?  He takes a 31.4

12    percentage of undocumented Latinos at the PUMA level and

13    applies it at the tract level with no change.  And Professor

14    Clark himself admitted in his deposition that as you go from

15    a larger population to a smaller population, the percentages

16    and your margin of error -- which we will be talking about in

17    a minute -- are less reliable for obvious reasons.  You're

18    going from a review of almost 160,000 people to a review of

19    6,000 people, and he uses the same percentage with no change.

20    It defies his own description of what is necessary for valid

21    statistical analysis.

22          The second part of his error is what is called the

23    margin of error.  Again, Professor Clark admitted that's an

24    important element in determining the reliability of any

25    statistical analysis because, in his words, it is an

16

1    estimate, it is not a count.  In any statistical analysis,

2    you have to have a margin of error.  So how did Professor

3    Clark come up with this margin of error here?

4         Well, he could have used CMS data.  CMS, at the

5    national level, has a margin of error of 9 percent.  He

6    ignored that.  Instead, there is another survey called the

7    American Community Survey that does not track or document

8    illegal aliens.  It simply does a review of the population.

9         At the track level, ACS said, with respect to all

10   Latinos, not undocumented, its margin of error was 26

11   percent.  That's the same margin of error that Professor

12   Clark uses for his estimate of the undocumented population

13   despite the fact that Professor Clark himself said that it is

14   much harder to track the undocumented population for the

15   obvious reason that they don't want to be found.  And he

16   admitted in his deposition, well, maybe it could have been

17   higher.

18        So if you just apply Professor Clark's own testimony,

19   it is clear that the MOE of 26 percent had no basis.  He is

20   taking an MOE for all Latinos and applying it to a subset of

21   undocumented Latinos, with no change.  And he could have used

22   the CMS percentage at the national level because he used CMS

23   data all the way through his process of analysis, but he

24   chose not to.  Without knowing what his MOE actually is,

25   there is no basis for this Court to accept his opinions.  And

1    the only point where there might be an argument that there is

2    a duel of experts is our expert, Dr. Weinberg -- who worked

3    at the Census Bureau for many years -- stated in his report a

4    26 percent margin of error makes that estimate unreliable.

5    And if you look at just the numbers and the swing, and in

6    Professor Clark's own report, the variation with respect to

7    how many undocumented Latinos are in this tract goes from 223

8    to 379.  And he has a similar swing with respect to Asian

9    undocumented aliens in the same tract.  That's just not

10    reliable.  And the fact is, as Professor Clark's admissions

11    show, is that MOE must be higher because he is trying to

12    document a different population that he himself testified

13    does not want to be found.  So they have failed to show any

14    statistical basis for disparate impact.  For that reason,

15    summary judgment should be granted.

16          With respect to step two -- and I will try to pick up

17    the pace here, Your Honor -- there is a dispute between the

18    plaintiffs and the defendants as to what is the standard.

19    They claim that we have to show a business necessity.  But

20    that's not what the Supreme Court said in *Inclusive*

21    *Communities*.  I quoted this previously in my argument.  What

22    the Supreme Court said is, if a party shows a valid interest,

23    then that's sufficient.  That's the standard in *Inclusive*

24    *Communities*, show a valid interest.  And the court says

25    that --

1    THE COURT:  What is the valid interest here?

2    MR. DINGMAN:  The valid interest here -- and this is

3    something that was addressed by Your Honor in your summary

4    judgment opinion, is to make leasing decisions, to conduct

5    credit checks, to conduct criminal background reviews, and to

6    avoid criminal liability under the anti-harboring statute.

7    Those are all clearly valid interests.  In the Court's

8    summary judgment opinion -- and I understand that was with

9    respect to disparate impact -- the Court said the

10   following --

11   THE COURT:  No, it was with regard to disparate

12   treatment.

13   MR. DINGMAN:  I'm sorry.  Yes, sir.

14   The Court said the following:  "Defendants had met

15   their burden of production to articulate legitimate

16   nondiscriminatory justifications for the policy."  And the

17   Court identified confirming lease applicants' identities,

18   performing criminal and credit background checks, minimizing

19   loss of eviction, to avoid potential criminal liability under

20   the anti-harboring statute.  Frankly, Your Honor, the

21   plaintiffs have not contended that these are not valid

22   interests.  Now, they argue on the anti-harboring statute

23   that since courts outside the Fourth Circuit have taken a

24   different approach that we should somehow feel comfortable

25   that there is no exposure to criminal liability.  But they

1    have not proffered any facts nor any expert to say that it's

2    unreasonable for a landlord to conduct criminal background

3    checks.  There is no valid interest in doing credit checks.

4    There is to valid interest in going through a lease

5    underwriting process.  They have no facts to refute the

6    evidence that has been presented.

7              One of the things they do is attack the expert that

8    we proffered, Mr. Caruso, but they have no expert to

9    contradict his testimony.  And what is important in his

10   opinion -- it's primarily -- to a large extent, it is based

11   on his experience.  He testified that he managed tens of

12   thousands of residential units; and in doing so -- for a

13   number of different landlords -- they implemented the same

14   policy of requiring this type of documentation.

15             CoreLogic, who is a third-party entity who does the

16   criminal background checks and credit checks, asked for the

17   same documentation under the policy.  What facts have the

18   plaintiffs presented to show that these are not valid

19   interests?  None.  No one.

20             So the last argument is, well, there's a better way

21   to do this.  You're not required -- you can get the

22   information you need to do your credit checks and your

23   criminal background checks through ITINs and through foreign

24   passports.  And Your Honor is exactly right, that's been the

25   essence of this case from the beginning.  If you go back and

1    you read paragraph 32 of the Complaint, that's precisely what

2    they said.  You can achieve your credit and criminal

3    background checks by using ITINs and foreign passports.

4           We have provided unchallenged statements from the IRS

5    that says ITINs are not reliable, they were never intended

6    for identification purposes.

7           As we have made clear -- and again, there is no

8    factual dispute -- the first step in any valid

9    check -- background check, credit check -- is making sure

10   that the identity of the person who is being the subject of

11   that check is who they say they are.

12          THE COURT:  Well, a passport would do that; wouldn't

13   it?

14          MR. DINGMAN:  A passport from a foreign government

15   that we have no idea how exactly it was put together or what

16   the requirements were to obtain it?  One of the plaintiffs in

17   this case used a fake passport to gain entry into this

18   country.

19          In the United States -- and this is also

20   uncontradicted -- because this is exactly what the male

21   plaintiffs did -- they had to go through an in-person

22   interview.  A man looked across the table at them and

23   verified who they are and who they say they are.  They were

24   fingerprinted.  That's how they obtained their documents that

25   satisfied the policy.

1        How a foreign government issues its passports, as

2   Your Honor was talking about in some of the cases, who knows?

3   Who knows what the process is?

4        So what is being suggested is rely on ITINs, which

5   the IRS itself says are not reliable.  We don't issue these

6   numbers for identification purposes.  And in the information

7   we submitted, the IRS has said it's abused significantly.

8   Why?  Because there is no in-person interview.  All you have

9   to do is send in documents and you receive an ITIN.  There is

10  no one who's identifying that you are who you say you are in

11  that application.  That's why the policy requires a Social

12  Security number or documentation that the person is legally

13  in the United States because there is a process -- it is not

14  infallible -- as Your Honor pointed out previously, any

15  document can be the subject of a forgery, but these are the

16  best and most reliable indices of the identity of the person

17  who is being asked to submit to the credit check or the

18  criminal background check.  And this gets again to this

19  overarching requirement that the policy be shown to be

20  artificial, arbitrary, and unnecessary.

21        We're here discussing, well, are ITINs and Social

22  Security numbers the same.  We clearly say that they're not,

23  and so does the IRS.  But this is not the kind of debate that

24  the Supreme Court intended when it made its decision in

25  *Inclusive Communities*.  There is no dispute that asking for

1    Social Security numbers in these documents is a reasonable

2    thing to do.  So how can there be disparate impact liability

3    as outlined in *Inclusive Communities*.

4          And to put an end to that, Your Honor, in their

5    brief, in their step three analysis, what the plaintiffs

6    suggest is, well, you could use exactly what the policy

7    requires with respect to lessees.  A contention that there is

8    no other way to do it.  But they say, with occupants, and

9    they're referring to the female plaintiffs, ITINs and foreign

10   passports are good enough.  Well, that makes no sense.  The

11   issue here is identity verification.  You can -- it doesn't

12   matter whether you're a lessee or an occupant, if your

13   identity is not validated, whatever check is done is

14   worthless.  So there is no distinction whether you're a

15   lessee or an occupant as to what is necessary at the first

16   step to identify this person.

17         So they have now conceded, with a lessee, there is no

18   other way.  That's their step 3 proposal.

19         THE COURT:  What did the spouses, the men, what did

20   they submit?

21         MR. DINGMAN:  The men had temporary passports or

22   visas that were validly issue by the United States

23   government.  And we went through in our prior submissions,

24   based on the testimony of the male plaintiffs and their

25   discovery responses, that they were fingerprinted, that they

1    were interviewed, they have to go back I think on an annual

2    basis.  So there is a process that they went through.  They

3    were fingerprinted, and they have to continually engage in

4    this process on an ongoing basis.  The female plaintiffs have

5    done none of that.

6         So they say, well, they have ITINs.  Well, I can take

7    any document and send it to the IRS and get an ITIN.  Even as

8    a woman.  No one is looking across the table and saying, are

9    you the person who is submitting this application.  There is

10   absolutely no verification, which is why the IRS itself says

11   it is rife with fraud.  And it is not reliable for

12   identification purposes.

13        So there is no other alternative that satisfies the

14   identification requirement of this policy.  And more to the

15   point, Your Honor, again, this is not what the Supreme Court

16   intended when it recognized disparate impact under the Fair

17   Housing Act.

18        The plaintiffs actually argue that this court should

19   find that the policy's artificial and arbitrary because they

20   contend ITINs are a reasonable substitute.  That doesn't make

21   the policy arbitrary or artificial.  And it gets the Court

22   into second-guessing, which you don't want to, because the

23   Supreme Court said, if we go down that path, then we're going

24   to inject race into every decision, and we're going to

25   confront some difficult constitutional issues.  That's why

1    we're not second-guessing.  We're saying, if a private entity

2    or a public body has a valid interest in the policy at issue,

3    then there is no violation of the Fair Housing Act under

4    disparate impact liability claim.  There are no facts to show

5    that this policy is arbitrary or artificial or unnecessary.

6    In fact, the plaintiffs have not proffered any facts to

7    challenge that, and we would ask that the Court grant summary

8    judgment.

9            THE COURT:  All right.  Thank you.

10           Ms. Puccinelli.

11           MS. PUCCINELLI:  Yes, Your Honor.

12           Your Honor, I quickly wanted to start off this

13   afternoon by correcting a few things regarding both the

14   posture of the case before the Fourth Circuit as well as the

15   standard that the Fourth Circuit has mandated be applied in

16   this case at this stage of the analysis.

17           Defendants have said that the Court, in its motion to

18   dismiss decision, dismissed the disparate impact claim.  And

19   then the Fourth Circuit remanded again to consider summary

20   judgment on the disparate impact claim.  In reality, while

21   this Court found that the plaintiffs could not use disparate

22   impact to proceed with their Fair Housing Act claim, it did

23   not dismiss the Fair Housing Act claim until the summary

24   judgment stage.  So the Fourth Circuit, in considering

25   plaintiff's appeal, was actually considering both the motion

1    to dismiss decision and the motion for summary judgment

2    decision.

3            THE COURT:  Can you point to language in the Fourth

4    Circuit opinion that makes that clear?

5            MS. PUCCINELLI:  Yes, Your Honor.

6            "On appeal, plaintiffs contend that the district

7    court erred in granting Waples' motion for summary judgment

8    on the FHA claim.  Moreover, plaintiffs argue that the

9    district court erred in concluding that their FHA claim could

10   not continue past the motion to dismiss stage under a

11   disparate impact theory of liability."  And that's erred in

12   failing to substantively address this theory considering the

13   cross motion for summary judgment, and that is on page 422,

14   Your Honor.

15           THE COURT:  That doesn't mean the Fourth Circuit

16   ruled on that.  I thought that what the Fourth Circuit said

17   is a disparate impact wasn't appropriately addressed at the

18   motion to dismiss stage but ought to be appropriately

19   addressed at the summary judgment stage.

20           MS. PUCCINELLI:  Correct, Your Honor, but the court

21   needed to reinstate the plaintiff's Fair Housing Act claim in

22   order to return it to this case so that summary judgment

23   could be reconsidered.

24           THE COURT:  On disparate impact?

25           MS. PUCCINELLI:  Correct.

 1            THE COURT:  I'm not sure I see how you and the

 2      defendant are in disagreement.

 3            MS. PUCCINELLI:  Just that the Court was considering

 4      both the summary judgment ruling that this Court made and the

 5      motion to dismiss ruling --

 6            THE COURT:  But they didn't rule on summary judgment.

 7      They didn't remand and say, okay, it's all over on disparate

 8      impact.

 9            MS. PUCCINELLI:  Correct, Your Honor.  But they

10      needed to reinstate the Fair Housing Act claim.

11            THE COURT:  But only the disparate impact portion of

12      it.

13            MS. PUCCINELLI:  Yes.

14            THE COURT:  All right.  Go on.

15            MS. PUCCINELLI:  And contrary to what the defendants

16      have represented, there are, in fact, two controlling

17      decisions in this case," *Inclusive Communities*, as well as

18      the Fourth Circuit's decision.  And the Fourth Circuit set

19      forth the standards to apply at each stage of the disparate

20      impact analysis.  Under -- and this is at page 424.  And the

21      court said, "under the first step, the plaintiffs must

22      demonstrate the robust causal connection between the

23      defendant's challenged policy and the disparate impact of a

24      protected class.

25            It goes on to state, "Under the second step, the

1    defendant has the burden of persuasion to state and explain

2    the valid interests served by their policies," and then in

3    parentheses, "citing to *Inclusive Communities*, stating that

4    this step is analogous to Title VII's business necessity

5    standard.  So defendants are, therefore, incorrect in

6    inserting that *Inclusive Communities* did not also require

7    defendants to show a business necessity.

8              THE COURT:  Well, they are correct because that is

9    not in any *Inclusive* opinion.  It is in the Fourth Circuit

10   opinion.

11             MS. PUCCINELLI:  It is also in *Inclusive Communities*,

12   Your Honor.

13             THE COURT:  Oh, it is?  What page is that on?

14             MS. PUCCINELLI:  That is on page 2522.

15             THE COURT:  All right.  Go on.

16             MS. PUCCINELLI:  In the third step of the framework,

17   the Fourth Circuit says, "In order to establish liability,

18   the plaintiff has the burden to prove that the defendant's

19   asserted interests could be served by another practice that

20   has a less discriminatory effect."

21             THE COURT:  That is the real gist of your argument

22   here.  You think that the tax ID numbers and the foreign

23   passports would satisfy any legitimate interests they have

24   and would not have any discriminatory impact.

25             MS. PUCCINELLI:  Correct, Your Honor.

1          THE COURT:  What do you say to their argument to the

2     contrary, that the tax numbers are not reliable, nor are

3     foreign passports?

4          MS. PUCCINELLI:  Well, Your Honor, defendants have

5     not offered any actual evidence that foreign passports are

6     not reliable.  They only have testimony from their expert,

7     Mr. Caruso, who notably has his primary experience in the

8     form of federally funded housing; whereas, defendants --

9          THE COURT:  Well, they have offered evidence, but you

10    say that evidence isn't very persuasive.

11         MS. PUCCINELLI:  Correct, Your Honor.

12         THE COURT:  That's a better way to put it, not that

13    they haven't offered evidence.

14         MS. PUCCINELLI:  Well, Your Honor, Mr. Caruso merely

15    states that the U.S. system of identifying identity is the

16    gold standard.  He doesn't actually tear down any foreign

17    governments's other similar efforts to verifying identity

18    through the granting of passports.

19         Also, Your Honor, plaintiffs have provided evidence

20    that neither a Social Security number, nor even an ITIN are

21    necessary to, for example, run credit checks or run criminal

22    background checks.  We've put forth a declaration from

23    defendant's current identity verification lease underwriting

24    system, Yardi, that explains all of this, and says that

25    Social Security numbers and ITINs could help to enhance the

1    reliability of those checks but are not, in fact, necessary

2    to run them.

3             And returning quickly back to the prima facie case,

4    the first step under the burden-shifting framework, when you

5    look to the Fourth Circuit's opinion, they don't actually

6    articulate any additional steps like what defendants have

7    articulated, including separating out the artificial,

8    unnecessary, arbitrary framework and motivation for disparate

9    impact as a separate step to satisfy in order to put forth a

10   prima facie case.  Nor did they actually include this

11   substantial limitation criteria as a part of the first step,

12   either.

13            Defendants actually argue that before the Fourth

14   Circuit, and the Fourth Circuit still, as you can see on

15   page 425, states that "to establish causation in a disparate

16   impact claim, the plaintiff must begin by identifying the

17   specific practice that is challenged."

18            They then go on to say a few lines down,

19   "Additionally, the plaintiff must offer statistical evidence

20   of a kind and degree sufficient to show that the practice in

21   question has caused the exclusion complained of because of

22   their membership in a protected group."  Those are the two

23   steps that are required to show a prima facie case of

24   disparate impact, and that's what plaintiffs have put forward

25   in this case.

1          And that evidence has come in the form of two

2    separate types of proof, the first being Professor Clark's

3    analysis, which contrary to what defendants have said, is in

4    fact reliable.  They did not submit a *Daubert* motion to try

5    and get him kicked out.  They have not tried to attack his

6    qualifications.  In fact, Professor Clark stands by his

7    methodology as shown in his rebuttal report stating that

8    Dr. Weinberg's analysis has -- he has been unable to

9    replicate it and actually reaches an absurd result by

10   creating a margin that goes from zero to somewhere in the

11   600s, and points to the fact that his and Dr. Weinberg's

12   point estimates for the number of undocumented immigrants in

13   the track are almost the same, which is a better indicator of

14   the reliability of his estimate than the margin of error,

15   which merely shows a range of potential numbers that could

16   actually contain the true population of undocumented

17   immigrants in the tract.

18         And plaintiffs have also offered two reports

19   generated by the defendants, which show -- and as this Court

20   recognized in its undisputed facts in its previous summary

21   judgment opinion -- that the majority of individuals,

22   91 percent in one report, and 84 percent in the other report,

23   of Latinos were impacted by the policy, both of which

24   clearly -- between Dr. Clark's analysis, Professor Clark's

25   analysis and this direct evidence show a disparate impact.

1          Turning to the second prong of the disparate impact

2     analysis, defendants don't even acknowledge that they had to

3     demonstrate a business necessity, which, as this Court

4     recognized, is a different and more difficult standard to

5     satisfy.  And that was from the Court's motion -- ruling on

6     the motion to dismiss.  And while defendants' claim that the

7     business objectives that they have put forth are legitimate,

8     they have not shown that they are true business necessities

9     such that the policy is required in order to fulfill them.

10    And that much is evident from the fact that they have not

11    shown that a foreign passport is less reliable than a Social

12    Security number or an ITIN to verify identity.  I don't know

13    about anyone else, but I got my Social Security number when I

14    was a baby, so I didn't have anyone sitting across from me

15    interrogating me about my criminal history or anything like

16    that.  So the fact that the male plaintiffs may have

17    undergone that interrogation in order to get their own Social

18    Security numbers is not dispositive for the majority of the

19    population.

20          And going to the next business justification,

21    plaintiffs have offered proof that a Social Security number

22    and other documentation are not actually needed to run a

23    credit check, and credit checks are not even run on all of

24    the occupants of the park, they are only run on the actual

25    lessees.

1          And turning to the next business justification, we

2    have the criminal background checks.  The female plaintiffs

3    can get criminal background checks without having a Social

4    Security number.  In fact, Rosy Giron de Reyes, one of the

5    named plaintiffs in this case, received a criminal background

6    check and attempted to offer it to defendants to satisfy

7    their policy and was rejected.

8          And as to release underwriting concerns, plaintiffs

9    have demonstrated that -- the male plaintiffs alone who

10   validly under the policy applied for leases and were granted

11   leases qualified for receiving, using their own credit, using

12   their own income, without the female plaintiffs at all.  And

13   that is why that dovetails with our third step, which is why

14   we have offered this proposed alternative to the policy that

15   has a less discriminatory effect because we have this clear

16   situation where you have a male plaintiff who goes to the

17   leaseholder office, is evaluated under his own merits,

18   irrespective of the other occupants of his home, is granted a

19   lease.  There is simply no need to go through the rigamarole

20   of checking out the wife's requirements as well just because

21   she is there.  We concede, though, that there is a business

22   interest in verifying the criminal background checks.  But as

23   we have already said -- of occupants -- as we have already

24   said, female plaintiffs can get criminal background checks

25   without Social Security numbers.  They have gotten them.

33

1    They could satisfy that business interest without the policy

2    as written, without the documents required by the policy.

3            And as to the anti-harboring interest, the majority

4    of courts that have considered this issue have held that

5    merely renting to undocumented immigrants does not violate

6    the anti-harboring statute.

7            THE COURT:  What about the Fourth Circuit?

8            MS. PUCCINELLI:  In the Fourth Circuit, the

9    defendants' conduct went above and beyond merely renting to

10   undocumented immigrants.  She had a history of disregarding

11   warnings regarding the need to -- regarding the need to --

12           THE COURT:  Don't you think there is a split in the

13   circuits about that?

14           MS. PUCCINELLI:  No, Your Honor, because the

15   defendant's conduct in *Aguilar* went above and beyond the

16   conduct that we have even remotely potentially in the case of

17   defendants here.  And also, it is worth noting that because

18   when this issue was presented to the Fourth Circuit by

19   defendants, the Fourth Circuit did not credit that the

20   defendants had their hands tied by the anti-harboring

21   provision of the ICRA.

22           THE COURT:  What did the Fourth Circuit say about it?

23           MS. PUCCINELLI:  It didn't say anything about it,

24   Your Honor.

25           THE COURT:  So we really don't know what the Fourth

34

1    Circuit would say about whether the anti-harboring statute

2    presents the defendants with any need to get to the bottom of

3    who is staying in some of their apartments.

4         Your point is there are a number of cases from other

5    circuits that indicate that merely renting to somebody is not

6    harboring, but the Fourth Circuit has a case where that did

7    occur, but you said the conduct went beyond that.  So it is

8    distinguishable.  I understand the argument.

9         Go ahead and finish your argument.  The hour is late.

10         MS. PUCCINELLI:  Apologies, Your Honor.

11         And with regard to the third step of the disparate

12    impact analysis, first of all, the Court in this posture need

13    only reach the third step if it finds that there is no

14    dispute of material --

15         THE COURT:  As a concession to the shortness of life,

16    let's get to the bottom.  Your view is the defendants should

17    not receive summary judgment.  All right.  Let's assume

18    that's right.  What do you think should go to a jury in this

19    case?  What issues should go to a jury in this case?

20         MS. PUCCINELLI:  Your Honor, I think the second and

21    third steps should go to the jury in this case.

22         THE COURT:  Specifically what?  What is it a jury is

23    going to be asked to decide on those two steps?

24         MS. PUCCINELLI:  The jury is going to be asked

25    whether a Social Security number or a passport, visa, and

1    I-94 are necessary to satisfy defendants' five purported

2    business interests.

3              THE COURT:  If you need an opportunity to consult,

4    rather than interrupt your colleague, ask for it, and I will

5    grant it.  Otherwise, it is disruptive.

6              MR. SANDOVAL-MOSHENBERG:  Yes, Your Honor.  Thank

7    you.

8              MS. PUCCINELLI:  And if the jury does find that those

9    interests are business necessities, whether or not any policy

10   that plaintiffs can articulate essentially shows that those

11   policies are not -- that the policy at issue is not necessary

12   to fulfill the business interests of plaintiffs and can be

13   better served by a less discriminatory policy.

14             THE COURT:  All right.  Thank you.

15             Very brief response.

16             MR. DINGMAN:  Here's my very brief response, Your

17   Honor:  As articulated by counsel, their argument is a step

18   three argument.  There is no dispute that the policy or the

19   valid interest at step two is verifying identification to

20   conduct these background checks.  They do not dispute that

21   that is a valid legitimate interest, business necessity,

22   whatever you want to call it.  And I would ask the Court to

23   go back and look at *Inclusive Communities*, because the court

24   there specifically said, if a private entity can show a valid

25   interest, that's enough.

36

```
1              When they get to the foreign passport and point to us

2       and say they have not proven they're invalid, that's not the

3       burden.  Your Honor.  It's step three, it's plaintiffs'

4       burden to show that they're proffering a viable alternative.

5       So it's their burden to present evidence that foreign

6       passports are sufficient.  It is their burden to present

7       evidence that ITINs are just as good.  It is not ours.

8              THE COURT:  All right.  Thank you.  I will take the

9       matter under advisement, and you'll hear from me on it.

10

11              (Proceedings adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

37

1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Patricia A. Kaneshiro-Miller, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7

8    /s/ Patricia A. Kaneshiro-Miller          May 1, 2020
     ------------------------------------      ---------------------
9    PATRICIA A. KANESHIRO-MILLER                      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

## /

**/s** [1] - 37:8

## 1

**1** [2] - 11:16, 37:8
**10** [1] - 2:23
**12(b)(6** [2] - 3:21, 4:6
**15** [1] - 2:23
**157,949** [1] - 15:5
**16-563** [1] - 1:4
**160,000** [1] - 15:18

## 2

**2007** [1] - 11:16
**2016-CV-563** [1] - 2:5
**2019** [1] - 1:7
**2020** [1] - 37:8
**223** [1] - 17:7
**2522** [1] - 27:14
**26** [3] - 16:10, 16:19, 17:4
**2:41** [1] - 2:2

## 3

**3** [2] - 15:10, 22:18
**31.4** [2] - 15:6, 15:11
**32** [1] - 20:1
**32.1** [1] - 11:15
**379** [1] - 17:8

## 4

**422** [1] - 25:13
**424** [1] - 26:20
**425** [1] - 29:15
**4406** [1] - 15:8

## 5

**5,944** [1] - 15:9

## 6

**6,000** [1] - 15:19
**600s** [1] - 30:11

## 8

**8** [1] - 1:7
**84** [1] - 30:22
**890** [1] - 7:6

## 9

**9** [1] - 16:5
**91** [1] - 30:22
**920** [1] - 7:6

## A

**able** [1] - 12:7
**above-entitled** [1] - 37:5
**absolutely** [2] - 14:11, 23:10
**absurd** [1] - 30:9
**abused** [1] - 21:7
**accept** [2] - 4:7, 16:25
**accepting** [1] - 4:9
**accordingly** [1] - 7:14
**achieve** [1] - 20:2
**acknowledge** [1] - 31:2
**ACS** [1] - 16:9
**Act** [15] - 4:25, 5:3, 5:9, 5:14, 6:21, 7:2, 8:24, 9:21, 10:5, 23:17, 24:3, 24:22, 24:23, 25:21, 26:10
**acts** [1] - 10:25
**actual** [5] - 12:14, 13:9, 28:5, 31:24
**additional** [1] - 29:6
**Additionally** [1] - 29:19
**address** [2] - 6:22, 25:12
**addressed** [6] - 3:25, 5:16, 11:18, 18:3, 25:17, 25:19
**adjourned** [1] - 36:11
**admissions** [3] - 14:20, 14:23, 17:10
**admitted** [5] - 11:8, 13:15, 15:14, 15:23, 16:16
**advisement** [1] - 36:9
**affirming** [1] - 11:7
**afternoon** [6] - 2:8, 2:12, 2:13, 2:16, 2:18, 24:13
**agree** [1] - 9:11
**Aguilar** [4] - 10:12, 10:15, 11:13, 33:15
**ahead** [3] - 2:24, 13:22, 34:9
**Aide** [1] - 2:9
**aided** [1] - 1:22
**al** [4] - 1:4, 1:8, 2:3, 2:4
**ALEXANDRIA** [1] - 1:2
**Alexandria** [1] - 1:6
**alien** [1] - 11:2
**aliens** [5] - 11:23, 11:24, 12:2, 16:8, 17:9
**allegations** [1] - 13:8
**alleged** [1] - 4:11
**allocating** [1] - 5:22
**almost** [3] - 7:21, 15:18, 30:13
**alone** [2] - 11:3, 32:9
**alternative** [5] - 8:22, 8:25, 23:13, 32:14, 36:4
**American** [1] - 16:7
**analogous** [1] - 27:4
**analysis** [20] - 3:12, 3:20, 3:22, 4:5, 7:1, 7:17, 10:2, 15:21, 15:25, 16:1, 16:23, 22:5, 24:16, 26:20, 30:3, 30:8, 30:24, 30:25, 31:2, 34:12
**announce** [1] - 7:8
**announced** [1] - 7:10
**annual** [1] - 23:1
**anti** [11] - 8:13, 10:10, 10:19, 11:19,

18:6, 18:20, 18:22, 33:3, 33:6, 33:20, 34:1
**anti-harboring** [11] - 8:13, 10:10, 10:19, 11:19, 18:6, 18:20, 18:22, 33:3, 33:6, 33:20, 34:1
**apartments** [1] - 34:3
**apologies** [1] - 34:10
**apologize** [1] - 13:20
**appeal** [6] - 3:5, 3:14, 12:23, 14:5, 24:25, 25:6
**appearances** [1] - 2:6
**APPEARANCES** [1] - 1:14
**Appellate** [1] - 11:15
**applicants** [1] - 14:9
**applicants'** [1] - 18:17
**application** [2] - 21:11, 23:9
**applied** [3] - 10:10, 24:15, 32:10
**applies** [1] - 15:13
**apply** [4] - 7:16, 11:20, 16:18, 26:19
**applying** [1] - 11:25, 16:20
**approach** [1] - 18:24
**approaches** [1] - 5:20
**appropriate** [1] - 5:25
**appropriately** [2] - 25:17, 25:18
**arbitrary** [17] - 5:11, 6:5, 6:9, 6:15, 6:20, 6:22, 7:18, 7:23, 8:2, 8:6, 8:18, 9:20, 21:20, 23:19, 23:21, 24:5, 29:8
**argue** [4] - 18:22, 23:18, 25:8, 29:13
**argued** [1] - 10:8
**arguing** [1] - 2:11
**argument** [10] - 8:17, 17:1, 17:21, 19:20, 27:21, 28:1, 34:8, 34:9, 35:17, 35:18
**articulate** [3] - 18:15, 29:6, 35:10
**articulated** [2] - 29:7, 35:17
**artificial** [18] - 5:11, 6:5, 6:9, 6:15, 6:20, 6:22, 7:18, 7:23, 8:2, 8:5, 8:14, 8:19, 9:20, 21:20, 23:19, 23:21, 24:5, 29:7
**Asian** [1] - 17:8
**asserted** [1] - 27:19
**assist** [1] - 8:11
**assume** [1] - 34:17
**assumption** [1] - 5:17
**attack** [2] - 19:7, 30:5
**attempt** [1] - 5:19
**attempted** [1] - 32:6
**authorities** [2] - 5:21, 6:2
**avoid** [2] - 18:6, 18:19
**avoiding** [1] - 8:12
**aware** [2] - 3:2, 10:25

## B

**baby** [1] - 31:14
**background** [16] - 8:12, 18:5, 18:18, 19:2, 19:16, 19:23, 20:3, 20:9, 21:18, 28:22, 32:2, 32:3, 32:5, 32:22, 32:24, 35:20
**barriers** [3] - 6:5, 6:16, 8:2

based [4] - 14:19, 15:7, 19:10, 22:24
basic [1] - 12:3
basis [7] - 4:14, 7:1, 16:19, 16:25, 17:14, 23:2, 23:4
BEFORE [1] - 1:11
begin [1] - 29:16
beginning [1] - 19:25
best [1] - 21:16
better [4] - 19:20, 28:12, 30:13, 35:13
between [5] - 13:5, 14:21, 17:17, 26:22, 30:24
beyond [4] - 4:13, 13:10, 33:9, 33:15, 34:7
binding [2] - 11:12, 11:17
bodies [2] - 5:4, 5:15
body [1] - 24:2
bottom [2] - 34:2, 34:16
bound [1] - 7:16
brief [5] - 3:18, 22:5, 35:15, 35:16
briefed [1] - 4:22
briefs [3] - 2:21, 3:9, 6:24
build [1] - 9:16
burden [11] - 7:11, 7:16, 13:25, 18:15, 27:1, 27:18, 29:4, 36:3, 36:4, 36:5, 36:6
burden-shifting [3] - 7:11, 7:16, 29:4
Bureau [1] - 17:3
Burke [1] - 15:4
business [14] - 17:19, 27:4, 27:7, 31:3, 31:7, 31:8, 31:20, 32:1, 32:21, 33:1, 35:2, 35:9, 35:12, 35:21

# C

cannot [3] - 9:20, 10:4, 12:3
Caruso [3] - 19:8, 28:7, 28:14
case [40] - 3:2, 3:11, 3:23, 4:12, 4:23, 4:24, 5:19, 8:4, 8:19, 10:2, 10:6, 10:12, 10:13, 10:14, 11:7, 11:16, 11:17, 12:1, 12:7, 12:23, 13:9, 14:6, 14:13, 19:25, 20:17, 24:14, 24:16, 25:22, 26:17, 29:3, 29:10, 29:23, 29:25, 32:5, 33:16, 34:6, 34:19, 34:21
Case [2] - 2:3, 2:5
cases [3] - 11:11, 21:2, 34:4
causal [2] - 13:4, 26:22
causality [3] - 13:6, 13:23, 14:15
causation [1] - 29:15
caused [1] - 29:21
cautionary [2] - 5:2, 5:6
Census [2] - 15:8, 17:3
Center [2] - 2:9, 15:2
CERTIFICATE [1] - 37:1
certify [1] - 37:3
challenge [1] - 24:7
challenged [2] - 26:23, 29:17
change [3] - 15:13, 15:19, 16:21
check [9] - 20:9, 20:11, 21:17, 21:18, 22:13, 31:23, 32:6
checking [1] - 32:20

checks [20] - 8:12, 18:5, 18:18, 19:3, 19:16, 19:22, 19:23, 20:3, 28:21, 28:22, 29:1, 31:23, 32:2, 32:3, 32:22, 32:24, 35:20
chose [1] - 16:24
Circuit [37] - 3:3, 3:5, 3:10, 3:13, 3:16, 3:18, 4:13, 4:20, 7:6, 7:15, 7:20, 10:11, 10:23, 11:6, 11:18, 12:22, 14:5, 18:23, 24:14, 24:15, 24:19, 24:24, 25:4, 25:15, 25:16, 26:18, 27:9, 27:17, 29:14, 33:7, 33:8, 33:18, 33:19, 33:22, 34:1, 34:6
circuit [2] - 7:5, 12:24
Circuit's [2] - 26:18, 29:5
circuits [3] - 11:12, 33:13, 34:5
circumstances [2] - 11:1, 12:17
Circumstantial [1] - 11:3
cited [1] - 8:3
citing [3] - 3:20, 7:21, 27:3
City [1] - 7:21
Civil [1] - 1:4
civil [1] - 2:3
claim [27] - 3:4, 3:7, 3:8, 3:25, 4:21, 4:25, 5:3, 5:9, 5:14, 7:2, 7:19, 9:21, 9:25, 10:4, 11:13, 17:19, 24:4, 24:18, 24:20, 24:22, 24:23, 25:8, 25:9, 25:21, 26:10, 29:16, 31:6
claimed [1] - 13:5
Clark [11] - 14:2, 14:19, 14:25, 15:9, 15:11, 15:14, 15:23, 16:3, 16:12, 16:13, 30:6
Clark's [7] - 14:23, 16:18, 17:6, 17:10, 30:2, 30:24
class [4] - 14:7, 14:13, 14:17, 26:24
clear [9] - 3:13, 4:16, 5:13, 11:21, 14:22, 16:19, 20:7, 25:4, 32:15
clearly [4] - 11:1, 18:7, 21:22, 30:24
CLERK [1] - 2:3
CMS [6] - 15:3, 15:5, 16:4, 16:22
colleague [1] - 35:4
comfortable [1] - 18:24
Communities [19] - 4:23, 6:25, 7:4, 7:5, 7:7, 7:23, 9:19, 9:24, 10:4, 12:25, 17:21, 17:24, 21:25, 22:3, 26:17, 27:3, 27:6, 27:11, 35:23
Community [1] - 16:7
Company [1] - 7:5
compelled [1] - 12:18
complained [1] - 29:21
complaint [2] - 4:11, 13:8
Complaint [1] - 20:1
completed [2] - 32:21
completely [2] - 14:19, 14:23
complied [1] - 13:15
computer [1] - 1:22
computer-aided [1] - 1:22
concede [1] - 32:21
conceded [1] - 22:17
concerns [1] - 32:8
concession [1] - 34:15

conclude [2] - 4:11, 7:14
concluding [1] - 25:9
conclusion [4] - 3:22, 7:4, 7:20, 8:4
conduct [8] - 18:4, 18:5, 19:2, 33:9, 33:15, 33:16, 34:7, 35:20
confined [1] - 13:7
confirming [1] - 18:17
confront [1] - 23:25
connection [2] - 13:5, 26:22
consciously [1] - 11:1
consider [2] - 3:17, 24:19
consideration [2] - 3:8, 3:24
considered [1] - 33:4
considering [4] - 24:24, 24:25, 25:12, 26:3
constitutional [1] - 23:25
consult [1] - 35:3
contain [1] - 30:16
contend [2] - 23:20, 25:6
contended [1] - 18:21
contention [1] - 22:7
contest [1] - 14:21
continually [1] - 23:3
continue [1] - 25:10
contradict [1] - 19:9
contrary [4] - 6:8, 26:15, 28:2, 30:3
controlling [4] - 4:23, 12:22, 26:16
controls [1] - 12:25
conviction [4] - 10:19, 10:23, 11:7, 11:19
CoreLogic [1] - 19:15
correct [7] - 25:20, 25:25, 26:9, 27:8, 27:25, 28:11, 37:4
correcting [1] - 24:13
counsel [2] - 2:10, 35:17
count [1] - 16:1
country [3] - 11:5, 12:15, 20:18
County [1] - 15:5
course [1] - 4:18
court [18] - 3:24, 4:16, 4:17, 5:7, 5:24, 6:6, 7:9, 7:14, 8:4, 9:13, 11:3, 17:24, 23:18, 25:7, 25:9, 25:20, 26:21, 35:23
COURT [42] - 1:1, 2:13, 2:18, 8:25, 9:5, 9:9, 10:14, 10:16, 12:10, 12:12, 13:16, 13:19, 13:22, 18:1, 18:11, 20:12, 22:19, 24:9, 25:3, 25:15, 25:24, 26:1, 26:6, 26:11, 26:14, 27:8, 27:13, 27:15, 27:21, 28:1, 28:9, 28:12, 33:7, 33:12, 33:22, 33:25, 34:15, 34:22, 35:3, 35:14, 36:8, 37:1
Court [55] - 1:19, 3:2, 3:3, 3:6, 3:13, 3:19, 3:20, 3:22, 4:2, 4:22, 4:24, 5:11, 5:17, 6:10, 6:19, 7:3, 7:10, 7:17, 8:3, 8:8, 8:15, 8:22, 9:11, 9:13, 9:19, 9:23, 10:3, 10:8, 10:11, 10:17, 11:13, 11:17, 13:7, 13:8, 14:4, 14:22, 16:25, 17:20, 17:22, 18:9, 18:14, 18:17, 21:24, 23:15, 23:21, 23:23, 24:7, 24:17, 24:21, 26:3, 26:4, 30:19, 31:3, 34:12, 35:22
Court's [7] - 4:5, 7:7, 7:22, 8:5, 12:24,

40

18:7, 31:5
**courts** [7] - 5:14, 7:3, 7:5, 9:22, 12:24, 18:23, 33:4
**Courts** [1] - 7:24
**create** [1] - 9:24
**created** [1] - 8:23
**creating** [1] - 30:10
**credit** [14] - 8:11, 18:5, 18:18, 19:3, 19:16, 19:22, 20:2, 20:9, 21:17, 28:21, 31:23, 32:11, 33:19
**credits** [1] - 5:22
**criminal** [19] - 8:12, 11:19, 18:5, 18:6, 18:18, 18:19, 18:25, 19:2, 19:16, 19:23, 20:2, 21:18, 28:21, 31:15, 32:2, 32:3, 32:5, 32:22, 32:24
**criteria** [1] - 29:11
**cross** [1] - 25:13
**CRR** [1] - 1:19
**current** [1] - 28:23

## D

**data** [2] - 16:4, 16:23
**DATE** [1] - 37:9
**Daubert** [1] - 30:4
**de** [2] - 2:3, 32:4
**DE** [1] - 1:3
**debate** [1] - 21:23
**decide** [1] - 34:23
**decision** [13] - 3:12, 4:19, 7:15, 7:22, 8:7, 8:15, 12:25, 21:24, 23:24, 24:18, 25:1, 25:2, 26:18
**decisions** [8] - 5:5, 5:15, 8:11, 9:14, 9:23, 11:16, 18:4, 26:17
**declaration** [1] - 28:22
**declined** [2] - 14:9, 14:11
**defendant** [6] - 2:19, 10:6, 10:25, 11:8, 26:2, 27:1
**defendant's** [5] - 11:4, 26:23, 27:18, 28:23, 33:15
**Defendants** [2] - 1:8, 1:17
**defendants** [24] - 2:15, 2:17, 3:16, 11:21, 11:22, 17:18, 18:14, 24:17, 26:15, 27:5, 27:7, 28:4, 28:8, 29:6, 29:13, 30:3, 30:19, 31:2, 32:6, 33:17, 33:19, 33:20, 34:2, 34:16
**defendants'** [3] - 31:6, 33:9, 35:1
**defense** [1] - 12:13
**defies** [1] - 15:20
**degree** [1] - 29:20
**demanding** [1] - 7:8
**demonstrate** [3] - 13:10, 26:22, 31:3
**demonstrated** [2] - 9:18, 32:9
**deposition** [2] - 15:14, 16:16
**DEPUTY** [1] - 2:3
**describe** [1] - 11:24
**description** [1] - 15:20
**despite** [1] - 16:13
**detail** [1] - 5:8
**determining** [1] - 15:24

**developers** [3] - 5:5, 5:16, 6:2
**development** [1] - 9:17
**different** [4] - 17:12, 18:24, 19:13, 31:4
**difficult** [2] - 23:25, 31:4
**Dingman** [2] - 1:17, 2:17
**DINGMAN** [17] - 2:16, 3:1, 9:1, 9:8, 9:11, 10:15, 10:17, 12:11, 12:13, 13:18, 13:20, 13:23, 18:2, 18:13, 20:14, 22:21, 35:16
**direct** [1] - 30:25
**disagreement** [1] - 26:2
**disconnect** [1] - 14:15
**discount** [1] - 6:24
**discovery** [1] - 22:25
**discretion** [4] - 5:22, 10:7, 11:22, 12:16
**discriminatory** [4] - 27:20, 27:24, 32:15, 35:13
**discussed** [3] - 4:22, 6:13, 10:7
**discusses** [1] - 11:15
**discussing** [1] - 21:21
**discussion** [1] - 4:15
**dismiss** [11] - 3:6, 3:14, 3:23, 4:7, 24:18, 24:23, 25:1, 25:10, 25:18, 26:5, 31:6
**dismissed** [1] - 24:18
**disparate** [46] - 3:4, 3:7, 3:25, 4:12, 4:24, 5:3, 5:9, 5:13, 6:1, 6:8, 6:11, 6:13, 6:21, 7:2, 7:11, 7:19, 7:25, 8:16, 8:23, 9:21, 9:25, 10:4, 13:3, 13:25, 17:14, 18:9, 18:11, 22:2, 23:16, 24:4, 24:18, 24:20, 24:21, 25:11, 25:17, 25:24, 26:7, 26:11, 26:19, 26:23, 29:8, 29:15, 29:24, 30:25, 31:1, 34:11
**Disparate** [1] - 6:4
**displace** [1] - 7:25
**dispositive** [1] - 31:18
**dispute** [8] - 8:10, 9:10, 17:17, 20:8, 21:25, 34:14, 35:18, 35:20
**disregard** [3] - 10:20, 10:25, 11:4
**disregarding** [1] - 33:10
**disruptive** [1] - 35:5
**distinction** [1] - 22:14
**distinguishable** [1] - 34:8
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [4] - 3:24, 7:9, 25:6, 25:9
**DIVISION** [1] - 1:2
**document** [5] - 9:2, 16:7, 17:12, 21:15, 23:7
**documentation** [7] - 11:9, 12:3, 13:14, 19:14, 19:17, 21:12, 31:22
**documents** [4] - 20:24, 21:9, 22:1, 33:2
**done** [3] - 4:18, 22:13, 23:5
**doubt** [1] - 13:10
**dovetails** [1] - 32:13
**down** [3] - 23:23, 28:16, 29:18
**Dr** [4] - 17:2, 30:8, 30:11, 30:24
**duel** [1] - 17:2

## E

**EASTERN** [1] - 1:1
**economic** [1] - 6:18
**effect** [2] - 27:20, 32:15
**efforts** [1] - 28:17
**Eighth** [1] - 7:20
**either** [1] - 29:12
**element** [1] - 15:24
**Ellis** [1] - 7:21
**ELLIS** [1] - 1:11
**Emanuel** [1] - 2:11
**enacting** [1] - 5:2
**end** [2] - 8:19, 22:4
**engage** [1] - 23:3
**enhance** [1] - 28:25
**ensure** [1] - 7:11
**ensuring** [1] - 5:25
**entitled** [1] - 37:5
**entity** [3] - 19:15, 24:1, 35:24
**entry** [1] - 20:17
**erred** [3] - 25:7, 25:9, 25:11
**erroneous** [1] - 5:17
**error** [10] - 15:16, 15:22, 15:23, 16:2, 16:3, 16:5, 16:10, 16:11, 17:4, 30:14
**essence** [3] - 8:7, 12:1, 19:25
**essentially** [2] - 9:4, 35:10
**establish** [4] - 11:4, 13:4, 27:17, 29:15
**established** [1] - 5:10
**estimate** [4] - 16:1, 16:12, 17:4, 30:14
**estimated** [1] - 15:6
**estimates** [1] - 30:12
**et** [4] - 1:4, 1:8, 2:3, 2:4
**evaluated** [1] - 32:17
**eviction** [1] - 18:19
**evidence** [15] - 11:3, 14:7, 14:11, 14:16, 19:6, 28:5, 28:9, 28:10, 28:13, 28:19, 29:19, 30:1, 30:25, 36:5, 36:7
**evident** [1] - 31:10
**exactly** [5] - 12:18, 19:24, 20:15, 20:20, 22:6
**example** [1] - 28:21
**exclusion** [1] - 29:21
**exercise** [1] - 5:21
**expand** [1] - 6:6
**experience** [2] - 19:11, 28:7
**expert** [6] - 14:1, 17:2, 19:1, 19:7, 19:8, 28:6
**experts** [2] - 14:21, 17:2
**explain** [2] - 6:3, 27:1
**explains** [1] - 28:24
**exposure** [1] - 18:25
**expressly** [1] - 9:23
**extent** [1] - 19:10

## F

**F.3d** [1] - 7:6
**facie** [5] - 3:11, 4:12, 29:3, 29:10,

29:23
  **facilitation** [1] - 10:18
  **fact** [20] - 3:16, 5:16, 7:1, 8:7, 8:15, 10:22, 11:14, 11:17, 11:23, 16:13, 17:10, 24:6, 26:16, 29:1, 30:4, 30:6, 30:11, 31:10, 31:16, 32:4
  **facts** [16] - 3:19, 4:8, 8:8, 8:13, 11:1, 11:6, 11:20, 12:17, 13:9, 19:1, 19:5, 19:17, 24:4, 24:6, 30:20
  **factual** [1] - 20:8
  **failed** [1] - 17:13
  **failing** [1] - 25:12
  **Fair** [16] - 4:25, 5:3, 5:9, 5:14, 6:21, 7:2, 8:23, 9:21, 9:25, 10:5, 23:16, 24:3, 24:22, 24:23, 25:21, 26:10
  **Fairfax** [1] - 15:5
  **fake** [1] - 20:17
  **favor** [1] - 4:9
  **federal** [3] - 7:3, 8:4, 9:13
  **federally** [1] - 28:8
  **female** [7] - 6:14, 13:12, 22:9, 23:4, 32:2, 32:12, 32:24
  **few** [2] - 24:13, 29:18
  **FHA** [3] - 3:25, 25:8, 25:9
  **Fifth** [1] - 7:6
  **fingerprinted** [3] - 20:24, 22:25, 23:3
  **finish** [1] - 34:9
  **firm** [1] - 2:11
  **first** [13] - 2:6, 2:20, 4:25, 10:24, 13:2, 14:16, 20:8, 22:15, 26:21, 29:4, 29:11, 30:2, 34:12
  **five** [1] - 35:1
  **focus** [1] - 9:10
  **follow** [1] - 5:21
  **following** [9] - 4:6, 5:18, 5:24, 6:7, 6:11, 7:6, 7:24, 18:10, 18:14
  **FOR** [1] - 1:1
  **foregoing** [1] - 37:4
  **foreign** [13] - 8:20, 19:23, 20:3, 20:14, 21:1, 22:9, 27:22, 28:3, 28:5, 28:16, 31:11, 36:1, 36:5
  **forgery** [1] - 21:15
  **form** [2] - 28:8, 30:1
  **forth** [6] - 5:7, 7:8, 26:19, 28:22, 29:9, 31:7
  **forward** [1] - 29:24
  **four** [3] - 12:6, 13:12, 13:13
  **Fourth** [37] - 3:3, 3:5, 3:10, 3:13, 3:16, 3:18, 4:13, 4:20, 7:15, 10:11, 10:23, 11:6, 11:18, 12:22, 14:5, 18:23, 24:14, 24:15, 24:19, 24:24, 25:3, 25:15, 25:16, 26:18, 27:9, 27:17, 29:5, 29:13, 29:14, 33:7, 33:8, 33:18, 33:19, 33:22, 33:25, 34:6
  **framework** [4] - 7:11, 27:16, 29:4, 29:8
  **frankly** [1] - 18:20
  **fraud** [1] - 23:11
  **fulfill** [2] - 31:9, 35:12
  **fundamental** [1] - 14:24
  **funded** [1] - 28:8

**G**

  **gain** [1] - 20:17
  **generated** [1] - 30:19
  **Gianna** [2] - 1:15, 2:10
  **Giron** [2] - 2:3, 32:4
  **GIRON** [1] - 1:3
  **gist** [1] - 27:21
  **gold** [1] - 28:16
  **government** [3] - 20:14, 21:1, 22:23
  **governmental** [4] - 6:7, 6:14, 7:12, 7:25
  **governments's** [1] - 28:17
  **grace** [1] - 6:17
  **grant** [2] - 24:7, 35:5
  **granted** [6] - 3:6, 3:10, 3:23, 17:15, 32:10, 32:18
  **granting** [2] - 25:7, 28:18
  **Grayson** [2] - 1:17, 2:17
  **group** [2] - 12:1, 29:22
  **guess** [4] - 5:15, 5:20, 9:14, 9:22
  **guessing** [2] - 23:22, 24:1
  **guidelines** [1] - 13:1

**H**

  **hac** [1] - 2:10
  **hands** [1] - 33:20
  **Hanes** [2] - 1:17, 2:17
  **harbor** [1] - 11:5
  **harboring** [12] - 8:13, 10:10, 10:19, 11:19, 18:6, 18:20, 18:22, 33:3, 33:6, 33:20, 34:1, 34:6
  **harder** [1] - 16:14
  **hear** [2] - 2:20, 36:9
  **HEARING** [1] - 1:10
  **heart** [1] - 10:13
  **held** [1] - 33:4
  **help** [1] - 28:25
  **higher** [2] - 16:17, 17:11
  **himself** [3] - 15:14, 16:13, 17:12
  **history** [2] - 31:15, 33:10
  **hold** [1] - 7:17
  **Home** [1] - 2:4
  **home** [1] - 32:18
  **HOME** [1] - 1:7
  **Honor** [34] - 2:16, 4:4, 4:22, 10:8, 10:13, 13:20, 13:24, 17:17, 18:3, 18:20, 19:24, 21:2, 21:14, 22:4, 23:15, 24:11, 24:12, 25:5, 25:14, 25:20, 26:9, 27:12, 27:25, 28:4, 28:11, 28:14, 28:19, 33:14, 33:24, 34:10, 34:20, 35:6, 35:17, 36:3
  **HONORABLE** [1] - 1:11
  **hour** [1] - 34:9
  **Housing** [16] - 4:25, 5:3, 5:9, 5:14, 6:21, 7:2, 8:24, 9:21, 9:25, 10:5, 23:17, 24:3, 24:22, 24:23, 25:21, 26:10
  **housing** [7] - 5:5, 5:21, 5:23, 6:2, 9:16, 9:22, 28:8

**HUD** [3] - 7:9, 12:21, 12:25

**I**

  **I-94** [1] - 35:1
  **ICP** [1] - 7:7
  **ICRA** [1] - 33:21
  **ID** [2] - 9:6, 27:22
  **idea** [1] - 20:15
  **identification** [6] - 8:18, 20:6, 21:6, 23:12, 23:14, 35:19
  **identified** [2] - 7:2, 18:17
  **identify** [1] - 22:16
  **identifying** [3] - 21:10, 28:15, 29:16
  **identities** [1] - 18:17
  **identity** [8] - 20:10, 21:16, 22:11, 22:13, 28:15, 28:17, 28:23, 31:12
  **ignore** [2] - 11:13, 11:23
  **ignored** [1] - 16:6
  **ignores** [1] - 11:1
  **illegal** [3] - 11:23, 13:11, 16:8
  **illegally** [6] - 10:22, 11:5, 12:5, 12:9, 12:15, 13:14, 13:19
  **immediately** [1] - 5:24
  **immigrants** [4] - 30:12, 30:17, 33:5, 33:10
  **impact** [49] - 3:4, 3:7, 3:25, 4:12, 4:24, 5:3, 5:9, 5:13, 6:1, 6:4, 6:8, 6:12, 6:13, 6:21, 7:2, 7:12, 7:19, 7:25, 8:23, 9:21, 9:25, 10:4, 10:9, 13:3, 13:5, 14:1, 14:6, 17:14, 18:9, 22:2, 23:16, 24:4, 24:18, 24:20, 24:22, 25:11, 25:17, 25:24, 26:8, 26:11, 26:20, 26:23, 27:24, 29:9, 29:16, 29:24, 30:25, 31:1, 34:12
  **impacted** [4] - 13:11, 14:12, 14:17, 30:23
  **implemented** [1] - 19:13
  **important** [5] - 4:4, 5:25, 10:24, 15:24, 19:9
  **impose** [1] - 5:4
  **improperly** [3] - 3:6, 3:23, 5:4
  **in-person** [2] - 20:21, 21:8
  **include** [1] - 29:10
  **including** [2] - 7:4, 29:7
  **Inclusive** [19] - 4:23, 6:25, 7:3, 7:7, 7:22, 9:19, 9:24, 10:3, 12:25, 17:20, 17:23, 21:25, 22:3, 26:17, 27:3, 27:6, 27:9, 27:11, 35:23
  **income** [2] - 5:22, 32:12
  **incorporate** [2] - 6:12, 7:10
  **incorrect** [1] - 27:5
  **increased** [1] - 14:10
  **indicate** [1] - 34:5
  **indicating** [1] - 11:2
  **indication** [1] - 12:4
  **indicator** [1] - 30:13
  **indices** [1] - 21:16
  **individual** [1] - 11:12
  **individuals** [1] - 30:21
  **infallible** [1] - 21:14

inferences [1] - 4:8
information [4] - 10:20, 15:2, 19:22,
21:6
inject [1] - 23:24
inserting [1] - 27:6
instance [1] - 12:13
instead [3] - 9:17, 14:13, 16:6
intended [5] - 6:21, 8:11, 20:5, 21:24,
23:16
intending [1] - 9:24
intent [1] - 13:21
interest [15] - 6:3, 9:18, 17:22, 17:24,
18:1, 18:2, 19:3, 19:4, 24:2, 32:22,
33:1, 33:3, 35:19, 35:21, 35:25
interests [11] - 8:14, 18:7, 18:22,
19:19, 27:2, 27:19, 27:23, 35:2, 35:9,
35:12
interpreted [1] - 10:11
interrogating [1] - 31:15
interrogation [1] - 31:17
interrupt [1] - 35:4
interview [2] - 20:22, 21:8
interviewed [1] - 23:1
invalid [1] - 36:2
invited [1] - 9:22
inviting [1] - 5:14
irrespective [1] - 32:18
IRS [6] - 20:4, 21:5, 21:7, 21:23, 23:7,
23:10
issue [11] - 4:17, 8:10, 10:1, 10:17,
21:5, 22:11, 22:22, 24:2, 33:4, 33:18,
35:11
issues [3] - 21:1, 23:25, 34:19
ITIN [4] - 21:9, 23:7, 28:20, 31:12
ITINs [11] - 8:20, 19:23, 20:3, 20:5,
21:4, 21:21, 22:9, 23:6, 23:20, 28:25,
36:7
itself [3] - 12:23, 21:5, 23:10

**J**

January [1] - 11:16
JUDGE [1] - 1:11
Judge [1] - 10:10
judgment [27] - 3:3, 3:8, 3:11, 3:17,
4:1, 4:14, 4:16, 4:18, 4:19, 8:16, 10:9,
13:7, 17:15, 18:4, 18:8, 24:8, 24:20,
24:24, 25:1, 25:7, 25:13, 25:19, 25:22,
26:4, 26:6, 30:21, 34:17
jury [6] - 34:18, 34:19, 34:21, 34:22,
34:24, 35:8
Justice [1] - 2:9
justification [2] - 31:20, 32:1
justifications [1] - 18:16

**K**

Kaneshiro [2] - 37:3, 37:8
KANESHIRO [2] - 1:19, 37:9
Kaneshiro-Miller [2] - 37:3, 37:8

KANESHIRO-MILLER [2] - 1:19, 37:9
kicked [1] - 30:5
kind [2] - 21:23, 29:20
knowing [1] - 16:24
knowledge [3] - 2:22, 11:4, 12:14
knows [2] - 21:2, 21:3

**L**

landlord [2] - 12:17, 19:2
landlords [1] - 19:13
language [3] - 7:22, 9:18, 25:3
large [2] - 12:1, 19:10
larger [1] - 15:15
last [1] - 19:20
late [1] - 34:9
Latino [2] - 14:10, 15:6
Latinos [11] - 14:6, 14:8, 14:12, 14:14,
14:17, 15:12, 16:10, 16:20, 16:21, 17:7,
30:23
law [1] - 2:11
lease [5] - 14:8, 18:17, 19:4, 28:23,
32:19
leaseholder [1] - 32:17
leases [2] - 32:10, 32:11
leasing [3] - 8:11, 10:22, 18:4
least [1] - 6:12
leeway [1] - 6:2
legal [2] - 9:2, 12:20
Legal [1] - 2:9
legally [3] - 13:16, 13:18, 21:12
legitimate [4] - 18:15, 27:23, 31:7,
35:21
less [5] - 15:17, 27:20, 31:11, 32:15,
35:13
lessee [3] - 22:12, 22:15, 22:17
lessees [2] - 22:7, 31:25
level [5] - 15:12, 15:13, 16:5, 16:9,
16:22
liability [13] - 4:1, 6:1, 6:13, 7:12, 7:25,
8:12, 18:6, 18:19, 18:25, 22:2, 24:4,
25:11, 27:17
life [1] - 34:15
limitation [1] - 29:11
limited [4] - 6:1, 10:6, 11:21, 12:16
LIMITED [1] - 1:7
Limited [1] - 2:4
lines [1] - 29:18
live [3] - 11:25, 12:7, 12:11
living [2] - 11:25, 12:2
look [7] - 4:4, 11:14, 13:8, 14:6, 17:5,
29:5, 35:23
looked [2] - 15:3, 20:22
looking [3] - 3:14, 15:1, 23:8
loss [1] - 18:19
low [1] - 5:22
low-income [1] - 5:22

**M**

majority [3] - 30:21, 31:18, 33:3
male [6] - 13:13, 20:20, 22:24, 31:16,
32:9, 32:16
man [1] - 20:22
managed [1] - 19:11
mandated [1] - 24:15
mandates [1] - 6:4
mantra [1] - 6:25
margin [10] - 15:16, 15:23, 16:2, 16:3,
16:5, 16:10, 16:11, 17:4, 30:10, 30:14
material [1] - 34:14
matter [3] - 22:12, 36:9, 37:5
mean [1] - 25:15
meaningless [2] - 7:1, 8:6
means [1] - 5:25
membership [1] - 29:22
men [2] - 22:19, 22:21
merely [5] - 28:14, 30:15, 33:5, 33:9,
34:5
merits [1] - 32:17
met [1] - 18:14
methodology [1] - 30:7
Michael [2] - 1:17, 2:16
might [6] - 6:13, 7:25, 17:1
Migration [1] - 15:3
Miller [2] - 37:3, 37:8
MILLER [2] - 1:19, 37:9
minimizing [1] - 18:18
Minneapolis [1] - 7:21
Minnesota [1] - 7:9
minute [1] - 15:17
minutes [1] - 2:23
misplace [1] - 6:14
MOBILE [1] - 1:7
Mobile [1] - 2:4
MOE [4] - 16:19, 16:20, 16:24, 17:11
moment [2] - 8:21, 9:5
moreover [1] - 25:8
Moshenberg [2] - 1:15, 2:9
MOSHENBERG [2] - 2:8, 35:6
most [1] - 21:16
motion [16] - 3:6, 3:14, 3:22, 4:1, 4:7,
24:17, 24:25, 25:1, 25:7, 25:10, 25:13,
25:18, 26:5, 30:4, 31:5, 31:6
MOTION [1] - 1:10
motion-to-dismiss [1] - 4:7
motivation [1] - 29:8
movant [1] - 2:19
move [1] - 12:11
MR [19] - 2:8, 2:16, 3:1, 9:1, 9:8, 9:11,
10:15, 10:17, 12:11, 12:13, 13:18,
13:20, 13:23, 18:2, 18:13, 20:14, 22:21,
35:6, 35:16
MS [22] - 24:11, 25:5, 25:20, 25:25,
26:3, 26:9, 26:13, 26:15, 27:11, 27:14,
27:16, 27:25, 28:4, 28:11, 28:14, 33:8,
33:14, 33:23, 34:10, 34:20, 34:24, 35:8

**multiple** [1] - 5:12
**must** [7] - 4:7, 12:24, 13:4, 17:11, 26:21, 29:16, 29:19

## N

**named** [1] - 32:5
**nation** [1] - 6:16
**national** [2] - 16:5, 16:22
**necessary** [7] - 10:19, 15:20, 22:15, 28:21, 29:1, 35:1, 35:11
**necessities** [2] - 31:8, 35:9
**necessity** [5] - 17:19, 27:4, 27:7, 31:3, 35:21
**need** [7] - 19:22, 32:19, 33:11, 34:2, 34:12, 35:3
**needed** [3] - 25:21, 26:10, 31:22
**never** [1] - 20:5
**next** [2] - 31:20, 32:1
**nondiscriminatory** [1] - 18:16
**none** [3] - 13:6, 19:19, 23:5
**notably** [1] - 28:7
**noted** [2] - 7:9, 7:14
**notice** [1] - 10:21
**noting** [1] - 33:17
**November** [1] - 1:7
**number** [16] - 7:3, 9:2, 12:20, 14:8, 14:9, 14:10, 19:13, 21:12, 28:20, 30:12, 31:12, 31:13, 31:21, 32:4, 34:4, 34:25
**Number** [1] - 2:5
**numbers** [12] - 8:17, 9:7, 17:5, 21:6, 21:22, 22:1, 27:22, 28:2, 28:25, 30:15, 31:18, 32:25

## O

**objectives** [1] - 31:7
**obtain** [1] - 20:16
**obtained** [1] - 20:24
**obvious** [2] - 15:17, 16:15
**occupant** [2] - 22:12, 22:15
**occupants** [5] - 14:10, 22:8, 31:24, 32:18, 32:23
**occur** [1] - 34:7
**OF** [3] - 1:1, 1:10, 37:1
**offer** [2] - 29:19, 32:6
**offered** [6] - 28:5, 28:9, 28:13, 30:18, 31:21, 32:14
**office** [1] - 32:17
**OFFICIAL** [1] - 37:1
**one** [15] - 2:24, 3:11, 5:6, 9:15, 10:1, 10:21, 11:6, 14:4, 19:7, 19:19, 20:16, 21:10, 23:8, 30:22, 32:4
**ongoing** [1] - 23:4
**opinion** [19] - 4:15, 5:8, 5:12, 5:17, 6:6, 7:7, 10:9, 11:14, 14:23, 15:7, 18:4, 18:8, 19:10, 25:4, 27:9, 27:10, 29:5, 30:21
**opinions** [2] - 14:18, 16:25
**opportunity** [2] - 2:23, 35:3

**opposed** [3] - 3:17, 8:14, 10:20
**order** [5] - 25:22, 27:17, 29:9, 31:9, 31:17
**otherwise** [2] - 9:22, 35:5
**ought** [1] - 25:18
**outlined** [1] - 22:3
**outside** [1] - 18:23
**overarching** [2] - 10:1, 21:19
**own** [9] - 14:20, 14:23, 15:20, 16:18, 17:6, 31:17, 32:11, 32:12, 32:17

## P

**p.m** [1] - 2:2
**pace** [1] - 17:17
**page** [5] - 25:13, 26:20, 27:13, 27:14, 29:15
**paragraph** [1] - 20:1
**parentheses** [1] - 27:3
**park** [8] - 11:24, 11:25, 12:2, 12:8, 12:11, 14:9, 31:24
**Park** [1] - 2:4
**PARK** [1] - 1:7
**part** [2] - 15:22, 29:11
**parties'** [1] - 9:10
**PARTNERSHIP** [1] - 1:7
**Partnership** [1] - 2:4
**party** [3] - 9:15, 17:22, 19:15
**passport** [7] - 9:6, 20:12, 20:14, 20:17, 31:11, 34:25, 36:1
**passports** [12] - 8:21, 19:24, 20:3, 21:1, 22:10, 22:21, 27:23, 28:3, 28:5, 28:18, 36:6
**past** [1] - 25:10
**path** [1] - 23:23
**Patricia** [2] - 37:3, 37:8
**PATRICIA** [2] - 1:19, 37:9
**people** [5] - 11:5, 15:5, 15:9, 15:18, 15:19
**percent** [8] - 15:6, 15:10, 16:5, 16:11, 16:19, 17:4, 30:22
**percentage** [3] - 15:12, 15:19, 16:22
**percentages** [1] - 15:15
**performing** [1] - 18:18
**person** [8] - 10:21, 20:10, 20:21, 21:8, 21:12, 21:16, 22:16, 23:9
**persuasion** [1] - 27:1
**persuasive** [1] - 28:10
**phrase** [1] - 5:12
**pick** [1] - 17:16
**piece** [1] - 13:24
**plaintiff** [8] - 2:7, 4:9, 4:11, 14:7, 27:18, 29:16, 29:19, 32:16
**plaintiff's** [3] - 12:1, 24:25, 25:21
**Plaintiffs** [2] - 1:5, 1:15
**plaintiffs** [42] - 2:10, 3:9, 3:15, 3:17, 6:24, 8:3, 11:11, 12:6, 12:7, 13:2, 13:11, 13:12, 13:13, 14:20, 17:18, 18:21, 19:18, 20:16, 20:21, 22:5, 22:9, 22:24, 23:4, 23:18, 24:6, 24:21, 25:6,

25:8, 26:21, 28:19, 29:24, 30:18, 31:16, 31:21, 32:2, 32:5, 32:8, 32:9, 32:12, 32:24, 35:10, 35:12
**plaintiffs'** [3] - 8:19, 13:25, 36:3
**pled** [1] - 4:8
**point** [9] - 9:12, 11:11, 17:1, 23:15, 25:3, 30:12, 34:4, 36:1
**pointed** [2] - 11:6, 21:14
**points** [1] - 30:11
**policies** [7] - 6:3, 6:7, 6:22, 7:24, 8:6, 27:2, 35:11
**policy** [39] - 5:10, 5:15, 6:19, 7:18, 8:10, 9:1, 9:14, 9:16, 10:5, 10:7, 12:18, 13:4, 13:5, 13:15, 14:8, 14:12, 18:16, 19:14, 19:17, 20:25, 21:11, 21:19, 22:6, 23:14, 23:21, 24:2, 24:5, 26:23, 30:23, 31:9, 32:7, 32:10, 32:14, 33:1, 33:2, 35:9, 35:11, 35:13, 35:18
**policy's** [1] - 23:19
**population** [16] - 14:3, 14:18, 15:1, 15:5, 15:6, 15:8, 15:9, 15:10, 15:15, 16:8, 16:12, 16:14, 17:12, 30:16, 31:19
**portion** [1] - 26:11
**possessed** [1] - 11:9
**possibly** [1] - 8:8
**post** [1] - 7:3
**post-Inclusive** [1] - 7:3
**posture** [2] - 24:14, 34:12
**potential** [2] - 18:19, 30:15
**potentially** [1] - 33:16
**practice** [3] - 27:19, 29:17, 29:20
**precisely** [1] - 20:1
**predicated** [1] - 14:13
**presence** [1] - 9:3
**present** [2] - 36:5, 36:6
**presented** [6] - 10:17, 14:7, 14:12, 19:6, 19:18, 33:18
**presents** [1] - 34:2
**previous** [1] - 30:20
**previously** [3] - 4:18, 17:21, 21:14
**prima** [5] - 3:11, 4:12, 29:3, 29:10, 29:23
**primarily** [2] - 14:1, 19:10
**primary** [2] - 5:6, 28:7
**principal** [1] - 9:10
**priorities** [3] - 6:14, 7:13, 8:1
**private** [9] - 5:5, 5:16, 6:2, 6:7, 6:14, 7:12, 8:1, 24:1, 35:24
**pro** [1] - 2:10
**proceed** [1] - 24:22
**proceeding** [1] - 6:11
**Proceedings** [2] - 1:21, 36:11
**proceedings** [1] - 37:5
**process** [7] - 12:21, 16:23, 19:5, 21:3, 21:13, 23:2, 23:4
**produced** [1] - 1:22
**production** [1] - 18:15
**professor** [1] - 14:25
**Professor** [16] - 14:2, 14:19, 14:22,

44

15:8, 15:11, 15:13, 15:23, 16:2, 16:11, 16:13, 16:18, 17:6, 17:10, 30:2, 30:6, 30:24
**proffered** [4] - 3:15, 19:1, 19:8, 24:6
**proffering** [1] - 36:4
**prong** [1] - 31:1
**proof** [3] - 12:20, 30:2, 31:21
**proper** [2] - 11:9, 13:13
**properly** [1] - 6:1
**property** [1] - 7:5
**proposal** [1] - 22:18
**proposed** [1] - 32:14
**protected** [2] - 26:24, 29:22
**prove** [2] - 13:25, 27:18
**proven** [1] - 36:2
**provide** [1] - 12:3
**provided** [3] - 8:8, 20:4, 28:19
**provision** [1] - 33:21
**public** [3] - 5:4, 5:15, 24:2
**Puccinelli** [3] - 1:15, 2:11, 24:10
**PUCCINELLI** [22] - 24:11, 25:5, 25:20, 25:25, 26:3, 26:9, 26:13, 26:15, 27:11, 27:14, 27:16, 27:25, 28:4, 28:11, 28:14, 33:8, 33:14, 33:23, 34:10, 34:20, 34:24, 35:8
**PUMA** [4] - 15:4, 15:7, 15:10, 15:12
**purported** [1] - 35:1
**purpose** [1] - 4:3
**purposes** [3] - 20:6, 21:6, 23:12
**put** [8] - 10:21, 20:15, 22:4, 28:12, 28:22, 29:9, 29:24, 31:7

## Q

**qualifications** [1] - 30:6
**qualified** [1] - 32:11
**quickly** [2] - 24:12, 29:3
**Quinn** [1] - 2:11
**quote** [2] - 3:19, 11:8
**quoted** [2] - 3:18, 17:21

## R

**race** [1] - 23:24
**range** [1] - 30:15
**rather** [3] - 6:14, 8:1, 35:4
**reach** [1] - 34:13
**reaches** [1] - 30:9
**read** [2] - 7:6, 20:1
**real** [1] - 27:21
**reality** [1] - 24:20
**really** [1] - 33:25
**reason** [3] - 13:10, 16:15, 17:14
**reasonable** [4] - 4:8, 5:20, 22:1, 23:20
**reasons** [2] - 14:24, 15:17
**rebuttal** [1] - 30:7
**receive** [2] - 21:9, 34:17
**received** [1] - 32:5
**receiving** [1] - 32:11
**reckless** [3] - 10:20, 10:25, 11:4

**recognized** [5] - 4:24, 8:23, 23:16, 30:20, 31:4
**recognizing** [1] - 5:13
**reconsidered** [1] - 25:23
**record** [2] - 3:17, 37:4
**reduce** [1] - 6:17
**reference** [1] - 8:5
**referred** [3] - 5:2, 15:3, 15:4
**referring** [2] - 4:10, 22:9
**refers** [1] - 11:15
**refute** [1] - 19:5
**regard** [2] - 18:11, 34:11
**regarding** [5] - 7:23, 14:2, 24:13, 33:11
**regulations** [1] - 7:9
**reinstate** [2] - 25:21, 26:10
**reiterated** [1] - 6:10
**rejected** [2] - 14:9, 32:7
**release** [1] - 32:8
**reliability** [3] - 15:24, 29:1, 30:14
**reliable** [10] - 15:17, 17:10, 20:5, 21:5, 21:16, 23:11, 28:2, 28:6, 30:4, 31:11
**relied** [1] - 15:2
**rely** [3] - 14:1, 14:18, 21:4
**remand** [3] - 3:3, 5:19, 26:7
**remanded** [4] - 3:7, 3:23, 4:2, 24:19
**remanding** [1] - 4:17
**remotely** [1] - 33:16
**removal** [1] - 6:5
**removing** [2] - 6:15, 8:1
**renting** [4] - 12:14, 33:5, 33:9, 34:5
**repeated** [2] - 6:25, 8:5
**repeats** [1] - 5:7
**replace** [1] - 7:12
**replicate** [1] - 30:9
**report** [6] - 14:25, 17:3, 17:6, 30:7, 30:22
**reported** [1] - 1:21
**REPORTER** [1] - 37:1
**Reporter** [1] - 1:19
**reports** [1] - 30:18
**represented** [1] - 26:16
**request** [1] - 6:17
**require** [1] - 27:6
**required** [6] - 10:5, 13:2, 19:21, 29:23, 31:9, 33:2
**requirement** [4] - 6:8, 8:9, 21:19, 23:14
**requirements** [5] - 4:6, 5:4, 10:18, 20:16, 32:20
**requires** [3] - 9:1, 21:11, 22:7
**requiring** [1] - 19:14
**residency** [1] - 12:20
**residential** [1] - 19:12
**respect** [14] - 3:4, 3:6, 3:11, 5:5, 8:16, 10:7, 13:6, 14:17, 16:9, 17:6, 17:8, 17:16, 18:9, 22:7
**response** [3] - 11:11, 35:15, 35:16
**responses** [1] - 22:25

**result** [3] - 13:3, 14:8, 30:9
**return** [1] - 25:22
**returning** [1] - 29:3
**review** [4] - 3:21, 15:18, 16:8
**reviewed** [2] - 2:21, 4:19
**reviews** [1] - 18:5
**REYES** [1] - 1:3
**Reyes** [3] - 2:3, 7:15, 32:4
**rife** [1] - 23:11
**rigamarole** [1] - 32:19
**RMR** [1] - 1:19
**robust** [3] - 13:4, 13:23, 26:22
**Rosy** [1] - 32:4
**ROSY** [1] - 1:3
**roughly** [1] - 15:9
**rule** [1] - 26:6
**Rule** [3] - 3:21, 4:6, 11:15
**ruled** [1] - 25:16
**ruling** [5] - 4:5, 4:14, 26:4, 26:5, 31:5
**run** [6] - 28:21, 29:2, 31:22, 31:23, 31:24

## S

**safeguards** [2] - 6:12, 7:10
**salience** [1] - 6:17
**Sandoval** [1] - 1:15, 2:9
**SANDOVAL** [2] - 2:8, 35:6
**Sandoval-Moshenberg** [2] - 1:15, 2:9
**SANDOVAL-MOSHENBERG** [2] - 2:8, 35:6
**satisfied** [1] - 20:25
**satisfies** [1] - 23:13
**satisfy** [7] - 8:8, 27:23, 29:9, 31:5, 32:6, 33:1, 35:1
**second** [7] - 5:15, 5:20, 6:10, 9:14, 9:22, 13:24, 15:22, 23:22, 24:1, 26:25, 31:1, 34:20
**second-guess** [4] - 5:15, 5:20, 9:14, 9:22
**second-guessing** [2] - 23:22, 24:1
**section** [1] - 15:4
**Security** [15] - 8:17, 9:2, 12:19, 21:12, 21:22, 22:1, 28:20, 28:25, 31:12, 31:13, 31:18, 31:21, 32:4, 32:25, 34:25
**see** [2] - 26:1, 29:14
**seem** [1] - 3:9
**send** [2] - 21:9, 23:7
**sense** [1] - 22:10
**separate** [2] - 29:9, 30:2
**separating** [1] - 29:7
**served** [4] - 6:3, 27:2, 27:19, 35:13
**set** [4] - 5:7, 6:16, 7:8, 26:18
**several** [1] - 7:10
**shifting** [3] - 7:11, 7:16, 29:4
**shorthand** [1] - 1:21
**shortness** [1] - 34:15
**show** [15] - 13:3, 14:12, 17:11, 17:13, 17:19, 17:24, 19:18, 24:4, 27:7, 29:20,

45

29:23, 30:19, 30:25, 35:24, 36:4
**showing** [1] - 9:2
**shown** [5] - 7:18, 21:19, 30:7, 31:8, 31:11
**shows** [4] - 14:16, 17:22, 30:15, 35:10
**sides** [1] - 2:21
**sift** [1] - 3:19
**significantly** [1] - 21:7
**similar** [2] - 17:8, 28:17
**Simon** [2] - 1:15, 2:9
**simply** [5] - 5:19, 8:20, 9:14, 16:8, 32:19
**single** [1] - 8:3
**sitting** [1] - 31:14
**situation** [1] - 32:16
**smaller** [1] - 15:15
**so-called** [1] - 10:18
**Social** [15] - 8:17, 9:1, 12:19, 21:11, 21:21, 22:1, 28:20, 28:25, 31:11, 31:13, 31:17, 31:21, 32:3, 32:25, 34:25
**social** [1] - 6:17
**solely** [6] - 6:15, 6:22, 8:1, 14:13, 14:18, 15:2
**someone** [1] - 12:14
**somewhere** [1] - 30:10
**sorry** [3] - 12:10, 14:5, 18:13
**sort** [1] - 9:15
**sound** [1] - 5:21
**specific** [1] - 29:17
**specifically** [7] - 3:7, 3:24, 4:2, 5:16, 12:23, 34:22, 35:24
**split** [1] - 33:12
**spouses** [1] - 22:19
**stage** [10] - 4:1, 4:7, 9:12, 13:7, 24:16, 24:24, 25:10, 25:18, 25:19, 26:19
**standard** [8] - 3:20, 4:16, 17:18, 17:23, 24:15, 27:5, 28:16, 31:4
**standards** [5] - 3:21, 5:2, 5:6, 11:18, 26:19
**standings** [1] - 6:11
**stands** [1] - 30:6
**start** [1] - 24:12
**started** [1] - 3:20
**state** [4] - 5:1, 6:2, 26:25, 27:1
**statements** [1] - 20:4
**states** [2] - 28:15, 29:15
**STATES** [2] - 1:1, 1:11
**States** [11] - 9:3, 10:15, 10:22, 12:4, 12:9, 12:20, 13:14, 13:16, 20:19, 21:13, 22:22
**stating** [2] - 27:3, 30:7
**statistical** [5] - 15:21, 15:25, 16:1, 17:14, 29:19
**statistics** [3] - 4:10, 15:2
**status** [1] - 13:12
**statute** [9] - 8:13, 10:10, 10:20, 11:19, 18:6, 18:20, 18:22, 33:6, 34:1
**staying** [1] - 34:3
**stenotype** [1] - 1:21

**step** [22] - 3:11, 10:2, 12:21, 13:2, 17:16, 20:8, 22:5, 22:16, 22:18, 26:21, 26:25, 27:4, 27:16, 29:4, 29:9, 29:11, 32:13, 34:11, 34:13, 35:17, 35:19, 36:3
**steps** [4] - 29:6, 29:23, 34:21, 34:23
**Sterling** [1] - 1:17
**still** [1] - 29:14
**stricter** [1] - 7:16
**Studies** [1] - 15:3
**subject** [2] - 20:10, 21:15
**submissions** [1] - 22:23
**submit** [3] - 21:17, 22:20, 30:4
**submitted** [1] - 21:7
**submitting** [1] - 23:9
**subset** [1] - 16:20
**substance** [1] - 4:21
**substantial** [2] - 10:18, 29:11
**substantially** [3] - 10:6, 11:21, 12:16
**substantively** [1] - 25:12
**substitute** [1] - 23:20
**sufficient** [4] - 9:7, 17:23, 29:20, 36:6
**sufficiently** [1] - 4:11
**suggest** [6] - 3:9, 8:13, 9:13, 11:12, 14:21, 22:6
**suggested** [3] - 11:22, 12:6, 21:4
**suggestion** [1] - 4:13
**suits** [1] - 6:12
**summary** [27] - 3:3, 3:8, 3:10, 3:17, 4:1, 4:14, 4:15, 4:17, 4:19, 8:16, 10:9, 13:7, 17:15, 18:3, 18:8, 24:7, 24:19, 24:23, 25:1, 25:7, 25:13, 25:19, 25:22, 26:4, 26:6, 30:20, 34:17
**Supreme** [18] - 4:24, 6:19, 7:7, 7:10, 7:22, 8:5, 8:22, 9:13, 9:19, 9:23, 10:3, 12:24, 14:4, 17:20, 17:22, 21:24, 23:15, 23:23
**survey** [1] - 16:6
**Survey** [1] - 16:7
**swing** [2] - 17:5, 17:8
**system** [3] - 6:18, 28:15, 28:24

# T

**table** [2] - 20:22, 23:8
**tax** [4] - 5:22, 9:6, 27:22, 28:2
**tear** [1] - 28:16
**temporary** [1] - 22:21
**tenants** [1] - 11:9
**tens** [1] - 19:11
**test** [1] - 7:8
**testified** [3] - 14:25, 17:12, 19:11
**testimony** [5] - 14:1, 16:18, 19:9, 22:24, 28:6
**THE** [43] - 1:1, 1:11, 2:3, 2:13, 2:18, 8:25, 9:5, 9:9, 10:14, 10:16, 12:10, 12:12, 13:16, 13:19, 13:22, 18:1, 18:11, 20:12, 22:19, 24:9, 25:3, 25:15, 25:24, 26:1, 26:6, 26:11, 26:14, 27:8, 27:13, 27:15, 27:21, 28:1, 28:9, 28:12, 33:7, 33:12, 33:22, 33:25, 34:15, 34:22, 35:3,

35:14, 36:8
**theory** [3] - 4:1, 25:11, 25:12
**therefore** [3] - 4:2, 4:9, 27:5
**third** [6] - 19:15, 27:16, 32:13, 34:11, 34:13, 34:21
**third-party** [1] - 19:15
**thousands** [1] - 19:12
**three** [5] - 10:2, 12:21, 22:5, 35:18, 36:3
**three-step** [2] - 10:2, 12:21
**throughout** [1] - 5:7
**tied** [1] - 33:20
**Title** [1] - 27:4
**today** [1] - 2:19
**together** [1] - 20:15
**track** [4] - 16:7, 16:9, 16:14, 30:13
**Tract** [1] - 15:8
**tract** [4] - 15:13, 17:7, 17:9, 30:17
**Transcript** [1] - 1:22
**transcript** [1] - 37:4
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 1:22
**treat** [1] - 6:25
**treatment** [2] - 8:16, 18:12
**Trenga** [1] - 10:10
**tried** [1] - 30:5
**true** [4] - 4:8, 4:10, 30:16, 31:8
**try** [2] - 17:16, 30:4
**trying** [1] - 17:11
**turn** [1] - 6:16
**turning** [4] - 4:21, 12:21, 31:1, 32:1
**two** [14] - 5:20, 7:5, 9:6, 10:23, 14:15, 14:21, 14:24, 17:16, 26:16, 29:22, 30:1, 30:18, 34:23, 35:19
**type** [1] - 19:14
**types** [1] - 30:2

# U

**U.S** [3] - 4:24, 9:2, 28:15
**U.S.-issued** [1] - 8:18
**unable** [1] - 30:8
**unchallenged** [1] - 20:4
**uncontradicted** [1] - 20:20
**Under** [1] - 26:25
**under** [20] - 4:5, 4:25, 5:9, 5:14, 8:12, 8:23, 9:21, 9:25, 10:5, 10:19, 11:19, 12:17, 12:21, 18:6, 18:19, 19:17, 23:16, 24:3, 25:10, 26:20, 26:21, 29:4, 32:10, 32:17, 36:9
**undergone** [1] - 31:17
**underlying** [1] - 5:10
**underwriting** [3] - 19:5, 28:23, 32:8
**undisputed** [2] - 12:8, 30:20
**undocumented** [20] - 11:2, 11:23, 12:2, 14:2, 14:14, 14:18, 15:1, 15:7, 15:8, 15:12, 16:10, 16:12, 16:14, 16:21, 17:7, 17:9, 30:12, 30:16, 33:5, 33:10
**undoubtedly** [1] - 7:8

**unfettered** [1] - 2:22
**UNITED** [2] - 1:1, 1:11
**United** [11] - 9:3, 10:15, 10:22, 12:4, 12:9, 12:20, 13:14, 13:16, 20:19, 21:13, 22:22
**units** [1] - 19:12
**unless** [3] - 6:8, 6:19, 7:17
**unnecessary** [13] - 5:11, 6:5, 6:9, 6:15, 6:20, 6:23, 7:18, 7:23, 8:2, 8:6, 21:20, 24:5, 29:8
**unpublished** [2] - 11:14, 11:16
**unreasonable** [1] - 19:2
**unreliable** [3] - 14:19, 14:24, 17:4
**up** [3] - 4:17, 16:3, 17:16
**upheld** [1] - 10:23
**uses** [3] - 5:11, 15:19, 16:12

## V

**valid** [24] - 6:3, 6:14, 7:25, 8:14, 8:18, 9:2, 9:14, 9:17, 15:20, 17:22, 17:24, 18:1, 18:2, 18:7, 18:21, 19:3, 19:4, 19:18, 20:8, 24:2, 27:2, 35:19, 35:21, 35:24
**validated** [1] - 22:13
**validly** [2] - 22:22, 32:10
**variation** [1] - 17:6
**verbatim** [1] - 7:21
**verification** [3] - 22:11, 23:10, 28:23
**verified** [1] - 20:23
**verify** [1] - 31:12
**verifying** [3] - 28:17, 32:22, 35:19
**version** [1] - 7:16
**versus** [1] - 2:4
**viable** [1] - 36:4
**vice** [1] - 2:10
**view** [2] - 9:7, 34:16
**VII's** [1] - 27:4
**violate** [2] - 6:20, 33:5
**violation** [1] - 24:3
**VIRGINIA** [1] - 1:1
**Virginia** [1] - 1:6
**visa** [1] - 34:25
**visas** [1] - 22:22

## W

**Waples** [1] - 2:4
**WAPLES** [1] - 1:7
**Waples'** [1] - 25:7
**warned** [1] - 7:24
**warnings** [1] - 33:11
**Weinberg** [1] - 17:2
**Weinberg's** [2] - 30:8, 30:11
**well-pled** [1] - 4:8
**whereas** [1] - 28:8
**wife's** [1] - 32:20
**witness** [1] - 14:2
**woman** [1] - 23:8
**words** [1] - 15:25

**worth** [1] - 33:17
**worthless** [1] - 22:14
**written** [1] - 33:2
**wrote** [1] - 10:8

## Y

**Yardi** [1] - 28:24
**years** [1] - 17:3
**Yehuda** [1] - 1:15

## Z

**zero** [1] - 30:10