**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

ROSY GIRON DE REYES, *et al.*,

        Plaintiffs,

v.

WAPLES MOBILE HOME PARK
LIMITED PARTNERSHIP, *et al.*,

        Defendants.

Civil No.:  1:16cv563-TSE-TCB

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFFS' SOLE REMAINING CLAIM**

Pursuant to this Court's April 7, 2020 order (the "Order"), Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A. J. Dwoskin & Associates, Inc. (collectively "Defendants") submit this supplemental brief responding to the questions in the Court's April 7 Order and in further support of Defendants' Motion for Summary Judgment on Count I of Plaintiffs' Complaint.

# TABLE OF CONTENTS

**Page**

I.    Under The Controlling *Inclusive Communities* Standard, The Court Must Resolve Two Threshold Legal Issues At Summary Judgment. ........................................................4

II.   The Fourth Circuit Did Not Address The Proper Application Of The "Artificial, Arbitrary, And Unnecessary" Standard, The Effect Of The Anti-Harboring Statute, Or Any Other Issue As A Matter Of Summary Judgment..................................10

III.  Although They Need Not Be Considered, The Court Should Grant Summary Judgment In Defendants' Favor At Both Steps Two And Three If It Reaches Them. ................................................................................................................14

      A.     The Uncontroverted Record Establishes That Defendants' Policy Serves Multiple "Valid Interests" And Therefore Meets Defendants' Step-Two Burden As A Matter Of Law. ................................................................15

      B.     The Uncontroverted Record Establishes That Plaintiffs' New Proposed Alternative To Defendants' Policy Does Not Meet Plaintiffs' Step-Three Burden As A Matter Of Law. ................................................................17

    CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adbul-Mumit v. Alexandria Hyundai, LLC*,
   896 F.3d 278 (4th Cir. 2018) ................................................11

*Betsey v. Turtle Creek Assocs.*,
   736 F.2d 983 (4th Cir. 1984) ................................................16

*Borum v. Brentwood Vill., LLC*,
   No. CV 16-1723 (RC), 2020 WL 1508906 (D.D.C. Mar. 30, 2020).......................12

*Brookshire v. C.F. Sauer Co.*,
   63 F. App'x 736 (4th Cir. 2003) (per curiam) ...........................6

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   850 F.3d 58 (2d Cir. 2017)...............................................13

*City of Miami v. Bank of Am. Corp.*,
   171 F. Supp. 3d 1314 (S.D. Fla. 2016) ....................................5

*Cobb Cty. v. Bank of Am. Corp.*,
   183 F. Supp. 3d 1332 (N.D. Ga. 2016) ....................................5

*Cty. of Cook v. Bank of Am. Corp.*,
   No. 14C 2280, 2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ..................5

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
   290 F.3d 639 (4th Cir. 2002) ..........................................19-20

*Ellis v. City of Minneapolis*,
   860 F.3d 1106 (8th Cir. 2017) ...........................................5

*Firs Home Owners Ass'n v. City of SeaTac*,
   No. C19-1130RSL, 2020 WL 1330687 (W.D. Wash. Mar. 23, 2020) ...........5, 7, 14

*Glynn v. EDO Corp.*,
   710 F.3d 209 (4th Cir. 2013) ............................................18

*Graves v. Lioi*,
   930 F.3d 307 (4th Cir. 2019) ...........................................12, 21

*Grenier v. Cyanamid Plastics, Inc.*,
   70 F.3d 667 (1st Cir. 1995)..............................................6

- ii -

*Guinness PLC v. Ward*,
    955 F.2d 875 (4th Cir. 1992) ...................................................................................18

*Hoyt v. City of St. Anthony Vill.*,
    No. 18-CV-2434, 2019 WL 2212147 (D. Minn. May 22, 2019)....................................5

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
    920 F.3d 890 (5th Cir. 2019), *pet. for cert. denied*, No. 19-497 (U.S. March
    23, 2020) ....................................................................................................5, 13, 14

*Lawson v. Union Cnty. Clerk of Court*,
    828 F.3d 239 (4th Cir. 2016), *as amended* (July 8, 2016) ......................................12

*McLennan v. Am. Airlines, Inc.*,
    440 F. Supp. 466 (E.D. Va. 1977) ..........................................................................16

*Orbit Corp v. Fedex Ground Package Sys., Inc.*,
    No. 2:14CV607, 2016 WL 6609184 (E.D. Va. Nov. 8, 2016) .....................................6

*Othentec Ltd. v. Phelan*,
    526 F.3d 135 (4th Cir. 2008) .....................................................................................9

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018) ................................................................................4, 17

*Texas Department of Housing and Community Affairs v. Inclusive Communities
    Project, Inc.*,
    135 S. Ct. 2507 (2015) ..................................................................................... *passim*

*U.S. ex rel. Carson v. Manor Care, Inc.*,
    851 F.3d 293 (4th Cir. 2017) ...................................................................................13

*United States v. Aguilar*,
    477 F. App'x 1000 (4th Cir. 2012) ...............................................................1, 2, 7, 10

*United States v. Murphy*,
    35 F.3d 143 (4th Cir. 1994) ........................................................................................9

*United States v. Tipton*,
    518 F.3d 591 (8th Cir. 2008) .....................................................................................10

*Wiest v. Tyco Elecs. Corp.*,
    812 F.3d 319 (3d Cir. 2016)........................................................................................12

**Statutes**

8 U.S.C. § 1324 ...............................................................................................................1, 20

8 U.S.C. § 1324(a)(1)(A)(iii) ...........................................................................................7, 8

42 U.S.C. § 1436a ................................................................................................................2

**Rules and Regulations**

24 C.F.R. §§ 5.508-5.512 .....................................................................................................2

24 CFR pt. 100.500(d)(1)(ii)..............................................................................................16

84 FR 42854-01, 2019 WL 3858146 .................................................................................16

Fed. R. Civ. P. 12(b)(6)...........................................................................................11, 12, 13

Fed. R. Civ. P. 56 ...............................................................................................................12

**Other Authorities**

Feb. 15, 2018 Press Release, available at
https://www.treasury.gov/tigta/press/press_tigta-2018-02.htm ...............................18

https://www.irs.gov/individuals/individual-taxpayer-identification-number ...............................18

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SOLE REMAINING CLAIM

In its April 7, 2020 Order, the Court asked the parties to address (i) what issues must be decided on Plaintiffs' Fair Housing Act (FHA) disparate-impact claim—their sole remaining claim in this lawsuit—following remand from the United States Court of Appeals for the Fourth Circuit and (ii) whether those issues should be resolved at summary judgment or at trial. As set forth in Defendants' summary-judgment briefing, at each step of the controlling three-step burden-shifting standard established by the U.S. Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), there are multiple issues that remain for this Court to decide, and each of them should be resolved at summary judgment in Defendants' favor.

The Court must first address two threshold legal questions, as *Inclusive Communities* requires: (1) Is Defendants' Policy[1] an "artificial, arbitrary, and unnecessary barrier" to housing, as *Inclusive Communities* requires?; and (2) Does the federal anti-harboring statute, 8 U.S.C. § 1324 and the Fourth Circuit's prior decision in *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012), which applied that criminal statute to a housing provider in Virginia, substantially limit Defendants' discretion such that their Policy cannot, as a matter of law, be found to have caused a disparate impact? Neither of these legal questions was addressed by the Fourth Circuit or is within a jury's purview, and both should be resolved in Defendants' favor. And if either of these questions is resolved in Defendants' favor, and both should be, Plaintiffs cannot establish a *prima facie* case

---

[1]    The "Policy" requires all adults who live at Defendants' mobile-home park in Fairfax, Virginia, to present either (1) an original Social Security card or (2) documentation evidencing legal status in the United States.

of disparate impact under *Inclusive Communities* and summary judgment should be awarded to Defendants.

Indeed, there can be no dispute that Defendants' Policy—which optimally enables Defendants to correctly determine one's identity and ascertain his or her lawful (or unlawful) presence in the United States, and which aligns with the federal government's own policy governing public housing[2]—is *not* an "artificial, arbitrary, and unnecessary" housing policy. Nor can there be any dispute that the anti-harboring statute, as authoritatively construed by the Fourth Circuit in the *Aguilar* case, substantially limits Defendants' discretion and necessitates their Policy because without requiring proof of lessees' *and* occupants' legal presence in the United States, Defendants would expose themselves to a substantial risk of criminal liability under the statute. And plainly, Plaintiffs' proposed alternative—asking occupants to provide documentation that does not confirm either their identities or their legal presence in the United States—would do nothing to lessen that risk. For these reasons alone, the Court should grant summary judgment in Defendants' favor and not subject Defendants' Policy to the *post hoc* second-guessing that Plaintiffs seek, but which *Inclusive Communities* explicitly forbids.

The outcome is no different if the Court determines that Defendants are not entitled to summary judgment on these two legal issues and proceeds to steps two and three of the *Inclusive Communities* standard. Plaintiffs' argument on those two steps boils down to this—that it is not necessary to serve Defendants' business interests to require *occupants* at Defendants' mobile-home park (the "Park") to produce the documents required by the Policy because Individual

---

[2]    Federal law expressly prohibits public-housing assistance from going to undocumented aliens, *see* 42 U.S.C. § 1436a, and U.S. Department of Housing and Urban Development (HUD) regulations require public-housing providers (including landlords) to request and review documentation "of eligible immigration status" before providing public housing assistance, *see* 24 C.F.R. §§ 5.508-5.512.

Taxpayer Identification Numbers ("ITINs") and foreign passports from occupants are both sufficient to verify identity and a less discriminatory alternative to the Policy. Plaintiffs have no argument at steps and two three in response to Defendants' assertion that it is sensible and permissible to inquire as to legal status in order to avoid the threat of criminal liability under the federal anti-harboring statute.

Moreover, Plaintiffs misstate the legal standard under *Inclusive Communities*, which forecloses disparate-impact liability where a policy serves a "valid interest" that could not be adequately served by the claimant's proposed alternative—defendants need not show a "business necessity" for their policy. And under either standard, there is no dispute that the documentation required under Defendants' Policy—but not the documentation Plaintiffs claim is an adequate substitute—is necessary to serve Defendants' undisputed interest: ensuring people are who they say they are so Defendants can avoid criminal liability under the anti-harboring statute, conduct accurate credit and criminal background checks, and minimize losses from eviction.

Indeed, this narrow remaining dispute between the parties is precisely not what the Supreme Court in *Inclusive Communities* contemplated courts or juries deciding. Reasonable housing policies that serve valid business interests and mirror federal policies in similar circumstances are not "artificial, arbitrary, and unnecessary" as a matter of law, and *Inclusive Communities* admonished courts not to second-guess such policies. Here, Defendants' interests indisputably are valid (and business necessities); Defendants' Policy indisputably serves those valid interests; and Plaintiffs' suggested alternative policy indisputably does not achieve those same valid interests. Therefore, under *Inclusive Communities*, these step-two and step-three issues also can and should be decided by the Court as a matter of law and the Court should grant Defendants summary judgment on those grounds as well.

I.    **Under The Controlling *Inclusive Communities* Standard, The Court Must Resolve Two Threshold Legal Issues At Summary Judgment.**

As noted, Defendants' pending motion for summary judgment raises two threshold legal arguments establishing, as a matter of law, that Plaintiffs cannot meet their burden to make out a prima facie case of disparate impact. The first argument is that Defendants' Policy is not an "artificial, arbitrary, and unnecessary" barrier to housing. The second argument is that the Policy is necessary to avoid the risk of criminal liability under the federal anti-harboring statute that would arise if undocumented immigrants are permitted to reside at Defendants' Park. Both arguments are firmly rooted in the Supreme Court's holding in *Inclusive Communities*; both must be resolved by this Court at the outset; and either requires summary judgment for Defendants.

**Not "Artificial, Arbitrary, And Unnecessary."** As Defendants previously explained (Dkt. 248 at 4, 13-14; Dkt. 265 at 1-3, 6), the Supreme Court in *Inclusive Communities* expressly declared that the FHA "imposes a *command* with respect to disparate-impact liability"—that "[g]overnmental or private policies are not contrary to the disparate-impact requirement *unless* they are 'artificial, arbitrary, and unnecessary barriers'" to housing. 135 S. Ct. at 2524 (citation omitted) (emphasis added). "Disparate impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,'" the Court stressed, "not the displacement of valid" housing policies or practices. *Id.* at 2522 (citation omitted). The aim of disparate-impact liability, the Court continued, is "*solely* 'removing artificial, arbitrary, and unnecessary barriers.'" *Id.* at 2524 (emphasis added). For this reason, "[c]ourts must [] examine with care whether a plaintiff has made out a prima facie showing of disparate impact"—including the "artificial, arbitrary, and unnecessary" requirement—"and prompt resolution of these cases is important." *Id.* at 2523.

Thus, under *Inclusive Communities*, courts may only permit disparate-impact claims to proceed to trial where there is more than a scintilla of evidence that, if credited, tends to prove that

the targeted policy or practice is "artificial, arbitrary, and unnecessary." *See also Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424-25 (4th Cir. 2018) (stating that in *Inclusive Communities*, "the Supreme Court emphasized that courts should only use disparate-impact claims to 'remov[e] [] artificial, arbitrary, and unnecessary barriers,' rather than 'displace valid governmental and private priorities'") (citations and internal quotation marks omitted).

Numerous other federal courts likewise have adhered to *Inclusive Communities*' directive, demanding from disparate-impact plaintiffs—even at the pleadings stage—precisely the *prima facie* showing Defendants advocate here: facts proving that the challenged policy or practice is "artificial, arbitrary, and unnecessary." *See*, *e.g.*, *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909 (5th Cir. 2019) (referring to the "artificial, arbitrary, and unnecessary barriers" standard as one of the "cautionary standards that the Supreme Court has declared to be *necessary ... in evaluating a prima facie case*" of disparate impact) (emphasis added), *pet. for cert. denied*, No. 19-497 (U.S. March 23, 2020); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) (explaining that "[u]nder *Inclusive Communities*, a plaintiff *must, at the very least*, point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity") (emphasis added); *Firs Home Owners Ass'n v. City of SeaTac*, No. C19-1130RSL, 2020 WL 1330687, at *4 (W.D. Wash. Mar. 23, 2020) (explaining that under *Inclusive Communities*, a "plaintiff must allege sufficient facts to give rise to a plausible inference that defendant has imposed 'artificial, arbitrary, and unnecessary barriers' to housing opportunities, unjustified by competing legal requirements or the multiple legitimate factors that go into zoning and regulatory decisions.").[3]

---

[3]    *See Hoyt v. City of St. Anthony Vill.*, No. 18-CV-2434 (PJS/ECW), 2019 WL 2212147, at *7 (D. Minn. May 22, 2019) (dismissing disparate-impact claim where plaintiffs failed "to plausibly allege" the required element that the defendant "'adopted an arbitrary and unnecessary policy'"); *Cty. of Cook v. Bank of Am. Corp.*, No. 14C 2280, 2018 WL 1561725, at *8 (N.D. Ill. Mar. 30, 2018) (explaining that "plaintiffs must plead and ultimately prove not only a statistical imbalance, but also an 'artificial, arbitrary, and unnecessary' [policy] and a 'robust' causal connection between the two") (citation omitted); *Cobb Cty. v.*

There are no facts in the record that would enable a reasonably jury to conclude by a preponderance of evidence that Defendants' Policy meets *Inclusive Communities*' heightened "artificial, arbitrary, and unnecessary" standard, and Plaintiffs have not even attempted to show otherwise (which is a waiver in its own right and alone a reason to grant summary judgment in Defendants' favor).[4] In fact, the uncontroverted record would compel a reasonable jury to conclude that the Policy is anything *but* "artificial, arbitrary, and unnecessary" to Defendants' business. Dkt. 248 at 13-14; *infra* at Argument II(A). Indeed, Defendants' Policy, which requires proof of legal presence in the United States, is exactly what the federal government requires of those that provide public housing. *Supra* n.2. How, therefore, could the Policy be "artificial, arbitrary, and unnecessary"? It can't be. And it isn't.

All of this explains Plaintiffs' vigorous effort to deny that they even need to meet the "artificial, arbitrary, and unnecessary" standard under *Inclusive Communities*. Dkt. 256 at 9-10; Dkt. 274 at 2 n.1. Indeed, the Plaintiffs would have this Court improperly give no weight at all to the Supreme Court's "artificial, arbitrary, and unnecessary" command. But nothing can explain away what the Supreme Court made abundantly clear in *Inclusive Communities*—disparate-impact plaintiffs must plead and prove facts that meet that standard, and Plaintiffs have not even attempted

---

*Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1347 (N.D. Ga. 2016) (stating that in *Inclusive Communities*, "the Supreme Court has explicitly called for claimants to allege, and then eventually show, that a policy is artificial, arbitrary, and unnecessary") (citation omitted); *City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) (dismissing disparate-impact claim where plaintiff "fail[ed] to allege facts demonstrating that the Defendants' alleged policies constituted 'artificial, arbitrary, and unnecessary barriers'").

[4]    *See* Dkt. 248 at 13; *Brookshire v. C.F. Sauer Co.*, 63 F. App'x 736, 736 (4th Cir. 2003) (per curiam) ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'") (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) (internal citation omitted)); *Orbit Corp v. Fedex Ground Package Sys., Inc.*, No. 2:14CV607, 2016 WL 6609184, at *17 (E.D. Va. Nov. 8, 2016) (holding that where plaintiffs failed to argue that the evidence created a genuine issue of material fact as to one of their claims, "the record plainly reveals that Plaintiffs have waived/abandoned their substantive claim for relief") (citation omitted).

- 6 -

to do so here. Accordingly, this Court can and should grant Defendants summary judgment for that reason alone.

**Anti-Harboring Statute**. The substantial risk of criminal liability for Defendants under the federal anti-harboring statute provides an independent ground for summary judgment in Defendants' favor at each step of Inclusive Communities' the burden-shifting standard.

As Defendants have explained (Dkt. 248 at 4, 10-12), in *Inclusive Communities*, the Supreme Court directed courts to reject disparate-impact claims at the step-one *prima facie* stage where "federal law substantially limits [a defendant's] discretion" in choosing and formulating the policy at issue. 135 S. Ct. at 2524. "The FHA[,]" the Court emphasized, "does not put housing authorities and private developers in a double bind of liability." *Id.* at 2523.

The anti-harboring statute—as applied to Defendants and their business of renting to a predominantly immigrant population—is just the type of substantially-limiting federal law the Supreme Court had in mind in *Inclusive Communities* when it talked about "federal law substantially limit[ing]" discretion and not imposing a "double bind of liability." *See also Firs Home Owners Ass'n*, 2020 WL 1330687, at *4 (explaining that under *Inclusive Communities*, a "plaintiff must allege sufficient facts to give rise to a plausible inference that defendant has imposed 'artificial, arbitrary, and unnecessary barriers' to housing opportunities, *unjustified by competing legal requirements*") (emphasis added). That statute makes it a federal crime if a person "knowing[ly] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors or shields from detection such alien in any place, including any building…." 8 U.S.C. § 1324(a)(1)(A)(iii). As interpreted by the Fourth Circuit in *Aguilar*, 477 F. App'x 1000, there is no reasonable dispute that the anti-harboring statute "substantially limits [Defendants'] discretion" in formulating its Policy because, as this Court has

previously ruled, Defendants could "have truly feared liability" under the statute. Dkt. 190 at 16 (concluding that there is "no question," given the reckless-disregard standard in § 1324, that a lessor could "properly and sensibly" inquire into immigration status of a lessee and his adult co-habitants). The factual record has not changed since the Court reached that conclusion and Plaintiffs provide no reason for the Court to revisit it now.

The anti-harboring statute also independently defeats Plaintiffs' claims at steps two and three as a matter of law because the Policy indisputably achieves Defendants' valid interest in avoiding criminal liability under the statute, and Plaintiffs' purportedly less discriminatory alternative to the Policy—"merely collecting proof of identify from all *occupants*" but not proof of those occupants' legal presence (Dkt. 274 at 5)—cannot achieve that interest. There can be no question that a Policy reasonably designed to avoid criminal harboring liability achieves a "valid interest." Nor can there be any dispute that a policy that only asks occupants to produce proof of their identity—with no indication whether they are legal residents and not undocumented immigrants—would do virtually nothing to achieve the "valid interest" in avoiding liability under the anti-harboring statute. Indeed, a policy that asks only lessees—but not occupants—whether they are legal residents could be used to prove the reckless disregard sufficient to establish such liability, since criminal harboring can arise from allowing undocumented occupants, no less than undocumented lessees, to reside at the Park. *See* 8 U.S.C. § 1324(a)(1)(A)(iii) (defining *mens rea* to include "reckless disregard").

Plaintiffs do not dispute any of this in their summary-judgment or supplemental briefing. Instead, they claim that at step two, there "is a dispute of fact as to whether it is a business necessity" to follow the Policy "to avoid liability under" the anti-harboring statute "because merely renting to undocumented immigrants, without more, is insufficient to constitute a violation of this

provision." Dkt. 274 at 5. This is both wrong and non-responsive to Defendants' principal argument. It is non-responsive because it ignores Defendants' contention that compliance with the anti-harboring statute defeats Plaintiffs' *prima facie* case by "substantially limit[ing]" Defendants' discretion in fashioning their leasing policy. *Supra* at 7.

Plaintiffs' argument is wrong on multiple levels. First, the scope of the anti-harboring statute and its effect on FHA disparate-impact liability in this context after *Inclusive Communities* presents a legal question for the Court, not a factual one, and Plaintiffs cite nothing in their supplemental briefing or their summary-judgment briefing that suggests otherwise. *See United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994) ("Interpreting a statute is a legal issue") (citation omitted). Indeed, Plaintiffs rely on nothing more than their own lay speculation that Defendants have nothing to fear under the anti-harboring statute and *Aguilar*, but that cannot create a genuine factual dispute precluding summary judgment. *See Othentec Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008) ("In trying to survive a motion for summary judgment, the nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'") (citation omitted).

Second, as set forth more fully below, Plaintiffs misstate *Inclusive Communities*' step-two standard, which looks only to whether a defendant's policy serves a "valid interest," not whether it is a "business necessity." *Infra* at 14-16. Even accepting Plaintiffs' erroneous contention that Defendants must show that there is a "business necessity" for their Policy, that would not alter the outcome because avoiding a real threat of criminal liability is no less a "business necessity" than it is a "valid interest." And here again, Plaintiffs do not—because they cannot—ever suggest otherwise, much less point to evidence or authority to counter that conclusion.

Third, contrary to Plaintiffs' suggestion (Dkt. 274 at 5), Defendants nowhere contend that "merely renting to undocumented immigrants, without more," violates the anti-harboring statute. Rather, given the high percentage of Latinos and undocumented immigrants in the region where the Park is located—who naturally are attracted to the more affordable housing options the Park provides[5]—renting units at the Park without taking steps to screen lessees and occupants to avoid the high likelihood of renting to undocumented immigrants could rise to the level of reckless disregard in violation of the statute as construed by the Fourth Circuit in *Aguilar*.

Thus, the anti-harboring statute provides an independent basis for this Court to grant summary judgment in Defendants' favor at each of the three steps.

## II.    The Fourth Circuit Did Not Address The Proper Application Of The "Artificial, Arbitrary, And Unnecessary" Standard, The Effect Of The Anti-Harboring Statute, Or Any Other Issue As A Matter Of Summary Judgment.

As Defendants spelled out in their summary-judgment briefing, the Fourth Circuit did not decide ***any*** issues as a matter of summary judgment, so this Court is free to, and must, resolve each of the grounds for summary judgment advanced by Defendants. *See* Dkt. 248 at 7-10; Dkt. 265 at 3-6.

Plaintiffs continue to maintain that this Court cannot consider at summary judgment any issues relating to step one and Plaintiffs' *prima facie* burden—or Defendants' arguments based on the "artificial, arbitrary, and unnecessary" standard and the anti-harboring statute—because the Fourth Circuit supposedly decided that Plaintiffs have met their step-one burden *at the summary judgment stage*. This is clearly wrong, as Plaintiffs' counsel herself acknowledged at the summary-

---

[5]    Indeed, because undocumented immigrants "cannot obtain traditional mortgages" (Dkt. 1 [Compl. ¶ 55]), Defendants' provision of nontraditional, mobile housing at the Park without the Policy—housing that would attract undocumented immigrants, especially in Fairfax, Virginia—could be viewed as "substantially facilitat[ing] an alien's remaining in the United States illegally" sufficient to violate the anti-harboring statute under that heightened standard in other circuits. *See United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008).

judgment hearing last November. *See* Tr. of Summary-Judgment Hr'g, Nov. 8, 2019, at 26:6-9 (attached as **Exhibit A**) (counsel agreeing with Court that the Fourth Circuit "didn't rule on summary judgment" or "remand and say, okay, it's all over on disparate impact"). Indeed, even the language Plaintiffs quote from the Fourth Circuit's ruling in their supplemental briefing confirms as much. *See* Dkt. 274 at 3 (quoting Fourth Circuit's ruling that "the district court should have addressed the FHA claim under the disparate-impact theory of liability at the motion for summary judgment stage").

Defendants previously addressed the scope of the Fourth Circuit's mandate at length in their summary-judgment briefing and will not repeat that discussion here. But a few points bear re-emphasis in light of Plaintiffs' supplemental brief.

*First*, there was no basis for Plaintiffs to appeal the Court's prior summary-judgment ruling on the disparate-impact claim other than to argue—as Plaintiffs did—that that ruling was based on the Court's purportedly erroneous Rule 12(b)(6) ruling that Plaintiffs failed to *allege* the "robust causality" element of their step-one burden. And in fact, Plaintiffs *opposed* Defendants' alternate argument for affirmance before the Fourth Circuit as to Plaintiffs' disparate impact claim based on the summary-judgment record, arguing that there were genuine disputes of fact for this Court to resolve. *See* Pls.' Reply Brief to the Fourth Circuit (Dkt. 72) at 28-31, Case No. 17-1723 (filed Jan. 31, 2018). Appellate courts do not decide issues the parties do not present, *see Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 290 (4th Cir. 2018) ("This court makes 'no habit of venturing beyond the confines of the case on appeal to address arguments the parties have deemed unworthy of orderly mention.'") (citation omitted), and district courts therefore should not assume that an appellate mandate implicitly encompasses a ruling on an issue neither party presented.

- 11 -

*Second*, the Fourth Circuit did not actually decide any summary-judgment issues *at all*. Rather, the court of appeals reversed the grant of summary judgment in Defendants' favor because it concluded that this Court's summary-judgment ruling was based on an error in its Rule 12(b)(6) dismissal of Plaintiffs' disparate-impact claim. The Fourth Circuit did not evaluate Plaintiffs' disparate-impact claim under a summary-judgment standard—the issue now before the Court—because Plaintiffs did not ask the court of appeals to do so. And given that disparate-impact plaintiffs must surmount an even "higher standard" under *Inclusive Communities* at the summary-judgment stage, *Borum v. Brentwood Vill., LLC*, No. CV 16-1723 (RC), 2020 WL 1508906, at *7 (D.D.C. Mar. 30, 2020), this difference in "procedural posture" between Plaintiffs' 12(b)(6) arguments on appeal and the present summary-judgment motions precludes application of the mandate rule under settled precedent. *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (affirming grant of summary judgment for defendants and rejecting argument that summary judgment was precluded by court of appeals' prior ruling finding complaint's allegations sufficient to withstand Rule 12(b)(6) challenge); *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329-30 (3d Cir. 2016) (rejecting plaintiff's argument that because the court had previously held that her complaint sufficiently alleged a claim, the district court was precluded from granting summary judgment and describing that argument as resting on a "critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56").

*Third*, appellate courts are not in the business of granting summary judgment in an appellant's favor when vacating summary judgment for appellees—especially where, as here, the appellant did not even ask the court of appeals to do so. *See, e.g., Lawson v. Union Cnty. Clerk of Court*, 828 F.3d 239, 256 (4th Cir. 2016), *as amended* (July 8, 2016) (rejecting "dissent['s]

- 12 -

propos[al] that we not only reach an undeveloped issue …, but that we take a leap further and grant summary judgment to a party"—the plaintiff—who did not "request[] that relief on appeal").

*Fourth*, the Fourth Circuit never mentioned Defendants' arguments based on the "artificial, arbitrary, and unnecessary" standard or the anti-harboring statute, let alone decide them. As noted, the court of appeals' focus was on "robust causality" and whether, contrary to this Court's Rule 12(b)(6) ruling, Plaintiffs had pleaded sufficient facts to show that the Policy disproportionately impacted Latinos. The court of appeals decided that issue adversely to Defendants and that alone was a sufficient basis to reverse.

On that record, there is utterly no basis to infer that the Circuit also implicitly rejected Defendants' other arguments where those were alternate grounds for affirmance that (i) this Court had not previously addressed or decided, and (ii) the court of appeals was not obligated to address or decide. *See, e.g.*, *U.S. ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 307 (4th Cir. 2017) (noting appellees' "alternative grounds for affirming the district court" but "declin[ing] to consider those grounds on appeal as they were not addressed by the district court, which should have that opportunity in the first instance"); *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78-79 (2d Cir. 2017) (" '[W]e may affirm [a district court's decision] on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court[,]'" but "[w]e … have 'discretion to choose not to do so based on prudential factors and concerns'") (citations omitted).

Accordingly, the Fourth Circuit's decision unequivocally leaves open the summary-judgment issues Defendants raise at each step of the three-step analysis under *Inclusive*

*Communities*, and this Court should grant summary judgment for Defendants based on the "artificial, arbitrary, and unnecessary" standard or the effect of the anti-harboring statute.[6]

## III.    Although They Need Not Be Considered, The Court Should Grant Summary Judgment In Defendants' Favor At Both Steps Two And Three If It Reaches Them.

For the reasons discussed in the previous section, the Court should grant Defendants' summary judgment based on threshold legal obstacles to Plaintiffs' claims and therefore need not consider steps two and three of the *Inclusive Communities* test. If the Court does reach steps two and three, it should arrive at the same conclusion—that Defendants are entitled to judgment as a matter of law because the evidence indisputably establishes that the Policy achieves Defendants' valid business interests and Plaintiffs' proposed less discriminatory alternatives do not.

The Court's Order correctly explains that at steps two and three, the Court must determine whether Defendants' "Policy serves a valid interest that could not be served by another practice with a less discriminatory effect." Order at 4. Under *Inclusive Communities*, at step two, Defendants must "state and explain the valid interest served by their policies" and, if Defendants

---

[6]    Included among the issues left open by the Fourth Circuit is whether Plaintiffs have provided competent and reliable *evidence* that, if credited, establishes the "robust causality" between the Policy and the alleged disparate impact required by *Inclusive Communities*. See Dkt. 248 at 8-10, 14-22. To the extent the Policy disproportionately impacts Plaintiffs, there is no question that is because of the illegal status of the female Plaintiffs, but that is not the causal connection *Inclusive Communities* requires. *See, e.g., Inclusive Cmtys.*, 920 F.3d at 907 (affirming dismissal of disparate-impact claim based on apartment owners' refusal to accept public-housing vouchers from potential tenants where the demographic statistics alleged by the plaintiff did not "support[] an inference that the implementation of [the] blanket 'no vouchers' policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area" and plaintiff "pleads no facts showing Dallas's racial composition before the Defendants-Appellees implemented their 'no vouchers' policy or how that composition has changed, if at all, since the policy was implemented"); *Firs Home*, 2020 WL 1330687, at *4 (dismissing disparate-impact claim that was based solely "on the number of Latino or Hispanic families that will be impacted by the closure of the Firs Mobile Home Park" which, "under *Inclusive Communities*, [is not] enough"). Under *Inclusive Communities*, where, as here, the disparate impact results from the "geographic distribution of minorities" in a given location, plaintiffs must show a connection between defendants' policy or practice and that "geographic distribution." *Inclusive Cmtys.*, 920 F.3d at 907. Plaintiffs have not even tried to make this showing here. Nor, in any event, have Plaintiffs even produced competent and reliable evidence that could support a reasonable jury's conclusion that the Policy in fact disproportionately impacts Latinos as opposed to other racial groups in the first place. *See* Dkt. 248 at 15-22.

meet that burden, Plaintiffs bear the burden at step three to show that Defendants' interests could be served by another practice that has a less discriminatory effect. 135 S. Ct. at 2522-23.

Importantly, however, even at the pleading stage—and certainly at the summary-judgment stage, at which point Plaintiffs have had a full opportunity to develop evidence to try to prove their claim—this step-two/step-three analysis does not occur in a vacuum. As the Court made clear in *Inclusive Communities*, "giv[ing] housing authorities and private developers leeway to state and explain the valid interest served by their policies" at step two is "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited. . . ." *Id.* at 2522. And courts should avoid engaging in "second-guess[ing] which of two reasonable approaches a housing [provider] should follow in the sound exercise of its discretion" in deciding what requirements those who rent and live in the provider's housing must meet. *Id.*

### A.    The Uncontroverted Record Establishes That Defendants' Policy Serves Multiple "Valid Interests" And Therefore Meets Defendants' Step-Two Burden As A Matter Of Law.

There is no dispute that Defendants' asserted interests in their Policy—enabling and assisting in identify verification, making leasing decisions, conducting credit and criminal background checks, and avoiding criminal liability under the anti-harboring statute—are valid and reasonable. Plaintiffs did not dispute as much in their summary-judgment briefing, and they do not dispute as much in their supplemental briefing. Nor could they, for if the law does not permit housing providers to try to achieve these sorts of rational interests fundamental to their business, disparate-impact liability would accomplish exactly what *Inclusive Communities* says it may not— judicial "second-guess[ing]" and "displace[ment]" of "valid … private" housing priorities, and the restriction of reasonable and necessary measures aimed at ensuring safety and rental payments and preventing evictions and the exposure to criminal liability, without affording "leeway" to housing providers. 135 S. Ct. at 2522-2524.

- 15 -

Since they cannot refute the validity of these interests, Plaintiffs continue trying to move the legal goalposts, persisting in their contention that Defendants must show their Policy is a "business necessity" based on a Fourth Circuit decision handed down more than three decades *before Inclusive Communities*, and a district court decision even older than that. Dkt. 274 at 3 (citing *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984) and *McLennan v. Am. Airlines, Inc.*, 440 F. Supp. 466, 472 (E.D. Va. 1977)). But again, and as this Court's April 7 Order reflects, *Inclusive Communities*—not those cases—controls here, and the Supreme Court there clearly held that articulation of a "valid interest" satisfies step two and did not adopt any requirement that a policy be "essential" or "necessary."[7]

Even if a "business necessity" were required, moreover, the "valid interests" demonstrated in the record also indisputably constitute "business necessities" as a matter of law. It is critical that housing providers take steps (like credit checks) to ensure the financial wherewithal of those who rent from them. It is just as important that housing providers implement reasonable measures (like criminal background checks) to keep their units safe for all those who reside and visit there. And it likewise is imperative that providers adopt policies that avoid liability—both civil and, even more so, criminal. But unless the identities of those renting and living at the Park can be verified, these screening processes would be unreliable and ineffectual—credit and criminal background checks on persons other than those renting and living at the Park would obviously be meaningless.

---

[7]    HUD's proposed new disparate-impact rule tracks this interpretation of *Inclusive Communities*. *See* Proposed Rule, 24 CFR Part 100.500(d)(1)(ii) (providing that defendants can establish defense to disparate-impact claim "by producing evidence showing that the challenged policy or practice advances a valid interest (or interests)"), *available at* 84 FR 42854-01 at *42863, 2019 WL 3858146.

**B.    The Uncontroverted Record Establishes That Plaintiffs' New Proposed Alternative To Defendants' Policy Does Not Meet Plaintiffs' Step-Three Burden As A Matter Of Law.**

In an effort to shift the burden on Defendants, Plaintiffs try to frame their "business necessity" argument as a step-two argument. Dkt. 274 at 4-5. But Plaintiffs' argument is really a step-*three* argument on which *they* bear the burden of proof. *See Reyes*, 903 F.3d at 424 (explaining that disparate-impact plaintiffs have the burden at step three of showing that there is a less discriminatory policy that could achieve defendants' interests). That argument reduces to this: that Defendants' Policy, as applied to occupants (but not as applied to lessees), is not, as a matter of law, necessary to serve Defendants' valid interests in verifying identities, conducting credit and criminal background checks, and minimizing lease underwriting and eviction concerns because there is record evidence that shows Plaintiffs' proposed alternative of providing ITINs and foreign passports will achieve those same interests. This argument fails as a matter of law.

As a threshold matter, Plaintiffs' paring back of their disparate-impact theory to apply only to the female "occupant" Plaintiffs—for the first time, and without amending their complaint or having pressed this new, narrower argument previously in this Court or the Fourth Circuit—only exposes the illogic in their position. If the Policy is a lawful, non-discriminatory means of verifying the identities of the *lessee* Plaintiffs, how can it be an unlawful, discriminatory means of verifying the identities of the *occupant* Plaintiffs? There is no explanation for this, and Plaintiffs do not offer one.

In any case, Plaintiffs' shape-shifting cannot save their defective "occupants-only" disparate-impact theory. First, at best, Plaintiffs' argument asks this Court to "second-guess" the "reasonable approach[]" taken in Defendants' Policy and allow a jury to find that that "reasonable approach[]" is in fact unlawful discrimination. This squarely contradicts *Inclusive Communities* and denies Defendants the "leeway" to which disparate-impact law entitles them under that binding

- 17 -

precedent.

Second, and in any event, Plaintiffs' evidence would ***not*** support a reasonable jury's finding, by a preponderance of the evidence, that requiring only ITINs and foreign passports would achieve Defendants' valid interests to the same extent as Defendants' Policy would, as Defendants' prior briefing demonstrates. Dkt. 248 at 27-30; Dkt. 265 at 16-20. There is no dispute that ITINs and foreign passports are far less reliable than Social Security cards and the other documents required by the Policy when it comes to verifying identity. With respect to ITINs specifically, the Internal Revenue Service itself has repeatedly noted the susceptibility of the ITIN process to fraud and error[8] and has declared in no uncertain terms that "ITINs do not serve any purpose other than federal tax reporting." *See* https://www.irs.gov/individuals/individual-taxpayer-identification-number ("What is an ITIN used for?"). Plaintiffs have no actual evidence to the contrary, and their conclusory assertions cannot create genuine factual disputes. *See Glynn v. EDO Corp.*, 710 F.3d 209, 216 (4th Cir. 2013) ("'[C]onclusory allegations and speculative assertions . . . without further legitimate support clearly do[] not suffice' to create a genuine issue of material fact.") (quoting *Guinness PLC v. Ward*, 955 F.2d 875, 901 (4th Cir. 1992)).

Further, as to Defendants' valid underwriting and eviction concerns, Plaintiffs claim the Policy is not necessary because the male Plaintiffs always made their rental payments on time. Dkt. 256 at 27. But this is a *non sequitur* because even assuming this fact, it says nothing about other lessees or potential lessees and their ability (and willingness) to pay.

Finally, as for avoiding criminal liability under the anti-harboring statute, whether the

---

[8]    *See* Feb. 15, 2018 Press Release, available at https://www.treasury.gov/tigta/press/press_tigta-2018-02.htm (statement by Department of the Treasury Inspector General for Tax Administration that "the IRS may have issued 151,384 potentially erroneous or fraudulent ITINs") (cited in Dkt. 248 at 30 n.11). In the report referenced in that press release, the Inspector General explained that not even the IRS, "via its systemic validation and verification processes," could "identify applications that are questionable based on potentially false or fraudulent supporting documentation[.]" Dkt. 248, Ex. 8 at 3 (Dkt. 248-8).

Policy serves Defendants' valid interest in avoiding criminal liability under the anti-harboring statute is not a fact issue—it is a legal one for this Court to decide. *Supra* at 9. There is, moreover, no evidence that Plaintiffs' proposed alternative would achieve that interest. Indeed, ITINs would not reveal *anything* about a person's citizenship or legal status in the United States, the critical fact in avoiding liability under the anti-harboring statute. And not only is there no evidence that foreign passports are remotely as reliable as U.S. passports or the other documentation—the record here, namely the fact that ███████████████████████████████████████

███, confirms that they are not. Dkt. 248 at 3, 29. The only viable means to avoid such potential criminal exposure is to inquire as to the immigration status of a lessee and his or her adult co-habitants, which is exactly what Defendants' Policy does.

Plaintiffs' final purported dispute of fact relating to whether Defendants' asserted interests are *post hoc* justifications fares no better. Dkt. 274 at 5. For one thing, this argument, that Defendants' interests are just made-up pretexts, was previously rejected by this Court based on the same summary-judgment record now before the Court. Dkt. 190 at 15-17; *see also* Dkt. 265 at 14-15.

For another, Plaintiffs cannot point to anything in *Inclusive Communities* or any other authority to support their "*post hoc* justification" theory in an FHA disparate-impact case like this one, where (i) Defendants' valid interests are rooted in common sense and existing legal requirements (*i.e.*, the anti-harboring statute) and (ii) Defendants' motives are irrelevant to whether there has been discrimination in violation of the statute. In their summary-judgment briefing, Plaintiffs cited three cases to support their contention that *post hoc* justifications "cannot satisfy what they call the 'business necessity' test." Dkt. 256 at 22 & 23 n.14. None are on point. The only Fourth Circuit case cited, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639 (4th Cir.

2002), is an intentional gender discrimination employment case under Title VII, not a disparate impact case. The other two—notably introduced with a "Cf." signal (Dkt. 256 at 22)—addressed what the courts there generically called a "*post hoc* explanation" in expert opinions in disparate-impact cases, but neither addressed whether so-called "*post hoc* justifications" for allegedly discriminatory housing policies can negate a "valid interest" or "business necessity" in a disparate-impact case.[9]

Finally, Plaintiffs' main line of "*post-hoc* justifications" attack on Defendants' interest in complying with the anti-harboring statute—an attack this Court previously rejected (Dkt. 190 at 16-17)—does not withstand scrutiny as a matter of fact. Plaintiffs base this argument on an isolated statement that Defendants' Rule 30(b)(6) designee, Defendants' Chief Financial Officer, Mark Jones, made in his deposition appearing to agree with Plaintiffs' counsel's leading question that there was "████████████████████████████████████████████████ ████████████████████████████████." Dkt. 256 at 21. But that is a plain mischaracterization of Mr. Jones's testimony, as a review of Jones's surrounding testimony—which Plaintiffs intentionally omit—makes clear.[10]

Indeed, shortly before the snippet of testimony Plaintiffs extract, in response to the direct question whether Defendants believed they were "████████████████████████████████████ ████████████████████████████████████████" Mr. Jones clearly responded that "████████ ████████████████████████████████████████████████████.

---

[9]    Plaintiffs even go so far as to suggest that Defendants must prove "that the Policy was actually motivated by any" of the reasons or interests Defendants have asserted. Dkt. 256 at 21. But none of Plaintiffs' cited cases remotely suggests as much. Nor, more importantly does *Inclusive Communities* or any Fourth Circuit decision of which we are aware.

[10]    In doing so, Plaintiffs also flatly ignore Defendants' interrogatory response describing reasons for the Policy, which stated unambiguously that "Defendants also seek to comply with 8 U.S.C. § 1324, *et seq.* in their housing practices." Dkt. 248 at 24 n.6.

████████████████████████████████████████████." *See* Tr. of M. Jones Deposition (attached as **Exhibit B**) at 136:1-7. In a follow-on question, Plaintiffs' counsel proceeded to concede that Defendants had a genuine interest in complying with the anti-harboring statute, stating that ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████]" and then asking what that was "███████████" in response to which Mr. Jones said "████████████████████████████████ █████████" context. *Id.* at 138:5-13.

Despite these clear answers, however, Plaintiffs' counsel immediately asked a question that plainly misstated—indeed, contradicted—the answers on the topic of the anti-harboring statute Mr. Jones had just provided, querying, in a leading question, "████████████████ ████████████████████████████████████████████ ████████████████████████", which undersigned counsel properly objected to as "misstat[ing]" Jones's previous testimony. *Id.* at 138:18-139:2. Plaintiffs leave all of this context out of their bare discussion of Mr. Jones's testimony, which is the linchpin of their "*post-hoc justifications*" argument. That is misleading at best. The fact is, properly viewed in context, Mr. Jones's deposition testimony directly undercuts Plaintiffs' "post-hoc justifications" argument, and it surely does not pass the "scintilla rule" and rise to the level of "sufficient evidence such that reasonable jurors could find by a preponderance of the evidence" for Plaintiffs. *Graves*, 930 F.3d at 333 (citation and internal quotation marks omitted).

Accordingly, if the Court were to reach steps two and three of the *Inclusive Communities* burden-shifting standard, it should find, as a matter of law, that Defendants' Policy does not violate the FHA's prohibition on disparate-impact discrimination and enter summary judgment in

- 21 -

Defendants' favor.

## CONCLUSION

For the reasons above and those set forth in Defendants' summary-judgment briefing, Defendants ask the Court to enter judgment in their favor on Count I of Plaintiffs' complaint and for such other relief as is just and proper.

Dated: May 15, 2020                    Respectfully submitted,


WAPLES MOBILE HOME PARK LIMITED
PARTNERSHIP, WAPLES PROJECT LIMITED
PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
_____
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*