# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., *Defendants*. | Civil Action No. 1:16cv00563-TSE-TCB |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE EXPERT TESTIMONY OF
PROFESSOR WILLIAM A.V. CLARK**

## TABLE OF CONTENTS

INTRODUCTION 1

BACKGROUND 2

LEGAL STANDARD 4

ARGUMENT 6

    I.   *Dr. Clark's opinions and testimony are reliable under Federal Rule of Evidence 702 and Daubert.* 6

    II.   *Dr. Clark's underlying methodology is reliable.* 9

    III.   *The undocumented Asian population is irrelevant to the FHA analysis.* 12

    IV.   *The probative value of Dr. Clark's statistical evidence outweighs any prejudice.* 13

CONCLUSION 15

# INTRODUCTION

Defendants' Motion to Strike the Opinion and Testimony of Dr. William A.V. Clark ("Motion to Strike"), Dkt. No. 293, repeats the same arguments from their failed Motion for Summary Judgment in an attempt to distract this Court from the validity of Dr. Clark's analysis and the assistance it will provide the jury in deciding this matter. This case is about the disparate impact Defendants' policy has on the availability of housing to the Latino population as compared to the non-Latino population in the relevant area of Fairfax County. Dr. Clark is a geographer and demographer who has researched and written extensively on such topics as residential mobility, housing choice, neighborhood change, and the impacts of demographic shifts including international migration on local areas. *See* Declaration of Dr. William A.V. Clark, Dkt. No. 294, Exh. 1 ("Dkt. No. 294-1"). Dr. Clark's conclusion that Latinos are disproportionately impacted by the Policy is based on an analysis of publicly available population data from the American Community Survey, Center for Migration Studies, and the Migration Policy Institute. Rather than forcing jurors to sift through this information, Dr. Clark's careful, expert analysis of this data is offered to assist jurors in understanding the figures underlying Plaintiffs' claim of disparate impact.

Defendants seek to exclude Dr. Clark's expert testimony because their expert disagrees with his margin of error ("MOE") calculations, his estimate of the undocumented Latino population, and the inclusion of the undocumented Asian population in his analysis. Defendants' arguments fail because the evidence is admissible under Fed. R. Evid. 702, as dueling experts are appropriate to present to the jury; the MOE determined by Dr. Clark is rooted in a valid methodology; and the FHA proscribes policies with a disparate impact on racial minorities in comparison to the majority group, not as between different racial minority groups. Therefore, the

1

opinions and testimony of Dr. Clark should not be excluded and the Motion to Strike should be denied.

## BACKGROUND

Drawing on his years of expertise and experience, as well as his analysis of the data in this case, Dr. Clark produced an expert report showing the statistical support for Plaintiffs' claims. He begins by stating the question his research and analysis will answer: "Does the policy requiring proof of citizenship in a mobile home park disproportionately impact Hispanic families?" Dkt. No. 294-1 at 1. His report meticulously explains the data he used, any assumptions he made, and how he reached his conclusion that the Hispanic population is indeed disproportionately impacted by this policy.

Dr. Clark provides that the sources for his data are American Community Survey Census materials from the U.S. Census Bureau (which included population counts for State, Fairfax County and City, and Tract 4406), data from the Center for Migration Studies (CMS) and the Migration Policy Institute. Dkt. No. 294-1 at 2. He specifies the purpose in using the selected data, "to compute percentages of the Hispanic (Latino) population. Data from the Pew Foundation, the Center for Migration Studies (CMS) and Migration Policy Institute (MPI) were used to report the undocumented population." *Id.*

After listing his sources and the purpose of each, and detailing his qualifications to perform this assessment, Dr. Clark lays out the population at the different geographical areas (the Commonwealth of Virginia, Fairfax County, Fairfax City and Tract 4406), noting the estimated number and proportion of the population in each area that is Hispanic. *Id*. at 3. He follows by providing for each geographical area the number of housing units, the number and proportion of those housing units which are mobile homes, and the median home value. *Id*. at 3-4.

Dr. Clark then turns to the undocumented population. He explains his decision to use data from the CMS for all calculations to ensure a consistent set of numbers, and notes that the numbers provided by the CMS are similar to the numbers from the Pew Foundation and the Migration Policy Institute, and that the CMS estimates are the only ones provided at the local geographic area. *Id*. at 4. Dr. Clark also provides a citation to further information on how the CMS reaches its estimates.

He then provides the following data points for Virginia, Fairfax County, and Tract 4406: Total Population; Total Undocumented, including percentage; Total Non Hispanic; as a sub-set of Total Non Hispanic, total undocumented and undocumented ratio; Total Hispanic; and, as a sub-set of Total Hispanic, total undocumented and undocumented ratio. Finally, Dr. Clark provides these same data points for the Public Use Microdata Area ("PUMA"), "[t]he smallest relevant geographic area for which there are undocumented population statistics." *Id.* at 4-5.

Using the PUMA-level data, Dr. Clark determined the proportion of undocumented Hispanics to the greater Hispanic population to be 31.4%. He then applied this calculation to the Hispanic population of Tract 4406, extrapolating based on the available data and his expertise. This results in an estimate of 301 undocumented Hispanics living in the park. *Id.*

Dr. Clark recognizes that, with a smaller area, there is a higher MOE. He reports that 26%—the MOE for the Hispanic population in Tract 4406—is an appropriate MOE for the undocumented population in the tract. This is based on his expertise and on the reasonable assumption that, because housing on Tract 4406 is relatively low-cost, the proportion of undocumented Latinos to the broader Latino population in Tract 4406 (a relatively affordable housing area) likely reflects the broader proportion of undocumented Latinos to the broader Latino population in Fairfax County. Dkt. No. 294-1 at 5.

3

Upon reviewing Dr. Clark's report, Defendants' expert, Dr. Daniel Weinberg, prepared his own report challenging the MOE Dr. Clark applied to the undocumented population on the tract, and arguing that Dr. Clark's calculations are incorrect because they do not account for the non-Hispanic Asian population. Dkt. No. 294-4 at 1. Dr. Clark produced a reply to respond to these points. Dkt. No. 294-3.

With respect to the Asian population at the park, Dr. Clark explained his decision not to assess this population because it forms a comparatively small portion of the park's populace ("12.1 percent of all residents (using an Asian surname analysis) in comparison with 60 percent Hispanic residents"), and because the Asian population is not at issue in this case. Dkt. No. 294-3 at 2. Even so, Dr. Clark "recalculated the magnitude of the disparate impact." *Id.* Applying the same methods and procedures described in his initial report, Dr. Clark determined that "the undocumented Asian population in tract 4406 as 113 with a range of approximately 92-134," a number close to Dr. Weinberg's estimate of 105. *Id.* Importantly, "If we remove the Asian population from the calculations in fact the undocumented ratio decreases for non-Hispanic/non-Asian groups *which would increase the impact of Hispanics* vis-a-vis non-Hispanics and non-Asians." *Id.* (Emphasis added.) Dr. Clark concludes that this Hispanic population is disparately impacted by Defendant's policy. *Id.* at 3.

**LEGAL STANDARD**

Fundamentally, relevant evidence is admissible unless otherwise provided by statute, the Supreme Court, the Federal Rules of Evidence, or the Constitution. *See* Fed. R. Evid. 402. The basic standard of relevance under Rule 401 is a liberal one, defining "relevance" as "any tendency to make the existence of any fact that is of consequence to the determination of the

4

action more probable or less probable than it would be without the evidence." *See* Fed. R. Evid. 401; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993).

The Supreme Court has established the factors that should be considered for admissibility of expert testimony under Federal Rule of Evidence 702. "Those factors are […], (1) whether the testimony is based on 'scientific knowledge' (i.e. knowledge grounded 'in the methods and procedures of science'"), and (2) whether the testimony will be helpful to the trier of fact… However, beyond this inquiry, the *Daubert* court expressly declined to require consideration of any other specific factors, stating that 'many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.'" *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 784 (4th Cir. 1998), *quoting Daubert*, 509 U.S. at 593.

Importantly, a court's gatekeeping role with regard to expert testimony is "to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009) "The flexible *Daubert* test does not require the judge to step into a white lab coat and perform a rigorous scientific analysis of the proposed expert testimony, but rather gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006), quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002).

"An expert need not base his opinion on the best possible evidence, but upon 'good grounds, based on what is known.'" *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 453 (E.D.N.Y. 2011) (quoting *Daubert*, 509 U.S. at 590); *see also In re Countrywide Fin. Corp. Mortgage–Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1036 (C.D. Cal. 2013) ("The *Daubert*

5

standard does not exist to ensure that only the most ideal scientific evidence is admissible in court proceedings, but instead to ensure that expert testimony is derived by the scientific method.") (internal quotation omitted). As a general matter, "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, *the rejection of expert testimony is the exception rather than the rule*." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018), quoting *United States v. Stanley*, 533 Fed. Appx. 325, 327 (4th Cir. 2013) (per curiam) (internal quotation marks omitted) (emphasis added).

## ARGUMENT

Dr. Clark's opinions and testimony are admissible under *Daubert* because they are based on both reliable data and a reliable methodology, and Defendants' substantive disputes with his opinions, supported by the opinions of their own expert, represent nothing more than the classic 'battle of the experts' that falls within the province of the jury to decide. Defendants' argument that Dr. Clark's calculations ought to have accounted for the impact of Defendant's policy on Asian tenants misapplies the Fair Housing Act, which does not require Plaintiffs to show Latinos are the *only* group which suffers a disparate impact from a particular housing policy. Finally, Dr. Clark's opinions and testimony are probative, and Defendants' Rule 403 objection should be overruled, because they relate to the issue at the heart of this case—whether Defendant's policy harms Latinos disproportionately compared to non-Latinos. For these reasons, Defendants' Motion to Strike is without merit and should be denied.

**I.     *Dr. Clark's opinions and testimony are reliable under Federal Rule of Evidence 702 and <u>Daubert</u>.***

The analysis provided by Dr. Clark meets the standard of reliability required by Rule 702 because his conclusions were based on the reasonable application of reliable principles and

methods. Defendants do not dispute the credentials of Dr. Clark.[1] Instead, they claim that Dr. Clark's methods do not meet the reliability requirement under Federal Rule of Evidence 702 because he did not provide a MOE for the undocumented Hispanic population in census tract 4406. Not only *did* Dr. Clark provide an MOE, carefully explaining in his report that the MOE he applied was an estimate based on the Census-reported MOE of 26%; he also detailed every step in his analysis and the information upon which he based his findings, as described above. Dkt. No. 294-1 at 5.

"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "To the extent [Defendants] perceive weaknesses in these assumptions, these issues can be addressed on cross-examination." *Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.*, No. 08-419, 2009 WL 5206280, at *4 (D.N.J., Dec. 22, 2009).

In this case, Dr. Clark's application of the Census-reported MOE is far from "so unrealistic and contradictory as to suggest bad faith"; on the contrary, his analysis was thorough and detailed. Moreover, his conclusions accord with the scientific method and are supported by the direct evidence in this case, as further discussed below. Nothing in Dr. Clark's thorough analysis or methodology suggests application of the "junk science" that *Daubert* and Rule 702 are meant to target. *EEOC v. Freeman*, to which Defendants cite for the proposition that "[e]xpert statistics are unreliable if they are based on 'incomplete data sets and inadequate

---

[1] Dr. Clark's credentials are clearly reputable and reliable. He is currently a Research Professor of Geography at UCLA; he has published nine books and around 400 articles on topics including demographic shifts, human migration, housing change, residential mobility, and housing choice; and he has previously provided expert testimony in various disparate impact cases, including under the FHA. Dkt. No. 294-1 at 2-3.

statistical techniques," provides a useful example: in that case, the expert's data did not cover the appropriate time period, was inappropriately enhanced by dishonest selection of the data points, included outdated and irrelevant data, omitted relevant information, and was not timely submitted, among other faults. 961 F. Supp. 2d 783, 792-93 (D. Md. 2013), *aff'd in part sub nom. EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015). This is a far cry from the case at bar, in which two experts disagree on which MOE should be applied. Importantly, as discussed below, Defendants' expert and Dr. Clark, each applying the MOE he deemed most appropriate, arrived at very similar results that confirm a disparate impact.

As Plaintiffs argued in their earlier Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 260 at 15), this type of disagreement between experts is a fact issue appropriate for a jury. *Chung v. Los Angeles*, 406 Fed. App'x 207, 210 (9th Cir. 2010) ("Theories of dueling experts create a triable issue of fact."); *Medical Device Technologies v. CR Bard Inc.*, 7 Fed. App'x 945, 949 (Fed. Cir. 2001) ("Equivalence remains a question of material fact when specific, detailed evidence by dueling expert witnesses is submitted, and, therefore, summary judgment is inappropriate on this issue."); *Lulamandier v. State Farm*, 2016 WL 3211515, at *3 (E.D. La. January 28, 2016) (collecting cases); *Schwaber v. Hartford Ins.*, 2007 WL 4532126, at *4 (D. Md. December 27, 2007) ("However, plaintiff's evidence merely establishes a classic duel between competing experts, and judging the credibility of experts falls squarely within the province of the jury.")

Defendants assert that the MOE advanced by their expert, Dr. Daniel Weinberg, is the appropriate MOE, and that Dr. Clark's use of a different MOE is erroneous. This could not more clearly be a battle of the experts. The difference of expert opinions does not call for the Court to exercise its gatekeeping duties, but rather implicates the jury's fact-finding duties.

## II. Dr. Clark's underlying methodology is reliable.

Defendants rely on the analysis of Dr. Weinberg, who avers that Dr. Clark erred in applying the MOE from ACS's data on total number of Latinos in Tract 4406 to his estimate of undocumented Latinos in Tract 4406. Dr. Weinberg is incorrect: Dr. Clark's opinion is based on his review of a reliable data set, and he arrives at the MOE by making reliable assumptions based on his specialized knowledge as a demographer. Tellingly, Dr. Weinberg's analysis of the same data produces very similar results. Therefore, Dr. Clark's MOE and resulting calculations are reliable and should not be excluded.

The use of census data for statistical analysis is reliable to show disparate impact. "Even when statistical analysis has involved general population census data to show discriminatory intent, it has not been precluded on Fed. R. Evid. 702 grounds." *EEOC v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 155 (D. Mass. 2016); *see also EEOC v. FAPS, Inc.*, No. 10–cv–3095–JAP DEA, 2014 WL 4798802, at *5–*6 (D.N.J. Sept. 26, 2014) ("Although not perfect, reliance upon this census data is a reliable proxy where, as both parties acknowledge, the actual Texas Roadhouse application data for years 2007 to 2013 is not complete.") *See also Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000) ("The presumption is that census figures are continually accurate."); *Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, 853–54 (5th Cir. 1999). Using census data, Dr. Clark estimates that there are about 301 undocumented Latino residents at Waples Mobile Home Park. Dkt. No. 294-1 at 5. He arrives at this figure by applying to the census tract the estimated percentage of Latinos that are undocumented at the PUMA level. *Id*. Dr. Clark then applied the Census-reported MOE for the Latino population to his estimated undocumented population to produce a range of 223-379. *Id*.

9

Here, as in *Texas Roadhouse,* the available data is incomplete because it lacks information as to the undocumented Latino population; thus, Dr. Clark uses Census information as a reliable proxy to calculate an estimated population and MOE.

Not only is the data sufficiently reliable to meet the requirements of Rule 702, but Dr. Clark's assumptions in analyzing that data also meet the reliability standard. "[A]n expert is permitted to form conclusions by extrapolating from existing data." *Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019), quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The margin of error speaks to the persuasive power of the sample, not its admissibility." *Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 989 F.Supp.2d 165, 174 (D. Mass. 2013). Additionally, "questions related to the bases and sources of an expert's opinions affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.3 Acres of Land More Or Less Situated in Lefore County, Ms.*, 80 F.3d 1074, 1077 (5th Cir. 1996).

Dr. Clark applied the Census-reported MOE for Latinos on the tract, recognizing that the structure of the tract ("concentrated lower cost housing in the Northeast section of the tract") indicates a likelihood of a greater undocumented population in that subarea. Dkt. No. 138-40 at 5. His assumptions are based on the data and on "specialized knowledge[,] not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Thus, Dr. Clark reasonably extrapolated an MOE based on the best available data and his knowledge as a demographer.

Importantly, there is not a threshold MOE that an analysis must meet in order to be admissible under Rule 702. Both Dr. Clark and Dr. Weinberg recognize that the estimates of the undocumented population at the park are uncertain. *Compare* Dkt. No. 294-1 at 5 *with* Dkt. No.

294-4 at 6. Even so, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994). Additionally, a lack of "statistical significance" is not automatically a fatal flaw. *See Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 24–25 (1st Cir. 2011); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir. 1998) (finding that the district court placed too much emphasis on lack of epidemiological studies where such studies "would be almost impossible to perform"); *Primiano v. Cook*, 598 F.3d 558, 566-67 (9th Cir. 2010) (noting that peer-reviewed studies are not necessary, especially when there are good reasons why such studies have not been performed).

Finally, Dr. Clark's analysis is supported by the direct evidence provided by Plaintiff: 60 percent of the residents of the Park are Latino (Dkt. No. 190 at 4), and 91.7% of the individuals actually affected by the policy are Latino. Dkt. No. 294-1. Notably, Dr. Weinberg estimates the undocumented Latino population at 287 residents, which is very close to Dr. Clark's estimate of 301. Indeed, this is consistent with this Court's recognition of a significant overlap between the undocumented population and the Latino population. Dkt. No. 56 at 16 ("That is, a disparate impact exists as to Latinos because Latinos have chosen in greater numbers than any other group to enter the United States illegally."). As Dr. Clark notes in his expert reply report, "Dr. Weinberg's argument and total focus on margin of error obscures the reasonableness of a result which is a point estimate of about 300 undocumented Hispanics during the Census period of 2010-2014." Dkt. No. 294-1 at 1.

Therefore, Dr. Clark's calculations (which are supported by direct evidence and are consistent with the calculations of Defendants' own expert witness) are more than reliable enough to meet the standard under Rule 702, such that any challenges to those calculations are questions of weight, not of admissibility.

11

### III.     *The undocumented Asian population is irrelevant to the FHA analysis.*

Defendants argue that Dr. Clark's analysis is unreliable because he did not include a comparison of the policy's disparate impact on undocumented Latinos at the park to its impact on undocumented Asians. This criticism is completely irrelevant. Not only does the comparison not change the fact of a disparate impact on the Latino population of the park (as detailed in Dr. Clark's reply report, Dkt. No. 294-1 at 2)—in fact, Dr. Clark notes, "If we remove the Asian population from the calculations […that] would *increase the impact of Hispanics* vis-a-vis non-Hispanics and non-Asians." (Dkt. No. 294-3 at 2) (emphasis added)—but it is also a false comparison: the FHA does not call for weighing the disparate impact on different minority groups against one another. The inquiry under the FHA is whether the Policy disparately impacts Latinos as compared to non-Latinos. *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 (1971) ("requirements operate to disqualify Negroes at a substantially higher rate than white applicants"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) ("the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants"); 29 C.F.R.§ 1607.4(D) (for the EEOC, "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact.").

Accordingly, the Court of Appeals in this case held that it was necessary to "compare whether Latinos that are subject to the Policy—i.e., Latino tenants at the Park—are disproportionately impacted by the Policy as compared to non-Latinos that are subject to the Policy—i.e., non-Latino tenants at the Park." *Reyes v. Waples*, 903 F.3d 415, 429 n.8 (4th Cir. 2018). As Dr. Clark observed, "Latinos are nearly 7 times more likely to be undocumented as

12

other groups and so 7 times more likely to be adversely affected by the policy." Dkt. No. 294-1 at 5. Whatever the cutoff for disparate impact may be, a sevenfold difference clearly meets the cut. *Cf.* 29 C.F.R. § 1607(D).

Moreover, even if this Court does consider the inclusion of the undocumented Asian population a pivotal factor in Dr. Clark's calculations, "failing to use a perfect set of variables that incorporates all relevant factors or excludes all potentially irrelevant variables is not a means for rejecting an expert's analysis." *Texas Roadhouse*, 215 F. Supp. 3d at 155. At most, "failure to include variables will affect the analysis' probativeness, not its admissibility." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017). *See Flebotte v. Dow Jones & Co.*, No. 97–cv–30117–FHF, 2000 WL 35539238, at *4 (D. Mass., Dec. 6, 2000); *McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals*, 140 F.3d 288, 302 (1st Cir. 1998). This is because, as explained above, "analyses are admissible […] unless they are so incomplete as to be inadmissible as irrelevant." *McMillan*, 140 F.3d at 303 (internal quotation marks and citations omitted). The fact that Asian tenants may also have an FHA claim against Defendants does not have any bearing on the reliability of Dr. Clark's analysis. Therefore, the inclusion of undocumented Asian tenants in Dr. Clark's analysis does not render his calculations unreliable.

### IV. *The probative value of Dr. Clark's statistical evidence outweighs any prejudice.*

Defendants contend that Dr. Clark's opinions should be excluded because they lack probative value. Dkt. No. 294 at 19. This is plainly untrue: the expert opinions at issue prove the extent of the disparate impact on the park's Latino tenants. Dkt. No. 294-1 at 5; Dkt. No. 294-3 at 2-3. Further, as explained above, these opinions come from a reliable analysis of reliable data. Dr. Clark's opinions and testimony have clear probative value.

"Under the Federal Rules of Evidence, admissibility of evidence is favored unless the probative value of the evidence is so low as to warrant exclusion when prejudice is a factor." *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994). "Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter. Evidence is not unfairly prejudicial merely because it damages a party's case. Rather, to be unfairly prejudicial, the evidence must have an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Leon v. Fedex Ground Package Sys., Inc.*, 163 F. Supp. 3d 1050, 1061 (D.N.M. 2016). "[Rule 403's] major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Hankey,* 203 F.3d 1160, 1172 (9th Cir. 2000).

Defendants go on to argue that the obvious probative value of Dr. Clark's evidence is outweighed by its prejudicial effect, because if Dr. Clark presents his expert opinion to the jury, they may "give significant weight to that view." Dkt. No. 294 at 19. However, "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *Hankey,* 203 F.3d at 1172 (emphasis added). Dr. Clark's reports and opinions do not rise to the level of unfair prejudice because they do not have "undue tendency to suggest decision on an improper basis"; they merely provide statistical context and support to our claim. *Leon*, 163 F. Supp. 3d at 1061. Moreover, the prejudice to the Defendants is "not so overwhelming as to trump the relevance of [Plaintiff's] evidence which [is] central to proving [Plaintiff's] theory." *See Elliot v. Turner Const. Co.*, 381 F.3d 995, 1004 (10th Cir. 2004). Further, the argument that evidence should be excluded because a jury might accord weight to an expert defies logic—the very purpose of

14

expert testimony is to provide "scientific, technical, or other specialized knowledge" to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Therefore, because the probative value of Dr. Clark's reports and opinions are not outweighed by unfair prejudice, the evidence should not be excluded under Rule 403.

## CONCLUSION

For the foregoing reasons, Dr. Clark's expert opinions are reliable and probative of an issue in this case, and his reply report successfully rebuts all of Defendants' arguments to the contrary. Any remaining disputes go not to admissibility but to the jury's assessment. Defendants' Motion to Strike should be denied.

Respectfully submitted,

_____//s//_____
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Nady Peralta, VSB #91630
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
*simon@justice4all.org*
*nady@justice4all.org*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kaiyeu Kevin Chu, VSB #85746
Matthew Traumpan (pro hac vice)
Gianna Puccinelli (pro hac vice)
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
*kevinchu@quinnemanuel.com*
*matthewtraupman@quinnemanuel.com*
*giannapuccinelli@quinnemanuel.com*

*Counsel for Plaintiffs*

**Certificate of Service**

       I hereby certify that on this 12th day of October, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

_____//s//_____
Simon Sandoval-Moshenberg, VSB #77110
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: (703) 720-5605
Fax: (703) 778-3454
*simon@justice4all.org*

*Counsel for Plaintiffs*