IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, <br><br> Defendants. | Civil No.: 1:16cv563-TSE-TCB |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO STRIKE THE OPINIONS AND TESTIMONY OF
PROFESSOR WILLIAM A.V. CLARK**

**INTRODUCTION**

The Fourth Circuit has made clear that, "[l]ike any other type of circumstantial evidence, statistical evidence 'must not be accepted uncritically,' and because many statistical models used in discrimination cases by professional statisticians are sophisticated and complex, courts must give 'close scrutiny [to the] empirical proof' on which the models are erected[]' [and] guard against the use of data which may have been 'segmented and particularized and fashioned to obtain a desired result.'" *E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1018–19 (4th Cir. 1983) (internal citations omitted). Applied here, the requisite "close scrutiny" forecloses the statistical estimates of the undocumented Hispanic population in the relevant geographical areas offered by Plaintiffs' expert, Professor Clark, to support Plaintiffs' disparate-impact housing discrimination claim because he fails to calculate or apply a credible margin of error ("MOE") to those estimates.

Indeed, as noted by the authoritative Reference Guide on Statistics, which Plaintiffs outright ignore in their Opposition, MOEs bear directly on the reliability of sample estimates. And the failure to calculate an MOE for sample estimates is contrary to accepted industry practice. *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1086–87 (D. Kan. 2018) ("Dr. Richman failed to provide margins of error with his original report for the first three estimates he discussed, and he admitted during his testimony that such failure does not conform to peer-review standards for statistical estimates."), *aff'd sub nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020); Dkt. 294 at 9-15 (citing, *inter alia*, the Reference Guide on Statistics and U.S. Census Bureau guidance documents).

Professor Clark thus concedes, as he must, that MOEs are a necessary measure of the reliability of a sample estimate. Yet, in relying on statistical sample estimates of the undocumented Hispanic population to reach his opinions relating to Plaintiffs' disparate-impact claim here, Professor Clark does not calculate MOEs at any level above the particular census tract level. And at that tract level, he simply applies an inapposite MOE from an inapposite data set—American

1

Community Survey's ("ACS") estimate of the *total* Hispanic population in the tract, inapposite by Dr. Clark's own admission because the *undocumented* Hispanic population is much harder to estimate. On this record, Dr. Clark's estimates fall well short of the well-established standard of reliability that expert opinions must meet before being allowed passage through *Daubert*'s gate.

Despite this critical deficiency, neither Professor Clark nor Plaintiffs cite *any* industry standard for Professor Clark's failure to calculate MOEs at levels above the tract level or his use of an inapposite MOE at the tract level—because none exists. Professor Clark's conclusions of disparate impact, which stem directly from these statistical estimates, accordingly rest on nothing more than his *ipse dixit*, and that is *never* enough to justify allowing expert testimony to go to the fact-finder.

Unable to justify Professor Clark's flawed methodology, Plaintiffs' Opposition is rife with misdirection. Rather than point to any basis in the field of statistics that would allow the application of an MOE from one population set to a completely different population set with no adjustment, Plaintiffs simply rely on the "expertise" of Professor Clark—as if that alone would cure the fundamental methodological defects in his approach.

Plaintiffs take the same approach as to the improper application of the Center for Migration Studies ("CMS") PUMA estimate of undocumented population at the tract level—which has a population of approximately 2% of the PUMA. The Court will not find a single reference in Plaintiffs' Opposition—or in Professor Clark's reports—to any industry standard, guideline, practice or publication in support of, or explaining, Professor Clark's application of the ACS MOE to the undocumented population or application of the PUMA percentage statistic for the undocumented population at the dramatically smaller tract level. Plaintiffs also spend much time discussing alleged evidence completely unrelated to Professor Clark's opinions that supposedly

2

support Professor Clark's conclusions. But his opinions must rise or fall on their own merit based upon accepted industry practices, and their purported alignment with other evidence doesn't move the *Daubert* needle. That Plaintiffs make no effort to identify any basis in the field of statistics that supports Professor Clark's use of the ACS MOE for the undocumented population or his use of the PUMA percentage statistic for the undocumented population at the tract level demonstrates that his opinions are fundamentally unreliable and cannot be presented in this matter.

To further distract the Court, Plaintiffs argue that the Census Bureau statistics are reliable, but Defendants have not argued otherwise. And they repeatedly use the rote mantra that this is just a "battle of the experts." Defendants, of course, are not asking this Court to choose Dr. Weinberg's opinions over Professor Clark's. Instead, Defendants contend that Professor Clark cannot enter the battle because he posits no basis for his methodology other than his own say-so. Accordingly, the Court should grant Defendants' Motion to Strike.

## ARGUMENT

### I. PROFESSOR CLARK'S METHODOLOGY IS FUNDAMENTALLY FLAWED BECAUSE HE DID NOT CALCULATE MARGINS OF ERROR

Professor Clark does not calculate MOEs at any level above the tract level, and at the tract level, he adopts an inapposite MOE from an inapposite data set, ACS's estimate of *total* Hispanic population; a data set that is inapposite by his own admission because the undocumented population is harder to estimate. These fundamental defects alone preclude his opinions.

Professor Clark repeatedly admits that it is difficult to estimate the undocumented population. Dkt. 294-2 at 33:5-16 (admitting that the undocumented population is more difficult to estimate); *id.* at 34:6-35:2 (CMS does not provide an MOE for its estimates smaller than the national level due to this difficulty); Dkt. 294-3 at 1 ("It is sufficiently difficult to estimate the actual number of undocumented Hispanics without trying to adjust further for over-count and

3

undercount."). Despite these admissions, Professor Clark never explains why it is appropriate to apply ACS's 26% MOE to his estimate of the undocumented Hispanics in Tract 4406. It is telling that given his background and experience, Professor Clark is unable to refer this Court to any standard, or any reference for that matter, from the field of statistics that supports his use of this ACS MOE.

Professor Clark utilizes a flawed methodology because he does not calculate an MOE for his statistical estimates of the undocumented Hispanic population for estimates above the tract level and adopts the inapposite MOE at the tract level. According to the U.S. Census Bureau and the Reference Guide on Statistics published by the Federal Judicial Center (Dkt. 294 at 9-11), an MOE is a necessary measure of a statistical estimate's reliability because it measures the "known or potential rate of error" of a statistical estimate drawn from a sample. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993) ("[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error[.]"). Professor Clark acknowledged that an MOE is necessary for an estimate drawn from a sample. Dkt. 294 at 12. Without knowing the MOE for a sample estimate, there is no indication of the reliability of the point estimate. Dkt. 294 at 10-13; *see Opal Fin. Grp., Inc. v. Opalesque, Ltd.*, 634 Fed. App'x 26, 29 (2d Cir. 2015) (affirming district court's decision to accord "little to no weight" to an estimate of 17.6% with error margin of plus or minus 10%).

In response, Plaintiffs' Opposition leaves many of Defendants' assertions uncontested. Plaintiffs do not dispute Defendants' assertion that an MOE is a necessary measure of a sampling estimate's reliability.[1] Nor can they given the definitive statements in, *inter alia*, the Reference

---

[1] Plaintiffs briefly suggest that an MOE speaks to the persuasive power of a sample, not its admissibility. Opp. at 10. The one case cited by Plaintiffs for this proposition demonstrates that it is not only inapposite but undermines Plaintiffs' argument because, there, the expert proposed a

Guide on Statistics. Dkt. 294 at 9-12. Plaintiffs never attempt to argue that the Reference Guide on Statistics is incorrect; never attempt to address the U.S. Census Bureau guidance documents explaining the relationship between MOEs and reliability (Dkts. 294-5; 294-6); and never attempt to distinguish Professor Clark's own statement wherein he acknowledged that an MOE is necessary for a sampling estimate. Dkt. 294 at 12. And, importantly, Plaintiffs never contest that Professor Clark failed to calculate an MOE for his estimates of the undocumented Hispanic population at the state, county, or PUMA levels.

As for Professor Clark's estimate of the undocumented Hispanic population at the tract level, Plaintiffs argue that he did "provide" an MOE for his estimate. Opp. at 7. But, here, Plaintiffs dodge the thrust of Defendants' criticism of Professor Clark's flawed methodology. Professor Clark adopted an inapposite MOE for his estimate of the undocumented Hispanics at the tract level. He adopted an MOE from a substantially different, inapposite data set—ACS's estimate of the total Hispanic population in Tract 4406—*even though he admitted that the undocumented population is harder to estimate.* By Professor Clark's own admission then, the MOE for his estimate of the undocumented Hispanic population must be higher than ACS's MOE for ACS's

---

sample size that would result in an estimate with both a confidence level and a +/- 10 percentage point MOE. *Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 989 F. Supp. 2d 165, 169 (D. Mass. 2013)). The defendants argued that this MOE, +/- 10 percentage points, was too high to be reliable. *Id.* at 174. Relying on two other cases in which the same expert had provided estimates with a +/- 10 percentage point MOE, the district court held that a +/- 10 percentage point MOE is not inherently unreliable. *Id.* Unlike in *Massachusetts Mut. Life Ins. Co.*, here, Defendants do not argue that Professor Clark's 26% margin of error is too high to be reliable; rather, it is his underlying methodology that is fundamentally flawed. Professor Clark *never* calculated an MOE at any level higher than the tract level, and at the tract level, he adopted an inapposite MOE and applied it to a population he admits is harder to estimate. Thus, by Professor Clark's own admission, the margin of error he used for his tract level estimate is inaccurate and should be higher, but Professor Clark never says what it should be. And unlike the proposed estimate in *Massachusetts Mut. Life Ins. Co.*, Professor Clark never provides the confidence level attached to his estimates.

estimate of the total Hispanic population. Indeed, Professor Clark states that estimating the undocumented Hispanic population is "sufficiently difficult" that any estimate cannot be adjusted further for over-count and undercount, issues which further affect accuracy of estimates. Dkt. 294-3 at 1. Professor Clark also recognized that CMS—the entity that provides the estimates of the undocumented population that he relied upon—finds estimating this population so difficult it does not provide an MOE for its estimates below the national level. Dkt. 294-2 at 34:10-35:2. Despite these admitted difficulties, Professor Clark (and Plaintiffs for that matter) never explains why it was appropriate to apply that inapposite 26% MOE from ACS's inapposite data set given that the actual MOE must be higher. Professor Clark remains silent on how much higher it should be. Simply put, "[w]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) (finding district court abused discretion in permitting speculative expert testimony).[2]

Thus, Professor Clark arrived at his statistical estimates by utilizing a flawed methodology which rests only on his *ipse dixit*. He opines that the 26% MOE used by ACS for its estimate of the *total* Hispanic population in Tract 4406 is the appropriate MOE for an estimate of the *undocumented* Hispanic population in Tract 4406 only because Professor Clark says so. And, Professor Clark fails to opine in his reports as to the confidence levels at which his statistical

---

[2] Plaintiffs also argue that the available data is incomplete therefore Professor Clark appropriately used Census information as a "reliable proxy to calculate an estimated population and MOE." Opp. at 10. As discussed herein and in Defendants' opening brief, the ACS MOE at the tract level was not a "reliable proxy" because the undocumented population is much harder to estimate as Professor Clark admitted. Nor does Professor Clark explain why he uses the ACS MOE or why it is appropriate to use the ACS MOE, especially given the admitted difference in estimating the undocumented population. In any event, the Fourth Circuit has often cautioned "experts against drawing broad conclusions from incomplete data." *E.E.O.C. v. Freeman*, 778 F.3d 463, 468 (4th Cir. 2015) (Agee, J., concurring) (citing cases).

estimates are made—an argument left uncontested by Plaintiffs. Without providing the confidence level for his estimate at the tract level, his estimate is meaningless. Dkt. 294 at 13-15.

Plaintiffs respond with a combination of misdirection and mischaracterization—of both the law and the record. As for the law, Plaintiffs routinely refer this Court to authority outside the Fourth Circuit in an attempt to fashion a low bar for the introduction of unreliable testimony pursuant to *Daubert* and Rule 702. *E.g.*, Opp. at 7 (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *id*. at 5 (citing authority from the Sixth Circuit and federal courts in New York and California). Not only is this out-of-circuit authority not controlling, but the standard in the Fourth Circuit for determining the reliability of expert testimony is not—and has never been—one of "bad faith" as Plaintiffs misleadingly suggest. Opp. at 7.[3] Instead, the Fourth Circuit has made clear that statistical evidence should be subjected to "close scrutiny" because statistical models in discrimination cases can be complex and the evidence can be "fashioned to obtain a desired result." *W. Elec. Co.*, 713 F.2d at 1018–19. As part of this "close scrutiny" and the Court's gate-keeping inquiry, the district court "should analyze the proposed expert testimony using several factors, including whether the expert opinion can be tested and whether it has been subjected to peer review." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005) (citing *Daubert*, 509 U.S. at 592). "The district court should also consider the rate of error of the methods employed by the expert, the existence and maintenance of standards used in the expert's methods, and whether the expert's methods have been generally accepted by his or her respective community." *Id.* When Professor Clark's testimony is examined through the lens of

---

[3] Plaintiffs' own prior *Daubert* pleadings in this case further undermine their attempt to create a new *Daubert* standard in this Circuit. When Plaintiffs argued, unsuccessfully, that the proffered testimony of Defendants' expert, Mr. George Caruso, should be excluded (Dkt. 168), Plaintiffs never suggested the Rule 702 standard in the Fourth Circuit for the exclusion of unreliable testimony was one of "bad faith". *See* Dkt. 168 at 4-6.

these factors, it is evident that his proffered testimony should be excluded.

As for the Defendants' actual challenges to Professor Clark's methodology, Plaintiffs do not contest that an MOE is a necessary measure of the reliability of a statistical estimate taken from a sample. Nor do they attempt to point this Court to any standard or reference that supports Professor Clark's use of the ACS MOE. Rather, they point to Professor Clark's "expertise" and the following statement from his report: "Because of the particular structure of the tract – concentrated lower cost housing in the Northeast section of the tract – it is also likely that a large proportion of the undocumented population is located in that subarea such that the policy's impact would be greater in that subsection of the tract." Opp. at 3 (citing Dkt. 294-1 at 5). While Professor Clark provides no basis for how he arrived at this conclusion, this statement provides no basis for his use of the ACS MOE. It is nothing more than Professor Clark's unsupported opinion. It does not state *why* Professor Clark used the ACS MOE or *why* such use is accepted in the field of statistics. Plaintiffs are left then relying only on Professor Clark's "expertise". But, expertise alone does not fill in gaps in an expert's methodology. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (noting that even if an expert is assumed to be qualified, the proffered testimony must be reliable).

Failing to provide a basis for Professor Clark's use of the ACS MOE, Plaintiffs respond with classic misdirection. For example, Plaintiffs discuss Professor Clark's credentials (Opp. at 2), and the validity of Census Bureau statistics (Opp. at 9), but Defendants have not challenged either. Plaintiffs also assert a common refrain presented in response to a *Daubert* challenge—that Defendants' arguments present no more than a classic battle of dueling experts and relate to issues appropriately reserved for trial. Opp. at 1, 8. But Defendants are not asking this Court to give credence to the opinions of their expert, Dr. Weinberg, over Professor Clark's opinions, nor is such

8

weighing of the competing experts' opinions proper at this stage. *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 710 (W.D.N.C. 2003) ("*Daubert* and its progeny does not eliminate the need for, or otherwise prohibit, a 'battle of the experts' as long as each of the expert's reasoning and methodology is sound."). Nor, in a similar vein, do Defendants argue, as Plaintiffs mistakenly assert (Opp. at 8), that Dr. Weinberg's MOE is appropriate. Defendants merely pointed out that Dr. Weinberg criticizes Professor Clark's methodology as unreliable, but this Court need not accept, nor even recognize, Dr. Weinberg's opinions as valid to acknowledge the fatal flaws in Professor Clark's methodology.[4] In fact, this Court can disregard Dr. Weinberg's opinions entirely and still easily reach the conclusion that Professor Clark's methodology is fundamentally flawed.

Plaintiffs further attempt to muddy the waters by arguing that Professor Clark's methodology is reliable because he and Dr. Weinberg arrived at similar point estimates. Opp. at 11. But, here, Plaintiffs misunderstand the significance of an MOE. As explained by the Reference Guide on Statistics and the Census Bureau documents attached to Defendants' memorandum, the MOE signifies the *reliability* of a point estimate drawn from a sample. A point estimate drawn from a sample, by itself, fails to take into account that its reliability is affected by sampling error, which necessarily occurs because a sample is not a true count of an entire population. Without an MOE, point estimates drawn from samples lack reliability.

Plaintiffs also argue Professor Clark's methodology is reliable because direct evidence supports Professor Clark's conclusions in that (1) Professor Clark performed a surname analysis and determined 60% of the residents of the Park at one point in time were Hispanic; and (2) other

---

[4] Plaintiffs also briefly suggest that Defendants' arguments regarding Professor Clark have already been rejected by this Court. Opp. at 1. Of course, Plaintiffs do not and cannot direct this Court to any ruling where this Court or the Fourth Circuit has actually decided that Professor Clark's opinions are sufficiently reliable such that they surpass the *Daubert* hurdle.

9

evidence suggests 91.7% of individuals affected by the Policy are Hispanic. Opp. at 11. This argument suffers from faulty reasoning. Professor Clark's methodology is not reliable because his *ipse dixit* opinions match other evidence in the case. If that were so, *ipse dixit* opinions would never be excluded because, parties would offer *ipse dixit* expert opinions to simply conform with other evidence in order to add the veneer of "expert" testimony to that evidence. More importantly, Professor Clark's reports demonstrate that he did not utilize any surname analysis of the individuals in the Park in his analysis or estimates of the undocumented population at any geographic level. Dkt. 294-1 at 5. In fact, Professor Clark did not offer any opinions on how many undocumented individuals made up the 60% of the Park residents he determined to be Hispanic through his surname analysis. *See* Dkt. 294-1. Furthermore, Professor Clark never offered *any* expert opinion regarding a surname analysis of individuals allegedly affected by the Policy. *See* Dkt. 294-1.[5]

Accordingly, Professor Clark's statistical estimates for population levels above the tract levels, which are offered without any MOE, are statistical junk science. *Fish*, 309 F. Supp. 3d at 1086–87 ("Dr. Richman failed to provide margins of error with his original report for the first three estimates he discussed, and he admitted during his testimony that such failure does not conform to peer-review standards for statistical estimates.") (finding that expert's estimates were not "statistically valid"). Professor Clark recognized that a point estimate without an MOE is inherently unreliable—which is why he attempted to adopt an MOE for his estimate of the undocumented Hispanic population at the tract level. But, in doing so, he utilized a fundamentally flawed methodology: He adopted an inapposite MOE from an inapposite data set for a population

---

[5] That surname analysis, and its resulting opinions, was performed only by Plaintiffs' former counsel, Mr. Ramkumar, and is not found in Professor Clark's reports. Dkt. 157-9.

10

that is—by his own admission—easier to estimate. Professor Clark never explained why the 26% MOE he utilized is appropriate despite this admitted, fundamental difference in estimating the *total* Hispanic population and the *undocumented* Hispanic population. It is evident that the "known or potential rate of error"—that is the MOE—for the estimate of the undocumented Hispanic population in Tract 4406 must be higher. How much? Professor Clark never answers that question.

In sum, Professor Clark's flawed methodology results in inadmissible, *ipse dixit* opinions that rest on Professor Clark's say-so and nothing more.

## II. PLAINTIFFS NEVER ADDRESS PROFESSOR CLARK'S *IPSE DIXIT* APPLICATION OF CMS'S PUMA STATISTICS TO TRACT 4406

Plaintiffs did not respond to Defendants' independent argument for exclusion based on Professor Clark's improper application of CMS's 31.4% PUMA estimate of the undocumented population to Tract 4406. Dkt. 294 at 18-19. Professor Clark's estimate of the undocumented Hispanic population in Tract 4406 is based on his application of CMS's 31.4% estimate of undocumented Hispanics in the relevant PUMA to the dramatically smaller census tract. Dkt. 294-1 at 5 ("Of the [PUMA] Hispanic population, 5,944 (31.4% are estimated to be undocumented… We can apply that estimate to the 957 Hispanics in Tract 4406…"). Therefore, Professor Clark's point estimate of the number of undocumented Hispanics in Tract 4406 (957) is wholly based on his application of the 31.4% PUMA estimate to Tract 4406. Dkt. 294-1 at 5. But, by his own admission (Dkt. 294 at 19), he performed no analysis to determine if the 31.4% estimate should apply to Tract 4406. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Neither Plaintiffs nor Professor Clark explain how it was appropriate for Professor Clark to apply the same

11

31.4% estimate for a much larger sample size (the PUMA) to a dramatically smaller sample size (the tract) without performing any analysis to determine if that estimate is applicable.[6] *Tyger Const. Co.*, 29 F.3d at 144 ("When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court.") (finding district court abused discretion in permitting speculative expert testimony).

Plaintiffs concede this argument by failing to contest it. *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) (noting that ignoring arguments represents a failure to join in the adversarial process" that "ordinarily result[s] in waiver"); *Ameur v. Gates*, 950 F. Supp. 2d 905, 918 n.4 (E.D. Va. 2013) ("Plaintiff's failure to respond is grounds for the Court to deem these arguments conceded."), *aff'd*, 759 F.3d 317 (4th Cir. 2014); *Ruddy v. Bluestream Prof'l Serv., LLC*, 444 F. Supp. 3d 697, 715 n.34 (E.D. Va. 2020) (noting that the plaintiff had "abandoned her claim by not responding to defendants' motion for summary judgment with respect to th[e] issue.") (citing cases). Consequently, Professor Clark's estimate of the undocumented Hispanics in Tract 4406 is untethered to the existing data and is only based on his *ipse dixit*.

---

[6] Moreover, as a sample estimate is moved from a larger to a smaller sample size (here, Professor Clark applies the 31.4% estimate from the PUMA to the dramatically smaller tract), the rate of error increases. Dkt. 294 at 18. Plaintiffs do not contest this assertion. For example, the ACS estimates for the total Hispanic population in the PUMA and Tract 4406, which Professor Clark relied upon and Dr. Weinberg attached to his report, demonstrate that there is a 7% MOE for ACS's estimate of the total Hispanic population of the PUMA (MOE of +/- 1,423 for a total Hispanic population estimate of 20,098) but a higher 26% MOE for ACS's estimate of the total Hispanic population in the much smaller tract. Dkt. 294-4 at Table 1. Professor Clark, however, never calculates an MOE for the 31.4% PUMA estimate therefore he fails to increase this MOE when he applies it to Tract 4406.

### III. PROFESSOR CLARK'S FAILURE TO DETERMINE MARGINS OF ERROR RENDERS HIS COMPARISON BETWEEN UNDOCUMENTED HISPANICS AND UNDOCUMENTED ASIANS MEANINGLESS

Professor Clark's flawed methodology – that is, his failure to determine an MOE for his estimates – renders his comparison between the undocumented Hispanic population and the undocumented Asian population unreliable and meaningless. Accordingly, even under Plaintiffs' faulty theory, it very well may be Asians, not Hispanics, who are more likely to be undocumented in the relevant areas.

In response, Plaintiffs argue that any comparison between undocumented Asians and undocumented Hispanics is inapposite. Opp. at 12-3. Plaintiffs are mistaken. If it is Asians, not Hispanics, who are disparately impacted by Defendants' Policy, Plaintiffs' disparate-impact claim fails for Plaintiffs have plead that the Policy disparately impacts Hispanics. As stated in *Inclusive Communities*, there must a be a "robust causal[]" connection between a policy and the alleged statistical disparity. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015) ("A robust causality requirement ensures that '[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create.") (citation omitted). To that end, Plaintiffs do not contest that the CMS statistics relied upon by Professor Clark demonstrate that in 2012, it was Asians, not Hispanics, who made up a majority of the undocumented population in the relevant PUMA. Dkt. 248-3 at Ex. 3(2) (Table B notes that 65.20% of the undocumented PUMA population was Asian and only 28.70% was Hispanic in 2012). Plaintiffs' claim therefore would have failed in 2012—an assertion that Plaintiffs fail to contest. Dkt. 294 at 16 n.20.

The comparison between undocumented Hispanics and Asians is therefore relevant and the Fourth Circuit did not hold otherwise by stating that Latino tenants need to be compared to non-

13

Latinos. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 429 n.8 (4th Cir. 2018).[7] Indeed, even the inapposite EEOC regulations cited by Plaintiffs invoke a comparison between different ethnic groups – invoking comparison between one group with less than 4/5s the rate of the "group with the highest rate". Opp. at 12. In fact, Professor Clark's own words undermine Plaintiffs' argument as he concluded in his reply report that "it is possible that the undocumented Asian population could affect the magnitude… of the disparate impact." Dkt. 294-3.

It is undisputed that Professor Clark did not analyze the undocumented Asian population in his opening report even though he concluded in that report that "Latinos are nearly 7 times more likely to be undocumented than *other groups…*" Dkt. 294-1 at 5 (emphasis added).[8] When he ultimately compared the undocumented Hispanic and Asian populations and dramatically revised his conclusion to state that Hispanics were not even twice as likely to be undocumented as Asians, he only made this comparison at the county level.[9] Dkt. 294-3 at 2. However, it is undisputed that Professor Clark never calculated any MOEs at the county level. Therefore, Professor Clark's comparison is without any measure of reliability for these sample estimates. Given that Professor Clark concluded that Hispanics were not even twice as likely to be undocumented, it is left unknown how reliable this comparison is – for instance, did the margins of error between the estimates of the two populations significantly overlap? Defendants will never know because of Professor Clark's fundamental failure to calculate margins of error.

---

[7] The Fourth Circuit uses the term Latinos; therefore, Defendants use that term here.

[8] Professor Clark uses the terms Hispanic and Latino interchangeably. Dkt. 294-1 at n.3.

[9] Although Professor Clark estimates the number of the undocumented Asians in Tract 4406 using the same improper application of the inapposite ACS MOE for the total Asian population in Tract 4406, he never compares this estimate to the estimate of the undocumented Hispanic population in Tract 4406 and thus never reaches any conclusions regarding a tract level comparison between those groups. Dkt. 294-3 at 2. In any event, such a comparison at that level would be flawed because of the inapposite use of the ACS MOE at the tract level.

Relying exclusively on out-of-circuit authority, Plaintiffs also argue that "if this Court does consider the inclusion of the undocumented Asian population a pivotal factor in Dr. Clark's calculations[,]" it was a mere failure to use a perfect set of variables that bears on the weight of his proffered testimony and does not render his calculations unreliable. Opp. at 13. This is more misdirection. The Fourth Circuit has cautioned that courts should scrutinize statistics because they involve complex models that can be fashioned to achieve a "desired result". *W. Elec. Co.*, 713 F.2d at 1018–19. Here, Professor Clark did not fail to use a "perfect set of variables", he initially failed to take into account the minority group that made up the largest percentage of the undocumented population in the relevant PUMA in 2012. When he did take it into account, he drastically revised his opinions. Dkt. 294-3 at 2. Regardless, Plaintiffs miss the point. This belated comparison, performed for the first time in Professor Clark's reply report, is fundamentally flawed because he never calculated any MOE for his estimates used for this comparison rendering the comparison wholly unreliable. Professor Clark's methodology is fundamentally flawed and he should not be permitted to present his proffered testimony to a jury.

### IV. EXCLUSION IS ALSO WARRANTED UNDER RULE 403

"[E]ven though Federal Rule of Evidence 702 'liberalize[d] the introduction of relevant expert evidence,' the district court must balance that freedom with the persuasiveness of potentially misleading expert evidence." *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, 182 F. App'x 267, 272 (4th Cir. 2006). "The Supreme Court has stated that a trial judge must be particularly concerned with Rule 403 with regard to expert testimony because of the difficulty in evaluating expert evidence. Expert testimony has potential to mislead the jury, since the jury may attach more significance to the testimony than is reasonably warranted." *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, No. CIV.A. 2:07CV415, 2009 WL 5842051, at *2 (E.D. Va. Jan. 6, 2009) (citing *Daubert*,

509 U.S. at 595). "[This] added caution is necessary because expert testimony often carries a certain aura that might lead a jury to attach more significance to the testimony than is reasonably warranted." *United States v. Lester*, 254 F. Supp. 2d 602, 607 (E.D. Va. 2003).

As noted above, Professor Clark's estimates, without any MOE and any associated confidence level, lack probative value. Nonetheless, Professor Clark purports to offer opinions of disparate impact built upon these unreliable estimates which he arrives at through his flawed methodology. The risk of unfair prejudice from this proffered testimony is high because Professor Clark's opinions—which go to the heart of Plaintiffs' prima facie case—will contain an expert aura that will lead the jury to attach more significance to the testimony than is reasonably warranted. *Lester*, 254 F. Supp. 2d at 607. This prejudice to Defendants cannot be countered through cross-examination on Professor Clark's failure to calculate MOEs for his underlying statistical estimates. At that point, the jury will have heard Professor Clark's ultimate opinions of disparate impact and the average juror will not understand the statistical implications of the failure to calculate a MOE on the reliability of a point estimate. Victor J. Gold, 29 Fed. Prac. & Proc. Evid. § 6270 (Wright & Miller) (2d ed. 2020) (noting that "Rule 702 is aimed at protecting jurors from evidence that is unreliable for reasons they may have difficulty understanding"). Imprecise and potentially inaccurate data should not be presented to a jury with "the aura of reliability and trustworthiness that surrounds expert evidence." *Union Pac. R. Co. v. Beemac Trucking, LLC*, No. 8:11CV8, 2013 WL 1821020, at *3 (D. Neb. Apr. 30, 2013) (internal quotations and citations omitted) (excluding expert testimony pursuant to Rule 403). The unfair prejudice faced by Defendants is precisely what Rule 403 guards against.

## **CONCLUSION**

For the reasons stated above, Defendants respectfully request the Court strike the opinions and testimony of Professor William A.V. Clark and for such other relief as may be just and proper.

Respectfully submitted,

WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, WAPLES PROJECT LIMITED PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*