IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **ROSY GIRON DE REYES,** *et al.*,<br>    **Plaintiffs,** | )<br>)<br>) |
| v. | )     No. 1:16-cv-563 |
| | ) |
| **WAPLES MOBILE HOME PARK**<br>**LIMITED PARTNERSHIP,** *et al.*,<br>    **Defendants.** | )<br>)<br>)<br>) |

## ORDER

At issue in this housing discrimination matter is Defendants' Motion to Strike the Opinions and Testimony of Plaintiffs' expert, Professor William A.V. Clark ("Motion to Strike"). The matter has been fully briefed and argued, including a telephonic hearing that occurred on November 4, 2020. Accordingly, the matter is now ripe for disposition.

### I.

Plaintiffs, eight current and former residents of Waples Mobile Home Park (the "Park"), brought this Fair Housing Act ("FHA") lawsuit, 42 U.S.C. § 3601, *et seq.*, against the owners and operators of the Park ("Defendants"), alleging that Defendants' policy requiring lessee and non-lessee occupants living at the Park to provide documentation evidencing legal status ("Policy") disproportionally ousts Latinos from the Park and therefore causes an unlawful disparate impact to Latinos on the basis of race or national origin. Ultimately, to prevail on a claim for disparate impact under the relevant provision of the FHA, Plaintiffs must demonstrate a "robust causal connection" between Defendants' Policy and the disparate impact on the identified protected class. *Reyes v. Waples Mobile Home Park. L.P.*, 903 F.3d 415, 424 (4th Cir. 2018) (citing *Texas Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2522 (2015)).

1

Specifically, in this case, Plaintiffs must establish that the Policy caused "a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy." *Reyes*, 903 F.3d at 428; *see also id.* at 429 n.8. To establish the necessary robust causal connection, Plaintiffs anticipate calling Professor Clark as an expert witness to present statistics indicating that the Policy has a disparate impact on Latinos living in the census tract containing the Park, namely U.S. Census Tract 4406 ("Tract 4406"). In detail, Plaintiffs anticipate that Professor Clark will testify that:

> (1) the undocumented Latino population in Tract 4406 is approximately 301 persons because the American Community Survey ("ACS") indicates that there are approximately 957 Latino persons in Tract 4406 and the Center for Migration Studies ("CMS") indicates that 31.4% of the Latino population in the surrounding area[1] is undocumented;
>
> (2) a range of point estimates for the undocumented Latino population in Tract 4406 is 223 to 379 persons, calculated by adding and subtracting ACS's 26% Margin of Error for the magnitude of sampling error in point estimates of the overall Latino population in Tract 4406; and
>
> (3) the Policy has a disparate impact on the Latino population because (i) based on the above statistics, Latinos are disproportionally more likely to be undocumented than non-Latinos and (ii) any policy having a disparate impact on the undocumented Latino population necessarily has a disparate impact on the overarching Latino population.[2]

Defendants argue that Professor Clark's anticipated testimony is unreliable and unfairly prejudicial because, according to Defendants:

> (1) Professor Clark's point estimate of 301 persons is based on Professor Clark's incorrect assumption that statistics used to estimate the undocumented Latino population in the larger surrounding area readily apply to Tract 4406;

---

[1] According to Professor Clark, the relevant surrounding area is the Fairfax City, Burke Public Use Microdata Area ("Fairfax-Burke PUMA")—an area which contains Tract 4406 and is the smallest geographic unit for which the CMS provides an estimate of the undocumented Latino population. CMS estimates that 31.4% of Latinos in the Fairfax-Burke PUMA are undocumented.

[2] Specifically, Professor Clark concludes that (1) "Latinos [in Tract 4406] are nearly 7 times more likely to be undocumented than other groups and so 7 times more likely to be adversely affected by the policy" and (2) "Latinos [in Tract 4406] are nearly twice as likely to be undocumented compared to Asians and 20 times more likely to be undocumented than other groups, and are thus substantially more likely to be adversely affected than any other group." Clark Report at 5 (Dkt 294-1) (bracket added); *see also* Clark Reply Report at 2 (Dkt. 294-3) (bracket added).

(2) Professor Clark's estimated range of 223 to 379 persons is based on a Margin of Error that fails to account fully for the uncertainty underlying an estimate of the undocumented Latino population in Tract 4406;

(3) Professor Clark's conclusions on disparate impact rely on a faulty Margin of Error for both the estimate of the undocumented Latino population and the relevant comparison group.[3]

Although Defendants make three objections to Professor Clark's testimony, the primary dispute here is Professor Clark's decision to use the ACS's 26% Margin of Error to calculate a range of point estimates for the size of the undocumented Latino population in Tract 4406.[4] Accordingly, the focus of the analysis here is Professor Clark's decision to use the 26% Margin of Error.

## I.

The standard for determining the admissibility of expert testimony under Rule 702, Fed. R. Evid. is well-established. In relevant part, expert testimony about a pertinent statistical association is admissible provided that the expert's opinion is "the product of reliable principles and methods.'" *In re Lipitor Mktg., Sales Practice & Prod. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (discussing admissibility of expert statistical analysis); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005) (same). In considering the reliability of expert statistical analysis, district courts assess the expert's methodology but not the conclusions

---

[3] As discussed *supra*, the relevant comparison is the Policy's impact on Latinos as compared with the Policy's impact on non-Latinos. Defendants' argument that the appropriate comparison is between Latinos and a specific subset of the non-Latino population, such as the Asian population, is foreclosed by the Fourth Circuit's opinion on appeal. *See, e.g.*, *Reyes*, 903 F.3d at 429 n.8 ("We must compare whether Latinos that are subject to the Policy—i.e., Latino tenants at the Park—are disproportionately impacted by the Policy as compared to non-Latinos that are subject to the Policy—i.e., non-Latino tenants at the Park.").

[4] Indeed, the parties do not dispute that an appropriate estimate of the undocumented Latino population in Tract 4406 is approximately 300 persons. In this respect, Defendants' opposition expert, Daniel H. Weinberg, Ph. D., provides an estimate of 287 persons, which is substantially close to Professor Clark's estimate of 301 persons.

generated by the expert's methodology. *Lipitor*, 892 F.3d at 631 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–95 (1993)). As part of this process, a district court assumes a "gatekeeping role to ensure that the [expert's] testimony [] rests on a reliable foundation" and in this respect may elect to consider an array of factors relevant to the reliability of the expert's methodology, such as "testing, peer review, error rates, and acceptability in the relevant scientific community." *Lipitor*, 892 F.3d at 631 (internal citations omitted); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This gatekeeping inquiry is "flexible" and a district court is "not under any obligation to consider a certain factor or weigh factors it did consider in a particular manner." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019).

Ultimately, "the rejection of expert testimony is the exception rather than the rule." *Lipitor*, 892 F.3d at 631 (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013)); *see also United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (same). This is so because "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system" or the "conventional devices" for challenging testimony: namely, cross-examination, presentation of contrary evidence, and timely requests for limiting instructions. *Lipitor*, 892 F.3d at 631 (internal citations omitted); *Daubert*, 509 U.S. at 596. Although the line between the district court's gatekeeping inquiry and the jury's role in assessing the credibility of witnesses may at times blur, the Fourth Circuit has made clear that disputes over the correctness of the "factual underpinnings of the expert witness' opinion" or the "values [an expert] chose to assign to certain variables" concern the "weight and credibility" of expert testimony and therefore are for the jury to resolve. *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017) (bracket added); *see also Baxter v. Comm'r of Internal Revenue Serv.*, 910 F.3d 150, 158 (4th Cir. 2018) (same).

## II.

As a preliminary matter, the thrust of Defendants' objection to Professor Clark's testimony—namely, that Professor Clark applied an inapposite 26% Margin of Error—amounts to a dispute over a "value[] [an expert] chose to assign to [a] certain variable[]" and is therefore not an appropriate objection to the admissibility of expert testimony. *Bresler*, 855 F.3d at 195 (bracket added); *Baxter*, 910 F.3d at 158. The nature of Defendants' objection is most evident from a comparison of the dueling expert reports in this case. In relevant part, Plaintiffs' expert, Professor Clark, claims that the appropriate Margin of Error is the sampling error for ACS's point estimate of the Latino population in Tract 4406 (26%), whereas Defendants' expert, Dr. Weinberg, argues that a more appropriate Margin of Error is the sampling error for ACS's point estimate of the foreign-born population in Tract 4406 (809%). These differing opinions on the appropriate variable to use to calculate the Margin of Error and the numerical value of an appropriate Margin of Error amount to a battle between experts that can be resolved by the jury. *See, e.g.*, *Ojeda-Sanchez*, No. 608-cv-906, 2010 WL 1873103, at *3 n.4 (S.D. Ga. May 10, 2020) ("The disagreement over the proper values to use when calculating the margin of error has more or less turned into a battle of experts."); *United States v. Harris*, 30 F.3d 132, 1994 WL 399180, at *2 (4th Cir. 1994) (expert testimony "does not require a specific margin of error" to reach the jury).[5]

Nonetheless, assuming *arguendo* that Defendants' three objections to Professor Clark's testimony are properly evaluated as part of the district court's gatekeeping inquiry, analysis of Defendants' three objections makes clear that Professor Clark's testimony should not be excluded.

---

[5] *See also Law Debenture Trust Co. of NY v. WMC Mortg., LLC*, No. 3:12-cv-1538, 2015 WL 9581729, at *7 (D. Conn. Dec. 30, 2015) ("WMC's criticism of Dr. Lipshutz's choice of sample size or margin of error may be advanced through cross-examination at trial, but does not rise to the level of excluding his testimony . . . ."); *Jones v. Harley-Davidson, Inc.*, No. 2:14-CV-694, 2016 WL 1435683, at *2 (E.D. Tex. Apr. 11, 2016) ("[T]he inability of the opposing party to confirm a margin of error is not a consistent basis for finding an expert's testimony unreliable."); *Mass. Mut. Life Ins. Col. V. Residential Funding Co., LLC*, 989 F. Supp. 2d 165, 172–73 (D. Mass. 2013) (quoting *Fed. House. Fin. Agency v. JP Morgan Chase & Co.*, No. 11-cv-6188, 2012 WL 6000885, at *10 (S.D.N.Y. Dec. 3, 2012)) ("The margin of error speaks to the 'persuasive power of the sample, not its admissibility.'").

This is so because Professor Clark's opinions rest on an adequately reliable methodology. To begin with, Professor Clark's decision to apply the 31.4% estimate from the Fairfax-Burke PUMA was not unreasonable because the Fairfax-Burke PUMA is the smallest geographical unit for which data on the undocumented population is available. Neither party has provided any compelling reason to believe that statistics from the Fairfax-Burke PUMA fail to reflect the demographics of Tract 4406. Second, Professor Clark's decision to use the 26% Margin of Error was not unreasonable, for it is not unreasonable to assume that the sampling error in estimates of the size and geographic location of the undocumented Latino population reasonably tracks the sampling error in estimates of the size and geographic location of the overall Latino population. Such assumption is not unreasonable because undocumented Latinos are a subset of the overall Latino population and since one might reasonably argue that, as a matter of history, immigrants from a given country have tended to live in the same neighborhoods as fellow members of the same race or country of origin. Third, Professor Clark's decision that the comparison group was non-Latinos was not unreasonable in light of the Fourth Circuit's opinion on appeal. *See, e.g.*, *Reyes*, 903 F.3d at 429 n.8. Nor was Professor Clark's decision to calculate the Margin of Error for the relevant comparison group under the same approach unreasonable, for the reasons discussed *supra*.[6]

Seeking to avoid this conclusion, Defendants argue that Professor Clark did not calculate a Margin of Error at a level above the Tract level and that Professor Clark purportedly acknowledged at his deposition that a 26% Margin of Error is too low. Defendants can make these arguments to the jury because these arguments do not alter the conclusion that Professor Clark's

---

[6] The decision to permit Professor Clark to testify about his understanding of the statistical association between the Policy and its impact on Latinos is consistent with decisions on expert testimony in other disparate impact cases. *See, e.g.*, *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 84 (3d Cir. 2017) (vacating district court's order excluding statistics-related expert testimony and remanding for further *Daubert* proceedings in ADEA disparate impact case); *Fortune Society v. Sandcastle*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019) (permitting demographer's expert testimony in disparate impact case under the FHA); *EEOC v. FAPS, Inc.*, No. 10-cv-3095, 2014 WL 4798802, at *6 (D.N.J. Sep. 26, 2014) (permitting statistics-related expert testimony in disparate impact case under Title VII).

testimony rests on an adequately reliable basis. The jury will decide whether to credit, discredit, or discount Professor Clark's testimony.

Finally, Defendants' Rule 403 arguments do not provide a compelling basis to exclude Professor Clark's testimony. Nothing in Rule 403 operates to exclude expert testimony that rests on an adequately reliable foundation. The Fourth Circuit has made clear that, in the context of expert testimony, "Rule 403 is not an injunction to exclude prejudicial evidence but a mandate . . . to weigh prejudice against probative value." *United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008). Here, statistics are a central component of step one of the three-step test for a claim of disparate impact under the FHA and any perceived unreliability in Professor Clark's methodology is easily explained to the jury through cross-examination, presentation of contrary evidence, and jury instructions. *Reyes*, 903 F.3d at 428–29. This is particularly evident because the American public is well aware that there is an undocumented Latino population and that it may be difficult to estimate the precise size and location of this group. This is not a case involving highly complex medical or scientific testimony—cases for which most jurors are truly at the complete mercy of an expert. The jury will have no difficulty understanding Defendants' objections to Professor Clark's testimony.

Accordingly,

It is **ORDERED** that Defendants' Motion *in Limine* to Strike Expert Testimony of Professor William A.V. Clark (Dkt. 293) is **DENIED**.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
November 10, 2020

/s/
T. S. Ellis, III
United States District Judge

7