## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Civil Action No. 1:16cv00563-TSE-TCB |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTIONS *IN LIMINE*

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs"), by counsel, respectfully submit the below motions *in limine*, pursuant to Federal Rules of Civil Procedure 26, 32, and 33, the Federal Rules of Evidence, and the Court's November 10, 2020 Order (Dkt. No. 310).

## FACTUAL BACKGROUND

Plaintiffs are four Latino couples of Salvadorian and Bolivian national origin that lived in Waples Mobile Home Park (the "Park") in Fairfax, Virginia for years with their children before they were suddenly ousted from their homes in 2015 and 2016. *See generally,* Dkt. No. 138, Exs. 8-11. The four female Plaintiffs are undocumented immigrants who possess U.S. government-issued ITINs, and the four male Plaintiffs are legally present in the U.S., although only one is a

1

lawful permanent resident.  *See id.*; *see also* Dkt. No. 256, Ex. 1 at 4.  All of the Plaintiffs' children are U.S. citizens.  *See* Dkt. No. 138, Ex. 8 ¶ 3, Ex. 9 ¶ 3, Ex. 10 ¶ 3, Ex. 11 ¶ 3.  Notably, each of the male Plaintiffs passed a credit and criminal background check as part of the application process to live at the Park, and subsequently entered into a yearly lease.  *See* Dkt. No. 138, Exs. 12-15.

Plaintiffs were functionally evicted from the Park due to Defendants' sudden enforcement of the previously unenforced Policy, which required all individuals who lived or intended to live at the Park to present an original social security card or, in the absence of a Social Security number, an original passport, an original U.S. visa, and an original arrival/departure form.  *See* Dkt. No. 138, Ex. 3 at WAPLES00000750.  Simply put, the Policy demands certain proofs of legal immigration status as a precondition not just for becoming a lessee, but even for residing at the Park as an occupant together with a qualifying lessee.  Such a Policy is not a standard leasing practice; indeed, with the exception of federally subsidized low-income public housing complexes not relevant here, Defendants could not identify a single landlord that maintained a similar policy.  Dkt. No. 138, Ex. 25 at 85:15-17; 86:1-12; 88:13-89:12.  Additionally, although the Policy was technically in existence when the Plaintiffs moved into the Park, it was rarely enforced, and record evidence shows that Defendants initially acquiesced to the female Plaintiffs' residence at the Park despite their immigration status.  *See, e.g.,* Dkt. No. 138 at Ex. 8 ¶ 14, Ex. 9 ¶¶ 12-13, Ex. 11 ¶ 12, Ex. 17, Ex. 18 at 39:3-5, Ex. 20 at 49:9-22; 58:5-59:4; Ex. 32.

Once Defendants began enforcing the Policy through a process of "recertification" in 2015, the Plaintiffs were informed that they were in breach of the Policy, because even though each of the male Plaintiffs—the sole leaseholders—were in compliance with the Policy, the female Plaintiffs were not.  *See, e.g.,* Dkt. No. 138, Exs. 4-6.  Defendants also rejected the female Plaintiffs' efforts to furnish alternative forms of identification to satisfy these new requirements

for residency, such as passports, ITINs, and even already-completed criminal background checks. *See* Dkt. No. 138, Ex. 16 at 59:7-9; Ex. 20 at 50:7-53:2; Ex. 34.  As a result of the female Plaintiffs' noncompliance with the Policy, Defendants refused to renew the Plaintiffs' annual leases, instead putting them on month-to-month leases with $100 surcharges.  *See, e.g.,* Dkt. No. 138, Exs. 4-6. They also threatened eviction if Plaintiffs could not cure the violation of the Policy within 21 days, *id.*, which would force the female Plaintiffs to live apart from their husbands and children.  The combination of rent increases and eviction notices—and the stress stemming from both—operated to functionally evict the families from the Park.  *See, e.g.,* Dkt. No. 138, Ex. 16 at 83:15-84:19, Ex. 20 at 61:1-62:8, Exs. 38-39.  Presently, none of the Plaintiffs lives there  *Id.*

## ARGUMENT

I.    **DEFENDANTS SHOULD BE PRECLUDED FROM PRESENTING EVIDENCE OR FURTHER PURSUING ARGUMENTS WITH RESPECT TO STEP ONE OF THE INCLUSIVE COMMUNITIES STANDARD THAT HAVE BEEN REJECTED BY THE COURT OF APPEALS OR THIS COURT**

The Fourth Circuit explained that step one of the three-step *Inclusive Communities* framework requires a plaintiff to "demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class."  *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026, 204 L. Ed. 2d 218 (2019).  Throughout these proceedings, Defendants repeatedly (indeed, incessantly) proposed three arguments as to why Plaintiffs failed to satisfy step one, all of which have been rejected by the Court of Appeals and this Court:

- Plaintiffs failed to show that Defendants' Policy is "artificial, arbitrary, and unreasonable," *see, e.g.,* Dkt. No. 248 at 13-14;

- The "anti-harboring" provision of the Immigration Reform and Control Act, 8 U.S.C. § 1324(a)(1)(A)(iii), precludes Plaintiffs from demonstrating robust causality, *see, e.g., id.* at 10-13; and

- Plaintiffs failed to show a "robust causal connection" between Defendants' Policy and its impact on them as Latinos, because the female Plaintiffs' immigration status (and not their ethnicity) precluded them from fulfilling the policy, *see, e.g., id.* at 14-15.

Defendants should be precluded from presenting evidence or further pursuing any of these three arguments before the jury.

Defendants presented each of these arguments to the Court of Appeals. *See* Brief of Appellees at 37-39; 33-35, 24-27, Case No. 17-1723 (4th. Cir. Dec. 15, 2017), Dkt No. 50. None was accepted; indeed, several were specifically discussed and emphatically rejected. For example, the Fourth Circuit wrote at length "to correct the district court's grievous error in concluding that the female Plaintiffs' [immigration] status precluded them from making a *prima facie* showing of disparate impact." *Reyes v. Waples Mobile Home Park Ltd. Partnership*, 903 F.3d 415, 429 (4th Cir. 2018). In addition, the appellate court discussed Plaintiffs' statistical evidence at length, and specifically held that Plaintiffs "satisfied the robust causality requirement" of *Inclusive Communities* step one. *Id.* at 429; *see also* 433 n.11. Accordingly, the court held that "Plaintiffs have satisfied their burden under step one of the burden-shifting framework to make a *prima facie* showing of disparate impact." *Id.* at 433 n.12.

Notwithstanding the Court of Appeals' ruling, Defendants presented each of these arguments to this Court in a motion for summary judgment on remand. *See* Dkt. No. 248 at 13-14, 10-12, 7-10; Dkt. No. 277 at 4-7, 7-10. The Court rejected the arguments, found disputed issues of material fact with respect to steps two and three, and set the case for trial. *See* Dkt. No. 283.

Defendants then presented the arguments one more time, through a motion to clarify the Court's August 19 Order. Dkt. No. 285 at 2, 5-6. The arguments were then rejected one more time, in a decision in which this Court observed that the Fourth Circuit's decision was "unmistakably clear" that Defendants' arguments with respect to step one were foreclosed:

> It is not appropriate to relitigate step one on remand because to do so would violate the Fourth Circuit's mandate. Indeed, the Fourth Circuit has emphasized that district courts are "bound to carry out the mandate of the higher court [and] may not reconsider the issues laid to rest."

Dkt. No. 298 at 1, 3 (citations omitted).

Accordingly, this Court should enter an order barring Defendants from presenting evidence or further pursuing any of these three arguments before the jury. By definition, such matters are irrelevant (and therefore excludable under Federal Rule of Evidence 402) because the Court is precluded from considering them. *See id.* (quoting *United States v. Susi*, 674 F.3d 278, 283 (4th Cir. 2012)). *See also South Atl. Ltd. P'ship of Tn., LP v. Riese,* 356 F.3d 576, 584 (4th Cir. 2004) ("The mandate rule does not simply preclude a district court from doing what an appellate court has expressly forbidden it from doing. Under the mandate rule, a district court cannot reconsider issues the parties failed to raise on appeal; the court must attempt to implement the spirit of the mandate; and the court may not alter rulings impliedly made by the appellate court.").

And even if evidence related to these rejected legal theories were somehow relevant, it would be confusing and prejudicial – and therefore excludable under Federal Rule of Evidence 403. *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1060, 1064 (9th Cir. 2008) ("a party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury, even if the evidence might have been relevant in some conceivable manner"; "We agree with the district court's conclusion that the probative value of any reference to the erroneous legal principle . . . was substantially outweighed by the risk of misleading or confusing

the jury."). The burden-shifting framework is complicated enough; to allow a party to confuse a jury further by reciting inapplicable phrases like "artificial, arbitrary, and unreasonable" or "robust causal connection," or to incorrectly state or imply the female Plaintiffs' immigration status precluded them from making a prima facie showing of disparate impact, would be unfair and prejudicial.

Plaintiffs are not claiming that they have been granted summary judgment with respect to step one. *See id.* at 3 n. 4 ("Plaintiffs do not contend that the Fourth Circuit granted summary judgment on step one to plaintiffs, such that the jury need not be instructed about step one."). Plaintiffs must present evidence supporting their position, and Defendants will have the chance to test that evidence. But in addressing the *sufficiency* of that evidence, Defendants should be bound by the direction of the Fourth Circuit, and should not be allowed to renew these repeatedly-rejected arguments before the jury.[1]

## II.    THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE ON "BUSINESS NECESSITIES" FOR THE POLICY WITHOUT ADEQUATE FOUNDATION

Step two of the three-step disparate impact framework requires Defendants to "state and explain the valid interest served by the policies," which "is analogous to Title VII's business necessity standard[.]" *Reyes*, 903 F.3d at 424 (citations omitted). Throughout the pendency of

---

[1]    Defendants repeatedly made a fourth argument regarding step one: that Plaintiffs failed to produce statistical evidence of a disparate impact sufficient to meet the burden of production under step one. *See, e.g.*, Brief of Appellees at 53-55, Case No. 17-1723 (4th Cir. Dec. 15, 2017), Dkt. No. 50; Dkt. No. 248 at 15-23; Dkt. No. 277 at 14 n.6; Dkt. No. 285 at 5-6. That argument was also repeatedly rejected. *Reyes*, 903 F.3d at 433 n.12 ("Plaintiffs have satisfied their burden under step one"); Dkt. No. 298 at 1, 3. Plaintiffs do not seek a separate order addressing that argument, because the substance of the argument was addressed (and rejected) again in the Court's decision rejecting Defendants' motion to strike the testimony of Plaintiffs' statistical expert, Prof. William Clark. *See* Dkt. No. 311.

this litigation, Defendants provided several purported justifications for the Policy to satisfy step two, namely:  (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability for harboring illegal aliens under the Immigration Reform and Control Act (the "ICRA"), and (5) to underwrite leases.  Dkt. No. 248 at 2.  But very few individuals were able to testify to these purported Policy justifications: some stated that they were unaware of any justifications, while others testified to a limited number of justifications, and still others refused to testify to the justifications at all.  Defendants have also pointed to evidence in their summary judgment briefing to which none of their witnesses can testify.  And certain witnesses testified to purported justifications for the Policy that are simply inapplicable here, including the anti-harboring statute or underwriting requirements imposed on federally funded low-income public housing, which therefore risk unduly confusing the jury.  Thus, Plaintiffs respectfully request that the Court preclude evidence, testimony, and argument relating to Defendants' purported justifications for the Policy lacking an adequate foundation in any particular witnesses' personal knowledge and in the factual record.

A.    **The Court Should Preclude Defendants from Eliciting Testimony Regarding Alleged "Business Necessities" Without Adequate Foundation**

Federal Rule of Evidence 602 provides, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."  During discovery, only Defendants' corporate representative, Mark Jones, provided testimony as to each of each of Defendants' purported justifications for the Policy.  Dkt. No. 138, Ex. 21 (Rule 30(b)(6) Dep. Tr.) at 139:6-140:21.  None of Defendants' other witnesses were able to testify to same:

- Albert Dwoskin, Defendants' President and CEO, testified that it had been fifteen to twenty years since he was involved in developing Defendants' rental policies, and admitted that he was only familiar with the policies at issue by virtue of the litigation. *See* Dkt. No. 138, Ex. 25 (Dwoskin Dep. Tr.) at 50:12-52:5. Other than that, he refused to testify to the reasons underlying the Policy, incorrectly claiming that he had already testified to same. *Id.* at 78:19-84:13. In doing so, he claimed to rely on counsel's improper instruction not to answer due to the question's cumulative nature. *See* Ex. 1 (Dwoskin Tr.) at 80:23-84:13.

- Carolina Easton, Defendants' former Quality Control Manager, similarly disclaimed knowledge of the reasons behind the Policy, stating that she was not involved in creating it. *See* Ex. 2 (Easton Dep. Tr.) at 30:10-16; *see also id.* at 178:25-179:8.

- Peter Williams, Defendants' former Director of Commercial Leasing and General Manager, testified that he was unaware of the reasons the Policy was created. *See* Ex. 3 (Williams Dep. Tr.) at 53:4-9. Instead, he testified to what he understood to be three "guiding principles": verifying identity, conducting criminal background checks, and lease underwriting. *Id.* at 52:6-53:5.

- Josephine Giambanco, Defendants' former property manager, testified that she had no understanding of the reasons behind the Policy, and instead just "follow[ed] [the Policy] to the best of [her] knowledge." Ex. 4 (Giambanco Dep. Tr.) at 57:15-25.

Even Mark Jones, Defendants' Rule 330(b)(6) corporate representative, admitted that he lacked personal knowledge of the reasons underlying the Policy to an extent: he testified that his understanding of Defendants' potential liability under the anti-harboring provision was largely based on his conversations with litigation counsel. *See* Ex. 5 (Rule 30(b)(6) Dep. Tr.) at 227:18-228:5. More tellingly, Mr. Jones testified that there was "nothing specific" that he believed would subject Defendants to criminal liability for leasing to undocumented immigrants. Dkt. No. 138, Ex. 21 at 138:18-139:5.

It is plain from these witnesses' prior testimony that the vast majority of them lack personal knowledge of the purported justifications for the Policy; thus, they should be precluded from testifying to same under Federal Rule of Evidence 602 without a proper foundation being laid as to when and how they learned of these purported justifications. And no purported business justification should be argued to the jury unless evidence has been introduced, or a witness has

first testified on personal knowledge, that the justification pre-existed the events at issue in this lawsuit.

**B.**      **The Court Should Preclude Defendants from Eliciting Testimony Regarding Materials Supporting their "Business Necessities" Without Adequate Foundation**

For similar reasons, the Court should preclude Defendants from introducing evidence or argument regarding the Treasury Inspector General's 2009 and 2018 reports regarding individual taxpayer identification numbers ("ITINs") unless they can lay an adequate foundation for same with their witnesses.[2]  Defendants referenced the Treasury Inspector General's reports in their Motion for Summary Judgment (Dkt. 248) to support their argument that ITINs are a poor substitution for the Policy as it pertains to verifying identity and conducting credit and criminal background checks.  Dkt. 248 at 29-30.  Under the Federal Rules of Evidence, however, the reports are hearsay, Fed. R. Evid. 802, and thus Defendants must demonstrate that the reports fall under a hearsay exception, Fed. R. Evid. 803.  But even if the reports were not hearsay, there is no evidence that any of Defendants' witnesses were aware of them, let alone considered them in formulating the Policy.  The reports are therefore irrelevant to step two of the *Inclusive Communities* standard insofar that they cannot support Defendants' stated "business necessities" if Defendants' witnesses were not even aware of them.  This is particularly true of the 2018 report, which was published long after the Plaintiffs had left the Park, and thus could not have motivated Defendants to create the Policy or enforce it against Plaintiffs.  The Court should therefore preclude Defendants from introducing evidence argument relating to these reports to the jury unless Defendants can show

---

[2]  *See Individual Taxpayer Identification Numbers Are Being Issued Without Sufficient Supporting Documentation,* U.S. Dep't of Treasury (Dec. 8, 2009), *available at* https://www.treasury.gov/tigta/auditreports/2010reports/201040005fr.html; Dkt. 248, Ex. 8.

when and how their witnesses learned of these documents and, for relevance purposes, how they considered them in forming the Policy.

### C.    The Court Should Preclude Defendants from Eliciting Evidence Regarding Alleged "Business Necessities" that Are Inapplicable to their Business

In their struggle to find "business necessities" to justify the Policy, Defendants have claimed several justifications that have no applicability to their business whatsoever, namely, compliance with the ICRA anti-harboring statute, 8 U.S.C. § 1324, and compliance with the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), 8 U.S.C. § 1611.   As an initial matter, because each of these purported justifications involve the interpretation and application of a legal statute, Defendants' witnesses are not qualified to testify as to whether such statutes would apply to their business.  *See, e.g., United States v. McIver*, 470 F.3d 550, 561–62 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." (citing *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *Okland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998)).  Rather, such legal conclusions lay squarely within the province of the Court. *See Plum Creek Timberlands, L.P. v. Yellow Poplar Lumber Co., Inc.,* No. 1:13CV00062, 2016 WL 6837173, at *3 (W.D. Va. Nov. 21, 2016) (excluding testimony amounting to legal opinions because it"[invaded] the province of the court").  Beyond that, however, Plaintiffs' stated reasons for shaping their Policy around these statutes are unavailing:  Defendants' act of leasing property to undocumented immigrants does not violate the ICRA's anti-harboring provision, and, because Defendants do not receive federal funding, the PRWORA does not apply to them.  And it cannot be that compliance with an inapplicable federal law constitutes a "business necessity."  *See Rhode Island Com'n for Human Rights v. Graul,* 120 F. Supp. 3d 110, 127-128 (D. R.I. 2015) (finding that misinterpreted legal standard "cannot be said to be necessary to achieve a valid interest" under

the second prong of the disparate impact standard (internal citations and quotation marks omitted)). Plaintiffs therefore request that the Court preclude Defendants from introducing evidence or argument on the ICRA's anti-harboring provision and the PRWORA, and issue an instruction to the jury that a mistake of law cannot constitute a "business necessity" under step two of the *Inclusive Communities* framework.

      1.   <u>Leasing property to undocumented immigrants would not subject Defendants to liability under the ICRA</u>

The ICRA's anti-harboring provision does not constitute a valid business interest under step two of the burden shifting framework because merely renting to undocumented immigrants, without more, does not violate the ICRA's anti-harboring provision.  The anti-harboring provision makes it illegal to "knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceal[], harbor[], or shield[] from detection such alien."  8 U.S.C. § 1324 (a)(1)(A)(iii).  Thus, the statute, on its face, does not require that Defendants refrain from leasing property to undocumented immigrants.  Nor have appellate courts who have considered this issue found as much.  *See United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police is ... not an offense under §1324(a)(1)(A)(iii).");  *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking immigration status constitutes harboring.");  *see also Lozano v. City*

*of Hazleton*, 724 F.3d 297, 320 (3d Cir. 2013); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 529 (5th Cir. 2013).[3]

Defendants have repeatedly cited *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012), a case which apparently involved a rooming-house, but that was an unpublished opinion which—unlike the Fourth Circuit decision here—is "not even regarded as binding precedent." *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996). But even in *Aguilar,* however, this Court noted that an individual possesses the pertinent *mens rea* when said individual acts "with reckless disregard" and "consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien." 477 F. App'x at 1002. Thus, because the defendant "admitted that 'it was the same' to her whether her tenants possessed proper documentation or not," and failed "to ascertain the status of her tenants even after repeatedly being warned by officials that numerous of her tenants were not properly documented," she possessed the requisite *mens rea* for conviction. *Id.* Defendants have submitted no evidence of (1) any conduct approaching the deliberate concealment described in the appellate decisions cited above; or (2) any intent approaching the "reckless disregard" of the defendant in *Aguilar.* As such, the Court should preclude Defendants from introducing any evidence or argument regarding the ICRA's anti-harboring statute provision in the context of step two of the *Inclusive Communities* standard.

---

[3] The Fourth Circuit implicitly rejected a similar argument that Defendants briefed extensively on appeal: Defendants argued that they "do[] not have 'discretion' to ignore IRCA's anti-harboring criminal prohibition," and that lack of discretion "severs any conceivable causal connection between the Policy and the impact on Plaintiffs." Br. of Appellees at 34-35, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, No. 17-1723 (4th Cir. Dec. 15, 2017), Doc. No. 50. The Fourth Circuit nevertheless found a "robust causal connection" between Defendants' Policy and the Plaintiffs' harm, 903 F.3d at 433 and n.12, which necessarily means that the court rejected Defendants' argument that the causal connection was "sever[ed]."

2.    The PRWORA does not apply to Defendants because they are not federally underlined funded

Additionally, Defendants have attempted to bolster their alleged interest in lease underwriting by claiming federal law requires landlords to verify the legal status of residents or risk not being able to underwrite them.  *See* Dkt. No. 256, Ex. 2 (Caruso Dep. Tr.) at 25:11-26:7. This federal law, the PRWORA, bars federal public housing subsidies to non-U.S. citizens other than "qualified aliens."  8 U.S.C. § 1611(a), (c)(1)(B).  However, the trailer park at issue in this litigation does not receive federal subsidies, Ex. 5 (30(b)(6) Dep. Tr) at 28:10-29:3, and thus inarguably is not subject to the PRWORA.  Mr. Caruso, their expert witness on this topic, agrees. *See* Dkt. No. 256, Ex. 2 at 29:15-30:4 (testifying that federal law only applies to publicly funded housing).  Defendants argue that "it is reasonable to adopt 'the most restrictive standard, which is the federal standard.'" Dkt. No. 248 at 27.  But, when faced with the prospect of a disparate impact on a protected class, "reasonable" is simply not enough.  *See Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 988 (4th Cir. 1984) (distinguishing evidence of a "business necessity" from evidence of a "legitimate non-discriminatory reason for the challenged practice" by stating that it is a "different and more difficult standard").  As with the ICRA's anti-harboring provision, the Court should therefore preclude Defendants from introducing any evidence or argument regarding the PRWORA in the context of step two of the *Inclusive Communities* standard.  A jury instruction that mistakes of law cannot constitute business necessities under step two would further bolster such a ruling.

III.    **THIS COURT SHOULD RESTRICT CROSS EXAMINATION REGARDING THE FEMALE PLAINTIFFS' IMMIGRATION STATUS**

The Policy at issue in this litigation is directed at undocumented individuals.  The basis of Plaintiffs' claim is that, in that particular census tract of Fairfax County, where a policy targets

undocumented individuals, the Latino population suffers a disparate impact.  In arguing that they are among those disparately impacted by this Policy, the female Plaintiffs have conceded—and the fact is undisputed—that they lack immigration status.  Further, the Fourth Circuit has already determined that the female Plaintiffs' lack of legal immigration status does not preclude them from making a prima facie showing of disparate impact.  At trial, this fact can be established at the start of the trial by presenting the jury with each Plaintiff's answers to the relevant Requests for Admission on this topic.  Therefore, additional testimony as to the immigration status of each Plaintiff does not serve any further probative purpose.  Further, there are strong community passions on the topic of illegal immigration, and additional testimony on this point runs the risk of awaking such passion in the jury.  For these reasons, additional testimony regarding the Plaintiffs' immigration status should be excluded as unfairly prejudicial under Rule 403.

Evidence of the female Plaintiffs' immigration status should be restricted because such evidence has no probative value beyond showing that they cannot comply with Defendants' policy (which can be established through the Requests for Admission), but would be unfairly prejudicial to Plaintiffs. Relevant evidence may be excluded "if the probative value of the evidence is substantially outweighed by unfair prejudice that will result from its admission . . . [unfair prejudice] refers to an undue tendency of evidence to influence a jury to make a decision for reasons unrelated to the probative value of the evidence." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014) (internal citations omitted); *see also* Fed. R. Evid. 403. "[U]sually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'" *United States v. Daulton*, 266 F. App'x 381, 385 (6th Cir. 2008) (quoting Fed. R. Evid. 403 cmt.)

In this case, the Fourth Circuit made clear that "Plaintiffs' disparate impact claim is not precluded simply because the female Plaintiffs cannot satisfy the Policy because they are illegal immigrants when they have alleged that the Policy disparately impacts Latinos." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 432 (4th Cir. 2018).

Other courts have agreed that, where a law protects illegal aliens, reference to their immigration status should be excluded. In *Uto v. Job Site Services, Inc.*, an employer sought to discover evidence of the employees' immigration status. In issuing a protective order barring that discovery, the court found that allowing discovery of the employees' immigration status would cause a chilling effect which would "effectively eliminate the FLSA as a means for protecting undocumented workers from exploitation and retaliation." 269 F.R.D. 209, 212 (E.D.N.Y. 2010). Similarly, the court in *Orellana v. Tecta America South Florida, Inc.* excluded evidence of the plaintiff's immigration status, finding that "because FLSA protects undocumented workers, there is no probative value to introducing evidence regarding Plaintiff's immigration status." No. 10-20137-CIV, 2011 WL 13220457, at *1 (S.D. Fla. May 23, 2011). *See also Romero v. Prindle Hill Constr., LLC*, No. 3:14CV01835, 2017 WL 3390242, at *4 (D. Conn. Aug. 7, 2017).

Now more than ever, there are strong sentiments, both approving and disapproving, surrounding the topic of illegal immigration.[4] Additional testimony relating to the female Plaintiffs' lack of immigration status may cause the jury to make a decision based on their emotions as to immigration, rather than on the evidence. *See Daulton,* 266 F. App'x at 385. For example, in

---

[4] *See, e.g.*, *Little Partisan Agreement on the Pressing Problems Facing the U.S.*, Pew Research Center (2018), *available at* https://www.pewresearch.org/politics/2018/10/15/little-partisan-agreement-on-the-pressing-problems-facing-the-u-s/ ("[I]llegal immigration is the highest-ranked national problem among GOP voters, but it ranks lowest among the 18 issues for Democratic voters (75% and 19%, respectively, say it is a very big problem).").

*Doe v. Bd. of Trustees of Nebraska State Colleges*, the court found that "the plaintiff's testimony about her native home and her ethnic origin will sufficiently inform the jury about her nationality and background. The Court finds that adding evidence concerning the legal process of maintaining her immigration status unduly increases the likelihood of prejudice toward her and the immigration system in general." 2020 WL 2793558, at *2 (D. Neb. May 29, 2020). *See also Martinez v. Cont'l Tire Americas, LLC*, 2020 WL 4464550, at *8 (D.N.M. Aug. 4, 2020); *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 999 (4th Cir. 2020) (Agee, C.J., dissenting) ("'[R]epeated references to a party's citizenship or nationality can be unduly prejudicial to that party . . . .  Trial courts have been repeatedly cautioned to guard against such bias-baiting arguments." (Internal citations omitted.)).

Because the female Plaintiffs' lack of immigration status is undisputed and does not preclude their claim, the fact of each female Plaintiff's immigration background is of no further probative value beyond what is established via the Requests for Admission. Meanwhile, further evidence as to the female Plaintiffs' lack of status risks awakening the passions of the jury. Therefore, any additional questioning on the subject can only serve to improperly influence the jury and should be restricted under Rule 403.

Finally, Plaintiffs (female and male alike, as only one of the four male Plaintiffs is a lawful permanent resident) can be expected to feel embarrassment and fear around answering detailed questions regarding their immigration status and history in a public setting.  Rule 611(a)(3) provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to […] protect witnesses from harassment or undue embarrassment." *See Alford v. United States*, 282 U.S. 687, 694 (1931) ("There is a duty to protect [the witness] from questions which go beyond the bonds of proper cross-examination merely to

16

harass, annoy or humiliate him."). In addition to its unduly prejudicial effect, this Court should restrict superfluous testimony regarding Plaintiffs' immigration status or lack thereof under Rule 611(a)(3) because once the evidence has established that fact, further cross examination that point can only serve to unduly embarrass and harass Plaintiffs.

## IV.    EVIDENCE OF DEFENDANTS' RELATIONSHIP WITH OR VIEWS OF THE LATINO COMMUNITY SHOULD BE EXCLUDED

### A.    Evidence of Defendants' Views or Opinions on Immigration Are Irrelevant and Should Be Excluded

Any evidence of the Defendants' views or opinions as to immigrants or immigration should be excluded as irrelevant because this action is based on a disparate impact theory of liability. A fact is relevant under Federal Rule of Evidence 401 when it tends to make a fact in issue more or less likely than it would be without the evidence. Disparate impact theory assesses the discriminatory effect of a policy without regard for the opinions, intentions, or motivations informing it, *see Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015). In other words, "[p]roof of discriminatory motive, we have held, is not required under a disparate impact theory." *Teamsters v. United States*, 431 U.S. 324, 335-36, n.15 (1977).

In *Griggs v. Duke Power Co.*, the Supreme Court found that the employer's "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." 401 U.S. 424, 432 (1971). In that case, the court noted a lack of discriminatory intent, but determined that "Congress directed the thrust of the [Fair Labor Standards] Act to the consequences of employment practices, not simply the motivation." *Id. See*

*also Burwell v. E. Air Lines, Inc.*, 633 F.2d 361, 374 (4th Cir. 1980) ("[A] complainant need not prove discriminatory motive in a case that discloses discriminatory impact.").

Likewise here, the relevant question is not whether the Defendants intended to create a discriminatory policy, or was motivated by discriminatory intent; the question is simply whether Defendants' Policy led to a disproportionately discriminatory outcome. Because opinions, intentions, and motivations behind a policy do not make it more or less likely that a minority group is disparately impacted by that policy, they are not relevant under Federal Rule of Evidence 401 and should be excluded under Federal Rule of Evidence 402.

**B.      Evidence that Defendants or Defendants' Employees Have FHA Training Is Irrelevant and Should be Excluded**

Likewise, any evidence of Defendants' or Defendants' employees' Fair Housing Act training should be excluded as irrelevant because this action is based on a disparate impact theory of liability, and such evidence does not make it more or less likely that a disparate impact occurred. *See* Fed. R. Evid. 401.

As discussed above, under the disparate impact theory, the appropriate measure of liability is whether the policy caused a minority group to be disproportionately affected, and intent is not an element of a prima facie case. *See Inclusive Communities Project, Inc.*, 576 U.S. at 524. *See also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422 (1975) ("Title VII is not concerned with the employer's good intent or absence of discriminatory intent for Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." (Internal quotations omitted)). Any evidence as to professional trainings or certifications of Defendants' employees has no probative value beyond showing a possible lack of discriminatory intent. However, because intent is not an element under disparate impact theory, such evidence does not bear on the likelihood that the policy in issue disparately impacts a minority group. Therefore,

any evidence that Defendants received Fair Housing Act trainings or certifications is irrelevant under Federal Rule of Evidence 401 and should be excluded under Federal Rule of Evidence 402.

### C.    Evidence that Defendants Specifically Advertised in Spanish Is Irrelevant and Should Be Excluded

Finally, any evidence that Defendants advertised their business in Spanish should be excluded as irrelevant because such evidence does not make it more or less likely that a protected class suffered a disparate impact. *See* Fed. R. Evid. 401. Evidence of any Spanish-language outreach or advertisement—similar to evidence of Defendants' views on immigration, or evidence of FHA training—only serves to show a lack of discriminatory intent, which, again, is not an element under disparate impact theory.  For the exact same reasons discussed in Sections IV.A-B above, this evidence is not relevant under Federal Rule of Evidence 401 and should be excluded under Federal Rule of Evidence 402.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant each of Plaintiffs' motions *in limine.*

Respectfully submitted,


_____//s//_____          January 11, 2021
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Nady Peralta, VSB #91630
Granville C. Warner, VSB 24957
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
nady@justice4all.org
cwarner@justice4all.org

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kaiyeu Kevin Chu, VSB #85746
Matthew Traupman (pro hac vice)
Gianna Puccinelli (pro hac vice)
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
kevinchu@quinnemanuel.com
matthewtraupman@quinnemanuel.com
giannapuccinelli@quinnemanuel.com

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on January 11, 2021, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.


_____//s//_____    Dated: January 11, 2021

Simon Sandoval-Moshenberg, VSB #77110
*simon@justice4all.org*
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454