**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, <br><br> *Defendants*. | Civ. No. 1:16-cv-00563 (LO/TCB) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE OF THE ETHNICITY OF INDIVIDUALS AT THE PARK
ALLEGEDLY AFFECTED BY THE POLICY**

Plaintiffs, by counsel, hereby submit the following memorandum of law in opposition to Defendants' Motion *in Limine* to Exclude Evidence of the Ethnicity of Individuals at the Park Allegedly Affected by the Policy (Dkt. No. 322).

## Introduction

Plaintiffs are four Latino couples who challenge a housing policy (the "Policy") under the Fair Housing Act on the grounds that it disproportionately prevents Latinos, as compared to non-Latinos, from living in Waples Mobile Home Park (the "Park"). The Park is owned and operated by Defendants.

Defendants seek two results in this Motion. First, they seek to prevent Plaintiffs from "present[ing] any evidence or argument as to the ethnicity of tenants or individuals at Waples Mobile Home Park who were allegedly affected by the Policy." Dkt. 322-001 (proposed order). Second, they seek to exclude fourteen of Plaintiffs' exhibits, which include lists of Park tenants

1

generally, and materials related to the specific tenants who – like Plaintiffs – were forced out of the Park by enforcement of the Policy. *Id.*

Defendants' arguments are based on two charts that Plaintiffs submitted during summary judgment briefing. In accordance with Federal Rule of Evidence 1006, those charts summarized three pieces of evidence: two documents produced by Defendants that identified tenants who were unable to meet the terms of the Policy, and a very large spreadsheet published by the Census Bureau on its web site. The Census Bureau document reports how people using each of thousands of different surnames describe their own ethnicity. The charts submitted by Plaintiffs showed that nearly all tenants who were unable to meet the Policy had surnames that, according to the Census spreadsheet, were overwhelmingly used by people who identified themselves as Latino.

Defendants argue that the charts could only be created by an expert, and that the chart creator cannot serve as a witness in any event. In addition, they argue that the jury should not even be able to see the names of the Park residents who were subject to eviction, because they might "reach improper assumptions about Latino-sounding surnames on the lists." Defendants' Memorandum ("Def. Mem.") Dkt. 323 at 13.

Those arguments miss the point. The charts are not expert testimony; they simply summarize voluminous, admissible evidence – which Defendants themselves used when they found it convenient. And that evidence completely contradicts Defendants' claim that the jury might "reach improper assumptions about Latino-sounding surnames"; in fact, the Census Bureau spreadsheet shows that it is *highly likely* that they will reach the *correct* conclusion.

Even though Defendants' arguments miss the point, there is a point to be made. Plaintiffs mistakenly failed to identify either the summary charts or the Census spreadsheet that the charts

relied upon in their exhibit list. Plaintiffs seek to remedy that mistake today, through a motion to amend their exhibit list to include the Census Bureau spreadsheet and a summary chart of relevant data, and to amend their witness list to include a witness who can sponsor the summary chart.

## Background

The Complaint alleges that Defendants' Policy "adversely affects Latinos in a significantly disproportionate way" because a majority of the undocumented population in Virginia is Latino, while the entire population is less than ten percent Latino. Dkt. 1 at ¶ 62. The Court of Appeals held that those allegations "sufficiently alleged a *prima facie* case of disparate impact." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428 (4th Cir. 2018).

Plaintiffs supported the allegations through the expert testimony of Dr. William A.V. Clark, Research Professor of Geography at UCLA. Dkt. 294-1, 294-3 (expert report and reply). Dr. Clark demonstrated that Latinos in the relevant area are nearly seven times as likely to be undocumented as other groups, and therefore nearly seven times more likely to be affected by the Policy. Dkt. 294-1 at 5.

Plaintiffs submitted additional evidence at summary judgment, through two charts that summarized documents produced by the Defendants. Dkt. 157-9. The documents produced by Defendants identify the tenants who were actually being forced to leave the Park because of the Policy. One document reflects a "file review" conducted by Defendants in 2016, which listed twelve tenants who "can not renew" their leases, and the "reason" that each tenant cannot renew. Def. Mem. Ex. 2 (WAPLES 00002442); Dkt. 138-1. The second Defendant document reflects a list of tenants, what is "missing" for each, and whether or not the tenant has supplied the

3

"missing" item. Def. Mem. Ex. 1 (Pl.'s Ex. 104 at 1-2)[1]; Dkt. 138-41. Plaintiffs' counsel created a summary chart for each of the two Defendant documents, listing the names of the tenants who "can not renew" or did not produce "missing" materials. The summary charts also refer to a spreadsheet published by the U.S. Census Bureau, titled "Frequently Occurring Surnames from the 2010 Census." https://www.census.gov/topics/population/genealogy/data/2010_surnames.html. Dkt. 157-9 at 1, fn. 1 (hereafter, "2010 Census Document"). The 2010 Census Document lists, for every name that occurred more than 100 times in the 2010 census, the ethnicity reported by people who use that name. *See* https://www2.census.gov/topics/genealogy/2010surnames/surnames.pdf (explanatory document). The resulting charts show that the eleven of twelve tenants subject to eviction used surnames that were unmistakably Latino: between 87.88% (Cruz) and 98.59% (Mendez Sanchez) of the time, those names were used by people who identified themselves as Latino. Dkt. 157-9 at 2.

The Court of Appeals found this supplementary evidence to be compelling. Although it concluded that Plaintiffs' primary evidence (that Latinos were much more likely to be undocumented, and therefore much more likely to be affected by the Policy) "satisfied the robust causality requirement," 903 F.3d at 429, it observed that the material summarized in the charts was "additional, stronger evidence . . . on the disparate impact theory of liability," 903 F.3d at 433 n.11.

Plaintiffs mistakenly failed to list the 2010 Census Document on their exhibit list, and a motion seeking leave to amend that list to include the Census document and a summary chart is

---

[1] Defendants' Exhibit 1 lacks Bates numbers, and it includes several sets of documents that were separately identified as exhibits by Plaintiffs. The documents relevant here are the first two pages in Defendants' Exhibit 1, which are identified by a cover sheet as "Pls.' Ex. 104."

4

filed today. That motion also seeks leave to amend Plaintiffs' witness list to include a paralegal employed by Plaintiffs' counsel who can sponsor summary charts under Federal Rule of Evidence 1006, to avoid the need to submit the "voluminous" 2010 Census Document.

## Argument

According to a document created by Defendants' employees, the surnames of the individuals who were subject to eviction in May 2016 were: Dabowski, Rivera, Cruz, Moya, Bolanos, Cespedes, Lopez Rodriguez, Benitez, Reyes, Mendez Sanchez, Serrano, and Flores. Def. Mem. Ex. 2 (WAPLES 00002441-46); Dkt. 157-9 at 2.

According to data created and published by the U.S. Census Bureau, eleven of the twelve surnames on that list (all but Dabowski) are overwhelmingly used by people who identify themselves as Latino: between 87.88% (Cruz) and 98.59% (Mendez Sanchez) of people with those surnames identify themselves as Latino. 2010 Census Document, https://www.census.gov/topics/population/genealogy/data/2010_surnames.html.

According to the Court of Appeals, this is "stronger" evidence of disparate impact than the Plaintiffs' evidence regarding the undocumented Latino population generally, 903 F.3d at 433 n. 11, which itself was found to be sufficient meet the "robust causality requirement" of *Tex. Dept. of Housing and Cmty. Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015), 903 F.3d at 429.

Predictably, Defendants seek to exclude this "stronger" evidence – arguing first that only experts can copy numbers from the 2010 Census Document, and second that the probative value of the evidence is outweighed by "unfair prejudice." Neither argument has merit.

5

## I. Charts Summarizing Defendants' Documents and Public Census Data Are Not "Opinion" Testimony That Must Be Offered by an Expert Witness.

The charts summarizing Defendants' documents and the 2010 Census Document do not constitute "opinion" testimony in any sense, and do not require an expert under Federal Rule of Evidence of 702. Instead, the charts are summaries of "voluminous" evidence of the type specifically allowed by Federal Rule of Evidence 1006.

The declaration accompanying the charts describes the simple process used to create them:

> 2. The United States Census Bureau makes publicly available a list of frequently occurring surnames from the 2010 Census, including File B, titled "Surnames Occurring 100 or more times. [Footnote 1: See United States Census Bureau, "Frequently Occurring Surnames from the 2010 Census, available at http://census.gov/topics/population/genealogy/data/2010_surnames.html.]
>
> 3. In connection with the above-captioned action, I reviewed the official U.S. Census Data for the surnames at issue in Exhibits 1 and 41 to Plaintiffs' opening brief. The relevant results are excerpted below. "Percent Hispanic" refers to the likelihood that a given surname belongs to an individual who is Hispanic.

Dkt. 157-9 at 1-2. In other words, Plaintiffs' counsel merely wrote down the names of tenants subject to eviction from the documents created by Defendants, then looked up those names on the 2010 Census Document, and then copied down the percentage from the "Percent Hispanic or Latino Origin" column for each name. There was no opinion offered; there was no expertise required.[2]

---

[2] In fact, Defendants apparently used the same process in their own summary judgment memorandum, albeit with an older Census chart. Dkt. 98 at 16 and n.4. Their brief asserts that "there is evidence that Defendants required non-Latino undocumented immigrants to comply with the Policy," supported that assertion by citing to a letter apparently addressed to a tenant named "Krishna," and then cited to a version of the same Census Bureau chart from 2000 to show that the tenant was "likely . . . of Asian or Pacific Island descent." *Id.*

Accordingly, the charts are not governed by Federal Rule of Evidence 702, which addresses opinion testimony by experts, but rather by Federal Rule of Evidence 1006, which allows the "use [of] a summary, chart, or calculation to prove the content of voluminous writings, recordings or photographs that cannot be conveniently examined by the court." The charts submitted by Plaintiffs' counsel were merely a convenience; Plaintiffs could have gotten to the same point by attaching a copy of the 2010 Census Document as an exhibit to their summary judgment papers and asking the Court to conduct its own search. But that Document is thousands of pages long; it contains 162,255 separate lines of data. So for the convenience of the Court and parties, Plaintiffs offered a summary of the relevant data. *See United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) ("The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents."); *United States v. Blackwell*, 436 F. App'x 192, 199 (4th Cir. 2011) (describing application of Rule 1006).

Notably, Defendants *do not* claim that the summary charts are inaccurate; the charts clearly *are* accurate. Defendants *imply* inaccuracy by repeatedly stating that Plaintiffs' counsel "purportedly" compared tenant names to the census chart, Def. Mem. at 2, 4, but they never point to any place where the chart and the summarized documents diverge. Similarly, they grumble that they "were never able to examine [Plaintiffs' counsel] to determine exactly what data he reviewed." *Id.* at 4 n.3. But what would that examination be? Plaintiffs' counsel described exactly what he did, and provided references to each name and number so those could be checked. Federal Rule of Evidence 1006 states only that "[t]he proponent must make the originals or duplicates available for examination or copying," and in this case two of the

7

documents were created by Defendants, and the remaining document was easily available on a public web site.

Nor do Defendants claim that the 2010 Census Document is inadmissible. That Document is self-authenticating under Federal Rule of Evidence 902(5) ("publication purporting to be issued by a public authority"), and admissible under Federal Rule of Evidence 803(8) (public records). *E.E.O.C. v. E.I. DuPont de Nemours & Co.*, 2004 WL 2347559, at *1-2 (E.D. La. Oct. 18, 2004) (Census Bureau table authenticated under Rules 901(a) and 902(5), and admissible under Rule 803(8)); *Williams v. Long*, 585 F. Supp. 2d 679, 688 (D. Md. 2008) (quoting *EEOC v. DuPont* with respect to authentication).

Defendants' only argument is that creation of the summary charts required an expert, but that isn't true. *United States v. Milkiewicz*, 470 F.3d 390, 401 (1st Cir. 2006) ("creating summaries of the data took patience but not expertise"); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 30 (1st Cir. 2011) (argument that a "paralegal . . . lacked the requisite expertise" to prepare summary charts was a "non-starter"). Indeed, but for the size of the 2010 Census Document, the members of a jury could easily perform the same tasks performed by Plaintiffs' counsel to create the charts at issue here: they could find names on Defendants' documents describing who was unable to meet the Policy, look for those names on the 2010 Census Document, and read the percentage of people with each of those names who identified themselves as Latino.

To support their claim that expertise is required, Defendants' repeatedly refer to the exercise used to create the charts as a "'surname analysis'" – using quotes as if they were repeating a description offered by Plaintiffs. *E.g.*, Def. Mem. at 2 ("the evidence supposedly supporting this claim comes *only* from a 'surname analysis' allegedly performed by Plaintiffs'

8

former counsel"). But Plaintiffs never described the creation of these charts as a "surname analysis." Instead, they stated that the charts were "based on the U.S. Census Bureau's surname analysis." Dkt. 157 at 7. Plaintiffs' counsel never claimed to do any analysis whatsoever; he simply copied names from the documents produced by Defendants, and numbers from the 2010 Census Document. Accordingly, the cases cited by Defendants, where lay witnesses were not permitted to conduct "surname analyses," are entirely beside the point. *Compare Harvick v. Oak Hammock Pres. Cmty. Owners Ass'n Inc.*, 2016 WL 362434, at *3 (M.D. Fla. Jan. 29, 2016) (*pro se* litigant performed unspecified "internet research" to determine that 22 homeowners were of Asian descent); *Perez v. City of Batavia*, 2004 WL 2967153, at *9, *7- *10 (N.D. Ill. Nov. 23, 2004) (detailed analysis of arrest statistics conducted by employee of plaintiffs' counsel had "four major methodological flaws," including changing the ethnic status that was reported by arresting officers).[3]

Accordingly, charts summarizing Defendants' documents and the 2010 Census Document do not constitute require the intervention of an expert under Federal Rule of Evidence of 702.

---

[3] Defendants also take issue with surname analyses generally, based on several voting rights cases. Again: those cases are beside the point for current purposes, because the charts at issue here were not "analyses." But Plaintiffs' expert, Dr. Clark, did perform a "surname analysis" of residents of the Park based on a list created by Defendants. Dkt. 294-1 at 5; Def Ex. 5 (WAPLES1335-37; Pls'. Ex. 110) And although Defendants vigorously contested Dr. Clark's report, *see* Dkt. 294, 302, 304, 311 (order denying motion to strike), they have not contested his surname analysis. In any event, the voting rights cases cited by Defendants do not – as Defendants imply – discard surname analyses. Instead, those cases express a preference for the use of "census data based upon self-identification," *Rodriguez v. Bexar Cty.,* 385 F.3d 853, 867 (5th Cir. 2004), which is precisely the type of data that is reported in the 2010 Census Document.

## II. There Is No Basis for Excluding Defendants' Records or Other Evidence Reflecting the Names and Ethnicity of Tenants.

Separately, Defendants assert that fourteen exhibits identified by Plaintiffs – each consisting of documents created by Defendants – should be excluded under Federal Rule of Evidence 403. Def. Mem. at 12-13. Those documents (which include the two documents that Plaintiffs' counsel used to create the charts used in summary judgment briefing) list the names of Park tenants, and in some cases the names of tenants who were unable to meet the Policy at issue in this case. *See* Def. Mem. Exs. 1-7. Defendants argue that these documents would create "unfair prejudice" because the jury might conclude that individuals with Latino-sounding surnames are, in fact, likely to be Latino. Def. Mem. at 13. In addition, Defendants assert that Plaintiffs should be precluded from "presenting any evidence or argument as to the ethnicity of tenants or individuals at the Park who were allegedly affected by the Policy," for the same reason. *Id.*

There is no basis under Rule 403 (or otherwise) for excluding this evidence. Rule 403 permits a court to "exclude relevant evidence" <u>only</u> "if its probative value is <u>substantially outweighed</u> by a danger of" "unfair prejudice" (which Defendants claim here), or one of the other factors listed in the Rule. Evidence does not become "unfair[ly] prejudicial" simply because it damages a party's case; instead "unfair prejudice" arises "when 'there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence.'" *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011) (quoting *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir.2004)). In addition, "the unfair prejudice must *substantially* outweigh the probative value of the evidence." *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)

10

(emphasis in original) (quoting *Hammoud*, 381 F.3d at 341). *See also United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008).

The Court of Appeals has already held that the evidence at issue here has significant probative value. The Plaintiffs met the "robust causality requirement" of *Inclusive Communities* by submitting evidence concerning the relative frequency of undocumented immigrants within the Latino population generally. 903 F.3d at 429. But the Court of Appeals went further to specifically note that documents showing which tenants were actually affected by the Policy constituted "stronger" evidence of disparate impact. 903 F.3d at 433 n.11. Indeed; the evidence is compelling. As the Court of Appeals noted, eleven of twelve – 91.7% – of the individuals who, according to one of Defendants' documents, "can not renew," have surnames that are used overwhelmingly (between 87.88% and 98.59% of the time) by people who identify themselves as Latino. Dkt. 157-9 at 2.[4]

The documents that Defendants seek to exclude also have probative value beyond the purposes identified by the Court of Appeals. For example, one dispute in this case hinges on whether, as Plaintiffs contend, Defendants willfully ignored their own Policy in allowing Plaintiffs and other tenants lacking those immigration documents to move into the Park, *see, e.g.*, Dkt. 142 at 8 ¶¶ 20-21 and exhibits cited therein; or whether, as Defendants contend, the policy was strictly enforced all along and Plaintiffs and many of their neighbors deceived their landlords in order to move into the Park, *see, e.g.,* Dkt. 98 at 5-6 and exhibits cited therein. The

---

[4] With a closer look, the evidence is even more compelling. Of the twelve names on Defendants' list of tenants who "can not renew," eight were in that position because they cannot meet the Policy at issue here – identified because they cannot produce a Social Security card ("SS"), or because the lack "immigration docs." Def. Mem. Ex. 2 (WAPLES 00002442). Every one of those eight tenants has a surname overwhelming used by people who identify themselves as Latino. Dkt. 157-9 at 2.

11

documents at issue here (which are lists of tenants and descriptions of enforcement efforts created by Defendants' employees) are essential to resolving that dispute, because the large numbers of non-compliant tenants who were nonetheless allowed to enter into a lease at the Park lends credence to Plaintiffs' contention that Defendants were ignoring and not enforcing their Policy prior to 2016. More broadly, these documents are essential to any cross-examination of Defendants' employees about the Policy and its application, because they show exactly what was being done, and to whom.[5]

In addition, Defendants' proposed order could be read to prevent Plaintiffs from asking for direct evidence of the ethnicity of the tenants subject to eviction under the Policy. Defendants seek an order "precluding Plaintiffs from presenting any evidence or argument as to the ethnicity of tenants or individuals at the Park who were allegedly affected by the Policy." Def. Mem. at 13. Presumably that would prevent Plaintiffs' counsel from asking Defendants' employees about whether particular tenants spoke only or mostly Spanish, or appeared to be of Latino descent. Likewise, Plaintiffs themselves knew some of their neighbors on the list in question, and could testify as to their apparent ethnicity. Taken literally, such an order would even prevent Plaintiffs' counsel from asking *the plaintiffs themselves* about their ethnicity. Ethnicity is the basis of this case; Plaintiffs allege that they are subject to discrimination because they are Latino. Accordingly, barring evidence about the Latino status of those affected by the Policy could eliminate significant amounts of basic, essential evidence.

---

[5] One document that Defendants seek to exclude (WAPLES00001335-37; Def. Mem Ex. 5) was used by Dr. Clark as the basis for his "surname analysis" of the tenants at the Park. Dkt. 294-1 at 5. Defendants strenuously contested Dr. Clark's report, but they did not object to that analysis, or to his use of that document. For that additional reason, that particular document should not be excluded.

On the other side of the Rule 403 balance, there is no basis for concluding that evidence reflecting the surnames of tenants would "unfair[ly] prejudice" Defendants. The only prejudice that Defendants claim is that "it is likely that the jury will reach improper assumptions about Latino-sounding surnames on the lists." Def. Mem. at 13. But that isn't true. In fact, it is *highly likely* that the jury would reach the *correct* conclusion with respect to Latino-sounding surnames: as the charts created by Plaintiffs' counsel for summary judgment demonstrated, the tenants subject to eviction with "Latino-sounding surnames" were 90% likely to be Latino. *See* Dkt. 157-9. More to the point, there is no reason to believe that these lists of tenants would create "a genuine risk that the emotions of a jury will be excited to irrational behavior, . . . [that] is disproportionate to the probative value of the offered evidence.'" *PBM Prod.*, 639 F.3d at 124 (4th Cir. 2011) (quoting *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir.2004)). Instead, these documents would allow the jury to see a more complete picture of what was happening at the Park.

Accordingly, there is no basis for excluding the fourteen exhibits identified by Defendants, or for limiting evidence with respect to the ethnicity of tenants subject to eviction under the Policy.

## **Conclusion**

For the foregoing reasons, Defendants' Motion in Limine (Dkt. No. 322) should be denied.

Respectfully submitted,                    Date:   June 4, 2021


_____//s//_____
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
*simon@justice4all.org*
Nady Peralta, VSB #91630
*nady@justice4all.org*
Granville Clayton Warner, VSB #24957
*cwarner@justice4all.org*
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kaiyeu Kevin Chu, VSB #85746
*kevinchu@quinnemanuel.com*
Matthew Traumpan (pro hac vice)
*matthewtraupman@quinnemanuel.com*
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Phone: (202) 538-8000
Fax: (202) 538-8100

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on this 4th day of June, 2021, I caused the foregoing, along with all attachments thereto, to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing (NEF) to all counsel of record.

_____//s//_____
Simon Sandoval-Moshenberg (VSB No. 77110)
*simon@justice4all.org*
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: (703) 720-5605
Fax: (703) 778-3454