**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

ROSY GIRON DE REYES, *et al.*,

         Plaintiffs,

v.

WAPLES MOBILE HOME PARK
LIMITED PARTNERSHIP, *et al.*,

         Defendants.

Civil No.:  1:16-cv-563 (LO) (TCB)

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE*</u>

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.    DEFENDANTS ARE FREE TO PRESENT EVIDENCE AND ARGUMENT AT TRIAL SHOWING THAT PLAINTIFFS CANNOT MEET THEIR STEP-1 BURDEN AND THAT THERE ARE COMPLETE DEFENSES AT STEP 1 ................. 3

II.   DEFENDANTS ARE FREE TO PRESENT EVIDENCE AND ARGUMENT AT TRIAL THAT AVOIDING CRIMINAL LIABILITY UNDER THE ANTI-HARBORING STATUTE IS A VALID INTEREST SERVED BY THEIR POLICY ................................................................................................................. 10

III.  PLAINTIFFS' BROAD REQUEST THAT THE COURT PRECLUDE EVIDENCE OF DEFENDANTS' "BUSINESS NECESSITY" FOR THE POLICY THAT LACKS AN "ADEQUATE FOUNDATION" IS PREMATURE, SEEKS AN IMPROPER ADVISORY RULING, AND RESTS ON AN ERRONEOUS LEGAL STANDARD ................................................................................................ 14

IV.  PLAINTIFFS' PREMATURE ATTACKS ON THE ANTICIPATED TESTIMONY OF DEFENDANTS' WITNESSES, U.S. TREASURY DEPARTMENT REPORTS, AND THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT FAIL ON THE LAW AND THE RECORD ......................................................................................................... 16

      A.    Plaintiffs Mischaracterize Step 2 Of *Inclusive Communities* And Defendants' Witnesses' Testimony In Making Its "Adequate Foundation" Attack ................................................................................. 16

      B.    The Treasury Reports Are Relevant To Steps 2 And 3 Of The *Inclusive Communities* Framework ....................................................... 19

      C.    The Court Should Reject Plaintiffs' Collateral Attack On Mr. Caruso's Unrebutted Opinions ............................................................. 22

V.   PLAINTIFFS PLACED THEIR IMMIGRATION STATUS SQUARELY AT ISSUE AND THE COURT SHOULD NOT RESTRICT CROSS-EXAMINATION REGARDING THEIR STATUS ......................................... 24

VI.  DEFENDANTS' ADVERTISING TO LATINOS IS RELEVANT TO PLAINTIFFS' DISCRIMINATION CLAIM AND DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE EVIDENCE OF FHA TRAINING SHOULD PLAINTIFFS INTRODUCE EVIDENCE IMPLYING INTENTIONAL DISCRIMINATION ................................................................................. 27

      A.    Defendants Have Leeway To State and Explain The Valid Interest Served By The Policy, Including Avoiding Liability Under The Anti-Harboring Statute ............................................................................. 27

B.    If Plaintiffs Introduce Evidence Raising Implications Of Intentional Discrimination, Defendants Should Be Permitted To Rebut Such Implications With Evidence Of FHA Training ....................................................... 28

C.    Evidence Of Spanish Language Advertisements Undermines Plaintiffs' Expert's Claims ................................................................................................. 29

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Albemarle Paper Co. v. Moody*,
　422 U.S. 405 (1975) ........................................................................ 16

*Burns by Burns v. CSX Transp., Inc.*,
　924 F.2d 1051 (4th Cir. 1991) ........................................................ 25

*Carlson v. Bos. Sci. Corp.*,
　856 F.3d 320 (4th Cir. 2017) .......................................................... 10

*Davis v. Alaska*,
　415 U.S. 308 (1974) ........................................................................ 24

*Doe v. Bd. of Trustees of Nebraska State Colleges*,
　2020 WL 2793558 (D. Neb. May 29, 2020) .................................... 25

*Ellis v. Int'l Playtex, Inc.*,
　745 F.2d 292 (4th Cir. 1984) ...................................................... 21, 22

*Uto v. Job Site Servs. Inc.*,
　269 F.R.D. 209 (E.D.N.Y. 2010) .................................................... 24

*Graves v. Lioi*,
　930 F.3d 307 (4th Cir. 2019) ............................................................ 5

*Griggs v. Duke Power Co.*,
　401 U.S. 424 (1971) ........................................................................ 16

*Intelligent Verification Sys., LLC v. Microsoft Corp.*,
　2015 WL 1518099 (E.D. Va. Mar. 31, 2015) .................................. 15

*Jones v. Ford Motor Co.*,
　204 F. App'x 280 (4th Cir. 2006) ................................................ 21, 22

*Martinez v. Cont'l Tire Americas, LLC*,
　476 F. Supp. 3d 1137 (D.N.M. 2020) .............................................. 25

*McKiver v. Murphy-Brown, LLC*,
　980 F.3d 937 (4th Cir. 2020) .......................................................... 25

*Orellana v. Tecta Am. S. Fla., Inc.*,
　2011 WL 13220457 (S.D. Fla. May 23, 2011) ................................ 24

*Reyes v. Waples Mobile Home Park L.P.*,
　903 F.3d 415 (4th Cir. 2018) .................................................. 7, 14, 23

*Rhode Island Com'n for Human Rights v. Graul*,
　120 F. Supp. 3d 110 (D. R.I. 2015) ................................................ 12

*Romero v. Prindle Hill Constr., LLC*,
  2017 WL 3390242 (D. Conn. Aug. 7, 2017) .......................................................... 24

*Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) .......................................................................... *passim*

*United States v. Aguilar*,
  477 F. App'x 1000 (4th Cir. 2012) .......................................................... *passim*

*United States v. Campbell*,
  168 F.3d 263 (6th Cir. 1999) ...................................................................... 5

*United States v. Lee*,
  358 F.3d 315 (5th Cir. 2004) ...................................................................... 5

*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020) .............................................................................. 5

*United States v. Tipton*,
  518 F.3d 591 (8th Cir. 2008) .................................................................... 13

*United States v. Verges*,
  2014 WL 559573 (E.D. Va. Feb. 12, 2014) .......................................... 15, 22


**Statutes**

8 U.S.C. § 1324 .......................................................................................11, 12, 13

8 U.S.C. § 1611 ...................................................................................... 23

42 U.S.C. § 1436a ...................................................................................... 23


**Regulations**

24 C.F.R. §§ 5.508-5.512 .......................................................................... 24


**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................. 3, 4, 5, 6, 7

Fed. R. Civ. P. 56 ...................................................................................... 5

Fed. R. Evid. 602 ...................................................................................... 15

Fed. R. Evid. 801 ...................................................................................... 25

Fed. R. Evid. 802 ...................................................................................... 21

Fed. R. Evid. 803(8) .................................................................................. 21

Fed. R. Evid. 804 ...................................................................................... 25

**Other Authorities**

Charles A. Wright, Arthur R. Miller & Richard L. Marcus,
Federal Practice and Procedure § 2264 (3d ed. 2020) ................................................................ 25

## INTRODUCTION[1]

Despite this Court's recent ruling that the Fourth Circuit did not grant "plaintiffs summary judgment on step one" (Dkt. 298 at 3 n.4), Plaintiffs' motion *in limine* effectively argues that it did, thus barring Defendants from presenting evidence or argument at trial showing that Plaintiffs cannot meet their "step-1" burden under *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). In the same breath, however, Plaintiffs say they "are not claiming that they have been granted summary judgment with respect to step one"—by the Fourth Circuit or this Court. Pls.' Mem. at 6 (Dkt. 332) (hereinafter "Mem"). It is, therefore, unclear how Plaintiffs can insist that "in addressing the sufficiency" of the parties' evidence on step one, "Defendants should be bound by the direction of the Fourth Circuit, and should not be allowed to renew" their arguments relating to step 1. In fact, there is no basis for Plaintiffs' request—neither the Fourth Circuit nor this Court have decided step-1 issues as a matter of law, so the jury will be tasked with deciding them at trial.

Plaintiffs then try to smuggle in a summary-judgment legal argument they previously elected not to make—that Defendants' leasing to undocumented immigrants does not violate the anti-harboring statute.[2] That is not a proper use of the *in limine* procedure. Nor is it the relevant issue. The relevant issue is whether avoiding possible criminal liability under the anti-harboring statute for renting to undocumented immigrants in a region with a large population of undocumented immigrants attracted to the affordable housing available at Defendants' Park is a "valid interest" served by the Policy—where Defendants reasonably could believe they could be

---

[1] Insofar as they are relevant, Defendants incorporate by reference the background discussions set forth in their other motions *in limine* filed on January 11, 2021.

[2] Plaintiffs did not move for summary judgment following remand from the Fourth Circuit.

exposed to liability for doing so given existing Fourth Circuit precedent.[3] Avoiding potential criminal liability unquestionably is a valid interest, and—as Plaintiffs themselves acknowledge—this is an issue for the Court to decide, not a jury, because a jury cannot interpret Fourth Circuit precedent or the anti-harboring statute. Should this Court agree that avoiding potential criminal liability is a valid interest (and the Court already reached that conclusion in a finding left undisturbed on appeal), *this case should not and cannot proceed to trial as Plaintiffs have no step-3 rebuttal to this valid interest.*

Beyond this, Plaintiffs make a premature and purely speculative line of argument that Defendants should not be permitted to offer at trial various categories of evidence of the "business necessities" for their Policy that lack an "adequate foundation." Whether evidence not yet adduced at a trial not yet commenced has an adequate foundation is an issue the Court cannot decide at this *in limine* stage. What it can, and should, decide is that Plaintiffs' proposed "business necessity" standard—purportedly requiring Defendants to prove at step 2 of the burden-shifting framework that its Policy is a "business necessity," rather than, as *Inclusive Communities* says, merely serves a "valid interest"—is not the law and, indeed, is contrary to it. And, for multiple reasons, the categories of evidence Plaintiffs seek to exclude, based on their contrived but erroneous "business necessity" standard, are plainly relevant and admissible at trial.

Plaintiffs conclude by seeking to limit or exclude still other categories of evidence that likewise are relevant to the issues remaining to be tried. They seek to restrict Defendants' cross-examination on Plaintiffs' immigration status even though Plaintiffs placed their immigration status squarely at issue when they filed this lawsuit. Plaintiffs' immigration status is relevant to

---

[3] *United States v. Aguilar*, 477 F. App'x 1000, 1003 (4th Cir. 2012) (affirming conviction for renting to illegal aliens and finding that defendant "recklessly disregarded the risk that [] her tenants w[ere] undocumented" because she "took no steps" to ascertain the status of her tenants).

Plaintiffs' prima facie case and their step-3 burden of proving that there is a policy that can serve Defendants' valid interests with a "less discriminatory effect." Plaintiffs also seek to restrict Defendants from introducing evidence of their Fair Housing Act ("FHA") training and Defendants' Spanish language advertisements. The FHA training, however, should be permitted to rebut implications of intentional discrimination that Plaintiffs clearly, and improperly, intend to raise. Defendants' Spanish language advertisements are relevant to rebut Plaintiffs' discrimination claims and Professor Clark's opinion that there is a possible impact of the Policy on Latinos at the Park. Professor Clark did not analyze whether there was such an actual impact or how such advertising would affect any alleged impact at the Park. Plaintiffs' motions should be denied.

## ARGUMENT

## I.  DEFENDANTS ARE FREE TO PRESENT EVIDENCE AND ARGUMENT AT TRIAL SHOWING THAT PLAINTIFFS CANNOT MEET THEIR STEP-1 BURDEN AND THAT THERE ARE COMPLETE DEFENSES AT STEP 1

Plaintiffs repeat, yet again, an argument they have made since the Fourth Circuit vacated this Court's Rule 12(b)(6) dismissal of their case—that the Fourth Circuit rejected as a matter of law Defendants' step-1 arguments and defenses.[4] Specifically, Plaintiffs argue that Defendants' contentions—rooted firmly in *Inclusive Communities*—that Plaintiffs cannot show that the Policy is "artificial, arbitrary, and unnecessary" and that the need to avoid criminal liability under the anti-harboring statute "substantially limited" Defendants' discretion in formulating the Policy, were rejected by the Fourth Circuit and cannot be argued or presented at trial. As stated by Defendants before, Plaintiffs' meritless argument ignores the procedural history in this case and

---

[4] Plaintiffs contend that Defendants are limited to merely "addressing the sufficiency of [Plaintiffs'] evidence." Mem. at 6. They go so far as to suggest that the Fourth Circuit ruled that Plaintiffs' met their burden of proving a statistical disparate impact even though the Fourth Circuit never considered the evidence relating to this issue—such as the competing statistical expert opinions—or any other evidence in this case for that matter. Mem. at 6 n 1. Plaintiffs' erroneous and expansive view of the Fourth Circuit's decision improperly invites this Court to commit error.

the import of the Fourth Circuit's and this Court's prior rulings—and contradicts Plaintiffs' ***own admission*** that the Fourth Circuit did ***not*** grant Plaintiffs summary judgment on step 1.

Starting with the latter point first, Plaintiffs repeatedly admitted to this Court that the Fourth Circuit did ***not*** grant Plaintiffs summary judgment on step 1. *See* Dkt. 298 n. 4 ("Plaintiffs do not contend that the Fourth Circuit granted summary judgment on step one to plaintiffs…"); Mot. for Clarification H'rg Tr. (Sept. 23, 2020) at 26:5-9 (Plaintiffs' counsel agreeing that "it's the position of the plaintiffs that [the Court] should proceed to trial on all three steps" of the burden-shifting framework.") (Ex. 1); Renewed Mot. for Summ. J. H'rg Tr. (Nov. 8, 2019) at 26:6-9 (Plaintiffs' counsel agreeing that the Fourth Circuit "didn't rule on summary judgment. They didn't remand and say, okay, it's all over on disparate impact.") (Dkt. 277-1). The reason is obvious—Plaintiffs did not move for summary judgment on their disparate impact claim. And so this Court, as detailed more fully below, did not grant Plaintiffs summary judgment—on step 1 or any other issue in the case. Yet, Plaintiffs now maintain that Defendants cannot argue or try to prove to the jury that Plaintiffs fail to meet their step-1 burden of proof because the Fourth Circuit somehow rejected those arguments when it found that Plaintiffs had adequately ***pleaded*** their disparate-impact claim.

Plaintiffs offer no legal theory or explanation for this line of argument—nor is there any. The Fourth Circuit either granted Plaintiffs summary judgment on step-1, thus removing step-1 issues from the province of the jury on remand, or it did not. And, as noted, it did not. Moreover, even if the Fourth Circuit had rejected Defendants' step-1 arguments relating to the "artificial, arbitrary, and unnecessary" requirement and the anti-harboring statute in its review of the Court's prior 12(b)(6) ***dismissal*** ruling—and, as shown below, it did no such thing—that would have no preclusive effect on Defendants' ability to make those arguments before the jury and offer evidence to show that Plaintiffs could not meet their burden at trial, either.

4

Turning to the history of these proceedings, it shows that step 1 remains—in its entirety—an issue for the jury to decide in this case. First, a brief overview of the law governing the interpretation of appellate mandates. To determine the scope of the Fourth Circuit's mandate in this case, this Court must look to "the specific language used in the context of the entire opinion[.]" *United States v. Campbell*, 168 F.3d 263, 267-268 (6th Cir. 1999). A "careful reading of the reviewing court's opinion" is required "to determine what issues were actually decided by the mandate." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004) (citation omitted). Courts of appeals do not decide issues the parties do not present to them. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. … '[I]n both civil and criminal cases, in the first instance and on appeal …, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'") (citation omitted).

Moreover, rulings on the sufficiency of ***allegations*** and the propriety of a ***dismissal under Rule 12(b)(6)***—such as the one handed down by the Fourth Circuit in this case—do not bind future courts assessing the propriety of ***summary judgment under Rule 56***—let alone juries considering evidence adduced at trial. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (holding that courts are free to reassess "past holdings based on a ***different procedural posture*** when … that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims") (emphasis added). Applying these principles, it is clear that the Fourth Circuit, like this Court, has not—because it could not have—ruled on whether Defendants can prove, at trial, that Plaintiffs cannot demonstrate that the Policy is "artificial, arbitrary, and unnecessary" and that the anti-harboring statute "substantially limited" Defendants discretion in adopting the Policy. These are step-1 issues that remain for trial.

**Pre-appeal proceedings in this Court.** Prior to the Fourth Circuit proceedings, this Court dismissed Plaintiffs' disparate-impact claim on the pleadings, and then relied on that ruling to deny Plaintiffs' cross-motion for summary judgment on step 1. Dkt. 56 at 16-19 (dismissing disparate-impact claim at the pleadings stage); Dkt. 190 at 8 n.8 (relying on the Court's previous ruling at the pleadings stage). This Court did not analyze Plaintiffs' step-1 summary judgment argument on its merits—it simply said that it had already decided at the Rule 12(b)(6) stage that Plaintiffs had failed to plead facts to meet their step-1 burden.  Dkt. 190 at 8 n.8. And this Court did not decide whether Plaintiffs had pleaded or offered sufficient evidence to show that the Policy is "artificial, arbitrary, and unnecessary" or that the anti-harboring statute did not "substantially limit" Defendants' discretion in adopting the Policy.

**The parties' briefing on appeal in the Fourth Circuit.** In their opening brief on appeal, Plaintiffs challenged the Court's step-1 ***dismissal*** ruling, but they did not appeal this Court's denial of their cross-motion for summary judgment—or make any arguments that the Fourth Circuit should grant them summary judgment on step 1 or any other issue. Pls.' Br. at 4, *Reyes et al. v. Waples Mobile Home Park L.P., et al.*, Case No. 17-1723, (4th Cir. Oct. 16, 2017) (Dkt. 26). Plaintiffs also argued, not that they be awarded judgment on step 1, but that the dismissal of their disparate impact claim at the motion-to-dismiss stage was in error and that their claim should be re-instated and the case remanded. Dkt. 289 at 6-8 (citing Plaintiffs' brief to the Fourth Circuit). In their response appellate brief, Defendants argued that this Court correctly dismissed Plaintiffs' disparate-impact claim on the pleadings—including on the alternate grounds that (i) Plaintiffs did not plead the Policy is "artificial, arbitrary, and unnecessary" and (ii) avoidance of liability under the anti-harboring statute substantially limited Defendants' discretion in adopting the Policy.

Defs.' Br. at "Summary of the Argument", 33-35, 37-39, *Reyes et al. v. Waples Mobile Home Park L.P., et al.*, Case No. 17-1723, 2017 WL 6462650, at *14-15 (4th Cir. Dec. 15, 2017) (Dkt. 50).

While Plaintiffs' reply appellate brief addressed Defendants' alternate "artificial, arbitrary, and unnecessary" and anti-harboring arguments for affirmance, it was limited to the pleadings and the Court's dismissal ruling. Pls.' Reply Br. at 1, 12-13, 32, *Reyes et al. v. Waples Mobile Home Park L.P., et al.*, Case No. 17-1723, (4th Cir. Jan. 29, 2018) (Dkt. 68). Plaintiffs concluded their reply brief by asking the Fourth Circuit to "vacate the District Court's grant of summary judgment on the Families' FHA claim and remand for further proceedings". *Id.* at 33.

**Fourth Circuit's decision.** Given Plaintiffs' appellate briefing, it is no surprise that the Fourth Circuit's opinion does not discuss or consider any of the ***evidence*** offered by the parties on step 1, much less decide that Plaintiffs were entitled to summary judgment. Instead, the Fourth Circuit:

(i)     explained that "[o]n appeal, Plaintiffs contend that the district court erred in granting Waples' motion for summary judgment on the FHA claim" and "argue that the district court erred in concluding that their FHA claim could not continue past the motion to dismiss stage under a disparate-impact theory of liability and thus erred in failing to substantively address this theory in considering the cross-motions for summary judgment" (*Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 422 (4th Cir. 2018));

(ii)    identified the issue before it as whether this Court properly "dismissed Plaintiffs' disparate-impact theory at the Rule 12(b)(6) stage" (*Id.*; *see also id.* at 423;

(iii)   accepted Plaintiffs' allegations of "statistics as true" under the familiar 12(b)(6) standard (*id.* at 428);

(iv)    concluded that "plaintiffs sufficiently alleged a prima facie case of disparate impact" (*id.* at 428) "and that the district court therefore erred in concluding otherwise" (*id.* at 429)—i.e., erred in concluding that plaintiffs had not alleged facts sufficient to defeat a motion to dismiss at step; and

(v)     "vacate[d] the district court's grant of Waples' motion for summary judgment on the FHA claim and remand[ed] to allow the district court to consider the cross-motions for summary judgment under Plaintiffs' disparate-impact theory of

liability in a manner consistent with this opinion" (*id.* at 433)—but did ***not*** reverse with instructions that this Court enter judgment for Plaintiffs on step 1.

The Fourth Circuit did not address Defendants' anti-harboring and "artificial, arbitrary, and unnecessary" arguments for affirmance and it repeatedly stated that this Court "did not consider" the cross-motions for summary judgment with respect to Plaintiffs' disparate-impact claim—including step 1. In light of the Fourth Circuit's opinion, then, it made perfect sense when Plaintiffs' counsel—during argument before this Court in November 2019 following the Fourth Circuit's decision—clearly conceded that the Fourth Circuit "didn't rule on summary judgment" or "remand and say, okay, it's all over on disparate impact." Dkt. 277-1.

**The Court's August 2020 summary-judgment ruling and subsequent order on Defendants' motion for clarification.** On remand from the Fourth Circuit, Defendants moved for summary judgment on Plaintiffs' disparate-impact claim. Defendants argued, among other things, that they were entitled to summary judgment based on the anti-harboring statute and the fact that—absent the Policy and given the Fourth Circuit's decision in *Aguilar*—Defendants could be found criminally liable under that provision for extending housing to undocumented immigrants at its Fairfax mobile-home park. Dkt. 248 at 10-13, 23-24; Dkt. 265 at 6-8, 12-13; Dkt. 277 at 7-10.

In August 2020, the Court denied Defendants' renewed motion for summary judgment. Dkt. 283. The Court did not address Defendants' arguments that, given the anti-harboring provision and the threat of criminal liability Defendants faced for renting mobile homes to undocumented immigrants, their discretion in adopting a leasing policy was "substantially limited" under *Inclusive Communities*, thereby defeating Plaintiffs' disparate-impact claim at "step 1" of the burden-shifting framework. The Court also did not address Defendants' argument that Plaintiffs could not, as a matter of law, show that Defendants' Policy is "artificial, arbitrary, and unnecessary" as required by *Inclusive Communities* because the Policy helps Defendants avoid

8

criminal liability under the anti-harboring provision, as construed by the Fourth Circuit in *Aguilar*. With respect to whether, at step 2 of that framework, Defendants had a "valid interest" in the Policy of avoiding criminal liability under the anti-harboring provision, the Court found that that presented a genuine issue of material fact for the jury to decide at trial. Dkt. 283 at 2.

Defendants moved for clarification because it was not clear whether or how this Court had decided Defendants' motion for summary judgment as to step 1. Dkts. 284, 285. At the hearing on that motion, Plaintiffs' counsel agreed that "it's the position of the plaintiffs that [the Court] should proceed to trial on all three steps" of the burden-shifting framework. Ex. 1 at 26:5-9. The Court itself observed that it thought it "indisputable … that the anti-harboring statute really played no role in the Fourth Circuit's analysis." *Id.* at 29:23-25. The Court also noted the fundamental problem with asking a jury to interpret the scope of the anti-harboring statute. Ex. 1 at 29:21-23 ("Yes, but my problem there,… is that juries don't decide that sort of thing; judges do."). The Court denied Defendants' motion, stating that whether the Policy served a "valid interest" in avoiding criminal liability under the anti-harboring statute is an issue for the jury, but the Court never addressed how a jury could be asked to interpret a federal statute or *Aguilar*. *See* Dkt. 298. The Court ultimately found that "plaintiffs 'have satisfied their burden under step one' by presenting evidence sufficient to defeat defendants' motion for summary judgment." *Id.* at 3. However, the Court noted, "Plaintiffs do not contend that the Fourth Circuit granted summary judgment on step one to plaintiffs, such that the jury need not be instructed on step one[,]" and the Court found that "plaintiffs appear to be correct" in this concession. *Id.* at 3 n.4.

It is clear, then, that no court—not this one or the Fourth Circuit—has granted either party summary judgment on step 1, decided the effect of the anti-harboring statute at any step of the burden-shifting analysis, or resolved as a matter of law whether Plaintiffs can show that the Policy

is "artificial, arbitrary, and unnecessary." All of these issues, as this Court itself has acknowledged, remain to be tried before and decided by the jury in this case. A ruling to the contrary—depriving Defendants of their due process right to mount defenses at trial—would embed reversible error in this case before a trial even commences.

## II. DEFENDANTS ARE FREE TO PRESENT EVIDENCE AND ARGUMENT AT TRIAL THAT AVOIDING CRIMINAL LIABILITY UNDER THE ANTI-HARBORING STATUTE IS A VALID INTEREST SERVED BY THEIR POLICY

Plaintiffs separately contend that Defendants should be barred from presenting evidence or argument that avoiding criminal liability under the anti-harboring statute is a "business necessity" behind their Policy because "Defendants' act of leasing property to undocumented immigrants does not violate the ICRA's anti-harboring provision" and "it cannot be that compliance with an inapplicable federal law constitutes a 'business necessity.'" This is flawed on every level.[5]

*First*, in its summary-judgment order, this Court explicitly ruled that there are genuine disputes of fact on step 2 as to "whether the Policy furthers defendants' interests in avoiding liability under the anti-harboring statute and avoiding loss from eviction." Dkt. 283 at 2; *see also* Dkt. 298 at 3–4 (reiterating same). That finding is the law of the case and Plaintiffs offer no basis— let alone a persuasive one—for the Court to depart from its own ruling and now deem the anti-harboring statute irrelevant to the issues remaining to be tried. *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The law-of-the-case doctrine provides that in the interest of finality, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (citation omitted). Indeed, as noted, Plaintiffs did not move for summary judgment at all—on step 2 or another other issue.

---

[5] As discussed below, "business necessity" is not the standard at step 2 of the disparate-impact burden-shifting framework under *Inclusive Communities*. *See infra* at Section III.

*Second*, Plaintiffs frame the step-2 issue regarding the anti-harboring statute improperly. The step-2 issue at trial relating to the anti-harboring statute is *not* whether "Defendants' act of leasing property to undocumented immigrants … violate[s] the ICRA's anti-harboring provision." Mem. at 10. Rather, it is whether, given the record here and the Fourth Circuit's decision in *Aguilar*, avoidance of possible liability under the anti-harboring statute and the Fourth Circuit's expansive reading of it in *Aguilar*, by not renting to undocumented immigrants, is a "valid interest" served by the Policy. *Inclusive Communities*, 576 U.S. at 521 (Defendants must be given "leeway to state and explain the valid interest their policies serve"). Indeed, avoidance of possible criminal liability is unquestionably a valid interest *as this Court already found.* Dkt. 190 at 16 (concluding that there is "*no question*," given the reckless-disregard standard in § 1324, that a lessor could "properly and sensibly" inquire into immigration status of a lessee and his adult co-habitants) (emphasis added); *id*. at 22 ("[A]s federal law makes clear, such an inquiry [into legal status] is not only lawful, but sometimes necessary for prudent behavior." (citing § 1324 and dismissing Plaintiff's § 1981 claim, which was not appealed)).[6]

*Third*, Plaintiffs' argument that Defendants' leasing to undocumented immigrants does not violate the anti-harboring provision on its face is *flat wrong* as Defendants have shown previously in this case. First, it runs counter to controlling Fourth Circuit precedent in *Aguilar*, where the Fourth Circuit specifically addressed the application of the anti-harboring statute to a residential landlord. The defendant there was convicted for renting rooms in her home to illegal aliens. She claimed that the district court erred in not instructing the jury that it must be proven that her conduct

---

[6] If Defendants' inquiry into the legal status of their tenants is "lawful," "necessary," and "prudent" in the § 1981 context, there cannot be disputes of fact over whether the Policy—inquiring into the legal status of tenants—furthers Defendants' interest in avoiding liability under the anti-harboring statute. *Compare* Dkt. 190 at 16, 22 *with* Dkts. 283 at 2 and 298 at 3.

"tended to substantially facilitate the alien remaining in the United States." 477 F. App'x at 1001-02. The Fourth Circuit affirmed the conviction, finding no plain error in the refusal to instruct the jury that intent to harbor is an element of the crime. The Fourth Circuit explained that "a defendant acts with reckless disregard where she is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien." *Id*. at 1002. And it found that defendant "recklessly disregarded the risk that [] her tenants w[ere] undocumented" because she "took no steps" to ascertain the status of her tenants. *Id*. at 1003.[7]

Given that the conviction in *Aguilar* occurred in this District and was affirmed by the Fourth Circuit, Defendants have no discretion to ignore the potential criminal implications of renting to an illegal alien, especially by taking "no steps" to ascertain the status of the tenants and their occupants at the Park, thus necessitating its Policy.[8] That is all the more true because, as Plaintiffs allege, a large percentage of undocumented persons in the relevant geographic area are Latinos. Thus, if Defendants ignored facts such as the inability of a Latino applicant from another country to provide a social security number or proof of legal status, they too could be accused of "reckless disregard" of the fact that applicants could be in the United States illegally and, like Ms.

---

[7] Plaintiffs imply that *Aguilar* can be ignored by this Court because it is unpublished and thus is not binding precedent. Mem. at 12. This argument misses the point. Defendants and other landlords, and this Court, cannot ignore—as Plaintiffs suggest—the Fourth Circuit's interpretation of the anti-harboring statute in *Aguilar* simply because *Aguilar* was unpublished.

[8] For these reasons, the anti-harboring statute is not an "inapplicable" federal law as Plaintiffs contend. Mem. at 10. Nor is the one case they cite for this proposition apposite. *Id*. (citing *R. I. Com'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 127-128 (D. R.I. 2015). In *Graul*, the district court struck an expert's opinion, found that the opinion was factually wrong, and concluded that the expert's interpretation of the Rhode Island housing and maintenance code was not plausible. *Id*. at 127. Here, it is not only plausible that Defendants could face liability under the anti-harboring statute, but as this Court *already* concluded, there is "***no question***," given the reckless-disregard standard in § 1324, that a lessor could "properly and sensibly" inquire as to the immigration status of applicants and their adult co-habitants. Dkt. 190 at 16. This finding by the Court was left undisturbed on appeal.

Aguilar, convicted of a crime for taking "no steps to ascertain the status of [their] tenants." *Aguilar*, 477 F. App'x at 1003.

These concerns are especially heightened for mobile-home park owners like Defendants because, as Plaintiffs themselves have alleged, undocumented immigrants "cannot obtain traditional home mortgages." Compl. ¶ 55. As a result, making nontraditional, mobile housing available to such immigrants may be seen as an inducement that "substantially facilitate[s] an alien's remaining in the United States illegally" in violation of the anti-harboring statute. *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *see also Aguilar*, 477 F. App'x at 1001-02. And, there is no reasonable dispute that the avoidance of potential criminal liability under the anti-harboring statute—as interpreted by the Fourth Circuit in *Aguilar*—serves a valid interest.[9] Indeed, ***this Court already found as much:*** Defendants could "have truly feared liability" under the statute. Dkt. 190 at 16 (concluding that there is "***no question***," given the reckless-disregard standard in § 1324, that a lessor could "properly and sensibly" inquire into immigration status of a lessee and his adult co-habitants) (emphasis added); *id.* at 22 ("[A]s federal law makes clear, such an inquiry is not only lawful, but sometimes necessary for prudent behavior.") (citing § 1324) (dismissing § 1981 claim). Plaintiffs fail to address this finding by the Court, which was left undisturbed on appeal. They offer no argument on how a jury could possibly decide the scope of potential criminal liability under a federal statute or controlling Fourth Circuit precedent.[10]

---

[9] Plaintiffs again refer to authority from outside this Circuit to attempt to avoid *Aguilar*. Mem. at 11. This tired argument deserves no credence. The Park is located in the Fourth Circuit so such out-of-circuit authority has no bearing on whether Defendants could truly face criminal liability *in this Circuit*.

[10] Given this clear statement of law from this Court, it remains unclear to Defendants how this issue is to proceed to the jury. In a footnote, Plaintiffs weakly argue that the Fourth Circuit "implicitly" rejected a "similar" argument that Defendants advanced on appeal. Mem. at 12 n.3. Tellingly, Plaintiffs cannot direct this Court to *any* ruling from the Fourth Circuit holding that avoidance of potential criminal liability under the anti-harboring statute is not a valid interest

Given *Aguilar*, Plaintiffs instead ask that Defendants, and other landlords in the Fourth Circuit, be forced to err on the side of potential criminal liability. But as the Supreme Court stated in *Inclusive Communities*, the FHA should not be interpreted to "put housing authorities and private developers in a double bind of liability[.]" 576 U.S. at 542. Plaintiffs now go further and argue not only that Defendants be forced to err on the side of potential criminal liability, but that they be ***precluded*** from presenting evidence at trial regarding their rational and reasonable fear of such criminal liability. Such a ruling would send this case to trial beset with reversible error.

### III.  PLAINTIFFS' BROAD REQUEST THAT THE COURT PRECLUDE EVIDENCE OF DEFENDANTS' "BUSINESS NECESSITY" FOR THE POLICY THAT LACKS AN "ADEQUATE FOUNDATION" IS PREMATURE, SEEKS AN IMPROPER ADVISORY RULING, AND RESTS ON AN ERRONEOUS LEGAL STANDARD

Prior to this Court hearing any evidence at trial, Plaintiffs request an advisory ruling precluding certain "evidence, testimony, and argument related to" Defendants' supposed "business necessity" for the Policy which, according to Plaintiffs, lacks an "adequate foundation." Mem. at 7. This line of argument is just as infirm as the others.

***First***, Plaintiffs mischaracterize—as they have throughout this case—step 2 of the *Inclusive Communities* framework as requiring evidence of a "business necessity" for the Policy. It does not. As stated in *Inclusive Communities*, after Plaintiffs prove a prima facie case of disparate impact, under step 2, Defendants must be given "leeway to state and explain the valid interest served by the policies." 576 U.S. at 541; *accord Reyes*, 903 F.3d at 424. As they have throughout this case, Plaintiffs attempt to write this clear language out of the *Inclusive Communities* and *Reyes*

_____

served by Defendant's Policy. This Court's statement of the law, therefore, was left undisturbed on appeal, and a jury cannot opine on the scope of liability of this statute—that is an issue for the Court to decide on this motion. Should the Court agree with Defendants on this issue (and its own prior ruling), this case should not and cannot proceed to trial as Plaintiffs have not proffered any step-3 argument to counter Defendants' valid interest. Indeed, there is no other policy which would ascertain the legal status of tenants and occupants at the Park.

decisions and replace it with Title VII's higher "business necessity" standard. But the Supreme Court in *Inclusive Communities* did not adopt the "business necessity" standard in FHA disparate-impact cases. Nor did the Fourth Circuit in *Reyes,* 903 F.3d at 432 (holding that step-2 standard is to "state and explain the valid interest served by [the] policies"). Instead, in *Inclusive Communities*, the Supreme Court cautioned that the Title VII framework "may not transfer exactly to the fair-housing context" and therefore chose a distinctly lower step-2 burden in order (i) to give latitude to, and avoid imposing "onerous costs" on, defendants in choosing housing policies that may be based on a "mix of factors," and (ii) to avoid putting "housing authorities and private developers in a double bind of liability[.]" 576 U.S. at 541, 542. Plaintiffs cite no authority for the proposition that the step-2 standard is one of "business necessity" and instead ask this Court to give the Supreme Court's words no meaning.

**Second**, Plaintiffs' request is plainly premature and calls for an advisory opinion about what the evidence at trial will or will not be. To support their suggestion that Defendants **might** offer testimony at trial that lacks an adequate foundation, Plaintiffs point to *deposition* testimony previously given by Defendants' employees who **might** be witnesses at trial. But clearly, the Court must hear the evidence first before making any determination based on foundation. A "motion in limine is not the appropriate vehicle for addressing the strength of the evidence[.]" *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-CV-525, 2015 WL 1518099, at *11 (E.D. Va. Mar. 31, 2015), *aff'd sub nom.* 628 F. App'x 767 (Fed. Cir. 2016). Rather, "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *United States v. Verges*, No. 1:13CR222 JCC, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014) (citation omitted) (rejecting motion *in limine* requesting to exclude broad categories of evidence). This Court is well aware of Rule 602 of the Federal Rules of Evidence, and as witnesses testify, Plaintiffs' counsel

15

is free to object. An advisory prediction on the foundation of testimony not yet heard by the Court plainly would be improper.

## IV.   PLAINTIFFS' PREMATURE ATTACKS ON THE ANTICIPATED TESTIMONY OF DEFENDANTS' WITNESSES, U.S. TREASURY DEPARTMENT REPORTS, AND THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT FAIL ON THE LAW AND THE RECORD

Apart from the flaws in Plaintiffs' premature efforts to exclude broad categories of Defendants' evidence at trial discussed in the previous section, Plaintiffs' arguments here fail for additional reasons—on the law and on the facts.

### A.   Plaintiffs Mischaracterize Step 2 Of *Inclusive Communities* And Defendants' Witnesses' Testimony In Making Its "Adequate Foundation" Attack

Plaintiffs' contention that a "vast majority" of Defendants' witnesses lack personal knowledge of the purported justifications for the Policy (Mem. at 8)—knowledge they supposedly must have to substantiate a "valid interest" supporting the Policy—distorts the deposition testimony of those witnesses. Moreover, the Court cannot determine whether a witness has a sufficient foundation for their testimony until the Court actually hears that foundation at trial. Plaintiffs' attempt to preclude Defendants from presenting any witnesses regarding the valid interests served by the Policy therefore must be rejected.

In *Inclusive Communities* the Supreme Court held that defendants must be given "leeway to state and explain the valid interest served by the policies." 576 U.S. at 541; *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422-23 (1975) (noting that Title VII "is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.'" (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)). At step 2, *Inclusive Communities* did not state that defendants must prove that their policy was motivated by the asserted valid interest. Instead, the

policy must simply "serve" a valid interest. To conclude otherwise would require the courts to strike down policies that in fact serve a valid interest.

Based on selective snippets from the deposition testimony of certain witnesses for Defendants, Plaintiffs argue that the Court should wholesale exclude the testimony of these witnesses on a key issue in this case—the valid interests served by the Policy—before these witnesses set foot in the courtroom. In effect, Plaintiffs ask the Court to preclude Defendants from presenting their valid interests to the jury as is their right under *Inclusive Communities*. Whether Defendants' witnesses have a sufficient foundation for their testimony can only be determined at trial. Further, even if there is a discrepancy between the deposition and trial testimony of a witness—and Defendants are not at all suggesting that there will be—that does not preclude the trial testimony of the witness, but rather goes to the weight the jury gives that testimony.

Defendants' witnesses testified repeatedly and consistently as to the valid interests served by the Policy. For example, Mark Jones, Defendants' 30(b)(6) witness and their former Chief Financial Officer, discussed the valid interests served by the Policy at length, testifying that (i) the reasons for the Policy are to confirm the identity of the applicant and any adult occupant, to perform credit checks, minimize identity fraud and to eventually perform criminal background checks, and minimize loss from eviction (Ex. 2 at 133:7-16); (ii) verifying an individual's legal status helps verify identity (*id.* at 134:4-21); (iii) legal status documents provide a key piece of information for underwriting and criminal screening (*id.* at 135:1-12; 136:8-12; 136:17-137:9); and (iv) Defendants faced criminal exposure by leasing to the undocumented (*id.* at 136:1-7).

Plaintiffs incorrectly claim that "Mr. Jones lacked personal knowledge of the reasons underlying the Policy to an extent" because his understanding of the anti-harboring statute was "largely based" on conversation with counsel. Mem. at 8. This is false. As noted above, Mr. Jones

testified at length as to multiple valid interests served by the Policy. As to the anti-harboring statute in particular, in response to a direct question whether Defendants believed they were "████████ ███████████████████████████████████████████████████████████" Mr. Jones responded that "███████████████████████████████████████████████████████████████████████████████████████." *Id.* at 136:1-7. In a follow-on question, Plaintiffs' counsel conceded that Defendants had a genuine interest in complying with the anti-harboring statute, stating that ███████████████████████ ██████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████" and then asking what that was "████████████" in response to which Mr. Jones said "██████████ ███████████████████████████████████████" context. *Id.* at 138:5-13.

Plaintiffs also misrepresent Mr. Dwoskin's testimony. He discussed the valid interests served by the Policy, stating that his business requires tenants to be in the United States legally just as the U.S. Government requires tenants to be in the United States legally in order to lease apartments that receive federal subsidies. Ex. 3 at 45:20-25; *see id.* at 85:15-86:7 (noting that landlords who are in a federal housing program require proof of legal status). After being asked about a specific resident information guide, Mr. Dwoskin testified that Plaintiffs would have to ask Mark Jones about developing policies specified in the document in question because it has been 15-20 years since he has been closely involved in developing future resident policies. *Id.* at 50:22-51:1. He testified that the policy of requiring legal status came into play after 9/11. *Id.* at 60:3-13. He also testified as to underwriting risks related to renting to undocumented immigrants because they are subject to deportations and there are costs associated with re-renting properties. *Id.* at 89:20-24. He testified that it's necessary to correctly identify the tenants living at his

properties, *id.* at 89:25-90:2; 91:1-4, and that he has had police raid his properties for illegal immigrants living in apartments, which causes disruption to the community, *id.* at 90:5-6.

Continuing with their mischaracterization, Plaintiffs also distort Peter Williams' testimony. Mr. Williams stated that as long as he worked at A. J. Dwoskin & Associates, Inc. it was the policy to ensure any applicant for the Park could legally live in the U.S. Ex. 4 at 51:6-14. He explained that he was not the person who formulated the Policy but that he had personal knowledge of some reasons for the Policy. *Id.* at 51:25-52:4. He testified that based on his knowledge, the valid interests served by the Policy are to verify identity, perform criminal background checks and address underwriting concerns. *Id.* at 52:5-53:3.

In regards to the testimony from Ms. Giambanco, the Park's manager, and Ms. Easton, Defendants' former Quality Control Manager, neither were in roles relating to creating the Policy. Accordingly, it is of no moment that they cannot testify as to the reasons for creating the Policy. They are, however, familiar with enforcement of the Policy and should not be preemptively prohibited from testifying about their knowledge of the Policy.

In sum, Plaintiffs should not be permitted to mischaracterize Defendants' employees' testimony in order to preemptively prohibit them from testifying based on testimony this Court has yet to hear. This is an improper use of a motion *in limine*, which cannot be used to address the strength of evidence. *See supra* Section III. Most importantly, as discussed above, at step 2, *Inclusive Communities* does not require Defendants to provide testimony regarding the motivations for the creation of a policy. Rather, Defendants are to be given "*leeway* to state and explain the valid interest *served by* the policies." 576 U.S. at 541 (emphasis added).

**B.      The Treasury Reports Are Relevant To Steps 2 And 3 Of The *Inclusive Communities* Framework**

The 2009 and 2018 Treasury Inspector General Reports Plaintiffs prematurely seek to exclude on supposed lack-of-adequate foundation grounds are clearly and directly relevant to steps 2 and 3 of the *Inclusive Communities* framework. At step 3, Plaintiffs have the burden to prove that the "the challenged practice could be served by another practice that has a less discriminatory effect." *Inclusive Communities*, 576 U.S. at 527. Plaintiffs alleged in their complaint that one of Defendants' valid interests, identity verification, could be served by a policy which only requires a non-U.S. citizen applicant to provide an Individual Taxpayer Identification Number ("ITIN") and a foreign passport. Compl. ¶¶ 31-33. Plaintiffs alleged specifically that "as a form of identification," ITINs are as "reliable and precise as a Social Security Number." *Id.* ¶ 31. The Treasury reports explicitly refute this theory, documenting numerous problems with using ITINs for identification. Exs. 5, 6. These reports demonstrate that according to the IRS—the entity accepting ITINs—ITINs should not be used to verify identity.[11]

The Reports also substantiate the "valid interests" served by the Policy at step 2 of the *Inclusive Communities* framework, such as identity verification. For example, the Reports corroborate the opinion of Defendant's leasing and management expert, Mr. George Caruso, who opined that it is reasonable to require proof of legal status as part of an application process because

---

[11] According to the 2009 report, "[t]here are also no controls to prevent an ITIN from being used by more than one taxpayer on multiple tax returns." Ex. 5 at 2 ¶ 11. The same report states "[t]hirty-five percent… of the [ITIN] application packages sampled that were submitted directly to the IRS by mail or through Taxpayer Assistance Centers[] contained errors. The errors ranged from missing and illegible documents to inconsistencies between the Forms W-7 and the supporting documents." *Id.* at 2 ¶¶ 8-9. The IRS states that "ITINS do not serve any purpose other than federal tax reporting." Dkt. 265 n. 13. In the 2018 report, the Inspector General found that "IRS management has not made a programming change needed to identify potentially fraudulent [ITIN] applications." Ex. 6 at 3 ("What TIGTA Found"). The Inspector General also found that "the IRS is unable to identify applications that are questionable based on potentially false or fraudulent supporting documentation via its systemic validation and verification processes" and that the "IRS may have issued 151,384 potentially erroneous or fraudulent ITINs." *Id.*

government documents verifying legal status "are among the gold standards in terms of decent third-party documentation." Ex. 7 at 116:10-117:1 (emphasis added).

Plaintiffs claim these Reports are hearsay and inadmissible pursuant to Fed. R. Evid. 802. Mem. at 9. But they are admissible pursuant to the public records exception to the hearsay rule, Fed. R. Evid. 803(8). Under Rule 803(8), "a record or statement of a public office" is admissible if (A) it sets out: either (i) the office's activities; (ii) a matter observed while under a legal duty to report… ; or (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness. Fed. R. Evid. 803(8). "Rule 803(8)(C) is premised on 'the assumption that a public official will perform his duty properly.'" *Jones v. Ford Motor Co.*, 204 F. App'x 280, 284 (4th Cir. 2006) (citing *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984)). "We presume the admissibility of public reports because of the reliability of the public agencies usually conducting the investigation and their lack of any motive for conducting the studies other than to inform the public fairly and adequately." *Id.* (citing *Ellis*, 745 F.2d at 300) (quotations omitted). As the party opposing admission, Plaintiffs bear the burden to demonstrate that these reports are not reliable, and Plaintiffs have not met this burden. *Ellis*, 745 F.2d at 301.

These reports satisfy the elements of Rule 803(8). They describe matters observed under a legal duty to report by the Treasury Inspector General and Plaintiffs have not argued nor articulated any reasons in their moving papers that would indicate a lack of trustworthiness of these reports. In *Jones*, the Fourth Circuit affirmed the district court's decision to permit into evidence a National Highway Traffic Safety Administration ("NHTSA") report on sudden acceleration in a personal injury matter where the plaintiff claimed the car suddenly accelerated causing an accident which

21

led to her injuries. 204 F. App'x at 283-84. The defendant used the conclusions in the NHTSA report to rebut plaintiffs' causation expert, and to support their experts' conclusions that the accident was not caused by sudden acceleration absent physical evidence of a vehicle defect. *Id.* at 283.  Like the NHTSA report in *Jones* and the reports in *Ellis*, these reports satisfy the public records exception to the hearsay rule and rebut Plaintiffs' disparate impact FHA claim.

Plaintiffs also claim the Reports are irrelevant at step 2 and should be excluded unless Defendants' witnesses can testify that they used these documents in formulating the Policy. Mem. at 9-10. As an initial matter, this argument ignores that these reports are relevant evidence to rebut Plaintiffs' ***step-3*** contention that ITINs are sufficient to verify identity as described above. *Verges*, 2014 WL 559573, at *3 (A "motion in limine… should be granted only when the evidence is clearly inadmissible on all potential grounds"). But, even as to step 2, these reports are relevant. At step 2, Defendants do not need to demonstrate that these reports ***motivated*** Defendants' Policy. Plaintiffs tellingly do not cite any authority for that novel claim. Instead, step 2 requires only that Defendants present evidence of the "valid interest[s] ***served by*** [Defendants' Policy]." *Inclusive Communities*, 576 U.S. at 541 (emphasis added). Proper verification of identity is one of Defendants' valid interests served by the Policy. As described above, Mr. Caruso will testify that, *inter alia*, it is reasonable to require proof of legal status because U.S. Government documents verifying legal status are among the "gold standards" in third-party identity documentation. These reports corroborate Mr. Caruso's opinion and demonstrate the pitfalls in identity verification in using ITINs to verify identity. At bottom, Plaintiffs seek to exclude the Reports because they are harmful to their case, but that is obviously no basis to exclude powerful and relevant evidence.

C.    **The Court Should Reject Plaintiffs' Collateral Attack On Mr. Caruso's Unrebutted Opinions**

Plaintiffs also broadly seek exclusion of evidence or argument relating to the federal Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), 8 U.S.C. § 1611, and further ask—again, prematurely—for an instruction to the jury that a mistake of law cannot constitute a "business necessity" under step 2 of the *Inclusive Communities* framework. Mem. at 11. These broad requests are meritless.

Plaintiffs again mischaracterize the step-2 burden under *Inclusive Communities* by referring to the burden as one requiring proof of a "business necessity" rather than only a "*valid interest served by their policies.*" *Inclusive Communities*, 576 U.S. at 541 (emphasis added); *accord Reyes*, 903 F.3d at 424. As stated above, Plaintiffs cannot refashion the words of *Inclusive Communities*. Moreover, apart from step 2, the PRWORA and other federal statutes and regulations that require landlords to verify the status of residents or risk not being able to underwrite them are directly relevant to whether Defendants' Policy here—which tracks the federal policy expressed in these statutes and regulations—is "artificial, arbitrary, and unnecessary" as *Inclusive Communities* requires Plaintiffs to show.

Still further, Plaintiffs' argument regarding the PRWORA appears to be nothing more than an attempt to set up a straw man in order to collaterally attack the unrebutted opinions of Defendants' leasing and management expert, Mr. Caruso, years after Plaintiffs' motion to strike his opinions was denied by this Court. (Dkt. 189.)[12] Mr. Caruso's testimony that, *inter alia*, Defendant's Policy is a reasonable leasing practice because it aligns with the federal government's own policy governing public housing is directly relevant to multiple issues at trial.[13] Ex. 8 at 1.

---

[12] Plaintiffs never appealed this Court's April 17, 2017 Order denying Plaintiffs' motion to strike Mr. Caruso's opinions. (Dkt. 189.) The Court's denial of that motion is the law of the case.

[13] Federal law expressly prohibits public-housing assistance from going to undocumented aliens, *see* 42 U.S.C. § 1436a, and U.S. Department of Housing and Urban Development (HUD) regulations require public-housing providers (including landlords) to request and review

Plaintiffs did not identify a countering expert and these opinions stand unrebutted. Now, Plaintiffs are attempting to revive their attacks on the admissibility of Mr. Caruso's opinions by requesting the Court to preclude him from even discussing the basis and reasons for his opinions. This is improper. Plaintiffs should not be permitted another bite at the *Daubert* apple.

## V. PLAINTIFFS PLACED THEIR IMMIGRATION STATUS SQUARELY AT ISSUE AND THE COURT SHOULD NOT RESTRICT CROSS-EXAMINATION REGARDING THEIR STATUS

Plaintiffs seek to restrict Defendants' cross-examination on Plaintiffs' immigration status even though Plaintiffs placed their immigration status squarely at issue by filing this suit. The heart of Plaintiffs' disparate impact claim is that the female Plaintiffs are not legally present in the United States and therefore they cannot comply with Defendants' Policy. Defendants should not be restricted in their fundamental right to cross-examine Plaintiffs on facts they place at issue. Indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Plaintiffs do not argue that the female Plaintiffs' illegal status is not relevant to their case— nor could they rationally make such an argument.[14] Plaintiffs, not Defendants, have to establish

---

documentation "of eligible immigration status" before providing public housing assistance, *see* 24 C.F.R. §§ 5.508-5.512. Plaintiffs have never adequately explained (because they cannot) why HUD may be permitted to inquire as to the legal status of individuals receiving public housing assistance but private landlords should face civil liability under the FHA for inquiring as to the legal status of tenants.

[14] Although the Fourth Circuit held that Plaintiffs' immigration status does not preclude them from bringing their disparate-impact claim, the Fourth Circuit did *not* hold that the Plaintiffs' immigration status is not relevant to Plaintiffs' disparate-impact claim. The Fair Labor Standards Act ("FLSA") cases that Plaintiffs cite are inapposite because they hold that immigration status was not relevant to claims made under the FLSA—a different law. *Uto v. Job Site Servs. Inc.*, 269 F.R.D. 209 (E.D.N.Y. 2010); *Orellana v. Tecta Am. S. Fla., Inc.*, No. 10-20137-CIV, 2011 WL 13220457 (S.D. Fla. May 23, 2011); *Romero v. Prindle Hill Constr., LLC*, No. 3:14CV01835(SALM), 2017 WL 3390242 (D. Conn. Aug. 7, 2017) (immigration status not relevant to FLSA claim but might be relevant if Defendant had a company policy against hiring non-citizens). Plaintiffs also cite other inapposite cases where immigration status was not relevant

that the female Plaintiffs are illegally present in order to prove their prima facie case. Without such facts, Plaintiffs will not be able to demonstrate how Plaintiffs are affected by Defendants' Policy, which requires proof of legal status. Plaintiffs have not agreed to any stipulation regarding the female Plaintiffs' illegal status, and thus the female Plaintiffs will have to introduce such evidence through their testimony. Now, they baselessly ask to prohibit cross-examination on the very testimony they intend to present.

Instead, Plaintiffs argue that *they* can establish that the female Plaintiffs are illegally present by introducing their own responses to Defendants' Requests for Admission. But that would clearly violate the rule against hearsay. *See* Fed. R. Evid. 801, 804. Indeed, "requests for admissions are admissible at trial only against the party making the admission. A party may not offer his own responses as proof of the facts admitted." *Burns by Burns v. CSX Transp., Inc.*, 924 F.2d 1051 (4th Cir. 1991); Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2264 (3d ed. 2020) ("A party may not utilize its own admissions at the trial. It is only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent.").

Also, in response to Requests for Admission, the female Plaintiffs have denied a request that asked them to ███████████████████████████████████████

███████████████████████" *E.g.*, Dkt. 98 (Ex. 1(C) at RFA 1). But in testimony, the female Plaintiffs

---

to distinctly different claims. *Doe v. Bd. of Tr. of Neb. State Colls.*, No. 8:17CV265, 2020 WL 2793558, at *1-2 (D. Neb. May 29, 2020) (immigration status not relevant to gender discrimination claim for emotional distress damages); *Martinez v. Cont'l Tire Am., LLC*, 476 F. Supp. 3d 1137, 1148-49 (D.N.M. 2020) (status not shown to be relevant to wrongful death claim for lost earnings). Plaintiffs also cite to a dissenting opinion in an inapposite Fourth Circuit case. *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 998 (4th Cir. 2020). There, a dissenting judge held that the district court abused its discretion by allowing Plaintiffs to introduce testimony that the defendant corporation was owned by a Chinese corporation. *Id.* Those facts and allegations are unrelated to the claims at issue here.

and three of the four male Plaintiffs admitted that ███████████████████████

█████████████████████. Dkt. 98 at Undisputed Fact 10.[15]

Defendants are entitled to cross-examine Plaintiffs at trial about the disparity between their

answers and testimony in order to impeach Plaintiffs' credibility.[16]

   The female Plaintiffs' immigration status is also relevant at step 3, which requires Plaintiffs

to produce evidence of a practice with a "less discriminatory" effect that could still satisfy

Defendants' concerns about identification of tenants and adult co-habitants. Plaintiffs alleged that

ITINs are as "reliable and precise as a Social Security Number." Compl. ¶ 31. Defendants contend

that ITINs are not nearly as reliable and precise as a social security number and that their valid

interests in confirming identity are served by requiring a social security number or a document

issued by the United States government showing legal presence. Such a document is issued only

after vetting by the United States government of the person seeking legal residence. For example,

the male Plaintiffs, who are all present in the United States legally, were required to be

fingerprinted and to answer extensive questions about themselves as part of their application for

Temporary Protected Status ("TPS") in the United States. But the female Plaintiffs have never

been subjected to such a process because they have never sought legal status in the United States.

   Thus, the United States government has never verified the identity of the female Plaintiffs

or conducted a criminal background check for them using their fingerprints as is the case with the

male Plaintiffs. As the parties have stipulated, there is no in-person interview conducted by the

IRS to verify identity before an ITIN is issued. Dkt. 180 at Fact 16. In order to demonstrate this

---

[15] Parties who say one thing in responses to Requests for Admissions (which are written by counsel) and another thing at deposition expose themselves to cross examination on their credibility.

[16] Nonetheless, Defendants do not intend to waste valuable trial time cross-examining Plaintiffs on undisputed facts—such as the fact that the female Plaintiffs are illegally present.

distinction, and thus the pitfalls of using an ITIN to verify identity, Defendants should be permitted to cross-examine the female plaintiffs on what they had to do—or more precisely, what they did not have to do in terms of verifying their identity—in order to receive any ITIN. Such examination will necessarily require questions regarding the female Plaintiffs' illegal status.

Plaintiffs also assert that foreign passports are sufficient to prove identity. But this claim is undermined by the fact that ███████████████████████████████████ ████████████████████. Defendants should be permitted to cross-examine that Plaintiff on those facts at trial. Plaintiffs also contend that the female Plaintiffs may feel embarrassed regarding questions on their immigration status. Mem. at 16. Defendants have no intention of eliciting superfluous testimony regarding the female Plaintiffs' status, or to go beyond the bounds of proper cross-examination, and have no intention of embarrassing the female Plaintiffs. But, it is Plaintiffs, not Defendants, who chose to put their immigration status squarely at issue when they filed their Complaint. The extent of proper cross-examination can only be determined by the Court at trial and should not be limited in advance of trial.

## VI. DEFENDANTS' ADVERTISING TO LATINOS IS RELEVANT TO PLAINTIFFS' DISCRIMINATION CLAIM AND DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE EVIDENCE OF FHA TRAINING SHOULD PLAINTIFFS INTRODUCE EVIDENCE IMPLYING INTENTIONAL DISCRIMINATION

Finally, Plaintiffs argue for the exclusion of several additional categories of evidence. But again, neither the law nor the record supports their broad requests.

### A. Defendants Have Leeway To State and Explain The Valid Interest Served By The Policy, Including Avoiding Liability Under The Anti-Harboring Statute

Plaintiffs first seek exclusion of Defendants' views or opinions because "intentions, or motivations" for a challenged Policy are not relevant. Mem. at 17. Plaintiffs directly contradict themselves within the same brief. In Section II of Plaintiffs' brief, Plaintiffs argue that Defendants' witnesses must have knowledge of the motivations behind the creation of the Policy for

Defendants' witnesses to be able to testify regarding the valid interests served by the Policy. Mem. at 6-9 (requesting that employees be prohibited from testifying unless they have personal knowledge of "justifications" for the Policy). Not only is this argument wrong as detailed above—*Inclusive Communities* does not require a defendant to articulate motivations behind the creation of a Policy—but it directly contradicts the argument that Plaintiffs are now making: that motivations for a Policy are *not* relevant.

Defendants agree—motivations or justifications for the creation of a Policy are not relevant under the *Inclusive Communities* framework. Instead, at step 2, Defendants must be given "leeway to state and explain the *valid interest served by the policies*." *Inclusive Communities*, 576 U.S. at 541 (emphasis added). This includes leeway to explain why excluding undocumented immigrants at the Park serves Defendants' valid concerns relating to underwriting, verifying identity, and avoiding liability under the federal anti-harboring statute. Defendants do not intend to elicit testimony regarding Defendants' views of the propriety of the United States' immigration laws, which make it a crime to harbor an illegal alien. Nonetheless, Defendants must be given leeway to discuss their valid concerns in avoiding potential liability under the anti-harboring statute.[17] At a minimum though, Plaintiffs should not be permitted to restrict the leeway mandated by the Supreme Court by prohibiting Plaintiffs from discussing their valid interests served by the Policy.

**B.    If Plaintiffs Introduce Evidence Raising Implications Of Intentional Discrimination, Defendants Should Be Permitted To Rebut Such Implications With Evidence Of FHA Training**

---

[17] But, as this Court has previously noted, a jury cannot decide the scope of potential criminal liability under that anti-harboring statute—that is an issue for this Court to decide prior to trial. Should this Court agree that this issue is one that must be decided by the Court and not a jury, and the Court agree with Defendants (and its own prior finding)—that the avoidance of potential criminal liability under the anti-harboring statute is a valid interest served by the Policy—this case should not proceed to trial. Plaintiffs have not proffered, nor can they proffer, any step-3 argument on a practice that would serve this valid interest with a "less discriminatory effect".

Plaintiffs also argue that Defendants' FHA training is not relevant to their disparate-impact claim. Plaintiffs, however, intend to introduce evidence at trial of purported eviction related correspondence that has no bearing on Plaintiffs' disparate-impact claim. *See* Dkt. 329. For example, Plaintiffs intend to introduce inspection reports for the Plaintiffs' homes at the Park. *Id*. at 10. Plaintiffs also intend to elicit testimony that the Policy was "rarely enforced" before it was enforced on Plaintiffs—they even mention such extraneous information in the instant motion *in limine* (Mem. at 2). Defendants moved to exclude such evidence as irrelevant to Plaintiffs' disparate-impact claim and unduly prejudicial because there are no allegations of intentional discrimination remaining for trial. Dkt. 329. Lacking any relevance, this evidence and other documents and related testimony described in Defendants' Motion *in Limine* to Exclude Evidence of Lease Materials and Purported "Eviction" Correspondence (Dkt. 329) are meant to imply that Defendants intentionally discriminated against Plaintiffs. If Plaintiffs are permitted to introduce such evidence at trial (and they should not be), Defendants should be permitted to introduce evidence of employees' FHA training to rebut such implications of intentional discrimination. If Plaintiffs are not permitted to make such improper implications at trial, Defendants do not need to introduce evidence of their FHA training.

## C. Evidence Of Spanish Language Advertisements Undermines Plaintiffs' Expert's Claims

Finally, Plaintiffs argue that evidence that Defendants advertise in Spanish should be excluded because it is not relevant to Plaintiffs' disparate-impact claim as it could only show a lack of discriminatory intent. Not so. Such evidence undermines the opinions of Plaintiffs' proffered statistical expert, Professor Clark. Plaintiffs allege that Defendants' Policy, which requires proof of legal status from applicants and their adult co-habitants, discriminates against Latinos because Latinos make up a large part of the undocumented population and thus Latinos

are more likely to be affected by Defendants' Policy. Compl. ¶ 63. Professor Clark opines in his report as to the possible impact of the Policy on Latinos at the Park. He opines that, based on a surname analysis, the residents of the Park are estimated to be 60 percent Latino. Ex. 9 at 5 ¶ 3.[18] He thus concludes that based on this estimate, "[a]s a disproportionate number of Hispanics are not citizens, a disproportionate number of residents will be impacted by the Park's leaseholder policy." *Id.* However, Professor Clark provides no opinions or analysis in his report on the actual impact of the Policy on the percentage of the Latinos living at the Park—that is, Professor Clark does not opine that the Policy actually caused the percentage of Latino residents at the Park to decline. Defendants intend to expose Professor Clark's failure to provide this critical analysis and thus rebut his opinions by introducing evidence that they advertise to Latinos.  Indeed, Professor Clark found that Latinos comprise the majority of occupants at the Park. However, Professor Clark has no opinions on whether the percentage of Latinos at the Park actually declined as a result of the Policy or whether he would have expected it to decline in light of Defendants' advertisements to Latinos. Defendants should be permitted to ask Professor Clark at trial if he considered this evidence, if it factored into his opinions, if he intentionally failed to provide opinions regarding the impact of the Policy at the Park because the evidence of these advertisements would lead to him conclude that the Policy would likely not impact the number of Latinos living at the Park, and if he would expect the number Latino residents at the Park to decline because of the Policy when Defendants advertise to Latinos.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Plaintiffs' motions *in limine* be denied and for such other relief as is just and proper.

---

[18] He never provides any opinion as to what percentage of these residents are undocumented.

30

Dated:  June 4, 2021              Respectfully submitted,


                                  WAPLES MOBILE HOME PARK LIMITED
                                  PARTNERSHIP, WAPLES PROJECT LIMITED
                                  PARTNERSHIP AND
                                  A. J. DWOSKIN & ASSOCIATES, INC.


                                  /s/
                                  _____
                                  Grayson P. Hanes (VSB No. 06614)
                                  Michael S. Dingman (VSB No. 30031)
                                  Justin deBettencourt (VSB No. 83806)
                                  REED SMITH LLP
                                  7900 Tysons One Place
                                  Suite 500
                                  McLean, Virginia 22102
                                  (703) 641-4200 (Telephone)
                                  (703) 641-4340 (Facsimile)
                                  ghanes@reedsmith.com
                                  mdingman@reedsmith.com
                                  jdebettencourt@reedsmith.com
                                  *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of June, 2021, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
_____
Grayson P. Hanes (VSB No. 06614)
Michael S. Dingman (VSB No. 30031)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
mdingman@reedsmith.com
jdebettencourt@reedsmith.com
*Counsel for Defendants*