# EXHIBIT 6

# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION



### Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers

**January 29, 2018**

**Reference Number: 2018-40-010**

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Redaction Legend:**
1 = Tax Return/Return Information
2 = Law Enforcement Techniques/ Procedures and Guidelines for Law Enforcement Investigations or Prosecutions.
3 = Personal Privacy Information.

**Phone Number  /** 202-622-6500
**E-mail Address  /** TIGTACommunications@tigta.treas.gov
**Website          /** http://www.treasury.gov/tigta



**To report fraud, waste, or abuse, call our toll-free hotline at:**

1-800-366-4484

**By Web:**

*www.treasury.gov/tigta/*

**Or Write:**

Treasury Inspector General for Tax Administration
P.O. Box 589
Ben Franklin Station
Washington, D.C. 20044-0589

Information you provide is confidential and you may remain anonymous.



# *HIGHLIGHTS*

**PROCESSES NEED TO BE IMPROVED TO IDENTIFY INCOMPLETE AND FRAUDULENT APPLICATIONS FOR INDIVIDUAL TAXPAYER IDENTIFICATION NUMBERS**

# Highlights

### Final Report issued on January 29, 2018

Highlights of Reference Number:  2018-40-010 to the Internal Revenue Service Commissioner for the Wage and Investment Division.

## IMPACT ON TAXPAYERS

In December 2015, Congress enacted the Protecting Americans From Tax Hikes Act of 2015 (PATH Act), which contains provisions specific to the issuance of Individual Taxpayer Identification Numbers (ITIN).  The Act required the IRS to perform a study on the effectiveness of the ITIN application process and to ensure that ITINs issued solely for purposes of claiming tax treaty benefits are used for such purposes.

## WHY TIGTA DID THE AUDIT

The PATH Act requires TIGTA to conduct an audit of the issuance of ITINs and report to the Senate Committee on Finance and the House Committee on Ways and Means not later than two years after the PATH Act's enactment and every two years thereafter.

## WHAT TIGTA FOUND

The IRS did not provide the required ITIN study by December 18, 2016.  Processes also have not been established to ensure that ITINs issued for tax treaty purposes are used solely for those purposes.  As of March 11, 2017, the IRS had issued 662,168 ITINs for the purposes of claiming tax treaty benefits, but TIGTA determined that only 2,869 (5.3 percent) of the 54,294 ITINs used on a Tax Year 2014 through 2016 tax return were used to claim tax treaty benefits.

IRS management has not made a programming change needed to identify potentially fraudulent applications.  The Real-Time System prevents a tax examiner from entering key information from supporting documentation for certain types of applications.  As a result, the IRS is unable to identify applications that are questionable based on potentially false or fraudulent supporting documentation via its systemic validation and verification processes.

TIGTA estimates that the IRS erroneously issued 8,116 ITINs because tax examiners did not always ensure that required supporting documentation was provided with applications.  In addition, improvements are needed to Real-Time System consistency and validity checks to better identify potentially erroneous or fraudulent applications for review.  Because of limitations in these checks, the IRS may have issued 151,384 potentially erroneous or fraudulent ITINs.

Processes do not ensure that revoked ITINs are prevented from being used on a tax return.  TIGTA found that 8,110 ITINs which had been revoked were still valid on the Individual Master File.  In addition, another 687 ITINs were assigned to deceased individuals, but the deceased individual's account was not locked to prevent the individual's identity from being used to file a tax return.  Further, processes do not sufficiently reduce the risk associated with Certified Acceptance Agents and the verification of identity and foreign status of ITIN applicants.

## WHAT TIGTA RECOMMENDED

TIGTA made 17 recommendations.  One was withdrawn since the underlying concern was addressed by the Tax Cuts and Jobs Act of 2017.  The IRS did not agree with one recommendation, which was to implement processes to ensure that ITINs issued solely for claiming tax treaty benefits are only used for such purposes.  We are concerned with the IRS's disagreement because this action is needed to comply with the law.  The IRS agreed with the other 15 recommendations and has proposed appropriate corrective actions.



**DEPARTMENT OF THE TREASURY**

WASHINGTON, D.C. 20220

TREASURY INSPECTOR GENERAL
FOR TAX ADMINISTRATION

January 29, 2018

**MEMORANDUM FOR** COMMISSIONER, WAGE AND INVESTMENT DIVISION

**FROM:**              Michael E. McKenney
                      Deputy Inspector General for Audit

**SUBJECT:**           Final Audit Report – Processes Need to Be Improved to Identify
                      Incomplete and Fraudulent Applications for Individual Taxpayer
                      Identification Numbers (Audit # 201740002)

This report presents the results of our review to determine whether the Internal Revenue Service
has established effective processes to ensure that only individuals with a tax need are assigned an
Individual Taxpayer Identification Number. This audit was part of our Fiscal Year 2017 Annual
Audit Plan and addresses the major management challenge of Reducing Fraudulent Claims and
Improper Payments.

Management's complete response to the draft report is included as Appendix VI.

Copies of this report are also being sent to the Internal Revenue Service managers affected by the
report recommendations. If you have any questions, please contact me or Russell P. Martin,
Assistant Inspector General for Audit (Returns Processing and Account Services).



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

# *Table of Contents*

Background ..................................................................................................................Page 1

Results of Review ........................................................................................................Page 6

    The Study on ITINs Required by Law Was Not Completed .......................Page 6

    Processes Required by Law Have Not Been Established to Ensure That ITINs Issued for Tax Treaty Purposes Are Used Only for Those Purposes ..................................................................Page 6

        Recommendation 1:................................................................Page 8

    Tax Examiners Did Not Always Ensure That Required Supporting Documentation Was Provided With Applications ..................................................................................Page 9

        Recommendations 2 and 3: ....................................................Page 10

    Management Has Not Made a Programming Change Needed to Identify Potentially Fraudulent Applications ..............................Page 11

    Improvements Are Needed to the Real-Time System Consistency and Validation Checks to Better Identify Potentially Erroneous or Fraudulent Applications ........................................Page 14

        Recommendations 4: ..............................................................Page 15

        Recommendations 5 through 8:...............................................Page 16

    Processes Do Not Ensure That ITINs Which Have Been Revoked or Belong to Deceased Individuals Cannot Be Used to File Tax Returns ..............................................................Page 16

        Recommendations 9 through 13:.............................................Page 18

    There Are Continued Risks Associated With Certified Acceptance Agents' Review and Verification of Identity and Foreign Status for ITIN Applications ....................................Page 19

        Recommendations 14 through 17: ...........................................Page 24



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

## Appendices

Appendix I – Detailed Objective, Scope, and Methodology .......................Page 25

Appendix II – Major Contributors to This Report ........................................Page 31

Appendix III – Report Distribution List .......................................................Page 32

Appendix IV – Outcome Measures...............................................................Page 33

Appendix V – Prior TIGTA Recommendations and IRS Corrective
Actions Related to the Issuance of ITINs ....................................................Page 40

Appendix VI – Management's Response to the Draft Report .....................Page 44



***Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers***

# *Abbreviations*

| | |
|---|---|
| AA | Acceptance Agent |
| ACTC | Additional Child Tax Credit |
| CAA | Certified Acceptance Agent |
| IMF | Individual Master File |
| IRM | Internal Revenue Manual |
| IRS | Internal Revenue Service |
| ITIN | Individual Taxpayer Identification Number |
| NAP | National Account Profile |
| PATH Act | Protecting Americans From Tax Hikes Act of 2015 |
| RTS | Real-Time System |
| TAC | Taxpayer Assistance Center |
| TIGTA | Treasury Inspector General for Tax Administration |



***Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers***

# *Background*

An Individual Taxpayer Identification Number (ITIN) is issued by the Internal Revenue Service (IRS) to individuals who are required to have a Taxpayer Identification Number[1] for tax purposes but do not have and are not eligible to obtain a Social Security Number.  As of December 2016, the IRS had issued more than 23 million ITINs.[2]  The Protecting Americans From Tax Hikes Act (PATH Act) of 2015,[3] enacted on December 18, 2015, requires the IRS to make a number of modifications to the ITIN program.  These include requirements to:

- ***Deactivate ITINs that are not used on a tax return <u>for three consecutive tax years</u>[4] or issued prior to January 1, 2013.***  This provision requires the IRS to deactivate ITINs that are not used[5] on a tax return for three consecutive tax years on the earlier of December 31 of the third consecutive tax year of nonuse or December 31, 2015.  ITINs issued prior to January 1, 2013, are also required to be deactivated based upon a specific schedule detailed in the PATH Act.  For those ITINs identified for deactivation, the IRS changes the status field of the ITIN from active to inactive in the ITIN Real-Time System (RTS).[6] The status field is also updated on the taxpayer's IRS Master File[7] account and the IRS's National Account Profile (NAP).[8]  The IRS uses the NAP when processing tax returns to determine if the ITIN on a tax return is valid.  Tax returns filed with a deactivated ITIN will be sent to the IRS's Error Resolution function.

- ***Distinguish ITINs issued solely for purposes of claiming tax treaty benefits.***  This provision requires the IRS to ensure that ITINs issued solely for purposes of claiming tax treaty benefits are used only for such purposes by distinguishing such numbers from

---

[1] A nine-digit number assigned to taxpayers for identification purposes.  Depending upon the nature of the taxpayer, the Taxpayer Identification Number is an Employer Identification Number, a Social Security Number, or an ITIN.
[2] Cumulative.
[3] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015).
[4] A 12-month accounting period for keeping records on income and expenses used as the basis for calculating the annual taxes due.  For most individual taxpayers, the tax year is synonymous with the calendar year.
[5] An ITIN is considered used if the ITIN is used for the individual who files the return, the individual's spouse, or a dependent included on a return.
[6] A web-based application used by ITIN tax examiners to process, assign, and record applicant submissions from individuals with tax consequences who do not have and are not eligible for a Social Security Number.  Tax examiners review all applications and attached documents then input the information into the ITIN RTS.
[7] The IRS database that stores various types of taxpayer account information.  This database includes individual, business, and employee plans and exempt organizations data.
[8] The NAP database is a compilation of selected entity data from various IRS Master Files that also includes data from the Social Security Administration.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

other ITINs issued.  Tax treaties reduce the U.S. taxes of residents of foreign countries and can supersede applicable provisions of the Internal Revenue Code.

- ***Train and approve community-based Certified Acceptance Agents (CAA).***  This provision requires the IRS to maintain a program for training and approving CAAs.  The CAAs can be from a financial institution, college, university, Federal agency, State or local government, or community-based organization; can be a tax preparer; or can be other persons authorized by the Secretary of the Treasury.  A CAA is authorized by the IRS to authenticate documents that support an applicant's foreign status and identity as sufficient for the purposes of obtaining an ITIN.  The CAAs must conduct an in-person interview with each applicant (primary, secondary, and dependent) in order to complete the ITIN application.

- ***Require documentation of identity, foreign status, and residency.***  This provision requires the IRS to ensure that the individual applying for an ITIN provides documentation that proves his or her identity, foreign status, and residency.  These documents must be original or certified copies from the issuing agency according to the requirements of the IRS.

In addition, the PATH Act includes specific reporting requirements for both the IRS and the Treasury Inspector General for Tax Administration (TIGTA).  These include that:

- ***The IRS is required to perform an ITIN study.***  This provision requires the IRS to conduct a study on the effectiveness of the application process for ITINs before the implementation of the amendments made by the PATH Act, the effects of these amendments on the application process, the comparative effectiveness of an in-person review process for application versus other methods of reducing fraud in the ITIN program and improper payments to ITIN holders as a result, and possible administrative and legislative recommendations to improve such process.

- ***TIGTA is required to conduct a biennial audit.***  This provision requires TIGTA to conduct an audit of the issuance of ITINs and report to the Senate Committee on Finance and the House Committee on Ways and Means not later than two years after the PATH Act's enactment and every two years thereafter.

## Process to obtain an ITIN

To obtain an ITIN, an individual, his or her spouse, or qualifying dependent(s) must complete Form W-7, *Application for IRS Individual Taxpayer Identification Number*, and mail it to the IRS Submission Processing Center in Austin, Texas, or provide it in person to an IRS assistor at a Taxpayer Assistance Center (TAC) or a CAA.  An Acceptance Agent (AA) or CAA is a person or an entity (business or organization) that, pursuant to a written agreement with the IRS, is authorized to assist individuals and other foreign persons who do not qualify for a Social Security Number but still need a Taxpayer Identification Number to file a tax return.  The AA's



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

role is to assist the applicant in completing the application and ensuring that documentation provided meets IRS requirements. The AA submits the application and supporting documents to the IRS for all ITIN applicants. The IRS reviews the application and documents to determine if the applicant has met the requirements to obtain an ITIN.

A CAA is authorized by the IRS to authenticate all documents that support an applicant's foreign status and identity as meeting IRS requirements to obtain an ITIN for primary and secondary taxpayers. In addition to the completed Form W-7, CAAs are required to attach and send copies of all documentation reviewed with the Form W-7 (COA), *Certificate of Accuracy for IRS Individual Taxpayer Identification Number*, to the IRS (*i.e.*, original documents are not required to be sent to the IRS for primary and secondary taxpayers). A CAA is only authorized to authenticate birth certificates and passports for dependent ITIN applications. Similar to applicants for primary or secondary filers, the IRS allows CAAs to send in copies of passports and birth certificates that support identity and foreign status for dependent ITIN applications.

All individuals applying for an ITIN must show they have a tax need for an ITIN by attaching a tax return or indicating that they are entitled to U.S. tax benefits under a tax treaty.[9] The applicant must also provide adequate supporting documentation to prove his or her identity and foreign status. For individuals who are 18 years of age or over and not students, at least one document must show the applicant's recent photograph. Applicants claimed as dependents must also prove U.S. residency unless the dependent is from Mexico or Canada or the applicant is a dependent of U.S. military personnel stationed overseas. Applicants are required to submit one of three documentation types:

- **Original documents** – documents that are not changed from their initial issuance *i.e.*, not a copy or a replica.

- **Certified copies** – documents that the original issuing agency provides and certifies as an exact copy of the original and that contain an official stamp or ink seal from the issuing agency or an embassy or consulate. For example, a foreign issuing agency could provide a certified copy of the applicant's passport. Faxes and photocopies are not acceptable supporting documents.

- **Notarized copies** – documents that are notarized are only accepted in a few instances, such as those in which military spouses and military dependents without a Social Security Number need an ITIN.

---

[9] Individuals may obtain an ITIN without a requirement to file a tax return if they are applying for an ITIN because they receive passive income that is subject to third-party withholding, third-party reporting of mortgage interest, or other income that is covered by a tax treaty.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

## Processing ITIN applications

The ITIN unit in the IRS Submission Processing Center in Austin, Texas, is responsible for processing all ITIN applications. The mission of this unit is to ensure that ITINs are issued timely to qualifying individuals who have a proven tax need. In Calendar Year 2016, the IRS reported receiving 885,113 Forms W-7 and issued 624,332 ITINs as of December 24, 2016. Tax examiners in the ITIN unit review ITIN applications and supporting documentation. Based on the tax examiner's review, the ITIN application will either be:

- **Assigned:** The IRS mails a notice with the assigned ITIN to the applicant.

- **Rejected:** The IRS mails a notice informing the individual that the ITIN application was rejected. The notice informs the taxpayer of the reason for the rejection and that he or she must file another application if he or she would like to reapply for an ITIN.

- **Suspended:** The ITIN application is suspended for a procedural issue or because it has questionable information. IRS guidelines define a questionable application as one for which the tax examiner identifies one or more discrepancies on the application. A procedural issue is one in which the applicant did not properly complete the application or did not attach the required documentation to the application.

The IRS uses the ITIN RTS to process Forms W-7, issue ITIN application correspondence, and revoke ITINs.[10] The system also provides data to management for use in administering the ITIN program. Finally, the RTS is used to update the NAP with the applicant's information once an ITIN is assigned, which then updates the Individual Master File (IMF).[11] Subsequent to processing the ITIN application, any tax return attached to the ITIN application is sent for processing.

## Prior TIGTA reports raised concerns with the IRS's ability to identify individuals filing fraudulent ITIN applications

Since Calendar Year 2009, we have issued four reports discussing weaknesses in the IRS's ITIN program that increase the risk that individuals filing questionable applications will be assigned an ITIN.[12] For example, in Calendar Year 2009, we found that the IRS was issuing multiple ITINs to the same individual. In Calendar Years 2009 and 2012, we found that processes to review and verify ITIN applications did not prevent the issuance of ITINs to individuals who did not provide sufficient documentation to support their identity or foreign status. We also raised concerns with the IRS's use of CAAs to certify documents used to support ITIN applications.

---

[10] ITINs are revoked when the taxpayer obtains a Social Security Number or is deceased or when an ITIN was assigned in error.
[11] The IRS database that maintains transactions or records of individual tax accounts.
[12] See Appendix V.



### Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers

We made a total of 16 recommendations to improve the ITIN program. The IRS agreed with 12 of these previous recommendations and partially agreed with one recommendation. The three recommendations that the IRS did not agree to implement include developing a process to identify individuals who are improperly using ITINs for work purposes[13] and developing a process to ensure that the residency requirement is met for children with ITINs who are claimed for the Child Tax Credit or the Additional Child Tax Credit (ACTC). The IRS also disagreed with our recommendation to discontinue the CAA designation and require that all documentation in support of an ITIN application be sent to the IRS for review and verification. However, the IRS did make some modifications to the CAA Program, with stronger due diligence standards to verify the accuracy of supporting documentation. See Appendix V for a list of prior TIGTA findings and recommendations and IRS corrective actions.

This review was performed at the Austin Submission Processing Center in Austin, Texas, and the Cincinnati Submission Processing Center in Covington, Kentucky, and with information obtained from the ITIN Policy Section in Atlanta, Georgia, during the period December 2016 through October 2017. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

---

[13] As a substitute for a Social Security Number.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

# *Results of Review*

## *The Study on ITINs Required by Law Was Not Completed*

The IRS did not provide the required ITIN study to the Senate Committee on Finance and the House Committee on Ways and Means by December 18, 2016, as required. The PATH Act details that this study should focus on the concept that all ITIN applications may have to be done in person to reduce the number of fraudulent applications processed by the IRS. Specifically, the PATH Act required the IRS to:

> *Conduct a study on the effectiveness of the application process for Individual Taxpayer Identification Numbers before the implementation of the amendments...the effects of the amendments on such application process, the comparative effectiveness of an in-person review process for application versus other methods of reducing fraud in the ITIN program and improper payments to ITIN holders as a result, and possible administrative and legislative recommendations to improve such process.*

On July 20, 2016, the IRS sent a letter to the Senate Committee on Finance and the House Committee on Ways and Means informing the Committees that a report would not be provided by December 18, 2016. In this letter, the IRS noted that issuing such a report before implementing the ITIN deactivation program would provide an incomplete assessment of the ITIN program. The IRS expected the ITIN Study will be delivered to the Senate Committee on Finance and the House Committee on Ways and Means in December 2017. However, as of January 5, 2018, the report was being reviewed by the IRS, Treasury, and Office of Management and Budget.

## *Processes Required by Law Have Not Been Established to Ensure That ITINs Issued for Tax Treaty Purposes Are Used Only for Those Purposes*

While the IRS captures information in its RTS that can identify ITINs that were issued for purposes of obtaining tax treaty benefits, the IRS has not established processes to ensure that these ITINs are used only for those purposes. The PATH Act required the Secretary of the Treasury to:

> *Implement a system that ensures that Individual Taxpayer Identification Numbers issued solely for purposes of claiming tax treaty benefits are used only for such purposes, by distinguishing such numbers from other Individual Taxpayer Identification Numbers issued.*



***Processes Need to Be Improved to Identify***
***Incomplete and Fraudulent Applications for***
***Individual Taxpayer Identification Numbers***

Our review of RTS data as of March 11, 2017, identified that the IRS has issued 662,168 ITINs for purposes of claiming tax treaty benefits. Of the 662,168 ITINs, 54,294 were used on a filed Tax Year 2014 through Tax Year 2016 return. Further analysis of the 54,294 identified that only 2,869 (5.3 percent) were used on a filed tax return with a tax treaty claim (the purpose for which the ITIN was issued). The remaining, 607,874 ITINs were not used on a Tax Year 2014 through Tax Year 2016 return. Of these, 579,230 ITINs were deactivated in compliance with the PATH Act.

The United States currently has tax treaties with 67 foreign countries. Under these treaties, residents of foreign countries are taxed at a reduced rate or are exempt from U.S. taxes on certain items of income they receive from sources within the United States. These reduced rates and exemptions vary among countries and specific items of income. With certain exceptions, tax treaties do not reduce the U.S. taxes of U.S. citizens or residents because they are subject to U.S. income tax on their worldwide income. Individuals claiming a tax treaty benefit can file Form 1040, *U.S. Individual Income Tax Return*, or Form 1040-NR, *U.S. Nonresident Alien Income Tax Return*.

Individuals applying for an ITIN to claim treaty benefits check a box on the application indicating that the ITIN is being requested for treaty purposes. Individuals requesting an ITIN for tax treaty purposes must also provide information relating to the applicable treaty on the ITIN application and other documentation to support eligibility for the treaty benefits. The IRS enters the treaty information into the RTS and codes the ITIN to show it was issued for tax treaty purposes. Figure 1 provides an example of the ITIN application box denoting the request for an ITIN for tax treaty purposes and request for information related to the applicable treaty.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

**Figure 1: ITIN Application Displaying Reason for Submitting**

Source: Screen excerpt of Form W-7.

When we raised our concerns that the IRS is not in compliance with the PATH Act, IRS management stated that no additional processes were developed for the processing of ITIN applications as a result of the tax treaty provision of the PATH Act because the RTS already tracks the purpose for which an ITIN was issued. IRS management also stated that all ITIN applications, including those that request the ITIN to claim a tax treaty benefit, are subject to the same scrutiny to verify the taxpayer's identity and foreign status.

Although the RTS system contains information to identify ITINs requested for tax treaty purposes, the PATH Act also requires the IRS to develop a process to ensure that, once assigned, *the ITIN is in fact used only for such purposes*. The IRS has developed no such process to comply with this legislative requirement.

## Recommendation

Recommendation 1: The Commissioner, Wage and Investment Division, should implement processes to ensure that ITINs issued solely for the purpose of claiming tax treaty benefits are used only for such purpose as required by the PATH Act.

> ***Management's Response:*** The IRS disagreed with this recommendation. IRS management believes that the current processes fully comply with the requirements of the PATH Act to distinguish ITINs issued solely for tax treaty benefits from other ITINs and ensure that these ITINs are used only for such purposes. IRS management further



**_Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers_**

explained that the IRS fully vets applicants claiming a tax treaty benefit at the time of issuance in the same manner as every other ITIN applicant and that reason is recorded in the RTS system. There may be situations in which a tax treaty purpose is coupled with a filing requirement. In both situations, the IRS believes that the applicant has fulfilled the requirements for an ITIN. Further, if the number is not used on a Federal tax return within three years, it will be deactivated for nonuse.

_**Office of Audit Comment**_: As noted in our report, the IRS has not established any processes to ensure that these ITINs are used only on a tax return that claims a tax treaty benefit regardless of whether a tax treaty benefit is coupled with another filing requirement. As such, the IRS is not compliant with this provision of the PATH Act.

## _Tax Examiners Did Not Always Ensure That Required Supporting Documentation Was Provided With Applications_

Based on our review of two statistically valid samples, we estimate that the IRS may have erroneously issued 8,116 ITINs to applicants who did not provide required supporting documentation between October 2016 and March 2017. For example:

- Our review of a statistically valid sample of 113 of the 13,548 dependent ITIN applications[14] submitted by CAAs between October 1, 2016, and March 31, 2017, identified *******1******* applications for which the IRS erroneously issued the ITIN. For each of these applications, the tax examiners did not correctly identify that the CAA did not provide required documents to prove the applicant's foreign status or identity, did not provide an original document when required, or did not provide documentation to prove date of entry into the United States.[15] Based on the results of our statistically valid sample, we project that the IRS may have erroneously issued 839 ITINs[16] between October 1, 2016, and March 31, 2017.

- Our review of a statistically valid sample of 113 of the 409,627 new and renewal applications[17] submitted between October 1, 2016, and March 11, 2017, identified ******1****** applications for which the IRS erroneously issued the ITIN. For these ******1******, tax examiners did not properly authenticate the supporting

---

[14] We selected dependent applications submitted by CAAs because on September 6, 2016, the IRS began allowing CAAs to authenticate passports and birth certificates to support foreign status and identity of dependents.

[15] Applicants claimed as dependents must also prove U.S. residency unless the applicant is from Mexico or Canada or the applicant is a dependent of U.S. military personnel stationed overseas. A passport that does not have a date of entry is not accepted as a stand-alone identification document for dependents.

[16] The point estimate projection is based on a two-sided 90 percent confidence interval. We are 90 percent confident that the point estimate is between 401 and 1,530.

[17] These applications could have been submitted by the applicant to the IRS, an IRS TAC, an AA, or a CAA. They include applications submitted by primary taxpayers, secondary taxpayers, and dependents.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

documentation submitted with the application or the required supporting documentation
was not provided.  Based on the results of our statistically valid sample, we project that
the IRS may have erroneously issued 7,277 ITINs[18] between October 1, 2016, and
March 11, 2017.

IRS management agreed that the IRS erroneously issued ITINs to the nine individuals we
identified whose applications did not include sufficient supporting documentation.  IRS
management stated that they will issue a Quality Assurance Alert to tax examiners to emphasize
that original or certified copies of documents must be provided in support of an ITIN application.
IRS management also indicated that internal guidelines will be updated in support of the Quality
Assurance Alert.  In addition, during the IRS's review of the ITIN applications we identified, the
IRS found that ***3**** used "prefilled" information on the ITIN application, which caused the
passport identification number to duplicate on seven applications for different individuals.  To
address this condition, the IRS will be adding language to Publication 4520, *Acceptance Agents
Guide for Individual Taxpayer Identification Number (ITIN)*, advising CAAs to refrain from
submitting Form W-7 applications with "prefilled" information (*e.g.*, passport identification
numbers), which can cause information to be duplicated on applications for multiple individuals.
Publication 4520 was revised in December 2017.

## *Recommendations*

The Commissioner, Wage and Investment Division, should:

***Recommendation 2***:  Ensure that tax examiners properly review ITIN applications to
authenticate required supporting documentation.

> ***Management's Response***:  The IRS agreed with this recommendation.  IRS
> management issued a Quality Assurance Alert to tax examiners on September 9, 2017,
> reminding them of the requirement for original or certified copies of documents provided
> in support of ITIN applications.

***Recommendation 3***:  Review the nine applications we identified as being erroneously issued
and correspond with the ITIN applicant to obtain required documentation supporting the issuance
of the ITIN if warranted.

> ***Management's Response***:  The IRS agreed with this recommendation and plans to
> take the appropriate follow-up actions.

---

[18] The point estimate projection is based on a two-sided 90 percent confidence interval.  We are 90 percent confident
that the point estimate is between two and 15,678.

***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

## *Management Has Not Made a Programming Change Needed to Identify Potentially Fraudulent Applications*

Additional analysis of the 226 applications we reviewed as part of our statistically valid samples identified 125 (55.3 percent) applications for which the tax examiner processing the application did not enter identifying information from supporting documents into the RTS. We found that programming in the RTS prevents tax examiners from entering key information from supporting documentation for those applications certifie by a CAA or at a TAC site. Each of the 125 applications we identified ******************************2************************** *******2*******. As a result, the IRS is unable to identify applications via its systemic validation and verification processes that are questionable based on potentially false or fraudulent supporting documentation.

When we discussed our concerns with IRS management, they stated that this was to reduce the time needed for tax examiners to input information from ITIN applications. Notwithstanding, we are concerned that not only are the time savings of not recording three fields minimal, but also the omission defeats the purpose of asking for it. This information helps to identify questionable applications. The three fields are the *****************2******************** ************2************. Figure 2 illustrates the key fields that are grayed out to prevent the input of supporting documentation information from applications certified by a CAA or at a TAC site.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

**Figure 2:  RTS Input Screen for Supporting Documentation**

*********************************************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************
****************************2****************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************
*********************************************************

*Source:  Screen print of the RTS W-7 Application View screen.*

In July 2012, the IRS developed consistency and validity checks within the RTS to identify an individual who fraudulently uses identification documents to obtain an ITIN.  This process includes the RTS performing a search to determine if the same supporting documentation was already submitted by another applicant.  The systemic process matches document identification numbers (*e.g.*, birth certificate, passport, driver's license) to determine if a document was previously submitted with the same documentation identification number and entered into the RTS.  When duplicates are identified, the RTS alerts the tax examiner processing the application to verify whether the use of the documents on the application being processed is valid.

These types of checks cannot be performed for those applications ************2*********** ****2**** the information needed to perform the verification match is not entered into the RTS from the supporting documentation.  As such, the IRS is significantly reducing its ability to identify potentially fraudulent applications.  The IRS has not captured key identifying information from supporting documentation since July 12, 2012.

IRS management stated that a request for computer programming change will be submitted in January 2018 to modify the RTS to enable tax examiners to input supporting documentation



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

from applications **************2**************.  However, IRS management cautioned that programming changes are subject to limited resources, budgetary constraints, and competing priorities.  Therefore, IRS management cannot provide an anticipated implementation date at this time.

### *Management characterizes the programming change needed to better detect and prevent the issuance of fraudulent ITINs as "noncritical"*

When we questioned the IRS's delay in implementing RTS changes that would strengthen its ability to identify potentially fraudulent ITIN applications, IRS management stated that their intent is to consolidate this change with other business requirements for prioritization and intended implementation in Calendar Year 2019.  Management indicated that this is the current delivery cycle time frame for "noncritical programming needs."  IRS management further stated that they have processes in place to detect the submission of fraudulent documents and noted that corrective actions have been implemented in response to prior TIGTA recommendations.  In addition, IRS management stated that capturing information from identification documents provides tax examiners with additional information to inform their decisions when processing ITIN applications, but those data are not components of the IRS's key internal controls used to detect and prevent duplicate ITIN assignments.

We disagree that the programming changes to better detect and prevent the issuance of fraudulent ITINs are "noncritical."  Prior TIGTA reviews have identified fraud associated with ITIN applications.  Congress is concerned about ITIN application fraud, which is evident from provisions in the PATH Act.  Further, management did not provide any evidence that the resources needed for these programming changes are extensive.  The programming changes needed appear to be minor.  The program changes need to allow identifying information to be entered similar to what the RTS already allows for those applications that are not ******2***** *******2******.

While the IRS has implemented a number of corrective actions, our prior reviews did not evaluate the effectiveness of the RTS in detecting and preventing potentially erroneous or fraudulent ITIN applications.  As such, the corrective actions taken in response to our prior reports will not address the deficiencies in the RTS system that are contributing to the issuance of erroneous or fraudulent ITINs.

Finally, it should be noted that 444,325 applications have been *************2************* **2** since programming was put in place that prevented the capture of key identifying information from supporting documentation.  With the IRS's estimated timetable of Calendar Year 2019 to address this deficiency, we estimate that the IRS will potentially receive an additional 88,865 *******2******* applications for which it will be unable to determine if the documents used were duplicated by another applicant.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

## *Improvements Are Needed to the Real-Time System Consistency and Validation Checks to Better Identify Potentially Erroneous or Fraudulent Applications*

Our review identified that RTS consistency and validity checks are not always identifying potentially erroneous ITIN applications for review.  For example, our review of RTS application data as of March 11, 2017, identified that the IRS may have issued 151,384 potentially erroneous ITINs.  The potentially erroneous issued ITINs include:

- 95,928 ITINs issued even though the RTS indicated that the application had been rejected.  These applications included those rejected because the applicant had been previously assigned an ITIN, the applicant did not attach his or her tax return as required, or the applicant did not respond to the IRS's request for additional information.  As of March 29, 2017, 10,780 (11.2 percent) of the 95,928 ITINs remain active and can be used to file a tax return.

  We notified IRS management of our concerns on June 30, 2017.  IRS management stated that they are unable to determine why some ITINs were issued to individuals whose application, per the RTS, was rejected.  IRS management explained that the RTS does not contain the history information needed to clarify what transpired for ITINs issued prior to the creation of the RTS.  In addition, IRS management stated that in some cases the application was rejected after the ITIN was issued.  For example, an ITIN can be assigned and then rejected by Quality Review within three calendar days of being processed if it determines that the ITIN application was incorrectly processed.  IRS management also stated that although the RTS assigned an ITIN for some rejected applications, the NAP or the IMF was not updated to show that the ITIN had been issued.

- 44,532 ITINs issued to 21,762 individuals who used the same ***********2********* ****2*** to apply for an ITIN.  We found that even though the IRS's consistency and validation checks include the identification for additional review of applicants who use the same *****************2*************** to obtain an ITIN, multiple ITINs continue to be issued to individuals.  It should be noted that, while the IRS has implemented systemic consistency and validity checks, the tax examiner can accept applications that do not pass the consistency and validity checks and issue an ITIN without further review.  As of June 28, 2017, a total of 44,524 (99.98 percent) of the 44,532 ITINs remain active and can be used to file a tax return.

  We notified IRS management of our concern on June 30, 2017.  IRS management indicated that they are in the process of determining the actions that need to be taken to address the duplicate ITINs we identified.

- 10,924 ITINs issued to 4,598 individuals who used the same supporting documents (*e.g.*, driver's license, passport number) when applying for an ITIN.  Further review of the



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

10,924 ITINs we identified with duplicate documents found that 3,365 (30.8 percent) were issued after the implementation of the consistency and validation checks in July 2012. It should also be noted that the number of ITINs the IRS actually issued to individuals who used the same supporting documents may be significantly more than the 10,924 ITINs we identified because the IRS does not capture documents in the RTS that ***********************2*********************. As of June 28, 2017, a total of 10,921 (99.97 percent) of the 10,924 ITINs remain active and can be used to file a tax return.

We notified IRS management of our concern on June 30, 2017. IRS management informed us that the checks to identify duplicate use of supporting documentation are only performed when an applicant's **************2************* also match another application contained in the RTS. IRS management stated that they had requested consistency and validity checks to identify duplicate documents separate from the checks to identify duplicate use of ************************2**********************. However, management indicated that the IRS Office of Information Technology informed them that the checks could not be programmed due to system limitations. A total of 10,668 (97.7 percent) of the 10,924 ITINs we identified did not have a duplicate *****************2************** and, as such, the fact that these applications included source documents previously used on another application would not have been identified as potentially erroneous.

IRS management stated that they are looking into a systemic process to prevent the issuance of ITINs to individuals who use the same supporting documents. IRS management noted that, in the interim, the IRS has established a manual process through a Secondary Review Team and the Patterns and Trends Identification Desk in the Austin ITIN Operation to detect these occurrences.

## Recommendations

The Deputy Commissioner for Services and Enforcement should:

<u>Recommendation 4</u>: Modify the RTS consistency and validity checks to identify all duplicate uses of supporting documents, including those for which the **************2************** ***2*** on the application do not match information in the RTS.

> ***Management's Response***: The IRS agreed with this recommendation. IRS management plans to request programming changes to unmask the supporting document fields and allow input when applications that have been *************2************** **2** are processed. This will permit the same supporting documentation to be displayed for those applications as is displayed for applications with source documents validated by tax examiners.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

<u>Recommendation 5</u>*:* Ensure that programming changes are made to require mandatory review when the RTS alerts tax examiners that an applicant is using the \*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*2\*\*\*\*\* or duplicate supporting documents as has previously been used to obtain an ITIN.

> ***Management's Response:*** The IRS agreed with this recommendation. IRS management plans to evaluate a systemic process that can be deployed to prevent ITIN assignments from being made when supporting documents have been previously used to obtain an ITIN. If a systemic process is feasible, the IRS will request the requisite programming changes.

***Recommendation 6:*** Establish systemic controls in the RTS to revoke ITINs determined to be issued in error after the three-day quality review period (*i.e.*, the system should not accept a reject action).

> ***Management's Response:*** The IRS agreed with this recommendation and plans to request the requisite programming change.

The Commissioner, Wage and Investment Division, should:

***Recommendation 7:*** Review the 95,928 ITINs we identified that were issued with a rejected application and take the actions necessary to revoke the ITINs if appropriate.

> ***Management's Response:*** The IRS agreed with this recommendation and plans to take appropriate follow-up action on the affected ITINs.

***Recommendation 8:*** Review the 44,532 ITINs we identified that were issued to individuals using the same \*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\* and the 10,924 ITINs we identified that were issued to individuals who used duplicate supporting documents to determine the validity of the ITINs and take the actions necessary to revoke those ITINs that are determined to be invalid.

> ***Management's Response:*** The IRS agreed with this recommendation and plans to take appropriate follow-up action on the affected ITINs.

## *Processes Do Not Ensure That ITINs Which Have Been Revoked or Belong to Deceased Individuals Cannot Be Used to File Tax Returns*

Our review of RTS data as of March 11, 2017, identified 8,110 ITINs that were valid for use in filing a tax return despite that they are shown as revoked in the RTS. For 1,237 of these revoked ITINs, the NAP status was not correctly updated to reflect that the ITIN had been revoked. The IRS revokes ITINs when the taxpayer obtains a Social Security Number or is deceased or when the IRS determines that an ITIN was assigned in error. When the revoked status of ITINs are not accurately updated, tax returns filed using the revoked ITINs are allowed to be processed because the ITIN incorrectly shows on the IMF and NAP as being active and valid.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

### We determined that 101 of these revoked ITINs were used on a Tax Year 2016 tax return; 78 of these filers received refunds totaling $221,956.

When we notified IRS management of our concerns, management stated that when an ITIN is revoked because the ITIN owner has a Social Security Number, the Accounts Management function has the responsibility to ensure that the ITIN account is merged into the Social Security Number account and the actions are completed and are successful before the ITIN is revoked. The ITIN unit does not perform any subsequent reviews to ensure that the accounts were successfully merged. In addition, prior to January 2016, the capability existed for IRS employees to establish an entity for an ITIN as well as initiate a request to make an ITIN valid. Both of these actions resulted in an ITIN showing as valid on the IMF even if the ITIN was previously revoked. Management further stated that when an ITIN is revoked because it was discovered that there are multiple ITINs for the individual, the revoke action was taken but the ITIN accounts were not merged into one account.

IRS management stated that they will review the accounts we identified and clarify what should occur with the IMF accounts when each revoke action is input. They will review existing instructions for clarification that can be made. The IRS will coordinate necessary actions to address the accounts on the valid side of the IMF. In addition, if programming changes are necessary, IRS management will request new requirements. For ITINs that were revoked but are still active on the NAP, it has been identified in the past that updates to the NAP have been missed. IRS management stated that they will coordinate necessary actions to address accounts that reflect active on the NAP.

### Not all ITINs that belong to a deceased individual were locked

We also identified 687 ITINs for which information in the RTS shows that the individual assigned the ITIN was deceased, but the individual's tax account was not locked. As part of its efforts to combat tax-related identity theft, the IRS locks the tax accounts of deceased individuals, including those with an ITIN, to prevent the individuals' identity from being used to file fraudulent tax returns. When tax accounts are locked, electronically filed tax returns are rejected and paper tax returns are prevented from posting to the Master File.

We notified IRS management of our concerns on June 30, 2017. IRS management stated that the IRS typically learns that an ITIN holder is deceased when a final return is filed on their behalf. During the processing of that return, a Computer Condition Code is applied to the return. This Computer Condition Code will cause the Master File to post the deceased tax account lock in the tax account. The 687 ITINs we identified included 120 deceased ITIN holders who do not have an account on the IMF. Without an active account on the IMF, the IRS is unable to add the deceased lock. However, the remaining 567 deceased ITIN holders did have a tax account on the IMF and should have had the deceased lock.

IRS management is taking steps to lock the IMF accounts for the remaining 567 deceased ITIN holders. In addition, IRS management stated that they are exploring options for locking a

Page  17



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

deceased ITIN holder's tax account when the IRS learns of the individual's death through means other than the filing of a tax return.

## Recommendations

The Commissioner, Wage and Investment Division, should:

**Recommendation 9**:  Review the 8,110 ITINs identified with a revoked status in the RTS but still valid on the IMF and take necessary action to change the ITINs to invalid.

> **Management's Response**:  The IRS agreed with this recommendation and plans to take appropriate follow-up action on the affected ITIN accounts.

**Recommendation 10**:  Review the 1,237 ITINs identified with a revoked status in the RTS but still active on the NAP and take necessary action to remove the ITIN from the NAP.

> **Management's Response**:  The IRS agreed with this recommendation and plans to take appropriate follow-up action on the affected ITIN accounts.

**Recommendation 11**:  Modify processes to systemically remove all revoked ITINs from the NAP and update the IMF.

> **Management's Response**:  The IRS agreed with this recommendation and plans to ascertain the reasons for revoked ITINs remaining on the NAP.  Depending on the cause, programming changes will be requested or corrections to existing programming will be initiated.

**Recommendation 12**:  Develop processes and procedures to identify deceased ITIN holders and lock their tax accounts if they exist.

> **Management's Response**:  The IRS agreed with this recommendation.  IRS management responded that the IRS has processes in place to systemically lock the accounts of deceased ITIN holders.  However, it is still investigating the reason why programming intended to transmit deceased ITIN holders' information from the RTS to the NAP has not worked as intended.  The IRS plans to initiate programming corrections once the cause has been determined.

**Recommendation 13**:  Ensure that the tax accounts for the 567 deceased ITIN holders we identified are locked.

> **Management's Response**:  The IRS agreed with this recommendation and plans to ensure that the accounts are locked.



***Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers***

## There Are Continued Risks Associated With Certified Acceptance Agents' Review and Verification of Identity and Foreign Status for ITIN Applications

The PATH Act requires the IRS to "maintain a program for training and approving community-based certified acceptance agents." Our review identified deficiencies in both processes for approving applications for participation in the CAA program and in ensuring that adequate training is completed by the CAA's. Specifically, we identified that IRS processes:

- Did not always ensure that CAA applicants met program suitability requirements before granting individuals and businesses the CAA designation.

- Do not prevent ITIN applications from being submitted by CAAs whose status has expired or been terminated.

- Do not ensure that a CAA's forensic training includes training on the review of document security features when authenticating an applicant's proof of identity.

### *The IRS reversed its corrective action to a prior TIGTA recommendation*

Prior to September 2016, in response to a TIGTA recommendation, the CAAs were not authorized to verify the identity and foreign status related to ITIN dependent applications. In July 2012, we reported that the processing and verification of ITIN applications should be performed only by IRS employees. We noted that despite the use of ITINs to obtain substantial Federal tax benefits and its unintended use as a Federal identification number for other purposes, the IRS allowed the CAAs to review and verify the identity and foreign status of individuals applying for an ITIN. We recommended that the IRS discontinue the CAA designation and require that all documentation in support of an ITIN application be sent to the IRS for review and verification. We further reported that the CAAs are frequently tax return preparers and, as such, have a financial interest in preparing an individual's tax return, which may run counter to the incentive to protect the Government's interest of validating the taxpayer's identity and foreign status. We concluded that there was not sufficient rationale to allow these individuals to act on behalf of the Government.

In response, management changed procedures and began requiring for all dependent applicants that the CAAs provide to the IRS, for review and certification, original documents or certified copies from the issuing agency. The IRS also established a requirement for CAAs to take formal forensic training to help them identify legitimate identification documents. However, the IRS continued to allow CAAs to submit copies of the documents they review for the primary and secondary applicants.

In September 2016, the IRS began actively recruiting CAAs with the goal to increase the availability of ITIN services nationwide. In conjunction, the IRS reversed its prior position and began to allow the CAAs to once again review and verify the identity and foreign status related



***Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers***

to dependent ITIN applications. This reversal of policy allows the CAAs to review the original passports and birth certificates associated with a dependent ITIN application, certify this information, and send the IRS photocopies.

### *Annual Compliance Reviews show significant CAA noncompliance with program requirements*

In addition to the concerns we raised in our prior report, the IRS's own compliance program found that the majority of CAAs reviewed were not compliant with program requirements. For example, the IRS reviewed 392 CAAs as part of its Calendar Year 2016 CAA Annual Compliance Review process and identified 338 (86.2 percent) that were not compliant with program requirements. Of the 338 CAAs:

- 177 CAAs received a warning. Warnings are sent to CAAs when the *******2******* ************************************************2***************************************** ************************************************2***************************************** ******2******. The warning letter notifies the CAA that it is being issued a warning for one year. The CAA is allowed to continue in the program. However, the IRS will monitor the CAA's activities to evaluate the CAA's progress. The warning letter provides the date of the compliance visit the decision is based on and lists the infractions identified during the visit. The warning letter also states that the IRS will continue to monitor the CAA's operation to ensure that the CAA corrects the situation and meets the program requirements in the future.

- 67 CAAs were placed on probation. CAAs are placed on probation when *****2***** ************************************************2***************************************** ************************************************2***************************************** ************************************************2***************************************** ***********************************2****************************

- 94 CAAs were terminated from participation in the program. The CAAs are terminated when ************************************************2***************************************** ************************************************2***************************************** ************************************************2***************************************** ************************************2***************************************** ****************2***************** It should be noted that for six of these CAAs, their status in the RTS was not updated to show they were terminated.

IRS compliance reviews include both physical visits and correspondence reviews. The physical reviews generally involve a revenue agent making a physical visit to interview the CAA; observe office space for interviews to evaluate safeguards to maintain confidentiality of client meetings and records; review files, records, and standard of operation procedures; review Form W-7 submissions; analyze advertising material; and inspect files the CAA is required to maintain for three years. To select the CAAs for review, the IRS analyzes the volume of ITIN applications



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

submitted by the CAAs and the rejection rate of the applications.  As of November 2016, there
were 2,789 CAAs in the United States and 222 CAAs located outside the United States.

### *Processes did not always ensure that CAA applicants met program suitability requirements before granting individuals or businesses the CAA designation*

Our review of a statistically valid sample of 94 of the 2,177 individuals and businesses that
applied to the CAA Program between August 1, 2016, and February 28, 2017, found that the IRS
incorrectly processed ****1 and 3**** of the CAA applications.  This included:

- *********1********* not subjected to a Federal Bureau of Investigations background
  check when required.  *****************************1***************************
  ****1******.  IRS program guidelines state that the application should be returned to the
  applicant to request current proof of professional certification or fingerprints.

  IRS management stated that they will correspond with ************1*********** to
  request current (unexpired) proof of professional status or fingerprint cards for the
  Federal Bureau of Investigations background check.  Information will be added to
  internal guidance directing employees to return the application as incomplete if an
  individual does not provide current (unexpired) proof of professional status, after
  attempting to verify the applicant's professional status by researching the applicable State
  agency's website.  Additionally, language will be added to internal guidance instructing
  employees to corresponded with applicants to request current information, including
  proof of professional status, when the documentation attached to the application is
  expired.

- *******3****** failed the tax compliance check.  For example, *****3***** required
  to file a *********************************3**********************************
  **3** not been filed.  IRS program guidelines state that a business and all authorized
  representatives must successfully pass all facets of the tax compliance check to be
  accepted into the ITIN CAA Program.  All business and personal tax returns must be
  timely filed, all tax liabilities must be paid or appropriately addressed (such as with an
  installment agreement), and no fraud penalties must be assessed against the individual or
  business.  IRS management stated that they will require ****3**** to submit the
  required returns.

Based on our statistical analysis, we estimate that 46 individuals or businesses[19] that applied to
the CAA program between August 1, 2016, and February 28, 2017, did not meet one or more of
the IRS suitability requirements.

---

[19] The point estimate projection is based on a two-sided 90 percent confidence interval.  We are 90 percent confident
that the point estimate is between 9 and 140.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

### *Processes do not prevent ITINs from being issued for applications submitted by CAAs whose status has expired or been terminated*

Our review of RTS data as of March 11, 2017, identified that 9,336 ITINs were issued based on applications submitted by 170 CAAs after the CAA Agreements had expired. Specifically, we found the following:

- 8,791 Forms W-7 were submitted by 129 CAAs after their agreement had expired and the CAA had been terminated.

- 536 Forms W-7 were submitted by *1 and 3* CAAs after their agreement had expired but the CAA had not been terminated.

- 9 Forms W-7 were submitted by *1 and 3* after the agreement had expired but there was no agreement expiration date or termination date recorded in the RTS.

A CAA Agreement is in effect on the date the agreement is signed by the IRS and expires on December 31 of the fourth full calendar year from which the agreement went into effect. To prevent a lapse in service, the IRS encourages the CAAs to submit a renewal application at least six months before the expiration date. In addition, the IRS sends a courtesy e-mail to the CAAs whose agreement will expire at the end of the year. However, the IRS does not have a process to notify CAAs when their agreement expires. Procedures for tax examiners processing ITIN applications do not instruct the tax examiner to verify that the CAA is active when processing an ITIN application submitted by a CAA.

We notified IRS management of our concerns on October 4, 2017. IRS management stated that the Form W-7 will be rejected when the CAA status in the RTS is other than "approved." However, IRS management also stated that the IRS does not update the CAA status for agreements that expire on December 31 from "approved" to "expired" until the following February. According to IRS management, the delay in updating the RTS status provides the IRS sufficient time to ensure that applications submitted by the CAA prior to the CAA Agreement expiring (prior to December 31) can be processed with no harm to the taxpayer. IRS management also indicated that 8,540 of the 9,336 ITINs we identified were issued prior to Calendar Year 2013, when the IRS strengthened controls to prevent ITINs from being issued for applications submitted by a CAA with an expired or terminated agreement after the CAA status is updated in the RTS.

Additional analysis of the 9,336 ITINs identified confirmed that 9,144 ITINs were issued prior to Calendar Year 2013. We also agree that Forms W-7 submitted by a CAA prior to the date the CAA Application expires or is terminated should be processed and ITINs assigned if warranted. However, the Forms W-7 for the remaining 192 ITINs we identified were submitted to the IRS after the date the CAA Agreement expired or was terminated. As such, these applications should have been rejected and the ITINs not assigned.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

### *Processes do not ensure that CAA forensic training adequately covers the review of document security features when authenticating an applicant's proof of identity*

Although the IRS requires forensic training, the IRS does not ensure that the training courses provide sufficient training on the review of document security features in authenticating the validity of documents the IRS accepts as proof of identity. For example, the IRS suggests two vendors that can be used to obtain this required training. The IRS does not require CAA applicants to take one of the two identified forensic document training courses. Instead, the IRS lists the two identified forensic document training courses on IRS.gov as training that can be taken but indicates that applicants can take any course. We reviewed the forensic document training provided by the two vendors suggested by the IRS and found that the courses did not provide adequate training on how to authenticate a ********************2*******************
*******2******.

We alerted the IRS of our observations on May 11, 2017. We recommended that the IRS inform the two suggested companies of the discrepancy between the training offered and the full list of supporting documentation accepted by the IRS. We also recommended that the IRS develop controls to verify that the forensic document training completed by CAA applicants who do not use one of the two IRS-identified training vendors satisfies the forensic document training requirement before being granted the CAA designation. IRS management agreed to provide feedback to the two IRS-identified training vendors on the documents that were not covered in their training. However, management stated that processes are already in place to review all new vendors used by CAA applicants to obtain forensic document training. Nonetheless, we remain concerned as to the sufficiency of IRS's review of new vendors given that the two forensic training courses the IRS recommends did not include training on all documents the IRS accepts as proof of identity.

IRS management further stated that whether or not a CAA is used in the ITIN application process, the IRS reviews all documents submitted with ITIN applications to determine if they meet acceptable documentation standards for issuance of an ITIN. However, management's statement is not accurate. In fact, IRS procedures *do not* require employees who process ITIN applications to review **************2************** submitted with a Form W-7 (COA) with a CAA-certified ITIN application for authenticity. IRS employees are instructed to verify only that the CAA ***********2**********documents listed on the Form W-7 (COA) to the ITIN application. Further, even if the IRS required its tax examiners to authenticate copies of ***2*** attached to applications submitted by the CAAs, ***************2*****************
*******************************************2****************************************************
************2***********



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

## Recommendations

The Commissioner, Wage and Investment Division, should:

**Recommendation 14***:* This recommendation has been withdrawn.  The recommendation was to reinstate the procedures that do not permit CAAs to certify supporting documents for dependent ITIN applications because dependents can be used to fraudulently obtain tax benefits such as the refundable ACTC.  However, with the passage of the Tax Cuts and Jobs Act of 2017 signed into law December 22, 2017, this is no longer a concern because the law includes a provision requiring a Social Security Number for each qualifying child for whom the ACTC is claimed on the tax return.

**Recommendation 15:** Develop processes and procedures to ensure that ITINs are not assigned for applications submitted by CAAs whose CAA Agreement has expired or been terminated.

> ***Management's Response:***  The IRS agreed with this recommendation and plans to update processes to ensure that the status of those CAAs whose CAA Agreement has expired or been terminated is properly updated in the RTS, thereby preventing the assignment of ITINs on applications submitted by them.

**Recommendation 16:**  Review the 192 ITINs we identified that were assigned to individuals whose applications were submitted by CAAs after the CAA Agreement expired or was terminated.  ITINs assigned to individuals for whom the IRS did not review original documents should be revoked and the individuals instructed to reapply for their ITIN if they have a continued tax need.

> ***Management's Response:***  The IRS agreed with this recommendation and plans to take appropriate actions to ensure that agreements are updated in the RTS within a reasonable time period.  The IRS also plans to review the applications we identified to determine if any additional action should be taken to ensure their validity.

**Recommendation 17:**  Prior to acceptance into the CAA program, ensure that the CAA-completed forensic training includes instruction on how to verify the security features on all original documents that the IRS accepts as proof of identity.

> ***Management's Response:***  The IRS agreed with this recommendation and plans to take action to ensure that required forensic training available to CAA applicants addresses all identification documents accepted to authenticate the identity of ITIN applicants.

*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

**Appendix I**

# *Detailed Objective, Scope, and Methodology*

Our overall objective was to determine whether the IRS has established effective processes to ensure that only individuals with a tax need are assigned an ITIN. To accomplish our objective, we:

I.    Determined if the IRS implemented the PATH Act[1] requirements timely.

    A.    Evaluated IRS efforts to perform a study of the ITIN program.

        1.    Determined the requirements of the study and the IRS's plans for conducting the study.

        2.    Determined whether the report of the study was issued to the appropriate congressional committees by December 18, 2016, as required by the PATH Act.

    B.    Determined if the IRS developed procedures to distinguish ITINs issued solely for the purposes of tax treaty benefits.

        1.    Reviewed Internal Revenue Manual (IRM) procedures to determine if there were procedures for identifying tax returns filed using an ITIN issued solely for the purposes of tax treaty benefits during processing of the tax return or selection for examination.

        2.    Obtained information from IRS management to determine steps taken to develop procedures to distinguish ITINs issued solely for the purposes of tax treaty benefits.

        3.    Determined whether the RTS[2] provided information to identify ITINs issued solely for the purposes of tax treaty benefits.

        4.    Determined whether the IRS implemented a system on the IMF[3] to identify ITINs issued solely for purposes of tax treaty benefits.

            a)    Determined if the IRS has controls on the IMF to identify ITINs issued for claiming a tax treaty.

---

[1] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015).
[2] The RTS is a web-based application used by ITIN tax examiners to process and record applicant submissions. Tax examiners review all applications and attached documents then input the information into the RTS.
[3] The IRS database that maintains transactions or records of individual tax accounts.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

b) Determined if returns are identified for appropriate actions to be taken on the tax return to prevent erroneous claims.

c) Identified whether any tax return posted to the IMF for Tax Year[4] 2016 using an ITIN that was requested to claim a tax treaty benefit.

II.   Determined if processes were followed when reviewing Forms W-7, *Application for IRS Individual Taxpayer Identification Number*, reviewing the applicant's documentation, and entering information into the RTS.

A. Reviewed IRM procedures to determine the process that must be followed when reviewing Forms W-7 for new ITIN applicants and ITIN renewals.

B. Reviewed IRM procedures to determine the types of supporting documents that are required to prove identity and foreign status for primary and secondary taxpayers and dependents.

C. Identified the criteria for inputting information from the ITIN application and supporting documentation information into the RTS.

D. Identified the population of 409,627 applications for new ITINs and applications to renew ITINs from the data extract provided by the IRS on March 11, 2017. We worked with our contract statistician to select a stratified statistical sample of 113 ITIN applications that include new ITIN applications and ITIN renewals submitted between October 1, 2016, and March 31, 2017. We used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent. Using a random number generator, we selected the sample cases and requested the case files from the IRS.

E. Identified the population of 13,548 dependent applications submitted by CAAs from the monthly data extracts provided by the IRS as of March 31, 2017. We worked with our contract statistician to select a statistical sample of 113 ITIN dependent applications submitted by CAAs between October 1, 2016, and March 31, 2017. To select our statistically valid sample, we used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent. Using a random number generator, we selected the sample cases and requested the case files from the IRS.

F. Reviewed each sample to evaluate:

1. Whether the correct process was followed when reviewing Forms W-7.

2. Whether applicants provided the required documentation.

---

[4] A 12-month accounting period for keeping records on income and expenses used as the basis for calculating the annual taxes due. For most individual taxpayers, the tax year is synonymous with the calendar year.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

    3. Whether information entered into the RTS was complete and accurate.

    4. Whether the correct determination was made to issue the ITIN, suspend the ITIN application, or reject the ITIN application based on the information and documents provided.

    5. Whether the ITIN application was processed within established time frames.

G. Reviewed RTS documentation to determine systemic controls in place to ensure that information entered into the RTS was complete and accurate.

H. Evaluated the RTS controls to prevent missing information on the ITIN application before the system allows the ITIN to be assigned.

    1. Identified key fields on the ITIN application that must be entered into the RTS before assigning the ITIN.

    2. Evaluated the process for tax examiners to record supporting documentation authenticated by ****************2************** on the RTS system.

III. Determined if the IRS is ensuring that information in the RTS is accurate and that ITINs were issued only to individuals entitled to receive them.

A. Determined if RTS systemic controls prevented an ITIN from being issued to an individual whose ITIN application had been rejected.

    1. Identified ITINs for which the ITIN history shows that the ITIN application was rejected but the Form W-7 history shows that the ITIN was issued.

    2. Interviewed RTS computer programmers to identify programming errors that would allow this to happen.

B. Determined if the ITIN RTS had adequate controls to prevent an individual from receiving more than one ITIN.

    1. Interviewed IRS management and RTS computer programmers to determine if the RTS has systemic controls to prevent multiple ITINs from being issued to an individual.

    2. Obtained requirements designed to prevent multiple ITINs from being issued to an individual.

    3. Evaluated the requirements designed to identify duplicate applications and alert the tax examiner before assigning an ITIN.

    4. Identified ITINs created with duplicate entity information and duplicate identity documentation.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

IV.  Determined if the IRS had adequate controls to revoke ITINs when necessary and to ensure that revoked ITINs were not used to file tax returns.

    A.  Reviewed IRM procedures for revoking ITINs on the Master File[5] and the RTS.

    B.  Evaluated the process used by the IRS to revoke ITINs in the RTS and verify that the ITINs revoked in the RTS are removed from the Master File.

    C.  Identified any ITINs in the RTS that should have been revoked but were valid on the Master File entity or active on the NAP, which would allow the ITIN holder to file tax returns.

    D.  Determined if the process to revoke ITINs for deceased taxpayers ensures that the ITIN is revoked on the RTS and flagged on the Master File with a deceased lock.

        1.  Reviewed IRM procedures for placing deceased locks on taxpayer accounts and verified that these procedures include placing locks on accounts of deceased ITIN holders.

        2.  Reviewed the systemic process for placing deceased locks on taxpayer accounts and verified that these procedures include placing locks on accounts of deceased ITIN holders.

        3.  Verified whether all the ITINs of deceased taxpayers present on the RTS had been revoked and a deceased lock placed on the Master File.

V.  Determined if the IRS is ensuring the suitability of the CAAs.

    A.  Reviewed IRM procedures to identify categories of tax return preparers who are not to submit a fingerprint for a background investigation.

        1.  Interviewed IRS management to gain an understanding of why certain categories of tax return preparers are not required to provide fingerprints.

        2.  Evaluated the criteria for not requiring certain CAA applicants to provide fingerprints and be subject to background investigations.

    B.  We identified the population of 2,177 individuals and businesses that applied to the CAA Program between August 1, 2016, and February 28, 2017.  We worked with our contract statistician to select a statistically valid sample of 94 CAA applications to determine if the applications were processed correctly and the CAA correctly certified.  To select our statistically valid sample, we used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent.

---

[5] The IRS database that stores various types of taxpayer account information.  This database includes individual, business, and employee plans and exempt organizations data.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

Using a random number generator, we selected the sample cases and requested the case files from the IRS. We reviewed the data to evaluate whether:

1. The CAA provided a fingerprint.

2. A background check was performed using the fingerprint.

3. The background information was evaluated correctly in certifying the applicant.

4. The applicant provided an original copy of a forensic training certificate issued by the training company.

5. The training company appeared to be a valid training company providing forensic training based on Internet research.

C. Evaluated CAA compliance reviews.

1. Evaluated selection criteria to determine if the most egregious cases of CAA noncompliance are selected for review.

2. Determined if the treatment given to noncompliant CAAs (*i.e.*, warning, probation, termination) identified by the IRS as a result of the Fiscal Year 2016 compliance reviews is sufficient given the offenses identified.

D. Determined if the forensic training that the IRS recommends for the CAAs adequately trains the CAAs to properly authenticate supporting documentation for ITIN applicants.

1. Evaluated the document forensic training to verify that the content is sufficient for the CAAs to authenticate supporting documentation required for the ITIN applications.

2. Evaluated the IRS's process to verify that the CAA applicants completed and comprehended the forensic document training.

E. Determined if the IRS monitors the CAA Agreement expiration dates to deactivate the expired CAAs on the RTS.

1. Evaluated the process the IRS used to monitor the expiration date of the CAA Agreements.

2. Identified all expired CAAs that are still active on the RTS.

3. Identified all the ITINs assigned with an application submitted by a CAA with an expired agreement.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

## *Data validation methodology*

During this review, we relied on RTS Data Center Warehouse data that contains all Form W-7 applications, an RTS extract provided by the IRS for all CAA data present on the RTS, the NAP data present on the Data Center Warehouse to verify the ITIN status, and the IMF entity data present on the Data Center Warehouse and extracted by TIGTA Strategic Data Services to verify the ITIN status on the IMF. Before relying on the data, we ensured that each file contained the specific data elements we requested. In addition, we selected random samples of each extract and verified that the data in the extracts were the same as the data captured in the IRS's Integrated Data Retrieval System[6] and the RTS. Based on the results of our testing, we believe that the data used in our review were reliable.

## *Internal controls methodology*

Internal controls relate to management's plans, methods, and procedures used to meet their mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance. We determined that the following internal controls were relevant to our audit objective: controls to ensure that the RTS correctly issued ITINs when applications and documents were approved by tax examiners, controls to prevent ITINs from being active on the NAP when Form W-7 is rejected, controls to prevent revoked ITINs from being active on the NAP and valid on the IMF, controls to prevent individuals from being issued multiple ITINs, and controls to ensure that only qualified CAA Agreements are accepted. We evaluated these controls by interviewing IRS management; performing analysis of data in the RTS, the IMF, and the NAP located on the TIGTA Data Center Warehouse; and reviewing statistical samples of ITIN applications and CAA applications.

---

[6] IRS computer system capable of retrieving or updating stored information. It works in conjunction with a taxpayer's account records.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

**Appendix II**

# *Major Contributors to This Report*

Russell P. Martin, Assistant Inspector General for Audit (Returns Processing and Account Services)
Deann L. Baiza, Director
Kathleen A. Hughes, Audit Manager
Ismael M. Hernandez, Lead Auditor
J. Edmund Carr III, Senior Audit Evaluator
Mark V. Willoughby, Senior Auditor
Michael J. Bibler, Auditor



***Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers***

**Appendix III**

## *Report Distribution List*

Commissioner
Office of the Commissioner – Attn:  Chief of Staff
Deputy Commissioner for Services and Enforcement
Deputy Commissioner, Wage and Investment Division
Director, Customer Account Services, Wage and Investment Division
Director, Submission Processing, Wage and Investment Division
Director, Office of Audit Coordination

*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

**Appendix IV**

# *Outcome Measures*

This appendix presents detailed information on the measurable impact that our recommended corrective actions will have on tax administration. These benefits will be incorporated into our Semiannual Report to Congress.

## *Type and Value of Outcome Measure:*

Reliability of Information – Potential; 839 ITINs were issued in error for dependent ITIN applications submitted by CAAs who did not provide documents to prove foreign status or identity, did not provide an original document when required, or did not provide documentation to prove date of entry into the United States (see page 9).

## *Methodology Used to Measure the Reported Benefit:*

We obtained a data extract from the IRS's ITIN RTS and identified 13,548 dependent ITIN applications submitted by a CAA between October 2016 and March 2017. We selected a statistically valid sample of 113 ITIN applications.[1] We reviewed each case to compare information on the application to the documents provided to support foreign status and identity to determine if the ITIN was correctly issued. We also compared information on the application and supporting documents to information in the RTS to determine if the RTS was correct. We identified **1** ITIN applications for which the ITIN was issued in error. We estimate that 839 ITINs were issued in error.[2]

## *Type and Value of Outcome Measure:*

Reliability of Information – Potential; 7,277 ITINs were issued in error for applications for which original documents were not authenticated by the tax examiner or supporting documentation was not provided for the date of entry into the United States for a dependent (see page 9).

---

[1] We used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent.

[2] The point estimate projection is based on a two-sided 90 percent confidence interval. We are 90 percent confident that the point estimate is between 401 and 1,530.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified 409,627 new and renewal ITIN applications between October 2016 and March 2017. We selected a statistically valid sample of 113 ITIN applications[3] and reviewed each case to compare information on the application to the documents provided to support foreign status and identity to determine if the ITIN was correctly issued. We also compared information on the application and supporting documents to information in the RTS to determine if the RTS was correct. We identified **1** ITIN applications for which the ITIN was issued in error. We estimate that 7,277 ITINs were issued in error.[4]

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 444,325 ITIN applications that were processed by a TAC site or a CAA for which key supporting documentation was not entered into the RTS (see page 11).

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified ITIN applications submitted *********2******** on and after July 12, 2012. We identified the documents registered in the RTS Support Document Table and identified all the applications that were missing information ******************************2****************************. We identified 241,971 ITIN applications submitted ***2*** with ******2****** in the RTS Support Document Table. In addition, we identified 202,354 ITIN applications submitted by a TAC **2** with *********2******** in the RTS Support Document Table. In total, we identified 444,325 ITIN applications that were processed *********2********** for which key supporting documentation was not entered into the RTS.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 10,780 ITINs were issued even though the RTS indicated that the ITIN application was rejected (see page 14).

### Methodology Used to Measure the Reported Benefit:

We obtained an extract from the IRS's ITIN RTS and identified ITIN applications which indicate that the application was rejected, but the ITIN was not revoked. We identified 95,928 new ITINs

---

[3] We used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent.

[4] The point estimate projection is based on a two-sided 90 percent confidence interval. We are 90 percent confident that the point estimate is between two and 15,678.



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

that were issued even though the applications were rejected. We matched the ITINs to the NAP file and determined that 10,780 ITINs are active on the NAP.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 44,524 ITINs were issued to 21,762 individuals who used ********************2********************* to apply for an ITIN (see page 14).

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified ITINs that were listed as active and assigned in the RTS. We matched these ITINs to the NAP to verify that the ITINs were active on the NAP. Using RTS data, we identified individuals using *********2********* **********2********** to apply for an ITIN. We identified 44,524 ITINs active on the NAP that were in the RTS that *************************2********************** with one or more ITINs. The 44,524 ITINs represent 21,762 individuals[5] who used the same *****2****** ****2**** and obtained an ITIN.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 10,921 ITINs that were issued to 4,598 individuals who used the same supporting documents (*e.g.*, driver's license, passport number) when applying for an ITIN (see page 14).

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified ITINs that were listed as assigned and active on the RTS. We matched these ITINs to the NAP to verify that the ITIN was active on the NAP. We identified that individuals are using the same supporting documents to apply for an ITIN. We limited our analysis to the following supporting documents: ****2**** *****************************************2********************************************* *******************************************2************************************************* ***************************************2*********************. We identified 10,921 ITINs in the RTS that share the same supporting documents and were active on the NAP. The 10,921 ITINs represent 4,598 individuals[6] who used the same supporting documents and obtained an ITIN.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 8,110 ITINs with a revoked status in the RTS, but the ITIN is still valid on the IMF (see page 16).

---

[5] Eight ITINs are unvalidated ITINs that are active.
[6] Three ITINs are unvalidated ITINs that are active.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified ITINs that had been revoked using the ITIN Status field and the revoke codes available in the RTS data. We matched the revoked ITINs to the IMF to identify ITINs that the RTS shows were revoked, but the ITIN was valid on the IMF. We identified 8,110 ITINs for which the RTS indicates that the ITIN had been revoked, but the ITIN was valid on the IMF.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 737 ITINs with a revoked status in the RTS, but the ITIN is still active on the NAP (see page 16).

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's ITIN RTS and identified ITINs that had been revoked using the ITIN Status field and the revoke codes available in the RTS data. We matched the revoked ITINs to the NAP to identify ITINs that the RTS shows were revoked, but the ITIN was still active on the NAP. We identified 1,237 ITINs for which the RTS indicates that the ITIN had been revoked, but the ITIN was active on the NAP. We compared the revoked ITINs that are active on the NAP to the ITINs that are valid on the IMF. We found 500 revoked ITINs that are active on the NAP and are also valid on the IMF. As such, we eliminated the 500 ITINs from this outcome because they are included in the outcome for revoked ITINs that are valid on the IMF.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 567 ITINs for which information in the RTS shows that the individual is deceased, but the individual's tax account was not locked (see page 16).

### Methodology Used to Measure the Reported Benefit:

We obtained a data extract of data from the IRS's ITIN RTS and identified ITINs that had a date of death in the RTS to identify individuals that had been assigned an ITIN but were deceased. We matched the ITINs to the IMF to determine if there was a deceased lock on the taxpayer's tax account. We identified 567 ITINs with an account on the IMF that did not have a deceased lock on the tax account.

### Type and Value of Outcome Measure:

Reliability of Information – Potential; 46 CAA applications were incorrectly processed by the IRS (see page 19).



### *Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

## Methodology Used to Measure the Reported Benefit:

We identified 2,177 CAA agreements created between August 1, 2016, and February 28, 2017. We asked our contracted statistician to identify a sample size for a statistically valid sample that we could project to the population of 2,177 CAA applications processed by the IRS. The statistician provided us with a sample size of 94 cases based on our requirements.[7] We used a random number application to select the sample CAA cases. We manually reviewed each case and verified the information against the RTS. As a result, we determined that *1 and 3* CAA Agreements were issued in error. These CAA Agreements have the following errors: no Federal Bureau of Investigations background investigation done on the applicant and a failed business tax compliance check. Based our statistical analysis, we estimate that 46 individuals or businesses[8] which applied to the CAA program between August 1, 2016, and February 28, 2017, did not meet one or more of the IRS suitability requirements.

## Type and Value of Outcome Measure:

Reliability of Information – Potential; 192 ITINs were issued based on applications submitted by a CAA whose CAA Agreement had expired (see page 19)

## Methodology Used to Measure the Reported Benefit:

We obtained a data extract from the IRS's RTS system that contains the Form W-7, *Application for IRS Individual Taxpayer Identification Number*, and CAA information. We obtained all the expired CAA Agreements and then matched them to obtained all the ITINs issued by the CAAs with an expired agreement. We identified the ITINs issued after the CAA Agreement had expired by comparing the AA signature date with the agreement expiration date. We classified the ITINs we identified into three categories by comparing the agreement expiration date and the agreement termination date.

- 8,791 Forms W-7 were processed and ITINs assigned that were submitted by 129 CAAs whose agreement had expired and the CAA had been terminated.

- 536 Forms W-7 were processed and ITINs assigned that were submitted by *1 and 3* CAAs whose agreement had expired and the CAA had not been terminated.

- 9 Forms W-7 were processed and ITINs assigned that were submitted by *1 and 3* CAA whose agreement had expired, but there was no agreement expiration date or termination date recorded in the RTS.

---

[7] We used an expected error rate of 10 percent, a precision rate of ± 5 percent, and a confidence interval of 90 percent.

[8] The point estimate projection is based on a two-sided 90 percent confidence interval. We are 90 percent confident that the point estimate is between 9 and 140.



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

The 9,336 ITINs were assigned for Forms W-7 submitted by 170 CAAs.  We eliminated
9,144 ITINs that were issued prior to Calendar Year 2013 when the IRS strengthened controls to
prevent ITINs from being issued for applications submitted by a CAA with an expired or
terminated agreement after the CAA status is updated in the RTS.  We determined that
192 ITINs were issued after the IRS strengthened controls in Calendar Year 2013.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

**Appendix V**

## Prior TIGTA Recommendations and IRS Corrective Actions Related to the Issuance of ITINs

| Audit | Recommendation | Corrective Action |
|---|---|---|
| Reference No. 2009-40-057<br><br>Actions Are Needed to Ensure Proper Use of Individual Taxpayer Identification Numbers and to Verify or Limit Refundable Credit Claims<br><br>Issue Date: March 2009 | Develop a process to identify individuals who are improperly using ITINs for work purposes. | IRS management disagreed with this recommendation. |
| | Develop a process to ensure that the residency requirement is met for children with ITINs being claimed for the Child Tax Credit and/or the ACTC. | IRS management disagreed with this recommendation. |
| | Legislation is needed to clarify whether or not refundable tax credits such as the ACTC may be paid to filers without a valid Social Security Number. | IRS management agreed with this recommendation. The Wage and Investment Division, in coordination with the Office of Chief Counsel, will discuss with the Department of the Treasury's Office of Tax Policy the merits of an administration proposal to amend the Internal Revenue Code to limit eligibility for the Child Tax Credit and the ACTC to individuals who have a Social Security Number issued by the Social Security Administration other than a number issued to an alien not authorized to work in the United States. |
| Reference No. 2012-42-081<br><br>Substantial Changes Are Needed to the Individual Taxpayer Identification Number Program to Detect Fraudulent Applications<br><br>Issue Date: July 2012 | Develop more detailed procedures and deliver adequate training on reviewing documentation supporting ITIN applications to identify questionable documents. | IRS management agreed with this recommendation. The IRS revised internal guidelines to provide more detailed procedures and coordinated with the Department of Homeland Security to provide a forensic train-the-trainer course to a cadre of ITIN employees. |
| | Expand the quality review process to include adequate emphasis on whether employees are accurately identifying fraudulent documents. | IRS management agreed with this recommendation. Internal guidelines were modified to clarify the quality review process. |



## *Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

| Audit | Recommendation | Corrective Action |
|---|---|---|
| | Revise the criteria for identifying questionable applications to include the significance of an error. | IRS management agreed with this recommendation. Internal guidelines were revised on instructing tax examiners to flag the application for secondary review if any flagrant discrepancy is identified. |
| | Establish a process to evaluate questionable applications to identify trends and schemes for referral. | IRS management agreed with this recommendation. The process used to identify potential schemes was reviewed and, with respect to the implementation of changes to the program currently under consideration, revised appropriately. |
| | Develop business processes and procedures that include evaluating and analyzing information included in the RTS to identify indicators of questionable ITIN applications. | IRS management agreed with this recommendation. The IRS has arranged for the Modernization and Information Technology Services organization to provide regular data extracts of the RTS. Processes were developed to analyze the data and identify indicators of questionable ITIN applications. |
| | Establish organizational lines of responsibility, processes, and procedures for detecting, referring, and working potential ITIN application fraud schemes. | IRS management agreed with this recommendation. In addition to the IRS's traditional process for making criminal referrals to Criminal Investigation, the IRS will evaluate processes that will be used to address ITIN and related refund fraud schemes through civil enforcement programs. |
| | Require only original documents or documents certified by the issuing agency to be provided in support of an ITIN application. | IRS management agreed with this recommendation. The IRS implemented interim guidelines to require original documents or documents certified by the issuing agency to be provided in support of an ITIN application. With certain limited exceptions, these interim guidelines are being put in place while the IRS conducts a more thorough review. |



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

| Audit | Recommendation | Corrective Action |
|---|---|---|
| | Discontinue the CAA designation and require that all documentation in support of an ITIN application be sent to the IRS for review and verification. | IRS management disagreed with this recommendation. |
| | Develop a process to identify and deactivate ITINs assigned to individuals who no longer have a tax filing requirement. | IRS management will consider this recommendation as the IRS evaluates the feasibility and impact of this change on the taxpayers and the IRS. The planned corrective action was superseded by the PATH Act. |
| Reference No. 2013-40-052<br><br>Review and Verification of Individual Taxpayer Identification Number Applications Has Improved; However, Additional Processes and Procedures Are Still Needed<br><br>Issue Date: May 2013 | Ensure that programming is developed to flag ITIN applications that contain characteristics of previously identified questionable ITIN applications when input into the RTS. | IRS management agreed with this recommendation. The IRS will prepare a risk assessment that, in addition to determining the scope and costs of programming, will address other mitigating controls that can be implemented in the event the requested programming changes are not funded. |
| | Ensure that the quality review process continues to emphasize the importance of tax examiners' identification of questionable documents and that weekly team meetings are held with tax examiners to discuss ITIN application processing trends, patterns, and concerns. | IRS management agreed with this recommendation. The ITIN Operations Department has incorporated this practice and will ensure that the team meetings continue to be held, at which tax examiners may discuss ITIN application processing trends, patterns, and concerns. |
| Reference No. 2015-40-038<br><br>Tax Examiners Do Not Have the Tools or Expertise to Authenticate Documents Certified by a Foreign Issuing Agency<br><br>Issue Date: May 2015 | Provide tax examiners with reference materials that *****2**** ********************2***************** various countries that can be used to verify the authenticity of copies of documents certified by a foreign issuing agency. | The IRS agreed with this recommendation, but the IRS's ability to use ***2*** is limited by treaty obligations. The IRS noted that it will explore *******************2****************** ******2****** for training purposes. It will also continue its discussions with the U.S. Department of State as it evaluates policy and procedures pertaining to the receipt and acceptance of certified copies of foreign-issued identification documents. |



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

| Audit | Recommendation | Corrective Action |
|-------|----------------|-------------------|
|  | Develop detailed procedures and deliver adequate training on verifying the authenticity of copies of documents certified by a foreign issuing agency. | IRS management agreed with this recommendation. The IRS believes that existing procedures adequately address the correct procedures for verifying the authenticity of copies of documents certified by foreign issuing agencies. However, it will use its ongoing communication and dialogue processes to reinforce proper procedures. Additionally, internal guidelines were updated to clarify instructions for verifying certified copies of documents. |

*Source: TIGTA audit reports and the Joint Audit Management Enterprise System.*

*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

**Appendix VI**

# *Management's Response to the Draft Report*



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
ATLANTA, GA 30308

COMMISSIONER
WAGE AND INVESTMENT DIVISION

DEC 1 4 2017

MEMORANDUM FOR MICHAEL E. MCKENNEY
DEPUTY INSPECTOR GENERAL FOR AUDIT

FROM:              Kenneth C. Corbin
                   Commissioner, Wage and Investment Division

SUBJECT:           Draft Audit Report – Processes Need to be Improved to Identify
                   Incomplete and Fraudulent Applications for Individual Taxpayer
                   Identification Numbers (Audit # 201740002)

Thank you for the opportunity to review the subject draft report and provide comments.
The Protecting Americans from Tax Hikes (PATH) Act of 2015[1] made changes to the
Individual Taxpayer Identification Number (ITIN) program. The provision affecting ITINs
included, in part, codifying the deactivation of unused ITINs. It established the term for
which ITINs are valid, and called for maintaining a program for training and approving
community-based Certified Acceptance Agents (CAA). The CAAs assist ITIN applicants
and the IRS by authenticating the applicants' identities through review and validation of
approved identification documents.

The PATH Act also required the IRS to complete a study of the effectiveness of the ITIN
program, specifically focusing on its effect on the ITIN application process. The study
will address the effectiveness of an in-person review process for applications versus
other methods of reducing fraud and improper payments associated with the program.
Additionally, we will identify possible administrative and legislative recommendations for
continued improvement. The IRS was required to provide a report on the study findings
within one year of the date of enactment. We informed Congress on July 20, 2016, that
the report of the study results would be delayed to allow for a complete analysis after
full implementation of the ITIN deactivation program.

A new provision added by the PATH Act requires the Service to distinguish ITINs issued
solely for purposes of claiming tax treaty benefits and ensure they are used only for that
purpose. We have issued ITINs to non-resident aliens (NRA) with U.S. sourced income
who claim a reduced withholding rate under the terms of the applicant's respective tax
treaty and recorded that reason in the Real-Time System (RTS), the system used to

---

[1] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015).



## *Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

2

process ITIN requests. We are evaluating potential solutions to address the challenges associated with ITINs assigned for treaty-based purposes and the unique situations that may arise in this area.

We continue to believe that we do not need a separate and distinct system for tracking ITINs issued for tax treaty purposes. In addition, some NRAs who request an ITIN for tax treaty purposes may later need to use the ITIN for other tax administration purposes. For example, an NRA may win a jackpot in the United States and claim a reduced rate of withholding based upon a governing income tax treaty. If the NRA invests the winnings in U.S. real property and sells the property the following year, the NRA will need to file a U.S. tax return in the later year. That later tax return may not reference a tax treaty. So, as stated in the report, we choose to apply the same scrutiny to applicants claiming a tax treaty benefit as we apply for all ITIN applicants. This equal scrutiny allows us to establish a process that does not require additional work in the later year. It is also noteworthy that of the 662,182 ITINs issued for the purpose of claiming tax treaty benefits, 579,230 have already been deactivated and another 28,644 have not been used on returns for tax years 2014 through 2016, and are likely to soon be deactivated. As stated in the report, we do not believe this provision of the PATH Act requires a change in how we process ITIN requests.

We agree with the report's findings that not all applications were processed correctly; however, we think it is important to highlight that, when reviewed inversely, the results show a very high accuracy rate for processing applications. For example, of 113 sampled dependent ITIN applications, although **1** applications were not processed correctly, **1** were, yielding an accuracy rate of **1** percent. Another review of new and renewal applications received between October 1, 2016, and March 11, 2017, found **1** out of 113 were processed incorrectly. The remaining **1** applications, or **1** percent, were correctly processed. A review of 94 CAA applications found that *1* were not processed correctly. Of those *1*, the supporting documentation for *1* was obtained and provided to the auditors on November 16, 2017. Our accuracy rate for this sample was **1** percent.

We disagree with the reporting on the status of programming changes needed to identify potentially fraudulent ITIN applications. The description of the process used by the RTS to identify potentially duplicate applications is factually incorrect. The report describes a process where the RTS performs a search to determine if the same supporting documentation was already submitted by another applicant. The RTS does not search on this information. The RTS performs proximal searches on the applicant's
******************************************************2******************************************************
******************************************************2******************************************************
******************************************************2******************************************************
******************************************************2******************************************************
******************************************************2******************************************************
******************************************************2******************************************************



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

3

***********************************************************2**********************************************************
***********************************************************2**********************************.

When the auditors brought their concerns to our attention, that the RTS was preventing
tax examiners from entering supporting document information from applications
************************************2********************************* we agreed that it would be
helpful to have that additional information available in the system. Describing our
consideration of the programming change as being "non-critical" is misleading as we
believe any programming change we request is both important and necessary. However,
resource constraints require that our requests be prioritized to ensure as much work can
be accomplished as is possible with the resources available. Because the system does
not search on this data element, we do not consider the change to rise to the level of
criticality that is generally assigned to changes required by legislative mandates or work
required to ensure crucial systems are functioning correctly. It is also important to note
that a request to immediately change the RTS programming could jeopardize the
completion of programming changes that have been requested in response to past
Treasury Inspector General for Tax Administration recommendations and are scheduled
for implementation in the next filing season.  The auditors' concerns are based on the
potential for an identification document to be used by more than one individual to obtain
an ITIN; however, for that to happen, ********************************2***************************
***********************************************************2**********************************************************
***********************************************************2**********************************************************
***********************************************************2*********************************************.

Attached are our comments and proposed actions to your recommendations.  If you have
any questions, please contact me, or a member of your staff may contact James P.
Clifford, Director, Customer Account Services, Wage and Investment Division, at (470)
639-2716.

Attachment



**Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers**

Attachment

### Recommendations

#### RECOMMENDATION 1
The Commissioner, Wage and Investment Division, should implement processes to ensure that ITINs issued solely for the purpose of claiming tax treaty benefits are only used for such purpose as required by the PATH Act.

#### CORRECTIVE ACTION
IRS believes that its current processes fully comply with the requirements of the Protecting Americans from Tax Hikes (PATH) Act. Thus, IRS disagrees with this recommendation. The PATH Act requires the IRS to distinguish ITINs issued solely for treaty benefits from other Individual Taxpayer Identification Numbers (ITIN) and ensure that these ITINs are only used for such purpose. Applicants claiming a tax treaty benefit are fully vetted at the time of issuance in the same manner as every other ITIN applicant and that reason is recorded in the Real-Time System (RTS). There may be situations where a tax treaty purpose is coupled with a filing requirement. In both situations, the IRS believes that the applicant has fulfilled the requirements for an ITIN. Furthermore, if the number is not used on a federal return within three years it will be deactivated for non-use.

#### IMPLEMENTATION DATE
N/A

#### RESPONSIBLE OFFICIAL
N/A

#### CORRECTIVE ACTION MONITORING PLAN
N/A

### Recommendations

The Commissioner, Wage and Investment Division, should:

#### RECOMMENDATION 2
Ensure that tax examiners properly review ITIN applications to authenticate required supporting documentation.

#### CORRECTIVE ACTION
We agree with this recommendation. A Quality Assurance Alert was issued to tax examiners on September 9, 2017, reminding them of the requirement for original or certified copies of documents provided in support of ITIN applications.

#### IMPLEMENTATION DATE
Implemented



***Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers***

2

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
N/A

**RECOMMENDATION 3**
Review the nine applications we identified as being erroneously issued and correspond
with the ITIN applicant to obtain required documentation supporting the issuance of the
ITIN if warranted.

**CORRECTIVE ACTION**
We agree with this recommendation and will take the appropriate follow-up actions.

**IMPLEMENTATION DATE**
June 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**Recommendations**

The Deputy Commissioner for Services and Enforcement, should:

**RECOMMENDATION 4**
Modify the RTS consistency and validity checks to identify all duplicate uses of
supporting documents including those where the ***********************2***********************
**2** on the application do not match information in the RTS.

**CORRECTIVE ACTION**
We agree with this recommendation and note that duplicate applications are already
identified when matches are detected on the **************************2***********************
*******2*******.  We will request programming changes to unmask the supporting
document fields and allow input when applications that have been ***********2**************
***************************************2****************************** are processed.  This will
permit the same supporting documentation to be displayed for those applications as is
displayed for applications with source documents validated by tax examiners.  We
anticipate this change being in place by January 2019; however, Information

*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

3

Technology resources are limited and are subject to budgetary constraints and competing
priorities.  Therefore, we cannot provide an implementation date.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 5**
Ensure that programming changes are made to require mandatory review when the RTS
alerts tax examiners when an applicant is using the same ****************2******************
************2********* or duplicate supporting documents as has previously been used to
obtain an ITIN.

**CORRECTIVE ACTION**
We agree with the recommendation.  Tax examiners currently evaluate potential
duplicate applications when an RTS alert appears.  We will evaluate a systemic process
that can be deployed to prevent ITIN assignments from being made when supporting
documents have been previously used to obtain an ITIN.  If a systemic process is
feasible, the requisite programming changes will be requested; however, Information
Technology resources are limited and are subject to budgetary constraints and
competing priorities.  Therefore, we cannot provide an implementation date.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 6**
Establish systemic controls in the RTS to require ITINs determined to be issued in error
after the three-day quality review period to be revoked (e.g., the system should not
accept a reject action).



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

4

**CORRECTIVE ACTION**
We agree with this recommendation and will request the requisite programming change.
We anticipate this change being in place by January 2019; however, Information
Technology resources are limited and are subject to budgetary constraints and
competing priorities. Therefore, we cannot provide an implementation date.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**Recommendations**

The Commissioner, Wage and Investment Division, should:

**RECOMMENDATION 7**
Review the 95,928 ITINs we identified that were issued with a rejected application and
take the actions necessary to revoke the ITINs when appropriate.

**CORRECTIVE ACTION**
We agree with this recommendation and will take appropriate follow-up action on the
affected ITINs.

**IMPLEMENTATION DATE**
October 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 8**
Review the 44,532 ITINs we identified that were issued to individuals using the same
***********************2********************** and the 10,924 ITINs we identified that were
issued to individuals who used duplicate supporting documents to determine the validity

*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

5

of the ITIN and take the actions necessary to revoke those ITINs that are determined to be invalid.

**CORRECTIVE ACTION**
We agree with this recommendation and will take appropriate follow-up action on the affected ITINs.

**IMPLEMENTATION DATE**
October 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.

**RECOMMENDATION 9**
Review the 8,110 ITINs identified with a revoked status in the RTS but still valid on the IMF and take necessary action to change the ITINs to invalid.

**CORRECTIVE ACTION**
We agree with this recommendation and will take appropriate follow-up action on the affected ITIN accounts.

**IMPLEMENTATION DATE**
October 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.

**RECOMMENDATION 10**
Review the 1,237 ITINs identified with a revoked status in the RTS but still active on the NAP and take necessary action to remove the ITIN from the NAP.

**CORRECTIVE ACTION**
We agree with this recommendation and will take appropriate follow-up action on the affected ITIN accounts.



*Processes Need to Be Improved to Identify*
*Incomplete and Fraudulent Applications for*
*Individual Taxpayer Identification Numbers*

6

**IMPLEMENTATION DATE**
October 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 11**
Modify processes to systemically remove all revoked ITINs from the NAP and update
the IMF.

**CORRECTIVE ACTION**
We agree with this recommendation and will ascertain the reasons for revoked ITINs
remaining on the National Account Profile (NAP). Depending on the cause,
programming changes will be requested or corrections to existing programming will be
initiated. Because Information Technology resources are limited and are subject to
budgetary constraints and competing priorities, we cannot provide an implementation
date.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 12**
Develop processes and procedures to identify deceased ITIN holders and lock their tax
accounts if they exist.

**CORRECTIVE ACTION**
We agree with the recommendation. Processes exist for the systemic locking of
accounts by the Individual Master File (IMF) when an account holder has been marked
as deceased. We are investigating the reason why programming intended to transmit
death information for ITIN holders from the RTS to the NAP has not worked as
intended. When the cause has been determined, a programming correction will be



*Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers*

7

initiated. Because Information Technology resources are limited and are subject to budgetary constraints and competing priorities, we cannot provide an implementation date.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.

**RECOMMENDATION 13**
Ensure that the tax accounts for the 567 deceased ITIN holders we identified are locked.

**CORRECTIVE ACTION**
We agree with this recommendation and will ensure the accounts are locked.

**IMPLEMENTATION DATE**
January 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Accounts Management, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.

**RECOMMENDATION 14**
Reinstate the procedures which do not permit CAAs to certify supporting documents for dependent ITIN applications as dependents can be used to fraudulently obtain tax benefits such as the refundable ACTC.

**CORRECTIVE ACTION**
We disagree with this recommendation as it conflicts with the intent of the Protecting Americans from Tax Hikes (PATH) Act of 2015[2]. Under the PATH Act, approved community-based Certified Acceptance Agents (CAA) are permitted to receive

---

[2] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015).

**Processes Need to Be Improved to Identify
Incomplete and Fraudulent Applications for
Individual Taxpayer Identification Numbers**

8

applications and the required supporting documentation. The IRS has requirements in
place for CAAs to take formal forensic training for the purpose of validating the
legitimacy of identification documents submitted by ITIN applicants. We also have a
CAA Annual Compliance Review process to provide oversight and quality assurance to
the CAA program.

**IMPLEMENTATION DATE**
N/A

**RESPONSIBLE OFFICIAL**
N/A

**CORRECTIVE ACTION MONITORING PLAN**
N/A

**RECOMMENDATION 15**
Develop processes and procedures to ensure ITINs are not assigned for applications
submitted by CAAs whose CAA Agreement has expired or been terminated.

**CORRECTIVE ACTION**
We agree with this recommendation and will ensure processes are updated to ensure
the status of those CAAs whose CAA Agreement has expired or been terminated is
properly reflected in the RTS, thereby preventing the assignment of ITINs on
applications submitted by them.

**IMPLEMENTATION DATE**
June 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment
Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control
system.

**RECOMMENDATION 16**
Review the 192 ITINs we identified that were assigned to individuals whose applications
were submitted by CAAs after the CAA Agreement expired or was terminated. ITINs
assigned to individuals for whom the IRS did not review original documents should be
revoked and the individuals instructed to reapply for their ITIN if they have a continued
tax need.



*Processes Need to Be Improved to Identify Incomplete and Fraudulent Applications for Individual Taxpayer Identification Numbers*

9

**CORRECTIVE ACTION**
We agree with this recommendation that the CAA agreement should be timely terminated and will take appropriate actions to ensure agreements are updated in RTS within a reasonable time period. We note that the issuance of these ITINs may have been the result of a timing issue (e.g., the ITIN applications were in process at the time the CAA certification expired or was revoked). We will review these applications to determine if any additional action should be taken to ensure their validity.

**IMPLEMENTATION DATE**
June 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.

**RECOMMENDATION 17**
Prior to acceptance into the CAA program, ensure that the CAA completed forensic training includes instruction on how to verify the security features on all original documents that the IRS accepts as proof of identity.

**CORRECTIVE ACTION**
We agree with the recommendation and will take action to ensure that required forensic training available to CAA applicants address all identification documents accepted to authenticate the identity of ITIN applicants.

**IMPLEMENTATION DATE**
October 15, 2018

**RESPONSIBLE OFFICIAL**
Director, Submission Processing, Customer Account Services, Wage and Investment Division

**CORRECTIVE ACTION MONITORING PLAN**
We will monitor this corrective action as part of our internal management control system.