**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*, | |
| *Plaintiffs*, | |
| vs. | |
| WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, | Civ. No. 1:16-cv-00563 (LO/TCB) |
| *Defendants*. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF**
**<u>MOTION *IN LIMINE*</u>**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................ 1

Argument ........................................................................................................................... 2

I.    Defendants misstate the evidentiary standard for Step Two of the disparate impact inquiry. ........................................................................................................... 2

    a.    On Step Two, Defendants must prove, with admissible evidence, that the actual reasons for their policy serve a genuine "business necessity." ................................ 2

    b.    Defendants' witnesses may not testify as to purported "business necessities" without personal knowledge. ................................................................... 5

II.    Defendants are precluded from pursuing (yet again) their failed "complete defenses." .... 7

    a.    Defendants misrepresent the procedural history of this case, and which Step One issues have already been decided. .......................................................... 7

    b.    Defendants should not be allowed to argue that compliance with federal law was the reason their Policy was instituted. ................................................. 12

III.    Defendants' evidentiary argument regarding FHA trainings, Spanish-language advertisements and Treasury reports are unavailing. ..................................................... 14

IV.    Defendants may not harass Plaintiffs about their immigration history, and Plaintiffs are not qualified to give expert testimony regarding immigration matters or ITINs. .............. 17

Conclusion ........................................................................................................................ 20

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Case**

*Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund of Phila.*,
    850 F.2d 1028 (3d Cir. 1988)...................................................................................... 19

*Betsey v. Turtle Creek Assoc.*,
    763 F.2d 983 (4th Cir. 1984) ....................................................................................... 4

*Carlson v. Boston Sci. Corp.*,
    856 F.3d 320 (4th Cir. 2017) .................................................................................. 9, 10

*Changzhou Kaidi Elec. Co. v. Okin Am., Inc.*,
    102 F. Supp. 3d 740 (D. Md. 2015)............................................................................. 5

*Christian Legal Soc'y of the Univ. of Cal. v. Martinez*,
    561 U.S. 661 (2010)................................................................................................... 20

*Cougill v. Prospect Mortg., LLC*,
    2014 WL 348539 (E.D. Va. Jan. 31, 2014) ................................................................ 5

*Davis v. Alaska*,
    415 U.S. 308 (1974)................................................................................................... 18

*United States ex rel. Davis v. U.S. Training Ctr. Inc.*,
    498 Fed. App'x 308 (4th Cir. 2012) .......................................................................... 18

*Dobbs v. DePuy Orthopedics, Inc.*,
    885 F.3d 455 (7th Cir. 2018) .................................................................................. 9, 10

*Doe v. Bd. of Tr. of Neb. State Colls.*,
    2020 WL 2793558 (D. Neb. May 29, 2020)............................................................. 18

*United States v. Dominguez*,
    604 F.2d 304 (4th Cir. 1979) .................................................................................... 18

*In re Felt*,
    255 F.3d 220 (5th Cir. 2001) ................................................................................. 8, 10

*Flores v. Amigon*,
    233 F. Supp. 2d 462 (E.D.N.Y. 2002) ...................................................................... 18

*Graves v. Lioi*,
    930 F.3d 307 (4th Cir. 2019) .................................................................................... 10

*United States v. Hernandez*,
    212 Fed. App'x 229 (4th Cir. 2007) .......................................................................... 18

*Keith v. Bobby*,
    618 F.3d 594 (6th Cir. 2010) ...................................................................................... 9

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
  496 F. Supp. 3d 600 (D. Mass. 2020),
  *appeal dismissed*, No. 21-1003 (1st Cir. Feb. 18, 2021) ......................................... 2

*Metro. Life Ins. Co. v. Carr*,
  169 F. Supp. 377 (D. Md. 1959) ........................................................................... 19

*Mt. Holly Gardens Citizens in Action v. Twp. of Mt. Holly*,
  658 F.3d 375 (3d Cir. 2011) ................................................................................ 4

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
  903 F.3d 415 (4th Cir. 2018) ........................................ 1, 2, 3, 4, 7, 8, 9, 10, 11, 16

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) .............................................................................................. 3

*Romero v. Prindle Hill Constr., LLC*,
  2017 WL 3390242 (D. Conn. Aug. 7, 2017) ...................................................... 18

*South Atl. Ltd. P'ship of Tn. v. Riese*,
  356 F.3d 576 (4th Cir. 1993) ......................................................................... 8, 11

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ..................................................................................... 1, 3, 4, 16

*Uto v. Job Site Servs., Inc.*,
  269 F.R.D. 209 (E.D.N.Y. 2010) ....................................................................... 18

## **Statutory Authorities**

8 U.S.C. § 1621 .......................................................................................................... 12

8 U.S.C. § 1324 ............................................................................................................ 1

## **Rules and Regulations**

24 C.F.R. 100.500(b)(2) ......................................................................................... 2, 5

78 Fed. Reg. 11460 ....................................................................................................... 2

85 Fed. Reg. 60288 ....................................................................................................... 2

86 Fed. Reg. 33590 ....................................................................................................... 2

Fed. R. Civ. P. 30(b)(6) ................................................................................................. 6

Fed. R. Civ. P. 56(a) .................................................................................................... 11

Fed. R. Evid. 103(d) ...................................................................................................... 5

Fed. R. Evid. 401(a) .................................................................................................... 15

Fed. R. Evid. 402 ......................................................................................................... 11

Fed. R. Evid. 403 .................................................................................................... 15, 18

Fed. R. Evid. 404(a)(1) ................................................................................................ 15

Fed. R. Evid. 611(a)(3) ................................................................................................ 18

Fed. R. Evid. 613(b) .................................................................................................. 19

Fed. R. Evid. 701(c) .................................................................................................. 19

Fed. R. Evid. 1002 .................................................................................................... 16

## Additional Authorities

Michael G. Allen, *et al., Assessing HUD's Disparate Impact Rule: A Practitioner's Perspective*, 49 Harv. C.R.-C.L. L. Rev. 155 (2014) ................................................................. 5

**<u>Introduction</u>**

As the briefing on this Motion *in Limine* makes clear, the parties have very different understandings of the burden of proof on Step Two of the Fair Housing Act ("FHA") three-step burden-shifting framework, under which "the defendant has the burden of persuasion to state and explain the valid interest served by their policies," which is "analogous to Title VII's business necessity standard." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018) (describing *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.* (hereinafter "*Inclusive Communities*"), 576 U.S. 519, 541 (2015)). Defendants would have this Court allow them to meet their Step Two burden by listing after-the-fact justifications which they do not claim were even known to the drafters of the policy at issue in this litigation,[1] and which were concocted by litigation counsel in defense of this lawsuit. Plaintiffs contend that the actual contemporaneous reasons for the Policy's creation are necessary for the trier of fact to determine whether those reasons meet the business necessity standard; and that such reasons are contested issues of fact, and therefore must be proven to the jury by means of admissible evidence. In deciding the instant Motion *in Limine*, the Court can now declare that the purpose of a trial is to determine the truth of actual historical facts, not juggle *post hoc* legal fictions.

Defendants continue to rehash the argument rejected by the Court of Appeals that the federal Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324, "substantially limited Defendants' discretion in formulating the Policy," Dkt. 379 at 3, misrepresenting the procedural history of the case to try to re-cast this as an undecided question. As discussed below in Section II, it is not. There is, however, a federal law that *does* substantially limit the Defendants' discretion in adopting housing policies: the FHA's prohibition on disparate racial impact. Where,

---

[1] Dkt. 1-1 (hereinafter "the Policy").

as here,[2] a facially race-neutral housing policy results in Latinos having greater difficulty in obtaining housing or a greater likelihood of being evicted, the FHA prohibits such policy, unless the landlord can show that the policy is necessary to meet a valid interest; even then, the policy is still unlawful if the plaintiffs can show that another policy would meet the same interest while having a less discriminatory impact. *Reyes*, 903 F.3d at 432. A federal regulation, 24 C.F.R. § 100.500(b)(2) (Feb. 15, 2013),[3] also clarified this restriction: the landlord must show that it actually needed the policy, not just be able to invent possible justifications for it.

For these reasons, and the reasons that follow, Plaintiffs' Motion *in Limine*, Dkt. 331, should be granted, and Plaintiffs' Proposed Order, Dkt. 331-1, should be entered by the Court.

## <u>Argument</u>

I.    **Defendants misstate the evidentiary standard for Step Two of the disparate impact inquiry.**

  a.    **On Step Two, Defendants must prove, with admissible evidence, that the actual reasons for their policy serve a genuine "business necessity."**

Defendants make two erroneous arguments concerning the legal standard for Step Two of the disparate impact inquiry that are applicable to several of Plaintiffs' motions *in limine*.

***First***, Defendants argue that "Plaintiffs mischaracterize—as they have throughout this

---

[2] "[W]e now hold that Plaintiffs have made a prima facie case that Waples' Policy disparately impacted Latinos in violation of the FHA, satisfying step one of the disparate-impact analysis[.]" *Reyes*, 903 F.3d at 429.

[3] "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11460, 11482 (Feb. 15, 2013) (hereinafter "the Disparate Impact Rule"). Amendments to this regulation were published in September 2020, 85 Fed. Reg. 60288 (Sept. 24, 2020), but the implementation of that superseding regulation was stayed in its entirety. *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 612 (D. Mass. 2020), *appeal dismissed*, No. 21-1003 (1st Cir. Feb. 18, 2021). Accordingly, the Disparate Impact Rule, which was in effect at all relevant times during the events complained of in this lawsuit, remains in effect today. *See also* 86 Fed. Reg. 33590, 33590 (June 25, 2021) (noting "the 2020 Rule never took effect" and therefore the 2013 Rule "remains in effect due to the preliminary injunction."). 1

case—step 2 of the *Inclusive Communities* framework as requiring evidence of 'business necessity' for the Policy. It does not." Dkt. 379 at 14. Instead (Defendants claim), the Supreme Court "chose a distinctly lower step-2 burden," *id.* at 15, which Defendants describe: "As stated in *Inclusive Communities*, after Plaintiffs prove a prima facie case of disparate impact, under step 2, Defendants must be given 'leeway to state and explain the valid interest served by the policies.' 576 U.S. at 541; *accord Reyes*, 903 F.3d at 424." Dkt. 379 at 14.

No part of that argument is correct. In the sentence that follows the language that Defendants quote as the standard ("leeway to state and explain the valid interest"), the Supreme Court stated the following: "This step of the analysis is analogous to the business necessity standard under Title VII." *Inclusive Communities*, 576 U.S. at 541. Then, emphasizing the point, the Supreme Court specifically referred to an explanation drafted by the U.S. Department of Housing and Urban Development (HUD) for the Disparate Impact Rule. *Id.* As the Court explained, HUD chose not to use the phrase "business necessity" because of a risk of confusion. *Id.*; *see also* 78 Fed. Reg. 11470 (Feb. 15, 2013). But HUD made clear that its Disparate Impact Rule "is equivalent to the 'business necessity' standard" and—most importantly—"is not to be interpreted as a more lenient standard than 'business necessity.'" 78 Fed. Reg. at 11470.

Going further, the *Inclusive Communities* Court next quoted the Step Two standard from a Title VII disparate impact case, *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009): "As the Court explained in *Ricci*, an entity "could be liable for disparate-impact discrimination only if the [challenged practices] were not job related and consistent with business necessity." 576 U.S. at 541 (citation omitted). And if any doubt remained, the *Inclusive Communities* Court described Step Two with slightly different phrasing, but still emphasizing "necessity": "[H]ousing authorities and private developers [must] be allowed to maintain a policy if they can prove it is

*necessary* to achieve a valid interest." *Id.* (emphasis supplied).[4]

Accordingly, the law is clear: at Step Two of the disparate impact analysis, Defendants must demonstrate with evidence that there is a "business necessity" for their Policy, not simply that it advances a valid interest.

**_Second_**, Defendants argue that, at Step Two, they are not required to defend the actual reasons that caused them to adopt their Policy: "At step 2, Defendants do not need to demonstrate that these reports ***motivated*** Defendants' Policy. Plaintiffs tellingly do not cite any authority for that novel claim. Instead, step 2 requires only that Defendants present evidence of the 'valid interest[s] served by [Defendants' Policy].'" Dkt. 379 at 22 (emphasis in original). That argument is wrong, too. In fact, the whole purpose of Step Two is to inquire into the actual reasons necessitating a challenged policy:

> The FHA is a broadly remedial statute designed to prevent and remedy invidious discrimination on the basis of race, . . . that facilitates its antidiscrimination agenda by encouraging a searching inquiry into the motives behind a contested policy to ensure that it is not improper.

*Mt. Holly Gardens Citizens in Action v. Twp. of Mt. Holly*, 658 F.3d 375, 385 (3d Cir. 2011) (citations omitted). *See also id.* ("[Step Two] simply results in a more searching inquiry into the defendant's motivations—precisely the sort of inquiry required to ensure that the government does not deprive people of housing 'because of race.'"); *Reyes*, 903 F.3d at 427 n.7 (describing *Mt. Holly* as "parallel[ing] our understanding" of *Inclusive Communities*).

The Disparate Impact Rule—to which the Supreme Court referred approvingly in *Inclusive Communities*, 576 U.S. at 541—makes the point even more directly: "A legally

---

[4] *Inclusive Communities* therefore did not change the law in the Fourth Circuit: under *Betsey v. Turtle Creek Assoc.*, 763 F.2d 983, 988 (4th Cir. 1984), Step Two required a showing of "business necessity." *See Reyes*, 903 F.3d at 428 (describing *Betsey* as "still good law").

sufficient justification must be supported by evidence and may not be hypothetical or speculative." 24 C.F.R. 100.500(b)(2) (Feb. 15, 2013). HUD states in its comments to the Rule that a Step Two justification must be "genuine and not false," 78 Fed. Reg. at 11470, "not fabricated or pretextual," *id.* at 11471. *See also* Michael G. Allen, *et al., Assessing HUD's Disparate Impact Rule: A Practitioner's Perspective*, 49 Harv. C.R.-C.L. L. Rev. 155, 187 (2014) ("HUD makes clear that any interest on which a defendant relies in seeking to justify a discriminatory effect must in fact have prompted the challenged practice."). In other words, a defendant cannot simply make up a Step Two justification after the fact; to be valid, a Step Two justification must be the actual reason compelling adoption of the challenged policy.

### b.    Defendants' witnesses may not testify as to purported "business necessities" without personal knowledge.

Defendants contend that the Plaintiffs misuse the motion *in limine* as a tool to address the witnesses' lack of foundation, Dkt. 379 at 19; and that these issues must be resolved at trial, *id.* at 16. A motion *in limine* is "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Changzhou Kaidi Elec. Co. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015). "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Cougill v. Prospect Mortg., LLC*, 2014 WL 348539, at *1 (E.D. Va. Jan. 31, 2014). Thus, while all Motions *in Limine* necessarily touch on objections that could be resolved at trial, the very purpose of the motion is to decide those objections beforehand where it aids the jury, the parties' trial preparation, and judicial economy to do so. *See also* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

Defendants contend that the Policy at issue serves the following valid interests: (1) to

confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability for harboring illegal aliens under the Immigration Reform and Control Act (the "ICRA"), and (5) to underwrite leases. Dkt. 248 at 2. However, none of their witnesses claim to have had personal knowledge of the reason the Policy was established at the time it was established.

Defendants rely on the testimony of three witnesses: Mark Jones, Peter Williams, and Albert Dwoskin. (They concede that Josephine Giambanco and Carolina Easton had no role in creating the Policy and cannot testify to the reasons for creating the Policy. Dkt. 379 at 19.)

Mr. Jones was deposed as a Rule 30(b)(6) witness. In that role, he was able to read the alleged business necessities for the Policy from the Interrogatories produced in this litigation, but did not testify that any of the alleged necessities were considered *at the time* the Policy was established. According to Mr. Jones' own testimony, the Policy was enacted in 2006, and he did not begin working for Defendants until 2011. Ex. 1 (Mark Jones deposition transcript) at 22:19-21; 161:2-21.[5] Unlike at a deposition, the Rules do not provide for a 30(b)(6) witness at trial. A witness cannot testify to a corporation's actions, or the contemporaneous reasons for those actions, without establishing a proper foundation of personal knowledge.

Peter Williams likewise lacks personal knowledge sufficient to testify to the business necessity of the Policy. When asked about the formulation of the Policy and reasons for changes to the Policy, Mr. Williams repeatedly disclaimed involvement: when asked why the Policy changed after 2012, Mr. Williams responded that "[he] would merely be speculating," and when

---

[5] Defendants' erroneous characterization of a *deposition question* as a *concession* regarding Defendants' alleged interest in complying with the anti-harboring statute, Dkt. 379 at 18, is nonsensical and furthermore belied by the transcript, which describes the statute as something "it seems [Defendants] believe [is] important." Dkt. 179-2 at 138:5-10.

asked who had suggested the change, he testified that he had "no recollection whatsoever." Ex. 2 (Peter Williams deposition transcript) at 33:15-22. *See also id.* at 47:15-48:1 and 51:19-52:4. Defendants contend that Mr. Williams testified to the "valid interests served" by the Policy, but Mr. Williams himself distinguishes this from personal knowledge of the justifications of the Policy, stating that he does not "know what the reasons were for the formulation of the policies" and that he is "not aware of any reasons" to justify the Policy. *Id.* at 53:4-9; 54:1-3.

Finally, Defendants' CEO and President Albert Dwoskin was clear that he was completely unfamiliar with the rental policy at issue here. Ex. 3 (Albert Dwoskin deposition transcript) at 55:25-56:22; *see also id.* at 59:6-11. Mr. Dwoskin also repeatedly refused to answer what the reasons were for the Policy. *Id.* at 78:19-83:16. Although Defendant argues fallaciously that his testimony as to the "valid interests served by the Policy" is sufficient to meet their Step Two burden, Mr. Dwoskin—like the other witnesses discussed in this Motion—has been clear that he lacks personal knowledge of the justifications for the Policy at the time it was created.

To be clear, Plaintiffs do not seek an order from this Court striking any of the above-listed witnesses from Defendants' witness list. To the contrary, Plaintiffs merely ask this Court to admonish Defendants to "lay and adequate foundation establishing their witnesses' personal knowledge before eliciting testimony on the 'business necessities' that the Policy purportedly fulfils." Perhaps they will be able to do this at trial. If not, they cannot be allowed to speculate.

## II.    Defendants are precluded from pursuing (yet again) their failed "complete defenses."

### a.    Defendants misrepresent the procedural history of this case, and which Step One issues have already been decided.

After the Fourth Circuit concluded that "the plaintiffs established a prima facie showing of disparate impact," *Reyes*, 903 F.3d at 432, and after this Court denied Defendants' motion for summary judgment on remand, Dkt. 283, Defendants filed a "Motion to Clarify and/or

7

Reconsider" the summary judgment denial, Dkt. 284. The primary argument in that "Motion to Clarify" was that this Court's summary judgment decision did not address the three arguments at issue here: (i) the argument that Plaintiffs must show that the Policy is an "artificial, arbitrary, and unnecessary barrier," (ii) the argument that the "anti-harboring" provision of IRCA precludes causality, and (iii) the argument that Plaintiffs' immigration status (and not their ethnicity) barred them from showing disparate impact. Dkt. 285 at 5-6 ("The Court's Summary Judgment Order does not address any of these arguments."); *compare* Dkt. 332 at 3-4 (listing the three arguments that Defendants contend are precluded).

This Court's response was blunt, and clear. Judge Ellis quoted the Fourth Circuit's holding that "'Plaintiffs have satisfied their burden under step one of the burden-shifting framework,'" Dkt. 298 at 2 (quoting *Reyes*, 903 F.3d at 433), and then observed that the appellate court's holding "expressly forecloses defendants' contention that it is appropriate to address step one on remand," *id.* Adding emphasis, the Court stated:

> As made clear by footnote twelve, plaintiffs have "satisfied their burden under step one" by presenting evidence sufficient to defeat defendants' motion for summary judgment. It is not appropriate to re-litigate step one on remand because to do so would violate the Fourth Circuit's mandate. Indeed, the Fourth Circuit has emphasized that district courts are "bound to carry out the mandate of the higher court [and] may not reconsider issues the mandate laid to rest."

*Id.* at 2-3 (citations omitted). Further, the Court explained that "[m]atters laid to rest by the [appellate court's] mandate" include both issues that were "expressly" decided, as well as issues "impliedly decided by the appellate court," because "district courts 'must attempt to implement the spirit of the mandate.'" *Id.* at 3 (quoting *South Atl. Ltd. P'ship of Tn. v. Riese*, 356 F.3d 576, 584 (4th Cir. 1993)).[6]

---

[6] The rule that district courts are bound by matters "impliedly decided" by appellate courts is not unique to the Fourth Circuit. *See, e.g.*, *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) ("And,

That ruling is the law of the case. *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The law-of-the-case doctrine provides that in the interest of finality, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (Citation omitted)). Accordingly, the three arguments addressed in Defendants' Motion to Clarify are foreclosed, and Defendants should be precluded from presenting evidence or further pursuing any of these arguments before the jury.

Moreover, Judge Ellis's ruling was completely correct. One of the three arguments was emphatically rejected as a "grievous error" by the Fourth Circuit, in a separate, lengthy section of its decision. *Reyes*, 903 F.3d at 429-32. The other two arguments (that Plaintiffs must show that the Policy is an "'artificial, arbitrary, and unnecessary barrier,'" and that the "anti-harboring" provision of IRCA precludes causality) were implicitly rejected: the arguments were "fully briefed to the appellate court" (*see* Dkt. 332 at 4 (references to arguments in Defendants' appellate briefs)),[7] and the rejection of those arguments was a "necessary predicate[]" to the

---

though not expressly addressed in an initial appeal, those matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case."); *Keith v. Bobby*, 618 F.3d 594, 599-600 (6th Cir. 2010) (the law of the case doctrine "thus generally bars the district court from reconsidering those issues that the court of appeals has already explicitly or impliedly resolved."); *Dobbs v. DePuy Orthopedics, Inc.*, 885 F.3d 455, 458 (7th Cir. 2018) ("But Dobbs raised this issue in his first appeal, and we implicitly rejected it. '[O]nce an appellate court either expressly or by necessary implication decides an issue, the decision [is] binding upon all subsequent proceedings in the same case' under the law-of-the-case doctrine.").

[7] Defendants argued to the Fourth Circuit that they did "not have 'discretion' to ignore IRCA's antiharboring criminal prohibition," and that such lack of discretion "severs any conceivable causal connection between the Policy and the impact on Plaintiffs." *Reyes*, No. 17-1723, Dkt. 50, at 34-35 (4th Cir. Dec. 15, 2017). The Fourth Circuit disagreed, finding a "robust causal connection" between Defendants' Policy and the Plaintiffs' evictions. *Reyes*, 903 F.3d at 433 and n.12. Indeed, as Plaintiffs argued in opposing summary judgment on remand, if the Fourth Circuit "had accepted Defendants' argument that the Policy is legally mandated by IRCA, then its entire opinion would have been unnecessary; given that the argument was squarely presented to the Court of Appeals, we should not presume that the judges knowingly rendered an

Fourth Circuit's holding that the Plaintiffs stated a *prima facie* case. *In re Felt*, 255 F.3d at 225. In other words, because those arguments would be (in Defendants' phrasing) "complete defenses" to a finding in favor of Plaintiffs at Step One, Dkt. 379 at 3, the Fourth Circuit must have rejected them in the process of ruling in Plaintiffs' favor at that step. That implicit rejection is binding on this Court. *Dobbs*, 885 F.3d at 458 ("'[O]nce an appellate court either expressly or by necessary implication decides an issue, the decision [is] binding upon all subsequent proceedings in the same case' under the law-of-the-case doctrine." (Citation omitted)).

Defendants' primary argument for presenting these arguments *yet again*[8] is that the Fourth Circuit mandate somehow doesn't apply, because the case was presented to the Fourth Circuit as a motion to dismiss, and it is now in a different posture. Dkt. 379 at 5, 9. But that confuses rulings on issues of law and rulings applying law to facts. Rulings on issues of law—such as the Fourth Circuit's rejection of Defendants' "complete defenses" to Step One—govern throughout a proceeding, without regard to the posture of the case. *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) ("The law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (Citation omitted)); *Carlson*, 856 F.3d at 325 (same). A plaintiff who survives a

---

advisory opinion." Dkt. 260 at 18.

[8] Indeed, Defendants have cited IRCA in every single dispositive motion since this case was filed. Yet not once has this Court credited it, and the case has been allowed to proceed to trial. *See* Dkt. 26 at 9 (Motion to Dismiss); Dkt. 98 at 23 (first Motion for Summary Judgment); Dkt. 248 at 10-12 (Motion for Summary Judgment on remand); Dkt. 285 at 5 (Motion to Clarify and/or Reconsider). In addition to the Fourth Circuit rejecting this argument in its published opinion in *Reyes*, the argument was also presented in Defendants' rejected Petition for Rehearing *En Banc*, No. 17-1723 (Dkt. 83) at 7-8; and Defendants' rejected Petition for Certiorari to the U.S. Supreme Court, No. 18-1217, Petition for Cert., at 13-15. Over five years into this litigation, Defendants have failed to establish that their Policy is mandated by the IRCA, or that failing to evict the Plaintiffs would have subjected them to criminal liability, and it is time for the argument to be put to bed once and for all.

motion to dismiss may ultimately fail to present sufficient evidence to support the allegations in her complaint. But a court's legal rulings—*e.g.*, that it would be a "grievous error" for a plaintiff's immigration status to block her discrimination claim, *Reyes*, 903 F.3d at 429—controls throughout the proceedings. Accordingly, as Plaintiffs noted in their opening memorandum, allowing argument and evidence with respect to rejected legal theories would be inconsistent with Fed. R. Evid. 402 (relevance) and 403 (prejudice). Dkt. 332 at 5-6.

For the same reason, Defendants' repeated assertion that Plaintiffs did not move for summary judgment is entirely beside the point.[9] Plaintiffs are not contending that they have proved any part of their case with undisputed evidence; Plaintiffs contend only that three of Defendants' legal arguments are foreclosed by the Fourth Circuit's mandate and this Court's decisions. Those legal arguments are foreclosed no matter what stage the proceedings are in.

Defendants also argue that the Fourth Circuit "did not address" two of their three "complete defenses" to Step One. Dkt. 379 at 6, 8. But as Judge Ellis held, the "matters laid to rest by the Fourth Circuit's mandate" include both issues that were "expressly" decided, as well as issues "impliedly decided by the appellate court," because "district courts 'must attempt to implement the spirit of the mandate.'" Dkt. 298 at 3 (quoting *Riese*, 356 F.3d at 584). There can be no question that the Fourth Circuit "impliedly decided" those issues, because it could not have held that "Plaintiffs have satisfied their burden at step one," *Reyes*, 903 F.3d at 433 n.12, without rejecting those "complete defenses at step 1," Dkt. 379 at 3.

Finally, Defendants imply—by pulling stray quotes from an oral argument transcript—

---

[9] To be clear, Plaintiffs did not file a summary judgment motion on Step One because they recognize that the dueling expert reports leave a "genuine dispute as to [a] material fact[.]" Fed. R. Civ. P. 56(a). But after the Fourth Circuit's opinion in *Reyes*, should the jury credit Plaintiffs' expert, the jury would have to find that Plaintiffs have satisfied their burden on Step One.

that the Court somehow left open these "complete defenses" to step one for later consideration. Dkt. 379 at 9. But the Court's decision could not have been more clear: "It is not appropriate to re-litigate step one on remand because to do so would violate the Fourth Circuit's mandate." Dkt. 298 at 3. A judge's questions at oral argument certainly do not eclipse his later written decision.

Accordingly, Defendants should be precluded from presenting evidence or argument with respect to (i) the argument that Plaintiffs must show that the Policy is an "artificial, arbitrary, and unnecessary barrier"; (ii) the argument that the "anti-harboring" provision of IRCA precludes causality; and (iii) the argument that Plaintiffs' immigration status (and not their ethnicity) barred them from showing disparate impact.

### b. Defendants should not be allowed to argue that compliance with federal law was the reason their Policy was instituted.

On Step Two, Defendants should not be allowed to argue that compliance with IRCA or with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 8 U.S.C. § 1621, required the institution of their Policy, nor should they be allowed to argue that the Policy was necessary to achieve compliance with those statutes as a valid interest.

Defendants argue that avoiding criminal liability under the IRCA is a "valid interest" under Step Two and complain that they should not be "precluded from presenting evidence at trial regarding their rational and reasonable fear of such criminal liability." Dkt. 379 at 14. This presupposes that their executives both *did in fact* fear criminal liability—a contested issue of fact, well within the jury's province to decide—and that such fear would have been "rational and reasonable"—an issue this Court can dispose of in pretrial motions, since both sides agree it is not within the jury's province to decide the law.[10] Regarding the former issue, as discussed

---

[10] The parties agree that the Court, not the jury, must determine whether Defendants' Policy was required to avoid criminal liability under the IRCA anti-harboring statute. *Compare* Dkt.

above, Defendants' witnesses must first lay foundation before giving any statement explaining the reasons for the Policy, they may not state reasons in the abstract that were first concocted by litigation counsel in order to defend this lawsuit.[11] Regarding the latter issue, Plaintiffs showed in their opening memorandum why simply renting to undocumented immigrants does not constitute harboring within the meaning of IRCA, *see* Dkt. 332 at 11-12; now, this Court can and should find that a mistaken interpretation of law (*i.e.*, the mistaken belief that federal law requires this Policy) cannot be "necessary" to achieve a particular interest, no matter how valid.

The same analysis applies to the PRWORA, but even more clearly. Defendants agree that PRWORA does not regulate this mobile home park, because the park does not receive federal housing subsidies. *See* Dkt. 332-5 at 28:10-29:3, Dkt. 256-2 at 29:15-30:4. Accordingly, since it is not even possible for Defendants to violate the PRWORA, compliance with that inapplicable statute could not possibly be "necessary" to achieve a "valid interest."

Contrary to Defendants' protestations, Dkt. 379 at 23-24, this does not represent "a straw man in order to attack" the opinions of Defendants' expert witness, nor a second bite at the apple on Plaintiffs' Motion to Strike. As the Court held, Dkt. 189 at 3, Mr. Caruso may rely on his experience in the industry to opine on whether "a lessor may have legitimate reasons to ask an applicant to prove his or her legal residence." He may not, however, testify that IRCA or the

---

332 at 10 *with* Dkt. 344 at 4.

[11] The concern that Defendants' witnesses will seek to explain their Policy to the jury by means of after-the-fact justifications is not abstract or hyperbolic. Indeed, even in their briefing papers on this Motion *in Limine*, Defendants cite facts in support of their argument—i.e. that "a large percentage of undocumented persons in the relevant geographic area are Latinos" and "undocumented immigrants cannot obtain traditional home mortgages," Dkt. 379 at 12-13— their knowledge of which admittedly comes from reading the pleadings in this case. If Defendants' executives genuinely feared criminal liability, they need to testify when and how they came to have this fear; and if the fear post-dates the adoption of the Policy, they should not be allowed to argue that the Policy's purpose was to mitigate this fear.

PRWORA justify this policy (much less require it), as that would be a mistaken interpretation of law and furthermore would impinge on the province of the Court to instruct the jury on the law.

For the foregoing reasons, Defendants should be barred from arguing or testifying that compliance with IRCA or PRWORA required the Policy at issue in this lawsuit, nor that their Policy was necessary to achieve compliance with either statute. As to the IRCA, Defendants' witnesses furthermore should not be allowed to cite that statute on Step Two without proper foundation that compliance with that statute was *in fact* the reason for instituting the Policy, a proposition they have not yet found a witness to support.[12]

### III.    Defendants' evidentiary argument regarding FHA trainings, Spanish-language advertisements and Treasury reports are unavailing.

***Evidence regarding FHA training certifications:*** Defendants' leading argument for the admissibility of this evidence is that they fear Plaintiffs intend to "imply that Defendants intentionally discriminated against Plaintiffs." Dkt. 379 at 29. To be clear: at trial, Plaintiffs will not imply that Defendants intentionally discriminated against them. The evidence that Plaintiffs intend to introduce—*e.g.* lease materials, eviction correspondence, evidence that the Policy was rarely enforced before it was enforced against Plaintiffs—are all relevant to either (1) show what Defendants actually did to Plaintiffs that caused their damages (raised their rent and terminated their tenancies which were otherwise in good standing); (2) counter Defendants' Step Two arguments (to the extent that all parties had been satisfied with the Plaintiffs' tenancy for several years before Defendants suddenly decided to enforce the long-dormant Policy, this tends to disprove that the policy was "necessary"); or (3) support Plaintiffs' Step Three arguments (because they show that simply enforcing the Policy on one lessee instead of all occupants, as

---

[12] Tellingly, Defendants' Memorandum does not claim that they *did* fear IRCA liability, just that they "reasonably could believe they could be exposed to liability." Dkt. 379 at 1.

was done in the case of all four Plaintiff families for several years to all parties' satisfaction, can effectively meet the valid interests of the landlord).

Rather, Defendants' introduction of evidence of FHA training is a further attempt to introduce evidence of *post hoc* rationalizations that do not evidence the contemporaneous reasons behind Defendants' Policy. Defendants admit that evidence of FHA training is only relevant to rebut an inference of discriminatory intent, Dkt. 379 at 29—a trial tactic which Plaintiffs have already committed not to employ, as described above. More critically, the FHA trainings took place after Defendants developed the Policy and after they began enforcing it against the Plaintiffs, and the individuals trained admittedly had no role in creating the Policy.[13] Therefore, the training can have no possible bearing on the genuine reasons for the Policy. For these reasons, it is not relevant within the meaning of Fed. R. Evid. 401(a). And insofar as Defendants seek to use this to portray themselves as desirous of avoiding intentional discrimination, this can be excluded under Fed. R. Evid. 403 as prejudicial, confusing and misleading; and under Fed. R. Evid. 404(a)(1) as impermissible character evidence.

**_Evidence regarding Spanish-language advertisements:_** The proffered evidence of Spanish-language advertisements does not meet basic standards of admissibility. First, Defendants do not offer any such advertisements as evidence, instead producing an email *regarding* advertising in a "Washington Hispanic" newspaper (with no indication that any

---

[13] Defendants began enforcing their Policy against Park residents at least as early as June 2015. *See*, *e.g.*, Dkt. 138, Ex. 51 (Resident Ledger Jose Reyes); Exh. 4 (Renewal Letter Jose Reyes); Dkt 138, Ex. 26 (Giambanco Dep. Tr.) at 50:11-14; 51:25-52:8. None of the cited FHA trainings occurred prior to the enforcement of the Policy. Exh. 5. Of the list of those trained, Defendants admit that Ms. Giambanco and Ms. Easton had no role relating to creating the Policy. Dkt. 379 at 19. Of the remaining list, Defendants claim that only Mark Jones was aware of the reasons behind the Policy (which Plaintiffs dispute). Dkt. 379 at 17. Yet Mark Jones' FHA training occurred on Aug. 2, 2016, over a year after the Policy was already enforced. Exh. 5 at 6.

resulting advertisement would be in Spanish). Dkt. 98, Ex. 32. The only other evidence is a 2014 marketing plan, which identifies a need to advertise in Spanish in a *different* mobile home park and plans to translate *that park's* website into Spanish, but does not say whether such things were ever done. Dkt. 98, Ex. 33 at 2-3. Despite extensive discussion of current marketing and advertising, the plan does not list a single example of a Spanish-language advertisement. *Id.* The documents at best prove that Spanish-language advertisements were *considered*. Accordingly, those documents would violate the Best Evidence Rule, Fed. R. Evid. 1002, if offered as evidence that Spanish-language ads were actually run.

Defendants also present a puzzling critique of the report of Plaintiffs' expert, Professor Clark. Defendants contend that Professor Clark's testimony is flawed because he did not opine on how Spanish-language advertisements may change the percentage of Latinos at the Park, but that point is fundamentally illogical: Professor Clark carried out specific demographic studies in Virginia, Fairfax County, Fairfax City, and the Census Tract where the Park is located to determine the disproportionate impact of the Policy. Dkt. 379, Ex. 9. Advertisements have no relevance to the demographic statistics of the region or the Census Tract. In any event, the Fourth Circuit found that Plaintiffs "satisfied the robust causality requirement" at Step One of *Inclusive Communities* through their statistical evidence, *Reyes*, 903 F.3d at 429, and this Court denied Defendants' motion to strike Professor Clark's report on remand, Dkt. 311.

**_Treasury reports:_** Defendants' argument that the 2009 and 2018 Treasury Inspector General's Reports are relevant to Step Two of the *Inclusive Communities* framework fails because they cannot show that the Reports informed the establishment of the Policy or the decision to enforce it on the Plaintiffs. This is especially so for the 2018 Report, authored two years after this lawsuit was filed.

16

Defendants claim that the Treasury Reports are relevant at Step Three because they corroborate the deposition testimony of George Caruso (Defendant's leasing and management expert), and because they refute one of Plaintiffs' proposed non-discriminatory alternatives to the Policy.[14] Dkt. 379 at 20. But Mr. Caruso does not at any point reference the Treasury Reports in his deposition testimony or in his expert report: when asked whether government-issued immigration documents are helpful in verifying identity, Mr. Caruso responds that "government documents"—a term he does not define, and which may or may not include government-issued Individual Taxpayer Identification Numbers (ITINs)—are among the "gold standard." Dkt. 379-007 at 116:10-17. To the extent this Court determines the Reports are admissible solely for the purposes of Step Three, they should be subject to a limiting instruction.

*__Evidence regarding Defendants' opinions on immigration:__* Finally, Defendants do not respond to Plaintiffs' request to exclude "[a]ny evidence of the Defendants' views or opinions as to immigrants or immigration," Dkt. 332 at 17, and so that request should be deemed unopposed.

**IV.    Defendants may not harass Plaintiffs about their immigration history, and Plaintiffs are not qualified to give expert testimony regarding immigration matters or ITINs.**

The female Plaintiffs' immigration status is, of course, *relevant* to this action; this does not mean it is *contested*. Indeed, after arguing extensively that they should be allowed to cross-examine female Plaintiffs on their lack of immigration status, Defendants admit it would be a waste of time because the fact is undisputed, Dkt. 379 at 26 n.2; yet contend they should nonetheless be allowed far-reaching cross-examination on other issues related to immigration status, Dkt. 379 at 25-27. The Court should preclude cross-examination on each of these issues,

---

[14] To be clear, "accept ITINs in lieu of Social Security Numbers" is not Plaintiffs' only proposed Step Three alternative practice. Other alternatives include "enforce the Policy only against the lessee, not against all adult occupants, as you did successfully for many years prior to deciding to enforce the Policy against these Plaintiffs"; or, "accept as tenants any individuals who are able to pass your income, credit, and background-check vendor's screening process."

including the lack of legal status. Further evidence has no probative value; its only purpose would be for harassment, and it would be needlessly duplicative and cause unfair prejudice.[15]

This Court has substantial discretion to exclude even relevant evidence that is otherwise admissible under the Federal Rules of Evidence. *See*, *e.g.*, *United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979) (finding that excluding testimony to prevent cumulative evidence or harassment is trial court's "basic power"); *United States ex rel. Davis v. U.S. Training Ctr. Inc.*, 498 Fed. App'x 308, 317 (4th Cir. 2012) (upholding trial court's discretion to exclude evidence of falsifying records and intimidation as highly prejudicial).[16]  This Court has a duty to limit cross-examination where necessary to protect witnesses. Fed. R. Evid. 611(a)(3). Defendants argue they have a fundamental right to cross-examine, conveniently omitting that cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Earlier in the case, this Court found as an undisputed fact that female Plaintiffs "entered the United States illegally and thus are unlawfully present in the country." Dkt. 190 at 2.

---

[15] Plaintiffs have demonstrated at length why this testimony would be unfairly prejudicial, and cause harassment and embarrassment for female Plaintiffs. Dkt. 332 at 14-17.

[16] Defendants mischaracterize cases cited by Plaintiffs in which evidence of immigration status was excluded as prejudicial, *despite its relevance*. Fed. R. Evid. 403 imposes limits on relevant evidence, which the court may exclude for unfair prejudice. Courts have generally held that information on a plaintiff's immigration status should be excluded *even when relevant*, because the likelihood that a plaintiff without legal immigration status would cease to pursue their legal rights far outweighs the probative value. *Uto v. Job Site Servs., Inc.*, 269 F.R.D. 209, 211-12 (E.D.N.Y. 2010) (citing *Flores v. Amigon*, 233 F. Supp. 2d 462, 464-65 (E.D.N.Y. 2002)); *accord Romero v. Prindle Hill Constr., LLC*, 2017 WL 3390242 (D. Conn. Aug. 7, 2017). Courts also consider that jurors may have negative attitudes towards undocumented immigrants, when weighing prejudice against relevance. *See*, *e.g.*, *Doe v. Bd. of Tr. of Neb. State Colls.*, 2020 WL 2793558, at *1-2 (D. Neb. May 29, 2020). Even in the criminal context, a trial court may impose reasonable limits on cross-examination "based upon concerns about harassment, prejudice . . . repetition, or relevance." *United States v. Hernandez*, 212 Fed. App'x 229, 230 (4th Cir. 2007).

Defendants agree that this finding of undisputed fact was undisturbed by the Fourth Circuit. Dkt. 248 at 1. In fact, Defendants have themselves relied on this conclusive finding. *See*, *e.g.*, Dkt. 248 at 15 (Memorandum in Support of Summary Judgment). Defendants have no reason of proof to cross-examine on this point.

In addition, Plaintiffs conceded that they lack lawful immigration status in their Requests for Admissions, which are valid proof at trial; additional evidence would be unnecessarily cumulative. *See Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund of Phila.*, 850 F.2d 1028, 1037 (3d Cir. 1988) (an RFA "is not merely another layer of evidence, upon which the district court can superimpose its own assessment of weight and validity. It is, to the contrary, an unassailable statement of fact that narrows the triable issues in the case."). Neither party should suffer the burden of proving an admitted fact "if the interests of the [party] do not require further proof of the matters covered by the request for admission." *Metro. Life Ins. Co. v. Carr*, 169 F. Supp. 377, 378 (D. Md. 1959).

Defendants argue that they are entitled to cross-examine female Plaintiffs because they denied a request to "[a]dmit that you are not able to comply with the Policy because you are not in the United States legally," and their deposition testimony. Dkt. 379 at 25. But the female Plaintiffs have never denied *being in the United States illegally*. Instead, their denial made the point that the reason they could not comply with the Policy was because they lacked the *specific* immigration documents listed in the Policy, which—as Plaintiffs' expert explains, *see* Dkt. 361 at 6-7—were not a good proxy for "in the United States legally." Of course, as lay witnesses lacking expertise in immigration matters, the female Plaintiffs cannot be expected to explain this from the witness stand. Fed. R. Evid. 701(c). Furthermore, Defendants can only introduce prior inconsistent statements for impeachment when they are inconsistent with the witness's testimony

at trial, Fed. R. Evid. 613(b); if Plaintiffs are not qualified to give this expert opinion, Defendants cannot cross-examine them on it.

Defendants finally contend that in order to challenge Plaintiffs' evidence on Step Three, they should be permitted to cross-examine female Plaintiffs on the process of obtaining an ITIN, and on one Plaintiff's use of someone else's foreign passport in 1996 to enter the United States. Dkt. 379 at 27. Again, while Plaintiffs have proffered an expert witness on these issues, they themselves are not experts on ITIN documents or foreign passports. They have no idea whether their own experiences obtaining ITINs were typical or atypical; nor whether security protocols for foreign passports have improved since 1996. If Defendants want to make an argument about the security of ITINs on Step Three of the disparate impact analysis, they cannot do that by the female Plaintiffs' lay witness testimony. Such cross-examination would, again, be needlessly cumulative without additional probative value: the parties have stipulated to exactly the testimony that Defendants seek to elicit. Dkt. 180 ¶¶ 15-16. Defendants admitted this in their own Motion *in Limine*: "there is no dispute between the parties on how a person obtains an ITIN." Dkt. 326 at 2. Because this fact is established by stipulation, there is no need of proof at trial: stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal Soc'y of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 677-78 (2010).

When additional evidence of an undisputed fact—female Plaintiffs' lack of immigration status—has no probative value, is needlessly cumulative, and will cause unfair prejudice and harassment, the Court should exercise its power to find such evidence inadmissible.

## Conclusion

For the foregoing reasons, Plaintiffs' Motion *in Limine*, Dkt. 331, should be granted.

20

Respectfully submitted,


_____//s//_____                    Dated: 6/28/2021
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Nady Peralta, VSB #91630
Granville C. Warner, VSB 24957
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
nady@justice4all.org
cwarner@justice4all.org

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kaiyeu Kevin Chu, VSB #85746
Matthew Traupman (pro hac vice)
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Phone: (202) 538-8000
Fax: (202) 538-8100
kevinchu@quinnemanuel.com
matthewtraupman@quinnemanuel.com

*Counsel for Plaintiffs*

**<u>Certificate of Service</u>**

I hereby certify that on this 28th day of June, 2021, I caused the foregoing to be filed

electronically with the Clerk of the Court using CM/ECF, which will then send a notification of

such filing to all counsel of record.


_____//s//_____
Simon Sandoval-Moshenberg, VSB #77110
*simon@justice4all.org*
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454