**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*,<br><br>     Plaintiffs,<br>v.<br><br>WAPLES MOBILE HOME PARK<br>LIMITED PARTNERSHIP, *et al.*,<br><br>     Defendants. | Civil No.:  1:16-cv-563 (LO) (TCB) |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM PURSUANT**
**<u>TO THE COURT'S JULY 28, 2021 ORDER</u>**

## TABLE OF CONTENTS

Page

ARGUMENT ........................................................................................................................ 1

I.    Defendants' Policy In Effect And Applied When Plaintiffs Filed This Lawsuit
Permitted Residents to Provide Any Document Proving Their Legal Presence................. 1

II.   Defendants' Policy Serves The Valid Interest At Step Two Of *Inclusive Communities* Of Avoiding Criminal Liability Under The Federal Anti-Harboring
Statute. ............................................................................................................................. 4

III.  Neither Defendants' Subjective Motive For Adopting Their Policy Nor Post-
Adoption Rationales For The Policy Have Any Bearing On Whether The Policy
Serves A Valid Interest In Avoiding Criminal Liability...................................................... 8

IV.  Plaintiffs Have Offered No Proof Of A Less Discriminatory Policy That Would
Exclude Undocumented Immigrants And Achieve The Valid Interest In Avoiding
Criminal Liability......................................................................................................... 12

CONCLUSION.................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barr v. Am. Ass'n of Political Consultants*,
   140 S. Ct. 2335 (2020)..................................................................................................9

*Bey v. City of New York*,
   999 F.3d 157 (2d Cir. 2021)..........................................................................................5

*Bouchat v. Balt. Ravens Football Club, Inc.*,
   346 F.3d 514 (4th Cir. 2003) .........................................................................................4

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016).................................................................................................10

*Flast v. Cohen*,
   392 U.S. 83 (1968).......................................................................................................15

*Johnson v. O'Brien*,
   No. 7:08-cv-00022, 2008 U.S. Dist. LEXIS 41546 (W.D. Va. May 27, 2008)......................15

*Long v. Barr*,
   451 F. Supp. 3d 507 (E.D. Va. 2020) ...........................................................................15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).....................................................................................................13

*Marshall v. Meadows*,
   105 F.3d 904 (4th Cir. 1997) .......................................................................................14

*Moose Lodge No. 107 v. Irvis*,
   407 U.S. 163 (1972).....................................................................................................15

*Raytheon Co. v. Hernandez*,
   540 U.S. 44 (2003)................................................................................................. 10-11

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018).....................................................................................................9

*Smith v. City of Jackson*,
   544 U.S. 228 (2005).....................................................................................................10

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).......................................................................................................13

*Stone v. Liberty Mut. Ins. Co.*,
    105 F.3d 188 (4th Cir. 1997) ................................................................................4

*Texas Dep't of Hous. & Cmt. Affairs v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015).................................................................................. *passim*

*U.S. v. Aguilar*,
    477 F. App'x 1000 (4th Cir. 2012) .............................................1, 4, 6, 7, 8

*United States v. Tipton*,
    518 F.3d 591 (8th Cir. 2008) ................................................................................8

*United States v. Wilson*,
    503 U.S. 329 (1992).................................................................................................9

*Warth v. Seldin*,
    422 U.S. 490 (1975)...............................................................................................14

*Williams v. Wells Fargo Bank, N.A.*,
    901 F.3d 1036 (8th Cir. 2018) ........................................................................ 5-6

**Statutes**

8 U.S.C. § 1324(a) ................................................................................................6

42 U.S.C. § 1436a ................................................................................................7

42 U.S.C. § 3604(a) .............................................................................................9

42 U.S.C. § 3614a ...............................................................................................10

**Regulations**

24 C.F.R. §§ 5.508-5.512.....................................................................................7

24 C.F.R. § 100.500(c)(2) (2013) .....................................................................10

24 C.F.R. § 100.500(c)(3) ..................................................................................12

Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A. J. Dwoskin & Associates, Inc. ("Defendants") submit this supplemental memorandum pursuant to the Court's July 28, 2021 Order (Dkt. 413) directing the parties to address the following issues:

1. What version of the Policy was "in effect and being applied when Plaintiffs filed suit"?

2. Whether Defendants' Policy served a "valid interest" of avoiding criminal liability under the Immigration and Reform and Control Act of 1986 ("IRCA") and *U.S. v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012) that meets "Step Two" of *Texas Dep't of Hous. & Cmt. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).

3. Whether a Defendant's motive for adopting a challenged policy impacts its valid interest at Step Two of *Inclusive Communities* and whether a *post-hoc* rationale for a policy undermines that valid interest.

4. If Defendants' policy allowing any immigration documents proving legal presence in the United States applies, whether any judicial order can redress the female Plaintiffs' asserted injuries in this case and whether the male Plaintiffs' standing relies solely on the redressability of the injuries suffered by the female Plaintiffs.

For the reasons discussed below, reviewing the undisputed record under the controlling law, it is clear that this case is appropriate for resolution at summary judgment because there are no genuine disputes of material fact and Defendants are entitled to judgment as a matter of law on Plaintiffs' remaining disparate-impact claim under the Fair Housing Act ("FHA").

## ARGUMENT

**I.      Defendants' Policy In Effect And Applied When Plaintiffs Filed This Lawsuit Permitted Residents to Provide Any Document Proving Their Legal Presence.**

The Court is correct that Defendants' policy in effect and applied when Plaintiffs filed this lawsuit on May 23, 2016, permitted residents at the Park to produce any document that proved their legal presence in the United States. Plaintiffs have never presented *any* evidence that, as applied to Plaintiffs or any other tenants, Defendants *only* accepted a passport, a visa, or an I-94.

As an initial matter, this issue is not material to any disparate-impact claim Plaintiffs have ever asserted in this case. Their claim consistently has been that, by requiring proof of legal presence in the United States and thus excluding undocumented immigrants from the Park, Defendants discriminated against Latinos because they were disproportionately impacted by the requirement. *See* Compl. ¶ 61. Plaintiffs never previously premised their disparate-impact claim on the theory that there are some undocumented Latino immigrants who could have provided certain documents showing legal presence, just not a passport, visa, or I-94 form. Plaintiffs' belated attempt to manufacture some dispute of fact about what Policy Defendants applied thus misses the mark and is contrary to the claim Plaintiffs consistently have advanced from the start of this case.

In any event, the record makes clear that the Policy applied to Plaintiffs here did not narrowly require prospective residents to supply a passport, visa, or I-94 form. As the Court correctly notes, Josephine Giambanco, the Park's manager responsible for enforcing the Policy at the Park, testified that the Defendants accepted any document demonstrating legal presence in the United States. Dkt. 151, Ex. 7 at 30:23-31:4 (ECF pgs. 4-5) ("If you don't have the Social Security card, you have to provide current documents that you are legal in the United States, *there's lots of documents out there*.") (emphasis added). Even in 2013, when Ms. Giambanco first started her employment at the Park, she testified that Defendants would accept any document proving legal presence. *Id*. at 63:18-64:5 (ECF pgs. 6-7) ("If you didn't have a Social Security card, you had to provide a passport, I-94, *you had to show some kind of proof for legal presence in the United States.*") (emphasis added). Defendants' other witnesses' testimony on this subject is in accord. Carolina Easton, Defendants' quality control manager, testified that Defendants would accept any document demonstrating legal presence in the United States. Dkt. 151, Ex. 8 at 30:21-32:7; 47:9-14; 57:18-21; 96:5-12; 125:3-11. Mark Jones, Defendants' designee, likewise testified that the

Defendants would accept any documents issued by the United States government showing legal presence in the United States. Dkt. 151, Ex. 6 at 87-88; 224:16-20.

The consistent witness testimony aligns with the documentary record. Defendants' Feb. 9, 2013 and May 8, 2015 Resident Selection and Occupancy Standards, Dkt. 151 at Exs. 9-10 respectively, which apply to the Park, *id.* at Ex. 20 (Jones Decl.), identify a number of documents—other than just a passport, visa, and I-94—that could constitute proof of legal residency, including permanent resident, temporary resident, and employment authorization cards. *See* Dkt. 151, Ex. 9 at 8 (outlining documents accepted such as permanent resident card or employment authorization card); Dkt. 151, Ex. 10 at 11 (same).[1] The January 24, 2011 Consumer Report & CoreLogic SafeRent and Training Manual also identifies various documents that will be accepted to establish legal residence. Dkt. 151, Ex. 11 at 50-59. The manual further provides that leaseholders and occupants "who do not have [Social Security Numbers], must also prove their identity and *provide documentation as to their validity in the United States.*" *Id.* at 67 and 68 (emphasis added).

In an attempt to manufacture a factual dispute when none exists, Plaintiffs have referred to certain Resident and Information Guides, which state that applicants without a Social Security Number, must submit an original Passport, original Visa and original I-94 or I-94W Arrival/Departure Form. Dkt. 361 at 1 (citing Exs. 1 and 2). But, these guides predate the April 22, 2016 guide in place when Plaintiffs filed suit, which states that applicants must only "provide immigration documentations prov[ing] legal presence in the United States[,]" (Dkt. 326-2), and they do not speak to how Defendants actually applied the Policy. Otherwise, Plaintiffs have not presented any evidence contradicting the consistent testimony on the application of the Policy from

---

[1] These documents also state that "all applicants must be legally eligible to live in the U.S." Dkt. 151, Ex. 9 at 7; *id.*, Ex. 10 at 9.

Defendants' witnesses sufficient to create a genuine issue of material fact. Plaintiffs also have not pointed to any record evidence demonstrating that (i) the female Plaintiffs or any other applicant, leaseholder, or occupant attempted to provide documentation of legal presence apart from a passport, a visa, or an I-94 or that (ii) Defendants rejected such an attempt as noncompliant with the Policy. Nor do Plaintiffs allege or contend that the female Plaintiffs *could have* provided other immigration documents proving legal presence. In the end, Plaintiffs are left with bare unsupported allegations and speculation that Defendants' Policy requires only limited documents. That is not remotely sufficient to defeat summary judgment on the issue of the applicable Policy.[2]

## II.   Defendants' Policy Serves The Valid Interest At Step Two Of *Inclusive Communities* Of Avoiding Criminal Liability Under The Federal Anti-Harboring Statute.

Requiring adult residents at Defendants' Park to provide proof of lawful U.S. residency indisputably serves a "valid interest" in Defendants avoiding criminal liability under the IRCA's anti-harboring provision, as construed by the Fourth Circuit in *Aguilar*.

*Inclusive Communities* makes clear that defendants' Step-Two burden is not a heavy one. It requires only that a defendant "state and explain the valid interest served by their policies." 576 U.S. at 541 (emphasis added). In addition, the Supreme Court articulated substantial "limitations" and "safeguards" governing the application of the burden-shifting framework in order to prevent abusive disparate-impact claims that would disrupt the efforts of housing providers and policymakers and inject unconstitutional considerations of race into their decisionmaking. *Id.* at 544. It first emphasized that "[a]n important and appropriate means of ensuring that disparate-

---

[2] *See Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) ("A party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'") (citation omitted); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment") (citation omitted).

impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest their policies serve[.]" *Id.* at 541. It also stressed that courts should avoid "put[ting] housing authorities and private developers in a double bind of liability, subject to suit whether they choose to" adopt one policy or another—or none at all. *Id.* at 542.

The Court further explained that an FHA disparate-impact case should be dismissed where "federal law substantially limits the [defendant's] discretion" in adopting housing policies. *Id.* at 543. It also made clear that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers'" and that courts "should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id.* Under these controlling and cautionary principles, a policy that identifies undocumented immigrants seeking to rent and live in mobile homes, in order to avoid criminal liability under a federal statute that broadly prohibits attempted harboring or shielding from detection undocumented immigrants, satisfies Defendants' Step-Two burden.

*Inclusive Communities* makes clear that where some other law "substantially limits" a housing provider's "discretion" and creates the risk of putting the provider in a "double bind of liability" no matter the housing policy they adopt, an FHA disparate-impact claim cannot stand. So too here. And, particularly given the "leeway" courts must give in determining whether a defendant has identified a "valid interest" behind its policy, there is no question that avoiding criminal liability under a federal criminal statute meets that standard. *See, e.g.*, *Bey v. City of New York*, 999 F.3d 157, 170-71 (2d Cir. 2021) (rejecting Title VII disparate-impact claim where the grooming policy at issue was necessary to comply with a respiratory-protection federal regulation; "complying with that legally binding federal regulation is, by definition, a business necessity and presents a complete defense to the [plaintiffs'] disparate impact claim"); *Williams v. Wells Fargo*

*Bank, N.A.*, 901 F.3d 1036, 1040-1041 (8th Cir. 2018) (rejecting disparate-impact claim based on bank's termination of employees previously convicted of certain criminal offenses where federal law ("Section 19") prohibited banks from employing such persons; the court of appeals held that "non-compliance with Section 19 could place Wells Fargo at risk of daily fines of $1 million" and, therefore, "the bank's decision to comply with the statute's command is a business necessity under Title VII").[3]

Defendants' Policy directly serves this "valid interest" in avoiding criminal liability. The anti-harboring statute broadly prohibits "conceal[ing], harbor[ing], or shield[ing] from detection, or attempt[ing] to conceal, harbor, or shield from detection," an undocumented immigrant "in any place, including any building or any means of transportation[,]" either "knowing[ly] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law. 8 U.S.C. § 1324(a). In *Aguilar*, the Fourth Circuit specifically addressed the application of that statute to a residential landlord. The landlord there was convicted for renting rooms in her home to illegal aliens. She claimed that the district court erred in not instructing the jury that it had to find that her conduct "tended to substantially facilitate the alien remaining in the United States." 477 F. App'x at 1001-02. The Fourth Circuit affirmed the conviction, finding no plain error in the refusal to instruct the jury that intent to harbor is an element of the crime. The Fourth Circuit explained that "a defendant acts with reckless disregard where she is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien." *Id*. at 1002. And it found that the defendant "recklessly disregarded the risk that [] her tenants

---

[3] Title VII disparate-impact authorities are relevant to interpreting the scope of disparate-impact liability under the FHA. *See Inclusive Cmtys.*, 576 U.S. at 533 (looking to Title VII cases and noting that they "provide essential background and instruction in the case now before the Court").

w[ere] undocumented" because she "took no steps" to ascertain the status of her tenants. *Id*. at 1003.[4]

Given *Aguilar* and the broad text of the anti-harboring provision, Defendants had no discretion to ignore the potential criminal implications of renting to undocumented immigrants and, like Ms. Aguilar, to take "no steps" to ascertain the residency status of the prospective occupants at the Park. That is all the more true given the undisputed record in this case, which confirms that Defendants face a very real risk of liability under the IRCA if they fail to take steps to ensure that they are not allowing undocumented immigrants to live at their Park. According to Plaintiffs' own allegations, a large percentage of undocumented persons in the relevant geographic area are Latinos. Compl. ¶¶ 58-63. Therefore, if Defendants ignored facts such as the inability of a Latino applicant from another country to provide a social security number or proof of legal status, they too could be found to recklessly disregard the fact that applicants could be in the United States illegally and, like Ms. Aguilar, convicted of a crime for taking "no steps to ascertain the status of [their] tenants." *Aguilar*, 477 F. App'x at 1003.[5]

In addition, as Plaintiffs also have alleged, undocumented immigrants "cannot obtain traditional home mortgages." Compl. ¶ 55. As a result, making nontraditional, mobile housing freely available to such immigrants may be seen as an inducement that "substantially facilitate[s] an alien's remaining in the United States illegally[,]" further supporting a violation of the anti-

---

[4]   The validity of Defendants' interest is further reinforced by the fact that the federal government itself prohibits undocumented immigrants from residing in federally subsidized housing. *See* 42 U.S.C. § 1436a; 24 C.F.R. §§ 5.508-5.512.

[5]   The Court rightly recognized that this concern of potential criminal liability presented a valid interest early on in this case. Dkt. 190 at 16-17 (concluding that there is "no question" that lessors "could properly and sensibly inquire into the immigration status of a lessee and his adult co-habitants" in seeking to avoid criminal liability under the anti-harboring statute); *id.* at 22 ("as federal law makes clear, such an inquiry [into legal status] is not only lawful, but sometimes necessary for prudent behavior").

harboring statute. *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *see also Aguilar*, 477 F. App'x at 1001-02. It also means that Defendants reasonably must assume—indeed, they know—that many of those seeking housing at the Park are undocumented immigrants, so failing to take steps to determine their legal status in offering housing would be reckless and expose Defendants to potential criminal liability under the statute.

*Inclusive Communities* makes clear that a housing provider cannot be forced to err on the side of potential criminal liability if it wishes to avoid disparate-impact liability under the FHA. A policy such as Defendants' that identifies undocumented immigrants and precludes them from leasing and living in the Park all but eliminates any prospect of anti-harboring liability and plainly cannot be said to be "artificial, arbitrary, and unnecessary." Defendants accordingly have established, as a matter of law, that they have met their Step-Two burden in this case.

## III.    Neither Defendants' Subjective Motive For Adopting Their Policy Nor Post-Adoption Rationales For The Policy Have Any Bearing On Whether The Policy Serves A Valid Interest In Avoiding Criminal Liability.

The Court's third question focuses on the relevance at Step Two under *Inclusive Communities*' disparate-impact standard, if any, of a defendant's motives at the time it adopted a policy and whether valid interests served by the policy were developed or discovered after its adoption. Under *Inclusive Communities*, precedents on which *Inclusive Communities* relies, the statutory text, and regulations issued by the Department of Housing & Urban Development (HUD), neither a defendant's subjective motive—at the time of a policy's adoption or otherwise—nor when the defendant subjectively developed a rationale for its policy have any bearing at Step Two and whether Defendants can meet their burden to show their Policy serves a valid interest.

To begin with, the FHA itself makes no mention of a defendant's subjective intent at the time it adopts a challenged housing policy or practice, or confine an examination of a defendant's rationales for its policy to what defendant knew or believed at the time of adoption. Rather, the

statute defines the prohibited conduct as the specific *application* of a policy or practice to a specific person and transaction, strictly in the present tense, making it unlawful "to refuse to sell or rent ..., or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person" on the basis of "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) ("Section 804(a)").

Had Congress wished to prohibit the past and original act of adopting a rental or sale policy that, on its face, has or could have a disparate impact—and make subjective intent at the time of adoption an element of such a claim—it easily could have done so. But it did not. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) (citation omitted) ("Had Congress" meant for subjective intent at the time of adoption to be relevant, "it knew how to say so"). Instead, as noted, Congress used present-tense verbs focused on specific conduct and transactions—selling, leasing, or "mak[ing] unavailable" a "dwelling[,]" but not merely "adopting" a "policy." And, unlike Section 804(a)'s disparate-***treatment*** cause of action—which *does* require proof of a defendant's intent, *see Inclusive Cmtys.*, 576 U.S. at 524—there is nothing in the statute that extends that requirement to disparate-***impact*** claims, or otherwise makes a defendant's intent relevant. *Id.* (describing disparate-impact theory as "[i]n contrast" with disparate-treatment's "intent or motive" requirement). These textual features—or the absence thereof—are significant and must be given effect. *See Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2349 (2020) ("[C]ourts today zero in on the precise statutory text"); *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

The statutory scheme, in turn, explains HUD's 2013 regulation fleshing out the burden-shifting standard. Specifically, at Step Two, HUD's regulation requires defendants to "prov[e] that the challenged practice ***is*** necessary"—present tense—"to achieve one or more substantial,

legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(c)(2) (2013).[6] Like FHA § 804(a),
the regulation does not refer to past adoption of a policy or a defendant's subjective motivation or
actual rationale at the time it adopted the policy, let alone require proof of any of this before a
defendant can meet its burden at Step Two. To the contrary: the regulation asks what valid interests
the policy or practices serves *in the present*.

      *Inclusive Communities*, and the precedents on which it relies, confirm what the statutory
text and HUD's regulation provide. First, *Inclusive Communities* provides that disparate-impact
defendants must be given "leeway to state and explain the *valid interest served by the policies*[,]"
576 U.S. at 541 (emphasis added), **not** "to state and explain the valid interest of *defendants that
actually motivated the adoption of the policies*" at issue. Strictly constraining housing providers to
defend their policies on the basis of rationales they actually had in mind at the time of the policies'
adoption is directly at odds with the "leeway" *Inclusive Communities* demands.

      Second, *Inclusive Communities*, and cases it cites, repeatedly stress that the text of FHA
§ 804(a)—like that of Title VII and the ADEA—"'focuses on the effects of the action on the
employee rather than the motivation for the action of the employer[.]'" *Id.* (quoting *Smith v. City
of Jackson*, 544 U.S. 228, 236 (2005)); *id.* at 534 ("Congress' use of the phrase 'otherwise make
unavailable refers to the consequences of an action rather than the actor's intent."); *id.* (reasoning
that "[i]n these three statutes the operative text looks to results" and "consequences, not intent").
All of this aligns, moreover, with the settled distinction in the law between disparate-treatment and
disparate-impact liability, with the former focused on and requiring discriminatory *intent*, and the
latter focused on and requiring discriminatory *effect*. *See id.* at 524; *Raytheon Co. v. Hernandez*,

---

[6]  As a HUD agency regulation construing a statute HUD is authorized to enforce (*see* 42 U.S.C.
§ 3614a), Section 100.500(c)(2) is entitled to deference. *See Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117, 2125 (2016).

540 U.S. 44, 52-53 (2003) (highlighting "distinction between" disparate-treatment and disparate-impact claims" insofar as "[l]iability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated'" the conduct at issue, while disparate-impact claims target discriminatory effect regardless of defendant's "subjective intent") (cleaned up).[7]

Third, *Inclusive Communities* directs courts to avoid "put[ting] housing authorities and private developers in a double bind of liability, subject to suit" no matter what policy or practice they adopt. *Id.* at 542. If, however, a defendant, sometime after adoption of a policy, realizes that its policy serves a valid interest in avoiding liability under another law—but, as Plaintiffs would have it, the defendant is not permitted to defend its policy on that basis—then the defendant will be placed in precisely the "double bind" that *Inclusive Communities* prohibits.[8] And where, as here, that "double bind" entails possible criminal conviction and imprisonment, it is all the more impermissible.

Nothing in the text of the FHA or HUD's 2013 regulation gives even a hint that Congress or the agency believed that a defendant's motivation at the time it adopted a housing policy—or the fact that a valid rationale for the policy was developed after its adoption—could be used to establish disparate-impact discrimination notwithstanding the existence of valid interests supporting the policy. For their part, *Inclusive Communities* and other Supreme Court precedents make clear that disparate-impact liability focuses on the consequences of an action, not the motivation behind it, and that defendants must be given wide "leeway" in defending their policies

---

[7]   In contrast to this precedent, Plaintiffs have not pointed to a single appellate decision endorsing their "subjective intent/time-of-adoption" construct. And, as Defendants previously explained, the two recent out-of-circuit district court decisions Plaintiffs cite are distinguishable and do not claim that *Inclusive Communities* supports their reasoning. (Dkt. 393 at 7-8.)

[8]   To be clear, as Defendants previously have argued, their valid interest in avoiding liability under the anti-harboring statute is *not* a so-called "post hoc rationale" for their Policy. *E.g.*, Dkt. 265 at 14-15; Dkt. 342 at 5-6.

at Step Two. Discrimination law already covers motive—through disparate-treatment claims, claims which Plaintiffs have abandoned in this case. There is, at bottom, no basis for inserting words into the text of the FHA that would impose a snapshot-frozen-in-time approach to assessing liability for discrimination, and put defendants in a "double bind" of liability in the event they did not have—or, perhaps, could not have had—a particular reason for a policy in mind at the time they adopted it. And this is especially true in this case, where Plaintiffs' proposed new theory of liability predicated on so-called "post hoc rationales" is without support in appellate precedent and had no case law support at all at the time Defendants adopted their Policy.

IV.   **Plaintiffs Have Offered No Proof Of A Less Discriminatory Policy That Would Exclude Undocumented Immigrants And Achieve The Valid Interest In Avoiding Criminal Liability.**

As shown above, Defendants' Policy achieves a valid interest in avoiding criminal liability under the anti-harboring statute as a matter of law. That means Plaintiffs can only avoid summary judgment on their disparate-impact claim if they can produce evidence that this same valid interest can "be served by another practice that has a less discriminatory effect." *Inclusive Communities*, 576 U.S. at 527 (citing 24 C.F.R. § 100.500(c)(3)). As the Court indicates, they cannot do so.

The Court is right to note that, assuming Defendants can meet their Step-Two burden, "only policies that exclude 'illegal aliens' are viable alternatives at Step Three of *Inclusive Communities*." (Dkt. 413 at 3.) In other words, only policies that have the ***same*** discriminatory exclusionary effect on undocumented immigrants as the Policy does can achieve the valid interest of avoiding liability under the anti-harboring statute—which means Plaintiffs cannot meet their Step-Three burden as a matter of law. *See Inclusive Cmtys.*, 576 U.S. at 533 ("[B]efore rejecting a business justification" or valid interest proffered by a defendant, "a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has *less disparate impact* and serves the [entity's] legitimate needs.'") (citation omitted; emphasis added). *Nor have*

*Plaintiffs ever attempted to identify a less discriminatory policy that could achieve avoidance of criminal liability as effectively as does Defendants' Policy, let alone offer evidence to prove it.*[9] As the Court has acknowledged, the *only* way to alleviate the concerns of potential criminal liability is to require that adult residents of the Park produce immigration documents showing proof of legal presence in the United States—just as the Policy does here. As a result, Plaintiffs cannot meet their Step-Three burden and Defendants are entitled to summary judgment on Plaintiffs' disparate-impact claim.

The Court proceeds to ask whether, if Plaintiffs were required by the Policy to provide proof of legal presence, there is any way the Court can redress the female Plaintiffs' asserted injuries from being excluded from the Park. Since any alternative to Defendants' Policy could only achieve the valid interest of avoiding criminal liability under the anti-harboring statute by—like the Policy—excluding undocumented immigrants, it would not redress Plaintiffs' harm from being excluded from the Park, and thus the Plaintiffs lack standing. In order to establish standing, the third and final element of standing requires that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). To meet redressability at the summary-judgment stage, a plaintiff must point to evidence of "specific, concrete facts demonstrating that

---

[9]   The premise of Plaintiffs' disparate-impact claim is that any policy directed at undocumented immigrants in the area in which the Park is located would have a disparate impact on Latinos, Compl. ¶ 61, who, according to Plaintiffs, make up the majority of undocumented immigrants in that area, *id*. ¶¶ 55-63. Plaintiffs have never offered (and could never offer) any alternative policy that would avoid potential criminal liability under the IRCA and *Aguilar* because according to Plaintiffs' faulty theory, any alternative policy that excludes undocumented immigrants would run afoul of the FHA.

the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

The Plaintiffs cannot, as a matter of law, meet their burden of demonstrating redressability. At Step Three, as noted, any alternative to Defendants' Policy would likewise require verification of proof of legal status of adult residents at the Park to avoid potential criminal liability under the IRCA and *Aguilar*—and it is undisputed that the female Plaintiffs cannot provide such proof. As the Court correctly notes, [t]here is no dispute that the female Plaintiffs are undocumented immigrants and cannot satisfy the 2015 revised policy[.]" (Dkt. 413 at 3.) There is nothing this Court can do to prevent the female Plaintiffs from being excluded from the Park and thus Plaintiffs' alleged injury cannot be redressed. *See Marshall v. Meadows*, 105 F.3d 904, 907 (4th Cir. 1997) (holding that because a state party's decision to hold an open primary was voluntary and lawful, there is "nothing this court can do" and thus the alleged injury cannot be redressed).

The Court also asks "whether the male Plaintiffs' standing relies solely on the redressability of the injuries suffered by the female Plaintiffs." (Dkt. 413 at 3.) It does. The male Plaintiffs are legally present and can meet—and have met—Defendants' Policy. It is undisputed that they were able to enter into leases at the Park, renew leases until the Policy was enforced on their wives, and they even admit that they were never denied the right to enter into rental agreements at the Park because they were Latino. *Compare* Dkt. 98 at pg. 5, Facts 11-13 (Defs.' Mem. Supp. Mot. Summ. J.) *with* Dkt. 138 at pg. 2, Facts 11-13 (Pls.' Opp. to Defs.' Mem. Supp. Mot. Summ. J.). The male Plaintiffs—as opposed to their wives—thus are not injured by the Policy because it does not exclude them from renting and living at the Park.

Further, it is undisputed that the male Plaintiffs' alleged injuries arise solely because their wives cannot comply with the Policy. But it is well-settled that a plaintiff only "has standing to

seek redress for injuries done to him, but may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972); *Johnson v. O'Brien*, No. 7:08-cv-00022, 2008 U.S. Dist. LEXIS 41546, at *28 n.9 (W.D. Va. May 27, 2008) (holding that plaintiff "may not bring any claim on behalf of his wife" because he does not have standing to seek redress for injuries done to others) (citing *Moose Lodge*, 407 U.S. at 166). As this Court recently explained, "justiciability and standing are not always coextensive as to plaintiffs, and, generally, the standing of one does not bear on the standing of another. '[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.'" *Long v. Barr*, 451 F. Supp. 3d 507, 531 (E.D. Va. 2020) (quoting *Flast v. Cohen*, 392 U.S. 83, 98, 99-100 (1968)).

When these requirements are applied to the male Plaintiffs, they compel the dismissal of the male Plaintiffs' FHA disparate-impact claims as well. The male Plaintiffs' standing relies solely on the redressability of the alleged injuries suffered by the female Plaintiffs, and as noted above, there is nothing this Court can do to prevent the female Plaintiffs from being excluded from the Park.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court grant summary judgment in their favor and enter judgment dismissing Plaintiffs' remaining disparate-impact claim.

Dated:  August 24, 2021                Respectfully submitted,


                                       WAPLES MOBILE HOME PARK LIMITED
                                       PARTNERSHIP, WAPLES PROJECT LIMITED
                                       PARTNERSHIP AND
                                       A. J. DWOSKIN & ASSOCIATES, INC.


                                       /s/
                                       _____
                                       Michael S. Dingman (VSB No. 30031)
                                       McGuireWoods LLP
                                       1750 Tysons Boulevard
                                       Suite 1800
                                       Tysons, VA 22102
                                       (703) 712-5462
                                       (703) 712-5262
                                       mdingman@mcguirewoods.com

                                       Grayson P. Hanes (VSB No. 06614)
                                       Justin deBettencourt (VSB No. 83806)
                                       REED SMITH LLP
                                       7900 Tysons One Place
                                       Suite 500
                                       McLean, Virginia 22102
                                       (703) 641-4200 (Telephone)
                                       (703) 641-4340 (Facsimile)
                                       ghanes@reedsmith.com
                                       jdebettencourt@reedsmith.com


                                       *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August, 2021, I caused the foregoing to be filed

electronically with the Clerk of the Court using CM/ECF, which will then send a notification of

such filing to all counsel of record.

/s/
Michael S. Dingman (VSB No. 30031)
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5462
(703) 712-5262
mdingman@mcguirewoods.com

Grayson P. Hanes (VSB No. 06614)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
jdebettencourt@reedsmith.com

*Counsel for Defendants*