UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROSY GIRON DE REYES, *et al.*,

    *Plaintiffs*,

v.

WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*,

    *Defendants*.

Civ. No. 1:16-cv-00563 (LO/TCB)

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S *SUA SPONTE* ORDER

Plaintiffs, by counsel, hereby file this Supplemental Brief in response to the Court's *sua sponte* Order, Dkt. 413.

### Standard of Review

The Court's Order seeking supplemental briefing reflects a significant misunderstanding about the standard of review applicable at this stage of the proceedings.

The Order focuses on the application of the anti-harboring provisions of the Immigration Reform and Control Act (IRCA), 8 U.S.C. § 1324. Specifically, the Court seeks briefing on whether IRCA provides Defendants with a "business necessity" for the purposes of Step Two of the Fair Housing Act's burden-shifting analysis, Dkt. 413 at 2; whether Defendants must show that they were actually motivated by IRCA in order to use it as a defense, *id.* at 3; and whether – assuming IRCA provides a defense at Step Two – Plaintiffs have standing, *id.*

In reviewing these issues the Court does not write on a blank slate. Instead, as Judge Ellis recognized, because the case has been addressed and remanded by the Fourth Circuit, the Court is bound by the appellate court's mandate:

> Indeed, the Fourth Circuit has emphasized that district courts are "bound to carry out the mandate of the higher court [and] may not reconsider issues that the mandate has laid to rest." *United States v. Susi,* 674 F.3d 278, 283 (4th Cir. 2012); *see also*

1

>   *Doe v. Chao,* 511 F.3d 461, 464-65 (4th Cir. 2007); *South Atl. Ltd. P'ship of Tn., LP v. Riese*, 356 F.3d 576, 583-84 (4th Cir. 2004).

Dkt. 298 at 3. *See also U.S. v. Bell,* 5 F.3d 64, 66 (4th Cir.1993) (quoting *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 168 (1939)) ("Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'").

Accordingly, the Court's reference to *Netscape Communs. Corp. v. Valueclick*, 704 F.Supp.2d 544, 547 (E.D. Va. 2010), is misplaced. The closing paragraph of the Court's Order cites to *Netscape* as support for the proposition that the Court may ignore interlocutory orders if it deems that to be necessary in order "to reach a correct result." Dkt. 413 at 3. But *Netscape* did not involve a case on remand after an appellate decision; in fact, in that case the district court (Judge Ellis) had not even ruled on all issues in that case, so the lenient standards of Rule 54(b) applied to the plaintiff's motion for reconsideration. *Id.* The situation here is completely different: this Court is bound by the Fourth Circuit mandate, which it is not free to "correct."

Moreover – and as Judge Ellis also recognized – the scope of an appellate court's mandate is not limited to those matters that the higher court expressly decided; it also covers matters that were *implicitly* decided: "We have also held that the mandate rule 'forecloses relitigation of issues *expressly or impliedly* decided by the appellate court.'" *Riese,* 356 F.3d at 584 (quoting *Bell,* 5 F.3d at 66) (emphasis supplied). In other words:

>   The mandate rule does not simply preclude a district court from doing what an appellate court has expressly forbidden it from doing. Under the mandate rule, a district court cannot reconsider issues the parties failed to raise on appeal; the court must attempt to implement the spirit of the mandate; and the court may not alter rulings impliedly made by the appellate court.

*Riese,* 356 F.3d at 584, citing *Bell,* 5 F.3d at 66.[1] *See also* Dkt. 298 at 3 (Judge Ellis's opinion,

---

[1] The implicit mandate rule is not unique to the Fourth Circuit. *See, e.g.*, *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) ("And, though not expressly addressed in an initial appeal, those matters

2

quoting these principles from *Riese*).

Defendants' argument with respect to IRCA was fully briefed to the Fourth Circuit. In a section of their appellate brief titled "Waples' Policy is necessary to avoid the criminal prohibition on harboring illegal aliens," Defendants summarized their argument as follows:

> Given the conviction in *Aguilar* in the same federal district in which the Park is located, this Court's affirmance of it, and the record in this case, Waples has no discretion to ignore the potential criminal implications of renting to an illegal alien.

Brief of Appellees at 34, Case No. 17-1723 (4th Cir. Dec. 15, 2017), Dkt. 50 at 48. That argument is a mirror image of the argument presented in their supplemental brief here:

> Given *Aguilar* and the broad text of the anti-harboring provision, Defendants had no discretion to ignore the potential criminal implication of renting to undocumented immigrants.

Dkt. 416 at 7.

The Fourth Circuit gave no credit to that argument, vacated Judge Ellis's opinion, and remanded the case. The Fourth Circuit's rejection was implicit rather than explicit, but there is no question that the argument was rejected: if the Fourth Circuit had accepted the argument that Defendants had "no discretion to ignore the potential criminal implications of renting to an illegal alien," *id.*, then it could not have concluded that Defendants' policy excluding undocumented immigrants constituted a *prima facie* violation of the Fair Housing Act, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428-29, 433 n.12 (4th Cir. 2018).

---

that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case."); *Keith v. Bobby*, 618 F.3d 594, 599-600 (6th Cir. 2010) (the mandate rule "thus generally bars the district court from reconsidering those issues that the court of appeals has already explicitly or impliedly resolved."); *Dobbs v. DePuy Orthopedics, Inc.*, 885 F.3d 455, 458 (7th Cir. 2018) ("But Dobbs raised this issue in his first appeal, and we implicitly rejected it. '[O]nce an appellate court either expressly or by necessary implication decides an issue, the decision [is] binding upon all subsequent proceedings in the same case' under the law-of-the-case doctrine.").

Defendants themselves characterized this argument as a "complete defense," *see* Dkt. 379 at 3, which must mean that the appellate court had to reject that defense to rule in Plaintiffs' favor. *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) ("And, though not expressly addressed in an initial appeal, those matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case.").

Defendants claim that their argument is different now, because they are presenting it at Steps Two and Three of the FHA burden-shifting analysis, while the Fourth Circuit considered it while analyzing Step One. But that distinction makes no difference: IRCA either *compels* Defendants to check immigration status or it doesn't, and the Fourth Circuit decided that it doesn't. If that is true at Step One, as the Fourth Circuit held that it is, then it must also be true at Steps Two and Three. *Riese,* 356 F.3d at 584 ("The mandate rule does not simply preclude a district court from doing what an appellate court has expressly forbidden it from doing. . . . the court must [also] attempt to implement the spirit of the mandate.").

## Argument

I. **The relevant Policy for purposes of Plaintiffs' claim for damages is that which caused Defendants to issue them notices of lease violation; the relevant Policy for purposes of Plaintiffs' claim for injunctive relief is that in effect today.**

Plaintiffs contend that Defendants' Policy violates the Fair Housing Act because it disproportionately ousts Latinos from the Park, as compared to non-Latinos. Complaint, Dkt. 1 at ¶1; *Reyes*, 903 F.3d at 419. Plaintiffs' claim for damages, therefore, challenges the Policy that caused them to incur damages in the form of being ousted from the Park – namely the requirement that they provide an original social security card, or, if they did not have a Social Security Number (SSN), an original passport, an original U.S. visa, and an original

4

arrival/departure form (I-94 or I-94W form), as it was enforced against Plaintiffs in 2015. That Policy is found at Dkt. 138 at Ex. 3. In contrast, Plaintiffs' claim for injunctive relief (as any claim for injunctive relief under any cause of action) can only challenge the Policy in effect today, which prevents them from returning to the Park. That Policy is found at Ex. 1 to this filing. Neither such Policy is the Policy that was in effect on the date of filing this lawsuit, but that is of no matter.[2] Other previous and subsequent versions of the Policy are, however, relevant evidence in this case, because they shed light on the Steps Two and Three analyses for the Policies being challenged. To the extent that Defendants claim otherwise, this is a material dispute of fact and summary judgment must be denied.[3]

Starting in 2006, Defendants' written Policy required applicants to produce this specific immigration documentation. Dkt. 326 at Ex. 1. However, the evidence shows that prior to 2015, Defendants' practice was to enforce the Policy as to leaseholders only, not occupants. *See*, *e.g.*, Ex. 4 (Jones Dep. Tr.) at 129-132. Beginning in 2015, Defendants suddenly enforced the Policy to all adults living in the Park. Ex. 5 (Giambanco Dep. Tr.) at 38-39; 140:2-9. This was an abrupt change in practice, after Defendants had acquiesced to female Plaintiffs' residence in the Park for years prior.[4] Because the combined impact of Defendants' enforcement actions functionally

---

[2] On the date of filing this action, the enforcement actions forcing Plaintiffs to leave the Park had already been effectuated. The Policy in effect on the date of filing is disputed: Defendants repeatedly claim that the Policy in effect as of filing is the April 22, 2016 Policy. Upon review of the record, in fact, Defendants changed their written Policy yet again in the days prior to litigation. Ex. 2, dated 5/16/2016. Internal communications show that, no matter what the written version of the policy was, what was implemented in practice was different, even after litigation had been filed. *See*, *e.g.*, Ex. 3, dated 8/18/2016 (requiring un-expired I-94 from individuals without SSN).

[3] Defendants' dispute is disingenuous and runs counter to their own briefing; in fact, they based their earlier motion for summary judgment on the Policy as cited by Plaintiffs, stating that it required Visas and I-94 forms. Dkt. 98 at 4, ¶ 1; 11; 16.

[4] *See*, *e.g.*, Dkt. 138 at Ex. 8 ¶ 14, Ex. 9 ¶ 12-13, Ex. 11 ¶ 12, Ex. 17, Ex. 18 at 39:3-5, Ex. 20 at 49:9-22; 58:5-59:4, Ex. 32.

evicted Plaintiffs from the Park, thus causing their damages, this is the Policy relevant to Plaintiffs' damages claim.

In 2015, Defendants' written Policy required Park residents without an SSN to "provide their original Passport, original U.S. Visa and original Arrival/Departure Form (I-94 or I-94W)." Dkt. 138 at Ex. 3.  This written Policy was laid out the Future Resident Guide. *Id.* This is the only written Policy available to residents.[5] Defendants attempt to dismiss this Guide as irrelevant, but their own witnesses directly contradict their claims, stating that the Guide defined the Policy. Ex. 5 at 19:17-20:9, 30:15-22, 60:9-17 ("Our policy is the future residents form, and that's everything that['s] needed"); Ex. 7 (Easton Dep. Tr.) at 35:8-25 (confirming that Guide applied to new applicants and renewals); *see* Ex. 4 at 132:11-18 (stating that Policy required occupant to file the same application as a prospective applicant).

Defendants offer other written documents (not the Policy itself) to contend that they accepted any proof of legal presence, but these are internally contradictory. For example, the 2011 Consumer Report and CoreLogic SafeRent and Training Manual identifies various immigration documents that *the database system accepts*, but where it lays out which documents are *required* from applicants, it repeatedly corroborates *Plaintiffs'* understanding of Defendants' Policy. *See*, *e.g.*, Dkt. 151 at Ex. 11 at 38 (when applicant does not have an SSN "it is company policy to require the individual's Passport, Visa and I-94 Arrival / Departure Form") (emphasis in original); *Id.* at 24, 39, 40, 68 (accord). If anything, the fact that the third-party background check vendor's database accepts a broad array of immigration documents beyond what the

---

[5] Where the non-renewal letters state that Plaintiffs are in violation of the Policy, they refer residents to the "Mobile Home Rules & Regulations and your lease paragraph 4 & 6." *See*, *e.g.*, Dkt. 138 at Ex. 6. Neither of these documents specify the documents required by the Policy. *See*, *e.g.*, Ex. 6 at 8 (Rules and Regulations); Dkt. 138 at Ex. 37 at 1, 2 (Lease).

6

landlord requires, serves to bolster Plaintiffs' arguments on Steps 2 and 3.

Evidence of how the Policy was presented and applied to Plaintiffs further confirms that, in practice, Defendants' Policy was not to accept "any proof of legal presence." Beginning in the 2015 recertification process, Defendants suddenly began to require an original passport, U.S. Visa, and original I-94 or I-94W of all adults living in the Park. *See* Ex. 5 at 38:2-12. Defendants' notices of lease violation refer to this Policy as requiring an SSN and valid U.S. government identification. *See*, *e.g.*, Dkt. 138 at Exs. 4, 6, 34. Because individuals without an SSN or un-expired U.S. identification can still be legally present, Dkt. 326 at Ex. 1 at ¶¶ 13-15, 18, these notices undermine Defendants' claims that "any" proof of legal presence was accepted.

Defendants mischaracterize their witness testimony, which in fact further corroborates that Defendants accepted only limited documentation. Defendants' corporate designee, Mark Jones, testified that an "active visa or a valid visa at the time internally due," was required as the accepted indicator that applicants were legally present. Ex. 4 at 87:12-88:2. Ms. Giambanco followed the Policy as outlined in the 2015 Future Resident Guide when performing recertifications. Ex. 5 at 19:17-20:9, 30:15-22, 60:9-17; 98:9-99:12 (applying Guide to Plaintiffs' recertification). Finally, Carolina Easton, Defendants' quality control manager, confirmed that the Future Resident Information Guide listed the required documents. Ex. 7 at 35:8-25. Beyond directly contradicting Defendants' contentions, this testimony shows a dispute of fact as to how the Policy was enforced in practice.

Finally, the circumstances surrounding Defendants' sudden enforcement of the Policy are essential for Steps Two and Three of the disparate impact inquiry. On Step Two, Defendants must show their application of the Policy in 2015 was necessary to achieve a valid interest. *See Reyes*, 903 F.3d at 424; *see also* Dkt. 402 at 2-5; Dkt. 364 at 4-6. If Defendants meet that burden,

7

on Step Three, the Policy is still unlawful if Plaintiffs can show that another policy with a less discriminatory impact would fulfill that interest. *See Reyes*, 903 F.3d at 432. Plaintiffs should be allowed to introduce evidence of Defendants' policies and practices at various times, so that the jury can determine whether the enforcement of Defendants' Policy in 2015 was necessary under Step Two or whether there were less discriminatory means available under Step Three. By means of this evidence, for example, Plaintiffs can show that the incidents that spurred Defendants' enforcement of the Policy were unrelated to immigration status, *see* Dkt. 138 at Ex. 21 at 44:20-46:7; that Plaintiffs did attempt to submit other documentation that would have satisfied Defendants' interests in criminal screening and verifying identify, which Defendants rejected, *see* Dkt. 138 at Ex. 16 at 59:7-9, Ex. 20 at 50:9-19, Ex. 34, Ex. 38, and that Defendants failed to produce evidence that they actually considered the purported justifications at the time they enforced the Policy.

## II. Avoiding criminal liability could be a valid interest under Step Two, but Defendants cannot show that their Policy is "necessary" to avoid such liability.

In the abstract, avoiding criminal liability could be a valid interest under Step Two of the *Inclusive Communities* standard. But it is not sufficient for a landlord to simply state a valid interest in the abstract; rather, the landlord must "*prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.*" *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015) (emphasis added), quoting 24 C.F.R. § 100.500(c)(2) (2013).[6] As the Fourth Circuit explained, the "necessary to achieve" language in *Inclusive Communities* is "analogous to Title VII's business

---

[6] As the Plaintiffs previously explained, *see* Dkt. 402 at 2 n.3, the 2013 version of the Disparate Impact Rule was in effect at the time Defendants sent the eviction notices that gave rise to this action, in effect at the time Plaintiffs filed suit, in effect at the time this Court denied summary judgment on remand, and remains in effect today.

8

necessity standard[.]" *Reyes*, 903 F.3d at 424. *See also Betsey v. Turtle Creek Assoc.*, 763 F.2d 983, 988 (4th Cir. 1984) (Step Two requires a showing of "business necessity"); *Reyes*, 903 F.3d at 428 (describing *Betsey* as "still good law"). To meet their burden of proof at trial, therefore, Defendants must "prove that the challenged practice is necessary" to avoid criminal liability under IRCA. *Inclusive Communities*, 576 U.S. at 527.[7]

Defendants have not met that burden. While they vociferously assert a "valid interest" in avoiding criminal liability, their summary judgment briefing did not show that their Policy was "necessary" to achieve that interest—to the contrary, Defendants simply cited the existence of IRCA and the *Aguilar* decision as an *ipso facto* justification for the Policy. *See, e.g.*, Dkt. 248 at 23-24; Dkt. 248-5 at 136, 140:19-21. No defense witness claimed to have even been aware of the existence of IRCA, or the *Aguilar* decision, prior to the filing of this lawsuit. *See* Dkt. 332 at 8; Dkt. 364 at 3-4; Dkt. 402 at 6-7. It is hard to imagine how a particular practice can be "necessary" to achieve a valid interest if not a single defense witness was able to state that they, personally, had ever even *heard* of the interest prior to being sued. *See* Dkt. 402 at 6-7.

Defendants argue that they will be placed in a "double bind of liability": either liable under IRCA (without their Policy), or liable under the FHA (with their Policy). Dkt. 416 at 4-5. But that argument only prevails if their Policy is *required* by IRCA, which it is not. The Fourth Circuit has never held that housing providers *must* establish their tenants' legal immigration status lest they be held criminally liable under IRCA, and *United States v. Aguilar*, 477 Fed. App'x 1000 (4th Cir. 2012), did not so hold.[8] In *Aguilar*—an unpublished *per curiam* opinion,

---

[7] The burden is obviously greater at summary judgment, because Defendants must show by admissible evidence that there is no genuine dispute as to these material facts. Fed. R. Civ. P. 56(a), (c).

[8] As Plaintiffs have noted, *see, e.g.*, Dkt. 365 at 3-4, the Second, Third, and Fifth Circuits have all rejected this proposition and held that the mere act of renting a residence to an

9

and so therefore not binding precedent—the Fourth Circuit noted that the landlord, who ran a flophouse by renting out nine of the ten rooms in her home, ignored the fact that immigration agents showed up at her house and repeatedly warned her that her tenants were not properly documented. *Id.* at 1002-3. This is a far cry from the situation of a corporate residential landlord operating a regulated mobile home park. A policy that simply does not ask tenants their legal immigration status, when (unlike in employment or federally subsidized housing) the inquiry is not specifically required by federal statute, would not constitute the "reckless disregard" required to give rise to criminal liability under the IRCA. *Id.* at 1002.

It is worth noting that Defendants have never been able to show a single other non-federally subsidized landlord who has a policy requiring proof of immigration status, and indeed their expert explicitly disclaimed knowledge of whether any other non-federally subsidized landlord has such a policy. Dkt. 168 at Ex. 2, 23:15-24:22, 40:6-41:11, 81:9-84:9, 96:4-18. Accordingly, if the IRCA actually required private landlords to check immigration status, then nearly every other non-federally subsidized landlord in Virginia would currently be subject to criminal liability under the IRCA. This is not the logical conclusion to be drawn from the Fourth Circuit's rejection of Defendants' arguments under the IRCA in *Reyes*. Indeed, Virginia state landlord-tenant law explicitly allows landlords of multifamily residential properties other than mobile home parks to "require, for the purpose of determining whether each applicant is eligible

---

undocumented immigrant does not constitute harboring. Significantly, the Supreme Court has denied certiorari on every single attempt to appeal these holdings, *see, e.g.*, *Bolmer v. Connolly Properties, Inc.*, 568 U.S. 821 (2012); *City of Hazleton, Pa. v. Lozano*, 571 U.S. 1237 (2014); *City of Farmers Branch, Tex. v. Villas at Parkside Partners*, 571 U.S. 1237 (2014). Defendants also petitioned for certiorari, arguing that the Supreme Court should grant certiorari to resolve the issue of "whether plaintiffs can meet [the *Inclusive Communities*] causality standard when the housing policy stems from an attempt to comply with federal law prohibiting the harboring of undocumented aliens." 2019 WL 1294668, at *1. The Supreme Court, of course, denied certiorari in *Reyes*. 139 S. Ct. 2026 (2019).

to become a tenant in the landlord's dwelling unit, that each applicant provide a social security number issued by the U.S. Social Security Administration or an individual taxpayer identification number issued by the U.S. Internal Revenue Service." *Code of Va.* § 55.1-1203(B). While that provision of Virginia Code does not apply to mobile home parks such as Waples, Defendants have not explained why an option explicitly provided by state law for apartment complexes would somehow place their mobile home park in violation of federal criminal law.

For these reasons, Plaintiffs respectfully submit that, while avoiding the risk of criminal liability may be a valid interest at Step Two of *Inclusive Communities*, Defendants have not met their burden of showing that a policy that requires adult residents to provide proof of lawful presence in the United States is *necessary* to achieve such avoidance.

### III. Defendants must show that the Step Two justification of avoiding criminal liability under the IRCA is "supported by evidence" and not "hypothetical or speculative."

In describing Step Two of the burden-shifting analysis, the Supreme Court in *Inclusive Communities* quoted the Disparate Impact Rule, 24 C.F.R. § 100.500(c)(2) (2013): a defendant must "prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 576 U.S. at 527. Indeed, the *Inclusive Communities* Court carefully aligned its analysis with the Disparate Impact Rule and the regulatory text accompanying the Rule. 576 U.S. at 527-28, 541, 542. The Fourth Circuit in *Reyes* likewise held that "[t]he HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities*[.]" 903 F.3d at 424 n.4.

Under that regulation, "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient

11

justification[.]" 24 C.F.R. § 100.500 (2013). While the regulation does not use the term "motive," it clearly distinguishes between "intent" and "justification," using the words separately and giving them separate meaning. *See, e.g.*, *Cunningham v. Scibana*, 259 F.3d 303, 308 (4th Cir. 2001) ("The use of different terms within related statutes generally implies that different meanings were intended."), quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 46:06, at 194 (6th ed. 2000). As to the issue of justification, the regulation goes on to explain, "A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." 24 C.F.R. § 100.500(b)(2). HUD states that a Step Two justification must be "genuine and not false," 78 Fed. Reg. at 11470, "not fabricated or pretextual," *id.* at 11471.[9] In other words, a defendant cannot simply fabricate a Step Two justification after the fact; to be legally sufficient, a Step Two justification must be genuine and must be supported by evidence.

Indeed, the whole purpose of Step Two is to inquire into the actual motives behind a challenged policy:

> The FHA is a broadly remedial statute designed to prevent and remedy invidious discrimination on the basis of race, . . . that facilitates its antidiscrimination agenda by encouraging a *searching inquiry into the motives behind a contested policy* to ensure that it is not improper.

*Mt. Holly Gardens Citizens in Action v. Twp. of Mt. Holly*, 658 F.3d 375, 385 (3d Cir. 2011) (citations omitted; emphasis supplied). *See also id.* ("[Step Two] simply results in a *more searching inquiry into the defendant's motivations*—precisely the sort of inquiry required to ensure that the government does not deprive people of housing 'because of race.'") (emphasis supplied); *Avenue 6E Investments LLC v. City of Yuma*, 818 F.3d 493, 513 (9th Cir. 2016), quoting *Mt. Holly*. To accomplish that goal, Step Two cannot be a contest in which lawyers

---

[9] Defendants agree that this HUD regulation is entitled to deference, *see* Dkt. 416 at 10 n.6.

12

concoct theoretical *post-hoc* justifications.

Defendants argue that motivation or justification is only an issue in a disparate treatment claim, but not in a claim alleging disparate impact. Dkt. 416 at 10-11. That is true at Step One, but not at Step Two. A plaintiff may prove a *prima facie* case of disparate impact (Step One) without reference to defendant's motivation – as Plaintiffs have done here, *Reyes*, 903 F.3d at 428-29. But the defendant's motivations are central to the Step Two analysis, because that Step requires a "searching inquiry into the motives behind a contested policy." *Mt. Holly*, 658 F.3d at 385; 78 Fed. Reg. at 11470, 11471 (Step Two justification must be "genuine and not false," "not fabricated or pretextual"). In conflating "intent" under the disparate treatment standard with "justification" under the disparate impact standard, Defendants confuse what the Fourth Circuit and the Supreme Court have purposefully distinguished.

To be clear, Plaintiffs do not argue that a justification must be fixed in time when a policy or practice is first developed or implemented, and Defendants' characterization as such is a straw-man argument. Dkt. 416 at 8-9. But for a policy or practice's justification to be "genuine and not false," 78 Fed. Reg. at 11470, and "not fabricated or pretextual," *id.* at 11471, it must have been in existence *at the time the policy or practice was applied to the complainant*, not invented after the complaint. Applied to the Policy at issue in this litigation, if Defendants cannot state the justifications in effect at the time the Policy was developed in 2006 because such records are lost to the sands of time, then at the very least they should be required to state the justifications in effect at the time the Policy was applied to the Plaintiffs, resulting in them being forced from their homes, in 2015 and early 2016. To rest upon a justification that was developed by litigation counsel only after the lawsuit was filed in May 2016 is precisely what HUD refers to as fabricated and pretextual.

13

### IV. A genuine dispute of material facts exists on Step Three.

The paragraph of the Order beginning "Finally" offers assumptions that are either demonstrably untrue, or are based on disputed facts (and therefore could not support summary judgment). First, the Court assumes that "avoiding IRCA liability under *Aguilar* serves a valid interest irrespective of motive." Dkt. 413 at 3. That assumption fails for four reasons: (1) Defendants must show a "business necessity," and not merely a "valid interest," *see* Part II, *supra*; (2) neither IRCA nor *Aguilar* requires Defendants to check the immigration status of tenants, as they claim, *id.*; (3) Defendants cannot use *post-hoc* rationalizations to establish a "business necessity," *see* Part III, *supra*; and (4) the Fourth Circuit has implicitly rejected Defendants' IRCA arguments, and this Court is bound by that decision, as described above.

Second, the Court assumes that "only policies that exclude 'illegal aliens' are viable alternatives at Step Three." Dkt. 413 at 3. That assumption fails for all the reasons listed above, since it depends entirely on the truth of the false assumption that "avoiding IRCA liability" meets the Step Two "business necessity" standard. In addition, it is wholly inconsistent with Defendants' actual conduct. As described in Part I, *supra*, the Policy at issue in this case existed for several years before it was enforced. During that period only one adult on each lease was required to prove lawful immigration presence, and each of the male Plaintiffs met that requirement for their families. Dkt. 138 at Exs. 12-15. The male Plaintiffs also passed credit checks and criminal background checks. *Id.* The female Plaintiffs – who are the spouses of the male Plaintiffs – possessed individual taxpayer identification numbers issued by the Internal Revenue Service, but not the specific documents required by the written Policy. Dkt. 138 at Ex. 16 at 59:7-9; Ex. 20 at 50:7-53:2; Ex. 34. Nevertheless, Defendants acquiesced to their presence in the Park. *See, e.g.*, Dkt. 138 at Ex. 8 ¶ 14, Ex. 9 ¶¶ 12-13, Ex. 11 ¶ 12, Ex. 17, Ex. 18 at 39:3-

5, Ex. 20 at 49:9-22; 58:5-59:4; Ex. 32. Accordingly, Defendants' own conduct demonstrates available alternative policies for the purposes of Step Three.[10]

The Court further requests briefing on two points. First, the Court requests briefing on whether, if its two assumptions are correct, "any judicial order can redress the female Plaintiffs' asserted injuries." Dkt. 413 at 3. That request is a *non sequitur*. If the Court's first two assumptions were correct then there would be no violation of the FHA, and no legally cognizable injury. But those assumptions are not correct, and the Fourth Circuit has (1) held that the Plaintiffs have stated a *prima facie* case of unlawful discrimination, and (2) rejected Defendants' argument based on IRCA liability.

Second, the Court "requests the Parties' positions on whether the male Plaintiffs' standing relies solely on the redressability of the injuries suffered by the female Plaintiffs." Dkt. 413 at 3. It does not. While it is literally true that the male Plaintiffs would have been permitted to continue to live in the Park after Defendants began to enforce the Policy requiring proof of immigration status, *that option was only available if they agreed to leave their wives*. That Hobson's choice was no choice at all; the male Plaintiffs were unlawfully evicted along with their wives and children, and injured as a result. Dkt. 1 at ¶¶ 64-111.

## Conclusion

For the foregoing reasons, this Court should not disturb its rulings on remand from the Fourth Circuit, Dkt. Nos. 283 and 298.

---

[10] Even after Defendants began to enforce the Policy as written, they did not immediately evict the Plaintiffs (as they would have done if the risk of IRCA liability were a "business necessity"); instead, they initially imposed $100 monthly surcharges. *See*, *e.g.*, Dkt. 138 at Ex. 5.

Respectfully submitted,

_____//s//_____  Dated: 9/7/2021
LEGAL AID JUSTICE CENTER
Simon Sandoval-Moshenberg, VSB #77110
Nady Peralta, VSB #91630
Granville C. Warner, VSB #24957
Larisa Zehr, VSB #96032
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454
simon@justice4all.org
nady@justice4all.org
cwarner@justice4all.org
larisa@justice4all.org
*Counsel for Plaintiffs*

<a>
</a>
<a>
</a>

<a>
</a>

<a>
</a>

**Certificate of Service**

I hereby certify that on this 7th day of September, 2021, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

_____//s//_____
Simon Sandoval-Moshenberg, VSB #77110
*simon@justice4all.org*
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Phone: (703) 778-3450
Fax: (703) 778-3454