UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA


ROSY GIRON DE REYES,                    :
                                        :
              et al.,                   :
                                        :
              Plaintiffs,               :   Civil Action
                                        :   No. 1:16-cv-00563-LO-TCB
v.                                      :
                                        :
WAPLES MOBILE HOME PARK,                :   July 16, 2021
LIMITED,                                :   9:00 a.m.
                                        :
              et al.,                   :
                                        :
                                        :
              Defendants.               :
                                        :
.............................. :


**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

  For the Plaintiffs:        **Simon Yehuda Sandoval-Moshenberg,**
                             **Esq.**
                             Simon Sandoval-Moshenberg, Esq.
                             Legal Aid Justice Center
                             6066 Leesburg Pike
                             Suite 520
                             Fall Church, VA 22041
                             703-778-3450
                             Fax: 703-778-3454
                             Email: Simon@justice4all.org

                             **Larisa D. Zehr, Esq.**
                             Legal Aid Justice Center
                             6066 Leesburg Pike
                             Suite 520
                             Falls Church, VA 22041
                             571-213-7582
                             Email: Larisa@justice4all.org

APPEARANCES:   (Cont.)

For the Plaintiffs:              **Granville Clayton Warner, Esq.**
                                 Legal Aid Justice Center
                                 6066 Leesburg Pike
                                 Suite 520
                                 Falls Church, VA 22041
                                 703-778-3450
                                 Fax: 703-778-3454
                                 Email: Cwarner@justice4all.org


For the Defendants:              **Michael Sterling Dingman, Esq.**
                                 McGuire Woods
                                 1750 Tysons Boulevard
                                 Suite 1800
                                 Tysons, VA 22102-4215
                                 703-712-5462
                                 Fax: 703-712-5262
                                 Mdingman@mcguirewoods.com

                                 **Grayson Pollard Hanes, Esq.**
                                 Reed Smith LLP
                                 7900 Tysons One Place
                                 Suite 500
                                 McLean, VA 22102
                                 (703) 641-4200
                                 Email: Ghanes@reedsmith.com



Court Reporter:                  **Scott L. Wallace, RDR, RMR, CRR**
                                 Official Court Reporter
                                 United States District Court
                                 401 Courthouse Square
                                 Alexandria, VA 2231-5798
                                 Office: 703.549.4626
                                 Cell: 202.277.3739
                                 Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

1          **MORNING SESSION, JULY 16, 2021**

2     (9:07 a.m.)

3          THE COURTROOM CLERK:  The Court calls *Rosy Giron de Reyes,*

4     *et al. versus Waples Mobile Home Park, Limited Partnership, et*

5     *al.,* Case Number 1:16-cv-563.

6          May I have appearances, please, first for the plaintiff.

7          MR. SANDOVAL-MOSHENBERG:  Good morning, Your Honor.  Simon

8     Sandoval-Moshenberg, Legal Aid Justice Center, for plaintiffs.

9     With me is Larisa Zehr and Clay Warner.

10         THE COURT:  All right.  Good morning to each of you.

11         MR. DINGMAN:  Good morning, Your Honor.  Michael Dingman

12    with McGuireWoods.  With me this morning is Grayson Hanes of Reed

13    Smith, counsel for the defendants.

14         THE COURT:  All right.  Good morning to both of you.

15         All right.  Well, it's an interesting case.  It's a gift

16    from Judge Ellis, and I've looked at the materials that you have

17    filed, and I don't know it as well as you do, but I've looked

18    pretty carefully at the 4th Circuit case, and I think that the

19    4th Circuit has directed the District Court to find that

20    plaintiffs, if the evidence that they say they have exists, that

21    they've made a prima facie case that Waples policies disparately

22    impacted Latinos in violation of the FHA, and I'm just reading

23    from their decision satisfying Step 1 of the disparate impact

24    analysis, and that the District Court therefore erred in

25    concluding otherwise.  And so my first question to you all is, if

1    I find that -- and I'll give you an opportunity to argue it this

2    morning -- but if I find that, how does the plaintiff want to

3    proceed?  Does the plaintiff then want an instruction that Step 1

4    has been found; that the plaintiffs then want its cakes and ice

5    cream on top so that it wants all this statistical evidence to

6    come in as part of a finding by the Court?  Is that necessary?

7    Because we're not dealing with a disparate treatment case, we're

8    dealing with a disparate impact case; and so why don't I start

9    you all there, and, Mr. Moshenberg, you can address the Court.

10          MR. SANDOVAL-MOSHENBERG:  Yes, Your Honor.  With regard to

11   Step 1, of course we agree that that is the ruling of the 4th

12   Circuit, and that's what Judge Ellis made very clear in his order

13   denying the motion to reconsider summary judgment.

14          So at this point we're at a stage at which -- you know,

15   there's disputed evidence, right.  We have a battle of the

16   experts.  We have our expert who's laid out our statistics.  They

17   have their expert who, you know, says our expert is junk.

18          We also have additional evidence of disparate impact, but,

19   quite frankly, unless the defendants are willing to stipulate,

20   which I don't see them as being very willing to do, I don't see

21   how you avoid having to put on that evidence.  And then, of

22   course, we do agree with Your Honor that if the jury credits our

23   evidence, then, per the 4th Circuit, Step 1 is met.

24          THE COURT:  So you think -- so you're not looking for an

25   instruction and a finding that Step 1 has been satisfied?  You

1    still believe you need to put that evidence on, even after the

2    4th Circuit has said what they said?

3         MR. SANDOVAL-MOSHENBERG:  I'd like to say yes, we are

4    entitled to an instruction stating that Step 1 is satisfied.  I'd

5    like to not have to put on any of that evidence.  Believe me, I

6    would prefer not to have to pay the expert his rates to come to

7    trial, but I just don't see how -- without the defendant

8    stipulating to the evidence, I just don't see how we can get

9    that.

10        THE COURT:  Okay.  All right.

11        MR. DINGMAN:  Good morning, Your Honor.  With respect to

12   the 4th Circuit's decision, it is the defendants' position, Your

13   Honor, that they made no finding with respect to Step 1.  And the

14   reason for that is, when you look at the posture of the appeal

15   and what the court actually ruled on, no court has actually

16   considered any of the evidence with respect to Step 1 and made a

17   ruling.  The case went to the 4th Circuit after Judge Ellis

18   declined to consider the competing motions for summary judgment

19   with respect to disparate impact.  The reason Judge Ellis

20   declined to consider the summary judgment motions is because he

21   determined that he had dismissed the disparate impact case at the

22   12(b)(6) stage, so Judge Ellis in this court did not consider the

23   summary judgment motions from either party with respect to

24   disparate impact and neither did the 4th Circuit.

25        The 4th Circuit ruled that Judge Ellis was incorrect in

1    dismissing the disparate impact case at the Rule 12(b)(6) stage.

2    And when they talk about a prima facie case, what they're talking

3    about is giving all the inferences, of course, in favor of the

4    plaintiff that they've stated a case on their pleadings, and,

5    therefore, it was improper for the Court to have dismissed the

6    case at the motion to dismiss.  It remanded the case back for

7    further proceedings, including summary judgment.

8         So the 4th Circuit did not take up the factual issues and

9    evidence pertaining to Step 1.  They simply ruled that they had,

10   the plaintiffs had stated a cause of action, and it had been

11   improper for this Court to dismiss it at the 12(b)(6) stage.

12        The 4th Circuit was not asked to grant summary judgment in

13   favor of the plaintiffs on Step 1.  The Court had no evidence

14   with respect to the statistical evidence that's part and required

15   for the plaintiffs to prove Step 1.

16        THE COURT:  Well, where did they come up with the -- I

17   guess in the complaint, but then they looked beyond the complaint

18   and at the statistics and pointed out the statistical information

19   as sufficient to establish the prima facie case; is that right?

20        MR. DINGMAN:  The Court referred to the declaration --

21        THE COURT:  -- right --

22        MR. DINGMAN:  -- from Judge Ellis's law clerk, which is

23   why you've been invited into this case, and said that does show

24   some evidence, but they did not rule that the anti-harboring

25   statute does not -- is an argument that the defendants are not

1    allowed to present.  They did not review the statistical disputes

2    between the experts as to whether there's an actual disparate

3    impact.  And in fact, Your Honor, that declaration that they

4    referred to is improper, and that's the subject of motions in

5    limine and now a motion to amend from the plaintiffs.

6         So there is a passing reference to that, but it's dicta at

7    best because the Court makes clear that it is deciding this with

8    respect to whether Judge Ellis was incorrect in dismissing the

9    disparate impact at the 12(b)(6) stage.  So the defendants have

10   not had the opportunity to present its evidence to this Court or

11   to the 4th Circuit on Step 1.  And frankly, what we see happening

12   here is the plaintiffs want to deprive the defendants of the

13   ability to present that case.  This Court has not heard from the

14   experts on the statistical requirements to prove Step 1.  This

15   Court has not heard from the experts for the defendants regarding

16   the anti-harboring statute and why the policy is important to

17   prevent possible criminal prosecution under that statute.

18   There's no discussion of any of these issues by the 4th Circuit

19   because they were not presented to the 4th Circuit.

20        So our view, Your Honor, is no issues have been resolved

21   as far as Step 1 because the Court and the 4th Circuit did not

22   rule on the competing motions for summary judgment.  It said

23   Judge Ellis was wrong not to consider them because he had

24   incorrectly ruled that he had struck those -- the disparate

25   impact claim at the motion to dismiss stage.  So the concern that

1  we have, Your Honor, to be direct, is defendants are being

2  deprived of an opportunity to present a defense on the predicate

3  issue required to demonstrate a disparate impact claim under the

4  Fair Housing Act.

5       This Court should consider, and we'll talk about this with

6  respect to the other motions in limine, the defenses to Step 1,

7  and there are many.  The 4th Circuit refers to one document in

8  passing that's a declaration that now the Court can see is

9  improper.  It wasn't presented by an expert; it was presented by

10  counsel.  Of course, no one knew that at the time at the 4th

11  Circuit.  So that is just one example of the danger of concluding

12  that the 4th Circuit engaged in some sort of evidentiary review

13  and ruled as a matter of law that all of the defenses of the

14  defendants' Step 1 has been denied.  That is not at all the

15  ruling.  So we would ask the Court to allow the defendants to

16  proceed with their defenses with respect to Step 1 of the

17  *Inclusive Communities*' requirements.  Thank you.

18       THE COURT:  Okay.  All right.  Mr. Moshenberg.

19       MR. SANDOVAL-MOSHENBERG:  Your Honor, a brief response.

20  Of course, we disagree with the defendants' presentation, but

21  more importantly, Judge Ellis disagreed with the defendants'

22  presentation.  This is precisely the argument that was made on

23  the motion to reconsider.  The motion for summary judgment used

24  the word "harboring" 19 times.  The motion to reconsider was all

25  about the harboring statute.  The word "harboring" appeared 12

1    times.  The defendants said, as the reason for their motion to

2    reconsider, the Court did not address defendants' argument that

3    plaintiffs cannot meet their prima facie burden at Step 1 because

4    "the anti-harboring statute substantially limits defendants'

5    discretion in formulating its policy."  That's a quote from their

6    brief.  So Judge Ellis considered and rejected these arguments.

7         Your Honor, I want to say one thing which I think my

8    co-counsel might kill me for because we haven't discussed this in

9    advance.  I hear your reluctance to have these statistical

10   experts testify in front of a jury, and one thing that we might

11   consider is a bench trial on Step 1, prior to the jury trial on

12   Steps 2 and 3, and I think the defendants would likely have to

13   consent to that.  I think they may have a right to a jury trial

14   on all three steps, but it is one thing that we can consider as

15   we move this case towards a jury trial in March.

16        THE COURT:  Well, I'm not reluctant.  I'm still trying to

17   figure out what the 4th Circuit said and what Judge Ellis said.

18   And I read the opinion of the 4th Circuit as telling the Court

19   that if the evidence is as we have reviewed it -- and obviously

20   they didn't make -- they didn't review whether -- well, I don't

21   know whether they reviewed whether Ivan Yacub's declaration was

22   admissible in a trial or not.  I would think that they did not,

23   but who knows.  But anyway, the -- it's a pretty strongly worded

24   opinion, and I wanted the parties' position on whether Step 1 was

25   still in play at trial.  And so that's one of the issues I wanted

1   to raise.

2        I don't -- you know, if we're going to have a trial, we're

3   going to have a trial that's going to include all the issues, and

4   we'll let the jury decide each one of them and not have two

5   different trials.

6        MR. SANDOVAL-MOSHENBERG:   Thank you, Your Honor.

7        THE COURT:   All right.

8        MR. SANDOVAL-MOSHENBERG:   We agree with your reading of

9   the 4th Circuit's case.

10       THE COURT:   Okay.  How do you want to proceed, then?

11  You've gotten different motions.  Do you want to deal with --

12       MR. SANDOVAL-MOSHENBERG:   Your Honor, I would be happy to

13  start with the plaintiffs' motion, since I'm already standing

14  here.

15       THE COURT:   All right.

16       MR. SANDOVAL-MOSHENBERG:   Sure.  Your Honor, I will argue

17  the plaintiffs' motion on the Step 2 issue.  We've now covered

18  the Step 1 issue.  My co-counsel, Larisa Zehr, is going to take

19  one of the issues with regards to the cross-examination of the

20  female plaintiffs.

21       THE COURT:   Okay.

22       MR. SANDOVAL-MOSHENBERG:   Your Honor, on Step 2 the

23  defendants state the wrong legal standard and then, in addition,

24  regardless of the legal standard, they're also asking this Court

25  to throw the Federal Rules of Evidence out the window.  The legal

1    standard on Step 2 is made clear by the Supreme Court in the

2    *Inclusive Communities* case which says, quote, "necessary to

3    achieve a valid interest."  The defendants like to ignore that

4    first word "necessary."  And for that reason, the 4th Circuit in

5    the *Reyes* opinion said, quote, "this step is analogous to Title

6    VII's business necessity standard."  So the point of all this is

7    that there has to be at a nexus between the policy or practice

8    and the valid interest.  It's not just enough for the landlord to

9    simply state a valid interest.  The landlord also has to show

10   that the policy or practice is necessary to achieve that

11   interest.

12         So, for example, making sure tenants are going to pay

13   their rent of course is a valid interest, but then they have to

14   show how this particular practice is actually necessary to make

15   sure that the tenants are going to pay their rents.

16         So the big fight in this case is really whether post-hoc

17   rationalizations are permissible or whether the reason has to

18   have been present at the time of the adoption of the challenged

19   policy or practice.

20         Now, we've cited a federal regulation to this effect and

21   several cases that say it has to be a genuine reason for the

22   policy or practice.

23         That regulation was in effect at all relevant times.  It

24   was in effect when the policy was implemented against the

25   plaintiff; it was in effect when the complaint was filed; and

1    it's still in effect today because the subsequent regulation that

2    would override it was enjoined and never took effect, and now the

3    Administration has filed a notice of proposed rulemaking to

4    withdraw the substituting regulation.

5        So the regulation we've cited in our brief is still in

6    effect, and the 4th Circuit in footnote 10 of its opinion

7    disagrees with what I'm sure my colleague will say which is that

8    the regulation conflicts with *Inclusive Communities*.  The 4th

9    Circuit dispatches of that in footnote 10 of its opinion and with

10   good reason, because the *Inclusive Communities* opinion cites the

11   regulation favorably.

12       So on the legal standard, it is not enough to simply state

13   a valid interest.  The defendants have to meet their burden to

14   show that it is necessary to achieve a valid interest.

15       THE COURT:  Is motive relevant to that inquiry?

16       MR. SANDOVAL-MOSHENBERG:  I think that motive, insofar as

17   it implies invidious intent, is not really so much the issue as

18   it is establishing the actual reasons.  The reasons for a thing

19   is a factual matter.  Why something is done, why a group of

20   people do a thing is a matter of fact, and those facts have to be

21   proven by the defendant because it's their burden on Step 2, and

22   then we get to the evidentiary standard, which is they have to

23   prove it with admissible evidence.  We're asking for the Court to

24   rule that witnesses can only speak to matters within their

25   personal knowledge.  That's a perfectly ordinary request.  The

1    defendants spent pages and pages opposing such a ruling, which I

2    think is extraordinary.  Of course, Federal Rule of Evidence 602

3    requires that the witness have personal knowledge.  They can't

4    just rattle off reasons for a policy or practice.  They have to

5    explain -- lay foundation by explaining how they know.

6         Did the witness learn it in the ordinary course of

7    business?  In which case, of course, they can absolutely testify

8    to it.

9         Did they learn it after the fact by reading a document?

10   In which case their testimony may have a best evidence problem

11   and the documents themselves might have to come into evidence.

12   Or did the witness learn it from litigation counsel after they

13   got sued in this case?  In that case they have a big problem.

14   They can't hide behind the shield of an attorney-client privilege

15   and then also use that as a sword.

16        Now, based on the depositions, we don't think that they do

17   have a witness who can testify on personal knowledge, but maybe

18   they do.  We're not asking for a ruling excluding any particular

19   witness, we're just asking that the defendants be admonished to

20   only put on witness who can give admissible testimony to their

21   personal knowledge.

22        So it's the same rule for the IRCA, the anti-harboring

23   statute, on Step 2.  We discussed it on Step 1 and how the 4th

24   Circuit and Judge Ellis has already dispatched of that argument

25   to Step 1, but the defendants also want to bring in the IRCA

1    statute on Step 1 as well.  Again, Your Honor, as we explained in

2    our brief, it's certainly not the case that the policy is

3    required by the anti-harboring statute, so their witnesses

4    shouldn't be allowed to state that it is so required.

5        That would be improperly instructing the jury and

6    erroneously instructing the jury on a matter of law.  I think

7    they seem to agree that their witnesses can't testify as to the

8    meaning of the IRCA, but even if they want to say, Okay, well,

9    whether or not it's required under the IRCA, it certainly is

10   prudent under the IRCA.  Again, they need a witness to state to

11   their personal knowledge when and how they came to learn that.

12   And again, we run into the problem of they can't be allowed to

13   testify as to reasons that were actually developed by their

14   litigation counsel in response to this lawsuit.

15       If it turns out that any of them were genuinely aware of

16   the existence of the IRCA and genuinely, you know, had that as a

17   reason to engage in this particular practice, they can testify to

18   that.  If it turns out none of them even knew that the IRCA

19   existed until after they were sued and their litigation counsel

20   told them about it, then, again, that would be using

21   attorney-client privilege as a sword.  And it's the same and even

22   more so with regards to the PRWORA -- the P-R-W-O-R-A -- statute,

23   and the reason is that that statute doesn't even apply.  It sort

24   of unambiguously and undisputably does not apply to this property

25   because the PRWORA only applies to properties that receive

1   federal subsidies, and this one indisputably does not.

2        And then finally, we think the same evidentiary rule

3   applies for the particular pieces of evidence, the documents that

4   we've highlighted in our motion in limine.

5        The Treasury reports from 2009 and 2018, again on Step 2,

6   those could only come in if a witness can show on personal

7   knowledge that they were the genuine reason that this policy or

8   practice was put into place.  For the 2018 Treasury report,

9   that's obviously not the case.  For the 2009 report, maybe

10  they'll be able to show that it was, but if they can't, it's

11  simply not relevant on Step 2.  I don't think they really dispute

12  this.  I think their main argument is that it's admissible on

13  Step 3, and for that, anything that's only admissible in Step 3

14  would need to be subject to a limiting instruction, and I don't

15  see how they can argue against a limiting instruction.

16       Likewise, with the Fair Housing Act training certificates,

17  these are trainings that took place after the events complained

18  of in this lawsuit.  Their main argument on that is that it's

19  relevant to rebut if the plaintiffs bring an inference of

20  intentional discrimination.  Judge, I'm hear to tell you that

21  we're not going to do that.  If we do, by all means they can

22  bring it in; but if we don't, they can't.  It's simply not

23  relevant on Step 2.

24       The same with these e-mails concerning plans to advertise

25  in Spanish, but there we also have a best evidence problem

1    because they don't actually put forward the purported Spanish

2    language advertisements.  They just put forward internal e-mails

3    discussing plans to advertise in Spanish, some of which don't

4    even pertain to this mobile home park.  They're regarding a

5    different mobile home park.

6         And then finally, Your Honor, we did ask for exclusion of

7    the defendants' views on immigrants or immigration.  That was

8    paragraph 6 of our proposed order.  The defendants did not oppose

9    that, so it should be granted as uncontested.  I'm now going to

10   ask my co-counsel to argue -- unless you have any questions, of

11   course, Your Honor.

12        THE COURT:  I don't.

13        MR. SANDOVAL-MOSHENBERG:  I'll ask Ms. Zehr to argue the

14   question of cross-examination regarding the plaintiffs'

15   immigration history.

16        THE COURT:  All right.

17        MS. ZEHR:  Good morning, Your Honor.  Larisa Zehr for the

18   plaintiffs.

19        THE COURT:  Good morning.

20        MS. ZEHR:  Defendants want to put our witnesses on the

21   stand and ask in front of a jury, "you're an illegal alien,

22   aren't you?  As you sit here, an ICE officer could come in and

23   arrest you, right?  You could be deported tomorrow, right?"

24   Plaintiffs have never denied being undocumented.  They've alleged

25   it in the complaint and they've admitted it in the depositions

1    and in the request for admissions.

2         Cross-examination on their immigration status where it is

3    admitted and uncontested would serve only to intimidate, harass,

4    and humiliate them and has no additional probative value, would

5    cause unfair prejudice, and it's cumulative.

6         Furthermore, female plaintiffs are not legal experts, and

7    they could not answer whether their status is the reason they

8    cannot comply with the policy, though they have admitted the fact

9    that they are undocumented.

10        They could also not testify as to the typical process of

11   getting an immigrant taxpayer identification number or the use of

12   a foreign passport, as defendants argue they're entitled to ask

13   on Step 3.  The appropriate subject of these questions is the

14   expert witness on immigration, not the plaintiffs.

15        Thus, defendants should be precluded from

16   cross-examination of plaintiffs on this point.  If you agree,

17   Your Honor, and if you have no further questions on this, I'd

18   like to turn it over to my co-counsel, Clay Warner, to argue on

19   plaintiffs' motion to amend.

20        THE COURT:  All right.  I don't have any questions.  Thank

21   you.

22        MS. ZEHR:  Thank you, Your Honor.

23        MR. DINGMAN:  Your Honor, if I may, I think it might be

24   easier if I could address the motion in limine first so that we

25   keep those issues together.  The motion to amend is sort of a

1    separate issue based on the declaration of Mr. Ramkumar.

2        THE COURT:  Yeah.  Are plaintiffs finished with the

3    motions in limine?

4        MR. SANDOVAL-MOSHENBERG:  They are, yes.

5        THE COURT:  All right.  Then, yes, let's have the response

6    to the plaintiffs' motion in limine Your Honor.

7        MR. DINGMAN:  Thank you, Your Honor.

8        THE COURT:  And I apologize.  I misspoke about the

9    declaration.  Of course it was Mr. Ramkumar, not Mr. Yacub.  Why

10   do you need to cross-examine the undocumented aliens who have all

11   admitted that they don't have status here and the evidence is

12   uncontested?

13       MR. DINGMAN:  Your Honor, we've never said and we've

14   always told the plaintiffs in this court that we have no interest

15   in embarrassing any of the plaintiffs.  So, if we can have

16   stipulations, then the issue is for what purposes are the

17   plaintiffs going to call them?  So if they -- and they have told

18   this Court they plan on putting all of them on the stand -- and

19   this will be the subject of a motion in limine that we filed --

20   and presumably walking them through I think it's 80 trial

21   exhibits of lease documents and letters back and forth and their

22   effort to try to comply with the policy.

23       So, if they go down that path, and we think it's improper

24   and irrelevant, and we'll get to that in our motion in limine,

25   then we should have the right to cross-examine.  We're not here

1    to embarrass anyone, but if the plaintiffs are going to be called

2    as witnesses and they're going to be asked questions about their

3    status, and they're going to be asked questions about their

4    efforts to comply with the policy, then we should have the right

5    to cross-examine.

6        THE COURT:  All right.  Go ahead.

7        MR. DINGMAN:  So, with respect to the first part of the

8    motion in limine, Your Honor, which is the Step 1 issue that

9    we've already touched upon quite a bit, where the motion in

10   limine really is sort of a summary judgment motion asking the

11   Court to rule that the defendants are precluded from presenting

12   any evidence at Step 1.  And, as we've discussed already, that's

13   not at all in our view what the 4th Circuit ruled.

14       I would also point out, Your Honor, and this is in our

15   brief, multiple times plaintiffs' counsel has represented to this

16   Court that they were not granted summary judgment on Step 1, and

17   that Step 1 must proceed to the jury.  So there's a little

18   disconnect when they come in and make the contrary argument, but

19   they've recognized that the 4th Circuit did not take up the

20   evidence because it was never presented to the 4th Circuit to

21   make factual findings and rule in favor of the plaintiffs on Step

22   1 without a trial, without considering any facts.

23       So that should be denied and the defendants should be

24   allowed to present these defenses.

25       The second argument has to do with Step 2, and there are

1    two issues there -- actually, there's a third one, Your Honor, on

2    the motivation issue, which also spills over into a motion in

3    limine that the defendants have filed, but I think now is the

4    appropriate time to deal with that so we try to keep these issues

5    sort of together.

6         So, on Step 2 the first issue is, what is the standard to

7    be applied?  And while the plaintiffs point this Court to HUD

8    guidelines and that sort of thing, the Court need look no further

9    than the *Inclusive Communities* decision itself.

10        In that case the Supreme Court said the following:  "Just

11   as an employer may maintain a workplace requirement that causes a

12   disparate impact, if that requirement is a reasonable measurement

13   of job performances, so, too, must housing authorities and

14   private developers be allowed to maintain a policy if they can

15   prove it is necessary to achieve a valid interest."  That's a

16   direct quote from *Inclusive Communities*.  And two things are

17   striking from that:  Must be allowed to continue with that policy

18   if it serves a valid interest.  That is the standard that the

19   Supreme Court set forth in *Inclusive Communities* to be applied in

20   the disparate impact case under the Fair Housing Act.

21        It's not a business necessity.  There's discussion of

22   business necessity by the *Inclusive Communities* court, but when

23   it gave its decision, it said, "Housing authorities and private

24   developers must be allowed to maintain a policy if it serves a

25   valid interest."  So the business necessity argument is contrary

1    to *Inclusive Communities,* and, of course, this Court is bound by

2    the Supreme Court, not by changing HUD guidelines based upon

3    who's in the president's office at any particular time.

4        The second part of the argument I don't quite understand,

5    whether the plaintiffs are asking this Court to preclude

6    witnesses from testifying before they've even appeared before

7    this Court; whether a witness has a sufficient foundation to

8    testify can only be determined when they're brought in and

9    examined, so any preliminary ruling based on snippets from the

10    deposition, the Court should preclude a witness from testifying,

11    is without any basis.  The witnesses have the right to testify,

12    the defendants have the right to present them, and the Court can

13    then make evidentiary rulings based on whatever objections are

14    made at that time, but to ask this Court to strike witnesses in

15    advance of a trial is improper.

16        THE COURT:  Going back to *Inclusive Communities* --

17        MR. DINGMAN:  -- yes, sir --

18        THE COURT:  -- you've cited one section of the decision,

19    and, you know, Mr. Moshenberg has cited another provision to

20    prove that the challenged practice is necessary to achieve one or

21    more substantial, legitimate, nondiscriminatory interests, and,

22    of course, they cite to the section of the CFR.  Do you see a

23    difference, and do you disagree with the necessary language and

24    think that that's really not the holding, that's not the

25    requirement?

```
 1          MR. DINGMAN:  I do not think it's a requirement, Your

 2     Honor, and I think when you look at the Inclusive Communities

 3     case in its totality, the Supreme Court cautioned repeatedly

 4     against having courts second-guess public authorities or private

 5     developers, and so the standard that was established is if

 6     there's a valid interest that is served by the policy, that it

 7     must be allowed to continue.

 8          The Court goes on to say, we are concerned that we are

 9     going to have a negative impact, frankly, on the purposes of the

10     Fair Housing Act if we second-guess or courts engage in reviewing

11     policies that have a valid interest and may be arguing, well,

12     maybe there's a different way to go about it, or maybe I would do

13     it differently.

14          So, the context of Inclusive Communities creating a Fair

15     Housing Act disparate impact claim that's not set out in the

16     statute was to cabin in this cause of action and not, for lack of

17     a better word, Your Honor, empower courts to second-guess public

18     housing authorities and private developers.

19          And so if a valid interest is established -- and the

20     Court's language is clear -- it must be allowed to stand.  The

21     policy must be allowed.

22          THE COURT:  Okay.  Thank you.  Go ahead.

23          MR. DINGMAN:  And that is a good lead-in, Your Honor, to

24     this argument about motivation.  Motivation has nothing to do

25     with the Step 2 analysis.  Again, the starting point has to be
```

1    the *Inclusive Communities* case, and the language I just read is

2    the entirety of what Step 2 requires.

3         There's no language in *Inclusive Communities* where the

4    court said a valid interest, provided that somebody had the

5    interest in mind when the policy was adopted 10, 15, 20 years ago

6    that's now being challenged.

7         And the case law is quite clear, Your Honor.  This is not

8    an intentional discrimination case any longer.  I mean, to some

9    extent plaintiffs want to present it that way, but disparate

10   treatment was dismissed.  It was not appealed.  This is a

11   disparate impact case.  And the Supreme Court has held in other

12   contexts, and it's even quoted by the plaintiffs in their brief

13   and I'll come back to that in a minute, the focus is on effect,

14   not motivation.  That's what the Supreme Court said in *Smith*

15   *Versus City of Jackson* which was referred to by *Inclusive*

16   *Communities* in its decision.

17        Motivation has no place in the separate impact analysis.

18   And if you take that to its logical conclusion, Your Honor,

19   plaintiffs would argue that the defendants could demonstrate that

20   the policy is absolutely necessary and provides and supports a

21   valid interest.  But, if nobody thought about that valid interest

22   or you don't have people who were there 15 years ago when the

23   policy was enacted, the Court has to strike it down, not because

24   it's not serving a valid interest, but because somebody's unable

25   to say, well, when we adopted the policy, we had this in mind.

1    That's contrary to *Inclusive Communities* which says if the policy

2    supports a valid interest, it must be allowed.

3        What the plaintiffs are arguing is the determination of a

4    valid interest has nothing to do, really, with the impact on the

5    business or the purpose of the policy, it's all about whether

6    somebody thought about the interest at the time the policy was

7    adopted, which would lead to, I would submit, the absurd result,

8    Your Honor, of the Court striking down a perfectly valid policy

9    simply because there wasn't a witness who could say I was in the

10   room 15 years ago and, yes, we thought about this interest.  If

11   it's a valid interest that the policy supports, then the policy

12   must be allowed.

13       Motivation, pretext, all of these arguments have nothing

14   to do with that analysis, and the plaintiffs have not cited this

15   Court to any cases that say that.  They've referred to the *Betsy*

16   case which was decided 30 years before *Inclusive Communities*.

17       And the challenge with that argument, Your Honor, is there

18   are many policies -- this happens to be one of them -- that may

19   be in place for 10, 12, 15 years.  People move on from

20   businesses.  So, if you're not able to find somebody who was in

21   the room 15 years ago, then your policy is deemed, per se,

22   invalid?  That's what they're arguing, and that is completely

23   contrary to *Inclusive Communities*.  And think about that for a

24   public housing authority, that people have moved on.  Well,

25   that's a really good policy, public housing authority, it serves

1    a vital interest, but I'm going to strike it down because you

2    couldn't present someone who was there when the policy was

3    adopted to say, yes, this was one of the interests that was

4    considered.

5         Same thing if years later a company decides to have

6    Mr. Hanes look at their policy, and he says that's a really good

7    policy because it covers this issue, and they say, no, well, we

8    didn't think about that at the time, but that's terrific.

9         They'd say, no, you can't rely on that now because you

10   didn't think about it when you adopted the policy.  That is

11   completely contrary to *Inclusive Communities*.

12        We're at a stage in this case, Your Honor, at Step 2 where

13   the only consideration is whether the policy serves a valid

14   interest.  If it does, then it must be allowed and motivation and

15   all of these issues have nothing to do with that issue.  And the

16   plaintiffs really do not disagree, Your Honor.  When you look at

17   their motion in limine on the Fair Housing Act training and the

18   reach-out of the defendants to the Hispanic community, what do

19   they argue?  Motivation isn't relevant.

20        So, on the one hand they say, well, exclude this testimony

21   because motivation has nothing to do with this analysis, and

22   they're right, but then on the other they say, but we get to

23   argue motivation.  The Supreme Court's very clear, not just in

24   *Inclusive Communities*, but in prior decisions dealing with

25   disparate impact.  It's the effect, not the motivation.

1    Motivation is only relevant if you have a disparate treatment

2    case, which we do not.  So their Step 2 motion in limine argument

3    or position should be denied.

4        We discussed already the cross-examination of the

5    witnesses.  There was one other -- forgive me, Your Honor, I'm

6    keeping notes here -- two other issues that were brought up that

7    I just wanted to address briefly.  These Treasury reports that

8    deal with ITINs effectively say that they're not reliable.

9    Whether those should be allowed into evidence, again, is

10   something to be decided at trial.  As we argue in our briefs, we

11   think there are hearsay exceptions to allow that information to

12   come in.  Again, that's something that this Court can consider

13   when it's presented and whether or not the requirements for an

14   exception to the hearsay rule have been satisfied.  So, again, a

15   preliminary ruling at this stage is not proper.

16       And Mr. -- I'm not sure who argued this, but anyway, there

17   was argument about the PRWCRA HUD guidelines, and the reason

18   we've identified those, Your Honor, is HUD itself requires

19   recipients of HUD funds to prove that they're in the United

20   States legally.  It's a requirement.  So, obviously we believe

21   that's relevant to the issue of a valid interest.  HUD mandates

22   it.  HUD requires it.  And the regulations go on to say, if

23   someone cannot prove legal residency, then they're not allowed

24   funding.  That's why it's relevant.  It goes to the issue of a

25   valid interest.  Thank you, Your Honor.  That's all we have.

1          THE COURT:  Thank you.  Do you want to reply?

2          MR. SANDOVAL-MOSHENBERG:  Very briefly, Your Honor.  My

3    colleague quotes the Supreme Court language "necessary to achieve

4    a valid interest," but then in describing it paraphrases it as

5    "serves a valid interest."  Those are two different things, Your

6    Honor.  We don't understand how a thing can be necessary if

7    absolutely no one even knew it at the time.  So it goes to the

8    evidentiary standard, as well as to the substantive standard.

9          THE COURT:  Doesn't the jury have to look at what's

10   happening today versus what was happening at the time the policy

11   was enacted?  I mean, you have -- what will they be asked to do,

12   answer whether the policy that was enacted 15 years ago was a

13   valid one or are they being asked to decide whether the policy

14   and the requirements are necessary today for the valid business

15   interest?

16         MR. SANDOVAL-MOSHENBERG:  Well, Your Honor, to be clear,

17   the policy that was put into place about 15 years ago was

18   basically never enforced --

19         THE COURT:  -- right --

20         MR. SANDOVAL-MOSHENBERG:  -- as long as just one lessee

21   was able to comply, and that's precisely why the park filled up

22   with families with undocumented individuals such as the

23   plaintiffs.  It was in the middle of 2015 when they made a real

24   about-face and started to start enforcing the policy, including

25   against the plaintiff families.  So that's the action that's

1    being -- that led to the plaintiffs' damages.  That's the action

2    that led to eviction notices going out to them, was in the middle

3    of 2015.  We don't think -- and then this case was filed in 2016.

4    We don't think that that's an unreasonable period of time to look

5    back.

6         So, the notion that, you know, they could somehow lose

7    what otherwise would have been a winnable case because they don't

8    have witnesses anymore -- really this case was filed just one

9    year after the events complained of in the lawsuit, but really

10   what the jury needs to --

11        THE COURT:  -- That was going to be my next question.

12   What's the jury going to --

13        MR. SANDOVAL-MOSHENBERG:  -- really what --

14        THE COURT:  -- look like?

15        THE COURT REPORTER:  I'm sorry.

16        MR. SANDOVAL-MOSHENBERG:  I apologize.

17        THE COURT:  What's the jury instruction going to look

18   like?  Is it going to be present tense or is it going to be past

19   tense?

20        MR. SANDOVAL-MOSHENBERG:  I think it's past tense, Your

21   Honor.

22        This is first and foremost a claim for damages.  They were

23   subject to eviction notices and, as a result, suffered damages

24   due to a particular policy change or practice change that took

25   place in 2015, and so the jury instruction would be in the past

1   tense, I believe, Your Honor.  I do want to point out that the

2   *Betsy* case is still good law.  The 4th Circuit described it as

3   such in the *Reyes* case.  And, you know, again, to the extent that

4   we're asking for a ruling with regards to foundation -- not to

5   repeat myself, Your Honor, but we're not seeking that any

6   witnesses be -- that any defense witnesses be excluded from

7   testifying; we're simply asking that they be admonished not to

8   say things without first saying how they know those things.  And

9   again, really the most important thing here is defense counsel is

10  not denying that these witnesses are -- that these -- I'm sorry,

11  that these reasons are all post-hoc, that these reasons were

12  cooked up by litigation counsel after receipt of service of

13  process of the lawsuit.

14       They raised attorney-client objections to all of those

15  conversations and so now they're trying to use the

16  attorney-client privilege as a sword by saying that their

17  witnesses can say things but not say how they come to know things

18  when, in fact, there's strong reason to believe they know things

19  by speaking with their litigation counsel.  Thank you.

20       THE COURT:  All right.  Thank you.  All right.  Let's go

21  to the defendants' motions in limine.

22       MR. DINGMAN:  Your Honor, a number of the motions in

23  limine we've sort of touched upon, so I'll just reiterate some of

24  the arguments there so as not to be too repetitive anyway.

25       The first motion in limine I want to address and just to

1    follow up on this, what we were just talking about a few minutes

2    ago, is that the defendants -- I'm sorry, the plaintiffs should

3    not be allowed to present any evidence or argument regarding

4    motivation, the issue that we were just speaking about.

5        And I want to correct one thing.  We have not conceded

6    that these issues were not something that was the basis for the

7    policy.  There's testimony that it was.  Our point, Your Honor,

8    is that it's completely irrelevant to the determination of a

9    valid interest and would take this Court down a path where a

10   policy that actually meets a valid interest would somehow be

11   struck down because there's not a witness who had sufficient

12   information or knowledge, according to the plaintiffs, to say,

13   yes, this was in the mind of the folks who adopted this policy

14   10, 15 years ago.

15       That's not a retirement under *Inclusive Communities,* and

16   it's a requirement that would set an incredibly high bar for not

17   just private developers and public housing authorities who might

18   adopt a policy only to have it challenged years later.  And if

19   there are changes in the law, if there are issues that come to

20   mind after the policy's adopted that substantiate that it does,

21   in fact, serve a valid interest, that's the question for the jury

22   to decide.

23       THE COURT:  So, what is the jury instruction going to look

24   like on Step 2?  Is it going to be -- require the jury to look at

25   the present justifications for the policy, or is it going to be

1    looking back at the policy considerations when it was implemented

2    15 years ago?  How does that -- and now, of course, with the

3    damages issue, how does that all integrate?

4        MR. DINGMAN:  The jury should be asked to look at the

5    policy and the interest that it serves today and to decide

6    whether the policy serves a valid interest based on what the

7    defendants state are the valid interests.

8        The Supreme Court decision in *Inclusive Communities* does

9    not look back; it looks at the policy and the valid interests

10   that it serves today.  There's nothing in *Inclusive Communities*

11   or any other case that suggests that that issue is decided

12   looking back and on whether someone had this valid interest in

13   mind.  To me, Your Honor, that would completely undermine the

14   mandatory language in *Inclusive Communities* that says a policy

15   must be allowed if it serves a valid interest.

16       That's in the present tense, not if it served a valid

17   interest in the past or somebody thought about this in the past.

18   Does it serve a valid interest now, as the defendants assert?

19       THE COURT:  Okay.

20       MR. DINGMAN:  We had another motion in limine, Your Honor,

21   on the anti-harboring statute, which we've already talked quite a

22   bit about.  And that I think the parties are in agreement that

23   this is not an issue for the jury because it's a legal question

24   based on the application interpretation of that statute by the

25   4th Circuit in the *Aguilar* case.  That is an issue, Your Honor,

1    that -- and we talked about this somewhat with Judge Ellis as

2    well -- that we view as a legal matter for the Court, because a

3    jury is not capable of interpreting a statute in the 4th

4    Circuit's decision to determine what the impact of that is.  We

5    have contended all along, and Judge Ellis agreed with us, that

6    the specter of criminal prosecution under the anti-harboring

7    statute is a valid interest served by this policy, and we quoted

8    this in our briefs, Your Honor, where Judge Ellis said there's no

9    question a lessor could properly inquire into the immigration

10   status of a tenant to avoid prosecution or potential prosecution

11   under the anti-harboring statute, and the reason for that, Your

12   Honor, is when you look at the *Aguilar* case, Judge Trenga found

13   that intent to harbor was not a requirement for criminal

14   prosecution, and the 4th Circuit affirmed.

15        The defendant in that case was convicted because of her

16   reckless disregard of information that alerted her to the

17   possibility that her tenants were in the United States illegally.

18   And what the 4th Circuit said in that case is that she recklessly

19   disregarded that, and, quote, took no steps to ascertain the

20   status of her tenants, even though she had information to alert

21   her to the fact that they might be in the United States

22   illegally.

23        And one of the things that the Court pointed out in the

24   *Aguilar* case was that the way that she offered residency, quote,

25   "was especially attractive to illegal aliens."  The theory of

1    this case is that mobile home parks provide a place for illegal

2    aliens to have a home, and the theory of this case is there's a

3    predominant Hispanic population in this area comprised of illegal

4    aliens.

5         So here we are, the park owner, with all of this

6    information, and the suggestion is we do nothing with that.

7    Well, that's what Aguilar did.  And she was found to have engaged

8    in criminal conduct because of her reckless disregard because she

9    did nothing to determine the status of her tenants when she had a

10   certain level of knowledge that they might be in the United

11   States illegally.

12        So what business, Your Honor, would say, well, let's test

13   the waters?  Let's see how close we can get to a criminal

14   prosecution without taking any action.  No business would.  And

15   the plaintiffs continually try to point this Court to decisions

16   from other circuits interpreting the anti-harboring statute, but

17   the 4th Circuit controls this case, the 4th Circuit controls the

18   area where this park is located.  And we have a criminal

19   conviction, not based on an intent to harbor, but based on

20   reckless disregard based on knowledge.  That's what we're

21   confronted with, and that's why it's a valid interest.  That's

22   why Judge Ellis found it to be a valid interest, which is a Step

23   1 and Step 2 defense.

24        So, the parties are in agreement as to the motion in

25   limine that this is a legal matter for the Court, not for the

1    jury, and it's a predicate legal matter in our view, Your Honor,

2    because if the Court, as Judge Ellis said, agrees, it's a Step 1

3    and Step 2 defense, and it's not a defense in our view that a

4    jury can determine because it requires the interpretation of

5    *Aguilar* and this federal statute.

6        THE COURT:  Understood.

7        MR. DINGMAN:  The next motion in limine, Your Honor, has

8    to do with the damage claim.  Plaintiffs are asserting that

9    they're entitled to present both a compensatory and a punitive

10   damages claim.  We believe it's clear, Your Honor, that neither

11   are allowed under *Inclusive Communities*, nor is it typical under

12   any federal anti-discrimination statute to allow for such damages

13   in a nondisparate treatment case; in other words, where there's

14   no intent to discriminate.

15       In *Inclusive Communities*, the Supreme Court addressed how

16   violations of the Fair Housing Act under disparate impact

17   theories should be addressed.

18       I mean, here's what the Court said.  "It must be noted

19   further that even when courts do find liability under a disparate

20   impact theory, the remedial orders must be consistent with the

21   Constitution.  Remedial orders in disparate impact cases should

22   concentrate on the elimination of the offending practice.  If

23   additional matters are adopted, courts should strive to design

24   and to eliminate racial disparities through race-neutral means."

25       The Court went on to caution against what it called the

1    specter of disparate impact litigation, quote, "causing private

2    developers to no longer construct or renovate housing units for

3    low-income individuals, then the FHA would have undermined its

4    own purpose as well as the free market system."

5        So when the Supreme Court recognized for the first time

6    disparate impact under the Fair Housing Act, it explained how

7    liability under this cause of action is to be addressed.

8        And it's to be addressed through remedial action to

9    eliminate the practice, which is entirely consistent with how

10   disparate impact claims are handled in other contexts, because

11   there is no intent to discriminate.  So the concept of imposing

12   damages, let alone punitive damages, when a defendant is found

13   not to have intentionally discriminated but rather to have

14   implemented a policy that had a disparate impact.

15       Now, plaintiffs are going to point the Court, as they

16   have -- Well, the Fair Housing Act says compensatory and punitive

17   damages, and it does, but that statute was construed by the

18   Supreme Court in the *Inclusive Communities* case.  What is the

19   remedy?  What should a court do if there's liability under the

20   Fair Housing Act under a disparate impact claim?  And the Court

21   was very clear and consistent with its prior rulings in other

22   anti-discrimination contexts, which is address the policy.

23   There's no reference to damages, and it would be completely

24   inconsistent with federal case law and other contexts to impose

25   damages on a defendant who did nothing to intentionally

1   discriminate.

2          In fact, under the plaintiffs' argument, the remedy for

3   intentional discrimination and unintentional discrimination under

4   the Fair Housing Act would be exactly the same.  That cannot be

5   consistent with the intent of Congress or the intent of the

6   Supreme Court in the *Inclusive Communities* case, that, regardless

7   of whether you intentionally discriminate or not, you are subject

8   to damages.  These are two distinct causes of action.  The

9   disparate impact has nothing to do with bad conduct, racial

10  animus, intentional actions, and therefore it should not give and

11  cannot give rise to a damage claim.

12         We would also point out, Your Honor, that in the *Smith*

13  *Versus Town of Clarkton* case, which we cited, it's not mandatory

14  under the Fair Housing Act that damages be awarded.  It says,

15  "the Court may award damages."  In that case, the District Court

16  found no racial animus and did not award damages, and that was

17  affirmed.

18         And I would suggest, Your Honor, that is completely

19  consistent with the concept that there is a clear and important

20  distinction between intentional discrimination and disparate

21  impact, and to treat them as the same is contrary to the statute

22  and it's contrary to *Inclusive Communities*, because, in effect,

23  the Court is going to punish a defendant who did not engage in

24  intentional discrimination just like it would a defendant who did

25  engage in intentional discrimination.

1    So we would ask that the Court grant the motion in limine

2    and not allow the introduction of evidence on compensatory

3    damages.

4    With respect to punitive damages, Your Honor, there is no

5    basis in this case when the intentional discrimination case has

6    been dismissed.

7    If the Court is inclined to allow an advance on damages,

8    we also ask the Court to consider bifurcating that part of the

9    trial under Rule 42(b), and the reason for that, Your Honor, is

10    our expectation is that the plaintiffs will present very

11    emotional testimony regarding the impact of moving from the park,

12    which, of course, has nothing to do with the predicate issue of

13    whether there's been disparate impact, whether there's a valid

14    interest.

15    Our concern is that kind of testimony before the jury has

16    decided the predicate liability issue would be extremely

17    prejudicial to the defendants, and bifurcating the trial will not

18    cause any sort of delay or inconvenience to the parties.

19    In their response the plaintiffs said that they anticipate

20    that they will call all eight plaintiffs, and that they expect

21    they would testify each for one hour split between what they said

22    would be liability and damages.  So, if we just do an even split,

23    on the damages part it would be four hours of testimony.  So --

24    and the trial would not be interrupted other than we try the case

25    with respect to liability, the jury goes out, makes a decision.

1  If they find in favor of the defendants, that's it.  If they find

2  in favor of the plaintiffs, then you present the four hours of

3  testimony and the jury goes back and considers damages, if the

4  Court allows that to go forward.  That is not an inconvenience,

5  we would submit, to the parties or to the Court, and it allows

6  for a fair review by the jury of the issue of the validity of

7  these policies and whether the disparate impact requirements

8  under *Inclusive Communities* has been met.

9       So, if the Court denies the motion in limine with respect

10  to damages, we would ask that the Court bifurcate the damage

11  portion of the case and have that considered only after and if

12  the jury finds in favor of the plaintiffs on liability.

13       The next motion in limine, Your Honor, addresses the

14  potential testimony of plaintiffs' expert, Ivan Yacub, who has

15  been proffered to offer expert testimony about various forms and

16  types of documentation that can establish legal residency in the

17  United States.

18       First and foremost, Your Honor, that issue is completely

19  irrelevant to this case.  The female plaintiffs, as counsel has

20  already argued, have admitted that they are in the United States

21  illegally.  They have not taken the position that they have any

22  documentation that they could present that would satisfy the

23  policy.  In fact, the predicate of this case is the assertion by

24  the plaintiffs that the policy is aimed at illegal aliens, and

25  that because it's aimed at illegal aliens and the greatest

1    segment of that population is Hispanic, it has a disparate

2    impact.  And so this case has nothing to do with can the

3    plaintiffs, the female plaintiffs present documentation showing

4    that they're in the United States legally.  They have admitted

5    they cannot.  So having an expert come in and talk to the jury

6    about all of the myriad ways that someone can establish legal

7    residency is going to be confusing and misleading and completely

8    irrelevant because there's not going --

9         THE COURT:  Why is it irrelevant to Step 3?  I'm not

10    following you.

11         MR. DINGMAN:  The only issue on Step 3, Your Honor, I

12    think that Mr. Yacub testifies about or identifies in his report

13    had to do with the ITINs.  On the ITINs, Your Honor, the parties

14    have already stipulated in this case what the process is to

15    obtain an ITIN.  It's also documented in federal regulations.  So

16    our view is there's no need for an expert to testify about the

17    ITIN process because the parties have stipulated to what that

18    process is; the Court can instruct the jury as to what that

19    process is because it's set out in federal regulations.

20         So, as to the ITIN issue, Your Honor, we do not think that

21    expert testimony is necessary or required.  As to his testimony

22    regarding the various types of documents that may establish legal

23    residency, that simply has nothing to do with this case.  There

24    is no argument that the female plaintiffs could comply, nor is

25    there an allegation that the impact of the policy is because the

1    plaintiffs -- I'm sorry, the defendants supposedly limit

2    compliance to a certain set of documents.

3         The other issue I wanted to point out, Your Honor, is

4    there's absolutely no basis for the plaintiffs' assertion that

5    the policy was limited to just these two documents, the I-94 and

6    the passports.

7         Every person who was deposed from the defendants testified

8    that any document showing legal status was acceptable.  The

9    CoreLogic manual from 2011 had a laundry list of acceptable

10   documents.  The residential manual also had a list of acceptable

11   documents.

12        So the factual predicate is just baseless.  There are no

13   facts that the plaintiffs can point to to say that when a policy

14   was implemented, as they said, in 2015, that the defendants

15   refused to accept any documents showing legal status.  All of the

16   evidence is completely to the contrary, not only from the

17   witnesses for the defendants but from the defendants' own

18   internal documents which set out all of these documents so that

19   the folks in the field knew, if someone presents a document

20   that's on that list, that's good enough.  So there's no factual

21   basis for this, either.  So, we would ask that the Court grant

22   the motion in limine and not allow Mr. Yacub to testify in this

23   case.

24        The next motion in limine, Your Honor, deals with what we

25   refer to as the lease materials and the eviction notices back and

1    forth.  As the Court is aware from the long history of this case,

2    early on there were state law claims under the Mobile Home Lot

3    Rental Act and breach of contract.  They've been resolved and

4    dismissed.  Nonetheless, the plaintiffs have put in, we tallied

5    it up, 64 trial exhibits regarding leases and applications,

6    another 15 exhibits regarding evictions that have nothing to do

7    with what's left in this case.

8         We set out at page 7 of our brief, Your Honor, what are

9    undisputed facts.  And the Court, I'm sure, has looked at a lot,

10   but if you went back and looked at the undisputed facts, there's

11   no dispute that the plaintiffs leased lots at the mobile home.

12   There's no dispute that they were asked to comply with the

13   policy.  There's no dispute that the female plaintiffs were not

14   able to comply with the policy.  There's no dispute that, because

15   of that, they left the park.  To walk the jury through each of

16   those steps has nothing to do with what's left to be determined

17   in this case, which is whether the policy serves a valid interest

18   and whether the plaintiffs are able to show at Step 1 a disparate

19   impact.

20        THE COURT:  Don't they have to have a basis for the

21   testimony of their expert about statistical information?  Don't

22   they need to demonstrate that they have viable plaintiffs who are

23   subject to the disparate impact of the policy, and that's the

24   tenants?

25        MR. DINGMAN:  Well, the -- I would say two things to that,

1    Your Honor.  The primary expert, Professor Clark for the

2    plaintiffs, doesn't -- does not rely on these documents.

3         And additionally, Your Honor, and this is something that

4    we would stipulate to because these are already undisputed facts,

5    there's no dispute, again, that the plaintiffs were asked to

6    comply with the policy, and there's no dispute that they were

7    unable to and that they then moved out of the park.

8         What we're concerned about with that, Your Honor, is two

9    things:  One, it's going to create a significant amount of

10   irrelevant evidence.  There's no dispute about these issues, but

11   it's also prejudicial to the defendants because our view is the

12   plaintiffs want to go through all of this to say, look at these

13   bad guys.  They're evicting these families from their homes and

14   they're threatening them with this and they're threatening them

15   with that.  What does that have to do with disparate impact?

16   Nothing.

17        And so our concern, Your Honor, one, it's irrelevant, but

18   it's also extremely prejudicial, and it could go both ways.  We

19   had argued that, for example, when the male plaintiffs filed

20   their applications, they misrepresented on the application who

21   would live in the park because they didn't identify their wives.

22   What does that have to do with this case now either?  And so,

23   having 80-some exhibits, walking through those issues when no one

24   disputes what we suggests is the basis for the case now, which is

25   were these defendants -- were their leases not renewed because of

1   the policy?  Yes -- there's no dispute about that.  So that's the

2   departure point, in our view, Your Honor, for the trial.

3             THE COURT:  All right.

4             MR. DINGMAN:  That's all I have, Your Honor.  Thank you.

5             THE COURT:  Thank you.

6             MS. ZEHR:  Your Honor, Larisa Zehr again, and I'll be

7   arguing the response to defendants' motions.

8             THE COURT:  All right.

9             MS. ZEHR:  With respect to the first -- defendants' first

10  motion regarding damages, in this case plaintiffs were evicted.

11  This is not a case where they were denied housing or testers

12  found that a policy violated the Fair Housing Act, which would be

13  cured by only injunctive relief.  Plaintiffs lost their homes due

14  to a policy that defendants were on notice could be unlawful

15  under the Fair Housing Act.

16            Compensatory and punitive damages for these losses are

17  available on disparate impact claims, and to argue the contrary

18  the defendants rely on a decontextualized reading of *Inclusive*

19  *Communities* and other statutes, but they ignore the jurisprudence

20  of the statute at issue here, the Fair Housing Act.

21            *Inclusive Communities* held that remedies should

22  concentrate on eliminating the offending practice, and courts

23  recognize that damages are a valid remedy in disparate impact

24  claims when, as here, injunctive relief on its own would not cure

25  the harm.

1    The Court -- the Supreme Court specifically cautioned in

2  *Inclusive Communities* against only one type of remedy, racial

3  quotas, but did not hold that damages were not available in

4  disparate impact claims.

5    The FHA, Fair Housing Act, expressly diverges from Title

6  VII and Title II to allow damages in these claims.  A full range

7  of remedies is available unless there's an express intent from

8  Congress otherwise, and the Supreme Court expressly held in

9  *Inclusive Communities* on an extensive review of the congressional

10  record that Congress retain the statutory text of the Fair

11  Housing Act as it was knowing that disparate impact claims had

12  been brought in every circuit and that damages were available in

13  such claims.

14    In addition, Your Honor, punitive damages are available

15  under the Fair Housing Act when a defendant persists in conduct

16  that they are aware of may violate federal law.  The jury may

17  conclude here, as plaintiffs have asserted, that all of

18  defendants' justifications for the policy are post-hoc

19  rationalizations.  It is then the jury's role to weigh that

20  evidence and decide whether defendants showed the requisite

21  knowledge under the punitive damages standard.

22    Finally, with regard to defendants' argument that

23  bifurcation should be allowed in the alternative, bifurcation is

24  an exceptional step.  It is defendants' burden to show that it is

25  proper, and they have not shown that here.  It is inconvenient

1    and inefficient to separate the brief testimony by only eight

2    plaintiffs in two separate -- into two separate trials.

3         And as to prejudice, defendants have made only vague

4    allegations that the testimony will be emotional, but plaintiffs

5    will only testify, as all plaintiffs in damages cases do, about

6    the impact of the policy on them and their families.

7         Bifurcation is not proper here either because testimony on

8    damages and liability overlap significantly.  For example,

9    evidence of when and why defendants justified the policy is

10   interrelated with evidence that shows that their valid interests

11   were, in fact, necessary, and that goes to show whether or not

12   they had sufficient knowledge for purposes of punitive damages.

13        For all of these reasons, Your Honor, bifurcation is not

14   proper and the Court should deny defendants' motion to exclude

15   evidence of damages.

16        THE COURT:  All right.

17        MS. ZEHR:  Going next to defendants' motion to exclude the

18   testimony of plaintiffs' expert Mr. Yacub.  Without Mr. Yacub's

19   testimony explaining the technical significance of the

20   immigration documents at issue in defendants' policies, the jury

21   will not be able to understand the impact of that policy, as well

22   as whether the policy was necessary and what alternatives are

23   available.

24        The actual written policy requires plaintiffs to produce

25   specific immigration documentation, and understanding who would

1    be excluded by those specific required documents is key to the

2    jury's analysis of whether the Step 2 justification; that is, the

3    anti-harboring statute, and defendants' stated justification that

4    the policy would allow them to minimize loss from renting to

5    noncitizens, the documents required are key to the jury's

6    understanding of whether those justifications actually justify

7    the policy.

8         This is relevant even to defendants' current policy which

9    requires applicants to have a social security number as well as

10   proof of legal status.

11        Defendants argue that if their policy will accept any

12   proof of legal presence, which we dispute, but the actual policy

13   did not -- but regardless, if they argue that any -- their policy

14   will accept any proof of legal presence, Mr. Yacub's testimony on

15   which document shows legal presence does matter because he will

16   be able to explain that the policy which still -- which requires

17   a social security number excludes legal immigrants.  Why does

18   this matter?  If the policy still excludes legal immigrants as

19   it's written, the stated justifications of anti-harboring and

20   minimizing the loss of renting to noncitizens are simply not

21   valid grounds to justify the policy.

22        Next, Your Honor, the testimony is not repetitive.

23   Mr. Yacub will explain not just how ITINs or Immigrant Taxpayer

24   Identification Numbers are obtained but also what they're used

25   for, and defendants can also cross-examine him about the forms of

1    identification used by undocumented individuals.

2         His testimony that other entities use ITINs and foreign

3    passports to verify identity and that undocumented individuals

4    are regularly included in leases will help the jury understand

5    their Step 3, what they must analyze on Step 3, that there are

6    alternative practices available.

7         And he is qualified to testify to this; not as an expert

8    on leasing policies but as an expert on the different forms of

9    immigration documentation and their use.

10        And finally, Your Honor, with respect to -- with respect

11   to defendants' argument regarding lease materials and eviction

12   correspondence.  These materials do not only go to undisputed

13   facts, as defendants claim.  At trial, the jury must decide key

14   disputes of material fact, whether defendants acquiesced to

15   female plaintiffs living in the park before suddenly enforcing

16   the policy, if they generally found tenancies satisfactory when

17   they had screened only one leaseholder, and how defendants

18   defined the policy.

19        Plaintiffs' proposed evidence shows these critical facts.

20   To be clear, plaintiffs will not introduce every document on the

21   exhibit list to save trial time, but the Court should not credit

22   defendants' attempts to categorically exclude these documents.

23        Even if these facts are undisputed, plaintiffs must meet

24   their burden of proof.  They must lay a basis for the actual

25   duties that existed in this case under the Fair Housing Act, the

1    harm, and the plaintiffs' standing to bring the suit.

2         Evidence of plaintiffs' acceptance of -- I'm sorry.

3    Evidence of defendants' acceptance of female plaintiffs as

4    tenants is directly relevant to their burden on Step 2, whether

5    the policy is necessary to meet their stated justifications.

6         Next, evidence of plaintiffs' model tenancy, their rent

7    ledgers, and inspection reports tend to show there's no business

8    necessity for the policy because tenants otherwise complied with

9    their leases.

10        And background checks and screening reports show that

11   defendants were satisfied with only screening the leaseholder

12   before suddenly enforcing the policy and that screenings can be

13   done using other forms of identification.

14        Finally, application forms and eviction correspondence

15   showing enforcement of the policy are relevant to another

16   disputed point, how the policy was defined when it was presented

17   and applied to plaintiffs, as well as the damages that they

18   experienced from defendants' violation of the Fair Housing Act.

19        Defendants have not shown unfair prejudice that

20   substantially outweighs the probative value on these key findings

21   of fact because the evidence does not make any inference of

22   intentional discrimination; rather, it goes to whether or not

23   defendants' stated justifications were necessary and the

24   defendants' claims of unfair implications that the policy is

25   improper are unavailing.  That's precisely what plaintiffs are

1    explicitly alleging in this lawsuit, that the policy is improper

2    under the Fair Housing Act.

3        Your Honor, would you like to hear an additional response

4    on the points of motivation and harboring?

5        THE COURT:  No, I don't need anymore argument on that.

6        MS. ZEHR:  Okay.  Then I will turn it over to my

7    co-counsel, Clay Warner, to respond and argue plaintiffs' motion

8    to amend.

9        THE COURT:  All right.  Why don't we let counsel reply

10    first.

11        MS. ZEHR:  Of course.  Thank you, Your Honor.

12        MR. DINGMAN:  I'm trying to make sure counsel gets

13    exercise.

14        THE COURT:  All right.

15        MR. DINGMAN:  Just a couple of very brief points I wanted

16    to make.  The argument that the plaintiffs were evicted is not

17    true.  There was no eviction matter instituted against these

18    plaintiffs.  In fact, the defendants allowed them to stay through

19    the end of the school year so that they could leave on their own

20    timeline.  So the statement that we evicted these plaintiffs is

21    straight up untrue, and it gets to a larger point of, is this the

22    who shot John we want to get into at trial?  And I think the

23    answer is absolutely not because it has nothing to do with

24    disparate impact.

25        This case, and this is what's alleged in the complaint, is

1    that this policy was aimed at illegal aliens and that the largest

2    segment of that population is Hispanic.  That's it.  That's all

3    that's left in this case.  And so to have 60 or whatever number

4    of exhibits and testimony about the lease and what went back and

5    forth and who said what to who and what accommodations were made

6    allow the defendants -- I'm sorry, the plaintiffs to stay for a

7    particular period of time has nothing to do with what's left in

8    this case.

9        With Mr. Yacub, the thing I want to point out there, Your

10   Honor, is the policy that they are relying upon was back in, I

11   believe it was 2007.  I may be wrong on that date.  And they've

12   already said to this Court, well -- it was enforced beginning in

13   2015.  The CoreLogic document is 2011, which has all of the lists

14   of documents that are acceptable.  That's undisputed.

15       So they want to say to the Court, we're frozen in time

16   with the policy back in 2007 and the Court has to ignore all of

17   the rental documents that provide guidance to the property

18   managers on what to accept has to be ignored, the same argument

19   that we're frozen in the past.  But the evidence is undisputed

20   that that policy did change with these internal documents where,

21   again, there's this laundry list of acceptable documents, and

22   every witness from the defendant said, yes, if someone had a

23   document on that list, that was acceptable.

24       So, Mr. Yacub coming in and going through however many

25   different types of documentation may establish legal presence has

1    nothing to do with this case.  Thank you, Your Honor.

2        THE COURT:  All right.  Thank you.

3        MR. WARNER:  Good morning.

4        THE COURT:  Good morning.

5        MR. WARNER:  Clay Warner for plaintiffs.  I'm going to

6    address our motion to amend to add to our exhibit list, but that

7    motion is tied to defendants' motion in limine to exclude

8    evidence of ethnicity.  I will try to keep them separated, but

9    they're going to merge together.  We forgot to add an exhibit on

10   our exhibit list that we produced under 26(a)(3), the documents

11   publicly available to charts produced by the Census Bureau, and

12   what it shows is how people with specific surnames responded to a

13   question on the 2010 Census.  The question is:  "Is this person

14   of Hispanic, Latino, or Spanish origin?"  It's a huge document,

15   so we also offer an alternative summary chart under Rule 1006.

16       That chart lists the names of people who are subject to

17   eviction under defendants' policies based on charts that

18   defendant created, and then it finds the corresponding number of

19   percentage Hispanic or Latino origin from the Census chart and

20   summaries it in one page.  The defendants raise a lot of clatter

21   about that chart, but I point out that they raise no point that

22   is in any way inaccurate.  If the Court would prefer the larger

23   document, we certainly can produce that.  If the Court would

24   prefer the convenience of the smaller one, that's fine, too.

25       Now, Rule 37 allows relief for things like we did,

1   forgetting to include a document, on two grounds.  Either there's

2   substantial justification or it's harmless to the opposing party.

3   We are not claiming substantial justification.  We claim only

4   that it's harmless.  There's a four-factor test.  We go through

5   it in our pleadings.  I won't go -- belabor it, just the simple

6   point is this.  This was not a surprise.  We used this document

7   in 2016 -- early 2017; the defendants had actually used the

8   earlier version of it right before us.  So it's no surprise.

9   There's no surprise to cure.

10          Disruption of the trial?  The trial's in March.  If

11  there's anything that needs to be done, there's plenty of time to

12  do it.  And I point out that the 4th Circuit's standard for

13  disruption is pretty high.  It's in the *Hill* case that's in our

14  pleadings.

15          As far as the importance to the trial, this is where it

16  ties into their motion to exclude evidence.  Now, the defendants

17  make much of the importance of this document because what they

18  want to do is to exclude and prevent the jury from hearing names

19  like Benitez and Bolanos, Cespades, Cruz, Flores, Gonzalez,

20  Furtado.  That's just going down alphabetically from those who

21  were subject to eviction under this policy.

22          They're trying to do that by setting up a little trick.

23  They claim that the jury can't see documents that they produced

24  that lists the names of people that they were evicting because,

25  quote, "the jury could reach improper conclusions about who is

1    Latino," unquote.  Well, this chart that we would like to put in

2    eliminates that possibility.  But let me just say, Your Honor,

3    the defendants whole hard argument on excluding evidence is based

4    on a wrong-headed approach.

5         Your Honor, if you look at that argument, the argument is

6    under Rule 403, which says the Court can exclude relevant

7    evidence only if its probative value is substantially outweighed

8    by one of several specified dangers.  In this case they claim the

9    danger is unfair prejudice.  We know that this evidence is

10   significantly probative for several purposes.  In fact, the 4th

11   Circuit has told us that.  And we're going to show there's no

12   danger of unfair prejudice, but let me describe the evidence

13   briefly.  The defendants are trying to exclude 14 exhibits.  As

14   far as we can tell, what they've marked is every document that

15   shows their efforts to enforce the policy in this case against

16   people at the park, including several summary charts that they

17   use to list all the tenants who were unable to meet the policy.

18        The evidence is significantly probative first because the

19   4th Circuit told us so.  The 4th Circuit told us that our

20   population level evidence, which is evidence of the Latino

21   population in this area and in this particular park, that alone

22   met our burden at Step 1.  But then they went on to say that this

23   evidence, the evidence of who is actually subject to eviction

24   was, quote, "stronger than the population level evidence."

25        The evidence is also probative at Steps 2 and 3.  For

1    example, we claim that this policy had been in effect for years

2    and was not enforced until some time in 2015.  These documents

3    will show that.  And it's hard for us to see how the policy could

4    be, a quote, "business necessity" if it was sitting around for

5    years unenforced.  So, we know that this evidence has significant

6    probative value.

7         In addition, we don't think there's any danger of unfair

8    prejudice.  We don't even think that's a close question.  Unfair

9    prejudice here in this circuit occurs when, quote, "the motions

10   of a jury will be excited to irrational behavior."  It's hard to

11   see how these eviction documents could meet that standard, and

12   really defendants don't make that claim.

13        What they argue, is, as I said, the jury could reach

14   improper conclusions about who is Latino, but that possibility

15   doesn't meet Rule 403.  Rule 403 doesn't create some laboratory

16   standard.  In fact, it's very, very unlikely that the jury would

17   reach improper conclusions.  Instead, it's very likely they're

18   going to hear names like Benitez and Bolanos, and they're going

19   to conclude correctly that those people are very, very likely to

20   be of Latino origin.  So -- but if, again, if the Court wishes to

21   avoid all possibility of that sort of misinterpretation, then

22   that's why we offer this chart as an exhibit or the summary

23   chart.  Thank you.

24        THE COURT:  All right.  Thank you.

25        MR. DINGMAN:  Your Honor, let me first address the history

1    of this issue, because I think it's important.  The declaration

2    from Mr. Ramkumar was submitted by the plaintiffs in a reply

3    brief to which defendants had no opportunity to respond.  Had

4    they had that opportunity, we would have challenged that

5    declaration which is clearly improper.  That's why this case is

6    here.  That's why the defendants are now trying to amend their

7    exhibits and their witness list, because they know that that

8    declaration was not proper, and we have been prejudiced by that

9    because the 4th Circuit looked at that not knowing the history,

10   and we had no ability to challenge that declaration.  And now

11   everybody's riding this declaration to say that there's evidence

12   out there of some sort of disparate impact when it is clearly an

13   improper declaration, and plaintiffs don't argue otherwise.

14   They're not proceeding under that declaration.  They're not

15   calling Mr. Ramkumar as a witness.  So they created this issue by

16   throwing in an improper declaration in a reply brief that we

17   never had an opportunity to respond to.

18        THE COURT:  So the Census Bureau evidence is admissible

19   under 803(8), isn't it?

20        MR. DINGMAN:  I don't think it's admissible under 803(8),

21   Your Honor, and the reason I say that is -- and this goes back --

22   and I'm just going to go ahead and argue our motion in limine

23   because I think these overlap.  Whether or not a surname can be

24   tied to a particular ethnicity requires expert testimony, and

25   what I heard counsel say is this Census document from 2010,

1    someone says, based on my name, I think I'm this ethnicity.

2    Where is the reliability of that?  How did they know?  That's

3    what they want to then use.  If you want to have a surname

4    analysis, it's not difficult to have an expert witness come in

5    and say, I've looked at these names and, based on my expertise,

6    it's my opinion that they fall in these ethnic groups.

7         In fact, Professor Clark, the expert they did designate,

8    did exactly that, except he was not asked to look at this

9    information that they're now trying to get in years later.

10         So the predicate issue is, you put in front of a jury a

11   document with surnames, and you invite them to speculate about

12   what the ethnicity of these surnames may or may not be, and we

13   cited the Court to the *Rodriguez* case from the 5th Circuit where

14   that court found that that tends misidentify Hispanic persons and

15   vice versa, which is why you need an expert, somebody like

16   Professor Clark, for example, who can come in and say to the

17   jury, I've examined these lists of names.  Based on my

18   credentials and so forth, my opinion is they're in this

19   ethnicity.  They have no such expert, and it's obviously way too

20   late to identify one.

21         So what they want to do is just put a document in front of

22   the jury that has a bunch of names on it that are based on a

23   document that is based on responses from people responding to the

24   Census as to what they think their ethnicity is, and they want

25   the jury to infer the ethnicity from all of that without the

1    guidance of an expert.  That's completely improper.  It would

2    invite the jury to speculate, and we have no opportunity now to

3    present our own expert to say, wait a minute, those surnames may

4    not fall in these ethnic categories because the plaintiffs never

5    identified such an expert.

6        THE COURT:  So they have no sponsor for the testimony that

7    would be necessary to frame the Census Bureau data?

8        MR. DINGMAN:  Correct.  They have no expert, no one who

9    can say, I'm an expert in surnames and these surnames fall in

10   these categories.  And it's something they could have done.  It

11   is done to some extent in Professor Clark's report, so it's not

12   as if they were unaware of this requirement.  Instead, they chose

13   four years ago to have counsel prepare this declaration, and when

14   we filed our motion in limine, Your Honor, and said, wait a

15   minute, he's not an expert.  He's counsel.  He's not on the

16   witness list.  Then and only then did they file this motion.

17   This issue has been known for years.

18       THE COURT:  Well, I guess my -- in looking at it, I'm

19   being asked whether they can amend their exhibit list to include

20   this document and nothing further, and is there a prejudice in

21   allowing them to do that when the trial is in March?  I don't

22   know what use they intend to make of the exhibit or how they

23   intend to sponsor it, but, you know -- so I'm looking at a little

24   narrower question, and if you don't think they can figure out a

25   way to sponsor it without opening up discovery and formally

1    trying to do so and identify a different expert to do so, then

2    what's the harm in admitting the document itself?

3         MR. DINGMAN:  I would say two things, Your Honor, and I'm

4    not going to repeat my argument.  I think, without an expert to

5    sponsor that document, it's simply putting in front of a jury a

6    document that's based on nothing more than Census responses.

7         THE COURT:  Okay.

8         MR. DINGMAN:  And the harm to the defendants is

9    significant, because the obvious implication that the plaintiffs

10   want to take from that document is the impact of the policy.

11   That's clear.  And, unfortunately, it colored in our view the 4th

12   Circuit's view of this because they've relied on this declaration

13   that has now been withdrawn and really had no basis in the first

14   place.

15        But the other issue, Your Honor, is, as we argue in our

16   brief, the standard they have to meet is excusable negligent

17   under Rule 6B.  They're asking this Court to file something out

18   of time.  And as we argued in our brief, the *Colony Apartments*

19   case, the 4th Circuit said, one, that's not easily demonstrated,

20   and two, it cannot be predicated on mistake of counsel.  Because

21   if it were, then any time a party wanted to file something, an

22   exhibit, in addition to the witness list, out of time, they could

23   simply say, sorry, we made a mistake.  And that's what they're

24   saying to this Court.  That's not enough to satisfy the excusable

25   neglect standard of Rule 6B and that's what the 4th Circuit said

1   in *Colony Apartments*.  So that's the first step they have to get

2   over, is to convince this Court that there was excusable neglect,

3   and here there is none because they were aware of this surname

4   issue years ago.  That's why Professor Clark addressed it in his

5   expert report with respect to what he was looking at.  So this is

6   not a new issue to them.

7          And even when we filed our motion in limine, it was

8   another six months before they filed this motion to amend.  So

9   they have not satisfied the first step of excusable neglect.  And

10  as far as the prejudice, Your Honor, our concern is, if this goes

11  forward, we have not identified a surname expert because they did

12  not identify a surname expert.  So, if they're allowed to put

13  this evidence in, we could have retained an expert who could have

14  looked at that and said, well, wait a minute, it doesn't really

15  say what you think it does, but we have no opportunity for that

16  now.  So we have no way to really defend against or to push back

17  again that document with our own expert who can say, well, that's

18  not reliable or maybe these surnames do not fall easily in these

19  categories as these plaintiffs claim.  So we have no witness now

20  who can address this issue.  That's our prejudice.

21         THE COURT:  All right.  Understood.

22         MR. WARNER:  We appreciate all the time you've given us

23  this morning.  I will try to be quick.  First, I want to point

24  out that the proper analysis is under Rule 37, not Rule 6B.

25  Every reported case in the 4th Circuit holds that Rule 37 is the

1    appropriate standard.  They found one unreported case under 6B

2    where the difference probably didn't matter, but even this year

3    the 4th Circuit has issued a couple of decisions using Rule 37.

4        On the question of whether or not an expert is required to

5    look at this chart, Your Honor, we don't think for the purposes

6    of this case that expertise is needed at all.

7        Now, all that's required is to look at an alphabetic list,

8    find a name on a list, read across to the column that is percent

9    Hispanic or Latino origin, and understand what a percentage

10   means.  This is not a close case.  Nearly every name of a family

11   that was evicted or subject to eviction under these policies

12   you're going to find is more than 90 percent likely to be a

13   Hispanic or Latino family.  We don't have to to prove that every

14   person was; we're proving disparate impact.  And so the fact is,

15   if we have 11 of 12 names that are more than 90 percent likely to

16   be Hispanic, as the 4th Circuit told us, that's even stronger

17   evidence than our otherwise sufficient evidence at the population

18   level.

19       THE COURT:  So does the document come in on its own

20   without a sponsor, without anyone identifying and describing what

21   the Census Bureau has done and what the data represents?

22       MR. WARNER:  We believe so, but if the Court has another

23   view, we're in July, the trial is in March; there's plenty of

24   time to accommodate those other views.  The one point we want to

25   make is that at some point litigation becomes unbelievably

```
 1   expensive, and if we need an expert to show a jury how to read an
 2   alphabetic list and how to understand a percentage, then we're
 3   blowing the cost way beyond what folks can afford.  Let me make
 4   another point here, too, is that -- you know, the defendants
 5   continue to call this a surname analysis to sort of make it sound
 6   as if it's something that an expert has to do, but it's a similar
 7   surname analysis like reading a sign as a linguistic analysis,
 8   anyone can do this.  We don't need expertise.  Yes, our expert
 9   did it a different way, but he's entitled to.  There are other
10   ways to do it.
11        I also want to point out that they continue to cite to
12   cases in which surname analyses were questioned, but the
13   Rodriguez case out of the 5th Circuit which is a voting rights
14   case actually noted that the kind of evidence that we're talking
15   about here, which is self-reporting of ethnic status or national
16   origin was the preferred kind of evidence.  This is the best, and
17   that's what we're proposing to use.
18        Lastly, Your Honor, I think -- I want to focus back on
19   their motion to exclude evidence, because even if you decide
20   against us on the motion to amend to add this document to our
21   exhibit list, we strongly believe that their motion to exclude
22   evidence must fail.  That evidence should come in for all of the
23   reasons that it's probative.  We do think it would be helpful to
24   the jury to have this chart so that they can feel comfortable
25   that names like Benitez and Bolanos are heavily Latino, but
```

1    they're going to know that on their own.  Thank you.

2         THE COURT:  Thank you.  All right.  Anything else this

3    morning?

4         MR. SANDOVAL-MOSHENBERG:  No, Your Honor.

5         MR. DINGMAN:  No, Your Honor.

6         THE COURT:  All right.  Well, obviously I've got some work

7    to do to catch up.  We do have some time to do that, but I

8    appreciate the written pleadings, which were very helpful, which

9    we'll continue to look through, but also the focus this morning

10   and the ability for you all to have reviewed what each other has

11   been saying and distill it and argue it this morning is much

12   appreciated.  We'll get you out a decision that hopefully will

13   guide you down the road.  It won't be tomorrow, but we'll get

14   something to you soon.  Mr. Hanes, good to see you, sir.

15        MR. HANES:  Yes, sir.

16        THE COURT:  And we'll go from there, and hopefully maybe

17   the ruling will help you to resolve it and the case among

18   yourselves.  And I'm sorry that we can't give you a trial date

19   until March.  I know that you were hoping for a much earlier

20   date, but given our criminal docket and where we are, it's just

21   impossible.  So, all right.  We're going to take a brief recess,

22   and then we'll come back with our next motion.

23        (Proceedings adjourned at 10:50 a.m.)

24

25

1

2

**<u>C E R T I F I C A T E</u>**

3

4              I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
5    proceedings in the above-entitled matter.

6

    /s/ Scott L. Wallace                    9/9/21
7   ----------------------------       ----------------
     **Scott L. Wallace, RDR, CRR            Date**
8       **Official Court Reporter**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25