# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| ROSY GIRON DE REYES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, *et al.*, <br><br> Defendants. | Civil No.: 1:16-cv-563 (LO) (TCB) |

### DEFENDANTS' REPLY IN SUPPORT OF SUPPLEMENTAL MEMORANDUM PURSUANT TO THE COURT'S JULY 28, 2021 ORDER

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................................... 1

I.     Plaintiffs' Assertion That There Is A Factual Dispute Regarding The Pertinent Version Of The Policy At Issue Is Immaterial To Plaintiffs' Disparate-Impact Claim And Has No Factual Basis In Any Event. ................................................................. 1

II.    Plaintiffs Agree That Avoiding Criminal Prosecution Is A Valid Interest. ........................ 4

III.   Plaintiffs' Improper Shift To A New Motive-At-Time-Of-*Application* Argument Is Just As Infirm As Their Abandoned Motive-At-Time-Of-*Adoption* Contention. ............. 7

IV.   Plaintiffs Have Not Met Their Step-Three Burden As A Matter Of Law. ......................... 9

CONCLUSION ...................................................................................................................... 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ave. 6E Invs., LLC v. City of Yuma*,
 818 F.3d 493 (9th Cir. 2016) ...................................................................................................9

*Bender v. Elmore & Throop, P.C.*,
 963 F.3d 403 (4th Cir. 2020) ...................................................................................................6

*Cyan, Inc. v. Beaver Cty. Emples. Ret. Fund*,
 138 S. Ct. 1061 (2018) .............................................................................................................8

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*,
 658 F.3d 375 (3d Cir. 2011).....................................................................................................9

*Ramos v. Louisiana*,
 140 S. Ct. 1390 (2020) .............................................................................................................5

*Texas Dep't of Hous. & Cmt. Affairs v. Inclusive Communities Project, Inc.*,
 576 U.S. 519 (2015)........................................................................................................ passim

*United States v. Aguilar*,
 477 F. App'x 1000 (4th Cir. 2012) .......................................................................................5, 6

*United States v. Wilson*,
 503 U.S. 329 (1992).................................................................................................................8

**Regulations**

78 Fed. Reg. 11471 ........................................................................................................................9

In its July 28, 2021 Order, the Court directed the parties to address four sets of questions. Yet, in their brief, Plaintiffs avoid answering several of these questions, largely ignore Defendants' arguments—including the import of *Inclusive Communities*—and discuss at length an issue the Court did not ask the parties to address. Plaintiffs also shift theories, abandon arguments, misstate the record, and contradict their own prior assertions, all in a failed effort to avoid what the law and record compel—summary judgment for Defendants on Plaintiffs' disparate-impact claim.

## ARGUMENT

I. **Plaintiffs' Assertion That There Is A Factual Dispute Regarding The Pertinent Version Of The Policy At Issue Is Immaterial To Plaintiffs' Disparate-Impact Claim And Has No Factual Basis In Any Event.**

Ignoring their own allegations that premise their disparate-impact claim on a policy requiring proof of legal status, Plaintiffs try to divert the Court's attention to an irrelevant issue: what documents a particular version of Defendants' Policy required at a certain point in time to demonstrate legal status. Whether the Policy in effect and being applied when this suit was filed or at some other time required only a passport, visa and I-94 form, or permitted any document proving legal presence, is immaterial because that is not the basis for Plaintiffs' disparate-impact claim and Plaintiffs concede that the female Plaintiffs cannot provide *any documentation of legal status*. Simply put, Plaintiffs' disparate-impact claim is not based on a Policy that requires some particular set of documents proving legal presence. Rather, as alleged in their Complaint, Plaintiffs' claim is that, in the area where the Park is located, "a policy that adversely affects the undocumented immigrant population will likewise have a significant disproportionate impact on the Latino population." Compl. ¶ 61.[1] Both versions of the Policy would—under Plaintiffs'

---

[1] As they told the Fourth Circuit, Plaintiffs "brought this lawsuit based on the implementation…of a policy…*requiring proof of legal status as a prerequisite for residing in*

1

theory—adversely affect the undocumented population in the relevant area because they both require proof of legal status, which by definition an undocumented immigrant lacks. Indeed, there is no allegation in the Complaint, or any record evidence, that the female Plaintiffs tendered any document demonstrating proof of legal residence.[2] Regardless of which version of the Policy requiring some proof of legal status applied, there is no material factual dispute that alters the outcome the law and record compel, as set forth below—summary judgment for the Defendants.[3]

Even if the Court were to indulge Plaintiffs' attempt to create some factual dispute out of the documents required by Defendants' Policy, Plaintiffs cannot identify any evidence that the relevant Policy applied to the Plaintiffs and in effect at the time of the lawsuit limited proof of legal residency to only a passport, visa and I-94 form. Indeed, Plaintiffs concede that, as evidenced by the Future Resident Information Guides in effect at the time of this lawsuit—which made clear that Defendants would accept any document proving legal status[4]—the applicable Policy at the time allowed for any document proving legal status. Dkt. 417 at 6.[5] The Policy with which the

---

*[the] Park*." Appellants' Br. at 1 (ECF pg. 11), Case No. 17-1723 (4th Cir. Oct. 16, 2017) (Dkt. 26) (emphasis added); *id*. at 7 (ECF pg. 17) ("Policy demands proof of legal status…").

[2] Plaintiffs do not dispute that the Policy in effect and being applied when Plaintiffs filed this lawsuit on May 23, 2016 permitted adult leaseholders and occupants to provide any document proving their legal presence.

[3] Plaintiffs contend that they should be permitted to introduce evidence of Defendants' policies at various times to argue that Defendants' enforcement of the Policy was unrelated to immigration status, and thus, presumably imply intentional discrimination. Dkt. 417 at 8. This is misdirection and improper. The only claim remaining is one of disparate impact, not disparate treatment; introduction of alleged policies at various times has no relevance to whether avoiding potential criminal liability under *Aguilar* and the IRCA is a valid interest at Step Two or whether, at Step Three, Plaintiffs can show a policy that serves that interest with a less discriminatory effect.

[4] *See* **Exhibit 1** (April 22, 2016 Guide); **Exhibit 2** (May 16, 2016 Guide).

[5] Relying on an email, Plaintiffs assert that no matter what the Guides stated, the applicable Policy was different. Dkt. 417 n.2. But the email, which provides examples of documents that can be provided, does not state that the exemplar documents are the *only* ones accepted.

2

female Plaintiffs indisputably could not comply—and the Policy that Plaintiffs challenged when they filed suit—was a Policy that accepted any document proving legal status. That is the Policy that prevents the female Plaintiffs from living at the Park, and it is the one relevant to Plaintiffs' claims for damages and injunctive relief.[6]

Plaintiffs' discussion of witness testimony is more distortion. None of Defendants' witnesses testified that the Policy was limited to only the documents identified in prior versions of the Guides. Dkt. 416 at 2-3 (ECF pg. 6-7).[7] Plaintiffs ignore this testimony. Nor do they dispute that the 2013 and 2015 Resident Selection & Occupancy Standards confirm Defendants' position.[8]

---

[6]  Plaintiffs insist that *that* Policy is not relevant, and that the relevant versions of the Policy are the ones that "functionally evicted" them from the Park and are in effect today. Dkt. 417 at 4-5. This is misdirection. Plaintiffs were never evicted. The Reyes family left the Park in May 2016, (Dkt. 138-8 ¶ 25), and the three other families remained at the Park *after* the Plaintiffs filed suit. *See* Dkt. 4 (TRO motion). The Policy in effect today still requires proof of legal status.

[7]  When asked *directly* about the documents required, Park manager Josephine Giambanco stated that "you had to show some kind of proof for legal presence in the United States." **Exhibit 3** at 63:18-64:8; *accord* 60:18-61:1; *see id.* at 98:9-20; 99:23-100:7; *id.* at 204:5-15. Defendants' quality control manager, Carolina Easton, responsible for audits and policies and procedures, **Exhibit 4** at 11:1-3, *repeatedly* testified that any document proving legal presence would be accepted—and she *specifically* refuted the notion that *only* an I-94, visa, and a passport would be accepted. *Id.* at 30:18-32:7; 47:9-14; 57:18-21; 67:8-68:5; 96:5-12; 125:3-11.

For his part, Mark Jones testified that the Policy required "documents to prove [] legal presence." **Exhibit 5** at 137:17-138:3. On pages 87-88, Mr. Jones stated that, as to the Policy *in 2013*, prior to enforcement against Plaintiffs and this lawsuit, an active or valid visa "at the time" was required, but added that everyone must be "documented or legally in the country" and that "a valid visa or valid immigration documentation" was required. *Id.* at 87:12-88:19. He also explained that when he referred to "visa documents," he was referring to documents issued by the U.S. government that substantiate legal presence in the United States. *Id.* at 224:16-20.

[8]  Plaintiffs assert that the 2011 CoreLogic SafeRent Training Manual corroborates Plaintiffs' understanding of Defendants' Policy, but this manual is from 2011 and applies to a screening service, CoreLogic, that Defendants stopped using in 2013 when they switched over to another company's screening service, Yardi. **Exhibit 5** at 92:6-7, 17-20; 144:3-18; **Exhibit 4** at 17:21-18:2. Plaintiffs also claim that lease violation notices referred to a different Policy. Dkt. 417 at 7. But these notices did not refer to any version of the Policy; they addressed that the male Plaintiffs had unauthorized occupants.

3

## II. Plaintiffs Agree That Avoiding Criminal Prosecution Is A Valid Interest.

In addressing the Court's second question, Plaintiffs do not dispute that a policy aimed at avoiding criminal prosecution serves a valid interest. Nor do they respond to Defendants' showing how *Inclusive Communities* frames and defines the "leeway" courts must extend when analyzing a defendant's Step-Two "valid interest" showing. They further ignore their own allegations—that undocumented persons cannot obtain traditional home mortgages and therefore tend to seek mobile-home housing, and that a large percentage of undocumented persons in the relevant geographic area are Latinos. And they do not rebut what the record confirms: that Defendants have sufficient information regarding undocumented occupants at the Park to face a very real risk of prosecution under the anti-harboring statute if they fail to take steps to ensure that they are not allowing undocumented immigrants to live at their Park.

Rather than address the Court's questions regarding valid interest, Plaintiffs obfuscate. They rewrite the Court's question, claiming "the Court seeks briefing on whether IRCA provides Defendants with a 'business necessity' for the purposes of Step Two[.]" Dkt. 417 at 1. But the Court never mentioned "business necessity," and, as Defendants previously have shown, "business necessity" is not the standard at Step Two. *See* Dkt. 379 at 14-15; Dkt. 265 at 11-12; Dkt. 392 at 9; Dkt. 393 at 6. Plaintiffs also maintain that the Policy is not "necessary" to avoid criminal prosecution under the anti-harboring statute because "no defense witness" claims to have "personally" known of the interest in avoiding such liability "prior to" the filing of this lawsuit. Dkt. 417 at 9. Not only is this not true (Dkt. 379 at 17-18), but, as discussed in the following section, such knowledge has no bearing on the validity of an interest at Step Two.

Defendants need not prove that, absent the Policy, their conduct in fact violated the anti-harboring statute in order to show that the Policy is necessary to Defendants' valid interest in avoiding criminal prosecution under the statute. But the Policy in fact *is* necessary to avoid

4

criminal prosecution under the anti-harboring statute as construed by the Fourth Circuit in *Aguilar* given the record in this very case. Renting mobile homes in Fairfax County without checking prospective occupants' immigration status would in fact expose Defendants to anti-harboring prosecution, especially when Defendants' application of the Policy here revealed the presence of a number of undocumented immigrants at the Park, such as the female Plaintiffs. *See* Dkt. 416 at 6-8. On this record, no landlord could decline to confirm one's legal status without a heightened risk of criminal prosecution. Plaintiffs try to distinguish *Aguilar*, but they cannot alter what the Fourth Circuit clearly held—that "a defendant acts with reckless disregard where she is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien" and takes "no steps" to ascertain the status of her tenants. *Id*. at 1002-03.[9]

Plaintiffs resort to the claim—made for the first time—that the Fourth Circuit's 2018 ruling in this case precludes the Court from considering the impact of the anti-harboring statute *for any purpose*. As Plaintiffs would have it, because (i) Defendants raised the anti-harboring statute as an alternate ground to affirm this Court's dismissal of Plaintiffs' disparate-impact claim due to their failure to show robust causality at Step One, and (ii) the Fourth Circuit vacated that dismissal ruling, that somehow necessarily means (iii) the Circuit rejected all applications of the statute in this case going forward. That is plainly incorrect and would deprive Defendants of the right to present a critical defense in this case. **First**, Plaintiffs concede that the Fourth Circuit did ***not*** expressly address Defendants' argument invoking the anti-harboring statute and *Aguilar*. Nor did the Circuit have any compulsion to address that alternative argument for affirmance—indeed,

---

[9] With *Aguilar* blocking their way, Plaintiffs turn to out-of-circuit precedent and the Supreme Court's denials of certiorari in this case and anti-harboring statute cases (Dkt. 417 at 9-10), but that is unavailing. No landlord in the Fourth Circuit's geographic footprint could safely rely on out-of-circuit precedent in the face of *Aguilar*. As for the Supreme Court's denials of certiorari, they have no legal significance. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 (2020).

where, as here, the argument had not been addressed by the district court (Dkt. 190 at 8 n.8 (stating the Court had already dismissed Plaintiffs' FHA claim), it is far more likely the Fourth Circuit simply exercised its discretion to consciously not address it at all. *See Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 408 (4th Cir. 2020) ("declin[ing] to address" alternative arguments for affirmance "in the first instance" where the "district court did not rule on these alternative arguments in its decision" on appeal). And even if the Circuit had implicitly rejected Defendants' **Step-One** argument based on the anti-harboring statute, that would have no bearing on the **Step-Two** issues Plaintiffs previously acknowledged remain open in this case.

*Second*, the Fourth Circuit did not rule on the parties' evidence or summary judgment because those issues were not before it. *See* Dkt. 379 at 3-9; Dkt. 289 at 11-12; Dkt. 277 at 11-12. Nor, as noted, did the Fourth Circuit address the anti-harboring statute, *Aguilar*, or Steps Two and Three of the *Inclusive Communities* standard. *See* Dkt. 379 at 7-8; Dkt. 277 at 11-13; Dkt. 289 at 11-13. Plaintiffs' attempt to expand the Fourth Circuit's ruling far beyond its limited parameters to prevent this Court from properly adjudicating this case should be rejected out of hand.

*Third*, Plaintiffs' argument contradicts what they have previously told the Court. At a 2020 hearing, Plaintiffs' counsel stated unequivocally that "plaintiffs believe that defendants appropriately argued [the anti-harboring statute] in the context of step two" and that the statute "is appropriately relegated to the step two analysis." **Exhibit 6** at 27:14-19 (Sept. 23, 2020 Hr'g Tr.). Plaintiffs reiterated as much in later submissions to this Court. *See* Dkt. 274 at 5 (asserting "[t]here is a dispute of fact as to whether it is a business necessity to use [the Policy] to avoid liability under the IRCA's anti-harboring provision"); Dkt. 288 at 3, 7.

Plaintiffs claim (at pg. 9) that Defendants have not shown that other non-federally subsidized landlords employ a similar policy, but that has nothing to do with whether *Defendants'*

6

*Policy* serves a valid interest in avoiding anti-harboring statute liability.[10] Plaintiffs also point (at pg. 11) to a Virginia statute that purportedly allows certain landlords to require a social security number or ITIN from tenants, and criticize Defendants for not explaining how this requirement—admittedly *not* applicable to mobile-home owners—would violate the anti-harboring statute. If anything, though, this only *reinforces* the reasonableness of the Policy and the validity of the interests it serves because Virginia law explicitly authorizes precisely what Defendants' Policy requires—an SSN.

### III. Plaintiffs' Improper Shift To A New Motive-At-Time-Of-*Application* Argument Is Just As Infirm As Their Abandoned Motive-At-Time-Of-*Adoption* Contention.

In their opening submission, Defendants demonstrated that the FHA's text, the text of HUD's disparate-impact regulation, *Inclusive Communities*, and other Supreme Court disparate-impact precedents make clear that a defendant's subjective motive for adopting a housing policy or practice—or its motive at any other point in time—has no bearing on whether it can meet its Step-Two burden. Dkt. 416 at 8-12. Plaintiffs' response to this is still more misdirection. It does not address the relevant reasoning in *Inclusive Communities* or the import of the FHA's or the HUD regulation's text. Nor does it address the Supreme Court's disparate-impact precedent on which *Inclusive Communities* relies. And Plaintiffs also still do not cite a single appellate precedent—before or since *Inclusive Communities*—holding that a defendant's actual reasons for adopting a policy bear on the Step-Two burden in disparate-impact cases.

At the same time, Plaintiffs abandon their prior contention that "whether Defendants' purported interests *motivated the adoption* of the Policy is … central to" Plaintiffs' disparate-

---

[10] This claim is also not true. Mr. Caruso, one of Defendants' experts, testified that for the properties he has managed since the 1990s, each had a policy "very similar" to Defendants', and other non-subsidized landlords have similar policies. Caruso Dep. Tr. 22:15-23:1; 23:15-22 (**Exhibit 7**). And, he has managed a substantial amount of properties. **Exhibit 8** (Caruso C.V.)

impact claim. *See* Dkt. 364 at 2 (emphasis added). They now claim they "do not argue that a justification must be fixed in time when a policy or practice is first developed or implemented[,]" Dkt. 417 at 13, and shift to a new argument—that a defendant must subjectively be motivated by a particular valid interest at the time it ***applies*** a policy to the particular plaintiff, an issue the Court did not ask the parties to address. This new snapshot-frozen-in-time theory is, in any case, just as flawed as Plaintiffs' abandoned time-of-*adoption* approach, for the reasons set forth in Defendants' opening brief. Had Congress intended to require a showing not only that an interest is valid, but, as Plaintiffs assert, that defendants also were "able to state that they, personally" were "aware" of it prior to the filing of the lawsuit against them (Dkt. 417 at 9)—a knowledge requirement not set forth in any Supreme Court or appellate disparate-impact precedent—surely Congress would have said so explicitly, for it "does not 'hide elephants in mouseholes.'" *Cyan, Inc. v. Beaver Cty. Emples. Ret. Fund*, 138 S. Ct. 1061, 1071 (2018) (citation omitted).

What is clear—and Plaintiffs cannot show otherwise—is that Congress, HUD, and the Supreme Court have never said that the same interest can be "valid" where it actually motivated the defendant at the particular time its policy was applied to the particular plaintiff, but *not* valid— *even for the same defendant*—if the defendant *cannot* prove that it was so motivated. Such a construction of the FHA would produce arbitrary outcomes based on the vagaries of whether a defendant can prove specific knowledge at a specific time. *See United States v. Wilson*, 503 U.S. 329, 334 (1992) (rejecting statutory interpretation that produces "arbitrary … result[s]"). And it would undermine important housing priorities and the broad discretion *Inclusive Communities* recognizes housing providers must be given, contrary to the purpose of the FHA.

Plaintiffs then turn to HUD's 2013 explanation that a "legally sufficient justification" at Step Two under the agency's pre-*Inclusive Communities* regulation must be "genuine and not

8

false" and "not fabricated or pretextual[.]" But avoiding criminal prosecution—whether or not a defendant has that specifically in mind when it adopts and applies its policy—is not a false or fabricated interest for the policy. And in any event, Plaintiffs again ignore what HUD also says: that whether Step Two is met "is not subjective" but, rather, "judged on the basis of objective facts[.]" 78 Fed. Reg. at 11471. Plaintiffs also cite a few out-of-circuit cases, but both are inapposite. Dkt. 417 at 12.[11] In *Mt. Holly*, decided two years **before** *Inclusive Communities*, the Third Circuit agreed that the defendants there had a legitimate interest for their policy, and reversed on grounds that the plaintiffs had met their **Step-One** burden to show a *prima facie* case. Moreover, in its generic reference to a defendant's motivations, the court did not discuss the "personal knowledge" that Plaintiffs claim must be showed—it simply acknowledged that the FHA statute is concerned with racial bias in decisionmaking.[12] And the court plainly did not hold that a defendant must actually be aware of its asserted valid interest for its policy in order to meet its burden at Step Two.

### IV. Plaintiffs Have Not Met Their Step-Three Burden As A Matter Of Law.

In addressing the Court's fourth set of questions, Defendants showed that, because Plaintiffs have *never* identified a less discriminatory policy that would achieve Defendants' interest in avoiding criminal prosecution under the anti-harboring statute, their disparate-impact claim fails as a matter of law. Much of Plaintiffs' response rests on their "valid interest" and "subjective motive" arguments (Dkt. 417 at 14), none of which establish that Plaintiffs can meet

---

[11] *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016).

[12] *Ave. 6E Investors* is inapposite for similar reasons. There, the Ninth Circuit reversed the dismissal of a disparate-impact claim because the district court erred in finding no disparate impact at Step One. The Ninth Circuit did not address Step Two and merely quoted *Mt. Holly*'s generic reference to a defendant's motivations.

9

their *Step-Three* burden, and all of which fail for the reasons noted. Plaintiffs otherwise rely solely on an "acquiescence" theory to try to meet that burden, claiming that since Defendants, at one time, allowed the female Plaintiffs to reside in the Park, that somehow shows there is a less discriminatory alternative that still would achieve Defendants' valid interest in avoiding criminal liability under the anti-harboring statute. Dkt. 417 at 14-15. One does not follow the other, however, and Plaintiffs do not cite any legal authority to support this "acquiescence" theory for meeting their Step-Three burden of proof. And in fact, it plainly fails to meet that burden, which requires a showing that the identified valid interest can "be served by another practice that has a less discriminatory effect." *Inclusive Communities*, 576 U.S. at 527. Simply put, Plaintiffs make no such showing here.

As for Plaintiffs' responses to the Court's standing questions, Defendants agree with Plaintiffs that if avoiding criminal prosecution is a valid interest and only policies that exclude illegal aliens are viable alternatives to Defendants' Policy, "there would be no violation of the FHA, and no legally cognizable injury." Dkt. 417 at 14. But Plaintiffs fail to offer a legal argument for why the male Plaintiffs' standing is not derivative of the female Plaintiffs' standing—plainly, it is. Plaintiffs instead contend that, although the male Plaintiffs could (and did in fact) meet the Policy and could live at the Park, they nonetheless "were unlawfully evicted along with their wives and children[.]" *Id.* But that is not true—the male Plaintiffs were never evicted (in fact, no Plaintiff was) because they could (and did) satisfy the Policy. Nor does the Plaintiffs' argument show that the male Plaintiffs' standing is independent of that of their wives, who indisputably could not meet the Policy.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court grant summary judgment in their favor and enter judgment dismissing Plaintiffs' remaining disparate-impact claim.

Dated:  September 17, 2021	Respectfully submitted,

                                      WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP, WAPLES PROJECT LIMITED PARTNERSHIP AND
A. J. DWOSKIN & ASSOCIATES, INC.

/s/
Michael S. Dingman (VSB No. 30031)
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5462
(703) 712-5262
mdingman@mcguirewoods.com

Grayson P. Hanes (VSB No. 06614)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
jdebettencourt@reedsmith.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of September, 2021, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

/s/
Michael S. Dingman (VSB No. 30031)
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5462
(703) 712-5262
mdingman@mcguirewoods.com

Grayson P. Hanes (VSB No. 06614)
Justin deBettencourt (VSB No. 83806)
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, Virginia 22102
(703) 641-4200 (Telephone)
(703) 641-4340 (Facsimile)
ghanes@reedsmith.com
jdebettencourt@reedsmith.com

*Counsel for Defendants*