UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

ROSY GIRON DE REYES,                    :
                                        :
            et al.,                     :
                                        :
            Plaintiffs,                 :   Civil Action
                                        :   No. 1:16-cv-00563-LO-TCB
      v.                                :
                                        :
WAPLES MOBILE HOME PARK,                :   October 19, 2021
LIMITED,                                :   10:00 a.m.
                                        :
            et al.,                     :
                                        :
                                        :
            Defendants.                 :
                                        :
............................ :


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE LIAM O'GRADY,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

  For the Plaintiffs:          **Simon Yehuda Sandoval-Moshenberg,**
                               **Esq.**
                               Simon Sandoval-Moshenberg, Esq.
                               Legal Aid Justice Center
                               6066 Leesburg Pike
                               Suite 520
                               Fall Church, VA 22041
                               703-778-3450
                               Fax: 703-778-3454
                               Email: Simon@justice4all.org

                               **Granville Clayton Warner, Esq.**
                               Legal Aid Justice Center
                               6066 Leesburg Pike
                               Suite 520
                               Falls Church, VA 22041
                               703-778-3450
                               Fax: 703-778-3454
                               Email: Cwarner@justice4all.org

```
   APPEARANCES:   (Cont.)


   For the Defendants:          Michael Sterling Dingman, Esq.
                                McGuire Woods
                                1750 Tysons Boulevard
                                Suite 1800
                                Tysons, VA 22102-4215
                                703-712-5462
                                Fax: 703-712-5262
                                Mdingman@mcguirewoods.com

                                Grayson Pollard Hanes, Esq.
                                Reed Smith LLP
                                7900 Tysons One Place
                                Suite 500
                                McLean, VA 22102
                                (703) 641-4200
                                Email: Ghanes@reedsmith.com



   Court Reporter:              Scott L. Wallace, RDR, RMR, CRR
                                Official Court Reporter
                                United States District Court
                                401 Courthouse Square
                                Alexandria, VA 2231-5798
                                Office: 703.549.4626
                                Cell: 202.277.3739
                                Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1        <u>**MORNING SESSION, OCTOBER 19, 2021**</u>

2    (10:01 a.m.)

3        THE COURTROOM CLERK:  The Court calls *Rosy Giron de Reyes,*

4    *et al. versus Waples Mobile Home Park, Limited Partnership*, et

5    al., Case No. 1:16-cv-563.

6        May I have appearances, please, first for the plaintiff?

7        MR. WARNER:  Clay Warner, Your Honor, for plaintiff.

8        THE COURT:  All right.  Good morning.  And if you're more

9    comfortable taking your masks off, I understand everyone is

10    vaccinated, as are all of my colleagues here in the well of the

11    court.  Whatever you're comfortable with.

12        MR. DINGMAN:  Thank you, sir.

13        Good morning, Your Honor.  Michael Dingman and Grayson

14    Hanes for the defendant.

15        THE COURT:  All right.  Good morning to you both.

16        All right.  Thank you for coming back.  After we sent out

17    the request for further briefing, I found that the parties were

18    still in certainly disagreement about where the facts of the case

19    were, and where the Fourth Circuit was on the decisions, and --

20    and what Judge Ellis had done, and I wanted to come back and see

21    if I could continue our dialogue.

22        As you're both aware, there's a -- not a lot of case law

23    on disparate impact cases, and, of course, we have the Supreme

24    Court case which guides us, and there's -- we also have the other

25    regulations and -- what I have divined from the Fourth Circuit

1    opinion is that they looked as they should have, as -- at the

2    disparate impact decision under the 12(b)(6) standard.

3         They clearly talked about the statistical analysis that

4    had been done and identified in the complaint.  They went on in

5    the decision to state that they had also looked at the additional

6    information that plaintiffs had brought to bear on that

7    statistical information then as to whether it demonstrated the

8    evidence under Prong 1, and we're impressed with it.  But they

9    didn't make a finding, that, as a matter of law, the plaintiffs

10   have met Prong 1, and they clearly found that that was a matter

11   that the Court would have to decide and -- when the case came

12   back down before it.

13        And they also didn't decide Prongs 2 or 3.  There was

14   briefing on it, I understand that, but, you know, they clearly

15   said, you know, looking at page 30, because the District Court

16   concluded that plaintiffs failed to make a prima facie case of

17   the FHA violation under the disparate impact theory at the motion

18   to dismiss stage, it never considered the second step.

19   Similarly, the District Court never considered the third and

20   final step.

21        In such circumstances, it's prudent for this Court to

22   remand to the District Court for consideration of these issues in

23   the first instance.  So then it comes back, and Judge Ellis, in a

24   fairly short opinion, denies summary judgment on the disparate

25   impact and identifies what he thinks generally to be issues that

1    are intertwined with material facts of issue in dispute and sets
2    it for a final pretrial conference.
3         We looked a little more closely at Prong Number 2 and
4    especially whether there was intent -- well, when we looked at
5    whether, in fact, there was a policy, and also whether that
6    policy was enforced, and, third, what the intent of the policy
7    itself was, because -- and this may be a matter which the jury
8    has to determine, but there was clear evidence that at certain
9    times, plaintiffs didn't intend to evict any of the tenants;
10   instead were using this as a means to get added monthly rents,
11   and so I don't know how that factors into our case, but I'm
12   interested in hearing from you-all on that.
13        And then there's a great disagreement as to whether
14   knowledge of the anti-harboring statute is necessary under Step
15   2.  And, in particular, plaintiff focuses in on how the issue of
16   how can you show a business necessity under Prong 2 if somebody
17   does not know about the anti-harboring statute and is not putting
18   forth the restriction, requirements of identification in defense
19   of it.
20        And certainly, also, the parties looked at the
21   CFR 100-500, which focuses that after the pleading stage, the
22   defendant may establish that plaintiff has failed to meet a
23   burden -- its burden of proof to establish a discriminatory
24   effects claim by demonstrating any of the following:  The policy
25   or practice is intended to predict an occurrence of an outcome;

1    the prediction represents a valid interest, et cetera, and then

2    goes on to say "the defendant's policy or practice is reasonably

3    necessary to comply with the third-party requirements, such as a

4    federal, state or local law." So I would like the parties to

5    address that.

6         And then finally whether -- once more, whether there's

7    really any real issue of fact as to Prong 3, if we get to

8    Prong 3.

9         So who wants to go first?  I guess it's Waples.

10        Do you want to go first?

11        MR. DINGMAN:  Yes, sir.  Good morning again, Your Honor.

12   So let me just walk through the questions that -- that I wrote

13   down that the Court has, and obviously, if I miss anything,

14   please let me know.

15        THE COURT:  Sure.

16        MR. DINGMAN:  On the first issue of this -- this added

17   monthly rent and what went on back in 2016, there was no

18   additional rent that was collected.  The plaintiffs were never

19   evicted from the park.  There were letters that were sent, and

20   that's what the Court, I believe, has seen that did suggest that

21   an additional rent would be required, but that was never enforced

22   or collected, and the parties effectively agreed to allow the

23   plaintiffs to leave the park voluntarily.

24        As we pointed out in our brief in response to the Court's

25   questions, there was a TRO filed.  That was all resolved because

1    there was an agreement not to evict and to allow these folks to

2    leave.  Many of them waited until the end of the school year and

3    then left.  So there was no additional monthly rent that was

4    collected.  There was no eviction of these plaintiffs.  I think

5    there's no dispute about that.

6         With respect to whether motive is a consideration at Step

7    2, we would suggest, Your Honor, that the answer is clearly no.

8    And that is based upon not just the Supreme Court's decision in

9    *Inclusive Communities* which controls this case, but the cases

10   that the Supreme Court in *Inclusive Communities* cited with

11   respect to what is the analysis for a disparate impact claim

12   under the Fair Housing Act.  And the Court itself in its initial

13   order asking for the additional briefing plugged in *Inclusive*

14   *Communities* in the *Griggs* case, for example, both of which

15   clearly state that motivation is not a consideration.

16        The *Griggs* case, for example, cited by the *Inclusive*

17   *Communities* court -- I just want to be sure to get the quote

18   correct.  The Court cited *Griggs*, and then it cited a more recent

19   case, *Smith v. City of Jackson*, and it says as follows:  "As the

20   Court observed" -- referring to the Fair Housing Title VII

21   claim -- "these provisions focus on the effects of the action on

22   the employee rather than the motivation for the action of the

23   employer."

24        And this was a review, obviously, of an employment

25   discrimination disparate impact claim.  We cited to the Court

1  these same cases and some additional cases.  In their response,

2  the plaintiffs did not address the Supreme Court's decisions at

3  all.  They make no effort to refute the holdings in those cases

4  that, with respect to disparate impact, it's the effect, not the

5  motivation.  That's what distinguishes disparate impact from

6  disparate treatment.  That is clear under Supreme Court

7  precedent.  Instead of addressing the Supreme Court cases, the

8  plaintiffs point the Court to a 2011 Third Circuit case, the

9  *Mount Holly* case, obviously decided before *Inclusive Communities*,

10  not binding on this Court, and, of course, subject to Supreme

11  Court precedent.

12      That case did not hold that at Step 2 motive is a required

13  issue to be considered by the Court in determining whether the

14  policy satisfies a valid interest.  In fact, it never got to the

15  Step 2 analysis.

16      And one would assume that the Third Circuit would not make

17  a decision that conflicts with binding Supreme Court precedent

18  that was in place in 2011 and was reinforced in *Inclusive

19  Communities*.  The plaintiffs have not pointed this Court to one

20  case where a court has held the policy serves a valid interest,

21  but because the defendant cannot demonstrate that that interest

22  was in mind when the policy was enacted, it's now an invalid

23  interest, and the policy has to be struck down.

24      That is completely contrary to what the Supreme Court held

25  in *Inclusive Communities*, and it makes absolutely no sense.

1   That's why there's no case law in support of that position.  And
2   just to play that through, Your Honor, and you mentioned in your
3   opening remarks a reference in the CFR to reasonably necessary to
4   comply with the law.

5       Under the plaintiff's theory, the Court could find that
6   there is a policy that is necessary to comply with the law and
7   therefore satisfies valid interests.  But the plaintiffs would
8   say, Wait a minute, nobody thought about that on the defendant's
9   side when the policy was enacted.  So now the Court has to strike
10  down this valid policy and put the defendants in a position of
11  conflicting and not complying with federal or state law.

12      That is the essence of their argument, that -- the
13  defendants can demonstrate that the policies serve a valid
14  interest, but if it cannot demonstrate that that was in their
15  mind when the policy was enacted -- or now they've sort of
16  shifted their theory to when it was enforced -- then the Court
17  must find a violation of the Fair Housing Act and must strike
18  down this policy putting the defendants in conflict with law.
19  That is completely contrary to *Inclusive Communities*.

20      THE COURT:  Well, the intent of the law is to prevent
21  discrimination in housing, and, of course, the FHA is included
22  in -- under the statute, so the broader premise is, we're going
23  to prevent discrimination in housing.  Disparate impact is
24  certainly a valid inquiry, legal inquiry, so you look at it from
25  an umbrella point of view.

1         If the defendants, Waples, didn't know about the

2    anti-harboring statute, then they certainly were not trying to

3    prevent discrimination, and in fact their policy is

4    discriminatory, so we're not going to look at whether they

5    actually have a valid interest because they didn't know about it.

6    I guess that's the argument.

7         Is that how you see it?

8         MR. DINGMAN:  Well, I -- I think the argument is, as I

9    understand it, is the plaintiffs want the Court to question

10   whether it's a valid interest because the defendants did not

11   consider it, which, of course, factually we disagree with, but

12   assuming that for the moment that the defendants did not think

13   about at the time that the policy was enacted, and our view of

14   that, Your Honor, is there's nothing in *Inclusive Communities*

15   that suggest that motivation is a consideration in determining

16   whether the policy satisfies a valid interest.

17        If the Supreme Court intended that to be one of the

18   requirements, it would have expressly said so, and that is not a

19   requirement in any other disparate impact case decided by the

20   Supreme Court.  So the Supreme Court, in looking at disparate

21   impact cases, has never held nor does the statute require, that

22   the valid interest must have been considered when the policy was

23   enacted.  The question that *Inclusive Communities* put forth at

24   Step 2 is whether a valid interest is served by the policy.  Hard

25   stop.  That's the inquiry.

1    The Supreme Court didn't say "and the valid interest was

2    considered by the defendant."  If that's what the Court intended,

3    that's a very important additional requirement and a requirement,

4    I would suggest to the Court, that would require just about every

5    disparate impact case under the Fair Housing Act to proceed to

6    trial because there would be a state of mind inquiry which could

7    never be resolved or rarely resolved by a court short of a trial.

8    And one of the things that the Supreme Court emphasized in

9    *Inclusive Communities* was a swift resolution of these types of

10   claims.  So it's contrary to that concept and contrary to the

11   language of *Inclusive Communities* for the plaintiffs to suggest

12   that there is an additional requirement to satisfy Step 2, that

13   demonstrating a valid interest is not enough, and that is their

14   argument.

15   And that leads to another conflict with *Inclusive*

16   *Communities*.  *Inclusive Communities* clearly stated that there's

17   no violation of the Fair Housing Act if the policy is necessary

18   to comply with federal law.  The CFR says the same thing.  The

19   suggestion of the plaintiffs is, even if the Court were to find

20   that there is significant risk, and we think it's uncontroverted

21   that there is, a prosecution under IRCA, the Court can still

22   strike down the policy, or if another case came before this Court

23   and the Court held that this policy is necessary to comply with

24   federal or state law, the Court could strike that policy down and

25   put the defendant in conflict with law.  That's exactly the

1    opposite of the holding in *Inclusive Communities*.  That's the

2    double bind of liability that the *Inclusive Communities* court

3    said, "We're not going to place defendants in that."

4        So motivation, intent, what the parties -- what the

5    defendants thought at the time the policy was enacted or enforced

6    has nothing to do with the Step 2 inquiry described by *Inclusive*

7    *Communities*.  It's a very straightforward inquiry.  Does the

8    policy satisfy a valid interest?  That's it.  The attempt to

9    layer on additional requirements is contrary to *Inclusive*

10   *Communities* and it finds no support in any other case.

11       There's no case that the plaintiffs have pointed to where

12   a court has held, yes, the policy serves a valid interest, but

13   because the defendants didn't think about the interest, I'm

14   striking down the policy and I'm finding a violation of the Fair

15   Housing Act.  There is no case in any context dealing with

16   disparate impact that comes to that conclusion.  There's a

17   reason.  Because disparate impact, as the Supreme Court has held

18   many times, is not concerned with the motivation of the policy;

19   it's concerned with the effect of the policy.  Therefore,

20   motivation or whether the parties, the defendants in this

21   instance, considered this particular issue is not relevant to the

22   Step 2 inquiry at all.

23       With respect to Step 3, Your Honor, there has been no

24   alternative policy proposed by the plaintiffs to satisfy the

25   issue that drives the policy or at least a Step 2 review of

```
1   potential criminal prosecution under IRCA and in light of the

2   Aguilar case.  That is because that case held that if there is

3   sufficient knowledge that you may be renting to someone who is

4   not in the United States legally and you take no action, then you

5   can be prosecuted under that statute.  That's what happened to

6   Ms. Aguilar.

7        So it was two steps.  Is there enough for you to know?

8   And if you get to that point, then you have to do something about

9   it.  The Court found that she had enough knowledge, reckless

10  knowledge, and then she did nothing to determine whether, in

11  fact, her tenants were in the United States legally, and she was

12  convicted.

13       In this case, Your Honor, the predicate of the complaint,

14  the plaintiffs' very allegations are that in this particular area

15  of Fairfax County, there's a high concentration of Latinos, and

16  therefore a high concentration of illegal immigrants in the

17  United States in that area, in that park.

18       That's the basis for their claim.  And it's uncontroverted

19  that the female plaintiffs, in fact, are not in the United States

20  legally.  So there is no alternative policy other than one that

21  requires some proof of legal residency.  Otherwise, if you rise

22  to the level of knowledge, and we suggest that there's no doubt

23  that that knowledge exists here, that's, again, the

24  plaintiffs' -- their disparate impact theory rests on that

25  concept.
```

1          We now have actual knowledge that the female plaintiffs

2     were not in the United States legally.  How can the defendants

3     then say we are not going to take any steps to verify whether

4     applicants or residents at our park are in the United States

5     legally?  That's what Ms. Aguilar failed to do, and she was

6     convicted of a crime.

7          So when we get to Step 3, the plaintiffs have not

8     proffered any policy that would address that issue because there

9     is none.

10         THE COURT:  What about the ITINs?  Is there some plausible

11    argument that that would give Waples cover from criminal

12    prosecution?

13         MR. DINGMAN:  No.  And the reason is, Your Honor, the

14    ITINs, and this is very clear from the IRS, are not proof of

15    legal residency.  They are issued primarily for tax collection

16    purposes.  Then, in fact, the IRS has made it clear that ITINs

17    are not proof of legal residency in the United States.  All

18    that's required is that you send in an application with some

19    document.

20         And as an example in this case, one of the female

21    plaintiffs entered the United States using somebody else's

22    passport.  She could have taken that passport, filled out the

23    ITIN application, sent it in, and she would have been issued an

24    ITIN number in the name of somebody else.  So the ITINs are not

25    proof of legal residency in the United States, and so they are

1      not an alternative policy.  And again, that's well known.

2            So, if you look at the defendants in this context, what do

3      you know, what did you attempt to do, a prosecutor or U.S.

4      attorney could say, Well, it's evident that ITINs are not proof

5      of legal residency.  It's just a number issued by the IRS.

6            So the ITINs are not a solution to that issue either.  In

7      fact, Your Honor, I would submit that if all an applicant can

8      provide is an ITIN, that demonstrates a lack of legal residency

9      in the United States, because if they had a document that's

10     established that legal residency, they would provide it.  They

11     would not say, "Hey, let me give you my ITIN number," because the

12     ITIN number is really there to collect taxes from people who are

13     not legally in the United States.

14           So not only is the ITIN not a solution, in our view, it

15     heightens the possibility of a prosecution because you would know

16     as a landlord this is not proof, and if this is all that the

17     applicant can provide, it's pretty strong evidence that they have

18     no ability to demonstrate legal residency in the United States.

19           And so in their response to the Court's question on Step

20     3, the plaintiffs didn't even offer a policy.  They made an

21     argument that, well, all the prior arguments that we've made

22     demonstrate that there's a violation of the Fair Housing Act, and

23     then they argue that because, allegedly, for some period of time

24     the plaintiffs were allowed to stay in the park, that there was

25     some acquiescence.  That's not a policy.  At best, that's an

1    argument that goes back to Step 2.  So the plaintiffs themselves

2    have not offered any alternative policy at Step 3 to address the

3    issue of how do you avoid potential prosecution under IRCA based

4    on the Aguilar decision?

5        The only way is to do what the plaintiffs have done

6    here -- I'm sorry, the defendants, which is provide proof of

7    legal residency.  That way they can -- the defendants can say we

8    attempted to make sure that we determined as best we could

9    whether our tenants are here illegally or not.

10        THE COURT:  Thank you, Mr. Dingman.

11        MR. DINGMAN:  Thank you.

12        MR. WARNER:  Good morning.  I'm going to try my best to

13    answer your questions and respond to Mr. Dingman.

14        I think, from the outset, it has become apparent that with

15    respect to factual matters, there's more disputes than either of

16    us can enumerate over the next period, and I'm going to start

17    with the first point about eviction.

18        We strongly contest any implication that the plaintiffs

19    left voluntarily.  They were about to be evicted, and they were

20    forced out of the park.  There's -- to say there's no dispute

21    that they weren't evicted is a little bit of a play, because what

22    I think is implied is that they left voluntarily, when I think

23    the only truth to that statement is that no one went through the

24    formal eviction proceedings in court to have them thrown on the

25    street.

1          THE COURT:  Clearly, the word was out that they were going

2     to be -- there was written documentation demonstrating an

3     intent --

4          MR. WARNER:  Correct.  Thank you.

5          THE COURT:  -- to end their lease.

6          MR. WARNER:  Let me next address the question of motive at

7     Step 2.  But let me start with a backdrop.  I want to go back to

8     the interrogatory answers that the defendants gave us in 2016

9     when we asked:  What were the reasons for your policy?  This is

10    after the plaintiffs left the park involuntarily, after the

11    lawsuit was filed, into discovery, after actually Judge Ellis had

12    issued his decision on their motion to dismiss.

13         So we were already in discovery, the plaintiff's --

14    defendant's response was:  "The reasons for creating the policy

15    are to confirm the identity of the applicants and any adult

16    occupancy" -- "occupants to perform credit checks, minimize

17    identity fraud, and to eventually perform criminal background

18    checks, and minimize loss from eviction."

19         There's nothing there about IRCA or *Aguilar* or harboring,

20    and that wasn't an oversight.  That was their position until --

21         THE COURT:  Would you read that one more time, the answer?

22         MR. WARNER:  Yeah.  It's Docket 138, Exhibit 42 at Page 2,

23    "To confirm the identity of the applicants and any adult

24    occupants, to perform credit checks, minimize identity fraud, and

25    to eventually perform criminal background checks and minimize

1    loss from eviction."

2        Again, what we know from that is that our highly capable

3    colleagues here came up with this IRCA argument, harboring

4    argument well into the litigation.  When it was applied to our

5    plaintiffs, Aguilar, IRCA were no part of the policy at all, no

6    part of the reason for it.

7        Now, regulations from HUD, which Your Honor has looked at,

8    we think it makes it very clear that this post-hoc creativity is

9    not to be countenance with respect to Step 2.  You have to look

10   at the actual reason.  HUD tells us the regulations have to be,

11   quote, "supported by evidence and may not be hypothetical or

12   speculative."  That's in the reg itself.

13       In the federal Register notice, they go further and say,

14   "It's supposed to be genuine and not false, not fabricated or

15   pretextual."  A post-hoc rationalization created by lawyers is

16   clearly fabricated.  It's obviously pre-textual; it's obviously

17   hypothetical and false.  It's not the reason the policy was

18   adopted, so it can't be a valid justification at Step 2.

19       I note also that -- and we said this in our papers -- the

20   Supreme Court quoted from the HUD regulations and set up the

21   system that they set up in *Inclusive Communities* to be parallel

22   with those HUD regulations.

23       Now, the responses from defendants are mostly beside the

24   point.  They say that there's nothing in Step 2, in the statute

25   about Step 2.  It says it has to be -- the defendants can't be

1  fabricated or pretextual.  Of course, there's nothing in the

2  statute.  There's nothing really nothing in the statute that

3  describes disparate impact either.  We know that from *Inclusive*

4  *Communities*.  It's a judicially-made system.  The three-step

5  standard is created by courts; it's not in the statute.

6       And then we're also -- I also hear that *Inclusive*

7  *Communities* itself goes at great length to talk about the fact

8  that motivation is not part of the consideration.  And that's

9  true, but that's at Step 1.  At Step 1, disparate impact does not

10 look at motivation.  It looks at effects, but it's Step 2 and

11 Step 3 which are relevant here.  We know from the HUD regulations

12 that motivation is important.

13      Now, Mr. Digman mentioned the *Mount Holly* case out of the

14 Third Circuit dismissed it because it was prior to *Inclusive*

15 *Communities*.  Literally, that's true, too, but the *Mount Holly*

16 case is completely consistent with *Inclusive Communities*.  What

17 he didn't mention was a Ninth Circuit case, *Avenue 6E*.  That

18 quotes the relevant portions of *Mount Holly* after *Inclusive*

19 *Communities*.

20      THE COURT:  Well, I don't think *Mount Holly* is on point,

21 really.  You're talking about the --

22      MR. WARNER:  I'm sorry, Your Honor.

23      THE COURT:  You're talking about the blight in the old

24 neighborhood.  I don't think *Mount Holly* applies to our Step 2

25 case.  I just don't think it's on all fours with our case.  It

1    was, as, you know, talking about a blight in the neighborhood and

2    was there a legitimate interest in restoring those downtown

3    neighborhoods, and it really looked at the Step 3 in the burden

4    shifting, I think.  So if you -- the Ninth Circuit case, I

5    haven't focused on it, if you believe that that somehow brings

6    *Mount Holly* into the discussion.

7         What's the Ninth Circuit case?

8         MR. WARNER:  It's *Avenue 6E*, Your Honor.

9         THE COURT:  Okay.

10        MR. WARNER:  Let me respectfully disagree on the point

11   with respect to *Mount Holly*.

12        When it was looking at a legitimate interest, it was doing

13   that at the Step 2 and Step 3 process, and that's exactly what

14   we're talking about:  Was there, in fact, a legitimate interest

15   in existence at the time the policy was enacted and implied?

16        I should move now to the discussion of IRCA and *Aguilar*

17   and whether or not that actually provides a defense at Step 2 or

18   Step 1 or Step 3.  But before I do that, I sort of want to make

19   two points at the outset.  One is that the defendant's briefing

20   with respect to Step 2 uses the term "valid interest," and I'm

21   sure, as the Court is aware, valid interest is the term used by

22   *Inclusive Communities*.

23        But in the sentence after "valid interest," the Supreme

24   Court defines that.  It defines it as follows:  "This step of

25   analysis is analogous to the business necessity standard under

1    Title VII."  And later in the same paragraph, it defines it

2    further, quote, "If they can prove that a step is necessary to

3    achieve a valid interest."

4         Now, defendants tend to ignore the existence of those

5    modifiers under the words necessary and necessity, but they're

6    there, and it's important to keep them in mind.

7         THE COURT:  Well, I mean, if you look at the business --

8    if you look at it as a business necessity, which I think is

9    appropriate, I think correct, avoiding criminal prosecution, is

10   that not a pretty obvious business necessity?

11        MR. WARNER:  Well, let me put it the way the defendants

12   did, because actually this statement I agree with.  If they could

13   show, quote, "they had no discretion to ignore the potential

14   criminal implication of renting to undocumented immigrants," then

15   yes.  That's a business necessity.

16        But let me start by saying something about that, which is

17   we made a point in our briefing.  That specific issue was

18   presented to the Fourth Circuit on appeal.  They presented it in

19   the context of Step 1 because of an invitation to do so in

20   *Inclusive Communities*.

21        THE COURT:  Right.

22        MR. WARNER:  But the matter was not taken up, and, in

23   fact, it was effectively rejected implicitly by the Fourth

24   Circuit.  And, as Judge Ellis went on at some length noting,

25   "this Court is bound by the implicit as well as explicit

1  rulings."

2      THE COURT:  As I started my -- our morning discussion, I

3  don't think the Fourth Circuit precluded analysis under Step 2,

4  and I don't think that they looked carefully at anything other

5  than the fact that Judge Ellis had wrongly decided the disparate

6  treatment, and that he also had really not looked at disparate

7  impact under the 12(b)(6) standard, and -- and given plaintiff's,

8  the well-pleaded complaint analysis.

9      And so that kind of went out with both guns, and -- but,

10 as I read in their decision, they said we're going to allow the

11 Court to go back, as we should, and look at the allegations in

12 the complaint under the -- under 12(b)(6), and he has not decided

13 either Steps 2 or 3, and so let's -- we'll look at it again if we

14 need to.

15     So I don't think there was a preclusive finding.  I know

16 that there was briefing on it and that the Court was invited to

17 do lots of different things, but I think what they did do was

18 limited to what they said in their decision.

19     MR. WARNER:  I appreciate that.  But just briefly, Your

20 Honor.

21     THE COURT:  Yeah.

22     MR. WARNER:  If that argument had any merit, the Fourth

23 Circuit would have had to have ruled for the defendants.

24     THE COURT:  On a 12(b)(6) standard?

25     MR. WARNER:  At Step 1.

23

1        THE COURT:  Did they have enough information at Step 1?

2        MR. WARNER:  At Step 1.  The argument comes from a line in

3   *Inclusive Communities*.  And the line is this:  "If the

4   plaintiffs cannot show a causal connection between the

5   defendant's policy and a disparate impact; for instance, because

6   federal law substantially limits the defendant's discretion, that

7   should result in dismissal of this case."  That's at page 543 of

8   the decision.

9        That was a Step 1 analysis.  That's what the defendants

10   invited the Fourth Circuit to rule on.  So if it were true that

11   the existence of IRCA substantially limits defendant's

12   discretion, they had to win at Step 1.

13        THE COURT:  But the Fourth Circuit didn't look at that,

14   they looked at the causal connection under -- they were totally

15   focused on the statistical analysis in doing so and not any

16   underlying law, at least my reading of it.

17        MR. WARNER:  Understood.  I just wanted to make sure that

18   you were aware --

19        THE COURT:  Okay.

20        MR. WARNER:  -- of the way that worked.

21        Now, but looking specifically at the defendant's argument,

22   they argue that they had no discretion, that the law gave them no

23   discretion, and I'm quoting from page 7 of their brief there.

24        So, in other words, what they're saying is they have to

25   show, based on undisputed facts, that IRCA requires them to check

1    the immigration status of all adult residents, and they have not

2    made that showing, not even close.

3        We asked and they did not identify a single private lessor

4    who had that form of policy.  And they've been completely unable

5    to explain a Virginia state law that specifically says that

6    lessors in an apartment context are allowed to accept ITINs, as

7    well as social security numbers, for lease underwriting.

8        Now, Mr. Dingman just said that the only reasons someone

9    would have an ITIN and not a social security number is if they're

10   not lawfully present in the United States, but Virginia law

11   expressly says that lessors can accept ITINs if a social security

12   number is not available.

13       The reason that they can't make those showings is they're

14   just badly misreading *Aguilar*.  *Aguilar* does not hold that all

15   landlords have to check immigration status.  The case involved

16   the owner of a flophouse who had been repeatedly confronted by

17   immigration authorities.

18       No court has held that renting an apartment -- that

19   someone renting an apartment or someone renting in this case a

20   mobile home lot must check immigration status under IRCA.  In

21   fact, the three circuits have addressed that, Your Honor, and

22   ruled the opposite way.

23       THE COURT:  Well, how about the fact that the immigration

24   service had been over to Waples and said -- and checked and told

25   them, "You need to make sure that your tenants are legally here"?

1    Isn't that -- aren't those allegations in this --

2         MR. WARNER:  I'm not aware of those allegations.  If they

3    are allegations, we dispute them.

4         THE COURT:  Okay.  All right.  Maybe I made that up.

5    Maybe that was part of the back-and-forth back on this side.

6         MR. WARNER:  This is an extraordinarily complicated case.

7         THE COURT:  Yeah.

8         MR. WARNER:  It's well into its sixth year.  We have 400

9    ECF filings, and we know you came in late, so I -- we really

10   appreciate the opportunity, and I know I speak for Mr. Dingman as

11   well, to explain this to you, so don't worry about that.

12        I also want to note that *Aguilar* is a case without

13   precedential value.  So defendant's argument essentially is that

14   a case without precedential value somehow created a significant

15   change in landlord tenant law within the Fourth Circuit alone and

16   nowhere else.  That's going to require private landlords be sort

17   of effectively pressed into service as agents of the immigration

18   authorities.  The case doesn't support that.

19        Your Honor, I want to make a final point that you didn't

20   raise at the beginning but it worried me somewhat when we read it

21   in your order, and that is with respect to standing.  As I said,

22   we understand this is an extremely confusing case.  We -- I'm

23   trying to make clear.  If it were true, and it is not, but if it

24   were true that the defendants were able to meet their burden at

25   Step 2 and that we were not able to meet our burden in Step 3,

1  then effectively we have no case, we have lost, there is no

2  cognizable injury.

3       So standing -- the question of standing really is a *non*

4  *sequitur* in that case, in that instance, but what worried me a

5  little bit is that it appears that what the question implies is

6  that somehow the male plaintiffs would not have an injury if they

7  were forced by a discriminatory policy to leave their wives.

8       THE COURT:  Right.  And I've looked at that further.  I

9  think there's an injury there, so I don't need you to go down

10  that road any further.  I can't -- I mean, there's not a case,

11  per se, on point on that, but forcing males to leave -- to tell

12  their wives that they have to leave the residence is an injury,

13  and that gives you standing.

14       MR. WARNER:  I said that was my last point.  I was wrong.

15  I want to say something about Step 3 for a moment.  Mr. Dingman

16  raised it.

17       Step 2 and Step 3 inquiries are obviously merged up, they

18  become part of the same thing, but our -- we have enormous

19  disputes about the validity of various policies.  Are ITINs

20  sufficient to do a credit and criminal background check is a

21  significant dispute, for example.  Whether there are alternative

22  ways to do things are hotly disputed throughout this process.

23  The -- and which policy applied at which time is a hot dispute.

24       A primary issue that floats through on Step 3, I just want

25  to point out, is that whatever the policy was in effect before

1    2015, the policy was -- it wasn't until 2015 that the

2    plaintiffs -- the defendants began to apply this policy against

3    the plaintiffs.  There was a period in time before then when

4    things were presumably going along just fine.  That alone, Your

5    Honor, is sufficient to show alternative policies under Step 3.

6         Thank you.

7         THE COURT:  All right.  Thank you.

8         All right, Mr. Dingman.

9         MR. DINGMAN:  Thank you, Your Honor.  I just want to

10   address a couple of those points.  And I'll just start where

11   counsel left off.

12        With this Step 3, I mean, the issue is, if the Court

13   accepts, and I'll come back to IRCA and *Aguilar*, that there is

14   risk of criminal prosecution, there simply is no other way to

15   address that than to ask, and they've not proffered one.  And we

16   are not suggesting that Aguilar now mandates that every landlord

17   has to engage in this type of policy.  What we're saying is the

18   facts here before the Court which are undisputed place the

19   defendants at risk if they do not ask.

20        All the Court has to do is go back to the complaint by the

21   plaintiffs themselves where they say, mobile home parks tend to

22   be a place where illegal immigrants can find a home to live.

23   There's a high concentration of Latinos in this area.  There's a

24   high concentration of illegal immigrants in this area.  Not in

25   Tyson's Corner, not in some other part of Fairfax County, at this

1  park.  And at this park there is actual knowledge that the female

2  plaintiffs were not in the United States legally.  There's actual

3  knowledge that others staying at the park were not in the United

4  States legally.

5      THE COURT:  Is it -- isn't it also -- and I hadn't thought

6  of this.  Is it an alternative policy to do -- to go back to

7  pre-2015 and say, We require social security numbers, passports,

8  green cards, or any other evidence that you have to prove that

9  you're here lawfully and then just not require any specific

10  document but go on assurances or the word of the husband or

11  whatever?  What was happening pre-2015 where there wasn't really

12  any enforcement?  Is that an alternative policy as plaintiffs

13  suggest?

14      MR. DINGMAN:  No.  It's not an alternative policy, Your

15  Honor, and there's a dispute about the enforcement of the

16  policies that are at issue, and I'll come back to that in just a

17  moment.  But the fact that, perhaps, for some period of time, for

18  the sake of argument, the policy was not enforced as it should

19  have been, that does not mean that the policy doesn't serve a

20  valid interest in protecting against prosecution under IRCA and

21  the *Aguilar* decision.

22      And to go back to the policy issue for a moment, the

23  plaintiffs continue to want to argue to this Court that there are

24  factual disputes that have merit.  This one has no merit, because

25  their claim has never been based on the allegation that the

1    impact that they alleged is due to the fact that a policy only

2    allowed for these three documents.   That has never been and is

3    not today the basis for their claim.

4         As they said straightforwardly in their complaint, any

5    policy that requires proof of legal residency has a disparate

6    impact on Latinos because of their high percentage of the

7    undocumented population in this area.   They have never argued or

8    alleged to this Court or to the Fourth Circuit that their case is

9    based on the type of documentation that would be accepted.   Their

10   argument, their position, the foundation of their claim is that

11   any policy that requires proof of legal residency has this

12   disparate impact.

13        So quibbling over whether this policy was in effect or

14   that policy was in effect, was it any document proving legal

15   residency, which we think is clear from the facts, was, in fact,

16   how the policy was enforced; or whether it was some subset, that

17   has no relevance to this case because the predicate allegation is

18   any policy that requires proof of legal residency is going to

19   have a disparate impact.   It does not matter what documents it

20   requires or limits.   If it requires proof, it has a disparate

21   impact.

22        THE COURT:  Okay.

23        MR. DINGMAN:  And going back to again on IRCA and *Aguilar*,

24   this notion that, well, not all landlords are following this

25   policy, again, the Court has to look at the facts of this case,

1    which are, we submit, undisputed on these issues and compare it

2    to *Aguilar*.  If you have enough information to be deemed to have

3    some knowledge that your tenants are here illegally, *Aguilar's*

4    implicated, IRCA is implicated.

5         So, if you're a landlord who does not have any of those

6    indications or that knowledge, we're not suggesting that *Aguilar*

7    requires a landlord to ask these questions or ask for proof of

8    legal residency, but here, at this park, based on the plaintiff's

9    own allegations, the knowledge of that possibility is

10   significant, and it has now been proven by the female plaintiffs

11   themselves.

12        THE COURT:  What is that?  I mean, what knowledge -- I

13   guess -- I'm not sure -- well, it may be relevant, but what

14   precipitated Waples enforcing its policy in 2015 the way that

15   they did?  Was it some knowledge of the immigration status of

16   tenants?

17        MR. DINGMAN:  I -- it was a combination of two things:

18   One, frankly, was more rigorous enforcement of the policy itself

19   that had -- that had been lax.  And the issue really for the park

20   in operating in this location is to be able to ensure that the

21   people who are living there, who are residing there, are in the

22   United States legally so that there are no ramifications that

23   come back to the defendants.

24        THE COURT:  Was it -- I'm sorry.  Was it a tenant who

25   turned 18 who had a sex offender conviction?

1    MR. DINGMAN:  There were some issues at another park where

2    there was some pretty unfortunate criminal activity, and that

3    did -- that was one of the impetus for saying, okay, let's make

4    sure that we are enforcing our policies as we should, and so that

5    certainly was one of the reasons that the policy was -- I won't

6    say enforced but the managers were directed to make sure that

7    there was compliance.

8        And, as a result of that, there was clear evidence that

9    the female plaintiffs, as an example, that there were individuals

10   living at the park or in the United States illegally, and given

11   the demographics and all the allegations of the plaintiffs,

12   that's what creates the risk.

13       So it's not to say every landlord has to engage in this.

14   But when you look at the facts of this case and this park, we

15   suggest that it undoubtedly rises to the level that there's risk

16   if you do nothing and allow people whom you know or have a pretty

17   good knowledge or belief are in the United States illegally.

18   That's what Ms. Aguilar did.

19       So it's not this broad mandate, as plaintiff suggests;

20   it's based on the facts of this case, and there's no fact dispute

21   about these issues.  Again, and I know I'm repeating myself, but

22   the very predicate for disparate impact is the allegation of the

23   plaintiffs that there's a high percentage of undocumented aliens

24   who are Latino in this particular area.  That's their basis for

25   why there's disparate impact.

1          Defendants have knowledge of that as well, and they have

2    actual empirical evidence of people living in the park who are

3    not documented, and they are not in the United States legally, so

4    the suggestion that you can simply ignore that and hope that

5    there's no ramifications, no prosecution, we think it's just

6    without any basis, Your Honor.  Again, not a broad requirement,

7    but under these facts we've established the necessity to avoid

8    even the potential of criminal prosecution.

9          THE COURT:  All right.  Thank you.

10          MR. DINGMAN:  Thank you.

11          MR. WARNER:  Would you indulge me for a moment?

12          THE COURT:  Yes, I will.

13          MR. WARNER:  Thank you.

14          The first point I want to make is that the question for

15    Step 2, which is a business necessity, is not whether there is

16    any theoretical risk of something but rather whether this is

17    necessary for the operation of the business.  So I -- I know the

18    way we talk about this slides back and forth, but I want to make

19    clear that theoretical risk of prosecution is not the standard

20    here, and it really shouldn't be.

21          THE COURT:  Well, no.  I don't know what you mean by

22    "theoretical."  There's a statute on the books, and it's been

23    applied in this -- in the *Aguilar* situation, so that's real life.

24    That's not theoretical, and, I mean -- so I don't understand what

25    theoretical means.

1          MR. WARNER:  What I'm saying is that in my case as a

2     practicing advice lawyer on some occasions, if someone asks me

3     what's the risk to me from this, and I read the *Aguilar* case, and

4     I go, Well, unless you're running a flophouse or you're renting

5     out nine of ten rooms of your house to people and the immigration

6     authorities are visiting you on a regular basis, the risk to you

7     is extremely small.  That's what I mean by risk.

8          THE COURT:  All right.  Well, that's malpractice, I think,

9     but we could differ on our belief on that.  The advice should be

10    we have an anti-harboring statute and this is what it says, and

11    you're at risk if you do X, Y or Z.  I will tell you that it

12    hasn't been applied in other than extreme circumstances, but you

13    have to lay the foundation first, and the foundation is there's a

14    law on the books.

15         MR. WARNER:  Your Honor, "harboring" and "leasing" are two

16    very different things, and I -- I don't want to go into all of

17    that.  I'm sure you will research it, but that's the very point.

18    Harboring, there is an intent to --

19         THE COURT:  Yeah.  To hide somebody in your premises.

20         MR. WARNER:  Correct.

21         THE COURT:  Absolutely.

22         MR. WARNER:  And leasing is not in any way harboring, but

23    let me just also respond briefly to a couple of points.  One is

24    that, with respect to the question of which policy applied at

25    which time, I think I actually have some agreement with

1   Mr. Dingman, and I should clarify that for the Court.  And that

2   is that any policy that required proof of immigration status in

3   any form, the female plaintiffs could not meet that policy.

4          THE COURT:  Okay.

5          MR. WARNER:  Our issue with respect to which policy

6   applied at which time was actually to make a point with respect

7   to Step 3, which was that some versions of their policy as they

8   came out didn't really actually do a very good job of

9   distinguishing those who were legally present and those who

10  weren't.  The Step 3 point gets down the line, but with respect

11  to our primary case -- in fact, our Step 1 case is based on a

12  proposition that they had a policy that our plaintiffs could not

13  meet, and that it had a disparate impact.

14         I also need to respond somewhat to Mr. Dingman's point

15  that in his factual situation, the Waples' factual situation,

16  somehow that was different, and that they then presented more

17  risk than they had to respond.  I don't really understand how

18  that works.  I mean, how does one decide that those are in a

19  riskier situation?  Is it because the people that you rent from

20  have accents, because they're darker?  Is it because they dress

21  in a different way?

22         I mean, I -- I'm -- this is a path that I don't think

23  courts want to go down, and I don't think Mr. Dingman wants to go

24  down, and I don't think Waples wants to go down.  But I just

25  point that out, that what we have here is a situation where what

1    we're saying is that -- you know, Mr. Warner, he's got no hair,

2    but he used to have light hair, he has got light skin, he doesn't

3    have an accent.  We don't have to ask him, but the next guy we

4    do.  And I don't think that's appropriate.

5        Thank you.

6        THE COURT:  All right.  Well, thank you once again for

7    coming in and helping me navigate the issues in the case.  It's

8    such an interesting case.  And we'll get you out a decision on

9    this in a little bit, and I know we've got all kinds of other

10   pending motions that we'll have to address if the case is going

11   to move forward, and I guess we'll start where Judge Ellis did,

12   with issuing -- and maybe I'm retreading old ground.

13       Was a final -- was a Rule 26 order ever issued to start

14   discovery on the case?  It was and then you went all the way

15   through discovery, and then these are the summary judgment

16   motions, and now in limine motions are the next step up.

17       So we'll let you know whether we need oral argument on the

18   in limine motions and schedule those, and -- but we'll look at

19   them.  We'll turn to those right away after -- if the case is

20   going to continue.

21       I apologize for asking.  Do we have a trial date?

22       MR. DINGMAN:  We do, Your Honor.  It's in March.

23       THE COURT:  Right.  Okay.

24       MR. DINGMAN:  I don't know the precise date off the top of

25   my head.

1     THE COURT:  Yeah, I know it's right after my five-week

2  gang case.  Yeah.  Okay.  Well, we've got some time for us to

3  resolve that, then, and -- okay.

4     All right.  Anything else for the good of the order here?

5     MR. DINGMAN:  Nothing for the defendants, Your Honor.

6     THE COURT:  Okay.  All right.  Well, thank you again, and

7  we'll get you out a decision as soon as we're able to.

8     All right.  Thank you.  We're in recess.

9     (Proceedings adjourned at 11:07 a.m.)

10              **C E R T I F I C A T E**

11

12              I, Scott L. Wallace, RDR-CRR, certify that
       the foregoing is a correct transcript from the record of
13     proceedings in the above-entitled matter.

14

       /s/ Scott L. Wallace              10/27/21
15     ----------------------------     ----------------
       **Scott L. Wallace, RDR, CRR**          **Date**
16     **Official Court Reporter**

17

18

19

20

21

22

23

24

25