**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

ROSY GIRON DE REYES, et al. )
)
*Plaintiffs,* )
)
v. )
)
WAPLES MOBILE HOME PARK LIMITED )
PARTNERSHIP, et al. )
)
*Defendants.* )
)
)

Civil Action No. 1:16-cv-00563
Hon. Liam O'Grady

## ORDER

**Introduction**

This action requires a recitation of this procedural history for context. The Plaintiffs filed

their initial Complaint on May 23, 2016 and on July 22, 2016, the Court granted in part the

Defendants' Motion to Dismiss. Dkt. 34. Specifically, the Plaintiffs' claims based upon a

disparate impact theory of discrimination were dismissed. *Id.* The Parties proceeded through

discovery and filed cross motions for summary judgment. After discovery was complete, the

Defendants filed a Motion for Summary Judgment that was granted by the Court. *See* Dkt. 190.

The Plaintiffs filed a timely appeal and the Fourth Circuit reversed the decision to grant the

Defendants' Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure

12(b)(6). *See de Reyes v. Waples Mobile Home Park*, 903 F.3d 415, 428 (4th Cir. 2018) ("At the

motion to dismiss stage, we must accept all well-pled facts as true and draw all reasonable

inferences in favor of the plaintiff. Therefore, accepting these statistics as true, we conclude that

Plaintiffs sufficiently alleged a prima facie case of disparate impact.") The Fourth Circuit also vacated the grant of summary judgment in favor of the Defendants on the Plaintiffs' Fair Housing Act claim, and remanded with the direction to "consider the cross motions for summary judgment under Plaintiffs' disparate-impact theory of liability in a manner consistent with [the Fourth Circuit's] opinion." *Id.* at 433.

On remand, the Parties' renewed motions for summary judgment were denied. Dkt. 283. The Defendants then moved to reconsider or clarify the denial of summary judgment and that Motion was taken under advisement. Dkt. 284; Dkt. 297. The case was then reassigned to this Court. *See* Dkt. 356. After reviewing the record and considering the Appellate Court's decision, this Court asked for supplemental briefing on the issues that will be addressed in this Order. Dkt. 413. The Parties diligently replied with the Court's request and further addressed these issues during multiple oral arguments.

**Background**

The Plaintiffs in this case are four married couples. Dkt. 1 at 4. They are Jose Reyes and Rosy Giron de Reyes; Alexis Bolanos and Ruth Rivas; Yovana Solis and Moya Yrapur; and Rosa Amaya and Herbert Cruz. *Id.* The Plaintiffs are Hispanic and have all immigrated to the United States from countries in Central America. *Id.* All the Plaintiffs live or have lived in a mobile home park owned by the Defendants, Waples Mobile Home Park Limited Partnership, and other associated business entities (collectively "Waples").[1] *Id.* In 2015, the mobile home park, located in Fairfax, Virginia, implemented a policy (the "Policy") that requires every tenant

---

[1] Waples is operated by A.J. Dwoskin & Associates, Inc. who is a co-defendant named in the case.

living in residence to provide Waples with either a social security card, a passport, a U.S. visa, or an Arrival Departure Form (called an I-94 or I-94W). *Id.* at 6. Prior to 2015, Waples only required the lease holder to provide one of these identification documents. *Id.*

Waples changed the Policy in response to an incident at another trailer park which prompted Waples to re-examine the enforcement of the existing Policy.[2] Dkt. 142-21 at 3. After this reexamination, Waples began to require every adult who lived in the mobile home park to provide the required forms of identification where previously Waples had only required the person who signed the lease to provide the required identification. Dkt. 211 at 4. Residents of the mobile home park that lived with tenants who did not provide one of the forms of identification were sent letters informing those residents that they would be unable to renew their existing leases. *See e.g.* Dkt. 151-13 at 3; Dkt. 142-4; Dkt. 142-5; Dkt. 142-6. Those residents were told that their current leases would be converted to month-to-month leases and that those residents would also be required to pay a higher monthly rate for rent.[3]

The female Plaintiffs were unable to provide the types of identification required under the Policy as it was newly enforced. Dkt. 1 at 9. Waples did not accept alternative forms of identification offered by the female Plaintiffs; specifically, they did not accept an Individual

---

[2] "I proposed the policy in the meeting as a solution to the incident or the issue that came up at Forest Park Mobile Home Park. That incident was an—a child turned to – who became 18 was a registered sex offender, and it was not disclosed but a tenant notified us of them being a resident. So we discussed how do we find or look into tenants with a crime that were current residents instead of a tenant or other tenant notifying us." Dkt. 142-21 (deposition of Mark Jones).

[3] Based on deposition testimony, the Defendants' intent when raising the rental rates was to incentivize the tenants who did not comply with the Policy to vacate their homes in lieu of initiating eviction proceedings. *See* Dkt. 142-21 at 11-12. The Court finds these actions could fall within actions which "otherwise make unavailable or deny" the Plaintiffs' housing as contemplated by the Fair Housing Act. 42 USC §3604(a). Whether or not these acts increased revenue for the Defendants does not factor into the Court's analysis of the claim made under the Fair Housing Act.

Taxpayer Identification Number ("ITIN").[4] *Id.* at 6-7. When the female Plaintiffs were unable to comply with the Policy, the leases for the mobile homes where they resided were converted to the more expensive month-to-month leases. *Id.* at 11. In May of 2016, the Plaintiffs began this civil action, asserting claims of discrimination under the Fair Housing Act. Dkt. 1.

**Legal Standard**

The Parties have previously moved for Summary Judgment and the Motions were fully briefed. *See* Dkt. 247. Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact." Federal Rule of Civil Procedure 56(a). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists, and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). There is a genuine dispute of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  While "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-248). "It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact." *Hyatt v. Avco. Fin. Servs. Mgmt. Co.*, 2000 U.S. Dist. Lexis 13645, at 11 (E.D. Va. March 2, 2000)

---

[4] The Internal Revenue Service issues ITINs to any individual earning income within the United States regardless of their immigration status. Dkt. 1 at 7.

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); aff'd, 22 F. App'x 81 (4th Cir. 2000). The Court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Federal Rule of Civil Procedure 56(f)(3).

## Discussion

The Fair Housing Act ("FHA") deems it unlawful to refuse to rent or sell a dwelling to any person based on race or national origin. 42 USC §3604(a). A plaintiff can demonstrate a violation of the Fair Housing Act under a disparate impact theory of liability. *Texas Department of Hous. & Cmmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539 (2015) ("Recognition of disparate-impact claims is consistent with the FHA's central purpose.") (references omitted). A disparate impact claim is analyzed under a three-step burden shifting framework that was first articulated in *Wards Cove Packing Co., Inc. v. Atonio*. 490 U.S. 642, 653 (1989). In the first step, the plaintiff demonstrates a "robust causality" between a challenged policy and the effect on a protected group. *de Reyes*, 903 F.3d at 424 (citations omitted). This causality can be proven through a statistical analysis. *Id.* at 425. If a plaintiff can show this causality, a district court will proceed to the second step of the burden shifting framework. At this step, the defendant must "state and explain the valid interest" achieved by the challenged policy. *Inclusive Communities*, 576 U.S. at 541. If a neutral justification for the policy which is "substantial, legitimate, and nondiscriminatory" is advanced by the defendant, the plaintiff may then demonstrate that the defendant's interest can be achieved by an alternative practice with a less discriminatory effect. *Id.* at 527. In the present case, the Court must evaluate the presence or

lack of evidence that is relevant to all three steps of the burden shifting framework.[5] If there is no dispute of material fact to one or more of the steps of the framework, summary judgment is appropriate and necessary to decide the disparate impact claim advanced by the Plaintiffs.

### 1. Do the Male Plaintiffs have Standing.

The Court first addresses the Defendants' argument that the male Plaintiffs lack standing to bring a suit under the Fair Housing Act ("FHA"). The Defendants have argued that "it is undisputed that the male Plaintiffs' alleged injuries arise solely because their wives cannot comply with the Policy." Dkt. 416 at 14. The Defendants believe that because the male Plaintiffs can comply with the Policy, the male Plaintiffs do not have standing in this case. *Id.* at 14-15.

The FHA allows for an "aggrieved person" to file a civil action under the statute. 42 U.S.C. §3613(a)(1). A person cannot be discriminated against on "the terms, conditions, or privileges" of a rental because of "race, color, religion, sex, familial status, or national origin." 42 U.S.C. §3604. Further, under the FHA the term "person" is defined as "one or more individuals." 42 U.S.C. 3602. The Supreme Court notes that the term "aggrieved person" has been interpreted broadly in its prior decisions. *Bank of Am. Corp. v. City of Miami*, 197 L. Ed. 2d 678, 687 (2017) (The Court held that a city had standing under the FHA to pursue a discrimination claim). The Supreme Court has previously found standing for white tenants who alleged harm from a loss of association in rental complexes that did not offer housing to racial minorities. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("the alleged

---

[5] The Fourth Circuit vacated the grant of the motion for summary judgment for Waples on the Plaintiffs' Fair Housing Act claim. *de Reyes*, 903 F.3d at 433. The Fourth Circuit has directed the Court to "consider the cross motions for summary judgment under Plaintiffs' disparate-impact theory of liability in a manner consistent with [the Fourth Circuit's] opinion." Id. In its opinion, the Fourth Circuit did not resolve any factual issue under the standards used for summary judgment.

injury to existing tenants by exclusion of minority persons from the apartment complex is the loss of important benefits from interracial associations.")

The male Plaintiffs argue that their standing derives from a loss of association caused by the Policy. Dkt. 417 at 15 (The decision to remain in the park was a "Hobson's choice" that would require the male Plaintiffs to leave their wives). Based on the loss of association with their spouses because of the enforcement of the Policy, the Court finds that the male Plaintiffs have adequately alleged interests which are within the zone of interest contemplated by the FHA. *See City of Miami*, 197 L. Ed. 2d at 689. Accordingly, the male Plaintiffs have met the requirements to fall within the broad category of an "aggrieved person" who have standing to bring suit under the FHA. Therefore, the male Plaintiffs have standing to bring the current civil action.

**2. Is there a genuine dispute of material fact as to whether the Plaintiffs can show a disparate impact of the Policy.**

The Court next addresses the first prong of the burden shifting framework to evaluate a claim brought under the Fair Housing Act ("FHA"). For a disparate impact claim, a Plaintiff may use statistical analyses to prove that a challenged policy disproportionately affects a protected class. The Plaintiffs are Hispanic, which is a protected class under the FHA. *de Reyes*, 903 F.3d at 423 n. 3 (*ref, Keller v. City of Fremont*, 719 F.3d 931, 948 (8th Cir. 2013); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016)).

The Fourth Circuit has discussed the methods of the statistical analysis proposed by the Plaintiffs in a previous decision. *de Reyes*, 903 F.3d at 428. The Fourth Circuit explained that in the present case—assuming what was plead in the complaint is true—the "Plaintiffs satisfied the robust causality requirement by asserting that the specific Policy requiring all adult Park tenants

to provide certain documents proving legal status was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park." *Id.* at 429 (footnote omitted). This finding is based on the Fourth Circuit's previous holding that "the correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 987 (4th Cir. 1984) (It was proper to analyze the disproportionate impact of a policy on a specific building where it was applied, as opposed to the entire multi-building complex or the community in general). It follows that a *prima facie* case of discrimination can be shown when there is a statistically significant difference in the effect of a policy on a minority group within the specific area in question. *Id.* at 988; citing *Hazelwood School District v. United States*, 433 U.S. 299, 307-8 (1977) ("When gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination." (citations omitted)).

The Parties disagree on the accuracy of the statistical methods used by the Plaintiffs' expert witness, Dr. William Clark, to support the claim of disparate impact. The Plaintiffs rely on Dr. Clark's expert report to show that there is a statistically significant difference of the effect of the Policy on the Hispanic population within the mobile home park. *See* Dkt. 142-40 at 51. Dr. Clark bases his opinion on two sets of data, the United States Census, and a study of percentages of undocumented immigrants (based on data from the Pew Foundation, the Center for Migration Studies, and Migration Policy Institute). *Id.* at 52. Dr. Clark uses a small area of the census (a Public Use Microdata Area) to approximate the population of the mobile home park. *Id.* at 55. From this data, Dr. Clark estimates the percentage of undocumented immigrants within the

smaller geographic area of the mobile home park to approximate the percentages of Latinos affected by the policy. *Id.* Dr. Clark then compares that result to an estimated percentage of affected non-Latinos. *Id.* Dr. Clark also argues that the disparate impact might be greater within the mobile home park than the impact found in his final calculation. This is because that small area analyzed within the census tract has many single-family homes (as opposed to mobile homes), and single-family homes may have a lower percentage of Hispanic residents. *Id.* Based on his analysis, Dr. Clark concludes that there is a statistical disparity, within the mobile home park, in the effect of the Policy on the Hispanic residents within the park compared to non-Hispanic residents. This evidence is sufficient to demonstrate a *prima facie* claim of disparate impact from the Policy within a specific geographical location that is closely correlated to the mobile home park under the first step of the burden shifting framework.

The Defendants' expert, Dr. Weinberg, argues that Dr. Clark's estimates are unreliable, and the estimates have too large of a margin of error to show statistical significance. Dkt. 248-3 at 2. Dr. Weinberg believes that Dr. Clark did not appropriately estimate his margin of error and therefore did not correctly calculate the disparate impact within the smaller area of data that Dr. Clark uses for his analysis. *Id.* However, even a valid critique of the statistical methods offered by the Plaintiffs does not inherently demonstrate that Plaintiffs could not meet the requirements of the first step of the burden shifting framework. *See National Fair Housing Alliance v. Bank of America, N.A.*, 401 F. Supp. 3d 619, 637 (D. Md. 2019). The disagreement between the Parties' experts shows that there is a genuine dispute of material fact as to whether the statistical analysis of the Plaintiff can support a *prima facie* case of disparate impact.

### 3. Is there a genuine dispute that the Policy achieves a valid interest.

The Court next evaluates whether a genuine issue of material fact exists as to the second step of the disparate impact burden shifting framework. The Supreme Court has held that the second step of the burden shifting framework is analogous to the business necessity standard used to evaluate disparate-impact liability in employment actions brought under Title VII of the civil rights act. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities. Project, Inc.*, 576 U.S. 519, 541 (2015). The business necessity standard is addressed by the Supreme Court in *Ricci v. Stefano*. 557 U.S. 557, 578 (2009) (A test that is related to job performance is a valid business necessity) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)). Therefore, the Court must decide the issue of whether a genuine dispute of material fact exists as to whether the Defendants can establish a valid reason for the challenged Policy. *See Inclusive Communities*, 576 U.S. at 541 ("...so too must housing authorities and private developers be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest.") To prevail on summary judgment, the Defendants must show that there is no dispute that the Defendants can prove "a business necessity sufficiently compelling to justify the challenged practice." *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 988 (4th Cir. 1983) (citations omitted).

Several district and appellate courts have evaluated the valid interest that private housing providers have advanced to defend FHA claims brought under a disparate impact theory of liability. Although these courts have articulated slightly different standards to evaluate the stated valid interest for a challenged policy, all the courts have required that the policy is legitimate and tied to the policy.

Summary judgment has been granted for plaintiffs bringing FHA claims when the district courts rejected a justification for a housing policy with occupancy limits when the defendants were unable to provide evidence that the occupancy limit was tied to any financial hardship or was necessary to comply with a specific Municipal Code. *Fair Hous. Ctr. Of Wash. v. Breier-Scheetz Props., LLC*, 2017 U.S. Dist. LEXIS 73037 at *9 (W.D. Wash. May 11, 2017). Other district courts have denied summary judgment based upon the existence of a disputed issue of material fact as to a challenged housing policy with occupancy limits. *See Treece v. Perrier Condo. Owners Ass'n*, 2020 U.S. Dist. LEXIS 26515 at *40 (E.D. La. February 14, 2020) ("Nevertheless, a defendant's proffered reasons for a policy cannot be merely speculative and must be supported by facts or documentation.") In *Treece*, plaintiff's summary judgment motion was denied when it was found that evidence might support that the challenged policy was tied to the quality of life in the defendant's condominiums or that increased occupancy would lead to increased wear and tear on the condominium infrastructure. Summary judgment has also been denied after district courts rejected the proposed valid interests that supported a defendant's challenged policy. Summary judgment was improper for the defendants when there is no evidence to support that policy or the evidence flatly contradicts the defendant's assertion of the interest. *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, (D.R.I. 2015) (Complying with state building codes was not a valid interest to justify occupancy limits, when higher occupancy limits would comply with those codes); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs.*, 801 F. Supp. 2d 12, (D. Conn. 2011) (The district court viewed a subjective rationale "skeptically" and granted summary judgment for plaintiffs when no evidence could support the stated valid interests).

The Court looks at these decisions in other districts to evaluate the second step of the burden shifting framework. In accord with this line of cases, summary judgment should be denied for a defendant when a challenged policy cannot be shown either to aid in the compliance with a law or there is no evidence to support the valid interest as legitimate. However, if it is unquestioned that a federal law guides the actions of the Defendants, there will be no issue of material fact to preclude summary judgment for the Defendants, as the interpretation and application of a federal statute and relevant case law is not a question for the jury. The Defendants have proffered that their Policy is necessary to assure compliance with a federal statute, so the Court will look at the record to decide if that statute is connected to the valid policy based on undisputed facts in the record.

In the present case, the Defendants have argued that the valid interest of the challenged policy is to avoid criminal liability. The federal anti-harboring statute holds liable any person who houses an unauthorized alien knowingly or in reckless disregard of their immigration status. 8 USC §1324. The Defendants in this case argue that the challenged policy is necessary to avoid criminal liability under this statute. The Defendants have argued that the decision in *United States v. Villalobos Aguilar* definitively shows that a landlord can be held liable under this statute. 477 Fed. Appx. 1000 (4th Cir. 2012). In *Aguilar*, the defendant's guilty verdict for harboring an unauthorized alien was upheld when the Fourth Circuit found that substantial evidence supported the verdict. *Id*. at 1002-1003. To find a defendant guilty under the statute, circumstantial evidence is sufficient to show the "reckless disregard" *mens rea* that is required to be proven. *Id*. at 1003 (citing *United Sates v. De Jesus-Batres*, 410 F.3d 154, 161 (5th Cir. 2005)). Specifically, the Appeals Court considered the fact that the landlord "took no steps to

ascertain the status of her tenants even after being warned by officials that numerous of her tenants were undocumented." Like the Defendants in the present case, the only action the landlord took in *Aguilar* was the receipt of a financial benefit as rental payments in exchange for housing. *Id.* at 1002. In the present case, the Defendants argue that it is necessary to take steps to ascertain the authorization status of the tenants within the mobile home park to avoid a prosecution and conviction like the landlord in *Aguilar.*

The Plaintiffs argue that *Aguilar* is factually distinct from the circumstances of the present case and that the *Aguilar* decision has been criticized by other circuits. Dkt. 417 at 9. However, this argument is unavailing. Circumstantial evidence is sufficient to support a finding of criminal liability under the statute. *Id.* at 1003 (evidence that defendants were aware persons were kept in their home until the persons paid a smuggling fee was sufficient circumstantial evidence to demonstrate a reckless disregard to the immigration status of those persons)); *see also Ricchio v. McLean*, 853 F.3d 553, 558 (1st Cir. 2017) (Circumstantial evidence plead in a complaint plausibly could support the claim that an immigrant victim of trafficking had been harbored under a separate immigration statute); *United States v. Tipton*, 518 F.3d 591, 594-596 (8th Cir. 2008) (A conviction for illegal harboring was upheld when the evidence that appellants knew aliens were unauthorized for employment was also sufficient to show reckless disregard or knowledge that the aliens did not have legal status in the country). It is undisputed that the Defendants in the present case leased housing to unauthorized immigrants for profit like the defendant in *Aguilar*. The Defendants cannot be forced to hope that there is a lack of circumstantial evidence to show the Defendants had the requisite *mens rea*, and subsequently face a conviction under the statute. In addition, the facts of the *Aguilar* case make it clear that the

Department of Justice will pursue criminal charges against a lessor of housing who does not take affirmative steps to verify the authorization of those immigrants—potentially like the Defendants in the present case.

Complying with federal law is unquestionably a valid interest for the Defendants. *Inclusive Communities*, 576 U.S. at 543 (A case should be dismissed if "federal law substantially limits" a defendant's discretion). The Defendants are right to rely on federal law when stating a valid interest for their challenged policy. Even if the *Aguilar* decision is in conflict with the decisions of other Appellate Courts, it is reasonable for the Defendants to rely on a prior decision of the Fourth Circuit, the Judicial Circuit within which they reside, to determine the scope of liability the Defendants could be exposed to at the time they enacted or enforced their policy.

The language used within the anti-harboring statute also supports a finding that the Defendants could face criminal liability. Statutory language is interpreted using its plain meaning. *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018). The anti-harboring statute itself criminalizes the act of harboring undocumented aliens for profit. 8 USC §1324(a)(1)(A)(iii). Harboring is defined as "the act of affording lodging, shelter, or refuge to a person." Black's Law Dictionary (9th Edition 2009). The language of the statute indicates that housing and collecting rent from unauthorized aliens are predicates of the criminal act for which the Defendants could face liability.

Furthermore, it is unimportant whether the Defendants can provide evidence that they possessed the valid interest at the time the Defendants adopted the challenged policy. The anti-harboring statute was in effect at the time the challenged policy was implemented. *Aguilar* had been decided at the time the challenged policy was enforced and that decision would inform the

14

Defendants that they could face liability in a Virginia Federal Court. The Defendants are presumed to have knowledge of the law at the time the Policy was implemented and enforced.

The question of whether the anti-harboring statue could apply to the Defendants in the instant case is a matter of law to be decided by the Court. *See North Carolina v. Virginia Beach*, 951 F.3d 596, 601 (4th Cir. 1991) (application of the law to the facts in question is a matter of law). Based on prior decisions in this judicial circuit and the language Congress used when the law was passed, the Court finds the Defendants could be found liable under the anti-harboring statute. Therefore, implementing a policy to avoid increased criminal liability under the anti-harboring statute is a valid and necessary interest that satisfies the second step of the burden shifting framework. Accordingly, there is no genuine dispute of material fact as to whether the Defendants can proffer a valid interest that is served by the Policy.

**4. Is there evidence that supports the existence of a reasonable alternative to the Policy.**

As there is not a genuine issue of material fact as to whether the Defendants can state a valid interest for instating the challenged policy, the Court must turn to the third step of the disparate impact burden shifting framework. The third prong of the burden shifting framework requires the Plaintiffs to produce evidence that shows the valid interest achieved by the Policy could be met "by another practice that has a less discriminatory effect." *Inclusive Communities*, 576 U.S. at 527.

The Plaintiffs have argued that the interests of the Policy could have been achieved by allowing the female Plaintiff's to use ITINs. The only evidence that the Plaintiffs have produced to support this assertion regarding ITINs is through the affidavit of an attorney, Ivan Yacub.

Yacub is an immigration attorney who represents many Hispanic individuals in the Northern Virginia area. Dkt. 326-1 at 2. Yacub explains the process through which a non-citizen can obtain an ITIN while residing in the United States for the purposes of paying taxes to the IRS. *Id.* at 3. In his affidavit, Yacub concludes that the Policy will exclude immigrants with both lawful and unlawful status from housing at the mobile home park. *Id.* at 10. Yacub at no time asserts that accepting ITINs as identification will allow the Defendants to comply with the anti-harboring statute. Yacub's affidavit unquestionably shows that possession of an ITIN will not demonstrate legal status in the country.

Accepting ITINs as identification is the Plaintiffs' proposed reasonable alternative to the Policy and is the only evidence of a reasonable alternative presented by the Plaintiffs. There is no evidence that the proposed reasonable alternative would allow the Defendants to limit their criminal liability under the anti-harboring statute. As there is no evidence from which a factfinder could conclude that the proposed reasonable alternative would allow Defendants to achieve their valid interest, there is no genuine dispute of material fact that would preclude summary judgement in favor of the Defendants.

A moving party may meet their burden on summary judgment by "pointing out" the "absence of evidence that supports a nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B). As correctly indicated by the Defendants, there is no evidence that the Plaintiffs have produced that can satisfy the requirements of the third step of the disparate impact burden shifting framework. Accordingly, a reasonable factfinder could not return a verdict in favor of the Plaintiffs. As such, it is proper to grant summary judgment for the Defendants.

**Conclusion**

There is a legitimate interest, based on federal law, for the implementation of the Policy. The Plaintiffs have produced no evidence upon which a reasonable jury could find that there is an alternative to the policy that would allow the Defendants to avoid liability under relevant law within this judicial Circuit. For the Court to hold otherwise would place the Defendants in the "double-bind" of liability that the burden shifting framework that evaluates a disparate impact claim is structured to avoid. *Inclusive Communities*, 576 U.S. at 542. Therefore, Summary Judgment is **GRANTED** for the Defendants. The Plaintiffs' Motion for Summary Judgment is **DENIED**.

It is so **ORDERED**.

May 6, 2022
Alexandria, Virginia

_____
Liam O'Grady
United States District Judge