**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1660

JOSE DAGOBERTO REYES; ROSY GIRON DE REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; HERBERT DAVID SARAVIA CRUZ,

  Plaintiffs – Appellants,

v.

WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; A. J. DWOSKIN & ASSOCIATES, INC.,

  Defendants – Appellees.

-------------------------------

NATIONAL HOUSING LAW PROJECT; THE UNITED STATES; JOHN D. TRASVINA, former HUD Assistant Secretary for Fair Housing and Equal Opportunity; NATIONAL FAIR HOUSING ALLIANCE; AMERICAN CIVIL LIBERTIES UNION; LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; EQUAL RIGHTS CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA, INC.; HABITAT FOR HUMANITY OF GREATER CHARLOTTESVILLE; PIEDMONT HOUSING ALLIANCE,

  Amici Supporting Appellant.

NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER; THE REAL ESTATE ROUNDTABLE,

  Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, Senior District Judge. (1:16−cv−00563−LO−TCB)

Argued: December 7, 2023                                         Decided: January 23, 2024

Before WILKINSON, KING, and HEYTENS, Circuit Judges.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion in which Judge King and Judge Heytens joined.

**ARGUED:** Nicholas Michael DiCarlo, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Appellants. Jonathan Y. Ellis, MCGUIREWOODS LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Simon Sandoval-Moshenberg, Larisa D. Zehr, LEGAL AID JUSTICE CENTER, Falls Church, Virginia; Adam B. Abelson, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, for Appellants. Michael S. Dingman, MCGUIREWOODS LLP, Tysons, Virginia; Grayson P. Hanes, Justin D. deBettencourt, McLean, Virginia, Colin E. Wrabley, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellees. Eric Dunn, Katherine E. Walz, Natalie N. Maxwell, NATIONAL HOUSING LAW PROJECT, San Francisco, California, for Amici National Homelessness Law Center, National Immigrant Law Center, National Low Income Housing Coalition, and National Housing Law Project. Kristen Clarke, Assistant Attorney General, Tovah R. Calderon, Teresa Kwong, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Damon Smith, General Counsel, Sasha Samberg-Champion, Deputy General Counsel for Enforcement and Fair Housing, Office of General Counsel, Office of Fair Housing, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Washington, D.C., for Amicus United States. Cameron L. Davis, Austin, Texas, Trevor S. Cox, J. Pierce Lamberson, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amicus Former HUD Assistant Secretary for Fair Housing and Equal Opportunity John D. Trasviña. Edward Olds, Reed Colfax, RELMAN COLFAX PLLC, Washington, D.C., for Amici National Fair Housing Alliance; American Civil Liberties Union; Lawyers' Committee for Civil Rights Under Law; Equal Rights Center; Housing Opportunities Made Equal of Virginia, Inc.; Habitat for Humanity of Greater Charlottesville; and Piedmont Housing Alliance. Erin E. Murphy, Trevor W. Ezell, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, for Amicus National Federation of Independent Business Small Business Legal Center. Edward M. Wenger, Robert Volpe, Thor Christianson, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, Washington, D.C., for Amicus The Real Estate Roundtable.

WILKINSON, Circuit Judge:

Residents of Waples Mobile Home Park challenged the Park's policy that required all adult tenants to provide proof of their legal status in the United States in order to renew their leases. The residents argued that the policy violated the Fair Housing Act because it disproportionately ousted Latinos from the Park. The district court granted summary judgment in favor of the Park after finding that the policy was reasonably necessary for the Park to avoid criminal liability under a federal statute prohibiting the harboring of undocumented immigrants. But the district court's ruling rested upon a basic misapprehension of the statute. Moreover, the record was insufficient to establish the Park's proposed defense. For these reasons, we reverse.

I.

A.

Waples Mobile Home Park in Fairfax, Virginia, (the "Park") is owned and operated by Waples Mobile Home Park LP, Waples Project LP, and A.J. Dwoskin & Associates, Inc. (collectively, "Waples"). Waples leases land to mobile-home owners looking to domicile in the area and serves as landlord for the Park.

Between 2010 and 2015, four noncitizen Latino families from El Salvador and Bolivia (the "Families") moved into the Park. Each family consisted of a father with legal status in the United States, a mother who was undocumented and illegally residing in the United States, and children who were United States citizens. The fathers were the leaseholders. Each had provided a valid Social Security number and passed credit and

criminal background checks as part of the routine application process. The Families had successfully renewed their leases without issue until 2015.

In 2015, Waples began enforcing a policy that required all adults living at the Park to present proof of legal status in the United States (the "Policy"). Specifically, the Policy required lease applicants and tenants seeking to renew their leases to identify all proposed adult occupants of the mobile home. It further required that every identified adult occupant provide proof of lawful status in the United States by presenting either (1) an original Social Security card, or (2) an original foreign Passport, original U.S. Visa, and original Arrival/Departure Form (I-94 or I-94W).

If an occupant did not comply with the Policy, Waples provided notice that the leaseholder had 21 days from receipt of the notice to cure the violation, or 30 days from receipt to vacate the Park. And if the household did not cure the violation or vacate the Park, Waples converted the lease from a year-long term to month-to-month and increased the rent by $100 per month. Waples threatened to increase the monthly rent by an additional $300 if the household did not comply with the Policy, but that additional surcharge was never imposed.

Though this Policy was new to tenants of the Park, it was not really a new policy. While the Policy as written had always required documentation from all adult residents in the Park, it was actually implemented by requiring documentation from the leaseholder alone.

Apparently, this was the case for many of the Park's policies. For instance, the decision to begin enforcing the Policy against all occupants stemmed from a discovery that

4

two tenants at different Waples properties committed sex offenses that should have been reported at the time of lease renewal. The occupants, however, were never asked to disclose those offenses. This was so even though another one of Waples's written policies required all adult lease applicants to disclose such offenses. The discovery of the sex offenses prompted a crackdown at all Waples sites, leading to a background check on all adult tenants when it came time to renew their leases.

Of course, the Policy posed a problem for the Families because the mothers could not provide proof of their legal status. The Families sought to use the mothers' Individual Taxpayer Identification Numbers ("ITINs") as an alternative way to comply with the Policy. The IRS issues ITINs to income-earning U.S. taxpayers irrespective of immigration status. The Families alleged that the ITINs could be used to run the requisite background checks. Waples declined to accept any alternative forms of identification, converted the leases to month-to-month terms, and imposed the $100 surcharge.

Eventually each of the Families chose to vacate their homes at the Park due to the rent increases and fear of eviction.

B.

The Families initiated this lawsuit against Waples in 2016. The complaint alleged, among other things, that the Policy violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. FHA claims can proceed under a disparate-treatment or a disparate-impact theory of liability. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). "Under a disparate-treatment theory of liability, a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' whereas 'a plaintiff bringing a disparate-

5

impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale.'" *Id.*

The Families proceeded under a disparate-impact theory, alleging the Policy violated the FHA by "disproportionately ousting Hispanic or Latino ('Latino') families from their homes and denying them one of the only affordable housing options in Fairfax County, Virginia." J.A. 46. Waples moved to dismiss several counts in the complaint, including the FHA claim.

The district court denied Waples's motion to dismiss as to the FHA claim. It held, however, that the Families could proceed only under a disparate-treatment theory of liability, instead of the disparate-impact theory they had proposed. *See Wright v. Nat'l Archives & Recs. Serv.*, 609 F.2d 702, 711 n.6 (4th Cir. 1979) (noting that the trial court may determine that either theory of liability is unsupported by the evidence, effectively allowing the claim to continue only under one theory of liability).

After discovery, the parties cross-moved for summary judgment on the FHA claim. The district court granted Waples's motion for summary judgment on the Families' FHA claim, which, in accordance with its prior ruling, the court only considered under the disparate-treatment theory of liability. The Families appealed, arguing that the district court's prior dismissal of their FHA claim under a disparate-impact theory of liability was in error.

This court vacated the district court's judgment and held that the claim should have been allowed to proceed under a disparate-impact theory. The court proceeded under the three-part burden-shifting framework established for disparate-impact claims in *Texas*

6

*Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). Under the *Inclusive Communities* framework, the plaintiff bears the initial burden of establishing a prima facie case of disparate impact. *Id*. at 527. If satisfied, the burden shifts to the defendant to show that the discriminatory policy was necessary to achieve a legitimate nondiscriminatory interest. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show that the interest could be served through less discriminatory means. *Id.*

The court concluded that the Families had satisfied Step One by demonstrating that the challenged Policy "caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy." *Reyes*, 903 F.3d at 428. Because the Families had established a prima facie case of disparate impact, the court remanded for the district court to consider Steps Two and Three of the *Inclusive Communities* framework in the first instance. *Id.* at 433.

On remand, the Families pursued only a disparate-impact theory for their FHA claim and Waples filed a renewed motion for summary judgment. Waples argued that it met its burden at Step Two because the Policy was necessary to serve several valid interests "such as verifying identity, conducting criminal background checks, avoiding loss from eviction, and avoiding liability under the anti-harboring statute, 8 U.S.C. § 1324(a)( 1 )(A)(iii)." J.A. 1275.

The Families countered that summary judgment was improper because there were triable issues of fact as to whether Waples could satisfy Step Two of the *Inclusive Communities* framework. Specifically, whether the Policy served a valid interest and, if so,

whether such an interest could be served through less discriminatory means by applying the Policy only to leaseholders as opposed to all tenants in residence. The district court sided with the Families and denied summary judgment to Waples.

As the parties were preparing for trial, the case was reassigned to a new district court judge who reversed course and granted summary judgment to Waples. The court found that Waples met its burden at Step Two because "implementing a policy to avoid increased criminal liability under the anti-harboring statute is a valid and necessary interest." *de Reyes v. Waples Mobile Home Park Ltd. P'ship*, 602 F. Supp. 3d 890, 899 (E.D. Va. 2022). The district court found it "unimportant" whether Waples's Policy was actually motivated by avoiding a harboring prosecution—it was sufficient that Waples was "presumed to have knowledge of the law at the time the Policy was implemented and enforced." *Id*. And at Step Three, the district court ruled that the Families' proposed reasonable alternative of allowing tenants to use ITINs would not "allow [Waples] to limit [its] criminal liability under the anti-harboring statute." *Id*. at 900.

The Families timely appealed.

## II.

We review a grant of summary judgment de novo, applying the same legal standards as the district court while viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reyes*, 903 F.3d at 423. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine

8

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person" on the basis of "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). In *Inclusive Communities*, the Supreme Court construed this provision to encompass not only intentional discrimination under a disparate-treatment theory of liability, but also disparate-impact discrimination claims. 576 U.S. at 545–46.

Under a disparate-impact theory of liability, "a facially neutral employment practice may be deemed violative of [the FHA] without evidence of the employer's subjective intent to discriminate." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–46 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k) (Title VII case). Instead, such claims allow "plaintiffs to counteract unconscious prejudices and disguised animus" by removing "artificial, arbitrary, and unnecessary barriers" to housing that create unjustified "discriminatory effects." *Inclusive Communities*, 576 U.S. at 540. In other words, a defendant can be liable under the FHA for instituting policies that have a disproportionately adverse effect on minorities and are not otherwise justified by a legitimate rationale. *Id.* at 524.

As discussed above, we analyze disparate-impact claims under a three-step burden-shifting framework. Step One requires the plaintiff to demonstrate "a robust causal

9

connection" between a defendant's challenged policy and a disparate impact on a protected class. *Reyes*, 903 F.3d at 424. If the plaintiff establishes such a connection, the burden shifts to the defendant to "state and explain the valid interest served by their policies." *Id*. If this standard is met, the burden then shifts back to the plaintiff "to prove that the defendant's asserted interests 'could be served by another practice that has a less discriminatory effect.'" *Id*.

The first time this case came before the court, we determined that the Families had satisfied their burden at Step One to show a causal connection between the Policy and an attendant disparate impact on Latino residents. *Reyes*, 903 F.3d at 432. We start from that holding.

A.

As for Step Two of the *Inclusive Communities* proof scheme, Waples argues that the Policy of verifying its tenants' legal status was justified by the risk of prosecution under the federal anti-harboring statute, which provides criminal penalties for "[a]ny person" who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." 8 U.S.C.A. § 1324(a)(1)(A)(iii). Waples points to this court's decision in *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012) (per curiam), which upheld a landlord's conviction under the anti-harboring statute, as proof that entering into a lease agreement with an undocumented immigrant could put it at risk.

Thus, it contends, the Policy of verifying legal status before renewing a lease was necessary to serve its valid interest of avoiding criminal liability.

Step Two of the *Inclusive Communities* framework requires defendants to "state and explain the valid interest served by their policies." 576 U.S. at 541. The "touchstone" of Step Two is "business necessity," *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), and business necessity in the context of the FHA is "analogous to the business necessity standard under Title VII," *Inclusive Communities*, 576 U.S. at 541. "Just as an employer may maintain a workplace requirement that causes a disparate impact if that requirement is a 'reasonable measure[ment] of job performance,'" a housing policy can stand if the landlord "can prove it is necessary to achieve a valid interest." *Id*.

A business necessity need not be a do-or-die matter. A necessitous policy can be, but need not be, one that spells the difference between solvency and bankruptcy. The Ninth Circuit has put it well: "Although the Supreme Court in *Inclusive Communities* used the phrase 'business necessity' to describe this step of the analysis, that term is somewhat of a misnomer . . . the defendant need not demonstrate that the challenged policy is 'essential or indispensable' to its business—only that the policy 'serves, in a significant way,' its legitimate interests." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 967 (9th Cir. 2021).

Avoiding criminal liability can certainly serve as the basis for a business necessity defense. *See Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 340 (4th Cir. 2022) ("[C]omplying with . . . legally binding federal regulation[s] is, by definition, a business necessity.") (quoting B*ey v. City of New York*, 999 F.3d 157, 171 (2d Cir. 2021)). But it also cannot be

the case that defendants can claim business necessity by rattling off inapplicable statutes as their justification for promulgating a challenged policy. *Inclusive Communities*, 576 U.S. at 524, 527 (noting that the interest underlying a business necessity defense must be "legitimate"). A "legitimate" interest cannot be a phony. *Id.* Otherwise defendants could manufacture business necessity based on speculative, or even imagined, liability. It seems then that the risk of prosecution or liability under a statute must at least be plausible. Here, the anti-harboring statute simply does not apply to landlords merely leasing to undocumented immigrants, and Waples's risk of prosecution is too attenuated to cross the threshold of a plausible concern.

The text of the anti-harboring statute requires something more than merely entering a lease agreement with an undocumented immigrant. To violate the statute, one must "knowing[ly]" or "reckless[ly]" "conceal, harbor, or shield from detection" such a person. 8 U.S.C.A. § 1324(a)(1)(A)(iii). Conceal, harbor, and shield are all active verbs. Thus, the statute only applies to those who intend in some way to aid an undocumented immigrant in hiding from the authorities. It involves an element of deceit that is not present in run-of-the mill leases made in the ordinary course of business.

Our decision in *Aguilar* does not suggest otherwise. 477 F. App'x. 1000. There we upheld a conviction under the anti-harboring statute of a woman who rented nine of the ten rooms in her home to undocumented immigrants. *Id.* at *1003. We held that substantial evidence supported her conviction because each of her tenants were undocumented, and she had been "repeatedly . . . warned by officials that numerous of her tenants were not properly documented." *Id*. Looking at the trial evidence, it was clear that the defendant in

*Aguilar* was running a flophouse to help offset her mortgage payments. *See United States v. Aguilar*, 4th Cir. No. 11-4961, ECF 31 (citing district court record). In other words, evidence of an intent to harbor undocumented immigrants was present.

But *Aguilar* did not hold that *housing* was a synonym for *harboring* under the statute, and the case cannot be read to extend the threat of prosecution under the statute to merely renting to an undocumented immigrant. Indeed, every precedential appellate decision to address whether renting to an undocumented person, without more, violates the statute has come to the same conclusion. *See, e.g.*, *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015) ("[W]hen the basis for the defendant's conviction under [the anti-harboring statute] is providing housing to a known illegal alien, there must be evidence from which a jury could conclude, beyond a reasonable doubt, that the defendant intended to safeguard that alien from the authorities."); *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under [the statute]."); *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking lawful immigration status constitutes harboring."); *Lozano v. City of Hazleton*, 724 F.3d 297, 320 (3d Cir. 2013) ("Renting an apartment in the normal course of business is not, without more, conduct that prevents the government from detecting an alien's unlawful presence. Thus, it is highly unlikely that renting an apartment to an unauthorized alien would be sufficient to constitute harboring in violation of the [statute]."); *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524,

13

530 (5th Cir. 2013) ("Farmers Branch's prohibition on renting to non-citizens here contrary to law thus not only fails to facilitate, but obstructs the goal of bringing potentially removable non-citizens to the attention of the federal authorities.").

In light of the consensus reading of the anti-harboring law, giving credence to Waples's understanding of the statute would make us a distinct outlier in an area of law which should ideally be national in character and uniform in the circuits' interpretation of it.

It is instructive to contrast the extensive regulation of immigration status in employment with the lack of such regulation in housing. Since 1986, the Immigration Act has required employers to vet the immigration status of their employees or face civil and criminal sanctions. *See* 8 U.S.C. § 1324a. The government requires employers to complete and maintain a Form I-9 Employment Eligibility Verification for each employee. It maintains an electronic database to allow employers to verify the immigration information that employees submit, and it provides extensive guidance to employers on complying with the statute. *See, e.g.*, U.S. Citizen and Immigration Services, *Handbook for Employers M-274* (updated July 2023).

In contrast, no similar verification requirement, regulatory regime, or elaborate penal structure exists in the context of housing. This makes good sense. A policy that discouraged or prohibited landlords from housing any undocumented individual would lead to homelessness on an even greater scale than we are presently experiencing. Congress can of course modify its approach to housing policy at any time it so desires. In the

meantime, we shall not misread the anti-harboring statute to facilitate the gratuitous infliction of homelessness upon countless numbers of people residing in this country.

The Department of Justice has represented in an amicus brief in support of the Families that "residential landlords do not ordinarily risk exposure to liability under [the anti-harboring statute] merely for failing to proactively verify their tenants' immigration statuses." Brief of Amicus Curiae, Dep't of Justice at 11. "The Department of Justice does not prosecute residential landlords merely because they do not, in the normal course of business, check the immigration status of every person living in their rentals." *Id*. at 12. Waples does not point to a single instance that would lead us to question the Department's representation.

In sum, the anti-harboring statute does not plausibly put Waples at risk for prosecution simply for leasing to families with undocumented immigrants. Accordingly, we hold that Waples did not satisfy its burden at Step Two because its Policy did not serve in any realistic way to avoid liability under the anti-harboring statute. Because Waples did not meet its burden at Step Two, we need not reach Step Three to determine whether the Families could show that a less discriminatory alterative was available. For these reasons, the district court erred in granting summary judgment to Waples.

B.

There is a further infirmity in Waples's position specific to this case. The record here is simply too thin to support a business necessity defense.

To begin with, the circumstances surrounding Waples's enforcement of the Policy were dubious. The Policy seemed to come out of nowhere. The Families had lived at the

15

Park for years before Waples began enforcing the long-dormant Policy provision. And the decision to begin enforcing the Policy stemmed, not from any immigration-related developments or discoveries at the Park, but from unrelated violations of other Waples policies at other Waples properties. Having a Policy on the books that required the verification of the legal status of all adult tenants in residence, but disregarding its enforcement for years, calls into question Waples's contention that it was concerned about avoiding harboring liability.

Even more puzzling is how Waples proceeded when it discovered that there were undocumented individuals living at the Park. If Waples was truly concerned about being prosecuted for housing undocumented immigrants, its expected course would be to remove such tenants from the Park as quickly as possible. But Waples did not evict a single person who failed to comply with the Policy from the Park. Instead, Waples increased the rent payments that noncompliant tenants were charged every month. That meant that while Waples was representing that it could not house undocumented immigrants without facing criminal penalties, it was knowingly housing such immigrants and charging them a premium to stay. If Waples were at risk for prosecution under the anti-harboring statute, it would have a difficult time explaining to a prosecutor why, instead of evicting known undocumented immigrants, it opted to implement a surcharge instead.

On a record this thin, Waples cannot have met its burden to establish that the Policy served a legitimate interest. Proof schemes depend on record evidence and the record here falls short of anything approaching business necessity. For this reason too, the district court erred in granting summary judgment to Waples.

III.

For the foregoing reasons, we reverse the grant of summary judgment for Waples and remand the case to the district court for further proceedings consistent with this decision.

*REVERSED AND REMANDED*