### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, *Plaintiffs*, vs. WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., *Defendants*. | Case No. 1:16-cv-00563 (PTG/WBP) |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS *IN LIMINE*

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs") submit the following memorandum of law in support of their motions *in limine*, in accordance with the Court's March 11, 2024, Order (ECF 451).

### Factual Background

**The Parties**

Plaintiffs are four Latino couples of Salvadoran and Bolivian national origin who lived for years with their children in Waples Mobile Home Park in Fairfax, Virginia (the "Park") until they were forced to leave in 2015 and 2016. *See generally* ECF 138, Exs. 8-11. The four male Plaintiffs are legally present in the United States; the four female Plaintiffs were, during the relevant period, undocumented immigrants who possess U.S. government-issued Individual Taxpayer

1

Identification Numbers ("ITINs"); all of their children are U.S. citizens. *Id.* Each of the male Plaintiffs passed a credit and criminal background check as part of the application process to live in the Park, and subsequently entered into yearly leases. *See* ECF 138, Exs. 12-15.

Defendants Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. (collectively "Defendants" or "Waples") are Virginia companies. Defendants own and operate the Park, and promulgated and enforced a discriminatory policy (the "Policy") against the Plaintiffs. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 419 (4th Cir. 2018) ("*Reyes I*").

### The Discriminatory Policy

The Policy requires all adult residents to present an original Social Security card or, in the absence of a Social Security card, an original passport plus an original U.S. visa and an original I-94 (or I-94W) arrival/departure form (the "Policy"). ECF 138, Ex. 3. Although the Policy says nothing explicit about immigration, the effect of the Policy is to exclude adults who are undocumented immigrants from the Park.

### Defendants' Enforcement of the Discriminatory Policy

Though the Policy was technically in existence when the Plaintiffs moved to the Park, it was rarely enforced. Defendants, for example, knowingly allowed the female Plaintiffs to live at the Park for years without submitting one of the specified forms of identification. *See, e.g.*, ECF 138, Exs. 4-7; Ex. 8 ¶ 14; Ex. 9 ¶¶ 12-13; Ex. 11 ¶ 12; Ex. 17; Ex. 18 at 39:3-5; Ex. 20 at 49:9-22; 58:5-59:4; Ex. 32.

In 2015, Defendants began to strictly enforce the Policy through a "recertification" process for Park tenants seeking to renew their annual leases, during which time Plaintiffs were informed that they were in violation of the Policy. *See* ECF 138, Exs. 4-7. Defendants rejected the Plaintiffs'

efforts to provide alternative forms of identification, such as passports, ITINs, and completed criminal background checks. ECF 138, Ex. 16 at 59:7-9; Ex. 20 at 50:7-53:2; Ex. 34.

Defendants threatened each of the Plaintiff families with eviction. ECF 138, Exs. 4-7. But in the first instance, Defendants converted Plaintiffs' leases to "month-to-month" status and increased their monthly rent by $100, and later threatened to hike the rent by another $300 per month. ECF 138, Exs. 4-7; Ex. 22. The combination of the rent increases and the eviction notices— and the stress stemming from both—operated to force the Plaintiffs from the Park. *See* ECF 138, Ex. 16 at 83:15-84:19; Ex. 20 at 61:1-62:8; Ex. 38; Ex. 39.

## Procedural Background

### The Complaint and the First Summary Judgment Ruling

Plaintiffs challenged the Policy by filing this lawsuit in May 2016. ECF 1. The complaint asserted claims under federal and state law, including that the Policy violated the federal Fair Housing Act, 42 U.S.C. § 3604 ("FHA"), by creating a disparate impact against Latinos. The complaint sought damages, declaratory relief, and an injunction ordering Defendants to stop enforcing the Policy. *Id.* at 23-24, 30-31.

Following motions practice and discovery, the parties filed cross-motions for summary judgment. ECF 97-98, 138, 150, 157. Judge Ellis granted partial summary judgment for Defendants in April 2017. ECF 190; 251 F.Supp.3d 1006 (E.D. Va. 2017).

### The First Appellate Reversal (*Reyes I*)

After Plaintiffs appealed, the Fourth Circuit vacated this Court's judgment in a published opinion. *Reyes I*, 903 F.3d 415. The court applied the three-step, burden-shifting proof framework adopted for FHA disparate impact claims by the U.S. Supreme Court in *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015)

("*Inclusive Communities*") (hereinafter, "burden-shifting framework" or "disparate impact standard"). The decision describes the applicable framework as follows:

- Under Step One, "the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class."

- Under Step Two, the defendant has the burden of persuasion to "state and explain the valid interest served by their policies," which is "analogous to Title VII's business necessity standard."

- Under Step Three, "and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests could be served by another practice that has a less discriminatory effect."

*Reyes I,* 903 F.3d at 424 (footnote and citations omitted).

Judge Ellis had ruled that Plaintiffs failed to meet their Step One burden to show disparate impact on a protected class "because the undisputed factual record confirms that the Policy burdens the female plaintiffs not because they are Hispanic, but rather because they entered the country illegally." 251 F.Supp.3d at 1016. That holding, according the Fourth Circuit, was a "grievous error" that "threaten[ed] to eviscerate disparate-impact claims altogether." *Reyes I*, 903 F.3d at 430. In fact, the Plaintiffs had "satisfied step one . . . by demonstrating that Waples' Policy . . . caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy." *Id.* at 428-29. That was because the Plaintiffs had presented evidence that Latinos comprised over 90% of the individuals unable to comply with the Policy and consequently facing eviction, despite comprising only 60% of those subject to the Policy. *Id.* at 433 n.11. Because the Plaintiffs had established a *prima facie* case of

disparate impact, the Fourth Circuit remanded to this Court to consider Steps Two and Three of the burden-shifting framework in the first instance. *Id.* at 433.

**The Second Summary Judgment Ruling**

On remand, the Plaintiffs pursued only a disparate impact theory, and Waples filed a new motion for summary judgment arguing (among other things) that it could not be held liable under the FHA because there was a Step Two "business necessity" for the Policy: avoiding criminal liability under the federal "anti-harboring" statute. ECF 208. That statute prohibits "conceal[ing], harbor[ing], or shield[ing] from detection" a so-called "alien," while "knowing or in reckless disregard of the fact" that the person entered or remained in the U.S. in violation of law. 8 U.S.C. § 1324(a)(1)(A). Judge Ellis denied Defendants' motion, and the subsequent motion for reconsideration, ruling that there were genuine disputes of material fact with respect to both Step Two and Step Three of the *Inclusive Communities* burden-shifting framework. ECF 298 at 3-4.

In February 2021—as the parties were briefing motions *in limine*—the case was reassigned to Judge O'Grady. ECF 356, 358. After hearing argument on the motions, and despite the prior rulings from Judge Ellis, Judge O'Grady *sua sponte* ordered the parties to file supplemental briefing on four issues, including (i) "whether avoiding the risk of criminal liability under [the anti-harboring statute] is a valid interest [at] Step Two of *Inclusive Communities*," and (ii) "whether Defendants' motive for implementing the [Policy] is relevant to Defendants' Step Two burden." ECF 413 at 2.

After supplemental briefing and argument on those issues, Judge O'Grady granted summary judgment to Defendants based on the anti-harboring statute. ECF 440. The Court ruled that "implementing a policy to avoid increased criminal liability under the anti-harboring statute is a valid and necessary interest that satisfies the second step of the burden shifting framework."

*Id.* at 15. In addition, the Court ruled that it was "unimportant whether the Defendants can provide evidence that they possessed the valid interest at the time the Defendants adopted the challenged policy." *Id.* at 14. As to Step Three, the Court concluded that Plaintiffs' proposed reasonable alternative—requesting tenants' ITINs but not proof of immigration status—would not "allow Defendants to limit their criminal liability under the anti-harboring statute." *Id.* at 16.

### The Second Appellate Reversal (*Reyes II*)

Plaintiffs appealed again, and the Fourth Circuit reversed again in another published decision. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270 (4th Cir. 2024) ("*Reyes II*"). The Fourth Circuit issued two independent holdings supporting reversal. First, "the district court's ruling rested upon a basic misapprehension of the [anti-harboring] statute." *Id.* at 273. That statute "does not plausibly put Waples at risk for prosecution simply for leasing to families with undocumented immigrants." *Id.* at 279. Accordingly, "Waples did not meet its burden at Step Two because its Policy did not serve in any realistic way to avoid liability under the anti-harboring statute." *Id.* Second, "[p]roof schemes depend on record evidence," and the "record here is simply too thin to support the business necessity defense," because Defendants' actions in enforcing the policy were inconsistent with their assertion that they were motivated by a concern with harboring. *Id.* at 279-80. The Fourth Circuit remanded again for "further proceedings consistent with [its] decision." *Id*. at 280.

### ARGUMENT

In *Reyes I* and *Reyes II*, the Fourth Circuit framed the issues to be resolved at trial. Plaintiffs will put on their statistical evidence that Defendants' Policy caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy, which the Fourth Circuit has held "satisfied [S]tep [O]ne" of the burden-shifting framework. *Reyes I*, 903 F.3d at 428-29; *see also id.* at 433 n.11. Defendants will have the

opportunity to offer evidence as to their Step Two "business necessity" defenses for the Policy, but subject to the clear holdings and limitations of *Reyes II*—including that the anti-harboring statute is an invalid justification and that any Step Two defense must be supported by evidence and cannot be "a phony." *Reyes II*, 91 F.4th at 276-80. And Plaintiffs will introduce Step Three evidence to prove that Defendants' asserted Step Two interests "could be served by another practice that has a less discriminatory effect," *Reyes I*, 903 F.3d at 424; *Reyes II*, 91 F.4th at 279.[1]

Despite these explicit holdings, Defendants have nonetheless insisted that they will continue to seek to introduce arguments and evidence that are irrelevant to the burden-shifting framework; have already been rejected outright by the Fourth Circuit; and/or are otherwise impermissible. Defendants' arguments and evidence which violate the law of the case or are inadmissible under the Federal Rules of Evidence should be excluded.

## I.    THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE OF "BUSINESS NECESSITY" AT STEP TWO UNLESS THE EVIDENCE RELATES TO THE ACTUAL, CONTEMPORANEOUS REASONS FOR THE POLICY.

In an earlier motion *in limine*, Defendants argued, regarding their burden at Step Two, that the "reasons [that] motivated the Policy are not relevant to a disparate impact claim." ECF 342 at 5; *see also* ECF 440 at 14 (summary judgment ruling that such evidence was "unimportant"). The Fourth Circuit rejected that position, making clear that Step Two requires Defendants to prove the actual, contemporaneous reasons for their Policy. *Reyes II*, 91 F.4th at 277, 279-80. Nevertheless, Defendants have advised that they will re-submit a motion *in limine* arguing once again that the actual reasons for the Policy are "not relevant." To ensure the matter is clear, Plaintiffs request an

---

[1] Plaintiffs will also introduce evidence of their entitlement to damages and other relief, which is a component of any disparate-impact claim. 46 U.S.C. § 3613(c).

order requiring Defendants to present evidence regarding the actual motivations for the Policy, and excluding evidence based on speculation or *post hoc* rationalization.

The Fourth Circuit held in *Reyes II* that "the record was insufficient to establish [Defendants'] proposed [Step Two] defense." 91 F.4th at 273. The record mattered because Step Two requires Defendants to prove a "'legitimate' interest," which "cannot be a phony." *Id.* at 277 (quoting *Inclusive Communities*, 576 U.S. at 527). "Otherwise defendants could manufacture business necessity based on speculative, or even imagined, liability." *Id.*

Applying that holding, the Fourth Circuit decided that Defendants failed to meet their Step Two burden because the evidence did not show that they were, in fact, motivated by concerns with their defense of complying with the anti-harboring statute. The court observed:

> Having a Policy on the books that required verification of the legal status of all adults in residence, but disregarding its enforcement for years, calls into question Waples's contention that it was concerned about harboring liability.

*Id.* at 279. And further,

> If Waples was truly concerned about being prosecuted for housing undocumented immigrants, its expected course would be to remove such tenants from the Park as quickly as possible. But Waples did not evict a single person who failed to comply with the Policy from the Park. Instead, Waples increased the rent payments that noncompliant tenants were charged every month. . . . If Waples were at risk for prosecution under the anti-harboring statute, it would have a difficult time explaining to a prosecutor why, instead of evicting known undocumented immigrants, it opted to implement a surcharge instead.

*Id.* at 279-80. The court concluded by emphasizing the central place of record evidence at Step Two:

> On a record this thin, Waples cannot have met its burden to establish that the Policy served a legitimate interest. *Proof schemes depend on record evidence and the record here falls short of anything approaching business necessity.* For this reason too, the district court erred in granting summary judgment to Waples.

*Id.* at 280 (emphasis added).

The Fourth Circuit's holding that Defendants must demonstrate an *actual, contemporaneous* justification for the Policy at Step Two follows from the Supreme Court's holding in *Inclusive Communities*, and from long-established regulations issued by the Department of Housing and Urban Development (HUD). The Supreme Court held that Step Two requires defendants to "prov[e] that the challenged practice is necessary to achieve one or more substantial, *legitimate*, nondiscriminatory interests." 576 U.S. at 527 (emphasis added). In that regard, the Court aligned its analysis with HUD's 2013 Disparate Impact Rule, 24 C.F.R. § 100.500(c)(2), and the regulatory text accompanying that Rule, 576 U.S at 527-28, 541, 542. *See also Reyes I*, 903 F.3d at 424 n.4 ("The HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities*[.]"). Under the HUD regulation, a defendant seeking to justify a discriminatory policy at Step Two must prove "[a] legally sufficient justification" that is "supported by evidence" and is not "hypothetical or speculative." 24 C.F.R. § 100.500(b)(2) (2013). A Step Two justification must be "genuine and not false," 78 Fed. Reg. at 11470, not "fabricated or pretextual," *id.* at 11471—or, in the words of the Fourth Circuit, not "a phony." 91 F.4th at 277.

As a result, Defendants may not concoct justifications for the Policy after the fact; to be legally sufficient, the justification must have been an actual, contemporaneous motivation for the Policy at the time of its enforcement. *Mt. Holly Gardens Citizens in Action v. Twp. of Mt. Holly*, 658 F.3d 375, 385 (3d Cir. 2011) ("[Step Two] simply results in a more searching inquiry into defendant's motivations—precisely the sort of inquiry required to ensure that the [defendant] does

not deprive people of housing 'because of race'"); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 513 (9th Cir. 2016) (same (citing *Mt. Holly Gardens,* 658 F.3d at 385)).[2]

In practice, this means that Defendants must produce admissible evidence of their actual reasons for enforcing the Policy against the Plaintiffs to meet their Step Two burden. Justifications developed after the fact (like their anti-harboring claim) are not relevant and must be excluded under Federal Rules of Evidence 401 and 402. *See e.g., Treece v. Perrier Condo. Owners Ass'n, Inc.*, Civil Action No. 17-10153, 2020 WL 759567, at *18 (E.D. La. Feb. 14, 2020) ("A reason is not 'legitimate' or 'valid' if it was not present at the time [of] a rule's adoption, but rather is a *post hoc* rationalization for a discriminatory policy, or when the justification is otherwise arbitrary."); *Fair Hous. Ctr. of Wash. v. Breier-Scheetz Props., LLC*, No. C16-922TSZ , 2017 WL 2022462, at *4 (W.D. Wash. May 11, 2017) ("defendants have offered no evidence that would allow the Court to conclude that defendants' concern about fairness is anything more than an arbitrary, *post-hoc* justification for a discriminatory policy").[3] Speculation is likewise irrelevant to the Defendants' burden to show their actual motivations. *See* 24 C.F.R. § 100.500(b)(2); *Charleston Hous. Auth.*

---

[2] *See also Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 988 (4th Cir. 1984) ("[W]hen confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice."); *Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 617 (2d Cir. 2016) (at Step Two, "the defendant or respondent may rebut the prima facie case by proving that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.'" (quoting 24 C.F.R. § 100.500(c)(1)-(2) (2013)); *Reinhart v. Lincoln Cnty.,* 482 F.3d 1225, 1229 (10th Cir. 2007) ("Once plaintiffs establish a prima facie case of disparate impact, the burden shifts to the defendant to produce evidence of a genuine business need for the challenged practice." (internal quotation omitted)).

[3] *See also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646-47 & n.2 (4th Cir. 2002) (when asked to justify an employment decision, an employer may not provide post-hoc rationalizations and claim that they are the actual criteria on which the decision was based); *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001) ("a factfinder could infer from the late appearance of Sears's current justification that it is a post-hoc rationale, not a legitimate explanation for Sears' decision not to hire Santana").

*v. U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (affirming district court's decision to "determine[] as a matter of fact that [the defendants'] justifications were pretextual because they were unsupported by evidence"). And testimony from witnesses who lack knowledge of the reasons for the Policy must also be excluded at Step Two under Rule 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

## II.   THE COURT SHOULD PRECLUDE DEFENDANTS FROM ELICITING EVIDENCE REGARDING ALLEGED "BUSINESS NECESSITIES" ARISING FROM INAPPLICABLE STATUTES.

In their struggle to find "business necessities" to justify the Policy under Step Two of the disparate impact standard, Defendants have claimed two legal justifications that have no applicability to their business whatsoever—namely, compliance with the "anti-harboring statute," 8 U.S.C. § 1324, and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), 8 U.S.C. § 1611.

As an initial matter, because each of these purported justifications involves the interpretation and application of a legal statute, Defendants' witnesses are not qualified to testify as to whether such statutes would apply to their business. *See, e.g., United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."); *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Rather, such legal conclusions lay squarely within the province of the Court. *See Plum Creek Timberlands, L.P. v. Yellow Poplar Lumber Co., Inc.,* No. 1:13CV00062, 2016 WL 6837173, at *3 (W.D. Va. Nov. 21, 2016) (excluding testimony amounting to legal opinions because it "invade[d] the province of the court").

Moreover, as the Fourth Circuit made clear on appeal, it "cannot be the case that defendants can claim business necessity by rattling off inapplicable statutes as their justification for

promulgating a challenged policy." *Reyes II*, 91 F.4th at 277. "A 'legitimate' interest cannot be a phony," as "[o]therwise defendants could manufacture business necessity based on speculative, or even imagined, liability." *Id.* Hence, to qualify as a business necessity under Step Two, "the risk of prosecution or liability under a statute must at least be plausible." *Id.*

Defendants do not face a plausible risk of prosecution or liability under either the anti-harboring statute or the PRWORA. The Fourth Circuit has already concluded that "the anti-harboring statute does not plausibly put Waples at risk for prosecution simply for leasing to families with undocumented immigrants." *Id.* at 279. Because the anti-harboring law was "inapplicable" to Defendants' mobile home park and liability under it not "plausible," the Court held that Defendants "did not satisfy [their] burden at Step Two." *Id.* Given the Fourth Circuit's clear holding, Defendants have notified Plaintiffs that they no longer intend to introduce argument or evidence about the anti-harboring statute at trial.

The same principle should bar Defendants from introducing argument or evidence about the PRWORA.[4] Before *Reyes II*, Defendants attempted to bolster their position by claiming that federal law requires landlords to verify the legal status of residents or risk not being able to underwrite them. *See* ECF 256, Ex. 2 at 25:11-26:7. This federal law, the PRWORA, restricts specified federal public housing subsidies to U.S. citizens and "qualified" immigrants, including lawful permanent residents, asylees, refugees, and others. 8 U.S.C. §§ 1611(a), (c)(1)(B), 1641. However, the PRWORA manifestly does not apply to Defendants' mobile home park. The Park does not receive federal subsidies, ECF 332, Ex. 5 at 28:10-29:3, and thus it cannot possibly be

---

[4] Unlike with the anti-harboring statute, Defendants have provided no assurances to Plaintiffs after *Reyes II* that they would not introduce argument or evidence related to the PRWORA.

subject to the PRWORA. Mr. Caruso, Defendants' expert witness on this topic, agrees. ECF 256, Ex. 2 at 29:15-30:16 (testifying that this federal law only applies to publicly funded housing).

Defendants argue that "it is reasonable to adopt 'the most restrictive standard, which is the federal standard.'" ECF 248 at 27. But, when faced with the prospect of a disparate impact on a protected class, what Defendants might consider "reasonable" is simply not enough. To justify a discriminatory policy at Step Two by reference to a statute, "the risk of prosecution or liability under [that] statute must at least be plausible." *Reyes II*, 91 F.4th at 277. Absent federal funding, here it is not.

Up to this point, Defendants have not alleged that they mistakenly believed that the PRWORA applied to Park. But that allegation would not salvage their reliance on the PRWORA —or any other statute. A misunderstanding of legal obligations does not justify a discriminatory policy; the "risk of prosecution or liability" must be real. *Id.*; *see also Rhode Island Comm'n for Human Rights v. Graul,* 120 F.Supp.3d 110, 127-128 (D. R.I. 2015) (finding that misinterpreted legal standard "cannot be said to be necessary to achieve a valid interest" under Step Two of the disparate impact standard).

Finally, even if evidence related to inapt legal theories were somehow relevant, it would be both confusing and unfairly prejudicial—and that risk of confusion and unfair prejudice would substantially outweigh its probative value under Federal Rule of Evidence 403. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1063-64 (9th Cir. 2008) ("a party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury, even if the evidence might have been relevant in some conceivable manner"; "We agree with the district court's

conclusion that the probative value of any reference to the erroneous legal principle . . . was substantially outweighed by the risk of misleading or confusing the jury.").

Plaintiffs therefore request that the Court preclude Defendants from introducing evidence or argument on the anti-harboring statute and the PRWORA. Plaintiffs further request that the Court issue an instruction to the jury that a mistake of law cannot constitute a "business necessity" under Step Two of the burden-shifting framework.

## III.    EVIDENCE OF DEFENDANTS' RELATIONSHIP WITH OR VIEWS TOWARD IMMIGRANTS AND THE LATINO COMMUNITY SHOULD BE EXCLUDED.

In their efforts to prove that the Policy did not have an unlawful discriminatory *effect*, Defendants seek to introduce evidence of their allegedly positive relationship with the Latino community and their lack of intent to discriminate against Latinos and immigrants. Because this evidence is irrelevant to a disparate *impact* inquiry and would only serve to confuse the jury, evidence that Defendants may have lacked animus toward immigrants or Latinos, received Fair Housing training, or advertised to the Latino community should be excluded.

### A.    Evidence of Defendants' Claimed Lack of Prejudice Toward Immigrants and the Latino Community Is Irrelevant and Should Be Excluded.

Any evidence of the Defendants' general lack of prejudice or animus toward immigrants, immigration, or the Latino community should be excluded as irrelevant because such views do not bear on a disparate impact theory of liability. Even if relevant, this evidence should be excluded because it would only serve to confuse and mislead the jury.

Under Federal Rule of Evidence 401, evidence is irrelevant if it does not tend to make a fact at issue more or less likely than it would be without the evidence. Disparate impact theory assesses the discriminatory *effect* of a policy but does not require evidence that the policy was motivated by animus or prejudice. *See Inclusive Communities*, 576 U.S. at 524. And a "facially neutral employment practice may be deemed violative of [the FHA] without evidence of the

employer's subjective intent to discriminate." *Reyes II*, 91 F.4th at 276 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645-46 (1989)).[5]

Because a finding of unlawful discriminatory effect does not hinge on whether Defendants acted with animus, evidence of the *absence* of discriminatory intent toward a protected class does not affect the inquiry into the Policy's impact. In *Griggs v. Duke Power Co.*, the Supreme Court found that the employer's "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." 401 U.S. 424, 432 (1971). In that case, the high court noted a lack of discriminatory intent, but determined that "Congress directed the thrust of the [Civil Rights] Act to the consequences of employment practices, not simply the motivation." *Id. See also Burwell v. E. Air Lines, Inc.*, 633 F.2d 361, 374 (4th Cir. 1980) ("[A] complainant need not prove discriminatory motive in a case that discloses discriminatory impact.") (Butzner, J., concurring).

Because evidence of Defendants' views towards Latinos and immigrants is irrelevant to the disparate impact standard, it must be excluded.

- At Step One, the relevant question is whether Defendants' Policy caused a disproportionately discriminatory effect, and the Fourth Circuit has concluded that it did. *Reyes I*, 903 F.3d at 428-29. Evidence of any favorable opinions of immigrants, immigration, and the Latino community could only serve to prove that Defendants

---

[5] Disparate impact inquiry does, however, require review of the business justification necessitating a challenged policy. *See* Section I, *supra*. In other pleadings, Defendants have attempted to conflate Steps One and Two of the burden-shifting framework in this regard, arguing that because proof of intent is not required at Step One, then defendants can create justifications out of whole cloth at Step Two. *E.g.*, ECF 416 at 8-12. As discussed above, the Fourth Circuit has clearly rejected that position.

generally did not intend to discriminate. Such views and opinions do not make it more or less likely that this Policy had a discriminatory effect.

- At Step Two, evidence of Defendants' general views toward the Latino community and immigrants has no bearing on whether the Policy served any of Defendants' purported business justifications, such as confirming residents' identities, performing criminal background checks, or facilitating lease underwriting.[6] *See Reyes II*, 91 F.4th at 275.

- At Step Three, such evidence is irrelevant to whether Defendants' asserted business interests could be served by another policy that has a less discriminatory effect. *Id.* at 276.

Moreover, this evidence would confuse and mislead the jury because it implies that Defendants should not be liable because they did not mean to discriminate. In fact, the purpose of disparate impact theory is to review a policy's discriminatory impact, regardless of whether Defendants acted with express prejudice or not. Because any probative value is substantially outweighed by the danger that it will confuse the issues before the jury, this evidence should also be excluded under Federal Rule of Evidence 403.

## B. Evidence that Defendants or Defendants' Employees Received FHA Training Is Similarly Irrelevant and Should be Excluded.

Similarly, any evidence of Defendants' or Defendants' employees' FHA training should be excluded as irrelevant because this action is based on a disparate impact theory of liability, and

---

[6] Defendants have asserted several reasons for implementing the Policy: (1) to confirm lease applicants' identities, (2) to perform credit and criminal background checks, (3) to minimize loss from eviction, (4) to avoid potential criminal liability under the anti-harboring statute (which Defendants no longer intend to argue in light of *Reyes II*), and (5) to underwrite leases. ECF 248 at 2. None of these purported justifications for the Policy is related to their lack of animus toward immigrants or the Latino community.

such evidence does not make it more or less likely that a disparate impact occurred. Any evidence as to professional trainings or certifications of Defendants' employees has no probative value beyond showing a possible general lack of discriminatory intent, which is irrelevant here. *Supra* at III.A.

In addition, any FHA trainings occurred only *after* Defendants began enforcing the Policy.[7] Those events are thus even less relevant, and more likely to confuse and mislead the jury. Hence, any evidence that Defendants received FHA trainings or certifications is irrelevant under Federal Rule of Evidence 401 and confusing to the jury under Rule 403 and should be excluded.

### C.    Evidence That Defendants Sought to Advertise in Spanish Is Also Irrelevant and Should Be Excluded.

Finally, any evidence that Defendants sought to advertise or in fact advertised their business in Spanish should be excluded as irrelevant because such evidence does not make it more or less likely that a protected class suffered a disparate impact.

As a preliminary matter, Defendants have produced no evidence of Spanish-language advertisements, or plans to advertise, for the Park.[8] But even if Defendants had produced evidence of plans to conduct Spanish-language outreach or advertisement for the Park—similar to evidence

---

[7] Defendants began enforcing their Policy against Park residents at least as early as June 2015. *See*, *e.g.*, ECF 138, Ex. 51; ECF 402, Ex. 4; ECF 138, Ex. 26 at 50:11-14; 51:25-52:8. None of the cited FHA trainings occurred prior to Policy enforcement. ECF 402, Ex. 5.

[8] Defendants produced one email regarding advertisements in a "Washington Hispanic" paper (with no indication of the language of the advertisements or subject matter). ECF 98, Ex. 32. The only other evidence is a 2014 marketing plan, which identifies a need to advertise in Spanish in a different mobile home park and plans to translate that park's website into Spanish. ECF 98, Ex. 33 at 2-3. The extensive marketing plan lists not a single example of a Spanish language advertisement. *See generally* ECF 98, Ex. 33. Additionally, the email is inadmissible evidence of Spanish language advertisements because it does not include the actual original advertisements. To prove the content of a writing, in this case, that the referenced advertisements were in Spanish, the original writing is required. Fed. R. Evid. 1002.

of Defendants' views on immigration, or evidence of FHA training—it would only serve to show a lack of discriminatory intent, which, again, does not make the disparate impact of the Policy more or less likely, and is therefore inadmissible under Rule 401.

## IV.  THE COURT SHOULD RESTRICT CROSS-EXAMINATION REGARDING THE FEMALE PLAINTIFFS' IMMIGRATION STATUS.

Beyond the core elements of the disparate-impact claim, the Court should limit distractions and unfairly prejudicial flashpoints at trial. One potential sideshow is the female Plaintiffs' immigration status.

The basis of Plaintiffs' claim is that, in that particular census tract of Fairfax County, where a policy targets undocumented individuals, the Latino population suffers a disparate impact. In arguing that they are among those disparately impacted by this Policy, the female Plaintiffs have conceded—and the fact is undisputed—that they lacked immigration status at the time Defendants' Policy was enforced against them. This fact can be established at the start of the trial by presenting the jury with each Plaintiff's answers to the relevant Requests for Admission on this topic. Additional testimony as to the immigration status of each Plaintiff should be excluded because it is cumulative and unfairly prejudicial under Rule 403, and can only serve to harass and embarrass the Plaintiffs, which this Court is empowered by Rule 611 to prevent.

Relevant evidence may be excluded "if the probative value of the evidence is substantially outweighed by unfair prejudice that will result from its admission," and unfair prejudice "refers to an undue tendency of evidence to influence a jury to make a decision for reasons unrelated to the probative value of the evidence." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014) (unreported) (internal citations omitted); *see also* Fed. R. Evid. 403. "[U]sually, although not always, unfairly prejudicial evidence appeals to the jury's emotions

rather than intellect." *United States v. Daulton*, 266 F. App'x 381, 385 (6th Cir. 2008) (quoting Fed. R. Evid. 403 cmt.).

The probative value of additional testimony regarding immigration status is negligible here. The Fourth Circuit made clear that "Plaintiffs' disparate impact claim is not precluded simply because the female Plaintiffs cannot satisfy the Policy because they are illegal immigrants when they have alleged that the Policy disparately impacts Latinos." *Reyes I*, 903 F.3d at 432. Other courts have agreed that, where a law protects illegal aliens, reference to their immigration status should be excluded. In *Uto v. Job Site Services, Inc.*, an employer sought to discover evidence of the employees' immigration status. In issuing a protective order barring that discovery, the court found that allowing discovery of the employees' immigration status would cause a chilling effect which would "effectively eliminate the FLSA as a means for protecting undocumented workers from exploitation and retaliation." 269 F.R.D. 209, 212 (E.D.N.Y. 2010). Similarly, the court in *Orellana v. Tecta America South Florida, Inc.* excluded evidence of the plaintiff's immigration status, finding that "because FLSA protects undocumented workers, there is no probative value to introducing evidence regarding Plaintiff's immigration status." No. 10-20137-CIV, 2011 WL 13220457, at *1 (S.D. Fla. May 23, 2011).

The likelihood of unfair prejudice, by contrast, is high. There are strong sentiments surrounding the topic of immigration.[9] Additional testimony relating to the female Plaintiffs' immigration status may cause the jury to make a decision based on their emotions as to

---

[9] *See, e.g.*, *Little Partisan Agreement on the Pressing Problems Facing the U.S.*, Pew Research Center (2018), *available at* https://www.pewresearch.org/politics/2018/10/15/little-partisan-agreement-on-the-pressing-problems-facing-the-u-s/ ("[I]llegal immigration is the highest-ranked national problem among GOP voters, but it ranks lowest among the 18 issues for Democratic voters (75% and 19%, respectively, say it is a very big problem).").

immigration, rather than on the evidence. *See Daulton,* 266 F. App'x at 385; *Doe v. Bd. of Trustees of Nebraska State Colleges*, 476 F.Supp.3d 1137, 1148-49 (D. Neb. May 29, 2020); *Martinez v. Cont'l Tire Americas, LLC*, 2020 WL 4464550, at *8 (D.N.M. Aug. 4, 2020).

In addition, Plaintiffs can be expected to feel embarrassment and fear around answering detailed questions regarding their immigration status and history in a public setting. Rule 611(a)(3) provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to […] protect witnesses from harassment or undue embarrassment." *See Alford v. United States*, 282 U.S. 687, 694 (1931) ("There is a duty to protect [the witness] from questions which go beyond the bonds of proper cross-examination merely to harass, annoy or humiliate him."). This Court should restrict superfluous testimony regarding Plaintiffs' immigration status or lack thereof under Rule 611(a)(3) because once the evidence has established that fact, further cross examination on that point can only serve to unduly embarrass and harass Plaintiffs, and would be merely cumulative under Rule 403.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant each of Plaintiffs' motions *in limine.*

Dated: April 10, 2024

Respectfully Submitted,

*/s/ Granville C. Warner*

LEGAL AID JUSTICE CENTER

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2024, I caused a copy of the foregoing to be served on the

Clerk of Court and all counsel of record via CM/ECF.


Dated: April 10, 2024                     <u>*/s/ Granville C. Warner*</u>

                                          Granville C. Warner