UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Case No. 1:16-cv-00563 (PTG/WBP) |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF IVAN YACUB, ESQ.

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs"), by counsel, submit the following memorandum of law in opposition to Defendants' Motion *in Limine* to Exclude the Testimony of Ivan Yacub, Esq. (ECF 456), and respectfully represent as follows:

### BACKGROUND

For well over a decade, Defendants have maintained a discriminatory policy ("the Policy") of requiring that adult lessees and occupants at the Waples Mobile Home Park ("the Park") provide certain documentation related to their legal immigration status. The specific immigration documentation requirements remained constant for most of the Plaintiffs' tenancies at the Park.

*Compare, e.g.,* ECF 361-1 (dated May 18, 2006) ("If applicant does not have a Social Security Number (SSN), he/she must submit their original Passport, original Visa and original I-94 or I-94W Arrival/Departure Form" (emphasis in original)), *with* ECF 361-2 (dated March 31, 2016) ("Applicants who do not have a Social Security Number, must provide their original Passport, original US Visa and original Arrival/Departure Form (I-94 or I-94W)").

By the beginning of 2016, Defendants had determined to enforce their Policy against the Plaintiffs, raised each Plaintiff's rent by $100 per month as a penalty for failing to abide by the Policy, and issued them eviction letters under the Policy then in effect.[1] *See, e.g.,* ECF 4-3 (dated Jan. 18, 2016); ECF 361-3 (same); ECF 361-4 (dated Jan. 27, 2016); ECF 361-5 (dated Feb. 4, 2016); ECF 4-7 (dated March 2, 2016). *See also* ECF 142 at ¶¶ 14-17, and exhibits cited therein. Those rent increases and eviction notices gave rise to this lawsuit. *See* ECF 1.

After Plaintiffs and other tenants in the Park retained counsel and began challenging the Policy,[2] Defendants changed the required list of documentation: Applicants must submit an original Social Security card and "Applicants who are not U.S. citizens, must also provide immigration documentation to prove legal presence in the United States." ECF 361-6, dated

---

[1] On March 11, 2016, Defendants threatened an additional $300 per month rent increase as a further consequence of failing to meet the demands of the Policy. *See* ECF 4-4. They backed down only when Plaintiffs filed a Motion for Temporary Restraining Order. *See* ECF 3, 18.

[2] *See, e.g.,* Antonio Olivo, "*Without Social Security numbers, illegal immigrants face eviction,*" The Washington Post (Feb. 10, 2016), available at https://www.washingtonpost.com/local/virginia-news/without-social-security-numbers-illegal-immigrants-face-eviction/2016/02/10/2fcd64c2-ca9d-11e5-a7b2-5a2f824b02c9_story.html ("The owners of a Northern Virginia mobile-home park are trying to evict about 15 residents who don't have Social Security numbers and are in the country illegally, an effort that attorneys for the families say violates federal and state fair housing laws. . . . Lawyers with the Legal Aid Justice Center are fighting the eviction proceedings in Fairfax County's General District Court, arguing that Waples Mobile Home Park is discriminating against the residents by refusing to accept as proof of identity tax identification numbers that the Internal Revenue Service provides to non-U.S. citizens working in the country."). *See also* ECF 361-7 at 96:14-20.

2

4/22/2016. Insofar as Defendants' Motion *in Limine* implies that this April 22, 2016 iteration was the iteration of the Policy that drove Plaintiffs from their homes, *see* ECF 457 at 7-9, this is incorrect.

Although the female Plaintiffs could not have satisfied either iteration of the Policy, the version of the Policy that caused injury to the Plaintiffs and gives rise to their claim to damages is the Policy in effect before April 22, 2016. This case must be tried based on the facts as they were at the time, and the jury will be called upon to determine whether Defendants' specific Policy that was applied to Plaintiffs violated the Fair Housing Act.

Because the Policy focuses on Social Security cards, U.S. visas, and I-94/I-94W forms—and because Plaintiff's proposed alternative under Step Three of the *Inclusive Communities* framework centers on use of Individual Taxpayer Identification Numbers (ITINs), which are government-issued identifiers commonly obtained by undocumented immigrants—Plaintiffs proffered an experienced Northern Virginia immigration lawyer, Ivan Yacub, Esq., as an expert witness. Mr. Yacub will explain those various documents to a jury consisting of U.S. citizens who may not be familiar with them: what they are, what they mean, how they are obtained, who has them, what they evidence with respect to the legal immigration status of their bearer, what other legal documents might evidence the same things, and even what they look like. *See* ECF 457-1 (Yacub Decl.). Defendants chose not to depose Mr. Yacub. Moreover, they do not challenge Mr. Yacub's qualifications as an expert under *Daubert,* nor the methods he used to arrive at his expert conclusions. Defendants' objection to his testimony goes solely to relevance under Rule 401 and waste of time under Rule 403.

## ARGUMENT

Mr. Yacub's testimony is relevant and helpful to the jury because he can explain in plain language the meaning of technical immigration concepts and documents that are central to

Defendants' asserted "business necessities" purportedly justifying the Policy at Step Two of the *Inclusive Communities* disparate-impact framework, and Plaintiffs' proposed less discriminatory alternative policy at Step Three. At Step Two, Defendants plan to argue that certain documents only available to individuals with legal immigration status are "necessary to achieve a valid interest" in confirming lease applicants' identities, performing credit and criminal background checks, minimizing loss from eviction, and underwriting leases. *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 541 (2015); ECF 459 at 7. If Defendants meet their Step Two burden, Plaintiffs will introduce evidence at Step Three to prove that Defendants' asserted interests "could be served by another practice that has a less discriminatory effect"—namely, either applying the Policy to only leaseholders rather than all adult Park occupants, or expanding the Policy to allow submission of ITINs in addition to documents only available to individuals with legal immigration status. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024).

Mr. Yacub's areas of testimony, which combined should take up no more than one hour of trial time, are directly relevant to these issues. *First*, Mr. Yacub can explain to the jury the technical immigration documents that are foundational to Defendants' Policy—including whether those documents are an accurate proxy for lawful presence in the United States, the difference between having a Social Security number or an ITIN, and the meaning of the various immigration statuses at issue in this case. *Second*, Mr. Yacub can explain to the jury the function and use of ITINs—an integral part of Plaintiffs' Step Three alternative. In addition to the application process (which is a focus of Defendants' Motion *in Limine*), Mr. Yacub can explain what an ITIN is and what it is for, who would need an ITIN as opposed to a Social Security number, and which business entities in the community generally accept ITINs from immigrants without legal immigration status. *Third*,

4

Mr. Yacub can describe his experience working with the immigrant community in Northern Virginia with regards to mixed-status families and undocumented immigrants on leases as lessees.

Mr. Yacub is the only proposed expert by either side with the technical knowledge to address these issues, which are "beyond the realm of common experience and [] require the special skill and knowledge of an expert witness." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000). Because Defendants raised no objections to his testimony other than relevance and waste of time, and his testimony is both highly relevant and non-duplicative, the Motion *in Limine* should be denied.

I.  **MR. YACUB'S TESTIMONY ON ISSUES RELATED TO LEGAL IMMIGRATION STATUS IS RELEVANT.**

"There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable." *Arizona v. United States,* 567 U.S. 387, 409 (2012). One of the many complexities that routinely bedevils state and local governments and private actors is the large number of different immigration categories available to noncitizens who are not lawful permanent residents, but nonetheless *are* lawfully present in the United States in the eyes of the federal government.[3] "Indeed, the federal government permits several categories

---

[3] A non-exhaustive list of such categories includes Temporary Protected Status, 8 U.S.C.§ 1254a; Consideration of Deferred Action for Childhood Arrivals (DACA), *see* https://www.uscis.gov/humanitarian/humanitarian-parole/consideration-of-deferred-action-for-childhood-arrivals-daca; various categories of deferred action other than DACA, *see* 8 C.F.R. § 274a.12(c)(14); Special Immigrant Juvenile Status, 8 U.S.C. § 1101(a)(27)(J); and humanitarian parole, *see* 8 C.F.R. § 212.5.

All of the above-listed immigration categories are accessible to individuals who entered the United States without inspection. *See, e.g.,* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1254a(c)(2)(A). Indeed, even certain individuals already ordered deported may nonetheless be lawfully present in the United States under, for example, Temporary Protected Status; an Order of Supervision, *see* 8 U.S.C. § 1231(a)(3); or withholding of removal, *see* 8 U.S.C. § 1231(b)(3).

of persons who may not be technically lawfully present in the United States to work and presumably live here." *Lozano v. City of Hazleton,* 496 F. Supp. 2d 477, 530-31 (M.D. Pa. 2007), *aff'd in part, vacated in part,* 620 F.3d 170 (3d Cir. 2010), *cert. granted, judgment vacated sub nom.,* 563 U.S. 1030 (2011), *and aff'd in part, rev'd in part,* 724 F.3d 297 (3d Cir. 2013).

Determining whether an individual is lawfully present in the United States is so complex that the Fifth Circuit invalidated a municipal ordinance similar to Defendants' current Policy because it "[did] not specify which of many federal immigration classifications [city] officials would use to resolve whether a non-citizen was 'lawfully present.'" *Villas at Parkside Partners v. City of Farmers Branch, Tex.,* 726 F.3d 524, 533 (5th Cir. 2013). Even the federal government's SAVE program for electronic immigration status verification[4] "can provide only a non-citizen's specific immigration status; it 'does not answer lawful presence or not.'" *Id.*

Of course, the jury cannot be expected to know or understand these complexities. The average juror (who must be a U.S. citizen, *see* 28 U.S.C. § 1865(b)(1), and thus may have no personal familiarity with the immigration process) would likely expect the question of determining immigration status to be a simple exercise of "show me your papers"; and could incorrectly believe

---

These categories are not rare: for example, USCIS estimates 9,390 DACA recipients in Virginia, *see* https://www.uscis.gov/sites/default/files/document/reports/DACA_Population _Receipts_since_Injunction_Jun_30_2020.pdf at p. 9; and nationwide more than 600,000 noncitizens remain awaiting adjudication of their asylum petitions before the immigration courts, *see* https://www.justice.gov/eoir/page/file/1106366/download, all of whom are lawfully present in the United States pursuant to 8 U.S.C. § 1182(a)(9)(B)(iii)(II).

[4] SAVE access is available only to "federal, state, and local benefit-granting agencies[.]" *See* https://www.uscis.gov/save. Defendants would not have any means of accessing SAVE to determine an individual's immigration status, much less their lawful presence.

6

that in case of ambiguity as to a particular tenant's lawful presence, Defendants could call upon the assistance of the Department of Homeland Security to clarify the matter.[5]

As Mr. Yacub describes in his expert declaration, *see* ECF 457-1 at ¶¶ 13-15, 20-22, 25-26, the immigration status documents required by the Policy in effect at the time Plaintiffs received punitive rent increases and eviction notices from the Defendants—namely, "original US Visa and original Arrival/Departure Form (I-94 or I-94W)"—are exceptionally poor proxies for legal presence in the United States. The Policy would effectively deny housing even to lawfully present immigrants who entered without inspection (and thus lack a US Visa and I-94/I-94W) yet subsequently obtained permission to remain in the United States (for example by means of a pending asylum application), but do not have a Social Security number (for example because pending asylum applicants must wait a significant amount of time before applying for a work permit, *see* 8 C.F.R. § 208.7(a)(1); and with limited exceptions a noncitizen needs a work permit before applying for a Social Security card, *see* https://www.ssa.gov/pubs/EN-05-10107.pdf). Such testimony is directly relevant to the jury's evaluation of Defendants' burden under Step Two of the *Inclusive Communities* standard to show that the Policy is "necessary to achieve a valid interest," *Inclusive Communities*, 576 U.S. at 541; and to Plaintiffs' burden under Step Three of identifying an alternate practice that satisfies Defendants' interests with a less discriminatory effect, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018). But without Mr. Yacub's testimony, the jury would be too befuddled by the complexities of immigration documentation to understand the meaning and impact of the Policy.

---

[5] To the extent that the jury might wonder why the male Plaintiffs did not solve the whole problem by simply petitioning for lawful immigration status for their wives, Mr. Yacub's testimony can also explain that. ECF 457-1 at ¶ 27.

Mr. Yacub's testimony is also relevant to helping the jury understand the meaning and impact of the current Policy, which does not specify particular immigration documentation but still requires a Social Security number. *See* ECF 361-5 (requiring both an original Social Security Card and also, for non-U.S. citizens, immigration documentation to prove legal presence in the U.S.). As Mr. Yacub explains in his expert declaration, certain individuals legally present in the United States nonetheless cannot obtain a Social Security number. ECF 457-1 at ¶¶ 4, 21. This means that certain individuals who *are* legally present would still not be able to comply with the current Policy, which bears on whether the Policy is necessary to achieve Defendants' asserted interests. Again, the average juror would have no way of knowing this.

Finally, Mr. Yacub's testimony will help the jury understand whether the Policy is a good fit for one of Defendants' stated business necessities, namely "to minimize loss from eviction," *see, e.g.,* ECF 248 at 2. Insofar as this rests on a presumption that unlawfully present noncitizens are at greater risk of eviction, Mr. Yacub's testimony can provide the jury with valuable context that the Policy does not even necessarily address unlawfully present noncitizens.

Mr. Yacub's testimony resembles that approved by the court in *Collins v. Cottrell Contracting Corp.*, 733 F. Supp. 2d 690, 702 (E.D.N.C. 2010), in that Mr. Yacub will "assist the jury in navigating the complex waters of [immigration] regulation, but they will not be bound by his opinions." Mr. Yacub will not "testify to the jury as to what the law means," or "usurp the province of the court[.]" *Id., citing Adalman v. Baker, Watts & Co.,* 807 F.2d 359 (4th Cir. 1986), *abrogated by statute (on other grounds)*. The testimony is relevant and not a waste of time, and is admissible under Rules 401 and 403.

## II. MR. YACUB'S TESTIMONY ON ITINs IS RELEVANT AND NOT REPETITIVE OF STIPULATED FACTS.

In moving to exclude all of Mr. Yacub's testimony regarding ITINs, Defendants rest entirely on the fact that the *process* for obtaining an ITIN has been stipulated by the parties. *See* ECF 457 at 6 (quoting ECF 180). But Mr. Yacub's ITIN-related testimony is far more expansive than that. He also describes what an ITIN is, ECF 457-1 at ¶ 7; what it looks like, *id.*; what the federal government uses it for, *id.*; and what other institutions in the community accept ITINs and/or foreign passports as proof of identify, *id.* at ¶ 9. Since the average juror may not have even heard of an ITIN, such testimony will provide important context that the jury needs to evaluate Plaintiffs' proposed alternative policy on Step Three of the *Inclusive Communities* standard. Indeed, Mr. Yacub is the only witness proffered by either party with the technical knowledge to explain to the jury the widespread use and function of ITINs. The testimony is relevant and not a waste of time, and should be allowed under Rules 401 and 403.

Defendants also single out part of Mr. Yacub's ITIN testimony for exclusion because, they claim, it will be confusing to the jury and unfairly prejudicial—that other institutions aside from the IRS accept foreign passports as proof of identity, and that many of his clients have used ITINs to obtain credit accounts and mortgages. *See* ECF 457 at 9-11 (citing ECF 457-1 at ¶ 9). This testimony is likewise highly probative as to Steps Two and Three.[6] Whether other institutions,

---

[6] Defendants flagrantly misrepresent the record by stating that "Plaintiffs have previously conceded that Defendants have met their step 2 burden in regard to the Policy as applied to lessees and that they have no rebuttal at step 3 in regard to lessees." ECF 457 at 10 n.4 (purporting to cite ECF 274 at 5-6). Plaintiffs have never conceded anything with respect to Defendants' burden at Step Two. In fact, the excerpt of Plaintiffs' briefing that Defendants cite states that "the resolution of whether Defendants have met their burden on [S]tep [T]wo of the *Inclusive Communities* burden-shifting framework should be left to a jury[.]" ECF 274 at 5. Nor have Plaintiffs made any concessions with respect to Step Three—as to lessees or anyone else. *See id.* at 5-6 (arguing that there are material issues of fact as to Step Three—"which the Court/jury need only reach if it finds that Defendants have satisfied their burden on step two").

9

"including, but not limited to banks, schools, and local police departments," accept foreign passports as proof of identity is highly relevant to whether the documents mandated by the Policy are necessary to achieve Defendants' asserted interest in confirming lease applicants' identities. *Supra* at 4.[7] And whether Mr. Yacub's clients have used ITINs to obtain credit accounts and mortgages bears directly on whether Defendants' asserted interests in confirming identities and performing credit and criminal background checks could be achieved by Plaintiffs' proposed Step Three alternative. *Id.* That this relevant testimony may reveal Defendants' Policy to be an "outlier" (ECF 457 at 10) may indeed be prejudicial to Defendants, but not unfairly so, as it speaks to their liability under the disparate-impact standard.

### III. MR. YACUB'S TESTIMONY ON UNDOCUMENTED IMMIGRANTS AS LESSEES IN NORTHERN VIRGINIA IS LIKEWISE RELEVANT.

Finally, Mr. Yacub's expert opinion states:

> In my law practice, I have met countless mixed-status married couples in Northern Virginia who are both on leases as lessees. I know this because in preparing spousal petitions, I have occasion to look at the leases of married couples who are my clients.
>
> In my law practice, I have met countless undocumented people who are on leases as lessees. I know this because in preparing various types of applications for legal status (including but not limited to DACA), I have to help my clients prove their physical presence in the United States, and providing my clients' leases is one of the best ways to do this.

ECF 457-1 at ¶¶ 28-29. Such testimony is likewise relevant to Steps Two and Three of the *Inclusive Communities* standard, as it addresses whether the Policy is necessary to achieve Defendants' asserted interests (which presumably other lessors also hold), and whether an alternative policy is

---

[7] Defendants object that banks, schools, and local police departments "do not provide housing," "do not have the same concerns of lease underwriting[,]" and "are not even subject to the Fair Housing Act." ECF 457 at 10. Yet Defendants ignore the relevance as to their asserted interests in confirming identities, an interest these entities indisputably share.

achievable. Defendants are wrong that this testimony is not "based in expertise," ECF 457 at 12, as it is derived from Mr. Yacub's experience and expertise in representing undocumented individuals and mixed-status families like Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion *in Limine* to Exclude the Testimony of Ivan Yacub, Esq. (ECF 456) should be denied.

Dated: May 1, 2024

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

Respectfully Submitted,

*/s/ Granville C. Warner*
LEGAL AID JUSTICE CENTER
Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of May, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

*/s/ Granville C. Warner*
Granville C. Warner, VSB #24957