UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Case No: 1:16-cv-00563 (PTG/WBP) |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE ETHNICITY OF INDIVIDUALS AT THE PARK ALLEGEDLY AFFECTED BY THE POLICY

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs"), by counsel, submit the following memorandum of law in opposition to Defendants' Motion *in Limine* to Exclude Evidence of the Ethnicity of Individuals at the Park Allegedly Affected by the Policy (ECF 462), and respectfully represent as follows:

### BACKGROUND

Plaintiffs are four Latino couples who lived for years with their children at the Waples Mobile Home Park in Fairfax, Virginia (the "Park"). *See generally* ECF 138 Exs. 8-11. They were forced to leave the Park beginning in 2016 after the Defendants, Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates

1

(collectively, "Defendants" or "Waples"), began to enforce a policy that had the effect of excluding undocumented immigrants (the "Policy"). *Id.* Ex. 3; Exs. 8-11. The four male Plaintiffs could comply with the Policy, but their wives (the four female Plaintiffs) could not, and the families were forced to move. *Id.* Exs. 8-11.

The Complaint alleges that the Policy has a disparate impact on Latinos, and therefore violates the Fair Housing Act. ECF 1 at 23-24. In its first opinion considering this case, the Fourth Circuit held that the Plaintiffs met their burden at Step One of the three-step burden-shifting framework described in *Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527, 541-42 (2015). *See Reyes v. Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 428-29 (4th Cir. 2018) ("*Reyes I"*). Specifically, the Fourth Circuit held that Plaintiffs had satisfied their Step One burden to "demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class," *id.* at 424, by demonstrating that the Policy "caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction," *id.* at 428. *See also id.* at 433 ("we conclude that Plaintiffs submitted sufficient evidence of a *prima facie* case of disparate impact").

Plaintiffs primarily supported the allegations at Step One through the expert testimony of Dr. William A.V. Clark, Research Professor of Geography at UCLA. ECF 138 at 14-15 & Ex. 40. Dr. Clark demonstrated that Latinos in the relevant geographic area are nearly seven times as likely to be undocumented as non-Latinos, and therefore nearly seven times more likely to be affected by the Policy. ECF 138 Ex. 40-B at 5.[1]

---

[1] Plaintiffs plan to call Dr. Clark to testify at trial. ECF 312 at 2. This Court has denied Defendants' motion to strike his testimony. ECF 311.

2

But the Court of Appeals found additional evidence submitted with Plaintiffs' summary judgment briefing to be even more compelling. Specifically, Plaintiffs referenced two documents produced by Defendants, which identified the tenants who were actually being forced to leave the Park because of the Policy. One of Defendants' documents reflects a "file review" conducted by Defendants in 2016, which listed twelve tenants who "can not renew" their leases, and the "reason" that each tenant cannot renew. ECF 138 Ex. 1.[2] The second document provided by Defendants reflects a list of tenants, what is "missing" for each, and whether or not the tenant has supplied the "missing" item. ECF 138 Ex. 41.[3] Plaintiffs' counsel created a summary of the two documents listing the names of the tenants who "can not renew" or did not produce "missing" materials. Following an example set by Defendants in their summary judgment briefing, ECF 98 at 16 & n. 4, Plaintiffs' summary chart ("2016 Chart") refers to a spreadsheet published by the U.S. Census Bureau, titled "Frequently Occurring Surnames from the 2010 Census," https://www.census.gov/topics/population/genealogy/data/2010_surnames.html ("Census Document"). ECF 157 Ex. 9 n. 1. The Census Document lists, for every name that occurred more than 100 times in the 2010 census, the ethnicity reported by people who use that name. *See* https://www2.census.gov/topics/genealogy/2010surnames/surnames.pdf (explanatory document). The resulting chart shows that eleven of twelve tenants subject to eviction used surnames that were unmistakably Latino: between 87.88% (Cruz) and 98.59% (Mendez Sanchez) of the time, those names were used by people who identified themselves as Latino. ECF 157 Ex. 9 at 2. Although the Fourth Circuit concluded that Plaintiffs' primary evidence (that Latinos were much more likely

---

[2] This document is labelled WAPLES00002441-2446. Defendants have included it as part of Exhibit 2 to their motion, along with similar documents. ECF 463 Ex. 2.

[3] The relevant portion of this document is labelled WAPLES00001272-73. Defendants have included it as the first two pages of Exhibit 1 to their motion. ECF 463 Ex. 1.

to be undocumented, and therefore much more likely to be affected by the Policy) "satisfied the robust causality requirement," *Reyes I*, 903 F.3d at 429, it observed that the material summarized in the charts was "additional, stronger statistical evidence . . . on the disparate impact theory of liability," *id.* at 433 n.11.

Plaintiffs mistakenly failed to list the Census Document on their exhibit list, which was filed in December 2020. ECF 312 Ex. 1. In June 2021 Plaintiffs filed a motion for leave to amend their exhibit list to include the Census Document. ECF 372. That motion also seeks leave to amend Plaintiffs' witness list to include a paralegal employed by Plaintiffs' counsel who can sponsor the new summary chart under Federal Rule of Evidence 1006, to avoid the need to submit the "voluminous" Census Document. ECF 373 at 2 & Ex. 3.

## ARGUMENT

Defendants' motion *in limine* seeks an astoundingly broad order: "precluding Plaintiffs from presenting any evidence or argument as to the ethnicity of tenants or individuals at Waples Mobile Home Park who were allegedly affected by the Policy." ECF 463 at 16. In the context of a lawsuit (like this one) alleging unlawful discrimination on the basis of ethnicity, that order would (in words applied by the Fourth Circuit to one of Defendants' earlier theories) "eviscerate disparate-impact claims altogether." *Reyes I*, 903 F.3d at 430. There is no support for such an order; indeed, Defendants never even acknowledge the breadth of the relief they seek.

Instead, Defendants focus on a chart submitted in 2016 with Plaintiffs' summary judgment materials. That 2016 Chart (ECF 157 Ex. 9 at 2) compared the names of individuals who were subject to eviction from the Park with the publicly-available Census Document – as Defendants had done in a prior submission, ECF 98 at 16 & n. 4. Defendants argue that the 2016 Chart is a "surname analysis" that could only be conducted by an expert, and for that reason is inadmissible.

4

ECF 463 at 2-5, 8-13. But the 2016 Chart has not been listed as a trial exhibit, so it will not play any further role in this case. And what has been listed as a trial exhibit (the publicly available Census Document, along with a summary chart) has already been the subject of several dozen pages of briefing, raising all of the arguments that Defendants repeat here. ECF 373, 391, 400. Plaintiffs believe that Defendants' arguments about the use of the Census Document are without merit; but meritorious or not, they have been exhaustively analyzed.

Defendants also focus on fourteen additional documents that were created by Defendants, and which show the process for enforcing the Policy (the "Enforcement Documents"). ECF 463 Exhibits.[4] The Enforcement Documents contain names that are recognizably Latino, including Cruz, Esteban, Bolanos, Cespedes, Rodriguez, Serrano, Reyes and Flores. ECF 463 Ex. 2 at WAPLES00002442 (list of tenants who "can not renew" because "do[ ] not have S[ocial] S[ecurity]" number). Defendants assert that only an expert can conclude that a person named "Reyes" is likely to be Latino, and they argue that members of a jury who are allowed to see the Enforcement Documents might take on this "expert" task for themselves. ECF 463 at 3. But the applicable rule is Federal Rule of Evidence 403 (excluding relevant evidence for "unfair prejudice"), not Rule 702 (expert witnesses). And there is no basis for excluding significantly probative evidence because of the possibility (which, as it turns out, is very slim) that a jury might misinterpret one aspect of the evidence. *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005) ("the unfair prejudice must *substantially* outweigh the probative value of the evidence" (internal quotes omitted)).

---

[4] Defendants grouped the fourteen exhibits identified by Plaintiffs into seven exhibits appended to their memorandum. ECF 462 at 7. To avoid confusion, we will refer to the documents using Defendants' exhibit numbers.

Section I below addresses Defendants' efforts to exclude the Enforcement Documents, and also addresses the fact that Defendants have not (and cannot) support the enormously broad terms of the order they seek. Section II addresses Defendants' attacks on the 2016 Chart and the use of the Census Document – although, again, those arguments are thoroughly reviewed in the briefs addressing Plaintiffs' motion to amend its exhibit and witness lists. ECF 373, 391, 400.

I. **THERE IS NO BASIS FOR EXCLUDING THE ENFORCEMENT DOCUMENTS OR OTHER EVIDENCE RELATING TO THE ETHNICITY OF INDIVIDUALS AT THE PARK AFFECTED BY THE POLICY.**

Defendants seek to exclude all evidence or testimony relating to the ethnicity of individuals at the Park affected by their discriminatory Policy—including fourteen exhibits listed on Plaintiffs' exhibit list, each of which is a document created by Defendants. ECF 463 at 7, 14; Exs. 1-7. One document is a list of tenants at the Park during the relevant period, ECF 462 Ex. 5, and the rest are emails and charts reflecting Defendants' enforcement of the Policy (and other policies) between 2014 and 2016, ECF 472 Exs. 1-4, 6-7. Defendants argue that these Enforcement Documents should be excluded under Rule 403 because "Plaintiffs have not identified any expert that will identify the persons on these lists as Latino pursuant to any 'surname analysis.'" ECF 463 at 14. According to Defendants, that lack of expert testimony will cause "unfair prejudice" because:

> A jury could see the lists and assume improperly that a certain surname on the list represents a Latino individual, but that very well may not be the case (such as if a non-Latina woman married a Latino man and took his surname). Thus, if the lists were reviewed by a jury, the jury could reach improper conclusions about who is Latino.

*Id.* at 3.

Neither Rule 403 nor any other rule provides a basis for excluding these documents. Rule 403 permits a court to "exclude relevant evidence" *only* "if its probative value is *substantially outweighed* by a danger of" "unfair prejudice" or one of the other factors listed in the Rule. (Emphasis supplied.) Evidence does not become "unfair[ly] prejudic[ial]" simply because it

6

damages a party's case; instead, "unfair prejudice" arises "'only in those instances where . . . there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence.'" *Hammoud*, 381 F.3d at 341 (4th Cir.2004) (quoting *United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995)). *See also United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008).

The Fourth Circuit has already held that the Enforcement Documents have significant probative value at Step One of the *Inclusive Communities* framework. The court held that Plaintiffs met the Step One "robust causality requirement" by submitting evidence concerning the relative frequency of undocumented immigrants within the local Latino population. *Reyes I,* 903 F.3d at 429. But the court went further to specifically note that documents showing which tenants were actually affected by the Policy – which is reflected in the Enforcement Documents – constituted "stronger" evidence of disparate impact. *Id.* at 433 n.11. Indeed, the evidence is compelling. As the Fourth Circuit noted, eleven of twelve – 91.7% – of the individuals who, according to one of Defendants' documents, "can not renew" their leases, have surnames that are used overwhelmingly (between 87.88% and 98.59% of the time) by people who identify themselves as Latino. *See* ECF 373 Ex. 3.[5]

The Enforcement Documents also have significant probative value at Step Two. Plaintiffs contend that Defendants willfully ignored the Policy by allowing Plaintiffs and other tenants lacking those immigration documents to move into the Park, *see, e.g.*, ECF 142 at 5-6 ¶¶ 3, 8-12

---

[5] With a closer look, the evidence is even more compelling. Of the twelve names on Defendants' list of tenants who "can not renew," eight were in that position because they could not meet the Policy at issue here – identified because they could not produce a Social Security card ("SS"), or because they lack "immigration docs." ECF 463 Ex. 2; ECF 138 Ex. 1 (WAPLES 00002442). Every one of those eight tenants has a surname overwhelmingly used by people who identify themselves as Latino. *See* ECF 373 Ex. 3.

7

and exhibits cited therein, which calls into question any "business necessity" for the Policy claimed by Defendants. That point gained added significance following the Fourth Circuit's decision in *Reyes II*, which held that Defendants' justifications at Step Two must be "legitimate"; in other words, the justifications must be actual reasons that motivated the Policy. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 277 (4th Cir. 2024) (Step Two requires defendants to prove a "'legitimate' interest," which "cannot be a phony"). Failure to enforce a policy calls legitimacy into question. *Id.* at 279 ("disregarding its enforcement for years, calls into question Waples's contention that it was concerned about avoiding harboring liability"). The Enforcement Documents reflect years of bureaucratic review (*compare* ECF 463 Ex. 7 at WAPLES00002634 (email dated March 17, 2014) and ECF 463 Ex. 2 at WAPLES00002441 (email dated May 17, 2016)), which apparently followed years of inactivity (*see* ECF 463-6 at WAPLES00002355 (email dated May 14, 2014) ("I do not believe that it was fully enforced upon renewals until recently")). The Enforcement Documents are, therefore, significantly probative with respect to the legitimacy of Defendants' "business necessity" justifications at Step Two.

On the other side of the Rule 403 ledger, there is no basis for concluding that evidence reflecting the surnames of the Park's tenants would "unfair[ly] prejudice" Defendants. The only prejudice that Defendants claim is that the exhibits "will likely lead to a jury improperly assuming that certain individuals on the lists are in fact Latino based on improper assumptions about surnames." ECF 463 at 9. There are multiple flaws with that argument.

First, it isn't true. In fact, it is *highly likely* that the jury would reach the *correct* conclusion with respect to these Latino-sounding surnames: as the chart submitted with Plaintiffs' motion to amend demonstrates, the tenants subject to eviction with "Latino-sounding surnames" were 90% likely to be Latino. ECF 373 Ex. 3.

8

Second, Defendants can easily avoid any possible prejudice by making the jury aware of potential errors through witness examination and argument. It is likely that jury members will already know that not *every* person named Reyes identifies as Latino, but Defendants can remind them through evidence and argument to make sure that the point is made. *See Rubert-Torres v. Hosp. San Pablo, Inc.,* 205 F.3d 472, 479 (1st Cir. 2000) ("Because the Federal Rules of Evidence favor the admissibility of evidence, less intrusive measures to minimizing the prejudicial effect of evidence are preferred to excluding evidence.").

Third, the question under Rule 403 is not: "Are the Enforcement Documents completely free from any possibility of misinterpretation?" Instead, the question is: "Are the Enforcement Documents likely to create "'a genuine risk that the emotions of a jury will be excited to irrational behavior . . . [that] is disproportionate to the probative value of the offered evidence?'" *Hammoud*, 381 F.3d at 341. It is possible (although, according to the Census Document, quite unlikely) that there is a tenant with a Latino surname listed on the Enforcement Documents who does not identify as Latino. But that certainly does not create a "genuine risk" that a jury would be "excited to irrational behavior." *Id.*

As a final point, we note again the scope of the order that Defendants seek. That order would go far beyond the Enforcement Documents:

> ORDERED that Plaintiffs shall not present *any evidence or argument as to the ethnicity of tenants or individuals at Waples Mobile Home Park who were allegedly affected by the Policy,* including evidence or argument as to the number and/or percentage of individuals who are Latino who were allegedly affected by the Policy.

ECF 462 Ex. 1 (proposed order; emphasis supplied). That order could prevent Plaintiffs from presenting statistical evidence at Step One – evidence that the Policy "caused a disproportionate number of Latinos to face eviction from the Park compared to the number of non-Latinos who faced eviction based on the Policy," *Reyes I,* 903 F.3d at 428 – even though that evidence was

9

already reviewed by the Fourth Circuit, and held to be "sufficient evidence of a *prima facie* case of disparate impact," *id.* at 433. The proposed order could also exclude the testimony of Plaintiffs' expert, Dr. William A.V. Clark – even though Judge Ellis previously rejected Defendants' motion challenging that testimony. ECF 311. It could even prevent the Plaintiffs themselves from testifying as to their own ethnicity, because they were "tenants or individuals at Waples Mobile Home Park who were allegedly affected by the Policy." ECF 462 Ex. 1.

Defendants do not present any arguments to support that astoundingly broad proposal – and no reasonable argument could possibly support it. Barring "any evidence" of ethnicity in cases alleging discrimination based on ethnicity would, in words applied by the Fourth Circuit to one of Defendants' earlier theories, "eviscerate disparate-impact claims altogether." *Reyes I*, 903 F.3d at 430.

## II. THE USE OF PUBLIC CENSUS DATA DOES NOT REQUIRE AN EXPERT WITNESS.

In the first round of summary judgment briefing, Defendants relied on a publicly available document created by the U.S. Census Bureau to make the point that "Defendants required non-Latino undocumented immigrants to comply with the Policy." ECF 98 at 16 & n. 4 ("According to U.S. Census data, the name 'Krishna' is likely to be the name of a person of Asian or Pacific Island descent."). In a reply brief, Plaintiffs relied on the same Census Document (in an updated version) to make the same point, but to the opposite effect: that the names of people who were actually forced to leave the Park because of the Policy were *very likely* to be names used by people who identify as Latino. ECF 157 at 7 & Ex. 9. The Fourth Circuit found Plaintiffs' evidence to be compelling: although Plaintiffs met their burden at Step One through the population-level evidence presented by their expert Dr. Clark, the Court found the evidence of the Policy's actual effect on actual people to be "stronger." *Reyes I*, 903 F.3d at 428-29, 433 n.11.

Plaintiffs initially mistakenly failed to identify the Census Document as an exhibit, but three years ago Plaintiffs filed a motion to amend their exhibit list to include that document, and to offer a summary chart as an alternative in accordance with Federal Rule of Evidence 1006 (allowing the use of "a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court"). ECF 372 Ex. 1 (proposed order); ECF 373. That motion has not yet been addressed. The arguments Defendants offer in opposition to that motion overlap significantly with the arguments offered here, *see* ECF 391, so the Court could reasonably address the admissibility of that evidence in the context of Plaintiffs' motion to amend. We review the issues again here out of an abundance of caution.

Defendants claim that Plaintiffs' use of the publicly available Census Document requires an expert witness. ECF 463 at 10. Nothing supports that claim. The simple process used to create the chart submitted in the first round of summary judgment briefing is described in an accompanying declaration:

> 2. The United States Census Bureau makes publicly available a list of frequently occurring surnames from the 2010 Census, including File B, titled "Surnames Occurring 100 or more times. [Footnote 1: See United States Census Bureau, "Frequently Occurring Surnames from the 2010 Census, available at http://census.gov/topics/population/genealogy/data/2010_surnames.html.]
>
> 3. In connection with the above-captioned action, I reviewed the official U.S. Census Data for the surnames at issue in Exhibits 1 and 41 to Plaintiffs' opening brief [ECF 138 Exs. 1, 41]. The relevant results are excerpted below. "Percent Hispanic" refers to the likelihood that a given surname belongs to an individual who is Hispanic.

ECF 157 Ex. 9 at 1-2. In other words, the creator of the chart merely wrote down the names of tenants subject to eviction from the documents created by Defendants, looked up those names on the Census Document, and copied down the percentage from the "Percent Hispanic or Latino Origin" column for each name. The chart submitted with Plaintiffs' motion to amend, ECF 373 Ex. 3, contains notes at the bottom describing the same process. There was no opinion offered;

there was no expertise required – just as there was no expertise required when Defendants used the same data to support their own summary judgment motion, ECF 98 at 16 & n.4.

Accordingly, the chart is not governed by Federal Rule of Evidence 702, which addresses opinion testimony by experts, but rather by Federal Rule of Evidence 1006, which allows the "use [of] a summary, chart, or calculation to prove the content of voluminous writings, recordings or photographs that cannot be conveniently examined by the court." The chart submitted by Plaintiffs' counsel is merely a convenience; Plaintiffs could have gotten to the same point by attaching a copy of the Census Document. But that Document is thousands of pages long; it contains 162,255 separate lines of data. So for the convenience of the Court, the jury, and the parties, Plaintiffs offer a summary of the relevant data. *See United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) ("The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents."); *United States v. Blackwell*, 436 F. App'x 192, 199 (4th Cir. 2011) (describing application of Rule 1006).

Notably, Defendants *do not* claim that the summary chart is inaccurate; the chart clearly *is* accurate. Defendants *imply* inaccuracy by stating that the creator "purportedly" compared tenant names to the census chart, ECF 463 at 2, but they never point to any place where the chart and the summarized documents diverge. Defendants also state that creation of the chart included "cherry-pick[ing]" names from the Census Document. *Id.* at 4. But of course, that was the point of the summary chart: to select the pertinent data from the voluminous Census Document so jurors and the Court do not have to manage an enormous document at trial. The names on the chart *accurately* reflect the names of those listed on the Enforcement Documents, and the numbers on the chart *accurately* reflect the numbers in the Census Document; Defendants do not claim otherwise. They

also grumble that they "were never able to examine [the creator of the 2016 Chart] to determine exactly what data he reviewed." *Id.* at 6 n.3. But they will be able to examine the creator of the chart offered as an exhibit at trial, *see* ECF 372 Ex. 1 (proposed order) – although the examination will show nothing more than what is clear from the summary chart: that Ms. Chavez Calvi examined two documents provided by Defendants (and attached to her chart), transcribed names from those documents to her chart, and then looked up the names in the Census Document. In any event, Federal Rule of Evidence 1006 requires only that "[t]he proponent must make the originals or duplicates available for examination or copying," and in this case two of the documents were created by Defendants, and the remaining document was available on a governmental website.

Defendants do not claim that the Census Document is inadmissible. Nor can they. That Document is self-authenticating under Federal Rule of Evidence 902(5) ("publication purporting to be issued by a public authority"), and admissible under Federal Rule of Evidence 803(8) (public records). *E.E.O.C. v. E.I. DuPont de Nemours & Co.*, 2004 WL 2347559, at *1-2 (E.D. La. Oct. 18, 2004) (Census Bureau table authenticated under Rules 901(a) and 902(5), and admissible under Rule 803(8)); *Williams v. Long*, 585 F. Supp. 2d 679, 688 (D. Md. 2008) (quoting *EEOC v. DuPont* with respect to authentication).

Defendants' only argument is that Plaintiffs' use of the summary charts required an expert, but that isn't true. *United States v. Milkiewicz*, 470 F.3d 390, 401 (1st Cir. 2006) ("creating summaries of the data took patience but not expertise"); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 30 (1st Cir. 2011) (argument that a "paralegal . . . lacked the requisite expertise" to prepare summary charts was a "non-starter[]"). Indeed, but for the size of the Census Document, the members of a jury could easily perform the same tasks performed by Plaintiffs' counsel to create the charts at issue here: they could find names on Defendants' documents describing who

13

was unable to meet the Policy, look for those names on the Census Document, and read the percentage of people with each of those names who identified themselves as Latino.

To support their claim that expertise is required, Defendants' repeatedly refer to the exercise used to create the charts as a "surname analysis" – using quotes as if they were repeating a description offered by Plaintiffs. *E.g.*, ECF 463 at 2 ("the evidence supposedly supporting this claim comes *only* from a 'surname analysis' allegedly performed by Plaintiffs' former counsel" (emphasis in original)). But Plaintiffs have never described the creation of their proposed chart as a "surname analysis." *See* ECF 157; ECF 373. Plaintiffs never claimed to do any analysis whatsoever; the creators of the charts simply copied names from the documents produced by Defendants, and numbers from the Census Document. Accordingly, the cases cited by Defendants, where lay witnesses were not permitted to conduct "surname analyses," are entirely beside the point. *Compare Harvick v. Oak Hammock Pres. Cmty. Owners Ass'n Inc.*, 2016 WL 362434, at *3 (M.D. Fla. Jan. 29, 2016) (pro se litigant performed an unspecified "Internet research" to determine that 22 homeowners were of Asian descent); *Perez v. City of Batavia*, 2004 WL 2967153, at *9, *7- *10 (N.D. Ill. Nov. 23, 2004) (detailed analysis of arrest statistics conducted by employee of plaintiffs' counsel had "at least four major methodological flaws," including changing the ethnic status that was reported by arresting officers).[6]

Finally, Defendants repeatedly assert that Plaintiffs have "conceded that a surname analysis is the province of expert testimony" because Plaintiffs' expert, Dr. Clark, proved a related point

---

[6] While insisting on a "surname analysis," Defendants claim at the same time that courts "have noted serious reliability problems associated with . . . 'Spanish-surname analysis.'" ECF 463 at 12. It is not completely clear where Defendants are going with that point, since they appear to be undercutting their main argument in support of surname analyses. But it is worth noting that the case they cite expresses a preference for the use of "census data based upon self-identification," *Rodriguez v. Bexar Cty.,* 385 F.3d 853, 867 n.18 (5th Cir. 2004), which is precisely the type of data that is reported in the Census Document.

14

through a "surname analysis." ECF 463 at 4, 15. That assertion fails for at least two reasons. First, as noted above, the summary chart is not a "surname analysis," or any sort of analysis. Second, the fact that Dr. Clark chose to use a particular tool does not mean that is the only available tool, and that it must be used in all situations. Other tools – including the Census Document – are available.

Accordingly, Plaintiffs' proposed use of the Census Document does not require the intervention of an expert under Federal Rule of Evidence of 702.

## CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* to Exclude Evidence of the Ethnicity of Individuals at the Park Allegedly Affected by the Policy (ECF 462) should be denied.

Dated: May 1, 2024

Respectfully Submitted,

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

*/s/ Granville C. Warner*
LEGAL AID JUSTICE CENTER
Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

*/s/ Granville C. Warner*
Granville C. Warner, VSB #24957