UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC., <br><br> *Defendants*. | Case No: 1:16-cv-00563 (PTG/WBP) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE LEASE MATERIALS AND PURPORTED EVICTION OF PLAINTIFFS**

Plaintiffs Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz ("Plaintiffs"), by counsel, submit the following memorandum of law in opposition to Defendants' Motion *in Limine* to Exclude Lease Materials and the Purported Eviction of Plaintiffs (ECF 465), and respectfully represent as follows:

**BACKGROUND**

This litigation is centered on Defendants' policy ("the Policy") of requiring adults living in the Waples Mobile Home Park ("the Park") to provide certain documentation, purportedly as proof of lawful immigration status in the United States. The Policy has existed in one form or another for years, but was only suddenly enforced against the Plaintiffs around 2015, years after

1

they had entered into leases with Defendants and moved into the Park. *See, e.g.*, ECF 402, Ex. 4; ECF 138, Ex. 26 at 50:11-14; 51:25-52:8. In suddenly enforcing the Policy, Defendants for the first time refused to renew Plaintiffs' annual leases unless they provided the required immigration documentation. Defendants' enforcement of the Policy forced Plaintiffs to lose their homes in the Park and has harmed Latinos at a rate that is disproportionate to non-Latinos, which prompted this action under the Fair Housing Act ("FHA").

Remarkably, even though this is a FHA case addressing Defendants' refusal to renew Plaintiffs' leases due to the discriminatory Policy, Defendants move to exclude all documents and testimony related to Plaintiffs' leases, and all documents and testimony related to the effects of Defendants' Policy that drove Plaintiffs from the Park (what Defendants call "purported eviction materials"). In support of their motion, Defendants make two principal arguments. First, Defendants contend that these materials are irrelevant because the parties stipulated to certain facts about the leases and the Policy. *See, e.g.* ECF 466 at 8, 11-13. Second, Defendants assert that the evidence is irrelevant and unfairly prejudicial because it does not bear on a disparate-impact claim but rather "engender[s] sympathy for the Plaintiffs" by "imply[ing] that Defendants engaged in intentional discriminatory actions against the Plaintiffs." *Id.* at 10-11, 13-14. Neither argument has merit.

## ARGUMENT

Evidence related to Plaintiffs' leases and Defendants' enforcement of the Policy is highly relevant because this documentation is probative both in establishing what form the Policy took when it was enforced against the Plaintiffs and showing the disproportionate effects of the Policy on the members of the protected class, including Plaintiffs. Accordingly, this evidence is critical to Plaintiffs' ability to meet its burden of proof under Step One of the FHA disparate impact

2

burden-shifting framework adopted by the U.S. Supreme Court in *Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015) ("*Inclusive Communities*"). At Step One, "the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 410, 424 (4th Cir. 2018) ("*Reyes I*") (footnote and citations omitted).[1] Specifically, the contested evidence is necessary to show the existence of the parties' landlord-tenant relationship; Defendants' enforcement (or lack of enforcement) of the Policy against Plaintiffs over time; causation (i.e., that Defendants' Policy is what caused injury to the Plaintiffs); standing (i.e., that the Plaintiffs suffered a cognizable injury sufficient to give rise to standing); and the quantum of harm (damages) suffered by Plaintiffs.

Moreover, the lease and eviction evidence Defendants seek to exclude is relevant and not unfairly prejudicial because it bears on all three Steps of the burden-shifting framework, not merely Step One. At Step Two, the evidence speaks to whether the Policy was "necessary to achieve" Defendants' asserted interests in confirming lease applicants' identities, performing credit and criminal background checks, minimizing loss from eviction, and underwriting leases. ECF 248 at 2; *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 275 (4th Cir. 2024) ("*Reyes II*"). And at Step Three, lease and eviction evidence addresses whether Defendants' asserted interests could be served by a less discriminatory alternative policy. *Reyes II*, 91 F.4th at 275 (at Step Three, the plaintiff must "show that the interest could be served through less discriminatory means"). That

---

[1] "To establish causation in a disparate-impact claim, '[t]he plaintiff must begin by identifying the specific [ ] practice that is challenged.'" *Reyes I*, 903 F.3d at 425. "The plaintiff must also 'demonstrate that the disparity they complain of is the result of one or more of the [ ] practices that they are attacking ..., specifically showing that each challenged practice has a significantly disparate impact' on the protected class." *Id.*

3

these materials are highly relevant is underscored by the fact that Defendants themselves included many of them on their *own* exhibit list.

Relatedly, with respect to all of these documents—whether the existence and timing of Plaintiffs' lease applications, their tenancies at the Property, the effectuation of Defendants' Policy, or the impact that flowed from the Policy—Plaintiffs' accompanying testimony will be critical. Not only do the documents need to be authenticated by Plaintiffs, but Plaintiffs' perspectives, particularly on the implementation and resulting effects of the Policy, will illustrate the disproportionate impact of the Policy, essentially a *Hobson's* choice once unable to comply with the Policy, and the extent of the harm suffered by Plaintiffs, as relevant to their damages. As to any Federal Rule of Evidence 403 concerns, if this evidence was as inflammatory as Defendants suggest, they would not seek to introduce some of it in their affirmative case. At any rate, the documentation's probative value far outweighs any possibility of unfair prejudice. And, as to any potential confusion of the issues, admission of this evidence is critical to *avoid* having the jury misunderstand the contours and effects of the Policy.

### I.     LEASE MATERIALS ARE RELEVANT.[2]

Plaintiffs' lease materials are plainly relevant because they show that Defendants entered into leases with Plaintiffs and that the parties exchanged information and documents that Defendants ultimately determined did not satisfy their Policy. Each of the subcategories of documents to which Defendants object is therefore relevant and admissible under Federal Rule of Evidence 401.

---

[2] For ease of reference, this Memorandum uses the same numbering conventions as Defendants' Objections to Plaintiffs' Trial Exhibits (ECF 321). "Lease Materials" refers to Plaintiffs' Exhibits 8-72.

4

Defendants make hay out of the summary judgment record, arguing that the lease exhibits are irrelevant because the facts proven by these exhibits are undisputed. ECF 465 at 7. Even if all of the facts substantiated by the exhibits at issue were undisputed, those facts would still need to be presented to a jury through evidence. But that is not the case here, where the "undisputed record" Defendants refer to came from an order that was vacated by the Fourth Circuit. *See* ECF 190 at 2-6, *vacated by Reyes I*, 903 F.3d 415. Now that this matter is going to trial, the jury must determine whether Plaintiffs have met their burden, and these exhibits are relevant to that analysis.

The parties' stipulations likewise do not obviate the need for this evidence. Defendants identify four stipulations as dispositive of the relevant issues—that the male Plaintiffs entered into leases with Defendants to live in the Park, the female Plaintiffs lived with their husbands at the Park, the female Plaintiffs could not comply with the Policy, and Plaintiffs subsequently vacated the Park. ECF 466 at 7-8. But those barebones stipulations do not show the jury how each Plaintiff came to live in the Park, entered into leases in the Park, or were forced to leave the Park – all of which speak to the existence and implementation of the Policy and resulting harm and impact related thereto.

Plaintiffs' lease applications are relevant to show the information that the parties had furnished to one another before entering into a lease agreement. For example, as seen below, the 2012 lease application of Plaintiff Herbert David Saravia Cruz unambiguously shows that his wife, Plaintiff Rosa Amaya, was listed as his spouse; this is fatal to Defendants' disputed factual contention that they were tricked into entering into leases with the male Plaintiffs only and did not know that the female Plaintiffs would also be living in the Park. ECF 98-20; *see, e.g.*, ECF 150 at 30. This, in turn, bears on Defendants' enforcement of the Policy, causation, and standing.

[Image of handwritten Application for Residency form]

The lease agreements—of which there are multiple versions, because the Plaintiffs each lived at the Park for several years—are relevant because they are the basis of the landlord-tenant relationship. The lease agreements are also themselves evidence rebutting Defendants' assertion at Step Two that the Policy was necessary to minimize loss from eviction.

The male Plaintiffs' resident ledgers are relevant because they show how long the Plaintiffs had been successfully living at the Park before the Policy was enforced against them (evidenced by the sudden charge of a month-to-month fee in addition to rent). ECF 466, Ex. 3 (Pl. Ex. 98-101). This bears on the Plaintiffs' claim that the Policy was enforced suddenly after the Plaintiffs had already been living on the property for several years and thus was not "necessary to achieve" any purported business justification for Defendants under Step Two. *Inclusive Communities*, 576 U.S. at 541; ECF 1 at ¶¶ 67; 81-83; 92-93; 103-05. Defendants have argued at Step Two that the Policy is necessary to prevent loss from eviction, *see* ECF 150 at 7, 10, 25-26, but the ledgers reflecting records of payment undermine that argument. Taken together with the lack of evidence showing any other noncompliance with the terms of the lease agreements, the ledgers show that the Plaintiffs were model tenants—information that is highly relevant to the jury in assessing the Defendants' purported business necessities at Step Two. Finally, the ledgers are also relevant to calculation of the Plaintiffs' damages, because they show for how long Defendants enforced their

6

discriminatory Policy against Plaintiffs, and that Defendants raised Plaintiffs' rent as part of this process.

## II. EVICTION CORRESPONDENCE IS RELEVANT.[3]

Eviction correspondence evidence (including notices of nonrenewal, inspection reports, notice of month-to-month premium, and written responses to the Plaintiffs' efforts to comply with the Policy) is also highly relevant to show how the Policy was defined and enforced against the Plaintiffs. Without these documents, no Plaintiff could describe why they left the Park without explaining, "I received a letter that said . . ."—thus immediately drawing an objection under the Best Evidence rule.[4]

Defendants argue that the notices of violation, nonrenewal, and month-to-month premium are only relevant to a dismissed state-law claim. ECF 466 at 12. However, the notices of nonrenewal which informed the Plaintiffs they could no longer reside at the Park under the Policy are relevant because they are the means by which the discriminatory Policy was effectuated.

Likewise, the inspection reports in question are evidence of the reasons the Plaintiffs were no longer permitted to remain at the Park, and are relevant not only to show the basis of the Plaintiffs' claim at Step One, but also at Step Three to rebut Defendants' business necessity argument. For example, the violation letters to Mr. Moya and Mr. Saravia-Cruz base Defendants' unwillingness to renew their leases solely on "unauthorized occupants living in [the] home." ECF 466, Ex. 4 (Pl. Ex. 151 & 152). In addition, the 2016 inspection report and lease nonrenewal letter

---

[3] "Eviction Correspondence" refers to Plaintiffs' Exhibits 151-166.

[4] "When a happening or transaction itself assumes the form of a writing, recording, or photograph, as with a deed or a written contract, proof of the happening or transaction necessarily involves the contents of the writing, recording, or photograph and calls for application of the Original Writing Rule." Michael H. Graham, 8 Handbook of Fed. Evid. § 1002:1 (9th ed.) (internal citations omitted).

7

to Mr. Bolaños explains that "due to unauthorized occupants living in your home you will be going on month-to-month until further notice", and points to both the lease and the Park rules as the basis for that Policy, and to show how the Policy was meant to meet Defendants' stated business necessities. ECF 466, Ex. 4 (Pl. Ex. 156).

The rent increase notices are evidence of an additional injury inflicted on the Plaintiffs by the Policy, as the FHA also prohibits discriminatory acts that would have the effect of "mak[ing] [housing] unavailable." 42 U.S.C. § 3604(a) (prohibiting such conduct on the basis of an FHA protected class). Additionally, the notices are relevant to show the jury the circumstances surrounding the Plaintiffs' departure from the Park. Defendants insist that the Plaintiffs were not evicted, *see, e.g.*, ECF 465 at 3; but the notices show that the Plaintiffs were under direct threat of forcible displacement, and moved out of the Park only to avoid that displacement. Without the notices, the jury would not understand the imminence of that threat.

Finally, the notices of the monthly rental increases—together with the ledgers—are directly relevant evidence of the quantum and nature of the harm suffered by Plaintiffs. In fact, some of the Plaintiffs' damages were caused by how quickly Plaintiffs had to leave the Park, as shown by the notices. Any prejudice caused by this evidence is substantially outweighed by its probative value. The evidence proves how the Policy was enforced against the Plaintiffs. These exhibits and related testimony are not so prejudicial as to be unfair, and will provide the jury with the information they need to make important findings of fact.

### III. OTHER DOCUMENTS ADDRESSED BY DEFENDANTS' MOTION ARE RELEVANT TO STEPS TWO AND THREE.[5]

Defendants argue that other documents are unfairly prejudicial because they "are meant to

---

[5] "Other Documents" refers to Plaintiffs' Exhibits 37, 61-65, 71, 159, and 163.

imply that Defendants' Policy is somehow improper." ECF 466 at 14. Rather than implying, this lawsuit explicitly alleges that the Policy violates the law because it harmed Plaintiffs and disparately impacts Latinos. These other documents are each relevant to Steps Two and Three of the *Inclusive Communities* burden-shifting framework.

Plaintiffs' Exhibit 159 is a letter and attachments written on behalf of tenants (including the Plaintiffs) by an organization called VOICE. ECF 142-49. In the document, VOICE responds to the concern that tenants without a social security number are able to provide alternative forms of identification. The letter lays out a number of options for background checks through the county and through resident screening software. This document is offered not for the truth of the matter therein, but rather to show that Defendants were on notice that their Policy may be unlawful, and that there were alternative means of carrying out identity and background screenings, which is an asserted "business necessity" for the Policy. ECF 150 at 26-27.

Plaintiffs' Exhibit 163, an email from a close friend of the Defendants' owner Albert Dwoskin, states "Couple and two kids facing eviction Dec 22. But fortunately I am friend with landlord / owner. . . . Landlord feeling new INS pressure to enforce citizenship rules." ECF 466, Ex. 4 at 1. This email could ultimately be admissible as impeachment evidence, with the friend called as an impeachment witness on rebuttal, should Mr. Dwoskin testify at trial (as he is expected to do) that the Policy was enforced uniformly throughout its existence and thus was "necessary to achieve" asserted Step Two interests.

Plaintiffs' Exhibits 37 and 55, the lease and Rules and Regulations of Plaintiff Felix Bolaños and his wife Ruth Rivas at another mobile home park, are relevant at Step Three—because they show that Plaintiffs' proffered alternative is not just a hypothetical, but actually in use by other mobile home park landlords in the same county. ECF 466, Ex. 2. That lease and

9

accompanying rules and regulations would accordingly constitute evidence that is probative of whether Defendants' asserted interests could be served by a less discriminatory alternative policy, such as allowing an Individual Taxpayer Identification Number to run a background check. *See Inclusive Communities*, 576 U.S. at 527; *see also Reyes II*, 91 F.4th at 274-75. These documents are also relevant evidence of the damages Mr. Bolaños and Ms. Rivas suffered when they were forced out of their home by the Policy, and into a much more expensive mobile home park with a more permissive (and lawful) policy.

Other exhibits showing criminal, credit, and background checks for Plaintiffs are relevant and necessary at Steps Two and Three. Defendants have argued that the Policy is necessary to obtain criminal, credit, and identity checks. However, the leaseholder in each of the four Plaintiff families was the husband. For each male Plaintiff, the Defendants were in fact able to confirm his identity, obtain a detailed credit and criminal history, and make an informed lease decision. Another exhibit shows that identity and criminal background checks were effectively performed for a female Plaintiff using a foreign passport. These exhibits are critical evidence for the jury that there are less discriminatory alternative means of achieving Defendants' alleged business necessities.

- Plaintiffs' Exhibit 61 is a criminal background check executed by Virginia State Police on Plaintiff Rosy Giron de Reyes via her Salvadoran passport. It contains identifying information (including Ms. Reyes's full name, birthdate, and gender) and her criminal history (which comes up blank). ECF 466, Ex. 3 at 88.

- Plaintiffs' Exhibits 62-64 are resident screening reports run by Defendants on Plaintiffs Mr. Moya, Mr. Reyes, and Mr. Saravia-Cruz. ECF 466, Ex. 3 at 91-117. The reports note each applicant's income and the rent-to-income ratio. Each report includes a credit

10

screening through Equifax showing the applicant's full credit history, including any former names, former addresses, and all bank accounts. For each former address, the reports also show landlord and dates of residence. Finally, the reports include a criminal background check across various jurisdictions. The screening report notes that the criteria for approval is decided by the landlord, and the male Plaintiffs' applications were all approved based on Defendants' criteria.

- Plaintiffs' Exhibit 65 is a collection of the additional screenings performed by CoreLogic on the male Plaintiffs, reflecting the approval of each applicant. ECF 142-15.

This evidence accordingly calls into question whether Defendants' more restrictive policy of requiring all adult living at the Park to submit proof of legal immigration status was necessary to achieve at least two of their stated interests – performing credit and criminal background checks and underwriting leases. This evidence shows alternative and reliable means for Defendants to obtain that information without causing a discriminatory effect. Absent this evidence, the jury would have limited means of evaluating whether an alternative is even possible and how effective it can be.

## IV. DEFENDANTS PURPORT TO OBJECT TO DOCUMENTS THEY INTEND TO PRODUCE AS EXHIBITS.

Defendants underscored that many of the exhibits they now seek to exclude in their motion are relevant and admissible because they themselves included these exhibits on their own list of what they intend to produce at trial. *See* Defs' Pretrial Disclosures, ECF 314-3; Plfs' Pretrial Disclosures, ECF 312-1. Because these documents are admissible as explained above, and because Defendants concede admissibility by listing them as "will introduce" exhibits for trial, Defendants have waived objection to the following exhibits:

11

|  | Defendants' Ex. No. (ECF 314-3) | Plaintiffs' Ex. No. (ECF 312-1, as numbered in ECF 321) |
|---|---|---|
| Reyes Application for Residency | 29 | 09 |
| Reyes Lease, 2013 | 30 | 40 |
| Reyes Lease, 2014 | 31 | 32 |
| Reyes Rules and Regulations | 33 | 51 |
| Bolaños Application for Residency | 53 | 08 |
| Bolaños Lease, 2012 | 54 | 33 |
| Bolaños Lease, 2013 | 55 | 34 |
| Bolaños Lease, 2014 | 56 | 35 |
| Bolaños Lease, 2015 | 57 | 25 |
| Bolaños Rules and Regulations, 2012 | 58 | 56 |
| Bolaños Rules and Regulations, 2014 | 59 | 46 |
| Bolaños Rules and Regulations | 60 | 47 |
| Moya Application for Residency | 85 | 12 |
| Moya Lease, 2011 | 86 | 28 |
| Moya Lease, 2012 | 87 | 38 |
| Moya Lease, 2013 | 88 | 41 |
| Moya Lease, 01/16/2014 | 89 | 39 |
| Moya Lease, 12/04/2014 | 90 | 42 |
| Moya Rules and Regulations, 2011 | 91 | 57 |
| Moya Rules and Regulations, 01/16/2014 | 92 | 58 |
| Moya Rules and Regulations, 12/04/2014 | 93 | 52 |
| Saravia-Cruz Application for Residency | 99 | 13 |
| Saravia-Cruz Lease, 02/09/2012 | 100 | 30 |
| Saravia-Cruz Lease, 11/14/2012 | 101 | 43 |
| Saravia-Cruz Lease, 11/14/2012 | 102 | 43 |
| Saravia-Cruz Lease, 01/28/2014 | 103 | 31 |
| Saravia-Cruz Lease, 01/15/2015 | 104 | 27 |
| Saravia-Cruz Rules and Regulations, 2012 | 105 | 59 |
| Saravia-Cruz Rules and Regulations, 2014 | 106 | 60 |
| Saravia-Cruz Policies, Rules and Regulations, 2015 | 107 | 50 |
| 21/30 Notice to Jose Reyes | 152 | 158 |
| Violation Letter to Mr. Moya | 153 | 151 |
| Violation Letter to Mr. Saravia-Cruz | 154 | 152 |
| Violation Letter to Mr. Bolaños | 155 | 156 |

12

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion *in Limine* to Exclude Lease Materials and the Purported Eviction of Plaintiffs (ECF 465) should be denied.

Dated: May 1, 2024

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

Respectfully Submitted,

*/s/ Granville C. Warner*
LEGAL AID JUSTICE CENTER
Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

*/s/ Granville C. Warner*
Granville C. Warner, VSB #24957