UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ,

*Plaintiffs*,

vs.

WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC.,

*Defendants*.

Case No. 1:16-cv-00563 (PTG/WBP)

**MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE
THE OPINIONS OF WILLIAM A.V. CLARK, Ph.D**

Two months after the Court's renewed deadline for motions, and nearly four years after their first motion on this subject was denied, Defendants have again filed a motion seeking to exclude the testimony of one of Plaintiffs' experts, Professor William A.V. Clark.

The motion is late – and it should be denied for that reason alone. In addition, it renews several arguments (specifically, in Parts II and III of Defendants' Memorandum) that have already been specifically addressed and rejected by this Court, through Judge Ellis. Those arguments should be rejected again, both under law of the case principles and because Judge Ellis was correct. Finally, Defendants' new arguments – which appear in Parts I and IV of Defendants' memorandum – could have been asserted in Defendants' denied motion and thus are waived, and have no merit whatsoever.

# BACKGROUND

## I. Prof. Clark's Report

Prof. Clark is a Research Professor of Geography at UCLA with extensive research experience in residential mobility, housing choice, neighborhood change, and the impacts of demographic shifts, including international migration, on local areas. *See* Declaration of Dr. William A.V. Clark, ECF 138-40 at 2. He has published widely in these areas, including nine books and about 400 research papers and reports. *Id*. at 12. Drawing on this expertise, Prof. Clark concluded that a policy which targets undocumented residents will have a significantly greater impact on Latinos than on non-Latinos at the state, county, and local levels – down to the smallest geographic unit that covers Waples Mobile Home Park (the "Park"). *Id.* at 55. Specifically, Prof. Clark concluded that Latinos in the relevant area are "nearly 7 times more likely to be undocumented than other groups[,] and so 7 times more likely to be adversely affected by" Defendants' policy requiring proof of immigration status (the "Policy"). *Id*.

Prof. Clark analyzed data from indisputably reliable sources. To determine the size of the Latino population, he used data from the American Community Survey Census from the U.S. Census Bureau, as well as the Center for Migration Studies ("CMS"), and the Migration Policy Institute ("MPI"). *Id.* at 52. To determine the size of undocumented populations at various geographic levels, Prof. Clark referred to data from the Pew Foundation, as well as CMS and MPI. *Id.*

Using those data, Prof. Clark determined that 25.3% of Latinos in Virginia are undocumented; 30.7% of Latinos in Fairfax County are undocumented, and 31.4% of Latinos in the Census Tract 4406 – which encompasses the Park – are undocumented. *Id.* at 54. In comparison, only 1.3% of the non-Latino population in Virginia is undocumented, and only 4.6%

2

of the non-Latino population in Fairfax County is undocumented. *Id.* Prof. Clark also determined that a policy targeting undocumented individuals would likely have an even greater impact in the Park, because the Park provided some of the only lower-cost housing in the area. *Id.* at 55.

## II.     Defendants' Motion to Strike

On September 22, 2020, Defendants filed a Motion to Strike the Opinions and Testimony of Professor William A.V. Clark under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). ECF 293-94. This Court (through Judge Ellis) rejected that motion. ECF 311.

The "thrust of Defendants' objection to Professor Clark's testimony" was the "margin of error" used for certain parts of the calculation. *Id.* at 5. The Court rejected that line of argument entirely, holding that debate about a margin of error is "a dispute over a value an expert chose to assign to a certain variable and is therefore not an appropriate objection to the admissibility of expert testimony" under *Daubert* and its progeny. *Id.* (citations and alterations omitted). Differing opinions on the appropriate margin of error "amount to a battle between experts that can be resolved by the jury." *Id.*

In addition, and "assuming *arguendo* that Defendants' three objections to Professor Clark's testimony are properly evaluated as part of the district court's gatekeeping inquiry" under *Daubert*, the Court reviewed and rejected each of those specific objections, holding that Prof. Clark's opinions "rest on an adequately reliable methodology." *Id.* at 5-6. Thus, Prof. Clark's decision to apply an estimate from one geographic tract to another was reasonable, and Defendants offered no "compelling reason to believe that" the two tracts were not similar demographically. *Id.* at 6. Similarly, his decision to use a 26% margin of error to calculate the undocumented Latino population was "not unreasonable, for it is not unreasonable to assume that the sampling error in estimates of the size and geographic location of the undocumented Latino population reasonably

3

tracks the sampling error in estimates of the size and geographic location of the overall Latino population." *Id.* And Prof. Clark's decision to compare the Latino population to the non-Latino population (rather than to the Asian population, as Defendants argued) was "not unreasonable in light of the Fourth Circuit's decision on appeal." *Id.* (citing *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903. F.3d 415, 429 n.8 (4th Cir. 2018) ("*Reyes I*")).

Finally, the Court rejected Defendants' arguments under Federal Rule of Evidence 403: "[n]othing in Rule 403 operates to exclude expert testimony that rests on an adequately reliable foundation." *Id.* at 7. Following Fourth Circuit precedent including *Reyes I*, the Court weighed the prejudicial effect against probative value of the expert testimony and determined that "statistics are a central component of step one of the three-step test for a claim of disparate impact under the FHA and any perceived unreliability in Professor Clark's methodology is easily explained to the jury through cross-examination, presentation of contrary evidence, and jury instructions." *Id*.

## ARGUMENT

### I. Defendants' Motion Should be Denied as Untimely.

This motion should be denied because Defendants failed to meet the Court's reasonable deadline for motions *in limine*. Following the second remand from the Fourth Circuit, this Court ordered the parties to "file their respective positions as to the outstanding issues for decision by the Court" by March 1, 2024. ECF 448. The parties identified the "outstanding issues" in a joint filing, but Defendants did not include this motion – or anything addressing Prof. Clark's testimony. ECF 449-1. In accordance with the parties' request, on March 11, 2024, the Court then ordered "that within thirty (30) days of the date of this Order, the parties may file renewed motions *in limine*." ECF 451 at 1. Defendants filed several motions by that deadline (April 10), including a motion to exclude the testimony of Plaintiffs' other expert, Ivan Yacub, Esq. ECF 456. But this

motion was not filed until two months later (June 11). Defendants offer no excuse for their delay. Their motion is untimely and should be denied.

## II.     The Arguments in Parts II and III of Defendants' Memorandum Have Already Been Addressed – and Properly Rejected – by this Court.

In Part II of their memorandum, Defendants argue that Prof. Clark's testimony should be excluded under Rule 403, because (they claim) "the statistical component of the disparate impact analysis is complex and not intuitive to a lay jury," and there would be a "substantial risk" of confusion even if the jury received clarifying instructions. ECF 495 at 5. In Part III, they argue that "Dr. Clark's opinions are unreliable because he did not properly calculate the margin of error." *Id.* at 6.

Both of those arguments were addressed and rejected by this Court, through Judge Ellis. ECF 311. With respect to Defendants' argument under Rule 403, the Court held:

> Nothing in Rule 403 operates to exclude expert testimony that rests on an adequately reliable foundation. The Fourth Circuit has made clear that, in the context of expert testimony, "Rule 403 is not an injunction to exclude prejudicial evidence but a mandate . . . to weigh prejudice against probative value." *United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008). Here, statistics are a central component of step one of the three-step test for a claim of disparate impact under the FHA and any perceived unreliability in Professor Clark's methodology is easily explained to the jury through cross-examination, presentation of contrary evidence, and jury instructions."

*Id.* at 7. With respect to Defendants' arguments about the margin of error calculation, the Court held that such disputes are "not an appropriate objection to the admissibility of expert testimony," but instead "amount to a battle of the experts that can be resolved by the jury." *Id.* at 5. Moreover, the Court held that "Professor Clark's opinions rest on an adequately reliable methodology." *Id.* at 6.

Defendants never mention this Court's prior ruling, but it still exists – and it provides the law of the case. *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (quoting *TFWS,*

5

*Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) ("The law-of-the-case doctrine provides that in the interest of finality, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'")). The policy underlying the law-of-the-case doctrine has rarely been more applicable than it is here: after eight years, two trips to the court of appeals, and nearly five hundred docket entries, the "interest of finality" stands very, very large. For that reason, the arguments raised in Parts II and III of Defendants' memorandum should be rejected.

Judge Ellis's rulings were also correct, and should be followed for that reason, as well. In the event the Court believes it necessary to address these issues again, we refer to arguments in Plaintiffs' prior opposition (ECF 302). Arguments regarding Rule 403 are on pages 15-17; arguments regarding the margin of error are on pages 8-13.

### III. The Arguments in Part I and IV of Defendants' Memorandum Lack Merit.

#### A. Part I – More Untimely Attempts to Confuse Prof. Clark's Conclusions

In Part I of their memorandum, Defendants offer two new arguments that attempt to undermine Prof. Clark's conclusions. Both arguments rely on the *first* court of appeals decision, could have been raised in their *first* motion challenging Prof. Clark's testimony, and thus are waived in addition to being untimely. In any event, neither argument has merit.

1) Defendants argue that Prof. Clark incorrectly relied on "statistics of the local community," rather than on a survey of the actual residents of the Park. ECF 495 at 3. They offer two pieces of support; neither makes their point.

First, Defendants claim that "[i]n *Reyes I,* the Fourth Circuit was clear that the comparison groups must include only Latinos and non-Latinos who resided 'at the Park'" – citing footnote 8 in the *Reyes I* opinion. ECF 495 at 2. The quoted words "at the Park" exist within that footnote,

6

but the footnote does *not* say or imply that relying on community statistics is inappropriate. As Defendants later explain, *id.* at 4, that footnote involved a debate between the majority and dissent about which *substantive* groups should be compared (only undocumented members of an ethnic group vs. all members), not a debate about whether the composition of the local community is relevant to show disparate impact.[1]

Second, Defendants claim that *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984), invalidates any form of analysis except a survey of the Park residents who were actually affected by the Policy. ECF 495 at 2-3. But the court in *Betsey* specifically rejected that conclusion. *Id.* at 987 n.3 ("By stressing the emphasis given in Title VII and Title VIII to the protection of individuals, we do not mean to suggest that this is the *only* way in which a discriminatory effect may be proved.") (emphasis in original). Indeed, the Supreme Court has held that cases using community statistics to challenge "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods . . . reside at the heartland of disparate-impact liability." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539-40 (2015) (citing cases). The reasons for that become clear from looking at the *Betsey* facts. The property at issue in *Betsey* consisted of three buildings. A new policy, applied only to Building Three, targeted residents with children. The plaintiff-tenants of that building argued that the policy had a discriminatory impact on Black residents as compared to non-Black residents. In that case,

---

[1] The Fourth Circuit did state that survey data – in this case, lists showing which Park residents were in fact unable to comply with the Policy – was "additional, stronger statistical evidence" supporting Plaintiffs' claims of disparate impact. *Reyes I,* 903 F.3d at 433 n.11. But it did *not* state that such survey results were the *only* way to meet the Step One burden. Defendants have moved to exclude the lists of Park residents unable to comply with the Policy. *See* ECF 462 (Motion in Limine to Exclude Evidence of the Ethnicity of Individuals at the Park Allegedly Affected by the Policy).

all the relevant information – which residents are Black, and which residents have children – was readily ascertainable. But that data is not always available – and it wasn't available here, because residents of the Park did not self-report immigration status. Therefore, Prof. Clark relied on Census and other data to determine the Latino population at the smallest possible geographical level, and to extrapolate the percentage of Latinos that are likely to be undocumented in that geographical area. ECF 138-40 at 55. Notably, Judge Ellis specifically approved Prof. Clark's approach. ECF 311. And the Fourth Circuit approved, as well, because it held – based on that evidence – that Plaintiffs could satisfy their burden at Step One. *Reyes I*, 903 F.3d at 428-29, 433.[2]

        2)     Defendants next argue that Prof. Clark's "exclusive analysis of the *undocumented* Latinos, rather than the *total* Latino population, renders his opinions irrelevant." ECF 495 at 3-4 (emphasis in original). That argument is baffling.

---

[2] A recent case relies on the decision in *Reyes I* to support the use of community statistics to prove disparate impact:

> [N]ational or state general statistics are appropriate where actual applicant data is not available. *Hazelwood Sch. Dist. v. United States*. 433 U.S. 299, 308-09 n.13 (1977). In *Hazelwood*, an employment discrimination case, the Court held that data on pool of eligible candidates is appropriate to consider where reliable actual applicant data was not available. *Id.* Defendants cannot insulate themselves from disparate impact claims by failing to keep records of the race of applicants. . . . A post-*Inclusive Communities Project* case confirms the validity of the use of the potential applicant pool: in *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, — U.S. ——, 139 S. Ct. 2026, 204 L.Ed.2d 218 (2019), the Fourth Circuit found that plaintiffs sufficiently alleged a prima facie case of disparate impact where they pled undocumented immigrants constitute 36.4% of the Latino population in Virginia compared with only 3.6% of the non-Latino population, demonstrating that Latinos are ten times more likely than non-Latinos to be adversely affected by the policy requiring documentation evidencing legal status.

*Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259, 292–93 (D. Conn. 2020).

Prof. Clark analyzed *both* the total Latino population *and* the undocumented Latino population – as well as the total non-Latino population and the undocumented non-Latino population. *See, e.g.*, ECF 138-40 at 54 (chart showing total population, total undocumented population, total Hispanic population, and undocumented Hispanic population – among other things). The point of his analysis was to compare those numbers to determine whether the Policy – which affects undocumented individuals – "disproportionately impact[s] Hispanic families[.]" *Id.* at 51. The comparison was stark: "Latinos are nearly 7 times more likely to be undocumented than other groups and so 7 times more likely to be adversely affected by the policy." *Id.* at 55.

### B.  Part IV – Prof. Clark's Testimony Does Not Violate Disclosure Requirements

Defendants claim that Prof. Clark failed to disclose the "basis and reasons" or "facts and data" supporting his opinion, as required by Fed. R. Civ. P. 26(a)(2)(B). ECF 495 at 7. It is worth noting that (i) Prof. Clark produced his report on October 28, 2016, ECF 138-40 at 56; (ii) he was deposed on December 22, 2016; and (iii) his report was the subject of a comprehensive motion to strike filed on September 22, 2020. In the seven and a half years between the report and this motion, Defendants never complained that Prof. Clark failed to disclose the "basis and reasons" or "facts and data" supporting his opinions – including as part of his deposition, or as part of their motion to strike. Given Defendants' habit of turning over every rock – sometimes twice or more – the fact that this rock has never been turned underscores what Defendants think of the strength of the argument.

And it has no merit. Defendants' specific complaint is that Prof. Clark failed to disclose the 85 names on a list of Park residents that he determined were likely Latino. ECF 495 at 7. Defendants are *not* arguing that he should have disclosed the list of Park residents that he reviewed – he identified that precisely (WAPLES00001335), and it was a document produced by

9

Defendants. ECF 138-40 p. 55. Nor are they arguing that he failed to disclose his methodology for determining that certain residents were likely Latino – he identified that precisely, too:

> I evaluated the names on the list against the Census List of Hispanic Surnames. The approach and techniques are discussed in Census Technical Working Paper No. 13, March 1996.

*Id.* Nor are they arguing that he failed to disclose the relevant support for his approach – he also identified the relevant Census documents (with instructions on how to get copies), as well as an academic paper. *Id.* & n.8.

Defendants' only complaint is that Prof. Clark did not separately list the 85 people from Defendants' list of residents that he concluded were likely Latino. But Rule 26 does not require that level of disclosure – particularly since Defendants had the opportunity to ask Prof. Clark specifically, if they found the issue compelling. They chose not to – perhaps because their own expert could re-create the analysis using the information Prof. Clark provided; or perhaps Defendants recognized that they could ask Prof. Clark about the names at trial; or perhaps they recognized that the point is relatively small: everyone knew that a significant portion of Park residents were Latino; whether it was 50% or 60% (as Prof. Clark concluded) or 70% is not crucial.

Even if Rule 26 did require disclosure of the 85 names, Rule 37(c)(1) would not support barring Prof. Clark from testifying on the point. Rule 37 contains an exception for "harmless" failures to disclose, and the fact that Defendants have done nothing to determine these 85 names for nearly eight years is a fair indication that the situation is harmless.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Exclude the Opinions of William A.V. Clark, Ph.D. (ECF 495) should be denied.

Dated: June 25, 2024

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

Respectfully Submitted,

*/s/ Granville C. Warner*
LEGAL AID JUSTICE CENTER
Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org

*Attorneys for Plaintiffs*

11

## Certificate of Service

I hereby certify that on this 25th day of June, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

*/s/ Granville C. Warner*
Granville C. Warner