# EXHIBIT 1

No. __-____

In The

# Supreme Court of the United States

————————

Waples Mobile Home Park Limited Partnership;
Waples Project Limited Partnership; and
A.J. Dwoskin & Associates, Inc.,
*Petitioners*,

v.

Rosy Giron de Reyes; Jose Dagoberto Reyes;
Felix Alexis Bolaños; Ruth Rivas; Yovana Jaldin
Solis; Esteban Ruben Moya Yrapura; Rosa Elena
Amaya; and Herbert David Saravia Cruz,
*Respondents*.

————————

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Fourth Circuit**

————————

**PETITION FOR A WRIT OF CERTIORARI**

————————

Michael S. Dingman
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5000

Jonathan Y. Ellis
McGuireWoods LLP
888 16th Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 828-2887

David C. Frederick
   *Counsel of Record*
Collin R. White
Kellogg, Hansen, Todd,
   Figel & Frederick,
   P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900
(dfrederick@kellogghansen.com)

June 21, 2024

*(Additional Counsel Listed On Inside Cover)*

GRAYSON P. HANES
ODIN, FELDMAN & PITTLEMAN,
 P.C.
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
(703) 218-2195

## QUESTIONS PRESENTED

1.    Whether a plaintiff relying on a disparate-impact theory of liability under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, carries her prima facie burden by showing only a preexisting statistical disparity within the affected population that the defendant did not create.

2.    Whether a defendant carries its burden to rebut such a case by showing that the challenged policy significantly serves a legitimate business purpose, or instead must further show that the policy is necessary to serve that purpose.

ii

## PARTIES TO THE PROCEEDINGS

Petitioners Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. were the defendants in the district court and the appellees in the court of appeals.

Respondents Rosy Giron de Reyes, Jose Dagoberto Reyes, Felix Alexis Bolaños, Ruth Rivas, Yovana Jaldin Solis, Esteban Ruben Moya Yrapura, Rosa Elena Amaya, and Herbert David Saravia Cruz were the plaintiffs in the district court and the appellants in the court of appeals.

iii

## RULE 29.6 STATEMENTS

Pursuant to this Court's Rule 29.6, petitioners Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. state the following:

Waples Mobile Home Park Limited Partnership is not a publicly held corporation and has no parent company. No publicly held corporation owns 10% or more of Waples Mobile Home Park Limited Partnership.

Waples Project Limited Partnership is not a publicly held corporation and has no parent company. No publicly held corporation owns 10% or more of Waples Project Limited Partnership.

A.J. Dwoskin & Associates, Inc. is not a publicly held corporation and has no parent company. No publicly held corporation owns 10% or more of A.J. Dwoskin & Associates, Inc.

iv

## RELATED CASES

*Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, 91 F.4th 270 (4th Cir. Jan. 23, 2024) (No. 22-1660)

*Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, 602 F. Supp. 3d 890 (E.D. Va. May 6, 2022) (No. 1:16-cv-563)

*Waples Mobile Home Park Ltd. P'ship, et al. v. Reyes, et al.*, 139 S. Ct. 2026 (May 13, 2019) (No. 18-1217) (denying certiorari)

*Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, 903 F.3d 415 (4th Cir. Sept. 12, 2018) (No. 17-1723)

*Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, 251 F. Supp. 3d 1006 (E.D. Va. Apr. 18, 2017) (No. 1:16-cv-563)

*Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, 205 F. Supp. 3d 782 (E.D. Va. Sept. 1, 2016) (No. 1:16-cv-563)

v

# TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ........................................ i

PARTIES TO THE PROCEEDINGS ......................... ii

RULE 29.6 STATEMENTS ........................................ iii

RELATED CASES ..................................................... iv

TABLE OF AUTHORITIES ..................................... vii

INTRODUCTION ...................................................... 1

OPINIONS BELOW ................................................... 3

JURISDICTION......................................................... 3

STATUTORY PROVISIONS INVOLVED ................. 3

STATEMENT OF THE CASE.................................... 3

   A. Legal Background ............................................ 3

   B. Factual And Procedural Background ........... 11

REASONS FOR GRANTING THE PETITION ....... 16

   I. THE FOURTH CIRCUIT'S DECISION
     DEEPENS DIVISION IN THE LOWER
     COURTS ABOUT AN FHA DISPAR-
     ATE-IMPACT PLAINTIFF'S PRIMA
     FACIE BURDEN ........................................... 16

   II. THE FOURTH CIRCUIT'S CON-
     STRUCTION OF AN FHA DEFEND-
     ANT'S REBUTTAL BURDEN CON-
     FLICTS WITH THE DECISIONS OF
     OTHER COURTS OF APPEALS .................. 22

   III. THE QUESTIONS PRESENTED ARE
      IMPORTANT.................................................. 25

vi

A. The Fourth Circuit's Erroneous Dilution Of *Inclusive Communities*' "Robust Causality Requirement" Warrants Review ............................................. 25

B. The Fourth Circuit's Erroneous Account Of An FHA Defendant's Rebuttal Burden Warrants Review .................. 29

C. This Case Is An Ideal Vehicle For Clarifying *Inclusive Communities* ............ 31

CONCLUSION ............................................................ 31

APPENDIX:

Opinion of the United States Court of Appeals for the Fourth Circuit, *Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, No. 22-1660 (Jan. 23, 2024) ................................................. 1a

Order of the United States District Court for the Eastern District of Virginia (Alexandria Division), *Reyes, et al. v. Waples Mobile Home Park Ltd. P'ship, et al.*, Case No. 1:16-cv-563 (May 6, 2022) .......................................................... 17a

Fair Housing Act, 42 U.S.C. § 3601 *et seq.*:

§ 804(a), 42 U.S.C. § 3604(a) ....................... 36a

vii

# TABLE OF AUTHORITIES

Page

CASES

*Bank of Am. Corp. v. City of Miami*:

    581 U.S. 189 (2017) ...................................... 7-8, 25

    140 S. Ct. 1259 (2020) ............................................ 8

*Bazemore v. Friday*, 478 U.S. 385 (1986)................. 26

*City of Miami Gardens v. Wells Fargo & Co.*,
    931 F.3d 1274 (11th Cir. 2019) ............................. 8

*Comcast Corp. v. National Ass'n of Afr. Am.-
    Owned Media*, 589 U.S. 327 (2020).................... 31

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S.
    181 (2008) .......................................................... 27

*Ellis v. City of Minneapolis*, 860 F.3d 1106
    (8th Cir. 2017).......................................... 17-18, 20

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973)....... 3,
    25, 27-28

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).... 1, 4,
    6, 31

*Holmes v. Securities Inv. Prot. Corp.*, 503 U.S.
    258 (1992) ............................................................ 7

*Inclusive Cmtys. Project, Inc. v. Heartland Cmty.
    Ass'n, Inc.*, 824 F. App'x 210 (5th Cir. 2020) ...... 21

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop.
    Co.*:

    920 F.3d 890 (5th Cir. 2019), *cert. denied*,
    140 S. Ct. 2506 (2020) ................................... 19-21

    930 F.3d 660 (5th Cir. 2019) ............................... 20

    140 S. Ct. 2506 (2020) ........................................ 20

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013)............................................ 13, 16-17, 25, 28

*Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345 (5th Cir. 2023)................................................................. 21

*Magner v. Gallagher*, 565 U.S. 1013 (2011)............... 8

*Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020) ..................................................... 26

*Massachusetts Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600 (D. Mass. 2020) ........................... 10

*Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016) ........................................24, 29

*Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 F. App'x 828 (11th Cir. 2018) ................. 18-20

*Plyler v. Doe*, 457 U.S. 202 (1982) ........................... 28

*Reyes v. Waples Mobile Home Park Ltd. P'ship*:

205 F. Supp. 3d 782 (E.D. Va. 2016), *vacated and remanded*, 903 F.3d 415 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2026 (2019) ............... 3, 11

251 F. Supp. 3d 1006 (E.D. Va. 2017), *vacated and remanded*, 903 F.3d 415 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2026 (2019) ....................................................... 3, 11-12

903 F.3d 415 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2026 (2019) .............................. 3, 12-14, 16, 20, 25, 28

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ................. 5-6

*Smith v. City of Jackson*, 544 U.S. 228 (2005)........... 7

*Southwest Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950 (9th Cir. 2021)................................. 21-24, 29-30

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)........ 1-10, 13, 16-18, 20, 22, 24-26, 28-31

*United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012).................................................... 14

*United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012).................................................... 15

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) ...................................................... 8

*Waples Mobile Home Park Ltd. P'ship v. Reyes*, 139 S. Ct. 2026 (2019) ......................................... 14

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) ..................................................... 5-7, 23, 26

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988). ..................................................... 4-6, 29-30

CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const.:

art. III ................................................................ 21

amend. XIV ......................................................... 28

Civil Rights Act of 1964, tit. VII, 42 U.S.C. § 2000e *et seq.* ............................................. 6-7, 27

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071...................................................... 7

Fair Housing Act, 42 U.S.C. § 3601 *et seq.* .. 1-5, 7-11, 16, 18-19, 22, 27-31

§ 804(a), 42 U.S.C. § 3604(a) ................................ 3

§ 808(a), 42 U.S.C. § 3608(a) ................................ 8

x

§ 815, 42 U.S.C. § 3614a.......................................... 8

8 U.S.C. § 1324(a)(1)(A)(iii) ...............................12, 14

28 U.S.C. § 1254(1) ................................................. 3

28 U.S.C. § 1292(b) ................................................ 21

42 U.S.C. § 3535(d) ................................................. 8

Va. Code § 55-248.41:1 (repealed 2019) .................. 12

24 C.F.R.:

    § 100.500 (2014)................................................. 9

    § 100.500(b)(1) (2020) ....................................... 9

    § 100.500(b)(3) (2020) ....................................... 9

    § 100.500(c)(1)................................................. 10

    § 100.500(c)(2) (2020) ....................................... 9

    § 100.500(c)(2) ................................................. 10

    § 100.500(c)(3) (2020) ....................................... 9

    § 100.500(c)(3)................................................. 11

    § 100.500(d)(1)(i) (2020) ..................................... 10

## ADMINISTRATIVE MATERIALS

Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013)........................ 8-9

Final Rule, *Reinstatement of HUD's Discriminatory Effects Standard*, 88 Fed. Reg. 19,450 (Mar. 31, 2023).............................................. 10-11

xi

OTHER MATERIALS

Defs.' Unopposed Mot. To Stay Proceedings,
    *Massachusetts Fair Hous. Ctr. v. HUD*, No.
    3:20-cv-11765-MGM, ECF No. 39 (D. Mass.
    Feb. 11, 2021) ...................................................... 10

Waples Mobile Home Park Limited Partnership, Waples Project Limited Partnership, and A.J. Dwoskin & Associates, Inc. respectfully petition for a writ of certiorari to review the judgment of the Fourth Circuit.

## INTRODUCTION

In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Court held by a 5-4 margin that the Fair Housing Act ("FHA") proscribes disparate-impact discrimination. But it also underscored "key respects" in which "disparate-impact liability has always been properly limited." *Id.* at 540. Without these "safeguards," the Court explained, "disparate-impact liability might displace valid governmental and private priorities, rather than solely 'removing artificial, arbitrary, and unnecessary barriers'" that, "in turn, would set our Nation back in its quest to reduce the salience of race in our social and economic system." *Id.* at 544 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)) (cleaned up). Yet both of *Inclusive Communities*' core safeguards have become mired in disagreements among the lower courts – disagreements this case exemplifies.

The first concerns *Inclusive Communities*' "robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 542 (cleaned up). The circuits have failed to fashion any common causality standard. Instead, they have recognized at least four distinct approaches to causality (of which the court below has adopted the least "robust").

2

The second concerns the "leeway" FHA defendants have "to state and explain the valid interest served by their policies." *Id.* at 541. Below, respondents conceded that petitioner-defendants' asserted interest was legitimate, and it is beyond reasonable dispute that the policy served that interest. But the court nevertheless held that the defendants could not carry their burden, in effect faulting them for failing to show the challenged policy was necessary to serve that interest. This, too, departs from other circuits' holdings.

The Court should resolve both questions. The important reasons *Inclusive Communities* gave for imposing these "safeguards" have not dissipated in the last decade, and the circuits now are deeply entrenched in their confusion regarding how to apply them. Further, the federal agency charged with enforcing the FHA has changed its position on the questions presented with changing administrations – twice. This Court's guidance thus is necessary.

This case provides an ideal vehicle for resolving the questions presented, and the courts below have issued conflicting opinions airing all sides of the relevant issues. There is no benefit to further percolation and substantial harm to allowing the conflicts to fester: although this Court emphasized imposition of "safeguards," such measures protect nothing if courts and enforcers apply them inconsistently. The churn will continue until this Court ends it, and this case supplies a clean vehicle to do so.

## OPINIONS BELOW

The opinion of the court of appeals (App. 1a-16a) is reported at 91 F.4th 270. The order of the district court (App. 17a-35a) is reported at 602 F. Supp. 3d 890.

A prior decision of the court of appeals (herein "*Reyes I*") is reported at 903 F.3d 415. The memorandum opinions of the district court relevant to that prior decision are reported at 251 F. Supp. 3d 1006 and 205 F. Supp. 3d 782, respectively.

## JURISDICTION

The court of appeals entered its judgment on January 23, 2024. On April 17, 2024, Chief Justice Roberts extended the time for filing a petition for a writ of certiorari to and including June 21, 2024. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## STATUTORY PROVISIONS INVOLVED

Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a), is reproduced at App. 36a.

## STATEMENT OF THE CASE

### A. Legal Background

**1.** The Fair Housing Act ("FHA") prohibits the denial of housing opportunities "because of" one's race, national origin, or any one of several specifically enumerated protected characteristics. 42 U.S.C. § 3604(a). Alienage and citizenship are not among those characteristics. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Court held that the FHA prohibits not only intentional discrimination – "disparate treatment" liability – but also certain housing practices with a "disparate impact" on members of a protected

4

group. *See id.* at 536-40. A practice can have a "disparate impact" if it is "adopted without a deliberately discriminatory motive," but "in operation" is "functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988).

In recognizing disparate-impact liability under the FHA, the Court underscored that the theory "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies," or the valid interests of private developers. 576 U.S. at 540 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court thus explained that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity." *Id.*

One limitation is "[a] robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 542 (cleaned up). In other words, "a prima facie case of disparate impact" requires a plaintiff to "produce statistical evidence demonstrating a causal connection" between a challenged policy and "a disparate impact." *Id.* at 543.

Another limitation is the "leeway" defendants enjoy "to state and explain the valid interest served by their policies." *Id.* at 541. That is, on rebuttal, "private developers [must] be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest." *Id.*; *see also id.* at 543 (similar for government defendants). "And before rejecting a business justification – or, in the case of a governmental entity, an analogous

5

public interest – a court must determine that a plaintiff has shown that there is 'an available alternative practice that has less disparate impact and serves the entity's legitimate needs.'" *Id.* at 533 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)) (cleaned up).

In *Watson*, a plurality of an evenly divided, eight-member Court, led by Justice O'Connor, addressed "why the evidentiary standards that apply in [disparate-impact] cases should serve as adequate safeguards against the danger" of encouraging employers to use racial preference to protect against liability. 487 U.S. at 993-94. One such safeguard, the plurality concluded, was that "causation must be proved" in disparate-impact cases because it would be "unrealistic to suppose that employers can eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." *Id.* at 992, 994. It explained that plaintiffs must "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs . . . because of their membership in a protected group." *Id.* at 994.

The Court subsequently adopted the *Watson* plurality's "specific causation requirement" in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). The Court held that "statistical disparities," standing alone, "will *not* suffice to make out a prima facie case of disparate impact." *Id.* at 656, 657. Without such limits, "any employer who had a segment of his work force that was – for some reason – racially imbalanced[] could be haled into court and forced to engage in the expensive and time-consuming task of defending the 'business necessity' of" its employment practices. *Id.* at 652.

*Inclusive Communities*, in turn, held that an FHA disparate-impact plaintiff must plead (and prove) "a

6

causal connection" and that courts "must . . . examine with care" whether such facts have been alleged, thus encouraging "prompt resolution of these cases." 576 U.S. at 543. The Court also cited circumstances when causation would be lacking or difficult to show, such as where "multiple factors . . . go into" a challenged decision or where "federal law substantially limits [a housing provider's] discretion." *Id.*

*Inclusive Communities*' second limitation drew on what Title VII law calls the "business necessity" defense. *Id.* at 541. "Just as an employer may maintain a workplace requirement that causes a disparate impact if that requirement is a 'reasonable measurement of job performance,'" the Court explained, "so too must housing authorities and private developers be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest." *Id.* (quoting *Griggs*, 401 U.S. at 436) (cleaned up); *see also id.* (explaining that, under Title VII, "an entity" can "'be liable for disparate-impact discrimination only if the challenged practices were not job related and consistent with business necessity'") (quoting *Ricci*, 557 U.S. at 587) (cleaned up).

This limitation traces to the same line of Title VII authority. As the Court explained in *Wards Cove*, "at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659 (citing *Watson*, 487 U.S. at 997-99, and *Griggs*, 401 U.S. at 432). Further, "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet." *Id.*

7

If a defendant makes such a showing, *Wards Cove* further explained, a plaintiff still may prevail by showing that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate hiring interests; by so demonstrating," the plaintiff can "prove that" the defendant's policy is "a pretext for discrimination." *Id.* at 660 (cleaned up). "Of course, any alternative practices which [the plaintiff] offer[s] up in this respect must be equally effective as [the defendant's] chosen hiring procedures in achieving [the defendant's] legitimate employment goals." *Id.* at 661.[1]

**2.** The Court returned to the FHA in *Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017). There, the court of appeals had held that, for purposes of the FHA, allegations that asserted harms were a policy's foreseeable result were sufficient to plead that that policy proximately caused those harms. *See id.* at 195-96. This Court vacated and remanded. *See id.* at 203. Rather than address the sufficiency of the *City of Miami* plaintiff's allegations, the Court directed the court of appeals to consider whether the plaintiff had plausibly alleged "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 202-03 (quoting *Holmes v. Securities Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

Justice Thomas (joined by Justice Kennedy, who wrote the *Inclusive Communities* majority opinion, and Justice Alito, who wrote the lead dissent) wrote

---

[1] Although Congress amended Title VII in the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, "to modify the Court's holding in *Wards Cove*" in certain respects, those changes do not extend to other statutes like the FHA. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005); *see, e.g.*, *Inclusive Cmtys.*, 576 U.S. at 542 (citing *Wards Cove* with approval).

8

separately to explain their view that remand was unnecessary. In light of the "attenuated chain of causation" connecting "the injurious conduct" and the "asserted injuries" in that case, those Justices thought "[t]he Court of Appeals" would "not need to look far to discern other, independent events that might well have caused the injuries" the plaintiff had alleged. *Id.* at 212-13 (Thomas, J., concurring in part and dissenting in part).[2]

**3.** Congress has given the Department of Housing and Urban Development ("HUD") authority to administer and make rules regarding the FHA. *See* 42 U.S.C. §§ 3608(a), 3614a; *see also id.* § 3535(d) (more general rulemaking authority). HUD has issued three conflicting orders that bear on this case.

In 2013 – before *Inclusive Communities*, but after the Court had granted review in another case presenting the same issue[3] – HUD issued a rule describing the standards governing disparate-impact claims. *See* Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) ("2013 Rule"). On causation, HUD stated that "the charging party or plaintiff has the burden of proving that a challenged practice causes

---

[2] *But see Bank of Am. Corp. v. City of Miami*, 140 S. Ct. 1259 (2020) (vacating Eleventh Circuit's contrary decision on remand as moot under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)); *see also City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1288, 1297 (11th Cir. 2019) (Pryor, J., joined by Branch, J., concurring) (on summary judgment in parallel case, explaining that "it would be difficult to overstate how misguided this litigation has proved to be," including because the plaintiff "produced no evidence of causation").

[3] *See Inclusive Cmtys.*, 576 U.S. at 552 n.4 (Thomas, J., dissenting) (discussing origins of 2013 Rule during the pendency of *Magner v. Gallagher*, 565 U.S. 1013 (2011) (granting certiorari)).

9

a discriminatory effect." *Id.* at 11,469. HUD also concluded that, to defend a policy shown to have a disparate impact, an FHA defendant must show that the challenged policy "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* at 11,472; *see generally* 24 C.F.R. § 100.500 (2014) (codifying this version of the regulation). In *Inclusive Communities*, the Court discussed the 2013 Rule without passing on its correctness. *See* 576 U.S. at 527.

In 2020, HUD concluded that *Inclusive Communities* required it to modify the 2013 Rule. Its revision would have required an FHA plaintiff to show (among other things) "[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective," and "[t]hat there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect." 24 C.F.R. § 100.500(b)(1), (3) (2020) ("2020 Rule"). The defendant then could rebut such an allegation "by producing evidence showing that the challenged policy or practice advances a valid interest (or interests) and is therefore not arbitrary, artificial, and unnecessary." *Id.* § 100.500(c)(2).

If a defendant made that showing, a plaintiff could not prevail under the 2020 Rule without showing "by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." *Id.* § 100.500(c)(3). The 2020 Rule further provided

10

that among the "Defenses" that "are available to a defendant in a discriminatory effect case" is a "showing" that the challenged policy "was reasonably necessary to comply with," among other things, federal or state law. *Id.* § 100.500(d)(1)(i).

A Massachusetts district court enjoined the 2020 Rule shortly before its effective date. *See Massachusetts Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 603 (D. Mass. 2020). The government appealed that decision. But in February 2021 – within a month after the present presidential administration began – the government withdrew its appeal and declined to defend the 2020 Rule. *See* Defs.' Unopposed Mot. To Stay Proceedings, *Massachusetts Fair Hous. Ctr. v. HUD*, No. 3:20-cv-11765-MGM, ECF No. 39 (D. Mass. Feb. 11, 2021).

In 2023, the present administration reinstated the 2013 Rule. *See* Final Rule, *Reinstatement of HUD's Discriminatory Effects Standard*, 88 Fed. Reg. 19,450 (Mar. 31, 2023) ("2023 Rule"). As before, HUD now omits any reference to *Inclusive Communities'* "robust causality" requirement or to its admonition that the FHA prohibits only those practices that are "arbitrary, artificial, and unnecessary"; the rule requires a plaintiff to show only "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). The 2023 Rule also increases a defendant's burden, requiring proof "that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant." *Id.* § 100.500(c)(2). If the defendant does so, the 2023 Rule provides, the "plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by

11

another practice that has a less discriminatory effect."
*Id.* § 100.500(c)(3).

## B. Factual And Procedural Background

**1.**    In 2016, "four noncitizen Latino families from
El Salvador and Bolivia" (respondents in this Court)
sued petitioners (collectively, "Waples"), the owners of
Waples Mobile Home Park ("the Park"), contending
that petitioners had violated the FHA by "enforcing a
policy that required all adults living at the Park to
present proof of legal status in the United States" (the
Policy).    App. 3a.

Respondents claimed that the Policy violated the
FHA because it "inflict[s] disproportionate harm
on Latinos as compared to similarly situated non-
Latinos."  C.A. App. 68 (¶ 114).  In support, respon-
dents relied on statistics showing that Latinos' share
of the undocumented alien population is higher than
their share of the overall population in Virginia (and
Fairfax County).  C.A. App. 57-59 (¶¶ 58-63).

The district court partially denied a motion to dismiss
respondents' FHA claim.  It held that respondents
could not proceed on a disparate-impact theory, but
that they could proceed on a disparate-treatment
theory.  205 F. Supp. 3d 782, 789-95 (E.D. Va. Sept. 1,
2016); *see also* C.A. App. 693-94.  It reasoned that
respondents' "use of the disparate impact theory in
this case is not consistent with a robust causality
requirement" because "the disparate impact on plain-
tiffs *as Latinos* is incidental to the Policy's effect on all
illegal aliens."  205 F. Supp. 3d at 792, 793.

The district court later granted partial summary
judgment on respondents' remaining claims, including
their FHA disparate-treatment claim. 251 F. Supp. 3d
1006 (E.D. Va. Apr. 18, 2017); C.A. App. 693-94.  It
concluded that the disparate-treatment claim was a

12

"nonstarter[]" because "the undisputed factual record
discloses that plaintiffs did not qualify to renew leases
under the Policy and Park rules. This is because some
adult occupants in plaintiffs' households could not
provide the requisite forms showing lawful status – a
requirement that applied uniformly to every house-
hold and applicant seeking to rent at the Park." 251
F. Supp. 3d at 1015 (citation omitted). The court
further rejected respondents' suggestion that the Pol-
icy is pretextual because Waples did not immediately
issue eviction orders, but instead put the renters on
month-to-month leases (requiring a correspondingly
higher rent). *Id.* at 1018. It explained that, in this
respect, respondents "seek to have it both ways: they
contend that [petitioners] invidiously discriminated
by choosing the *less* drastic option (changing [respon-
dents'] rent terms in lieu of immediate eviction),
and that [petitioners] should have avoided liability
under" federal law that criminalized the harboring
of undocumented aliens[4] "by risking liability under"
state law that limited a landlord's discretion to evict
tenants immediately. *Id.*; *see also id.* at 1024 (discuss-
ing respondents' claims under Virginia Code § 55-
248.41:1 (repealed 2019)).

Respondents then voluntarily dismissed their
remaining claims and appealed only the district
court's dismissal of their disparate-impact theory.
C.A. App. 1101, No. 17-1723 (4th Cir. Oct. 16, 2017);
903 F.3d 415, 422-23 (4th Cir. Sept. 12, 2018).

---

[4] *See* 8 U.S.C. § 1324(a)(1)(A)(iii) (prohibiting "[a]ny person"
from, "knowing or in reckless disregard of the fact that an alien
has come to, entered, or remains in the United States in violation
of law, conceal[ing], harbor[ing], or shield[ing]" that alien "from
detection . . . in any place, including any building").

13

2. In *Reyes I*, a divided panel of the Fourth Circuit vacated and remanded. The majority held that respondents had sufficiently alleged "robust causality" because their state-wide and county-wide demographic statistics alone established that the Policy "was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park." 903 F.3d at 428-29. The majority said that it was required to "infer that Congress intended to permit disparate-impact liability for policies aimed at illegal immigrants when the policy disparately impacts a protected class, regardless of any correlation between the two." *Id.* at 431-32.

Judge Keenan dissented, concluding that respondents had "not alleged facts satisfying the 'robust causality' standard." *Id.* at 433-34. She concluded the Policy "disproportionately impacts Latinos not because they are Latino, but because Latinos are the predominant sub-group of undocumented aliens in a specific geographical area." *Id.* at 434. She further explained that "[s]uch geographical happenstance," which "link[s] disparate impact liability to the coincidental location of certain undocumented aliens," could not be reconciled with a "robust" causation requirement or with "the aim of the FHA to avoid 'perpetuating segregation.'" *Id.* (quoting *Inclusive Cmtys.*, 576 U.S. at 540). She further emphasized that "accepting the plaintiffs' theory of disparate impact liability would expand the FHA beyond its stated terms to protect undocumented aliens as a class, based solely on an allegation of disparate impact within that class." *Id.* (citing *Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013) (opinion of Loken, J.)).

The panel majority remanded the case for further proceedings regarding Waples' claim that the policy

14

served a valid interest. Waples petitioned for a writ of certiorari, which the Court denied. *See* 139 S. Ct. 2026 (2019) (No. 18-1217).

**3.** On remand, the district court again granted summary judgment for petitioners, relying on their interest in avoiding prosecution under the anti-harboring statute. *See supra* p. 12 n.4 (citing 8 U.S.C. § 1324(a)(1)(A)(iii)). Respondents appealed. The court of appeals reversed. It did not revisit *Reyes I*, but instead "start[ed] from [its] holding" on the pleadings that respondents "had satisfied their burden at Step One to show a causal connection between the Policy and an attendant disparate impact on Latino Residents." App. 9a.

The court of appeals acknowledged (as respondents had conceded) that "[a]voiding criminal liability can certainly serve as the basis for a business necessity defense." App. 11a. Further, it never denied that the Policy permits Waples to avoid anti-harboring liability. Yet it rejected Waples' defense for two reasons.

*First*, it emphasized that "renting to an undocumented person" is not sufficient to prove a violation of the anti-harboring statute absent proof of an intent to harbor that person. App. 12a. In reaching this *mens rea* holding, the court limited the only circuit precedent addressing the question that was on the books when Waples began enforcing the Policy. *See id.* (discussing *United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012)). The court also credited the present Department of Justice's representation in an *amicus* brief that it "does not prosecute residential landlords merely because they do not, in the normal course of business, check the immigration status of every person living in their rentals." App. 14a. Without addressing contrary

positions the Department previously has taken,[5] the court held that, because "the anti-harboring statute does not plausibly put Waples at risk for prosecution simply for leasing to families with undocumented immigrants . . . , Waples did not satisfy its burden at Step Two because its Policy did not serve in any realistic way to avoid liability under the anti-harboring statute." App. 14a-15a.

*Second*, the court concluded that Waples' evidence was "simply too thin to support a business necessity defense." App. 15a. It doubted the sincerity of Waples' concern about avoiding prosecution, primarily pointing to a period during which Waples had not enforced the Policy. *Id.* It further stated that, "[i]f Waples was truly concerned about being prosecuted for housing undocumented immigrants, its expected course would be to remove such tenants from the Park as quickly as possible." *Id.* The court thus reasoned that Waples "would have a difficult time explaining to a prosecutor why, instead of evicting undocumented immigrants, it opted to" put them on month-to-month leases (with higher rent, which the court derided as "a surcharge") "instead." App. 16a. The court did not address the state-law limitations on eviction discussed above. *See supra* pp. 11-12. It remanded the case again. App. 16a.

---

[5] *See*, *e.g.*, *United States v. Costello*, 666 F.3d 1040, 1043, 1048 (7th Cir. 2012) (rejecting government's position "that 'to harbor' just means to house a person" and its further assurance "not to worry" on the ground that "judges can rely on prosecutors to avoid bringing cases at the outer margin of the government's sweeping definition of 'harboring'").

**REASONS FOR GRANTING THE PETITION**

The Court should grant the petition because both of *Inclusive Communities*' "safeguards" against overly expansive disparate-impact liability have broken down. The Fourth Circuit's is the least "robust" of four different readings of *Inclusive Communities*' "robust causality" requirement. Even circuits that deny having picked a side have recognized the split. The Fourth Circuit's construction of a defendant's rebuttal burden also conflicts with that of two other circuits.

## I. THE FOURTH CIRCUIT'S DECISION DEEPENS DIVISION IN THE LOWER COURTS ABOUT AN FHA DISPARATE-IMPACT PLAINTIFF'S PRIMA FACIE BURDEN

The Fourth Circuit erroneously concluded that respondents satisfied *Inclusive Communities*' "robust causality requirement" based solely on the preexisting makeup of the undocumented-immigration population. That decision exacerbates the circuits' confusion about what that "requirement" requires.

***Eighth Circuit.*** As Judge Keenan recognized in her *Reyes I* dissent, the Fourth Circuit broke from a decision of the Eighth Circuit almost on all fours with this case. In a divided decision in *Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013), Judge Loken rejected as "unsound" a disparate-impact challenge to a local ordinance that prohibited landlords from providing housing to undocumented aliens. *Id.* at 949.[6] The *Keller* plaintiffs had merely "cit[ed] statistics showing that a large number of the City's foreign-

---

[6] The other member of the majority, Judge Colloton, concurred in the dismissal of the *Keller* plaintiffs' claims but would have done so on standing grounds rather than on the grounds articulated by Judge Loken. *See* 719 F.3d at 951-53 (Colloton, J., concurring in part and concurring in the judgment).

born population came from Latin American countries," such that enforcement of the challenged ordinance "would result in a reduction of the Hispanic population in Fremont." *Id.* at 948. Judge Loken found these statistics failed "to identify the 'relevant population' to be compared." *Id.*

For Judge Loken, "[i]t would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected class of aliens not lawfully present in this country." *Id.* at 949. He found "no hint in the FHA's history and purpose that such a law or ordinance, *which is valid in all other respects*, violates the FHA if local statistics can be gathered to show that a disproportionate number of the adversely affected aliens are members of a particular ethnic group." *Id.* He noted in particular that such a claim would be based on nothing more than happenstance: "In most cases today, [a disproportionate number of undocumented aliens] would of course be Latinos, but at various times in our history, and in various locales, the 'disparate impact' might have been on immigrants from . . . other parts of the world." *Id.*

Although *Keller* preceded *Inclusive Communities*, the Eighth Circuit has read the latter decision to impose a more stringent standard. In *Ellis v. City of Minneapolis*, 860 F.3d 1106 (8th Cir. 2017), a landlord catering predominantly to low-income tenants (a disproportionate percentage of whom were, in the affected area, members of a protected group) challenged a city government's housing-code enforcement policies. *Id.* at 1108-09. Particularly relevant here is the court's treatment of the challenged provisions of the city's housing code. The Eighth Circuit read *Inclusive Communities* to impose a threshold requirement that an

FHA plaintiff "point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity." *Id.* at 1114. Affirming the district court's judgment, the Eighth Circuit held that the plaintiffs had failed to allege "that the housing-code standards complained of are arbitrary and unnecessary," requiring dismissal. *Id.* at 1112.

That standard would require judgment in petitioners' favor, because respondents have no basis to claim that the Policy is artificial, arbitrary, and unnecessary.

***Eleventh Circuit.*** In its unpublished decision in *Oviedo Town Center II, L.L.L.P. v. City of Oviedo*, 759 F. App'x 828 (11th Cir. 2018) (per curiam), the Eleventh Circuit read *Inclusive Communities* to adopt a similarly stringent causation standard. There, an affordable-housing complex challenged a municipal policy that had the effect of increasing that complex's utility rates. *Id.* at 832. The Eleventh Circuit read *Inclusive Communities* to establish "detailed causation requirements as a means of cabining disparate-impact liability." *Id.* at 833-34. Among these were the principle that a disparate-impact claim cannot "be founded on nothing more than a showing that a policy impacted more members of a protected class than non-members of protected classes." *Id.* at 834. Finding that the plaintiffs' evidence "revealed only that more racial minorities live in" the plaintiffs' complexes "than lived in the rest of" the city, the Eleventh Circuit held that that evidence did "not establish a disparate impact, let alone any causal connection between" the policy and "the disparate impact." *Id.* at 835.

This reading of *Inclusive Communities* likewise would require judgment in petitioners' favor, because

respondents' claim is "founded on nothing more than" a preexisting racial disparity that the Policy did not cause. *Id*. at 834.

***Fifth Circuit.*** The following year, in *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019), the Fifth Circuit solidified the Eleventh Circuit's reading of this Court's *Inclusive Communities* standard in a precedential decision. In *Lincoln Property*, an FHA plaintiff challenged certain apartment complexes' policy to turn away public-housing vouchers, pointing to statistics showing that the population that held vouchers and lived in the Dallas metro area was disproportionately black. *See id*. at 897-98. Affirming dismissal, the Fifth Circuit held that the plaintiff had failed "to allege facts sufficient to provide the robust causation necessary for an actionable disparate impact claim." *Id*. at 906.

Specifically, it held that the alleged demographic statistics did not "support[] an inference that the implementation of [the] blanket 'no vouchers' policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area." *Id*. at 907. It similarly observed that the plaintiff "pleads no facts showing Dallas's racial composition before the [complexes] implemented their 'no vouchers' policy or how that composition has changed, if at all, since the policy was implemented." *Id*. Thus, the plaintiff had alleged "no facts supporting a reasonable inference that [the complexes] bear any responsibility for the geographic distribution of minorities throughout the Dallas area prior to the implementation of the 'no vouchers' policy." *Id*.

In arriving at its disparate-impact holding, the Fifth Circuit explained the "varying views" among the courts of appeals set forth above about *Inclusive*

*Communities'* "robust causality requirement." *See id.* at 901-05 (citing *Reyes I*, *Ellis*, and *Oviedo Town Center*). The Fifth Circuit avoided openly deepening the circuit split only by giving a "narrower construction" to *Reyes I*, declining to read it "to support a finding of robust causation any time that a defendant's policy impacts a protected class more than others." *Id.* at 906. Unpersuaded, Judge Davis dissented, pointing out that *Reyes I* found the "robust causation" requirement to be satisfied merely because "the challenged policy 'was likely to cause Latino tenants at defendant's property to be disproportionately subject to eviction compared to non-Latinos at defendant's property.'" *Id.* at 921-22 (Davis, J., concurring in part and dissenting in part) (quoting *Reyes I*, 903 F.3d at 429) (cleaned up).

Two months after this Court declined to grant the first petition in this case, the Fifth Circuit denied a petition for en banc review in *Lincoln Property* by a 9-7 vote. *See* 930 F.3d 660, 661 (5th Cir. 2019) (Haynes, J., dissenting from denial of rehearing en banc).[7] The dissenting judges read *Inclusive Communities'* "robust causality requirement" minimally, as "refer[ing] to the existence of a causal connection between the defendants' policy and a statistical disparity. It did not" (they thought) "add anything more." *Id.* at 663 n.5. Those judges urged the challengers to "seek review from the Supreme Court." *Id.* at 667. They petitioned for certiorari, but the Court denied the petition. *See Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 140 S. Ct. 2506 (2020) (No. 19-497).

The Fifth Circuit remains committed to *Lincoln Property* – reading it to hold that "'robust causation'

---

[7] Judge Costa voted to grant rehearing but did not join the dissent from denial.

[requires that] either: 'a change in the defendant's enforcement of a policy' caused a disparate impact; or a challenged policy 'caused the relevant minority group to be the dominant group' of those affected by the policy," turning away arguments that it should be overruled. *Inclusive Cmtys. Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F. App'x 210, 214-17 (5th Cir. 2020) (per curiam) (cleaned up).[8]

***Ninth Circuit.*** Surveying the foregoing circuit law in *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*, 17 F.4th 950 (9th Cir. 2021), the Ninth Circuit confirmed that the split is entrenched, but avoided articulating any clear standard itself. There, a municipal utility that supplied water to "the public housing tenants of" a particular "residential complex" claimed immunity from any obligation "to pay its public housing tenants' delinquent water bills." *Id.* at 955-56. The utility imposed a heightened "refundable security deposit" on "new public housing customers." *Id.* at 956. Plaintiffs challenged the policy, citing an alleged disparate impact. *See id.* The district court granted summary judgment on the ground that the plaintiffs had failed to satisfy the "robust causality" standard.

Although the Ninth Circuit affirmed the judgment for reasons discussed below, it rejected the district court's causation holding. It noted the "four different views among" the circuits (pointing to all of those discussed above) but avoided picking one because of what it held to be "[t]he clarity of th[e] causal relationship"

---

[8] *See also Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 350 (5th Cir. 2023) (dismissing appeal regarding a question certified under 28 U.S.C. § 1292(b) regarding *Lincoln Property*'s reading of *Inclusive Communities* on the ground that the plaintiff lacked Article III standing).

alleged. *Id.* at 966. That court explained that the challenged policy had "explicitly bifurcated a population based on a non-protected characteristic: public housing." *Id.* And, it continued, this "bifurcation generated a disproportionate effect that would not have existed in its absence and ensured the adverse effects of the policy applied only to the population subset that was overrepresented (in comparison to the overall District customer population) by certain members of a protected group." *Id.*

*Southwest Fair Housing Council* illustrates the lower courts' need for this Court's guidance. The Ninth Circuit nominally avoided deepening the circuit split only by adding yet another undefined linguistic layer to the mix – finding that an alleged "causal relationship" had hurdled an unarticulated "clarity" threshold, obviating the need to choose one of the "four different views" that other courts already had developed. *Id.* This profusion of lower-court tests – now adorned with a super-test to avoid choosing among the others – will continue until the Court resolves the circuits' disagreement about how to apply *Inclusive Communities*' causality standard.

## II. THE FOURTH CIRCUIT'S CONSTRUCTION OF AN FHA DEFENDANT'S REBUTTAL BURDEN CONFLICTS WITH THE DECISIONS OF OTHER COURTS OF APPEALS

The Fourth Circuit's reading of *Inclusive Communities* also narrows defendants' "leeway to state and explain the valid interest served by their policies," 576 U.S. at 541, in a way that other circuits have not.

**Ninth Circuit.** In *Southwest Fair Housing Council*, despite disagreeing with the district court's causality reasoning, the Ninth Circuit still affirmed summary judgment, relying on the "business necessity" defense.

The court noted that the phrase "business necessity" "is somewhat of a misnomer," including because "the standard is not 'necessity':  the defendant need not demonstrate that the challenged policy is '"essential" or "indispensable"' to its business – only that the policy 'serves, in a significant way,' its legitimate interests."    17 F.4th at 967 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989)).  The court thus explained that "it is defendant's burden at [the summary-judgment] stage to show (1) a legitimate business interest, and (2) that the practice or policy serves in a significant way that legitimate interest." *Id.* at 968.

The Ninth Circuit went on to find that the challenged security deposit served the district's legitimate interest in fiscal solvency.  The challengers protested that the public-housing tenants "represent only a small portion of the District's full customer base." *Id.* But the court explained that the challengers were "not entitled to assert" "that, in their estimation, the District could have recouped most, though not all, of its costs related to delinquencies with a lower deposit amount and that the District should be content with that." *Id.* at 969.  The court also rejected the similar contention that "the delinquencies were de minimis," because "a policy need not be essential or indispensable to significantly serve a legitimate interest; moreover, [the challengers] offer no meaningful limiting principle as to how minor a potential financial loss must be before a business may not protect itself against it."  *Id.* at 968-69; *see also id.* at 969-70 ("[P]laintiffs may not simply assert a business's interest is illegitimate because the plaintiff does not believe the financial losses at issue are worth preventing. That is nothing more than subjective second-guessing the sound exercise of a business's discretion.").

*Second Circuit.* The Fourth Circuit's decision also conflicts with *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016). That case concerned a county-government zoning policy that the plaintiffs alleged, and the district court found, had a prohibited disparate impact. *See id.* at 618. The district court proceeded to find, relying on circuit precedent preceding the 2013 Rule and *Inclusive Communities*, that the government had failed to carry its rebuttal burden because, although the challenged policy "advanced certain legitimate, bona fide governmental interests," the government "did not establish the absence of a less discriminatory alternative." *Id.* at 617. The Second Circuit vacated that element of the judgment, finding that *Inclusive Communities* had "implicitly adopted" the contrary rule that it is the plaintiff's burden to prove "a less discriminatory alternative." *Id.* at 618. It thus remanded "for consideration of whether Plaintiffs satisfied their burden of proving an available alternative practice that has less disparate impact and serves Defendants' legitimate nondiscriminatory interests." *Id.* at 619.

Although it cited *Southwest Fair Housing Council* in passing, *see* App. 10a, the Fourth Circuit's decision conflicts with both it and *Mhany Management*. Respondents conceded, and the Fourth Circuit agreed, that "criminal liability can certainly serve as the basis for a business necessity defense." App. 11a. The only remaining issue for Waples under *Southwest Fair Housing Council* or *Mhany Management* would have been whether the Policy serves that concededly legitimate interest in a significant way. It does: it provides Waples an unambiguous defense to any anti-harboring prosecution. That is sufficient to shift the burden back to respondents under Second and Ninth Circuit law, but not under the Fourth Circuit's decision here.

## III. THE QUESTIONS PRESENTED ARE IMPORTANT

### A. The Fourth Circuit's Erroneous Dilution Of *Inclusive Communities*' "Robust Causality Requirement" Warrants Review

This Court should review and reverse the Fourth Circuit's errant causality standard. *First*, it conflicts with both *Inclusive Communities* and the proximate-causation standard that the authors of the majority and both dissenting opinions in *Inclusive Communities* endorsed in *Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017). As Judge Keenan explained in *Reyes I*, evidence doing no more than pointing "to the coincidental location of certain undocumented aliens" does not satisfy any "robust causality requirement," but does "expand the FHA beyond its stated terms to protect undocumented aliens as a class, based solely on an allegation of disparate impact within that class." 903 F.3d at 434 (Keenan, J., dissenting) (citing *Keller*, 719 F.3d at 949 (opinion of Loken, J.)). Further, there is no serious dispute that "other, independent events" having nothing to do with the Policy "caused [respondents'] injuries." *City of Miami*, 581 U.S. at 212-13 (Thomas, J., concurring in part and dissenting in part); *see also Inclusive Cmtys.*, 576 U.S. at 543 (noting that causation would be difficult, if not impossible, to show "multiple factors . . . go into" a challenged decision).

*Second*, the Fourth Circuit's reasoning threatens this Court's clear teaching that a proper disparate-impact analysis must account for confounding factors for which the defendant bears no responsibility. For example, in *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86 (1973), the Court compared a policy's impact on *U.S. citizens* of Mexican ancestry to its impact on

*U.S. citizens* of other ancestries, rather than comparing all persons of Mexican ancestry to those of other ancestries. Similarly, in *Wards Cove*, the Court compared a practice's impact on *qualified* racial minority candidates to its impact on *qualified* white candidates, rather than comparing all minority candidates to white candidates. *See* 490 U.S. at 650-51; *see also Bazemore v. Friday*, 478 U.S. 385, 400 & n.10 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part) (statistical evidence that does not "account[] for the major factors" may be "so incomplete as to be inadmissible as irrelevant" in discrimination case); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 211 (2d Cir. 2020) ("[R]elying on [general population statistics, absent evidence that they accurately reflect the pool of qualified job applicants for the position in question,] to show a disparate impact is a bit like relying on apples to study oranges.").

But the Fourth Circuit failed to account for such a confounding factor because it elided the distinction between the Policy and immigration status as such. The Policy requires residents to present proof of immigration status; that proof supplies Waples' defense to a harboring prosecution. The relevant prima facie question thus is whether requiring proof of legal status in the United States causes a prohibited disparate impact that is distinguishable from "racial disparities [Waples] did not create." *Inclusive Cmtys.*, 576 U.S. at 542; *see also Wards Cove*, 490 U.S. at 651-52 (if an imbalance arises "for reasons that are not [an employer's or a landlord's] fault," then the employer's or landlord's policy "cannot be said to have had a 'disparate impact'"). Evidence that (for example) Latinos with lawful status have been disproportionately harmed by a requirement to produce proof of

that status might well support a prima facie case (though one open to rebuttal, *cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)). But the FHA is not plausibly read to brand Waples a civil-rights violator based on racial disparities within the undocumented-alien population that federal immigration policy (not Waples' Policy) created.

*Third*, the Fourth Circuit's decision undermines the settled rule that citizenship status is *not* a protected characteristic. In *Espinoza*, this Court rejected a Mexican citizen's Title VII challenge to an employer's citizenship test. 414 U.S. at 92. The Court acknowledged that such a test could be "a pretext to disguise what is in fact national-origin discrimination." *Id.* It nonetheless emphasized evidence that the employer had routinely hired "employees of Mexican origin, provided the individual concerned has become an American citizen." *Id.* at 92-93. The Court concluded that Espinoza "was denied employment, not because of the country of her origin, but because she had not yet achieved United States citizenship." *Id.* at 93.

Indeed, the Court observed that "the Federal Government itself, through Civil Service Commission regulations, has engaged in what amounts to discrimination against aliens by denying them the right to enter competitive examination for federal employment." *Id.* at 89. The Court declined to "conclude Congress would at once continue the practice of requiring citizenship as a condition of federal employment and, at the same time, prevent private employers from doing likewise." *Id.* at 91. Nor is citizenship-based discrimination the same as national-origin discrimination merely because foreign-born people must earn citizenship, while native-born people become citizens automatically: "it is not the employer who places the

burdens of naturalization on those born outside the country, but Congress itself." *Id*. at 93 n.6.

For similar reasons, the Court has refused to treat "illegal aliens" as a "suspect class" for Fourteenth Amendment purposes. The Court "reject[ed]" that "claim" in *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982). It explained that, "[u]nlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime." *Id.* Moreover, the Court explained, the federal government's "alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation." *Id.*

The Fourth Circuit's decision embraces arguments *Espinoza* rejected and invites conflict *Plyler* avoided. Respondents' case turns on the racial composition of the affected undocumented-alien population. But, again, that composition is an incidental effect of federal immigration policy. And, as Judge Loken pointed out in *Keller*, *see supra* pp. 16-17 (discussing 719 F.3d at 948-49), that composition changes over time (and did here)[9] – making FHA liability turn on immigration patterns and policy matters that have nothing to do with the FHA's purpose "to avoid 'perpetuating segregation.'" *Reyes I*, 903 F.3d at 434 (Keenan, J., dissenting) (quoting *Inclusive Cmtys.*, 576 U.S. at 540).

---

[9] Although undocumented aliens in the area immediately surrounding the Park were disproportionately Latino in 2014, they were disproportionately *Asian* only two years earlier in 2012. C.A. App. 662.

In short, the FHA cannot be read to grant persons whose presence in the Nation violates immigration law a legally actionable entitlement to rent a private landlord's property while they elude deportation. Racial imbalances within the undocumented-alien population arise "because of" federal immigration policy rather than "membership in a protected group." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) (plurality). Permitting undocumented aliens to bootstrap spurious correlation into disparate-impact causation would put immigration law and the FHA in irreconcilable conflict.

## B. The Fourth Circuit's Erroneous Account Of An FHA Defendant's Rebuttal Burden Warrants Review

The Court also should review and correct the erroneously heavy burden the Fourth Circuit has put on FHA defendants. The Fourth Circuit faulted Waples for failing to show that it was likely to be prosecuted for the conduct the Policy prohibited, without more – treating that as an issue Waples must address on rebuttal. App. 12a-13a. This is erroneous for multiple reasons.

To start, an FHA defendant bears no burden to show narrow tailoring (much less absolute identity between the conduct a policy prevents and a criminal offense it avoids). Under *Inclusive Communities*, "housing authorities and private developers" enjoy greater "leeway to state and explain the valid interest served by their policies." 576 U.S. at 541. As *Mhany Management* and *Southwest Fair Housing Council* recognize, evidence that the challenged policy significantly serves a legitimate end (which the Policy plainly does) is sufficient to shift the burden back to the plaintiff to propose a less-discriminatory and equally effective alternative.

The Fourth Circuit's contrary decision parallels the arguments the Ninth Circuit soundly rejected in *Southwest Fair Housing Council*. The nub of the Fourth Circuit's opinion is that Waples "could have" mitigated "most, though not all, of" its risk of a harboring prosecution without the Policy because a conviction would require proof of a culpable mental state. *Cf.* 17 F.4th at 968-70. But the FHA does not require Waples to forgo an unambiguous defense to criminal liability based on prosecutors' assurances that Waples' "risk" without that defense is "de minimis"; "[t]hat is nothing more than subjective second-guessing the sound exercise of a business's discretion." *Cf. id.* at 969-70.

In addition to folding a plaintiff's reply burden into a defendant's rebuttal burden, the Fourth Circuit's decision defeats other settled limitations on disparate-impact liability. "At summary judgment, the burden on the plaintiff at the third step is not only to present potential alternatives, but to provide evidence that equally effective and less discriminatory alternatives exist." *Id.* at 970-71 (citing *Watson*, 487 U.S. at 997-98). This evidence must, moreover, "take into account the costs and burdens of proposed alternatives." *Id.* at 971. Yet the Fourth Circuit never addressed whether the *mens rea* defense respondents propose would be as effective as the ironclad defense the Policy provides, or the costs and burdens that defense would entail. That error likewise warrants review and correction.

\* \* \*

Employers, government agencies, landlords, and others make decisions every day that remain subject to challenge years later based on a discriminatory effect that they did not intend. *Inclusive Communities* was right to recognize that this rule is tolerable only subject to "safeguards" that ensure it does "solely"

what *Griggs* meant it to do – root out "'artificial, arbitrary, and unnecessary barriers'" – and does not "displace valid governmental and private priorities." 576 U.S. at 544 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).

*Inclusive Communities*' safeguards have failed; neither the courts nor the enforcing agency have found a coherent and consistent reading of either one. Tenants and landlords cannot abide this uncertainty about their FHA rights and obligations in the housing disparate-impact context. This Court alone can supply the clarity they need.

### C. This Case Is An Ideal Vehicle For Clarifying *Inclusive Communities*

The Court should address both questions presented, because they point to a common fundamental issue: what an FHA plaintiff needs to prove to show that a challenged policy makes a housing opportunity unavailable "because of" a protected characteristic absent discriminatory intent. There is no reason (and no way) to consider either question in isolation. *Cf. Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020) ("Under *McDonnell Douglas*'s terms, too, only the burden of production ever shifts to the defendant, never the burden of persuasion.").

Further, since the prior petition, the confusion on the first issue has deepened, the second issue has been introduced, and both questions thoroughly have been addressed below. This case thus is an ideal vehicle for the Court to clarify *Inclusive Communities*' "safeguards."

### CONCLUSION

The petition for a writ of certiorari should be granted.

32

Respectfully submitted,

MICHAEL S. DINGMAN
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
(703) 712-5000

JONATHAN Y. ELLIS
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Washington, D.C. 20006
(202) 828-2887

DAVID C. FREDERICK
   *Counsel of Record*
COLLIN R. WHITE
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK,
   P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900
(dfrederick@kellogghansen.com)

GRAYSON P. HANES
ODIN, FELDMAN & PITTLEMAN,
   P.C.
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
June 21, 2024                        (703) 218-2195