# Exhibit 1



# Transcript of William A.V. Clark, Ph.D.

**Date:** December 22, 2016

**Case:** de Reyes, et al. -v- Waples Mobile Home Park Limited Partnership, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                  Alexandria Division
4    --------------------------------x
5    ROSY GIRON DE REYES,              :
6    et al.,                           :
7               Plaintiffs,   : Civil No.:
8       v.                    : 1:16cv563-TSE-TCB
9    WAPLES MOBILE HOME PARK LIMITED   :
10   PARTNERSHIP,                      :
11   et al.,                           :
12               Defendants.    :
13   --------------------------------x
14         Videoconference Deposition of
15            WILLIAM A.V. CLARK, Ph.D.
16                  McLean, Virginia
17            Thursday, December 22, 2016
18                    4:05 p.m.
19
20   Job No:  130604
21   Pages:  1 - 87
22   Reported by:  Kelly Carnegie, CSR, RPR
```

**Page 2**

```
1        Videoconference Deposition of WILLIAM A.V.
2    CLARK, Ph.D., held at the offices of:
3
4
5
6            Reed Smith, LLP
7            7900 Tysons One Place
8            Suite 500
9            McLean, Virginia 22102
10
11
12
13
14       Pursuant to Notice, before Kelly Carnegie,
15   Certified Shorthand Reporter, Registered
16   Professional Reporter, and Notary Public in and for
17   the Commonwealth of Virginia.
18
19
20
21
22
```

**Page 3**

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3        JONGWOOK KIM, ESQUIRE
4        (Appearing by Videoconference)
5        Quinn Emanuel Urquhart & Sullivan, LLP
6        777 Sixth Street, NW
7        Eleventh Floor
8        Washington, D.C. 20001
9        (202) 538-8000
10
11   ON BEHALF OF THE DEFENDANTS:
12       MICHAEL S. DINGMAN, ESQUIRE
13       JUSTIN D. deBETTENCOURT, ESQUIRE
14       Reed Smith, LLP
15       7900 Tysons One Place
16       Suite 500
17       McLean, Virginia 22102
18       (703) 641-4200
19
20   ALSO PRESENT:  Karen Condon
21           (Appearing by Videoconference)
22
```

**Page 4**

```
1                C O N T E N T S
2    EXAMINATION OF WILLIAM A.V. CLARK, Ph.D.    PAGE
3        By Mr. Dingman                           5
4
5
6
7                E X H I B I T S
8        (Exhibits retained by counsel.)
9    DEPOSITION EXHIBITS                        PAGE
10   Exhibit 1   Expert Report of
11            William A.V. Clark, Ph.D.       56
12   Exhibit 2   Expert Reply Report of
13            William A.V. Clark, Ph.D.       72
14
15
16
17
18
19
20
21
22
```

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

5

P R O C E E D I N G S

1    MR. DINGMAN: Let's go on the record.
2    I'll state this and then ask for your
3    agreement, Wookie, it's the following: We
4    understand that the court reporter is administering
5    the oath even though she is not in the presence of
6    the deponent. Nevertheless, we stipulate that the
7    report can administer the oath and further agree
8    that there will be no objection to the admissibility
9    of the transcript based on the oath.
10    Are we in agreement on that?
11    MR. KIM: Yes, we're in agreement.
12    MR. DINGMAN: Thank you.
13   Whereupon,
14        WILLIAM A.V. CLARK, Ph.D.
15   being first duly sworn or affirmed to testify to the
16   truth, the whole truth, and nothing but the truth,
17   was examined and testified as follows:
18        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
19   BY MR. DINGMAN:
20    Q   Please state your name, sir.
21    A   **William Arthur Valentine Clark, C-l-a-r-k.**

6

1    Q   Mr. Clark, have you been deposed
2    previously as an expert witness?
3    A   **I have.**
4    Q   On approximately how many occasions?
5    A   **Somewhere in the range of 35 to 40 times.**
6    Q   All right. So you're familiar with the
7    deposition process, but let me just go over some of
8    the instructions for the deposition.
9        I'll be asking you questions about your
10   opinions in this lawsuit. If I ask a question that
11   you do not understand or does not make sense to you,
12   please let me know and I'll rephrase it so that you
13   can answer it. The understanding will be if you
14   answer the question, then you've understood it,
15   okay?
16    A   **Yes.**
17    Q   And as I'm sure you've been told before,
18   all answers need to be verbal, especially since it's
19   videoconference, as opposed to a head shake or an
20   "uh-huh" so that the transcript is clear, all right?
21    A   **Yes.**
22    Q   The obligation for you under oath is to

7

1    simply give the most complete answer that you can to
2    the questions that are put to you. Do you
3    understand that you are testifying under oath?
4    A   **Yes.**
5    Q   Is there any reason you're not able to
6    testify fully and truthfully today?
7    A   **No.**
8    Q   What have you done to prepare for your
9    deposition?
10    A   **I reread my report and response to Dr.**
11   **Weinberg, and reread Dr. Weinberg's report, and this**
12   **morning I met with Mr. Kim.**
13    Q   Did you meet with anyone besides Mr. Kim
14   this morning?
15    A   **No.**
16    Q   Have you previously testified as an expert
17   witness in a lawsuit involving a claim of disparate
18   impact?
19    A   **Yes.**
20    Q   Do you understand that phrase, "disparate
21   impact?"
22    A   **Yes.**

8

1    Q   What is your understanding of that term?
2    A   **It's when some policy or some decision**
3    **affects some groups differently than others.**
4    Q   And have you testified as an expert
5    witness in any lawsuits involving that type of
6    claim?
7    A   **Yes.**
8    Q   How many such lawsuits have you testified
9    in?
10    A   **Recently, I believe four. There may have**
11   **been some others in the past.**
12    Q   Can you identify the four cases that
13   you've recently testified as an expert witness in a
14   lawsuit involving disparate impact claims.
15    A   **The most recent one was listed on my**
16   **report and related to a housing case in San Jose,**
17   **California. Previous to that, there were two cases**
18   **with respect to disparate impact and housing in**
19   **Koreatown in Los Angeles, and before that there was**
20   **a disparate impact case in Milwaukee.**
21    Q   With respect to the case that you referred
22   to in -- that's identified in your expert report,

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

9

1  there were three cases there, one involving the
2  Little Rock School District, one involving Pitt
3  County Schools, and then one called Jones versus
4  Travelers.  Which of those cases involved the
5  disparate impact claim?
6      A  The disparate impact claim was in the
7  Travelers case.
8      Q  And then you mentioned there was one
9  involving Koreatown and one in Milwaukee.  Is that
10 correct?
11     A  There were two in Koreatown, one in
12 Milwaukee.
13     Q  Okay.  Is the Travelers case the most
14 recent one?
15     A  Yes.
16     Q  Okay.  Who retained you in the Travelers
17 case?
18     A  A law firm in San Jose.  I don't recall
19 the name of the attorney at the moment.
20     Q  For which party in that case were you
21 retained?
22     A  For the Travelers Insurance Group.

10

1      Q  What were the claims at issue in that
2  case?
3      A  The plaintiffs owned rental housing in San
4  Jose and they rented apartments to Section 8
5  tenants.  Travelers insured that property under
6  commercial insurance.  They declined to renew the
7  insurance policy when it expired.  The suit was
8  brought arguing that they made that decision in --
9  by making that decision, they had a disparate impact
10 on Section 8 tenants who were renting those
11 apartments.
12     Q  What group in that case claimed to have
13 been disparately impacted by that decision?
14     A  The group was the Section 8 tenants.
15     Q  Was there any specific race or ethnicity
16 of the Section 8 tenants at issue in that case?
17     A  I don't recall whether race was an issue.
18 It was about Section 8 tenants, many of whom of
19 course were minorities, but I don't know that it was
20 specifically about race.  It was essentially about
21 affecting Section 8 residents.
22     Q  Let me ask it this way:  What was the

11

1  protected class, if you will, that was affected by
2  the decision?
3      A  The argument was that the Section 8
4  tenants were a protected class --
5      Q  Regarding --
6      A  -- which many of them were -- because many
7  of them were minorities.
8      Q  What were you asked to do in that case?
9      A  I was asked to analyze the distribution of
10 Section 8 tenants and to evaluate their residential
11 locations and whether or not they were concentrated
12 within the city of San Jose.
13     Q  Did you prepare a report in that case?
14     A  I did.
15     Q  What were the conclusions of your report?
16     A  That's about 18 months ago and I don't --
17 I haven't reviewed the report recently, so I don't
18 have specifics that I can give you on the
19 conclusions.
20     Q  Do you recall generally what the
21 conclusions were?
22     A  I wouldn't want to state them without

12

1  reviewing the report again.
2      Q  Did the case proceed to trial?
3      A  No.
4      Q  You mentioned that you were also involved
5  in two cases involving Koreatown where disparate
6  impact was at issue.  Can you tell me approximately
7  what years those cases took place?
8      A  In 2010 to 2012, in that range, perhaps
9  one a little earlier.
10     Q  Who retained you in -- were those cases
11 related, or were they separate lawsuits?
12     A  I think they were separate lawsuits, but
13 they related to the same management company.
14     Q  Who retained you in those lawsuits?
15     A  Manatt Phelps.
16     Q  Were you retained on behalf of the
17 plaintiff or the defendants in that case or those
18 cases?
19     A  I -- excuse me.  I was retained on behalf
20 of the defendant.
21     Q  Who were the defendants in those cases?
22     A  I think the correct -- Donald Sterling and

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

---

13

1  Sterling Associates.
2      Q   So you were retained on behalf of Mr.
3  Sterling?
4      A   Mr. Sterling was the owner of the
5  apartments.  I was retained by the corporation of
6  which he was at that time the majority owner.
7      Q   What were the disparate impact issues in
8  the Koreatown cases?
9      A   The disparate impact issue related to
10 whether or not the corporation was renting
11 disproportionately to Korean tenants vis-a-vis
12 Hispanic and black tenants.
13     Q   And what were you asked to do in that case
14 on behalf of the defendants?
15     A   I was asked to do a statistical analysis
16 of all of the rental buildings in Koreatown.
17     Q   For what purpose?
18     A   To determine whether or not there was a
19 differential impact on Hispanic and black tenants
20 vis-a-vis Korean tenants.
21     Q   How did you go about performing that
22 analysis?

---

14

1      A   I did census analysis of data in
2  Koreatown, which in fact, despite its name, is
3  largely Hispanic.  And I also did specific analyses
4  of the occupancy of 23 to 28 buildings -- I don't
5  recall the exact number -- in Koreatown.
6      Q   What census data did you review or analyze
7  as part of the work that you did in those cases?
8      A   I used both 2010 census data and 2005 to
9  2012 ACS data.
10     Q   Your reference to ACS, that's to the
11 American Community Survey?
12     A   That's correct.
13     Q   What was the other census data that you
14 relied on?
15     A   The decennial census from 2010, which is
16 the complete census on race and ethnicity.
17     Q   What is the difference between the
18 decennial census and the ACS data?
19     A   The decennial census as of 2010 now uses
20 the short form which collects specific data that can
21 be used for redistricting and in effect captures
22 only the most basic information -- age, sex, race,

---

15

1  and I think there's something else, but it doesn't
2  come to my mind right now -- whereas the ACS is
3  sample survey data and does not count the total
4  population as does the 2010 decennial census.
5      Q   What is the difference in the survey set
6  or numbers of individuals survied between the
7  decennial census and the ACS data?
8      A   If I heard correctly, you're asking what
9  is the difference in the sample data between the ACS
10 and the decennial?
11     Q   Yes, sir.
12     A   The decennial census is not a sample.  It
13 is a count of the population.  The ACS is a sample
14 survey conducted on a rolling basis.
15     Q   What percentage of the population is
16 surveyed as part of the ACS process?
17     A   It's a rolling sample of approximately
18 three million households, so it's a much -- it's
19 about three -- less than three percent.
20     Q   How did you use the ACS data with respect
21 to your opinions in the Koreatown cases?
22     A   I used it to capture current information

---

16

1  on what was happening in Koreatown after the 2010
2  decennial census.
3      Q   What data did you rely upon from the ACS
4  information as part of your analysis in that case?
5      A   The same data that I used with the
6  decennial data, that is, data on age, race, and
7  ethnicity.
8      Q   Did you accept the ACS data without any
9  modification?
10     A   I'm not sure I know what you mean by
11 accept the data.  The data is the data.  I used what
12 the ACS published.
13     Q   So if the ACS data, for example, said 30
14 percent of the occupants or inhabitants of
15 Koreatown, the total Hispanic population was 30
16 percent, you would have just accepted that without
17 any modification by you.  Is that right?
18     A   I accepted the ACS data as published with
19 the usual comments on their estimates of range of
20 error and the other information they provided about
21 their estimates.
22     Q   So that I'm clear, in your -- in the

---

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

17

1 opinions you provided in the Koreatown case, did you
2 rely on the data from the ACS, or did you rely upon
3 that as a starting point for your analysis?
4    A  I used the ACS data in constructing
5 estimates on the population in Koreatown and the
6 changes over time.
7    Q  So did the ACS data tell you what the
8 population breakout was for Koreatown?
9    A  With some work on the way in which the
10 data is prepared at the tract level, I was able to
11 make estimates for Koreatown, but of course there is
12 no exact match to what Koreatown is and the census
13 tracts because Koreatown is a verbal statement about
14 a general area in the city.
15    Q  As part of your opinions in the Koreatown
16 case, did you estimate the population breakdown by
17 ethnicity in that location?
18    A  I believe I did.
19    Q  Were these breakdowns based solely on the
20 ACS data, or some change to that data that you
21 implemented?
22    A  You're asking me to recall work of several

18

1 years ago, and I can't give you more specifics than
2 I already have.  I worked with that data as only a
3 small fraction of the work on the disparate impact
4 analysis.  It was essentially contextual to provide
5 data on what the population composition of Koreatown
6 was at the time.
7    Q  Other than the ACS data and the decennial
8 information, what other information did you consider
9 in your analysis in the Koreatown cases?
10    A  Well, the most important data of course
11 was the data on the occupancy of the buildings and
12 the tenants themselves, and I had specific data on
13 every resident in all the buildings in Koreatown,
14 including the rents paid, the period of occupancy,
15 and a range of information about the buildings
16 themselves.
17    Q  How did that information assist you in
18 performing your analysis in that case?
19    A  If I recall correctly, much of the case
20 related to the levels of rents and the affordability
21 of people in the buildings versus the pool that
22 could afford to rent those buildings.

19

1    Q  What were your conclusions in the
2 Koreatown cases?
3    A  Again, I respond by saying I'm recalling
4 material from a period of time several years ago
5 now.  The general conclusion was that when you
6 factored in the cost of housing and the
7 affordability of housing, there was not a disparate
8 impact on Hispanic or African-American tenants.
9    Q  Did that -- did those cases proceed to a
10 trial?
11    A  One of the cases, which began as a
12 disparate impact case, transformed into a
13 discrimination case and went to trial.  The other
14 case was settled.
15    Q  Okay.  You also mentioned that you were
16 involved in a disparate impact case in Milwaukee.
17 What was the year of that case?
18    A  I don't recall.
19    Q  And you mentioned just a minute ago that
20 one of the Koreatown cases became a discrimination
21 case.  Have you testified as an expert witness in
22 any discrimination or disparate treatment case?

20

1    A  I have certainly given depositions and
2 I've certainly testified about discriminatory impact
3 in school desegregation cases.  I don't know that
4 I've ever testified about discrimination in
5 disparate impact.
6    Q  Do you understand the distinction between
7 a disparate impact and a disparate treatment claim?
8    A  Yes.
9    Q  What's your understanding of the
10 difference?
11    A  Prior to the Texas ruling of about a year
12 ago, the issue in showing disparate impact was that
13 you were also concerned with intent.  After the
14 Texas ruling, as I understand it, it's essentially
15 sufficient to show statistical differences to prove
16 disparate impact.
17    Q  The Texas case, are you referring to The
18 Inclusive Communities case?
19    A  Yes.
20    Q  Have you been involved previously with any
21 study or effort to estimate the undocumented
22 immigrant population for any particular area of the

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

21

1 United States?
2    A  Yes.
3    Q  On how many occasions?
4    A  I wrote two books, "The California
5 Cauldron" and "The American Dream," both of which
6 have substantial sections on undocumented
7 immigrants, the estimation of those populations, and
8 discussions of their locations, outcomes, and a
9 variety of demographic aspects.
10    Q  Let's start first with the book you
11 mentioned.  I think it was "The California
12 Cauldron."  Is that correct?
13    A  Yes.
14    Q  When was that book published?
15    A  In the 1990s.
16    Q  And what undocumented population did you
17 estimate in that publication?
18    A  I used data on the undocumented population
19 that had been published and estimated by others.  I
20 didn't provide estimates myself of the undocumented
21 population.
22    Q  So you accepted the estimates that others

22

1 had provided.  Is that correct?
2    A  I used those estimates.  I described them.
3 I discussed them.  I evaluated them.  To that
4 extent, I utilized them in my published book.
5    Q  What did you do to evaluate those
6 estimates?
7    A  I did what all demographers do:  I
8 validated to the extent I could how those estimates
9 had been prepared.
10    Q  So you looked at the methodology for how
11 those estimates were derived?
12    A  For example, yes.
13    Q  Did you look at any other data or
14 information to determine the validity of those
15 estimates?
16    A  I don't know what you mean by other data.
17    Q  Other than looking at the methodology for
18 these estimates, did you take anything else into
19 account to determine whether the estimates were
20 accurate?
21    A  Well, we've already discussed the fact
22 that we reviewed the methodology and we looked at

23

1 the estimates.  As a demographer, I don't know what
2 more you would do except evaluate the methodology
3 and look at the estimates and discuss the findings
4 that you can draw from that.
5    Q  What methodology was utilized for those
6 estimates that you relied upon in your "California
7 Cauldron" book?
8    A  Well, as you probably know, the work on
9 undocumented immigrants is an evolving issue and it
10 began with people who looked at the I53 cards, I
11 believe they were called, which were required of
12 every resident alien, and they used a comparison of
13 those with the actual census data to come up with
14 estimates, which suggested back in the 1990s that
15 there was somewhere between two and four million
16 undocumented immigrants.  That number varied over
17 time as people attempted to refine the technology to
18 get a better estimate of the undocumented
19 population.
20    Q  What area of the United States were you
21 attempting to estimate the undocumented population
22 for in "The California Cauldron" book?

24

1    A  I think we established I wasn't trying to
2 estimate it.  I was using estimates that had been
3 prepared by demographers who were using their skills
4 to provide us with the best estimate they could.
5 And it was for California, to answer your specific
6 question.
7    Q  The other book you mentioned was "The
8 American Dream."  When was that book published?
9    A  2003, I believe.
10    Q  What was the subject of that book?
11    A  That was a study of immigrant progress in
12 the United States over the 30-year period as
13 immigration increased from a few hundred thousand to
14 more than a million a year.
15    Q  In that book did you attempt to estimate
16 the undocumented population for any particular area
17 of the United States?
18    A  I don't recall.  I haven't gone back and
19 looked at that recently.  It did deal with the
20 undocumented population, but it was not so much a
21 critical part of that book as it was "The California
22 Cauldron."

25

1  Q  Let me ask you sort of the predicate
2  question:  We've been using the phrase "undocumented
3  population."  What does that phrase mean to you?
4     A  Well, it's a general term that we use to
5  describe residents of the United States without
6  documentation.  They could be people who have come
7  in entry without inspection, or they could be people
8  who have come in with inspection and stayed beyond
9  the time of their visas.  So it's a general term to
10 describe people who do not have the appropriate
11 documentation for residents in the U.S.
12    Q  So the undocumented population would refer
13 to those who were in the United States illegally?
14    A  That -- that's been a term that's been
15 used, but there's been discussions about whether you
16 should use "illegal" rather than using the term
17 "undocumented."  But you could by definition say
18 that if they're here without documentation, they are
19 not legal residents.
20    Q  Other than the two books you have
21 mentioned, have you been involved in any other
22 studies, publications of any kind in which the

26

1  subject was an attempt to estimate the undocumented
2  population in a particular geographical area?
3     A  There may be other publications which have
4  certainly been involved with discussions of the
5  undocumented population.  Your specific question
6  about whether I have estimated it for specific
7  areas, I don't believe that I have articles that
8  have done that.
9     Q  Have you engaged in that type of analysis
10 as an expert witness on any occasion other than this
11 case?
12    A  I believe it was part of the Koreatown
13 study.  We were concerned with people who were
14 documented or not, but I don't think that that
15 became an essential part of that case.
16    Q  In the reports in this case, Professor
17 Clark, there's a term that's used called "margin of
18 error."  Can you define that term for me.
19    A  When statisticians and demographers make
20 estimates using samples, they recognize that there
21 is some -- because it's not a count, there is some
22 error in the result, and we provide a range around

27

1  that that we believe contains the true value if we
2  had actually counted the population.
3     Q  How do you determine the margin of error
4  for a particular estimate?
5     A  From a variety of statistical methods,
6  that effectively you are asking essentially
7  questions about what is the reliability of a number
8  that you've calculated, and you say, well, that
9  number could vary by a certain percentage either
10 side.  Think of it as like a bell curve.
11        The true value is, say, the average age of
12 the population of the United States, 33.5.  If we
13 counted everybody and estimated their age, that's
14 the true value.  We take a sample, we get a number
15 that's somewhat near that.  If we kept taking
16 samples, more will be near the true value than will
17 be further away from it.  That range is what we use
18 to calculate the margin of error.
19    Q  What factors impact the reliability of an
20 estimate?
21    A  How well you do the sample, how much
22 variance there is in the population, the skills of

28

1  the demographer doing the estimate.
2     Q  Does the size of the sample impact the
3  reliability of the estimate that's derived from it?
4     A  The size of the sample plays a role, yes.
5     Q  What role does that play?
6     A  Well, larger samples are usually likely to
7  be more accurate.
8     Q  When you take into account these various
9  factors that could affect the reliability of the
10 estimate, is there a particular method by which you
11 then determine the margin of error?
12    A  Well, the margin of error is calculated as
13 a — as a — using the statistical probability.  You
14 ask what's the reliability of the estimate based on
15 a five percent variation, a ten percent variation,
16 and you produce that estimate as a measure of the
17 potential variation in the true value.
18    Q  In determining your margin of error, is
19 that determined at all by the confidence level that
20 you utilize?
21    A  The confidence level influences -- you can
22 have margins of error at various confidence levels.

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

29

1    Q   What is the confidence level that you
2  consider to be the standard in what you do?
3    **A  Well, it's not what I do.  Demographers**
4  **and census people use various levels of -- various**
5  **probability estimates ranging in the five -- .05 and**
6  **.10, five and ten percent.**
7    Q   Well, the Census Bureau uses a confidence
8  level of 90 percent, correct?
9    **A  Yes.  That's the other way of saying it.**
10   Q   As a demographer, is that an acceptable
11 standard to use?
12   **A  It's used -- of course it is.  The census**
13 **uses it.  Demographers use it.**
14   Q   In looking at a sample, in determining the
15 margin of error, if you go from a larger sample, say
16 a national survey, to a county survey, does the
17 margin of error increase as you go from the larger
18 to the smaller area?
19   **A  It can, yes.**
20   Q   Are there any instances where that would
21 not happen?
22   **A  I don't know.**

30

1    Q   Well, would you agree as a general rule
2  that if you go from, say, a national survey to a
3  local county survey that the margin of error will
4  increase?
5    **A  It depends on your sampling methodology.**
6  **You could sample with a greater number at the local**
7  **level than at the national.  If you're just doing**
8  **the national sample and seeing what the estimate**
9  **would be at the local level, there's going to be a**
10 **greater margin of error at the local level than**
11 **there is at the national level.**
12   Q   So is it more looking at the sample size
13 at the national level and comparing that, for
14 instance, to the sample size at the county level?
15   **A  I don't understand your question.**
16   Q   Well, I'm trying to understand your
17 explanation.  If you have a margin of error at the
18 national level that's looking at the same population
19 segment, let's say, and you have a sample at the
20 county level that's looking at that same population
21 segment, is the margin of error going to be higher
22 at the county level compared to the national?

31

1    **A  I already said it depends on the sample**
2  **size at both levels.  You could have a large sample**
3  **size at the local level and you could have a small**
4  **sample at the national level.**
5    Q   So how do you determine --
6    **A  The sample size -- excuse me.**
7    Q   Go ahead.
8    **A  No.**
9    Q   So how do you make that comparison?
10   **A  I don't understand what comparison you**
11 **want.**
12   Q   So if the sample size at the national
13 level is three million, let's assume, and the county
14 size is 3,000 in a county with a population of a
15 million, how do you as a demographer determine the
16 margin of error in comparing those two statistics?
17   **A  Well, you're not comparing -- first of**
18 **all, it depends on what statistic you're trying to**
19 **estimate.  But in the case you provided, three**
20 **million at the national, 3,000 at the county, the**
21 **margin of error would probably be greater at the**
22 **county level than at the national level.**

32

1    Q   So what I'm trying to get at is in making
2  those comparisons, what factors do you as a
3  demographer look at to determine the difference in
4  the margin of error in that situation?
5    **A  I'm sorry.  I just don't understand your**
6  **question.  The margin of error is the margin of**
7  **error which you calculate at the national level and**
8  **the local level.  That's it.**
9    Q   Would you agree that the Census Bureau,
10 for example, when it goes from the national level
11 down to smaller geographical areas, its margin of
12 error increases?
13   **A  Yes.**
14   Q   So is that typical, that when you go from
15 a larger to a smaller geographical area, the margin
16 of error increases?
17   **A  There are a number of assumptions in your**
18 **statement.  It would only increase if you hold the**
19 **sample size constant.**
20   Q   When you say hold the sample size
21 constant, what do you mean?
22   **A  Well, you have three million at the**

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

---

33

1  national level, you have some smaller number at the
2  local level, and we've agreed that the margin of
3  error would be greater at the smaller area than at
4  the national.
5      Q   In attempting to estimate the undocumented
6  population as we've defined it, are there particular
7  challenges to that type of estimate as opposed to
8  estimating another segment of the population?
9      A   I believe that's true.
10     Q   What are the difficulties, if you will, in
11 estimating the undocumented population?
12     A   Well, because they're undocumented, some
13 of them prefer not to be measured in census
14 estimations.  So getting an accurate count is more
15 difficult for a population that is less willing,
16 less wanting to be measured.
17     Q   As a demographer, how do you deal with
18 that?
19     A   Well, there's a huge literature and it's
20 been discussed at length, and both Dr. Weinberg and
21 I reference some of the important people, Fasel,
22 Warren, Word, all these people, Peter Morrison, who

---

34

1  have worked on this project of how to estimate the
2  undocumented population, and now the demographers at
3  The Center for Migration Studies have done a very
4  good job of coming up with pretty good estimates of
5  the national and local undocumented populations.
6      Q   So The Center for Migration Studies has
7  estimated the undocumented population at the
8  national level for the United States, correct?
9      A   Yes.
10     Q   Is it also true that CMS, who is -- I'll
11 refer to them as The Center for Migration Studies --
12 has acknowledged a nine percent margin of error with
13 respect to its estimate of the undocumented
14 population at the national level?
15     A   That's correct.
16     Q   Has CMS estimated the margin of error for
17 its estimates at smaller geographical areas such as
18 a state?
19     A   They have not.
20     Q   Do you know why they have not done that?
21     A   I think the -- they say it's difficult
22 enough to try and get estimates of the undocumented

---

35

1  population.  Putting margins of error on this is
2  difficult -- a difficult process.  Why they actually
3  didn't do it, they don't say in their report.  I
4  hasten to add that that material has just come out,
5  and I understand, but this is hearsay, that they may
6  attempt to provide margins of error.
7      Q   Would you expect the margin of error for
8  the undocumented population to be higher at the
9  state level as opposed to the national estimate from
10 CMS?
11     A   Would I expect the margin of error to be
12 higher?
13     Q   Yes, at the state level.
14     A   Depending on the state, possibly.  I don't
15 think it would necessarily be any higher in
16 California, but it's possible.
17     Q   What factors would you consider in
18 determining whether the margin of error at the state
19 level is higher than the nine percent margin of
20 error at the national level of CMS estimates?
21     A   I'm not sure I understand where you're
22 going with your question, but it seems to me we've

---

36

1  talked about how you make estimates already.  I
2  don't know what I can add.
3      Q   Well, you've testified that as you go from
4  a larger to a smaller geographical area, the margin
5  of error increases.  My question for you is CMS, as
6  you've testified, acknowledges a nine percent margin
7  of error for its estimate at the national level of
8  undocumented -- the undocumented population.  Would
9  you expect the margin of error for the undocumented
10 population estimated by CMS to be higher at the
11 state level?
12     A   I already answered that question.  I said
13 it might be, but as in the case of California, I do
14 not think it would be.
15     Q   How about the state of Virginia?
16     A   Virginia has a significant undocumented
17 population.  It could well be higher, but we haven't
18 done that estimate.  We don't know.
19     Q   Does CMS -- to what -- what's the smallest
20 geographical area that CMS provides an estimate of
21 the undocumented population?
22     A   For sub-county units.

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

37

1    Q    Is that what's been referred to in some of
2 the reports -- and I'll use the acronym -- PUMA,
3 P-U-M-A?
4    A    Yes, public use microdata area.
5    Q    So that's the smallest geographical area
6 that CMS will provide an estimate or has provided an
7 estimate for the undocumented population, correct?
8    A    That is the smallest area to which they
9 have published estimates.
10   Q    Okay. Are there any other entities that
11 have estimated the undocumented population at a
12 geographical area smaller than a PUMA?
13   A    Not that I know of.
14   Q    Do you know why that is?
15   A    It's a very time consuming and tedious
16 activity, and I don't think the other two major
17 groups, The Pew Foundation and the -- I can't recall
18 the name -- the Migration Studies Institute --
19   Q    Yeah.
20   A    -- have done that.
21   Q    In the expert report that you provided in
22 this case, you adopted the margin of error that the

38

1 American Community Survey attached to the estimate
2 of the total number of Hispanics in the census tract
3 at issue. Is that correct?
4    A    That's correct.
5    Q    Do you know how ACS determined that margin
6 of error?
7    A    Certainly when I was reviewing the
8 document, I could have given you a much more
9 specific answer. They used the procedures the ACS
10 uses for all of its margins of error, and they pass
11 that down to the local unit, and that's their best
12 estimate of a range for that small population in a
13 census tract. In this case I think it was 26
14 percent.
15   Q    All right. At what point does the margin
16 of error cause you as a demographer to question the
17 reliability of the estimate?
18   A    Well, I think we have to be clear that the
19 issue and the importance is -- the point is not the
20 margin of error. The margin of error gives us a
21 guide as to what the range might be. But in the
22 end, all statisticians and demographers are

39

1 interested in making point estimates, and that's
2 what I was concerned with here. I was concerned
3 with making a point estimate, the best estimate I
4 could of the undocumented population in the census
5 tract, which I did.
6        And interestingly, Dr. Weinberg has a
7 point estimate that's not that much different from
8 the one I have. That's a point estimate around
9 which there is a margin of error. The fact that we
10 both got a point estimate that's close to one
11 another gives me certain confidence that that's
12 about where the proper number lies.
13       We don't know the exact number, we don't
14 know the true number, but there is a range of error
15 around those, and I believe that the point estimate
16 is the way of thinking about this around which there
17 is a bell-shaped curve. As I point out in my
18 report, I think that is the important finding, that
19 we are trying to determine the point estimate.
20 That's the focus, not the margin of error.
21   Q    But doesn't the margin of error tell you
22 how reliable your point estimate is?

40

1    A    Margin of error is useful in telling us
2 how well we can rely on it, but if we focus only on
3 the margin of error, we lose sight of the fact that
4 we're trying to make a point estimate. There is a
5 margin of error around it, but as I pointed out in
6 the rebuttal report, the margin of error is not 101
7 percent, which would not -- which would be
8 nonsensical.
9        So there is some margin of error. I
10 believe I appropriately used, failing other
11 information that was -- had good back-up, I reliably
12 used the ACS report for all Hispanics to estimate
13 the undocumented Hispanic population.
14   Q    So let me get back to my question then.
15 When you have a point estimate and you assign it a
16 margin of error, at what point does the margin of
17 error get so high that the estimate is no longer
18 reliable?
19   A    The estimate is -- has -- the estimate is
20 the estimate. What we're saying is it is in some
21 range. You can use other information when you're
22 actually trying to determine such a difficult

Transcript of William A.V. Clark, Ph.D.

Conducted on December 22, 2016

---

41

1  situation as this, as well as the margin of error.
2  For example, we know that there are about 80
3  Hispanic residents in the mobile home park at issue
4  in this case. So the number of undocumented is
5  going to be some -- in some range there.
6          We know that in trying to make an
7  estimate, we can use other information such that if
8  we construct a range for the margin of error which
9  is greater -- which goes to zero, that doesn't make
10 sense. So we have to use both statistical sense and
11 common sense in trying to evaluate difficult point
12 estimates like the undocumented.
13     Q  So is it your testimony that you can
14 disregard the margin of error in determining the
15 reliability of an estimate?
16     A  I didn't ever say that.
17     Q  Okay. Well, my question then is when does
18 the margin of error get to a point where as a
19 demographer you cannot rely on the estimate?
20     A  The only way to answer that question would
21 be to have a specific situation, and I -- we don't
22 have a specific situation that I can give you to

---

42

1  answer your question. There is no general answer to
2  the question when is the margin of error unreliable.
3  That's the question you're asking.
4      Q  So your testimony is you could have a 100
5  percent margin of error and still have a reliable
6  estimate. Is that correct?
7      A  No, I didn't testify to that.
8      Q  Okay. Well, what number below a 100
9  percent margin of error would you as a demographer
10 say the estimate is no longer reliable?
11     A  I wouldn't use that language. And what I
12 did in my report was take the ACS estimate and use
13 that to create a range. I think that's reliable. I
14 don't have to make decisions about what might
15 happen. I actually used an ACS figure and applied
16 it to my point estimate to give a range of around --
17 I don't recall exactly -- 230 to 320.
18     Q  Let me ask it this way: If the ACS margin
19 of error was 50 percent rather than 26 percent,
20 would your estimate still be reliable?
21     A  Yes.
22     Q  Would it still be reliable if the margin

---

43

1  of error was 75 percent?
2      A  As I said to you earlier, I don't want to
3  go into this kind of to-and-fro where you say is it
4  this, is it this, is it this, because what I said to
5  you was I used a reliable margin of error that was
6  provided by the ACS for all Hispanics within that
7  tract and applied it to my estimate of the
8  undocumented. I believe that's a reliable point
9  estimate. I believe that's a reasonable margin of
10 error.
11     Q  I understand your testimony, but I'm
12 asking a different question. I'm asking you as a
13 demographer, when does the margin of error get to a
14 percentage where you can no longer deem the estimate
15 to be reliable?
16     A  I don't have an answer to that question.
17     Q  Why not?
18     A  It's not a question I've ever spent the
19 time thinking about to be able to give you a
20 reasoned answer.
21     Q  Why does the Census Bureau publish margins
22 of error with its statistics and estimates?

---

44

1      A  Because it wants us to reflect on the
2  value of the point estimate and to make sure that we
3  realize that there is variation in those point
4  estimates. But they also say, having sat on a
5  number of the census commissions, that the point
6  estimate is still their best estimate, otherwise
7  they wouldn't publish it.
8      Q  So let me ask this again: Can you ignore
9  the margin of error in determining the reliability
10 of a point estimate?
11     A  I never said that.
12     Q  Well, since you have to take the margin of
13 error into account then in determining the
14 reliability of a point estimate, when does the
15 margin of error get to a point where you cannot deem
16 the estimate to be reliable?
17         MR. KIM: Objection, asked and answered.
18     A  We've been over this several times. I've
19 given you my answer, that I've used the ACS margin
20 of error. The question you're asking is a
21 philosophical question, and as I said to you
22 earlier, I haven't reflected on whether there's an

---

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

---

45

1 answer to that question.

2 BY MR. DINGMAN:

3    Q   What's the highest margin of error you've

4 used in presenting an estimate?

5    A   I can't recall specific examples.

6    Q   With respect to the margin of error that

7 you used in your report, the 26 percent was the

8 margin of error for Hispanics in the census tract at

9 issue, correct?

10    A   That's correct.

11    Q   Why didn't you adjust that margin of error

12 up when you estimated the undocumented population?

13    A   I didn't understand your question.

14    Q   Why didn't you increase the margin of

15 error when you attempted to estimate the

16 undocumented population in your report?

17    A   I didn't adjust it up.  I used 26 percent.

18    Q   Well, that's my question.  You testified

19 that it's more difficult to estimate the

20 undocumented population, so why didn't you use a

21 higher margin of error for that estimate?

22    A   I believe the ACS is the most reliable

---

46

1 piece of information we have about Hispanics and

2 that I used to apply to my undocumented estimate so

3 that I could give you a range.  In fact, I believe

4 my point estimate is about correct.

5    Q   Well, the ACS 26 percent margin of error

6 has nothing to do with the undocumented population,

7 correct?

8    A   It does to the extent that undocuments

9 are -- the undocumented are members of that Hispanic

10 population.

11    Q   But the ACS doesn't differentiate, it

12 simply has an estimate of the total Hispanic

13 population, right?

14    A   That's correct.

15    Q   And that had a margin of error of 26

16 percent, correct?

17    A   Correct.

18    Q   And you attempted to estimate a sub-group

19 of undocumented Hispanics, correct?

20    A   Yes.

21    Q   Which is less certain, as you've already

22 testified, correct?

---

47

1    A   Correct.

2    Q   So shouldn't the margin of error go up?

3    A   If you had some basis to change it, you

4 could make that adjustment.  That would increase the

5 number.

6       But I make two points in response to you:

7 We have another statistician who has also provided a

8 point estimate, without a range of error, I might

9 add.  So we don't know what the range of error of

10 Dr. Weinberg's point is.  But both point estimates

11 are within a relatively narrow range.  Whether the

12 margin of error is actually 26 percent, we can only

13 rely on the fact that that's our best information at

14 this point.

15    Q   Well, you would agree, Professor Clark,

16 that Mr. Weinberg believes that your estimate is

17 completely unreliable because of the margin of

18 error, correct?

19    A   He says that in his report.

20    Q   So the issue isn't so much the point

21 estimate, but whether it's sufficiently reliable,

22 correct?

---

48

1    A   No.  He made a point estimate that is very

2 similar to my point estimate.  He failed to provide

3 a range of error.  He didn't go through a margin of

4 error analysis.  All he did was use some language,

5 which I must admit I find difficult to understand,

6 about 800 percent and then 101 percent and

7 one-eighth, but he did not provide a margin of

8 error.  But he did provide a point estimate, both of

9 which are well within my margin of error using the

10 ACS data.

11    Q   But you would agree, wouldn't you,

12 Professor Clark, that somebody can provide you a

13 point estimate on anything, but you as a demographer

14 have to determine whether it's reliable, right?

15    A   Well, I don't provide estimates on just

16 anything.  As a demographer faced with a specific

17 question, I do my best estimate for that procedure.

18 That's what I did in this case and provided a point

19 estimate that about 300 Hispanics in that tract are

20 undocumented.

21    Q   But you have to demonstrate the

22 reliability of that estimate, right?

---

Transcript of William A.V. Clark, Ph.D.                    13 (49 to 52)
Conducted on December 22, 2016

49

1    A  I did.  I provided a range of error, and
2 the fact that another statistician came in with a
3 value within that range of error provides me with a
4 great deal of confidence that I'm pretty right.
5    Q  Except that his error was 809 percent and
6 yours was 26 percent, right?
7    A  No, that's not correct.  He did not
8 provide a range of error for his point estimate.  He
9 did not provide a margin of error for his point
10 estimate, and the 800, 900 percent is not
11 sufficiently explained in the report for me to
12 understand.
13    Q  Well, isn't the real issue between you and
14 Dr. Weinberg is that you think your 26 percent
15 margin of error makes your point estimate reliable
16 and he believes it's not reliable because his margin
17 of error is 809 percent?
18    A  He doesn't provide a margin of error.  He
19 provides some statistics about percentages.  There
20 is no margin of error in Dr. Weinberg's report in
21 any form.  He doesn't even calculate a margin of
22 error with his analysis.  He provides no margin of

50

1 error.
2    Q  You've read his report?
3    A  Yes.
4    Q  Did you read the tables where he
5 calculated the margin of error?
6    A  I did.
7    Q  So how are you saying that he did not
8 estimate a margin of error?
9    A  There's no margin of error around his
10 point estimate.  That's what I'm saying.
11    Q  Well, then what margin of error do you
12 believe he set forth in his report?
13    A  I don't have his report in front of me, so
14 I can't recall it.
15    Q  With the CMS data having a nine percent
16 margin of error at the national level, what margin
17 of error would an estimate of the undocumented
18 population be at the census tract level?
19    A  That hasn't been estimated.
20    Q  Wouldn't it be exponentially higher?
21    A  We do not know.  It has not been
22 estimated.  You're speculating.  Sorry.

51

1    Q  Well, if you don't know, aren't you
2 speculating on the margin of error at that level?
3    A  No.  I chose to use a point estimate -- we
4 keep coming back to the same point -- and I used the
5 reliable ACS measure of the range of error for all
6 Hispanics given that we know there are a large
7 number of Hispanics in Virginia and in Fairfax
8 County, and so I have a certain amount of confidence
9 in my results.
10    Q  But the ACS margin of error that you used
11 was not an estimate of the undocumented population,
12 correct?
13    A  I think you stated that at least twice
14 now.
15    Q  Okay.
16    A  That's correct.
17    Q  Then why is it a valid margin of error for
18 the undocumented population?
19    A  Because the undocumented population are a
20 proportion of the total Hispanic population, and
21 because it is probably the best margin of error
22 we're going to reliably have, I used that around my

52

1 point estimate.  And I remind you that Dr. Weinberg
2 has a point estimate very close to mine, so
3 therefore it suggests that the number is reliably in
4 that range.
5    Q  Again, I know you've read Dr. Weinberg's
6 report.  Doesn't he expressly say that the point
7 estimate is completely unreliable?
8    A  He says that about my point estimate.
9    Q  All right.  So the disagreement isn't the
10 point estimate derived from your methodology, it's
11 whether it's sufficiently reliable, right?
12    A  I would have to go back and look at his
13 report again, but I think we don't disagree about
14 the point estimate.
15    Q  But there's a significant disagreement
16 about the reliability of the estimate, right?
17    A  There is a disagreement about the
18 appropriate margin of error.
19    Q  Isn't that questioning the reliability of
20 the estimate?
21    A  Well, to the extent that the results are
22 very similar, as I keep saying, I think it shows

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

14 (53 to 56)

---

53

1  some reliability in the estimate, just the opposite
2  of what Dr. Weinberg is saying.
3      Q   Professor Clark, when were you first
4  contacted about this case?
5      A   Around November 20, the 22nd.
6      Q   Of this year?
7      A   Yes.
8      Q   Who contacted you at that time?
9      A   I believe it was Mr. Kim and one or two
10 other associates or senior members of the Quinn
11 firm.  There was a conference call.
12     Q   Who was involved in that call besides Mr.
13 Kim?
14     A   I'm sorry.  I don't recall the names.  I
15 wrote them down, but I don't have them in front of
16 me.
17     Q   Okay.  When you were first retained in
18 this case, were you provided any documents to
19 review?
20     A   Eventually I was given the initial
21 complaint and response, and I think the judge's
22 ruling.

---

54

1      Q   Professor Clark, I'd like to go back to --
2  I asked you when you were first contacted in the
3  case, and you testified November of 2016.  Your
4  report is actually dated in October.  So does that
5  help refresh your memory of when you may have first
6  been contacted in the case?
7      A   Maybe it was October.  The report was
8  dated October 28?
9      Q   Yes, sir.
10     A   Maybe it was September 22.  Let me see if
11 I can -- I'm sorry, I just don't recall, but it was
12 in the fall.
13     Q   Okay.
14     A   I could go back and look at my e-mail log,
15 but I don't recall.  Sorry.
16     Q   Okay.  I just wanted to clarify that
17 because I know that the report was October.  So
18 sometime in the fall of this year, you were
19 contacted about this case, correct?
20     A   Correct.  Probably late September.
21     Q   Okay.  What were you asked to do?
22     A   I was asked to look at the issue of

---

55

1  whether or not residents in the Waples Mobile Home
2  Park were being affected by this particular policy
3  of having to show documentation of their residency
4  and whether this -- whether there was a disparate
5  impact on Hispanics, and they sent me their initial
6  filing which was focused on the state of Virginia.
7      Q   And what did you do to then prepare your
8  analysis and ultimate report in this case?
9      A   Initially I collected census data on
10 populations in Virginia, Fairfax County, Fairfax
11 City, and the census tract once I determined where
12 the mobile home park was located.
13     Q   What did you do next?
14     A   I did the analysis on whether there was a
15 disparate impact on Hispanics, in other words, were
16 Hispanics likely to be disparate -- have a disparate
17 impact on this policy.
18         At that point I did not have data on the
19 occupancy of the mobile home park itself, which to
20 me was a central issue about whether you could
21 measure a disparate impact, but I could see whether
22 or not such a policy had disparate impact if it

---

56

1  applied to Hispanics at the state, county, and local
2  level.
3      Q   Did anyone assist you in preparing your
4  report in this case?
5      A   No.
6      Q   Did anyone assist you in performing the
7  research that you've discussed?
8      A   No.
9      Q   Have you been retained in any prior case
10 or any other engagement by the law firm of Quinn
11 Emanuel?
12     A   No.
13     Q   All right.
14         MR. DINGMAN:  I'm going to ask that the --
15 and Karen should have this -- that your expert
16 report be identified as Exhibit 1 to the deposition,
17 and Karen can provide a copy of that to you.
18         (Deposition Exhibit No. 1 was marked for
19 identification and was retained by counsel.)
20 BY MR. DINGMAN:
21     Q   Professor Clark, I'd like you to take a
22 look at Exhibit 1, and can you confirm this is the

---

Transcript of William A.V. Clark, Ph.D.

15 (57 to 60)

Conducted on December 22, 2016

---

57

1 expert report that you prepared for this case?

2    A  It is.

3    Q  One of the terms in there in the report

4 refers to "applied demographic analysis." Can you

5 just describe for me what that is.

6    A  Where is the term you're using from?

7    Q  Look to the first page under "The

8 Question: A question which routinely emerges in

9 demographic analysis." Well, let me ask it this

10 way: Are you familiar with the term "applied

11 demographic analysis?"

12    A  Yes.

13    Q  And what does that term mean to you?

14    A  It's come to mean the approach that

15 demographers take when they use their tools to look

16 at specific local issues, or even national issues,

17 when they're applying demographic tools to local

18 problems.

19    Q  What demographic tools did you apply to

20 this report?

21    A  Very simple statistical tools of counting,

22 of creating tables, of calculating proportions, and

---

58

1 applying estimating techniques.

2    Q  If you'll take a look at page 1 of your

3 report, in the first section called "The Question,"

4 you state, "Does the policy requiring proof of

5 citizenship in a mobile home park disproportionately

6 impact Hispanics families?" Was it your

7 understanding that the claim of disparate impact was

8 the inability to show legal status in the United

9 States?

10    A  My understanding was whether or not a

11 policy that had the impact -- had the implication of

12 impacting a particular ethnic group was a disparate

13 impact. Initially, at least, and when I did this

14 report, it was not focused on whether or not they

15 showed documentation.

16    Q  Well, was it your belief that proof of

17 citizenship was required for someone to apply to

18 live at the mobile home park?

19    A  Well, my understanding is that because

20 people were already living there, they couldn't have

21 used that as an application rule because they

22 wouldn't be there, because when they applied, if

---

59

1 that was part of the rule, they wouldn't have been

2 able to be a resident. But I didn't investigate

3 that specific issue.

4    Q  Well, what policy did you investigate to

5 determine whether it had a disparate impact on

6 Hispanic families at the mobile home park?

7    A  The question was if you are applying a

8 policy to one group versus another, it can have a

9 disparate impact if it's affecting more than -- more

10 of one group than another, and it was essentially

11 because many undocumenteds are Hispanic, it was

12 having an impact, a disparate impact on Hispanics.

13    Q  But that's sort of my question. The issue

14 in the policy that the plaintiffs assert claim to

15 have some sort of disparate impact was the

16 requirement to prove legal status in the United

17 States, right?

18    A  That's the assertion in the plaintiffs'

19 case, yes.

20    Q  If you look under paragraph -- section two

21 that's entitled Findings and Opinions, you state in

22 the last sentence, "Any policy focused specifically

---

60

1 on the sub-area defined by Tract 4406 will have a

2 disproportionate impact on the Hispanic population."

3 What's the basis for that statement?

4    A  Which finding are you citing?

5    Q  It's 2a on page 1.

6    A  2a?

7    Q  Yes, sir. It's the last sentence in 2a.

8    A  Well, if any policy focused specifically

9 on a part of Tract 4406, it's not applied to the

10 whole tract, and because they're mostly Hispanics in

11 that area, it's going to have a disproportionate

12 impact.

13    Q  Well, wouldn't you have to know what the

14 policy is before you make that statement?

15    A  No. Any policy that was focused on that

16 sub-area that had an impact on the Hispanic

17 population specifically would be disparate.

18    Q  So any application, policy, or process,

19 regardless of what it says, would have a disparate

20 impact on the Hispanic population. Is that what

21 you're saying?

22    A  The policy is focused -- the policy that

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

---

61

1  we're talking about, which is the policy about
2  requiring proof of citizenship which is listed in
3  the first paragraph, would have an impact on
4  Hispanics disproportionately.
5      Q  But here you're saying any policy would
6  have a disparate impact, right?
7      A  I think that statement refers to the
8  question that's posed above.  But in fact the tract
9  has a very high proportion of Hispanics compared to
10 non-Hispanics, and any policy that was -- had the
11 effect of targeting Hispanics, any policy would be
12 disproportionate.
13     Q  So your statement any policy focused in
14 this Tract 4406 would disproportionately impact
15 Hispanics is not correct.  It would have to be
16 something that would target them.  Is that your
17 testimony?
18     A  It would have to be related to being
19 Hispanic because that's the disparate impact.
20     Q  Well, if someone can't comply with the
21 policy because they're in the United States
22 illegally, does that have anything to do with them

---

62

1  being Hispanic?
2      A  You can be in the United States without
3  documents whether or not you're Hispanic.
4      Q  Right.  So whether someone is here
5  illegally or not has nothing to do with whether
6  they're Hispanic or not, right?
7      A  It so happens that a very large proportion
8  of the undocumented are Hispanic.
9      Q  Whether that's true or not, my question is
10 whether you're in the United States legally or not
11 has nothing to do with whether you're Hispanic or
12 some other race, correct?
13     A  You can be of different races and be in
14 the U.S. without documentation, correct.
15     Q  So a policy that asks for determination of
16 legal status isn't directed or targeting Hispanics,
17 right?
18     A  Unfortunately, because many Hispanics are
19 in fact undocumented, it has the impact of being a
20 disparate outcome because there are many -- there
21 are very few whites that are undocumented.  There
22 are some, of course.  So it's a disparate impact.

---

63

1  If you apply a policy that has an impact on one
2  group but doesn't on another, that's the core of the
3  disparate impact.  So the fact that most
4  undocumented immigrants are Hispanic means that it's
5  a disparate impact if you apply a -- that particular
6  policy.
7      Q  So your testimony is the disparate impact
8  is due to the fact that there's a larger group of
9  Hispanics in the undocumented population than some
10 other race or ethnic group?
11     A  I believe the report says that, yes.  It
12 compares them with Asians and with others.
13     Q  I'd like you to now take a look, Professor
14 Clark, at section 2d.  We're still on page 1.  And
15 at the last line on that page, the sentence starts
16 "Using the best available estimates," carrying over
17 to page 2, "somewhat greater than 30 percent of the
18 Hispanic population is likely to be undocumented."
19 What were the best available estimates that you
20 refer to there?
21     A  Well, that's discussed further in the
22 report.  Those are the estimates of The Center for

---

64

1  Migration Studies, but confirmed by the studies from
2  the Pew Research Center and from the Migration
3  Studies Institute.
4      Q  But the CMS doesn't have any estimate of
5  the undocumented population at the tract level,
6  correct?
7      A  That's correct.
8      Q  So then you did not rely upon CMS data for
9  your ultimate conclusion in this case, right?
10     A  No, that's not correct.  I used the CMS
11 data from the PUMA to estimate what the undocumented
12 population is in the tract, that tract as part of
13 the PUMA.
14     Q  What's the population size in the PUMA
15 that you relied upon?
16     A  I don't have it in front of me, but it's a
17 large number.
18     Q  Well over 100,000, correct?
19     A  I believe so.
20     Q  And the census Tract 4406, that population
21 is less than 4,000, correct?
22     A  Yes.

---

Transcript of William A.V. Clark, Ph.D.

17 (65 to 68)

Conducted on December 22, 2016

65

1    Q   And you made no adjustment between the CMS
2  estimate at the PUMA level and the tract level in
3  your report, correct?
4    A   Yes.  I took the data from the PUMA level
5  and used that to make an estimate at the tract
6  level.  I used the proportions at the PUMA level and
7  applied them to the tract level.
8    Q   But as we discussed before, as you go from
9  a larger -- in this instance more than 100,000 --
10 population in the PUMA to less than 4,000 in the
11 tract, shouldn't the margin of error or should there
12 be some adjustment because you're going from a
13 larger to a smaller area?
14   A   We went around that at some length.  I
15 gave you a range of the estimate for the
16 undocumented population at the tract level based on
17 the material I used from the PUMA, and what is
18 notable is that the numbers pan out in the way that
19 the Fairfax County and the tract values are about
20 the same.  And so if we know that we can have a fair
21 amount of reliability from the Fairfax County data
22 and we're getting similar kinds of results at the

66

1  tract level, we feel reasonably confident of those
2  results.
3    Q   What was your basis for assuming that the
4  CMS estimate at the PUMA level would be the same for
5  the census tract level?
6    A   The census tract is part of the PUMA.  The
7  counterfactual would be that the tract is very
8  different from the rest of the PUMA, and there's no
9  evidence that it is.  It's like the PUMA as a whole.
10 Therefore, we apply the same proportion at the PUMA
11 level down to the tract level.  That's a standard
12 procedure in demography, that you use a proportion
13 at the higher level and a proportion down at the
14 lower levels.
15   Q   Well, isn't it true that the PUMA level
16 data could be dispersed throughout various census
17 tracts that are encompassed in the PUMA?
18   A   It is true that there's variation across
19 the PUMA, but there's no evidence that the PUMA is
20 so variable that it would make the estimating
21 procedure improper.
22   Q   How did you determine that in this case?

67

1    A   I looked at the census tracts that made up
2  the PUMA.  There are many of them like Tract 4406.
3    Q   So is it your testimony that Tract 4406 is
4  similar in its demographic make-up as other census
5  tracts in the PUMA?
6    A   I did not do that analysis.
7    Q   Continuing on page 2, I'd like you to
8  focus now on subparagraph F.  The last sentence
9  states, "As a disproportionate number of Hispanics
10 are not citizens, a disproportionate number of
11 residents will be impacted by the park's leaseholder
12 policy."  When you make this statement, "a
13 disproportionate number of Hispanics are not
14 citizens," who are you comparing that group to?
15   A   Disproportionate to other groups.
16   Q   Which other groups?
17   A   Well, after -- I was just using
18 non-Hispanics as the other group in that statement,
19 but in the rebuttal report when Dr. Weinberg raised
20 the issue of not estimating it for Asians, I redid
21 the analysis so that we looked at Asians and other
22 populations, and the disproportionate impact

68

1  analysis is still true, but it's a slightly lower --
2  it's in fact considerably lower for not-Asians,
3  non-Hispanics.
4    Q   So in this statement, "a disproportionate
5  number of Hispanics are not citizens," you're
6  comparing Hispanics -- I mean, who are you comparing
7  Hispanics to to make that statement?
8    A   Non-Hispanics.
9    Q   Who are also non-citizens?
10   A   If you look at non-Hispanics who are not
11 citizens, Hispanics are more likely to have been
12 non-citizens than are non-Hispanics.
13   Q   Moving on to the next section, which is
14 section three entitled Data and Resources, in the
15 first photograph, the second sentence you state, "I
16 have carried out specific demographic studies of
17 Fairfax County and the tracts within the county."
18 What specific studies are you referring to there?
19   A   The studies in the report.
20   Q   So whatever studies you did of Fairfax
21 County, they're in your report that's Exhibit 1.  Is
22 that correct?

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

18 (69 to 72)

69

1    A   And whatever is in the response to Dr.
2  Weinberg, yes.
3          MR. DINGMAN:  Why don't we take a short
4  break and let me reorganize.  I think we can finish
5  up hopefully in the next 20, 30 minutes.
6          THE WITNESS:  Okay.
7          MR. KIM:  Sounds good.
8          (A brief recess was had from 5:34 p.m. to
9  5:42 p.m.)
10         MR. DINGMAN:  Are we set to resume?
11         THE WITNESS:  Yes.
12         MR. DINGMAN:  Okay.
13 BY MR. DINGMAN:
14    Q   Professor Clark, I'd like you to turn to
15 page 5 of your report.  In the last paragraph before
16 the section with the heading Geography, in the first
17 sentence you state, "In sum, comparing the
18 undocumented population in Fairfax County and Census
19 Tract 4406 to other groups at the county and the
20 census tract level reveals a disparate impact at
21 both levels."  What are the other groups at the
22 county that you refer to in that statement?

70

1    A   Non-Hispanic populations.
2    Q   And why do you say there's a disparate
3  impact at both levels?
4    A   At both county and census tract levels.
5    Q   So the other groups are just
6  non-Hispanics, or are they the non-Hispanic
7  undocumented population that you're referring to
8  here?
9    A   Non-Hispanic populations.
10    Q   So that statement has nothing to do with
11 whether they're documented or not?
12    A   No.  I misspoke.  That's drawn from the
13 table before where in fact I produce an undocumented
14 ratio for the county in the tract of 30.7 and 31.4.
15    Q   So I'm still trying to understand the
16 statement here.  You said you compared the
17 undocumented population in Fairfax County to other
18 groups at the county.  So who were the other groups
19 at the county?  The documented population?
20    A   No, the undocumented non-Hispanic
21 population.
22    Q   Okay.  And when you did this report, you

71

1  did not take into account the undocumented Asian
2  population, correct?
3    A   That's correct.
4    Q   Why not?
5    A   As I said in my rebuttal report, the Asian
6  undocumented population as I understood it were not
7  part of the -- were not at issue in this litigation,
8  and I did not do the calculations for them.
9    Q   Well, how could you ignore them when you
10 make your statement that Latinos are nearly seven
11 times more likely to be undocumented than other
12 groups?
13    A   Well, the statement is correct, but the
14 other groups, it turns out, did have undocumented
15 populations, and that number needed to be
16 reevaluated when it was pointed out to me that there
17 was a significant Asian undocumented population,
18 which I did in the second report.
19    Q   Were you aware of that undocumented Asian
20 population when you wrote your initial report?
21    A   I was not aware of the size of the
22 undocumented Asian population.  I knew there was an

72

1  Asian undocumented population.  I had not focused on
2  that because I was focusing on the Hispanic issue,
3  and I had recently worked on the Hispanic
4  composition of the Waples Mobile Home Park, and the
5  Asian composition of the home -- mobile home park
6  was very small.
7    Q   But you agree to do this comparison, you
8  needed to take into account the size of the
9  undocumented Asian population in the census tract,
10 correct?
11    A   That's what I did in the second report,
12 yes.
13         MR. DINGMAN:  Let's mark as Exhibit 2 the
14 expert reply report for Professor Clark.
15         (Deposition Exhibit No. 2 was marked for
16 identification and was retained by counsel.)
17 BY MR. DINGMAN:
18    Q   Professor Clark, if you could look at
19 Exhibit 2 and confirm that this is your reply report
20 in this case.
21    A   It is.
22    Q   Okay.  As part of your report, you

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

73

1  reviewed the expert report provided by Daniel
2  Weinberg, correct?
3      **A  Yes.**
4      Q   Prior to this case, did you know Mr.
5  Weinberg?
6      **A  Yes.**
7      Q   In what capacity?
8      **A  A long time ago Dr. Weinberg submitted a**
9  **chapter to a book that I edited, and over the years**
10 **I had occasional exchanges with him.  I gave a**
11 **lecture at the Census Bureau and I met him there.**
12 **I've seen him at and talked to him at national**
13 **population meetings.**
14     Q   What's your opinion of Dr. Weinberg?
15     **A  He's a very competent demographer and**
16 **statistician.**
17     Q   In reviewing his report, did you have any
18 issue with the methodology that he used to come up
19 with the MOE that he determined?
20     **A  As I explained to you earlier, I found it**
21 **difficult to understand his 101 percent MOE.  He**
22 **made numerous assumptions that I could not find any**

74

1  **basis for, and so I found that I couldn't agree with**
2  **that.**
3      Q   What were the assumptions that you believe
4  he made that you could not account for?
5      **A  They're in his report, and I can't recall**
6  **them specifically, but he did, as he says, make a**
7  **number of assumptions to come up with 101 percent**
8  **error.  There's a paragraph that begins "I make the**
9  **following assumptions."  I cannot recall them for**
10 **you specifically now.**
11     Q   Okay.  If you'll take a look at your
12 expert reply report, did you identify in there the
13 assumptions that you believe Dr. Weinberg made that
14 were not supportable?
15     **A  I don't believe I went through them.  I**
16 **went through the report and pointed out, as we've**
17 **already discussed, that he got a point estimate**
18 **similar to mine.  He didn't calculate a range -- a**
19 **margin of error using 101 percent which would have**
20 **produced a zero to 602 range, and I suggested that**
21 **that analysis obscures the reasonableness of a**
22 **result, which is a point estimate of about 300**

75

1      **undocumented Hispanics.**
2      Q   If you would look at page 1 of your reply
3  report, under the heading Point Estimates and the
4  Margin of Error, in the second paragraph you state
5  that Dr. Weinberg asserts that the margin of error
6  should be 101 percent, correct?
7      **A  I say that, yes.**
8      Q   But there's nothing in your reply report
9  that challenges how he came to that conclusion,
10 correct?
11     **A  I explained to you earlier that I could**
12 **not understand how he came to that conclusion.**
13     Q   Well, do you even state in your reply
14 report that his conclusion is wrong?
15     **A  I can't say whether it is right or wrong**
16 **because I can't interpret it.**
17     Q   Why can you not interpret it?
18     **A  The presentation is -- does not have**
19 **clarity.**
20     Q   And what do you contend to be the lack of
21 clarity in the presentation of Dr. Weinberg's
22 report?

76

1      **A  I've said several times I don't understand**
2  **what his assumptions were or how he went from 800**
3  **percent and one-eighth of that to 101 percent.  Why**
4  **one-eighth?  There was no discussion of that.  So I**
5  **could not understand what he did.**
6      Q   So do you then have no opinion as to
7  whether his calculations are correct or not?
8      **A  I believe his use of 101 percent does not**
9  **come up to the standard of a reasonable result.**
10 **Clearly there is no point estimate of zero in the**
11 **census tract, so the range he's proposing is**
12 **nonsensical as a margin of error.**
13     Q   Well, is it that the margin of error
14 demonstrates that the estimate is unreliable?
15     **A  I believe that's an incorrect statement.**
16     Q   Why do you believe that's an incorrect
17 statement?
18     **A  Because I provided an estimate using the**
19 **ACS margin of error, which I think is a reasonable**
20 **interpretation applied to the Hispanic -- from the**
21 **Hispanic population applied to produce an**
22 **undocumented population.**

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

77

1    Q   In his calculation, Dr. Weinberg took into
2  account the CMS margin of error at the national
3  level of nine percent, correct?
4    A   And then he multiplied it up.
5    Q   Right.  But he took into account the nine
6  percent margin of error that CMS admits to with
7  respect to its national estimates, correct?
8    A   Yes.
9    Q   You ignored that, correct?
10   A   I didn't ignore it.  I said that this is
11 the best estimate we have.  There is no margin of
12 error provided by CMS.  He made a number of
13 assumptions about that for which I can find no
14 basis.
15   Q   Well, isn't his assumption pretty
16 straightforward?  He started at a national margin of
17 error and took that down to a census tract level?
18   A   Not if you just multiplied up by some
19 number, which has no basis that I can find.
20   Q   So you don't recall that his basis was
21 looking at the number of foreign-born nationals from
22 the census data?

78

1    A   He uses that, but that's -- but there's no
2  justification for it.  And we're getting away from
3  the point.  You're focusing on margins of error, and
4  I keep needing to remind you that we do have a point
5  estimate here.  That's the issue.  There is an issue
6  of what the margin of error should be, but the point
7  estimate, which both Dr. Weinberg and I got, is a
8  good estimate for the number of undocumented in the
9  census tract.  And that I think is the end of the
10 discussion, really, because we've got a point
11 estimate.
12      Perhaps the margin of error should be
13 larger, but the margin of error only gives us a
14 sense of where the point estimate lies.  Think of it
15 again, as I said, as a bell curve.  Multiple samples
16 will produce most of the results near the point
17 estimate.
18   Q   But in order to determine whether a point
19 estimate is reliable, you have to consider the
20 margin of error, correct?
21   A   You can consider the margin of error.  It
22 gives you a range in which the point estimate could

79

1  lie.  We've already established the point estimate
2  of undocumented Hispanics in the census tract is not
3  zero, but that's what Dr. Weinberg is claiming.
4    Q   What Dr. --
5    A   So that makes his result nonsensical.
6    Q   Isn't he demonstrating that the estimate
7  has no reliability with his margin of error?
8    A   No, no.  He's demonstrating that you could
9  get a point estimate of zero under his discussion.
10 That's not possible.
11   Q   Let me ask you this question.
12   A   The margin of error --
13   Q   Go ahead.
14   A   The margin of error includes all point
15 estimates.
16   Q   As a demographer, can you accept an
17 estimate as reliable without knowing the margin of
18 error associated with the estimate?
19   A   You can accept the point estimate.  There
20 is a margin of error around it.  You may not know
21 exactly what the margin of error is.  You can still
22 accept the point estimate.  We accept them all the

80

1  time.  Demographers accept estimates of income, of
2  the proportion of women with levels of fertility.
3  We accept point estimates all the time, both
4  professionally and in the lay public.  We don't
5  always have point -- we don't -- in fact, we often
6  do not have margins of error, but we accept them.
7    Q   Why does the Census Bureau attach a margin
8  of error to all of its estimates if it's unnecessary
9  to determine the reliability of the estimate?
10   A   I didn't say that.  The Census Bureau in
11 its great care with lots of mathematical
12 statisticians is concerned to give a range around
13 which their point estimates lie.  They want people
14 to be aware that the estimate is somewhere in this
15 range.
16   Q   Isn't it true the Census Bureau also wants
17 individuals to be aware that the estimate may not be
18 reliable?
19   A   I'm not sure that's a correct statement
20 about the Census Bureau, but we have to see what
21 their documentation says on that.
22   Q   Based on your experience, do you

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

81

1  understand that that's the reason they provide a
2  margin of error, to allow others to assess the
3  reliability of their estimates?
4      A  That's one of the reasons they do it, and
5  I've used what I believe is a reliable piece of
6  their margins of error, that is, the margin of error
7  for the census tract, which is quite large, 26
8  percent, for my margin of error for the undocumented
9  population.  If we're talking only about the
10  Hispanic population, that margin of error is in ACS.
11  The only question is whether it applies to make an
12  estimate of the undocumented population.  I believe
13  it does give us the best estimate.
14      Q  But in coming to your conclusions, you
15  relied upon the CMS data at the PUMA level, correct?
16      A  To estimate the number of undocumenteds in
17  that tract, I deduced it from the PUMA.
18          But recall again that the other data at
19  the county level is confirmatory of my result at the
20  local level.  The fact that I'm getting something
21  similar gives me a great deal of confidence in that
22  value.  If the value of the census tract level was

82

1  wildly different from the county level, I would be
2  concerned about my point estimate, but I'm not.
3      Q  In relying upon the PUMA CMS estimate, you
4  do not know what the margin of error is for that
5  estimate, correct?
6      A  I think that question has been asked at
7  least twice before, and I've answered.  We don't
8  know the margin of error for the CMS data.  CMS did
9  not provide margins of error at the PUMA level.
10      Q  How can you as a demographer determine
11  whether their estimate is reliable or not?
12      A  They have gone through a complicated
13  process of taking the national data, positing it out
14  to state and to local areas.  This is, as mine, the
15  best estimate of the number of undocumented.  That
16  is a large team of demographers and statisticians
17  produced this data.  It is publicly available now
18  online.  I believe it is as reliable data as we can
19  get about the undocumented population.
20      Q  Whether it's the most reliable or not, how
21  can you determine whether it's sufficiently reliable
22  to establish, for instance, in this case as a fact

83

1  the number of claimed undocumented Hispanics in a
2  particular area?
3      A  We can because they have taken the data at
4  these various levels and passed it down to smaller
5  levels.  But when we look back at it at the county
6  level, we're getting very -- we're getting much more
7  reliable estimates because it's at a larger level.
8          And again and again you seem to be
9  unwilling to accept the fact that both experts found
10  a point estimate around 280 to 300.  That point
11  estimate is a reasonable estimate of the
12  undocumented Hispanic population.  We know that
13  there is an undocumented Hispanic population in the
14  county, in the PUMA, and in the tract.
15          This discussion between two experts is
16  about the size of that population, not about whether
17  there is or isn't.  There is.  The question is
18  what's its size.  I believe my point estimate and
19  using the ACS range gives us reliable results.
20      Q  And Dr. Weinberg believes that your
21  results are inherently unreliable, right?
22      A  Well, he's -- he provides a point estimate

84

1  with no range, so I have no way of judging whether
2  he finds my result unreliable apart from his
3  discussion of the CMS bringing up to 900 percent,
4  dividing it by one-eighth.  I asked myself why is he
5  dividing it by one-eighth and then bringing it down
6  the 101 percent.  But when I apply 101 percent to my
7  data, as he says that's what the margin of error
8  should be, I get nonsensical results.
9      Q  Professor Clark, are you being paid for
10  your expert testimony in this case?
11      A  I am.
12      Q  And what is the rate that you're charging
13  for your expert work in this case?
14      A  $300 an hour.
15      Q  How much have you charged to date for your
16  expert work in the case?
17      A  About $7,000.
18      Q  Who has paid your fee?
19      A  No one has paid it as yet.
20      Q  Do you expect to be paid?
21      A  I expect to be paid.
22          MR. DINGMAN:  That's all the questions I

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

85

1  have.  Thank you for your time.
2        THE WITNESS:  Thank you.  Thank you, sir.
3        MR. KIM:  We don't have any questions.
4    We'll review the transcript.
5        MR. DINGMAN:  All right.  Thank you.
6        (Off the record at 6:04 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

87

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2         I, Kelly Carnegie, Certified Shorthand
3    Reporter, Registered Professional Reporter, the
4    officer before whom the foregoing proceedings were
5    taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my direction; that reading and
10   signing was requested; and that I am neither counsel
11   for, related to, nor employed by any of the parties
12   to this case and have no interest, financial or
13   otherwise, in its outcome.
14         IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 27th day of
16   December, 2016.
17   My commission expires: July 31, 2018
18
19   _Kelly Carnegie_____
20   NOTARY PUBLIC IN AND FOR THE
21   COMMONWEALTH OF VIRGINIA
22   Notary Registration Number: 7060756

86

1         ACKNOWLEDGEMENT OF DEPONENT
2         I, WILLIAM A.V. CLARK, Ph.D., do
3    hereby acknowledge that I have read and examined the
4    foregoing testimony, and the same is a true, correct
5    and complete transcription of the testimony given by
6    me and any corrections appear on the attached Errata
7    sheet signed by me.
8
9
10   _____  _____
11      (DATE)              (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

**A**

**able**
7:5, 17:10,
43:19, 59:2
**about**
6:9, 10:18,
10:20, 11:16,
13:21, 15:19,
16:20, 17:13,
18:15, 20:2,
20:4, 20:11,
25:15, 26:6,
27:7, 36:1,
36:15, 39:12,
39:16, 41:2,
42:14, 43:19,
46:1, 46:4,
48:6, 48:19,
49:19, 52:8,
52:13, 52:16,
52:17, 53:4,
54:19, 55:20,
61:1, 65:19,
74:22, 77:13,
80:20, 81:9,
82:2, 82:19,
83:16, 84:17
**above**
61:8
**accept**
16:8, 16:11,
79:16, 79:19,
79:22, 80:1,
80:3, 80:6, 83:9
**acceptable**
29:10
**accepted**
16:16, 16:18,
21:22
**account**
22:19, 28:8,
44:13, 71:1,
72:8, 74:4,
77:2, 77:5
**accurate**
22:20, 28:7,
33:14

**acknowledge**
86:3
**acknowledged**
34:12
**acknowledgement**
86:1
**acknowledges**
36:6
**acronym**
37:2
**across**
66:18
**acs**
14:9, 14:10,
14:18, 15:2,
15:7, 15:9,
15:13, 15:16,
15:20, 16:3,
16:8, 16:12,
16:13, 16:18,
17:2, 17:4,
17:7, 17:20,
18:7, 38:5,
38:9, 40:12,
42:12, 42:15,
42:18, 43:6,
44:19, 45:22,
46:5, 46:11,
48:10, 51:5,
51:10, 76:19,
81:10, 83:19
**activity**
37:16
**actual**
23:13
**actually**
27:2, 35:2,
40:22, 42:15,
47:12, 54:4
**add**
35:4, 36:2,
47:9
**adjust**
45:11, 45:17
**adjustment**
47:4, 65:1,
65:12
**administer**
5:8

**administering**
5:5
**admissibility**
5:9
**admit**
48:5
**admits**
77:6
**adopted**
37:22
**affect**
28:9
**affected**
11:1, 55:2
**affecting**
10:21, 59:9
**affects**
8:3
**affirmed**
5:16
**affixed**
87:15
**afford**
18:22
**affordability**
18:20, 19:7
**african-american**
19:8
**after**
16:1, 20:13,
67:17
**again**
12:1, 19:3,
52:5, 52:13,
78:15, 81:18,
83:8
**again:**
44:8
**age**
14:22, 16:6,
27:11, 27:13
**ago**
11:16, 18:1,
19:4, 19:19,
20:12, 73:8
**agree**
5:8, 30:1,
32:9, 47:15,

**48:11, 72:7,**
74:1
**agreed**
33:2
**agreement**
5:4, 5:11, 5:12
**ahead**
31:7, 79:13
**al**
1:6, 1:11
**alexandria**
1:3
**alien**
23:12
**all**
6:6, 6:18,
6:20, 13:16,
18:13, 22:7,
28:19, 31:18,
33:22, 38:10,
38:15, 38:22,
40:12, 43:6,
48:4, 51:5,
52:9, 56:13,
79:14, 79:22,
80:3, 80:8,
84:22, 85:5
**allow**
81:2
**already**
18:2, 22:21,
31:1, 36:1,
36:12, 46:21,
58:20, 74:17,
79:1
**also**
3:20, 12:4,
14:3, 19:15,
20:13, 34:10,
44:4, 47:7,
68:9, 80:16
**always**
80:5
**american**
14:11, 21:5,
24:8, 38:1
**amount**
51:8, 65:21

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    24

analyses
14:3
analysis
13:15, 13:22,
14:1, 16:4,
17:3, 18:4,
18:9, 18:18,
26:9, 48:4,
49:22, 55:8,
55:14, 57:4,
57:9, 57:11,
67:6, 67:21,
68:1, 74:21
analyze
11:9, 14:6
angeles
8:19
another
33:8, 39:11,
47:7, 49:2,
59:8, 59:10,
63:2
answer
6:13, 6:14,
7:1, 24:5, 38:9,
41:20, 42:1,
43:16, 43:20,
44:19, 45:1
answered
36:12, 44:17,
82:7
answers
6:18
any
7:5, 8:5,
10:15, 16:8,
16:17, 19:22,
20:20, 20:22,
22:13, 24:16,
25:21, 25:22,
26:10, 29:20,
35:15, 37:10,
49:21, 53:18,
56:9, 56:10,
59:22, 60:8,
60:15, 60:18,
61:5, 61:10,
61:11, 61:13,

64:4, 73:17,
73:22, 85:3,
86:6, 87:11
anyone
7:13, 56:3,
56:6
anything
22:18, 48:13,
48:16, 61:22
apart
84:2
apartments
10:4, 10:11,
13:5
appear
86:6
appearing
3:4, 3:21
application
58:21, 60:18
applied
42:15, 43:7,
56:1, 57:4,
57:10, 58:22,
60:9, 65:7,
76:20, 76:21
applies
81:11
apply
46:2, 57:19,
58:17, 63:1,
63:5, 66:10,
84:6
applying
57:17, 58:1,
59:7
approach
57:14
appropriate
25:10, 52:18
appropriately
40:10
approximately
6:4, 12:6,
15:17
area
17:14, 20:22,
23:20, 24:16,

26:2, 29:18,
32:15, 33:3,
36:4, 36:20,
37:4, 37:5,
37:8, 37:12,
60:11, 65:13,
83:2
areas
26:7, 32:11,
34:17, 82:14
aren't
51:1
arguing
10:8
argument
11:3
around
26:22, 39:8,
39:15, 39:16,
40:5, 42:16,
50:9, 51:22,
53:5, 65:14,
79:20, 80:12,
83:10
arthur
5:22
articles
26:7
asian
71:1, 71:5,
71:17, 71:19,
71:22, 72:1,
72:5, 72:9
asians
63:12, 67:20,
67:21
asked
11:8, 11:9,
13:13, 13:15,
44:17, 54:2,
54:21, 54:22,
82:6, 84:4
asking
6:9, 15:8,
17:22, 27:6,
42:3, 43:12,
44:20
asks
62:15

aspects
21:9
assert
59:14
assertion
59:18
asserts
75:5
assess
81:2
assign
40:15
assist
18:17, 56:3,
56:6
associated
79:18
associates
13:1, 53:10
assume
31:13
assuming
66:3
assumption
77:15
assumptions
32:17, 73:22,
74:3, 74:7,
74:9, 74:13,
76:2, 77:13
attach
80:7
attached
38:1, 86:6
attempt
24:15, 26:1,
35:6
attempted
23:17, 45:15,
46:18
attempting
23:21, 33:5
attorney
9:19
available
63:16, 63:19,
82:17
average
27:11

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    25

| | | | |
|---|---|---|---|
| **aware**<br>71:19, 71:21,<br>80:14, 80:17<br>**away**<br>27:17, 78:2<br>**B**<br>**back**<br>23:14, 24:18,<br>40:14, 51:4,<br>52:12, 54:1,<br>54:14, 83:5<br>**back-up**<br>40:11<br>**based**<br>5:10, 17:19,<br>28:14, 65:16,<br>80:22<br>**basic**<br>14:22<br>**basis**<br>15:14, 47:3,<br>60:3, 66:3,<br>74:1, 77:14,<br>77:19, 77:20<br>**became**<br>19:20, 26:15<br>**because**<br>11:6, 17:13,<br>26:21, 33:12,<br>43:4, 44:1,<br>47:17, 49:16,<br>51:19, 51:21,<br>54:17, 58:19,<br>58:21, 58:22,<br>59:11, 60:10,<br>61:19, 61:21,<br>62:18, 62:20,<br>65:12, 72:2,<br>75:16, 76:18,<br>78:10, 83:3,<br>83:7<br>**been**<br>6:1, 6:17,<br>8:11, 10:13,<br>20:20, 21:19,<br>22:9, 24:2,<br>25:2, 25:14, | 25:15, 25:21,<br>26:4, 33:20,<br>37:1, 44:18,<br>50:19, 50:21,<br>54:6, 56:9,<br>59:1, 68:11,<br>82:6<br>**before**<br>2:14, 6:17,<br>8:19, 60:14,<br>65:8, 69:15,<br>70:13, 82:7,<br>87:4<br>**began**<br>19:11, 23:10<br>**begins**<br>74:8<br>**behalf**<br>3:2, 3:11,<br>12:16, 12:19,<br>13:2, 13:14<br>**being**<br>5:16, 55:2,<br>61:18, 62:1,<br>62:19, 84:9<br>**belief**<br>58:16<br>**believe**<br>8:10, 17:18,<br>23:11, 24:9,<br>26:7, 26:12,<br>27:1, 33:9,<br>39:15, 40:10,<br>43:8, 43:9,<br>45:22, 46:3,<br>50:12, 53:9,<br>63:11, 64:19,<br>74:3, 74:13,<br>74:15, 76:8,<br>76:15, 76:16,<br>81:5, 81:12,<br>82:18, 83:18<br>**believes**<br>47:16, 49:16,<br>83:20<br>**bell**<br>27:10, 78:15<br>**bell-shaped**<br>39:17 | **below**<br>42:8<br>**besides**<br>7:13, 53:12<br>**best**<br>24:4, 38:11,<br>39:3, 44:6,<br>47:13, 48:17,<br>51:21, 63:16,<br>63:19, 77:11,<br>81:13, 82:15<br>**better**<br>23:18<br>**between**<br>14:17, 15:6,<br>15:9, 20:6,<br>23:15, 49:13,<br>65:1, 83:15<br>**beyond**<br>25:8<br>**black**<br>13:12, 13:19<br>**book**<br>21:10, 21:14,<br>22:4, 23:7,<br>23:22, 24:7,<br>24:8, 24:10,<br>24:15, 24:21,<br>73:9<br>**books**<br>21:4, 25:20<br>**both**<br>14:8, 21:5,<br>31:2, 33:20,<br>39:10, 41:10,<br>47:10, 48:8,<br>69:21, 70:3,<br>70:4, 78:7,<br>80:3, 83:9<br>**break**<br>69:4<br>**breakdown**<br>17:16<br>**breakdowns**<br>17:19<br>**breakout**<br>17:8<br>**brief**<br>69:8 | **bringing**<br>84:3, 84:5<br>**brought**<br>10:8<br>**buildings**<br>13:16, 14:4,<br>18:11, 18:13,<br>18:15, 18:21,<br>18:22<br>**bureau**<br>29:7, 32:9,<br>43:21, 73:11,<br>80:7, 80:10,<br>80:16, 80:20<br>**by:**<br>1:22<br>**C**<br>**c-l-a-r-k**<br>5:22<br>**calculate**<br>27:18, 32:7,<br>49:21, 74:18<br>**calculated**<br>27:8, 28:12,<br>50:5<br>**calculating**<br>57:22<br>**calculation**<br>77:1<br>**calculations**<br>71:8, 76:7<br>**california**<br>8:17, 21:4,<br>21:11, 23:6,<br>23:22, 24:5,<br>24:21, 35:16,<br>36:13<br>**call**<br>53:11, 53:12<br>**called**<br>9:3, 23:11,<br>26:17, 58:3<br>**came**<br>49:2, 75:9,<br>75:12<br>**can't**<br>18:1, 37:17, |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    26

45:5, 50:14,
61:20, 74:5,
75:15, 75:16
**cannot**
41:19, 44:15,
74:9
**capacity**
73:7
**capture**
15:22
**captures**
14:21
**cards**
23:10
**care**
80:11
**carnegie**
1:22, 2:14,
87:2
**carried**
68:16
**carrying**
63:16
**case**
8:16, 8:20,
8:21, 9:7, 9:13,
9:17, 9:20,
10:2, 10:12,
10:16, 11:8,
11:13, 12:2,
12:17, 13:13,
16:4, 17:1,
17:16, 18:18,
18:19, 19:12,
19:13, 19:14,
19:16, 19:17,
19:21, 19:22,
20:17, 20:18,
26:11, 26:15,
26:16, 31:19,
36:13, 37:22,
38:13, 41:4,
48:18, 53:4,
53:18, 54:3,
54:6, 54:19,
55:8, 56:4,
56:9, 57:1,
59:19, 64:9,

66:22, 72:20,
73:4, 82:22,
84:10, 84:13,
84:16, 87:12
**cases**
8:12, 8:17,
9:1, 9:4, 12:5,
12:7, 12:10,
12:18, 12:21,
13:8, 14:7,
15:21, 18:9,
19:2, 19:9,
19:11, 19:20,
20:3
**cauldron**
21:12, 24:22
**cauldron"**
21:5, 23:7,
23:22
**cause**
38:16
**census**
14:1, 14:6,
14:8, 14:13,
14:15, 14:16,
14:18, 14:19,
15:4, 15:7,
15:12, 16:2,
17:12, 23:13,
29:4, 29:7,
29:12, 32:9,
33:13, 38:2,
38:13, 39:4,
43:21, 44:5,
45:8, 50:18,
55:9, 55:11,
64:20, 66:5,
66:6, 66:16,
67:1, 67:4,
69:18, 69:20,
70:4, 72:9,
73:11, 76:11,
77:17, 77:22,
78:9, 79:2,
80:7, 80:10,
80:16, 80:20,
81:7, 81:22
**center**
34:3, 34:6,

34:11, 63:22,
64:2
**central**
55:20
**certain**
27:9, 39:11,
46:21, 51:8
**certainly**
20:1, 20:2,
26:4, 38:7
**certificate**
87:1
**certified**
2:15, 87:2
**certify**
87:5
**challenges**
33:7, 75:9
**change**
17:20, 47:3
**changes**
17:6
**chapter**
73:9
**charged**
84:15
**charging**
84:12
**chose**
51:3
**citing**
60:4
**citizens**
67:10, 67:14,
68:5, 68:11
**citizenship**
58:5, 58:17,
61:2
**city**
11:12, 17:14,
55:11
**civil**
1:7
**claim**
7:17, 8:6, 9:5,
9:6, 20:7, 58:7,
59:14
**claimed**
10:12, 83:1

**claiming**
79:3
**claims**
8:14, 10:1
**clarify**
54:16
**clarity**
75:19, 75:21
**clark**
1:15, 2:2, 4:2,
4:11, 4:13,
5:15, 5:22, 6:1,
26:17, 47:15,
48:12, 53:3,
54:1, 56:21,
63:14, 69:14,
72:14, 72:18,
84:9, 86:2
**class**
11:1, 11:4
**clear**
6:20, 16:22,
38:18
**clearly**
76:10
**close**
39:10, 52:2
**cms**
34:10, 34:16,
35:10, 35:20,
36:5, 36:10,
36:19, 36:20,
37:6, 50:15,
64:4, 64:8,
64:10, 65:1,
66:4, 77:2,
77:6, 77:12,
81:15, 82:3,
82:8, 84:3
**collected**
55:9
**collects**
14:20
**come**
15:2, 23:13,
25:6, 25:8,
35:4, 57:14,
73:18, 74:7,

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    27

76:9
**coming**
34:4, 51:4,
81:14
**comments**
16:19
**commercial**
10:6
**commission**
87:17
**commissions**
44:5
**common**
41:11
**commonwealth**
2:17, 87:21
**communities**
20:18
**community**
14:11, 38:1
**company**
12:13
**compared**
30:22, 61:9,
70:16
**compares**
63:12
**comparing**
30:13, 31:16,
31:17, 67:14,
68:6, 69:17
**comparison**
23:12, 31:9,
31:10, 72:7
**comparisons**
32:2
**competent**
73:15
**complaint**
53:21
**complete**
7:1, 14:16,
86:5
**completely**
47:17, 52:7
**complicated**
82:12
**comply**
61:20

**composition**
18:5, 72:4,
72:5
**concentrated**
11:11
**concerned**
20:13, 26:13,
39:2, 80:12,
82:2
**conclusion**
19:5, 64:9,
75:9, 75:12,
75:14
**conclusions**
11:15, 11:19,
11:21, 19:1,
81:14
**condon**
3:20
**conducted**
15:14
**conference**
53:11
**confidence**
28:19, 28:21,
28:22, 29:1,
29:7, 39:11,
49:4, 51:8,
81:21
**confident**
66:1
**confirm**
56:22, 72:19
**confirmatory**
81:19
**confirmed**
64:1
**consider**
18:8, 29:2,
35:17, 78:19,
78:21
**considerably**
68:2
**constant**
32:19, 32:21
**construct**
41:8
**constructing**
17:4

**consuming**
37:15
**contacted**
53:4, 53:8,
54:2, 54:6,
54:19
**contains**
27:1
**contend**
75:20
**contextual**
18:4
**continuing**
67:7
**copy**
56:17
**core**
63:2
**corporation**
13:5, 13:10
**correct**
9:10, 12:22,
14:12, 21:12,
22:1, 29:8,
34:8, 34:15,
37:7, 38:3,
38:4, 42:6,
45:9, 45:10,
46:4, 46:7,
46:14, 46:16,
46:17, 46:19,
46:22, 47:1,
47:18, 47:22,
49:7, 51:12,
51:16, 54:19,
54:20, 61:15,
62:12, 62:14,
64:6, 64:7,
64:10, 64:18,
64:21, 65:3,
68:22, 71:2,
71:3, 71:13,
72:10, 73:2,
75:6, 75:10,
76:7, 77:3,
77:7, 77:9,
78:20, 80:19,
81:15, 82:5,

86:4, 87:6
**corrections**
86:6
**correctly**
15:8, 18:19
**cost**
19:6
**could**
18:22, 22:8,
24:4, 25:6,
25:7, 25:17,
27:9, 28:9,
30:6, 31:2,
31:3, 36:17,
38:8, 39:4,
42:4, 46:3,
47:4, 54:14,
55:20, 55:21,
66:16, 71:9,
72:18, 73:22,
74:4, 75:11,
76:5, 78:22,
79:8
**couldn't**
58:20, 74:1
**counsel**
4:8, 5:19,
56:19, 72:16,
87:10
**count**
15:3, 15:13,
26:21, 33:14
**counted**
27:2, 27:13
**counterfactual**
66:7
**counting**
57:21
**county**
9:3, 29:16,
30:3, 30:14,
30:20, 30:22,
31:13, 31:14,
31:20, 31:22,
51:8, 55:10,
56:1, 65:19,
65:21, 68:17,
68:21, 69:18,

69:19, 69:22,
70:4, 70:14,
70:17, 70:18,
70:19, 81:19,
82:1, 83:5,
83:14
**course**
10:19, 17:11,
18:10, 29:12,
62:22
**court**
1:1, 5:5
**create**
42:13
**creating**
57:22
**critical**
24:21
**csr**
1:22
**current**
15:22
**curve**
27:10, 39:17,
78:15

**D**

**daniel**
73:1
**data**
14:1, 14:6,
14:8, 14:9,
14:13, 14:18,
14:20, 15:3,
15:7, 15:9,
15:20, 16:3,
16:5, 16:6,
16:8, 16:11,
16:13, 16:18,
17:2, 17:4,
17:7, 17:10,
17:20, 18:2,
18:5, 18:7,
18:10, 18:11,
18:12, 21:18,
22:13, 22:16,
23:13, 48:10,
50:15, 55:9,

55:18, 64:8,
64:11, 65:4,
65:21, 66:16,
68:14, 77:22,
81:15, 81:18,
82:8, 82:13,
82:17, 82:18,
83:3, 84:7
**date**
84:15
**date)**
86:11
**dated**
54:4, 54:8
**day**
87:15
**de**
1:5
**deal**
24:19, 33:17,
49:4, 81:21
**debettencourt**
3:13
**december**
1:17, 87:16
**decennial**
14:15, 14:18,
14:19, 15:4,
15:7, 15:10,
15:12, 16:2,
16:6, 18:7
**decision**
8:2, 10:8,
10:9, 10:13,
11:2
**decisions**
42:14
**declined**
10:6
**deduced**
81:17
**deem**
43:14, 44:15
**defendant**
12:20
**defendants**
1:12, 5:19,
12:17, 12:21,

13:14
**defendants:**
3:11
**define**
26:18
**defined**
33:6, 60:1
**definition**
25:17
**demographer**
23:1, 28:1,
29:10, 31:15,
32:3, 33:17,
38:16, 41:19,
42:9, 43:13,
48:13, 48:16,
73:15, 79:16,
82:10
**demographers**
22:7, 24:3,
26:19, 29:3,
29:13, 34:2,
38:22, 57:15,
80:1, 82:16
**demographic**
21:9, 57:4,
57:9, 57:11,
57:17, 57:19,
67:4, 68:16
**demography**
66:12
**demonstrate**
48:21
**demonstrates**
76:14
**demonstrating**
79:6, 79:8
**depending**
35:14
**depends**
30:5, 31:1,
31:18
**deponent**
5:7, 86:1
**deposed**
6:1
**deposition**
1:14, 2:1, 4:9,

6:7, 6:8, 7:9,
56:16, 56:18,
72:15
**depositions**
20:1
**derived**
22:11, 28:3,
52:10
**describe**
25:5, 25:10,
57:5
**described**
22:2
**desegregation**
20:3
**despite**
14:2
**determination**
62:15
**determine**
13:18, 22:14,
22:19, 27:3,
28:11, 31:5,
31:15, 32:3,
39:19, 40:22,
48:14, 59:5,
66:22, 78:18,
80:9, 82:10,
82:21
**determined**
28:19, 38:5,
55:11, 73:19
**determining**
28:18, 29:14,
35:18, 41:14,
44:9, 44:13
**difference**
14:17, 15:5,
15:9, 20:10,
32:3
**differences**
20:15
**different**
39:7, 43:12,
62:13, 66:8,
82:1
**differential**
13:19

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    29

| | | | |
|---|---|---|---|
| differentiate | 26:4 | do: | **E** |
| 46:11 | disparate | 22:7 | e-mail |
| differently | 7:17, 7:20, | document | 54:14 |
| 8:3 | 8:14, 8:18, | 38:8 | earlier |
| difficult | 8:20, 9:5, 9:6, | documentation | 12:9, 43:2, |
| 33:15, 34:21, | 10:9, 12:5, | 25:6, 25:11, | 44:22, 73:20, |
| 35:2, 40:22, | 13:7, 13:9, | 25:18, 55:3, | 75:11 |
| 41:11, 45:19, | 18:3, 19:7, | 58:15, 62:14, | eastern |
| 48:5, 73:21 | 19:12, 19:16, | 80:21 | 1:2 |
| difficulties | 19:22, 20:5, | documented | edited |
| 33:10 | 20:7, 20:12, | 26:14, 70:11, | 73:9 |
| dingman | 20:16, 55:4, | 70:19 | effect |
| 3:12, 4:3 | 55:15, 55:16, | documents | 14:21, 61:11 |
| dingman: | 55:21, 55:22, | 53:18, 62:3 | effectively |
| 5:2, 5:13, | 58:7, 58:12, | doing | 27:6 |
| 5:20, 45:2, | 59:5, 59:9, | 28:1, 30:7 | effort |
| 56:14, 56:20, | 59:12, 59:15, | donald | 20:21 |
| 69:3, 69:10, | 60:17, 60:19, | 12:22 | either |
| 69:12, 69:13, | 61:6, 61:19, | done | 27:9 |
| 72:13, 72:17, | 62:20, 62:22, | 7:8, 26:8, | eleventh |
| 84:22, 85:5 | 63:3, 63:5, | 34:3, 34:20, | 3:7 |
| directed | 63:7, 69:20, | 36:18, 37:20 | else |
| 62:16 | 70:2 | down | 15:1, 22:18 |
| direction; | disparately | 32:11, 38:11, | emanuel |
| 87:9 | 10:13 | 53:15, 66:11, | 3:5, 56:11 |
| disagree | dispersed | 66:13, 77:17, | emerges |
| 52:13 | 66:16 | 83:4, 84:5 | 57:8 |
| disagreement | disproportionate | dr | employed |
| 52:9, 52:15, | 60:2, 60:11, | 7:10, 7:11, | 87:11 |
| 52:17 | 61:12, 67:9, | 33:20, 39:6, | encompassed |
| discrimination | 67:10, 67:13, | 47:10, 49:14, | 66:17 |
| 19:13, 19:20, | 67:15, 67:22, | 49:20, 52:1, | end |
| 19:22, 20:4 | 68:4 | 52:5, 53:2, | 38:22, 78:9 |
| discriminatory | disproportionately | 67:19, 69:1, | engaged |
| 20:2 | 13:11, 58:5, | 73:8, 73:14, | 26:9 |
| discuss | 61:4, 61:14 | 74:13, 75:5, | engagement |
| 23:3 | disregard | 75:21, 77:1, | 56:10 |
| discussed | 41:14 | 78:7, 79:3, | enough |
| 22:3, 22:21, | distinction | 79:4, 83:20 | 34:22 |
| 33:20, 56:7, | 20:6 | draw | entities |
| 63:21, 65:8, | distribution | 23:4 | 37:10 |
| 74:17 | 11:9 | drawn | entitled |
| discussion | district | 70:12 | 59:21, 68:14 |
| 76:4, 78:10, | 1:1, 1:2, 9:2 | dream | entry |
| 79:9, 83:15, | dividing | 21:5, 24:8 | 25:7 |
| 84:3 | 84:4, 84:5 | due | errata |
| discussions | division | 63:8 | 86:6 |
| 21:8, 25:15, | 1:3 | duly | |
| | | 5:16 | |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    30

| | | | |
|---|---|---|---|
| **especially** | **estimations** | **excuse** | **fact** |
| 6:18 | 33:14 | 12:19, 31:6 | 14:2, 22:21, |
| **esquire** | **et** | **exhibit** | 39:9, 40:3, |
| 3:3, 3:12, 3:13 | 1:6, 1:11 | 4:10, 4:12, | 46:3, 47:13, |
| **essential** | **ethnic** | 56:16, 56:18, | 49:2, 61:8, |
| 26:15 | 58:12, 63:10 | 56:22, 68:21, | 62:19, 63:3, |
| **essentially** | **ethnicity** | 72:13, 72:15, | 63:8, 68:2, |
| 10:20, 18:4, | 10:15, 14:16, | 72:19 | 70:13, 80:5, |
| 20:14, 27:6, | 16:7, 17:17 | **exhibits** | 81:20, 82:22, |
| 59:10 | **evaluate** | 4:8, 4:9 | 83:9 |
| **establish** | 11:10, 22:5, | **expect** | **factored** |
| 82:22 | 23:2, 41:11 | 35:7, 35:11, | 19:6 |
| **established** | **evaluated** | 36:9, 84:20, | **factors** |
| 24:1, 79:1 | 22:3 | 84:21 | 27:19, 28:9, |
| **estimated** | **even** | **experience** | 32:2, 35:17 |
| 21:19, 26:6, | 5:6, 49:21, | 80:22 | **failed** |
| 27:13, 34:7, | 57:16, 75:13 | **expert** | 48:2 |
| 34:16, 36:10, | **eventually** | 4:10, 4:12, | **failing** |
| 37:11, 45:12, | 53:20 | 6:2, 7:16, 8:4, | 40:10 |
| 50:19, 50:22 | **ever** | 8:13, 8:22, | **fair** |
| **estimates** | 20:4, 41:16, | 19:21, 26:10, | 65:20 |
| 16:19, 16:21, | 43:18 | 37:21, 56:15, | **fairfax** |
| 17:5, 17:11, | **every** | 57:1, 72:14, | 51:7, 55:10, |
| 21:20, 21:22, | 18:13, 23:12 | 73:1, 74:12, | 65:19, 65:21, |
| 22:2, 22:6, | **everybody** | 84:10, 84:13, | 68:17, 68:20, |
| 22:8, 22:11, | 27:13 | 84:16 | 69:18, 70:17 |
| 22:15, 22:18, | **evidence** | **experts** | **fall** |
| 22:19, 23:1, | 66:9, 66:19 | 83:9, 83:15 | 54:12, 54:18 |
| 23:3, 23:6, | **evolving** | **expired** | **familiar** |
| 23:14, 24:2, | 23:9 | 10:7 | 6:6, 57:10 |
| 26:20, 29:5, | **exact** | **expires:** | **families** |
| 34:4, 34:17, | 14:5, 17:12, | 87:17 | 58:6, 59:6 |
| 34:22, 35:20, | 39:13 | **explained** | **fasel** |
| 36:1, 37:9, | **exactly** | 49:11, 73:20, | 33:21 |
| 39:1, 41:12, | 42:17, 79:21 | 75:11 | **fee** |
| 43:22, 44:4, | **examination** | **explanation** | 84:18 |
| 47:10, 48:15, | 4:2, 5:19 | 30:17 | **feel** |
| 63:16, 63:19, | **examined** | **exponentially** | 66:1 |
| 63:22, 75:3, | 5:18, 86:3 | 50:20 | **fertility** |
| 77:7, 79:15, | **example** | **expressly** | 80:2 |
| 80:1, 80:3, | 16:13, 22:12, | 52:6 | **few** |
| 80:8, 80:13, | 32:10, 41:2 | **extent** | 24:13, 62:21 |
| 81:3, 83:7 | **examples** | 22:4, 22:8, | **figure** |
| **estimating** | 45:5 | 46:8, 52:21 | 42:15 |
| 33:8, 33:11, | **except** | **F** | **filing** |
| 58:1, 66:20, | 23:2, 49:5 | **faced** | 55:6 |
| 67:20 | **exchanges** | 48:16 | **financial** |
| **estimation** | 73:10 | | 87:12 |
| 21:7 | | | |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    31

**find**
48:5, 73:22,
77:13, 77:19
**finding**
39:18, 60:4
**findings**
23:3, 59:21
**finds**
84:2
**finish**
69:4
**firm**
9:18, 53:11,
56:10
**first**
5:16, 21:10,
31:17, 53:3,
53:17, 54:2,
54:5, 57:7,
58:3, 61:3,
68:15, 69:16
**five**
28:15, 29:5,
29:6
**floor**
3:7
**focus**
39:20, 40:2,
67:8
**focused**
55:6, 58:14,
59:22, 60:8,
60:15, 60:22,
61:13, 72:1
**focusing**
72:2, 78:3
**following**
74:9
**following:**
5:4
**follows:**
5:18
**foregoing**
86:4, 87:4,
87:5
**foreign-born**
77:21
**form**
14:20, 49:21

**forth**
50:12
**found**
73:20, 74:1,
83:9
**foundation**
37:17
**four**
8:10, 8:12,
23:15
**fraction**
18:3
**front**
50:13, 53:15,
64:16
**fully**
7:6
**further**
5:8, 27:17,
63:21

**G**

**gave**
65:15, 73:10
**general**
17:14, 19:5,
25:4, 25:9,
30:1, 42:1
**generally**
11:20
**geographical**
26:2, 32:11,
32:15, 34:17,
36:4, 36:20,
37:5, 37:12
**geography**
69:16
**getting**
33:14, 65:22,
78:2, 81:20,
83:6
**giron**
1:5
**give**
7:1, 11:18,
18:1, 41:22,
42:16, 43:19,
46:3, 80:12,

**81:13**
**given**
20:1, 38:8,
44:19, 51:6,
53:20, 86:5
**gives**
38:20, 39:11,
78:13, 78:22,
81:21, 83:19
**go**
5:2, 6:7,
13:21, 29:15,
29:17, 30:2,
31:7, 32:14,
36:3, 43:3,
47:2, 48:3,
52:12, 54:1,
54:14, 65:8,
79:13
**goes**
32:10, 41:9
**going**
30:9, 30:21,
35:22, 41:5,
51:22, 56:14,
60:11, 65:12
**gone**
24:18, 82:12
**good**
34:4, 40:11,
69:7, 78:8
**great**
49:4, 80:11,
81:21
**greater**
30:6, 30:10,
31:21, 33:3,
41:9, 63:17
**group**
9:22, 10:12,
10:14, 58:12,
59:8, 59:10,
63:2, 63:8,
63:10, 67:14,
67:18
**groups**
8:3, 37:17,
67:15, 67:16,

**69:19, 69:21,**
70:5, 70:18,
71:12, 71:14
**guide**
38:21

**H**

**hand**
87:15
**happen**
29:21, 42:15
**happening**
16:1
**happens**
62:7
**hasten**
35:4
**head**
6:19
**heading**
69:16, 75:3
**heard**
15:8
**hearsay**
35:5
**held**
2:2
**help**
54:5
**here**
25:18, 39:2,
61:5, 62:4,
70:8, 70:16,
78:5
**hereby**
86:3, 87:5
**hereunto**
87:14
**high**
40:17, 61:9
**higher**
30:21, 35:8,
35:12, 35:15,
35:19, 36:10,
36:17, 45:21,
50:20, 66:13
**highest**
45:3

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                     32

hispanic
13:12, 13:19,
14:3, 16:15,
19:8, 40:13,
41:3, 46:9,
46:12, 51:20,
59:6, 59:11,
60:2, 60:16,
60:20, 61:19,
62:1, 62:3,
62:6, 62:8,
62:11, 63:4,
63:18, 72:2,
72:3, 76:20,
76:21, 81:10,
83:12, 83:13
hispanics
38:2, 40:12,
43:6, 45:8,
46:1, 46:19,
48:19, 51:6,
51:7, 55:5,
55:15, 55:16,
56:1, 58:6,
59:12, 60:10,
61:4, 61:9,
61:11, 61:15,
62:16, 62:18,
63:9, 67:9,
67:13, 68:5,
68:6, 68:7,
68:11, 75:1,
79:2, 83:1
hold
32:18, 32:20
home
1:9, 41:3,
55:1, 55:12,
55:19, 58:5,
58:18, 59:6,
72:4, 72:5
hopefully
69:5
hour
84:14
households
15:18
housing
8:16, 8:18,

10:3, 19:6, 19:7
huge
33:19
hundred
24:13

**I**

identification
56:19, 72:16
identified
8:22, 56:16
identify
8:12, 74:12
ignore
44:8, 71:9,
77:10
ignored
77:9
illegal"
25:16
illegally
25:13, 61:22,
62:5
immigrant
20:22, 24:11
immigrants
21:7, 23:9,
23:16, 63:4
immigration
24:13
impact
7:18, 7:21,
8:14, 8:18,
8:20, 9:5, 9:6,
10:9, 12:6,
13:7, 13:9,
13:19, 18:3,
19:8, 19:12,
19:16, 20:2,
20:5, 20:7,
20:12, 20:16,
27:19, 28:2,
55:5, 55:15,
55:17, 55:21,
55:22, 58:6,
58:7, 58:11,
58:13, 59:5,
59:9, 59:12,

59:15, 60:2,
60:12, 60:16,
60:20, 61:3,
61:6, 61:14,
61:19, 62:19,
62:22, 63:1,
63:3, 63:5,
63:7, 67:22,
69:20, 70:3
impacted
10:13, 67:11
impacting
58:12
implemented
17:21
implication
58:11
importance
38:19
important
18:10, 33:21,
39:18
improper
66:21
inability
58:8
includes
79:14
including
18:14
inclusive
20:18
income
80:1
incorrect
76:15, 76:16
increase
29:17, 30:4,
32:18, 45:14,
47:4
increased
24:13
increases
32:12, 32:16,
36:5
individuals
15:6, 80:17
influences
28:21

information
14:22, 15:22,
16:4, 16:20,
18:8, 18:15,
18:17, 22:14,
40:11, 40:21,
41:7, 46:1,
47:13
inhabitants
16:14
inherently
83:21
initial
53:20, 55:5,
71:20
initially
55:9, 58:13
inspection
25:7, 25:8
instance
30:14, 65:9,
82:22
instances
29:20
institute
37:18, 64:3
instructions
6:8
insurance
9:22, 10:6,
10:7
insured
10:5
intent
20:13
interest
87:12
interested
39:1
interestingly
39:6
interpret
75:16, 75:17
interpretation
76:20
investigate
59:2, 59:4
involved
9:4, 12:4,

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                    33

19:16, 20:20,
25:21, 26:4,
53:12
**involving**
7:17, 8:5,
8:14, 9:1, 9:2,
9:9, 12:5
**issue**
10:1, 10:16,
10:17, 12:6,
13:9, 20:12,
23:9, 38:3,
38:19, 41:3,
45:9, 47:20,
49:13, 54:22,
55:20, 59:3,
59:13, 67:20,
71:7, 72:2,
73:18, 78:5
**issues**
13:7, 57:16
**itself**
55:19

**J**

**job**
1:20, 34:4
**jones**
9:3
**jongwook**
3:3
**jose**
8:16, 9:18,
10:4, 11:12
**judge's**
53:21
**judging**
84:1
**july**
87:17
**justification**
78:2
**justin**
3:13

**K**

**karen**
3:20, 56:15,

56:17
**keep**
51:4, 52:22,
78:4
**kelly**
1:22, 2:14,
87:2
**kept**
27:15
**kim**
3:3, 7:12,
7:13, 53:9,
53:13
**kim:**
5:12, 44:17,
69:7, 85:3
**kind**
25:22, 43:3
**kinds**
65:22
**knew**
71:22
**know**
6:12, 10:19,
16:10, 20:3,
22:16, 23:1,
23:8, 29:22,
34:20, 36:2,
36:18, 37:13,
37:14, 38:5,
39:13, 39:14,
41:2, 41:6,
47:9, 50:21,
51:1, 51:6,
52:5, 54:17,
60:13, 65:20,
73:4, 79:20,
82:4, 82:8,
83:12
**knowing**
79:17
**korean**
13:11, 13:20
**koreatown**
8:19, 9:9,
9:11, 12:5,
13:8, 13:16,
14:2, 14:5,

15:21, 16:1,
16:15, 17:1,
17:5, 17:8,
17:11, 17:12,
17:13, 17:15,
18:5, 18:9,
18:13, 19:2,
19:20, 26:12

**L**

**lack**
75:20
**language**
42:11, 48:4
**large**
31:2, 51:6,
62:7, 64:17,
81:7, 82:16
**largely**
14:3
**larger**
28:6, 29:15,
29:17, 32:15,
36:4, 63:8,
65:9, 65:13,
78:13, 83:7
**last**
59:22, 60:7,
63:15, 67:8,
69:15
**late**
54:20
**latinos**
71:10
**law**
9:18, 56:10
**lawsuit**
6:10, 7:17,
8:14
**lawsuits**
8:5, 8:8,
12:11, 12:12,
12:14
**lay**
80:4
**leaseholder**
67:11
**least**
51:13, 58:13,

82:7
**lecture**
73:11
**legal**
25:19, 58:8,
59:16, 62:16
**legally**
62:10
**length**
33:20, 65:14
**less**
15:19, 33:15,
33:16, 46:21,
64:21, 65:10
**let's**
5:2, 21:10,
30:19, 31:13,
72:13
**level**
17:10, 28:19,
28:21, 29:1,
29:8, 30:7,
30:9, 30:10,
30:11, 30:13,
30:14, 30:18,
30:20, 30:22,
31:3, 31:4,
31:13, 31:22,
32:7, 32:8,
32:10, 33:1,
33:2, 34:8,
34:14, 35:9,
35:13, 35:19,
35:20, 36:7,
36:11, 50:16,
50:18, 51:2,
56:2, 64:5,
65:2, 65:4,
65:6, 65:7,
65:16, 66:1,
66:4, 66:5,
66:11, 66:13,
66:15, 69:20,
77:3, 77:17,
81:15, 81:19,
81:20, 81:22,
82:1, 82:9,
83:6, 83:7

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

34

| | | | |
|---|---|---|---|
| **levels** | **long** | 42:14, 44:2, | 68:6 |
| 18:20, 28:22, | 73:8 | 47:4, 47:6, | **means** |
| 29:4, 31:2, | **longer** | 60:14, 65:5, | 63:4 |
| 66:14, 69:21, | 40:17, 42:10, | 66:20, 67:12, | **measure** |
| 70:3, 70:4, | 43:14 | 68:7, 71:10, | 28:16, 51:5, |
| 80:2, 83:4, 83:5 | **look** | 74:6, 74:8, | 55:21 |
| **lie** | 22:13, 23:3, | 81:11 | **measured** |
| 79:1, 80:13 | 32:3, 52:12, | **make-up** | 33:13, 33:16 |
| **lies** | 54:14, 54:22, | 67:4 | **meet** |
| 39:12, 78:14 | 56:22, 57:7, | **makes** | 7:13 |
| **likely** | 57:15, 58:2, | 49:15, 79:5 | **meetings** |
| 28:6, 55:16, | 59:20, 63:13, | **making** | 73:13 |
| 63:18, 68:11, | 68:10, 72:18, | 10:9, 32:1, | **members** |
| 71:11 | 74:11, 75:2, | 39:1, 39:3 | 46:9, 53:10 |
| **limited** | 83:5 | **management** | **memory** |
| 1:9 | **looked** | 12:13 | 54:5 |
| **line** | 22:10, 22:22, | **manatt** | **mentioned** |
| 63:15 | 23:10, 24:19, | 12:15 | 9:8, 12:4, |
| **listed** | 67:1, 67:21 | **many** | 19:15, 19:19, |
| 8:15, 61:2 | **looking** | 6:4, 8:8, | 21:11, 24:7, |
| **literature** | 22:17, 29:14, | 10:18, 11:6, | 25:21 |
| 33:19 | 30:12, 30:18, | 21:3, 59:11, | **met** |
| **litigation** | 30:20, 77:21 | 62:18, 62:20, | 7:12, 73:11 |
| 71:7 | **los** | 67:2 | **method** |
| **little** | 8:19 | **margins** | 28:10 |
| 9:2, 12:9 | **lose** | 28:22, 35:1, | **methodology** |
| **live** | 40:3 | 35:6, 38:10, | 22:10, 22:17, |
| 58:18 | **lots** | 43:21, 78:3, | 22:22, 23:2, |
| **living** | 80:11 | 80:6, 81:6, 82:9 | 23:5, 30:5, |
| 58:20 | **lower** | **mark** | 52:10, 73:18 |
| **llp** | 66:14, 68:1, | 72:13 | **methods** |
| 2:6, 3:5, 3:14 | 68:2 | **marked** | 27:5 |
| **local** | | 56:18, 72:15 | **michael** |
| 30:3, 30:6, | **M** | **match** | 3:12 |
| 30:9, 30:10, | **made** | 17:12 | **microdata** |
| 31:3, 32:8, | 10:8, 48:1, | **material** | 37:4 |
| 33:2, 34:5, | 65:1, 67:1, | 19:4, 35:4, | **might** |
| 38:11, 56:1, | 73:22, 74:4, | 65:17 | 36:13, 38:21, |
| 57:16, 57:17, | 74:13, 77:12 | **mathematical** | 42:14, 47:8 |
| 81:20, 82:14 | **major** | 80:11 | **migration** |
| **located** | 37:16 | **maybe** | 34:3, 34:6, |
| 55:12 | **majority** | 54:7, 54:10 | 34:11, 37:18, |
| **location** | 13:6 | **mclean** | 64:1, 64:2 |
| 17:17 | **make** | 1:16, 2:9, 3:17 | **million** |
| **locations** | 6:11, 17:11, | **mean** | 15:18, 23:15, |
| 11:11, 21:8 | 26:19, 31:9, | 16:10, 22:16, | 24:14, 31:13, |
| **log** | 36:1, 40:4, | 25:3, 32:21, | 31:15, 31:20, |
| 54:14 | 41:6, 41:9, | 57:13, 57:14, | 32:22 |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                      35

**milwaukee**
8:20, 9:9,
9:12, 19:16
**mind**
15:2
**mine**
52:2, 74:18,
82:14
**minorities**
10:19, 11:7
**minute**
19:19
**minutes**
69:5
**misspoke**
70:12
**mobile**
1:9, 41:3,
55:1, 55:12,
55:19, 58:5,
58:18, 59:6,
72:4, 72:5
**modification**
16:9, 16:17
**moe**
73:19, 73:21
**moment**
9:19
**months**
11:16
**more**
18:1, 23:2,
24:14, 27:16,
28:7, 30:12,
33:14, 38:8,
45:19, 59:9,
65:9, 68:11,
71:11, 83:6
**morning**
7:12, 7:14
**morrison**
33:22
**most**
7:1, 8:15,
9:13, 14:22,
18:10, 45:22,
63:3, 78:16,
82:20

**mostly**
60:10
**moving**
68:13
**much**
15:18, 18:19,
24:20, 27:21,
38:8, 39:7,
47:20, 83:6,
84:15
**multiple**
78:15
**multiplied**
77:4, 77:18
**must**
48:5
**myself**
21:20, 84:4

——— N ———

**name**
5:21, 9:19,
14:2, 37:18
**names**
53:14
**narrow**
47:11
**national**
29:16, 30:2,
30:7, 30:8,
30:11, 30:13,
30:18, 30:22,
31:4, 31:12,
31:20, 31:22,
32:7, 32:10,
33:1, 33:4,
34:5, 34:8,
34:14, 35:9,
35:20, 36:7,
50:16, 57:16,
73:12, 77:2,
77:7, 77:16,
82:13
**nationals**
77:21
**nd**
53:5
**near**
27:15, 27:16,

78:16
**nearly**
71:10
**necessarily**
35:15
**need**
6:18
**needed**
71:15, 72:8
**needing**
78:4
**neither**
87:10
**never**
44:11
**nevertheless**
5:7
**next**
55:13, 68:13,
69:5
**nine**
34:12, 35:19,
36:6, 50:15,
77:3, 77:5
**no:**
1:20
**non-citizens**
68:9, 68:12
**non-hispanic**
70:1, 70:6,
70:9, 70:20
**non-hispanics**
61:10, 67:18,
68:3, 68:8,
68:10, 68:12,
70:6
**nonsensical**
40:8, 76:12,
79:5, 84:8
**not-asians**
68:2
**notable**
65:18
**notarial**
87:15
**notary**
2:16, 87:1,
87:20, 87:22

**nothing**
5:17, 46:6,
62:5, 62:11,
70:10, 75:8
**notice**
2:14
**november**
53:5, 54:3
**number**
14:5, 23:16,
27:7, 27:9,
27:14, 30:6,
32:17, 33:1,
38:2, 39:12,
39:13, 39:14,
41:4, 42:8,
44:5, 47:5,
51:7, 52:3,
64:17, 67:9,
67:10, 67:13,
68:5, 71:15,
74:7, 77:12,
77:19, 77:21,
78:8, 81:16,
82:15, 83:1
**number:**
87:22
**numbers**
15:6, 65:18
**numerous**
73:22
**nw**
3:6

——— O ———

**oath**
5:6, 5:8, 5:10,
6:22, 7:3
**objection**
5:9, 44:17
**obligation**
6:22
**obscures**
74:21
**occasion**
26:10
**occasional**
73:10

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                          36

occasions
6:4, 21:3
occupancy
14:4, 18:11,
18:14, 55:19
occupants
16:14
october
54:4, 54:7,
54:8, 54:17
of:
2:2
officer
87:4
offices
2:2
often
80:5
okay
6:15, 9:13,
9:16, 19:15,
37:10, 41:17,
42:8, 51:15,
53:17, 54:13,
54:16, 54:21,
69:6, 69:12,
70:22, 72:22,
74:11
once
55:11
one
2:7, 3:15,
8:15, 9:1, 9:2,
9:3, 9:8, 9:9,
9:11, 9:14,
12:9, 19:11,
19:20, 39:8,
39:10, 53:9,
57:3, 59:8,
59:10, 63:1,
81:4, 84:19
one-eighth
48:7, 76:3,
76:4, 84:4, 84:5
online
82:18
only
14:22, 18:2,

32:18, 40:2,
41:20, 47:12,
78:13, 81:9,
81:11
opinion
73:14, 76:6
opinions
6:10, 15:21,
17:1, 17:15,
59:21
opposed
6:19, 33:7,
35:9
opposite
53:1
order
78:18
other
14:13, 16:20,
18:7, 18:8,
19:13, 22:13,
22:16, 22:17,
24:7, 25:20,
25:21, 26:3,
26:10, 29:9,
37:10, 37:16,
40:10, 40:21,
41:7, 53:10,
55:15, 56:10,
62:12, 63:10,
67:4, 67:15,
67:16, 67:18,
67:21, 69:19,
69:21, 70:5,
70:17, 70:18,
71:11, 71:14,
81:18
others
8:3, 8:11,
21:19, 21:22,
63:12, 81:2
otherwise
44:6, 87:13
out
35:4, 39:17,
40:5, 65:18,
68:16, 71:14,
71:16, 74:16,

82:13
outcome
62:20, 87:13
outcomes
21:8
over
6:7, 17:6,
23:16, 24:12,
44:18, 63:16,
64:18, 73:9
owned
10:3
owner
13:4, 13:6

**P**

p-u-m-a
37:3
page
4:2, 4:9, 57:7,
58:2, 60:5,
63:14, 63:15,
63:17, 67:7,
69:15, 75:2
pages:
1:21
paid
18:14, 84:9,
84:18, 84:19,
84:20, 84:21
pan
65:18
paragraph
59:20, 61:3,
69:15, 74:8,
75:4
park
1:9, 41:3,
55:2, 55:12,
55:19, 58:5,
58:18, 59:6,
72:4, 72:5
park's
67:11
part
14:7, 15:16,
16:4, 17:15,
24:21, 26:12,

26:15, 59:1,
60:9, 64:12,
66:6, 71:7,
72:22
particular
20:22, 24:16,
26:2, 27:4,
28:10, 33:6,
55:2, 58:12,
63:5, 83:2
parties
87:11
partnership
1:10
party
9:20
pass
38:10
passed
83:4
past
8:11
people
18:21, 23:10,
23:17, 25:6,
25:7, 25:10,
26:13, 29:4,
33:21, 33:22,
58:20, 80:13
percent
15:19, 16:14,
16:16, 28:15,
29:6, 29:8,
34:12, 35:19,
36:6, 38:14,
40:7, 42:5,
42:9, 42:19,
43:1, 45:7,
45:17, 46:5,
46:16, 47:12,
48:6, 49:5,
49:6, 49:10,
49:14, 49:17,
50:15, 63:17,
73:21, 74:7,
74:19, 75:6,
76:3, 76:8,
77:3, 77:6,

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

37

| | | | |
|---|---|---|---|
| 81:8, 84:3, 84:6 | plays | 55:2, 55:17, | 69:18, 70:7, |
| percentage | 28:4 | 55:22, 58:4, | 70:17, 70:19, |
| 15:15, 27:9, | please | 58:11, 59:4, | 70:21, 71:2, |
| 43:14 | 5:21, 6:12 | 59:8, 59:14, | 71:6, 71:17, |
| percentages | point | 59:22, 60:8, | 71:20, 71:22, |
| 49:19 | 17:3, 38:15, | 60:14, 60:15, | 72:1, 72:9, |
| performing | 38:19, 39:1, | 60:18, 60:22, | 73:13, 76:21, |
| 13:21, 18:18, | 39:3, 39:7, | 61:1, 61:5, | 76:22, 81:9, |
| 56:6 | 39:8, 39:10, | 61:10, 61:11, | 81:10, 81:12, |
| perhaps | 39:15, 39:17, | 61:13, 61:21, | 82:19, 83:12, |
| 12:8, 78:12 | 39:19, 39:22, | 62:15, 63:1, | 83:13, 83:16 |
| period | 40:4, 40:15, | 63:6, 67:12 | populations |
| 18:14, 19:4, | 40:16, 41:11, | pool | 21:7, 34:5, |
| 24:12 | 41:18, 42:16, | 18:21 | 55:10, 67:22, |
| peter | 43:8, 44:2, | population | 70:1, 70:9, |
| 33:22 | 44:3, 44:5, | 15:4, 15:13, | 71:15 |
| pew | 44:10, 44:14, | 15:15, 16:15, | posed |
| 37:17, 64:2 | 44:15, 46:4, | 17:5, 17:8, | 61:8 |
| ph | 47:8, 47:10, | 17:16, 18:5, | positing |
| 1:15, 2:2, 4:2, | 47:14, 47:20, | 20:22, 21:16, | 82:13 |
| 4:11, 4:13, | 48:1, 48:2, | 21:18, 21:21, | possible |
| 5:15, 86:2 | 48:8, 48:13, | 23:19, 23:21, | 35:16, 79:10 |
| phelps | 48:18, 49:8, | 24:16, 24:20, | possibly |
| 12:15 | 49:9, 49:15, | 25:3, 25:12, | 35:14 |
| philosophical | 50:10, 51:3, | 26:2, 26:5, | potential |
| 44:21 | 51:4, 52:1, | 27:2, 27:12, | 28:17 |
| photograph | 52:2, 52:6, | 27:22, 30:18, | predicate |
| 68:15 | 52:8, 52:10, | 30:20, 31:14, | 25:1 |
| phrase | 52:14, 55:18, | 33:6, 33:8, | prefer |
| 7:20, 25:2, | 74:17, 74:22, | 33:11, 33:15, | 33:13 |
| 25:3 | 75:3, 76:10, | 34:2, 34:7, | prepare |
| piece | 78:3, 78:4, | 34:14, 35:1, | 7:8, 11:13, |
| 46:1, 81:5 | 78:6, 78:10, | 35:8, 36:8, | 55:7 |
| pitt | 78:14, 78:16, | 36:10, 36:17, | prepared |
| 9:2 | 78:18, 78:22, | 36:21, 37:7, | 17:10, 22:9, |
| place | 79:1, 79:9, | 37:11, 38:12, | 24:3, 57:1 |
| 2:7, 3:15, 12:7 | 79:14, 79:19, | 39:4, 40:13, | preparing |
| plaintiff | 79:22, 80:3, | 45:12, 45:16, | 56:3 |
| 12:17 | 80:5, 80:13, | 45:20, 46:6, | presence |
| plaintiffs | 82:2, 83:10, | 46:10, 46:13, | 5:6 |
| 1:7, 10:3, | 83:18, 83:22 | 50:18, 51:11, | present: |
| 59:14 | pointed | 51:18, 51:19, | 3:20 |
| plaintiffs' | 40:5, 71:16, | 51:20, 60:2, | presentation |
| 59:18 | 74:16 | 60:17, 60:20, | 75:18, 75:21 |
| plaintiffs: | points | 63:9, 63:18, | presenting |
| 3:2 | 47:6 | 64:5, 64:12, | 45:4 |
| play | policy | 64:14, 64:20, | pretty |
| 28:5 | 8:2, 10:7, | 65:10, 65:16, | 34:4, 49:4, |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                        38

| | | | |
|---|---|---|---|
| 77:15 | project | publication | 45:13, 45:18, |
| **previous** | 34:1 | 21:17 | 48:17, 57:8, |
| 8:17 | **proof** | **publications** | 58:3, 59:7, |
| **previously** | 58:4, 58:16, | 25:22, 26:3 | 59:13, 61:8, |
| 6:2, 7:16, | 61:2 | **publicly** | 62:9, 79:11, |
| 20:20 | **proper** | 82:17 | 81:11, 82:6, |
| **prior** | 39:12 | **publish** | 83:17 |
| 20:11, 56:9, | **property** | 43:21, 44:7 | **question:** |
| 73:4 | 10:5 | **published** | 25:2, 57:8 |
| **probability** | **proportion** | 16:12, 16:18, | **questioning** |
| 28:13, 29:5 | 51:20, 61:9, | 21:14, 21:19, | 52:19 |
| **probably** | 62:7, 66:10, | 22:4, 24:8, 37:9 | **questions** |
| 23:8, 31:21, | 66:12, 66:13, | **puma** | 6:9, 7:2, 27:7, |
| 51:21, 54:20 | 80:2 | 37:2, 37:12, | 84:22, 85:3 |
| **problems** | **proportions** | 64:11, 64:13, | **quinn** |
| 57:18 | 57:22, 65:6 | 64:14, 65:2, | 3:5, 53:10, |
| **procedure** | **proposing** | 65:4, 65:6, | 56:10 |
| 48:17, 66:12, | 76:11 | 65:10, 65:17, | **quite** |
| 66:21 | **protected** | 66:4, 66:6, | 81:7 |
| **procedures** | 11:1, 11:4 | 66:8, 66:9, | |
| 38:9 | **prove** | 66:10, 66:15, | **R** |
| **proceed** | 20:15, 59:16 | 66:17, 66:19, | **race** |
| 12:2, 19:9 | **provide** | 67:2, 67:5, | 10:15, 10:17, |
| **proceedings** | 18:4, 21:20, | 81:15, 81:17, | 10:20, 14:16, |
| 87:4, 87:7 | 24:4, 26:22, | 82:3, 82:9, | 14:22, 16:6, |
| **proceedings;** | 35:6, 37:6, | 83:14 | 62:12, 63:10 |
| 87:7 | 48:2, 48:7, | **purpose** | **races** |
| **process** | 48:8, 48:12, | 13:17 | 62:13 |
| 6:7, 15:16, | 48:15, 49:8, | **pursuant** | **raised** |
| 35:2, 60:18, | 49:9, 49:18, | 2:14 | 67:19 |
| 82:13 | 56:17, 81:1, | **put** | **range** |
| **produce** | 82:9 | 7:2 | 6:5, 12:8, |
| 28:16, 70:13, | **provided** | **putting** | 16:19, 18:15, |
| 76:21, 78:16 | 16:20, 17:1, | 35:1 | 26:22, 27:17, |
| **produced** | 22:1, 31:19, | **Q** | 38:12, 38:21, |
| 74:20, 82:17 | 37:6, 37:21, | **question** | 39:14, 40:21, |
| **professional** | 43:6, 47:7, | 6:10, 6:14, | 41:5, 41:8, |
| 2:16, 87:3 | 48:18, 49:1, | 24:6, 26:5, | 42:13, 42:16, |
| **professionally** | 53:18, 73:1, | 30:15, 32:6, | 46:3, 47:8, |
| 80:4 | 76:18, 77:12 | 35:22, 36:5, | 47:9, 47:11, |
| **professor** | **provides** | 36:12, 38:16, | 48:3, 49:1, |
| 26:16, 47:15, | 36:20, 49:3, | 40:14, 41:17, | 49:3, 49:8, |
| 48:12, 53:3, | 49:19, 49:22, | 41:20, 42:1, | 51:5, 52:4, |
| 54:1, 56:21, | 83:22 | 42:2, 42:3, | 65:15, 74:18, |
| 63:13, 69:14, | **public** | 43:12, 43:16, | 74:20, 76:11, |
| 72:14, 72:18, | 2:16, 37:4, | 43:18, 44:20, | 78:22, 80:12, |
| 84:9 | 80:4, 87:1, | 44:21, 45:1, | 80:15, 83:19, |
| **progress** | 87:20 | | 84:1 |
| 24:11 | | | |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                    39

| | | | |
|---|---|---|---|
| ranging | recent | registration | rent |
| 29:5 | 8:15, 9:14 | 87:22 | 18:22 |
| rate | recently | related | rental |
| 84:12 | 8:10, 8:13, | 8:16, 12:11, | 10:3, 13:16 |
| rather | 11:17, 24:19, | 12:13, 13:9, | rented |
| 25:16, 42:19 | 72:3 | 18:20, 61:18, | 10:4 |
| ratio | recess | 87:11 | renting |
| 70:14 | 69:8 | relatively | 10:10, 13:10 |
| read | recognize | 47:11 | rents |
| 50:2, 50:4, | 26:20 | reliability | 18:14, 18:20 |
| 52:5, 86:3 | record | 27:7, 27:19, | reorganize |
| reading | 5:2, 85:6, 87:6 | 28:3, 28:9, | 69:4 |
| 87:9 | redid | 28:14, 38:17, | rephrase |
| real | 67:20 | 41:15, 44:9, | 6:12 |
| 49:13 | redistricting | 44:14, 48:22, | reply |
| realize | 14:21 | 52:16, 52:19, | 4:12, 72:14, |
| 44:3 | reduced | 53:1, 65:21, | 72:19, 74:12, |
| really | 87:8 | 79:7, 80:9, 81:3 | 75:2, 75:8, |
| 78:10 | reed | reliable | 75:13 |
| reason | 2:6, 3:14 | 39:22, 40:18, | report |
| 7:5, 81:1 | reevaluated | 42:5, 42:10, | 4:10, 4:12, |
| reasonable | 71:16 | 42:13, 42:20, | 5:8, 7:10, 7:11, |
| 43:9, 76:9, | refer | 42:22, 43:5, | 8:16, 8:22, |
| 76:19, 83:11 | 25:12, 34:11, | 43:8, 43:15, | 11:13, 11:15, |
| reasonableness | 63:20, 69:22 | 44:16, 45:22, | 11:17, 12:1, |
| 74:21 | reference | 47:21, 48:14, | 35:3, 37:21, |
| reasonably | 14:10, 33:21 | 49:15, 49:16, | 39:18, 40:6, |
| 66:1 | referred | 51:5, 52:11, | 40:12, 42:12, |
| reasoned | 8:21, 37:1 | 78:19, 79:17, | 45:7, 45:16, |
| 43:20 | referring | 80:18, 81:5, | 47:19, 49:11, |
| reasons | 20:17, 68:18, | 82:11, 82:18, | 49:20, 50:2, |
| 81:4 | 70:7 | 82:20, 82:21, | 50:12, 50:13, |
| rebuttal | refers | 83:7, 83:19 | 52:6, 52:13, |
| 40:6, 67:19, | 57:4, 61:7 | reliably | 54:4, 54:7, |
| 71:5 | refine | 40:11, 51:22, | 54:17, 55:8, |
| recall | 23:17 | 52:3 | 56:4, 56:16, |
| 9:18, 10:17, | reflect | relied | 57:1, 57:3, |
| 11:20, 14:5, | 44:1 | 14:14, 23:6, | 57:20, 58:3, |
| 17:22, 18:19, | reflected | 64:15, 81:15 | 58:14, 63:11, |
| 19:18, 24:18, | 44:22 | rely | 63:22, 65:3, |
| 37:17, 42:17, | refresh | 16:3, 17:2, | 67:19, 68:19, |
| 45:5, 50:14, | 54:5 | 40:2, 41:19, | 68:21, 69:15, |
| 53:14, 54:11, | regarding | 47:13, 64:8 | 70:22, 71:5, |
| 54:15, 74:5, | 11:5 | relying | 71:18, 71:20, |
| 74:9, 77:20, | regardless | 82:3 | 72:11, 72:14, |
| 81:18 | 60:19 | remind | 72:19, 72:22, |
| recalling | registered | 52:1, 78:4 | 73:1, 73:17, |
| 19:3 | 2:15, 87:3 | renew | 74:5, 74:12, |
| | | 10:6 | |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

40

74:16, 75:3,
75:8, 75:14,
75:22
**reported**
1:22
**reporter**
2:15, 2:16,
5:5, 87:1, 87:3
**reports**
26:16, 37:2
**requested;**
87:10
**required**
23:11, 58:17
**requirement**
59:16
**requiring**
58:4, 61:2
**reread**
7:10, 7:11
**research**
56:7, 64:2
**residency**
55:3
**resident**
18:13, 23:12,
59:2
**residential**
11:10
**residents**
10:21, 25:5,
25:11, 25:19,
41:3, 55:1,
67:11
**resources**
68:14
**respect**
8:18, 8:21,
15:20, 34:13,
45:6, 77:7
**respond**
19:3
**response**
7:10, 47:6,
53:21, 69:1
**rest**
66:8
**result**
26:22, 74:22,

76:9, 79:5,
81:19, 84:2
**results**
51:9, 52:21,
65:22, 66:2,
78:16, 83:19,
83:21, 84:8
**resume**
69:10
**retained**
4:8, 9:16,
9:21, 12:10,
12:14, 12:16,
12:19, 13:2,
13:5, 53:17,
56:9, 56:19,
72:16
**reveals**
69:20
**review**
14:6, 53:19,
85:4
**reviewed**
11:17, 22:22,
73:1
**reviewing**
12:1, 38:7,
73:17
**reyes**
1:5
**right**
6:6, 6:20,
15:2, 16:17,
38:15, 46:13,
48:14, 48:22,
49:4, 49:6,
52:9, 52:11,
52:16, 56:13,
59:17, 61:6,
62:4, 62:6,
62:17, 64:9,
75:15, 77:5,
83:21, 85:5
**rock**
9:2
**role**
28:4, 28:5
**rolling**
15:14, 15:17

**rosy**
1:5
**routinely**
57:8
**rpr**
1:22
**rule**
30:1, 58:21,
59:1
**ruling**
20:11, 20:14,
53:22

**S**

**said**
16:13, 31:1,
36:12, 43:2,
43:4, 44:11,
44:21, 70:16,
71:5, 76:1,
77:10, 78:15,
87:7
**same**
12:13, 16:5,
30:18, 30:20,
51:4, 65:20,
66:4, 66:10,
86:4
**sample**
15:3, 15:9,
15:12, 15:13,
15:17, 27:14,
27:21, 28:2,
28:4, 29:14,
29:15, 30:6,
30:8, 30:12,
30:14, 30:19,
31:1, 31:2,
31:4, 31:6,
31:12, 32:19,
32:20
**samples**
26:20, 27:16,
28:6, 78:15
**sampling**
30:5
**san**
8:16, 9:18,

10:3, 11:12
**sat**
44:4
**say**
25:17, 27:8,
27:11, 29:15,
30:2, 30:19,
32:20, 34:21,
35:3, 41:16,
42:10, 43:3,
44:4, 52:6,
70:2, 75:7,
75:15, 80:10
**saying**
19:3, 29:9,
40:20, 50:7,
50:10, 52:22,
53:2, 60:21,
61:5
**says**
47:19, 52:8,
60:19, 63:11,
74:6, 80:21,
84:7
**school**
9:2, 20:3
**schools**
9:3
**seal**
87:15
**second**
68:15, 71:18,
72:11, 75:4
**section**
10:4, 10:10,
10:14, 10:16,
10:18, 10:21,
11:3, 11:10,
58:3, 59:20,
63:14, 68:13,
68:14, 69:16
**sections**
21:6
**see**
54:10, 55:21,
80:20
**seeing**
30:8

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016

41

| | | | |
|---|---|---|---|
| **seem** | 78:6, 78:12, | 30:12, 30:14, | **sometime** |
| 83:8 | 84:8 | 31:2, 31:3, | 54:18 |
| **seems** | **shouldn't** | 31:6, 31:12, | **somewhat** |
| 35:22 | 47:2, 65:11 | 31:14, 32:19, | 27:15, 63:17 |
| **seen** | **show** | 32:20, 64:14, | **somewhere** |
| 73:12 | 20:15, 55:3, | 71:21, 72:8, | 6:5, 23:15, |
| **segment** | 58:8 | 83:16, 83:18 | 80:14 |
| 30:19, 30:21, | **showed** | **skills** | **sorry** |
| 33:8 | 58:15 | 24:3, 27:22 | 32:5, 50:22, |
| **senior** | **showing** | **slightly** | 53:14, 54:11, |
| 53:10 | 20:12 | 68:1 | 54:15 |
| **sense** | **shows** | **small** | **sort** |
| 6:11, 41:10, | 52:22 | 18:3, 31:3, | 25:1, 59:13, |
| 41:11, 78:14 | **side** | 38:12, 72:6 | 59:15 |
| **sent** | 27:10 | **smaller** | **sounds** |
| 55:5 | **sight** | 29:18, 32:11, | 69:7 |
| **sentence** | 40:3 | 32:15, 33:1, | **specific** |
| 59:22, 60:7, | **signature)** | 33:3, 34:17, | 10:15, 14:3, |
| 63:15, 67:8, | 86:11 | 36:4, 37:12, | 14:20, 18:12, |
| 68:15, 69:17 | **signature-dkv4y** | 65:13, 83:4 | 24:5, 26:5, |
| **separate** | 87:18 | **smallest** | 26:6, 38:9, |
| 12:11, 12:12 | **signed** | 36:19, 37:5, | 41:21, 41:22, |
| **september** | 86:7 | 37:8 | 45:5, 48:16, |
| 54:10, 54:20 | **significant** | **smith** | 57:16, 59:3, |
| **set** | 36:16, 52:15, | 2:6, 3:14 | 68:16, 68:18 |
| 15:5, 50:12, | 71:17 | **solely** | **specifically** |
| 69:10, 87:14 | **signing** | 17:19 | 10:20, 59:22, |
| **settled** | 87:10 | **some** | 60:8, 60:17, |
| 19:14 | **similar** | 6:7, 8:2, 8:3, | 74:6, 74:10 |
| **seven** | 48:2, 52:22, | 8:11, 17:9, | **specifics** |
| 71:10 | 65:22, 67:4, | 17:20, 26:21, | 11:18, 18:1 |
| **several** | 74:18, 81:21 | 33:1, 33:12, | **speculating** |
| 17:22, 19:4, | **simple** | 33:21, 37:1, | 50:22, 51:2 |
| 44:18, 76:1 | 57:21 | 40:9, 40:20, | **spent** |
| **sex** | **simply** | 41:5, 47:3, | 43:18 |
| 14:22 | 7:1, 46:12 | 48:4, 49:19, | **standard** |
| **shake** | **since** | 53:1, 59:15, | 29:2, 29:11, |
| 6:19 | 6:18, 44:12 | 62:12, 62:22, | 66:11, 76:9 |
| **sheet** | **sir** | 63:9, 65:12, | **start** |
| 86:7 | 5:21, 15:11, | 65:14, 77:18 | 21:10 |
| **short** | 54:9, 60:7, 85:2 | **somebody** | **started** |
| 14:20, 69:3 | **situation** | 48:12 | 77:16 |
| **shorthand** | 32:4, 41:1, | **someone** | **starting** |
| 2:15, 87:1, | 41:21, 41:22 | 58:17, 61:20, | 17:3 |
| 87:2 | **sixth** | 62:4 | **starts** |
| **should** | 3:6 | **something** | 63:15 |
| 25:16, 56:15, | **size** | 15:1, 61:16, | **state** |
| 65:11, 75:6, | 28:2, 28:4, | 81:20 | 5:3, 5:21, |

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    42

| | | | |
|---|---|---|---|
| 11:22, 34:18, 35:9, 35:13, 35:14, 35:18, 36:11, 36:15, 55:6, 56:1, 58:4, 59:21, 68:15, 69:17, 75:4, 75:13, 82:14 | **stayed** 25:8 **stenographically** 87:8 **sterling** 12:22, 13:1, 13:3, 13:4 **still** 42:5, 42:20, 42:22, 44:6, 63:14, 68:1, 70:15, 79:21 | **suggests** 52:3 **suit** 10:7 **suite** 2:8, 3:16 **sullivan** 3:5 **sum** 69:17 **supportable** 74:14 | **talking** 61:1, 81:9 **target** 61:16 **targeting** 61:11, 62:16 **team** 82:16 **techniques** 58:1 **technology** 23:17 |
| **stated** 51:13 **statement** 17:13, 32:18, 60:3, 60:14, 61:7, 61:13, 67:12, 67:18, 68:4, 68:7, 69:22, 70:10, 70:16, 71:10, 71:13, 76:15, 76:17, 80:19 | **stipulate** 5:7 **straightforward** 77:16 **street** 3:6 **studies** 25:22, 34:3, 34:6, 34:11, 37:18, 64:1, 64:3, 68:16, 68:18, 68:19, 68:20 | **sure** 6:17, 16:10, 35:21, 44:2, 80:19 **survey** 14:11, 15:3, 15:5, 15:14, 29:16, 30:2, 30:3, 38:1 **surveyed** 15:16 **survied** 15:6 **sworn** 5:16 | **tedious** 37:15 **tell** 12:6, 17:7, 39:21 **telling** 40:1 **ten** 28:15, 29:6 **tenants** 10:5, 10:10, 10:14, 10:16, 10:18, 11:4, 11:10, 13:11, 13:12, 13:19, 13:20, 18:12, 19:8 |
| **states** 1:1, 21:1, 23:20, 24:12, 24:17, 25:5, 25:13, 27:12, 34:8, 58:9, 59:17, 61:21, 62:2, 62:10, 67:9 | **study** 20:21, 24:11, 26:13 **sub-area** 60:1, 60:16 **sub-county** 36:22 **sub-group** 46:18 | **T** **table** 70:13 **tables** 50:4, 57:22 **take** 22:18, 27:14, 28:8, 42:12, 44:12, 56:21, 57:15, 58:2, 63:13, 69:3, 71:1, 72:8, 74:11 | **term** 8:1, 25:4, 25:9, 25:14, 25:16, 26:17, 26:18, 57:6, 57:10, 57:13 **terms** 57:3 |
| **statistic** 31:18 **statistical** 13:15, 20:15, 27:5, 28:13, 41:10, 57:21 **statistician** 47:7, 49:2, 73:16 **statisticians** 26:19, 38:22, 80:12, 82:16 **statistics** 31:16, 43:22, 49:19 **status** 58:8, 59:16, 62:16 | **subject** 24:10, 26:1 **submitted** 73:8 **subparagraph** 67:8 **substantial** 21:6 **sufficient** 20:15 **sufficiently** 47:21, 49:11, 52:11, 82:21 **suggested** 23:14, 74:20 | **taken** 83:3, 87:5, 87:7 **taking** 27:15, 82:13 **talked** 36:1, 73:12 | **testified** 5:18, 7:16, 8:4, 8:8, 8:13, 19:21, 20:2, 20:4, 36:3, 36:6, 45:18, 46:22, 54:3 **testify** 5:16, 7:6, 42:7 **testifying** 7:3 |

**testimony**
41:13, 42:4,
43:11, 61:17,
63:7, 67:3,
84:10, 86:4,
86:5
**texas**
20:11, 20:14,
20:17
**th**
87:15
**thank**
5:13, 85:1,
85:2, 85:5
**themselves**
18:12, 18:16
**thereafter**
87:8
**therefore**
52:3, 66:10
**think**
12:12, 12:22,
15:1, 21:11,
24:1, 26:14,
27:10, 34:21,
35:15, 36:14,
37:16, 38:13,
38:18, 39:18,
42:13, 49:14,
51:13, 52:13,
52:22, 53:21,
61:7, 69:4,
76:19, 78:9,
78:14, 82:6
**thinking**
39:16, 43:19
**thousand**
24:13
**three**
9:1, 15:18,
15:19, 31:13,
31:19, 32:22,
68:14
**through**
48:3, 74:15,
74:16, 82:12
**throughout**
66:16

**thursday**
1:17
**time**
13:6, 17:6,
18:6, 19:4,
23:17, 25:9,
37:15, 43:19,
53:8, 73:8,
80:1, 80:3, 85:1
**times**
6:5, 44:18,
71:11, 76:1
**to-and-fro**
43:3
**today**
7:6
**told**
6:17
**took**
12:7, 65:4,
77:1, 77:5,
77:17
**tools**
57:15, 57:17,
57:19, 57:21
**total**
15:3, 16:15,
38:2, 46:12,
51:20
**tract**
17:10, 38:2,
38:13, 39:5,
43:7, 45:8,
48:19, 50:18,
55:11, 60:1,
60:9, 60:10,
61:8, 61:14,
64:5, 64:12,
64:20, 65:2,
65:5, 65:7,
65:11, 65:16,
65:19, 66:1,
66:5, 66:6,
66:7, 66:11,
67:2, 67:3,
69:19, 69:20,
70:4, 70:14,
72:9, 76:11,

77:17, 78:9,
79:2, 81:7,
81:17, 81:22,
83:14
**tracts**
17:13, 66:17,
67:1, 67:5,
68:17
**transcript**
5:10, 6:20,
85:4, 87:6
**transcription**
86:5
**transformed**
19:12
**travelers**
9:4, 9:7, 9:13,
9:16, 9:22, 10:5
**treatment**
19:22, 20:7
**trial**
12:2, 19:10,
19:13
**true**
27:1, 27:11,
27:14, 27:16,
28:17, 33:9,
34:10, 39:14,
62:9, 66:15,
66:18, 68:1,
80:16, 86:4,
87:6
**truth**
5:17
**truthfully**
7:6
**try**
34:22
**trying**
24:1, 30:16,
31:18, 32:1,
39:19, 40:4,
40:22, 41:6,
41:11, 70:15
**turn**
69:14
**turns**
71:14

**twice**
51:13, 82:7
**two**
8:17, 9:11,
12:5, 21:4,
23:15, 25:20,
31:16, 37:16,
47:6, 53:9,
59:20, 83:15
**type**
8:5, 26:9, 33:7
**typewriting**
87:9
**typical**
32:14
**tysons**
2:7, 3:15

**U**

**uh-huh"**
6:20
**ultimate**
55:8, 64:9
**under**
6:22, 7:3,
10:5, 57:7,
59:20, 75:3,
79:9, 87:9
**understand**
5:5, 6:11, 7:3,
7:20, 20:6,
20:14, 30:15,
30:16, 31:10,
32:5, 35:5,
35:21, 43:11,
45:13, 48:5,
49:12, 70:15,
73:21, 75:12,
76:1, 76:5, 81:1
**understanding**
6:13, 8:1,
20:9, 58:7,
58:10, 58:19
**understood**
6:14, 71:6
**undocumented**
20:21, 21:6,
21:16, 21:18,

21:20, 23:9,
23:16, 23:18,
23:21, 24:16,
24:20, 25:2,
25:12, 25:17,
26:1, 26:5,
33:5, 33:11,
33:12, 34:2,
34:5, 34:7,
34:13, 34:22,
35:8, 36:8,
36:9, 36:16,
36:21, 37:7,
37:11, 39:4,
40:13, 41:4,
41:12, 43:8,
45:12, 45:16,
45:20, 46:2,
46:6, 46:9,
46:19, 48:20,
50:17, 51:11,
51:18, 51:19,
62:8, 62:19,
62:21, 63:4,
63:9, 63:18,
64:5, 64:11,
65:16, 69:18,
70:7, 70:13,
70:17, 70:20,
71:1, 71:6,
71:11, 71:14,
71:17, 71:19,
71:22, 72:1,
72:9, 75:1,
76:22, 78:8,
79:2, 81:8,
81:12, 82:15,
82:19, 83:1,
83:12, 83:13
**undocumenteds**
59:11, 81:16
**undocuments**
46:8
**unfortunately**
62:18
**unit**
38:11
**united**
1:1, 21:1,

23:20, 24:12,
24:17, 25:5,
25:13, 27:12,
34:8, 58:8,
59:16, 61:21,
62:2, 62:10
**units**
36:22
**unnecessary**
80:8
**unreliable**
42:2, 47:17,
52:7, 76:14,
83:21, 84:2
**unwilling**
83:9
**urquhart**
3:5
**use**
15:20, 25:4,
25:16, 27:17,
29:4, 29:11,
29:13, 37:2,
37:4, 40:21,
41:7, 41:10,
42:11, 42:12,
45:20, 48:4,
51:3, 57:15,
66:12, 76:8
**useful**
40:1
**uses**
14:19, 29:7,
29:13, 38:10,
78:1
**using**
24:2, 24:3,
25:2, 25:16,
26:20, 28:13,
48:9, 57:6,
63:16, 67:17,
74:19, 76:18,
83:19
**usual**
16:19
**usually**
28:6
**utilize**
28:20

**utilized**
22:4, 23:5

**V**

**valentine**
5:22
**valid**
51:17
**validated**
22:8
**validity**
22:14
**value**
27:1, 27:11,
27:14, 27:16,
28:17, 44:2,
49:3, 81:22
**values**
65:19
**variable**
66:20
**variance**
27:22
**variation**
28:15, 28:17,
44:3, 66:18
**varied**
23:16
**variety**
21:9, 27:5
**various**
28:8, 28:22,
29:4, 66:16,
83:4
**vary**
27:9
**verbal**
6:18, 17:13
**versus**
9:3, 18:21,
59:8
**videoconference**
1:14, 2:1, 6:19
**videoconference)**
3:4, 3:21
**virginia**
1:2, 1:16, 2:9,
2:17, 3:17,

36:15, 36:16,
51:7, 55:6,
55:10, 87:21
**vis-a-vis**
13:11, 13:20
**visas**
25:9

**W**

**want**
11:22, 31:11,
43:2, 80:13
**wanted**
54:16
**wanting**
33:16
**wants**
44:1, 80:16
**waples**
1:9, 55:1, 72:4
**warren**
33:22
**washington**
3:8
**way**
17:9, 29:9,
39:16, 41:20,
65:18, 84:1
**way:**
10:22, 42:18,
57:10
**we'll**
85:4
**we're**
5:12, 40:4,
40:20, 51:22,
61:1, 63:14,
65:22, 78:2,
81:9, 83:6
**we've**
22:21, 25:2,
33:2, 33:6,
35:22, 44:18,
74:16, 78:10,
79:1
**weinberg**
7:11, 33:20,
39:6, 47:16,

49:14, 52:1,
53:2, 67:19,
69:2, 73:2,
73:5, 73:8,
73:14, 74:13,
75:5, 77:1,
78:7, 79:3,
83:20
**weinberg's**
7:11, 47:10,
49:20, 52:5,
75:21
**went**
19:13, 65:14,
74:15, 74:16,
76:2
**whatever**
68:20, 69:1
**whereas**
15:2
**whereof**
87:14
**whereupon**
5:14
**whether**
10:17, 11:11,
13:10, 13:18,
22:19, 25:15,
26:6, 35:18,
44:22, 47:11,
47:21, 48:14,
52:11, 55:1,
55:4, 55:14,
55:20, 55:21,
58:10, 58:14,
59:5, 62:3,
62:4, 62:5,
62:9, 62:10,
62:11, 70:11,
75:15, 76:7,
78:18, 81:11,
82:11, 82:20,
82:21, 83:16,
84:1
**whites**
62:21
**whole**
5:17, 60:10,

66:9
**wildly**
82:1
**william**
1:15, 2:1, 4:2,
4:11, 4:13,
5:15, 5:22, 86:2
**willing**
33:15
**within**
11:12, 43:6,
47:11, 48:9,
49:3, 68:17
**without**
11:22, 16:8,
16:16, 25:5,
25:7, 25:18,
47:8, 62:2,
62:14, 79:17
**witness**
6:2, 7:17, 8:5,
8:13, 19:21,
26:10, 87:14
**witness:**
69:6, 69:11,
85:2
**women**
80:2
**wookie**
5:4
**word**
33:22
**words**
55:15
**work**
14:7, 17:9,
17:22, 18:3,
23:8, 84:13,
84:16
**worked**
18:2, 34:1,
72:3
**wouldn't**
11:22, 42:11,
44:7, 48:11,
50:20, 58:22,
59:1, 60:13
**wrong**
75:14, 75:15

**wrote**
21:4, 53:15,
71:20
**Y**
**yeah**
37:19
**year**
19:17, 20:11,
24:12, 24:14,
53:6, 54:18
**years**
12:7, 18:1,
19:4, 73:9
**you:**
47:6
**Z**
**zero**
41:9, 74:20,
76:10, 79:3,
79:9
**$**
**$300**
84:14
**$7,000**
84:17
**.**
**.05**
29:5
**.10**
29:6
**0**
**04**
85:6
**05**
1:18
**1**
**100**
42:4, 42:8
**100,000**
64:18, 65:9
**101**
40:6, 48:6,

73:21, 74:7,
74:19, 75:6,
76:3, 76:8, 84:6
**130604**
1:20
**16**
1:8
**18**
11:16
**1990**
21:15, 23:14
**1:cv-tse-tcb**
1:8
**2**
**20**
53:5, 69:5
**20001**
3:8
**2003**
24:9
**2005**
14:8
**2010**
12:8, 14:8,
14:15, 14:19,
15:4, 16:1
**2012**
12:8, 14:9
**2016**
1:17, 54:3,
87:16
**2018**
87:17
**202**
3:9
**22**
1:17, 53:5,
54:10
**22102**
2:9, 3:17
**23**
14:4
**230**
42:17
**26**
38:13, 42:19,
45:7, 45:17,

Transcript of William A.V. Clark, Ph.D.
Conducted on December 22, 2016                                    46

46:5, 46:15,
47:12, 49:6,
49:14, 81:7
**27**
87:15
**28**
14:4, 54:8
**280**
83:10
**2a**
60:5, 60:6,
60:7
**2d**
63:14

---
**3**

**3,000**
31:14, 31:20
**30**
16:13, 16:15,
24:12, 63:17,
69:5
**30.7**
70:14
**300**
48:19, 74:22,
83:10
**31**
87:17
**31.4**
70:14
**320**
42:17
**33.5**
27:12
**34**
69:8
**35**
6:5

---
**4**

**4,000**
64:21, 65:10
**40**
6:5
**42**
69:9
**4200**
3:18

**4406**
60:1, 60:9,
61:14, 64:20,
67:2, 67:3,
69:19
**4:**
1:18

---
**5**

**50**
42:19
**500**
2:8, 3:16
**53**
23:10
**538**
3:9
**56**
4:11
**563**
1:8
**5:**
69:8, 69:9

---
**6**

**602**
74:20
**641**
3:18
**6:**
85:6

---
**7**

**703**
3:18
**7060756**
87:22
**72**
4:13
**75**
43:1
**777**
3:6
**7900**
2:7, 3:15

---
**8**

**80**
41:2

**800**
48:6, 49:10,
76:2
**8000**
3:9
**809**
49:5, 49:17
**87**
1:21

---
**9**

**90**
29:8
**900**
49:10, 84:3