# EXHIBIT 2



# Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP

**Date:** December 20, 2016

**Case:** de Reyes, et al. -v- Waples Mobile Home Park Limited Partnership, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3               ALEXANDRIA DIVISION
4  - - - - - - - - - - - - - - - - - - - -x
5  ROSY GIRON DE REYES, et al.,        :
6          Plaintiffs,                 :
7  v.                                  :
8  WAPLES MOBILE HOME PARK LIMITED     :
9  PARTNERSHIP, et al.,                :
10         Defendants.                 :
11 - - - - - - - - - - - - - - - - - - - -x
12 Civil No.: 1:16cv563-TSE-TCB
13
14
15     Videoconference Deposition of GEORGE C. CARUSO
16              McLean, Virginia
17          Tuesday, December 20, 2016
18                 12:37 p.m.
19
20 Job No.:  131024
21 Pages:  1 - 130
22 Reported by:  Lisa Kirk
```

**Page 2**

```
1          Deposition of GEORGE C. CARUSO, held at
2  the offices of:
3          REED SMITH LLP
4          7900 Tysons One Place
5          Suite 500
6          McLean, Virginia 22102
7          703.641.4200
8
9
10
11
12
13
14
15
16
17
18          Pursuant to Notice, before Lisa Kirk,
19 Court Reporter and Notary Public in and for the
20 Commonwealth of Virginia.
21
22
```

**Page 3**

```
1           A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3     JOY ODOM, ESQUIRE
4     Quinn Emanuel Urquhart & Sullivan, LLP
5     777 6th Street, Northwest
6     11th Floor
7     Washington, D.C. 20001
8     202.538.8159
9
10    SIMON SANDOVAL-MOSHENBERG, ESQUIRE
11    Legal Aid Justice Center
12    6066 Leesburg Pike
13    Suite 520
14    Falls Church, Virginia 22041
15    703.778.3450
16
17
18
19
20
21
22
```

**Page 4**

```
1       A P P E A R A N C E S  C O N T I N U E D
2  ON BEHALF OF THE DEFENDANTS:
3     JUSTIN D. deBETTENCOURT, ESQUIRE
4     Reed Smith, LLP
5     7900 Tysons One Place
6     Suite 500
7     McLean, Virginia 22102
8     703.641.4209
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 5**

C O N T E N T S

EXAMINATION OF GEORGE C. CARUSO                    PAGE
    By Ms. Odom                           6, 121
    By Mr. deBettencourt                  114

E X H I B I T S

(Attached to the transcript.)

CARUSO DEPOSITION EXHIBIT                          PAGE
    Exhibit 1      Expert Report                      6

**Page 6**

1    (Caruso Exhibit 1 was marked for
2  identification and is attached to the transcript.)
3                P R O C E E D I N G S
4        MS. ODOM:  All right, so Mr. Caruso, we're
5  going to go ahead and go on the record and the court
6  reporter is going to swear you in in just a minute.
7  Your testimony today is as if you were giving it in a
8  courtroom.
9        And I just need to ask Mr. deBettencourt if
10 he agrees that we can stipulate to Mr. Caruso being
11 sworn remotely.
12      MR. deBETTENCOURT:  Yes.
13      MS. ODOM:  Okay.  So the parties are agreed
14 on that and the court reporter will go ahead and give
15 you the oath now.
16 Whereupon,
17                GEORGE C. CARUSO,
18 being first duly sworn or affirmed to testify to the
19 truth, the whole truth, and nothing but the truth,
20 was examined and testified as follows:
21 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
22      BY MS. ODOM:

**Page 7**

1    Q   All right, so Mr. Caruso, have you ever
2  been deposed before?
3    A   Yes, ma'am.
4    Q   How many times?
5    A   Well, I was asked that question in a
6  deposition last year and I think it's five or six.
7  If you've been doing this as many years as I have,
8  you don't remember everything anymore, but I've been
9  deposed multiple times.
10   Q   All right.  Beyond the deposition last
11 year, have you had any depositions in the last five
12 years?
13   A   Yes, one prior to that that would be right
14 at the five-year time frame.
15   Q   Okay.  What kind of case was that?
16   A   That was an employment law case.
17   Q   All righty.
18   A   I was the corporate representative of my
19 then employer before I retired.
20   Q   All right, so since you've been deposed
21 before, you're probably already familiar with the
22 rules of the road, so to speak, but I just want to

**Page 8**

1  go back over them with you.  You and I want to try
2  to not talk over each other.  With you being remote,
3  that might be a little bit difficult with the lag
4  time, but we'll do our best because the court
5  reporter can only take down one of us at a time.
6  I'd ask you to let me finish my question before you
7  start to answer and I'll try to let you finish your
8  answer and try not to interrupt you.  You
9  understand, as we discussed a minute ago, that the
10 testimony you give today is as if you were giving it
11 in court in front of a judge and jury.
12   A   I do.
13   Q   So you've got a responsibility to tell the
14 truth and the whole truth there.  Is there any
15 reason that you're aware of why you can't give your
16 best and most accurate testimony today?
17   A   None that I'm aware of.
18   Q   All right.  So I saw in your resumé to your
19 report, which we've marked as Exhibit A, and I
20 regret you don't have a copy of it, but I understand
21 you're familiar with it.  And if you need to refer
22 back to your report at sometime, just let us know

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    3 (9 to 12)
Conducted on December 20, 2016

---

9

1  and we'll work that out.

2  **A    Okay.**

3      Q    We can, maybe, fax it to you or we can hold

4  it up to the camera if you need to look at it for

5  any reason.  But I saw you've got about 40 years of

6  experience in managing residential properties; is

7  that right?

8  **A    I started in 1972, so, yeah.  That would**

9  **be, what, 44 years?**

10     Q    That's right, by my calculation.  And you

11 asset manage about 5,000 multifamily units in D.C.

12 for --

13 **A    Yes.  Well (inaudible).  I am, in theory,**

14 **partially retired at this point.  The reason I say**

15 **in theory, that's because some weeks I work a full**

16 **week, some weeks I don't work at all, but I was**

17 **working full time until April of '14, when I turned**

18 **65, and gave up my full-time position.  And one of**

19 **my big clients is Mid-City Financial Corporation.**

20 **That's where I do asset management.  I also own**

21 **properties for my own portfolio.**

22     Q    As part of your asset management for

---

10

1  Mid-City what are some of the responsibilities you

2  have in that job?

3  **A    Well, I don't officially have a title.  We**

4  **just call me the owner's representative, but I sit**

5  **in on budget meetings, operational stuff.**

6  **Basically, the in-house expert on operations and**

7  **property management that they have, and given my**

8  **experience and the fact that I operated their**

9  **portfolio, among others, for 14 years when I was**

10 **working at Edgewood full time.  Mid-City Financial**

11 **Corporation and Edgewood Management Corporation are**

12 **owned by the same parent entity, so I will**

13 **occasionally refer to the two interchangeably**

14 **because Edgewood is the management operation and**

15 **Mid-City is the ownership operation.**

16     Q    When you say you're involved in the

17 operations, what does that consist of?

18 **A    Anything having to do with the operation of**

19 **the apartment communities that we own.**

20     Q    So is that the day-to-day logistics of

21 keeping the doors open and the grounds kept or is it

22 something else?

---

11

1      MR. deBETTENCOURT:  Objection, form.

2  **A    No.**

3      MS. ODOM:

4      Q    Go ahead.

5  **A    I don't do much in the way of day-to-day**

6  **operations anymore.  When there's an issue or an**

7  **issue needs to be looked at, I'm the one who goes**

8  **and does it.  If we're going to do major capital**

9  **work, I'm the one who hires the engineers, hires the**

10 **contractors, reviews the plans.  I'm involved in the**

11 **annual budgeting processes.  I'm involved in the**

12 **regulatory issues with the regulatory agencies.  If**

13 **we need permits pulled for something, I'm the one**

14 **who goes and pulls the permits.  So it's higher**

15 **level stuff.  I stay out of -- I mean, we have**

16 **full-time management people.  And when I retired, I**

17 **retired to let the folks that I spent the last 15**

18 **years training replace me and manage.  So I do the**

19 **higher-end special projects and talk to them from**

20 **time to time, but I do not do day-to-day management**

21 **any longer.**

22     Q    Would you say that you're involved in the

---

12

1  creation or upkeep of any of the properties'

2  policies?

3  **A    In most cases I'm a reviewer of drafts when**

4  **we change them.  There was a time, prior to my**

5  **retirement, that I was in charge of creating the**

6  **policies.  Now I'm the reviewer of the policies.**

7      Q    What types of policies are those?

8  **A    Across the whole board, the entire policy**

9  **manuals that Edgewood uses, so that would be**

10 **policies on admissions, policies on tenant file**

11 **management, federal regulatory policies, bidding,**

12 **management, contracting, you name it.**

13     Q    So at some point before your retirement in

14 2014 you had responsibility for overseeing and

15 helping to draft the admissions and tenant policies

16 for the Mid-City properties?

17     MR. deBETTENCOURT:  Objection, form.

18 **A    Actually, my responsibilities were broader**

19 **than that.  Mid-City is only one of the components.**

20 **Edgewood Management has a substantial book of**

21 **third-party management and I was the executive vice**

22 **president and chief knowledge officer.  I was**

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

---

**13**

1  responsible for drafting and enforcing all policies
2  on the entire portfolio, which in those days ran
3  between 165 and 175 properties, around 30,000 units,
4  give or take. Properties are continuously coming in
5  and leaving a portfolio, as you might imagine.
6      MS. ODOM:
7      Q   Where did you first become employed with
8  Mid-City and Edgewood?
9      A   August of 2002.
10     Q   And has that been your primary form of
11  employment since 2002 up until your point of
12  retirement?
13     A   That is my primary compensated form of
14  employment. Myself and my sisters are the
15  beneficiaries of and I am the manager of a series of
16  family trusts, where we manage our own family assets
17  that come from my parents and my grandparents.
18     Q   Do those assets include residential
19  properties for rent or lease?
20     A   They do. They include single-family
21  residential properties for rent and lease, and they
22  also include a major agricultural operation.

---

**14**

1      Q   How many different residential complexes
2  would you say you've managed over your career?
3      A   Without a lot of research it would be
4  difficult to say, but the number is very substantial
5  at this point. The reason I say that -- and I'll
6  just walk you quickly forward from the major
7  positions once I became an operational vice
8  president. I started in the business in Chicago. I
9  was at Harbor Realty and Management, which is an old
10  Chicago management firm. We managed a large
11  portfolio of properties on Lake Shore Drive. Then I
12  moved to the West Coast and went to work for
13  American Diversified, American Diversified Capital
14  Corporation. That's the largest corporation I've
15  ever worked for. They had -- during the period of
16  time I was there we had a shade more than 55,000
17  units in about 300 locations. After that I moved to
18  The Mitchell Company in Mobile, Alabama. We
19  operated principally in seven states in the
20  southeast, plus Louisiana and Texas. We were a
21  merchant builder, so the portfolio varied, but in
22  most cases it was somewhere in the range from 15 to

---

**15**

1  20,000 units. And then I went to Alco Properties in
2  Memphis. I had a shade more than 8,000 units there.
3  We owned virtually everything we managed. Then I
4  had my mid-career sabbatical as executive director
5  of the National Affordable Housing Management
6  Association, was there for six years in Washington
7  doing lobbying and policy work, and then went to
8  work for Edgewood in 2002. So over those 40 years
9  I've managed everything from high-end luxuries down
10  to assisted properties and pretty much everything in
11  between. There was one point in the mid '80s where
12  I managed the largest single-use residential rental
13  building in the world, which is Lake Point Tower in
14  Chicago. I also managed the largest assisted
15  property in Huron, South Dakota at a whopping -- I
16  still remember the number -- 23 units.
17     Q   When you did lobbying and policy work in
18  Washington, D.C., what was the topic or focus of
19  that work?
20     A   I was the executive director of the
21  National Affordable Housing Management Association.
22  It's a real estate trade organization, still exists

---

**16**

1  today. We worked with HUD, the Department of
2  Agriculture, the Department of Treasury, Congress,
3  and various administrations on a broad range of
4  affordable housing issues, taxation issues, and all
5  the sorts of things that one does if one is running
6  a real estate trade association.
7      Q   Did any of your lobbying or policy work
8  involve the issue of undocumented immigrants in
9  housing?
10     A   It certainly did.
11     Q   In what way?
12     A   When the late Representative Henry Hyde and
13  the now retired, but still alive, Representative
14  Elton Gallegly introduced the first citizenship
15  requirement bills in the early 1990s, we worked with
16  folks and lobbied. We weren't terribly in favor of
17  them, but Representative Hyde was not going to be
18  deterred.
19     Q   You and your organization --
20     A   And he had the votes.
21     Q   I'm sorry, I didn't mean to interrupt you.
22  And your organization, you said, were not terribly

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    5 (17 to 20)
Conducted on December 20, 2016

17

1  in favor of residency verification requirements?
2       MR. deBETTENCOURT:  Objection,
3  mischaracterize.
4     A    We weren't necessarily in favor of the
5  legislation as written, particularly the parts that
6  would penalize owners if someone presented us with
7  fraudulent documents.  We were not against the
8  residency requirements, per se.  What we were
9  against was owners being held responsible for things
10 that they didn't have control over producing, and we
11 were deeply concerned that we have better ability to
12 verify documents.
13      MS. ODOM:
14  Q    What is affordable housing?
15      MR. deBETTENCOURT:  Objection, form.
16     A    Depending on who you are and what your
17 income level is, that's a very flexible definition.
18 Can you help me out with a little bit more
19 specificity?
20      MS. ODOM:
21  Q    Sure.  In the context of your lobbying and
22 policy work in D.C. you said it related to

18

1  affordable housing, and I wondered what, from your
2  perspective, that covered.
3     A    It's principally all housing types that are
4  aimed at housing people at or below, roughly, 60
5  percent of area median income.
6  Q    Did any of your policy or lobbying work
7  relate to federal subsidies or financing for low
8  income --
9     A    Yes.
10  Q    -- tenants?
11     A    Yes.
12  Q    In what way?
13     A    Well, much of the affordable housing stock
14 in this country is underpinned by FHA mortgages.
15 You know who FHA is.  You know it's a federal
16 division.  They're also underpinned by Freddie and
17 Fannie financing, and to some extent Freddie Mac
18 financing, so we worked with all those groups in
19 terms of financing.  And, of course, if you're in
20 the affordable housing business, you have an
21 inherent interest in the rulemaking and rules that
22 HUD is proposing adopting that will impact how you

19

1  operate the housing.  And then, finally, in the deep
2  assistance sector, there's annual appropriations to
3  help support some of the costs of the
4  deeply-assisted portfolio.
5  Q    Can you give me an estimate of, roughly,
6  what percentage of the properties you've managed
7  received federal funding or subsidy?
8     A    Not without sitting down with portfolio
9  lists and research.  Typically, in the period I was
10 with Edgewood, about 60 percent of our portfolio was
11 assisted and about 40 percent was not.
12  Q    Are the operations for assisted residential
13 housing as opposed to non-assisted any different or
14 do they operate the same way?
15     A    They operate in similar ways.  If you're
16 using federal or state money, federal or state money
17 comes with strings and it comes with rules, so you
18 have more reporting and more regulations that you
19 have to deal with.  The nature of the operation is
20 basically similar in both cases.
21  Q    What are some of those strings that an
22 assisted entity would have to deal with?

20

1     A    That's a very broad topic and we can spend
2  days on it.
3  Q    Well, let's --
4     A    There is literally -- there's literally a
5  three-foot long section of the Code of Federal
6  Regulations called 24 CFR, chapter 24.  It occupies
7  a bookshelf about that long (indicating).
8       THE WITNESS:  For the recorder, I'm holding
9  my hands about three feet apart.
10     A    And if you've been in this business as long
11 as I have, you've been inside those regulations for
12 years.  And as I said, if they're writing you a
13 check, they have all kinds of regulations that you
14 have to comply with.
15      MS. ODOM:
16  Q    Understood.
17     A    (Inaudible.)
18      (At which time the court reporter requested
19 clarification regarding the answer.)
20     A    If they're either writing you a check to
21 cover the cost of operations or they're writing --
22 or they have written you a mortgage, you get with

21

1    that regulations that you have to comply with.

2        Q    So we'll come back with some specificity

3    later.  I don't want to spend days on the

4    regulations and strings that may be attached to

5    federal funding or subsidies, but I did want to get

6    a sense of whether any of the properties that you've

7    managed over the years have included mobile home

8    properties or whether it's only been apartments?

9        MR. deBETTENCOURT: Objection.

10       A    I have been --

11       THE WITNESS:  Go ahead.  I'm sorry.

12       MR. deBETTENCOURT: Objection, form.

13       MS. ODOM:

14       Q    You can go ahead and answer.

15       A    The short answer is I have done residential

16   rental and residential condominiums most of my

17   career.  I have done a smattering -- and I use that

18   term very carefully -- a smattering of commercial

19   and retail spaces.  I have not operated mobile home

20   parks directly.

21       Q    For the properties that you have helped

22   manage in some capacity over the years, did they all

22

1    have a policy excluding undocumented immigrants from

2    tenancy?

3        MR. deBETTENCOURT: Objection, form.

4        A    I think there you have to be careful to

5    specify when.  The legislation that relates to that

6    didn't come into play until the early 1990s.  It

7    wasn't an issue until the early 1990s.  So in the

8    early stages of my career it wasn't an issue because

9    nobody seemed to care.  When Congress passed a

10   series of bills and legislation related to it in the

11   early and middle '90s, and then visited those bills

12   again in the late '90s, it moved from being not on

13   your agenda to being on your agenda.

14       MS. ODOM:

15       Q    So let's take the question from after

16   Congress passed that legislation in the early '90s

17   forward.  For the properties that you've assisted in

18   managing since the 1990s to the present, has each of

19   those properties had a policy like the one at issue

20   in this case?

21       A    Very similar to it, yes.

22       Q    Every single property?

23

1        A    Yup, because for Fair Housing reasons you

2    want to operate consistently.  Otherwise, the FH&EO

3    Division of HUD will be on you.  And if you manage

4    what I call a split company, which means you're

5    doing both conventional and assisted or affordable

6    management, you need to adopt one set of policies

7    and maintain them consistently.

8        Q    Is the ratio of assisted to non-assisted

9    entities -- you said a moment ago it was about 60

10   percent received federal funding and about 40

11   percent didn't.  Does that ratio hold true from the

12   1990s to the present or is it different?

13       A    Without sitting down with the specific

14   property lists, I wouldn't be able to tell you.

15       Q    Are you able to tell me whether entities

16   that don't receive federal or state housing subsidy

17   or funding also have a policy like the one in this

18   case?

19       MR. deBETTENCOURT: Objection, form.

20       A    Some of my colleagues in this business that

21   are not doing deep assistance work have adopted very

22   similar policies, yes.

24

1        MS. ODOM:

2        Q    But not all?

3        A    I have to tell you I don't go around asking

4    everybody that when I talk to them.

5        Q    But from your personal experience and

6    knowledge, are you able to say whether the

7    properties that you've had some involvement in all

8    have a policy that exclude undocumented immigrants

9    from tenancy whether or not they receive federal

10   funding?

11       MR. deBETTENCOURT: Objection, form, asked

12   and answered.

13       MS. ODOM:

14       Q    You can go ahead and answer.

15       A    I think I would stay with what I said

16   earlier, and that is for the most part, yes, but

17   without specifically looking at a property list and

18   looking at whether owners had a special set of

19   requirements, which some of them do, I can't tell

20   you with 100 percent certainty that every property

21   did.  I can tell you that virtually everything we

22   had in the portfolio did.

---

**25**

1  Q   Do you know whether the Waples Mobile Home
2  Park received any form of federal or state housing
3  finance or subsidy?
4  **A   I'm unaware of their situation.**
5  Q   Would that be an important piece of
6  information for you to know in order to determine
7  whether the policy at issue in this case was
8  necessary?
9  **A   No, I don't think so.**
10 Q   Why not?
11 **A   When this legislation came into place, it**
12 **was clear that the intent of Congress was to ensure**
13 **that folks in residency should be in this country**
14 **appropriately. In addition, at the same time, and**
15 **this is exceedingly important, as you know, laws**
16 **were enacted that employers are to ascertain the**
17 **legality of all employees. And if you don't know**
18 **the status of somebody, you can't underwrite them,**
19 **because if you have somebody that doesn't have**
20 **status, that means, by definition, they're not**
21 **working legally. It's difficult to underwrite it.**
22 Q   So we'll get to the employment verification

**26**

1  part of your opinions in a second, but I want to
2  finish up with you on the federal funding aspect
3  first. You said when Congress passed the
4  legislation in the early 1990s, it was clear their
5  intent was that landlords verify the residency of
6  their tenants, the legal status of their tenants.
7  **A   Yes. Yeah.**
8     MR. deBETTENCOURT: Objection, form.
9     MS. ODOM:
10 Q   So my question for you is do you believe
11 that's true whether or not a particular landlord
12 receives federal or state subsidies for housing?
13    MR. DeBETTENCOURT: Objection, form.
14 **A   I'm not sure I understand precisely what**
15 **you're trying to get at.**
16    MS. ODOM:
17 Q   All right. I'll rephrase it. Is it your
18 opinion that the Congressional intent for what a
19 landlord has to verify about a prospective tenant,
20 is that the same whether or not that landlord is
21 receiving any type of government funding?
22    MR. deBETTENCOURT: Objection, form,

**27**

1  speculation.
2     MS. ODOM:
3  Q   You can go ahead and answer if you
4  understand the question. If not, I can restate it.
5  **A   I think you better try and nail it down a**
6  **little bit, because the other thing you're doing**
7  **here is trying to divorce employment from leasing**
8  **activities, and you can't, because you're**
9  **underwriting against employment.**
10 Q   Well, I think I'd like to take it in two
11 pieces, so I understand your opinion that for
12 underwriting employment verification is important,
13 but I also understand your report to be offering a
14 second opinion, which is that in order for a
15 landlord to become eligible for federal or state
16 housing funding, they must verify that all tenants
17 are present in the United States legally. Do I have
18 your opinions correct?
19    MR. deBETTENCOURT: Objection, form.
20 **A   Yes, you have my views right on that. You**
21 **have to — in order to qualify for subsidy money**
22 **from the federal or state agencies, you have to be**

**28**

1  **in the country legally.**
2     MS. ODOM:
3  Q   Okay. So my question is if a landlord is
4  not applying for any subsidies and is not receiving
5  any sort of government funding, do they still have
6  to verify the presence of a tenant, that that tenant
7  is in the United States legally? If you take
8  funding out of it, what does the government got left
9  to say to you?
10    MR. deBETTENCOURT: Objection, form.
11 **A   The government's still got left to say to**
12 **you you still have to underwrite it, so you run**
13 **around that issue. And, two, if you're running what**
14 **I'll call a mixed company, which means you're**
15 **running a management house that does both types of**
16 **management, you can't have an inconsistent set of**
17 **standards. Fair Housing will get on you about that.**
18 **So most of us that run mixed companies, we have one**
19 **set of standards whether the property is subsidized**
20 **or not. And we adopt the most restrictive standard,**
21 **which is the federal standard.**
22    MS. ODOM:

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

8 (29 to 32)

---

29

1  Q   Would you agree with me that the
2  underwriting of a lease is a more local focus for a
3  landlord?  That is to say, that's something that the
4  landlord is concerned about, the risk of that lease,
5  and nobody else but the landlord is concerned about
6  that?  Would you agree that's a fair statement?
7      MR. deBETTENCOURT:  Objection, form.
8  **A  I'm trying to understand what you're trying**
9  **to get at.**
10     MS. ODOM:
11  Q   Sure.  Is the government concerned about
12 the proper underwriting by a landlord of a
13 prospective tenant's lease?
14     MR. DeBETTENCOURT:  Objection, speculation.
15  **A  There will be instances where they would be**
16 **concerned, where you've got money borrowed from an**
17 **agency that's either insured by or cuts mortgages**
18 **on, because they want to make sure that the terms of**
19 **the loan are being met, most particularly that the**
20 **loan is getting paid.  Now, that's a roundabout way**
21 **of getting to it, but you have to look at both**
22 **elements.  You've got the financing element if**

---

30

1  **you've got somebody in the equation that's got, you**
2  **know, government-related or government-insured**
3  **financing, and then you have the operational**
4  **element.**
5      MS. ODOM:
6  Q   Okay.  If we have no loan, if there's no
7  government loan or agency loan in the picture, is
8  the government concerned --
9  **A  Right.**
10  Q   -- about the quality of a landlord's
11 underwriting of a lease?
12     MR. deBETTENCOURT:  Same objection.
13  **A  No, but the landlord would be.**
14     MS. ODOM:
15  Q   And only the landlord, correct?
16  **A  So it would seem.**
17  Q   So, really, there is -- there are two
18 pieces of your opinion.  And I understand that you
19 want to take them in whole, but we have the federal
20 funding and subsidy part of your opinion, and then
21 we have the underwriting portion.  And the
22 government doesn't concern itself with the

---

31

1  landlord's underwriting of a lease; is that fair?
2      MR. DeBETTENCOURT:  Objection, form.
3  **A  There's one limited circumstance where they**
4  **would be concerned with the underwriting of the**
5  **lease.  If it -- if someone filed a complaint that**
6  **they were being treated disparately from other**
7  **applicants, in other words, file a Fair Housing**
8  **complaint, the government can come in and take a**
9  **look at how you do your underwriting, how you do**
10 **your admissions, and whether you're consistent in**
11 **the application of the rules.  I've had Fair Housing**
12 **inquiries look at those.  They literally come in,**
13 **sit down, and go through the resident files.**
14     MS. ODOM:
15  Q   But in the absence of such a complaint, the
16 landlord's underwriting is the landlord's business;
17 is that right?
18     MR. deBETTENCOURT:  Objection, form.
19  **A  Yeah.**
20     MS. ODOM:
21  Q   Is Waples Mobile Home Park in the
22 low-income housing business?

---

32

1  **A  Counsel hasn't shared with me precisely**
2  **what the target market is on that, so I'm not in a**
3  **position to really opine on that.**
4  Q   Would you have wanted to receive that
5  information for your opinions?
6      MR. deBETTENCOURT:  Objection.  To the extent
7  this question calls for communications from counsel,
8  I'm going to instruct you to answer -- instruct you
9  not to answer.
10     MS. ODOM:
11  Q   And just to be clear, I'm not asking you
12 for anything that counsel at Reed Smith has told
13 you.  I'm simply asking if you had all the
14 information available to you that you would have
15 wanted to have in an ideal world?
16     MR. deBETTENCOURT:  Objection, form.
17  **A  As the folks at Reed Smith --**
18     THE WITNESS:  Go ahead.
19  **A  As the folks at Reed Smith have indicated,**
20 **the only conversations I've had have been with the**
21 **lawyers.**
22     MS. ODOM:

---

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 11 of 73
PageID# 11943
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    9 (33 to 36)
Conducted on December 20, 2016

33

1    Q    Did you ever request any other documents or
2  information than were provided to you?
3        MR. deBETTENCOURT: Objection, privileged
4  information. To the extent this question calls for
5  communications between you and counsel, I'm going to
6  instruct you not to answer.
7        MS. ODOM:
8    Q    Are you able to answer, Mr. Caruso?
9        MR. deBETTENCOURT: I'm instructing you not
10 to answer, Mr. Caruso.
11       MS. ODOM:
12   Q    Well, let me ask you this. Did you rely on
13 any materials besides your own experience in
14 creating your report and forming your opinions?
15   **A    No. Largely, my opinions were -- I was**
16 **asked to render my views as to how one might go**
17 **about operating this, in the abstract and that's**
18 **what I've done.**
19   Q    So to be clear, for example, you didn't
20 review any of the documents that were produced in
21 this case?
22       MR. deBETTENCOURT: Objection, form.

34

1    **A    The only document I've seen related to this**
2  **case is my -- and you're going to have to help me**
3  **with the name of the document -- the document my**
4  **opinion was put in. What's that?**
5        MS. ODOM:
6    Q    Your expert report?
7    **A    But it had a header on it. I don't**
8  **remember what the header said.**
9    Q    Yup, it's got a caption on it. I'm not
10 sure -- where is the camera located? You probably
11 can't see. I'll walk it over to you, so you can
12 see.
13   **A    No, I can't.**
14   Q    All right, so --
15   **A    My eyesight is not that good.**
16   Q    Let me -- all right, are you able to see
17 that, Mr. Caruso?
18       MS. ODOM: For the record, I'm holding up
19 what's been marked as Exhibit 1, which is
20 Mr. Caruso's report.
21   Q    Does that look --
22   **A    Yeah, there's -- that's the header page and**

35

1  **I think there's two pages that follow that label**
2  **Exhibit A.**
3    Q    That's right. So I just want to be clear,
4  that's the only document in this case that you've
5  reviewed; is that right?
6    **A    Yup.**
7    Q    And to make sure the record is clear on
8  this, you are following Counsel's instruction not to
9  answer whether you asked for any other documents to
10 review?
11       MR. deBETTENCOURT: Objection, asked and
12 answered, privileged information.
13       I'm instructing you not to answer.
14       MS. ODOM: I'm simply asking the witness to
15 state for the record whether he's following Counsel's
16 instruction not to answer whether he asked for any
17 other documents. That does not call for privileged
18 information.
19       MR. DeBETTENCOURT: You can answer that
20 question.
21       MS. ODOM:
22   Q    Would you like me to restate it,

36

1  Mr. Caruso?
2    **A    Yeah, that would be helpful.**
3    Q    Sure. No problem. So I was just asking
4  you to confirm for the record that you're following
5  Counsel's instruction not to answer as to whether
6  you asked to see any other documents in this case.
7    **A    I am following Counsel's instruction.**
8    Q    Have you ever come into contact or become
9  aware of undocumented immigrants at the Mid-City and
10 Edgewood properties?
11       MR. deBETTENCOURT: Objection, form.
12   **A    Yes.**
13       MS. ODOM:
14   Q    How many times?
15       MR. deBETTENCOURT: Same objection.
16   **A    I can't give you a precise number, and only**
17 **very occasionally. And I would only see it after an**
18 **issue had revealed itself and we were in the process**
19 **of removing those folks from residence.**
20       MS. ODOM:
21   Q    Would it be less than ten times?
22   **A    I can't give you a precise number, but it's**

37

1  probably less than -- less than a couple cases a
2  year.
3      Q    Since 2002?
4      A    Yeah.
5      Q    Let's take the most recent case.  What was
6  the circumstance in which that situation revealed
7  itself to you?
8          MR. deBETTENCOURT: Objection, form.
9      A    The last case I recall, we, in the process
10 of reacting to a visit -- I use that term
11 advisably -- by the U.S. Attorneys for the District
12 of Columbia to do -- perform an arrest in an
13 apartment, it became revealed that some of the
14 documents that had been provided to us were
15 forgeries, and we ultimately ended up removing those
16 people.  One of the people had already been arrested
17 and we ended up removing the household as a
18 consequence of it because they gave us forged
19 documents.
20     MS. ODOM:
21     Q    Did the forged documents include a Social
22 Security card?

38

1      A    I can't remember with precision what all in
2  the jacket was forged, but there were forgeries in
3  the file.
4      Q    Did these tenants that we're speaking about
5  cause any disturbance at the property or was the
6  legal issue one that had arisen outside the confines
7  of the property?
8          MR. deBETTENCOURT: Objection, form.
9      A    As I recall, and it's a little fuzzy, one
10 of the tenants was picked up on a drug offense, and
11 I don't remember whether the offense was on the
12 property or abutting it.
13     MS. ODOM:
14     Q    Did Mid-City receive any complaints from
15 other tenants about this individual?
16     A    I don't recall my staff mentioning anything
17 to me.  Obviously, when somebody raids one of your
18 properties, you know about it, and a lot of
19 residents get very concerned.
20     Q    Had this tenant been current on his rent
21 payments?
22     A    To the best of my knowledge, yes, but it

39

1  emerged that his income was fraudulently
2  understated, and he was current on what we thought
3  he was making.
4      Q    Is it possible for a citizen or
5  fully-documented immigrant to fraudulently
6  understate their income on a lease application?
7      A    Yes.
8      Q    Can you tell me some of the residential
9  landlords in northern Virginia and D.C. that you
10 consider to be well-managed?
11     A    Well, clearly, I would consider my firm to
12 be well-managed.
13     Q    Aside from your own?
14     A    Huh?
15     Q    Aside from your own, are there any that you
16 can think of?
17     A    I have colleagues that post properties.  I
18 consider their stuff to be very well-managed.  I
19 have colleagues at Equity Residential.  I consider
20 their stuff to be very well-managed.  I have friends
21 at PRD.  I consider their stuff to be very
22 well-managed.  I have some friends at Aimco.  I

40

1  consider their stuff to be well-managed.  I can go
2  on.  I have a lot of friends, but I know a number of
3  firms that are well-managed in the District and in
4  northern Virginia, and in Maryland, and the other
5  places where they operate.
6      Q    Do each of the properties that you just
7  mentioned have a policy similar to Waples that
8  excludes undocumented immigrants from tenancy?
9          MR. deBETTENCOURT: Objection, form.
10     A    I haven't done specific polling with them,
11 but to the extent that those firms I just mentioned
12 have deep assistance jobs, they obviously do,
13 because they comply with the rules just like we do.
14     MS. ODOM:
15     Q    How do you know that?
16     A    Because if you want to be in the deep
17 assistance management business, HUD can lift your
18 authority to manage if you're not managing correctly
19 and not complying with the rules.
20     Q    So the threat of regulatory intervention,
21 you believe, is an incentive to have a policy like
22 this?

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP

Conducted on December 20, 2016

---

41

1    A    Well, that's one of the incentives.  The
2  threat of civil money penalties against you as an
3  individual or an executive of the firm is another,
4  and there's a whole string of other things that --
5  I've been a senior executive for many years and I've
6  had to sign a lot of management certifications and a
7  lot of contracts and a lot of other documents, and
8  the term we use inside the house is -- whenever I
9  sign them, one of my subordinates comes in, I say to
10 them, looking at them like I'm looking at you, okay,
11 I'm betting my career here, is everything right.
12   Q    So what about landlords or residential
13 property management companies that aren't in the
14 deep assistance business, as you've called it?  Do
15 they have the same fear of regulatory intervention
16 and civil monetary penalties?
17   A    Without -- you're going to need to narrow
18 that question and you're going to need to either
19 include or exclude mortgage financing from that.
20   Q    All right, let's exclude mortgage financing
21 and --
22   A    Meaning you don't have any mortgage money

42

1  from any federal or state agency?
2    Q    To the landlord.  So to the extent --
3    A    Right.
4    Q    -- a tenant has received a mortgage, that's
5  a private mortgage between the tenant and the
6  mortgagor.
7    A    Right, but a tenant with a mortgage
8  wouldn't be living in a rental property, I wouldn't
9  think.
10   Q    Well, are you familiar with the way that
11 the Waples' leases work?
12   A    You mean -- you're talking specifically --
13 you're going to have to narrow that down for me.  I
14 think you're talking about where -- in a mobile home
15 community you're essentially engaging in a ground
16 lease.  And the item -- just like you would in a
17 commercial situation, and the item sitting on top of
18 it can be separately mortgaged.  Is that the
19 differentiation you're making?
20   Q    Well, is that your understanding of the way
21 the Waples community operates?
22        MR. deBETTENCOURT: Objection, form.

43

1    A    Not knowing precisely how they lease their
2  lots, I can't answer that.  I've never seen a lot
3  lease.  I don't know what their restrictions are or
4  are not.  I don't know how they structure their
5  deals.
6        MS. ODOM:
7    Q    Do you think that's information that would
8  be relevant to the opinions in your report?
9    A    Not particularly, no.  If you're going to
10 comply with the Fair Housing rules and you're going
11 to operate in what I regard as a fully-professional
12 manner, the nature of the financing package on the
13 item sitting on the ground lease is not necessarily
14 all that relevant.
15        (At which time the court reporter requested
16 clarification regarding the answer.)
17   Q    Except to the extent that it may imbue some
18 regulatory risk on the landlord; is that right?
19        MR. deBETTENCOURT: Objection, form.
20   A    Again, not having seen the documents and
21 not knowing how they do the ground lease, I don't
22 know.

44

1        MS. ODOM:
2    Q    Well, to get us back to how we got down
3  this path, what we were discussing is whether a
4  community like Waples is the same as one like Aimco
5  or Mid-City or Edgewood, that's what you've called a
6  deep assistance management group.
7    A    Mm-hmm.
8        MR. deBETTENCOURT: Objection,
9  mischaracterize.
10        MS. ODOM:
11   Q    And my question for you in the beginning
12 was whether Waples is differently situated from
13 those entities?  Is it your opinion that Waples is
14 situated the same as an entity like Mid-City?
15        MR. deBETTENCOURT: Objection, form.
16   A    If you're asking me -- if you're asking me
17 whether I would operate them differently than I
18 operate other stuff, I maintain a consistent
19 approach and recommend to my folks that they
20 maintain a consistent approach, and that is we do
21 the same thing the same way everywhere.
22        MS. ODOM:

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    12 (45 to 48)
Conducted on December 20, 2016

---

45

1    Q    And that's because of the Fair Housing
2  rules?
3    A    **(No verbal response.)**
4    Q    But you also mentioned that you are -- I
5  say you, meaning Mid-City and Edgewood, are what you
6  phrased as a deep assistance manager?
7    A    **Mm-hmm.**
8    Q    Can you explain for me what that means?
9         MR. deBETTENCOURT:  Objection, form.
10        MS. ODOM:
11    Q    You can go ahead and answer.
12    A    **A deep assistance situation is where some**
13  **subdivision of either a state -- the state or**
14  **federal government is writing a check on a monthly**
15  **basis to cover part of the costs of the operation of**
16  **the community.  So deep assistance is a situation**
17  **where the tenant payment is not 100 percent of the**
18  **cost of operating a community.**
19    Q    And because an entity like Aimco or
20  Mid-City or Edgewood is receiving that check to
21  cover their costs --
22    A    **Mm-hmm.**

46

1    Q    -- of operation, that generates a
2  regulatory risk from HUD; is that correct?
3         MR. deBETTENCOURT:  Objection, form.
4    A    **In point of fact, you sign a document**
5  **called a Regulatory Agreement in order to get the**
6  **payments, so, yes, you have a contractual**
7  **arrangement with the federal government or with the**
8  **state agency.**
9         MS. ODOM:
10    Q    And that contractual agreement is part of
11  the motivation to ensure that the policies at that
12  residential complex comply in all ways with federal
13  requirements?
14        MR. deBETTENCOURT:  Objection, form.
15    A    **That is correct.**
16        MS. ODOM:
17    Q    So my question for you is whether Waples
18  receives deep assistance, whether it receives any
19  check from the government?
20    A    **I can't answer that.  I don't know.**
21    Q    So I'd like you to assume that the answer
22  is no, that Waples doesn't receive any sort of

47

1  government funding in the way that we've been
2  talking about.
3    A    **Mm-hmm.**
4    Q    Using that assumption, does Waples have
5  less of a regulatory risk or concern than an entity
6  like Mid-City?
7         MR. deBETTENCOURT:  Objection, form.
8         MS. ODOM:
9    Q    You can answer.
10    A    **One more time, not knowing how the upper**
11  **tiers look, and what other assets, or inside Waples**
12  **ownership entity going up, these deals tend to be**
13  **very complexly structured, as I've said before, and**
14  **I'll keep saying it, I always felt it necessary to**
15  **follow Congressional intent, maintaining a**
16  **consistent policy whether or not there's federal**
17  **funding present.  Doing it one way and doing it that**
18  **way consistently inside the context of the rules has**
19  **always been how I've operated.**
20    Q    So you said something a second ago I want
21  to go back to.  You said these things are structured
22  in a complex way.  My question is if an entity has a

48

1  managing entity, and then it may have several
2  different properties beneath that umbrella --
3    A    **Mm-hmm.**
4    Q    -- is something that happens at one
5  property, in terms of deep assistance, relevant to
6  what happens at a different property that doesn't
7  receive deep assistance?
8         MR. deBETTENCOURT:  Objection, form.
9    A    **There's a term of art that HUD uses called**
10  **misallocation of assets and equity skimming.  And if**
11  **you're doing something one place that you shouldn't**
12  **be doing the other, and it impacts where money is**
13  **going, yes, it can involve it.**
14        MS. ODOM:
15    Q    Okay.  But assuming there's no
16  misallocation of funds in the way that you
17  described, that one complex of units receives
18  federal funding and one complex of units does not,
19  even though they're managed under the same umbrella,
20  is the fact that one of those entities receives
21  federal funding relevant at all to the policies of
22  the non-funded entity?

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                13 (49 to 52)

---

49

1      MR. deBETTENCOURT:  Same objection.
2      **A    To the extent it can get you in a suit with**
3  **FH&EO if there was a Fair Housing complaint, yes,**
4  **because, again, they come in and the first thing**
5  **they look for is is your pattern and practice**
6  **consistent, do you do the same thing in the same way**
7  **everywhere, and is everyone required to meet the**
8  **same rules.**
9      MS. ODOM:
10     Q    Are you aware of what requirements a
11 prospective tenant must meet at the Waples Mobile
12 Home Park in order to be accepted as a tenant?
13     **A    I have not seen their tenant selection plan**
14 **and their policies on an individual basis.**
15     Q    Are you able to describe the policy that's
16 being challenged in this case?
17     **A    I think you could probably describe it much**
18 **better than I could.**
19     Q    Well, I'd like for you to take a crack at
20 it for me.  Are you able to describe the policy
21 that's been challenged in this litigation?
22     **A    As I understand it, the key question here**

---

50

1  **is the owners and operators of Waples are being**
2  **challenged over their requirement that everyone that**
3  **is an adult leaseholder has to be in this country**
4  **legally.  Now, whether that means they are a citizen**
5  **or resident alien or some other form of legal**
6  **residence in the country, they have to be here**
7  **legally.**
8      Q    Do you know what documents the Waples'
9  policy requires a prospective tenant to provide?
10     **A    I have not seen a complete list of the**
11 **documents that they have to provide.  And depending**
12 **on one's situation, that document list is going to**
13 **be widely variable.**
14     Q    You said you hadn't seen a complete list.
15 Have you seen a partial list?
16     **A    My understanding, and it's only oral, is**
17 **that they have to be here legally.  I don't know how**
18 **exactly that lays out in the policy and tenant**
19 **selection plan.  I've not seen the tenant selection**
20 **plan.**
21     Q    For a prospective tenant that does not have
22 a Social Security number, do you know what documents

---

51

1  they are required to provide with their application
2  at Waples?
3      **A    I've not seen the list.  I don't know.**
4      Q    Do you know the defendants in that --
5      **A    Can you guys do me a favor a second?**
6      Q    Sure.
7      **A    Could you kill the microphone that's down**
8  **by that keyboard?  It's making me crazy.**
9      It is off, but --
10     **A    Thank you.**
11     Q    You know what, I'm so sorry, Mr. Caruso, I
12 don't think we're able to mute this one, but we're
13 going to move it so that you don't have to listen to
14 it.
15     **A    That's good.**
16     Q    This may make me extra loud, a downside.
17 And I meant to say this at --
18     **A    Yeah, because all I'm hearing is this**
19 **clickety, clickety, clickety, click, and it just --**
20 **I know you gotta make notes.  I get that part.  I**
21 **just...**
22     Q    Anything we can do.  And I meant to say

---

52

1  this at the outset, but if you get where you'd like
2  to take a break, just let me know and we'll take
3  one.
4      **A    I'll raise my hand just like you do in**
5  **first grade (indicating).**
6      Q    A-plus, there you go.
7      **A    Okay.**
8      Q    All right.  Do you know what the
9  defendants' reasons are for having this policy?  And
10 when I say defendants, I mean the A.J. Dwoskin
11 company and Waples Mobile Home Park.
12     **A    I think it's a general proposition, they**
13 **want to make sure when they're underwriting folks,**
14 **that they have a reasonable assurance that the rent**
15 **is going to get paid.  And in order to have a**
16 **reasonable assurance the rent is going to get paid,**
17 **that generally means somebody is going to have to**
18 **have a job.  And we've been around that bush**
19 **already.  And, again, you know, as we've said**
20 **before --**
21     MR. deBETTENCOURT:  Mr. Caruso --
22     **A    -- package of things --**

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

14 (53 to 56)

---

53

1      MR. DeBETTENCOURT: -- sorry to interrupt.
2      THE WITNESS: Go ahead.
3      MR. deBETTENCOURT: To the extent this
4  question calls for communications with counsel, I'm
5  going to instruct you not to answer. If you're able
6  to answer without relying on communications with
7  counsel, you can answer the question.
8      A    Well, since all of my information has come
9  through counsel, then I guess we're done.
10     MS. ODOM:
11     Q    Don't get excited just yet. Can you tell
12 me --
13     A    No, with that question. Not that we're
14 done completely, just we're done with that question.
15     Q    Do you know what an ITIN is?
16     A    I've seen it.
17     Q    Seen an ITIN?
18     A    A blank of an ITIN. And I've probably seen
19 filled-out ITINs at some point or another.
20     Q    Do you know what an ITIN does for a person,
21 what effect it has?
22     MR. deBETTENCOURT: Objection, form.

---

54

1      A    Effectively, as I get it, what that enables
2  the federal government to do is get their payroll
3  taxes.
4      MS. ODOM:
5      Q    How does somebody get an ITIN?
6      A    You register and get one and they give you
7  an ID number to submit your taxes.
8      Q    How about a U.S. visa, what does that
9  enable a person to do?
10     MR. deBETTENCOURT: Objection, form.
11     A    Depends on the visa. In the case of most
12 visas, you're going to have to actually look at the
13 visa document. In many instances it will either
14 allow work or not allow work. Lots of visas are
15 time limited. There's different types of visas. I
16 mean, you're -- you know, you're dealing with an
17 area that, particularly when you get to immigration
18 laws, is exceedingly complex. You could see all
19 kinds of forms.
20     MS. ODOM:
21     Q    Do you have any experience with U.S. visas
22 or ITINs or I-94 forms?

---

55

1      MR. deBETTENCOURT: Objection, form.
2      A    Well, since we're not in the business of
3  housing anybody that's not here legally, while ITINs
4  may exist for some of our residents, the ones we're
5  more interested in is verifying their employment,
6  making sure that they're in the system, and we know
7  that they're in residence legally. I mean,
8  everything we do in terms of processing these
9  documents drives to are they here legally, are they
10 working legally.
11     MS. ODOM:
12     Q    Does Mid-City and Edgewood accept ITINs as
13 part of an application for a tenant?
14     A    Somebody could hand one of them to us, but
15 the thing we'd be interested in is we want to see,
16 and I'm going to use a generic term here, we want to
17 see the Green Card. As you know, Green Cards are
18 not even green anymore, and you also know that Green
19 Cards covers a broad range of documents. We want to
20 see the documents related to are they here legally
21 and we want to know where their work is, we want to
22 know that they're employed in an appropriate way.

---

56

1      Q    If a prospective tenant at Mid-City or
2  Edgewood presents a Green Card as part of the
3  application process --
4      A    Mm-hmm.
5      Q    -- is there any sort of enhanced diligence
6  to verify their employment?
7      A    We have a whole package of things, and
8  employment will have to be verified, incomes have to
9  be verified, and we have to have third-party
10 documentation, yes.
11     Q    What sort of third-party documentation?
12     A    Typically, we get third-party documentation
13 from the employer or from an agency that works for
14 the employer. Some large employers now outsource
15 that to companies that provide documentation, as you
16 may be aware.
17     Q    Is that documentation like pay stubs or
18 verifications of employment or what does that
19 consist of?
20     A    Pay stubs is going to be a last resort only
21 if we don't have anything else and we're going to do
22 fact checking based on it. Typically, what we are

---

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 17 of 73
PageID# 11949
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    15 (57 to 60)
Conducted on December 20, 2016

57

1  looking for is when we put it into the system, we're
2  going to want to see a written confirmation of
3  employment from the employer as to wages and as to
4  tenure in that position.  The form of that will
5  vary, but that's what we're looking for.
6      Q    And in your experience, is that customary
7  across residential management companies?
8      A    Yes.
9      Q    Will Mid-City and Edgewood accept a foreign
10 passport as proof of identity in the application
11 process?
12     A    If it has the appropriate visas, with the
13 appropriate work permits, and we can verify it.  Or,
14 and I use this term because it's not related to what
15 we do here and I'll just mention it in passing -- I
16 have over the years leased apartments on a regular
17 basis to foreign nationals who are here at the
18 forbearance of the Department of State, in other
19 words, they're diplomats, and we handle diplomats in
20 a different way.
21     Q    Because they come with the imprimatur of
22 the Department of State?

58

1      A    Well, that's number one, and you also --
2  because they enjoy diplomatic immunity, there's a
3  lot of other things you have to do to assure oneself
4  that you're going to get paid.  You can't walk into
5  a landlord-tenant court and throw out a diplomat for
6  not paying the rent.  It doesn't happen.
7      Q    I can imagine the logistical hurdles
8  involved.  Does the U.S. government accept foreign
9  passports as proof of identity for foreign
10 nationals?
11     MR. deBETTENCOURT:  Objection, speculation.
12     A    I really don't have the means to answer
13 that one way or the other.
14     MS. ODOM:  All right, let's take a quick
15 break.
16     (Off the record.)
17     BY MS. ODOM:
18     Q    So I want to move on to talking about the
19 underwriting of leases.  We mentioned it earlier,
20 and in your report you write that legal status is an
21 important factor in underwriting a particular lease.
22     A    Mm-hmm.

59

1      Q    And I want to understand why you think
2  that's the case.
3      MR. deBETTENCOURT:  Objection, form.
4      A    Fairly simple answer, and that is, as you
5  know, under the provisions of the change in the laws
6  a few years back, you fill out an I-9.  It has to be
7  verified and you have to be here either through I-9
8  or E-Verify.  And in order to work legally in this
9  country you gotta be here legally.
10     MS. ODOM:
11     Q    What is E-Verify?
12     A    E-Verify is the electronic system that CIS
13 stood up to be a faster turnaround to the I-9
14 system.  You can do it using E-Verify when you hire
15 somebody now.  It's an electronic system.  You set
16 up an account.  We've been using E-Verify for, I
17 don't know, four or five years.  It's just a lot
18 faster than the old I-9 paper systems.
19     Q    Is every employer required to participate
20 in E-Verify?
21     MR. deBETTENCOURT:  Objection, speculation.
22     MS. ODOM:

60

1      Q    You can go ahead and answer.
2      A    You're required to do one or the other,
3  meaning you have to do it through the I-9 system or
4  you have to do it through E-Verify.  E-Verify is not
5  absolutely mandated, but almost everybody I know is
6  moving towards it because it just makes life easier.
7      Q    And this applies to every employer, whether
8  it's private or government or whether the employee
9  is being hired as a, you know, private contractor,
10 for example?
11     MR. deBETTENCOURT:  Objection, form.
12     A    Well, you gotta be careful there.  If
13 you're hiring a contractor, you're, by definition,
14 or you'll get in trouble with Labor, not hiring an
15 employee.  You know there is a differentiation
16 between the two?  You've gotta be very careful about
17 that.
18     MS. ODOM:
19     Q    I am aware of the difference.  And my
20 question for you is if someone is being brought on
21 as a contractor, does their employer have to go
22 through the I-9 or E-Verify process?

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 18 of 73
PageID# 11950
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

16 (61 to 64)

---

61

1      MR. deBETTENCOURT:  Same objection.
2      **A   Last time I looked, if you're hiring**
3  **somebody and you're paying them, you've gotta verify**
4  **that they're legal to work.**
5      MS. ODOM:
6      Q   Does an individual need to have a Social
7  Security number in order to fill out an I-9?
8      **A   There's a big box on the front side of the**
9  **I-9 and that's what you gotta have in order to make**
10 **it work in the system.**
11     Q   A big box containing what?
12     **A   A Social Security number (indicating).**
13     Q   If someone doesn't -- I didn't mean to
14 interrupt you.  I'm so sorry.  Go ahead.
15     **A   For E-Verify you absolutely have to have**
16 **one.  For the I-9 system, you've gotta get one or**
17 **you're going to have to determine what their Social**
18 **Security number is, so you can get the rest of the**
19 **verifications.  There are means of alternate -- and**
20 **I'm not going to go into it here because I don't**
21 **study it day-to-day -- there are alternate means to**
22 **verify, but it all drills against are they here**

62

1  **legally.**
2      Q   So if someone doesn't have a Social
3  Security number, they may still be able to complete
4  an I-9?
5      MR. deBETTENCOURT:  Objection, form.
6      **A   I suppose.  I'm not sure.  Since I use only**
7  **exclusively E-Verify, and you gotta have it to have**
8  **that system work, I don't know how the manual system**
9  **works.  I'm not current on it.  I haven't used it in**
10 **several years.**
11     MS. ODOM:
12     Q   Does the fact that an individual has a
13 Social Security number prove that they have legal
14 status to work in the United States?
15     **A   Let me answer that by saying yes, we have**
16 **run across fraudulent Social Security numbers.**
17     Q   So I don't think that quite answered my
18 question.  My question is whether if a person
19 possesses a Social Security number, does that
20 demonstrate to a landlord that that individual has a
21 legal status to work?
22     **A   It's an indicator in the rest of the**

---

63

1  **verification systems they're going to use.  It's not**
2  **exclusively to approve it.**
3      Q   I'm not sure I understood that answer.  So
4  if a landlord, such as Mid-City --
5      **A   Mm-hmm.**
6      Q   -- gets a Social Security number on an
7  application, is that taken as an indication that the
8  applicant is able to work legally in the United
9  States?
10     **A   Well, that's where the process starts.**
11 **That's where we do the rest of the background checks**
12 **and the other stuff that goes with it.**
13     Q   Is it the case that individuals without a
14 Social Security number are still able to work
15 legally in the United States?
16     MR. deBETTENCOURT:  Objection, speculation.
17     **A   I haven't been that deep into those regs in**
18 **a while.  I just simply -- I'm not going to try to**
19 **give you a guess on that, because that's what it**
20 **would be.  I'd have to go look it up.**
21     MS. ODOM:
22     Q   But in your experience, you can't recall a

64

1  situation where an individual was legally empowered
2  to work in the United States, but did not have a
3  Social Security number?
4      MR. deBETTENCOURT:  Objection, form.
5      **A   Yes, I have.  Those have been the diplomats**
6  **I mentioned earlier.**
7      MS. ODOM:
8      Q   Aside from the diplomats?
9      **A   I've also had military attachés and**
10 **military officers training at the naval base in**
11 **Pensacola that, again, did not have, but we had the**
12 **documentation from the country from which they were,**
13 **where they were citizens, that they were legal to**
14 **reside in our apartments while they were attending**
15 **flight school in Pensacola.  So, yeah, there are**
16 **some situations you'll see where you've got foreign**
17 **nationals training at U.S. military facilities or**
18 **diplomats or other special situations.  They're very**
19 **rare.**
20     Q   Have you ever encountered anyone, outside
21 those contexts of diplomacy or military training,
22 where an individual did not have a Social Security

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP

17 (65 to 68)

Conducted on December 20, 2016

---

65

1 number, but they were still able to work and be
2 employed in the United States?
3     MR. deBETTENCOURT: Objection, form.
4   A  Not that I can recall.
5     MS. ODOM:
6   Q  Have you ever looked it up or seen any
7 studies or articles about that?
8     MR. deBETTENCOURT: Same objection.
9   A  Well, as a manner in policy
10 wonk (phonetic), I'm sure I have, but at this moment
11 I can't remember which visas. I spent a lot of time
12 working with those issues when those proposals were
13 first brought up in the early '90s. There was a lot
14 of ground that had to be plowed before those bills
15 became law.
16     MS. ODOM:
17   Q  What is your basis for the statement in
18 your report that, and I quote, any applicant who
19 does not have legal status to work will be unable to
20 obtain employment that can be verified as to
21 duration and amount to permit underwriting?
22   A  Well, it's actually pretty simple. If

---

66

1 you're working for somebody that's breaking the law
2 by employing them, how do you know that anything
3 else they're going to tell you is the truth.
4   Q  I'm not sure I understand that answer. Are
5 you suggesting that if an employer employs an
6 undocumented immigrant, they may also misrepresent
7 that individual's wages or duration of employment?
8     MR. deBETTENCOURT: Objection, form.
9   A  Yeah.
10     MS. ODOM:
11   Q  Have you ever had that happen, in your
12 experience?
13   A  What, where employers have lied to me?
14 Yes.
15   Q  How many times has that happened?
16   A  In these days, electronic verification and
17 backup checking on stuff, it's more rare than it
18 once was, but it still happens with some regularity,
19 where we'll get something that, as we're doing the
20 underwriting, we find doesn't add up.
21   Q  How many instances would you say over the
22 last ten years that has happened?

---

67

1   A  In the assisted arena if you have someone
2 who is materially misstating their income on the
3 downside, meaning understated their income, there
4 are rules and procedures as to how you give them to
5 the HUD Inspector General or the Department of
6 Justice, because they want a referral on them. And
7 most years towards the end of my career we were
8 doing 15 or 20 referrals a year. There's a whole
9 process when you discover someone has misstated
10 things, particularly in assisted, where you have a
11 meeting, there's a whole due process system laid
12 out, and you go through what's essentially an
13 administrative review, and then act based on that.
14 And there are requirements for folks that have
15 materially -- and the threshold is fairly high.
16 It's about $10,000 a year of misstatement -- but
17 you're required to make a referral.
18   Q  How many of those referrals on an annual
19 basis would be for individuals who were foreign
20 nationals or immigrants?
21   A  Comparatively, few. Matter of fact, off
22 the top of my head, I can't remember any in the last

---

68

1 couple of years.
2   Q  So employer misstatements are typically
3 about citizens of the United States as opposed to
4 immigrants or foreign nationals, in your experience?
5     MR. deBETTENCOURT: Objection, form.
6   A  I can't say I have a scientifically
7 developed view of the statistics on it, but either
8 collusion, where an employer lies to us, on either
9 the high side or the low side because they're trying
10 to help somebody out, or where you've got deep
11 assistance programs and somebody is deliberately
12 misstating their income on the low side, which is a
13 federal offense, you know, those situations, in most
14 cases, you're going to be dealing with somebody
15 that's here legally. As I mentioned earlier on in
16 this process today, we did have a raid, it did
17 emerge that somebody was here on forged documents.
18 They looked, at first impression, like they were
19 legitimate. They turned out not to be.
20     MS. ODOM:
21   Q  How did it come to your attention that the
22 documents were forged?

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

18 (69 to 72)

---

69

1        MR. deBETTENCOURT: Objection, form.
2    **A   When my site manager had a conversation**
3    **with the Assistant U.S. Attorney and they were**
4    **starting to work the case up after the raid.**
5        MS. ODOM:
6    Q   In your experience, is there any way to
7    assess whether a document is a forgery, short of
8    talking to the DOJ, for example?
9        MR. deBETTENCOURT: Same objection.
10   **A   Well, most of the documents that we see in**
11   **application processes in recent years have been**
12   **moved to more secure forms of documentation, meaning**
13   **that if you know what you're looking at, it's**
14   **tougher to misrepresent a document than it used to**
15   **be. But I have occasionally seen some mighty good**
16   **forgeries.**
17       MS. ODOM:
18   Q   So how have the document verification
19   processes changed to make it more difficult to pass
20   off a forgery? Can you give me some specifics on
21   that?
22       MR. deBETTENCOURT: Same objection.

---

70

1    **A   Well, I guess the first specific is if you**
2    **reach into your purse and get out your driver's**
3    **license, it looks a lot different than the driver's**
4    **licenses we got when I first started driving 50**
5    **years ago. Mine didn't have a picture on it. It**
6    **didn't have a piece of paper. I'll just give you**
7    **one illustration. This is not directly relevant,**
8    **but I'm getting close. That's my NEXUS card from**
9    Customs (indicating). It has four or five, on each
10   side, infrared, readable security features and all
11   kind of other stuff, including this goofy little
12   globe and all that other stuff. I mean, a lot of
13   the documents you see now are higher security. If
14   you have a passport, you've probably seen the recent
15   ones, and higher security now with an electronic
16   chip in them. So, you know, the documents we see
17   are higher security than they used to be. The one
18   that still is the lowest security on the planet, as
19   near as I can ascertain, is the Social Security card
20   because it's still printed on paper and it doesn't
21   have any security features to it.
22       MS. ODOM:

---

71

1    Q   When you said you've seen some --
2        THE WITNESS: Guys?
3        MS. ODOM: I'm sorry, please go ahead.
4        THE WITNESS: We need a quick break. This
5    is my sister on the phone. She doesn't normally call
6    me. I'm going to step out. I'll be right back.
7        (Off the record.)
8        BY MS. ODOM:
9    Q   So before we took the brief break we were
10   talking about the need to verify someone's sustained
11   legitimate employment as part of the underwriting of
12   a lease.
13   **A   Mm-hmm.**
14   Q   Would an alternative be to verify whether
15   an applicant has reserved funds sufficient to cover
16   the rental amounts for the lease period as opposed
17   to employment?
18   **A   Well, in some cases you will be dealing**
19   **with someone that's either living off assets or has**
20   **transfer payments or things like that, yes,**
21   **particularly when you're dealing with a senior**
22   **citizen that's no longer working, but, again,**

---

72

1    there's ways to verify those sources as well.
2    Q   And would a person's legal status in the
3    United States necessarily be relevant to whether
4    they had reserved funds or assets available to pay
5    the rental amounts?
6    **A   Help me out. I'm trying to understand what**
7    **you're asking here.**
8    Q   Sure. So if the person's legal status is
9    relevant to whether they can get employment and
10   that's part of --
11   **A   Mm-hmm.**
12   Q   -- the risk assessment for a potential
13   lease, my question is --
14   **A   Mm-hmm.**
15   Q   -- do we still care, in underwriting a
16   lease, if the person is legally present in the
17   United States if they've been able to demonstrate
18   the funds available to pay the rental amounts for
19   the lease?
20   **A   You run into the conundrum of if you don't**
21   **underwrite every lease exactly the same way and**
22   **verify the same things, you have the Fair Housing**

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

73

1  exposure.

2      Q   And what statute would that be?

3          MR. deBETTENCOURT: Objection, form.

4      A   I don't carry it around, but you've got

5  the -- I mean, you have three major Fair Housing

6  Acts and you have enough implementation language on

7  that, on the HUD side, that it literally fills

8  books, but the key thing that I've emphasized

9  throughout here, and will continue to emphasize, is

10  that you've got to underwrite every application

11  using the same methodology all the time. In other

12  words, you determine what your steps are to

13  underwrite it, you follow the steps, you verify

14  things in regard to those steps. You literally step

15  through the process the same way for every

16  applicant. Now, sources of income will vary, but

17  you follow the process consistently for every

18  applicant.

19          MS. ODOM:

20      Q   Is a Social Security number required to

21  verify the identity of a prospective applicant?

22      A   It's one of the pieces of information

74

1  you're generally going to use. You'll generally be

2  using date of birth as well, because most of the

3  commercial databases that we use to do verifications

4  are going to trigger off of those two items. And if

5  you get a false positive, those are the two items

6  that you start looking at to determine why you might

7  have a false positive.

8      Q   Are there other pieces of information that

9  could be used?

10      A   Well, typically, you're also going to use

11  the last -- depending on their tenure, most of the

12  commercial systems that I'm aware of that we use to

13  do our verifications, are going to look at the last

14  somewhere between five and seven years worth of

15  residences, and they're going to look at the credit

16  files, and the credit files are going to show names,

17  addresses, residences, positions, and what have you

18  in them, so it's all part of a blend. And then,

19  finally, when you get to the last piece, which is

20  checking on your criminal history and the sex

21  offender registries, you're going to need those

22  because you'd be surprised how many false positives

75

1  we come up with of those, and that's where Social

2  Security numbers and dates of birth become really

3  important, because you can get multiple people with

4  the same name and they'll pop up, and you have to go

5  isolate whether it's the person that you're looking

6  at is the right person.

7      Q   So is a Social Security number used to pull

8  up an individual on a sex offender registry or to

9  pull up some sort of criminal file?

10          MR. deBETTENCOURT: Objection, compound.

11      A   Depends on the state, depends on the

12  locality, depends how they design the database.

13          MS. ODOM:

14      Q   Are you familiar with the Yardi company?

15      A   I am.

16      Q   How are you familiar with Yardi?

17      A   For several years, for one of our big

18  owners, we used the Yardi product suite.

19      Q   Was that Mid-City or Edgewood?

20      A   It was Edgewood.

21      Q   Does Edgewood still use Yardi?

22      A   We don't have those buildings anymore. We

76

1  were doing work for our colleagues at a major super

2  regional bank, that I'd prefer not to identify, and

3  they took back a portfolio of 15 properties, and

4  this particular bank used -- Yardi also does banking

5  and financial industry back-office software. Do you

6  understand what I mean by that?

7      Q   I do.

8      A   Okay. Yardi has a suite of back office and

9  this particular client wanted us to use Yardi on the

10  front end because it uploaded to their back office

11  more easily.

12      Q   Does Mid-City and Edgewood currently use an

13  entity like Yardi to perform background checks on

14  prospective tenants?

15      A   At this point we use exclusively RealPage

16  software. We don't use -- RealPage is one of

17  Yardi's competitors.

18      Q   Are you familiar with CoreLogic?

19      A   I've heard the name. Beyond that, I'm not.

20      Q   Does RealPage require a Social Security

21  number to run a criminal background check?

22      A   Bearing in mind it's been a couple of years

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP

20 (77 to 80)

Conducted on December 20, 2016

---

77

1  since I've been inside that program, last time I
2  looked that's one of the designators that's built
3  into it, because it picks it up off of the
4  applications automatically.
5       Q   My question is a little bit different.  The
6  question was whether a Social Security number is
7  required to be input for the program to run?
8       MR. deBETTENCOURT:  Objection, form.
9       A   Remember, you get to customize the user
10  interface with all these software programs, and our
11  interface was customized so that it did require a
12  Social Security number.
13      MS. ODOM:
14      Q   Do you have any opinion on whether Yardi is
15  a good quality company?
16      MR. deBETTENCOURT:  Objection, form.
17      A   I have friends who are either still senior
18  executives there or recently-retired senior
19  executives there and I hold them in very high
20  regard.  It's a quality company run by quality
21  people.
22      MS. ODOM:

---

78

1       Q   Is a Social Security number able to reveal
2  an applicant's past five to seven years of
3  residences?
4       A   You're going to need to help me out what
5  you're going for there because the Social Security
6  number and underwriting leasing systems I'm familiar
7  with is only one piece of the database you feed to
8  it as it goes out and does its lookup.
9       Q   Okay, so my question is -- you mentioned as
10  part of the verification of a tenant's identity in
11  underwriting the lease --
12      A   Right, right.
13      Q   -- you get their Social Security number,
14  you get their date of birth, and you said you also
15  look at their past five to seven years of
16  residences; is that right?
17      MR. deBETTENCOURT:  Objection, form.
18      A   We will ask them what their most recent
19  three residences have been, because we're going to
20  want to pick that up and compare it.  Again, all of
21  this is part of when you get the report back, if
22  some data elements don't match, it flags it, and you

---

79

1  have to look further to see why you're getting the
2  flag.
3       MS. ODOM:
4       Q   But is a Social Security number able to
5  reveal anything about prior residences?
6       MR. deBETTENCOURT:  Objection, form.
7       A   On its own, as a number, and not knowing
8  how the software company set the algorithm up, I
9  can't answer that, because these days all of that
10  stuff is driven off of these big proprietary
11  algorithms.  And even if you're their customer, they
12  won't let you see how exactly the black box works.
13      MS. ODOM:
14      Q   Is a Social Security number required to run
15  a credit check?
16      MR. deBETTENCOURT:  Objection, form.
17      A   There was a time, when I was doing business
18  with TRW, that you wouldn't get one back if you
19  didn't feed them one.  I think these days, with the
20  RealPage vendors that we have, that may no longer be
21  the case.  I haven't looked at the issue in a while.
22  You have to understand I go so far back that when I

---

80

1  did credit checks when I was first a site manager 45
2  years ago, you literally called somebody and you
3  could hear them rifling, on the other end of the
4  phone, through a card index, and they read you what
5  they have.  These days it's all done inside these
6  big algorithms and we don't see much of what it is.
7  The site staff just gets a green, yellow or red
8  indicator and handles it based on that.  I mean, the
9  system has been so thoroughly automated now, that
10  you don't see inside the black box anymore.  I don't
11  know precisely how the black box works.
12      MS. ODOM:
13      Q   Do you know whether an ITIN number can be
14  used to run a credit check?
15      A   Against, since I'm using integrated systems
16  and I'm not running stand-alone credit checks
17  anymore, I can't speak to that.
18      Q   So you just don't have an opinion one way
19  or another on that?
20      MR. DeBETTENCOURT:  Objection,
21  mischaracterize.
22      A   (No verbal response.)

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    21 (81 to 84)
Conducted on December 20, 2016

---

81

1    MS. ODOM:
2    Q    Why is it necessary to separately
3 underwrite every adult in a household?
4    MR. deBETTENCOURT: Objection, form.
5    **A    In most cases the leases that we write are**
6 **called joint and severals.  You're a lawyer.  You**
7 **know what a joint and several lease is, so...**
8    MS. ODOM:
9    Q    So to make sure I understand your opinion
10 right, it seems to be your testimony that you
11 underwrite separately every adult applicant, so that
12 each individual over the age of 18 in the household
13 can be held responsible to pay the lease?
14    MR. deBETTENCOURT: Objection,
15 mischaracterize.
16    MS. ODOM:
17    Q    Is that right?
18    **A    We use joint and several leases, so we**
19 **underwrite on the basis that under the joint and**
20 **several provisions we can collect.  Not everybody**
21 **uses joint and several leases.  We do.**
22    Q    Are you aware of any landlords or

---

82

1 residential property management companies in
2 northern Virginia that do not use joint and several
3 leases?
4    **A    I'm going to answer that in a very**
5 **elliptical way, and that is I specifically don't get**
6 **into those kinds of conversations with my colleagues**
7 **in Virginia or Maryland, because all of us are of a**
8 **certain age and remember what happened to two big**
9 **management companies that still exist, and I'm not**
10 **going to embarrass them by naming them, when the**
11 **Justice Department came after them for antitrust for**
12 **discussing how they went about their business, and**
13 **ruined three people's careers.  So the short answer**
14 **is I studiously avoid those conversations when I'm**
15 **having lunch with my friends because there's some**
16 **things you never talk about.  You never talk about**
17 **how you price your management services, you never**
18 **talk about how you write leases, and you never talk**
19 **about anything that can be deemed antitrust or**
20 **collusive behavior.  And I'm sure, as a member of**
21 **the Bar, you understand exactly why I do that.**
22 **There's some subjects you don't discuss.**

---

83

1    Q    And how you write leases is one of the
2 subjects that is avoided?
3    **A    How you write leases is one of the subjects**
4 **that I studiously avoid, yes.**
5    Q    So to the extent that you are giving an
6 opinion in your report about how to underwrite a
7 lease, it comes from your own personal experience
8 over your career?
9    **A    It comes from the leases I underwrite or in**
10 **firms I control or am executive in.**
11    Q    And not in any way from information that
12 you've obtained from anyone else in the residential
13 property management business?
14    **A    (Inaudible.)**
15    MR. deBETTENCOURT: Objection, form.
16    Sorry.  Sorry, Mr. Caruso.
17    Objection, form.
18    THE WITNESS: Got it.
19    MR. deBETTENCOURT: You may answer.
20    **A    We don't have -- we don't sit and have**
21 **conversations about that.**
22    MS. ODOM:

---

84

1    Q    And included in how an entity may write a
2 lease would be what documents that entity requires
3 from its prospective tenants to apply?
4    **A    Mm-hmm.**
5    MR. deBETTENCOURT: Objection, form.
6    MS. ODOM:
7    Q    And how an entity may assess whether an
8 individual is legally present within the United
9 States?
10    MR. deBETTENCOURT: Same objection.
11    **A    I've been to some training forums where**
12 **there's been generalized discussions about this is**
13 **how you're going to need to report on this and this**
14 **is what they're going to look at if they challenge**
15 **you, and the they in this case being a regulator.**
16 **So, yeah, from time to time I've been to legal**
17 **updates on that, where the regulators have shared**
18 **what they want to see.**
19    MS. ODOM:
20    Q    Does Edgewood and Mid-City write joint and
21 several leases where one adult in the household is
22 unemployed?

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    22 (85 to 88)
Conducted on December 20, 2016

85

1          MR. deBETTENCOURT: Objection, form.

2     **A    You're going to need to parse that question**
3  **more carefully.  On the conventional side we may**
4  **well do it.  On the assisted side there's a whole**
5  **set of rules and there is literally an 800-page**
6  **manual about how you write leases with family**
7  **compositions on members over 18 that we have to**
8  **comply with.**

9          MS. ODOM:

10    Q    Okay.  So let's take it on the non-assisted
11 side.  So for --

12    **A    Mm-hmm.**

13    Q    -- properties or complexes that don't
14 receive financial assistance from the government.

15    **A    Mm-hmm.**

16    Q    If you have, let's say, a couple that
17 applies --

18    **A    Mm-hmm.**

19    Q    -- for a lease, and let's say the male is
20 employed, but the female is a stay-at-home parent,
21 for example, would Mid-City or Edgewood write such a
22 lease?

86

1          MR. DeBETTENCOURT:  Same objection.

2     **A    The short answer would be probably, if the**
3  **income was sufficient, and the duration -- and**
4  **the -- the employment history was steady enough that**
5  **we didn't regard it as an untoward risk.**

6          MS. ODOM:

7     Q    Okay.  Same question if you have a pair of
8  applicants on the non-assisted side, and you have
9  one individual, who is able-bodied and working, and
10 you have one individual who's disabled and not
11 receiving disability income and not able to work,
12 would that lease be written as well under those same
13 conditions that you stated?

14         MR. deBETTENCOURT:  Same objection.

15    **A    That would get looked at a lot more**
16 **carefully and taken apart, because it's been my**
17 **experience you have almost nobody that's fully**
18 **disabled that doesn't have some form of transfer**
19 **payment coming to them.**

20         MS. ODOM:

21    Q    Why would that be looked at more carefully?

22    **A    Well, if they're saying -- if somebody is**

87

1  **disabled and there's no transfer of payments, that**
2  **immediately raises the flag, wait a minute, are they**
3  **getting SSI or some other form of transfer payment,**
4  **and they're not declaring it because it would raise**
5  **their family contribution.**

6     Q    But, again, just to remind you, we're
7  discussing on the non-assisted side.

8     **A    Yeah, okay.  On the non-assisted side we'd**
9  **probably still take a quick look at it, but I think**
10 **if the one who is employed had enough income that**
11 **they could cover it, yeah, but bear in mind, our**
12 **policy is we also make sure that people are here**
13 **legally.**

14    Q    Well, same question and the same premise,
15 on the non-assisted side if you have, let's say, a
16 parent who applies, alongside a 19-year-old,
17 unemployed child, would such a lease be written even
18 though the child over the age of majority was
19 unemployed?

20    **A    Is the child a student?**

21    Q    Let's assume no.

22    **A    Again, you take -- I'll take it apart.  And**

88

1  **if it's an adult child living at home, again, if**
2  **the -- well, we're going to get down in the weeds.**
3  **Is that adult child on the lease as a leaseholder or**
4  **are they on the lease as another adult present in**
5  **the household?**

6     Q    As another adult present in the household.

7     **A    Well, that means they're not responsible**
8  **for payment of the rent.**

9     Q    Okay.  So --

10    **A    And they don't have any hold over tenancy**
11 **rights either.**

12    Q    So just to make sure I understand the
13 details of the joint and several leases that we're
14 discussing, that Edgewood and Mid-City write, even
15 though every adult in the household must submit an
16 application, it can be the case that only one adult
17 is actually responsible for payment of the lease?

18         MR. deBETTENCOURT:  Objection, mis --

19    **A    No, they're both responsible for payment --**
20         MR. deBETTENCOURT:  Sorry, Mr. Caruso.
21         THE WITNESS:  Go ahead.
22         MR. deBETTENCOURT:  Objection,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP 23 (89 to 92)
Conducted on December 20, 2016

---

89

1  mischaracterize.
2      You may answer.
3      **A    That was where I was going.  You gotta be**
4  **careful about that and that's far too general an**
5  **answer.  You've gotta make sure that the lease is**
6  **going to get paid.  And, again, since it's a joint**
7  **and several, you can collect against everybody**
8  **whether they have income or not.**
9      MS. ODOM:
10     Q    Even if one individual is a resident and
11 one individual --
12     **A    If they're a person on the lease, you're**
13 **going to take everybody to court, not just the**
14 **person who has a job.**
15     Q    Should it be different in the case of a
16 husband, for example, who meets all the underwriting
17 requirements, but his wife is unable to, even though
18 she's only a resident?
19     MR. deBETTENCOURT: Objection, form.
20     **A    If it's a spouse, we probably wouldn't cut**
21 **the lease where they're only a resident.  We want**
22 **everybody to meet all the requirements.  That**

---

90

1  **doesn't necessarily equate to she has to have a job,**
2  **but it means she has to meet all the other**
3  **requirements.**
4      MS. ODOM:
5      Q    So to make sure I understand your answer,
6  Edgewood and Mid-City would not terminate a lease if
7  a male met all of the underwriting requirements,
8  including legal status in the U.S., but the wife,
9  who was only listed as a resident in the home, did
10 not meet the same requirements?
11     MR. deBETTENCOURT: Objection,
12 mischaracterize.
13     MS. ODOM:
14     Q    You can answer.
15     **A    Well, as Counsel said, you're**
16 **mischaracterizing it.  You've gotta be cautious**
17 **there, and that is if the other adult present,**
18 **meaning the wife, if they're not here legally, under**
19 **the tenant selection plans we use, since they're**
20 **consistent on both sides of the business, we're not**
21 **going to cut a lease for her.**
22     Q    I'm not sure -- I'm not sure we're talking

---

91

1  on the same terms.  So if you have --
2      **A    I don't want to be accused of -- I don't**
3  **want to be accused of disparate policies on the**
4  **assisted versus the conventional side.  We use one**
5  **set of policies.  We've chosen to adopt the federal**
6  **standard across the board.**
7      Q    Okay.  Well, I'd like to -- what I'm trying
8  to do is just understand the contours of the
9  opinions that you've offered in the case.
10     **A    Mm-hmm.**
11     Q    And so in that vein, I'd like to ask you to
12 consider this hypothetical, which I'll go ahead and
13 lay out.  If you have a property that's not assisted
14 and it doesn't have a side of the business that is
15 assisted, there's no -- there's not going to be a
16 claim of disparate treatment on the assisted versus
17 non-assisted side, and that property writes a lease
18 for a male applicant, who meets underwriting
19 criteria, and the only reason why a lease is being
20 terminated is because that individual's wife is
21 undocumented, would that be something that Mid-City
22 and Edgewood would terminate a lease for?

---

92

1      MR. deBETTENCOURT: Objection, form.
2      **A    Was the wife there -- was the wife there**
3  **originally when the lease was first cut?**
4      MS. ODOM:
5      Q    Well, under our hypothetical the wife has
6  always been present in the home, but there's been a
7  recent policy change that required her to be listed
8  on the lease as a resident.
9      MR. deBETTENCOURT: Objection, form.
10     **A    Okay, so, hypothetically -- not how I do**
11 **it, but, hypothetically, there's been a policy**
12 **change and now all the adults have to be on the**
13 **lease.  If your policy is that all adults having to**
14 **be on the lease also have to reside here legally,**
15 **you would not lease in that circumstance because**
16 **it's a violation of the admission standards you've**
17 **adopted.  You've got to be consistent against your**
18 **admission standards.**
19     MS. ODOM:
20     Q    Okay, well, again, we're talking about an
21 existing lease.  We're talking about a lease that
22 existed before a policy emerged requiring the wife

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

24 (93 to 96)

93
1  to be on the policy.
2     A   Which means that the next time the lease
3  comes up for its annual renewal, they have to meet a
4  different set of standards because you've changed
5  your tenant selection standards, which means that
6  potentially that lease wouldn't be renewed if it
7  didn't meet the new standards.
8     Q   Is that a reason for nonrenewal that
9  Edgewood or Mid-City would put forward?
10       MR. deBETTENCOURT: Objection, form.
11    A   We were talking a hypothetical, not
12  Edgewood and Mid-City, because Edgewood and Mid-City
13  follow the federal rule. She wouldn't have gotten
14  there to begin with because we would have made sure
15  when we initially -- since 19, I don't know, 94,
16  when these regs came in, we've underwritten
17  everybody the same way.
18       MS. ODOM:
19    Q   Have you read the Complaint in this case?
20    A   Nope, I have not. I have not.
21    Q   Do you think that the information contained
22  in the Complaint may be relevant to your opinion?

94
1     A   I was asked a fairly narrow set of
2  questions, and that is what do you think is the
3  appropriate set of standards --
4        MR. deBETTENCOURT: Mr. Caruso, to the
5  extent --
6        THE WITNESS: Go ahead.
7        MR. deBETTENCOURT: -- to the extent this
8  question calls for any communications with counsel,
9  I'm going to instruct you not to answer. You may
10  answer the question outside of -- outside of that.
11  And I'm instructing you not to answer on the basis of
12  privilege.
13    A   Then I think we have our answer.
14       MS. ODOM:
15    Q   So I want to make sure I understand the
16  extent of the opinions that you're offering in this
17  case.
18    A   I'll be happy to let you understand it in
19  three minutes.
20       MS. ODOM: Okay. We'll go off the record
21  and take a quick break.
22       (Off the record.)

95
1        BY MS. ODOM:
2     Q   I wanted to go back to what was the
3  question that you were asked to answer in your
4  report?
5        MR. DeBETTENCOURT: Objection.
6        To the extent that this question calls for
7  communications between counsel, on the basis of
8  privilege, I'm going to instruct you not to answer.
9     A   I would be following the lawyer's
10  instructions.
11       MS. ODOM:
12    Q   Are you able to tell me anything about what
13  the purpose of your report is?
14       MR. deBETTENCOURT: Mr. Caruso, you can
15  discuss the facts and data you relied on in your
16  report, the opinions that you came to in your report,
17  but the communications with counsel about your report
18  are privileged under Rule 26.
19       THE WITNESS: Okay.
20    A   Very generally, the questions that were
21  posed to me are what is your normal practice and
22  what do you believe to be the industry practices,

96
1  and that's what I -- that's what I discussed, those
2  three basic elements that all tie together.
3        MS. ODOM:
4     Q   And I believe, as you testified earlier,
5  and I don't want to misstate it, so please correct
6  me if I'm wrong, but your relation of what industry
7  practice is is based on your own personal knowledge
8  over your career; is that right?
9        MR. deBETTENCOURT: Objection, mischarac --
10    A   That's correct.
11       MS. ODOM:
12    Q   Because it's not advisable or possible to
13  discuss things like how to write a lease with other
14  property management companies?
15       MR. deBETTENCOURT: Same objection.
16    A   As I said earlier, I saw some friends'
17  careers end up in flames over those discussions, so,
18  yes, I've been very careful about that.
19       MS. ODOM:
20    Q   So we've mentioned a few times, in the
21  1990s there became legislation about fair housing,
22  and I want to make sure that we're talking about the

97

1  same act. Are you referring to the Personal
2  Responsibility and Work Opportunity Reconciliation
3  Act of 1996?
4      MR. deBETTENCOURT: Objection, form.
5      MS. ODOM:
6   Q   It's called PRWORA colloquially.
7   A   I'd have to go stick my head -- was the
8  principal sponsor on that Henry Hyde?
9   Q   I can look and check.
10  A   The reason I say that is we've always
11 called it internally the Hyde bill, but
12 Representative Hyde was chairman of the committee.
13 You know, I've had to deal, over the years, with all
14 these long acronyms that they invent over on the
15 Hill and I've gotten to the point where,
16 unfortunately, I know most things by bill numbers,
17 not by bill titles, because it's just easier. I
18 think, but can't guarantee, we're talking about the
19 same thing.
20  Q   And your opinion and testimony is that
21 federal regulations require entities who receive
22 deep assistance to check legal status of tenants?

98

1      MR. deBETTENCOURT: Objection,
2  mischaracterize.
3   A   Among other places, that's a requirement in
4  the HUD Occupancy Handbook, 4350.3. It's also a
5  requirement in the HUD Public Housing Handbook of
6  similar type. I don't remember the PIH.
7      THE WITNESS: That's -- for our recorder,
8  that's Public and Indian Housing. Sorry I was
9  engaging in HUD speak.
10  A   PIH also has a manual that relates to a
11 different manual number, but that's a requirement of
12 the 4350.3, which goes upwards and connects with the
13 legislation.
14     MS. ODOM:
15  Q   Do you know whether PRWORA that was passed
16 in 1996 regulates Waples Mobile Home Park?
17     MR. deBETTENCOURT: Objection, form.
18  A   Without sitting down and reading the bill,
19 I wouldn't be able to answer that.
20     MS. ODOM:
21  Q   And same answer as to whether it applies to
22 any of the other A.J. Dwoskin properties?

99

1      MR. deBETTENCOURT: Objection, foundation.
2   A   Yup, I would have to research that
3  specifically. I don't want to guess. I don't do
4  guessing, or at least I don't guess very well.
5      MS. ODOM:
6   Q   Do the HUD manuals that you have been
7  describing regulate Waples Mobile Home Park?
8   A   Again, not knowing the financial structure
9  underlying it, I don't -- I can't answer that.
10  Q   What would you need to know to be able to
11 answer that question?
12  A   At the minimum, I'd need to know how the
13 deal is financed, who holds the notes, and what
14 forms of assistance, if any, are granted, and
15 whether or not there's any -- you can get swept into
16 these requirements by having community development
17 block grant money in a property, you can get swept
18 in by having CBE money in the property. You can
19 get -- there's a number of ways you can get swept
20 into compliance on these rules by accepting various
21 funds for various things, including infrastructure
22 work. So without actually sitting and looking at

100

1  the documents, I would decline to speculate.
2   Q   Well, what types of documents would we look
3  at for the Waples Mobile Home Park?
4      MR. deBETTENCOURT: Objection, form.
5   A   You'd probably start with the
6  partnershipping (phonetic). Number one, I don't
7  know if it's a partnership or corporation, or an
8  LLC, so you need to figure out what the entity is
9  for starters. And then you start taking a look at
10 what the financing is on it, and you look and see if
11 there's any inbound money from a local agency that
12 takes federal money, from a state agency that takes
13 federal money, or from a federal agency. You'd have
14 to look, generally, at all of those when you start
15 doing it. I know how our deals are structured and
16 where they are. And the reason we came to the
17 decision we did was we wanted a one-size-fits-all,
18 so as to not drive our staff crazy. And what we do,
19 as I said before, is we went to the most
20 restrictive, complying with the federal rules for
21 everything we operate.
22     MS. ODOM:

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 28 of 73
PageID# 11960
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP    26 (101 to 104)
Conducted on December 20, 2016

101

1    Q    Would part of that staff be property
2  managers?
3    A    Yeah, site managers.
4    Q    So would you expect site managers to know
5  whether a HUD manual applies to a particular
6  property?
7        MR. deBETTENCOURT:  Objection, form.
8    A    I can't speak -- I can't speak for other
9  companies.  I can say that over the nature of my
10 career, I want my site managers to know how they're
11 regulated and I want them to know the particulars.
12 Having said that, I am unusual in this business in
13 the sense that I also share with my site managers
14 something a lot of my colleagues do not.  My site
15 managers know how the properties are financed and my
16 site managers have access to budgets and payrolls.
17       MS. ODOM:
18    Q    How do you know that your colleagues in the
19 industry do not share that financial information
20 with property managers?
21    A    I've been in enough meetings and lunches
22 with colleagues, where we've discussed budgeting

102

1  matters and other things, that there's a wide
2  variance among firms as to what site managers and
3  first-level supervisors know and what they don't
4  know in terms of how the company is organized and
5  how things are done.  Various owners have various
6  policies on that.  We take a very liberal view, but
7  we make it very clear to our folks that all this is
8  considered confidential information, and they're
9  going to be sitting in my office, having a career --
10 a potentially career-changing discussion if any of
11 that material is shared outside of the company, but
12 not everybody takes as broad a view as I do.
13    Q    Do the HUD manuals regulate any A.J.
14 Dwoskin policy or property, to your knowledge?
15       MR. deBETTENCOURT:  Objection, form.
16    A    Don't know.  Can't answer without knowing
17 how they're structured.
18       MS. ODOM:
19    Q    In your own personal assets that you have
20 in management --
21    A    Mm-hmm.
22    Q    -- do you have a policy related to the

103

1  verification of an individual's legal status in the
2  United States?
3        MR. deBETTENCOURT:  Objection, asked and
4  answered.
5        MS. ODOM:
6    Q    You can answer.
7    A    Because it's more convenient for me to do
8  so, I run all of my tenancy checks through the
9  company, rather than buying separate licensing.  So
10 the short answer is that my tenants get subjected to
11 the same standards as anybody that leases from
12 Edgewood.
13    Q    Give us just one second, Mr. Caruso.  I
14 think we're just about done.
15    A    Sure.
16    Q    But let me check with my colleague.
17    A    Okay.
18    Q    One last question for you.  Do you have an
19 opinion on whether undocumented tenants are any more
20 dangerous or likely to be a risk to the safety of
21 the community than documented individuals?
22    A    With all due respect, Counselor, that's

104

1  kind of like asking, when did you stop beating your
2  wife to a politician.
3    Q    Well, respectfully, I think it is a little
4  bit different.  Do you have any experience that
5  leads you to believe they're more dangerous?
6        MR. deBETTENCOURT:  You may continue,
7  Mr. Caruso.
8    A    It's been my experience that I can have --
9  I got -- I'm very blessed to have the vast majority
10 of the folks that live with us are good people and
11 do the right thing all the time.  We have some
12 number of rogues, fools, thieves, and bad actors
13 among us.  I've never differentiated as to whether
14 or not they're here legally or not, because the
15 bottom line is if you're dealing drugs on one of my
16 properties, you're going to be off of my properties.
17 If you're assaulting somebody, you're going to be
18 off of my properties.  And whether you're here
19 legally or not is not going to be one of the first
20 considerations in my mind.  The first consideration
21 in my mind is you're going.  So that may be an
22 elliptical answer, but that's what it comes down to.

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

27 (105 to 108)

---

105

1 I haven't studied the statistics. So there you are,
2 Joy.
3     MS. ODOM:
4    Q   So if I understand your answer, you don't
5 have any specialized -- or knowledge one way or
6 another as to whether undocumented immigrants pose a
7 greater risk to safety than documented tenants?
8     MR. deBETTENCOURT: Objection,
9 mischaracterize --
10     (Simultaneous conversation.)
11    A  (Inaudible.)
12     MS. ODOM:
13    Q  Do you have any --
14     (At which time the court reporter requested
15 clarification regarding the answer.)
16    A  Well, let's just go with the objection, but
17 we have bad behavior. I don't try to parse it
18 between people that are here legally and people that
19 are not. Bad actors are going to go out of my
20 properties.
21     MS. ODOM:
22    Q  Mr. Caruso, do you have any specialized

---

106

1 knowledge as to whether crime rates are higher or
2 lower in an undocumented immigrant population as
3 opposed to citizens or documented immigrants?
4    A  We, from time to time, as part of our
5 reporting to ownership, look at major crimes and we
6 work with the police agencies of all the places
7 where I work. And it has been my experience that
8 criminal behavior is more tied to lack of income and
9 lack of education than just about any other index
10 you're going to find.
11    Q  Do you have any specialized knowledge as to
12 whether undocumented tenants are any more likely not
13 to pay rent?
14    A  Meaning do I have empirical knowledge of
15 that?
16    Q  Sure. Let's start there.
17    A  No, I don't have empirical data on that.
18    Q  Do you have any sort of data on that?
19    A  Occasional conversations over lunch with
20 some of my colleagues, but none of it would rise to
21 the level of even the most basic scientific rigor.
22    Q  Have you researched it otherwise in any

---

107

1 capacity?
2    A  On a fairly regular basis, when we do
3 refinancings, we have to submit with the refinancing
4 applications evaluations of crime in both the
5 neighborhood and in our particular properties,
6 because that's reviewed as part of grant-making and
7 other decisions, so there have been instances where
8 I've had to get intensively into data. I have also
9 had to respond to, in the District of Columbia,
10 petitions to seize property over criminal behavior
11 on properties for some of my fee owners. Not to
12 make a long answer out of it, the Assistant U.S.
13 Attorneys have a statute in D.C. that allows them to
14 initiate procedures to seize property if they see
15 that the owner is not combatting crime and drugs
16 effectively, and I've had to respond to some of
17 those complaints post raids.
18    Q  Did the data that you're referring to in
19 that answer relate in any way to an undocumented
20 immigrant subset of the population in either the
21 communities of Mid-City and Edgewood or outside?
22    A  Among the data you have to pull is you have

---

108

1 to get with the police agencies, pull the arrest
2 records, and pull the backgrounds on the arrest
3 records, in some cases your lawyers will be looking
4 at the court records, so occasionally,
5 coincidentally, it will pop up as to what status
6 might be. In most cases it's going to be
7 demonstrating that you are taking the necessary
8 steps not to admit people to a property who are
9 likely to prey on other people and who are not going
10 to be in there distributing drugs and in there
11 distributing -- in the case of the District, in the
12 case of Maryland, in there distributing weapons.
13 Virginia has much different set of rules regarding
14 weapons than do the District and Maryland and New
15 Jersey.
16    Q  But did those efforts to collect and report
17 data tell you anything or enable you to learn
18 anything about whether undocumented immigrants are
19 more likely to be violent, for example, than a
20 documented person?
21     MR. deBETTENCOURT: Objection, form.
22 I haven't seen any data leaping off the

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

---

109

1  page speaking one way or the other to it.  The only
2  corollary that I would suggest, because I have seen
3  this, is to the extent someone is working in the
4  black economy, it makes them more prey to earning
5  their living in inappropriate ways, meaning if the
6  only job you can get is one distributing drugs or
7  moving illegal weapons or stealing automobiles, you
8  might see a correlation.
9       MS. ODOM:
10      Q    Is it your opinion that individuals engaged
11  in those criminal enterprises are more likely to be
12  undocumented immigrants?
13      MR. deBETTENCOURT:  Objection, form.
14      A    No, I didn't say that.  I just said if you
15  can't get legitimate employment otherwise.  Now,
16  there's a lot of reasons why you might not be able
17  to get legitimate employment otherwise, not least of
18  which is you've recently been released from prison,
19  not least of which is you don't have an education,
20  not least of which is a number of things, but, you
21  know, recognizing that I've had to spend a lot of
22  the last 30 years fighting drugs and other things in

---

110

1  properties, we see that when we are on the back side
2  of a raid and trying to make sure that we don't
3  admit those kinds of folks again.
4       MS. ODOM:
5       Q    Do you have any specialized knowledge as to
6  whether undocumented tenants are more likely to
7  leave a property without giving appropriate notice
8  to the landlord?
9       MR. deBETTENCOURT:  Objection, form.
10      A    I don't think I have a strong opinion one
11  way or the other on that.
12      MS. ODOM:
13      Q    Setting aside whether you have an opinion
14  on it, do you have any knowledge about it?
15      MR. deBETTENCOURT:  Same objection.
16      A    Our underwriting process is strict enough
17  that the rate of skips, meaning people leaving,
18  owing you money, or just disappearing in the middle
19  of the night -- the rate of skips we have is a very
20  low number.  It's down in the single digits, and I
21  mean well down in the single digits, so the answer
22  is, by and large, we don't have much in the way of

---

111

1  skips, but we attribute that, for the most part,
2  that we are pretty careful on admits.
3       MS. ODOM:
4       Q    Outside the Edgewood and Mid-City context,
5  are you aware of whether skips, as you put it, are
6  more likely to be undocumented immigrants?
7       A    I don't really have any data on it because
8  I haven't had any conversations with any of my
9  colleagues on it one way or the other.
10      Q    Do you have any specialized knowledge as to
11  whether it's more difficult to properly identify a
12  prospective tenant?  And for reference, I'm looking
13  at page 2 of your report, where it discusses the
14  fundamental part of underwriting a lease application
15  is having proper identification of the applicant.
16      MR. deBETTENCOURT:  Objection, form.
17      You may answer.
18      A    You need to know who they are and you need
19  to be able to determine what their payment history
20  is and what have you.
21      MS. ODOM:
22      Q    Is it your opinion that you're unable to

---

112

1  determine identity and payment history on an
2  undocumented immigrant?
3       MR. deBETTENCOURT:  Objection,
4  mischaracterize.
5       THE WITNESS:  I think you said it nicely.
6       A    That does mischaracterize my view a little
7  bit.  What it comes down to is it's much more
8  difficult to get data because you don't know where
9  to find it and you can't do a sufficient background.
10      MS. ODOM:
11      Q    Do you have any specialized knowledge as to
12  what information is required to pull up an
13  individual on the sex offender registry?
14      MR. deBETTENCOURT:  Objection, form.
15      A    We've talked about that earlier.  It varies
16  widely by state and locality, so depending on where
17  you're operating and depending what you're trying to
18  pull, you may have to follow a different procedure.
19      MS. ODOM:
20      Q    Do you have any specialized knowledge as to
21  whether a Social Security number is ever required,
22  no matter what state you're in, to pull up an

---

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

29 (113 to 116)

---

113

1  individual on the sex offender registry?

2      MR. deBETTENCOURT:  Same objection.

3      A    The records I've seen are generally, among

4  other things, going to have that number in among a

5  bunch of other data, not least of which it will also

6  have convict numbers if they've served time, but

7  it's going to have other identifying data.  It's

8  going to have data of birth.  And in most cases you

9  can have most of the data that's on the booking

10 sheet, too, plus, in a lot of instances, you're

11 going to have online availability for mugshots.

12 You've got to be especially careful with sex

13 offender data because the data, you can get false

14 positives real easily, and you don't want to accuse

15 someone of something that's not true, so you gotta

16 be really careful on vetting out those records.

17     MS. ODOM:

18     Q    Is a Social Security number necessary to

19 vet those records?

20     MR. deBETTENCOURT:  Objection, form.

21     A    Once again, since everybody does their

22 files differently, I can't tell you how important it

---

114

1  is vis-à-vis the other pieces of information without

2  you saying, okay, in Fairfax County what do you have

3  to have, and then I have to go look up what I have

4  to do in Fairfax County, because that's -- the

5  process is inherently local and it varies enough

6  that you can't make broad generalizations about it.

7      MS. ODOM:  All right, thanks, Mr. Caruso.  I

8  think that's it for me.  I'm not sure if

9  Mr. deBettencourt has anything.

10     MR. deBETTENCOURT:  Mr. Caruso, I do have a

11 couple questions.  Actually, I'm going to take just a

12 two-minute break here.

13     MS. ODOM:  Sure.

14     MR. deBETTENCOURT:  And then I'll have some

15 questions for you, Mr. Caruso.  So we're going to

16 take a break and then I'll have a couple questions.

17     (Off the record.)

18 EXAMINATION BY COUNSEL FOR THE DEFENDANTS

19     BY MR. deBETTENCOURT:

20     Q    Hi Mr. Caruso, this is Justin

21 deBettencourt.  I just have a couple questions to

22 follow up on Counsel's questions.  Isn't it true

---

115

1  that in the conventional, non-assisted, and non-HUD

2  context it's a reasonable practice to require proof

3  of legal status as part of an application process?

4      A    I think so.

5      Q    And why does that opinion that you just

6  gave, that you think so, apply to the conventional,

7  non-assisted, and non-HUD context?

8      A    Well, a couple reasons, Justin.  Number

9  one, particularly when you get into medium-sized and

10 larger firms, you have to be very careful to be dead

11 consistent about everything you do, or else you're

12 going to be facing all kinds of issues all the time.

13 As I said earlier, I've worked, in the last 25 years

14 or thereabouts, in mixed portfolio companies, where

15 we had both unassisted and assisted, and we've

16 always adopted the more restrictive set of standards

17 just because it gives us the consistency and doesn't

18 create Fair Housing problems.  You've gotta -- you

19 know, you have to be very cautious in terms of how

20 you operate in relation to confidentiality support,

21 good vetting support.  You want good residents and a

22 good solid community, and you need to make sure

---

116

1  everybody else is safe.  So the long and short of it

2  is I think it's part of the whole package.  And it

3  became more so when Congress made the changes and

4  made it illegal to give anybody work unless they

5  were here legally.  So you kind of look at the broad

6  sweep of this stuff and you say is this a -- you

7  know, is it unusual to do that.  And I don't think

8  it is.  I think it's a consistent, thoughtful

9  policy.

10     Q    Isn't it true that asking for immigration

11 documents from the U.S. government helps a landlord

12 verify the identity of an applicant or tenant?

13     A    Yeah.  As a matter of fact, in most cases

14 you have to get decent third-party verification, and

15 government documents is -- are among the gold

16 standards in terms of decent third-party

17 documentation.  You might recall, I don't know, I

18 guess three hours ago when we started this, Joy

19 mentioned, you know, can you take pay stubs.  Well,

20 you do it, but it's a very desperate last measure

21 because you want better justification than that and

22 you want something that's a more secure document if

---

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 32 of 73
PageID# 11964
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

30 (117 to 120)

117

1  you can get it.
2      Q   Isn't it true that the U.S. government
3  vets -- let me rephrase.  Isn't it true that when a
4  person obtains immigration documents from the U.S.
5  government, the U.S. government vets their
6  background?
7          MS. ODOM:  Objection, foundation.
8          MR. deBETTENCOURT:
9      Q   You may answer.
10     A   I assume so.  I don't believe they issue
11 documents just on somebody's say-so.  I'm not
12 intimately familiar with the level of backgrounding
13 they do, but, you know (inaudible) --
14         (At which time the court reporter requested
15 clarification regarding the answer.)
16         THE WITNESS:  Mr. deBettencourt, why don't
17 you try asking the question again and we'll start it
18 all over and she can just dump that section.
19         MR. deBETTENCOURT:
20     Q   Isn't it true that when someone applies for
21 immigration documents from the U.S. government, the
22 U.S. government vets their background?

118

1          MS. ODOM:  And I'll restate the objection to
2  foundation.
3      A   Based on what I know, I believe so, but I
4  don't do those.  I'm not intimate with what they do
5  by way of background, but I know they do do
6  background work.
7          MR. deBETTENCOURT:
8      Q   Mr. Caruso, on page 1 of your report you
9  state, any applicant who does not have legal status
10 to work will be unable to obtain employment that can
11 be verified as to duration and amount to permit
12 underwriting.
13     A   Yes.
14     Q   Isn't it true that you base that statement
15 on the fact that if a person does not have legal
16 status to work, it'll be difficult for them to
17 obtain -- difficult for them to obtain employment in
18 the United States?
19         MS. ODOM:  Objection, form.
20     A   Well, we know that with the I-9
21 requirement, and now the E-Verify requirement, you
22 gotta have status to be able to work.  And if you

119

1  have an employer that's following the laws, it's
2  going to flag somebody when you put them in the
3  E-Verify system.  And that doesn't mean you don't
4  employ them.  It just means you gotta do a further
5  investigation to determine what's going on before
6  you, you know, banish them to Siberia, as it were.
7  But you want to work with documents that are
8  independently verifiable by third parties to make
9  sure that you know where somebody is coming from.
10 And my general sense of it is if you've got somebody
11 that's working for someone that is openly violating
12 a federal statute, I'm not sure I can rely on any
13 information that person is going to give me.
14         MR. deBETTENCOURT:
15     Q   Mr. Caruso, are you basing your opinions in
16 this report on your knowledge of the industry, in
17 addition to your own experience?
18     A   Yeah.  I mean, I've been part of the
19 industry -- and as you saw my résumé, as opposing
20 counsel saw my résumé, I've been fortunate to be
21 elected to various positions in industry training
22 associations over the years.  Most recently I was

120

1  president of the Southeastern Affordable Housing
2  Management Association for ten years.  I sit on --
3  I'm this year's Chairman of the Institute of Real
4  Estate Management's Federal Advocacy Board.  So I
5  hang around with a lot of people on a regular basis,
6  because now that I'm retired, I have much more time
7  to spend on the Hill dealing with legislative
8  matters.  So this is not just an opinion developed
9  working inside my own church as it were.  I take a
10 more ecumenical approach, and I have a lot of
11 friends in the industry, too, and we all work
12 together, because, you know, as they say, if you
13 don't hang together, you will most assuredly hang
14 separately.  I believe that was Benjamin Franklin,
15 wasn't it?
16     Q   I'm not sure.  You probably know best.
17     A   I think that was Franklin when the
18 Declaration of Independence was signed.  And that
19 is, Gentlemen, if we don't hang together, we will
20 most assuredly hang separately.
21         MR. deBETTENCOURT:  All right, well, at this
22 point I don't have any further questions.

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

121

1       MS. ODOM:  So I do have a couple questions.
2   FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
3       BY MS. ODOM:
4       Q    You said you base the opinions in your
5   report on your knowledge of the industry.  And I
6   just want to clarify.  There are some things about
7   the industry that you can't or don't talk about with
8   your friends, and one of those things --
9       A    That's true.
10      Q    One of those things is how to underwrite a
11  lease?
12      MR. deBETTENCOURT:  Objection,
13  mischaracterize.
14      A    One of those things -- the things I don't
15  talk about with my friends most specifically is I
16  don't talk about pricing, I don't talk about lease
17  terms and conditions more generally.  We do talk, in
18  general terms, about how to underwrite a lease, but
19  we don't talk in specific terms about it because
20  you've got to be careful about what you do and don't
21  discuss.
22      MS. ODOM:

122

1       Q    And some of the specific terms that you
2   don't discuss would be prerequisites to gaining a
3   lease at a particular property?
4       MR. deBETTENCOURT:  Same objection.
5       A    Tenant selection plans are an internal
6   document I would -- I and a number of my colleagues
7   are uncomfortable sharing those around, at least in
8   their whole form.  Occasionally we'll have comments
9   on, well, what are you doing on this issue and we'll
10  kick it around a little bit, but, no, that's -- I
11  regard that as a proprietary business document
12  inside our company and I advise my staff they're not
13  allowed to share it around.  We do, however -- and I
14  want to put this out on the table.  If an applicant
15  asks us for a copy of the tenant selection plan,
16  they are promptly provided one, because they are
17  legally entitled to see the document and they're
18  entitled to take it away.  I just don't share it
19  around when I'm having lunch with people.
20      MS. ODOM:
21      Q    Do you share the details of your
22  properties' tenant selection plans as it relates to

123

1   an individual's legal status in the United States?
2       A    Since that was one of the hottest
3   legislative topics when Representatives Gallegly and
4   Hyde introduced the bill in the mid '90s, I probably
5   spent 20 percent of my time for 18 months on those
6   issues while that bill was in its gestation.
7       Q    But in recent years, in the context of
8   having lunch with friends or having discussions with
9   colleagues or associates in other residential
10  management companies --
11      (Simultaneous conversation.)
12      A    Something will occasionally --
13      MR. deBETTENCOURT:  Objection, form.
14      A    -- but I wouldn't regard it as substantive.
15      (At which time the court reporter requested
16  clarification regarding the answer.)
17      A    Something will occasionally pop up, but I
18  wouldn't regard it as a substantive conversation.
19      MS. ODOM:
20      Q    Meaning that you do not have substantive
21  conversations about legal status in the United
22  States being a prerequisite to tenancy at your

124

1   properties?
2       MR. deBETTENCOURT:  Objection, form,
3   mischaracterize.
4       A    I've had lots of conversations over the
5   years about how we're going to lobby the government
6   to get regulations that we can live with.  I can't
7   remember having a conversation with anybody in the
8   last couple of years on how I deal with an
9   individual tenant.
10      MS. ODOM:
11      Q    Or generally about what a particular
12  property complex does by way of a policy on
13  documented immigrants or undocumented immigrants?
14      MR. deBETTENCOURT:  Objection, form.
15      A    That would generally be fair.
16      MS. ODOM:
17      Q    You testified a few minutes ago in response
18  to Mr. deBettencourt's question that in the
19  conventional, non-assisted, non-HUD space it is
20  reasonable to have a policy that requires a
21  prospective tenant to be legally present in the
22  United States?  Do you recall that?

Case 1:16-cv-00563-PTG-WBP    Document 521-2    Filed 01/14/25    Page 34 of 73
PageID# 11966
Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

32 (125 to 128)

---

125

1      MR. deBETTENCOURT:  Objection,
2  mischaracterize.
3      A  I do.
4      MS. ODOM:
5      Q   Why do you think that is reasonable?
6      A  As I indicated in the materials that I gave
7  Mr. deBettencourt, that are now part of this
8  pleadings, if they can't legally work in this
9  country, how are they going to earn the money to pay
10 their rent?  You are, in most cases, granting
11 someone credit to the tune of somewhere between
12 15,000 and 40,000 a year, depending on the rent and
13 where the location might be, at least with regard to
14 my portfolio.  And while I don't do mobile home
15 parks, I do enough landlord-tenant law to know that
16 in the event where you have that complication and
17 you have what's effectively a ground lease, and you
18 have to get back possession of it, that's going to
19 be a long fight in the courts and you could lose a
20 lot of money.  So the short answer is I want to make
21 sure that I'm doing the right job for my owners, who
22 are underwriting, carefully enough, including that

126

1  they can legally work here, that the likelihood is
2  they'll pay their lease and they'll take their lease
3  to term.  That's what we're after is we offer
4  accommodation, in exchange for that they give us
5  money and they have the right to that space for a
6  fixed period of time, be it an apartment, a mobile
7  home lot, a commercial building, whatever.
8      Q   I believe you also testified you didn't
9  think that was an unusual policy?  What is that --
10     A  I don't think it's -- I don't think it's
11 unusual.
12     MR. deBETTENCOURT:  Objection, form.
13     MS. ODOM:
14     Q   What is that based on?  What makes you say
15 that it's not unusual?
16     A  In the sitting, having lunch, and
17 walking-around conversations with my colleagues,
18 when tenant selection plans come up and there's a
19 question about it, I haven't heard anybody suggest
20 that having a citizenship -- you know, having --
21 being here illegally -- citizenship is the wrong
22 term.  Being here illegally, I don't know if anybody

127

1  thinks that's a -- you know, that knowingly housing
2  illegals is a good business plan.  It's just not.
3      Q   And since you haven't heard anybody say
4  anything about the fact that that would be an
5  unreasonable thing, have you heard anything one way
6  or the other when you're discussing this with your
7  colleagues?
8      MR. deBETTENCOURT:  Objection, form.
9      A  I'm going to answer this in an elliptic
10 way.  We've just gone through an election season
11 that's been very divisive and immigration has been
12 on the front burner for most of this period of time.
13 And I'm not taking a position either way.  We have a
14 president.  He was elected.  I'm not talking about
15 that.  But immigration has popped up again as a big
16 issue this year and I've had some conversations with
17 folks who say, God, it would be nice if we got this
18 over with and got to the point where we have some
19 standard, we weren't constantly fighting about it.
20 It's just -- it's been difficult for everybody.
21     MS. ODOM:
22     Q   Difficult for property managers?

128

1      A  Yeah.
2      Q   Because they're on the hook to verify legal
3  status in the United States?
4      MR. deBETTENCOURT:  Objection, form.
5      A  We're between the proverbial rock and the
6  hard place.  The rock is legal status to work,
7  underwriting, and what have you, and the hard place
8  is Fair Housing and Equal Opportunity.  And you
9  don't want to find yourself in those two places.
10 And we have consistently, as an industry, found
11 ourselves in that position for the last 18 months to
12 2 years, as in a adjunct to this greater policy
13 debate about what to do about the roughly 12 million
14 people that are in this country that don't have a
15 legal right to be here.
16     MS. ODOM:
17     Q   So in the absence of some federal
18 requirement requiring a residential property company
19 to verify legal status in the United States, it's
20 easier if that company doesn't verify legal status?
21 Would that be a fair statement?
22     MR. deBETTENCOURT:  Objection, form.

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

33 (129 to 132)

---

129

1      A    I'm not sure I would concur with that
2  formulation of it, no.
3          MS. ODOM:
4      Q    What about that formulation of it do you
5  not concur with?
6      A    Well, we touched on this, I think, half a
7  dozen times, and I've tried to be consistent about
8  it, but what it boils down to is when we're leasing
9  stuff, the rent has to get paid.  And if they can't
10 be legally employed, how do you assure yourself that
11 the rent is going to get paid.
12         MS. ODOM:  All right, I think that's it for
13 me, Mr. Caruso.  Thanks for your time.
14         THE WITNESS:  Well, on that note --
15         MR. deBETTENCOURT:  That's it for me, too,
16 Mr. Caruso.  Have a good vacation.
17         (Off the record at 3:35 p.m.)
18
19
20
21
22

---

130

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY REPUBLIC
2
3          I, LISA KIRK, the officer before whom the
4  foregoing deposition was taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the testimony given; that said testimony
7  was taken by me stenographically and thereafter
8  reduced to typewriting under my direction; that
9  reading and signing was not requested; and that I am
10 neither counsel for, related to, nor employed by any
11 of the parties to this case and have no interest,
12 financial or otherwise, in its outcome.
13         IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 4th day of
15 January, 2017.
16 My commission expires:
17 July 31, 2018
18
19 _____
20 NOTARY PUBLIC IN AND FOR
21 THE COMMONWEALTH OF VIRGINIA
22 Notary Registration Number - 7057881

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                        34

**A**

**a-plus**
52:6
**ability**
17:11
**able**
23:14, 23:15,
24:6, 33:8,
34:16, 49:15,
49:20, 51:12,
53:5, 62:3,
63:8, 63:14,
65:1, 72:17,
78:1, 79:4,
86:11, 95:12,
98:19, 99:10,
109:16, 111:19,
118:22
**able-bodied**
86:9
**about**
9:5, 9:11,
14:17, 19:10,
19:11, 20:7,
20:9, 23:9,
23:10, 26:19,
28:17, 29:4,
29:5, 29:11,
30:10, 33:17,
38:4, 38:15,
38:18, 41:12,
42:14, 47:2,
54:8, 58:18,
60:16, 65:7,
67:16, 68:3,
71:10, 79:5,
82:12, 82:16,
82:18, 82:19,
83:6, 83:21,
84:12, 85:6,
89:4, 92:20,
92:21, 95:12,
95:17, 96:18,
96:21, 96:22,
97:18, 103:14,
106:9, 108:18,
110:14, 112:15,

114:6, 115:11,
121:6, 121:7,
121:15, 121:16,
121:18, 121:19,
121:20, 123:21,
124:5, 124:11,
126:19, 127:4,
127:14, 127:19,
128:13, 129:4,
129:7
**absence**
31:15, 128:17
**absolutely**
60:5, 61:15
**abstract**
33:17
**abutting**
38:12
**accept**
55:12, 57:9,
58:8
**accepted**
49:12
**accepting**
99:20
**access**
101:16
**accommodation**
126:4
**account**
59:16
**accurate**
8:16
**accuse**
113:14
**accused**
91:2, 91:3
**acronyms**
97:14
**across**
12:8, 57:7,
62:16, 91:6
**act**
67:13, 97:1,
97:3
**activities**
27:8
**actors**
104:12, 105:19

**acts**
73:6
**actually**
12:18, 54:12,
65:22, 88:17,
99:22, 114:11
**add**
66:20
**addition**
25:14, 119:17
**addresses**
74:17
**adjunct**
128:12
**administrations**
16:3
**administrative**
67:13
**admission**
92:16, 92:18
**admissions**
12:10, 12:15,
31:10
**admit**
108:8, 110:3
**admits**
111:2
**adopt**
23:6, 28:20,
91:5
**adopted**
23:21, 92:17,
115:16
**adopting**
18:22
**adult**
50:3, 81:3,
81:11, 84:21,
88:1, 88:3,
88:4, 88:6,
88:15, 88:16,
90:17
**adults**
92:12, 92:13
**advisable**
96:12
**advisably**
37:11

**advise**
122:12
**advocacy**
120:4
**affirmed**
6:18
**affixed**
130:14
**affordable**
15:5, 15:21,
16:4, 17:14,
18:1, 18:13,
18:20, 23:5,
120:1
**after**
14:17, 22:15,
36:17, 69:4,
82:11, 126:3
**again**
22:12, 43:20,
49:4, 52:19,
64:11, 71:22,
78:20, 87:6,
87:22, 88:1,
89:6, 92:20,
99:8, 110:3,
113:21, 117:17,
127:15
**against**
17:7, 17:9,
27:9, 41:2,
61:22, 80:15,
89:7, 92:17
**age**
81:12, 82:8,
87:18
**agencies**
11:12, 27:22,
106:6, 108:1
**agency**
29:17, 30:7,
42:1, 46:8,
56:13, 100:11,
100:12, 100:13
**agenda**
22:13
**ago**
8:9, 23:9,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                        35

47:20, 70:5,
80:2, 116:18,
124:17
**agree**
29:1, 29:6
**agreed**
6:13
**agreement**
46:5, 46:10
**agrees**
6:10
**agricultural**
13:22
**agriculture**
16:2
**ahead**
6:5, 6:14,
11:4, 21:11,
21:14, 24:14,
27:3, 32:18,
45:11, 53:2,
60:1, 61:14,
71:3, 88:21,
91:12, 94:6
**aid**
3:11
**aimco**
39:22, 44:4,
45:19
**aimed**
18:4
**al**
1:5, 1:9
**alabama**
14:18
**alco**
15:1
**alexandria**
1:3
**algorithm**
79:8
**algorithms**
79:11, 80:6
**alien**
50:5
**alive**
16:13
**all**
6:4, 7:1, 7:10,

7:17, 7:20,
8:18, 9:16,
13:1, 16:4,
18:3, 18:18,
20:13, 21:22,
24:2, 24:7,
25:17, 26:17,
27:16, 32:13,
34:14, 34:16,
38:1, 41:20,
43:14, 46:12,
48:21, 51:18,
52:8, 53:8,
54:18, 58:14,
61:22, 70:10,
70:12, 73:11,
74:18, 77:10,
78:20, 79:9,
80:5, 82:7,
89:16, 89:22,
90:2, 90:7,
92:12, 92:13,
96:2, 97:13,
100:14, 102:7,
103:8, 103:22,
104:11, 106:6,
114:7, 115:12,
117:18, 120:11,
120:21, 129:12
**allow**
54:14
**allowed**
122:13
**allows**
107:13
**almost**
60:5, 86:17
**alongside**
87:16
**already**
7:21, 37:16,
52:19
**also**
9:20, 13:22,
15:14, 18:16,
23:17, 27:13,
45:4, 55:18,
58:1, 64:9,

66:6, 74:10,
76:4, 78:14,
87:12, 92:14,
98:4, 98:10,
101:13, 107:8,
113:5, 126:8
**alternate**
61:19, 61:21
**alternative**
71:14
**always**
47:14, 47:19,
92:6, 97:10,
115:16
**american**
14:13
**among**
10:9, 98:3,
102:2, 104:13,
107:22, 113:3,
113:4, 116:15
**amount**
65:21, 118:11
**amounts**
71:16, 72:5,
72:18
**annual**
11:11, 19:2,
67:18, 93:3
**another**
41:3, 53:19,
80:19, 88:4,
88:6, 105:6
**answer**
8:7, 8:8,
20:19, 21:14,
21:15, 24:14,
27:3, 32:8,
32:9, 33:6,
33:8, 33:10,
35:9, 35:13,
35:16, 35:19,
36:5, 43:2,
43:16, 45:11,
46:20, 46:21,
47:9, 53:5,
53:6, 53:7,
58:12, 59:4,

60:1, 62:15,
63:3, 66:4,
79:9, 82:4,
82:13, 83:19,
86:2, 89:2,
89:5, 90:5,
90:14, 94:9,
94:10, 94:11,
94:13, 95:3,
95:8, 98:19,
98:21, 99:9,
99:11, 102:16,
103:6, 103:10,
104:22, 105:4,
105:15, 107:12,
107:19, 110:21,
111:17, 117:9,
117:15, 123:16,
125:20, 127:9
**answered**
24:12, 35:12,
62:17, 103:4
**antitrust**
82:11, 82:19
**any**
7:11, 8:14,
9:5, 11:21,
12:1, 16:7,
18:6, 19:13,
21:6, 25:2,
26:21, 28:4,
28:5, 33:1,
33:13, 33:20,
35:9, 35:16,
36:6, 38:5,
38:14, 39:15,
41:22, 42:1,
46:18, 46:22,
54:21, 56:5,
65:6, 65:18,
67:22, 69:6,
70:21, 77:14,
81:22, 83:11,
88:10, 94:8,
98:22, 99:14,
99:15, 100:11,
102:10, 102:13,
103:19, 104:4,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          36

105:5, 105:13,
105:22, 106:9,
106:11, 106:12,
106:18, 106:22,
107:19, 108:22,
110:5, 110:14,
111:7, 111:8,
111:10, 112:11,
112:20, 118:9,
119:12, 120:22,
130:10
**anybody**
55:3, 103:11,
116:4, 124:7,
126:19, 126:22,
127:3
**anymore**
7:8, 11:6,
55:18, 75:22,
80:10, 80:17
**anyone**
64:20, 83:12
**anything**
10:18, 32:12,
38:16, 51:22,
56:21, 66:2,
79:5, 82:19,
95:12, 108:17,
108:18, 114:9,
127:4, 127:5
**apart**
20:9, 86:16,
87:22
**apartment**
10:19, 37:13,
126:6
**apartments**
21:8, 57:16,
64:14
**applicant**
63:8, 65:18,
71:15, 73:16,
73:18, 73:21,
81:11, 91:18,
111:15, 116:12,
118:9, 122:14
**applicant's**
78:2

**applicants**
31:7, 86:8
**application**
31:11, 39:6,
51:1, 55:13,
56:3, 57:10,
63:7, 69:11,
73:10, 88:16,
111:14, 115:3
**applications**
77:4, 107:4
**applies**
60:7, 85:17,
87:16, 98:21,
101:5, 117:20
**apply**
84:3, 115:6
**applying**
28:4
**approach**
44:19, 44:20,
120:10
**appropriate**
55:22, 57:12,
57:13, 94:3,
110:7
**appropriately**
25:14
**appropriations**
19:2
**approve**
63:2
**april**
9:17
**area**
18:5, 54:17
**aren't**
41:13
**arena**
67:1
**arisen**
38:6
**around**
13:3, 24:3,
28:13, 52:18,
73:4, 120:5,
122:7, 122:10,
122:13, 122:19

**arrangement**
46:7
**arrest**
37:12, 108:1,
108:2
**arrested**
37:16
**art**
48:9
**articles**
65:7
**ascertain**
25:16, 70:19
**aside**
39:13, 39:15,
64:8, 110:13
**asked**
7:5, 24:11,
33:16, 35:9,
35:11, 35:16,
36:6, 94:1,
95:3, 103:3
**asking**
24:3, 32:11,
32:13, 35:14,
36:3, 44:16,
72:7, 104:1,
116:10, 117:17
**asks**
122:15
**aspect**
26:2
**assaulting**
104:17
**assess**
69:7, 84:7
**assessment**
72:12
**asset**
9:11, 9:20,
9:22
**assets**
13:16, 13:18,
47:11, 48:10,
71:19, 72:4,
102:19
**assistance**
19:2, 23:21,

40:12, 40:17,
41:14, 44:6,
45:6, 45:12,
45:16, 46:18,
48:5, 48:7,
68:11, 85:14,
97:22, 99:14
**assistant**
69:3, 107:12
**assisted**
15:10, 15:14,
19:11, 19:12,
19:22, 22:17,
23:5, 23:8,
67:1, 67:10,
85:4, 91:4,
91:13, 91:15,
91:16, 115:15
**associates**
123:9
**association**
15:6, 15:21,
16:6, 120:2
**associations**
119:22
**assume**
46:21, 87:21,
117:10
**assuming**
48:15
**assumption**
47:4
**assurance**
52:14, 52:16
**assure**
58:3, 129:10
**assuredly**
120:13, 120:20
**attached**
5:10, 6:2, 21:4
**attachés**
64:9
**attending**
64:14
**attention**
68:21
**attorney**
69:3

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    37

attorneys
37:11, 107:13
attribute
111:1
august
13:9
authority
40:18
automated
80:9
automatically
77:4
automobiles
109:7
availability
113:11
available
32:14, 72:4,
72:18
avoid
82:14, 83:4
avoided
83:2
aware
8:15, 8:17,
36:9, 49:10,
56:16, 60:19,
74:12, 81:22,
111:5
away
122:18

**B**

back
8:1, 8:22,
21:2, 44:2,
47:21, 59:6,
71:6, 76:3,
76:8, 76:10,
78:21, 79:18,
79:22, 95:2,
110:1, 125:18
back-office
76:5
background
63:11, 76:13,
76:21, 112:9,
117:6, 117:22,

118:5, 118:6
backgrounding
117:12
backgrounds
108:2
backup
66:17
bad
104:12, 105:17,
105:19
banish
119:6
bank
76:2, 76:4
banking
76:4
bar
82:21
base
64:10, 118:14,
121:4
based
56:22, 67:13,
80:8, 96:7,
118:3, 126:14
basic
96:2, 106:21
basically
10:6, 19:20
basing
119:15
basis
45:15, 49:14,
57:17, 65:17,
67:19, 81:19,
94:11, 95:7,
107:2, 120:5
bear
87:11
bearing
76:22
beating
104:1
became
14:7, 37:13,
65:15, 96:21,
116:3
because
8:4, 9:15,

10:14, 22:8,
23:1, 25:19,
27:6, 27:8,
29:18, 37:18,
40:13, 40:16,
45:1, 45:19,
49:4, 51:18,
57:14, 57:21,
58:2, 60:6,
61:20, 63:19,
67:6, 68:9,
70:20, 74:2,
74:22, 75:3,
76:10, 77:3,
78:5, 78:19,
79:9, 82:7,
82:15, 86:16,
87:4, 91:20,
92:15, 93:4,
93:12, 93:14,
96:12, 97:17,
103:7, 104:14,
107:6, 109:2,
111:7, 112:8,
113:13, 114:4,
115:17, 116:21,
120:6, 120:12,
121:19, 122:16,
128:2
become
13:7, 27:15,
36:8, 75:2
been
7:2, 7:7, 7:8,
7:20, 13:10,
20:10, 20:11,
21:8, 21:10,
32:20, 34:19,
37:14, 37:16,
38:20, 41:5,
47:1, 47:19,
49:21, 52:18,
59:16, 63:17,
64:5, 69:11,
72:17, 76:22,
77:1, 78:19,
80:9, 84:11,
84:12, 84:16,

86:16, 92:6,
92:11, 96:18,
99:6, 101:21,
104:8, 106:7,
107:7, 109:18,
119:18, 119:20,
127:11, 127:20
before
2:19, 7:2,
7:19, 7:21, 8:6,
12:13, 47:13,
52:20, 65:14,
71:9, 92:22,
100:19, 119:5,
130:3
begin
93:14
beginning
44:11
behalf
3:2, 4:2
behavior
82:20, 105:17,
106:8, 107:10
being
6:10, 6:18,
8:2, 17:9,
22:12, 22:13,
29:19, 31:6,
49:16, 50:1,
60:9, 60:20,
84:15, 91:19,
123:22, 126:21,
126:22
believe
26:10, 40:21,
95:22, 96:4,
104:5, 117:10,
118:3, 120:14,
126:8
below
18:4
beneath
48:2
beneficiaries
13:15
benjamin
120:14

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                              38

| | | | |
|---|---|---|---|
| **besides** | **block** | **budgets** | **came** |
| 33:13 | 99:17 | 101:16 | 25:11, 82:11, |
| **best** | **board** | **builder** | 93:16, 95:16, |
| 8:4, 8:16, | 12:8, 91:6, | 14:21 | 100:16 |
| 38:22, 120:16 | 120:4 | **building** | **camera** |
| **better** | **boils** | 15:13, 126:7 | 9:4, 34:10 |
| 17:11, 27:5, | 129:8 | **buildings** | **can't** |
| 49:18, 116:21 | **book** | 75:22 | 8:15, 24:19, |
| **betting** | 12:20 | **built** | 25:18, 27:8, |
| 41:11 | **booking** | 77:2 | 28:16, 34:11, |
| **between** | 113:9 | **bunch** | 34:13, 36:16, |
| 13:3, 15:11, | **books** | 113:5 | 36:22, 38:1, |
| 33:5, 42:5, | 73:8 | **burner** | 43:2, 46:20, |
| 60:16, 74:14, | **bookshelf** | 127:12 | 58:4, 63:22, |
| 95:7, 105:18, | 20:7 | **bush** | 65:11, 67:22, |
| 125:11, 128:5 | **borrowed** | 52:18 | 68:6, 79:9, |
| **beyond** | 29:16 | **business** | 80:17, 97:18, |
| 7:10, 76:19 | **both** | 14:8, 18:20, | 99:9, 101:8, |
| **bidding** | 19:20, 23:5, | 20:10, 23:20, | 102:16, 109:15, |
| 12:11 | 28:15, 29:21, | 31:22, 40:17, | 112:9, 113:22, |
| **big** | 88:19, 90:20, | 41:14, 55:2, | 114:6, 121:7, |
| 9:19, 61:8, | 107:4, 115:15 | 79:17, 82:12, | 124:6, 125:8, |
| 61:11, 75:17, | **bottom** | 83:13, 90:20, | 129:9 |
| 79:10, 80:6, | 104:15 | 91:14, 101:12, | **capacity** |
| 82:8, 127:15 | **box** | 122:11, 127:2 | 21:22, 107:1 |
| **bill** | 61:8, 61:11, | **business;** | **capital** |
| 97:11, 97:16, | 79:12, 80:10, | 31:16 | 11:8, 14:13 |
| 97:17, 98:18, | 80:11 | **buying** | **caption** |
| 123:4, 123:6 | **break** | 103:9 | 34:9 |
| **bills** | 52:2, 58:15, | **by:** | **card** |
| 16:15, 22:10, | 71:4, 71:9, | 1:22 | 37:22, 55:17, |
| 22:11, 65:14 | 94:21, 114:12, | | 56:2, 70:8, |
| **birth** | 114:16 | **C** | 70:19, 80:4 |
| 74:2, 75:2, | **breaking** | **calculation** | **cards** |
| 78:14, 113:8 | 66:1 | 9:10 | 55:17, 55:19 |
| **bit** | **brief** | **call** | **care** |
| 8:3, 17:18, | 71:9 | 10:4, 23:4, | 22:9, 72:15 |
| 27:6, 77:5, | **broad** | 28:14, 35:17, | **career** |
| 104:4, 112:7, | 16:3, 20:1, | 71:5 | 14:2, 21:17, |
| 122:10 | 55:19, 102:12, | **called** | 22:8, 41:11, |
| **black** | 114:6, 116:5 | 20:6, 41:14, | 67:7, 83:8, |
| 79:12, 80:10, | **broader** | 44:5, 46:5, | 101:10, 102:9 |
| 80:11, 109:4 | 12:18 | 48:9, 80:2, | **career-changing** |
| **blank** | **brought** | 81:6, 97:6, | 102:10 |
| 53:18 | 60:20, 65:13 | 97:11 | **career;** |
| **blend** | **budget** | **calls** | 96:8 |
| 74:18 | 10:5 | 32:7, 33:4, | **careers** |
| **blessed** | **budgeting** | 53:4, 94:8, 95:6 | 82:13, 96:17 |
| 104:9 | 11:11, 101:22 | | |

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                        39

careful
22:4, 60:12,
60:16, 89:4,
96:18, 111:2,
113:12, 113:16,
115:10, 121:20
carefully
21:18, 85:3,
86:16, 86:21,
125:22
carry
73:4
caruso
1:15, 2:1, 5:2,
5:11, 6:1, 6:4,
6:10, 6:17, 7:1,
33:8, 33:10,
34:17, 36:1,
51:11, 52:21,
83:16, 88:20,
94:4, 95:14,
103:13, 104:7,
105:22, 114:7,
114:10, 114:15,
114:20, 118:8,
119:15, 129:13,
129:16
caruso's
34:20
case
7:15, 7:16,
22:20, 23:18,
25:7, 33:21,
34:2, 35:4,
36:6, 37:5,
37:9, 49:16,
54:11, 59:2,
63:13, 69:4,
79:21, 84:15,
88:16, 89:15,
91:9, 93:19,
94:17, 108:11,
108:12, 130:11
cases
12:3, 14:22,
19:20, 37:1,
68:14, 71:18,
81:5, 108:3,

108:6, 113:8,
116:13, 125:10
cause
38:5
cautious
90:16, 115:19
cbe
99:18
center
3:11
certain
82:8
certainly
16:10
certainty
24:20
certificate
130:1
certifications
41:6
certify
130:4
cfr
20:6
chairman
97:12, 120:3
challenge
84:14
challenged
49:16, 49:21,
50:2
change
12:4, 59:5,
92:7, 92:12
changed
69:19, 93:4
changes
116:3
chapter
20:6
charge
12:5
check
20:13, 20:20,
45:14, 45:20,
46:19, 76:21,
79:15, 80:14,
97:9, 97:22,

103:16
checking
56:22, 66:17,
74:20
checks
63:11, 76:13,
80:1, 80:16,
103:8
chicago
14:8, 14:10,
15:14
chief
12:22
child
87:17, 87:18,
87:20, 88:1,
88:3
chip
70:16
chosen
91:5
church
3:14, 120:9
circumstance
31:3, 37:6,
92:15
cis
59:12
citizen
39:4, 50:4,
71:22
citizens
64:13, 68:3,
106:3
citizenship
16:14, 126:20,
126:21
civil
1:12, 41:2,
41:16
claim
91:16
clarification
20:19, 43:16,
105:15, 117:15,
123:16
clarify
121:6

103:16
clear
25:12, 26:4,
32:11, 33:19,
35:3, 35:7,
102:7
clearly
39:11
click
51:19
clickety
51:19
client
76:9
clients
9:19
close
70:8
coast
14:12
code
20:5
coincidentally
108:5
colleague
103:16
colleagues
23:20, 39:17,
39:19, 76:1,
82:6, 101:14,
101:18, 101:22,
106:20, 111:9,
122:6, 123:9,
126:17, 127:7
collect
81:20, 89:7,
108:16
colloquially
97:6
collusion
68:8
collusive
82:20
columbia
37:12, 107:9
combatting
107:15
come
13:17, 21:2,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                           40

22:6, 31:8,
31:12, 36:8,
49:4, 53:8,
57:21, 68:21,
75:1, 126:18
**comes**
19:17, 41:9,
83:7, 83:9,
93:3, 104:22,
112:7
**coming**
13:4, 86:19,
119:9
**comments**
122:8
**commercial**
21:18, 42:17,
74:3, 74:12,
126:7
**commission**
130:16
**committee**
97:12
**commonwealth**
2:23, 130:21
**communications**
32:7, 33:5,
53:4, 53:6,
94:8, 95:7,
95:17
**communities**
10:19, 107:21
**community**
42:15, 42:21,
44:4, 45:16,
45:18, 99:16,
103:21, 115:22
**companies**
28:18, 41:13,
56:15, 57:7,
82:1, 82:9,
96:14, 101:9,
115:14, 123:10
**company**
14:18, 23:4,
28:14, 52:11,
75:14, 77:15,
77:20, 79:8,

102:4, 102:11,
103:9, 122:12,
128:18, 128:20
**comparatively**
67:21
**compare**
78:20
**compensated**
13:13
**competitors**
76:17
**complaint**
31:5, 31:8,
31:15, 49:3,
93:19, 93:22
**complaints**
38:14, 107:17
**complete**
50:10, 50:14,
62:3
**completely**
53:14
**complex**
46:12, 47:22,
48:17, 48:18,
54:18, 124:12
**complexes**
14:1, 85:13
**complexly**
47:13
**compliance**
99:20
**complication**
125:16
**comply**
20:14, 21:1,
40:13, 43:10,
46:12, 85:8
**complying**
40:19, 100:20
**components**
12:19
**compositions**
85:7
**compound**
75:10
**concern**
30:22, 47:5

**concerned**
17:11, 29:4,
29:5, 29:11,
29:16, 30:8,
31:4, 38:19
**concur**
129:1, 129:5
**conditions**
86:13, 121:17
**condominiums**
21:16
**confidential**
102:8
**confidentiality**
115:20
**confines**
38:6
**confirm**
36:4
**confirmation**
57:2
**congress**
16:2, 22:9,
22:16, 25:12,
26:3, 116:3
**congressional**
26:18, 47:15
**connects**
98:12
**consequence**
37:18
**consider**
39:10, 39:11,
39:18, 39:19,
39:21, 40:1,
91:12
**consideration**
104:20
**considerations**
104:20
**considered**
102:8
**consist**
10:17, 56:19
**consistency**
115:17
**consistent**
31:10, 44:18,

44:20, 47:16,
49:6, 90:20,
92:17, 115:11,
116:8, 129:7
**consistently**
23:2, 23:7,
47:18, 73:17,
128:10
**constantly**
127:19
**contact**
36:8
**contained**
93:21
**containing**
61:11
**context**
17:21, 47:18,
111:4, 115:2,
115:7, 123:7
**contexts**
64:21
**continue**
73:9, 104:6
**continuously**
13:4
**contours**
91:8
**contracting**
12:12
**contractor**
60:9, 60:13,
60:21
**contractors**
11:10
**contracts**
41:7
**contractual**
46:6, 46:10
**contribution**
87:5
**control**
17:10, 83:10
**conundrum**
72:20
**convenient**
103:7
**conventional**
23:5, 85:3,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                41

91:4, 115:1,
115:6, 124:19
**conversation**
69:2, 105:10,
123:11, 123:18,
124:7
**conversations**
32:20, 82:6,
82:14, 83:21,
106:19, 111:8,
123:21, 124:4,
126:17, 127:16
**convict**
113:6
**copy**
8:20, 122:15
**corelogic**
76:18
**corollary**
109:2
**corporate**
7:18
**corporation**
9:19, 10:11,
14:14, 100:7
**correct**
27:18, 30:15,
46:2, 46:15,
96:5, 96:10,
130:5
**correctly**
40:18
**correlation**
109:8
**cost**
20:21, 45:18
**costs**
19:3, 45:15,
45:21
**could**
49:17, 49:18,
51:7, 54:18,
55:14, 74:9,
80:3, 87:11,
125:19
**counsel**
6:21, 32:1,
32:7, 32:12,

33:5, 53:4,
53:7, 53:9,
90:15, 94:8,
95:7, 95:17,
114:18, 119:20,
121:2, 130:10
**counsel's**
35:8, 35:15,
36:5, 36:7,
114:22
**counselor**
103:22
**country**
18:14, 25:13,
28:1, 50:3,
50:6, 59:9,
64:12, 125:9,
128:14
**county**
114:2, 114:4
**couple**
37:1, 68:1,
76:22, 85:16,
114:11, 114:16,
114:21, 115:8,
121:1, 124:8
**course**
18:19
**court**
1:1, 2:21, 6:5,
6:14, 8:4, 8:11,
20:18, 43:15,
58:5, 89:13,
105:14, 108:4,
117:14, 123:15
**courtroom**
6:8
**courts**
125:19
**cover**
20:21, 45:15,
45:21, 71:15,
87:11
**covered**
18:2
**covers**
55:19
**crack**
49:19

**crazy**
51:8, 100:18
**create**
115:18
**creating**
12:5, 33:14
**creation**
12:1
**credit**
74:15, 74:16,
79:15, 80:1,
80:14, 80:16,
125:11
**crime**
106:1, 107:4,
107:15
**crimes**
106:5
**criminal**
74:20, 75:9,
76:21, 106:8,
107:10, 109:11
**criteria**
91:19
**current**
38:20, 39:2,
62:9
**currently**
76:12
**customary**
57:6
**customer**
79:11
**customize**
77:9
**customized**
77:11
**customs**
70:9
**cut**
89:20, 90:21,
92:3
**cuts**
29:17

**D**

**dakota**
15:15

**dangerous**
103:20, 104:5
**data**
78:22, 95:15,
106:17, 106:18,
107:8, 107:18,
107:22, 108:17,
108:22, 111:7,
112:8, 113:5,
113:7, 113:8,
113:9, 113:13
**database**
75:12, 78:7
**databases**
74:3
**date**
74:2, 78:14
**dates**
75:2
**day**
130:14
**day-to-day**
10:20, 11:5,
11:20, 61:21
**days**
13:2, 20:2,
21:3, 66:16,
79:9, 79:19,
80:5
**de**
1:5
**dead**
115:10
**deal**
19:19, 19:22,
97:13, 99:13,
124:8
**dealing**
54:16, 68:14,
71:18, 71:21,
104:15, 120:7
**deals**
43:5, 47:12,
100:15
**debate**
128:13
**debettencourt**
4:3, 5:4, 6:9,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    42

114:9, 114:21,
117:16, 125:7
**debettencourt's**
124:18
**december**
1:17
**decent**
116:14, 116:16
**decision**
100:17
**decisions**
107:7
**declaration**
120:18
**declaring**
87:4
**decline**
100:1
**deemed**
82:19
**deep**
19:1, 23:21,
40:12, 40:16,
41:14, 44:6,
45:6, 45:12,
45:16, 46:18,
48:5, 48:7,
63:17, 68:10,
97:22
**deeply**
17:11
**deeply-assisted**
19:4
**defendants**
1:10, 51:4,
52:10, 114:18
**defendants'**
52:9
**defendants:**
4:2
**definition**
17:17, 25:20,
60:13
**deliberately**
68:11
**demonstrate**
62:20, 72:17
**demonstrating**
108:7

**department**
16:1, 16:2,
57:18, 57:22,
67:5, 82:11
**depending**
17:16, 50:11,
74:11, 112:16,
112:17, 125:12
**depends**
54:11, 75:11,
75:12
**deposed**
7:2, 7:9, 7:20
**deposition**
1:15, 2:1,
5:11, 7:6, 7:10,
130:4
**depositions**
7:11
**describe**
49:15, 49:17,
49:20
**described**
48:17
**describing**
99:7
**design**
75:12
**designators**
77:2
**desperate**
116:20
**details**
88:13, 122:21
**determine**
25:6, 61:17,
73:12, 74:6,
111:19, 112:1,
119:5
**deterred**
16:18
**developed**
68:7, 120:8
**development**
99:16
**difference**
60:19
**different**
14:1, 19:13,

23:12, 48:2,
48:6, 54:15,
57:20, 70:3,
77:5, 89:15,
93:4, 98:11,
104:4, 108:13,
112:18
**differentiated**
104:13
**differentiation**
42:19, 60:15
**differently**
44:12, 44:17,
113:22
**difficult**
8:3, 14:4,
25:21, 69:19,
111:11, 112:8,
118:16, 118:17,
127:20, 127:22
**digits**
110:20, 110:21
**diligence**
56:5
**diplomacy**
64:21
**diplomat**
58:5
**diplomatic**
58:2
**diplomats**
57:19, 64:5,
64:8, 64:18
**direction;**
130:8
**directly**
21:20, 70:7
**director**
15:4, 15:20
**disability**
86:11
**disabled**
86:10, 86:18,
87:1
**disappearing**
110:18
**discover**
67:9

**discuss**
82:22, 95:15,
96:13, 121:21,
122:2
**discussed**
8:9, 96:1,
101:22
**discusses**
111:13
**discussing**
44:3, 82:12,
87:7, 88:14,
127:6
**discussion**
102:10
**discussions**
84:12, 96:17,
123:8
**disparate**
91:3, 91:16
**disparately**
31:6
**distributing**
108:10, 108:11,
108:12, 109:6
**district**
1:1, 1:2,
37:11, 40:3,
107:9, 108:11,
108:14
**disturbance**
38:5
**diversified**
14:13
**division**
1:3, 18:16,
23:3
**divisive**
127:11
**divorce**
27:7
**document**
34:1, 34:3,
35:4, 46:4,
50:12, 54:13,
69:7, 69:14,
69:18, 116:22,
122:6, 122:11,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                      43

122:17
**documentation**
56:10, 56:11,
56:12, 56:15,
56:17, 64:12,
69:12, 116:17
**documented**
103:21, 105:7,
106:3, 108:20,
124:13
**documents**
17:7, 17:12,
33:1, 33:20,
35:9, 35:17,
36:6, 37:14,
37:19, 37:21,
41:7, 43:20,
50:8, 50:11,
50:22, 55:9,
55:19, 55:20,
68:17, 68:22,
69:10, 70:13,
70:16, 84:2,
100:1, 100:2,
116:11, 116:15,
117:4, 117:11,
117:21, 119:7
**doing**
7:7, 15:7,
23:5, 23:21,
27:6, 47:17,
48:11, 48:12,
66:19, 67:8,
76:1, 79:17,
100:15, 122:9,
125:21
**doj**
69:8
**done**
21:15, 21:17,
33:18, 40:10,
53:9, 53:14,
80:5, 102:5,
103:14
**doors**
10:21
**down**
8:5, 15:9,

19:8, 23:13,
27:5, 31:13,
42:13, 44:2,
51:7, 88:2,
98:18, 104:22,
110:20, 110:21,
112:7, 129:8
**downside**
51:16, 67:3
**dozen**
129:7
**draft**
12:15
**drafting**
13:1
**drafts**
12:3
**drills**
61:22
**drive**
14:11, 100:18
**driven**
79:10
**driver's**
70:2, 70:3
**drives**
55:9
**driving**
70:4
**drug**
38:10
**drugs**
104:15, 107:15,
108:10, 109:6,
109:22
**due**
67:11, 103:22
**duly**
6:18
**dump**
117:18
**duration**
65:21, 66:7,
86:3, 118:11
**during**
14:15
**dwoskin**
52:10, 98:22,

102:14

**E**

**e-verify**
59:8, 59:11,
59:12, 59:14,
59:16, 59:20,
60:4, 60:22,
61:15, 62:7,
118:21, 119:3
**each**
8:2, 22:18,
40:6, 70:9,
81:12
**earlier**
24:16, 58:19,
64:6, 68:15,
96:4, 96:16,
112:15, 115:13
**early**
16:15, 22:6,
22:7, 22:8,
22:11, 22:16,
26:4, 65:13
**earn**
125:9
**earning**
109:4
**easier**
60:6, 97:17,
128:20
**easily**
76:11, 113:14
**eastern**
1:2
**economy**
109:4
**ecumenical**
120:10
**edgewood**
10:10, 10:11,
10:14, 12:9,
12:20, 13:8,
15:8, 19:10,
36:10, 44:5,
45:5, 45:20,
55:12, 56:2,
57:9, 75:19,

75:20, 75:21,
76:12, 84:20,
85:21, 88:14,
90:6, 91:22,
93:9, 93:12,
103:12, 107:21,
111:4
**education**
106:9, 109:19
**effect**
53:21
**effectively**
54:1, 107:16,
125:17
**efforts**
108:16
**either**
20:20, 29:17,
41:18, 45:13,
54:13, 59:7,
68:7, 68:8,
71:19, 77:17,
88:11, 107:20,
127:13
**elected**
119:21, 127:14
**election**
127:10
**electronic**
59:12, 59:15,
66:16, 70:15
**element**
29:22, 30:4
**elements**
29:22, 78:22,
96:2
**eligible**
27:15
**elliptic**
127:9
**elliptical**
82:5, 104:22
**else**
10:22, 29:5,
56:21, 66:3,
83:12, 115:11,
116:1
**elton**
16:14

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                     44

emanuel
3:4
embarrass
82:10
emerge
68:17
emerged
39:1, 92:22
emphasize
73:9
emphasized
73:8
empirical
106:14, 106:17
employ
119:4
employed
13:7, 55:22,
65:2, 85:20,
87:10, 129:10,
130:10
employee
60:8, 60:15
employees
25:17
employer
7:19, 56:13,
56:14, 57:3,
59:19, 60:7,
60:21, 66:5,
68:2, 68:8,
119:1
employers
25:16, 56:14,
66:13
employing
66:2
employment
7:16, 13:11,
13:14, 25:22,
27:7, 27:9,
27:12, 55:5,
56:6, 56:8,
56:18, 57:3,
65:20, 66:7,
71:11, 71:17,
72:9, 86:4,
109:15, 109:17,

118:10, 118:17
employs
66:5
empowered
64:1
enable
54:9, 108:17
enables
54:1
enacted
25:16
encountered
64:20
end
67:7, 76:10,
80:3, 96:17
ended
37:15, 37:17
enforcing
13:1
engaged
109:10
engaging
42:15, 98:9
engineers
11:9
enhanced
56:5
enjoy
58:2
enough
73:6, 86:4,
87:10, 101:21,
110:16, 114:5,
125:15, 125:22
ensure
25:12, 46:11
enterprises
109:11
entire
12:8, 13:2
entities
23:9, 23:15,
44:13, 48:20,
97:21
entitled
122:17, 122:18
entity
10:12, 19:22,

44:14, 45:19,
47:5, 47:12,
47:22, 48:1,
48:22, 76:13,
84:1, 84:2,
84:7, 100:8
equal
128:8
equate
90:1
equation
30:1
equity
39:19, 48:10
especially
113:12
esquire
3:3, 3:10, 4:3
essentially
42:15, 67:12
estate
15:22, 16:6,
120:4
estimate
19:5
et
1:5, 1:9
evaluations
107:4
even
48:19, 55:18,
79:11, 87:17,
88:14, 89:10,
89:17, 106:21
event
125:16
ever
7:1, 14:15,
33:1, 36:8,
64:20, 65:6,
66:11, 112:21
every
22:22, 24:20,
59:19, 60:7,
72:21, 73:10,
73:15, 73:17,
81:3, 81:11,
88:15

everybody
24:4, 60:5,
81:20, 89:7,
89:13, 89:22,
93:17, 102:12,
113:21, 116:1,
127:20
everyone
49:7, 50:2
everything
7:8, 15:3,
15:9, 15:10,
24:21, 41:11,
55:8, 100:21,
115:11
everywhere
44:21, 49:7
exactly
50:18, 72:21,
79:12, 82:21
examination
5:2, 6:21,
114:18, 121:2
examined
6:20
example
33:19, 60:10,
69:8, 85:21,
89:16, 108:19
exceedingly
25:15, 54:18
except
43:17
exchange
126:4
excited
53:11
exclude
24:8, 41:19,
41:20
excludes
40:8
excluding
22:1
exclusively
62:7, 63:2,
76:15
executive
12:21, 15:4,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    45

15:20, 41:3,
41:5, 83:10
**executives**
77:18, 77:19
**exhibit**
5:11, 5:12,
6:1, 8:19,
34:19, 35:2
**exist**
55:4, 82:9
**existed**
92:22
**existing**
92:21
**exists**
15:22
**expect**
101:4
**experience**
9:6, 10:8,
24:5, 33:13,
54:21, 57:6,
63:22, 66:12,
68:4, 69:6,
83:7, 86:17,
104:4, 104:8,
106:7, 119:17
**expert**
5:12, 10:6,
34:6
**expires:**
130:16
**explain**
45:8
**exposure**
73:1
**extent**
18:17, 32:6,
33:4, 40:11,
42:2, 43:17,
49:2, 53:3,
83:5, 94:5,
94:7, 94:16,
95:6, 109:3
**extra**
51:16
**eyesight**
34:15

| **F** |

**facilities**
64:17
**facing**
115:12
**fact**
10:8, 46:4,
48:20, 56:22,
62:12, 67:21,
116:13, 118:15,
127:4
**factor**
58:21
**facts**
95:15
**fair**
23:1, 28:17,
29:6, 31:1,
31:7, 31:11,
43:10, 45:1,
49:3, 72:22,
73:5, 96:21,
115:18, 124:15,
128:8, 128:21
**fairfax**
114:2, 114:4
**fairly**
59:4, 67:15,
94:1, 107:2
**falls**
3:14
**false**
74:5, 74:7,
74:22, 113:13
**familiar**
7:21, 8:21,
42:10, 75:14,
75:16, 76:18,
78:6, 117:12
**family**
13:16, 85:6,
87:5
**fannie**
18:17
**far**
79:22, 89:4
**faster**
59:13, 59:18

**favor**
16:16, 17:1,
17:4, 51:5
**fax**
9:3
**fear**
41:15
**features**
70:10, 70:21
**federal**
12:11, 18:7,
18:15, 19:7,
19:16, 20:5,
21:5, 23:10,
23:16, 24:9,
25:2, 26:2,
26:12, 27:15,
27:22, 28:21,
30:19, 42:1,
45:14, 46:7,
46:12, 47:16,
48:18, 48:21,
54:2, 68:13,
91:5, 93:13,
97:21, 100:12,
100:13, 100:20,
119:12, 120:4,
128:17
**fee**
107:11
**feed**
78:7, 79:19
**feet**
20:9
**felt**
47:14
**female**
85:20
**few**
59:6, 67:21,
96:20, 124:17
**fh&eo**
23:2, 49:3
**fha**
18:14, 18:15
**fight**
125:19
**fighting**
109:22, 127:19

**figure**
100:8
**file**
12:10, 31:7,
38:3, 75:9
**filed**
31:5
**files**
31:13, 74:16,
113:22
**fill**
59:6, 61:7
**filled-out**
53:19
**fills**
73:7
**finally**
19:1, 74:19
**finance**
25:3
**financed**
99:13, 101:15
**financial**
9:19, 10:10,
76:5, 85:14,
99:8, 101:19,
130:12
**financing**
18:7, 18:17,
18:18, 18:19,
29:22, 30:3,
41:19, 41:20,
43:12, 100:10
**find**
66:20, 106:10,
112:9, 128:9
**finish**
8:6, 8:7, 26:2
**firm**
14:10, 39:11,
41:3
**firms**
40:3, 40:11,
83:10, 102:2,
115:10
**first**
6:18, 13:7,
16:14, 26:3,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    46

49:4, 52:5,
65:13, 68:18,
70:1, 70:4,
80:1, 92:3,
104:19, 104:20
**first-level**
102:3
**five**
7:6, 7:11,
59:17, 70:9,
74:14, 78:2,
78:15
**five-year**
7:14
**fixed**
126:6
**flag**
79:2, 87:2,
119:2
**flags**
78:22
**flames**
96:17
**flexible**
17:17
**flight**
64:15
**floor**
3:6
**focus**
15:18, 29:2
**folks**
11:17, 16:16,
25:13, 32:17,
32:19, 36:19,
44:19, 52:13,
67:14, 102:7,
104:10, 110:3,
127:17
**follow**
35:1, 47:15,
73:13, 73:17,
93:13, 112:18,
114:22
**following**
35:8, 35:15,
36:4, 36:7,
95:9, 119:1

**follows:**
6:20
**fools**
104:12
**forbearance**
57:18
**foregoing**
130:4, 130:5
**foreign**
57:9, 57:17,
58:8, 58:9,
64:16, 67:19,
68:4
**forged**
37:18, 37:21,
38:2, 68:17,
68:22
**forgeries**
37:15, 38:2,
69:16
**forgery**
69:7, 69:20
**form**
11:1, 12:17,
13:10, 13:13,
17:15, 21:12,
22:3, 23:19,
24:11, 25:2,
26:8, 26:13,
26:22, 27:19,
28:10, 29:7,
31:2, 31:18,
32:16, 33:22,
36:11, 37:8,
38:8, 40:9,
42:22, 43:19,
44:15, 45:9,
46:3, 46:14,
47:7, 48:8,
50:5, 53:22,
54:10, 55:1,
57:4, 59:3,
60:11, 62:5,
64:4, 65:3,
66:8, 68:5,
69:1, 73:3,
77:8, 77:16,
78:17, 79:6,

79:16, 81:4,
83:15, 83:17,
84:5, 85:1,
86:18, 87:3,
89:19, 92:1,
92:9, 93:10,
97:4, 98:17,
100:4, 101:7,
102:15, 108:21,
109:13, 110:9,
111:16, 112:14,
113:20, 118:19,
122:8, 123:13,
124:2, 124:14,
126:12, 127:8,
128:4, 128:22
**forming**
33:14
**forms**
54:19, 54:22,
69:12, 99:14
**formulation**
129:2, 129:4
**fortunate**
119:20
**forums**
84:11
**forward**
14:6, 22:17,
93:9
**found**
128:10
**foundation**
99:1, 117:7,
118:2
**four**
59:17, 70:9
**frame**
7:14
**franklin**
120:14, 120:17
**fraudulent**
17:7, 62:16
**fraudulently**
39:1, 39:5
**freddie**
18:16, 18:17
**friends**
39:20, 39:22,

40:2, 77:17,
82:15, 120:11,
121:8, 121:15,
123:8
**friends'**
96:16
**front**
8:11, 61:8,
76:10, 127:12
**full**
9:15, 9:17,
10:10
**full-time**
9:18, 11:16
**fully**
86:17
**fully-documented**
39:5
**fully-professional**
43:11
**fundamental**
111:14
**funding**
19:7, 21:5,
23:10, 23:17,
24:10, 26:2,
26:21, 27:16,
28:5, 28:8,
30:20, 47:1,
47:17, 48:18,
48:21
**funds**
48:16, 71:15,
72:4, 72:18,
99:21
**further**
79:1, 119:4,
120:22, 121:2
**fuzzy**
38:9

---
**G**
---

**gaining**
122:2
**gallegly**
16:14, 123:3
**gave**
9:18, 37:18,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    47

115:6, 125:6
**general**
52:12, 67:5,
89:4, 119:10,
121:18
**generalizations**
114:6
**generalized**
84:12
**generally**
52:17, 74:1,
95:20, 100:14,
113:3, 121:17,
124:11, 124:15
**generates**
46:1
**generic**
55:16
**gentlemen**
120:19
**george**
1:15, 2:1, 5:2,
6:17
**gestation**
123:6
**getting**
29:20, 29:21,
70:8, 79:1, 87:3
**giron**
1:5
**give**
6:14, 8:10,
8:15, 13:4,
19:5, 36:16,
36:22, 54:6,
63:19, 67:4,
69:20, 70:6,
103:13, 116:4,
119:13, 126:4
**given**
10:7
**given;**
130:6
**gives**
115:17
**giving**
6:7, 8:10,
83:5, 110:7

**globe**
70:12
**go**
6:5, 6:14, 8:1,
11:4, 21:11,
21:14, 24:3,
24:14, 27:3,
31:13, 32:18,
33:16, 40:1,
45:11, 47:21,
52:6, 53:2,
60:1, 60:21,
61:14, 61:20,
63:20, 67:12,
71:3, 75:4,
79:22, 88:21,
91:12, 94:6,
94:20, 95:2,
97:7, 105:16,
105:19, 114:3
**god**
127:17
**goes**
11:7, 11:14,
63:12, 78:8,
98:12
**going**
6:5, 6:6, 11:8,
16:17, 32:8,
33:5, 34:2,
41:17, 41:18,
42:13, 43:9,
43:10, 47:12,
48:13, 50:12,
51:13, 52:15,
52:16, 52:17,
53:5, 54:12,
55:16, 56:20,
56:21, 57:2,
58:4, 61:17,
61:20, 63:1,
63:18, 66:3,
68:14, 71:6,
74:1, 74:4,
74:10, 74:13,
74:15, 74:16,
74:21, 78:4,
78:5, 78:19,

82:4, 82:10,
84:13, 84:14,
85:2, 88:2,
89:3, 89:6,
89:13, 90:21,
91:15, 94:9,
95:8, 102:9,
104:16, 104:17,
104:19, 104:21,
105:19, 106:10,
108:6, 108:9,
113:4, 113:7,
113:8, 113:11,
114:11, 114:15,
115:12, 119:2,
119:5, 119:13,
124:5, 125:9,
125:18, 127:9,
129:11
**gold**
116:15
**gone**
127:10
**good**
34:15, 51:15,
69:15, 77:15,
104:10, 115:21,
115:22, 127:2,
129:16
**goofy**
70:11
**gotta**
51:20, 59:9,
60:12, 60:16,
61:3, 61:9,
61:16, 62:7,
89:3, 89:5,
90:16, 113:15,
115:18, 118:22,
119:4
**gotten**
93:13, 97:15
**government**
26:21, 28:5,
28:8, 29:11,
30:7, 30:8,
30:22, 31:8,
45:14, 46:7,

46:19, 47:1,
54:2, 58:8,
60:8, 85:14,
116:11, 116:15,
117:2, 117:5,
117:21, 117:22,
124:5
**government's**
28:11
**government-insured**
30:2
**government-related**
30:2
**grade**
52:5
**grandparents**
13:17
**grant**
99:17
**grant-making**
107:6
**granted**
99:14
**granting**
125:10
**greater**
105:7, 128:12
**green**
55:17, 55:18,
56:2, 80:7
**ground**
42:15, 43:13,
43:21, 65:14,
125:17
**grounds**
10:21
**group**
44:6
**groups**
18:18
**guarantee**
97:18
**guess**
53:9, 63:19,
70:1, 99:3,
99:4, 116:18
**guessing**
99:4

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    48

**guys**
51:5, 71:2

**H**

**half**
129:6
**hand**
52:4, 55:14,
130:14
**handbook**
98:4, 98:5
**handle**
57:19
**handles**
80:8
**hands**
20:9
**hang**
120:5, 120:13,
120:19, 120:20
**happen**
58:6, 66:11
**happened**
66:15, 66:22,
82:8
**happens**
48:4, 48:6,
66:18
**happy**
94:18
**harbor**
14:9
**hard**
128:6, 128:7
**head**
67:22, 97:7
**header**
34:7, 34:8,
34:22
**hear**
80:3
**heard**
76:19, 126:19,
127:3, 127:5
**hearing**
51:18
**held**
2:1, 17:9,

**help**
81:13
**help**
17:18, 19:3,
34:2, 68:10,
72:6, 78:4
**helped**
21:21
**helpful**
36:2
**helping**
12:15
**helps**
116:11
**henry**
16:12, 97:8
**here**
27:7, 41:11,
49:22, 50:6,
50:17, 55:3,
55:9, 55:16,
55:20, 57:15,
57:17, 59:7,
59:9, 61:20,
61:22, 68:15,
68:17, 72:7,
73:9, 87:12,
90:18, 92:14,
104:14, 104:18,
105:18, 114:12,
116:5, 126:1,
126:21, 126:22,
128:15
**hereby**
130:4
**hereunto**
130:13
**hi**
114:20
**high**
67:15, 68:9,
77:19
**high-end**
15:9
**higher**
11:14, 70:13,
70:15, 70:17,
106:1
**higher-end**
11:19

**hill**
97:15, 120:7
**hire**
59:14
**hired**
60:9
**hires**
11:9
**hiring**
60:13, 60:14,
61:2
**history**
74:20, 86:4,
111:19, 112:1
**hold**
9:3, 23:11,
77:19, 88:10
**holding**
20:8, 34:18
**holds**
99:13
**home**
1:8, 21:7,
21:19, 25:1,
31:21, 42:14,
49:12, 52:11,
88:1, 90:9,
92:6, 98:16,
99:7, 100:3,
125:14, 126:7
**hook**
128:2
**hottest**
123:2
**hours**
116:18
**house**
28:15, 41:8
**household**
37:17, 81:3,
81:12, 84:21,
88:5, 88:6,
88:15
**housing**
15:5, 15:21,
16:4, 16:9,
17:14, 18:1,
18:3, 18:4,

**hud**
18:13, 18:20,
19:1, 19:13,
23:1, 23:16,
25:2, 26:12,
27:16, 28:17,
31:7, 31:11,
31:22, 43:10,
45:1, 49:3,
55:3, 72:22,
73:5, 96:21,
98:5, 98:8,
115:18, 120:1,
127:1, 128:8
**however**
122:13
**hud**
16:1, 18:22,
23:3, 40:17,
48:9, 67:5,
73:7, 98:4,
98:5, 98:9,
99:6, 101:5,
102:13
**hud;**
46:2
**huh**
39:14
**hurdles**
58:7
**huron**
15:15
**husband**
89:16
**hyde**
16:12, 16:17,
97:8, 97:11,
97:12, 123:4
**hypothetical**
91:12, 92:5,
93:11
**hypothetically**
92:10, 92:11

**I**

**i-**
54:22
**i-9**
59:6, 59:7,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          49

| | | | |
|---|---|---|---|
| 59:13, 59:18, | 127:11, 127:15 | **inconsistent** | 74:8, 83:11, |
| 60:3, 60:22, | **immunity** | 28:16 | 93:21, 101:19, |
| 61:7, 61:9, | 58:2 | **independence** | 102:8, 112:12, |
| 61:16, 62:4, | **impact** | 120:18 | 114:1, 119:13 |
| 118:20 | 18:22 | **independently** | **infrared** |
| **id** | **impacts** | 119:8 | 70:10 |
| 54:7 | 48:12 | **index** | **infrastructure** |
| **ideal** | **implementation** | 80:4, 106:9 | 99:21 |
| 32:15 | 73:6 | **indian** | **inherent** |
| **identification** | **important** | 98:8 | 18:21 |
| 6:2, 111:15 | 25:5, 25:15, | **indicated** | **inherently** |
| **identify** | 27:12, 58:21, | 32:19, 125:6 | 114:5 |
| 76:2, 111:11 | 75:3, 113:22 | **indicating)** | **initially** |
| **identifying** | **impression** | 20:7, 52:5, | 93:15 |
| 113:7 | 68:18 | 61:12, 70:9 | **initiate** |
| **identity** | **imprimatur** | **indication** | 107:14 |
| 57:10, 58:9, | 57:21 | 63:7 | **input** |
| 73:21, 78:10, | **in-house** | **indicator** | 77:7 |
| 112:1, 116:12 | 10:6 | 62:22, 80:8 | **inquiries** |
| **illegal** | **inappropriate** | **individual** | 31:12 |
| 109:7, 116:4 | 109:5 | 38:15, 41:3, | **inside** |
| **illegally** | **inaudible)** | 49:14, 61:6, | 20:11, 41:8, |
| 126:21, 126:22 | 9:13, 117:13 | 62:12, 62:20, | 47:11, 47:18, |
| **illegals** | **inbound** | 64:1, 64:22, | 77:1, 80:5, |
| 127:2 | 100:11 | 75:8, 81:12, | 80:10, 120:9, |
| **illustration** | **incentive** | 84:8, 86:9, | 122:12 |
| 70:7 | 40:21 | 86:10, 89:10, | **inspector** |
| **imagine** | **incentives** | 89:11, 112:13, | 67:5 |
| 13:5, 58:7 | 41:1 | 113:1, 124:9 | **instances** |
| **imbue** | **include** | **individual's** | 29:15, 54:13, |
| 43:17 | 13:18, 13:20, | 66:7, 91:20, | 66:21, 107:7, |
| **immediately** | 13:22, 37:21, | 103:1, 123:1 | 113:10 |
| 87:2 | 41:19 | **individuals** | **institute** |
| **immigrant** | **included** | 63:13, 67:19, | 120:3 |
| 39:5, 66:6, | 21:7, 84:1 | 103:21, 109:10 | **instruct** |
| 106:2, 107:20, | **including** | **industry** | 32:8, 33:6, |
| 112:2 | 70:11, 90:8, | 76:5, 95:22, | 53:5, 94:9, 95:8 |
| **immigrants** | 99:21, 125:22 | 96:6, 101:19, | **instructing** |
| 16:8, 22:1, | **income** | 119:16, 119:19, | 33:9, 35:13, |
| 24:8, 36:9, | 17:17, 18:5, | 119:21, 120:11, | 94:11 |
| 40:8, 67:20, | 18:8, 39:1, | 121:5, 121:7, | **instruction** |
| 68:4, 105:6, | 39:6, 67:2, | 128:10 | 35:8, 35:16, |
| 106:3, 108:18, | 67:3, 68:12, | **information** | 36:5, 36:7 |
| 109:12, 111:6, | 73:16, 86:3, | 25:6, 32:5, | **instructions** |
| 124:13 | 86:11, 87:10, | 32:14, 33:2, | 95:10 |
| **immigration** | 89:8, 106:8 | 33:4, 35:12, | **insured** |
| 54:17, 116:10, | **incomes** | 35:18, 43:7, | 29:17 |
| 117:4, 117:21, | 56:8 | 53:8, 73:22, | **integrated** |
| | | | 80:15 |

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                        50

intensively
107:8
intent
25:12, 26:5,
26:18, 47:15
interchangeably
10:13
interest
18:21, 130:11
interested
55:5, 55:15
interface
77:10, 77:11
internal
122:5
internally
97:11
interrupt
8:8, 16:21,
53:1, 61:14
intervention
40:20, 41:15
intimate
118:4
intimately
117:12
introduced
16:14, 123:4
invent
97:14
investigation
119:5
involve
16:8, 48:13
involved
10:16, 11:10,
11:11, 11:22,
58:8
involvement
24:7
isolate
75:5
issue
11:6, 11:7,
16:8, 22:7,
22:8, 22:19,
25:7, 28:13,
36:18, 38:6,

79:21, 117:10,
122:9, 127:16
issues
11:12, 16:4,
65:12, 115:12,
123:6
it'll
118:16
item
42:16, 42:17,
43:13
items
74:4, 74:5
itin
53:15, 53:17,
53:18, 53:20,
54:5, 80:13
itins
53:19, 54:22,
55:3, 55:12
itself
30:22, 36:18,
37:7

**J**

jacket
38:2
january
130:15
jersey
108:15
job
1:20, 10:2,
52:18, 89:14,
90:1, 109:6,
125:21
jobs
40:12
joint
81:6, 81:7,
81:18, 81:19,
81:21, 82:2,
84:20, 88:13,
89:6
joy
3:3, 105:2,
116:18
judge
8:11

july
130:17
jury
8:11
justice
3:11, 67:6,
82:11
justification
116:21
justin
4:3, 114:20,
115:8

**K**

keep
47:14
keeping
10:21
kept
10:21
key
49:22, 73:8
keyboard
51:8
kick
122:10
kill
51:7
kind
7:15, 70:11,
104:1, 116:5
kinds
20:13, 54:19,
82:6, 110:3,
115:12
kirk
1:22, 2:19,
130:3
know
8:22, 18:15,
25:1, 25:6,
25:15, 25:17,
30:2, 38:18,
40:2, 40:15,
43:3, 43:4,
43:22, 46:20,
50:8, 50:17,
50:22, 51:3,

51:4, 51:11,
51:20, 52:2,
52:8, 52:19,
53:15, 53:20,
54:16, 55:6,
55:17, 55:18,
55:21, 55:22,
59:5, 59:17,
60:5, 60:9,
60:15, 62:8,
66:2, 68:13,
69:13, 70:16,
80:11, 80:13,
81:7, 93:15,
97:13, 97:16,
98:15, 99:10,
99:12, 100:7,
100:15, 101:4,
101:10, 101:11,
101:15, 101:18,
102:3, 102:4,
102:16, 109:21,
111:18, 112:8,
115:19, 116:7,
116:17, 116:19,
117:13, 118:3,
118:5, 118:20,
119:6, 119:9,
120:12, 120:16,
125:15, 126:20,
126:22, 127:1
knowing
43:1, 43:21,
47:10, 79:7,
99:8, 102:16
knowingly
127:1
knowledge
12:22, 24:6,
38:22, 96:7,
102:14, 105:5,
106:1, 106:11,
106:14, 110:5,
110:14, 111:10,
112:11, 112:20,
119:16, 121:5

**L**

label
35:1

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          51

**labor**
60:14
**lack**
106:8, 106:9
**lag**
8:3
**laid**
67:11
**lake**
14:11, 15:13
**landlord**
26:11, 26:19,
26:20, 27:15,
28:3, 29:3,
29:4, 29:5,
29:12, 30:13,
30:15, 42:2,
62:20, 63:4,
110:8, 116:11
**landlord's**
30:10, 31:1,
31:16
**landlord-tenant**
58:5, 125:15
**landlord;**
43:18
**landlords**
26:5, 39:9,
41:12, 81:22
**language**
73:6
**large**
14:10, 56:14,
110:22
**largely**
33:15
**larger**
115:10
**largest**
14:14, 15:12,
15:14
**last**
7:6, 7:10,
7:11, 11:17,
37:9, 56:20,
61:2, 66:22,
67:22, 74:11,
74:13, 74:19,

77:1, 103:18,
109:22, 115:13,
116:20, 124:8,
128:11
**late**
16:12, 22:12
**later**
21:3
**law**
7:16, 65:15,
66:1, 125:15
**laws**
25:15, 54:18,
59:5, 119:1
**lawyer**
81:6
**lawyer's**
95:9
**lawyers**
32:21, 108:3
**lay**
91:13
**lays**
50:18
**leads**
104:5
**leaping**
108:22
**learn**
108:17
**lease**
13:19, 13:21,
29:2, 29:4,
29:13, 30:11,
31:5, 39:6,
42:16, 43:1,
43:3, 43:13,
43:21, 58:21,
71:12, 71:16,
72:13, 72:16,
72:19, 72:21,
78:11, 81:7,
81:13, 83:7,
84:2, 85:19,
85:22, 86:12,
87:17, 88:3,
88:4, 88:17,
89:5, 89:12,

89:21, 90:6,
90:21, 91:17,
91:19, 91:22,
92:3, 92:8,
92:13, 92:14,
92:15, 92:21,
93:2, 93:6,
96:13, 111:14,
121:11, 121:16,
121:18, 122:3,
125:17, 126:2
**lease;**
31:1
**leased**
57:16
**leaseholder**
50:3, 88:3
**leases**
42:11, 58:19,
81:5, 81:18,
81:21, 82:3,
82:18, 83:1,
83:3, 83:9,
84:21, 85:6,
88:13, 103:11
**leasing**
27:7, 78:6,
129:8
**least**
99:4, 109:17,
109:19, 109:20,
113:5, 122:7,
125:13
**leave**
110:7
**leaving**
13:5, 110:17
**leesburg**
3:12
**left**
28:8, 28:11
**legal**
3:11, 26:6,
38:6, 50:5,
58:20, 61:4,
62:13, 62:21,
64:13, 65:19,
72:2, 72:8,

84:16, 90:8,
97:22, 103:1,
115:3, 118:9,
118:15, 123:1,
123:21, 128:2,
128:6, 128:15,
128:19, 128:20
**legality**
25:17
**legally**
25:21, 27:17,
28:1, 28:7,
50:4, 50:7,
50:17, 55:3,
55:7, 55:9,
55:10, 55:20,
59:8, 59:9,
62:1, 63:8,
63:15, 64:1,
68:15, 72:16,
84:8, 87:13,
90:18, 92:14,
104:14, 104:19,
105:18, 116:5,
122:17, 124:21,
125:8, 126:1,
129:10
**legislation**
17:5, 22:5,
22:10, 22:16,
25:11, 26:4,
96:21, 98:13
**legislative**
120:7, 123:3
**legitimate**
68:19, 71:11,
109:15, 109:17
**less**
36:21, 37:1,
47:5
**let's**
20:3, 22:15,
37:5, 41:20,
58:14, 85:10,
85:16, 85:19,
87:15, 87:21,
105:16, 106:16
**level**
11:15, 17:17,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    52

106:21, 117:12
**liberal**
102:6
**license**
70:3
**licenses**
70:4
**licensing**
103:9
**lied**
66:13
**lies**
68:8
**life**
60:6
**lift**
40:17
**likelihood**
126:1
**likely**
103:20, 106:12,
108:9, 108:19,
109:11, 110:6,
111:6
**limited**
1:8, 31:3,
54:15
**line**
104:15
**lisa**
1:22, 2:19,
130:3
**list**
24:17, 50:10,
50:12, 50:14,
50:15, 51:3
**listed**
90:9, 92:7
**listen**
51:13
**lists**
19:9, 23:14
**literally**
20:4, 31:12,
73:7, 73:14,
80:2, 85:5
**litigation**
49:21

**little**
8:3, 17:18,
27:6, 38:9,
70:11, 77:5,
104:3, 112:6,
122:10
**live**
104:10, 124:6
**living**
42:8, 71:19,
88:1, 109:5
**llc**
100:8
**llp**
2:3, 3:4, 4:4
**loan**
29:19, 29:20,
30:6, 30:7
**lobbied**
16:16
**lobby**
124:5
**lobbying**
15:7, 15:17,
16:7, 17:21,
18:6
**local**
29:2, 100:11,
114:5
**locality**
75:12, 112:16
**located**
34:10
**location**
125:13
**locations**
14:17
**logistical**
58:7
**logistics**
10:20
**long**
20:5, 20:7,
20:10, 97:14,
107:12, 116:1,
125:19
**longer**
11:21, 71:22,

79:20
**look**
9:4, 29:21,
31:9, 31:12,
34:21, 47:11,
49:5, 54:12,
63:20, 74:13,
74:15, 78:15,
79:1, 84:14,
87:9, 97:9,
100:2, 100:9,
100:10, 100:14,
106:5, 114:3,
116:5
**looked**
11:7, 61:2,
65:6, 68:18,
77:2, 79:21,
86:15, 86:21
**looking**
24:17, 24:18,
41:10, 57:1,
57:5, 69:13,
74:6, 75:5,
99:22, 108:3,
111:12
**looks**
70:3
**lookup**
78:8
**lose**
125:19
**lot**
14:3, 38:18,
40:2, 41:6,
41:7, 43:2,
58:3, 59:17,
65:11, 65:13,
70:3, 70:12,
86:15, 101:14,
109:16, 109:21,
113:10, 120:5,
120:10, 125:20,
126:7
**lots**
43:2, 54:14,
124:4
**loud**
51:16

**louisiana**
14:20
**low**
18:7, 68:9,
68:12, 110:20
**low-income**
31:22
**lower**
106:2
**lowest**
70:18
**lunch**
82:15, 106:19,
122:19, 123:8,
126:16
**lunches**
101:21
**luxuries**
15:9

---
**M**
---
**ma'am**
7:3
**mac**
18:17
**made**
93:14, 116:3,
116:4
**maintain**
23:7, 44:18,
44:20
**maintaining**
47:15
**major**
11:8, 13:22,
14:6, 73:5,
76:1, 106:5
**majority**
87:18, 104:9
**make**
29:18, 35:7,
51:16, 51:20,
52:13, 61:9,
67:17, 69:19,
81:9, 87:12,
88:12, 89:5,
90:5, 94:15,
96:22, 102:7,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          53

107:12, 110:2,
114:6, 115:22,
119:8, 125:20
**makes**
60:6, 109:4,
126:14
**making**
39:3, 42:19,
51:8, 55:6
**male**
85:19, 90:7,
91:18
**manage**
9:11, 11:18,
13:16, 21:22,
23:3, 40:18
**managed**
14:2, 14:10,
15:3, 15:9,
15:12, 15:14,
19:6, 21:7,
48:19
**management**
9:20, 9:22,
10:7, 10:11,
10:14, 11:16,
11:20, 12:11,
12:12, 12:20,
12:21, 14:9,
14:10, 15:5,
15:21, 23:6,
28:15, 28:16,
40:17, 41:6,
41:13, 44:6,
57:7, 82:1,
82:9, 82:17,
83:13, 96:14,
102:20, 120:2,
123:10
**management's**
120:4
**manager**
13:15, 45:6,
69:2, 80:1
**managers**
101:2, 101:3,
101:4, 101:10,
101:13, 101:15,

101:16, 101:20,
102:2, 127:22
**managing**
9:6, 22:18,
40:18, 48:1
**mandated**
60:5
**manner**
43:12, 65:9
**manual**
62:8, 85:6,
98:10, 98:11,
101:5
**manuals**
12:9, 99:6,
102:13
**many**
7:4, 7:7, 14:1,
36:14, 41:5,
54:13, 66:15,
66:21, 67:18,
74:22
**marked**
6:1, 8:19,
34:19
**market**
32:2
**maryland**
40:4, 82:7,
108:12, 108:14
**match**
78:22
**material**
102:11
**materially**
67:2, 67:15
**materials**
33:13, 125:6
**matter**
67:21, 112:22,
116:13
**matters**
102:1, 120:8
**maybe**
9:3
**mclean**
1:16, 2:6, 4:7
**mean**
11:15, 16:21,

42:12, 52:10,
54:16, 55:7,
61:13, 70:12,
73:5, 76:6,
80:8, 110:21,
119:3, 119:18
**meaning**
41:22, 45:5,
60:3, 67:3,
69:12, 90:18,
106:14, 109:5,
110:17, 123:20
**means**
23:4, 25:20,
28:14, 45:8,
50:4, 52:17,
58:12, 61:19,
61:21, 88:7,
90:2, 93:2,
93:5, 119:4
**meant**
51:17, 51:22
**measure**
116:20
**median**
18:5
**medium-sized**
115:9
**meet**
49:7, 49:11,
89:22, 90:2,
90:10, 93:3,
93:7
**meeting**
67:11
**meetings**
10:5, 101:21
**meets**
89:16, 91:18
**member**
82:20
**members**
85:7
**memphis**
15:2
**mention**
57:15
**mentioned**
40:7, 40:11,

45:4, 58:19,
64:6, 68:15,
78:9, 96:20,
116:19
**mentioning**
38:16
**merchant**
14:21
**met**
29:19, 90:7
**methodology**
73:11
**microphone**
51:7
**mid**
15:11, 123:4
**mid-career**
15:4
**mid-city**
9:19, 10:1,
10:10, 10:15,
12:16, 12:19,
13:8, 36:9,
38:14, 44:5,
44:14, 45:5,
45:20, 47:6,
55:12, 56:1,
57:9, 63:4,
75:19, 76:12,
84:20, 85:21,
88:14, 90:6,
91:21, 93:9,
93:12, 107:21,
111:4
**middle**
22:11, 110:18
**might**
8:3, 13:5,
33:16, 74:6,
108:6, 109:8,
109:16, 116:17,
125:13
**mighty**
69:15
**military**
64:9, 64:10,
64:17, 64:21
**million**
128:13

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016

54

**mind**
76:22, 87:11,
104:20, 104:21
**mine**
70:5
**minimum**
99:12
**minute**
6:6, 8:9, 87:2
**minutes**
94:19, 124:17
**mis**
88:18
**misallocation**
48:10, 48:16
**mischarac**
96:9
**mischaracterize**
17:3, 44:9,
80:21, 81:15,
89:1, 90:12,
98:2, 105:9,
112:4, 112:6,
121:13, 124:3,
125:2
**mischaracterizing**
90:16
**misrepresent**
66:6, 69:14
**misstate**
96:5
**misstated**
67:9
**misstatement**
67:16
**misstatements**
68:2
**misstating**
67:2, 68:12
**mitchell**
14:18
**mixed**
28:14, 28:18,
115:14
**mm-hmm**
44:7, 45:7,
45:22, 47:3,
48:3, 56:4,

58:22, 63:5,
71:13, 72:11,
72:14, 84:4,
85:12, 85:15,
85:18, 91:10,
102:21
**mobile**
1:8, 14:18,
21:7, 21:19,
25:1, 31:21,
42:14, 49:11,
52:11, 98:16,
99:7, 100:3,
125:14, 126:6
**moment**
23:9, 65:10
**monetary**
41:16
**money**
19:16, 27:21,
29:16, 41:2,
41:22, 48:12,
99:17, 99:18,
100:11, 100:12,
100:13, 110:18,
125:9, 125:20,
126:5
**monthly**
45:14
**months**
123:5, 128:11
**more**
14:16, 15:2,
17:18, 19:18,
29:2, 47:10,
55:5, 66:17,
69:12, 69:19,
76:11, 85:3,
86:15, 86:21,
103:7, 103:19,
104:5, 106:8,
106:12, 108:19,
109:4, 109:11,
110:6, 111:6,
111:11, 112:7,
115:16, 116:3,
116:22, 120:6,
120:10, 121:17

**mortgage**
20:22, 41:19,
41:20, 41:22,
42:4, 42:5, 42:7
**mortgaged**
42:18
**mortgages**
18:14, 29:17
**mortgagor**
42:6
**most**
8:16, 12:3,
14:22, 21:16,
24:16, 28:18,
28:20, 29:19,
37:5, 54:11,
67:7, 68:13,
69:10, 74:2,
74:11, 78:18,
81:5, 97:16,
100:19, 106:21,
108:6, 111:1,
113:8, 113:9,
116:13, 119:22,
120:13, 120:20,
121:15, 125:10,
127:12
**motivation**
46:11
**move**
51:13, 58:18
**moved**
14:12, 14:17,
22:12, 69:12
**moving**
60:6, 109:7
**much**
11:5, 15:10,
18:13, 49:17,
80:6, 108:13,
110:22, 112:7,
120:6
**mugshots**
113:11
**multifamily**
9:11
**multiple**
7:9, 75:3

**must**
27:16, 49:11,
88:15
**mute**
51:12
**myself**
13:14

**N**

**nail**
27:5
**name**
12:12, 34:3,
75:4, 76:19
**names**
74:16
**naming**
82:10
**narrow**
41:17, 42:13,
94:1
**national**
15:5, 15:21
**nationals**
57:17, 58:10,
64:17, 67:20,
68:4
**nature**
19:19, 43:12,
101:9
**naval**
64:10
**near**
70:19
**necessarily**
17:4, 43:13,
72:3, 90:1
**necessary**
25:8, 47:14,
81:2, 108:7,
113:18
**need**
6:9, 8:21, 9:4,
11:13, 23:6,
41:17, 41:18,
61:6, 71:4,
71:10, 74:21,
78:4, 84:13,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    55

85:2, 99:10,
99:12, 100:8,
111:18, 115:22
**needs**
11:7
**neighborhood**
107:5
**neither**
130:10
**never**
43:2, 82:16,
82:17, 82:18,
104:13
**new**
93:7, 108:14
**next**
93:2
**nexus**
70:8
**nice**
127:17
**nicely**
112:5
**night**
110:19
**nobody**
22:9, 29:5,
86:17
**non-assisted**
19:13, 23:8,
85:10, 86:8,
87:7, 87:8,
87:15, 91:17,
115:1, 115:7,
124:19
**non-funded**
48:22
**non-hud**
115:1, 115:7,
124:19
**none**
8:17, 106:20
**nonrenewal**
93:8
**nope**
93:20
**normal**
95:21

**normally**
71:5
**northern**
39:9, 40:4,
82:2
**northwest**
3:5
**notarial**
130:14
**notary**
2:21, 130:20,
130:22
**note**
129:14
**notes**
51:20, 99:13
**nothing**
6:19
**notice**
2:19, 110:7
**number**
14:4, 15:16,
36:16, 36:22,
40:2, 50:22,
54:7, 58:1,
61:7, 61:12,
61:18, 62:3,
62:13, 62:19,
63:6, 63:14,
64:3, 65:1,
73:20, 75:7,
76:21, 77:6,
77:12, 78:1,
78:6, 78:13,
79:4, 79:7,
79:14, 80:13,
98:11, 99:19,
100:6, 104:12,
109:20, 110:20,
112:21, 113:4,
113:18, 115:8,
122:6, 130:22
**numbers**
62:16, 75:2,
97:16, 113:6

**O**

**oath**
6:15

**obtain**
65:20, 118:10,
118:17
**obtained**
83:12
**obtains**
117:4
**obviously**
38:17, 40:12
**occasional**
106:19
**occasionally**
10:13, 36:17,
69:15, 108:4,
122:8, 123:12,
123:17
**occupancy**
98:4
**occupies**
20:6
**odom**
3:3, 5:3
**of:**
2:2
**offender**
74:21, 75:8,
112:13, 113:1,
113:13
**offense**
38:10, 38:11,
68:13
**offer**
126:3
**offered**
91:9
**offering**
27:13, 94:16
**office**
76:8, 76:10,
102:9
**officer**
12:22, 130:3
**officers**
64:10
**offices**
2:2
**officially**
10:3

**okay**
6:13, 7:15,
9:2, 28:3, 30:6,
41:10, 48:15,
52:7, 76:8,
78:9, 85:10,
86:7, 87:8,
88:9, 91:7,
92:10, 92:20,
94:20, 95:19,
103:17, 114:2
**old**
14:9, 59:18
**once**
14:7, 66:18,
113:21
**one**
2:4, 4:5, 7:13,
8:5, 9:18, 11:7,
11:9, 11:13,
12:19, 15:11,
16:5, 22:19,
23:6, 23:17,
28:18, 31:3,
33:16, 37:16,
38:6, 38:9,
38:17, 41:1,
41:9, 44:4,
47:10, 47:17,
48:4, 48:11,
48:17, 48:18,
48:20, 51:12,
52:3, 54:6,
55:14, 58:1,
58:13, 60:2,
61:16, 70:7,
70:17, 73:22,
75:17, 76:16,
77:2, 78:7,
79:18, 79:19,
80:18, 83:1,
83:3, 84:21,
86:9, 86:10,
87:10, 88:16,
89:10, 89:11,
91:4, 100:6,
103:13, 103:18,
104:15, 104:19,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    56

| | | | |
|---|---|---|---|
| 105:5, 109:1, 109:6, 110:10, 111:9, 115:9, 121:8, 121:10, 121:14, 122:16, 123:2, 127:5 | 19:19, 45:15, 46:1 | **organized** 102:4 | 113:16, 122:14 |
| **one's** 50:12 | **operational** 10:5, 14:7, 30:3 | **originally** 92:3 | **outcome** 130:12 |
| **one-size-fits-all** 100:17 | **operations** 10:6, 10:17, 11:6, 19:12, 20:21 | **other** 8:2, 27:6, 31:6, 31:7, 33:1, 35:9, 35:17, 36:6, 38:15, 40:4, 41:4, 41:7, 44:18, 47:11, 48:12, 50:5, 57:18, 58:3, 58:13, 60:2, 63:12, 64:18, 70:11, 70:12, 73:11, 74:8, 80:3, 87:3, 90:2, 90:17, 96:13, 98:3, 98:22, 101:8, 102:1, 106:9, 107:7, 108:9, 109:1, 109:22, 110:11, 111:9, 113:4, 113:5, 113:7, 114:1, 123:9, 127:6 | **outset** 52:1 |
| **ones** 55:4, 70:15 | **operators** 50:1 | | **outside** 38:6, 64:20, 94:10, 102:11, 107:21, 111:4 |
| **oneself** 58:3 | **opine** 32:3 | | **outsource** 56:14 |
| **online** 113:11 | **opinion** 26:18, 27:11, 27:14, 30:18, 30:20, 34:4, 44:13, 77:14, 80:18, 81:9, 83:6, 93:22, 97:20, 103:19, 109:10, 110:10, 110:13, 111:22, 115:5, 120:8 | | **over** 8:1, 8:2, 14:2, 15:8, 17:10, 21:7, 21:22, 34:11, 50:2, 57:16, 66:21, 81:12, 83:8, 85:7, 87:18, 88:10, 96:8, 96:17, 97:13, 97:14, 101:9, 106:19, 107:10, 117:18, 119:22, 124:4, 127:18 |
| **only** 8:5, 12:19, 21:8, 30:15, 32:20, 34:1, 35:4, 36:16, 36:17, 50:16, 56:20, 62:6, 78:7, 88:16, 89:18, 89:21, 90:9, 91:19, 109:1, 109:6 | | | |
| **open** 10:21 | **opinions** 26:1, 27:18, 32:5, 33:14, 33:15, 43:8, 91:9, 94:16, 95:16, 119:15, 121:4 | **others** 10:9 | **overseeing** 12:14 |
| **openly** 119:11 | | **otherwise** 23:2, 106:22, 109:15, 109:17, 130:12 | **owing** 110:18 |
| **operate** 19:1, 19:14, 19:15, 23:2, 40:5, 43:11, 44:17, 44:18, 100:21, 115:20 | **opportunity** 97:2, 128:8 | | **own** 9:20, 9:21, 10:19, 13:16, 33:13, 39:13, 39:15, 79:7, 83:7, 96:7, 102:19, 119:17, 120:9 |
| | **opposed** 19:13, 68:3, 71:16, 106:3 | **ourselves** 128:11 | |
| **operated** 10:8, 14:19, 21:19, 47:19 | **opposing** 119:19 | **out** 9:1, 11:15, 17:18, 28:8, 50:18, 58:5, 59:6, 61:7, 67:12, 68:10, 68:19, 70:2, 71:6, 72:6, 78:4, 78:8, 91:13, 100:8, 105:19, 107:12, | **owned** 10:12, 15:3 |
| **operates** 42:21 | **oral** 50:16 | | **owner** 107:15 |
| **operating** 33:17, 45:18, 112:17 | **order** 25:6, 27:14, 27:21, 46:5, 49:12, 52:15, 59:8, 61:7, 61:9 | | **owner's** 10:4 |
| **operation** 10:14, 10:15, 10:18, 13:22, | **organization** 15:22, 16:19, 16:22 | | **owners** 17:6, 17:9, 24:18, 50:1, 75:18, 102:5, 107:11, 125:21 |

**ownership**
10:15, 47:12, 106:5

**P**

**package**
43:12, 52:22, 56:7, 116:2
**page**
5:2, 5:11, 34:22, 85:5, 109:1, 111:13, 118:8
**pages**
35:1
**pages:**
1:21
**paid**
29:20, 52:15, 52:16, 58:4, 89:6, 129:9, 129:11
**pair**
86:7
**paper**
59:18, 70:6, 70:20
**parent**
10:12, 85:20, 87:16
**parents**
13:17
**park**
1:8, 25:2, 31:21, 49:12, 52:11, 98:16, 99:7, 100:3
**parks**
21:20, 125:15
**parse**
85:2, 105:17
**part**
9:22, 24:16, 26:1, 30:20, 45:15, 46:10, 51:20, 55:13, 56:2, 71:11, 72:10, 74:18,

78:10, 78:21, 101:1, 106:4, 107:6, 111:1, 111:14, 115:3, 116:2, 119:18, 125:7
**partial**
50:15
**partially**
9:14
**participate**
59:19
**particular**
26:11, 58:21, 76:4, 76:9, 101:5, 107:5, 122:3, 124:11
**particularly**
17:5, 29:19, 43:9, 54:17, 67:10, 71:21, 115:9
**particulars**
101:11
**parties**
6:13, 119:8, 130:11
**partnership**
1:9, 100:7
**partnershipping**
100:6
**parts**
17:5
**pass**
69:19
**passed**
22:9, 22:16, 26:3, 98:15
**passing**
57:15
**passport**
57:10, 70:14
**passports**
58:9
**past**
78:2, 78:15
**path**
44:3

**pattern**
49:5
**pay**
56:17, 56:20, 72:4, 72:18, 81:13, 106:13, 116:19, 125:9, 126:2
**paying**
58:6, 61:3
**payment**
45:17, 86:19, 87:3, 88:8, 88:17, 88:19, 111:19, 112:1
**payments**
38:21, 46:6, 71:20, 87:1
**payroll**
54:2
**payrolls**
101:16
**penalize**
17:6
**penalties**
41:2, 41:16
**pensacola**
64:11, 64:15
**people**
11:16, 18:4, 37:16, 75:3, 77:21, 87:12, 104:10, 105:18, 108:8, 108:9, 110:17, 120:5, 122:19, 128:14
**people's**
82:13
**percent**
18:5, 19:10, 19:11, 23:10, 23:11, 24:20, 45:17, 123:5
**percentage**
19:6
**perform**
37:12, 76:13
**period**
14:15, 19:9,

**71:16, 126:6,**
127:12
**permit**
65:21, 118:11
**permits**
11:13, 11:14, 57:13
**person**
53:20, 54:9, 62:18, 72:16, 75:5, 75:6, 89:12, 89:14, 108:20, 117:4, 118:15, 119:13
**person's**
72:2, 72:8
**personal**
24:5, 83:7, 96:7, 97:1, 102:19
**perspective**
18:2
**petitions**
107:10
**phone**
71:5, 80:4
**phonetic)**
65:10, 100:6
**phrased**
45:6
**pick**
78:20
**picked**
38:10
**picks**
77:3
**picture**
30:7, 70:5
**piece**
25:5, 70:6, 74:19, 78:7
**pieces**
27:11, 30:18, 73:22, 74:8, 114:1
**pih**
98:6, 98:10
**pike**
3:12

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                              58

**place**
2:4, 4:5,
25:11, 48:11,
128:6, 128:7
**places**
40:5, 98:3,
106:6, 128:9
**plaintiffs**
1:6, 6:21,
121:2
**plaintiffs:**
3:2
**plan**
49:13, 50:19,
50:20, 122:15,
127:2
**planet**
70:18
**plans**
11:10, 90:19,
122:5, 122:22,
126:18
**play**
22:6
**pleadings**
125:8
**please**
71:3, 96:5
**plowed**
65:14
**plus**
14:20, 113:10
**point**
9:14, 12:13,
13:11, 14:5,
15:11, 15:13,
46:4, 53:19,
76:15, 97:15,
120:22, 127:18
**police**
106:6, 108:1
**policies**
12:2, 12:6,
12:7, 12:10,
12:11, 12:15,
13:1, 23:6,
23:22, 46:11,
48:21, 49:14,

91:3, 91:5,
102:6
**policy**
12:8, 15:7,
15:17, 16:7,
17:22, 18:6,
22:1, 22:19,
23:17, 24:8,
25:7, 40:7,
40:21, 47:16,
49:15, 49:20,
50:9, 50:18,
52:9, 65:9,
87:12, 92:7,
92:11, 92:13,
92:22, 93:1,
102:14, 102:22,
116:9, 124:12,
124:20, 126:9,
128:12
**politician**
104:2
**polling**
40:10
**pop**
75:4, 108:5,
123:17
**popped**
127:15
**population**
106:2, 107:20
**portfolio**
9:21, 10:9,
13:2, 13:5,
14:11, 14:21,
19:4, 19:8,
19:10, 24:22,
76:3, 115:14,
125:14
**portion**
30:21
**pose**
105:6
**posed**
95:21
**position**
9:18, 32:3,
57:4, 127:13,

128:11
**positions**
14:7, 74:17,
119:21
**positive**
74:5, 74:7
**positives**
74:22, 113:14
**possesses**
62:19
**possession**
125:18
**possible**
39:4, 96:12
**post**
39:17, 107:17
**potential**
72:12
**potentially**
93:6, 102:10
**practice**
49:5, 95:21,
96:7, 115:2
**practices**
95:22
**prd**
39:21
**precise**
36:16, 36:22
**precisely**
26:14, 32:1,
43:1, 80:11
**precision**
38:1
**prefer**
76:2
**premise**
87:14
**prerequisite**
123:22
**prerequisites**
122:2
**presence**
28:6
**present**
22:18, 23:12,
27:17, 47:17,
72:16, 84:8,

88:4, 88:6,
90:17, 92:6,
124:21
**presented**
17:6
**presents**
56:2
**president**
12:22, 14:8,
120:1, 127:14
**pretty**
15:10, 65:22,
111:2
**prey**
108:9, 109:4
**price**
82:17
**pricing**
121:16
**primary**
13:10, 13:13
**principal**
97:8
**principally**
14:19, 18:3
**printed**
70:20
**prior**
7:13, 12:4,
79:5
**prison**
109:18
**private**
42:5, 60:8,
60:9
**privilege**
94:12, 95:8
**privileged**
33:3, 35:12,
35:17, 95:18
**probably**
7:21, 34:10,
37:1, 49:17,
53:18, 70:14,
86:2, 87:9,
89:20, 100:5,
120:16, 123:4
**problem**
36:3

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          59

problems
115:18
procedure
112:18
procedures
67:4, 107:14
process
36:18, 37:9,
56:3, 57:11,
60:22, 63:10,
67:9, 67:11,
68:16, 73:15,
73:17, 110:16,
114:5, 115:3
processes
11:11, 69:11,
69:19
processing
55:8
produced
33:20
producing
17:10
product
75:18
program
77:1, 77:7
programs
68:11, 77:10
projects
11:19
promptly
122:16
proof
57:10, 58:9,
115:2
proper
29:12, 111:15
properly
111:11
properties
9:21, 12:16,
13:3, 13:4,
13:19, 13:21,
14:11, 15:1,
15:10, 19:6,
21:6, 21:8,
21:21, 22:17,

22:19, 24:7,
36:10, 38:18,
39:17, 40:6,
48:2, 76:3,
85:13, 98:22,
101:15, 104:16,
104:18, 105:20,
107:5, 107:11,
110:1, 124:1
properties'
12:1, 122:22
properties;
9:6
property
10:7, 15:15,
22:22, 23:14,
24:17, 24:20,
28:19, 38:5,
38:7, 38:12,
41:13, 42:8,
48:5, 48:6,
82:1, 83:13,
91:13, 91:17,
96:14, 99:17,
99:18, 101:1,
101:6, 101:20,
102:14, 107:10,
107:14, 108:8,
110:7, 122:3,
124:12, 127:22,
128:18
proposals
65:12
proposing
18:22
proposition
52:12
proprietary
79:10, 122:11
prospective
26:19, 29:13,
49:11, 50:9,
50:21, 56:1,
73:21, 76:14,
84:3, 111:12,
124:21
prove
62:13

proverbial
128:5
provide
50:9, 50:11,
51:1, 56:15
provided
33:2, 37:14,
122:16
provisions
59:5, 81:20
prwora
97:6, 98:15
public
2:21, 98:5,
98:8, 130:20
pull
75:7, 75:9,
107:22, 108:1,
108:2, 112:12,
112:18, 112:22
pulled
11:13
pulls
11:14
purpose
95:13
purse
70:2
pursuant
2:19
put
34:4, 57:1,
93:9, 111:5,
119:2, 122:14

Q

qualify
27:21
quality
30:10, 77:15,
77:20
question
7:5, 8:6,
22:15, 26:10,
27:4, 28:3,
32:7, 33:4,
35:20, 41:18,
44:11, 46:17,

47:22, 49:22,
53:4, 53:7,
53:13, 53:14,
60:20, 62:18,
72:13, 77:5,
77:6, 78:9,
85:2, 86:7,
87:14, 94:8,
94:10, 95:3,
95:6, 99:11,
103:18, 117:17,
124:18, 126:19
questions
94:2, 95:20,
114:11, 114:15,
114:16, 114:21,
114:22, 120:22,
121:1
quick
58:14, 71:4,
87:9, 94:21
quickly
14:6
quinn
3:4
quite
62:17
quote
65:18

R

raid
68:16, 69:4,
110:2
raids
38:17, 107:17
raise
52:4, 87:4
raises
87:2
ran
13:2
range
14:22, 16:3,
55:19
rare
64:19, 66:17
rate
110:17, 110:19

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                              60

| | | | |
|---|---|---|---|
| **rates** | 46:22, 48:7, | **reference** | 20:11, 20:13, |
| 106:1 | 85:14, 97:21 | 111:12 | 21:1, 21:4, |
| **rather** | **received** | **referral** | 97:21, 124:6 |
| 103:9 | 19:7, 23:10, | 67:6, 67:17 | **regulator** |
| **ratio** | 25:2, 42:4 | **referrals** | 84:15 |
| 23:8, 23:11 | **receives** | 67:8, 67:18 | **regulators** |
| **reach** | 26:12, 46:18, | **referring** | 84:17 |
| 70:2 | 48:17, 48:20 | 97:1, 107:18 | **regulatory** |
| **reacting** | **receiving** | **refinancing** | 11:12, 12:11, |
| 37:10 | 26:21, 28:4, | 107:3 | 40:20, 41:15, |
| **read** | 45:20, 86:11 | **refinancings** | 43:18, 46:2, |
| 80:4, 93:19 | **recent** | 107:3 | 46:5, 47:5 |
| **readable** | 37:5, 69:11, | **regard** | **relate** |
| 70:10 | 70:14, 78:18, | 43:11, 73:14, | 18:7, 107:19 |
| **reading** | 92:7, 123:7 | 77:20, 86:5, | **related** |
| 98:18, 130:9 | **recently** | 122:11, 123:14, | 17:22, 22:10, |
| **real** | 109:18, 119:22 | 123:18, 125:13 | 34:1, 55:20, |
| 15:22, 16:6, | **recently-retired** | **regarding** | 57:14, 102:22, |
| 113:14, 120:3 | 77:18 | 20:19, 43:16, | 130:10 |
| **really** | **recognizing** | 105:15, 108:13, | **relates** |
| 30:17, 32:3, | 109:21 | 117:15, 123:16 | 22:5, 98:10, |
| 58:12, 75:2, | **recommend** | **regional** | 122:22 |
| 111:7, 113:16 | 44:19 | 76:2 | **relation** |
| **realpage** | **reconciliation** | **register** | 96:6, 115:20 |
| 76:15, 76:16, | 97:2 | 54:6 | **released** |
| 76:20, 79:20 | **record** | **registration** | 109:18 |
| **realty** | 6:5, 34:18, | 130:22 | **relevant** |
| 14:9 | 35:7, 35:15, | **registries** | 43:8, 43:14, |
| **reason** | 36:4, 58:16, | 74:21 | 48:5, 48:21, |
| 8:15, 9:5, | 71:7, 94:20, | **registry** | 70:7, 72:3, |
| 9:14, 14:5, | 94:22, 114:17, | 75:8, 112:13, | 72:9, 93:22 |
| 91:19, 93:8, | 129:17, 130:6 | 113:1 | **relied** |
| 97:10, 100:16 | **recorder** | **regret** | 95:15 |
| **reasonable** | 20:8, 98:7 | 8:20 | **rely** |
| 52:14, 52:16, | **records** | **regs** | 33:12, 119:12 |
| 115:2, 124:20, | 108:2, 108:3, | 63:17, 93:16 | **relying** |
| 125:5 | 108:4, 113:3, | **regular** | 53:6 |
| **reasons** | 113:16, 113:19 | 57:16, 107:2, | **remember** |
| 23:1, 52:9, | **red** | 120:5 | 7:8, 15:16, |
| 109:16, 115:8 | 80:7 | **regularity** | 34:8, 38:1, |
| **recall** | **reduced** | 66:18 | 38:11, 65:11, |
| 37:9, 38:9, | 130:8 | **regulate** | 67:22, 77:9, |
| 38:16, 63:22, | **reed** | 99:7, 102:13 | 82:8, 98:6, |
| 65:4, 116:17, | 2:3, 4:4, | **regulated** | 124:7 |
| 124:22 | 32:12, 32:17, | 101:11 | **remind** |
| **receive** | 32:19 | **regulates** | 87:6 |
| 23:16, 24:9, | **refer** | 98:16 | **remote** |
| 32:4, 38:14, | 8:21, 10:13 | **regulations** | 8:2 |
| | | 19:18, 20:6, | |

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    61

remotely
6:11
removing
36:19, 37:15,
37:17
render
33:16
renewal
93:3
renewed
93:6
rent
13:19, 13:21,
38:20, 52:14,
52:16, 58:6,
88:8, 106:13,
125:10, 125:12,
129:9, 129:11
rental
15:12, 21:16,
42:8, 71:16,
72:5, 72:18
rephrase
26:17, 117:3
replace
11:18
report
5:12, 8:19,
8:22, 27:13,
33:14, 34:6,
34:20, 43:8,
58:20, 65:18,
78:21, 83:6,
84:13, 95:4,
95:13, 95:16,
95:17, 108:16,
111:13, 118:8,
119:16, 121:5
reported
1:22
reporter
2:21, 6:6,
6:14, 8:5,
20:18, 43:15,
105:14, 117:14,
123:15
reporter-notary
130:1

reporting
19:18, 106:5
representative
7:18, 10:4,
16:12, 16:13,
16:17, 97:12
representatives
123:3
republic
130:1
request
33:1
requested
20:18, 43:15,
105:14, 117:14,
123:15
requested;
130:9
require
76:20, 77:11,
97:21, 115:2
required
49:7, 51:1,
59:19, 60:2,
67:17, 73:20,
77:7, 79:14,
92:7, 112:12,
112:21
requirement
16:15, 50:2,
98:3, 98:5,
98:11, 118:21,
128:18
requirements
17:1, 17:8,
24:19, 46:13,
49:10, 67:14,
89:17, 89:22,
90:3, 90:7,
90:10, 99:16
requires
50:9, 84:2,
124:20
requiring
92:22, 128:18
research
14:3, 19:9,
99:2

researched
106:22
reserved
71:15, 72:4
reside
64:14, 92:14
residence
36:19, 50:6,
55:7
residences
74:15, 74:17,
78:3, 78:19,
79:5
residences;
78:16
residency
17:1, 17:8,
25:13, 26:5
resident
31:13, 50:5,
89:10, 89:18,
89:21, 90:9,
92:8
residential
9:6, 13:18,
13:21, 14:1,
15:12, 19:12,
21:15, 21:16,
39:8, 39:19,
41:12, 46:12,
57:7, 82:1,
83:12, 123:9,
128:18
residents
38:19, 55:4,
115:21
resort
56:20
respect
103:22
respectfully
104:3
respond
107:9, 107:16
response
45:3, 80:22,
124:17
responsibilities
10:1, 12:18

responsibility
8:13, 12:14,
97:2
responsible
13:1, 17:9,
81:13, 88:7,
88:17, 88:19
rest
61:18, 62:22,
63:11
restate
27:4, 35:22,
118:1
restrictions
43:3
restrictive
28:20, 100:20,
115:16
resumé
8:18
retail
21:19
retired
7:19, 9:14,
11:16, 11:17,
16:13, 120:6
retirement
12:5, 12:13,
13:12
reveal
78:1, 79:5
revealed
36:18, 37:6,
37:13
review
33:20, 35:10,
67:13
reviewed
107:6
reviewed;
35:5
reviewer
12:3, 12:6
reviews
11:10
reyes
1:5
rifling
80:3

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                          62

**right**
6:4, 7:1, 7:10,
7:13, 7:20,
8:18, 9:7, 9:10,
26:17, 27:20,
30:9, 31:17,
34:14, 34:16,
35:3, 35:5,
41:11, 41:20,
42:3, 42:7,
43:18, 52:8,
58:14, 71:6,
75:6, 78:12,
78:16, 81:10,
81:17, 96:8,
104:11, 114:7,
120:21, 125:21,
126:5, 128:15,
129:12
**rights**
88:11
**righty**
7:17
**rigor**
106:21
**rise**
106:20
**risk**
29:4, 43:18,
46:2, 47:5,
72:12, 86:5,
103:20, 105:7
**road**
7:22
**rock**
128:5, 128:6
**rogues**
104:12
**rosy**
1:5
**roughly**
18:4, 19:5,
128:13
**roundabout**
29:20
**ruined**
82:13
**rule**
93:13, 95:18

**rulemaking**
18:21
**rules**
7:22, 18:21,
19:17, 31:11,
40:13, 40:19,
43:10, 45:2,
47:18, 49:8,
67:4, 85:5,
99:20, 100:20,
108:13
**run**
28:12, 28:18,
62:16, 72:20,
76:21, 77:7,
77:20, 79:14,
80:14, 103:8
**running**
16:5, 28:13,
28:15, 80:16
**résumé**
119:19, 119:20

**S**

**s**
15:11, 22:11,
22:12, 22:16,
65:13, 123:4
**sabbatical**
15:4
**safe**
116:1
**safety**
103:20, 105:7
**said**
16:22, 17:22,
20:12, 23:9,
24:15, 26:3,
34:8, 47:13,
47:20, 47:21,
50:14, 52:19,
71:1, 78:14,
90:15, 96:16,
100:19, 101:12,
109:14, 112:5,
115:13, 121:4,
130:6
**same**
10:12, 19:14,

25:14, 26:20,
30:12, 36:15,
41:15, 44:4,
44:14, 44:21,
48:19, 49:1,
49:6, 49:8,
61:1, 65:8,
69:9, 69:22,
72:21, 72:22,
73:11, 73:15,
75:4, 84:10,
86:1, 86:7,
86:12, 86:14,
87:14, 90:10,
91:1, 93:17,
96:15, 97:1,
97:19, 98:21,
103:11, 110:15,
113:2, 122:4
**sandoval-
moshenberg**
3:10
**saw**
8:18, 9:5,
96:16, 119:19,
119:20
**say**
9:14, 10:16,
11:22, 14:2,
14:4, 14:5,
24:6, 28:9,
28:11, 29:3,
41:9, 45:5,
51:17, 51:22,
52:10, 66:21,
68:6, 85:16,
85:19, 87:15,
97:10, 101:9,
109:14, 116:6,
120:12, 126:14,
127:3, 127:17
**say-so**
117:11
**saying**
47:14, 62:15,
86:22, 114:2
**school**
64:15
**scientific**
106:21

**scientifically**
68:6
**se**
17:8
**seal**
130:14
**season**
127:10
**second**
26:1, 27:14,
47:20, 51:5,
103:13
**section**
20:5, 117:18
**sector**
19:2
**secure**
69:12, 116:22
**security**
37:22, 50:22,
61:7, 61:12,
61:18, 62:3,
62:13, 62:16,
62:19, 63:6,
63:14, 64:3,
64:22, 70:10,
70:13, 70:15,
70:17, 70:18,
70:19, 70:21,
73:20, 75:2,
75:7, 76:20,
77:6, 77:12,
78:1, 78:5,
78:13, 79:4,
79:14, 112:21,
113:18
**see**
34:11, 34:12,
34:16, 36:6,
36:17, 54:18,
55:15, 55:17,
55:20, 57:2,
64:16, 69:10,
70:13, 70:16,
79:1, 79:12,
80:6, 80:10,
84:18, 100:10,
107:14, 109:8,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                          63

110:1, 122:17
**seem**
30:16
**seemed**
22:9
**seems**
81:10
**seen**
34:1, 43:2,
43:20, 49:13,
50:10, 50:14,
50:15, 50:19,
51:3, 53:16,
53:17, 53:18,
65:6, 69:15,
70:14, 71:1,
108:22, 109:2,
113:3
**seize**
107:10, 107:14
**selection**
49:13, 50:19,
90:19, 93:5,
122:5, 122:15,
122:22, 126:18
**senior**
41:5, 71:21,
77:17, 77:18
**sense**
21:6, 101:13,
119:10
**separate**
103:9
**separately**
42:18, 81:2,
81:11, 120:14,
120:20
**series**
13:15, 22:10
**served**
113:6
**services**
82:17
**set**
23:6, 24:18,
28:16, 28:19,
59:15, 79:8,
85:5, 91:5,

93:4, 94:1,
94:3, 108:13,
115:16, 130:13
**setting**
110:13
**seven**
14:19, 74:14,
78:2, 78:15
**several**
48:1, 62:10,
75:17, 81:7,
81:18, 81:20,
81:21, 82:2,
84:21, 88:13,
89:7
**severals**
81:6
**sex**
74:20, 75:8,
112:13, 113:1,
113:12
**shade**
14:16, 15:2
**share**
101:13, 101:19,
122:13, 122:18,
122:21
**shared**
32:1, 84:17,
102:11
**sharing**
122:7
**sheet**
113:10
**shore**
14:11
**short**
21:15, 69:7,
82:13, 86:2,
103:10, 116:1,
125:20
**shorthand**
130:1
**should**
25:13, 89:15
**shouldn't**
48:11
**show**
74:16

**siberia**
119:6
**side**
61:8, 68:9,
68:12, 70:10,
73:7, 85:3,
85:4, 85:11,
86:8, 87:7,
87:8, 87:15,
91:4, 91:14,
91:17, 110:1
**sides**
90:20
**sign**
41:6, 41:9,
46:4
**signature-ils**
130:18
**signed**
120:18
**signing**
130:9
**similar**
19:15, 19:20,
22:21, 23:22,
40:7, 98:6
**simon**
3:10
**simple**
59:4, 65:22
**simply**
32:13, 35:14,
63:18
**simultaneous**
105:10, 123:11
**since**
7:20, 13:11,
22:18, 37:3,
53:8, 55:2,
62:6, 77:1,
80:15, 89:6,
90:19, 93:15,
113:21, 123:2,
127:3
**single**
22:22, 110:20,
110:21
**single-family**
13:20

**single-use**
15:12
**sister**
71:5
**sisters**
13:14
**sit**
10:4, 31:13,
83:20, 120:2
**site**
69:2, 80:1,
80:7, 101:3,
101:4, 101:10,
101:13, 101:14,
101:16, 102:2
**sitting**
19:8, 23:13,
42:17, 43:13,
98:18, 99:22,
102:9, 126:16
**situated**
44:12, 44:14
**situation**
25:4, 37:6,
42:17, 45:12,
45:16, 50:12,
64:1
**situations**
64:16, 64:18,
68:13
**six**
7:6, 15:6
**skimming**
48:10
**skips**
110:17, 110:19,
111:1, 111:5
**smattering**
21:17, 21:18
**smith**
2:3, 4:4,
32:12, 32:17,
32:19
**social**
37:21, 50:22,
61:6, 61:12,
61:17, 62:2,
62:13, 62:16,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    64

62:19, 63:6,
63:14, 64:3,
64:22, 70:19,
73:20, 75:1,
75:7, 76:20,
77:6, 77:12,
78:1, 78:5,
78:13, 79:4,
79:14, 112:21,
113:18
**software**
76:5, 76:16,
77:10, 79:8
**solid**
115:22
**some**
9:15, 9:16,
10:1, 12:13,
18:17, 19:3,
19:21, 21:2,
21:22, 23:20,
24:7, 24:19,
37:13, 39:8,
39:22, 43:17,
45:12, 50:5,
53:19, 55:4,
56:14, 64:16,
66:18, 69:15,
69:20, 71:1,
71:18, 75:9,
78:22, 82:15,
82:22, 84:11,
86:18, 87:3,
96:16, 104:11,
106:20, 107:11,
107:16, 108:3,
114:14, 121:6,
122:1, 127:16,
127:18, 128:17
**somebody**
25:18, 25:19,
30:1, 38:17,
52:17, 54:5,
55:14, 59:15,
61:3, 66:1,
68:10, 68:11,
68:14, 68:17,
80:2, 86:22,

104:17, 119:2,
119:9, 119:10
**somebody's**
117:11
**someone**
17:6, 31:5,
60:20, 61:13,
62:2, 67:1,
67:9, 71:19,
109:3, 113:15,
117:20, 119:11,
125:11
**someone's**
71:10
**something**
10:22, 11:13,
29:3, 47:20,
48:4, 48:11,
66:19, 91:21,
101:14, 113:15,
116:22, 123:12,
123:17
**sometime**
8:22
**somewhere**
14:22, 74:14,
125:11
**sorry**
16:21, 21:11,
51:11, 53:1,
61:14, 71:3,
83:16, 88:20,
98:8
**sort**
28:5, 46:22,
56:5, 56:11,
75:9, 106:18
**sorts**
16:5
**sources**
72:1, 73:16
**south**
15:15
**southeast**
14:20
**southeastern**
120:1
**space**
124:19, 126:5

**spaces**
21:19
**speak**
7:22, 80:17,
98:9, 101:8
**speaking**
38:4, 109:1
**special**
11:19, 24:18,
64:18
**specialized**
105:5, 105:22,
106:11, 110:5,
111:10, 112:11,
112:20
**specific**
23:13, 40:10,
70:1, 121:19,
122:1
**specifically**
24:17, 42:12,
82:5, 99:3,
121:15
**specificity**
17:19, 21:2
**specifics**
69:20
**specify**
22:5
**speculate**
100:1
**speculation**
27:1, 29:14,
58:11, 59:21,
63:16
**spend**
20:1, 21:3,
109:21, 120:7
**spent**
11:17, 65:11,
123:5
**split**
23:4
**sponsor**
97:8
**spouse**
89:20
**ssi**
87:3

**staff**
38:16, 80:7,
100:18, 101:1,
122:12
**stages**
22:8
**stand-alone**
80:16
**standard**
28:20, 28:21,
91:6, 127:19
**standards**
28:17, 28:19,
92:16, 92:18,
93:4, 93:5,
93:7, 94:3,
103:11, 115:16,
116:16
**start**
8:7, 74:6,
100:5, 100:9,
100:14, 106:16,
117:17
**started**
9:8, 14:8,
70:4, 116:18
**starters**
100:9
**starting**
69:4
**starts**
63:10
**state**
19:16, 23:16,
25:2, 26:12,
27:15, 27:22,
35:15, 42:1,
45:13, 46:8,
57:18, 57:22,
75:11, 100:12,
112:16, 112:22,
118:9
**stated**
86:13
**statement**
29:6, 65:17,
118:14, 128:21
**states**
1:1, 14:19,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                65

27:17, 28:7,
62:14, 63:9,
63:15, 64:2,
65:2, 68:3,
72:3, 72:17,
84:9, 103:2,
118:18, 123:1,
123:22, 124:22,
128:3, 128:19
**statistics**
68:7, 105:1
**status**
25:18, 25:20,
26:6, 58:20,
62:14, 62:21,
65:19, 72:2,
72:8, 90:8,
97:22, 103:1,
108:5, 115:3,
118:9, 118:16,
118:22, 123:1,
123:21, 128:3,
128:6, 128:19,
128:20
**statute**
73:2, 107:13,
119:12
**stay**
11:15, 24:15
**stay-at-home**
85:20
**steady**
86:4
**stealing**
109:7
**stenographically**
130:7
**step**
71:6, 73:14
**steps**
73:12, 73:13,
73:14, 108:8
**stick**
97:7
**still**
15:16, 15:22,
16:13, 28:5,
28:11, 28:12,

62:3, 63:14,
65:1, 66:18,
70:18, 70:20,
72:15, 75:21,
77:17, 82:9,
87:9
**stipulate**
6:10
**stock**
18:13
**stood**
59:13
**stop**
104:1
**street**
3:5
**strict**
110:16
**string**
41:4
**strings**
19:17, 19:21,
21:4
**strong**
110:10
**structure**
43:4, 99:8
**structured**
47:13, 47:21,
100:15, 102:17
**stubs**
56:17, 56:20,
116:19
**student**
87:20
**studied**
105:1
**studies**
65:7
**studiously**
82:14, 83:4
**study**
61:21
**stuff**
10:5, 11:15,
39:18, 39:20,
39:21, 40:1,
44:18, 63:12,

66:17, 70:11,
70:12, 79:10,
116:6, 129:9
**subdivision**
45:13
**subjected**
103:10
**subjects**
82:22, 83:2,
83:3
**submit**
54:7, 88:15,
107:3
**subordinates**
41:9
**subset**
107:20
**subsidies**
18:7, 21:5,
26:12, 28:4
**subsidized**
28:19
**subsidy**
19:7, 23:16,
25:3, 27:21,
30:20
**substantial**
12:20, 14:4
**substantive**
123:14, 123:18,
123:20
**sufficient**
71:15, 86:3,
112:9
**suggest**
109:2, 126:19
**suggesting**
66:5
**suit**
49:2
**suite**
2:5, 3:13, 4:6,
75:18, 76:8
**sullivan**
3:4
**super**
76:1
**supervisors**
102:3

**support**
19:3, 115:20,
115:21
**suppose**
62:6
**sure**
17:21, 26:14,
29:11, 29:18,
34:10, 35:7,
36:3, 51:6,
52:13, 55:6,
62:6, 63:3,
65:10, 66:4,
72:8, 81:9,
82:20, 87:12,
88:12, 89:5,
90:5, 90:22,
93:14, 94:15,
96:22, 103:15,
106:16, 110:2,
114:8, 114:13,
115:22, 119:9,
119:12, 120:16,
125:21, 129:1
**surprised**
74:22
**sustained**
71:10
**swear**
6:6
**sweep**
116:6
**swept**
99:15, 99:17,
99:19
**sworn**
6:11, 6:18
**system**
55:6, 57:1,
59:12, 59:14,
59:15, 60:3,
61:10, 61:16,
62:8, 67:11,
80:9, 119:3
**systems**
59:18, 63:1,
74:12, 78:6,
80:15

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    66

| **T** |
|---|

**table**
122:14
**take**
8:5, 13:4,
22:15, 27:10,
28:7, 30:19,
31:8, 37:5,
49:19, 52:2,
58:14, 85:10,
87:9, 87:22,
89:13, 94:21,
102:6, 114:11,
114:16, 116:19,
120:9, 122:18,
126:2
**taken**
63:7, 86:16,
130:4, 130:7
**takes**
100:12, 102:12
**taking**
100:9, 108:7,
127:13
**talk**
8:2, 11:19,
24:4, 82:16,
82:18, 121:7,
121:15, 121:16,
121:17, 121:19
**talked**
112:15
**talking**
42:12, 42:14,
47:2, 58:18,
69:8, 71:10,
90:22, 92:20,
92:21, 93:11,
96:22, 97:18,
127:14
**target**
32:2
**taxation**
16:4
**taxes**
54:3, 54:7
**tell**
8:13, 23:14,

23:15, 24:3,
24:19, 24:21,
39:8, 53:11,
66:3, 95:12,
108:17, 113:22
**ten**
36:21, 66:22,
120:2
**tenancy**
22:2, 24:9,
40:8, 88:10,
103:8, 123:22
**tenant**
12:10, 12:15,
26:19, 28:6,
38:20, 42:4,
42:5, 42:7,
45:17, 49:11,
49:12, 49:13,
50:9, 50:18,
50:19, 50:21,
55:13, 56:1,
90:19, 93:5,
111:12, 116:12,
122:5, 122:15,
122:22, 124:9,
124:21, 126:18
**tenant's**
29:13, 78:10
**tenants**
18:10, 26:6,
27:16, 38:4,
38:10, 38:15,
76:14, 84:3,
97:22, 103:10,
103:19, 105:7,
106:12, 110:6
**tend**
47:12
**tenure**
57:4, 74:11
**term**
21:18, 37:10,
41:8, 48:9,
55:16, 57:14,
126:3, 126:22
**terminate**
90:6, 91:22

**terminated**
91:20
**terms**
18:19, 29:18,
48:5, 55:8,
91:1, 102:4,
115:19, 116:16,
121:17, 121:18,
121:19, 122:1
**terribly**
16:16, 16:22
**testified**
6:20, 96:4,
124:17, 126:8
**testify**
6:18
**testimony**
6:7, 8:10,
8:16, 81:10,
97:20, 130:6
**texas**
14:20
**th**
3:6
**thank**
51:10
**thanks**
114:7, 129:13
**theory**
9:13, 9:15
**thereabouts**
115:14
**thereafter**
130:7
**thieves**
104:12
**thing**
27:6, 44:21,
49:4, 49:6,
55:15, 73:8,
97:19, 104:11,
127:5
**things**
16:5, 17:9,
41:4, 47:21,
52:22, 56:7,
58:3, 67:10,
71:20, 72:22,

73:14, 82:16,
96:13, 97:16,
99:21, 102:1,
102:5, 109:20,
109:22, 113:4,
121:6, 121:8,
121:10, 121:14
**think**
7:6, 22:4,
24:15, 25:9,
27:5, 27:10,
35:1, 39:16,
42:9, 42:14,
43:7, 49:17,
51:12, 52:12,
59:1, 62:17,
79:19, 87:9,
93:21, 94:2,
94:13, 97:18,
103:14, 104:3,
110:10, 112:5,
114:8, 115:4,
115:6, 116:2,
116:7, 116:8,
120:17, 125:5,
126:9, 126:10,
129:6, 129:12
**thinks**
127:1
**third**
119:8
**third-party**
12:21, 56:9,
56:11, 56:12,
116:14, 116:16
**thoroughly**
80:9
**thought**
39:2
**thoughtful**
116:8
**threat**
40:20, 41:2
**three**
20:9, 73:5,
78:19, 82:13,
94:19, 96:2,
116:18

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    67

**three-foot**
20:5
**threshold**
67:15
**through**
31:13, 53:9,
59:7, 60:3,
60:4, 60:22,
67:12, 73:15,
80:4, 103:8,
127:10
**throughout**
73:9
**throw**
58:5
**tie**
96:2
**tied**
106:8
**tiers**
47:11
**time**
7:14, 8:4, 8:5,
9:17, 10:10,
11:20, 12:4,
14:16, 20:18,
25:14, 43:15,
47:10, 54:15,
61:2, 65:11,
73:11, 77:1,
79:17, 84:16,
93:2, 104:11,
105:14, 106:4,
113:6, 115:12,
117:14, 120:6,
123:5, 123:15,
126:6, 127:12,
129:13
**times**
7:4, 7:9,
36:14, 36:21,
66:15, 96:20,
129:7
**title**
10:3
**titles**
97:17
**today**
6:7, 8:10,

**8:16, 16:1,**
68:16
**together**
96:2, 120:12,
120:13, 120:19
**told**
32:12
**took**
71:9, 76:3
**top**
42:17, 67:22
**topic**
15:18, 20:1
**topics**
123:3
**touched**
129:6
**tougher**
69:14
**towards**
60:6, 67:7
**tower**
15:13
**trade**
15:22, 16:6
**training**
11:18, 64:10,
64:17, 64:21,
84:11, 119:21
**transcript**
5:10, 6:2,
130:5
**transfer**
71:20, 86:18,
87:1, 87:3
**treasury**
16:2
**treated**
31:6
**treatment**
91:16
**tried**
129:7
**trigger**
74:4
**trouble**
60:14
**true**
23:11, 26:11,

**113:15, 114:22,**
116:10, 117:2,
117:3, 117:20,
118:14, 121:9,
130:5
**trusts**
13:16
**truth**
6:19, 8:14,
66:3
**trw**
79:18
**try**
8:1, 8:7, 8:8,
27:5, 63:18,
105:17, 117:17
**trying**
26:15, 27:7,
29:8, 68:9,
72:6, 91:7,
110:2, 112:17
**tuesday**
1:17
**tune**
125:11
**turnaround**
59:13
**turned**
9:17, 68:19
**two**
10:13, 27:10,
28:13, 30:17,
35:1, 60:16,
74:4, 74:5,
82:8, 128:9
**two-minute**
114:12
**type**
26:21, 98:6
**types**
12:7, 18:3,
28:15, 54:15,
100:2
**typewriting**
130:8
**typically**
19:9, 56:12,
56:22, 68:2,

**74:10**
**tysons**
2:4, 4:5

**U**

**ultimately**
37:15
**umbrella**
48:2, 48:19
**unable**
65:19, 89:17,
111:22, 118:10
**unassisted**
115:15
**unaware**
25:4
**uncomfortable**
122:7
**under**
48:19, 59:5,
81:19, 86:12,
90:18, 92:5,
95:18, 130:8
**underlying**
99:9
**underpinned**
18:14, 18:16
**understand**
8:9, 8:20,
26:14, 27:4,
27:11, 27:13,
29:8, 30:18,
49:22, 59:1,
66:4, 72:6,
76:6, 79:22,
81:9, 82:21,
88:12, 90:5,
91:8, 94:15,
94:18, 105:4
**understanding**
42:20, 50:16
**understate**
39:6
**understated**
39:2, 67:3
**understood**
20:16, 63:3
**underwrite**
25:18, 25:21,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                    68

28:12, 72:21,
73:10, 73:13,
81:3, 81:11,
81:19, 83:6,
83:9, 121:10,
121:18
**underwriting**
27:9, 27:12,
29:2, 29:12,
30:11, 30:21,
31:1, 31:4,
31:9, 31:16,
52:13, 58:19,
58:21, 65:21,
66:20, 71:11,
72:15, 78:6,
78:11, 89:16,
90:7, 91:18,
110:16, 111:14,
118:12, 125:22,
128:7
**underwritten**
93:16
**undocumented**
16:8, 22:1,
24:8, 36:9,
40:8, 66:6,
91:21, 103:19,
105:6, 106:2,
106:12, 107:19,
108:18, 109:12,
110:6, 111:6,
112:2, 124:13
**unemployed**
84:22, 87:17,
87:19
**unfortunately**
97:16
**united**
1:1, 27:17,
28:7, 62:14,
63:8, 63:15,
64:2, 65:2,
68:3, 72:3,
72:17, 84:8,
103:2, 118:18,
123:1, 123:21,
124:22, 128:3,

128:19
**units**
9:11, 13:3,
14:17, 15:1,
15:2, 15:16,
48:17, 48:18
**unless**
116:4
**unreasonable**
127:5
**until**
9:17, 13:11,
22:6, 22:7
**untoward**
86:5
**unusual**
101:12, 116:7,
126:9, 126:11,
126:15
**updates**
84:17
**upkeep**
12:1
**uploaded**
76:10
**upper**
47:10
**upwards**
98:12
**urquhart**
3:4
**use**
21:17, 37:10,
41:8, 55:16,
57:14, 62:6,
63:1, 74:1,
74:3, 74:10,
74:12, 75:21,
76:9, 76:12,
76:15, 76:16,
81:18, 82:2,
90:19, 91:4
**user**
77:9
**uses**
12:9, 48:9,
81:21
**using**
19:16, 47:4,

59:14, 59:16,
73:11, 74:2,
80:15

**V**

**vacation**
129:16
**variable**
50:13
**variance**
102:2
**varied**
14:21
**varies**
112:15, 114:5
**various**
16:3, 99:20,
99:21, 102:5,
119:21
**vary**
57:5, 73:16
**vast**
104:9
**vein**
91:11
**vendors**
79:20
**verbal**
45:3, 80:22
**verifiable**
119:8
**verification**
17:1, 25:22,
27:12, 63:1,
66:16, 69:18,
78:10, 103:1,
116:14
**verifications**
56:18, 61:19,
74:3, 74:13
**verified**
56:8, 56:9,
59:7, 65:20,
118:11
**verify**
17:12, 26:5,
26:19, 27:16,
28:6, 56:6,

57:13, 61:3,
61:22, 71:10,
71:14, 72:1,
72:22, 73:13,
73:21, 116:12,
128:2, 128:19,
128:20
**verifying**
55:5
**versus**
91:4, 91:16
**vet**
113:19
**vets**
117:3, 117:5,
117:22
**vetting**
113:16, 115:21
**vice**
12:21, 14:7
**videoconference**
1:15
**view**
68:7, 102:6,
102:12, 112:6
**views**
27:20, 33:16
**violating**
119:11
**violation**
92:16
**violent**
108:19
**virginia**
1:2, 1:16, 2:6,
2:23, 3:14, 4:7,
39:9, 40:4,
82:2, 82:7,
108:13, 130:21
**virtually**
15:3, 24:21
**vis-à-vis**
114:1
**visa**
54:8, 54:11,
54:13
**visas**
54:12, 54:14,

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                   69

54:15, 54:21,
57:12, 65:11
**visit**
37:10
**visited**
22:11
**votes**
16:20

---
**W**
---

**wages**
57:3, 66:7
**wait**
87:2
**walk**
14:6, 34:11,
58:4
**walking-around**
126:17
**want**
7:22, 8:1,
21:3, 21:5,
23:2, 26:1,
29:18, 30:19,
35:3, 40:16,
47:20, 52:13,
55:15, 55:16,
55:19, 55:21,
57:2, 58:18,
59:1, 67:6,
78:20, 84:18,
89:21, 91:2,
91:3, 94:15,
96:5, 96:22,
99:3, 101:10,
101:11, 113:14,
115:21, 116:21,
116:22, 119:7,
121:6, 122:14,
125:20, 128:9
**wanted**
32:4, 32:15,
76:9, 95:2,
100:17
**waples**
1:8, 25:1,
31:21, 40:7,
42:21, 44:4,

44:12, 44:13,
46:17, 46:22,
47:4, 47:11,
49:11, 50:1,
51:2, 52:11,
98:16, 99:7,
100:3
**waples'**
42:11, 50:8
**washington**
3:7, 15:6,
15:18
**way**
11:5, 16:11,
18:12, 19:14,
29:20, 42:10,
42:20, 44:21,
47:1, 47:17,
47:18, 47:22,
48:16, 49:6,
55:22, 57:20,
58:13, 69:6,
72:21, 73:15,
80:18, 82:5,
83:11, 93:17,
105:5, 107:19,
109:1, 110:11,
110:22, 111:9,
118:5, 124:12,
127:5, 127:10,
127:13
**ways**
19:15, 46:12,
72:1, 99:19,
109:5
**we'll**
8:4, 9:1, 21:2,
25:22, 52:2,
66:19, 94:20,
117:17, 122:8,
122:9
**we're**
6:4, 11:8,
38:4, 51:12,
53:9, 53:13,
53:14, 55:2,
55:4, 56:21,
57:1, 57:5,

66:19, 78:19,
87:6, 88:2,
88:13, 90:20,
90:22, 92:20,
92:21, 96:22,
97:18, 103:14,
114:15, 124:5,
126:3, 128:5,
129:8
**we've**
8:19, 47:1,
52:18, 52:19,
59:16, 91:5,
93:16, 96:20,
97:10, 101:22,
112:15, 115:15,
127:10
**weapons**
108:12, 108:14,
109:7
**weeds**
88:2
**week**
9:16
**weeks**
9:15, 9:16
**well-managed**
39:10, 39:12,
39:18, 39:20,
39:22, 40:1,
40:3
**went**
14:12, 15:1,
15:7, 82:12,
100:19
**weren't**
16:16, 17:4,
127:19
**west**
14:12
**whatever**
126:7
**whenever**
41:8
**whereof**
130:13
**whereupon**
6:16

**whether**
21:6, 21:8,
23:15, 24:6,
24:9, 24:18,
25:1, 25:7,
26:11, 26:20,
28:19, 31:10,
35:9, 35:15,
35:16, 36:5,
38:11, 44:3,
44:12, 44:17,
46:17, 46:18,
47:16, 50:4,
60:7, 60:8,
62:18, 69:7,
71:14, 72:3,
72:9, 75:5,
77:6, 77:14,
80:13, 84:7,
89:8, 98:15,
98:21, 99:15,
101:5, 103:19,
104:13, 104:18,
105:6, 106:1,
106:12, 108:18,
110:6, 110:13,
111:5, 111:11,
112:21
**whole**
6:19, 8:14,
12:8, 30:19,
41:4, 56:7,
67:8, 67:11,
85:4, 116:2,
122:8
**whopping**
15:15
**wide**
102:1
**widely**
50:13, 112:16
**wife**
89:17, 90:8,
90:18, 91:20,
92:2, 92:5,
92:22, 104:2
**within**
84:8

Transcript of George C. Caruso, CPM, RAM, SHCM, HCCP
Conducted on December 20, 2016                                  70

| | | | |
|---|---|---|---|
| **without** | **worked** | 75:18, 75:21, | 35:6, 99:2 |
| 14:3, 19:8, | 14:15, 16:1, | 76:4, 76:8, | **$** |
| 23:13, 24:17, | 16:15, 18:18, | 76:9, 76:13, | **$10,000** |
| 41:17, 53:6, | 115:13 | 77:14 | 67:16 |
| 63:13, 98:18, | **working** | **yardi's** | **.** |
| 99:22, 102:16, | 9:17, 10:10, | 76:17 | |
| 110:7, 114:1 | 25:21, 55:10, | **yeah** | **.3450** |
| **witness** | 65:12, 66:1, | 9:8, 26:7, | 3:15 |
| 35:14, 130:13 | 71:22, 86:9, | 31:19, 34:22, | **.4200** |
| **witness:** | 109:3, 119:11, | 36:2, 37:4, | 2:7 |
| 20:8, 21:11, | 120:9 | 51:18, 64:15, | **.4209** |
| 32:18, 53:2, | **works** | 66:9, 84:16, | 4:8 |
| 71:2, 71:4, | 56:13, 62:9, | 87:8, 87:11, | **.8159** |
| 83:18, 88:21, | 79:12, 80:11 | 101:3, 116:13, | 3:8 |
| 94:6, 95:19, | **world** | 119:18, 128:1 | **1** |
| 98:7, 112:5, | 15:13, 32:15 | **year** | **100** |
| 117:16, 129:14 | **worth** | 7:6, 7:11, | 24:20, 45:17 |
| **wondered** | 74:14 | 37:2, 67:8, | **11** |
| 18:1 | **wouldn't** | 67:16, 125:12, | 3:6 |
| **wonk** | 23:14, 42:8, | 127:16 | **114** |
| 65:10 | 79:18, 89:20, | **year's** | 5:4 |
| **words** | 93:6, 93:13, | 120:3 | **12** |
| 31:7, 57:19, | 98:19, 123:14, | **year-old** | 1:18, 128:13 |
| 73:12 | 123:18 | 87:16 | **121** |
| **work** | **write** | **years** | 5:3 |
| 9:1, 9:15, | 58:20, 81:5, | 7:7, 7:12, 9:5, | **130** |
| 9:16, 11:9, | 82:18, 83:1, | 9:9, 10:9, | 1:21 |
| 14:12, 15:7, | 83:3, 84:1, | 11:18, 15:6, | **131024** |
| 15:8, 15:17, | 84:20, 85:6, | 15:8, 20:12, | 1:20 |
| 15:19, 16:7, | 85:21, 88:14, | 21:7, 21:22, | **14** |
| 17:22, 18:6, | 96:13 | 41:5, 57:16, | 9:17, 10:9 |
| 23:21, 42:11, | **writes** | 59:6, 59:17, | **15** |
| 54:14, 55:21, | 91:17 | 62:10, 66:22, | 11:17, 14:22, |
| 57:13, 59:8, | **writing** | 67:7, 68:1, | 67:8, 76:3 |
| 61:4, 61:10, | 20:12, 20:20, | 69:11, 70:5, | **15,000** |
| 62:8, 62:14, | 20:21, 45:14 | 74:14, 75:17, | 125:12 |
| 62:21, 63:8, | **written** | 76:22, 78:2, | **16** |
| 63:14, 64:2, | 17:5, 20:22, | 78:15, 80:2, | 1:12, 1:17 |
| 65:1, 65:19, | 57:2, 86:12, | 97:13, 109:22, | **165** |
| 69:4, 76:1, | 87:17 | 115:13, 119:22, | 13:3 |
| 86:11, 97:2, | **wrong** | 120:2, 123:7, | **175** |
| 99:22, 106:6, | 96:6, 126:21 | 124:5, 124:8, | 13:3 |
| 106:7, 116:4, | **X** | 128:12 | **18** |
| 118:6, 118:10, | **x** | **yellow** | 81:12, 85:7, |
| 118:16, 118:22, | 1:4, 1:11 | 80:7 | 123:5, 128:11 |
| 119:7, 120:11, | **Y** | **yourself** | **19** |
| 125:8, 126:1, | **yardi** | 128:9, 129:10 | 87:16, 93:15 |
| 128:6 | 75:14, 75:16, | **yup** | |
| | | 23:1, 34:9, | |

**1972**
9:8
**1990**
16:15, 22:6,
22:7, 22:18,
23:12, 26:4,
96:21
**1996**
97:3, 98:16
**1:cv-tse-tcb**
1:12

---
**2**
---

**20**
1:17, 67:8,
123:5
**20,000**
15:1
**20001**
3:7
**2002**
13:9, 13:11,
15:8, 37:3
**2014**
12:14
**2016**
1:17
**2017**
130:15
**2018**
130:17
**202.538**
3:8
**22041**
3:14
**22102**
2:6, 4:7
**23**
15:16
**24**
20:6
**25**
115:13
**26**
95:18

---
**3**
---

**30**
109:22

**30,000**
13:3
**300**
14:17
**31**
130:17
**35**
129:17
**37**
1:18
**3:**
129:17

---
**4**
---

**40**
9:5, 15:8,
19:11, 23:10
**40,000**
125:12
**4350.3**
98:4, 98:12
**44**
9:9
**45**
80:1
**4th**
130:14

---
**5**
---

**5,000**
9:11
**50**
70:4
**500**
2:5, 4:6
**520**
3:13
**55,000**
14:16
**563**
1:12

---
**6**
---

**60**
18:4, 19:10,
23:9
**6066**
3:12

**65**
9:18
**6th**
3:5

---
**7**
---

**703.641**
2:7, 4:8
**703.778**
3:15
**7057881**
130:22
**777**
3:5
**7900**
2:4, 4:5

---
**8**
---

**8,000**
15:2
**80**
15:11
**800**
85:5
**87**
130:18

---
**9**
---

**90**
22:11, 22:12,
22:16, 65:13,
123:4
**94**
54:22, 93:15