UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROSY GIRON DE REYES; JOSE DAGOBERTO REYES; FELIX ALEXIS BOLANOS; RUTH RIVAS; YOVANA JALDIN SOLIS; ESTEBAN RUBEN MOYA YRAPURA; ROSA ELENA AMAYA; and HERBERT DAVID SARAVIA CRUZ,<br><br>*Plaintiffs*,<br><br>vs.<br><br>WAPLES MOBILE HOME PARK LIMITED PARTNERSHIP; WAPLES PROJECT LIMITED PARTNERSHIP; and A.J. DWOSKIN & ASSOCIATES, INC.,<br><br>*Defendants*. | Case No: 1:16-cv-00563 (PTG/WBP) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF WILLIAM A.V. CLARK**

In *Reyes I*, the Fourth Circuit made clear that "we must compare whether Latinos that are subject to the Policy—i.e., Latino tenants at the Park—are disproportionately impacted by the Policy as compared to non-Latinos that are subject to the Policy—i.e., non-Latino tenants at the Park." 903 F.3d 415, 429 n.8; *see also* ECF 311 at 3 n.3 (Ellis, J., denying Defendants' earlier motion to strike Prof. Clark's opinions: "[T]he relevant comparison is the Policy's impact on Latinos compared with the Policy's impact on non-Latinos."). The Policy requires immigration documentation to live at the Park; accordingly; undocumented tenants cannot comply and are the ones "impacted by the Policy." If the Park's Latino tenants are likelier to be undocumented than the Park's non-Latino tenants, that is probative evidence that the Policy had a disparate impact on the Park's Latino tenants. Dr. Clark's opinions provide evidence of this by showing that the Latino population in the geographic area encompassing the Park—Fairfax County—is disproportionately

1

undocumented compared to the non-Latino population, and that the same distribution is likely within the Park itself.

**1. Demographics in the geographic area encompassing the park are probative of demographics within the Park itself.** *Reyes I* held that *statewide* demographics were an instructive proxy for the demographics of tenants within the Park itself. Even as the Fourth Circuit clarified that the comparison must focus on tenants in the Park, 903 F.3d at 429 n.8, the Court held that Plaintiffs had sufficiently alleged a prima facie case of disparate impact using Virginia statistics that "Latinos are ten times more likely than non-Latinos to be adversely affected by the Policy, as undocumented immigrants constitute 36.4% of the Latino population compared with only 3.6% of the non-Latino population." 903 F.3d at 428-29. It would make little sense to hold that statewide demographics "satisfied step one of the *Inclusive Communities* framework" at the pleading stage, *id.* at 428, only later to hold that evidence of the demographics in a more narrowly targeted geographic proxy area (Fairfax County) is inadmissible at trial.

Indeed, at summary judgment, *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC* relied in part on *Reyes I* to hold that "national or state statistics are appropriate" as a proxy for data about the actual applicant pool where 'there is no reason to suppose' that the local characteristics would differ from the national statistics or "where actual applicant data is not available." 478 F. Supp. 3d 259, 291-92 (D. Conn. 2020) (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977)). Thus, "the decisions of Plaintiff's experts to rely on a broader potential applicant pool outside of the actual pool of . . . applicants [was] reasoned, adequately based in law and sufficient for the Court to find the testimony admissible"; it was up to the jury to weigh the inferential step from geographic proxy data to conclusions regarding demographics of the narrower

applicant pool. *Id.* at 293-94 (citation omitted); *see also* ECF 311 at 6 (Ellis, J: "Professor Clark's opinions rest on an adequately reliable methodology.").

**2. *Betsey v. Turtle Creek Associates* does not preclude geographic proxy evidence.** In *Betsey*, the Fourth Circuit reversed the district court for improperly requiring Plaintiffs to show not only that the challenged policy would have a disparate impact on black tenants inside the subunit to which the challenged policy was applied (Building 3 in The Point complex), but also that the policy would reduce the percentage of blacks within The Point more broadly and even in the county as a whole. 736 F.2d 983, 986-87 (4th Cir. 1984). Instead, the plaintiffs only needed to prove a disparate impact on racial minorities "in the total group to which the policy was applied," namely Building 3. *Id.* at 987-88. *Betsey* identified the question to be answered (whether there is a disparate impact *among those subject to the policy*); it did not go further and say anything about the acceptable *mode of proof* for answering that question, namely whether evidence of the demographics within the local geographic area can be probative of demographics within the group subject to the policy. There was no occasion to reach that question in *Betsey*, because there was direct evidence of the demographics within Building 3. *Id.* at 988. Here, there is no analogous data because Park residents did not self-report their immigration status. And of course, *Reyes I* held that geographic proxy evidence is probative of comparative impact at the Park.

**3. Dr. Clark demonstrates that the Latino population in the areas encompassing the Park contains a greater frequency of undocumented persons (persons who are "impacted by the Policy," *Reyes I*, 903 F.3d at 429 n.8) than the non-Latino population.**

- Dr. Clark's key findings are in the chart on page 4 of his report (ECF294-1), reproduced below. It contains figures for the "Total Hispanic" population in Fairfax County; from this Dr. Clark derived the percentage (or "ratio") of this total population that is undocumented and therefore would be "impacted by the Policy"—30.7% undocumented. See blue highlighting on the chart.

3

- Next, Dr. Clark conducted a comparator analysis on the "Total Non Hispanic" population in Fairfax County to conclude that only 4.6% of that population is undocumented. See ==yellow highlighting== on the chart.

|  | Virginia | Fairfax County | Tract 4406 |
|---|---|---|---|
| Total Population | 8,185,131 | 1,117,072 | 3,294 |
| Total Undocumented (%) | 268,916 (3.4) | 97,655 (8.0) |  |
| Total Non Hispanic | 7,497,866 | 938,150 | 2,337 |
| Undocumented | 95,196 | 42,773 |  |
| Undocumented ratio | 1.3 | 4.6 |  |
| Total Hispanic | 687,265 | 178,922 | 957 |
| Undocumented | 173,720 | 54,882 | 301 |
| Undocumented ratio | 25.3 | 30.7 | 31.4 |

- Comparing the percentage of Latinos in Fairfax County who are undocumented and therefore "impacted by the Policy" (30.7%) against the percentage of non-Latinos in Fairfax County who are undocumented (4.6%) shows that Latinos in the area are nearly 7 times more likely to be undocumented than non-Latinos, and therefore are nearly 7 times more likely to be affected by the Policy than non-Latinos (30.7 divided by 4.6 is 6.67). Report at 5.

- That this difference in frequency of undocumented persons between the Latino and non-Latino populations occurs in Fairfax County, the area encompassing the Park, is evidence that a similar distribution occurs within the Park itself under *Reyes I*. **For this reason alone, Dr. Clark's opinions are probative and admissible.**

- Dr. Clark did not stop there. He took two additional steps to support his analysis. First, Dr. Clark expressly drew the link between the Fairfax County geographic proxy demographics and available Park-specific data. Based on an analysis of a Park residents list, he concluded that 60% of the Park residents were Latino. Report at 2 (finding f), 5. As the above Fairfax County statistics show, the 60% of Park residents who are Latino are much more likely to be undocumented, and therefore "impacted by the Policy," than the remaining 40% of Park residents who are non-Latino. As Dr. Clark put it: "Sixty percent of the list of residents (provided by counsel) who are, or were recently, residents of the Park have Hispanic surnames. As a disproportionate number of Hispanics are not citizens, a disproportionate number of residents will be impacted by the Park's leaseholder policy." Report at 2 (finding f).

- Second, Dr. Clark added to a key component of his analysis—that 30.7% of Latinos in Fairfax County are undocumented—by analyzing even smaller, more targeted geographic units containing the Park (both (a) the Fairfax County Central, Fairfax City, Burke Public Use Microdata Area—the smallest area in which undocumented immigrant data were available, ECF 311 at 6—and (b) Census Tract 4406). At those levels, 31.4% of the Latino population is undocumented. See column four in the chart, rows 7-9; Report at 4-5. Not only is this figure similar to and confirmative of the 30.7% Fairfax County figure; it also shows that the closer one gets to isolating the Park, the greater the frequency of undocumented individuals among the Latino population. ECF 294-1 at 7.

**4. Defendants' assertion that Dr. Clark's analysis does not include comparison of the total Latino population with the total non-Latino population (ECF No. 495 at 4) is wrong**. Dr. Clark compares these two groups; he shows how the frequency of undocumented status differs between them (the total Latino population in Fairfax County includes a 30.7% segment that is undocumented and therefore likely to be impacted by the Policy; the total non-Latino population in Fairfax County includes only a 4.6% segment that is undocumented and therefore likely to be impacted by the Policy).

Dated: January 28, 2025

ZUCKERMAN SPAEDER LLP
Nicholas M. DiCarlo (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
202.778.1800
ndicarlo@zuckerman.com

Cyril V. Smith (admitted *pro hac vice*)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
csmith@zuckerman.com

Respectfully Submitted,

*/s/ Granville C. Warner*
LEGAL AID JUSTICE CENTER
Granville C. Warner, VSB #24957
Nady Peralta, VSB #91630
Larisa D. Zehr, VSB #96032
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042
703.778.3450
cwarner@justice4all.org
nady@justice4all.org
larisa@justice4all.org


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2025, I caused the foregoing to be filed electronically with the Clerk of the Court using CM/ECF, which will then send a notification of such filing to all counsel of record.

*/s/ Granville C. Warner*
Granville C. Warner, VSB #24957